# UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

| | | |
|---|---|---|
| _____ ) | | |
| FRONTIER AIRLINES, INC., ) | | |
| ) | | |
| Petitioner, ) | | |
| ) | | |
| v. ) | Docket No. 25-1002 | |
| ) | | |
| UNITED STATES DEPARTMENT ) | | |
| OF TRANSPORTATION, ) | | |
| ) | | |
| Respondent. ) | | |
| _____ ) | | |

## PETITIONER'S EMERGENCY MOTION TO PARTIALLY STAY THE DEPARTMENT OF TRANSPORTATION'S DECEMBER 17, 2024 FINAL ORDER AND FOR EXPEDITED CONSIDERATION OF THE APPEAL

## **TABLE OF CONTENTS**

I.      INTRODUCTION ................................................................................. 1

II.     BACKGROUND ................................................................................. 2

     A.      Statutory and regulatory background. ...................................... 2

     B.      Slot exemptions at DCA. .......................................................... 4

     C.      Current proceedings. ................................................................. 5

III.    ARGUMENT ...................................................................................... 9

     A.      The Court should partially stay DOT's Order. ......................... 9

          1.      Frontier will likely succeed on the merits. ................. 10

          2.      Frontier will suffer irreparable injury. ...................... 17

          3.      A stay would not harm other parties. .......................... 19

          4.      A stay is in the public interest. ................................... 20

     B.      The Court should expedite the appeal per Circuit Rule 27(e) ........... 22

          1.      Expedited review is necessary to avoid irreparable harm. ...... 22

          2.      The general public has an unusual interest in prompt disposition. ................................................................. 23

          3.      Proposed expedited briefing schedule. ...................... 23

IV.     CONCLUSION ................................................................................. 24

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Federal Cases**

*City of N.Y. v. Minetta*,
    262 F.3d 169 (2d Cir. 2001) ........................................................................2, 3

*Cuomo v. NRC*,
    772 F.2d 972 (D.C. Cir. 1985)....................................................................10, 21

*FCC v. Prometheus Radio Project*,
    592 U.S. 414 (2021).........................................................................................10

*Gorman v. NTSB*,
    558 F.3d 580 (D.C. Cir. 2009)..........................................................................14

*Lake Region Healthcare Corp. v. Becerra*,
    113 F.4th 1002 (D.C. Cir. 2024)..................................................................10, 15

*Loper Bright Enters. v. Raimondo*,
    603 U.S. 369 (2024).....................................................................................10, 15

*Maracich v. Spears*,
    570 U.S. 48 (2013)............................................................................................12

*In re NTE Connecticut, LLC*,
    26 F.4th 980 (D.C. Cir. 2022)......................................................................18, 19

*Ohio v. EPA*,
    603 U.S. 279 (2024).........................................................................................10

*Pacific Gas & Elec. Co. v. FERC*,
    113 F.4th 943 (D.C. Cir. 2024)....................................................................10, 15

*Republic Airline Inc. v. Dep't of Transp.*,
    669 F.3d 296 (D.C. Cir. 2012)...................................................................3, 10, 15

*SW General, Inc. v. NLRB*,
    796 F.3d 67 (D.C. Cir. 2015).............................................................................12

*U.S. Sugar Corp. v. EPA*,
    113 F.4th 984 (D.C. Cir. 2024)....................................................................13, 15

ii

*United States v. Alaska Air Group*,
No. 1:16-cv-02377 (D.D.C. Dec. 6, 2016) ........................................17

*Virginia Petrol. Jobbers Ass'n v. Fed. Power Comm'n*,
259 F.2d 921 (D.C. Cir. 1958) .........................................................19

*Wisconsin Gas Co. v. FERC*,
758 F.2d 669 (D.C. Cir. 1985) .........................................................17

**Federal Statutes**

5 U.S.C. § 706(2)(A) ...........................................................................10

49 U.S.C. § 41714(h)(3) ..............................................................3, 12, 13

49 U.S.C. § 41714(h)(4) ........................................................................2

49 U.S.C. § 41714(h)(5) ..............................................................3, 11, 12

49 U.S.C. § 41714(h)(5)(B) ..................................................................13

49 U.S.C. § 41714(h)(5)(B)(i) ................................................................3

49 U.S.C. § 41714(k) ...........................................................4, 6, 15, 16

49 U.S.C. § 41718(a) (2001) ...................................................................4

49 U.S.C. § 41718(a) (2004) ...................................................................5

49 U.S.C. § 41718(g)(2) (2013) ..............................................................5

49 U.S.C. § 41718(i) .........................................................................5, 15

49 U.S.C. § 41718(i)(2) .......................................................................3, 6

49 U.S.C. § 41718(i)(3) ..........................................................................6

49 U.S.C. § 41718(i)(4)(B)(ii) ..............................................................21

Pub.L. No. 106-181, 114 Stat. 61 (2000) ..........................................4, 17

Pub.L. No. 108-176, § 425, 117 Stat. 2490 (2003) .............................4, 5

Pub.L. No. 112-95, § 414, 126 Stat. 11 (2012) ......................................5

Pub.L. No. 118-63, 138 Stat. 1025 (2024).................................................5

**Rules**

D.C. Cir. Rule 18(a)(1) ........................................................................9

D.C. Cir. Rule 27(e)............................................................................22

**Regulations**

14 C.F.R. pt. 93, subpts. K & S ...........................................................2

14 C.F.R. § 93.213(a)(1) ....................................................................12

14 C.F.R. § 93.213(a)(5) ................................................................3, 12

71 Fed. Reg. 77,854 (Dec. 27, 2006)..................................................2

81 Fed. Reg. 89,979 (Dec. 13, 2016)..................................................3

**Other Authorities**

Air Transp. Agreement Between The Gov't Of The U.S. And The
     Gov't Of Can., State Dept. No. 07-74, 2007 WL 4864001 (Mar.
     12, 2007) ......................................................................................6

D.C. Cir. Handbook of Prac. & Internal Procs. VIII.B (2024)...............22

H.R. Rep. No. 106-513 .......................................................................16

## I.     INTRODUCTION

Congress recently empowered the Department of Transportation (DOT) to award 10 "slot exemptions"—takeoff and landing rights—at Ronald Reagan Washington National Airport (DCA). Two slot exemptions to service a new roundtrip flight were made available to an airline qualifying as a "limited incumbent carrier," meaning the airline operates at DCA but holds "fewer than" 40 slots. Only one carrier meets this criteria: Frontier Airlines (Frontier).

Nevertheless, DOT determined Frontier does not qualify as a limited incumbent, instead awarding these slot exemptions to Alaska Airlines (Alaska) even though Alaska has over 500 slots due to its codeshare agreement with American Airlines (American). DOT instructed Alaska to begin service by March 17, 2025. DOT's action—both disqualifying Frontier, and qualifying Alaska—is arbitrary and capricious.

In short, DOT wholly misinterpreted the statute to create the unnecessary contradiction that Frontier is both an "incumbent" that operates at DCA *and* a "new entrant" that does not operate at DCA. DOT also disregarded—without explanation—its precedent that repeatedly qualified Frontier as a limited incumbent. Further, DOT admitted the statute's codeshare provision disqualifies Alaska as a limited incumbent—but chose to not apply it.

The Court should partially stay DOT's erroneous Order pending the appeal as soon as possible because Frontier will likely succeed on the merits and will otherwise suffer irreparable harm.[1] Likewise, the Court should expedite consideration of the appeal.[2]

## II.     BACKGROUND

### A.     Statutory and regulatory background.

To improve airport safety and efficiency, the Federal Aviation Administration (FAA) limits the number of takeoffs and landings at the nation's most congested airports. 71 Fed. Reg. 77,854 (Dec. 27, 2006). Since 1968, it did so in part through regulations called the High Density Rule (HDR), which require airlines to obtain "slots"—reservations for takeoffs and landings—from the FAA before operating flights at specific times. 14 C.F.R. pt. 93, subpts. K & S; 49 U.S.C. § 41714(h)(4). Slots come in "pairs" for a roundtrip flight.

Over time, however, "the HDR was perceived as a barrier to improved service, in part because new air carriers were unable to establish service due to the lack of slot availability." *City of N.Y. v. Minetta*, 262 F.3d 169, 172–73 (2d Cir. 2001). Accordingly, in 1994, Congress provided DOT the ability "to grant

---

[1]     Frontier does not request a stay of the portion of DOT's Order pertaining to "non-limited" incumbent carriers.

[2]     Counsel for Frontier could not contact opposing counsel regarding this emergency motion because opposing counsel has not entered an appearance.

exemptions from the slot requirement"—*i.e.*, additional takeoffs and landings. *Id.*. These exemptions are "aptly named 'slot exemptions.'" *Republic Airline Inc. v. Dep't of Transp.*, 669 F.3d 296, 297 (D.C. Cir. 2012).

Congress has increased the slot total at DCA four times since 2000 through slot exemptions. Congress defines which carriers can apply for exemptions by categorizing airlines in one of three ways:

> (1) **New entrant air carrier**: "[A]n air carrier that does not hold a slot at [DCA] and has never sold or given up a slot at [DCA] after December 16, 1985, and a limited incumbent carrier," 49 U.S.C. § 41714(h)(3);

> (2) **Limited incumbent air carrier**: "[A]n air carrier or commuter operator that holds fewer than [40] air carrier or commuter slots" at DCA, *id.* § 41714(h)(5), 14 C.F.R. § 93.213(a)(5); or

> (3) **Non-limited incumbent air carrier**: An air carrier that holds 40 or more slots at DCA.[3]

When counting slots for purposes of the limited and non-limited incumbent categories (but *not* the new entrant category), "slot exemptions" are not included. 49 U.S.C. § 41714(h)(5)(B)(i). The converse is true for carriers in "codeshare agreements," which allow airlines "to market tickets for certain flights on each other's network." *United States v. Alaska Air Group, Inc.*, 81 Fed. Reg. 89,979, 89,979 (Dec. 13, 2016). For codeshares, if the carriers' combined slots/slot

---

[3]    "Non-limited incumbent air carrier" is not defined, but Congress and DOT use this term as explained here. *See* 49 U.S.C. § 41718(i)(2).

exemptions at DCA "exceed 20," then neither carrier qualifies as a new entrant or a limited incumbent. 49 U.S.C. § 41714(k).

**B.    Slot exemptions at DCA.**

In April 2000, Congress adopted Pub.L. No. 106-181, 114 Stat. 61 (2000), requiring DOT to grant 12 slot exemptions at DCA to any type of carrier (new entrant, limited incumbent, non-limited incumbent) for nonstop flights beyond DCA's 1,250 mile perimeter. 49 U.S.C. § 41718(a) (2001). Frontier was awarded two exemptions. At the time, because Frontier did not have any slots or exemptions, DOT concluded, "Frontier represents a true new entrant at DCA."[4]

DOT later reallocated certain exemptions post-September 11. Although DOT did not grant Frontier additional exemptions, DOT noted in one proceeding that "*Frontier clearly qualifies as a limited incumbent airline at DCA*, as it currently holds only two DCA slot exemptions for a single daily round trip to Denver."[5]

In December 2003, the Vision 100–Century of Aviation Reauthorization Act granted 12 more slot exemptions at DCA for beyond-perimeter flights. Pub.L. No.

---

[4]    DOT Order 2000-7-1, Docket DOT-OST-2000-7181-0093 (July 5, 2000) at 22, https://www.regulations.gov/document/DOT-OST-2000-7181-0093, (Ex. A).

[5]    DOT Order 2002-11-20, Docket DOT-OST-2000-7181-2117 (Nov. 27, 2002) at 8, https://www.regulations.gov/document/DOT-OST-2000-7181-2117, (emphasis added) (Ex. B).

108-176, § 425, 117 Stat. 2490, 2555 (2003); 49 U.S.C. § 41718(a) (2004). Frontier, which still only serviced two slot exemptions, was awarded four more. DOT's order considered Frontier "[i]n comparison to *other limited incumbent applicants*," and stated that "[n]o party to this proceeding disputes Frontier's new entrant/limited incumbent status."[6]

The FAA Modernization and Reform Act of 2012 authorized eight slot exemptions for new entrants and limited incumbents. Pub.L. No. 112-95, § 414, 126 Stat. 11, 90 (2012); 49 U.S.C. § 41718(g)(2) (2013). Frontier applied for two, but was not awarded any (for reasons not relevant here). DOT noted, however, that "Frontier confirms its status as a limited incumbent carrier" in light of operating six slot exemptions at DCA.[7]

### C.    Current proceedings.

In the FAA Reauthorization Act of 2024 (FAA 2024), Congress provided 10 slot exemptions for flights between DCA and domestic airports. Pub.L. No. 118-63, 138 Stat. 1025 (2024); 49 U.S.C. § 41718(i). Eight are for "incumbent air carriers qualifying for status as a non-limited incumbent carrier at [DCA] as of the

---

[6]    DOT Order 2004-4-1, Docket DOT-OST-2000-7181-4657 (Apr. 1, 2004) at 19, https://www.regulations.gov/document/DOT-OST-2000-7181-4657, (emphasis added) (Ex. C).

[7]    DOT Order 2012-5-12, Docket DOT-OST-2012-0029-6192 (May 14, 2012) at 8, https://www.regulations.gov/document/DOT-OST-2012-0029-6192, (Ex. D).

date of enactment of [FAA 2024]," § 41718(i)(2), and two are for "incumbent air carriers qualifying for status as a limited incumbent carrier at [DCA] as of the date of enactment of [FAA 2024]," § 41718(i)(3). None are for "new entrants." *Id.*

DOT's June 24, 2024 Notice requesting applications listed only two carriers as potentially eligible as limited incumbents: (1) Air Canada, even though it does not qualify because it cannot service a flight between DCA and another U.S. domestic airport;[8] and (2) Alaska, even though Alaska (which has 18 slots/slot exemptions at DCA) has a codeshare with American (which has 504 slots/slot exemptions at DCA),[9] thus exceeding the limit of "20 slots and slot exemptions" under a codeshare relationship, which disqualifies it as a limited incumbent.[10] 49 U.S.C. § 41714(k). The Notice did not list Frontier. Ex. E at 2.

---

[8]   Air Transp. Agreement Between The Gov't Of The U.S. And The Gov't Of Can., State Dept. No. 07-74, 2007 WL 4864001 (Mar. 12, 2007).

[9]   FAA Air Carrier Flight Totals, (March 24, 2024), https://www.faa.gov/about/office_org/headquarters_offices/ato/service_units/systemops/perf_analysis/slot_administration/data/doc/DCA_W23_AC_HOLDER_TOTALS.pdf (American has 358 slots; Alaska has 18 slots; and Frontier has 6 slots); FAA Commuter Holder Totals, (March 24, 2024), https://www.faa.gov/about/office_org/headquarters_offices/ato/service_units/systemops/perf_analysis/slot_administration/data/doc/DCA_W23_COMMUTER_HOLDER_TOTALS.pdf (American has 146 slots).

[10]  DOT Notice, Docket DOT-OST-2024-0065-0001 (Jun. 24, 2024) at 2, https://www.regulations.gov/document/DOT-OST-2024-0065-0001, (Ex. E).

Frontier applied for the two limited incumbent slot exemptions, proposing a nonstop flight from DCA to San Juan, Puerto Rico (SJU).[11] Alaska also applied for the limited incumbent slots for a flight from DCA to San Diego, California (SAN).[12] Frontier and Spirit Airlines (Spirit) objected to Alaska's application because of its codeshare, noting that Alaska could apply for the non-limited incumbent slot exemptions.[13] Alaska chose not to.

On October 16, 2024, DOT issued an Order to Show Cause in which it tentatively decided that Frontier is not eligible as a "limited incumbent" because it only operates through slot exemptions, which the statutory definition of "limited

---

[11]   Frontier, Application for Slot Exemption, Docket DOT-OST-2024-0065-5802 (July 8, 2024), https://www.regulations.gov/document/DOT-OST-2024-0065-5802, (Ex. F).

[12]   Alaska, Application for Slot Exemption, Docket DOT-OST-2024-0065-5926 (Jul. 8, 2024), https://www.regulations.gov/document/DOT-OST-2024-0065-5926.

[13]   Ex. F at 4; Spirit, Letter re Spirit Eligibility for DCA Limited Incumbent Slot Exemptions, Docket DOT-OST-2024-0065-0007 (June 26, 2024) at 3–4, https://www.regulations.gov/document/DOT-OST-2024-0065-0007 (Spirit Letter); Spirit Application, Docket DOT-OST-2024-0065-0065 (July 8, 2024) at 2 n.4, https://www.regulations.gov/document/DOT-OST-2024-0065-5921; Frontier Objection, Docket DOT-OST-2024-0065-23586 (Oct. 30, 2024) at 3–8, https://www.regulations.gov/document/DOT-OST-2024-0065-23586, (Ex. G); Spirit Consolidated Reply, Docket DOT-OST-2024-0065-23597 (Nov. 8, 2024) at 2–6, https://www.regulations.gov/document/DOT-OST-2024-0065-23597.

incumbent air carrier" excludes counting.[14] DOT acknowledged that the same

definition does not contain a minimum limit for slots—*i.e.*, a carrier must hold

"fewer than" 40 slots—and that it previously defined Frontier as a "limited

incumbent" in other proceedings. *Id.* Nevertheless, DOT found Frontier to be a

"new entrant," ignoring the statutory language and its precedent. *Id.* At the same

time, DOT tentatively qualified Alaska as a limited incumbent, not counting its

codeshare with American. *Id.* at 21.

On December 17, 2024, DOT made final its tentative rulings, awarding

Alaska the two limited incumbent slot exemptions.[15] DOT did not discuss Frontier

other than to say it addressed Frontier's arguments in the Order to Show Cause,

reaffirming its determination that Frontier "is a new entrant carrier at DCA and

does not qualify as a limited incumbent carrier in this proceeding." *Id.* at 7.

In discussing Alaska, DOT recognized that the codeshare provision is

"generally applicable" and admitted that "[r]eading § 41714(k) rigidly" would

exclude Alaska as a limited incumbent due to its codeshare, but then asserted that

---

[14]    DOT Order to Show Cause 2024-10-11, Docket DOT-OST-2024-0065-23578
        (Oct. 16, 2024) at 20 (Order to Show Cause),
        https://www.regulations.gov/document/DOT-OST-2024-0065-23579, (Ex. H).

[15]    DOT Order 2024-12-8, Docket DOT-OST-2024-0065-23605 (Dec. 17, 2024)
        (Order), https://www.regulations.gov/document/DOT-OST-2024-0065-23605,
        (Ex. I).

FAA 2024 "requires the Department to grant slot exemptions . . . without reference to codeshare agreements." *Id.* at 8. DOT further claimed that section 41714(k) "is properly interpreted to exclude regional affiliates from obtaining exemptions," even though the statute does not include this limitation. *Id.*

The Order directed the slot awardees to begin service "no later than March 17, 2025." Ex. I at 10. Alaska has confirmed it will start its service on that date.[16]

## III.    ARGUMENT

### A.    The Court should partially stay DOT's Order.

This Court weighs four factors in considering a motion to stay an agency rule pending judicial review: (i) the likelihood the moving party will prevail on the merits; (ii) the prospect of irreparable injury to the moving party without a stay; (iii) the possibility of harm to other parties if relief is granted; and (iv) the public interest.[17] D.C. Cir. Rule 18(a)(1). These factors are considered and balanced

---

[16]    Alaska Notice, Docket DOT-OST-2024-0065-23608 (Dec. 31, 2024), (Alaska Notice), https://www.regulations.gov/document/DOT-OST-2024-0065-23608.

[17]    Per Circuit Rule 18(a)(1), a motion to stay an agency order must state whether such relief was requested from the agency. Frontier did not first request this relief from DOT. A request for a stay from DOT is not required by statute or regulation. Further, throughout the relevant DOT proceedings—including in Objections to DOT's Order to Show Cause—Frontier made many of the arguments that are in this motion. Further appeal to DOT, which previously disregarded these arguments, is impracticable.

together; a "stay may be granted with either a high probability of success and some injury, or vice versa." *Cuomo v. NRC*, 772 F.2d 972, 974 (D.C. Cir. 1985).

### 1. Frontier will likely succeed on the merits.

#### a. Standard of review.

This Court must "hold unlawful and set aside agency action, findings, and conclusions found to be [] arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A); *Republic*, 669 F.3d at 299. An agency action is "arbitrary" or "capricious" if it is not "reasonable and reasonably explained." *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021); *Ohio v. EPA*, 603 U.S. 279, 292–94, 300 (2024) (staying agency action). "One of the core tenets of reasoned decision-making is that 'an agency [when] changing its course . . . is obligated to supply a reasoned analysis for the change.'" *Republic*, 669 F.3d at 299 (citation omitted) (alteration in original).

Importantly, DOT's decision is not entitled to deference. *Pacific Gas & Elec. Co. v. FERC*, 113 F.4th 943, 947–48 (D.C. Cir. 2024) (quoting *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 413 (2024)). Instead, the Court exercises independent judgment to interpret the statute. *Lake Region Healthcare Corp. v. Becerra*, 113 F.4th 1002, 1007 (D.C. Cir. 2024).

10

### b.    Frontier is a limited incumbent carrier.

DOT's conclusion that Frontier is not a limited incumbent carrier, and thus ineligible for slot exemptions under FAA 2024, is arbitrary and capricious.

DOT explained that FAA 2024 creates "a two-part test for eligibility: first, a carrier must be an incumbent on the date of enactment of FAA 2024; and second, a carrier must then also qualify for status as a limited incumbent, or non-limited incumbent carrier." Ex. H at 19.[18]

DOT concluded that Frontier qualified under the first prong as an "incumbent air carrier" because it "was engaged in air transportation at DCA" when FAA 2024 was enacted. *Id*. at 20.

The only question, then, is whether Frontier is a "limited incumbent carrier" (operating "fewer than" 40 slots) or a "non-limited incumbent carrier" (operating 40 or more slots). 49 U.S.C. § 41714(h)(5). Those are the only options because a carrier cannot be both (1) an "incumbent air carrier" that operates at DCA; *and* (2) a "new entrant" that does not operate at DCA. In other words, there is no "new entrant incumbent carrier" category.

---

[18]    DOT's Order summarily affirmed its preliminary determinations with respect to Frontier, and thus the Order to Show Cause is the appropriate citation. Ex. I at 7.

DOT veered off course and concluded otherwise. It held that, although Frontier is an "incumbent air carrier," it is also a "new entrant" and not a "limited incumbent" because it only operates slot exemptions. Ex. H at 20. This determination is arbitrary, capricious, and contrary to law. Among other things, it violates the principle that statutes must be "interpreted in a way that renders them compatible, not contradictory." *Maracich v. Spears*, 570 U.S. 48, 68 (2013) ("There can be no justification for needlessly rendering provisions in conflict if they can be interpreted harmoniously" (citation and alteration omitted)); *SW General, Inc. v. NLRB*, 796 F.3d 67, 75 (D.C. Cir. 2015).

Specifically, DOT created a contradiction—that a carrier can both operate and not operate at DCA—that is easily avoided by applying the statute's plain language. In short, a carrier can be: (1) an incumbent if it operates at DCA through slots or slot exemptions; and (2) a limited incumbent if it operates "fewer than" 40 slots (including "zero" if the carrier only operates slot exemptions) or a non-limited incumbent if it operates 40 or more slots.

Similarly, DOT's holding is incompatible with the definition of "new entrant." The statute defines both "new entrant" and "limited incumbent" in relation to how many "slots" a carrier holds. 49 U.S.C. § 41714(h)(3), (5); 14 C.F.R. § 93.213(a)(1), (5). Congress's further directive to not count slot

12

exemptions applies *only* to "limited incumbent."[19] 49 U.S.C. § 41714(h)(5)(B). Congress did not exclude slot exemptions when defining "new entrant." *Id.* § 41714(h)(3). Frontier's operation of slot exemptions thus means it cannot be a "new entrant." By holding otherwise, DOT improperly grafted the slot exemption exclusion to the new entrant definition.

Accordingly, if DOT's error stands, Frontier may *never* qualify for DCA slot exemptions because it is definitionally excluded from all categories: (1) it is not a "new entrant" because it operates slots/slot exemptions at DCA; (2) it is not a "limited incumbent" because its slot count is zero; and (3) it is not a "non-limited incumbent" because its slot holdings do not exceed 40. That is not the "best," let alone a reasonable, reading of the statute. *U.S. Sugar Corp. v. EPA*, 113 F.4th 984, 991 (D.C. Cir. 2024). And it is easily avoided by applying the statute's text.

To be clear, it is undisputed that Frontier both operates at DCA and operates "fewer than" 40 slots at DCA. That should be the end of the analysis, as these are the only requirements of a "limited incumbent carrier." It does not matter that, once excluding exemptions, Frontier's slot count equals zero because zero is obviously "fewer than" 40.

---

[19] And consequently "non-limited incumbent."

DOT's contrary conclusion relies on the premise that zero *is not* "fewer than" 40. Ex. H at 20. In doing so, it ignores the FAA's interpretation in a similar context—upheld by this Court—that "less than 20 seats" includes zero seats. *Gorman v. NTSB*, 558 F.3d 580, 588 (D.C. Cir. 2009) ("Zero is, in fact, a number and [i]f you have zero seats, you do have less than 20" (internal quotations omitted) (alteration in original)).

DOT's conclusion also conflicts with how it categorized Frontier in prior proceedings.[20] Only before Frontier was awarded any slot exemptions did DOT consider Frontier a "new entrant" at DCA. Ex. A at 22. After Frontier received two slot exemptions, DOT consistently classified Frontier as a limited incumbent. Ex. B at 8 ("Frontier clearly qualifies as a limited incumbent airline at DCA, as it currently holds only two DCA slot exemptions"); *see also* Ex. D at 8; Ex. C at 19. Worse, DOT acknowledged this conflict, but did not address or distinguish its precedent at all. Ex. I at 3. Instead, DOT simply was "not persuaded by the arguments [Frontier makes] regarding [its] eligibility in this proceeding." *Id.* at 7.

---

[20]  Alaska, unsurprisingly, supports DOT's interpretation. Ex. I at 5. Alaska's current position, however, contradicts its applications in prior proceedings when it, like Frontier, operated only with slot exemptions. Ex. D at 18 (Alaska qualifies "[a]s a new entrant/limited incumbent"); Ex. C at 4 ("Alaska highlights . . . its status as a fully-qualified limited incumbent at DCA"); Ex. B at 3 ("Alaska asserts that it is a limited incumbent carrier as it holds only two DCA exemption slots").

DOT's decision to contradict and ignore precedent (let alone the statute)—without explanation or reason—cannot survive arbitrary and capricious review, particularly since *Loper Bright*. 603 U.S. at 410–13; *Republic*, 669 F.3d at 299 ("It is axiomatic that an agency must treat similar cases in a similar manner unless it can provide a legitimate reason for failing to do so." (citations omitted)).

Frontier is thus likely to prevail on the merits of this issue.

### c.    Alaska is ineligible for the limited incumbent slot exemptions.

Since *Loper Bright*, courts reviewing agency actions exercise independent judgment and construe statutes *de novo*. *Lake Region*, 113 F.4th at 1007; *U.S. Sugar Corp.*, 113 F.4th at 991. DOT's action cannot withstand such a review. Indeed, DOT ignored the statute completely, even suggesting that section 41714(k) does not apply in these proceedings because it is not repeated in section 41718(i). Ex. I at 8. In so doing, DOT exceeded its authority.

This Court uses the traditional rules of statutory construction. *Pacific Gas*, 113 F.4th at 947–48. That means beginning with the text. *Id*. The text reads:

> For purposes of this section and sections 41716, 41717, and 41718, an air carrier that operates under the same designator code, or has or enters into a code-share agreement, with any other air carrier shall not qualify for a new slot or slot exemption as a new entrant or limited incumbent air carrier at an airport if the total number of slots and slot exemptions held by the two carriers at the airport exceed 20 slots and slot exemptions.

49 U.S.C. § 41714(k). Section 41718, of course, contains FAA 2024.

DOT found that "Alaska and American have had a codeshare relationship at DCA since at least 2000," Ex. H at 21, where Alaska holds 18 slots (including exemptions) and American holds 504 slots (including exemptions), totaling 522. *See supra* § II.C. The statute facially and unambiguously renders Alaska ineligible as a limited incumbent.

DOT recognized that, in awarding Alaska the limited incumbent slot exemptions, it was departing from the statute's text: "Reading § 41714(k) rigidly as Spirit and Frontier urge us to do, detracts from the broader text and purpose of the statute, which provides slot exemptions to address competition and access issues at DCA." Ex. I at 9. DOT then asserted that FAA 2024 requires it to grant slot exemptions "without reference to codeshare agreements" (even though DOT acknowledged the codeshare provision is generally applicable); characterized Alaska's codeshare with American as "limited" (even though the statute makes no such distinction); and determined section 41714(k) did not apply (even though the provision is mandatory—"shall not qualify"—not permissive). *Id.* at 8–10; Ex. H at 21–22. In other words, DOT openly ignored and amended the statute to create a discretionary exception that Congress never authorized.

Although the Court need not consider legislative history because the statute is unambiguous, the snippets DOT relied on do not support its determination. DOT cited proposed legislation pertaining to equal treatment of "commuter" airlines,

16

and found it significant that Alaska is not one. Ex. H at 22. That proposed

provision was eliminated a year later in H.R. Rep. No. 106-513, when the section

41714(k) language was proposed and ultimately adopted. Pub.L. No. 106-181, 114

Stat. 61 (2000). The earlier legislative history has no place in this analysis, and

whether Alaska is a "commuter" is irrelevant.

Likewise, though the terms of the Alaska-American codeshare are irrelevant,

DOT inaccurately characterized them when stating that, at DCA, "both carriers

operate independently under their own marketing control." Ex. I at 8 n.22. While

DOT correctly noted that "American cannot place its code on any Alaska flight

originating or terminating at DCA," *id*. at 9, it omitted that Alaska *can* display its

codes on American flights at DCA, *United States v. Alaska Air Group*, No. 1:16-

cv-02377 (D.D.C. Dec. 6, 2016), Dkt. 2-1 at 4–6 (excluding flights to LAX).

Indeed, as of May 2024, Alaska and American's codeshare included over 100

flights at DCA. Spirit Letter at 3-4, Ex. A.

Accordingly, Frontier is likely to prevail on the merits of this issue.

## 2.    Frontier will suffer irreparable injury.

Without a stay, Frontier will suffer irreparable injuries that are "both certain

and great," "actual and not theoretical." *Wisconsin Gas Co. v. FERC*, 758 F.2d

669, 674 (D.C. Cir. 1985). Frontier's economic losses during this appeal are

"irreparable" because they are not recoverable through relief the Court may grant. *In re NTE Connecticut*, *LLC*, 26 F.4th 980, 990–91 (D.C. Cir. 2022).

Frontier has long sought expansion in both the DCA and SJU markets. Frontier has applied for DCA slot exemptions at every opportunity because DCA is a critical airport—the 16th largest U.S. airport for daily revenue, and serving the entire Washington, D.C. metropolitan area. Affidavit of Joshua Flyr ¶¶ 2–3 (attached hereto).

Frontier has also significantly invested in operations at SJU. It currently offers approximately 25 flights from SJU, opening a base there in June 2024. *Id.* ¶¶ 5–6. That said, SJU is one of Frontier's smallest bases. This smaller scale results in financial and operational inefficiencies. *Id.* ¶ 7. The addition of the DCA–SJU daily roundtrip flight would reduce Frontier's fixed cost burden (*i.e.*, the balance between Frontier's costs and revenue) at SJU by approximately 4%— savings that would be passed on to consumers in reduced fares. *Id.*

Similarly, Frontier cannot maximize its investment at DCA. For example, Frontier currently operates one gate for its three DCA flights. *Id.* ¶ 8. On average, DCA gates handle seven flights per day. Frontier can better utilize this gate, and amortize its expenses, if awarded the additional exemptions. *Id.*

Presently, JetBlue Airways (JetBlue) is the only airline that services a DCA– SJU nonstop flight. Without a stay, JetBlue can further entrench itself at an airport

18

and with a community that is central to Frontier's business. *Id.* ¶ 9. Specifically, DOT's error prevents Frontier from growing its customer base, gaining customer loyalty, and improving its reputation with customers who utilize DCA and SJU, allowing other airlines (JetBlue in particular) to monopolize this market. *Id.*

Frontier will also suffer financial harm that cannot be redressed through a favorable decision on the merits. *See In re NTE Connecticut*, 26 F.4th at 990–91. Not only will Frontier's investments at DCA and SJU remain underutilized, but Frontier will lose an estimated $5.7 million in annual revenue by not having a DCA–SJU route. Flyr Affidavit ¶ 2. Similarly, Alaska will service the DCA–SAN route beginning March 17, 2025, which will draw customers away from Frontier's connecting services between DCA and SAN—an estimated loss of $500,000 per year. *Id.* ¶ 11.

### 3.    A stay would not harm other parties.

Conversely, a stay would not "substantially harm other parties interested in the proceedings." *Virginia Petrol. Jobbers Ass'n v. Fed. Power Comm'n*, 259 F.2d 921, 924 (D.C. Cir. 1958). DOT will not suffer harm from a stay. Nor will Alaska, the other likely interested party. In many ways, a stay benefits Alaska.

Alaska has already begun marketing the DCA–SAN route, and service is set to begin on March 17, 2025. Flyr Affidavit ¶ 15. Alaska will make significant financial and reputational investments over the next few months to prepare for

19

service. *Id*. ¶ 13. If the Court does not grant a stay but later grants the Petition for Review, Alaska will need to terminate this route, losing its investments. Among other things, Alaska will be required to cancel and refund tickets, causing customer discontent and reputational harm to the airline, which is a type of company that customers uniquely need to trust when setting their plans. *Id*. ¶¶ 14–15.

Moreover, as Frontier (and Spirit) emphasized throughout the DOT proceedings, Alaska is a non-limited incumbent at DCA, and could have applied for the eight non-limited incumbent slot exemptions, even in the alternative. Alaska chose not to. Any harm resulting from a stay was thus easily avoidable and in many ways self-imposed.

### 4.    A stay is in the public interest.

The public interest strongly favors a stay, as it will avoid negative impacts on consumers and prevent wasting federal resources during Frontier's appeal.

As discussed, without a stay, the public will begin purchasing flights on Alaska's DCA–SAN route and arranging travel plans. Later vacating DOT's Order would impact flights, causing significant disruption to those flying and those expecting them.

Likewise, federal resources will be expended to coordinate logistics for the March 17 commencement. Should DOT's Order be vacated, the federal time and

20

resources invested in working with Alaska to prepare its DCA–SAN service would be futile, and additional resources would be expended to reverse course.

Finally, the views of "Congress, the elected representatives of the entire nation," are "another sense by which the public interest should be gauged." *Cuomo*, 772 F.2d at 978. In FAA 2024, Congress directed DOT to allocate slot exemptions based in part on the "positive impact on the overall level of competition in the markets that will be served." 49 U.S.C. § 41718(i)(4)(B)(ii). Certainly, the public interest is best served when competition is healthy. A stay provides that.

For example, in the one Washington, D.C. area airport where Frontier services a nonstop to SJU (Baltimore, Maryland (BWI)), average fares for a one-way ticket from *all* carriers are nearly $100 lower than the average fares at the other two Washington, D.C. airports where Frontier does not service a nonstop SJU route. Flyr Affidavit ¶ 10. As discussed, there is presently no competition on the DCA–SJU route; JetBlue monopolizes it. *Id.* Further, providing the limited incumbent exemptions to Alaska harms competition. As of December 2024, only three of the 417 daily departures from DCA were offered by ultra low-cost carriers like Frontier. *Id.* ¶ 12. Awarding the additional exemptions to Alaska further skews this imbalance toward high-cost legacy carriers, decreasing competition. *Id.* A stay will more quickly foster competition, providing customers with more options at

21

reduced rates, without requiring the public to suffer an anticompetitive market for an unnecessary amount of time.

**B.     The Court should expedite the appeal per Circuit Rule 27(e).**

**1.     Expedited review is necessary to avoid irreparable harm.**

Alaska recently confirmed that it will start its DCA–SAN service on March 17, 2025. Alaska Notice. It already began marketing this flight. Flyr Affidavit ¶ 15. As discussed, a stay should be entered as soon as possible, and not later than March 16, 2025, to avoid harm to Frontier and Alaska, as well as disruption to the public and federal government, if this Court grants Frontier's Petition for Review after Alaska begins its new flight. These same injuries favor expediting the appeal even more.

In particular, Frontier will continue to miss out on market share, customer loyalty, operational efficiencies, and revenue—all of which cannot be redressed, and will be exacerbated the longer the appeal remains pending. Similarly, Alaska will further invest in its DCA–SAN route over time, making it more harmful to unwind its operations. And in the event further slot exemptions come available at DCA—either through new legislation or reallocation—Frontier may be ineligible for them due to its undefinable status.

22

### 2.    The general public has an unusual interest in prompt disposition.

For reasons discussed in Section III.A.4, the public has an unusual interest in prompt disposition of this dispute. *See* D.C. Cir. Handbook of Prac. & Internal Procs. VIII.B (2024).

As it stands, the public is suffering from an anticompetitive market between DCA–SJU where JetBlue reigns supreme. The sooner DOT's Order is vacated— which leaves Frontier as the only limited incumbent eligible for the two slot exemptions—the sooner the public can benefit from the increased competition and options Frontier will bring to this route, as it did previously at BWI.

Similarly, the public often plans travel months in advance. Certainty is critical. Just like passengers need to know if Frontier's DCA–SJU will be available, the same is true for Alaska's DCA–SAN route. To plan a trip on Alaska's flight, only to learn that the flight is not available when the Court disposes of this case on a normal schedule, will leave the public in a scramble with fewer, more expensive travel options.

### 3.    Proposed expedited briefing schedule.

Frontier proposes the following briefing schedule:

| Filing | Due Date |
|---|---|
| Petitioner's Opening Brief and Joint Appendix | 14 days after a Court order on the instant motion |

| Respondent's Response Brief | 14 days after filing of Petitioner's Opening Brief |
|---|---|
| Respondent-Intervenor's Response Brief (if any) | 7 days after filing of Respondent's Response Brief |
| Petitioner's Reply Brief | 14 days after filing of Respondent's Response Brief |

Frontier agrees to this case being placed in the Court's stand-by pool for expedited calendaring.

## IV.    CONCLUSION

For the foregoing reasons, this Court should stay the part of DOT's Order that relates to the limited incumbent slot exemptions and expedite consideration of this appeal.

*[Signature on Next Page]*

24

Respectfully submitted:

/s/ Lorene L. Boudreau
Lorene L. Boudreau
D.C. Circuit #55126
BALLARD SPAHR LLP
1735 Market Street, 51st Floor
Philadelphia, PA 19103-7599
Direct: 215.864.8245
Fax: 215.864.8999
boudreaul@ballardspahr.com

Aaron Schaer
(D.C. Circuit Application
Forthcoming)
BALLARD SPAHR LLP
1420 Fifth Avenue, Suite 4200
Seattle, WA 98101-2375
Direct: 206.223.7103
Fax: 206.223.7107
schaera@ballardspahr.com

*Counsel for Petitioner Frontier
Airlines, Inc.*

DATED: January 17, 2025

25

## <u>CERTIFICATE OF COMPLIANCE WITH TYPEFACE AND WORD-<br>COUNT LIMITATIONS</u>

I, Lorene Boudreau, counsel for Petitioners and a member of the Bar of this

Court, certify pursuant to Federal Rules of Appellate Procedure 27(d) and 32(g)

that the foregoing Emergency Motion to Partially Stay the Department of

Transportation's December 17, 2024 Final Order and for Expedited Consideration

of the Appeal is proportionally spaced, has a serif typeface of 14 points or more,

and contains 5,200 words.

Respectfully submitted:

/s/  Lorene L. Boudreau
Lorene L. Boudreau
D.C. Circuit #55126
BALLARD SPAHR LLP
1735 Market Street, 51st Floor
Philadelphia, PA 19103-7599
Direct: 215.864.8245
Fax: 215.864.8999
boudreaul@ballardspahr.com

*Counsel for Petitioner Frontier
Airlines, Inc.*

Dated: January 17, 2025

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on January 17, 2025, I caused a true and accurate copy of the foregoing Emergency Motion to Partially Stay the Department of Transportation's December 17, 2024 Final Order and for Expedited Consideration of the Appeal to be served by hand delivery upon the following:

Secretary Pete Buttigieg
United States of America Department of Transportation
Office of the Secretary
1200 New Jersey Ave, SE
Washington, DC 20590

United States of America Department of Transportation
Office of the General Counsel
1200 New Jersey Ave, SE
Washington, DC 20590

Respectfully submitted:

/s/  Lorene L. Boudreau
Lorene L. Boudreau
D.C. Circuit #55126
BALLARD SPAHR LLP
1735 Market Street, 51st Floor
Philadelphia, PA 19103-7599
Direct: 215.864.8245
Fax: 215.864.8999
boudreaul@ballardspahr.com

*Counsel for Petitioner Frontier Airlines, Inc.*

## INDEX OF ATTACHMENTS AND EXHIBITS

## TO PETITIONER'S EMERGENCY MOTION TO PARTIALLY STAY THE DEPARTMENT OF TRANSPORTATION'S DECEMBER 17, 2024 FINAL ORDER AND FOR EXPEDITED CONSIDERATION OF THE APPEAL

Affidavit of Joshua Flyr (January 3, 2025)

Exhibit A:   DOT Order 2000-7-1 (July 5, 2000)

Exhibit B:   DOT Order 2002-11-20 (Nov. 27, 2002)

Exhibit C:   DOT Order 2004-4-1 (Apr. 1, 2004)

Exhibit D:   DOT Order 2012-5-12 (May 14, 2012)

Exhibit E:   DOT Notice: Establishment of Slot Exemption Proceeding(Jun. 24, 2024)

Exhibit F:   Frontier Application for Slot Exemption (July 8, 2024)

Exhibit G:   Frontier Objection to DOT Order to Show Cause(Oct. 30, 2024)

Exhibit H:   DOT Order to Show Cause 2024-10-11 (Oct. 16, 2024)

Exhibit I:   DOT Final Order 2024-12-8 (Dec. 17, 2024)

## UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

|  |  |  |
|---|---|---|
| FRONTIER AIRLINES, INC., | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| v. | ) | Docket No. __25-1002__ |
| | ) | |
| UNITED STATES DEPARTMENT | ) | |
| OF TRANSPORTATION, | ) | |
| | ) | |
| Respondent. | ) | |
| | ) | |

## AFFIDAVIT OF JOSHUA FLYR IN SUPPORT OF PETITIONER'S EMERGENCY MOTION FOR A PARTIAL STAY OF THE DEPARTMENT OF TRANSPORTATION'S DECEMBER 17, 2024 FINAL ORDER AND FOR EXPEDITED CONSIDERATION OF THE APPEAL

I, Joshua Flyr, declare as follows:

1.     I am the Vice President of Network & Operations Design at Frontier Airlines, Inc. (Frontier). I have been in that role since February 2017. My prior positions at Frontier include Senior Director of Network as well as Director, Planning and Alliances. Overall, I have worked at Frontier since April 2011. Through my work, I am aware of Frontier's general business operations and business plans, as well as the impacts (financial and otherwise) of flight routes on Frontier's business performance and viability. I have personal knowledge of the facts set forth herein. I make this affidavit in support of Frontier's Emergency

Motion for a Partial Stay of the Department of Transportation's December 17, 2024 Final Order and Expedited Consideration of the Appeal.

2.  Holding a "slot" or "slot exemption" at Washington D.C.'s Reagan National Airport (DCA) is highly valuable for Frontier. This is in part because it is the 16th largest U.S. airport in terms of daily revenue. Specific to the DCA to San Juan, Puerto Rico (SJU) nonstop flight that Frontier sought in the recent Department of Transportation (DOT) slot exemption proceedings, the Washington D.C. metropolitan area is the fourth largest market for flights to and from SJU, and Frontier estimates an annual revenue gain of $5.7 million if it can serve the SJU-DCA route.

3.  It is also incredibly difficult to expand operations at DCA due to the slot exemption program. In my time at Frontier, we have always applied for slot exemptions whenever they have become available due to their value and scarcity.

4.  On average, over 800 passengers travel each way between the Washington, D.C. metropolitan area and SJU daily, amounting to approximately $146,000 in daily ticket revenue. This makes up around 5% of SJU's daily ticket revenue.

5.  An operational base for an airline refers to an airport at which an airline stations its aircraft and crew, often acting as a central hub from which the

airline operates its flight routes and manages its day-to-day operations, such as maintenance, crew scheduling, and flight planning.

6.     Frontier has 12 operational bases, including: (1) Denver, Colorado, where Frontier offers approximately 70 daily flights; (2) Orlando, Florida, where Frontier offers approximately 55 daily flights; (3) Atlanta, Georgia, where Frontier offers approximately 45 daily flights; and (4) SJU, where Frontier offers approximately 25 daily flights. SJU is Frontier's newest operational base, having opened in June 2024.

7.     Because Frontier's SJU operational base is smaller than its other bases, by comparison it runs at an operational and financial inefficiency. For example, there are certain fixed costs in terms of employees, crew, and administrative items that are required of any operational base. The more flights an operational base services, the more these costs are spread out, amortized, and minimized in relation to the amount of revenue Frontier receives from the base. Frontier calls this balance between costs and revenue at operational bases its "fixed cost burden." For SJU specifically, if Frontier were able to add the DCA–SJU daily nonstop flight, Frontier anticipates it would reduce its fixed cost burden at SJU by approximately 4%. In part due to Frontier's business model as an ultra low-cost carrier, Frontier would pass on these savings to consumers through reduced fare, which in turn stimulates more ticket revenue for Frontier.

8.    Similarly, Frontier currently leases one preferential gate at DCA (*i.e.*, where passengers board and deplane) for its three DCA flights. A preferential gate at DCA can handle approximately seven flights per day. As with an operational base, there are certain fixed costs to lease a preferential gate, including for staffing and the lease itself. Frontier can better utilize this preferential gate, and amortize its expenses, if awarded the additional slot exemptions at DCA.

9.    Presently, JetBlue Airways Corp. (JetBlue) is the only airline that services a nonstop flight on the DCA–SJU route. The longer JetBlue monopolizes this route, the more entrenched it becomes at SJU in part through customer loyalty, familiarity, and awards/frequent flyer programs. Conversely, it becomes more difficult for Frontier to grow its customer base, gain customer loyalty, and improve its reputation with customers who utilize DCA and SJU, which are two airports central to Frontier's business plans.

10.    JetBlue's monopoly on the market also hurts consumers in terms of higher ticket prices. For example, Frontier currently services one nonstop route between the Washington, D.C. market—in Baltimore, Maryland (BWI)—and SJU. At BWI, fares for a one-way ticket to SJU from all carriers are nearly $100 lower on average than the one-way tickets from air carriers at the other two Washington, D.C. airports—DCA and Washington Dulles International Airport (IAD)—where Frontier does not service a nonstop route to SJU. By comparison, JetBlue—who

carries approximately 80% of the daily DCA–SJU traffic (the other 20% coming from connecting routes)—charges an average fare of $236 for a one-way ticket from DCA to SJU, whereas Frontier charges an average fare of $88 for a one-way ticket from BWI to SJU. If Frontier could run a nonstop DCA–SJU route, it would increase competition and exert downward pressure on ticket fares from all airlines serving this route, similar to what occurred with the BWI–SJU route.

11.    Frontier currently services the DCA–San Diego, California (SAN) route with connecting traffic through Frontier's Denver, Colorado hub. If Alaska Airlines, Inc. (Alaska) is able to offer a nonstop flight on the DCA–SAN route, Frontier forecasts an annual revenue loss of approximately $500,000 due to loss of traffic from customers utilizing this Alaska flight instead of Frontier's.

12.    As of December 2024, there is an average of 417 daily departures from DCA. Only three of these departures (approximately 0.7%) are offered by ultra low-cost carriers like Frontier. An award of an additional slot exemption pair to Alaska further skews this historical slot allocation toward high-cost legacy carriers and away from ultra low-cost carriers, decreasing competition and harming customers through fewer options and higher fares.

13.    Months before an airline begins servicing a route, it must begin setting up infrastructure and organizing its operations so that it can handle the flight, as well as market the new route to customers. This requires a significant financial and

reputational investment as the airline makes staffing, operational, and administrative decisions, and begins to sell tickets for future travel on the route to customers.

14.    The price in terms of money and reputation of having to terminate a route is significant. Among many other things, an airline would be required to cancel and refund tickets, or at least rebook customers on flights they did not originally want (perhaps due to time or number of connections). This causes customer discontent and disruption, and reputational harm to an airline—a company that customers uniquely need to trust when setting their business and leisure plans.

15.    I am aware that Alaska has already begun marketing the nonstop DCA–SAN route it was awarded by DOT in the recent slot exemption proceedings, meaning consumers can purchase tickets on this route, with flights starting on March 17, 2025. So have the four airlines that were awarded slot exemptions by DOT as non-limited incumbents: American Airlines, Inc.; Delta Air Lines, Inc.; Southwest Airlines Co.; and United Airlines, Inc. Based on my knowledge and experience, the longer Alaska's DCA–SAN flight remains available to consumers to purchase—which correlates to the number of actual flights consumers purchase—the more complicated and costly (financially and reputationally) it will be for Alaska to address issues that will arise if the flight is later terminated.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed this _3rd_ day of January, 2025, at Denver, Colorado.

Joshua Flyr