# Exhibit A

Posted:  July 5, 2000
          3:30 p.m.

Order 2000-7-1
Served: July 5, 2000

86686



**UNITED STATES OF AMERICA
DEPARTMENT OF TRANSPORTATION
OFFICE OF THE SECRETARY
WASHINGTON, D.C.**

Issued by the Department of Transportation
on the 5th day of July, 2000

---

Applications of

**AMERICA WEST AIRLINES, INC.
AMERICAN AIRLINES, INC.
AMERICAN TRANS AIR, INC.
DELTA AIR LINES, INC.
FRONTIER AIRLINES, INC.
NATIONAL AIRLINES, INC.
NORTHWEST AIRLINES, INC.
TRANS WORLD AIRLINES, INC.
UNITED AIR LINES, INC.**

Docket OST-2000-7181– 93

For exemptions from 14 CFR Part 93,
Subparts K and S, pursuant to 49 U.S.C.
§ 41718(a), Special rules for Ronald Reagan
Washington National Airport (beyond perimeter slot
exemptions)

---

## ORDER GRANTING OUTSIDE-THE-PERIMETER SLOT EXEMPTIONS AT RONALD REAGAN WASHINGTON NATIONAL AIRPORT

### SUMMARY

By this order the Department partially grants the applications of a number of carriers for slot exemptions at Ronald Reagan Washington National Airport (hereafter "DCA") in order to provide nonstop service between DCA and five cities, as follows:  (1) America West Airlines, six slot exemptions in order to provide one daily nonstop round trip between DCA and Las Vegas, NV, and two daily nonstop round trips between DCA and Phoenix; (2) Frontier Airlines, two slot exemptions to provide one nonstop round trip a day between DCA and Denver; (3) National Airlines, two slot exemptions to provide one nonstop round trip a day between DCA and Las Vegas, NV; and (4) Trans World Airlines, two slot exemptions to provide one nonstop round trip a day between DCA and Los

- 2 -

Angeles, conditioned upon its execution, within 60 days, of a signed agreement with Chatauqua Airlines to provide it on-line feeder service at Los Angeles.

## BACKGROUND

On April 5, 2000, the President signed into law the Wendell H. Ford Aviation Investment and Reform Act for the 21st Century (AIR-21). Among other things, AIR-21 liberalized slot and slot exemption access at the four airports now subject to the provisions of the High Density Rule, 14 C.F.R. 93 Subparts K and S. Specifically, at DCA, new 49 U.S.C. §41718(a), as added by Section 231 of AIR-21, provides that the Secretary *shall* grant 12 slot exemptions to air carriers for the provision of nonstop air transportation outside the 1,250 mile perimeter established for civil aircraft operations at DCA under 49 U.S.C. §49109.

AIR-21 directs the Secretary to distribute those 12 slot exemptions if the Secretary finds that the exemptions will (1) provide air transportation with domestic network benefits[1] beyond the 1,250 mile perimeter; (2) increase competition by new entrant air carriers or in multiple markets; (3) not reduce travel options for communities served by small hubs airports and medium hub airports within the 1,250 mile perimeter; and (4) not result in meaningful travel delays.

By Notice dated April 14, 2000, the Department notified interested parties that requests under this section had to be submitted to the Secretary not later than May 5; that comments with respect to any timely filed request for a slot exemption had to be filed by May 22; and that the Secretary's decision would be made not later than July 5.

## APPLICATIONS

### America West Airlines, Inc.

On May 5, 2000, America West requested 10 slot exemptions under the provisions of AIR-21 to enable it to operate three round trips (six slot exemptions) between Phoenix, AZ, and DCA using B-757 aircraft (190 seats) and two daily round trips (four slot exemptions) between Las Vegas, NV, and DCA.

America West argues that grant of its application will result in the first significant new network of single online connections between DCA and the western United States by a

---

[1] AIR-21 amended the previous definition of "new entrant," and its statutory applicability. Under the revised 49 U.S.C. § 41714(h)(3), as added by section 231 of AIR-21, the term "new entrant," for purposes of the slot exemption provisions including those at DCA, means "an air carrier that does not hold a slot at the airport concerned and has never sold or given up a slot at that airport after December 16, 1985, and a limited incumbent carrier as defined in subpart S of part 93 of title 14 code of federal regulations." The latter term, again as amended by AIR-21, is defined as an air carrier or commuter operator that holds or operates (or held or operated, since December 16, 1985) fewer than 20 slots and slot exemptions at the high density airport in question.

- 3 -

post deregulation low-cost, low-fare carrier. The applicant contends that its proposed service would provide substantial new travel options and flexibility for DCA-western U.S. passengers as well as significant new price competition and fare savings. Specifically, America West states that its proposal would provide 15 communities with their first one-stop online connecting service to DCA as well as competing one-stop connecting service to 42 cities beyond Phoenix and Las Vegas. America West contends that grant of its request would result in $18 million in savings to America West passengers and an additional $12 million in savings to other carriers' passengers whose fares would be disciplined by America West's. The applicant asserts that its unrestricted transcontinental business fares average 43 percent less than those offered by other major network competitors and that those savings would become available to DCA passengers as well if the Department granted its application. America West also argues that lack of DCA access has forced it to operate at a considerable competitive disadvantage since other carriers have better access to points on its network than does America West itself. The carrier contends that grant of its application would address this imbalance. Finally, America West argues that its proposed service would benefit small communities and not reduce travel options for small hub airports and medium hub airports inside the perimeter.

**American Airlines, Inc.**
On March 30, 2000, American Airlines requested four beyond-perimeter slot exemptions to provide two daily round trips between DCA and Los Angeles International Airport (LAX). The carrier would use B-757 aircraft (176 seats).

American maintains that LAX is the best candidate for four of the available twelve slot exemptions. The applicant argues that Los Angeles is the largest city proposed for service in this proceeding and that DCA-LAX is the largest proposed beyond-perimeter market. American contends that its request should be granted for several reasons.

First, the applicant asserts that it would provide the first non-stop service between LAX and DCA.

Second, the carrier claims it would provide connecting service, either on its own or through its code-sharing agreements, to 26 U.S. points and 16 foreign points. American further argues that it would provide first or competitive one-stop service to DCA from numerous California, Nevada, and Hawaii cities.

Third, the applicant contends that the grant of its request would improve competition at LAX, where United Air Lines is the largest carrier. American argues that United has 29.3 percent of total enplanements at LAX, while American has only 12.3 percent. In addition, American maintains that United has a 50.9 percent share of the Washington-LAX market, while American has only a 31.0 percent share. Approval of its application, American argues, would therefore improve competition in the Washington-LAX market. American also states that its proposal has received significant congressional and civic support.

- 4 -

Lastly, American contends that its application best matches all four of the AIR-21 selection criteria. First, American maintains that it will be able to provide on-line connecting benefits to numerous western and international cities. Second, American asserts that approval of its application will improve competition at LAX, in the DCA-LAX market, and at small California cities such as Santa Barbara that will gain first time access to single connecting, on-line service to DCA. Third, American maintains that grant of its request would not reduce existing service to DCA. Fourth, American argues that a 1999 GAO report ultimately concluded that authorizing of additional slots at DCA would not create significant delays.

**American Trans Air, Inc. (ATA)**
On May 5, 2000, ATA requested four slot exemptions to provide one round trip a day to San Francisco International Airport (SFO) and one round trip a day to LAX with B-757 aircraft (216 seats).

Since ATA began providing low-fare DCA-Chicago Midway service, the carrier claims that a high proportion of its capacity has been used to accommodate LAX or SFO passengers. The applicant seeks to better serve this substantial market segment with nonstop, low-fare service from DCA to California.

ATA contends that its low-fare service from New York La Guardia (LGA) to SFO and LAX has proved successful. The carrier argues that despite operating only three daily round trips between LGA and LAX, it is the second largest carrier in the market, offering fares 60 percent below those charged by American and United. ATA argues that it can replicate this success at DCA and consequently lower the DCA high average fares and bring market discipline to the dominant carriers in the Washington-California markets. Based on its LGA experience, ATA estimates that it can generate $64 million in consumer savings in the DCA-California markets.

ATA further argues that its proposal satisfies the selection criteria outlined in AIR-21. First, the applicant maintains that its proposal would enhance competition in the Washington-California markets and offer on-line networking benefits to Hawaii and interline network benefits to numerous west coast communities. Second, ATA contends that the grant of its proposal would enhance the number of travel options available to passengers and reduce travel delays.

Last, ATA contends that its proposal meets the airline selection criteria outlined in section 41715 of AIR-21 by increasing employment at ATA and throughout the nation as a result of ATA's $2 billion aircraft order with Boeing.

**Delta Air Lines, Inc.**
On March 22, 2000, Delta requested four DCA slots to provide two daily non-stop round trips to Salt Lake City (SLC) using B-757 aircraft (183 seats).

- 5 -

Delta argues that the grant of its proposal would best satisfy the selection criteria outlined by AIR-21. Specifically, the applicant contends that its proposal would provide extensive network benefits beyond the 1,250-mile perimeter. Delta maintains that with its partner, Skywest, it can offer connecting service to 65 cities from Salt Lake City, providing dozens of small- and medium-sized communities in the intermountain west region access to either their first online single connecting service or additional competitive online single connecting service to DCA. (SkyWest also code-shares with United Airlines.) In addition, the applicant argues that SLC is among the nation's top business centers and has a rapidly growing population. Second, Delta argues that its proposal will increase competition in multiple markets through its SLC connecting service to 65 cities. Delta contends that ten communities in the northern tier of the western United States would receive their first one-stop, on-line service to DCA. Third, Delta asserts that there would be no reduction in travel options for communities served by small hub airports and medium hub airports within the perimeter, as the carrier has no plans to reduce existing service. Fourth, Delta contends that its proposed service would not cause additional travel delays. The applicant asserts that Salt Lake City is among the least congested of the western U.S. hub airports and that a 1999 GAO report found that the addition of slots at DCA would not cause significant aircraft delays.

**Frontier Airlines, Inc.**
Frontier requests four slot exemptions to enable it to operate two nonstop round trips a day between Denver and DCA with Boeing 737-300 aircraft. Its proposed start-up date is September 7, 2000. In support of its application, Frontier states that it is a true low-fare, new-entrant success story, having started operations in July 1994 at Denver. It has prospered and grown, despite being blocked from several major airports due to a lack of slots. It says it would represent the first low-fare new entry at DCA in 15 years. In support of the favorable competitive impact of its low fares, the carrier points to its entry into the Denver–BWI market in November 1997 and the resulting 20 percent decrease in fares and 67 percent increase in passengers in the market. Frontier paints a similar picture in the Denver-La Guardia market where it inaugurated service in December 1997. Finally, Frontier states that its application meets all of the statutory criteria in that it would: provide network benefits to communities that it currently serves into Denver from the south, west and northwest; increase competition by a new entrant; not reduce travel options for communities within the 1,250-mile perimeter; and not result in increased delays at DCA or elsewhere throughout the system.

**National Airlines, Inc.**
National requests six slot exemptions in order to operate three daily round trips between Las Vegas and DCA with 175-seat B-757 aircraft. National states that Las Vegas is the second-largest domestic market outside DCA's perimeter, and the fastest growing. The applicant maintains that during the past decade, traffic at Las Vegas's McCarran International Airport has increased by 6.5 percent a year. In contrast, says National,

- 6 -

Las Vegas-Washington traffic has been relatively stagnant because of inadequate capacity. National contends that its proposed service would dramatically improve Las Vegas-Washington service and generate significant network benefits by creating online single connecting service to DCA from both Los Angeles and San Francisco immediately, and from additional cities west of the carrier's Las Vegas hub eventually.[2]

National states that it qualifies as a "new entrant carrier" under 49 U.S.C. 41714(h)(3), and that it will promote competition by offering significantly lower fares than those now being offered by United for Las Vegas-Dulles service or by Southwest Airlines, Inc., for Las Vegas-BWI service. National also notes that its introduction of Las Vegas-DCA service could not harm its service from other points to DCA since it serves no such routes, and that the proposed service would not result in meaningfully increased travel delays.

**Northwest Airlines, Inc.**
Northwest requests two slot exemptions in order to operate one daily round trip between Seattle and DCA with 124-seat Airbus 319 aircraft. In support of its request, Northwest notes that Seattle is the fifth-largest origin-and-destination (O&D) market lacking nonstop access to DCA, and only United Air Lines operates nonstop service between Seattle and the Washington area. Northwest states that its proposed service would therefore enable it to compete head-to-head with United's present monopoly in the Seattle-Washington market. Northwest also asserts that it operates a substantial network of connecting services at Seattle in conjunction with its code-share partners, including service at 38 cities in the western United States and eight others in Japan, Canada and Mexico. As a result, its nonstop Seattle-DCA service would provide the first one-stop access to DCA for 16 mostly small- or medium-sized U.S. cities. Northwest further states that it has no plans to reduce its existing services to DCA from any airport within the perimeter as a result of its proposal, and that the grant of its application would not meaningfully increase travel delays at DCA or anywhere else. Northwest says that its service would reduce the travel times and increase the convenience of passengers traveling to DCA from Seattle and other cities on its network. Northwest therefore asserts that its proposal would improve service to DCA for western U.S. cities, particularly small and medium-sized ones, and would promote domestic air transportation.

**Trans World Airlines, Inc.**
On May 5, 2000, TWA requested six slot exemptions to provide three daily round trip flights between DCA and LAX with B-757 aircraft (180 seats).

TWA contends that its proposal would satisfy a need for new competition in the non-stop DCA-LAX market and that it views the opportunity to provide this service as a catalyst for developing an integrated LAX network. The carrier also contends that its application best meets the AIR-21 selection criteria. First, the carrier argues that through a code-

---

[2] National states that it has plans to add flights to Las Vegas from Portland, San Diego, San Jose and Seattle within the next four years.

sharing agreement with regional carrier Chautauqua Airlines, TWA will offer the first or competitive one-stop service to five California cities, namely San Luis Obispo, Bakersfield, Monterey, Santa Barbara, and Palm Springs, in addition to providing first-time service to the largest beyond-perimeter city currently without direct service to DCA. Second, TWA maintains that it would also offer competition in multiple markets and provide the first nonstop service between DCA and LAX. Further, the carrier claims that its strong brand name would facilitate competition with United Air Lines and American Airlines, the dominant carriers in the Washington-LAX market. Third, TWA asserts that its proposal will not reduce travel options for communities within the perimeter, as there will be no reduction in existing service. Fourth, TWA argues that the proposed service will reduce travel time for DCA-LAX passengers. TWA also cites a 1999 GAO report, which concluded that additional operations at DCA would not cause significant delays.

TWA also contends that its proposal best matches the relevant carrier selection criteria outlined in section 41715(c) of AIR-21. The applicant argues that grant of its request would enhance both intra-gateway LAX competition and on the local DCA-LAX route. In a different vein, TWA argues that the grant of its application would be instrumental in revitalizing the carrier's declining fortunes. TWA further argues that it is has the best service performance of any applicant, having the leading on-time performance record. In that regard, TWA also notes that it won J.D. Powers and Associates' 1998 and 1999 awards for customer service.


**United Air Lines, Inc.**
United has applied for four slot exemptions to allow it to operate two nonstop round trips a day between Los Angeles and DCA using 182-seat Boeing 757 Stage 3 aircraft. United states that granting its application would be fully consistent with all of the statutory criteria. Regarding network benefits in multiple markets, United states that it has made a significant investment in developing Los Angeles into a major hub to the point that it now serves 48 domestic cities from Los Angeles, not to mention 11 international cities, with an average of 384 departures a day. In addition, United states that its regional code-share affiliate SkyWest Airlines serves 19 cities from Los Angeles, further enhancing the network benefits. United also asserts that 16 communities would receive their first ever one-stop online connection to DCA, while 16 more would receive their first competitive one-stop service. In addition, United would use 182-seat Boeing 757s--the largest aircraft currently authorized to use DCA. United further states that granting its application would not have a negative effect on service at any communities located within the perimeter. Finally, United states that grant of its application would not result in "meaningfully increased travel delays" at any airport.

- 8 -

## RESPONSIVE PLEADINGS

### Pleadings in Support of Various Applications

#### Phoenix

On May 22, 2000, the City of Phoenix filed an answer in support of America West's application. Phoenix argues that it was the fastest growing metropolitan area in the U.S. from 1970 to 1996 and that is enjoys a large, diverse, high-technology economy. Phoenix contends that America West is the only major network carrier that cannot serve its primary hub from DCA. Phoenix argues that, except for United at Los Angeles, America West has more daily departures and serves more points at Phoenix than would any other applicant's proposed services. It further contends that America West offers more U.S. western city departures from Phoenix than would any other carrier in this proceeding from its proposed destination city. Phoenix argues that America West offers the aircraft with the largest two-class service of any of the applicants.

#### Denver

On May 22, 2000, the City and County of Denver filed an answer in support of Frontier's application. Denver asserts that it was the sixth largest U.S. airport in 1999 with 38 million passengers, an extensive route network and a critical link to small and mid-sized communities in the Rocky Mountain and Great Plains regions. Denver argues that of the seven applicant cities, Denver is the closest to DCA and, therefore, awarding Denver service would be the result most consistent with the intent of the Perimeter Rule to limit DCA access to closer cities. Denver contends that granting Denver DCA access would effectively extend the Perimeter Rule by only 220 miles while grant of applications to other cities would unfairly allow other communities to "leapfrog" Denver. Denver argues that Frontier serves 20 cities from Denver and that the carrier would be a new entrant at DCA. Denver argues that Frontier's presence at Denver has had a major impact toward lowering fares in Denver markets.

#### Seattle

On May 22, 2000, the Port of Seattle filed an answer in support of Northwest's application. Seattle argues that absent the Perimeter Rule and High Density Rule, Seattle would have nonstop DCA service today. Seattle asserts that it is the fifth largest market without nonstop DCA service and that it is an important business, high technology, world trade center that generates over 500,000 annual Washington, D.C. O&D passengers. Seattle contends that DCA is largely a business, rather than a leisure, market and that most low-fare Washington leisure travelers use BWI and IAD airports. Seattle argues that these airports could most effectively serve the Las Vegas market. Seattle contends that Northwest's selection would provide domestic network benefits to 38 cities, 16 of which would benefit from first one-stop DCA service. Seattle argues that Los Angeles and San Francisco already enjoy substantial competitive nonstop transcontinental service to two Washington airports and that Phoenix, Denver and Salt Lake City already provide overlapping Rocky Mountain regional service. Seattle cites its rapidly expanding economy

- 9 -

and claims to be the fastest growing of the three west coast airports seeking nonstop service to DCA in this proceeding. Seattle argues that grant of Northwest's application of only two slot exemptions would bring new competitive services to Seattle while reserving a significant slot pool for other applicants.

**Alaska/Horizon Airlines**

On May 22, 2000, Alaska Airlines, Inc., and Horizon Air Industries, Inc. d/b/a Horizon Air (Alaska/Horizon) filed comments in support of Northwest's proposal. Alaska/ Horizon contends that through the Alaska/Northwest codeshare agreement, selection of Northwest's proposal would result in the unique double benefit of two new carriers for Pacific Northwest-DCA passengers. This is because Alaska and Northwest would compete on some routes as well as codeshare, thereby resulting in substantial potential competitive and network benefits.

**St. Louis**

On May 22, 2000, the City of St. Louis and the St. Louis Airport Commission (St. Louis Parties) filed comments in support of TWA's application. The St. Louis Parties argue that TWA's proposal will strengthen the carrier, now an employee-owned company, and positively impact the St. Louis region.

**Las Vegas**

On May 22, 2000, Las Vegas McCarran International Airport, the Las Vegas Chamber of Commerce, the Las Vegas Visitor and Convention Authority, and the Nevada Development Authority (Las Vegas Parties) filed an answer in support of the applications of America West and National. The Las Vegas parties argue that Las Vegas offers service to 70 nonstop domestic destinations and that the Las Vegas area has experienced strong growth and an expanding economy. The Las Vegas parties argue that many incumbent applicant carrier proposals closely resemble existing services to alternative Washington airports and should not be given high selection priority. The Las Vegas Parties also assert that selection of two Las Vegas-Washington proposals would avoid creation of a monopoly in the market. The Las Vegas Parties also argue that Las Vegas-Washington nonstop flights have the highest load factors of any nonstop flights between Washington and the applicant cities.

**Salt Lake City**

On May 22, 2000, the Utah Air Travel Commission and the Salt Lake City Corporation (Utah and the Salt Lake City Parties) filed an answer in support of Delta's application. The Utah and the Salt Lake City Parties argue that an award to Delta would result in new and expanded DCA connecting benefits to 33 beyond-perimeter cities, including 28 small and medium sized cities. The Utah and the Salt Lake City Parties assert that Delta's service would provide 267,000 seats for new DCA services to these points and Salt Lake City and would improve traveling convenience for thousands of passengers. The Utah and the Salt Lake City Parties take no position on other proposals, except to the extent that fully granting America West's request would preclude a full award for Delta's Salt Lake City proposal. The Utah and Salt Lake City Parties argue that Salt Lake City's superior

- 10 -

geographic position would result in significantly overall less DCA connecting circuity for more points than other competing cities.

## Opposition Pleadings

### America West

On May 22, 2000, America West filed comments. America West claims that none of the applicants can match the domestic network benefits of its proposal. America West asserts that an award of slot exemptions to any of the established DCA incumbents would provide minimal network benefits since most of the larger cities claimed for new DCA single connecting service in the competing applications can be reached by one-stop service over inside perimeter hubs. America West asserts that Los Angeles applicants United and American emphasize the benefits of their proposals to the local market in contrast to the statutory criteria requiring domestic network benefits and competition in multiple markets. America West also contends that selection of a DCA incumbent, especially American, Delta, or United would do little to lower very high DCA average fares and that it offers lower fares in several of the markets where it competes with Frontier, National and ATA. America West argues that its proposed service would bring new single connecting service to over 1.25 million passengers in concert with the congressional intent of AIR-21.

### American

On April 7, 2000, American filed a motion to file late[3] and an answer in opposition to Delta's application to the extent that granting Delta's request precludes granting American's application. On May 22, 2000, American filed an answer to all of the applications filed in this docket. American contends that since Los Angeles is the largest U.S. city without DCA service it should be given selection priority over other cities in this proceeding. American argues that of the four carriers seeking DCA slot exemptions for Los Angeles service, it should be ranked first. American asserts that United is the dominant carrier at both Washington and Los Angeles as well as in the Los Angeles-Washington market and should not be selected as a matter of competitive balance. American also argues that the service benefits of ATA's proposed single daily round trip as well as its network benefits at Los Angeles are insufficient. American alleges that TWA is not strong enough to effectively compete against United and that TWA's network benefits are speculative.

### ATA

ATA filed an answer on May 22, 2000, arguing that the Department should first consider the largest markets for proposed service, i.e., Los Angeles and San Francisco. ATA argues that the other competing hubs are significantly smaller and therefore should be given less consideration for first-time nonstop DCA service than Los Angeles or San Francisco. ATA contends that its proposal would provide the greatest benefits per slot (passengers, seats, and lowest fares) of any of the applicants. ATA contends that selection of United or American for DCA-LAX service would simply strengthen the market

---

[3] We will grant American's motion to file late as well as all other motions to file late or unauthorized documents.

- 11 -

dominance of one of those carriers and that either applicant would simply carry self-diverted traffic that would move on its services in any event.

ATA contends that TWA's difficult financial position, cost structure, and lack of a low-fare reputation would inhibit its full development as an effective competitor against American or United. ATA asserts that San Francisco's position as second largest beyond-perimeter market without nonstop DCA service also makes it a prime candidate for selection for new service. ATA notes that it is the only applicant to propose nonstop service in the San Francisco-DCA market.

ATA argues that America West deserves some consideration for DCA slot exemptions given its role in seeking liberalization of the DCA slot regime. On the other hand, ATA argues that America West's code-sharing relationships with Continental, Mesa, and Northwest disqualify America West as a DCA limited incumbent under 49 U.S.C. §41714(k).[4] ATA argues that its proposal is superior to America West's request based on the importance of the markets to be served, number of passengers, seats, and impact of low fares.

ATA asserts that Delta's proposal offers few, if any, competitive benefits and that most of its anticipated traffic would be self diverted from current services rather than be new traffic. ATA asserts that Delta would be offering service to a smaller market than either Los Angeles or San Francisco and would use a smaller aircraft than ATA. ATA contends that National would bring some low fare benefits to the Las Vegas-Washington market but that National's low-fare offerings require advance purchase and have other restrictions not required by ATA's low-fare services. ATA also argues that the Las Vegas market is considerably smaller than Los Angeles or San Francisco and that National's B-757 aircraft have 20 percent fewer seats than ATA's B-757.

ATA argues that Northwest's Seattle proposal would be provided with a smaller, foreign-manufactured aircraft and serve a market substantially smaller than San Francisco or Los Angeles. ATA asserts that Northwest would offer a "conventional established fare menu." ATA argues that Frontier's Denver proposal with small B-737 aircraft to a market smaller than Los Angeles or San Francisco should be ranked lower than ATA's proposal.

### Delta
Delta argues that the applications of American, United, TWA, and ATA (California applications) all involve markets that now receive high levels of nonstop service to either Baltimore Washington International or Dulles International airports. Delta also argues that California's far western location does not make its cities a good candidate as a connecting hub except for a few California cities.

---

[4] Under 49 U.S.C. § 41714(k) "…an air carrier that operates under the same designator code, or has or enters into a code-share agreement, with any other air carrier shall not qualify for a new slot or slot exemption as a new entrant or limited incumbent air carrier at an airport if the total number of slots and slot exemptions held by the 2 carriers at the airport exceed 20 slots and slot exemptions."

- 12 -

Delta contends that the American, TWA, and United applications have focused on the large size of the Los Angeles-DCA local market and placed less emphasis on increasing competition in multiple markets. Delta argues that ATA would provide few domestic network benefits. Delta states that American already competes effectively in the Los Angeles-Washington market, both locally and on a connecting basis. Delta asserts that selecting American would do little to increase competition in multiple markets because American already serves most of its claimed Los Angeles connecting cities from its Dallas/Ft. Worth hub and that most of the benefits of United's Los Angeles hub are for international service, rather than for domestic service as required by the statute. Delta argues that United would have an incentive to reserve its DCA-Los Angeles service for its local passengers paying the highest fares and to transport connecting passengers on its existing service, thereby lessening the network benefits of its proposal.

Delta states that ATA would provide no network benefits, and that ATA's existing one-stop service provides the carrier with ample opportunity to compete in the market. Like the other applicants proposing nonstop service to California, TWA's choice of DCA-Los Angeles for DCA service is misguided, and even with its proposed codesharing relationship, TWA's network benefits would be minimal. Delta argues that TWA could better serve DCA-western points through its St. Louis hub.

Delta argues that America West's request for 10 of the 12 available slot exemptions in this proceeding to duplicative and overlapping hubs (Phoenix and Las Vegas) is excessive and unjustified and that fully granting America West's request would preclude development of alternative competitive beyond-perimeter hub services. Delta contends that given reasonable circuity and connecting times, 15 out of 16 potential Las Vegas connecting markets can also be served through America West's larger Phoenix hub.

Delta also contends that the Department should also consider the recent poor on-time arrival performance of carriers serving Las Vegas, Phoenix and Seattle compared to Salt Lake City, given the statutory requirement that an award should not result in meaningful increased traffic delays. Delta argues that its performance at Salt Lake City was ranked first for the same year ended March 2000 period. Delta argues that America West should not be awarded more than two round trips (four slots). Delta argues that Frontier's proposal would offer service to only nine cities beyond Denver and no cities would receive their first time one-stop connecting DCA service. Delta contends that all nine of those cities already receive significant one-stop connecting service to DCA from other carriers. Delta argues that small and medium-sized Rocky Mountain communities would receive few benefits from Frontier's proposal. Delta contends that its proposal would benefit 27 communities with new or improved DCA access as compared to just two for Frontier. Delta argues that Frontier's small aircraft also limit the benefits that could be realized from its proposed service. Delta also contends that its own fares from Washington to Frontier's proposed destinations are 22 percent lower than Frontier's.

Delta argues that National's Las Vegas proposal is flawed because DCA-Las Vegas demand has not been growing and that overall Washington-Las Vegas demand has been

- 13 -

declining. Delta asserts that National's proposal would offer few new network benefits since National's only two beyond-Las Vegas points, Los Angeles and San Francisco, already receive ample one-stop connecting services. Delta asserts that Northwest would operate its proposed Seattle service using the smallest aircraft of all the applicants, thus limiting the benefits of its service, and that Northwest would have to depend on the code-share services of Alaska Airlines. Delta contends that Seattle's Pacific Northwest location limits its utility as a domestic connecting hub and that almost all of Northwest's claimed connecting cities would require a significant backhaul. Delta argues that Northwest already serves many of these communities to DCA with more convenient one-stop connections over Minneapolis/St. Paul, a large within-perimeter hub. Delta argues that Northwest's proposed one-round-trip-a-day limits the number of viable connecting flights and travel options available to passengers as compared to multi-flight proposals.

### Frontier

On May 22, 2000, Frontier filed an answer arguing that promotion of new entry by new entrant airlines should be a key selection factor given the pro-competitive goals of the Airline Deregulation Act, the Department's own policies promoting new entrant service, and the objectives of AIR-21. Frontier asserts that only it would bring new competition to a highly concentrated hub (Denver) while providing new competitive services to multiple markets. Frontier argues that given the recent general rise in air fares, the Department must ensure that new entrant airlines have every opportunity to offer alternative, lower fares to the traveling public. Frontier contends that of all the applicant cities, Denver is the most conveniently located beyond-perimeter hub, providing significantly less circuity to DCA than other proposed communities. Frontier argues that as a general competitive issue, large slot-holders at all High Density Rule airports, and especially at DCA, should not be given additional slots in this proceeding. Frontier argues that grant of 10 of the 12 slot exemptions to America West would effectively be a monopoly beyond-perimeter award to one carrier. Frontier asserts that an award to America West would not result in new connecting service to many large western cities such as Denver or Albuquerque. Frontier argues that an award to America West would likely result in self diversion of passengers from America West's current Columbus-DCA service, forcing the carrier to reduce flights on that segment. Such a result would be contrary to the beyond-perimeter selection criterion not to denigrate service at communities within the perimeter outlined in 49 U.S.C. §41718(a)(3). Frontier argues that given its current relationships with Northwest and Continental, America West cannot be considered a new entrant air carrier at DCA under 49 U.S.C. § 41714(k).

Frontier asserts that National's Las Vegas proposal would provide service at a community where traffic demand has been flat and that traffic in the Las Vegas-Dulles market has, in fact, decreased. Frontier argues that National offers connecting service only to Los Angeles and San Francisco. Frontier argues that many routings over National's Las Vegas hub are more circuitous than from Frontier's Denver hub and that Frontier would offer connecting service to more communities than would National.

- 14 -

Regarding the Los Angeles proposals, Frontier argues that they should not be favored because effectively only the Los Angeles/Southern California Basin would benefit from nonstop DCA-Los Angeles service. Frontier contends that given the significant circuity involved with LAX connecting service, other major west coast cities such as Portland or Seattle would not benefit from selection of LAX for new DCA service.

### National

On May 22, 2000, National filed an answer arguing that, consistent with the congressional intent of AIR-21, the Department's policy objectives, and the goals of airline deregulation, the Department should favor awarding DCA slot exemptions to a new entrant carrier such as itself over the DCA incumbent carriers. National asserts that only three applicants (National, Frontier, and ATA) qualify as DCA new entrant/limited incumbent carriers. Specifically, National argues that America West does not qualify as a new entrant/limited incumbent because it has a code-share agreement with Continental Airlines and under the provisions of 49 U.S.C. § 41714(k) the DCA slot holdings of both carriers must be aggregated in considering new entrant/limited incumbent eligibility. National argues that America West and Continental combined hold 49 DCA slots, making the combination the fifth largest DCA slot holder. National argues that the goal of improving competition and facilitating new entrant market entry should take precedence over increasing connections at beyond-perimeter hubs for incumbent carriers. National argues that it would offer significantly lower fares in the DCA-Las Vegas market than incumbent carriers, including America West. National asserts that America West currently matches the higher Dulles-Las Vegas fares offered by United but does not match Southwest's lower fares to BWI. National asserts that DCA passengers traveling on proposed incumbent carrier services would primarily be diverted from existing incumbent within perimeter hub connecting services or from existing incumbent Dulles or BWI services. National argues that those resulting traffic diversions would engender strong incentives to reduce existing incumbent services in contradiction to AIR-21's requirement that a DCA slot exemption award " not reduce travel options for communities served by small hub airports and medium hub airports within the perimeter." Finally, National argues that its proposal could not result in service reductions at within perimeter hubs since National does not serve DCA.

### Northwest

On May 22, 2000, Northwest filed comments. Northwest asserts that Los Angeles should not be selected over Seattle because Los Angeles already enjoys more competitive nonstop service to Washington than any other city proposed in this proceeding with three carriers offering a total of 14 daily flights to Dulles and four daily flights to Baltimore/Washington International. Also, Northwest asserts that selecting American would not introduce a new competitor in the Los Angeles-Washington market. Northwest alleges that American would provide one-stop connecting service to only 13 communities beyond Los Angeles as compared to 48 cities served comparably by Northwest at Seattle.

Similarly, Northwest states that ATA's proposal for Washington-Los Angeles and Washington-San Francisco service would simply add service to markets already well-served by IAD and BWI airports. Northwest argues that ATA's proposal would add new

service to only two points, Honolulu and Kahului (Maui), Hawaii, beyond the perimeter. Northwest argues that America West's proposals benefit only two of the smallest Washington O&D markets, Phoenix and Las Vegas, and that both of those cities are already competitively served through BWI, while Seattle, a larger Washington O&D market, receives only monopoly service from United. Northwest argues that America West at Las Vegas will offer one-stop connecting service to only 21 domestic points outside the perimeter while Northwest would offer similar service to 48 cities. Northwest argues similarly that America West's proposed Phoenix service would offer one-stop connecting service to fewer domestic points than would Northwest's Seattle proposal. Northwest argues that Delta proposes to serve DCA-Salt Lake City when it provides two daily round trips in the IAD-Salt Lake City market and that selecting Delta will not improve competition since it is the monopoly carrier in the market. Northwest contends that Delta would provide 46 communities with single-connecting service as compared to 48 communities at Seattle by Northwest. Northwest says that Frontier currently operates two daily flights between Denver and BWI and that United also serves the Denver-Dulles market. Northwest argues that Frontier serves only nine cities from Denver and that Frontier would not offer a single community its first single connecting service to Washington. Northwest argues that National's DCA-Las Vegas service would benefit a small market that already receives service to both BWI and IAD. Further, Northwest argues that National offers same-day, one-stop connecting service in only two markets, Los Angeles and San Francisco, both of which already receive substantial Washington service. Northwest argues that TWA's Los Angeles request proposes service for a well-served market and that only two markets, Kona and Honolulu, would receive single connecting service from TWA's proposal. Northwest argues that United's proposal would simply enhance United's dominant position in the well-served Los Angeles-Washington market.

### TWA

On May 22, 2000, TWA filed comments stating that with limited DCA frequencies the Department must identify the largest DCA markets without nonstop DCA service and decide which applicants can best serve those cities. TWA asserts that no applicant disputes that Los Angeles is the largest market proposed for DCA service and the fact that four carriers applied for Los Angeles indicates its importance. TWA contends that the competing cities have only from 13 to 30 percent of the Los Angeles population and 16 to 62 percent of Los Angeles-Washington O&D traffic. TWA argues that the Department must limit its choices to a few communities to maximize the competitive and service benefits from its total decision package. TWA argues that selecting either United or American for Los Angeles service would only strengthen the positions of one of the two dominant carriers in the market. TWA asserts that AIR-21 gives the Department the opportunity to inject new competition in the Los Angeles-Washington and beyond-Los Angeles markets. TWA argues that its three daily round trip Los Angeles service proposal is superior to United's and American's proposed two daily round trips. TWA further asserts that its Los Angeles network benefits are comparable to those of American and United. While TWA concedes that United's Los Angeles network could reach marginally

greater numbers of passengers, TWA argues that that would not overcome the detrimental competitive impact of selecting United for Los Angeles service.

TWA argues that ATA's primary focus is on serving its Chicago Midway hub rather than serving Los Angeles and that with a single daily round trip, ATA would not provide effective competition in the DCA-Los Angeles market. TWA contends that ATA's proposal offers no network benefits and that ATA's proposed connections to Hawaii are not viable, since they would require a passenger to overnight at either Los Angeles or San Francisco. TWA contends that ATA's corporate strategy has been to avoid competition with major carriers rather than to serve as a low-fare alternative. TWA also argues that it would offer lower fares than those of the Los Angeles-Washington incumbents, as generally evidenced by its transcontinental low-fare policies. TWA argues that ATA's proposed Los Angeles service would cater only to price-sensitive passengers, to the detriment of service and schedule sensitive business passengers, and that TWA would offer a more comprehensive package of service options for both classes of passengers.

TWA argues that Delta's Salt Lake City proposal would result in new single connecting services for only ten new cities and that its proposed new one-stop connecting service would reach communities with a total population of less than 450,000, and only 16,690 O&D passengers a year. TWA argues that those network benefits are modest when compared to the beyond Los Angeles market. TWA concedes that the benefits of America West's Phoenix proposal are significant, with new one-stop connecting service to 14 new cities with a total population of over two million and 73,660 O&D passengers, but TWA argues that its proposal would offer comparable network benefits and would serve a much larger local market. TWA argues that America West's proposed service at Las Vegas would operate at the smallest community with the smallest traffic of any applicant's proposed nonstop DCA markets, providing only one online connection (Bakersfield) that couldn't be accessed via Phoenix. TWA argues that growth in the Las Vegas-DCA market has been flat.

TWA argues that Northwest's Seattle proposal would serve a comparatively smaller volume market with one-stop connecting service to 13 cities. TWA states that Northwest's proposed service would reach cities with a population of 833,535 and 37,980 O&D passengers, or significantly less than the beyond-Los Angeles traffic. TWA argues that Northwest's smaller A319 aircraft would not fully utilize the limited available slot exemptions and, on this basis, Northwest should not be considered for selection.

TWA argues that National's Las Vegas request is excessive in terms of the DCA-Las Vegas market size and National's claimed benefits. TWA asserts that, in contrast to National's assertions, the Las Vegas-Washington market does not require additional service stimulation, and perceived market stagnation is simply a shift in passenger preference from Dulles to BWI service. TWA argues that Frontier's proposed B-737 Denver service (roughly 140 seats) is with an aircraft too small to justify the award of more than one daily round trip (two slot exemptions) in the DCA-Denver market.

- 17 -

**United**

On May 22, 2000, United filed comments. United argues that, as the largest local beyond perimeter market, Los Angeles-Washington requires service to DCA. The applicant asserts that although three other carriers have also applied to serve DCA-Los Angeles, none offer the domestic hub benefits that United would bring since none operate a hub at Los Angeles. United argues that all of the other applicants are either proposing service at smaller points (Northwest, Delta, and America West) or do not operate true hubs comparable to United's Los Angeles operations (America West and National at Las Vegas, Frontier at Denver and American Trans Air at San Francisco). United claims that its service would provide greater benefits to more passengers in more communities in western states than any other applicant including the first one-stop connecting service to 16 cities and competitive DCA connecting service to 16 other cities. United states that it would serve all of American's first-time, one-stop connecting markets and 12 additional cities as well. United says that it will provide additional one-stop connecting service to 16 markets as compared to nine markets for American.

United states that the network benefits claimed by ATA are miniscule and that TWA's claimed network benefits of single connecting service to five communities rest on a uncompleted codesharing arrangement with Chautauqua Airlines. United argues that Delta's Salt Lake City proposal would offer only new single connecting service to 10 points compared to 16 points for United. Also, United argues that its 16 connecting service cities generate 144 Washington passengers per day compared to 18.5 Washington passengers per day for Delta's 10 cities. Delta's 10 cities also involve greater circuity than United's cities. United states that the benefits of additional DCA service to 30 cities claimed by Delta are not substantial since most of those communities enjoy connecting opportunities over numerous alternative within-perimeter hubs. United contends that Northwest's Seattle proposal with a single daily round trip and the smallest aircraft proposed[5] provides fewer benefits than United's. United contends that although Northwest claims one-stop connecting service to 38 communities, many of those connections would not be viable with only one round trip a day in the market. United asserts that the feasibility of these proposed services is further diminished given that many of these communities already have daily connecting service to DCA and that service to DCA via Seattle to many of these points involves substantial circuity. United also asserts that Northwest is the only applicant to propose service with a foreign manufactured aircraft, which is a factor that the Department may consider in granting slot exemption awards.

United argues that America's West's Phoenix and Las Vegas proposals would serve smaller Washington markets than Los Angeles. United argues that both of those cities already receive nonstop Washington service from America West to BWI and connecting service to DCA via Columbus. United argues that only 15 of America West's claimed 42 connecting cities to DCA would receive first time connecting service compared to 16 cities by United. United contends that service to its connecting cities is less circuitous

---

[5] United also contends that the operating characteristics of Northwest's A319 aircraft limit its full utilization at DCA.

- 18 -

than the service proposed by America West to its connecting cities. United argues that America West's claims of consumer savings from its proposed services are exaggerated and unsupported by its current pricing policies.

United argues that Frontier's proposed service at Denver would be operated with small B737-200 aircraft[6] (136 seats) designed primarily to accommodate the local Denver-DCA market with few network benefits. United contends that most of the connecting cities claimed by Frontier are large cities already well served over alternate connecting hubs or communities involving substantial circuity over Denver. United argues that Frontier already serves the Denver-Washington market with BWI service, and that BWI is better suited to the low-fare, discretionary traffic sought by Frontier. United argues that given Frontier's low load factors on the Denver-BWI route, Frontier would likely reduce that service if its DCA request were granted. United argues that fewer passengers would benefit from selecting Frontier over United.

United argues that National's Las Vegas proposal would provide service to the smallest proposed local market in terms of DCA passengers, and that the Los Angeles-Washington market is almost three times larger. United asserts that Las Vegas is primarily a leisure market that is now well-served by Southwest to BWI. United contends that traffic in the Las Vegas-Washington market grew 17.7 percent per year as compared to 6.5 percent for theoverall Las Vegas market, and therefore lack of DCA service has not limited growth. United asserts that National's proposal provides only minimal network benefits.


**Other Pleadings**

**Washington Airports Authority (MWAA)**
On May 22, 2000, MWAA filed a response. MWAA takes no position on the merits of the various applications, but says that the Department should disregard the irrelevant attacks of some applicants on the Perimeter Rule and the High Density Rule. MWAA argues that the applicants have focused on the first two statutory selection criteria involving domestic network benefits and increased competition by new entrant air carriers or in multiple markets. MWAA asserts that the applicants have not effectively addressed the third criterion involving the reduction of travel options for passengers. MWAA contends that the applicants have not uniformly stated that they would retain current levels of Dulles service if also selected for DCA service. MWAA says that only Delta has addressed this issue. Regarding the fourth criterion involving no increased travel delays resulting from an award, MWAA has also expressed concern that several applicants have cited a General Accounting Office study as evidence that DCA can accommodate up to seven additional flights per hour without additional delay. MWAA argues that the GAO study assumes an increase in combined instrument flight rule (IFR) and visual flight rule (VFR) operations and is not valid for additional available capacity under IFR conditions alone. MWAA also argues that the Department must consider the impact of distributing

---

[6] Like Northwest's aircraft, United also contends that the operating characteristics of Frontier's B737-300 aircraft limit its full utilization at DCA.

- 19 -

hourly slot awards in this proceeding along with "slot slides" permitted under 49 U.S.C. §41714(d).

### Other Issues

On June 5, National filed a motion to strike portions of comments filed by America West regarding fares offered by National and National's recent financial performance. National alleges that America West has misrepresented National's fare structure by claiming that America West's fares are lower in several markets. National contends that it actually offers lower fares than America West in most comparative markets. National argues that America West has characterized National as conducting unprofitable operations when America West should have been aware of recent press coverage of National's profitable operations.

On June 8, America West filed an answer. America West argues that it made no misstatements concerning National and the motion should be denied. America West contends that its fare comparisons are based on average fares paid by passengers and are derived from the Department's O&D data, DB1B data base. America West argues that these data are better comparative indicators than National's published fare comparisons, which can change frequently. America West also argues that the Department's Form 41 submissions indicate that National experienced a 1999 net loss of over $40 million. America West argues that even if National was profitable for the month of March 2000, the carrier has not demonstrated sustained profitability.

We will deny National's motion. National has not shown that America West has misused, mischaracterized, or distorted this information, and we do not find that its exclusion from the record is warranted. As derived from Department sources, these data are officially noticeable and may be used by any party. Of course, our decision to allow the information into the record of this proceeding does not imply our endorsement of any of the America West's arguments that rely on these data as support.

### DECISION

We have decided to select America West for four slot exemptions for nonstop service to Phoenix and two slot exemptions for nonstop service to Las Vegas, Frontier for two DCA slot exemptions for nonstop service to Denver, National for two DCA slot exemptions for nonstop service to Las Vegas, and TWA for two slot exemptions for nonstop service to Los Angeles.

While all the applicants put forth strong arguments in favor of their proposals, AIR-21 necessarily requires that we focus our attention on those certain criteria specified by Congress to govern our selection. Section 41718 identifies four criteria the Department

- 20 -

must consider in making allocations in this proceeding.  The statute also requires that any successful applicant meet all four criteria.

Accordingly, as directed by new § 41718(a)(1) any slot exemptions we award must provide "domestic network benefits" beyond the perimeter.  Next, under § 41718(a)(2), we are directed to ensure that the slot exemptions awarded will also increase competition by new entrant carriers or in multiple markets.  Under § 41718(a)(3), we must insure that a grant of exemptions would not reduce travel options for communities served by small hub airports and medium hub airports within the perimeter.  Finally, under § 41718(a)(4), the exemptions awarded must not result in meaningfully increased travel delays.  With regard to the latter two statutory requirements, as discussed below we find that all applicants meet both.

Our analysis indicated that the network benefit and competition criteria imposed under (a)(1) and (a)(2) were more determinative than the other two Congressionally-mandated criteria.  The Congress did not, however, provide any specific direction as to how we should weigh between the former two criteria in our decisional process.  This is clearly required, however, since carriers tended to offer more relative strength in meeting one criterion than in the other.  Thus, carriers with a stronger existing presence at DCA emphasized their networks and the competitive benefits that could be brought to multiple markets via those networks. Carriers with a less established presence emphasized that Congress's focus on competitive benefits could best be met by selecting their applications, and that even though, in most cases, their networks were smaller they could bring more effective competition to them.  We have concluded that, to give full meaning to § 41718(a)(2), Congress's direction could best be met by awarding exemptions to new entrants/limited incumbent carriers, as well as to those carriers that have relatively smaller operations at DCA <u>and</u> would offer competitive benefits in multiple markets, rather than providing additional opportunities for carriers that already have extensive operations at DCA.  In other words, we concluded that increased service alternatives by existing competitors at DCA would have less competitive effect than additional service alternatives by new competitors.  The latter thus would better meet the statutory intent of increasing competition.

As indicated, under § 41718(b)(3), we must ensure that a grant of exemptions would not reduce travel options for communities served by small hub airports and medium hub airports within the perimeter.  By this, we believe Congress wished especially to ensure that the service being provided though the new exemptions would not displace or disrupt service now being provided though a small or medium hub.  There was little argument in the responses that service being proposed by other carriers would have this effect, and we did not find any proposals that carried any significant risk that small and medium hubs inside the perimeter would be sufficiently affected by the awards made so as to reduce the travel options for the communities they currently serve.

Finally, we have given heed to Congress's concern that the exemptions awarded would not result in meaningfully increased travel delays.  As several commenters pointed out, the

- 21 -

General Accounting Office in 1999 found that additional operations at DCA would not cause significant delays. While we take note of Metropolitan Washington Airports Authority's reservation that that study is not valid for available capacity under IFR conditions alone, our review here indicated that 24 additional operations at DCA, spread out over the slot period as required by § 41718(c)(2) to no more than 2 per hour, would not "meaningfully" increase travel delays at that airport. Nor would the few additional operations at each of the beyond perimeter destination hubs involved – only four per day at Phoenix and Las Vegas and two at each of the other airports – meaningfully increase the delays there.

We concluded that America West had the strongest overall application. It is the only major network carrier that cannot now provide service between DCA and beyond perimeter cities via either of its two principal network hubs, which are themselves beyond the perimeter. Thus, although because of its code-share relationships with Continental it would not be a new entrant at DCA, allowing America West to serve DCA from those hubs will provide the carrier the opportunity to become an effective new competitor between DCA and all beyond perimeter cities it serves via Phoenix and Las Vegas. Even TWA in its answer to competing applications noted that the network benefits of America West's Phoenix hub were significant.

Frontier has argued that giving America West an award would likely cause it to reduce Columbus-DCA service. America West has specifically rejected this contention. America West states "America West, which has by far the smallest presence of any major network carrier at DCA, has no plans to reduce its existing DCA services to Columbus, Ohio the only airport it is currently able to serve from DCA, as a result of its proposed Phoenix and Las Vegas service." We have no reason to dispute that assertion.

America West has applied for six exemptions to serve Phoenix, and four to serve Las Vegas. As respondents pointed out, a grant of ten exemptions to America West – of the twelve overall to be awarded – could preclude development of alternative competitive beyond-perimeter services. As guided by Congress's transcendent interest in promoting competition, and after considering the strengths and weaknesses of the competing applications, we have decided to grant America West four exemptions for Phoenix and two for Las Vegas. Granting two slots at Las Vegas will enable America West to offer additional connecting options to passengers who will have the option of connecting either through Phoenix or Las Vegas.

Having disposed of America West, we turn to the three applicants who clearly qualify as new entrants under § 41718(a)(2): ATA, Frontier, and National.

Although American Trans Air has new entrant status, and the statute provided that we give weight to increased competition by new entrants, the statute also required the provision of network benefits. ATA offers service from Los Angeles and San Francisco only to Honolulu and Kahului. However, given ATA's current schedule a connecting flight to DCA from either Los Angeles of San Francisco would involve an overnight stay,

- 22 -

significantly limiting its attractiveness to passengers. It is difficult to find "network benefits" in this arrangement. ATA argues that the requirement for network benefits could also be met by travelers using its low-fare service to Los Angeles and connecting on an interline basis to other cities beyond. We disagree. Travelers so strongly prefer online connecting services that interline connections would not provide the network benefits sought by Congress. We therefore find that ATA is unable to show, as it must to qualify under § 41718(a)(1), that an award of slot exemptions in this proceeding would enable it to provide domestic network benefits.

We have decided to award two exemptions to Frontier, for service to Denver. Frontier represents a true new entrant at DCA, as its Denver service will represent its first ever from Reagan National Airport. Besides being a true new entrant applicant, Frontier offers connecting service to approximately ten cities to the north, south, and west, including such cities as Portland, San Francisco, and Seattle/Tacoma. While travelers from these cities have present connecting service to the Washington market, we believe that Frontier at Denver would provide a viable and potentially attractive alternative at several of these points. Given the limited number of slot exemptions available and the strengths of some other applicants, we have limited the award to two slots rather than the four the carrier requested. We also recognize that Frontier's proposed service would be provided with B-737's, a relatively small aircraft; however, we believe that these disadvantages are outweighed by Frontier's new entrant status and the network benefits that Frontier's proposal would bring.

Similarly, we have awarded two exemptions to National, for service to Las Vegas. National is also a true new entrant applicant and its selection will bring a new competitor to DCA. National will provide network benefits beyond Las Vegas to Los Angeles and San Francisco, and the carrier has stipulated that it will add service to additional cities west of Las Vegas. Moreover, National has a demonstrated history of offering low fares in the markets it serves, thereby benefiting travelers and enhancing competition. We believe that National's Las Vegas service would provide a viable and potentially attractive alternative at these points. As with Frontier, given the strength of other applications, we have also limited its award to two slots, rather than the six it requested.

None of the remaining applicants for the last two slot exemptions available qualify as new entrant/limited incumbent carriers under the definitions established by AIR-21. American, Delta, Northwest, TWA, and United all serve Reagan National and all hold or held more than 20 slots. However, each would offer network benefits through service provided to cities served beyond their respective outside-perimeter nonstop destinations and would increase competition in multiple markets. One distinction, however, is that all of these carriers, with the exception of TWA, are major operators at Reagan National. American operates 63 daily slots, Delta 95, Northwest 40, and United 34, while TWA presently operates a total of only 13 slots a day at DCA. Of the incumbent carriers, TWA clearly has the smallest presence.

- 23 -

TWA also argues that it has the potential to offer a meaningful competitive alternative to the existing one-stop services to LAX that are now being provided by incumbent DCA slot holders, often through multiple hubs located within the perimeter. Because American, Delta, Northwest, and United operate much more service to DCA than TWA, those carriers can offer multiple flights to alternative hubs that already connect with service to · many of the western cities those carriers are proposing to serve on a connecting basis in this proceeding. TWA, on the other hand, in order to provide connecting service to beyond-perimeter cities must rely on its single hub at St. Louis. This hinders its ability to effectively compete in transcontinental markets from DCA and to offer the variety of departure alternatives that its competitors operate in those markets. While we do not overestimate the competitive impact of a single daily round trip in a market of this size, we do believe that enabling TWA to serve on a nonstop basis will afford it the opportunity to become a more effective competitor and to present travelers with an additional service opportunity.

TWA also will offer the benefit of online, single connection service to 5 cities in California through its partner, Chautauqua Airlines. We are mindful that TWA's west coast network is significantly smaller that those of several of the other carriers that are seeking outside-perimeter slot exemptions in this proceeding. However, we find that each of these cities will be afforded either first single-plane or additional competitive access to Washington National by TWA and, when considered together with the competitive benefits derived from expanding service opportunities for a carrier with a relatively limited presence at DCA, the public will be well served by our decision to award TWA two slot exemptions.

We find that these selections will provide the greatest benefit of the 12 slot exemptions the Secretary must grant consistent with the criteria established by AIR-21. The other applicants, other than American Trans Air, would provide additional network benefits, but the competitive significance of those applications is limited by the fact that many of the passengers for which they would provide new single-connecting service are already served by these carriers over alternate inside-perimeter hubs.

In addition, in the case of American and United we must consider the fact that, irrespective of their proposals' network benefits, their proposals would also result in an increased presence in the Washington-Los Angeles market in which they are already the dominant participants. American acknowledges in its pleading that it and United now carry more than 80 percent of the traffic in the Los Angeles-Washington market. Moreover, it would undermine the otherwise pro-competitive intent of § 41718 were we to make available the limited pool of slot exemptions to carriers that have relatively large operations at DCA, and provide considerable service to their principal network hub cities.

Delta's application has merit because Salt Lake City is a major network hub for Delta that is outside the perimeter and, thus, cannot be linked directly to DCA. Like American and United, however, Delta now serves on a single-connection basis via its principal inside the perimeter hubs many of the same cities it would serve via Salt Lake City. Given the

- 24 -

limited number of slot exemptions the Department has to distribute, we have to take into account the fact that a very high percentage of passengers and a large proportion of the communities that Delta would serve via Salt Lake City already receive single connection service on Delta via its other hubs. Delta's increased number of service alternatives would benefit these passengers and communities, but we concluded that increased service alternative by new competitors would have a greater competitive influence.

We decided not to select Northwest's proposal because, while it does offer network benefits, as a whole the Northwest proposal does not offer the same level of benefits as other competing proposals. The geographic location of Seattle limits its effectiveness as a hub for service from the east. In that regard, Northwest in its application includes connections to cities in Arizona, California, Nevada and Montana that would involve very circuitous routings, such as Phoenix, and San Francisco. In fact, like American, Delta and United, Northwest now serves on a, single-connection basis via its principal inside-perimeter hubs many of the same cities it would serve via Seattle, and many would involve less circuity.

## CONDITIONS

Unused slots: We are directing America West Airlines, Inc., Trans World Airlines, Inc., Frontier Airlines, Inc., and National Airlines, Inc. to file in the Docket no later than July 14, 2000, the proposed flight schedules and effective date for operations authorized by this Order. Once the Department approves the final times for each of the applicants, the carriers will then have 60 days to inaugurate their service as proposed. If service is not inaugurated within that timeframe, or if service is inaugurated and later the awardee discontinues service for any reason, the slot exemptions will be immediately returned to the Department for redistribution.

TWA's slot exemptions: As we noted, one factor that weighed on our decision to provide TWA slot exemptions is its intention to establish network benefits beyond Los Angeles through its commuter partner, Chautauqua Airlines. Because this is fundamental both to the statutory criterion requiring the provision of network benefits, and also to our decision to select TWA's proposal in lieu of other applicants, we will require evidence of a contract with a feeder carrier prior to TWA's implementing service. Should TWA not provide such evidence within 60 days of the service date of this order, the two slot exemptions we are conditionally granting TWA will be automatically returned to the Department for reallocation.

- 25 -

## ENVIRONMENTAL ISSUES

Although 49 U.S.C. §41718(e) specifically exempts our action here from environmental review[7], we remain sensitive to the environmental impact of increased operations at DCA. Consistent with the statute, we will require that all operations authorized by this order will be conducted with Stage 3 aircraft. We also note that 49 U.S.C. §41718(g) requires the Department to submit a study to the Congress in fiscal 2001 comparing noise levels at the four slot-controlled airports with noise levels experienced before 1991. DCA also has, and must give, priority for noise compatibility planning and program grants, 49 U.S.C. §§ 47117(e), and 41718(e)(3).

## ADMINISTRATIVE TERMS

As the FAA slot regulation makes clear "slot(s) do not represent a property right but represent an operating privilege subject to absolute FAA control (and) slots may be withdrawn at any time to fulfill the Department's operating needs..." 14 CFR 93.223(a). Under the provisions of 49 U.S.C. §41714(j) these carriers may not sell, trade, transfer, or convey the operating authorities granted by the subject exemptions unless otherwise authorized herein.

Further, granting of these exemptions in no way is to be construed as allowing a carrier to operate services that it could not otherwise operate, *i.e.*, carriers must still meet all the requirements of the Department of Transportation, the Federal Aviation Administration, and all other statutes and regulations governing air transportation.

This Order is issued under authority delegated in 49 CFR 1.56(a).

## ACCORDINGLY,

1.      The Department grants exemptions from 14 CFR Part 93, Subparts K and S, to Frontier Airlines, Inc., (two slot exemptions, to serve Denver, Colorado); National Airlines, Inc., (two slot exemptions, to serve Las Vegas, Nevada); America West Airlines, Inc., (four slot exemptions, to serve Phoenix, Arizona, and two slot exemptions to serve Las Vegas, Nevada); and Trans World Airlines, Inc., (two slot exemptions, to serve Los Angeles, California) to enable these applicants to conduct the operations described in this order at Ronald Reagan Washington National Airport.;

2.      The Department directs America West Airlines, Inc., Trans World Airlines, Inc., Frontier Airlines, Inc., and National Airlines, Inc. to file in the Docket no later than July 14, 2000, the proposed flight schedules and effective date for operations authorized by this Order. The slot exemptions granted must be conducted with Stage 3 aircraft, may

---

[7] §41718(e) states, "Neither the request for, nor the granting of an exemption, under this section shall be considered for purposes of any Federal law a major Federal action significantly affecting the quality of the human environment."

- 26 -

not be used for operations between the hours of 10:00 p.m. and 7:00 a.m., and may not increase the number of operations at Ronald Reagan Washington National Airport in any one-hour period during the hours between 7:00 a.m. and 9:59 p.m. by more than two operations. Carriers are advised to consider maximum flexibility in proposed operating . times to ensure compliance with these limits.;

3. The Department will make the final determination of slot times as soon as possible after schedules are filed to enable the carriers to conduct the operations authorized by this Order. The Department directs America West Airlines, Inc., Trans World Airlines, Inc., Frontier Airlines, Inc., and National Airlines, Inc. to contact the Federal Aviation Administration Slot Administration Office after the Department's determination of slot times. The FAA will assign slot exemption numbers, effective dates, and operating times consistent with statutory limitations.

4.    If America West Airlines, Inc., Trans World Airlines, Inc., Frontier Airlines, Inc., or National Airlines, Inc. fail to inaugurate service within 60 days of being given their exact slot times by the Department, or if service is inaugurated and subsequently suspended, the Department will reallocate those slot exemptions;

5.    We require TWA to provide evidence of a signed contract with a carrier to provide on-line feeder service to TWA at Los Angeles, including start-up dates, frequency levels, aircraft type, and all other relevant operating data within 60 days of the date of service of this order. Should TWA not provide such evidence, the two slot exemptions we are conditionally granting TWA will be automatically returned to the Department for reallocation;

6.    Except as otherwise granted, we deny all other applications for exemptions from 14 C.F.R. Part 93, subparts K and S, filed in this dockets;

7.    We deny the motion to strike filed by National Airlines, Inc.;

8.    We grant all motions to file late or otherwise unauthorized documents;

- 27 -

9. The authorities granted under these exemptions are subject to all of the other requirements delineated in 14 C.F.R. Part 93, subparts K and S, including, but not limited to, the reporting provisions and use or lose requirements; and

10. We will serve this order on all parties in Docket OST-2000-7181.

By:

**A. BRADLEY MIMS**
Acting Assistant Secretary for Aviation
and International Affairs

(SEAL)

*An electronic version of this document will be made available on the World Wide Web at:*
*http://dms.dot.gov/reports/reports-aviatio.asp*

# Exhibit B

Order 2002-11-20

Served: November 27, 2002



**UNITED STATES OF AMERICA**
**DEPARTMENT OF TRANSPORTATION**
**OFFICE OF THE SECRETARY**
**WASHINGTON, D.C.**

Issued by the Department of Transportation
on the 27th day of November, 2002

---

**Applications of**

**ALASKA AIRLINES, INC.**
**AMERICA WEST AIRLINES, INC.**
**AMERICAN AIRLINES, INC.**
**DELTA AIR LINES, INC.**
**FRONTIER AIRLINES, INC.**
**UNITED AIRLINES, INC.**
**US AIRWAYS, INC.**

For exemptions from 14 C.F.R. Part 93,
Subparts K and S, pursuant to 49 U.S.C.
§ 41718(a), Special rules for Ronald Reagan
Washington National Airport (beyond-perimeter slot
exemptions)

**Dockets OST-2000-7181** ˉˉ    **// 7**

---

**ORDER GRANTING OUTSIDE-THE-PERIMETER SLOT EXEMPTIONS
AT RONALD REAGAN WASHINGTON NATIONAL AIRPORT**

**SUMMARY**

By this order, the Department grants the application of Delta Air Lines, Inc., for two slot
exemptions at Ronald Reagan Washington National Airport (hereafter "DCA") in order to
provide nonstop service between DCA and Salt Lake City, Utah.

**BACKGROUND**

On April 5, 2000, the President signed into law the Wendell H. Ford Aviation Investment
and Reform Act for the 21st Century (AIR-21). Among other things, AIR-21 liberalized
slot and slot exemption access at the four airports subject to the provisions of the High
Density Rule, 14 C.F.R. 93 Subparts K and S. Specifically, at DCA, 49 U.S.C.
§41718(a), as added by Section 231 of AIR-21, provides that the Secretary shall grant 12

2

slot exemptions to air carriers for the provision of nonstop air transportation outside the 1,250-mile perimeter established for air transportation at DCA under 49 U.S.C. § 49109.

AIR-21 directs the Secretary to distribute those 12 slot exemptions if the Secretary finds that the exemptions will (1) provide air transportation with domestic network benefits beyond the 1,250-mile perimeter; (2) increase competition by new entrant air carriers' or in multiple markets; (3) not reduce travel options for communities served by small hub airports and medium hub airports within the 1,250-mile perimeter; and, (4) not result in meaningful travel delays.

On July 5, 2000, the Department issued Order 2000-7-1, which granted a total of 12 slot exemptions at DCA for services outside the 1,250-mile perimeter to the following carriers: America West Airlines, Inc.; Frontier Airlines, Inc.; National Airlines; and, Trans World Airlines, Inc.[2]

Under the provisions of that order, National Airlines was granted two slot exemptions to provide nonstop service to Las Vegas, Nevada.

In order to optimize utilization of valuable slots and slot exemptions, under Federal Aviation Administration (FAA) regulations, slots or slot exemptions not used at least 80% of the time over a two-month period are subject to recall by the FAA for non-use. In the aftermath of September 11, the FAA suspended the minimum slot usage requirement to give airlines an opportunity to adjust to changes in the aviation operating environment and passenger demand without airlines' losing slots or slot exemptions during this period. On February 28, 2002, the FAA extended the suspension of the use-or-lose requirement until October 27, 2002.

National Airlines ceased all DCA operations shortly after September 11, and never restarted those operations. On September 3, 2002, by letter to the Department, National Airlines, among other things, requested a six-month extension of the FAA suspension of the use-it-or-lose-it requirement at DCA. By letter dated September 27, the FAA denied National's request and stated the Department would institute a proceeding to reallocate the two slot exemptions unless National provided assurance that it would institute DCA service in a timely fashion, so as to comply with the FAA's use-it-or-lose-it requirement.

---

[1]  AIR-21 amended the previous definition of ¨ new entrant," and its statutory applicability. Under the revised 49 U.S.C. § 41714(h)(3), as added by section 231 of AIR-21, the term "new entrant," for purposes of the slot exemption provisions including those at DCA, means "an air carrier that does not hold a slot at the airport concerned and has never sold or given up a slot at that airport after December 16, 1985, and a limited incumbent carrier as defined in subpart S of part 93 of title 14 code of federal regulations." The latter term, again as amended by AIR-21, is defined as an air carrier or commuter operator that holds or operates (or held or operated, since December 16, 1985) fewer than 20 slots and slot exemptions at the high density airport in question.

[2]  American Airlines subsequently purchased most of TWA's assets. However, because AIR-21 prohibits the sale or transfer of slot exemptions (49 U.S.C. § 41718(e)), the Department conducted a carrier selection case similar to this one and awarded TWA's two slot exemptions to Alaska Airlines for nonstop DCA-Seattle service. See Order 2001-6-20.

In a September 30 response, National indicated that it could not provide that assurance. (These letters have been placed in Docket OST-2000-7181.) As a result, by Notice issued October 15, 2002, the Department invited proposals from eligible carriers for reallocation of the two slot exemptions awarded to National Airlines by Order 2000-7-1 to provide nonstop service to DCA from airports beyond the 1,250-mile perimeter.  The Notice specified that applications were to be submitted by October 17 with comments due by October 31.  The Department also noted that due to the restrictions of AIR-21, we may not be able to accommodate the slot times requested by applicants.[3]

## APPLICATIONS

### Alaska Airlines Inc.

Alaska requests two slot exemptions to operate one daily round trip between Los Angeles and DCA with 120-seat Boeing 737-700 aircraft.  Alaska asserts that it is a limited incumbent carrier as it holds only two DCA exemption slots.  While Alaska itself serves many cities from Los Angeles, it states that its code-share partner, Horizon Air, provides more connecting opportunities.  In addition, Alaska also has a code-share with American Eagle that would provide eight additional cities with one-stop service to DCA.  Finally, Alaska states that it plans to add other points over time, and it would bring low-fare competition to the communities it does serve.  Alaska's principal justification for its proposal is the success of its DCA-Seattle service.

### America West Airlines, Inc.

America West requests two slot exemptions to operate one additional round trip between Las Vegas and DCA. It does not specify aircraft type, so it could be any of the three types in its fleet:  190-seat B-757, 150-seat Airbus 320, or 124-seat Airbus 319 aircraft. America West states that it is a limited incumbent carrier, as it holds only six DCA slot exemptions.  (The Department notes that, in addition, America West holds three slot exemptions authorized by Federal Aviation Administration Exemption 5133K which are currently operated by America West Express.) It further argues that an additional DCA-Las Vegas frequency would enable it to be an effective competitor at DCA, and that it is the only airline with both a large network and low fares to compete with large incumbent carriers in multiple Washington markets.

Other carrier applicants oppose America West's proposal, arguing that it has already been granted more DCA slot exemptions than any other carrier.

---

[3]   National's allocated slot times for its nonstop DCA-Las Vegas service were in the 800 and 2000 hour periods.  49 li.S.C. § 41718(c)(2) does not allow us to assign more than two slot exemptions per one-hour period, and most one-hour periods were fully subscribed by the Department's Notice dated August 2. 2000.

**American Airlines, Inc.**

American requests two slot exemptions to provide one daily round trip between DCA and Los Angeles using B-757 aircraft (176 seats). American argues that the reasons for selecting Los Angeles in the first proceeding have not changed, and that its request should be granted because its significant presence at Los Angeles would allow it to best compete with the largest Los Angeles carrier, United.

Other carrier applicants oppose American's request, arguing that it already has a strong presence at Los Angeles and DCA, as well as at other Washington area airports. As such, it is a dominant carrier in the Los Angeles-Washington market and it operates substantial connecting service between DCA and Los Angeles via within-perimeter hubs such as Dallas/Ft. Worth, Chicago and St Louis.

**Delta Air Lines,** Inc.

Delta requests two slot exemptions to provide one daily round trip to Salt Lake City using B-757 aircraft (183 seats). Delta argues that its proposal would best satisfy the objectives of maximizing domestic network benefits, that its Salt Lake City hub is well located for low circuity DCA connecting service for numerous communities, and that it would provide the best and strongest competition for American and United. The Utah Air Travel Commission and the Salt Lake City Department of Airports (Utah and the Salt Lake City Parties) filed answers in support of Delta's application. They argue that Delta's strong Salt Lake City presence and the excellent geographic position of Salt Lake City for routings to DCA, which require minimal backhaul, make Delta the superior choice.

The other applicants have stated that Delta already is a large operator at DCA and that most of the markets that could connect at Salt Lake City already have the ability to connect one-stop to DCA via one of Delta's interior hubs at Atlanta and Cincinnati.

**Frontier Airlines, Inc.**

Frontier requests two slot exemptions to operate one additional round trip between Denver and DCA using Boeing 737-300 aircraft. Frontier states that, although its DCA-Denver service authorized by the Department has been successful, that it operates at a significant disadvantage compared with other carriers operating more flights in the Washington-Denver market, and that it could offer better service and compete more effectively with a second daily round trip. The carrier also notes that since the last DCA slot case, it has vastly expanded its network at Denver in three ways: 1) it has increased its own presence at Denver by adding new spokes; 2) it has entered into a code-share agreement with Mesa Airlines to provide reional jet service into Denver from six cities as Frontier JetExpress; and, 3) it has expanded its code-share agreement with Great Lakes Aviation to provide turbo-prop service under the Frontier code. Frontier also argues that due to increasing airline industry concentration, it should be awarded the two available slot exemptions as a way to improve airline competition generally. The City and County

of Denver filed an answer in support of Frontier's application. Denver asserts that Frontier has substantially improved competition at Denver, but the selection of Frontier's proposal is critical to the full development of Frontier's DCA-Denver service and Frontier's continued growth generally as a new entrant carrier.

Other applicants oppose Frontier's application, principally on the grounds that Frontier already received two AIR-21 slot exemptions that it is using to serve the Denver-DCA market.

**United Airlines, Inc.**

United requests two slot exemptions to operate one nonstop round trip between Los Angeles and DCA with 182-seat Boeing 757 aircraft. United contends that TWA's earlier DCA-Los Angeles service was successful and should be reinstated by United. United contends that its significant connecting complex at Los Angeles will enable it to afford significantly greater public benefits than had been provided by TWA's service. United states that its proposal should be given priority because Los Angeles has the largest population, greatest commercial center, and largest connecting hub of any beyond-perimeter community in the United States.

Other carrier applicants oppose United's request, arguing that it already has a strong presence at Los Angeles and DCA, as well as at other Washington airports. As such, it is a dominant carrier in the Los Angeles-Washington market and it operates substantial connecting service between DCA and Los Angeles via its within-perimeter hub at Chicago.

**US Airways, Inc.**

US Airways requests two slot exemptions to provide one nonstop round trip between San Francisco and DCA with 182-seat Boeing 757 aircraft. US Airways states that San Francisco is one of the largest markets without nonstop service to DCA. The carrier also points out that its recent code-sharing relationship with United Airlines provides network benefits to all of the destinations that United serves from its hub at San Francisco. US Airways argues that it offers significant network benefits, primarily due to its substantial DCA presence, for San Francisco local and connecting passengers seeking to connect to east coast points.

Other carrier applicants oppose US Airways' request, arguing that it is already the largest slotholder at DCA.

**DECISION**

We have decided to select Delta Air Lines for nonstop service to Salt Lake City. We conclude that Delta has the application that best meets all of the AIR-21 statutory criteria.

Section 41718(a)(1) directs that any slot exemptions we award must provide "domestic network benefits" beyond the perimeter.  Second, under § 41718(a)(2), we are directed to ensure that the slot exemptions awarded will also increase competition by new entrant carriers or in multiple markets.  Third, under § 41718(a)(3), we must ensure that an award of exemptions would not reduce travel options for communities served by small hub airports and medium hub airports within the perimeter.  Finally, under § 41718(a)(4), the exemptions granted must not result in meaningfully increased travel delays.  With regard to the latter two statutory requirements, as discussed below, we find that all applicants meet both.[4]

We affirm our finding in Order 2000-7-1 that the determinative criteria for the allocation of slot exemptions beyond the DCA perimeter are those involving network benefits and competition that is provided by new entrants or in multiple markets.  As we also stated in that Order, Congress did not provide any specific guidance as to the relative weight we should assign these two criteria in our decisional process.

As before, applicants stressed their advantages under one or the other of these two criteria, depending upon the strength of their existing presence at DCA. Those with the strongest presence highlighted the scope and size of their respective networks and the competitive benefits that could be brought to multiple markets via those networks (American, Delta, United, and US Airways).  Applicants with a more modest DCA presence (Alaska, America West and Frontier) stressed the competitive benefits afforded by their limited incumbency at DCA.  These carriers argued that, even though their networks might be smaller, enhancement of their limited presence at DCA would create a stronger competitive impact than an award to any of the larger more established DCA incumbents.

As indicated, under § 41718(b)(3), the Department must also consider the effect of an award of exemptions upon inside-perimeter services.  Specifically, we must ensure that an award of exemptions would not reduce travel options for communities served by small hub airports and medium hub airports within the perimeter.  In our earlier decision, we concluded that Congress sought to ensure that new services provided though the AIR-21 exemptions would not displace or disrupt existing services at small or medium hubs.  No party asserted that the proposed services of the various applicants would produce this result, and we did not conclude that any of the proposed services is likely to cause a reduction in the travel options for the communities currently served by small and medium hubs inside the perimeter.

---

[4]  Alaska Airlines argued that Delta, among others, could not use the exact times that National was using and that, therefore, it would be required to swap slot-times internally in order to fit the schedule.  That, in turn. Alaska argues, means that an inside-the-perimeter community's service would be denigrated.  We do not find that argument compelling; with more than 100 slots at DCA, we find that Delta has sufficient flexibility to fine-tune schedules with slot times so that no community's service need be materially denigrated.  ·

Consistent with our finding in the initial slot exemption proceeding, none of the services proposed in this case would result in meaningfully increased travel delays. The General Accounting Office, in 1999, found that additional operations at DCA would not cause significant delays. We concluded in Order 2000-7-1 that 24 additional operations at DCA, spread out over the entire slot-controlled period to comply with the statutory limitation of no more than two additional operations per hour, would not "meaningfully" increase travel delays at DCA. We affirm that finding here.

In analyzing the applications in this proceeding, we compared all proposals on a city-by-city and carrier-by-carrier basis. We sought to determine which proposal best met the statutorily mandated selection criteria and, in doing so, would afford the greatest public benefits.

**Los Angeles**

The three Los Angeles applicants fall into two groups: the established large incumbents, American and United, with significant Los Angeles hubs; and the smaller network carrier, Alaska Airlines, with minimal Los Angeles presence. Both American and United argued the advantages of their respective Los Angeles networks. They further point out that the Los Angeles market is one of the largest in the country. Nonetheless, neither the size nor the significance of the local market is an AIR-21 selection criterion, and accordingly we cannot make a finding that any one city, such as Los Angeles, deserves DCA nonstop service on that basis. In fact, the argument that Washington-Los Angeles is a large local market militates against its selection, as it would reduce any network benefits. That is, the large number of local passengers would tend to preempt seats that would otherwise be available to connecting passengers for beyond-Los Angeles destinations, thereby diminishing the network benefits and service to multiple markets afforded by these proposals.

Furthermore, both American and United are major DCA incumbents and, therefore, do not qualify as either new entrants or limited incumbents at DCA.

The other Los Angeles applicant, Alaska Airlines, while a limited incumbent at DCA, would provide comparatively minor network benefits. Alaska's only service beyond Los Angeles would be to four U.S. cities -- Anchorage, Seattle, Portland, and San Francisco. Seattle and Anchorage already receive direct DCA service from Alaska Airlines (Seattle nonstop and Anchorage one-stop). Portland would be better served via Seattle than Los Angeles, so any network benefits would be minimal. Its code-share partner, Horizon Air, would provide connections to six destinations.

**San Francisco**

As with the Los Angeles proposals, the statutory criteria do not allow us to consider the needs for service or the benefits to passengers traveling in the local market. As with Los Angeles, San Francisco is also a very large local market. We are required to consider the

8

network benefits and increase competition in multiple markets.  Thus, every seat taken up by a local San Francisco-DCA passenger deprives a connecting passenger the ability to access DCA on a one-stop basis.  Further, US Airways is the largest slotholder at DCA, so it also does not meet the new entrant/limited incumbent criterion.

Las Vegas

While America West is not a new entrant (it operates 10 DCA slots to serve Columbus, Phoenix, and Las Vegas), it is a limited incumbent, as it has fewer than 20 slot and slot exemptions.  Moreover, its proposed service would provide domestic network benefits and increase competition in multiple markets because it has a significant hub and spoke system at Las Vegas, serving 19 U.S. cities.  However, because America West already offers nonstop DCA-Las Vegas service, the *new* network benefits provided by America West's additional service would be quite limited.  While many of the cities that America West now serves beyond Las Vegas would receive a second daily connecting flight to DCA, no additional market would be afforded first-time access to DCA on the America \Vest network as a result its selection in this proceeding.  In addition, America West serves only one city from Las Vegas that it does not serve out of Phoenix, its largest hub, and America West currently provides two nonstop round trips a day in the DCA-Phoenix market.

**Denver**

Frontier clearly qualifies as a limited incumbent airline at DCA, as it currently holds only two DCA slot exemptions for a single daily round trip to Denver.  Of the applicants, only Alaska and America West are on a comparable footing as a limited DCA incumbent.  Frontier's selection would provide some network benefits and, as a consequence, increase traffic in multiple markets.  Frontier has also added cities from its Denver hub since its selection for DCA-Denver slot exemptions in July 2000.  Since its initial award, Frontier has also developed a code-share agreement with Mesa Airlines at Denver and has expanded a code-share agreement with Great Lakes Aviation.  On the other hand, since Frontier already serves the DCA-Denver market, its selection would not result in any new cities gaining on-line, single-connecting service to DCA.  Second, although the aircraft is unspecified, Frontier would likely serve the DCA-Denver route with the same aircraft that it currently operates on the route, B737-300 (136-140 seats), one of the smallest aircraft of any of the applicants.

**Salt Lake City**

Although Delta is not a new entrant or limited incumbent, because it provides considerable service to DCA from both Atlanta and Cincinnati, it offers both significant network benefits and would increase competition in multiple markets as a consequence of its large connecting network at Salt Lake City.  And while some communities that would connect at Salt Lake City can already access DCA via Atlanta or Cincinnati, there are a number of communities, principally north and west of Salt Lake City that would benefit from

improved service, namely one-stop connections over Salt Lake City, as opposed to two-stop connections over Salt Lake City and either Atlanta or Cincinnati.  As far as capacity, Delta would use 183-seat B-757, a relatively large aircraft.  That large aircraft, coupled with the fact that the DCA-Salt Lake City market is likely the smallest local market of any of the applicants, further enhances Delta's network benefits as it would start with a large inventory of seats and relatively fewer would be taken up by local Salt Lake City-DCA passengers.

**CONCLUSION**

Based on all of the above, we believe that Delta's service best meets the statutory criteria of proposing service that would provide network benefits and increase competition in multiple markets.  Delta and its code-share partners serve a total of 67 communities from its Salt Lake City hub, including several cities that would gain first-time, single-connect service to DCA.  This, combined with the use of large aircraft in a smaller local market, will result in more seats for connecting passengers, and gives Delta a decided advantage in the "network benefits" criterion of the statute.  As we have discussed, all three Los Angeles proposals suffer from the fact that Los Angeles is a very large local market, and the almost certain preemption of seats by local passengers seriously diminishes any network benefits that these proposals might offer.  And while Alaska, unlike American and United, qualifies as a limited incumbent at DCA, the network benefits afforded by its proposed beyond-Los Angeles service would be negligible.  San Francisco suffers from the same weakness as the Los Angeles proposals, namely that it is a very large local market susceptible to seat preemption.  In addition, US Airways is the largest slotholder at DCA.  At Las Vegas, America West does qualify as a limited incumbent, but it already serves the Las Vegas-DCA market, and, on top of that, it serves all of the same cities, except one, to DCA from its larger Phoenix hub.  Frontier also qualifies as a limited incumbent, but it also already serves the Denver-DCA market so no additional communities would receive first-time service to DCA as a direct consequence of its selection in this proceeding.

**CONDITIONS**

Assignment of Slot Times:  We are directing Delta Air Lines, Inc. to file in the Docket no later than December 16, 2002, the proposed flight schedules and effective date for inauguration of operations authorized by this order.  As we stated in our Notice of October 15, 2001, the slot times currently allocated for National's DCA-Las Vegas service are in the 800 and 2000 hour periods.  Since 49 U.S.C. §41718(c)(2) does not allow us to assign more than two slot exemptions per one hour period, and most one hour periods were fully subscribed by the Department's Notice of August 2, 2000, Delta should contact the Slot Administration Office of the Federal Aviation Administration as soon as possible to determine available slot times.  The Department will determine the final slot times assigned to Delta in accordance with the provisions of 49 U.S.C. §41718(c)(2)  Thereafter, Delta may request the FAA Slot Administration Office to approve exchanges of the assiuned slot exemptions times with other slots or slot exemptions for the purpose of conducting the operations authorized by this Order in a different hour.  In acting on

such a request, the FAA will employ standard practices in conjunction with applicable statutory and regulatory requirements for the utilization of slot times between and among individual air carriers. Regardless of subsequent approved slot time exchanges, the slot times assigned by the Department or the FAA's Slot Administration Office pursuant to this order will be tagged such that if any of the service granted by this Order is suspended, or is not inaugurated in a timely manner, the Department will withdraw the slot exemptions based on their tagged slot time rather than by any subsequent slot time operated.

**ENVIRONMENTAL ISSUES**

Although 49 U.S.C. §41718(e) specifically exempts our action here from environmental reviews, we remain sensitive to the environmental impact of increased operations at DCA. Consistent with the statute, we will require that all operations authorized by this order will be conducted with Stage 3 aircraft. In addition, this award does not represent additional operations at DCA, but, rather, a redistribution of existing service and slot exemptions from National Airlines to Delta Air Lines. DCA also has, and must be given, priority for noise compatibility planning and program grants, 49 U.S.C. §§ 47117(e), and 41718(e)(3).

**ADMINISTRATIVE TERMS**

As the FAA slot regulation makes clear "slot(s) do not represent a property right but represent an operating privilege subject to absolute FAA control (and) slots may be withdrawn at any time to fulfill the Department's operating needs..." 14 C.F.R. 93.223(a). Under the provisions of 49 U.S.C. §41714(j), these carriers may not sell, trade, transfer, or convey the operating authorities granted by the subject exemptions unless otherwise authorized herein.

Further, granting of these exemptions in no way is to be construed as allowing a carrier to operate services that it could not otherwise operate, *i.e.,* Delta must still meet all the requirements of the Department of Transportation, the Federal Aviation Administration, and all other statutes and regulations governing air transportation.

This order is issued under authority delegated in 49 C.F.R. 1.56(a).

**ACCORDINGLY,**

1. The Department grants two slot exemptions from 14 C.F.R. Part 93, Subparts K and S, to Delta Air Lines, Inc., to enable Delta Air Lines to provide one nonstop round trip a day in the Salt Lake City-DCA market as described in this order;

---

[5] §41718(e) states, "Neither the request for, nor the granting of an exemption, under this section shall be considered for purposes of any Federal law a major Federal action significantly affecting the quality of the human environment."

2.      The Department directs Delta Air Lines, Inc., to file in the Docket no later than December 16, 2002, the proposed flight schedules and effective date for operations authorized by this Order, and Delta Air Lines must commence its proposed service no later than January 31, 2003.  The slot exemptions granted must be conducted with Stage 3 aircraft, may not be used for operations between the hours of 1O.00 p.m. and 7:00 a.m., and may not increase the number of operations at Ronald Reagan Washington National Airport in any one-hour period during the hours between 7:00 a.m. and 9:59 p.m. by more than two operations.  Delta Air Lines is advised to consider maximum flexibility in proposed operating times to ensure compliance with these limits;

3.      The Department will make the final determination of slot times as soon as possible after schedules are filed to enable the carrier to conduct the operations authorized by this Order.  The Department directs Delta Air Lines, Inc. to contact the Federal Aviation Administration Slot Administration Office for the determination of available slot times. The FAA will assign slot exemption numbers, effective dates, and operating times consistent with statutory limitations;

4.      Except as otherwise granted, we deny all other applications for exemptions from 14 C.F.R. Part 93, Subparts K and S, filed in these dockets;

5.      The authorities granted under these exemptions are subject to all of the other requirements delineated in 14 C.F.R. Part 93, Subparts K and S, including, but not limited to, the reporting provisions and use-or-lose requirements; and,

6.      We will serve this order on all parties in Docket OST-2000-7181 and the Federal Aviation Administration Slot Administration Office.


By:



**READ C. VAN DE WATER**
Assistant Secretary for Aviation
and International Affairs

(SEAL)


*An electronic version of this document will he made available on the World Wide Weh at: http:/dms.dot.gov/*

# Exhibit C

275347



# UNITED STATES OF AMERICA
## DEPARTMENT OF TRANSPORTATION
### OFFICE OF THE SECRETARY
### WASHINGTON, D.C.

Issued by the Department of Transportation
on the 1st day of April, 2004

---

**Applications of**

**ALASKA AIRLINES, INC.**
**ALOHA AIRLINES, INC.**
**AMERICA WEST AIRLINES, INC.**
**AMERICAN AIRLINES, INC.**
**DELTA AIR LINES, INC.**
**FRONTIER AIRLINES, INC.**
**PRIMARIS AIRLINES, INC.**
**UNITED AIR LINES, INC.**
**US AIRWAYS, INC.**

For exemptions from 14 C.F.R. Part 93,
Subparts K and S, pursuant to 49 U.S.C.
§ 41718(a), special rules for Ronald Reagan
Washington National Airport (beyond-perimeter slot
exemptions)

**Served: April 1, 2004**

**Docket OST-2000-7181 –** *4657*

---

## ORDER GRANTING BEYOND-PERIMETER SLOT EXEMPTIONS AT
## RONALD REAGAN WASHINGTON NATIONAL AIRPORT

### SUMMARY

By this Order, the Department partially grants the requests of four carriers for 12 slot
exemptions at Ronald Reagan Washington National Airport ("DCA") in order to provide
nonstop service to a number of communities, as follows:

1. Alaska Airlines, Inc., four (4) slot exemptions to provide (a) one daily nonstop
   round trip between DCA and Seattle, Washington, and (b) one daily nonstop
   round trip between DCA and Los Angeles, California;
2. America West Airlines, Inc., two (2) slot exemptions to provide one daily nonstop
   round trip between DCA and Phoenix, Arizona;
3. Frontier Airlines, Inc., four (4) slot exemptions to provide two daily nonstop
   round trips between DCA and Denver, Colorado;
4. United Air Lines, Inc., two (2) slot exemptions to provide one daily nonstop
   round trip between DCA and Denver, Colorado.

**BACKGROUND**

On December 12, 2003, President Bush signed into law the Vision 100 – Century of Aviation Reauthorization Act, P.L. 108-176 ("Vision 100"), which, among other things, directs the Department to grant 12 new slot exemptions at DCA for nonstop service to/from cities beyond the 1,250-mile perimeter.[1]  To that end, we issued a Notice on December 17, 2003, requesting proposals by January 9, 2004.  Replies were due on January 23, 2004.  In total, we received applications from nine carriers for a total of 44 slot exemptions.[2]

This is our fourth allocation of slot exemptions in the beyond-perimeter docket. Following the passage of the Wendell H. Ford Aviation Investment and Reform Act for the 21st Century (AIR-21), we originally awarded all 12 slot exemptions available under the law to America West, Frontier, National Airlines, and TWA for various nonstop services to communities beyond the perimeter.  Order 2000-7-1 (July 5, 2000).  In 2001, we reallocated two of the 12 slot exemptions to Alaska after TWA returned its holdings during its bankruptcy and acquisition by another carrier.  Order 2001-6-20 (June 22, 2001).  In 2002, we reallocated two more of the slot exemptions to Delta after National Airlines ceased operations at DCA.  Order 2002-11-20 (Nov. 27, 2002).

For the 12 DCA beyond-perimeter slot exemptions that are now available as a result of Vision 100, the Department considers, using the criteria set forth in 49 U.S.C. § 41718(a), applications from air carriers to provide nonstop service to DCA from airports beyond the 1,250-mile perimeter.  The statutory criteria require that the granted exemptions will: (1) provide air transportation with domestic network benefits beyond the 1,250-mile perimeter; (2) increase competition by new entrant air carriers[3] or in multiple markets; (3) not reduce travel options for communities served by small hub airports and medium hub airports within the 1,250-mile perimeter; and (4) not result in meaningfully increased travel delays.

---

[1] Specifically, at DCA, 49 U.S.C. § 41718(a), amended by Vision 100, provides that the Secretary shall, subject to certain findings, grant 24 slot exemptions to air carriers for the provision of air transportation beyond the 1,250-mile perimeter established for air transportation under 49 U.S.C. § 49109.  By prior orders, the Department fully allocated 12 beyond-perimeter slot exemptions.  Therefore, the Department must now distribute an additional 12 DCA beyond-perimeter slot exemptions.  In like manner, 49 U.S.C. § 41718(b), as amended by Vision 100, provides that the Secretary shall grant 20 slot exemptions to air carriers for the provision of air transportation within the 1,250-mile perimeter, and 10 of the exemptions had been permanently allocated by prior orders.  Therefore, the Department must distribute an additional 10 DCA within-perimeter slot exemptions, which the Department will do in a separate order.

[2] The Department received more than 12 comments filed *after* the January 23 deadline established by our Notice.  Each commenting party sought leave to file comments out of time.  In the interest of a complete record, we grant all leave requests, however, we have not found these additional submissions to contain any new dispositive information.  Thus, they do not inform our decision in this Order.

[3] The terms "new entrant air carrier" and "limited incumbent air carrier" are defined in 49 U.S.C. § 41714(h).  In addition, under 49 U.S.C. § 41714(k) "…an air carrier that operates under the same designator code, or has or enters into a code-share agreement, with any other air carrier shall not qualify for a new slot or slot exemption as a new entrant or limited incumbent air carrier at an airport if the total number of slots and slot exemptions held by the 2 carriers at the airport exceed 20 slots and slot exemptions."

- 3 -

## APPLICATIONS AND RESPONSIVE PLEADINGS

### A.    Application of Alaska Airlines, Inc. ("Alaska")

Alaska has requested eight (8) total slot exemptions in order to establish two daily nonstop round trips to Los Angeles International Airport ("LAX") and two additional daily round trips to Seattle-Tacoma International Airport ("SEA").[4]

*Arguments in Support*
In general support of its application, Alaska cites the success of its single daily DCA roundtrip flight to Seattle (with high load factors), its transcontinental expansion program, usage of Boeing 737 Next Generation aircraft, numerous awards for service, and its marketing know-how in the DCA market. Alaska claims that it satisfies all of the criteria of § 41718(a).[5]

Regarding its proposed service to **LAX**, Alaska argues that Los Angeles is the largest beyond-perimeter market without nonstop service to DCA, and one of the largest markets in the Alaska system without direct access to DCA. Alaska claims that its request would permit passengers to connect to 26 beyond markets. The airline touts attractive departure times at DCA and practical departure times at LAX. The fact that Alaska serves another Washington-area airport ensures Alaska's commitment to develop the DCA-LAX service, according to Alaska. California in general, and Los Angeles in particular, are strategic markets for Alaska – at LAX, Alaska enplaned more than 1.3 million passengers in 2003, and the airline has recently rebuilt its facilities to be the "airport of the future." Finally, Alaska asks the Department to consider the needs of local-market, nonstop passengers, in addition to those passengers connecting to beyond markets since beyond-market passengers can already fly to DCA on a one-stop basis. Alaska believes the Department should look to the total number of local *and* beyond-market network passengers, where Alaska asserts it has a strong application. Alaska proposes to serve both local-market and beyond-market passengers without bias in its reservations system.

Regarding its proposed service to **SEA**, Alaska notes that its second DCA-SEA proposed round trip would continue on a single-plane basis to Fairbanks, linking military bases and the interior and arctic regions to Washington, DC. A third round trip would continue on a single-plane, seasonal basis to Juneau, which establishes new service for the residents of Alaska's capital city. Because Alaska already operates one daily nonstop from DCA to SEA, the airline argues that additional service will provide substantial network benefits. For one, Alaska asserts that new service will maximize connections to the three largest cities in Alaska, and to 70 additional nonstop destinations, including 30 new communities, served by Alaska and its code-share partners.

---

[4] In the 2001 proceeding, the Department reallocated two returned slot exemptions to Alaska for service to SEA. Order 2001-6-20 (June 22, 2001).

[5] On January 14, Alaska requested that Exhibit AS-103 of its application be replaced with a revised schedule. The Department grants Alaska's request.

- 4 -

On January 23, Alaska filed consolidated comments. In those comments, Alaska highlights the size of its proposed markets, its status as a fully-qualified limited incumbent at DCA, its exemplary record of developing new DCA markets, its incentives to market and promote new service, its network benefit potential, and its financial strength and stability. Alaska argues that four applicants – American, Delta, United and US Airways – are substantial slot holders that do not merit slot exemption awards.

*Responsive Pleadings*

Numerous carriers commented on Alaska's application. Carriers most commonly argued that Alaska's choice of aircraft – a B737-700 configured to seat 120 passengers – provided less capacity than other proposals, and that Alaska's alleged network benefits were exaggerated. Regarding network benefits, carriers asserted that Alaska proposed to carry a disproportionate share of local traffic from LAX and that it claimed credit for serving cities in Canada via SEA, which is irrelevant under the controlling statutory criteria, which focus exclusively on "domestic network benefits." In other isolated comments, carriers assert that Alaska is not the best choice for a beyond-perimeter award because: (1) it is not a low-fare carrier; (2) its proposal for DCA-LAX service overlaps with its existing DCA-SEA service; (3) its new entrant status is not sufficient for an award; (4) it already holds slot exemptions; (5) it is more focused on its DCA-SEA service, not its proposed DCA-LAX service; and (6) it has not committed to serving the Washington, D.C. region.

## B.    Aloha Airlines, Inc. ("Aloha")

Aloha has requested a total of four (4) slot exemptions to establish new service to John Wayne Airport ("SNA") in Orange County, California. The two new round trips would continue on a single-plane basis to Honolulu.

*Arguments in Support*

In general support of its application, Aloha asserts that its proposed service would be the only nonstop DCA-SNA service. Aloha argues that Hawaii is separated from the mainland and dependent on reliable, affordable air service. According to Aloha, the airline meets the statutory criteria of § 41718(a). Aloha emphasizes the importance of its new entrant status at DCA and the Washington-Baltimore area, and argues that its network will improve service and connections at its domestic hub, and at its "focus" airports in Kona, Kahului, Reno, and Phoenix. Using Boeing 737s, Aloha's business plan proposes to avoid congested terminals, match fares with those of low-fare and legacy carriers, and provide upscale amenities.

On January 23, Aloha filed consolidated comments. In those comments, Aloha argues that it is the only true new entrant among the applicants in this proceeding. To support its claim, Aloha states that it is the only operating carrier with no presence at DCA, and thus is uniquely positioned to enhance competition and maximize the number of new DCA competitors. Aloha compares itself to Alaska, which in 2001 had no presence on the East Coast, and was awarded beyond-perimeter slot exemptions by the Department.

Aloha reiterates its need for four slot exemptions, notwithstanding that one of its operations has a planned arrival at DCA at 12:25 a.m.[6] Aloha believes that the Department has sufficient authority to issue exemptions under these circumstances, but suggests that if the Department disagrees, the airline will accept an award of three slot exemptions.

Aloha asserts that its proposal would provide the first nonstop service between any of the three Washington area airports and Orange County. All other destinations proposed by the applicants either have existing DCA service or have service from a Washington area airport. Aloha adds that its proposal adds new single-plane service to a major market in Honolulu, with convenient connections to other important Hawaiian and Pacific markets.

Aloha also asserts that it is the only applicant to offer low fares in combination with significant new network benefits. The network carriers, according to Aloha, cannot enhance competition to the same degree, and should be precluded from being awarded slot exemptions. Aloha singles out US Airways, American, Delta, and United as large DCA incumbent network carriers.

*Responsive Pleadings*
Numerous carriers commented on Aloha's application. Carriers most commonly argued that Aloha provides few network benefits, both by proposing to serve SNA instead of the larger LAX, and also because of the relatively small number of one-stops (or spokes) that it offers from SNA. Carriers also commonly noted that its proposed schedule precludes it from consideration by the Department under § 41718(c)(2), that it has no presence in the East of the United States, and that its network is duplicated by other applicants that can reach Hawaii with one-stops while simultaneously offering more network benefits. In other isolated comments, carriers assert that Aloha is not the best choice for a beyond-perimeter award because: (1) it is not a low-fare carrier; (2) it does not have the necessary slots at SNA to realize its proposal; (3) it has less capacity on its proposed aircraft than other applicants; and (4) it is not strong financially.

##      C.      America West Airlines, Inc. ("America West")

America West has requested a total of six (6) slot exemptions to establish two additional nonstop round trips to Phoenix Sky Harbor International Airport ("PHX") and one additional nonstop flight to Las Vegas' McCarran International Airport ("LAS"). Alternatively, America West requests ten (10) slot exemptions to establish two new daily nonstop round trips to LAX, two new daily nonstop round trips to San Francisco International Airport ("SFO"), and one additional nonstop round trip to PHX.[7]

---

[6] Section 41718(c)(2) states that "[t]he exemptions granted under [the within perimeter and beyond perimeter subsections] may not be for operations between the hours of 10:00 p.m. and 7:00 a.m...."
[7] In the 2000 proceeding, the Department awarded America West four exemptions (two round trips) to Phoenix and two exemptions (one round trip) to Las Vegas.

- 6 -

*Arguments in Support*

In general support of its application, America West asserts that it is the largest low-fare, full-service, hub-and-spoke airline, positioning it to serve 20 million passengers a year at 44 western cities, including 36 competitive one-stop destinations and two hubs. America West also touts the fact that it serves the most passengers in the West of any new entrant network carrier, that it generates substantial consumer value with its current DCA slot portfolio, that it will be able to fully serve business and leisure travelers with additional slot holdings, that it will be able to compete vigorously with legacy carriers with additional slot holdings, and that it is generally in the public interest to award new slot holdings to the airline.

Regarding its proposed service to **PHX**, America West argues that it is best able to maximize consumer benefits and serve the public interest by continuing to serve Phoenix. To support that argument, America West emphasizes its network in Phoenix, which provides 191 daily departures. The airline asserts that it could generate substantial consumer value (mainly in the way of lower fares) with additional DCA-PHX slot exemptions. To compete with legacy carriers – that are expanding domestic alliances and scheduling more within-perimeter flights connecting to the West – America West argues that it requires additional access in the key east-west time channels in order for its DCA-to-the-West concept to work. Although it has fewer slots than some legacy carriers, America West claims that its load factors are higher than all the legacy carriers – on average, 77 percent in the DCA-PHX market. America West's load factors during peak business travel hours average 90 percent.

Regarding its proposed service to **LAS**, America West's arguments in support of its proposed DCA-LAS service mirror those of its proposed DCA-PHX service. America West points out that it provides 57 daily departures from its LAS hub, serving 64,000 DCA passengers annually with its current slot exemption authority to LAS.

Regarding its **alternative proposed service to LAX, SFO and PHX**, America West asserts that, as the largest east-west low-fare, full-service carrier, it is the best choice for point-to-point awards because it has the network scope and scale to influence the pricing of the legacy carriers. America West also argues that its experience with transcontinental service will be an asset. The airline claims that its entry into the JFK-LAX and BOS-LAX markets has dramatically decreased incumbent walk-up and leisure fares. With additional slot exemptions to LAX, SFO and PHX, America West expects to generate $94.7 million in annual consumer savings. The point-to-point awards, according to America West, will also free up seats on its existing beyond-perimeter service to PHX, which will enhance low-fare service for travelers seeking to reach other western destinations served by America West.

On January 23, America West filed consolidated comments. In those comments, America West argues that, as a new entrant with a substantial western hub and spoke network, it is the best choice for beyond-perimeter awards. The airline touts its ability to provide substantial competitive benefits in multiple markets and solid network benefits.

- 7 -

*Responsive Pleadings*
Numerous carriers commented on America West's application. Carriers most commonly argued that America West already holds the most beyond-perimeter slot exemptions, and should therefore not be considered for additional awards. Along the same lines, some carriers added that because America West already has four exemptions to PHX and two to LAS, it can add very few new network benefits; furthermore, the network benefits it does claim to add are duplicative between LAS and PHX. Some carriers also point to the fact that America West's alternative "point-to-point" proposal is weak because it relies too much on local traffic in California and contains no code-sharing benefits. Delta argues that America West fails to meet a statutory criterion because it has reduced travel options by abandoning its Columbus hub. United argues that America West is not the best choice for a beyond-perimeter award because it has less capacity on its proposed aircraft than other applicants. *See* Comments of United at 17 (stating that America West uses a 190-seat B757 for one DCA-PHX operation and a 124-seat A319-100 for one DCA-PHX operation and a DCA-LAS operation).

### D.    American Airlines, Inc. ("American")

American has requested a total of two (2) total exemptions to establish one daily nonstop round trip to LAX.

*Arguments in Support*
In general support of its application, American claims that its new service will bring substantial competitive benefits to the large LAX market, as well as to other cities in California and Hawaii. American argues that it meets the criteria of § 41718(a). Additionally, American argues that, because the Department has awarded beyond-perimeter slot exemptions to cities smaller than Los Angeles in prior proceedings, the airline's application is worthy of an award. American asserts that it is well positioned to benefit the public with service to LAX because it can add one-stop service to five small cities in California, and numerous other large, small, and international destinations. With renovated and enhanced airport facilities, and Boeing 757 jets, American believes it will be competitive and attractive to consumers. American also asserts that it can help redress the competitive imbalance at LAX, reducing the majority market share of United. Lastly, American argues that the Department should restore direct service to LAX, which was contemplated by Congress during deliberation of AIR-21 and originally awarded to TWA in the 2000 proceeding.

On January 23, American filed consolidated comments. In those comments, American argues that reinstatement of LAX service should be a top priority for the Department. Furthermore, American's proposal offers significant capacity, has widespread support, and is well positioned to challenge the alleged dominance of United at LAX.

*Responsive Pleadings*
Numerous carriers commented on American's application. Carriers most commonly argued that American already holds numerous slots at DCA, has a dominant presence at LAX, offers no substantial network benefits, and has presented the same proposal that

- 8 -

has been rejected several times by the Department. With regard to weak network benefits, carriers cite the high percentage of local market passengers, backhaul and circuity problems inherent in an LAX hub, and the fact that American can reach DCA through within-perimeter hubs. In other isolated comments, carriers assert that American is not the best choice for a beyond-perimeter award because: (1) it is not a low-fare carrier; and (2) it has no incentive to aggressively promote DCA-LAX nonstop service.

### E.    Delta Air Lines, Inc. ("Delta")

Delta has requested a total of two (2) slot exemptions to establish one additional daily round trip to Salt Lake City International Airport ("SLC").[8]

*Arguments in Support*
In general support of its application, Delta argues that cities in the Intermountain West are critically underserved, and that Salt Lake City is the only nonstop-to-nonstop DCA gateway for eleven communities in five intermountain states. According to Delta, the single daily round trip awarded to Delta in the 2002 proceeding is insufficient to meet the demands of the region. Highlighting "domestic network benefits" and "competition in multiple markets," Delta claims that a second daily round trip to SLC would create important public interest benefits and significantly enhance the service and competitive benefits of Delta's existing SLC hub. Delta argues that its request will produce important domestic network benefits because SLC is a Delta hub, providing over 300 daily departures to 70 destinations. Twenty-two cities will gain two daily travel times to DCA via SLC, Delta claims. Delta argues that it needs a second daily flight to compete effectively with other carriers who have been awarded beyond-perimeter slot exemptions in the West. The perimeter rule, Delta asserts, prevents the airline from offering the frequency of service that it would otherwise offer to DCA. Lastly, Delta maintains that its proposed additional service will not reduce travel options or result in increased delays.

On January 23, Delta filed consolidated comments. In those comments, Delta argues that its proposal will benefit the most beyond-perimeter network passengers (as opposed to local market passengers in California cities). Delta touts its performance in its current DCA-SLC nonstop service and the fact that it has carried more passengers to DCA than Alaska.

*Responsive Pleadings*
Numerous carriers commented on Delta's application. Carriers most commonly argued that Delta is a large slot holder at DCA, that it can effectively serve DCA through several within-perimeter hubs, and that its offers few new network benefits. With regard to network benefits, carriers allege that Delta can – at most – reach two new cities with its current proposal, which is not the same level of network benefits proposed by other applicants. Alaska suggests that Delta may be precluded from receiving an award under

---

[8] In the 2002 proceeding, the Department reallocated two returned slot exemptions (one round trip) to Delta for service to SLC. Order 2002-11-20 (Nov. 27, 2002).

- 9 -

the Department's authority based on its proposed 10:50 p.m. arrival time at DCA.[9]  In other isolated comments, carriers assert that Delta is not the best choice for a beyond-perimeter award because: (1) it is not a low-fare carrier; (2) it has low load factors on its existing DCA-SLC service; and (3) it has reduced capacity on its existing DCA-SLC service.

### F.    Frontier Airlines, Inc. ("Frontier")

Frontier has requested four (4) slot exemptions to establish two additional nonstop round trips to Denver International Airport ("DEN").[10]

*Arguments in Support*
In general support of its application, Frontier points to its growing traffic, expansion plans, and position as an east-west hub operator that offers friendly fares and service. Frontier argues that its service will produce substantial network benefits in underserved areas and small to mid-sized communities located beyond the perimeter.  Frontier's hub in Denver carries nearly 15 million passengers to 42 cities.  Frontier claims that it can bring the first one-stop service to DCA to a number of markets.  According to Frontier, it is a good choice for new slot exemptions because of its uncomplicated low-fare options, and because it requires additional frequencies to fully serve customers when security, mechanical, or weather problems occur.  Frontier also argues that, as a new entrant with a flexible fare structure, its proposal would increase competition in multiple markets.  It cites United' creation of the new brand "Ted" as a reaction to competition injection by Frontier.  Frontier asserts that granting multiple slots to low-fare carriers using hubs is the most effective way to stimulate competition in multiple markets.  The airline's entry into the Washington/Baltimore-DEN and New York-DEN markets has dramatically reduced fares, according to Frontier.  Finally, Frontier argues that its proposed service would not reduce travel options or increase travel delays.

On January 23, Frontier filed consolidated comments.  In those comments, Frontier argues that it is committed to the Washington-Denver market, but requires additional access to DCA and relief from United, who operates a hub in Denver.

*Responsive Pleadings*
Numerous carriers commented on Frontier's application. Carriers most commonly argued that Frontier already received slot exemptions in the 2000 proceeding, and therefore proposes no new network benefits.  What network benefits do exist, some carriers believe, are overstated. ·In other isolated comments, carriers assert that Frontier is not the best choice for a beyond-perimeter award because: (1) it has no First Class service; (2) it

---

[9] Alaska refers to § 41718(c)(2), which states that "[t]he exemptions granted under [the within-perimeter and beyond-perimeter subsections] may not be for operations between the hours of 10:00 p.m. and 7:00 a.m...." We note that Delta stated, on the record, that it is willing to accept a slot time prior to 10:00 p.m., if necessary. *See* Response of Delta (Jan. 30, 2004). However, the Department's decision in this Order is not based on the issue of Delta's proposed schedule.

[10] In the 2000 proceeding, the Department awarded two slot exemptions (one round trip) to Frontier for service to DEN.

- 10 -

carries significant local traffic from Denver; (3) it has less capacity on its proposed aircraft than do other applicants; (4) it already has nonstop service from Denver to Washington Dulles, and (5) it proposes to serve Denver, which has a smaller population than the cities other applicants propose to serve.

### G.   Primaris Airlines, Inc. ("Primaris")

Primaris has requested four (4) slot exemptions to establish two new daily nonstop round trips to LAX.

*Arguments in Support*
In general support of its application, Primaris states that it will soon introduce premium, all business-class service at very low fares in high volume origin and destination markets. Primaris states that, having completed Department certification, it expects to complete Federal Aviation Administration (FAA) certification in late winter or early spring 2004.[11] Primaris argues that, despite its current status as a carrier without effective authority, it is eligible to receive slot exemptions based on the Department's decision in Order 99-9-11 (Sept. 16, 1999) (awarding JFK slot exemptions to JetBlue). Primaris argues that it would substantially increase competition by introducing a new-entrant, low-fare carrier in the Washington-Los Angeles market. Los Angeles is the largest market beyond the perimeter that remains unserved, according to Primaris. The airline argues that it will provide domestic network benefits by entering into code-share relationships reaching many cities in California and other western states.[12] Primaris also argues that its proposal would not reduce travel options or result in travel delays.

On January 23, Primaris filed consolidated comments. In those comments, Primaris stresses that it is a new entrant airline, stating that the "new entrant" criterion of § 41718(a) is the weightiest of the statutory criteria. Primaris points to the fact that it proposes to serve the largest DCA origin and destination market without existing nonstop service.

*Responsive Pleadings*
Numerous carriers commented on Primaris's application. Carriers unanimously agree that Primaris should be precluded from consideration because it is not a fully-funded operating carrier with effective authority from either the Department or FAA. Some carriers also point to the fact that Primaris is not proposing to become a network carrier, and, for that reason, cannot offer any substantial network benefits or competition in multiple markets. United argues that Primaris does not propose adequate capacity to

---

[11] The Department notes that as of February 1, Primaris holds a certificate of convenience and public necessity. Order 2003-9-19 (Sept. 24, 2003). This certificate, when effective, will permit Primaris to operate scheduled service to domestic and limited foreign destinations. The certificate is not yet effective because Primaris has not met its start-up funding goals nor received an FAA Air Carrier Operating Certificate. FAA notified the Department on February 2 that "Primaris is well along the way toward certification, and, barring any unexpected problem, we anticipate that Primaris would receive its Air Carrier Certificate and Operations Specifications in April of this year."

[12] Citing Orders 2000-7-1 (July 5, 2000) and 2001-6-20 (June 22, 2001), Primaris states that code-sharing is sufficient to fulfill the network benefits prong of § 41718(a).

DCA, since it plans to configure Boeing 757s with all first-class seating (with no middle rows). Frontier and United also distinguish Order 99-9-11 (Sept. 16, 1999), upon which Primaris relies to show its eligibility for an award of slot exemptions. Frontier and United argue that Order 99-9-11 involved proceeding with no competing applications whereby the Department awarded slot exemptions to JetBlue at John F. Kennedy International Airport (JFK) following submission of a detailed business plan. Even though JetBlue was not a certificated carrier when the Department granted its request for JFK slot exemptions, Frontier and United point out that no other carriers had applied. Furthermore, United argues that the Department made its award to JetBlue based on a full record. United asserts that Primaris' situation is more analogous to Order 98-4-22 (April 21, 1998), where the Department denied AccessAir's request for LaGuardia slots noting that AccessAir's certification at FAA was not complete.

### H.    United Air Lines, Inc. ("United")

United has requested six (6) slot exemptions to establish two new nonstop round trips to SFO and one new nonstop round trip to DEN.

*Arguments in Support*
In general support of its application, United argues that the Department should correct an imbalance in the current allocation of slot exemptions, which United believes is skewed in favor of smaller network carriers. United argues that it has the best beyond-perimeter network of any carrier, and that its proposal would incorporate DCA service at two geographically distant hubs and promote network-versus-network and gateway-versus-gateway competition between the largest possible number of western communities and DCA.

Regarding its proposed service to **SFO**, United argues that it can offer superior domestic network benefits by serving SFO and connecting DCA to its network, which serves 51 medium, small and non-hub beyond-perimeter airports in the contiguous U.S. United claims that SFO generates as many or more business and leisure travelers than the biggest western cities with beyond-perimeter service, and that SFO connects to numerous small and medium-sized communities in California and western states, some of which do not have one-stop access to DCA. United also argues that its proposed service will increase competition in multiple markets by providing new and competitive one-stop services. United asserts that its choice of aircraft and extensive network will foster competition, especially for its broad transcontinental operations. United maintains that its proposed service will not reduce travel options or result in increased travel delays. Because United has a strong beyond-perimeter network reaching more domestic beyond-perimeter airports, the airline concludes that its proposal is in the public interest.

Regarding its proposed service to **DEN**, United argues that its proposal to serve DEN complements its SFO proposal, because each hub offers online connections to distinct geographical areas in multiple western states. United argues further that it offers superior domestic network benefits, especially with respect to Frontier's operations in Denver. As noted above, United points out that it serves the most medium, small, and non-hub

airports of any carrier. United further points out that Denver is a major economic center that can easily support two additional nonstop round trips from DCA. Several cities in the region would gain new one-stop service to DCA. United asserts that it can reach 54 more communities than can Frontier. United argues that its proposed service will increase competition in multiple markets by expanding its network and the aircraft capacity in the DCA-DEN market. United can compete directly with Frontier, according to United. United also argues that its proposed service will not reduce travel options or increase travel delays. Finally, United concludes that granting its request is in the public interest because Denver is a major economic center, where United has a superior network.

On January 23, United filed consolidated comments. In those comments, United argues that it is the only non-incumbent applicant proposing to serve a western hub. United claims to have a more extensive network, more capacity, and a greater number of potential markets to offer than does any other applicant. United also notes an "incrementality" problem with incumbent slot exemption holders; those carriers that already received slot exemptions from the Department in the 2000 proceeding cannot claim to offer new network benefits of the same magnitude that United can.

*Responsive Pleadings*
Numerous carriers commented on United's application. Carriers most commonly argued that United's proposal raises competition concerns because of its extensive service between Washington, DC, and DEN/SFO. Carriers also commonly note that awarding slot exemptions to a carrier in Chapter 11 bankruptcy would constitute unsound public policy. Numerous carriers point out that United's proposed network benefits are illusory because service to DEN and SFO is duplicated by other carriers, duplicative of service that United can offer from its hubs within the perimeter, and because international connections, backhaul, and local traffic complicate United's proposal to serve SFO. In other isolated comments, carriers assert that United is not the best choice for a beyond-perimeter award because: (1) its proposal to serve SFO benefits fewer passengers than do other proposals to serve LAX; (2) it is not a new entrant; and (3) it has no incentive to aggressively promote DCA-DEN/SFO service.

## I.   US Airways, Inc. ("US Airways")

US Airways has requested eight (8) slot exemptions to establish two new nonstop round trips to Luis Muñoz Marín International Airport in San Juan, Puerto Rico ("SJU") and two new nonstop round trips to SFO.

*Arguments in Support*
In general support of its application, US Airways notes that the Department has awarded beyond-perimeter slot exemptions to major incumbents such as Delta, and that the Department has considered substantial route networks in making its route selections. As a new entrant carrier when it comes to operating beyond-perimeter service, US Airways argues that the Department should give priority to those carriers prohibited from operating beyond-perimeter service. The airline claims to be able to offer substantial

consumer network benefits if it were awarded beyond-perimeter slot exemptions, among them service to/from 42 communities. US Airways touts its foresight in developing a strong network at DCA prior to, and especially after, September 11.

Regarding its proposed service to **SJU**, US Airways argues that its proposed service will enhance competition by injecting a major third competitor to the daily nonstop Washington-Puerto Rico market. Besides building its growing Caribbean network, US Airways asserts that new service to SJU will provide code-share connections to 12 total destinations, including domestic destinations such as St. Thomas and St. Croix in the U.S. Virgin Islands. Those beyond-SJU destinations will be able to connect, on a one-stop basis, to 33 destinations in the continental U.S. US Airways also argues that its proposed service would not reduce travel options or increase travel delays.

Regarding its proposed service to **SFO**, US Airways argues that its proposed service to SFO, a first-ever scheduled nonstop service, will save time and provide consumers and shippers with additional options to important regions of the country. Using a simplified fare structure, and maximizing consumer choice and connecting opportunities, US Airways believes it can compete vigorously with other Washington-Bay Area services, including those of JetBlue and Southwest Airlines. US Airways asserts that numerous small and large communities will enjoy connecting service through code-share partners. With additional slots exemptions to SFO, US Airways can improve the value and operation of its mainly East Coast network, more effectively serving West Coast communities than it could through its within-perimeter hubs in Pittsburgh, Philadelphia, and Charlotte. US Airways also argues that its proposed service would not reduce travel options or increase travel delays.

On January 23, US Airways filed consolidated comments. In those comments, US Airways argues that it is the only non-incumbent applicant proposing new service with significant network benefits. US Airways claims to be a new entrant for the purposes of this beyond-perimeter slot exemption proceeding. US Airways points to its large capacity aircraft and ability to draw passengers from behind DCA.

*Responsive Pleadings*
Numerous carriers commented on US Airways' application. Carriers most commonly argued that US Airways is the largest slot holder at DCA. With respect to its proposal to serve SJU, many carriers note a lack of network benefits and a small local market. With respect to its proposal to serve SFO, many carriers note that SFO is the hub of US Airways' code-share partner United, and US Airways has no on-line connections there. In other isolated comments, carriers assert that US Airways is not the best choice for a beyond-perimeter award because: (1) it is not a low-fare carrier; (2) it is not financially sound; and (3) it can serve its proposed destinations through its within-perimeter hubs.

### Answer of the Utah and Salt Lake City Parties

On January 23, the State of Utah, the Mayor of Salt Lake City, the Salt Lake Chamber, Salt Lake City Department of Airports and the Utah Air Travel Commission jointly filed

- 14 -

an answer. The parties support the application of Delta. The parties believe that Delta's application provides the most significant new and improved service benefits to the traveling public.

## DECISION

### A.    Summary

We have decided on the following selections: Alaska for two slot exemptions for nonstop service to Seattle and two slot exemptions for nonstop service to Los Angeles; America West for two slot exemptions for nonstop service to Phoenix; Frontier for four slot exemptions for nonstop service to Denver; and United for two slot exemptions for nonstop service to Denver. In making our decision, we have carefully reviewed the applications and responsive pleadings, and conclude that service to these communities by these carriers best meets the applicable statutory criteria and creates the greatest public benefits.

### B.    Statutory Criteria

To award beyond-perimeter slot exemptions, the Department must find that an applicant meets all four criteria enumerated by § 41718(a). First, under (a)(1), we must find that an award of slot exemptions will provide domestic network benefits beyond the perimeter. Second, under (a)(2), we must find that an award of exemptions will increase competition by new entrant carriers or in multiple markets. This second criteria is disjunctive; the Department may consider the impact on competition by carriers with *either* new entrant status *or* an ability to serve multiple markets, *or both.* Third, under (a)(3), we must ensure that an award of exemptions would not reduce travel options for communities served by small hub airports and medium hub airports within the perimeter. Fourth, under (a)(4), the exemptions granted must not result in meaningfully increased travel delays.

Congress did not provide any specific guidance as to the weight we should assign among these criteria in our decisional process. Because we find that each of the proposals would not reduce travel options for communities served by small and medium hub airports within the perimeter under (a)(3)[13] and would not result in meaningfully increased travel

---

[13] Under (a)(3), we must ensure that an award of exemptions would not reduce travel options for communities served by small hub airports and medium hub airports within the perimeter. In our earlier decisions, we concluded that Congress sought to ensure that new services provided though the AIR-21 exemptions would not displace or disrupt existing services at small or medium hubs. Order 2000-7-1 at 20 (July 5, 2000); Order 2001-6-20 at 7 (June 22, 2001); Order 2002-11-20 at 6 (Nov. 27, 2002). In our view, no party has raised a legitimate concern that any of the proposed applications would produce this result. The Department rejects Delta's argument that America West should be precluded from an award of slot exemptions based on past service reductions in Columbus, Ohio. We find no evidence that America West's actions in Columbus were connected to its operation of slot exemptions at DCA. Similarly, we have no basis upon which to conclude that an award of new slot exemptions to America West would cause a reduction of services within the perimeter.

delays under (a)(4),[14] we affirm our previous statements that the determinative criteria for the allocation of beyond perimeter slot exemptions are those involving network benefits and increased competition by new entrants or in multiple markets under (a)(1) and (a)(2). *See* Order 2000-7-1 at 20 (July 5, 2000); Order 2001-6-20 at 7 (June 22, 2001); Order 2002-11-20 at 6 (Nov. 27, 2002).

As between (a)(1) and (a)(2), we conclude that the Department can best meet Congress' direction by awarding slot exemptions to carriers that can provide the greatest network benefits beyond the perimeter, and that have little or no presence at DCA *and* offer competitive benefits in multiple markets. In practical terms, carriers meeting all elements of the statutory criteria – the domestic network benefits of (a)(1) and both the 'new entrant' and 'multiple markets' element of (a)(2) – will likely demonstrate the greatest public benefits. Carriers that can demonstrate domestic network benefits will logically be able to offer benefits in multiple markets. Carriers that can demonstrate domestic network benefits and new entrant status further increase the number of competitive benefits at DCA and beyond by injecting a new competitor into the relevant markets. Moreover, where new entrants operate their only hubs and focus cities beyond the perimeter, they lack the slot holdings to effectively connect their networks to DCA. Granting exemptions to such carriers can, in many cases, facilitate one-stop service to DCA from beyond-perimeter points, delivering further competitive benefits to underserved communities across the country.

Our approach has been consistent over time. In Order 2000-7-1, we chose service opportunities by new competitors over existing carriers at DCA because we determined that this course would produce a greater competitive impact than would additional service by the larger DCA incumbents, thereby best satisfying the statutory objective of increasing competition. *See* Order 2000-7-1 at 20-21 (July 5, 2000). In Order 2001-6-20, in the process of reallocating slot exemptions that had been returned to the Department, we determined that Alaska best met the statutory criteria because it most successfully combined domestic network benefits with enhanced competition as a result of new entrant status. *See* Order 2001-6-20 at 8 (June 22, 2001). In Order 2002-11-20, the Department again sought to reallocate slot exemptions that had been returned. After having given primary consideration to new entrants in two prior proceedings, involving the same pool of AIR-21 slot exemptions, we determined that Delta, even though it was not a new entrant, best met the statutory criteria. We found that Delta could provide

---

[14] Under (a)(4), we must ensure that an award of exemptions would not result in meaningfully increased travel delays. The General Accounting Office, in 1999, found that additional operations at DCA would not cause significant delays. The Federal Aviation Administration later concluded that 24 additional operations at DCA, spread out over the entire slot-controlled period to comply with the statutory limitation of no more than two additional operations per hour, would not meaningfully increase travel delays at DCA. *See* Order 2000-7-1 at 21 (July 5, 2000); Order 2001-6-20 at 8 (June 22, 2001); Order 2002-11-20 at 7 (Nov. 27, 2002). Although our past conclusions were drawn from an analysis of 12 total beyond-perimeter exemptions, no party contended – and no evidence in the docket exists to show – that 12 additional slot exemptions would meaningfully increase travel delays at DCA or anywhere else in the U.S. aviation system. To the contrary, each applicant stated that its proposed services would have no appreciable affect on travel delays.

superior network benefits and could increase competition by adding capacity in multiple markets. *See* Order 2002-11-20 at 8-9 (Nov. 27, 2002).

In this proceeding, the Department performed qualitative and quantitative analysis to gauge the network benefits and competitive impact offered by each applicant under (a)(1) and (a)(2). Our analysis focused on the potential number of online single connection markets that could be served via the applicants' proposed points, the size of those potential connecting markets, the extent to which the applicants already competitively serve those potential connecting markets via their existing service at DCA, and the applicants' status as a new entrant or incumbent. We applied this analysis carefully to the pleadings and found that applicants typically stressed their comparative strengths under one or the other of (a)(1) or (a)(2), depending upon the size of their hubs and presence at DCA. Those with the strongest presence at DCA highlighted the scope and size of their respective networks and the competitive benefits that could be brought to multiple markets via those networks (American, Delta, United, and US Airways). Applicants with little or no presence at DCA (Alaska, Aloha, America West, Frontier, and Primaris) stressed the competitive benefits afforded by their new entrant or limited incumbent status, coupled with their ability to discipline multiple markets with low fares and network benefits. The applicants in this latter group of carriers argued that, even though their networks might be smaller, enhancement of their presence at DCA would create a stronger competitive impact than an award to the more established DCA incumbents.

Using this analysis, and following § 41718(a), we find that Frontier, Alaska, and America West fully meet the requirements of the statute by offering substantial domestic network benefits beyond the perimeter under (a)(1) and increasing competition as new entrants *and* in multiple markets under (a)(2). These carriers stand out from the rest in this respect. Aloha and Primaris, although they are new entrants, do not satisfy the statutory criteria to the same degree. We find that Aloha offers far fewer domestic network benefits than Frontier, Alaska, America West, and United, and thus cannot increase competition in the same multiple of markets. We find also that it is not in the public interest to award slot exemptions to Primaris based on its status as a carrier without effective authority from the Department or FAA.

The Department further finds that the competitive benefit of granting additional frequencies to Frontier, Alaska (in the case of Seattle) and America West on routes that they already serve nonstop from DCA is greater than if we only granted new frequencies to incumbent carriers. The reason is that the incumbent carriers in this proceeding can, in many cases, already offer DCA travelers numerous connecting opportunities via their within-perimeter hubs, often with multiple frequencies per day, and in particular to large beyond markets. Frontier, Alaska, and America West each have only limited slot exemptions, enabling them to offer, at most, three round trips per day and limited connecting opportunities in their DCA markets. As frequency of service and schedule convenience is a major driver of airline choice, the Department believes an award of additional frequencies will have a large impact on competition for DCA passengers. Also, Frontier, Alaska, and America West each operate their only hubs and focus cities beyond the perimeter. Thus, unlike the incumbents that possess inherent frequency and

flexibility advantages with respect to the DCA market by virtue of their within-perimeter hubs, these new entrant carriers cannot otherwise provide the same level of networked service to points beyond.

We gave the same careful consideration to American, Delta, United, and US Airways, all of whom are incumbents at DCA. While § 41718(a) specifically mentions new entrants, we have never found that it precludes incumbent carriers from being awarded beyond-perimeter slot exemptions. In fact, an incumbent carrier offering strong domestic network benefits that could increase competition in multiple markets meets the demands of § 41718(a)(1) and (a)(2). We so found in Order 2002-11-20, where we awarded Delta two AIR-21 slot exemptions to serve its Salt Lake City hub. *See* Order 2002-11-20 (Nov. 27, 2002). In this Order, we find that the incumbent carriers submitted meritorious proposals demonstrating a range of domestic network benefits and abilities to increase competition in multiple markets. We find that United meets the requirements of § 41718(a) and deserves an award of two slot exemptions for service to its hub in Denver. United's application, as explained further below, demonstrates unrivaled network benefits and a pro-competitive effect in multiple markets beyond Denver.

### C.    Awards

We conclude that **Alaska** merits an award of four exemptions. Alaska's status as a new entrant/limited incumbent will have a positive effect on competition at DCA and in multiple markets beyond its hub in Seattle and focus city in Los Angeles. Alaska has a proven track record of providing domestic network benefits in DCA origin and destination markets; since Alaska began service at DCA, nearly half of its DCA origin and destination traffic has been in connecting markets.

In the case of its Seattle hub, Alaska could provide single connection service from DCA to as many as 38 domestic points, both large and small. Alaska plans to offer single-plane continuing service to Fairbanks and Juneau (seasonally), which would provide more convenient travel options for passengers in markets that are among Alaska's largest DCA origin and destination markets.

In the case of Los Angeles, Alaska could provide online single connection service from DCA to as many as 17 domestic points. While this is less than half the number of destinations Alaska could serve via Seattle, they account for more than three-fourths of the total traffic in Alaska's beyond-Seattle connecting markets, since many of these beyond-Los Angeles destinations are large cities.[15] While there is overlap between the connecting markets that Alaska could serve over Seattle and Los Angeles, passengers would benefit from an alternative competitive nonstop choice to DCA on Alaska. *See* Order 2000-7-1 at 21 (July 5, 2000). Furthermore, connections to many of the destinations Alaska could serve via both Los Angeles and Seattle, such as major cities in California, would be less circuitous if routed over Los Angeles rather than Seattle, making those services more attractive competitive options. In many cases, Alaska serves those destinations with more frequency in Los Angeles versus Seattle, thereby increasing

---

[15] Source: DOT DB1B data, for the year ended third quarter 2003.

the opportunity for more timely connections. There are also a couple of smaller cities that Alaska does not serve out of Seattle but does serve out of Los Angeles that would receive new online single connection service from DCA.

Since our 2002 proceeding, Alaska has improved its services at Los Angeles. Besides adding its own service to Reno, Nevada, and code-share service to San Jose, California, Alaska has expanded its marketing alliance with American (which has a large presence at Los Angeles), invested in new facilities and equipment at LAX, and launched additional nonstop transcontinental services. The Department believes that Alaska's growing network and future potential at LAX, combined with its status as a new entrant/limited incumbent and successful operator of two DCA slot exemptions, overshadow any perceived reliance on local market passengers in Los Angeles. *See* Order 2000-7-1 at 23 (July 5, 2000); *cf.* Orders 2001-6-20 at 11 (June 22, 2001) (awarding service to a community other than Los Angeles on the grounds that the carriers proposing Los Angeles service either held a dominant position at LAX or were unable to offer significant domestic network benefits) and 2002-11-20 at 7 (Nov. 27, 2002) (stating that the Department cannot award slot exemptions based only on the size of the local market).

We are not persuaded by the comments opposing an award to Alaska. Carriers most commonly argued that Alaska's choice of aircraft – a B737-700 configured to seat 120 passengers – provides less capacity than other proposals. However, in this instance, the Department will not deny slot exemptions to Alaska solely on this basis. Any lack of capacity is outweighed by the potential domestic network benefits and increased competition that Alaska offers. *See* Order 2001-6-20 at 9, footnote 5 (June 22, 2001) (discussing the Department's view of capacity, and in particular, its view of Frontier's and Alaska's fleet). We note that Alaska indicated in its application that it plans to eventually increase capacity by upgrading to a B737-900 with 172 seats on the DCA-Los Angeles route.

We conclude that **America West** merits an award of two exemptions. America West's status as a new entrant/limited incumbent, price competitor, and successful operator of DCA slot exemptions will have a positive effect on competition at DCA and in multiple markets in the West. America West operates a very strong hub in Phoenix. In the case of Phoenix, America West could provide single connection service from DCA to as many as 38 domestic points, both large and small. The beyond points that America West could serve via Phoenix account for the second highest passenger total of any limited incumbent proposal (slightly less than Frontier).[16]

We are not persuaded by the comments opposing an award to America West. Carriers most commonly noted that America West should be precluded from further awards because it holds the most beyond-perimeter exemptions of any carrier and cannot offer new network benefits. The Department recognizes the fact that America West holds and operates six slot exemptions from the 2000 proceeding, but we believe that the statutory criteria require us to consider incumbency in a broader context. Even with its new allocations, America West remains a limited incumbent, but it is one that can serve

---

[16] Source: DOT DB1B data, for the year ended third quarter 2003.

multiple markets competitively. Although it has six beyond-perimeter slot exemptions, the Department believes that the competitive benefit of granting an additional frequency to America West is still higher than it would be if we granted frequencies to carriers that in many cases already offer DCA travelers numerous connecting opportunities to the destinations beyond their proposed points via their within-perimeter hubs. At the same time, an award of additional frequency will make America West's still comparatively limited DCA service pattern more competitive with incumbent carriers that, in many cases, offer travelers many more frequencies in these beyond-Phoenix markets with their existing DCA services. Finally, based on the circumstances in this proceeding, the Department rejects the argument that America West's choice of aircraft should preclude it from being awarded slot exemptions.

We conclude that **Frontier** merits four exemptions for service to Denver. Frontier is a new entrant/limited incumbent with a record as a low-fare competitor that will help discipline the multiple markets that it serves via its Denver hub. Frontier's network in Denver is already strong and is expanding. The Department estimates that Frontier could provide single connection service from DCA to as many as 45 domestic points, both large and small, via Denver. In comparison to other limited incumbent applicants, the airline offers the largest number of potential online single connection destinations, and these markets combine to account for the most origin and destination traffic of any other connecting point proposed by a limited incumbent.[17] Like Alaska, Frontier has a proven track record of providing domestic network benefits in DCA origin and destination markets; since Frontier began service at DCA, nearly 40 percent of its origin and destination traffic has been in connecting markets.

No party to this proceeding disputes Frontier's new entrant/limited incumbent status or its capacity to offer substantial network benefits out of Denver. However, carriers most commonly noted that Frontier already received two slot exemptions in the 2000 proceeding, and, therefore, proposed no new network benefits. We disagree with that logic, as we have discussed above. Carriers also argued that Frontier could not provide sufficient capacity to merit slot exemptions, since it proposes to use an A319 aircraft, with seating for 132 in a single-class configuration. The Department does recognize capacity as an important part of enhancing competition, but will not, in this instance, deny slot exemptions to Frontier solely on this basis. Any lack of capacity is outweighed by the potential domestic network benefits and increased competition that Frontier offers. *See* Order 2001-6-20 at 9, footnote 5 (June 22, 2001) (discussing the Department's view of capacity, and in particular, its view of Frontier's and Alaska's fleet).

We conclude that **United**, even though it is not a new entrant/limited incumbent, merits an award of two exemptions for service to Denver. United's application wins our approval based on the strength of its network and ability to increase competition by adding capacity and new one-stop connections to DCA in multiple markets. *Cf.* Order 2002-11-20 (Nov. 27, 2002) (awarding slot exemptions to Delta for service to its western hub, SLC, based on strong network benefits and the ability to increase competition in multiple markets). The Department's action to grant two exemptions to United ensures

---

[17] Source: DOT DB1B data, for the year ended third quarter 2003.

that many new beyond points in the West are served by more than one competitor, with more than one service option to DCA. Specifically, we note that our award will provide competition with Frontier in the DCA-Denver and beyond markets.

With respect to domestic network benefits, United could provide single connection service from DCA to as many as 68 domestic points via Denver, the most points of any applicant. Although 17 of the 68 points are already served on a one-stop basis via United's within-perimeter hub at Chicago O'Hare, the Department finds that many new destinations are served via Denver, with substantial traffic to support an award of nonstop service to DCA.

With respect to competition by new entrants or in multiple markets, we find that United's ability to serve multiple markets – including many new markets without single connection service to DCA – will enhance competition in the markets involving DCA and areas beyond the perimeter. The Department emphasizes that, having zero slot exemptions in its portfolio, United is currently unable operate nonstop DCA-Denver service. United's only destination out of DCA is Chicago O'Hare, and we find that a beyond-perimeter award will help to discipline western markets through increased competition.

Under the present circumstances, we are not persuaded by the comments opposing an award to United for service to Denver. Carriers most commonly noted United's dominant presence in Denver and its extensive Washington-Denver service. Although the Department does consider the impact on competition that comes from a carrier's position in a given community and a given market, we must also consider the size and reach of a carrier's network in that community. In the case of Denver, the domestic network benefits offered by United at its Denver hub rival those of all applicants in this proceeding – yet, while we frequently look to low-fare competitors, new entrants or other limited incumbents to bolster competition, we believe United's presence will increase competition in the multiple markets that it serves via Denver. Additionally, while the Department believes it is significant that United serves Denver with multiple frequencies from Washington Dulles, we must also recognize the uniqueness of service to DCA, existing DCA-Denver nonstops operated by Frontier, and the fact that United is not otherwise able to offer nonstop service to that market from its Denver hub. Lastly, Alaska and American argued that it would constitute poor public policy to award slot exemptions to United while it is operates in bankruptcy. We disagree, and decline to consider United's status under the bankruptcy code for the purposes of this slot exemption proceeding. United is a fully operating carrier, with effective authority from the Department and FAA, and can thus be considered for slot exemption awards. The Department must consider the public benefits that could be created by awarding slot exemptions to United. In this instance, we believe nonstop service to United's hub in Denver offers substantial public benefits.

- 21 -

## D.    Other Applications

*Aloha's* application, emphasizing the airline's new entrant status, demonstrated that it could bring competitive benefits to DCA and beyond markets. Aloha is correct to note that the Department has emphasized the measurable competitive impact of granting new entrants slot exemptions at DCA. Besides new entrant status, Aloha offers the additional benefits of attractive in-flight amenities and single-plane service to Honolulu. The Department is concerned, however, that Aloha does not offer the kind and quality of domestic network benefits via Orange County as other applicants have offered in this proceeding. We note that Aloha could only offer single connection service to, at most, five points.

*American's* application has merit. In particular, the Department recognizes American's commitment to improving domestic network benefits in Los Angeles and its ability to serve DCA with large capacity Stage 3 jets. However, we find that American's application constitutes a weaker mix of network benefits and increased competition in multiple markets than proposed by other applicants. American applied for exemptions only to Los Angeles, where it has a large presence in market share, but where it offers fewer online single connection markets than Alaska. Importantly, of the 13 points that American could potentially offer DCA travelers on a one-stop basis, eight may already be reached via one or more of its within-perimeter hubs. We also note that American is not a new entrant/limited incumbent or low-fare price competitor.

*Delta's* application builds largely on its successful track record of operating DCA slot exemptions to Salt Lake City. The Department recognizes the benefit to consumers and beyond-perimeter passengers that additional frequencies could have – among them, increasing the reach, convenience and competitiveness of Delta's Intermountain West network. However, we find Delta's proposal to add frequency at Salt Lake City – when it simultaneously maintains several within-perimeter hubs – less compelling than the proposals of other applicants. We also note that Delta is not a new entrant/limited incumbent or low-fare competitor.

*Primaris's* application proposes to introduce a premium, business-class service in medium- and long-haul routes at "comparatively" low fares in high volume O&D markets. We fully recognize that Primaris would be a new entrant, if not for its current status as a carrier without effective certificate authority from the Department or FAA.[18] Under these circumstances, we are reluctant to take the extraordinary step of granting slot exemptions to Primaris when its certification by the FAA is still pending, as is its final fitness certification. *See* Order 98-4-22 at 24 (April 21, 1998) (denying LaGuardia slot exemptions to AccessAir on the grounds that it did not have effective authority from the Department or FAA). We therefore find that it is not in the public interest to award slot

---

[18] Although Primaris was found fit to engage in interstate scheduled air transportation by Order 2003-9-19 (Sept. 24, 2003), the effectiveness of that authority is conditioned upon the carrier's providing the Department with evidence that it has received its FAA Air Carrier Certificate and that it has available to it sufficient financial resources to meet the Department's financial fitness criteria. To date, Primaris has not filed such evidence.

exemptions to Primaris. Order 99-9-11 (Sept. 16, 1999), which Primaris cites in support of its application, is inapposite. Among other differences, there were no competing applications for the slot exemptions in that proceeding. We also note that Primaris is not a network carrier, thus at the outset it cannot argue a strong case for providing domestic network benefits, even with future code-share agreements. On the date of its application, Primaris demonstrated no network benefits in Los Angeles. Furthermore, its capacity is less than other carriers due to its all-business class configuration.

*US Airways'* application offers substantial capacity and service to new beyond-perimeter cities. However, we find that US Airways is clearly the dominant carrier at DCA, which weighs against it on § 41718(a)(2). In the case of San Francisco, US Airways could provide online connection service from DCA to as many as 20 domestic points. However, eight of those 20 points are already served one-stop from DCA via one or more of US Airways' within-perimeter hubs and/or via code-share with United, via United's within-perimeter hub at Chicago O'Hare. The eight points account for 88 percent of the total traffic generated in the 20 total potential connecting markets. In the case of San Juan, the Department finds that there are almost no network benefits; the additional beyond-perimeter points available via San Juan are already served on a single connection basis via US Airways' within-perimeter hubs. We also note that US Airways is not a low-fare competitor.

## CONDITIONS

### A. Start-up

We will require that the awardees inaugurate full service within 90 days of the date on which the Department allocates slot times. If, for any reason, an awardee is not able to use the slot exemptions awarded, we request that it notify the Department as soon as possible, but not later than 30 days after the date of service of this order, so that we can reallocate them.

### B. Assignment of Slot Times

We are directing Frontier, Alaska, America West, and United to file in the Docket no later than seven business days from the service date of this Order, their proposed flight schedules and effective dates for inauguration of operations authorized by this Order.

As we stated in our Notice of December 22, 2003, 49 U.S.C. § 41718(c)(2) allows us to assign only one additional slot exemption per one-hour period, an increase from the original two per hour authorized in AIR-21. The Department will evaluate the assignment of slot times for both the within- and beyond-perimeter slot exemptions as one "pool." Because many one-hour periods are likely to be over-subscribed, we may not be able to accommodate carrier requests for slot exemption times. There are 15 hourly periods beginning at the 0700 period and ending at the 2100 period and a total of 44 slot

exemptions must fit into those 45 slot times.[19]  Thus, under both AIR-21 and Vision 100, the following slot times are available: 0700 (two available), 0800 (one available), 0900 (one available), 1000 (two available), 1100 (three available), 1200 (two available), 1300 (three available), 1400 (one available), 1500 (one available), 1600 (one available), 1700 (one available), 1800 (one available), 1900 (one available), 2000 (two available), 2100 (one available).  In instances where carriers granted slot exemptions in the instant proceedings have conflicting requested scheduled times, the Department can be expected to give priority to those carriers with the least flexibility provided by current DCA slot and slot exemption holdings.  Moreover, given their longer stage lengths and flight times as well as the requirement for network benefits at § 41718(a)(1) that may require that their DCA slot times be conducted with connecting banks, beyond-perimeter services may have less scheduling flexibility and merit a priority over within-perimeter services.  In applying for specific times, applicants granted slot exemptions should be prepared to justify their requests.  Applicants should keep these constraints in mind prior to submitting any schedules and should understand that these slot-time constraints may cause some proposals not to be viable.  In coordination with Federal Aviation Administration's Slot Administration Office, we shall assign slot times corresponding with the authority granted in these proceedings in a notice subsequent to our decision.

Thereafter, the awardees may request the FAA Slot Administration Office to approve temporary exchanges of the assigned slot exemptions times with other slots or slot exemptions for the purpose of conducting the operations authorized by this Order in a different hour.  In acting on such a request, the FAA will employ standard practices in conjunction with applicable statutory and regulatory requirements for the utilization of slot times between and among individual air carriers.  Regardless of subsequent approved slot time exchanges, the slot times assigned by the Department or the FAA's Slot Administration Office pursuant to this Order will be tagged such that, if any of the service granted by this Order is suspended or is not inaugurated in a timely manner, the Department will withdraw the slot exemptions based on their tagged slot time rather than by any subsequent slot time operated.

## ENVIRONMENTAL ISSUES

Although 49 U.S.C. §41718(e) specifically exempts our action here from review under the National Environmental Policy Act,[20] we remain sensitive to the environmental impact of increased operations at DCA.  Consistent with the statute, we will require that all operations authorized by this order will be conducted with Stage 3 aircraft.  Also,

---

[19] AIR-21 authorized 24 DCA slot exemptions and Vision 100 authorized an additional 20 slot exemptions. As our Notice of October 22 states, the AIR-21 times allocated for the Corporate Airlines' DCA service in the within-perimeter proceeding are in the 1000 and 1100 hour period, and these times will be available. There are times available at the 0700, 1100, 1200, 1300 (two openings available), and 2000 hour periods based on the previous AIR-21 times assigned in previous proceedings.  Additionally, the Vision 100 legislation increased the amount of permissible operations per hour at DCA by one.

[20] Section 41718(e) states, "Neither the request for, nor the granting of an exemption, under this section shall be considered for purposes of any Federal law a major Federal action significantly affecting the quality of the human environment."

under 49 U.S.C. § 47117(e), the Department will give DCA priority in making grants for airport noise compatibility planning and programs.

## ADMINISTRATIVE TERMS

As the FAA slot regulation makes clear, "slot(s) do not represent a property right but represent an operating privilege subject to absolute FAA control (and) slots may be withdrawn at any time to fulfill the Department's operating needs . . . ." 14 C.F.R. § 93.223(a). Moreover, under the provisions of 49 U.S.C. § 41714(j), these carriers may not sell, trade, transfer, or convey the operating authorities granted by the subject exemptions unless otherwise authorized herein.

Further, granting of these exemptions in no way is to be construed as allowing a carrier to operate services that it could not otherwise operate. Each of the awardees must still meet all the requirements of the Department of Transportation, the Federal Aviation Administration, and all other statutes and regulations governing air transportation.

This order is issued under authority delegated in 49 C.F.R. § 1.56(a).

## ACCORDINGLY,

1.  The Department grants slot exemptions from 14 C.F.R. Part 93, Subparts K and S, to Alaska Airlines, Inc. (two slot exemptions to serve Seattle-Tacoma International Airport and two to serve Los Angeles International Airport); America West Airlines, Inc. (two slot exemptions to serve Phoenix Sky Harbor International Airport); Frontier Airlines, Inc. (four slot exemptions to serve Denver International Airport); and United Air Lines, Inc. (two slot exemptions to serve Denver International Airport);

2.  The Department directs Alaska Airlines, Inc., America West Airlines, Inc., Frontier Airlines, Inc., and United Air Lines, Inc. to file in Docket OST-2000-7181 no later than seven business days after the service date of this Order their proposed flight schedules and effective date for operations authorized by this Order. Further, Alaska Airlines, Inc., America West Airlines, Inc., Frontier Airlines, Inc., and United Air Lines, Inc. must commence their proposed service no later than 90 days after the date on which the Department allocates slot times pursuant to this Order. The slot exemptions granted must be conducted with Stage 3 aircraft, may not be used for operations between the hours of 10:00 p.m. and 7:00 a.m., and may not increase the number of operations at Ronald Reagan Washington National Airport in any one-hour period during the hours of 7:00 a.m. and 9:59 p.m. by more than three operations. These carriers are advised to exercise maximum flexibility in proposed operating times to ensure compliance with these limits;

3.  The Department will make the final determination of slot times as soon as possible after the schedules are filed to enable the carrier to conduct the operations authorized by this Order. The Department directs the awardees to contact the FAA Slot Administration Office after the Department's determination of slot times. The FAA will

- 25 -

assign slot exemption numbers, effective dates, and operating times consistent with statutory limitations;

4.      We grant all motions to file otherwise unauthorized documents;

5.      Except as otherwise granted, we deny all other applications for exemptions from 14 C.F.R. Part 93, Subparts K and S, filed in this docket;

6.      The authorities granted under these exemptions are subject to all of the other requirements delineated in 14 C.F.R. Part 93, Subparts K and S, including, but not limited to, the reporting provisions and use-or-lose requirements;

7.      This docket will remain open until further order of the Department; and

8.      We will serve this order on all interested parties and the Federal Aviation Administration Slot Administration Office.

By:


**KARAN K. BHATIA**
Assistant Secretary for Aviation
and International Affairs

(SEAL)

*An electronic version of this document will be made available on the World Wide Web at:*
*http://dms.dot.gov/*

# Exhibit D

Order 2012-5-12
Served:  May 14, 2012



**UNITED STATES OF AMERICA
DEPARTMENT OF TRANSPORTATION
OFFICE OF THE SECRETARY
WASHINGTON, D.C.**

Issued by the Department of Transportation
on the 14th day of May, 2012

| | |
|---|---|
| **Applications of:**<br><br>**AIR CANADA;**<br>**ALASKA AIRLINES, INC.;**<br>**FRONTIER AIRLINES, INC.;**<br>**JETBLUE AIRWAYS CORPORATION;**<br>**MN AIRLINES LLC d/b/a SUN COUNTRY AIRLINES;**<br>**SOUTHWEST AIRLINES CO.; and**<br>**VIRGIN AMERICA INC.**<br><br>For exemptions from 14 C.F.R. Part 93, Subparts K and S, pursuant to 49 U.S.C. § 41718(g), Special rules for Ronald Reagan Washington National Airport (beyond-perimeter slot exemptions), as added by Section 414 of the Federal Aviation Administration Modernization and Reform Act of 2012 | **Docket DOT-OST-2012-0029** |

**ORDER GRANTING BEYOND-PERIMETER SLOT EXEMPTIONS AT
RONALD REAGAN WASHINGTON NATIONAL AIRPORT**

**SUMMARY**

By this Order, the Department grants two beyond-perimeter slot exemptions at Ronald Reagan Washington National Airport (DCA) to each of four new entrant or limited incumbent carriers, utilizing single-aisle Stage 3 aircraft, to operate a nonstop roundtrip as follows:

- Alaska Airlines, Inc. (Alaska) for service to Portland, Oregon;

- JetBlue Airways Corporation (JetBlue) to serve San Juan, Puerto Rico;

- Southwest Airlines Co. (Southwest) for service to Austin, Texas; and

- Virgin America Inc. (Virgin America) to serve San Francisco, California.

– 2 –

## Background

On February 14, 2012, President Obama signed into law the FAA Modernization and Reform Act of 2012 (FAA 2012), Pub. L. No. 112-95. Section 414 of FAA 2012 amended Section 41718 of Title 49 U.S. Code by adding a subsection (g), *Additional Slot Exemptions*, which directs the Department to grant, not later than 90 days after enactment, eight slot[1] exemptions for nonstop service between DCA and airports beyond the 1,250-mile perimeter (known as "beyond-perimeter" slot exemptions) for service to be provided by new entrant and limited incumbents.[2]

By Order 2012-2-21(February 24, 2012), the Department requested applications from new entrant and limited incumbent carriers for the eight additional beyond-perimeter slot exemptions made available under 49 U.S.C. Section 41718(g)(2).[3]

This is the fifth allocation proceeding for beyond-perimeter slot exemptions at DCA. With the creation of these 16 additional exemptions,[4] a total of 40 takeoffs and landings for service beyond the 1,250-mile perimeter at DCA have been authorized by law.[5] Following the passage of the Wendell H. Ford Aviation Investment and Reform Act for the 21st Century (AIR-21), the Department awarded all 12 slot exemptions available under the law to America West Airlines, Inc. (America West), Frontier Airlines, Inc.

---

[1] A slot is a reservation for an instrument flight rule takeoff or landing. Therefore, two slots are required to operate a roundtrip. 49 U.S.C. § 41714(h)(4). A slot exemption is an exemption from the slot limitations in the Federal Aviation Administration's High Density Rule, 14 CFR Part 93, subparts K and S.

[2] Section 414(c) of FAA 2012 amended the definition of a limited incumbent carrier by increasing the threshold of slots held or operated by an air carrier or commuter carrier, not including slot exemptions, slots operated under certain fee-for-service arrangements for another carrier, or slots held under a sale and license-back financing arrangement with another carrier, from fewer than 20 to fewer than 40.

[3] Due to the timetable for decision established by statute, applicants were required to submit a schedule for their proposed operations, including takeoff and landing times at DCA.

[4] Section 414 of FAA 2012 also directed the Department to grant eight beyond-perimeter slot exemptions to incumbent carriers qualifying for status as a non-limited incumbent at DCA as of the date of enactment, up to a maximum of two each, the operation of which is conditioned upon the carrier's discontinuing use of an equivalent number of existing slots currently used for service between DCA and a large hub airport within the 1,250 mile perimeter of DCA See, 49 U.S.C. §§ 41718 (c)(2)(B); (g)(1), (3)-(5). The incumbent carriers meeting the Section 41718(g)(3) definition at DCA included American Airlines, Inc. (American), Delta Air Lines, Inc. (Delta), United Air Lines, Inc. (United), and US Airways, Inc. (US Airways). By Order 2012-2-21 (February 24, 2012), the Department granted the incumbent carriers qualifying under U.S.C. Section 41718(g)(3) two exemptions for beyond perimeter use, subject to the conditions set forth in the statute, and as required by 49 U.S.C. Section 41718(g)(3)-(4) for daily nonstop roundtrips to three airports in California and one in Utah. American will discontinue one nonstop roundtrip to Dallas-Fort Worth International Airport and replace it with one nonstop roundtrip to Los Angeles International Airport, starting June 14, 2012. Delta will discontinue the use of two DCA slots for service to New York La Guardia, in order to operate an additional nonstop roundtrip to Salt Lake City International Airport beginning June 7, 2012. Beginning May 15, 2012, United will convert the use of two DCA slot exemptions by discontinuing one roundtrip to O'Hare International Airport and replacing it with a nonstop roundtrip to the San Francisco International Airport. US Airways will discontinue one nonstop roundtrip between DCA and Dallas-Fort Worth International Airport and, instead, provide one nonstop to the San Diego International Airport beginning June 8, 2012.

[5] Of these 40 beyond-perimeter slot exemptions, 32 will have resulted in a net increase in DCA operations. The eight newly-created slot exemptions for non-limited incumbents correspond to a discontinuance of eight existing within-perimeter slot allocations. 49 U.S.C. § 41718(a).

- 3 -

(Frontier), National Airlines, Inc. (National), and Trans World Airlines, Inc (TWA), for various nonstop services to communities beyond the perimeter. Order 2000-7-1 (July 5, 2000). In 2001, the Department reallocated two of the 12 slot exemptions to Alaska Airlines, Inc. (Alaska) after TWA returned its holdings during its bankruptcy and acquisition by another carrier. Order 2001-6-20 (June 22, 2001). In 2002, the Department reallocated two more of the slot exemptions to Delta Air Lines, Inc. (Delta) after National ceased operations at DCA. Order 2002-11-20 (November 27, 2002). Similarly, following the passage of Vision 100 - Century of Aviation Reauthorization Act, P.L. 108-176 (Vision 100), the Department awarded the 12 additional DCA beyond-perimeter slot exemptions that were made available under the law to: Alaska for single daily nonstop roundtrip service to both Seattle, Washington, and Los Angeles, California; America West for a daily nonstop roundtrip to Phoenix, Arizona; and Frontier for two daily nonstop roundtrips and United for one daily nonstop roundtrip to Denver, Colorado.[6]

As detailed in Order 2012-2-21, Section 414 of FAA 2012 directs the Department to consider seven criteria in awarding the eight additional DCA beyond-perimeter slot exemptions that have been created and made available to new entrant and limited incumbent carriers. We are directed to consider the extent to which the exemptions will: (A) provide air transportation with domestic network benefits beyond the 1,250 mile perimeter; (B) increase competition in multiple markets; (C) not reduce travel options for communities served by small hub airports and medium hub airports within the 1,250 mile perimeter; (D) not result in meaningfully increased travel delays; (E) enhance options for nonstop travel to and from the beyond-perimeter airports that will be served; (F) have a positive impact on the overall level of competition in the markets that will be served; or (G) produce public benefits, including lower fares, higher capacity, and a variety of service options.[7] The statutory amendments provide three new criteria for our

---

[6] See Order 2004-4-1.

[7] Section 41718 (g)(1)-(2) reads:
>    (1) Increase in Slot Exemptions.—Not later than 90 days after the date of enactment of the FAA
>    Modernization and Reform Act of 2012, the Secretary shall grant, by order 16 exemptions
>    from—
>        (A) the application of sections 49104(a)(5), 49109, and 41714 to air carriers to operate
>        limited frequencies and aircraft on routes between Ronald Reagan Washington National
>        Airport and airports located beyond the perimeter described in section 49109; and
>        (B) the requirements of subparts K and S of part 93, Code of Federal Regulations.
>    (2) New Entrants and Limited Incumbents—Of the slot exemptions made available under
>    paragraph (1), the Secretary shall make 8 available to limited incumbent air carriers or new
>    entrant air carriers (as such terms are defined in section 41714(h)). Such exemptions shall be
>    allocated pursuant to the application process established by the Secretary under subsection
>    (d). The Secretary shall consider the extent to which the exemptions will—
>        (A) provide air transportation with domestic network benefits in areas beyond the
>        perimeter described in section 49109;
>        (B) increase competition in multiple markets;
>        (C) not reduce travel options for communities served by small hub airports and medium
>        hub airports within the perimeter described in section 49109;
>        (D) not result in meaningfully increased travel delays;
>        (E) enhance options for nonstop travel to and from the beyond-perimeter airports that
>        will be served as a result of those exemptions;

- 4 -

consideration in making these awards (new subsections (E), (F) and (G)) and do not require that an application meet each of the seven criteria.

Because we find that each of the proposals would not reduce travel options for communities served by small and medium hub airports within the perimeter and would not result in meaningfully increased travel delays, we focus our analysis in this proceeding on the extent to which the applicants meet other statutory criteria.

## APPLICATIONS

As summarized below, the Department received applications from Air Canada, Alaska, Frontier, JetBlue, Southwest, MN Airlines LLC d/b/a Sun Country Airlines (Sun Country), and Virgin America. The entire public record for this proceeding, including proposals and reply comments, may be accessed online through the Federal Docket Management System at http://www.regulations.gov by doing a "search" on docket number DOT-OST-2012-0029.

## Air Canada

Air Canada has requested two slot exemptions in order to establish one daily nonstop roundtrip to Vancouver International Airport (YVR) utilizing Airbus A319 aircraft configured with 120 seats, including 14 in business class and 106 in economy.

### Arguments in Support

Air Canada states that, as Canada's largest full-service airline, it is the first and only foreign carrier operating out of DCA.[8] The carrier argues that it has made a significant financial investment in securing slots at DCA and is committed to maintaining a presence

---

(F) have a positive impact on the overall level of competition in the markets that will be served as a result of those exemptions; or

(G) produce public benefits, including the likelihood that the service to airports located beyond the perimeter described in section 49109 will result in lower fares, higher capacity, and a variety of service options.

Prior to the 2012 amendment, the pertinent provision in Section 41718 read:

(a) The Secretary shall grant, by order, 24 exemptions from the application of sections 49104(a)(5), 49109, 49111(e), and 41714 of this title to air carriers to operate limited frequencies and aircraft on select routes between Ronald Reagan Washington National Airport and domestic hub airports and exemptions from the requirements of subparts K and S of part 93, Code of Federal Regulations, if the Secretary finds that the exemptions will—

(1) provide air transportation with domestic network benefits in areas beyond the perimeter described in that section;

(2) increase competition by new entrant air carriers or in multiple markets;

(3) not reduce travel options for communities served by small hub airports and medium hub airports within the perimeter described in section 49109; and

(4) not result in meaningfully increased travel delays.

[8] Air Canada states that it has operated flights between points in Canada and DCA since it was granted access to DCA under the 1995 U.S.-Canada Air Transport Agreement, which provides that Canadian carriers are to acquire necessary DCA slots "under the prevailing rules for slot acquisition and minimum slot use applicable to United States Airlines," DOT Order 95-4-30. Air Canada also states that it supported the 2007 U.S.-Canada Open Skies Agreement.

- 5 -

at the airport.  Air Canada confirms its status as a limited incumbent carrier at DCA, holding 16 slots and slot exemptions[9], and states that, despite its efforts to do so, it has been unable to secure additional slots to expand service at DCA.  The carrier also maintains that the statutory criteria that guided the award of previous DCA slot exemptions effectively prevented it from participating because service was to be provided to airports within the United States.

Regarding its proposed service to YVR, Air Canada claims that the airport is Canada's second busiest and that Vancouver is Canada's third largest urban area.  The carrier describes Vancouver as "the commercial heart of Western Canada," and states that it is the largest market in Canada without nonstop service from the DC area.  The carrier argues that its proposed service will reduce travel time to Vancouver by at least 1 hour and 39 minutes when compared to existing one-stop alternatives and will have a positive impact on competition.  Air Canada proposes to use Airbus 319 aircraft configured with 120 seats, providing two-class service.  Air Canada also asserts that, together with its regional partner, Jazz, the two airlines provide service to 10 communities in the United States, and to a total of 46 destinations in North America (including Mexico and Caribbean), Asia Pacific, and Europe from YVR.  The carrier also argues that its proposed service would create new within network connecting opportunities to 17 new communities in Western Canada.  The carrier asserts its proposed service will have a positive impact on competition by competing with existing one-stop service to YVR from DCA and Washington Dulles International Airport (IAD), operated by Delta, United, American and Alaska.

In its March 27 answer, Air Canada reiterated the advantages that would be realized through its proposed service, and again asserted that it is not economically feasible for it to offer service to YVR from IAD, due to the high costs and inefficiencies of providing service at two airports in the same metropolitan area, and that its business travelers prefer DCA.  Air Canada also urges the Department to extend DCA service to as many new markets as possible, rather than granting slot exemptions to markets already receiving nonstop DCA service.

*Responsive Pleadings*

Many of the other applicants commented on Air Canada's proposal.  They most commonly argued that Air Canada's proposal would not provide low fares or domestic network benefits, and that Air Canada should not receive any preferential treatment as a non-U.S. air carrier.[10]  Several carriers also explain that Air Canada already holds a comparatively significant number of within-perimeter slots at DCA and provides air service to its within-perimeter hubs, which offer connecting service to Vancouver.  Many of the applicants also make note of Air Canada's proposed aircraft type, which would offer comparatively fewer seats, and of the relatively small size of the Vancouver - Washington, D.C., market.  Some highlight Air Canada's code-share relationship with United and its Star Alliance membership and claim that an award to Air Canada would

---

[9] Air Canada holds slot exemptions under 49 USC 41718.

[10] In this regard, some commenters argue that, because the U.S.-Canada Air Transport Agreement subjects Air Canada's access to DCA to the "prevailing perimeter rule," the bilateral agreement does not require the Secretary to consider Air Canada's application for beyond-perimeter slots.  See, Section 41718(h)(3), as added by FAA 2012.

- 6 -

effectively provide a large incumbent carrier access to another transpacific gateway, which is contrary to the purpose of awarding DCA slot exemptions to new entrants or limited incumbents. Competing carriers also argue that the schedule included as part of Air Canada's proposal is not convenient for customers in the local market, but intended to facilitate connections to international destinations.

## Alaska

Alaska has requested four total slot exemptions in order to operate one daily nonstop roundtrip each to Portland International Airport (PDX) and San Diego International Airport (SAN), both utilizing Boeing 737-800 aircraft with 157 seats, 16 in first class and 141 in economy. The carrier states that the proposed service to PDX is its first priority and that proposed service to SAN would continue on a single-plane basis to Honolulu, Hawaii.

### Arguments in Support

Alaska points to its presence along the entire West Coast, the high load and completion factors and on-time performance of its service utilizing DCA slot exemptions, comparatively low customer complaint ratio, history of providing lower DCA fares (and the associated passenger cost savings), and status as a growing and financially strong carrier with excellent relationships with its stakeholders. Alaska also points out that it is the only network carrier not to have filed for bankruptcy, that it has received industry awards, and that political, civic and employee interests support its application. Alaska states that it operates only three roundtrips at DCA, which, with the exception of Sun Country, represents the smallest presence when compared to other carriers operating at DCA. Alaska states that FAA 2012 added three new decisional criteria and changed the manner in which the criteria are to be applied by no longer requiring that an applicant meet each enumerated standard, but instead provided more flexibility for the Department to weigh each criterion separately. Alaska argues that the amended statute requires that local market benefits be treated as a co-equal decisional factor with beyond-perimeter network benefits and that its proposal to serve Portland and San Diego, the two largest Washington, D.C.-area markets lacking nonstop DCA service, is the strongest application in the docket.

In reference to its proposed service to PDX, Alaska argues that Portland is the third largest beyond-perimeter market within its network system without nonstop service to DCA. Alaska commits to providing low-fares, approximately 18 percent below existing fares for Portland service at IAD, for at least a year, subject to adjustment as a result of increasing fuel prices. Alaska claims that its request would produce immediate network benefits by connecting to 10 communities from Portland, and over time, even more opportunities because of its substantial presence at the airport. The airline claims that its proposal would offer service with a convenient schedule, provide additional capacity in the Washington, D.C. area – Pacific Northwest market, represent a convenient, low-fare alternative to existing service at IAD, and increase competition.

Regarding its proposed service to SAN, the carrier states that it would offer service to close-in DCA for a large volume of government traffic, including military. Alaska

argues that San Diego is the second largest beyond-perimeter market within its network system without nonstop service to DCA. Similar to its proposal to PDX, the carrier commits to providing low fares, approximately 31 percent below existing fares for SAN service at IAD, for at least a year, subject to adjustment as a result of increasing fuel prices. Alaska asserts that its proposal would provide additional capacity and a convenient, low-fare alternative to existing service at IAD and Baltimore/Washington International Thurgood Marshall Airport (BWI), and provide important new competition as well.

In its March 27 reply comments, Alaska acknowledges US Airways' recent announcement to inaugurate DCA - SAN service on June 8 and argues that its proposed service to SAN is even more important because it will provide much needed and well-timed competition in the market. Alaska also explains that, unlike US Airways' proposed service, its service would become permanent in nature due to the conditions associated with the beyond-perimeter slot exemptions, and be suitable for SAN originating passengers while US Airways' service appears to be timed to accommodate DCA originating passengers.

*Comments of the Port of Portland*
The Port of Portland, the owner and operator of PDX, submitted reply comments in support of Alaska's application on March 27. The Port asserts that it has been experiencing rapid growth in passenger traffic and that the PDX - DCA market is the largest origin and destination (O&D) market without current or announced service in this proceeding. The Port also claims that DCA is PDX's second largest destination without nonstop service. The Port contends that it has better access to capital cities in Europe and Asia than it does to DCA.

*Comments of the San Diego County Regional Airport Authority (SDCRAA)*
SDCRAA, operator of SAN, also submitted comments in support of Alaska's proposal on March 27. SDCRAA explains that the City of San Diego is the second largest city in California and the County is the fifth most populous county in the United States and second most populous in California. The Airport Authority states that SAN is situated 18 miles from the US-Mexico border and therefore serves a diverse bi-national catchment area and has the highest airport-wide load factor in this proceeding. SDCRAA states that the San Diego region represents the single largest concentration of active duty military in the country and would benefit from direct access to the closest airport to the Pentagon. The airport operator also mentions that Alaska's proposal would provide Honolulu - DCA passengers with their first roundtrip single-plane one-stop flight. SDCRAA also asserts that Alaska's proposal would introduce new airline competition in the Washington market and is supported by a broad coalition of over 100 political leaders, civic organizations, corporations and individuals.

*Reply comments of Association of Flight Attendants – CWA*
On March 27, the Association of Flight Attendants-CWA (AFA) submitted reply comments in support of Alaska's application. AFA explains that Alaska and its employees have a very good working relationship. The Association also makes note that

- 8 -

Alaska is the only established network carrier that has not filed for bankruptcy and therefore has avoided major job losses and service terminations.

*Responsive Pleadings*

Competing applicants explain that Alaska is not typically categorized as a low-fare carrier and has already been awarded a significant number of beyond-perimeter slot exemptions at DCA.  Competitors also urge the Department not to award Alaska four slot exemptions in this proceeding.  Several carriers highlight that both PDX and SAN already have mainline service to IAD and/or BWI and question the need for proposed SAN service based on US Airways' recent announcement to provide service in the DCA - SAN market beginning June 8.  Several other carriers dispute Alaska's claims of network benefits based on the service the carrier already provides at the Los Angeles International Airport (LAX) and the Seattle-Tacoma International Airport (SEA).  Carriers offering single-plane service to an additional destination argue that their respective proposals offer more benefits to a greater number of passengers.  Applicants proposing aircraft with more passenger seats also argue that Alaska will offer service to fewer passengers.

## Frontier

Frontier has requested two slot exemptions in order to offer one daily nonstop roundtrip to Colorado Springs Airport (COS), utilizing Airbus A320 aircraft with 168 seats, 36 of which have increased pitch, while the remaining 132 are economy.  Proposed service would continue on a single-plane basis to San Diego, California.

*Arguments in Support*

Frontier claims to be a well-established carrier known for offering low air fares and high quality customer service.  Frontier confirms its status as a limited incumbent carrier and states that Denver is the only beyond-perimeter community it serves, and that it provides service to five within-perimeter communities using slots held by its affiliate, Republic Airlines.  The carrier claims its nonstop DCA-COS operation fulfills the statutory criteria and would best maximize the public interest and competition benefits.

Specifically for Colorado Springs, Frontier states that the community is the second largest city in Colorado and that Washington, D.C. is its largest destination due in part to the Air Force Academy and the significant presence of military personnel in the region.  The carrier also argues that Colorado Springs is an underserved, high-fare market without nonstop service to DCA, and asserts that its proposal would not only provide additional capacity and offer a convenient, low-fare alternative to existing nonstop regional jet service at IAD and other connecting service, but also produce public benefits and introduce competition.  In support of its claim to offer low fare service and stimulate demand in the COS market, Frontier references the 37 percent increase in DCA-Denver passenger traffic and 13 percent decrease in average DCA-DEN fares after it entered that market.  Frontier also argues that its proposed service would enhance market structure, competition and network benefits to at least five additional beyond-perimeter communities, including its extensive network at Denver International Airport (DEN).  Frontier also claims that its proposed service would increase competition by reducing the

- 9 -

travel time to Colorado Springs by at least 1 hour and 44 minutes when compared to existing one-stop alternatives. Also, Frontier claims that its one stop DCA-SAN flight would inject low-fare competition into the DCA-SAN and broader WAS-SAN markets.

In its consolidated answer of March 27, Frontier urges the Department not to grant any carrier more than one pair of slot exemptions, in order to maximize the number of carriers receiving slot exemption awards, and to limit the awards for service to cities that will receive first-time nonstop DCA service. In addition to restating many of arguments made in its application, Frontier explains that, like Alaska and Virgin America, it lacks a within-perimeter hub from which it could flow traffic to the west. The carrier also explains that Colorado Springs is a newly established western focus city from which it plans to serve or already serves five different western markets, including its Denver hub, and asserts that its proposal would provide the only low-cost, low-fare service to Colorado Springs from the entire Washington, D.C., metropolitan area, thereby competing with United Express' IAD-COS service.[11] It argues that its proposal would provide more annual seats than any other applicant and states that its application has strong public support from government officials, Members of Congress, travelers and businesses.

### Answer of the City of Colorado Springs and the Colorado Springs Airport (COS)
COS submitted comments strongly supporting Frontier's application on March 27. COS emphasizes that the Washington, D.C., metropolitan area is its largest market in terms of daily passengers. The Colorado Springs representatives highlight many of the arguments made by Frontier and explain that because of the variability in travel time, the air service available at DEN is not an acceptable substitute for its community. COS reiterates that Frontier would offer a low-fare service alternative utilizing mainline aircraft with on-board amenities (including personal TVs) to compete against the regional jet service provided by a legacy carrier at IAD.

### Responsive Pleadings
Most of the other applicants in the proceeding offered comments on Frontier's proposal. Many make note of the comparatively small size of the Washington, D.C. - Colorado Springs O&D market and reference the existing regional jet service available at IAD.[12] Several carriers also claim that Denver is an acceptable substitute for Colorado Springs because of the reasonable driving distance between them. The carriers state that Frontier has already been awarded six beyond-perimeter DCA slot exemptions to serve Denver

---

[11] Frontier claims that its beyond-COS connections would offer the traveling public an alternative, low-fare service option that the Department should consider, citing our consideration of Alaska Airlines' connecting service, in DOT Order 2004-4-1 (Apr. 1, 2004), at 17, as precedent

[12] Southwest argues that, in measuring the Washington Metro region origin and destination traffic at COS, we should disregard the BWI and IAD traffic, because of a previous DOT/FAA determination that the three Washington area airports are "not interchangeable." Notice Granting Petition with Conditions, 75 Fed. Reg., 26322-26333 (May 11, 2010). Frontier, in its April 11 Motion for Leave to File and Response to Second Unauthorized Filing by Southwest, argues that the proceedings are distinguishable because the Delta-US Airways slot swap divestitures were identified to address concentration and competition concerns that otherwise would have arisen with the slot exchange, and the Department of Justice noted that other area airports may be acceptable substitutes for price-sensitive passengers.

- 10 -

and explain that Denver is also served from IAD and BWI. Other applicants also dispute Frontier's claims of domestic network benefits. They argue that many of the additional connections (including San Diego) that may be available on Frontier's network at Colorado Springs already have, or shortly will have, nonstop service to DCA and that Frontier has a very limited presence at SAN. Other carriers also argue that the carrier has an uncertain future, as its parent, Republic Airways Holdings, Inc., has mentioned that Frontier may be spun off or sold.

**JetBlue**

JetBlue has requested two slot exemptions in order to add one daily nonstop roundtrip to Luis Muñoz Marín International Airport (SJU) in San Juan, Puerto Rico, and, if granted, another pair of slot exemptions to provide one daily roundtrip to Austin-Bergstrom International Airport (AUS) in Austin, Texas. Proposed service to SJU would utilize Airbus A320 aircraft configured with 150 seats, while service to AUS would utilize 100-seat Embraer E190 aircraft.

*Arguments in Support*
JetBlue highlights its award-winning customer service, "everyday" air fares, history of stimulating demand for service, and the standard features of its service, including no overbooking, first checked bag free, all one-way fares, pre-assigned seats, the amount of legroom available in its seats, the relatively young age of its aircraft fleet, unlimited snacks and drinks, and 136 channels of free entertainment. In support of its claims to stimulate demand and lower fares, JetBlue points to the highly favorable impact of its services on fares and traffic in the Jacksonville, FL-SJU, Orlando, FL-Bogota, Colombia markets, and Boston-DCA markets, respectively. The carrier also explains that while it has recently begun service at DCA and that it has a growing presence at the airport through newly acquired and leased slots, it remains a limited incumbent carrier.

Regarding its proposed service to SJU, JetBlue explains that San Juan is the capital of the Commonwealth of Puerto Rico and a focus city within its network. It states that with its partner Cape Air, the two airlines provide connections to eight domestic and international destinations from SJU. The carrier argues that its proposed service would provide an important boost to Puerto Rico's economy, and therefore is consistent with the Obama administration's goal of fostering and sustaining the economic development of Puerto Rico (citing to Executive Order 13517, of October 30, 2009). JetBlue also explains that nonstop service between DCA and SJU currently does not exist and asserts that its proposal would introduce a unique coach product in the market, lower fares, increase capacity, expand service options and offer an increased level of competition to service offered at IAD and BWI.

Similar to its arguments in support of SJU, JetBlue describes Austin as the fifth largest market beyond the 1,250-mile perimeter that does not have nonstop service from DCA. The carrier explains that the community's population is increasing and describes the community as a growing center for business and tourism. The carrier states that it currently offers service to six destinations from Austin and asserts that its proposed service would offer meaningful competition, primarily in the DCA-AUS local market.

Similar to its arguments for its proposed service to SJU, the carrier also claims that its AUS proposal would lower fares, expand service options, stimulate the markets, provide public benefits and increase competition.  For example, JetBlue states that its proposed $125 - $665 one way fare is "significantly" lower than United's current one way IAD-AUS fare structure of $222-$1,473.

In its March 27 filing, JetBlue asserts that its proposal to SJU would introduce nonstop service to the Caribbean, a region that is not currently served from DCA.  JetBlue also highlights the significant financial investment it has made in gaining competitive access to, and securing slots at, DCA, which the Department should recognize.  In regard to its proposed service to SJU, JetBlue notes reports that American Eagle may suspend operations at the airport, indicating that additional opportunities for its expansion at SJU may exist.  The applicant also states that its SJU proposal would increase service to small hub airports and notes that its proposed schedule would occur at off-peak times at DCA and therefore not increase travel delays.  JetBlue states that its application is supported by Congressional interests, economic development officials, the cruise industry, and private citizens.  In regard to Austin, JetBlue states that it would connect with service to Long Beach, and, like its proposed schedule for SJU service, its service would occur during uncongested times at DCA and not increase travel delays.

### Answer of the City of Austin in Support of the Applications of JetBlue and Southwest

The City of Austin (Austin), owner and operator of AUS, submitted comments in support of both carriers' applications.  The city explains that it is only 65 miles beyond the current 1,250 mile perimeter from DCA and argues that it would already have multiple nonstop flights to DCA, if the perimeter rule did not exist.  Austin claims that originating travelers to DCA are currently paying significantly higher fares than from other destinations under consideration.  The City also states that with the recent announcement of United to SFO and US Airways to SAN, Austin is the second largest market in this proceeding without nonstop service to DCA.  Austin also maintains that yields to DCA are the highest among destinations included in the applications under consideration.  The City also asserts that service to AUS would create public benefits at San Antonio International Airport (SAT).  The owner and operator of AUS also states that both carriers' applications have support from its 16 elected leaders, their more than two million constituents, twenty-one Austin area business and economic development groups, two major universities, the Austin Convention and Visitors Bureau and Texas Department of Transportation, four national associations based in Austin, and the AFSCME, Local 1624.

### Responsive Pleadings

Most competing applicants in the proceeding offered comments on JetBlue's application.  These carriers note that while JetBlue has not been awarded previous DCA slot exemptions, it has already established a significant presence at DCA, operating more flights than any other applicant in this proceeding.  The commenting carriers provide details on the existing service to both SJU and AUS that is available at IAD and BWI from low-cost and legacy carriers.  Other applicants note that JetBlue's proposal would

- 12 -

serve smaller and/or leisure markets, utilize aircraft with fewer passenger seats, offer very limited connecting opportunities, and assert that monopoly routes from DCA usually result in fares that are comparatively more expensive.[13]  One of the other applicants also mentions JetBlue's cooperative agreement with American Airlines, which operates a significant number of DCA slots, and questions the likelihood of any resulting pricing discipline on fares.

## Southwest

Southwest's proposal is for two slot exemptions to establish one daily nonstop roundtrip to AUS, initially utilizing Boeing 737-700 aircraft with 137 seats and, by November 2012, Boeing 737-800 aircraft with 175 seats.  Service would also continue on a single-plane basis to San Diego, California.

### *Arguments in Support*

Southwest's application asserts in particular the fare savings it would bring to passengers in Austin, San Diego, and other connecting markets.  The carrier also highlights its award winning customer service, lower air fares, "no-fee" policy for checked baggage and reservation changes, the popularity of its frequent flier program and status as the nation's largest domestic airline in terms of passenger traffic.  The carrier also relates it has only a small presence at DCA, with access to 25 slots and slot exemptions, all through its AirTran subsidiary.

Similar to JetBlue's arguments in support of proposed service to Austin, Southwest also notes the lack of nonstop service from DCA and the economic growth the community has recently experienced.  The carrier also details its presence at AUS by explaining that in June 2012, it will operate nonstop to 20 communities.  Southwest also stresses that its proposed service to AUS will provide immediate connecting service to Dallas Love Field (DAL) and William P. Hobby Airport (HOU), offering a low-fare competitive alternative to customers that prefer close-in airports in Dallas and Houston, Texas.  The carrier also argues that its proposal will produce public benefits in the form of fare savings, traffic stimulation, new service options and increased competition.  In support of these claims, for example, Southwest claims that its projected DCA-AUS fare will be 36 percent lower than the current average DCA-AUS fare and that it will compete with United's IAD-AUS service by offering lower fares.

On March 27, Southwest filed a consolidated answer asserting that when compared to the other proposals, DCA - AUS is the second largest market that currently does not have nonstop service, that market yields are the highest, and that its proposed service will generate 147,000 new passengers, which it claims is the largest estimate of traffic stimulation among the applicants.  The applicant also states that, based on its presence in the domestic market, it holds the smallest relative portfolio of DCA slot or slot exemptions and that offering single-plane, one-stop service to an underserved market increases competition and maximizes network benefits.  Southwest claims its fares would

---

[13] The carriers note that the Department, in the past, has favored carriers offering greater capacity in restricted-entry proceedings, citing to DOT Order 2005-3-25, at 4.

- 13 -

be significantly lower than JetBlue's in the DCA-AUS market and that it would attract more passengers due to its relatively large AUS presence.

### Comments of the City of Austin in Support of the Applications of JetBlue and Southwest

See discussion above, at page 11.

### Comments of the Southwest Airlines Pilots' Association (SWAPA)

On March 27, the Southwest Airlines Pilots' Association (SWAPA) submitted comments in support of Southwest's application. SWAPA notes that when compared to the other applications, Southwest's Boeing 737-800 aircraft will provide the highest level of seating capacity. SWAPA also argues that the network benefits associated with Southwest's proposal could extend to additional communities with adjustments in schedule. SWAPA claims that Southwest will maximize the utilization of a scarce resource and produce the greatest public benefits.

### Responsive Pleadings

The other applicants contend that Southwest already has a substantial presence at DCA via its AirTran subsidiary. Several applicants also note that Southwest's proposal offers very limited connecting opportunities at AUS and that monopoly routes from DCA usually result in fares that are comparatively more expensive. Several carriers detail the existing mainline service to AUS available at both BWI and IAD. Other carriers also downplay any of the additional network benefits that may exist at SAN, DAL and HOU, arguing that numerous connecting opportunities to DCA already exist and that Southwest's connections to DAL and HOU should not be considered because they are each within-perimeter destinations. JetBlue also compares Southwest's forecast traffic stimulation with its own and asserts that if several assumptions and the methodology used were consistent among the two proposals, the differences in stimulated passenger demand would be small.

### Supplemental Pleadings

On April 3, Southwest filed a limited response and motion for leave to file. In response to comments from the other applicant proposing service to Austin, Southwest asserts that its presence in Austin is larger, that it will operate aircraft with more seats and offer lower fares and, therefore, its proposal will produce greater stimulation in the DCA-AUS market. Southwest references the Department's finding in the recent Delta– US Airways slot swap proceeding to argue that BWI and DCA are not effective substitutes for one another. Second, Southwest explains that traffic stimulation is expected to be larger in the earlier periods of service and taper off as service on the specific route matures.

Frontier replied to Southwest's response on April 5. Frontier argues that Southwest is inconsistent in its arguments regarding the availability of competing service in the Washington, D.C., area and argues that traffic data at all three airports (BWI, DCA and IAD) are competitive alternatives and makes note of Southwest's significant presence at BWI. The carrier explains that the Department's finding in the recent slot swap between Delta and US Airways was in the context of a slot exchange of within-perimeter slots to

- 14 -

mitigate competition issues specific to DCA and not in regard to specific beyond-perimeter route applications.

On April 6, JetBlue also replied to Southwest's filing. JetBlue challenges Southwest's traffic stimulation projections, and argues that Southwest's projections are overly optimistic.

In response to Frontier and JetBlue, Southwest filed a second response on April 9. In that filing, Southwest makes references to several additional statements made by the Department in the Delta – US Airways slot swap case to further justify its claims that BWI and DCA are not interchangeable. Moreover, Southwest details the recent results of the mandated divestiture as a result of the Delta – US Airways slot swap to illustrate the value airlines place on the possibility of operating a few flights at DCA. Southwest also explains that its pricing strategy is based on distance and not on competition, and therefore its projected fares are based on its yield curve. In responding to JetBlue, Southwest provides additional detail with regard to its calculations.

Frontier also filed a response to Southwest's second filing on April 11. In the reply, Frontier provides several examples of the fares Southwest offers in monopoly markets. Frontier uses these examples to argue that Southwest's estimated average DCA – AUS fare of $169 is unrealistic, to challenge Southwest's claim that its fares are based on distance rather than the competitive landscape and as further evidence to indicate that Southwest may not provide low fares in markets where competition does not exist.

## Sun Country

Sun Country applied for two slot exemptions to operate one daily nonstop roundtrip to Las Vegas McCarran International Airport (LAS), utilizing Boeing 737-700 aircraft with 129 seats, including 12 in first-class.

*Arguments in Support*
Sun Country states that it is an independent low-fare carrier that has been recognized for its low fares, quality of service and customer satisfaction. It claims that it has a history of increasing passenger demand and lowering air fares in the markets it enters. Sun Country states that it qualifies as a limited incumbent, noting that it currently operates only a single roundtrip at DCA. The carrier argues that it could reduce its airport unit costs and serve its customers better if it could increase its presence at DCA.

Regarding its proposed service to LAS, Sun Country explains that it has served the community for 29 years and that the demand for flights continues to increase. The carrier also notes that Las Vegas is a major convention and trade show destination and the fourth largest O&D market beyond the 1,250 perimeter at DCA. The airline acknowledges that the Department has already granted slot exemptions for service to Las Vegas (operated now by US Airways), but argues that its proposal would offer service with a more attractive schedule, provide convenient, low-fare travel, additional capacity and enhanced service options in the two markets, produce public benefits and increase competition.

Sun Country submitted additional comments on March 27. The carrier argues that based on the size of the DCA-LAS market, additional service is warranted. Sun Country restates many of the arguments made in its original application and urges the Department to award these slot exemptions to carriers that are not adequately represented at DCA. The applicant also highlights the competitive impact its DCA – Lansing, Michigan, service has had and states that an award of two additional slot exemptions would be helpful in obtaining "a critical mass of slots" at DCA.[14]

*Responsive Pleadings*
Several other applicants argued that Las Vegas is primarily a leisure market with low fares that limit the extent of competitive benefits, and that service would be provided with aircraft with comparatively smaller seating capacity. Other parties make note of both the existing service in the DCA – LAS market and the additional low-fare nonstop service available at IAD and BWI. The other carriers also mention that the carrier has a very limited presence at LAS, and highlight the lack of domestic network benefits associated with Sun Country's proposal.

## Virgin America

Virgin America has requested four slot exemptions in order to establish two daily nonstop roundtrips to SFO utilizing Airbus A319 aircraft with 8 first class seats, 12 main cabin select seats and 99 seats in the main cabin, or 119 seats in total. The proposed service will offer both morning and afternoon/evening flights in each direction.

*Arguments in Support*
Virgin America summarizes its growth in size as an airline since beginning service in 2007, describes its focus towards improving customers' in-flight experience, including the features of its award winning product (fuel efficiency, in-flight WiFi, interactive flight status maps, seat-to-seat chat, power outlets, USB jacks at every seat, movies, satellite TV, premium TV, music videos, radio, games, on-demand food and beverage ordering), and explains its history of lowering air fares in the markets it enters. The carrier also confirms that it qualifies as a new entrant carrier and that it has never held, sold or given up a DCA slot. The applicant argues that the size and significance of the local market, rather than a strict focus on demonstrating "domestic network benefits" and "increasing competition in multiple markets," should now play a more prominent role when evaluating applications, in light of the additional statutory selection criteria included in FAA 2012 and the fact that the Department may choose to consider the criteria either in isolation or in combination. Virgin America, accordingly, suggests the Department should select the service proposed at a beyond-perimeter market serving a large metropolitan area with significant O&D traffic.

In regard to its proposal to serve San Francisco, the carrier argues that the San Francisco Bay Area is the largest metropolitan area and O&D market in the country without

---

[14] Sun Country refers to the DOT/FAA Notice Granting Petition with Conditions, 75 Fed. Reg., 26322-26333 (May 11, 2010), in which we recognized the importance of a critical mass of slots by structuring a slot auction for DCA and LaGuardia Airport slots in bundles of eight slot pairs.

- 16 -

nonstop service to DCA, and therefore its proposal will benefit more local passengers than any other application in this proceeding. The carrier states that SFO serves as its base of operations where it offers service to five (one seasonally) destinations in the west and three in Mexico. Virgin America also asserts that the Washington, D.C. – San Francisco market is important to the carrier by referencing its current service at IAD, which has been in place since 2007. The carrier urges that the proposed service will complement this existing service and allow it to continue to grow the market. The applicant also argues that its proposal would offer a viable service pattern of at least two daily nonstop flights in the market, and provide convenient one-stop connections to four of its other destinations in the west. The carrier claims its proposed service will also provide public benefits, including lower fares, offer a wide array of price, service and quality options, greater capacity in the market, and enhance competition. In support of this claim, Virgin America asserts that average fares fell in several markets within a year after it commenced service, including DFW-SFO/LAX, BOS-SFO/LAX, JFK-SFO, LAS-SFO, JFK-LAS, and ORD-SFO/LAX. Virgin America also states that its DCA-SFO service will offer convenient online connections to other western cities.

In its March 27 filing the carrier reiterates that it is the only carrier in this proceeding that does not operate at DCA,[15] and that with the revision to the statutory selection criteria included in FAA 2012, the size of the local market should play a more prominent role when applications in this proceeding are evaluated, with less weight given to domestic network benefits and increased competition in multiple markets.[16] It stresses that the SFO – DCA market is significantly larger than those included in other applications. The carrier acknowledges United's recent announcement to inaugurate DCA – SFO service on May 14th and argues that its proposed service to SFO is even more important because it will provide much needed and well-timed competition in the market. Virgin America argues that its request for two roundtrips in the same market is consistent with some of the Department's previous DCA slot exemption awards[17] and necessary for it to compete with United, which has a much larger presence at both DCA and SFO.

### Comments of the City and County of San Francisco and San Francisco International Airport (SF0)

SFO submitted comments strongly supporting Virgin America's application on March 27. Similar to the carrier's arguments, SFO explains that Virgin America is the only new entrant in the proceeding and has provided important service quality and fare competition since its launch in 2007. The San Francisco parties also highlight the revisions made to the statutory selection criteria in FAA 2012 and assert that much

---

[15] Virgin America claims that the Department has favored new entrants in the past, citing to the DOT/FAA O'Hare Notice, 71 Fed. Reg. 51381, 51388-90 (Aug. 29, 2006) and to the US Airways/Delta slot swap for the proposition that a new entrant needs a critical mass of slots. 75 Fed. Reg. 7130-11 (Feb. 28, 2010).

[16] In this regard, it refers to one of our former beyond-perimeter selection cases in which we indicated that the AIR-21 selection criteria did not afford us sufficient discretion to consider the size and significance of the local beyond-perimeter market. Order 2002-11-20 (Nov. 27, 2002).

[17] DOT Order 2000-7-1 (Jul. 5, 2000), awarding four exemptions to America West under AIR-21 to provide two roundtrip DCA-PHX flights; and Order 2004-4-1 (Apr. 1, 2004), awarding four Vision-100 exemptions to Frontier for two roundtrip DCA-DEN flights.

- 17 -

greater emphasis should be placed on the size of the local markets proposed and competitive benefits associated with each proposal. The commenters explain that the SFO – Washington, D.C., market (approximately one million passengers) is nearly three times larger than the next largest market which does not have nonstop service to DCA. SFO estimates that, based on the size of the SFO-DCA market, six flights would be warranted.

*Responsive Pleadings*

The majority of other applicants filed reply comments on Virgin America's application. Competitors urge the Department not to award half of the slot exemptions available in this proceeding to a single applicant.[18] Several of the competing carriers highlight the existing service available at BWI and IAD, including more than 12 daily frequencies at IAD, a portion of which is provided by Virgin America. The other carriers also make note of the relatively low average market load factors and fares to argue that the San Francisco – Washington, D.C. market is already well-served. The other carriers also question the need for the proposed SFO service based on United's recent announcement to provide service from DCA beginning May 14, 2012. Several other carriers also dispute Virgin America's claims of network benefits based on inefficient routing that would occur from SFO and because many of the communities that Virgin America's proposed service would connect to already have or soon will have nonstop service from DCA.[19] One of the competing applicants also references a recent news article and questions the performance capability of the engines on Virgin America's proposed aircraft and suggests that an upgrade will be required to ensure the maximum number of passenger seats will be available for sale.[20]

*Comments of the Metropolitan Washington Airports Authority (MWAA)*

On March 27, MWAA filed comments to inform the Department and applicants of the circumstances at DCA. MWAA does not state a preference for any application. Rather, MWAA explains that the new service to be awarded under this proceeding will increase both congestion and noise within the vicinity of DCA and place additional strain on the airport's facilities, including automobile parking. MWAA explains that the 44 gates and overnight aircraft parking spaces at DCA are heavily utilized and that carriers hoping to gain access to the airport may have difficulty securing gates and other essential operating space. MWAA also expresses concern with the increase in authorized flights at DCA and the decline in domestic service at IAD.[21]

---

[18] Frontier, for example, referred to a 2000 Order in which we allocated twelve slot exemptions by granting two per carrier. DOT Order 2000-7-1.

[19] The carriers also refer to DOT Order 2000-7-1, at 24, where we declined to find significant beyond-perimeter network benefits in a proposal that offered circuitous routings and duplicative service.

[20] On March 30 and April 2, Virgin America filed responses stating that engine upgrades are in process and will be completed on any of the aircraft that will be used to operate at DCA by June 30.

[21] These additional slot exemptions, however, were mandated by FAA 2012, which also increased permissible operations by two per hour. We note that MWAA, in the past, has successfully managed to accommodate requests by new or expanding airlines to gates and facilities. MWAA has facilitated access by airlines that leased, purchased or traded slots, received slots through lotteries, or were granted slot exemptions. We firmly expect MWAA to similarly facilitate these additional operations.

## DECISION

All of the applications have merit and have received strong community support.  In reaching our decision, we have carefully reviewed the applications and responsive pleadings, and we have evaluated the extent to which each application met the revised factors Congress outlined in Section 41718(g)(2).  We conclude that the following proposed services merit allocations under the statute and award slot exemptions to: Alaska Airlines, for two slot exemptions for nonstop service to Portland, Oregon; JetBlue Airways, for two slot exemptions for nonstop service to San Juan, Puerto Rico; Southwest Airlines, for two slot exemptions for nonstop service to Austin, Texas; and Virgin America, for two slot exemptions for nonstop service to San Francisco, California. Our reasoning to support these decisions is set out below.

### Alaska to Portland

We conclude that Alaska merits an award of two exemptions for service to Portland (PDX).  Alaska's application will enhance options for nonstop travel, have a positive impact on competition, and produce public benefits of higher capacity and service options.

We find that Alaska's nonstop DCA-PDX service will enhance options for nonstop travel, because PDX is the fourth largest local O&D[22] market from DCA currently without nonstop service.[23]  Currently, Alaska's ability to accommodate the DCA-PDX demand for service is limited, given the carrier's sustained load factors of 91% on its existing nonstops to Seattle and 88% to Los Angeles.[24]  We further find that Alaska's nonstop DCA-PDX service will have a positive impact on the overall level of competition in the markets that will be served by increasing competition in the local market, which today consists of connecting service from DCA.  Alaska's new service will also increase competition in multiple markets throughout the Pacific Northwest, particularly in conjunction with its Seattle nonstop operations.  As a new entrant/limited incumbent, Alaska has had a highly positive impact on competition between DCA and both Seattle and Los Angeles following its market entries in 2001 and 2004, respectively.[25]  We also find that the nonstop DCA-PDX service will produce public benefits by Alaska's use of high capacity aircraft and convenient schedules.  Based on the service patterns Alaska established with its existing exemptions, it has attracted the third highest passenger share between DCA and PDX and the fourth highest revenue share[26] even without the ability to flow traffic over multiple within perimeter hubs.  However, Alaska's current ability to enhance the level of competition between DCA and PDX as

---

[22] DOT DB1B data, year ended September 30, 2011.
[23] Schedules as of May 1, 2012.  The three larger O&D markets without current nonstop service are San Francisco (receiving an award here for service by Virgin America, and, prospectively, service from United); San Diego (receiving prospective service from US Airways), and San Antonio, TX, for which no application for service has been filed in this docket.
[24] DOT T-100 onboard passengers, Year 2011.
[25] *See*, Order 2001-6-20 and Order 2004-4-1.
[26] DOT DB1B data, year ended September 30, 2011.

- 19 -

well as increase the amount of competitive network benefits to markets in the Pacific Northwest is limited, as it has no intervening within-perimeter hub over which to flow traffic to/from DCA.  Operating in conjunction primarily with its Seattle nonstops, Alaska's DCA-PDX service also will enhance domestic network benefits and increase competition in multiple markets throughout the Pacific Northwest.

We are not persuaded by the comments opposing an award to Alaska for Portland.  The primary contention raised in opposition to this application is that Alaska is not typically categorized as a low-fare carrier.  Although criterion (G) from FAA 2012 provides for consideration of whether exemptions "produce public benefits, including low fares, higher capacity, and a variety of service options," the language of this provision does not require us to disqualify from favorable consideration any carrier not classified as "low-fare."  Alaska, with just three roundtrips from DCA, has produced a positive competitive impact at the airport.  Its proposal for Portland will build on its prior operational achievements and produce public benefits by offering the second highest capacity aircraft of all applicants from the launch date.  The carrier will also provide a variety of service options, such as using complementary flight times to flow traffic to the Pacific Northwest either via Portland or Seattle, depending on consumer preference.  These particular strengths, together with the network benefits offered in the Pacific Northwest, support our decision that the benefits of an award to Alaska for Portland outweigh the benefits that would be achieved under the proposals that we have not selected.

## JetBlue to San Juan

We conclude that JetBlue merits an award of two exemptions for service to San Juan.  JetBlue's application will enhance options for nonstop travel, have a positive impact on competition and provide domestic network benefits.

We find that JetBlue's nonstop DCA-SJU service will enhance options for nonstop travel to a unique region.  The focus of all beyond-perimeter exemptions thus far has been to markets in the western U.S.  Eight western cities[27] have been awarded nonstop service and many more communities have gained single-connection service to DCA through beyond-perimeter hubs.  JetBlue's current share of DCA-SJU is less than five percent, resulting in a sixth place ranking.

We also find that JetBlue's nonstop DCA-SJU service will have a positive impact on competition in the markets to be served, based particularly on the carrier's experience serving DCA.  JetBlue recently began operations at DCA[28] via a lease of slots from American and one pair of allocated slots from FAA, in 2010, and plans to expand its operations in June, utilizing the slots it purchased from Delta in 2011.  Although its time in DCA has been short and its scope of nonstop services is limited, initial data indicate

---

[27] Denver, Las Vegas, Los Angeles, Phoenix, Salt Lake City, and Seattle currently have nonstop beyond perimeter service.  New service will be initiated to San Diego and San Francisco in June and May 2012, respectively.
[28] Effective November 2010.

- 20 -

that JetBlue, an established low-fare carrier, has generated positive competitive discipline in the DCA markets it serves, as it has rapidly gained passenger share, while at the same time recording average fares below the respective incumbent carriers.

Further, we find JetBlue's nonstop DCA-SJU service will provide beyond-perimeter domestic network benefits on a roundtrip basis to St. Thomas, a sizeable market from DCA in which JetBlue would be a new entrant. Overall JetBlue's service will have a positive impact on the level of competition.

We are not persuaded by the comments opposing an award to JetBlue for San Juan. Carriers' comments included references to JetBlue's having the largest presence of all applicants at DCA, that nonstop service to SJU already exists from IAD and BWI, and that SJU is primarily a leisure destination. Although JetBlue will have the largest DCA operation of all the applicants,[29] it remains qualified as a limited incumbent. In the last beyond-perimeter exemption case, we recognized the uniqueness of service to DCA, even when other area airports may have nonstop service to the same beyond-perimeter destination.[30] Finally, nothing within the selection criteria directs us to avoid granting exemptions to leisure-oriented markets, as public benefits may accrue to any segment of the traveling public.

## Southwest to Austin

We conclude that Southwest merits an award of two exemptions for service to Austin. Southwest's application will enhance options for nonstop travel, have a positive impact on competition and produce public benefits including lower fares.

Southwest's nonstop DCA-AUS service will enhance options for nonstop travel to a market located just 65 miles beyond DCA's perimeter that is ranked fifth among cities without nonstop service to DCA.[31] We also find that Southwest's nonstop DCA-AUS service will have a positive impact on competition, because current service from DCA to AUS is divided primarily between the four non-limited incumbents (American, Delta, United and US Airways) with each carrier having at least a double-digit share, and, based on Southwest's past performance, its new service would stimulate traffic. We further find that Southwest's nonstop DCA-AUS service will produce public benefits, particularly by lowering fares in the market. Austin has the highest average local O&D fare[32] and yield of all applicant destinations, and Southwest, an established low-fare carrier, is expected to exert competitive discipline on the fare levels.

We are not persuaded by the comments opposing an award to Southwest. Southwest has a solid history of offering low fares and, given its specific commitments here, we believe its proposal for service to a large and growing market like Austin, where DCA's four

---

[29] Effective June 2012.
[30] *See* Order 2004-4-1 at 20.
[31] DOT DB1B data, year ended September 30, 2011.
[32] *Id.*

non-limited incumbents currently control over 90 percent of the local O&D revenue,[33] merits an award.

## Virgin America to San Francisco

We conclude that Virgin America merits an award of two exemptions for service to San Francisco. Virgin America's application will enhance options for nonstop travel, have a positive impact on competition and produce public benefits including lower fares.

We find that Virgin America's nonstop DCA-SFO service will enhance options for nonstop travel, because Virgin America is the only new entrant applicant in this proceeding, and San Francisco is the largest O&D market from DCA without nonstop service. The local DCA-SFO market is currently fragmented, with all four non-limited incumbents at DCA (American, Delta, United and US Airways) having double-digit passenger shares via their existing connecting services.

Commenters asserted that establishing a sustainable presence in such a market will be challenging, especially given the nonstop entry of SFO hub carrier United.[34] However, we note that Alaska at Seattle, and Frontier at Denver, initially launched and successfully maintained beyond perimeter operations at DCA with only two exemptions each. Additionally, the size of the DCA-SFO market can accommodate Virgin America's competitive nonstop service.

Although Virgin America has put forth strong arguments supporting its request for four SFO exemptions, in the context of only eight exemptions being available and given the merits of the other proposals, we believe the overall benefits of a second SFO pair do not exceed the benefits attained through award of the first nonstops to Austin, Portland, or San Juan.

## Other Applications

## Air Canada to Vancouver

We decided not to select Air Canada's proposed nonstop DCA-YVR proposal because, although it would enhance nonstop travel options, the local O&D market is relatively small compared to the DCA-Portland/Austin/San Francisco/and San Juan markets. Additionally, due to the seasonal nature of the DCA-YVR market, we do not find the impact to the overall level of competition from Air Canada's proposal would be as robust as that of the selected markets. Air Canada currently provides nonstop service from DCA to two of its hubs, Montreal and Toronto, as well as its nation's capital of Ottawa.[35]

---

[33] *Id.*

[34] United will commence service on May 14, 2012.

[35] Contrary to the assertions made by some commenters, the terms of the U.S.-Canada Agreement do not preclude an award of beyond-perimeter slot exemptions under Section 41718(g)(2) to a Canadian carrier.

- 22 -

Other applicants commented about the very small size of the local O&D market with one noting further that there had been multiple unsuccessful attempts made by Air Canada and its Star Alliance partner, United, to offer sustained hub-to-hub service between Washington Dulles and Vancouver.[36]  We find Air Canada's application substantially less compelling than those for nonstop service to Portland, Austin, San Francisco and San Juan.

## Alaska to San Diego

In its application, Alaska states that its number one priority for slot exemptions is Portland, making San Diego its second choice.  Although San Diego is the second largest O&D without nonstop service from DCA and has the second highest average fare of all applicant cities,[37] we find that Alaska's case for Portland is the stronger of the two, due primarily to the network benefits associated with Alaska's Pacific Northwest operations.  While we cannot disagree that there are strong benefits generated from an award to Alaska for San Diego,[38] they are not as compelling as those for an award to Portland, (including to Alaska Airlines itself), Austin, San Francisco, and San Juan.  The services to Portland, Austin and San Juan that we are selecting here represent the first and only nonstop operations between those cities and DCA.  Unlike those markets, San Diego, beginning in less than a month, will have nonstop US Airways service to DCA, and Southwest plans, soon thereafter, to offer single plane DCA service through Austin.  We recognize that San Francisco's award does not constitute the first nonstop service in the market, as United is inaugurating its new nonstop service this week.  However, as already discussed, San Francisco is a larger O&D market than San Diego, and it will be served by a low-fare carrier that will also be the only new entrant at DCA.

## Frontier to Colorado Springs

We have determined not to select Frontier's application primarily due to the relatively small size of the DCA-COS market.  Although Frontier seeks to complement its successful record of operating six beyond-perimeter exemptions to Denver with a first nonstop to COS and plans to use the largest capacity aircraft of all applicants, COS is the smallest domestic O&D market of all the proposals.  COS, with 49 passengers per day each way,[39] is only the 19th largest O&D market from DCA without nonstop service.  Frontier already captures 21 per cent of the local DCA-COS market via its existing connections in Denver.

---

Annex II, section 2, para 1 of the Agreement allows Canadian carriers to operate in the DCA-Canada markets subject to "(a) the prevailing perimeter rule" and "(c) the acquisition by Canadian airlines of necessary slots at [DCA] under the prevailing rules for slot acquisition and minimum slot use applicable to United States airlines."  The Agreement provides that Canadian carriers are to be subject to the same perimeter and slot rules as US carriers.

[36] *See,* Consolidated Answer of Southwest Airlines Co., March 27, 2012, Exhibit WN-R-701A.

[37] DOT DB1B data, year ended September 30, 2011.

[38] US Airways will commence nonstop service effective June 8, 2012.

[39] DOT DB1B data, year ended September 30, 2011.

- 23 -

Frontier claims that its DCA-COS nonstop would provide extensive network benefits beyond the perimeter in the form of single connections to Seattle, Los Angeles, Portland, and Phoenix.[40]  All of these services from its designated "focus city" are scheduled to start after this Order is issued, and none of these points, as scheduled, will connect to Frontier's proposed service between COS and DCA.  San Diego, which Frontier proposes to serve on a one-stop basis over COS, is already served by Frontier on a single-connection basis to DCA over Denver at the same time of day in both directions as proposed via COS.  Additionally, Frontier says that it would offer an attractive low-fare service alternative to its beyond points,[41] but it already does so via its Denver hub.

## JetBlue to Austin

JetBlue requested that its application for service to Austin be granted only if its San Juan application is granted first.  We agree that Austin merits an award of slot exemptions, but we find that the range and scale of benefits resulting from an award to Southwest, particularly in the areas of aircraft capacity and beyond markets, to be superior.  Regarding aircraft capacity, as we described above, Southwest will commence service using Boeing 737-700 aircraft with 137 seats and, in November 2012, upgrade to B 737-800 aircraft with 175 seats, whereas JetBlue proposes use of 100-seat Embraer E190 aircraft.

## Sun Country to Las Vegas

We have decided not to select Sun Country's application for nonstop DCA-LAS service primarily because, as discussed, LAS already receives nonstop service to DCA via slot exemptions.  We note, however, that the DCA-LAS market generates the largest local demand from DCA of all the applicant destinations, and Sun Country's proposed schedule would complement the existing schedule offered by US Airways, by providing attractive departure and arrival times for convention and conference attendees in both LAS and DCA.  Nonetheless, we find that without any beyond Las Vegas connecting opportunities, Sun Country's proposed benefits are less compelling when compared to the scale of benefits offered by the service proposals for Portland, Austin, San Francisco, and San Juan.

---

[40] *See* Frontier Application at 14.
[41] *Id*. at 13.

**CONDITIONS**

**Start-up**

We will require that the awardees inaugurate full service by no later than September 8, 2012.  If, for any reason, an awardee is not able to use the slot exemptions awarded, we request that it notify the Department as soon as possible, but not later than 10 days after the date of service of this Order.

## Assignment of Slot Times

As stated in Order 2012-2-21, Section 414 (b) of FAA 2012 allows the Department to assign two additional slot exemptions per one hour period (for a total of five), an increase from the three per hour authorized in Vision 100.  There are 15 hourly periods beginning at 7:00 a.m. and ending at 9:59 p.m., and all slot exemptions must fit into those 75 slot times.  Applicants were advised of these slot-time constraints.  The Department noted that it anticipated multiple requests for the same slot periods, and therefore, all requests for slot exemption times may not be accommodated.  In applying for specific times, the Department indicated to applicants that if they were awarded slot exemptions, specific justification of their requests may be required and that these slot-time constraints may cause some proposals not to be viable.  In coordination with FAA's Slot Administration Office, we shall assign slot times corresponding with the authority granted in these proceedings, and in accordance with the requirements of FAA 2012, in a notice subsequent to our decision.

## ENVIRONMENTAL ISSUES

Although 49 U.S.C. Section 41718(e) specifically exempts our action here from review under the National Environmental Policy Act,[42] we remain sensitive to the environmental impact of increased operations at DCA.   Consistent with the statute, we will require that all operations authorized by this Order be conducted with Stage 3 aircraft.

Also, under 49 U.S.C. § 47117(e), the Department will give DCA priority in making grants for airport noise compatibility planning and programs.

## ADMINISTRATIVE TERMS

Under the provisions of 49 U.S.C. Section 41714(j), awardees may not sell, trade, transfer, or convey the operating authorities granted by the subject exemptions, except through an air carrier merger or acquisition.

---

[42] Section 41718(e) states, "Neither the request for, nor the granting of an exemption, under this section shall be considered for purposes of any Federal law a major Federal action significantly affecting the quality of the human environment."

- 25 -

Further, granting of these exemptions in no way is to be construed as allowing a carrier to operate services that it could not otherwise operate. Each awardee must still meet all the requirements of the Department and FAA, including but not limited to, use-or-lose provisions, and all other statutes and regulations governing air transportation.

This Order is issued under authority delegated in 49 C.F.R. Section 1.56(a).

**ACCORDINGLY,**

1. The Department grants slot exemptions from 14 C.F.R. Part 93, Subparts K and S, to Alaska Airlines, Inc. (two slot exemptions to serve Portland International Airport); JetBlue Airways Corporation (two slot exemptions to serve Luis Muñoz Marín International Airport); Southwest Airlines Co. (two slot exemptions to serve Austin-Bergstrom International Airport); and Virgin America Inc. (two slot exemptions to serve San Francisco International Airport);

2. The Department directs Alaska Airlines, Inc., JetBlue Airways Corporation, Southwest Airlines Co., and Virgin America Inc., to file in Docket OST-2012-0029 no later than ten business days after the service date of this Order their proposed flight schedules and effective date for operations authorized by this Order. Further, Alaska Airlines, Inc., JetBlue Airways Corporation, Southwest Airlines Co., and Virgin America Inc., must commence their proposed service by no later than September 8, 2012. The slot exemptions granted must be conducted with single-aisle Stage 3 aircraft, may not be used for operations between the hours of 10:00 p.m. and 7:00 a.m., and may not increase the number of operations at Ronald Reagan Washington National Airport in any one-hour period during the hours of 7:00 a.m. and 9:59 p.m. by more than five operations. These carriers are advised to exercise maximum flexibility in proposed operating times to ensure compliance with these limits;

3. In coordination with the FAA Slot Administration Office, the Department will make the final assignment of operating times for these beyond-perimeter slot exemptions in a separate notice, as soon as possible. The Department directs the awardees to contact the FAA Slot Administration Office regarding their proposed schedules associated with the slot exemptions. FAA will assign slot exemption numbers, effective dates, and operating times consistent with statutory limitations;

4. The Department prohibits Alaska Airlines, Inc., JetBlue Airways Corporation, Southwest Airlines Co., and Virgin America Inc., from selling, trading, transferring, or conveying the operating authorities granted by the subject exemptions, except through an air carrier merger or acquisition;

5. The Department grants all motions to file otherwise unauthorized documents and denies motions to strike such documents;

- 26 -

6.  Except as otherwise granted, we deny all other applications for exemptions from 14 C.F.R. Part 93, Subparts K and S, filed in this docket;

7.  The authorities granted under these exemptions are subject to all of the other requirements delineated in 14 C.F.R. Part 93, Subparts K and S, including, but not limited to, the reporting provisions and use-or-lose requirements;

8.  This docket will remain open until further order of the Department; and

9.  We will serve this Order on all interested parties including MWAA and the FAA Slot Administration Office.

By:

**SUSAN L. KURLAND**
Assistant Secretary for Aviation
and International Affairs

(SEAL)

*An electronic version of this document will be made available on the World Wide Web at:*
*http://www.regulations.gov/*

# Exhibit E

**Served: June 24, 2024**



UNITED STATES OF AMERICA
DEPARTMENT OF TRANSPORTATION
OFFICE OF THE SECRETARY

---

ESTABLISHMENT OF SLOT EXEMPTION PROCEEDING
AT RONALD REAGAN WASHINGTON NATIONAL AIRPORT
PURSUANT TO 49 U.S.C. § 41718
Docket DOT-OST-2024-0065

---

NOTICE

**Summary**

By this Notice, the U.S. Department of Transportation (the Department) is requesting applications from eligible air carriers for 10 slot exemptions for service to Ronald Reagan Washington National Airport (DCA) from domestic airports within or beyond the 1,250-mile perimeter established by 49 U.S.C. § 49109. Completed applications must be filed in docket DOT-OST-2024-0065 by July 8, 2024, and comments on any timely-filed applications must be filed by July 17, 2024.

**Background**

On May 16, 2024, President Biden signed into law the Securing Growth and Robust Leadership in American Aviation Act of 2024, also known as the FAA Reauthorization Act of 2024 (FAA 2024). Section 502 of FAA 2024 authorizes ten (10) new slot exemptions[1] at DCA for service to domestic airports either within or beyond the 1,250-mile perimeter established by 49 U.S.C. § 49109. By this Notice, the Department is requesting applications from eligible air carriers that wish to provide new nonstop services using these exemptions. FAA 2024 directs the Department to grant the 10 exemptions in two categories: eight exemptions, or four round trips, are reserved for incumbent carriers qualifying as non-limited incumbent carriers, while the remaining two exemptions, or one round trip, are reserved for limited incumbent carriers.[2] Any one carrier may be awarded no more or less than two exemptions (one round trip).

---

[1] A slot is a reservation for an instrument flight rule takeoff or landing. Therefore, two slots are required to operate a round trip. 49 U.S.C. § 41714(h)(4). A slot exemption is an exemption from the slot limitations in the Federal Aviation Administration's High Density Rule, 14 CFR Part 93, subparts K and S.

[2] 49 U.S.C. § 41714(h)(5) defines a limited-incumbent carrier as one that holds or operates fewer than 40 slots at DCA, not including any slot exemptions granted by the Secretary.

- 2 -

**Applications Requested**

The Department requests applications from eligible non-limited and limited incumbent air carriers for the slot exemptions made available by FAA 2024. Because Section 502 requires the Department to grant the exemptions not later than 60 days after the enactment of FAA 2024, we are establishing an expedited schedule for the application process. Accordingly, completed applications must be filed in Docket DOT-OST-2024-0065 no later than July 8, 2024. Any comments related to timely applications must be filed in Docket DOT-OST-2024-0065 no later than July 17, 2024. The Department anticipates issuing a single final selection order in this proceeding.

*Eligibility*

FAA 2024 directs the Department to make eight of the 10 additional slot exemptions available to incumbent air carriers qualifying for status as a non-limited incumbent carrier at DCA as of the date of the enactment of the statute. The remaining two slot exemptions shall be made available to incumbent air carriers qualifying for status as a limited incumbent carrier at DCA as of the date of the enactment of the statute, and as defined by 49 U.S.C. § 41714(h)(5). Additionally, FAA 2024 requires that the slot exemptions be used only to provide service to U.S. domestic airports. The Department, in coordination with the FAA Slot Administration Office, is providing below a list of current DCA Non-Limited and Limited Incumbent carriers at the time of the enactment of FAA 2024.[3]

| Non-Limited Incumbent Carriers | Limited Incumbent Carriers |
|---|---|
| American Airlines (AA) Delta Air Lines (DL) JetBlue (B6) Southwest Airlines (WN) United Airlines (UA) | Alaska Airlines (AS) Air Canada (AC)[4] |

*Application Process for Eligible Air Carriers*

As required by FAA 2024, the Department will consider applications and grant a total of ten (10) within or beyond perimeter slot exemptions for eligible non-limited (8), and eligible limited incumbent (2) air carriers. In assigning the slot exemptions, FAA 2024 directs the Department to consider the extent to which the exemptions will: (i) enhance options for nonstop travel to beyond-perimeter airports that do not have nonstop service from DCA as of the date of enactment of FAA 2024; or (ii) have a positive impact on the overall level of competition in the markets that will be served as a result of those exemptions.

---

[3] This list includes only those carriers marketing air transportation at DCA on the date of enactment of FAA 2024.
[4] *See* 49 U.S.C. § 41718(h)(3) and Order 2012-2-21.

- 3 -

At a minimum, carriers should include in their applications the market (and airport) to be served, the aircraft type, a schedule showing proposed times, an approximate start-up date, and an analysis of the relative merits of the carrier's proposed service when evaluated under the Section 502 criteria.[5] Applications should otherwise conform with the requirements of 14 CFR Subpart C. Completed applications must be properly served and filed in Docket DOT-OST-2024-0065 by July 8, 2024, and comments with respect to any timely-filed request for slot exemptions must be properly served and filed by July 17, 2024. Consistent with past practice and the expedited timeframe in the legislation, the Department expects to make selections in a single final order.

*Scheduling of Within and Beyond Perimeter Slot Exemptions*

After the final order, we will direct selected carriers to work with the FAA Slot Administration Office to assign slot times corresponding with the authority granted in this proceeding and in accordance with the requirements of FAA 2024. Under 49 U.S.C. § 41718(c)(2), the Secretary may not increase the number of operations at DCA by more than five in any of 15 one-hour periods between 7:00 a.m. and 9:59 p.m. EST. Many hours have already reached the statutory cap with existing exemptions and therefore not all requests will be able to be granted. Final slot times for the granted exemptions will be allocated via notice after the Department's decision.

We shall serve a copy of this Notice on all certificated U.S. Air Carriers, Air Canada, the Metropolitan Washington Airports Authority, the Mayor of the District of Columbia, the Governor of Virginia, and the FAA's Slot Administration Office.

By:

**CAROL (ANNIE) PETSONK**
Assistant Secretary for Aviation
and International Affairs

Dated:

(SEAL)

*An electronic version of this document will be available online at:*
*http://www.regulations.gov*

---

[5] Due to the expedited schedule required by Section 502, the Department encourages applicants to provide no more than one backup service proposal in their applications.

# Exhibit F

**BEFORE THE**
**DEPARTMENT OF TRANSPORTATION**
**WASHINGTON, D.C.**

| | |
|---|---|
| **Application of**<br><br>**FRONTIER AIRLINES, INC.**<br><br>**For Slot Exemption at Ronald Reagan Washington National Airport Pursuant to 49 U.S.C. § 41718** | **Docket DOT-OST-2024-0065** |

## APPLICATION FOR SLOT EXEMPTION

Communications concerning this document should be sent to:

Howard M. Diamond
EVP, Legal and Corporate Affairs
Frontier Airlines
4545 Airport Way
Denver, CO 80239
Tel. 720-374-4367
E-mail: Howard.Diamond@flyfrontier.com

Brian E. Foont
The Foont Law Firm, LLC
11727 Gainsborough Road
Potomac, MD 20854
Tel. 202-236-4851
E-Mail: Foont@FoontLaw.com

**BEFORE THE**
**DEPARTMENT OF TRANSPORTATION**
**WASHINGTON, D.C.**

| | |
|---|---|
| Application of<br><br>**FRONTIER AIRLINES, INC.**<br><br>For Slot Exemption at Ronald Reagan Washington National Airport Pursuant to 49 U.S.C. § 41718 | **Docket DOT-OST-2024-0065** |

**APPLICATION FOR SLOT EXEMPTION**

## I.    Frontier's Request

Regarding the U.S. Department of Transportation (DOT)'s Slot Exemption Proceeding at Ronald Reagan Washington National Airport Pursuant to 49 U.S.C. § 41718 issued June 24, 2024 ("Notice"),[1] Frontier Airlines, Inc. ("Frontier") hereby requests two (2) slots (*i.e.*, 1 slot pair) for use in the operation of daily flights from Ronald Reagan Washington National Airport (DCA) to/from Luis Muñoz Marín International Airport (SJU).

## II.    Eligibility

As explained in the Notice, Section 502 of the Securing Growth and Robust Leadership in American Aviation Act of 2024, also known as the FAA Reauthorization Act of 2024 ("FAA 2024"), authorizes ten (10) new slot exemptions at DCA. Eight (8) (*i.e.*, 4 slot pairs) of those are to be distributed to "incumbent air carriers qualifying for status as a non-limited incumbent carrier at Ronald Reagan Washington National Airport as of the date of enactment of the FAA Reauthorization Act of 2024"[2] and two (2) (*i.e.*, 1 slot pair) to "incumbent air carriers qualifying

---

[1] Docket DOT-OST-2024-0065.

[2] 49 U.S.C. § 41718(i)(2).

1

for status as a limited incumbent carrier at Ronald Reagan Washington National Airport as of the date of enactment of the FAA Reauthorization Act of 2024."[3] In both cases, eligibility first requires being an "incumbent air carrier." That is, the carriers that will receive slot exemptions must have been operating at DCA on May 16, 2024. With that prerequisite met, a carrier is eligible if it is a non-limited incumbent carrier at DCA or a limited incumbent carrier at DCA.[4]

The statutory definition of "limited incumbent air carrier" provided at 49 U.S.C. § 41714(h)(5) is as follows:

> Limited incumbent air carrier.—The term "limited incumbent air carrier" has the meaning given that term in subpart S of part 93 of title 14, Code of Federal Regulations; except that—
>
> (A)    "40" shall be substituted for "12" in sections 93.213(a)(5), 93.223(c)(3), and 93.225(h);
>
> (B)    for purposes of such sections, the term "slot" shall not include—
>
> (i)    "slot exemptions";
>
> (ii)    slots operated by an air carrier under a fee-for-service arrangement for another air carrier, if the air carrier operating such slots does not sell flights in its own name, and is under common ownership with an air carrier that seeks to qualify as a limited incumbent and that sells flights in its own name; or
>
> (iii)    slots held under a sale and license-back financing arrangement with another air carrier, where the slots are under the marketing control of the other air carrier; and
>
> (C)    for Ronald Reagan Washington National Airport, the Administrator shall not count, for the purposes of section 93.213(a)(5), slots currently held by an air carrier but leased out on a long-term basis

---

[3] 49 U.S.C. § 41718(i)(3). We note that FAA 2024 refers to "limited incumbent carrier" as opposed to "limited incumbent air carrier," the latter of which is defined in the statute at 49 U.S.C. § 41714(h)(5) and adopted by the DOT in the Notice (note 2). The regulations at 14 C.F.R. § 93.213(a)(5), however, define the term "limited incumbent carrier" (*i.e.*, without the word "air"), which is referenced in the statutory definition of "limited incumbent air carrier." Given that the DOT has adopted the statutory, rather than the regulatory, definition in the Notice, Frontier applies that definition herein, but notes that Congress may have been referring to the precisely matching regulatory term. Frontier hereby reserves its arguments in that regard, having concluded that under either definition, it is the only incumbent limited incumbent carrier eligible to receive a slot pair in the present proceeding.

[4] FAA 2024 effectively precludes granting slots to a new entrant air carrier unless it is also a limited incumbent air carrier. "New entrant air carrier" is defined in the statute as (emphasis added) "an air carrier that does not hold a slot at the airport concerned and has never sold or given up a slot at that airport after December 16, 1985, *and a limited incumbent carrier*." 49 U.S.C. § 41718(h)(3). Because FAA 2024 requires that the grantee of the slot be an incumbent air carrier, *i.e.*, already operating at DCA, new entrant air carriers that are not also limited incumbent carriers are excluded. Note that the regulatory definition of "New entrant carrier" does not include limited incumbent carriers. 14 C.F.R. § 93.213(a)(1).

> by that carrier for use in foreign air transportation and renounced by
> the carrier for return to the Department of Transportation or the
> Federal Aviation Administration.

The definition referred to above at 14 C.F.R. § 93.213(a)(5) is as follows:

> *Limited incumbent carrier* means an air carrier or commuter operator that holds or
> operates fewer than 12 air carrier or commuter slots, in any combination, at a
> particular airport, not including international slots, Essential Air Service Program
> slots, or slots between the hours of 2200 and 0659 at Washington National Airport
> or LaGuardia Airport. However, for the purposes of this paragraph (a)(5), the
> carrier is considered to hold the number of slots at that airport that the carrier has,
> since December 16, 1985:
> (i)     Returned to the FAA;
> (ii)    Had recalled by the FAA under § 93.227(a); or
> (iii)   Transferred to another party other than by trade for one or more slots at the
>         same airport.

As noted, Frontier is a limited incumbent carrier at DCA.[5] Specifically, because Frontier "holds or operates fewer than 12" slots at DCA, *i.e.*, six (6),[6] and (i), (ii), and (iii) in the above regulation do not add to that number, it is a limited incumbent carrier under 14 C.F.R. § 93.213(a)(5). Applying the adjustments specified in the above statute, the upper limit of slots to qualify as a limited incumbent carrier is increased to forty (40). There is, however, no minimum specified, with the regulation simply requiring that an air carrier hold or operate "fewer than 12" slots at DCA. Consequently, even though Frontier's slot total is reduced to zero (0) under 49 U.S.C. § 41714(h)(5)(B)(i) because all of its slots are 'exemption slots', Frontier remains a limited incumbent carrier under the statute.[7]

---

[5] Docket DOT-OST-0029-6192 at 8 (DOT acknowledging Frontier's confirmation of its status as a limited incumbent carrier without contradiction).

[6] Frontier received one (1) slot pair pursuant to Order 2000-7-1 and two (2) slot pairs pursuant to Order 2004-4-1.

[7] It is worth addressing the contrary argument that Frontier is not a limited incumbent air carrier. Under the statute, one of three categories must apply: (i) new entrant air carriers (definition provided *supra* at note 4), (ii) limited incumbent air carriers (as defined above), and (iii) non-limited incumbent air carriers, which, as commonly used, refers to carriers whose holding of slots (with the adjustments applied) exceeds forty (40). Because the statutory definition includes limited incumbent air carriers, a carrier may be both a new entrant air carrier and a limited incumbent air carrier (this is not so under the regulatory definition (*see*, *supra*, note 4) that does not include limited incumbent carriers). If one were, however, to deny that Frontier is a limited incumbent air carrier, it would not then

Not only is Frontier a limited incumbent carrier, but it is also *the only limited incumbent carrier eligible to receive slot exemptions in the present proceeding*. In the Notice, the DOT, citing the FAA Slot Administration Office, asserts that there are two (2) limited incumbent carriers: Alaska Airlines and Air Canada. A third carrier, Spirit Airlines, Inc. ("Spirit"), asserts that it is as well.[8] Concerning Alaksa Airlines, Spirit's counsel correctly explains in a letter to DOT that:

> Consistent with two decades of Department precedent, 49 U.S.C. § 41714(k) expressly prohibits Alaska from qualifying as a limited incumbent for new slot exemptions because it has an ongoing codeshare agreement with American Airlines and the "total number of slots and slot exemptions held by the two carriers at the airport exceed 20."[9]

Further, Spirit's counsel correctly notes that Air Canada, being a foreign carrier, is not able to provide service to a U.S. domestic airport from DCA as required for the slots being distributed.[10] Air Canada is, therefore, ineligible to receive any of the slot exemptions in the present proceeding.[11]

Spirit's counsel concludes by asserting that Spirit is a limited incumbent carrier and, therefore eligible to receive slots in the present proceeding.[12] The problem is that Spirit's counsel avoids addressing the first "incumbent" in 49 U.S.C. § 41718 (i)(3) (emphasis added):

> LIMITED INCUMBENTS.—Of the slot exemptions made available under paragraph (1), the Secretary shall make 2 available to *incumbent* air carriers

---

be a new entrant air carrier because Frontier holds slots (the definition of "new entrant air carrier" does not exclude 'exemption slots'). Thus, such a denial would put Frontier in a category not encompassed by the statute, *i.e.*, not a new entrant air carrier, limited incumbent carrier, or non-limited incumbent carrier. That is contrary to both a reasonable interpretation of the definition of "limited incumbent carrier" and the framework of the statute that is designed to categorize all carriers.

[8] Docket DOT-OST-2024-0065-0007.

[9] *Supra*, note 8 at 1. We note that, in contrast to the definition of "limited incumbent air carrier" under 49 U.S.C. § 41714(h)(5), the rule under 49 U.S.C. § 41714(k) counts both "slots and slot exemptions" for the purposes of the limit of twenty (20) specified in that provision.

[10] 49 U.S.C. § 41718 (i)(1)(A).

[11] *Supra*, note 8 at 1. *See also* Docket DOT-OST-2012-0029-6192 at 5 (DOT noting Air Canada's acknowledgement where the same requirement applied in a prior proceeding, that it "maintains that the statutory criteria that guided the award of previous DCA slot exemptions effectively prevented it from participating because service was to be provided to airports within the United States.").

[12] *Supra*, note 8 at 2.

> *qualifying for status as a limited incumbent carrier* at Ronald Reagan Washington
> National Airport as of the date of enactment of the FAA Reauthorization Act of
> 2024.

As explained above, the FAA 2024 requires that both types of "incumbency" must be met, *i.e.*, the carrier must be both an "incumbent air carrier," *i.e.*, operating at DCA, and a "limited incumbent carrier." Spirit may meet the latter requirement, but as Spirit's counsel notes, Spirit "does not currently operate or market flights at DCA."[13] Spirit is, therefore, not an incumbent air carrier at DCA and, consequently, ineligible to receive slots under FAA 2024.

Based on the above, Frontier is the only carrier eligible to receive the DCA slots in this proceeding given its status as both an incumbent air carrier and a limited incumbent carrier at DCA. All others are (i) not an incumbent carrier at DCA, *i.e.*, do not operate at DCA (*e.g.*, Spirit), (ii) ineligible to operate domestic service from DCA (*e.g.*, Air Canada), (iii) ineligible as a limited incumbent carrier under the statute due to code sharing arrangement with which it exceeds the limits under 49 U.S.C. § 41714(k) (*e.g.*, Alaska), or (iv) a non-limited incumbent carrier (as listed in the Notice).

## III. Why Frontier? Why SJU?

FAA 2024 specifies two (2) alternative criteria for the Secretary to consider in granting the exemptions available in the present proceeding. The second specifies, "have a positive impact on the overall level of competition in the markets that will be served as a result of those exemptions."[14]

Beyond being the only carrier eligible to receive the slot pair allocated by FAA 2024 as an incumbent air carrier qualifying for status as a limited incumbent carrier at DCA and permitted to operate domestic service, Frontier is the right carrier to receive a slot pair and SJU is the right deployment option for that slot pair. Both are pro-consumer and pro-competition.

---

[13] *Supra*, note 8 at 2.
[14] 49 U.S.C. § 41718(i)(4)(B)(ii).

## A. Fares

Frontier operates and promotes itself as an "ultra-low-cost carrier" charging fares substantially lower than those offered by other carriers. Frontier frequently offers the lowest fares available in the markets in which it operates, often by a substantial margin.

In the present proceeding, Frontier is seeking a slot pair to be used for flights to/from SJU. At present, only JetBlue operates from DCA to SJU. That exclusivity allows JetBlue to charge a substantial premium relative to fares from other Washington, DC area airports (BWI and IAD). By way of example, JetBlue's average fare on

|  | 2019 | 2023 | Jan - Apr 2024 |
|---|---|---|---|
| DCA - SJU average non-stop fare on JetBlue | $219 | $246 | **$247** |
| BWI and IAD - SJU average non-stop fare | $180 | $185 | **$171** |
| JetBlue Premium | 22% higher | 33% higher | **44% higher** |

that non-stop route in 2019 was $219, by 2023 it had increased to $246, and for January through April 2024, it had increased still further to $247. In contrast, the average non-stop fare from other D.C.-area airports (BWI and IAD) in 2019 was $180, in 2023 it increased slightly to $185, but in the first four months of 2024 fell to $171.[15] Thus, JetBlue not only enjoys a premium versus other DC-area airports, but that premium increased from 22% in 2019 to 33% in 2023, and even further to 44% for the first four months of 2024.

---

[15] We skip 2020, 2021, and 2022 to avoid the influence and anomaly of COVID-19.

Frontier introducing direct competition in the DCA-SJU market will increase capacity and allow consumers more choices with more favorable pricing – as is the case on every route on which Frontier and JetBlue compete head-to-head. In most cases, JetBlue's average fares are more than double Frontier's, and for some, the difference reaches five and even almost ten times Frontier's.



## B. SJU



*Frontier SJU Routes to/from Mainland Americas Destinations*



*Frontier Routes SJU Routes to/from Caribbean Destinations*

Frontier's interest in and dedication to the SJU market are substantial. In support of that, on January 17, 2024, Frontier announced that it would open a crew base at SJU.[16] Frontier opened that base on June 4, 2024.[17] During that same month, Frontier launched service to several new

---

[16] Frontier Airlines to Open Crew Base at San Juan's Luis Muñoz Marín International Airport, January 17, 2024 (https://news.flyfrontier.com/frontier-airlines-to-open-crew-base-at-san-juans-luis-munoz-marin-international-airport/) (last visited 07/08/24).

[17] Frontier Airlines Opens Crew Base at Luis Muñoz Marín International Airport, June 5, 2024 (https://news.flyfrontier.com/frontier-airlines-opens-crew-base-at-luis-munoz-marin-international-airport/#:~:text=SAN%20JUAN%2C%20P.R.,its%20first%20year%20of%20operation (last visited 07/08/24)).

destinations, with more scheduled for July 2024. That was on top of the destinations Frontier already served and continues to serve to/from SJU bringing the total to over twenty (20).[18]

Frontier hopes to continue to develop its already extensive network of flight offerings to and from SJU, including from DCA, as it brings its competitive ultra-low-cost business model to ever more markets. It, therefore, respectfully requests that it be granted two (2) slots / one (1) slot pair to operate DCA-SJU.

Respectfully submitted

Brian E. Foont
The Foont Law Firm, LLC
11727 Gainsborough Road
Potomac, MD 20854
Tel. 202-236-4851
E-Mail: Foont@FoontLaw.com

Counsel for Frontier Airlines, Inc.

July 8, 2024

---

[18] Service to certain destinations is seasonal.

## CERTIFICATE OF SERVICE

I, Brian E. Foont, certify that on July 8, 2024, I caused a copy of the Application of Frontier Airlines, Inc. For Slot Exemption at Ronald Reagan Washington National Airport Pursuant to 49 U.S.C. § 41718 (Docket DOT-OST-2024-0065) to be served upon the U.S. Department of Transportation via posting to Docket DOT-OST-2024-0065 at http://www.regulations.gov.


_____
Brian E. Foont

# Exhibit G

**BEFORE THE**
**DEPARTMENT OF TRANSPORTATION**
**WASHINGTON, D.C.**

| | |
|---|---|
| **Application of**<br><br>**FRONTIER AIRLINES, INC.**<br><br>**For Slot Exemption at Ronald Reagan Washington National Airport Pursuant to 49 U.S.C. § 41718** | **Docket DOT-OST-2024-0065** |

**OBJECTION TO ORDER TO SHOW CAUSE**

Communications concerning this document should be sent to:

Howard M. Diamond
EVP, Legal and Corporate Affairs
Frontier Airlines
4545 Airport Way
Denver, CO 80239
Tel. 720-374-4367
E-mail: Howard.Diamond@flyfrontier.com

Brian E. Foont
The Foont Law Firm, LLC
11727 Gainsborough Road
Potomac, MD 20854
Tel. 202-236-4851
E-Mail: Foont@FoontLaw.com

**BEFORE THE**
**DEPARTMENT OF TRANSPORTATION**
**WASHINGTON, D.C.**

| |
|---|
| **Application of**<br><br>**FRONTIER AIRLINES, INC.**<br><br>**For Slot Exemption at Ronald Reagan**<br>**Washington National Airport Pursuant to**<br>**49 U.S.C. § 41718** |

**Docket DOT-OST-2024-0065**

**OBJECTION TO ORDER TO SHOW CAUSE**

## I.    Background

The U.S. Department of Transportation (DOT)'s Slot Exemption Proceeding at Ronald Reagan Washington National Airport Pursuant to 49 U.S.C. § 41718 issued June 24, 2024 ("Notice")[1] called for applications for ten (10) slots (5 slot pairs) for use in the operation of daily flights from Ronald Reagan Washington National Airport (DCA). Four (4) slot pairs are to be allocated to incumbent carriers with status as a non-limited incumbent carriers and one (1) slot pair to an incumbent carrier with status as a limited incumbent carrier.

Frontier Airlines, Inc. ("Frontier") requested the one (1) slot pair allocated to an incumbent carrier with status as a limited incumbent carrier.[2] In its application, and further supported in its Comments on Timely-Filed Applications,[3] Frontier asserted that it is the only air carrier eligible to receive the slot pair allocated to an incumbent carrier with status as a limited incumbent carrier.

---

[1] Docket DOT-OST-2024-0065-0001 (Jun. 24, 2024).

[2] Frontier Airlines, Inc., Application for Slot Exemption, Docket DOT-OST-2024-0065-5802 (July 8, 2024) ("Frontier Application").

[3] Frontier Airlines, Inc., Comments on Timely-Filed Applications, Docket DOT-OST-2024-0065-22195 (July 17, 2024).

In connection with that, it addressed the applications of the two (2) other carriers that applied in the same category: Spirit Airlines, Inc. ("Spirit") and Alaska Airlines, Inc. ("Alaska").

Concerning Spirit, Frontier noted that Spirit did not operate at Ronald Reagan Washington National Airport (DCA) on May 16, 2024 (and still does not) and, therefore, did not meet the requirement of being an "incumbent."[4] The DOT has tentatively agreed with that basis for Spirit not being eligible to receive slots in the present proceeding.[5]

Regarding Alaska, Frontier (and Spirit) noted that Alaska is ineligible to receive slots as a limited incumbent carrier under 49 U.S.C. § 41714(k).[6] The DOT has, however, tentatively determined that Alaska is eligible despite that statutory bar.[7]

Finally, concerning Frontier's application, the DOT has tentatively determined that Frontier, while an incumbent, *i.e.*, was operating flights at DCA on May 16, 2024, contrary to its prior determinations,[8] is not a limited incumbent air carrier and is, therefore, ineligible to receive slots in the present proceeding.[9]

Frontier respectfully objects. As explained herein, the DOT's exempting Alaska from the statutory exclusion under 49 U.S.C. § 41714(k) exceeds the DOT's authority by adding an exception to the statute that is neither specified in the text nor supported by the statutory scheme or legislative intent. Moreover, Frontier's disqualification is based on an erroneous interpretation of 49 U.S.C. § 41714(h)(5) and contrary to the DOT's prior determinations concerning Frontier.

---

[4] Frontier Application at 6.

[5] DOT Order 2024-10-11, Docket DOT-OST-2024-0065-23579 (Oct. 16, 2024) at 21 ("Order").

[6] Frontier Application at 4. Letter from Counsel to Spirit, Docket DOT-OST-2024-0065-0007 (June 26, 2024).

[7] Order at 21-22.

[8] *See*, *infra*, § III.a.

[9] Order at 20.

## II.     Alaska Airlines

### a.  Statutory Exclusion

The DOT recognizes the difficulty presented by 49 U.S.C. § 41714(k) in awarding Alaska

the slots allocated to a limited incumbent carrier in the present proceeding. That statute provides:

> For purposes of this section and sections 41716, 41717, and 41718, an air carrier that operates under the same designator code, or has or enters into a code-share agreement, with any other air carrier shall not qualify for a new slot or slot exemption as a new entrant or limited incumbent air carrier at an airport if the total number of slots and slot exemptions held by the two carriers at the airport exceed 20 slots and slot exemptions.

Despite Spirit raising this issue on June 26, 2024[10] prior to Alaska submitting its application on

July 8, 2024,[11] and both Spirit[12] and Frontier[13] raising it in their applications for slots in this

proceeding, Alaska did not address this issue in its application or subsequent comments in this

proceeding.[14] Rather, the DOT, *sua sponte*, tentatively determined:

> The scope of Alaska and American's code sharing relationship is limited by a settlement agreement reached in 2017 to resolve issues related to the merger transaction between Alaska and Virgin America Airlines. The agreement prohibits Alaska from marketing any American flight that originates or terminates at any Key Alaska Airport, or American from marketing any Alaska flight that originates or terminates at any Key American Airport. The agreement also prohibits the marketing of Alaska and American service on defined overlap routes. Therefore, Alaska does not presently place the American Airlines code on any nonstop flight it operates at DCA, and would not be permitted to do so for any service operated with a new slot exemption award. Additionally, the relationship between Alaska and American does not include any slot sharing provisions. Therefore, Alaska does not receive any meaningful access to the DCA market via its relationship with American. Further, the legislative history of § 41714(k), as represented by its predecessor provisions in the House and Senate, indicates that it was intended to prevent commuter air carriers (as defined at 49 U.S.C. § 41714(h)(1)) from gaining preferential access to slots or slot exemptions as a new entrant or limited incumbent,

---

[10] Letter from Spirit Airlines, Inc., Docket DOT-OST-2024-0065-0007 (Jun. 26, 2024).

[11] Application of Alaska Airlines, Inc. for Slot Exemptions, Docket DOT-OST-2024-0065-5926 (July 8, 2024).

[12] Application of Spirit Airlines, Inc. for Two Slot Exemptions for DCA-SJC Service, Docket DOT-OST-2024-0065-5821 (July 8, 2024) at footnote 4.

[13] Frontier Airlines, Inc. Application For Slot Exemption, Docket DOT-OST-2024-0065-5802 (July 8, 2024) at 4.

[14] *See*, *generally*, supra footnotes 11 and 12.

only to market and operate those slots on behalf of a larger, incumbent mainline carrier. That is not the case here as Alaska is not a commuter air carrier and is not seeking to operate its proposed DCA-SAN service under the marketing control and branding of American.[15]

There are three difficulties with the DOT's above analysis. First, it is contrary to rules established by the Supreme Court for statutory interpretation. Second, it disregards Alaska's code sharing on American Airlines, Inc.'s ("American") flights, including those operating from DCA. Third, it misrepresents the legislative history of 49 U.S.C. § 41714(k).

### i. Contrary to Statute's Plain Meaning

The Supreme Court has held, "If the statutory language is plain, we must enforce it according to its terms."[16] The Court continues, "So when deciding whether the language is plain, we must read the words 'in their context and with a view to their place in the overall statutory scheme.'"[17] The meaning of 49 U.S.C. § 41714(k) is plain. The DOT is not interpreting the statute in light of its legislative history or otherwise but instead amending it to provide an exception that is simply not in its text. Specifically, the DOT adds a discretionary exemption as to whether the code-sharing provides "meaningful access to the airport." With respect to code-sharing partners collectively holding more than twenty (20) slots, the statute says, "shall not qualify," not "may not qualify" with discretion left to the DOT.

Moreover, the statute does not require that the carriers involved codeshare on DCA flights for the exclusion under 49 U.S.C. § 41714(h)(5) to apply. Rather, it presents a straightforward test of summing the number of slots (including slot exemptions) of each of the code sharing partners and determining if that total exceeds twenty (20). In this case, Alaska holds eighteen (18) slots,

---

[15] Order at 21.

[16] *King v. Burwell*, 576 U.S. 473, 486, 486 (2015) *citing Hardt v. Reliance Standard Life Ins. Co.*, 560 U.S. 242, 251 (2010).

[17] *Id.* at 486 *citing FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 133 (2000).

including slot exemptions,[18] and American has three hundred and fifty-eight (358)[19] for a total of three hundred and seventy-six (376) – more than seventeen (17) times the limit specified in the statute. Even if, *arguendo*, "meaningful access" were an appropriate standard, Alaska alone has three (3) and American nearly sixty (60) times as many slots as Frontier. Alaska placing its code on even a small portion of American's flights operated from DCA would give it via code sharing greater access to DCA than Frontier has with its limited number of slots. In any event, however, there is no such discretion under the statute to exempt Alaska from its application.

We further note that the DOT reports that, "In 2012, Alaska received two slot exemption awards as a new entrant/limited incumbent carrier."[20] 49 U.S.C. § 41714(k) is not referenced in the order awarding those slot exemptions.[21] We suggest that the 2012 award to Alaska may have been an error and contrary to 49 U.S.C. § 41714(k). In any event, 49 U.S.C. § 41714(k) clearly bars Alaska from receiving slots allocated to a limited incumbent carrier in this proceeding.

### ii.  Code Share Provides Meaningful Access

In support of its tentative conclusion, the DOT asserts that ". . . Alaska does not presently place the American Airlines code on any nonstop flight it operates at DCA . . ." While that may be true, the reverse is not. In May through September 2024, approximately fifty-seven (57) of American's daily flights from DCA were marketed under Alaska's code to fifty-three (53)



*Figure 1 – American's Flights Operated With Alaska's Code*

---

[18] *Winter 2023/2024 DCA Air Carrier Holder Details*, FEDERAL AVIATION ADMINISTRATION, at 3 (https://www.faa.gov/about/office_org/headquarters_offices/ato/service_units/systemops/perf_analysis/slot_adminis tration/data/doc/DCA_W23_AC_HOLDER_DETAIL.pdf (last visited 10/30/2024).

[19] Id at 2.

[20] Order at 21.

[21] DOT Order 2012-5-12, Docket DOT-OST-2012-0029-6192 (May 14, 2012).

different destinations (see Figure 1).[22] Thus, we suggest its code-sharing with American does provide Alaska with "meaningful access to the DCA market." Moreover, noting that in the Order the DOT tentatively awards one (1) slot pair to American as a non-limited incumbent carrier, even if Alaska does not, as the DOT suggests, place American's code on its flights, Alaska's code may very well end up on the flights that American operates with its new slot pair. Thus, in this proceeding, Alaska alone stands to obtain the ability to market two (2) new flights from DCA.

### iii.  Conclusion Not Supported by Congressional Intent

Citing H.R. No. 106-167 and S. Rep. No. 106-9, the DOT asserts:

> the legislative history of § 41714(k), as represented by its predecessor provisions in the House and Senate, indicates that it was intended to prevent commuter air carriers (as defined at 49 U.S.C. § 41714(h)(1)) from gaining preferential access to slots or slot exemptions as a new entrant or limited incumbent, only to market and operate those slots on behalf of a larger, incumbent mainline carrier.[23]

We note that H.R. Rept. No. 106-167 comes in two (2) parts. The first is dated May 28, 1999[24] and the second June 9, 1999.[25] S. Rep. No. 106-9 on the unenacted Air Transportation Improvement Act[26] is dated March 8, 1999.[27] While the DOT asserts that the legislative history of 49 U.S.C. § 41714(k) "indicates that it was intended to prevent commuter air carriers (as defined at 49 U.S.C. § 41714(h)(1)) from gaining preferential access to slots or slot exemptions as a new entrant or limited incumbent, only to market and operate those slots on behalf of a larger, incumbent mainline carrier," H.R. Rept. No. 106-167 anticipated a provision that would instead require treating

---

[22] Cirium Codeshare Summary Report for the months of May, June, July, August, and September 2024 based on data for Sunday through Friday with fewer on Saturdays.

[23] Order at 22.

[24] See https://www.congress.gov/congressional-report/106th-congress/house-report/167/1 (last visited 10/30/2024).

[25] See https://www.congress.gov/congressional-report/106th-congress/house-report/167/2 (last visited 10/30/2024).

[26] S.82, 106th Cong. (1999-2000).

[27] See https://www.congress.gov/congressional-report/106th-congress/senate-report/9/1 (last visited 10/30/2024).

commuter air carriers with cooperative agreements with other air carriers comparably without regard to the form of the relationship:

> Treatment of Certain Commuter Air Carriers.--The Secretary shall treat all commuter air carriers that have cooperative agreements, including code share agreements with other air carriers, equally for determining eligibility for exemptions under this section regardless of the form of the corporate relationship between the commuter air carrier and the other air carrier.[28]

The above text also appears in S. Rep. No. 106-9 with the title "Commuter Air Carrier."[29] Thus, the early legislative history does not accord with the DOT's representation above. Note, however, that the "Commuter Air Carrier" material was not included in the final statute. Instead, the text that appears at 49 U.S.C. § 41714(k) was added via an amendment months later in the course of the conference between the House of Representatives and the Senate on H.R. 1000[30] and appeared in Section 231 of the enrolled bill on January 24, 2000.[31] The purpose of that section is explained in the conference report where the text of 49 U.S.C. § 41714(k) appears:

> For the purpose of determining whether an airline qualifies as a new entrant or limited incumbents for receiving slot exemptions, DOT shall count the slots and slot exemptions of both that airline and any other airline that it has a code-share agreement at that airport.[32]

Thus, the legislative history and intent of 49 U.S.C. § 41714(k) supports the plain meaning of the text of the statute and reinforces that Alaska is not eligible to receive slots as a limited incumbent carrier given its code-sharing relationship with American because, combined, Alaska and

---

[28] H.R. Rept. No. 106-167 dated May 28, 1999 at 17 (see https://www.congress.gov/congressional-report/106th-congress/house-report/167/1?outputFormat=pdf (last visited 10/23/2024)).

[29] S. Rep. No. 106-9 dated March 8, 1999 at 88 (See https://www.congress.gov/congressional-report/106th-congress/senate-report/9/1?outputFormat=pdf (last visited 10/23/2024)).

[30] H.R. Rept. No. 106-513 dated March 8, 2000 at 174 (see https://www.congress.gov/106/crpt/hrpt513/CRPT-106hrpt513.pdf (last visited 10/30/2024)).

[31] H.R. 1000, Enrolled Bill dated January 24, 2000 at 47 (see https://www.congress.gov/106/bills/hr1000/BILLS-106hr1000enr.pdf) (last visited 10/30/2024)).

[32] H.R. Rept. No. 106-513 dated March 8, 2000 at 174 (see https://www.congress.gov/congressional-report/106th-congress/house-report/513/1 (last visited 10/30/2024)).

American hold three hundred and seventy-six (376) slots – more than seventeen (17) times the limit of twenty (20) specified in the statute.

## III.    Frontier Airlines

### a.    DOT Tentative Finding

In 2002, the DOT determined, "Frontier clearly qualifies as a limited incumbent airline at DCA, as it currently holds only two DCA slot exemptions for a single daily round trip to Denver."[33] Since that time, Frontier has been granted four (4) further slot exemptions.[34] The definition of limited incumbent airline that applied in 2002 remains unchanged but for the upper limit having been increased from twenty (20) to forty (40).[35] In 2012, the DOT stood by that finding despite all of Frontier's slots still being slot exemptions, "Frontier, a limited incumbent carrier at DCA . . ."[36] Despite its earlier determinations, the DOT now asserts:

> Based upon the drafting of FAA 2024, the Department tentatively finds Frontier Airlines ineligible to apply for slot exemptions in this proceeding. Frontier passes the first test for eligibility but not the second. While Frontier was engaged in air transportation at DCA on the date of enactment of FAA 2024, therefore qualifying as an incumbent air carrier, it did (and continues to do) so by only using six slot exemption awards. 49 U.S.C. § 41714(h)(5)(B)(i) excludes an air carrier's count of slot exemptions at DCA for purposes of determining a carrier's status as a limited incumbent air carrier in order to allocate slot exemptions at DCA. 49 U.S.C. § 41714(h)(3) states that "[t]he term 'new entrant air carrier' means an air carrier that does not hold a slot at the airport concerned and has never sold or given up a slot at that airport after December 16, 1985, and a limited incumbent carrier." It is important to note that while § 41714(h)(3) states that limited incumbent carriers are also new entrant carriers, the reverse is not true, i.e., all new entrant carriers are not limited incumbent carriers.[37]

---

[33] DOT Order 2002-11-20, Docket DOT-OST-2000-7181-2117 (Nov. 27, 2002) at 8.

[34] As noted in the Order at footnote 87, "Frontier received two slot exemptions by Order 2000-7-1 and four slot exemptions by Order 2004-4-1."

[35] Per Pub. L. 106-181 (Apr. 5, 2000) the definition of "limited incumbent air carrier" was added as quoted above at p. 8, except that the limit under (A) was then twenty (20). That limit was subsequently increased to 40 pursuant to Section 414(c) of Pub. L. 112-95 (Feb. 14, 2012).

[36] DOT Order 2012-7-26, Docket DOT-OST-2000-7182 (July 24, 2012) at 18.

[37] Order at 20.

While the DOT asserts that, "Based upon the drafting of FAA 2024 . . .," FAA 2024 does not change the definition of "limited incumbent air carrier."[38] The DOT further concludes:

> Frontier, therefore, is not a limited incumbent air carrier, but rather meets the definition of a new entrant air carrier as defined by 49 U.S.C. § 41714(h)(3) since, at time of enactment of FAA 2024, Frontier did not hold or operate any non-exemption slots at DCA, nor had ever sold or given up a slot at DCA after December 16, 1985. Congress did not make any of the ten slot exemptions from the FAA 2024 Act available to new entrant air carriers. We tentatively determine, therefore, that Frontier is not eligible to receive a slot exemption award under 49 U.S.C. § 41718(i).[39]

We submit that logic is flawed, inconsistent with the statutory scheme, and, as noted above, contrary to the DOT's prior determinations.[40]

### b.  Analysis of Definition of "New Entrant Air Carrier"

The definition of "new entrant air carrier" specified at 49 U.S.C. § 41714(h)(3) as "an air carrier that does not hold a slot at the airport concerned and has never sold or given up a slot at that airport after December 16, 1985, and a limited incumbent carrier." The DOT asserts that Frontier is not a limited incumbent carrier (emphasis added):

> but rather meets the definition of a new entrant air carrier as defined by 49 U.S.C. § 41714(h)(3) since, at time of enactment of FAA 2024, **Frontier did not hold or**

---

[38] *See*, *generally*, Pub. L. 118.63, H.R. 3935, Sec. 502.

[39] *Supra*, footnote 37.

[40] We note that the DOT has previously altered its interpretation of statutes, explaining, "To the extent our decision today might be construed as a change in statutory interpretation, it is well-established that 'an agency's interpretation of an ambiguous statute is entitled to judicial deference' under *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984), and the agency may change 'a prior statutory interpretation . . . without notice and comment.' *Syncor Int'l Corp. v. Shalala*, 127 F.3d 90, 94 (D.C. Cir. 1997). *See also*, *e.g.*, *Firearms Import/Export Roundtable Trade Group v. Jones*, No. 11-547, 2012 WL 1288476, at *5 (D.D.C. March 12, 2012) ('[W]ithout notice and comment an agency may issue an interpretation that changes a prior statutory interpretation.') (quoting *Syncor*, 127 F.3d at 94) (internal citations omitted)." DOT Order 2012-7-26, Docket DOT-OST-2000-7182 (July 24, 2012) at footnote 21, but note that *Chevron U.S.A.* has been overturned by *Loper Bright Enterprises v. Raimondo*, 603 U.S. ___ (2024), 144 S. Ct. 2244 (2024). Thus, the DOT is no longer entitled "Chevron deference," and, we suggest, all the more so when changing its application of a statute that it had applied in a different fashion for over twenty (20) years without notice or basis for that change and in a fashion and context that may not have even obtained such deference. *See Chevron Deference: A Primer*, CONGRESSIONAL RESEARCH SERVICE, September 19, 2017 at 4-18 (https://crsreports.congress.gov/product/pdf/R/R44954/3 (last visited 10/30/2024)).

**operate any non-exemption slots at DCA**, nor had ever sold or given up a slot at DCA after December 16, 1985.[41]

The statute at 49 U.S.C. § 41714(h)(3), however, refers to "slots," not "non-exemption slots." Within the statutory scheme, "slot" is defined at 49 U.S.C. § 41714(h)(4) as "a reservation for an instrument flight rule takeoff or landing by an air carrier of an aircraft in air transportation." That definition does not differentiate between exemption slots and non-exemption slots. This stands in contrast to, for example, the definition of "limited incumbent air carrier" which excludes slot exemptions from the count of slots held by the carrier. If slots always excluded slot exemptions, the exclusion of slot exemptions would not be necessary and, of course, the definition of "slot" would be different.

Given the above, we arrive at a paradoxical result: Because Frontier holds slots at DCA, Frontier is not a new entrant air carrier (but for being a limited incumbent air carrier). Per the DOT, however, Frontier is not a limited incumbent air carrier at DCA because it "did not hold or operate any non-exemption slots at DCA."[42] Consequently, applying the correct meaning of new entrant carrier, the DOT's selective analysis places Frontier – which the DOT acknowledges is an incumbent at DCA[43] – in a category all its own outside the universe of carriers defined in 49 U.S.C. § 41714: a carrier that operates at DCA but is not a new entrant air carrier, a limited incumbent air carrier, or a non-limited incumbent air carrier. We suggest that is at odds with the statutory scheme of 49 U.S.C. § 41714.

---

[41] *Supra*, footnote 37.

[42] Id.

[43] Order at 20.

### c. Frontier's Qualification as a Limited Incumbent Carrier

The statutory definition of "limited incumbent air carrier" provided at 49 U.S.C. § 41714(h)(5) is as follows:

> Limited incumbent air carrier.—The term "limited incumbent air carrier" has the meaning given that term in subpart S of part 93 of title 14, Code of Federal Regulations; except that—
>
> (A)    "40" shall be substituted for "12" in sections 93.213(a)(5), 93.223(c)(3), and 93.225(h);
>
> (B)    for purposes of such sections, the term "slot" shall not include—
>
>     (i)    "slot exemptions";
>
>     (ii)    slots operated by an air carrier under a fee-for-service arrangement for another air carrier, if the air carrier operating such slots does not sell flights in its own name, and is under common ownership with an air carrier that seeks to qualify as a limited incumbent and that sells flights in its own name; or
>
>     (iii)    slots held under a sale and license-back financing arrangement with another air carrier, where the slots are under the marketing control of the other air carrier; and
>
> (C)    for Ronald Reagan Washington National Airport, the Administrator shall not count, for the purposes of section 93.213(a)(5), slots currently held by an air carrier but leased out on a long-term basis by that carrier for use in foreign air transportation and renounced by the carrier for return to the Department of Transportation or the Federal Aviation Administration.

The definition referred to above at 14 C.F.R. § 93.213(a)(5) is as follows:

> *Limited incumbent carrier* means an air carrier or commuter operator that holds or operates **fewer than 12** air carrier or commuter slots, in any combination, at a particular airport, not including international slots, Essential Air Service Program slots, or slots between the hours of 2200 and 0659 at Washington National Airport or LaGuardia Airport. However, for the purposes of this paragraph (a)(5), the carrier is considered to hold the number of slots at that airport that the carrier has, since December 16, 1985:
>
> (i)    Returned to the FAA;
>
> (ii)    Had recalled by the FAA under § 93.227(a); or
>
> (iii)    Transferred to another party other than by trade for one or more slots at the same airport.

Holding just six (6) slots, Frontier is a limited incumbent carrier under 14 C.F.R. § 93.213(a)(5).

We must, however, apply the modifications specified in 49 U.S.C. § 41714(h)(5). First, per 49

U.S.C. § 41714(h)(5)(A), we substitute "40" for "12." That does not change the result. Next, per 49 U.S.C. § 41714(h)(5)(B)(i), we subtract slot exemptions. Because all of Frontier's slots are slot exemptions, that reduces its total to zero (0). The remaining modifications do not apply. Zero (0) is less than forty (40), so Frontier remains a limited incumbent air carrier.

It should be noted that 49 U.S.C. § 41714(h)(5) expands the scope 14 C.F.R. § 93.213(a)(5). That is, 14 C.F.R. § 93.213(a)(5) specifies a cap of twelve (12) slots, with a few exclusions, and requires carriers to add to its total slots under (i), (ii), and (iii). The statute at 49 U.S.C. § 41714(h)(5) does the reverse by increasing the cap to forty (40) and giving carriers the benefit of subtracting some or even all of its slot holdings. The key, however, is the term "fewer." The DOT's interpretation would suggest that the regulation states "fewer but not less than two (2)," which it does not.

We respectfully submit correctly applying the plain meaning of "new entrant carrier" (but for also including limited incumbent air carriers), would exclude Frontier from that categorization. Further, applying both the plain meaning of "limited incumbent air carrier" and the DOT's precedent would include Frontier in that category. These straightforward and common-sense conclusions would maintain all carriers operating at DCA within the statutory scheme of 49 U.S.C. § 41714, in contrast, as noted above, to the DOT's interpretation that would paradoxically leave Frontier outside of its scope.

## IV.    Conclusions and Prayer for Relief

In light of the above, Frontier respectfully submits that 49 U.S.C. § 41714(k) bars Alaska from receiving slots in this proceeding as a limited incumbent carrier because of its code sharing with American and their combined total slots at DCA far exceeding the limit of twenty (20) in that statute. Further, as explained above, Frontier is a limited incumbent air carrier at DCA and,

moreover, is the only limited incumbent air carrier that is also an incumbent air carrier at DCA. It is, therefore, the only limited incumbent air carrier eligible to receive slots in this proceeding. Consequently, Frontier requests that the DOT modify its tentative ruling and award Frontier the two (2) exemption slots allocated to an incumbent air carrier with status as a limited incumbent carrier for which it has applied to operate daily flights from DCA to/from Luis Muñoz Marín International Airport (SJU).

Respectfully submitted,

Brian E. Foont
The Foont Law Firm, LLC
11727 Gainsborough Road
Potomac, MD 20854
Tel. 202-236-4851
E-Mail: Foont@FoontLaw.com

Counsel for Frontier Airlines, Inc.

October 30, 2024

**CERTIFICATE OF SERVICE**

I, Brian E. Foont, certify that on October 30, 2024, I caused a copy of Frontier Airlines, Inc.'s Objection To Order To Show Cause to be served upon the U.S. Department of Transportation via posting to Docket DOT-OST-2024-0065 at http://www.regulations.gov.


_____
Brian E. Foont

# Exhibit H



Order 2024-10-11
Served: October 16, 2024

**UNITED STATES OF AMERICA**
**DEPARTMENT OF TRANSPORTATION**
**OFFICE OF THE SECRETARY**
**WASHINGTON, D.C.**

Issued by the Department of Transportation
On the 16th day of October, 2024

<table>
<tr><td>

**Applications of:**

**ALASKA AIRLINES, INC.;**
**AMERICAN AIRLINES, INC.;**
**DELTA AIR LINES, INC.;**
**FRONTIER AIRLINES, INC.;**
**JETBLUE AIRWAYS CORPORATION;**
**SPIRIT AIRLINES, INC.;**
**SOUTHWEST AIRLINES CO.; and**
**UNITED AIRLINES, INC.**

For exemptions from 14 C.F.R. Part 93, Subparts K and S, pursuant to 49 U.S.C. § 41718(i), Special rules for Ronald Reagan Washington National Airport (Additional Slot Exemptions), as added by Section 502 of the Federal Aviation Administration Modernization and Reauthorization Act of 2024

</td><td>

**Docket DOT-OST-2024-0065**

</td></tr>
</table>

**ORDER TO SHOW CAUSE**

**I.  SUMMARY**

By this Order, the U.S. Department of Transportation (the Department) tentatively grants two slot exemptions at Ronald Reagan Washington National Airport (DCA) to each of five non-limited incumbent or limited incumbent air carriers, to operate new nonstop roundtrip service as follows:

- Alaska Airlines, Inc. (Alaska) for service to San Diego, California (SAN);

- American Airlines, Inc. (American) for service to San Antonio, Texas (SAT);

-2-

- Delta Air Lines, Inc. (Delta) for service to Seattle, Washington (SEA);

- Southwest Airlines Co. (Southwest) for service to Las Vegas, Nevada (LAS); and

- United Airlines, Inc. (United) for service to San Francisco, California (SFO).

## II. BACKGROUND

On May 16, 2024, President Biden signed into law the Federal Aviation Administration Modernization and Reauthorization Act of 2024 (FAA 2024).[1] Section 502 of FAA 2024 amends § 41718 of Title 49 of the U.S. Code by adding subsection (i), "*Additional Slot Exemptions.*" That subsection reads, in relevant part:

> (i) Additional Slot Exemptions.—
>> (1)Increase in slot exemptions.—Not later than 60 days after the date of enactment of the FAA Reauthorization Act of 2024, the Secretary shall grant, by order, 10 exemptions from—
>>> (A) the application of sections 49104(a)(5), 49109, and 41714 to air carriers to operate limited frequencies and aircraft on routes between Ronald Reagan Washington National Airport and domestic airports located within or beyond the perimeter described in section 49109; and
>>> (B) the requirements of subparts K, S, and T of part 93 of title 14, Code of Federal Regulations.
>>
>> (2)Non-limited incumbents.— Of the slot exemptions made available under paragraph (1), the Secretary shall make 8 available to incumbent air carriers qualifying for status as a non-limited incumbent air carrier at Ronald Reagan Washington National Airport as of the date of enactment of the FAA Reauthorization Act of 2024.
>>
>> (3)Limited incumbents.— Of the slot exemptions made available under paragraph (1), the Secretary shall make 2 available to incumbent air carriers qualifying for status as a limited incumbent carrier at Ronald Reagan Washington National Airport as of the date of enactment of the FAA Reauthorization Act  of 2024.
>>
>> (4)Allocation procedures.—The Secretary shall allocate the 10 slot exemptions provided  under paragraph (1) pursuant to the application process established by the Secretary under subsection (d), subject to the following:
>>> (A)Limitations.—Each air carrier that is eligible under paragraph (2) and paragraph (3) shall be eligible to operate no more and no less than 2 of the newly authorized slot exemptions.
>>> (B)Criteria.—The Secretary shall consider the extent to which the exemptions will—
>>>> (i)enhance options for nonstop travel to beyond-perimeter airports that do not have nonstop service from Ronald Reagan Washington National Airport as of the date of enactment of the FAA Reauthorization Act of 2024; or
>>>> (ii)have a positive impact on the overall level of competition in the markets that will be served as a result of those exemptions.

Section 41718(i) directs the Department to grant ten slot exemptions for nonstop service between DCA and domestic U.S. airports within or beyond the 1,250-mile perimeter established for

---

[1] FAA Reauthorization Act of 2024, Pub L. No. 118-63 (May 16, 2024) ("FAA 2024").

commercial operations at DCA.[2] Section 41718(i) allocates two new slot exemptions to an incumbent air carrier that qualifies for status as a limited incumbent carrier as of the date of enactment of FAA 2024, with the remaining eight slot exemptions allocated to incumbent air carriers that qualify for status as non-limited incumbent carriers as of the date of enactment of FAA 2024. [3] No air carrier selected by the Department may receive more or less than two slot exemptions.

### III. APPLICATIONS

By Notice on June 24, 2024, the Department requested applications for the ten new slot exemptions made available by § 41718(i).[4] As detailed in the Department's Notice and referenced above, section 41718(i) directs the Secretary to consider two criteria when awarding the new exemptions. Specifically, the Secretary must consider the extent to which the exemptions will: (A) enhance options for nonstop travel to beyond-perimeter airports that do not have nonstop service from Ronald Reagan Washington National Airport as of the date of enactment of FAA 2024, or (B) have a positive impact on the overall level of competition in the markets that will be served as a result of those exemptions. The Department's analysis focuses on the extent to which the applications meet the eligibility and allocation criteria provided by § 41718(i).

As summarized below, the Department received applications from Alaska, American, Delta, Frontier, JetBlue, Southwest, Spirit, and United. The entire public record for this proceeding, including proposals, answers, and all public comments, may be accessed online at https://www.regulations.gov, by searching for docket DOT-OST-2024-0065.

### Alaska Airlines[5]

In its application, Alaska requests two slot exemptions to establish one daily nonstop roundtrip service between DCA and San Diego International Airport (SAN) using 159-seat Boeing 737-800 or 737-8 MAX aircraft, commencing within 90-days of allocation.

### Arguments in Support

Alaska states that San Diego is the largest market from DCA without nonstop service, with 225 passengers per-day each-way (PPDEW) and 164,000 total annual origin/destination passengers

---

[2] A slot exemption is an exemption from the slot limitations in the Federal Aviation Administration's High Density Rule, 14 CFR Part 93, subparts K and S. A slot exemption permits one instrument flight rule takeoff or landing. Two slot exemptions are required to operate one roundtrip service. 49 U.S.C. § 41714(h)(4).

[3] A limited incumbent is generally an air carrier that holds or operates fewer than 40 slots (i.e. 20 roundtrips) and is not a new entrant, where any slot exemptions are excluded from the count. *See* 49 U.S.C. § 41714(h)(5); 14 C.F.R. § 93.213(a)(5).

[4] DOT-OST-2024-0065-5926, Establishment of Slot Exemption Proceeding at Ronald Reagan Washington National Airport Pursuant to 49 U.S.C. § 41718.

[5] *See* DOT-OST-2024-0065-5926, Application of Alaska Airlines, Inc. for Slot Exemptions.

in 2023.[6] Additionally, the application cites General Services Administration (GSA) estimates of approximately 28,000 travelers between DCA-SAN on official government business during 2024, increasing to 32,000 in 2025.[7] In its application, Alaska argues that the introduction of service to SAN will result in price discipline, stating that the carrier's entry in the IAD-SAN market during Q2 2023 reduced average air fares by 26%.[8] Alaska states that this price discipline would extend to customers using DCA-SAN service to connect onward to one of the carrier's nonstop markets from SAN. Additionally, Alaska states that consumers will benefit from time-savings associated with the new nonstop service, and global connections via its membership in the Oneworld Global Alliance and other airline partnerships.

Regarding demand for the proposed service, Alaska states in its application that San Diego is the eighth-largest city in the United States, is home to the country's largest military community, and is the largest market beyond DCA's 1,250-mile perimeter without nonstop service. Alaska cites $23.4B and $10.2B in economic impact to the tourism sectors of San Diego and Washington, DC, respectively.[9]

Alaska provides detail in its application regarding perceived competitive and consumer benefits related to the carrier's product offering and operational record. Specifically, Alaska states that customers travelling between DCA-SAN will benefit from a diverse product offering, which includes First Class, Premium, and Main Cabin seating, as well as a range of air fare options, such as its "Saver Fare." Alaska argues that its mix of products and loyalty program will have a positive impact for consumers traveling between DCA-SAN, offering additional choices and competitive service to that of other incumbent air carriers.[10] Operationally, Alaska states that its DCA flights operate with an 87.76% load factor, and a 99.78% completion factor, which the carrier describes as the highest of all carriers operating at DCA. Because of this, Alaska argues it is positioned to utilize new slot exemptions most efficiently.

**Responsive Pleadings**

Multiple other applicants submitted comments regarding Alaska's classification as a limited incumbent or non-limited incumbent in this proceeding. JetBlue and United state that all carriers should have the opportunity to provide comment should the Department make any changes regarding Alaska's eligibility in this proceeding. Frontier and Spirit state that Alaska should not be eligible as a limited incumbent in this proceeding, and instead should be evaluated as a non-limited incumbent. We address these comments later in this order.[11]

JetBlue states that Alaska's proposed schedule may require the use of airport infrastructure at DCA that is not presently available (for example, remain overnight "RON" parking). JetBlue

---

[6] *Id.* at 4 and AS-1.

[7] *Id* and at AS-5.

[8] *Id.* at 5 and AS-7.

[9] *Id.*

[10] Quality-of-service metrics, such as onboard product offerings, are outside the scope of consideration for this proceeding.

[11] *See infra* at 18.

also states that Alaska's addition of DCA-SAN service may lead to a reduction in service at IAD or BWI.[12] Spirit states that SAN is presently well served from IAD and therefore an allocation for DCA-SAN service would not be sufficiently competitive.[13]

### American Airlines[14]

In its application, American requests two slot exemptions to establish one daily nonstop roundtrip service between DCA and San Antonio International Airport (SAT) using Airbus A321 aircraft.

### Arguments in Support

American states that San Antonio is the second-largest market from DCA without nonstop service, with 154 PPDEW and 56,000 total annual origin/destination passengers in 2023. American further states that between DCA, IAD, BWI and SAT, there were 221,000 total annual origin/destination passengers in 2023.[15] The application argues that the introduction of American's nonstop service to SAT will result in price discipline and states that IAD and BWI are presently United's and Southwest's highest-fare routes respectively, from SAT.

Regarding demand for the proposed service, American states that DCA-SAT is the third-largest unserved origin/destination market in the United States.[16] American further notes in its application that the proposed schedule will enable round-trip connectivity via DCA to 20 markets, and one-way connectivity to an additional three markets. American states that the total PPDEW for anticipated reachable markets via one-stop connections from new DCA-SAT service, was more than 1,100 in July 2023.[17]

In its application, American states that San Antonio is the fastest growing U.S. city without nonstop service to DCA. The proposal specifically cites the city's population growth over the last decade (18%) and economic output ($163B). American discusses the high concentration of U.S. military activity in the San Antonio region, including three military bases, cited at $55B in state economic impact in 2023. Additionally, American states that the GSA estimates that there will be 17,472 U.S. Government travelers on official business between DCA-SAT in 2024.[18]

---

[12] *See* DOT-OST-2024-0065-22193, Consolidated Answer of JetBlue Airways Corporation.
[13] *See* DOT-OST-2024-0065-22203, Consolidated Answer of Spirit Airlines, Inc.
[14] *See* DOT-OST-2024-0065-5784, Application of American Airlines, Inc.
[15] *Id*. At 3.
[16] *Id*. At 4.
[17] *Id*. At 5.
[18] *Id*. At 6.

-6-

**Responsive Pleadings**

Multiple other applicants commented on American's application, stating that American should not receive an allocation in this proceeding due to the carrier's dominant position at DCA.[19] Other applicants stated that American presently holds the largest single-carrier share of beyond-perimeter slot exemptions at DCA. For example, Delta stated that American's share of flights and slot exemptions at DCA is 60% and 30%, respectively. Delta, Southwest, and United state that because American presently holds two pairs of slot exemptions at DCA that do not have a route-specific requirement, it could feasibly use its existing exemptions to commence service between DCA and SAT.[20]

Additionally, United states that American presently serves customers sufficiently between DCA-SAT via connections over its other hubs, and that passenger demand for its own proposal for service to SFO is greater than that for American's proposed service. Southwest states that its proposed addition of service at DCA is superior to American's proposal because American's average air fares are higher than its own. Southwest also alleges that American does not presently utilize its slots and slot exemptions at DCA efficiently because it uses its DCA hub to serve a significant number of connecting passengers. Southwest further states that providing American two slot exemptions to provide service to San Antonio is not in the public interest because of limited available capacity at DCA. JetBlue states that SAT is presently accessible to customers via Southwest's service between DCA and AUS, and suggests that there may be alternative legislative solutions for enabling access to SAT, such as minimally expanding the existing DCA perimeter.

**Delta Air Lines[21]**

In its application, Delta requests two slot exemptions to establish one daily nonstop roundtrip service between DCA and Seattle-Tacoma International Airport (SEA), or to establish a second daily roundtrip service between DCA and Salt Lake City International Airport (SLC). The proposed service would be operated using 194-seat Airbus A321NEO aircraft, commencing within 60-days of allocation.

**Arguments in Support**

Delta states that Seattle is the fourth largest beyond-perimeter market from DCA, with 629 PPDEW.[22] Delta argues that unlike other beyond-perimeter markets, DCA-SEA lacks adequate capacity and competition. The application states that DCA-SEA is presently operated by a single

---

[19] *See* DOT-OST-2024-0065-22180, Comments of Delta Air Lines, Inc.; DOT-OST-2024-0065-22193, Consolidated Answer of JetBlue Airways Corporation; DOT-OST-2024-0065-22225, Consolidated Answer of Southwest Airlines Co.; DOT-OST-2024-0065-22188, Consolidated Comments of United Airlines, Inc.

[20] American holds four slot exemptions created under 49 U.S.C. § 41718(g)(3) for non-limited incumbent air carriers at DCA. § 41718(g)(3)(D) states that each non-limited incumbent carrier receiving slot exemptions under the statute shall "have sole discretion concerning the use of an exemption made available under paragraph (1), including the initial or any subsequent beyond perimeter destinations to be served."

[21] *See* DOT-OST-2024-0065-5803, Application of Delta Air Lines, Inc. for Slot Exemptions.

[22] *Id.* at 8.

-7-

carrier, which cannot alone meet existing demand for the route. Delta estimates that demand for DCA-SEA exceeds available capacity by 311 PPDEW.

In its application, Delta states that the average air fare for service between IAD-SEA is $289, while the average air fare for DCA-SEA is $355. Delta also states that in 2023, 72% of customers in the Washington, DC metro area preferred to use DCA for destinations within the 1,250-mile perimeter.[23] Delta states that the addition of its service between DCA-SEA would meet 60% of unmet demand for the market and provide a competitive balance with the single carrier presently operating on this route.

Delta further states that Seattle has the fifth largest population of cities beyond DCA's 1,250-mile perimeter. The application discusses Seattle's population of 4.1 million (citing 30% growth over the last 20 years) and large business community (e.g., 10 Fortune 500, 17 Fortune 1000 companies). Delta argues that corporate travelers prefer to use DCA to reach SEA and estimates that Alaska currently serves 80% of corporate travelers on the DCA-SEA route.[24] Delta states it presently operates more than 150 peak day departures from SEA to 60 global markets, and that its growth in SEA has resulted in a reduction of single-carrier markets from 47 to 23 in 12 years.[25]

Delta provides detail in its application regarding competitive and consumer benefits related to the carrier's product offering and operational record. Specifically, Delta states that it leads global network carriers in operational reliability. Delta also states that it has the lowest number of complaints per 100,000 passengers (3.5) when compared to American (6) and United (6.6), and it cites its award of a top ranking in J.D. Power's 2024 North America Airline Satisfaction Study for first/business and premium economy travelers in its application.

Delta's application includes a backup service proposal for a second daily nonstop operation between DCA and Salt Lake City International Airport. Delta asserts that the additional service would provide customers with connections between DCA and markets in the western United States.[26]

---

[23] *Id.* at 9. The Department notes that Delta's estimate is based on a comparison of PPDEW between DCA/IAD-SEA for FY2023 and average daily seats for June 2024. Delta's PPDEW calculation assumes that 72% of origin/destination passengers between IAD/DCA-SEA prefer to use DCA in an unconstrained perimeter environment. To achieve this, Delta combines origin/destination passengers for IAD/DCA in markets with greater than two daily frequencies, and with a greater than 500mi stage length. See *id.* at DL-107).

[24] *Id.* at 11.

[25] *Id.* at 12.

[26] *Id.* at 14 and DL-504. Delta states that its proposed schedule for DCA-SLC service would provide connections "to and from dozens of cities in the western United States." Delta estimates that 40% of passengers on DCA-SLC would connect onward from SLC, and provides a forecasted distribution of connecting passengers for 10 markets in the western U.S.

**Responsive Pleadings**

Multiple other applicants submitted comments regarding Delta's application.[27] Alaska did not submit comments regarding the merits of Delta's application, but rebutted statements made in Delta's proposal regarding DCA-SEA service. For example, Alaska states that air fare levels between DCA-SEA are consistent with that of other transcontinental routes from DCA. Alaska also states that Delta's DCA-SLC service has the highest ticket price in the country, and that Delta's beyond-perimeter flying has some of the highest air fares of any carrier at DCA. Alaska further states that its existing service between DCA-SEA is successful and that capacity on the route presently exceeds demand.

In response to Delta's application, JetBlue states that Delta's DCA-SEA service may lead to a reduction in service from IAD or BWI, and that Delta customers can reach SEA today from DCA, connecting over LAX or SLC and its other core hubs. Southwest states that SEA is already served from DCA and therefore Delta's proposed service would not enhance competition on the route, because Delta operates at a higher fare premium than Southwest and other carriers. Southwest also states that there is presently a surplus of seats in the DCA-SEA market and disagrees with Delta's presentation of passenger demand data for the proposed route. Southwest further states that Delta should not be eligible to serve its backup market (SLC) because it already does so with another DCA slot exemption.[28] Additionally, United states that Delta did not acknowledge capacity constraints at DCA in its application, and that demand between DCA-SFO exceeds that of DCA-SEA. United also states that it can connect more passengers over its SFO hub than Delta does via SEA.

**JetBlue[29]**

In its application, JetBlue requests two slot exemptions to establish a second daily nonstop roundtrip service between DCA and Luis Muñoz Marin International Airport (SJU) in San Juan, PR, or to establish one daily roundtrip service between DCA and Los Angeles International Airport (LAX). The proposed service would utilize 160- or 200-seat Airbus A321 or A321NEO aircraft.

**Arguments in Support**

JetBlue states that consumer demand for its current nonstop service between DCA-SJU exceeds the carrier's capacity on the route.[30] As such, JetBlue states that the proposed additional operation would capture unmet demand on the DCA-SJU route. JetBlue argues that the additional 200 daily seats between DCA and SJU would offer price discipline in the form of an estimated 31% decrease in average air fares between Washington, DC, and San Juan. JetBlue

---

[27] *See* DOT-OST-2024-0065-22194, Comments of Alaska Airlines, Inc. for Slot Exemptions; DOT-OST-2024-0065-22193, Consolidated Answer of JetBlue Airways Corporation; DOT-OST-2024-0065-22225, Consolidated Answer of Southwest Airlines Co.; DOT-OST-2024-0065-22188, Consolidated Comments of United Airlines, Inc.

[28] Order 2002-11-20.

[29] *See* DOT-OST-2024-0065-5808, Application of JetBlue Airways Corporation for Beyond-Perimeter Slot Exemptions.

[30] *Id.* at 10.

cites a $270, $245, and $147 average fare to SJU from IAD, DCA, and BWI respectively in 2023. In its application, JetBlue estimates that the average fare between DCA-SJU could fall to an estimated $170 if it commences a second daily operation on the route.[31] Additionally, JetBlue states that consumers would benefit from eleven (11) additional one-stop connections via SJU to various points in the Caribbean.

Regarding demand for the proposed service, JetBlue states that San Juan is the 25th largest market from Washington, DC and is underserved because there is only one daily nonstop service from DCA. JetBlue states that unlike other markets, demand for flying to Puerto Rico and the Caribbean has not fluctuated but has steadily grown. The application states that two million annual cruise passengers use the Port of San Juan, and that JetBlue's second daily service to SJU would enable greater connectivity for travelers boarding cruises. JetBlue further states that approximately 100,000 people of Puerto Rican descent live in the Washington, DC metropolitan area, and therefore the new service would also benefit travelers visiting friends and relatives (VFR).

Additionally, JetBlue states that after commencing service between DCA-SJU in 2012, PPDEW increased by 93% to 175. In its application, JetBlue estimates an additional 51.1% growth if it commences a second daily operation on the route – to approximately 275 passengers per-day each-way.[32]

JetBlue also notes in its application that the GSA estimates more than 6,000 travelers in 2024 will use the DCA-SJU route on official business. The application states that there is a clear preference for travelers on this route to use DCA, citing GSA figures for IAD-SJU and BWI-SJU that show DCA-SJU is estimated to serve a greater number of travelers in 2024. JetBlue points out that between July 2023-June 2024, the carrier served 4,079 travelers on government contracted fares for the DCA-SJU route.[33]

Finally, JetBlue describes in its application its commitment to the San Juan market, including approximately 700 staff and a future crew and pilot base at SJU. JetBlue states it is the largest airline at SJU, with over 4.7 billion available seat miles (ASMs) in 2024.[34]

No supporting materials were provided in the application for JetBlue's backup market of Los Angeles, CA.

**Responsive Pleadings**
Multiple other applicants submitted comments stating that JetBlue's proposal is not competitive because it is presently the only carrier operating on the DCA-SJU route and uses existing slot

---

[31] *Id.* The Department notes that this analysis is illustrative. The Department's assessment of air fare levels for proposed markets in this proceeding focuses only on observed data.
[32] *Id.* at 12.
[33] *Id.* at 13.
[34] *Id.* at 15.

exemptions to do so.[35, 36] Other applicants stated that an allocation for JetBlue's proposed second-daily service would strengthen its dominance on the route and insulate it from competition. For example, Delta states that because JetBlue is the only carrier operating between DCA-SJU, its own air fare projections included in its proposal are without merit.

In response to JetBlue's application, United notes that JetBlue proposes to serve the smallest market of all applicants in this proceeding and would not provide competitive and efficient connections for consumers. United further states that air fares on the DCA-SJU route have gradually increased over time. United also states that JetBlue's backup proposal (LAX) should not be considered because JetBlue did not include any information regarding this service in its application. Finally, Southwest states that there is presently adequate competition and service on the DCA-LAX route.

### Southwest Airlines[37]

In its application, Southwest requests two slot exemptions to establish one daily nonstop roundtrip between DCA and Harry Reid International Airport (LAS) in Las Vegas, NV (with continuing service to Sacramento International Airport (SMF)), commencing within 90-days of allocation using Boeing 737-800 or 737-8 MAX aircraft with 175 seats.[38]

#### Arguments in Support
Southwest states that Las Vegas is DCA's largest underserved market by population size. The application cites 261,000 total annual origin/destination passengers, or 358 PPDEW.[39] Southwest argues that current capacity on the DCA-LAS route is not sufficient to meet demand, stating that American, which is the single carrier operating this route, has 137,128 annual scheduled seats between DCA-LAS. Southwest argues that this represents a 90% market gap, when scheduled nonstop seats are compared to total origin/destination passengers. Southwest also notes that LAS is the fifth largest beyond-perimeter market from DCA.[40]

In its application, Southwest states that demand for DCA-LAS was 28% higher in CY2023 than in CY2019, compared to an average of -0.1% for all other beyond-perimeter markets.[41] Southwest further states that compared to 2019 levels, demand for DCA-LAS has recovered at a higher rate than that of all domestic markets from DCA (+0.2% when compared to CY2019).[42]

---

[35] *See* DOT-OST-2024-0065-22191, Consolidated Response of American Airlines, Inc.; DOT-OST-2024-0065-22180, Comments of Delta Air Lines, Inc.; DOT-OST-2024-0065-22225, Consolidated Answer of Southwest Airlines Co.; DOT-OST-2024-0065-22188, Consolidated Comments of United Airlines, Inc.
[36] Order 2012-5-12.
[37] *See* DOT-OST-2024-0065-5815, Application of Southwest Airlines Co.
[38] Because a slot exemption award in this proceeding would be used to operate service between DCA and LAS, Las Vegas is evaluated as the primary proposed market when assessing Southwest's application against the statutory criteria.
[39] *Id.* at 6.
[40] *Id.*
[41] *Id.* at 7.
[42] *Id.* at 8.

-11-

Southwest also cites a greater than 90% load factor for current nonstop service between DCA-LAS as representative of the strong passenger demand for the route.[43]

Southwest further states that its projected average one-way fare on the DCA-LAS route is estimated at $188.[44] In its application, Southwest compares this to a current average of $258 across all DCA carriers, and $298 for American Airline's nonstop service. Southwest argues that it would introduce price discipline on the DCA-LAS route, lowering average fares by around 27%. Southwest states that it is likely American and other carriers would also lower air fares to compete with the new service. For example, Southwest explains in its application that for past market-entry at DCA, Southwest's service resulted in an average reduction of 21% for air fares and a passenger increase of approximately 42%.[45]

Southwest's proposal also includes a one-stop connection between DCA and Sacramento (SMF). Regarding the proposed connection between DCA and SMF, Southwest states that it will provide the only one-stop "same plane" service between the markets. The application also states that the proposed DCA-LAS-SMF route will be the "fastest flight option" available to passengers traveling between DCA-SMF. Southwest states that SMF is the fourth-largest market without service from DCA and cites current average Southwest fare levels at 29% lower than average fares between DCA-SMF. Southwest states that the proposed DCA-LAS-SMF route would provide connecting itinerary opportunities for more than two million annual passengers.[46] Additionally, Southwest states in its application that its average fares in potential downline/connecting markets from SMF are lower than average in all but one. Southwest argues that its entry on the DCA-LAS-SMF route would therefore create additional options for travelers while stimulating price discipline through lower average fares.

**Responsive Pleadings**

Delta submitted comments in support of Southwest's application, stating that the proposal demonstrates an "earnest commitment to enhancing competition."[47] However, JetBlue states that Southwest's proposed DCA service could lead to the reduction of current service at BWI and states that Southwest already serves LAS from BWI.[48]

United submitted comments stating that passenger demand between DCA/IAD/BWI (WAS)-SFO is greater than between WAS-LAS, arguing that its own application, therefore, has greater merit based on anticipated consumer benefit.[49] United also states that Southwest's proposed one-stop

---

[43] *Id.*

[44] *Id.* at 9 and WN-301. Southwest calculates forecasted fare levels for new DCA-LAS service using systemwide average domestic average air fares, compared to systemwide stage length in 2023. The Department notes that this analysis is illustrative. The Department's assessment of air fare levels for proposed markets in this proceeding focuses only on observed data.

[45] *Id.* at 10 and WN-303.

[46] *Id.* at 12 and WN-311.

[47] *See* DOT-OST-2024-0065-22180, Comments of Delta Air Lines, Inc.

[48] *See* DOT-OST-2024-0065-22193, Consolidated Answer of JetBlue Airways Corporation

[49] *See* DOT-OST-2024-0065-22188, Consolidated Comments of United Airlines, Inc.

-12-

service to SMF is not competitive as SMF is already served with one-stop service on United and other carriers. United further states that Southwest's forecast air fare impacts, included in its proposal, are without merit because they are not consistent with Southwest's current business practices and air fare levels.

### United Airlines[50]

In its application, United Airlines requests two slot exemptions to establish a second daily nonstop roundtrip between DCA and San Francisco International Airport (SFO), or to establish once daily roundtrip service between DCA and Los Angeles International Airport (LAX). The service would commence approximately 90-days after allocation using Boeing 737-8 MAX aircraft with 166 seats.

### Arguments in Support

United states that while it was not supportive of expanding access to DCA due to concerns regarding airport capacity and congestion, its proposed service would offer consumer benefits while mitigating operational impacts at the airport. To this end, United states that it intends to operate the new service during early morning or late evening hours, which it states are less congested periods at DCA.

Regarding demand for the service, United's application cites 584,000 annual bookings between Washington, DC, and San Francisco. When also considering Oakland (OAK) and San Jose (SJC), United cites 685,000 total annual bookings.[51] United states SFO is presently the second largest beyond-perimeter route from a passenger-demand perspective. The application discusses existing corporate ties between Washington, DC, and San Francisco, stating that the presence of Fortune 500 companies and leading industries drive time-sensitive travel between the two markets. United points out that California's economy is the fifth largest in the world and increased by 6.1% in 2023 versus the year prior.

United further states that in 2023, 60% of the carrier's frequent flyers who traveled from DCA used the airport exclusively for Washington, DC travel.[52] United argues that this indicates there is a significant group of travelers who only use DCA when traveling, and when traveling with United. The application argues that this suggests the proposed new service would not conflict with United's existing hub presence at IAD.

Additionally, United states that its proposed SFO service would provide one-stop connections to 25 domestic, and seven international markets. Further, United's application cites 16 cities which would receive new roundtrip connecting service to/from DCA. While the DCA-SFO route is presently served, United states that the addition of this second daily service would improve

---

[50] *See* DOT-OST-2024-0065-5775, Application of United Airlines, Inc.

[51] *Id.* at 4 and UA-107.

[52] *Id.* at 5. Calculated as 60% of United MileagePlus members traveling to/from DCA in 2023, based on United passenger flown databases.

schedule utility for customers traveling between the two markets. United argues that the increase in capacity would result in additional flight options and lower air fares on the route.

Regarding the potential competitive benefit of the proposed routes, United states that it holds only a small share of operations at DCA, while American Airlines and Alaska Airlines are the largest carriers for service between California and DCA. The application cites a 52% seat share for Alaska on all transcontinental routes, a 26% seat share for American's service to Los Angeles, and an 11% seat share for Delta's service to Los Angeles.[53] United argues that its proposed service would provide competition to incumbent air carriers presently operating on these routes.

Regarding its backup proposal for once daily service between DCA and Los Angeles, United states that it presently only serves DCA-LAX customers with one-stop, connecting service, and thus carries approximately 4% of its Washington, DC-Los Angeles customers via DCA.[54] United states that the introduction of new nonstop service between DCA-LAX would provide competition for American, Alaska, and Delta which currently operate on this route. United further states that its proposed schedule would avoid peak hours at DCA to have a smaller impact on airport delays and operations. United also notes that the proposed service would enable roundtrip connections to eight domestic destinations from Los Angeles.

**Motion of JetBlue[55]**

JetBlue filed a motion to disqualify United from consideration, stating that the application includes a proposed departure time that is outside of hours when slot exemptions may be allocated at DCA. In its motion, JetBlue states that United submitted an application that includes a proposed 6:30am departure from DCA, which falls outside of the slot exemption periods defined in 49 U.S.C. § 41718(c)(2). JetBlue also states that the data provided by United supporting its proposal are invalid because they are premised on a flight schedule not within slot exemption hours at DCA. We address this Motion later in this Order.[56]

**Answer of United Airlines in Objection of JetBlue's Motion[57]**

United submitted an objection to JetBlue's motion to disqualify, stating that there is no basis or precedent for disqualification from this proceeding. United states that it is aware of the technical language specified by the Department that directs successful applicants to work with the FAA Slot Administration Office regarding the scheduling of new slot exemptions. Additionally, United states that it has previously received an award of a DCA slot exemption with proposed service during an hour falling outside of slot exemption periods defined by 49 U.S.C. § 41718(c)(2). United states it would work with the FAA to achieve an "optimal solution" regarding the scheduling of new slot exemptions.

---

[53] *Id.* at 13 and UA-113.
[54] *Id.* at 18.
[55] *See* DOT-OST-2024-0065-10863, Motion of JetBlue Airways Corporation.
[56] *See infra* at 18.
[57] *See* DOT-OST-2024-0065-12069, Objection of United Airlines, Inc.

-14-

**Responsive Pleadings**

Other applicants submitted comments regarding United's application.[58] Multiple other applicants stated that United already serves SFO from DCA, and therefore does not offer a competitive proposal under the statutory criteria in this proceeding. Delta states that United strongly opposed the creation of new slot exemptions under FAA 2024. Delta further states that United's market share at DCA will not change if it receives a slot exemption in this proceeding, and that the proposed DCA-SFO service would not generate city-pair competition, but strengthen United's dominant presence in the Washington, DC market.

JetBlue states that United's proposed schedule could require RON parking positions at DCA, and notes that there is limited available gate and parking capacity at the airport. JetBlue also states that the addition of DCA-SFO service could lead to the reduction of service at BWI or IAD. Additionally, Spirit states that its own proposed service to SJC would provide competition for United's existing DCA-SFO service, and that a second-daily SFO service would not reduce air fares between the two markets. Southwest also states that United's proposed service would reduce competition at DCA by adding a frequency on an already high-fare market that does not have sufficient demand to warrant new flying.

**Supplemental Pleadings[59]**

On July 24, United filed a limited response and motion for leave to file.[60] In response to comments from other applicants, United states that the statutory criteria provided by FAA 2024 allow for a broad assessment of competitive impacts resulting from exemptions in this proceeding. United argues that its application enhances competition in multiple areas that merit consideration. United alleges that an additional frequency on the DCA-SFO route, or introduction of new service on the DCA-LAX route, as stated by United, would provide consumer benefits by increasing competition on routes served by other air carriers. United further alleges that its proposed SFO service would enable the greatest number of connections of all proposed markets. United further argues that competitive impacts on beyond-perimeter routes at DCA are unique and dissimilar to those in within-perimeter markets. For example, United argues in its response that past beyond-perimeter exemptions have resulted in competitive benefits (such as price discipline) even when a route is operated by a single air carrier. Regarding its backup application for DCA-LAX service, United alleges that this service would provide a long-term competitive benefit, as other carriers on this route presently operate using slot exemptions which do not include a market requirement and could plausibly be changed.

---

[58] *See* DOT-OST-2024-0065-22191, Consolidated Response of American Airlines, Inc.; DOT-OST-2024-0065-22180, Comments of Delta Air Lines, Inc.; DOT-OST-2024-0065-22193, Consolidated Answer of JetBlue Airways Corporation; DOT-OST-2024-0065-22195, Frontier Airlines, Inc. Comments on Timely-Filed Applications; DOT-OST-2024-0065-22225, Consolidated Answer of Southwest Airlines Co.; DOT-OST-2024-0065-22203, Consolidated Answer of Spirit Airlines, Inc.

[59] By this Order, the Department is granting all motions seeking leave to file otherwise unauthorized documents submitted by various air carriers in the docket.

[60] DOT-OST-2024-0065-23492, Motion for Leave to File and Supplemental Comments of United Airlines, Inc.

In response to comments from JetBlue, United states that its application should not be dismissed by the Department and doing so would be contrary to precedent. United states that its proposed service can be operated flexibly in the hours in which the Department is permitted to add slot exemptions. United further states that its application is fully compliant with the statutory criteria for this proceeding.

On July 24, JetBlue filed a letter in response to United's motion for leave to file.[61] JetBlue stated that the Department should not consider the motion because United did not provide good cause for not addressing issues discussed in an earlier answer. In its letter, JetBlue states that the Department should not delay the issuance of a final order in this proceeding. On July 25, Southwest filed a letter in support of JetBlue's response to United's motion for leave to file.[62] In its letter, Southwest states that United's motion should be denied as it does not provide good cause for filing additional comments after the Department's deadline.

### Spirit[63]

In its application, Spirit requests two slot exemptions to establish one daily roundtrip service between DCA and San Jose Mineta International Airport (SJC) using 182-seat Airbus A320NEO aircraft.

#### Arguments in Support

Spirit states that SJC is geographically located in proximity to 40% of the population in the Bay Area, making it the most convenient option for southern Bay Area travelers.[64] While San Francisco is served from both DCA and IAD, Spirit states that there is not presently nonstop service to/from SJC from either airport. Spirit's application argues that the new service would therefore provide a competitive, low fare option for travelers between the two regions.

Regarding demand for the proposed service, Spirit cites 1,445.9 PPDEW travelling between SFO/SJC/OAK and IAD/DCA in YE4Q2023.[65] Spirit states that San Jose is one of the largest U.S. cities that does not presently have nonstop service to Washington, DC. Additionally, Spirit states that customers would have access to one-stop destinations on Spirit via SJC.[66]

Spirit further states that the San Jose region is home to the world's largest technology companies, most of which are located within 12 miles of SJC Airport. In its application, Spirit argues that the

---

[61] *See* DOT-OST-2024-0065-23495, JetBlue Airways Corporation (Letter in Response to United Airlines Unauthorized Filing).
[62] *See* DOT-OST-2024-0065-23502, Southwest Airlines Co. (Letter in Response to United Airlines Unauthorized Filing).
[63] *See* DOT-OST-2024-0065-5921, Application of Spirit Airlines, Inc. for Two Slot Exemptions for DCA-SJC Service.
[64] *Id.* at 3.
[65] *Id.* at Exhibit 3.
[66] *Id.* at 5. Spirit cites new service between SJC and Dallas Ft. Worth (DFW), Las Vegas (LAS), and San Diego (SAN).

presence of these companies suggests that there is demand for the additional connection to Washington DC, stating that Silicon Valley companies have "significant investments in facilities located in the Washington, DC region."[67]

Spirit provides detail in its application, regarding perceived competitive and consumer benefits related to the carrier's product offering. Specifically, Spirit states that its service offers a range of air fare options and bundles for "value-conscious consumers." Spirit further states that in multiple cases of market entry, its presence has resulted in a reduction in average industry fares at airports with competition from a hub competitor.

### Responsive Pleadings

Multiple other applicants submitted comments stating that Spirit was not eligible for this proceeding.[68] For example, Alaska asked that DOT confirm Spirit's ineligibility in a final order. Alaska and others state that Spirit does not presently operate service at DCA. JetBlue states that Spirit is not eligible because it proposes to operate slot exemptions during hours that are presently fully subscribed. We address these comments later in this Order.[69]

### Frontier[70]

In its application, Frontier requests two slot exemptions to establish one daily roundtrip service between DCA and Luis Muñoz Marin International Airport in San Juan, PR (SJU). Frontier does not specify an aircraft type or starting date for the proposed service in its application.

### Arguments in Support

Frontier states that its air fares are typically the lowest available in the markets in which they operate.[71] Frontier argues that JetBlue's status as the single-carrier operating the DCA-SJU route disincentivizes price discipline and has led to higher air fares. Frontier's application cites a $247 average air fare between January-April 2024, compared to $219 in 2019. Additionally, Frontier states that the average air fare for service between BWI/IAD-SJU is notably lower, citing $171 and $180 for the same periods, respectively.[72]

Frontier further states in its application that the additional service between DCA-SJU would benefit consumers by introducing price discipline and additional flight options. Frontier states that the carrier offers "favorable" pricing on routes for which it competes with JetBlue.[73]

---

[67] *Id.* at 7.
[68] *See* DOT-OST-2024-0065-22194, Comments of Alaska Airlines, Inc. for Slot Exemptions; DOT-OST-2024-0065-22193, Consolidated Answer of JetBlue Airways Corporation; DOT-OST-2024-0065-22195, Frontier Airlines, Inc. Comments on Timely-Filed Applications.
[69] *See infra* at 18.
[70] *See* DOT-OST-2024-0065-5802, Frontier Airlines, Inc. Application for Slot Exemption.
[71] *Id.* at 6.
[72] *Id.*
[73] *Id.* at 7. Frontier comparison of average air fares for 2H2023 in JetBlue/ Frontier "head-to-head" markets.

Frontier adds that it will open a crew base at SJU, with additional planned growth to more than 20 markets.

**Responsive Pleadings**

In response to Frontier's application, Alaska submitted comments stating that Frontier is not eligible to receive a slot exemption in this proceeding because it is a new entrant carrier.[74] Alaska asks the Department to confirm this eligibility determination in a final order. Spirit also states that Frontier is not eligible for an allocation in this proceeding, and that Frontier previously acknowledged its status as a new entrant at DCA.[75] Alaska and JetBlue state that Frontier should be disqualified from this proceeding because it did not provide in its application the required information regarding its proposed service. JetBlue states that Frontier does not accurately present data related to average air fares between DCA-SJU, alleging that that Frontier's average fare for its current slot exemption route at DCA (Denver) is higher than any of its service to DEN from all other points.

**Other Comments Filed**

**Comments of Consumer Advocates[76]**

Representatives of eleven consumer advocacy groups submitted joint comments asking the Department to ensure that new slot exemptions at DCA are allocated to maximize consumer benefit by increasing airline competition and reducing air fares. Specifically, the comments suggest that the Department allocate new slot exemptions at DCA to "airlines that do not currently control large numbers of long-haul slots at DCA," including "as many ultra-low cost carriers as are legally qualified under the act." The comments also ask the Department to ensure that carriers receiving new slot exemptions have access to "gates and other critical airport facilities" at DCA which are requisite for operating new service. In support of this, the comments cite a 4% increase in the Consumer Price Index over the last year, as compared to a 25% increase in air fares (reported by the Bureau of Labor Statistics). The comments also cite estimates from the International Air Transport Association of a 14.7% increase in airline operating profit, and 11.3% increase in airline net profit, respectively, between 2023 and 2024. The comments state concern regarding the impact of air carrier dominance at DCA and other major U.S. gateways, and further discuss that 55% of beyond-perimeter slot pairs at DCA are allocated to two carriers, American and Alaska.

**Comments of Breeze Aviation Group, Inc.[77]**

Breeze Aviation Group, Inc. (Breeze) submitted comments expressing interest in applying for the slot exemptions in this proceeding. Breeze states that, had it been eligible, its application may have included proposed service between DCA and U.S. points including Boise, Sacramento, Reno, and Albuquerque. Breeze states that their application would have well-satisfied FAA

---

[74] *See infra* at 18.
[75] *See infra* at 18. Spirit cites the Application of Frontier for slot exemptions made available by Order 2012-2-21.
[76] *See* DOT-OST-2024-0065-4565, Blue Future (Correspondence).
[77] *See* DOT-OST-2024-0065-5714, Comments of Breeze Aviation Group, Inc.

2024's statutory criteria. The comments discuss Breeze's stated operating model, which connects unserved markets, and markets with only one-stop service via other air carrier hubs. Breeze states that its entry in other markets has led to a reduction in air fares and an increase in passenger traffic. Breeze's comments state that FAA 2024, as passed by Congress, is incongruent with prior DCA legislation because it does not permit the Department to allocate slot exemptions to new entrant air carriers. Accordingly, Breeze asks that the Department "advocate for policies that make opportunities available for new entrant airlines at DCA and other constrained airports."

### Comments of Service Employees International Union[78]

The Service Employees International Union (SEIU) submitted comments on behalf of its members. SEIU states that it is a labor organization representing two million workers across the United States and Canada. SEIU states that it represents more than 42,000 airport service workers. SEIU states that the employees it represents work for contractors hired by airlines, and therefore it is concerned regarding the "deeply consolidated" nature of the airline industry.[79] SEIU states that it is concerned about the potential for the allocation of additional slot exemptions at DCA to increase airline market concentration. SEIU requests that the Department award slot exemptions in this proceeding to air carriers that do not already have large slot portfolios at DCA. SEIU explains that doing so will create more competition at DCA, which benefits travelers and airport workers. SEIU states that DCA is the only U.S. slot-controlled airport where a single airline "holds a majority of slots."[80] The comments further discuss concern regarding the impact of an increase in airline concentration at DCA on airport workers, stating that in the past airlines have "outsourced jobs, changed contractors, and moved work to subsidiaries as it suits their bottom line."[81] SEIU states that allocating slot exemptions in a pro-competitive manner would disincentivize unfair or deceptive employment practices for airport workers at DCA. SEIU states that some airlines and airline trade groups have argued against past attempts to update labor and wage practices by some airports, citing, for example, the Philadelphia City Council's attempt to update minimum wage standards at Philadelphia International Airport. SEIU states that improved standards for airport workers bring consumer benefits through improved service and lower rates of turnover. SEIU requests that the Department consider these factors to allocate additional slot exemptions at DCA in a pro-competitive manner, and with recognition of Department precedent and current air carrier dominance at DCA.

## IV. ELIGIBILITY OF AIR CARRIERS TO APPLY FOR AND RECEIVE SLOT EXEMPTIONS

The Department received multiple comments from air carriers regarding the eligibility of certain air carriers for available slot exemptions in this proceeding. The Department summarizes these comments and its tentative determinations regarding air carrier eligibility below.

---

[78] *See* DOT-OST-2024-0065-19814, Comments of Service Employees International Union.
[79] *Id.* at 2.
[80] *Id.*
[81] *Id.* at 5.

-19-

**Incumbency at DCA**

Section 41718(i) states, "the Secretary shall make 2 [slot exemptions] available to incumbent air carriers qualifying for status as a limited incumbent carrier," and, "shall make 8 [slot exemptions] available to incumbent air carriers qualifying for status as a non-limited incumbent carrier at Ronald Reagan Washington National Airport as of the date of enactment of the FAA Reauthorization Act of 2024." This denotes a two-part test for eligibility: first, a carrier must be an incumbent on the date of enactment of FAA 2024; and second, a carrier must then also qualify for status as a limited incumbent, or non-limited incumbent carrier. "Incumbent air carrier" is not a defined term under either 14 C.F.R. Part 93 or 49 U.S.C. Subtitle VII. Therefore, we rely on a plain language reading of the statute. In this case, "incumbent air carrier" is a carrier that is engaged in air transportation at DCA as of the date of enactment of FAA 2024.[82]

In its June 24, 2024 Notice, the Department, in coordination with the FAA Slot Administration Office, provided a list of non-limited incumbent and limited incumbent carriers providing air transportation at DCA on the date of the enactment of FAA 2024.[83] The Department notes that it did not receive comments regarding, and finds no reason not to confirm the eligibility of: American, Delta, Southwest, and United as non-limited incumbent air carriers in this proceeding. Each of these air carriers was engaged in air transportation at DCA as of the enactment date of the FAA 2024 Act and holds or operates more than 40 slots.

**Eligibility of Frontier Airlines**

In its application for service to SJU, Frontier states that it is eligible for slot exemptions in this proceeding as a limited incumbent carrier. Frontier states that it meets a plain meaning definition of "incumbent air carrier" because it marketed service at DCA as of the date of the enactment of FAA 2024. Additionally, Frontier states that 49 U.S.C. § 41714(h)(5) amends the regulatory definition of limited incumbent carrier under 14 C.F.R. § 93.213(a)(5) to increase the upper threshold from twelve to 40 slots, but does not specify a lower limit.[84] Therefore, Frontier argues that it is eligible as a limited incumbent in the Department's proceeding, despite operating at DCA with six statutory slot exemptions but no slots.[85] Frontier states that it is the only limited incumbent air carrier eligible to apply for slot exemptions in this proceeding.

In comments filed July 17, 2024,[86] Frontier reiterates its position, stating that Spirit is not eligible to apply for slot exemptions in this proceeding due to the statutory requirement that any

---

[82] *See* 49 U.S.C. § 40102(a)(5).
[83] *See* 6-24-2024 Notice at 2.
[84] *See* DOT-OST-2024-0065-5802, Frontier Airlines, Inc. Application for Slot Exemption.
[85] 49 U.S.C. § 41714(h)(5)(B)(i) amends the definition of limited incumbent air carrier in 14 CFR §§ 93.213(a)(5) and 93.223(c)(3) to exclude slot exemptions in a carrier's total number of slots at a particular airport.
[86] *See* DOT-OST-2024-0065-22195, Frontier Airlines, Inc. Comments on Timely-Filed Applications.

qualifying carrier is an "incumbent," interpreted by Frontier as marketing service at DCA at time of the enactment of FAA 2024.

**Tentative Determination**

Based upon the drafting of FAA 2024, the Department tentatively finds Frontier Airlines ineligible to apply for slot exemptions in this proceeding. Frontier passes the first test for eligibility but not the second. While Frontier was engaged in air transportation at DCA on the date of enactment of FAA 2024, therefore qualifying as an incumbent air carrier, it did (and continues to do) so by only using six slot exemption awards.[87] 49 U.S.C. § 41714(h)(5)(B)(i) excludes an air carrier's count of slot exemptions at DCA for purposes of determining a carrier's status as a limited incumbent air carrier in order to allocate slot exemptions at DCA.[88] 49 U.S.C. § 41714(h)(3) states that "[t]he term 'new entrant air carrier' means an air carrier that does not hold a slot at the airport concerned and has never sold or given up a slot at that airport after December 16, 1985, and a limited incumbent carrier." It is important to note that while § 41714(h)(3) states that limited incumbent carriers are also new entrant carriers, the reverse is not true, *i.e.,* all new entrant carriers are not limited incumbent carriers.

Frontier, therefore, is not a limited incumbent air carrier, but rather meets the definition of a new entrant air carrier as defined by 49 U.S.C. § 41714(h)(3) since, at time of enactment of FAA 2024, Frontier did not hold or operate any non-exemption slots at DCA, nor had ever sold or given up a slot at DCA after December 16, 1985. Congress did not make any of the ten slot exemptions from the FAA 2024 Act available to new entrant air carriers. We tentatively determine, therefore, that Frontier is not eligible to receive a slot exemption award under 49 U.S.C. § 41718(i).

**Eligibility of Spirit Airlines**

On June 26, 2024, Spirit filed a Letter of Intent to apply for the two slot exemptions available for limited incumbent air carriers in this proceeding.[89] In its letter, Spirit states that it is eligible to apply for exemptions as a limited incumbent in this proceeding because it meets the definition of a limited incumbent carrier under 14 CFR § 93.213(a)(5) and a limited incumbent air carrier in 49 U.S.C. § 41714(h)(5). Spirit states that it received four permanent slots for service at DCA under an FAA slot lottery allocation proceeding conducted on August 12, 2003. In 2012, Spirit entered into an agreement to sell those four slots to Southwest. Therefore, Spirit argues that, under 14 CFR § 93.213(a)(5), it should be considered to hold its four permanent slots at DCA because they were held by Spirit after December 16, 1985, and were subsequently "transferred to another party other than by trade for one or more slots at the same airport."

---

[87] Frontier received two slot exemptions by Order 2000-7-1 and four slot exemptions by Order 2004-4-1.
[88] 49 U.S.C. § 41714(h)(5)(B)(i) states that "[t]he term 'limited incumbent air carrier' has the meaning given that term in subpart S of part 93 of title 14, Code of Federal Regulations; except that—for purposes of such sections, the term 'slot' shall not include 'slot exemptions.'"
[89] *See* DOT-OST-2024-0065-0007, Spirit Airlines, Inc. (Intent to Apply for 2 Limited Incumbent Slot Exemptions).

**Tentative Determination**

The Department tentatively finds Spirit Airlines ineligible to apply for slot exemptions in this proceeding. As above, the same two-part test applies: first, a carrier must be an incumbent on the date of enactment of FAA 2024; and second, a carrier must then also qualify for status as a limited incumbent carrier. In contrast to Frontier, Spirit does not pass the first part of the test. Spirit has not engaged in air transportation at DCA since 2012 (after it sold its slots to Southwest). Therefore, Spirit does not meet the prerequisite of incumbency under § 41718(i)(3) as it did not provide air transportation at DCA as of May 16, 2024 (the date of enactment of FAA 2024). We therefore tentatively find that Spirit is ineligible for an award in this proceeding.

**Classification of Alaska Airlines**

Spirit and Frontier both argue in comments to the Department that 49 U.S.C. § 41714(k) disqualifies Alaska from applying for slot exemptions as a limited incumbent air carrier.[90] Specifically, the carriers argue that Alaska's code sharing relationship with American requires that the Department consider the number of combined slots and slot exemptions held by both carriers when determining Alaska's status at DCA. The carriers request that Alaska only be considered eligible for slot exemptions in this proceeding as a non-limited incumbent carrier.

**Tentative Determination**

The Department tentatively determines for this proceeding that Alaska Airlines qualifies as a limited incumbent air carrier and is eligible to apply for slot exemptions in this category. Section 41714(k) states that "…an air carrier that operates under the same designator code, or has or enters into a code-share agreement, with any other air carrier shall not qualify for a new slot or slot exemption as a new entrant or limited incumbent air carrier at an airport if the total number of slots and slot exemptions held by the two carriers at the airport exceed 20 slots and slot exemptions." Section 41714(k) was created by the Wendell H. Ford Aviation Investment and Reform Act for the 21st Century in April of 2000.[91] Alaska and American have had a code share relationship at DCA since at least 2000.[92]  In 2012, Alaska received two slot exemption awards as a new entrant/limited incumbent carrier.[93]

The scope of Alaska and American's code sharing relationship is limited by a settlement agreement reached in 2017 to resolve issues related to the merger transaction between Alaska and Virgin America Airlines.[94] The agreement prohibits Alaska from marketing any American flight that originates or terminates at any Key Alaska Airport, or American from marketing any

---

[90] See DOT-OST-2024-0065-22195, Frontier Airlines, Inc. Comments on Timely-Filed Applications; DOT-OST-2024-0065-22203, Consolidated Answer of Spirit Airlines, Inc.
[91] Pub L. No. 106-181, Apr. 5, 2000.
[92] Sabre GDD.
[93] *See* Order 2012-5-12 at 8.
[94] *See* https://www.justice.gov/atr/case-document/file/915971/dl?inline.

Alaska flight that originates or terminates at any Key American Airport.[95] The agreement also prohibits the marketing of Alaska and American service on defined overlap routes.[96] Therefore, Alaska does not presently place the American Airlines code on any nonstop flight it operates at DCA, and would not be permitted to do so for any service operated with a new slot exemption award. Additionally, the relationship between Alaska and American does not include any slot sharing provisions. Therefore, Alaska does not receive any meaningful access to the DCA market via its relationship with American. Further, the legislative history of § 41714(k), as represented by its predecessor provisions in the House and Senate, indicates that it was intended to prevent commuter air carriers (as defined at 49 U.S.C. § 41714(h)(1)) from gaining preferential access to slots or slot exemptions as a new entrant or limited incumbent, only to market and operate those slots on behalf of a larger, incumbent mainline carrier.[97] That is not the case here as Alaska is not a commuter air carrier and is not seeking to operate its proposed DCA-SAN service under the marketing control and branding of American.[98]

**Motion of JetBlue Concerning Application of United Airlines**

JetBlue filed a motion to disqualify United's primary application for service to San Francisco from consideration in this proceeding. In its motion, JetBlue argues that United's application includes a proposed departure time that is outside of hours when slot exemptions may be allocated at DCA.[99] Specifically, JetBlue references Section 41718(c)(2)(A), which states that slot exemptions "may not be for operations between the hours of 10:00 p.m. and 7:00 a.m.; and…may not increase the number of operations at Ronald Reagan Washington National Airport in any 1-hour period during the hours between 7:00 a.m. and 9:59 p.m. by more than five operations."

**Tentative Determination**

The Department tentatively denies JetBlue's motion for the following reasons. United has submitted an application in this proceeding that is compliant with the relevant statute and the Department's June 24, 2024, Notice. In keeping with the requirements of § 41718(i), the Department requested that air carriers submit certain information in their applications including

---

[95] Key American Airports are – DCA, Charlotte Douglas International Airport (CLT), Chicago Midway and Chicago O'Hare International Airports (MDW/ORD), Dallas Ft. Worth International Airport and Love Field (DFW/DAL), Fort Lauderdale Hollywood International Airport (FLL), John F. Kennedy International Airport (JFK), Miami International Airport (MIA), New York LaGuardia Airport (LGA), Philadelphia International Airport (PHL), Phoenix Sky Harbor International Airport (PHX). Key Alaska Airports are – Portland International Airport (PDX), Seattle-Tacoma International Airport (SEA), San Francisco International Airport (SFO), Ted Stevens Anchorage International Airport (ANC).

[96] Alaska and American are prohibited from marketing any flight that serves an Alaska/American overlap route, and any route between Los Angeles (LAX) and a Key Alaska Airport or a Key American Airport.

[97] *See* H.R. No. 106-124 *and* S. Rep. No. 106-9.

[98] 14 CFR § 298.3(b) defines a commuter air carrier as one that, among other things, does not directly or indirectly utilize large aircraft in air transportation and does not hold a certificate of public convenience and necessity. Alaska utilizes large aircraft in air transportation and holds a certificate of public convenience and necessity.

[99] *See* DOT-OST-2024-0065-10863, Motion of JetBlue Airways Corporation.

-23-

*proposed* operating schedules. [100] While the Department has used this information to assess the merits and viability of the applicants' proposals, as stated in the Department's Notice, final slot times for the granted exemptions will be allocated via Notice after the Department's final allocation decision. Selected carriers will be directed to work with the FAA Slot Administration Office to assign slot times corresponding with the authority granted in this proceeding and in accordance with the requirements of § 41718. [101]

## V. TENTATIVE DECISION

The Department, in reaching its tentative decision, has carefully evaluated each application against the statutory criteria, and assessed the competitive and public benefits presented by each proposal. Following its evaluation, the Department tentatively concludes that the following applications best align with the statutory criteria and will provide the greatest competitive and public benefits: Alaska, for nonstop service to San Diego, CA; American, for nonstop service to San Antonio, TX; Delta, for nonstop service to Seattle, WA; Southwest, for nonstop service to Las Vegas, NV; and United, for nonstop service to San Francisco, CA. The Department provides its reasoning to support these decisions below.

As stated herein, § 41718(i) directs the Secretary to consider the extent to which the exemptions will: (A) enhance options for nonstop travel to beyond-perimeter airports that do not have nonstop service from Ronald Reagan Washington National Airport as of the date of enactment of FAA 2024, or (B) have a positive impact on the overall level of competition in the markets that will be served as a result of those exemptions. All of the eligible applications received by the Department have merit and are supported by stakeholders such as state and local elected officials, airports, regional corporations, and community organizations.

The Department also acknowledges comments received in this proceeding by multiple other stakeholders concerning the allocation of these additional slot exemptions. [102] These comments primarily discuss market concentration at DCA and new entrant access to slots and slot exemptions. The Department notes that the criteria established by Congress in the FAA 2024 Act limit our discretion to select a wide range of air carriers and business models for the new slot exemptions made available at DCA. [103] The Department seeks to ensure that scarce aviation infrastructure and landing permissions, such as slots and slot exemptions, are used to the

---

[100] § 41718(i) states, "any slot exemption request filed with the Secretary…shall include: the names of the airports to be served, the times requested, and such additional information as the Secretary may require."

[101] As referenced by this Order, 49 U.S.C. § 41718(c)(2)(A)(ii) limits the number of operations that may be added during any one hour between 7:00 a.m. and 9:59 p.m. at DCA to no more than five. Several hours have already reached the statutory limit and slot exemptions awarded in this proceeding will not be eligible for operation during these hours. Selected carriers are expected to work collaboratively with the Department and the FAA Slot Administration Office to accommodate new operations. Selected carriers may be asked to justify requested slot times or the viability of the proposed service during alternate operating hours.

[102] *See infra* at 17.

[103] Departing from past practice, § 41718(i) does not reserve any exemptions in this proceeding for new entrant air carriers at DCA.

maximum benefit of the traveling public, as contemplated by 41718(i)(4)(B), and further discussed below.

**Alaska to San Diego, CA**

We tentatively conclude that Alaska merits an award of two exemptions for service to San Diego, CA. The proposed service will enhance options for travel to a beyond-perimeter airport that does not presently have nonstop service from DCA. The service will also have a positive impact on the overall level of competition in the Washington, DC-San Diego, CA market.

SAN is the largest local origin/destination market from DCA currently without nonstop service. The Department's analysis finds that there are approximately 139,000 annual local O&D passengers between DCA-SAN, or roughly 189 per-day, each way.[104] Because there is not presently nonstop service between the two markets, local travelers between DCA-SAN today can only access either market via connecting flight options from DCA or SAN. Further, the Department's analysis indicates that 34% of all local O&D customers between DCA-SAN are carried by American, with the second-largest share of O&D customers carried by Southwest (23%). Alaska currently carries a negligible share (less than 1%) of local O&D customers between DCA-SAN, and approximately 8% of local O&D customers between all Washington, DC airports and SAN. The introduction of nonstop service on Alaska would therefore provide a new, convenient flight option, and enhance competition by increasing the number of air carriers in the WAS-SAN market.

The Department's analysis indicates that air fares for DCA-SAN are currently 30% higher than the average for DCA, as well as the average air fare for the greater-Washington, DC market, and the U.S. national average. [105, 106] Alaska does not have a dominant presence at DCA, holding only approximately 2% of allocated slots, and carrying approximately 3% of O&D traffic.[107, 108] These factors combined persuade the Department to tentatively conclude that Alaska's DCA-SAN service would have a positive impact on the overall level of competition in the Washington, DC-San Diego market. While Alaska did not provide detail in its proposal regarding the availability of new connecting itineraries via the DCA-SAN service, the Department acknowledges that customers may also benefit from access to the carrier's nonstop network at SAN.

We are not persuaded by comments in opposition of an award to Alaska in this proceeding. The primary contention against Alaska is related to Alaska's classification as a limited incumbent carrier. This issue is addressed elsewhere herein.[109] Other comments from applicants concern the

---

[104] DOT DB1B Market YE 1Q2024.
[105] DCA/IAD/BWI Airports.
[106] DOT DB1B Market, OAG Schedules, DOT F41 Financials YE 1Q2024.
[107] FAA Slot Administration Data.
[108] DOT DB1B Market YE 1Q2024.
[109] *See supra*, at 18.

availability of existing nonstop service between other Washington-area airports and SAN.[110] As stated above, Alaska carries a minimal share of local customers between Washington, DC, and San Diego, and does not hold a dominant share of allocated slots at DCA. The Department tentatively concludes that the benefits of an award to Alaska outweigh those of the proposals not selected in this proceeding.

**American to San Antonio, TX**

We tentatively conclude that American merits an award of two slot exemptions for service to San Antonio, TX. The proposed service will enhance options for travel to a beyond-perimeter airport that does not presently have service from DCA. The service will also have a positive impact on the overall level of competition in the Washington, DC-San Antonio market.

SAT is the second-largest local origin/destination market from DCA currently without nonstop service. The Department's analysis finds that there are approximately 110,000 annual local O&D passengers between DCA-SAT, or roughly 151 per-day, each way.[111] Because there is not presently nonstop service between the two markets, local travelers between DCA-SAT today can only access either market via connecting flight options from DCA or SAT. The Department notes its analysis finds that Southwest presently carries the single-largest share of local O&D customers between DCA-SAT (45%).[112] Therefore, it can be reasonably assessed that the introduction of new nonstop service between DCA-SAT will enhance the overall level of competition in the market by adding new capacity in a presently unserved market, and providing alternate flight options to the primary carrier in this city-pair.

Multiple parties and other carriers note that American holds the dominant share of allocated slots and slot exemptions at DCA and therefore should not receive additional access through this proceeding.[113] Comments also state that American could feasibly serve SAT from DCA today using slot exemptions which it holds, and which do not include a market/ airport requirement (sometimes referred to as "flexible slot exemptions").[114]

The Department is not persuaded by these arguments against an award to American for service to SAT. The primary reason for this tentative conclusion is that American's application is one of only two from eligible air carriers that proposes new service to an unserved beyond-perimeter

---

[110] Alaska and United currently operate nonstop service between IAD-SAN, Spirit and Southwest currently operate nonstop service between BWI-SAN.
[111] DOT DBIB Market YE 1Q2024.
[112] *Id.*
[113] *See* DOT-OST-2024-0065-22180, Comments of Delta Air Lines, Inc.; DOT-OST-2024-0065-22193, Consolidated Answer of JetBlue Airways Corporation; DOT-OST-2024-0065-22225, Consolidated Answer of Southwest Airlines Co.; DOT-OST-2024-0065-22188, Consolidated Comments of United Airlines, Inc.; DOT-OST-2024-0065-4565, Blue Future (Correspondence); DOT-OST-2024-0065-5714, Comments of Breeze Aviation Group, Inc.; DOT-OST-2024-0065-19814, Comments of Service Employees International Union.
[114] *See* Order 2012-2-1.

-26-

market from DCA – clearly fulfilling the first statutory requirement defined by § 41718(i).[115] Further, and as stated above, American does not presently carry a majority-share of customers traveling between DCA-SAT. Finally, the award of an additional slot exemption pair for service to SAT will provide new connectivity from DCA without requiring a reduction in service to another beyond-perimeter market.

The Department is concerned about the concentration of slots at DCA. We note, however, that were American to use an existing "flexible" slot exemption pair to commence DCA-SAT service, it would require the removal of service from another beyond-perimeter market, which weighs against the statutory criteria in this proceeding. Additionally, as the slot exemptions being awarded here are market-specific, this mitigates the risk that American could move the service to a less competitive market in the future. The Department therefore tentatively concludes that the benefits of an award to American outweigh those of the proposals not selected in this proceeding as well as the detriments of selecting American.

**Delta to Seattle, WA or Salt Lake City, UT**

We tentatively conclude that Delta merits an award of two slot exemptions for service to Seattle, WA. The proposed service will enhance options for travel to a beyond-perimeter airport and have a positive impact on the overall level of competition in the Washington, DC-Seattle market.

The Department's analysis finds that there are approximately 232,000 total annual local O&D passengers between DCA-SEA, or 279 per-day, each way.[116] While there is a large local O&D market for DCA-SEA, the route is presently only served nonstop by one carrier, Alaska. The Department finds that Alaska presently carries approximately 73% of local O&D customers between DCA-SEA, with American a distant second-place competitor with only approximately 9% of passengers. Delta currently carries only approximately 6% of local O&D customers between DCA-SEA. Additionally, the Department notes that average air fares for DCA-SEA are presently more than 60% higher than the average at DCA, as well as the average air fare for the greater-Washington, DC market, and the U.S. national average. [117, 118] This combination of factors leads the Department to tentatively conclude that an award to Delta for service to SEA would have a positive impact on the overall level of competition in the Washington, DC-Seattle market. The service will provide new capacity in a high-demand, beyond-perimeter market, while also offering consumers an alternative to the dominant, sole carrier on the route.

Other carriers stated that SEA is already served from DCA, and from the greater-Washington, DC market today.[119] JetBlue states that Delta's addition of service between DCA-SEA may result

---

[115] *See supra* at 18.
[116] DOT DB1B Market YE 1Q2024.
[117] DCA/IAD/BWI Airports.
[118] DOT DB1B Market, OAG Schedules, DOT F41 Financials YE 1Q2024.
[119] *See* DOT-OST-2024-0065-22225, Consolidated Answer of Southwest Airlines Co.

-27-

in a reduction of service to SEA from other Washington-area airports.[120] JetBlue and Southwest state that Delta customers can presently access SEA via service connecting over other Delta hubs, and that Delta's air fares are typically higher than others in the markets it serves. Lastly, Southwest states that there is presently a surplus of seats in the DCA-SEA market, disagreeing with Delta's assessment of passenger demand for the proposed route.

The Department is not persuaded by these comments because, as stated above, the DCA-SEA route is presently served by a single carrier which carries a majority-share of local O&D traffic, and because current air fares are notably higher than the average for DCA and the Washington, DC market. The Department's analysis also finds that a large share of customers traveling between the greater-Washington, DC market and Seattle are connecting beyond either WAS or SEA (approximately 26%).[121] This leads the Department to tentatively conclude that Delta's proposed service would increase nonstop seat capacity for local O&D customers, better serving customers traveling to/from Washington, DC, and Seattle. In consideration of the above, the Department tentatively concludes that the benefits of an award to Delta outweigh those of the proposals not selected in this proceeding.

In awarding two slot exemptions for service to Seattle, the Department selects Delta's primary proposed market in this proceeding. The Department tentatively concludes that Delta's primary proposal more fully meets the criteria of the statute, and its benefits outweigh a selection of Delta's backup proposal (SLC) in this proceeding.

**Southwest to Las Vegas, NV**

We tentatively conclude that Southwest merits an award of two slot exemptions for service to Las Vegas, NV. The proposed service will enhance options for travel to a beyond-perimeter airport and have a positive impact on the overall level of competition in the Washington, DC-Las Vegas market.

LAS is one of the largest local O&D markets proposed for service in this proceeding. The Department's analysis finds that there are approximately 275,000 annual O&D customers between DCA-LAS, or 376 per-day, each way.[122] Further, the DCA-LAS O&D market has the greatest discrepancy between annual passengers and available nonstop seats of any market proposed in this proceeding. For the year ending first quarter of 2024, there were approximately 137,000 nonstop seats between DCA-LAS, or 0.5 seats per O&D passenger.[123] Put simply, the current O&D market between DCA-LAS is roughly two times larger than the available nonstop capacity. Southwest's service would therefore enhance competition by providing new service in a high-demand, underserved beyond-perimeter market.

---

[120] *See* DOT-OST-2024-0065-22193, Consolidated Answer of JetBlue Airways Corporation.
[121] SABRE GDD.
[122] DOT DB1B Market YE 1Q2024.
[123] DOT DB1B Market, OAG Schedules YE 1Q2024.

-28-

DCA-LAS is presently served nonstop by American using an existing slot exemption award from the Department.[124] Of local O&D customers traveling between DCA-LAS, nearly 56% are carried by American. Southwest carries the second-largest share of customers between DCA-LAS (20%).[125] However, because Southwest does not currently offer nonstop service on this route, the carrier's customers can only access DCA or LAS via one-stop connecting service. Further, current air fares between DCA-LAS are roughly 27-29% higher than average for DCA, as well as the average air fare for the greater-Washington, DC market, and the U.S. national average.[126, 127] These factors suggest that new nonstop service between DCA-LAS would have a positive impact on the overall level of competition in the market by providing a nonstop alternative to service currently operated by the dominant carrier at DCA, and by increasing flight options from DCA on a low fare air carrier.

United, in opposition, states that the consumer benefits of its own proposal for service to SFO or LAX outweighs that of Southwest's proposed DCA-LAS service.[128] United also states that its proposed service would benefit a larger passenger market and provide greater one-stop connections for DCA travelers. JetBlue states that the addition of DCA-LAS service by Southwest could lead to the reduction of service from IAD or BWI to LAS by Southwest and other carriers.[129]

As stated above, the DCA-LAS local O&D market is large, and there is presently a deficit of nonstop seats as compared to annual passengers. Additionally, the introduction of Southwest's service would compete with American, which is the only carrier operating DCA-LAS, and which carries a majority share of O&D passengers on the route. The Department also notes comments of Delta in support of Southwest's proposal.[130] In consideration of the above, the Department tentatively concludes that the benefits of an award to Southwest outweigh those of the proposals not selected in this proceeding.

**United to San Francisco, CA or Los Angeles, CA**

We tentatively conclude that United merits an award of two slot exemptions for service to San Francisco, CA. The proposed service will enhance options for travel to a beyond-perimeter airport and have a positive impact on the overall level of competition in the Washington, DC-San Francisco market.

SFO is one of the largest local O&D markets proposed for service in this proceeding. The Department's analysis finds that there are approximately 238,000 total annual local O&D

---

[124] *See* Order 2000-7-1.
[125] DOT DB1B Market YE 1Q2024.
[126] DCA/IAD/BWI Airports.
[127] DOT DB1B Market, OAG Schedules, DOT F41 Financials YE 1Q2024.
[128] *See* DOT-OST-2024-0065-22188, Consolidated Comments of United Airlines, Inc.
[129] *See* DOT-OST-2024-0065-22193, Consolidated Answer of JetBlue Airways Corporation.
[130] *See* DOT-OST-2024-0065-22180, Comments of Delta Air Lines, Inc.

-29-

passengers between DCA-SFO, or roughly 393 per-day, each way.[131] Of these passengers, United and Alaska both carry a roughly even share, around 36% and 35% respectively. While Alaska and United presently operate nonstop service between DCA-SFO using slot exemption awards, the Department tentatively concludes that United's proposed second-daily service would have a positive impact on the overall level of competition in the market.[132]

This is primarily due to the prospective addition of newly accessible one-stop connecting markets from DCA, over United's SFO hub. The Department's analysis of United's application finds that the proposed service could add up to 32 new roundtrip one-stop connections from DCA via SFO, including seven international connections to points in Asia.[133] While the availability of new connecting points is, in part, dependent on United's operating schedule for the proposed service, the Department believes it is likely that new time-of-day coverage between DCA-SFO would enable added one-stop connections that will benefit consumers in the Washington, DC-San Francisco market.

Current air fares between DCA-SFO are approximately 60% higher than the average for DCA, as well as the average air fare for the greater-Washington, DC market, and the U.S. national average. [134, 135] Because United is not the sole nor dominant carrier on the DCA-SFO route, the Department believes that the addition of nonstop seat capacity on the route would likely place downward pressure on air fare levels for DCA-SFO. Additionally, United is not a dominant carrier at DCA, holding only nine percent of allocated slots, including four slot exemptions.[136] These factors combined lead the Department to tentatively conclude that the addition of service between DCA-SFO will have a positive impact on the overall level of competition in the market by providing additional flight options in a high-demand beyond-perimeter market, expanding accessible one-stop markets from DCA, and stimulating price discipline on the route through added capacity.

Multiple other applicants state that United already serves DCA-SFO, and therefore its proposal would not enhance competition on the route.[137] Delta states that the addition of service between DCA-SFO would further strengthen United's dominance in the greater-Washington, DC market, and would not enhance competition because DCA-SFO is presently served nonstop. The Department acknowledges United's presence in the greater-Washington, DC market through its IAD hub. For the specific circumstance of this proceeding, however, the Department is persuaded that the competitive benefit of an award to United fulfills the direction of the statute.

---

[131] DOT DB1B Market YE 1Q2024.
[132] *See* Order 2012-2-21.
[133] OAG Schedules YE 1Q2024.
[134] DCA/IAD/BWI Airports.
[135] DOT DB1B Market, OAG Schedules, DOT F41 Financials YE 1Q2024.
[136] FAA Slot Administration Data.
[137] *See* DOT-OST-2024-0065-22180, Comments of Delta Air Lines, Inc.; DOT-OST-2024-0065-22193, Consolidated Answer of JetBlue Airways Corporation; DOT-OST-2024-0065-22225, Consolidated Answer of Southwest Airlines Co., DOT-OST-2024-0065-22203, Consolidated Answer of Spirit Airlines, Inc.

-30-

The Department tentatively concludes that the benefits of an award to United outweigh those of the proposals not selected in this proceeding and the potential detriments of selecting United.

In awarding two slot exemptions for service to San Francisco, the Department selects United's primary proposed market in this proceeding. The Department tentatively concludes that United's primary proposal more fully meets the criteria of the statute, and its benefits outweigh a selection of United's backup proposal (LAX) in this proceeding.

### JetBlue to San Juan, PR or Los Angeles, CA

We tentatively conclude that JetBlue does not merit an award of two slot exemptions in this proceeding for proposed service to San Juan, PR or backup proposed service to Los Angeles, CA. While JetBlue's primary proposal would provide expanded access between Washington, DC and Puerto Rico, the service would not enhance air travel options in an unserved beyond-perimeter market. Additionally, because JetBlue is currently the sole operator between DCA-SJU, the Department finds that the proposed second-daily service would not have a significant, positive impact on the level of competition in the Washington, DC-San Juan market.

While JetBlue is not a significant slot-holder at DCA, the Department's analysis finds that JetBlue presently carries nearly 80% of local O&D passengers traveling between DCA-SJU, and that air fares on the route are approximately 16-18% higher than the average for DCA, as well as the average air fare for the greater-Washington, DC market, and the U.S. national average.[138, 139] Because an award to JetBlue would further strengthen the carrier's dominance in the DCA-SJU market, the application is less compelling than others in this proceeding. The Department acknowledges the importance of air connectivity between the continental U.S. and Puerto Rico. In consideration of the above factors however, the Department tentatively finds that the potential benefits of JetBlue's proposal do not outweigh those of the other applications tentatively selected in this proceeding.

Regarding its backup proposal for service to Los Angeles, JetBlue did not supply the Department with material analysis supporting its application for DCA-LAX. Therefore, the Department cannot adequately assess the merits or deficiencies of the proposed service, nor transparently evaluate the backup proposal.

### VI. CONDITIONS

### Start-up

We expect that awardees will inaugurate full service in a reasonable timeframe – tentatively 90 days following the date of service of a Final Order, unless otherwise approved by the

---

[138] DCA/IAD/BWI Airports.
[139] DOT DB1B Market YE 1Q2024.

Department. If, for any reason, an awardee is not able to use the slot exemptions awarded, the carrier shall notify the Department as soon as possible - tentatively not later than 10 days after the date of service of a Final Order.

**Assignment of Slot Times**

As stated in the Department's June 24, 2024, Notice, 49 U.S.C. § 41718(C)(2)(ii) allows the Department to assign two additional slot exemptions per one hour period (for a total of five). There are 15 hourly periods between 7:00 a.m. EST and 9:59 p.m. EST, and all slot exemptions must fit into the combined 75 slot times during these periods. Applicants were advised of these constraints, and that multiple periods have already reached the statutory cap for slot exemption assignments. In a Final Order in this proceeding, selected carriers will be directed to work collaboratively with the FAA Slot Administration Office to accommodate these new operations. Selected carriers may be asked to justify requested slot times or the viability of the proposed service during alternate operating hours.

This Order is issued under authority redelegated by the Under Secretary of Transportation in 49 CFR § 1.25a(b)(6)(ii)(D) to the Assistant Secretary for Aviation and International Affairs.

**ACCORDINGLY,**

1.  We direct all interested persons to show cause why we should not issue an order making final our tentative findings and conclusions discussed herein. Objections or comments to our tentative findings and conclusions shall be due no later than 14 calendar days from the service date of this Order, and answers to objections shall be due no later than seven (7) business days thereafter. In the event that no objections are filed, all further procedural steps shall be deemed waived, and we may enter an order making final our tentative findings and conclusions;

2.  We tentatively grant slot exemptions from 14 C.F.R. Part 93, Subparts K and S, to Alaska Airlines, Inc. (two slot exemptions to serve San Diego International Airport); American Airlines, Inc. (two slot exemptions to serve San Antonio International Airport); Delta Air Lines, Inc. (two slot exemptions to serve Seattle-Tacoma International Airport); Southwest Airlines Co. (two slot exemptions to serve Harry Reid International Airport); and United Airlines, Inc. (two slot exemptions to serve San Francisco International Airport);

3.  Except as otherwise granted, we tentatively deny all other applications for exemptions from 14 C.F.R. Part 93, Subparts K and S, filed in this docket;

4.  The Department prohibits Alaska Airlines, Inc., American Airlines, Inc., Delta Air Lines, Inc., Southwest Airlines Co., and United Airlines, Inc. from selling, trading, transferring,

or conveying the operating authorities granted by the subject exemptions, except through an air carrier merger or acquisition;

5. The Department prohibits Alaska Airlines, Inc., American Airlines, Inc., Delta Air Lines, Inc., Southwest Airlines Co., and United Airlines, Inc. from using the operating authorities granted by the subject exemptions to conduct air transportation to points other than those approved by this Order;

6. The authorities tentatively granted under these exemptions are subject to all of the other requirements delineated in 14 C.F.R. Part 93, Subparts K and S, including, but not limited to, the reporting provisions and use-or-lose requirements set forth in 14 C.F.R. § 93.227;

7. The Department tentatively denies the motion of JetBlue Airways Corporation to disqualify United from consideration for an award of DCA beyond-perimeter exemption slots, filed on July 10, 2024;

8. The Department grants all motions seeking leave to file otherwise unauthorized documents submitted by various air carriers in the docket; and

9. We will serve this Order on all parties on the service list in this docket.

By:


**CAROL A. (ANNIE) PETSONK**
Assistant Secretary for Aviation
and International Affairs


(SEAL)


*An electronic version of this document will be available online at:*
https://www.regulations.gov

# Exhibit I

Order 2024-12-8
Served: December 17, 2024



**UNITED STATES OF AMERICA**
**DEPARTMENT OF TRANSPORTATION**
**OFFICE OF THE SECRETARY**
**WASHINGTON, D.C.**

Issued by the Department of Transportation
On the 17th day of December, 2024

| | |
|---|---|
| **Applications of:**<br><br>**ALASKA AIRLINES, INC.;**<br>**AMERICAN AIRLINES, INC.;**<br>**DELTA AIR LINES, INC.;**<br>**FRONTIER AIRLINES, INC.;**<br>**JETBLUE AIRWAYS CORPORATION;**<br>**SPIRIT AIRLINES, INC.;**<br>**SOUTHWEST AIRLINES CO.; and**<br>**UNITED AIRLINES, INC.**<br><br>For exemptions from 14 C.F.R. Part 93, Subparts K and S, pursuant to 49 U.S.C. § 41718(i), Special rules for Ronald Reagan Washington National Airport (Additional Slot Exemptions), as added by Section 502 of the Federal Aviation Administration Modernization and Reauthorization Act of 2024 | **Docket DOT-OST-2024-0065** |

**FINAL ORDER**

## I.    SUMMARY

By this Order, the U.S. Department of Transportation (the Department) makes final its tentative findings and conclusions set forth in Order 2024-10-11 and awards two slot exemptions at Ronald Reagan Washington National Airport (DCA) to each of the five air carriers listed below, to operate new nonstop roundtrip service as follows:

- Alaska Airlines, Inc. (Alaska) for service to San Diego, California (SAN);

- American Airlines, Inc. (American) for service to San Antonio, Texas (SAT);

- Delta Air Lines, Inc. (Delta) for service to Seattle, Washington (SEA);

- Southwest Airlines Co. (Southwest) for service to Las Vegas, Nevada (LAS); and

- United Airlines, Inc. (United) for service to San Francisco, California (SFO).

## II.     BACKGROUND

Section 502 of the Federal Aviation Administration Reauthorization Act of 2024 (FAA 2024), signed into law on May 16, 2024, amends Section 41718 of Title 49 of the U.S. Code by directing the Department to grant 10 exemptions to air carriers to operate limited frequencies and aircraft on routes between Ronald Reagan Washington National Airport and domestic airports within or beyond the airport's 1,250-mile perimeter.[1] Accordingly, by Notice on June 24, 2024, the Department sought applications for the 10 exemptions. By Order 2024-10-11, issued on October 16, 2024, the Department directed all interested persons to show cause why we should not make final our tentative findings and conclusions stated therein and award two slot exemptions at DCA to each of five air carriers to operate new nonstop roundtrip service. We gave interested persons 14 calendar days to file objections or comments to Order 2024-10-11 and 7 business days thereafter to file answers to any objections or comments.

## III.     SUPPORTING COMMENTS

The Department received comments in support of its tentative findings and conclusions from Alaska, American, Delta, Southwest, and United.[2,3] These parties support the Department's assessment of the statute, and the Department's determination of the competitive benefits associated with our tentative allocation of the 10 additional slot exemptions at DCA.

### Comments of Alaska

In its comments to the Department, Alaska supports the Department's tentative determination that Alaska is *eligible* in this proceeding as a limited incumbent. Additionally, Alaska supports the Department's tentative determination that Frontier and Spirit are *ineligible* to apply for slot exemptions in this proceeding. Alaska also states that its codeshare relationship with American is strictly limited by its formal settlement agreement related to the acquisition of Virgin America. Alaska alleges that the nature of its relationship with American does not make it an "affiliated

---

[1] FAA Reauthorization Act of 2024, Pub L. No. 118-63 (May 16, 2024) ("FAA 2024").
[2] DOT-OST-2024-0065-23590, Comments of Alaska Airlines, Inc. on Show Cause Order 2024-10-11; DOT-OST-2024-0065-23585, Comments of American Airlines, Inc.; DOT-OST-2024-0065-23584, Comments of Delta Air Lines, Inc.; DOT-OST-2024-0065-23593, Comments of Southwest Airlines Co. to Order to Show Cause; DOT-OST-2024-0065-23588, Comments of United Airlines, Inc.
[3] The San Diego Congressional Delegation and California Senate Delegation also filed letters in support of the Department's tentative findings and conclusions.

-3-

carrier" of American at DCA, and that Alaska cannot, and will not, place American's code on Alaska-operated DCA-SAN flights.

## IV.    OBJECTIONS

Objections to Order 2024-10-11 were filed by JetBlue Airways Corporation (JetBlue), Frontier Airlines, Inc. (Frontier), Spirit Airlines, Inc. (Spirit), and the San Jose Mineta International Airport (SJC Airport).[4]

### Objection of JetBlue[5]

In objection to Order 2024-10-11, JetBlue argues that the Department's decision in this proceeding contrasts with stated policy goals with respect to competition in the airline industry. JetBlue objects to the Department's selections, stating that the Department rejects the "three smallest applicants who deliver lower-fare competition."[6] JetBlue alleges that the Department, in making final its tentative findings and conclusions, would "further erode competition" with an award of slot exemptions to "high-fare legacy carriers." JetBlue states that the Department's decision in this proceeding, and in other actions, has strengthened the position of dominant carriers and challenged the growth of smaller carriers. Further, JetBlue reiterates its own comments made on the public record for this proceeding regarding the alleged noncompliance of United's application for slot exemptions, and United's history of strong public opposition to additional slot exemptions at DCA.

Finally, JetBlue objects to the Department's analysis of air fares in the Washington-San Juan market. JetBlue states that the assessment of air fares is not adjusted for the stage-length of proposed routes, and therefore does not provide an accurate comparison for beyond-perimeter routes at DCA.

### Objection of Frontier[7]

Frontier objects to the Department's tentative determination that the carrier is ineligible to apply for slot exemptions in this proceeding as a limited incumbent air carrier. Frontier alleges that because the statutory definition of new entrant does not distinguish between slots and slot exemptions, Frontier cannot be classified as such due to its status as a carrier operating with slot exemptions at DCA at the time of the enactment of FAA 2024. Further, Frontier states that the Department, in previous proceedings, has treated it as a limited incumbent air carrier.[8] Finally, Frontier reiterates that because § 41714(h)(5)(B) does not specify a lower limit for slot holdings to be counted when considering the classification of DCA air carriers, Frontier – which holds

---

[4] Additional comments in opposition were filed by Exhaustless, Inc. *See* DOT-OST-2024-0065-23583, as discussed below.

[5] DOT-OST-2024-0065-23589, Objection of JetBlue Airways Corporation.

[6] *Id.*

[7] DOT-OST-2024-0065-23586, Frontier Airlines, Inc. (Objection to Order to Show Cause).

[8] *Id.*

zero (0) slots at DCA when slot exemptions are excluded – remains eligible as a limited incumbent.

Frontier also objects to the Department's tentative determination of Alaska's eligibility as a limited incumbent air carrier in this proceeding. Frontier alleges that this approach is contrary to a plain reading of the statute, that the tentative determination is not supported by the legislative history or congressional intent of 49 U.S.C. § 41714(k), and that Alaska's codeshare relationship with American provides the carrier with meaningful access at DCA.

### Objection of Spirit[9]

Spirit objects to the Department's tentative determination that the carrier is ineligible to apply for slot exemptions in this proceeding in the limited incumbent air carrier category. Specifically, Spirit objects to the tentative conclusion that carriers eligible to obtain slot exemptions in this proceeding must have been incumbents providing air transportation at DCA on the date of the enactment of FAA 2024. Spirit alleges that the word "incumbent" is not defined in any relevant statute or regulation, and that the text of FAA 2024 does not depart from past slot exemption provisions. Additionally, Spirit states that prior versions of the statute – prior to the amendment made by Congress in enacting FAA 2024 – utilize the term "operates," not "incumbent," when referring to air carriers providing service at an airport. Therefore, Spirit argues that FAA 2024 does not require a carrier to be operating on the date of enactment to qualify as a limited incumbent in this proceeding. Spirit asks that the Department amend its tentative determination and recognize the carrier as an eligible limited incumbent in this proceeding.

Spirit also objects to the Department's tentative determination of Alaska's classification as a limited incumbent air carrier in this proceeding. Spirit alleges that the Department misclassified Alaska, contrary to § 41714(k). According to Spirit, Alaska's codeshare relationship with American disqualifies Alaska from consideration as a limited incumbent. Spirit notes that FAA 2024 does not amend the statutory definition of limited incumbent or affiliated air carriers. Finally, Spirit objects to the Department's assessment of the legislative history for § 41714(k). Spirit asks that the Department amend its tentative determination and re-categorize Alaska as a non-limited incumbent in this proceeding.

### Objection of San Jose Mineta International Airport[10]

SJC Airport objects to the Department's tentative determination that Spirit is ineligible to apply for slot exemptions in this proceeding. SJC Airport states that Spirit's application to serve its airport is consistent with the statutory criteria provided by FAA 2024 and would enable new, competitive service between Washington, D.C. and the South Bay region.

---

[9] DOT-OST-2024-0065-23587, Objection of Spirit Airlines to Order to Show Cause.
[10] DOT-OST-2024-0065-23591, San Jose Mineta International Airport (Objection to Show Cause Order 2042-10-11).

**Objection of Exhaustless Inc.**[11]

Exhaustless Inc. (Exhaustless) opposes the Department's tentative findings and conclusions in Order 2024-10-11. Exhaustless states that, in awarding additional slot exemptions at DCA, the Department "has tentatively decided to purloin all supplier and consumer airspace reservations serving D.C. Airport – and those serving every other airport in the United States – from Exhaustless' multi-sided market-clearing service," and "unlawfully 'grant' to certain carriers a title of heredity for those reservations to use the public's airspace."[12]

## V.    RESPONSES TO OBJECTIONS

**Answer of Alaska**[13]

In its answer of November 8, Alaska opposes the objections of Spirit and Frontier, which allege that Alaska's codeshare agreement with American disqualifies it from being classified as a limited incumbent. Alaska argues that the context and legislative history of the relevant statute are valid, of relevance, and support the Department's tentative determination. Alaska, in support of its argument, provides additional legislative history for the relevant statute.[14]

Additionally, Alaska restates its argument that Spirit and Frontier are not eligible to apply for slot exemptions in this proceeding. Alaska disputes Spirit's contention that certain, more specific wording in the statute would need to specify that eligible carriers had to be providing air transportation at DCA as of the date of enactment of FAA 2024. Alaska also restates its support for the Department's tentative determinations regarding air carrier eligibility. Alaska again states that Spirit is not eligible as a limited incumbent in this proceeding because it does not meet a plain-meaning definition of "incumbent." Regarding Frontier, Alaska states that the statutory language is unambiguous in that it classifies Frontier as a new entrant, and thus as ineligible to receive slot exemptions under the criteria established by FAA 2024.

**Reply of Spirit**[15]

Spirit filed a consolidated reply in response to Alaska and Frontier. Spirit disputes the comments of Alaska, which supports its eligibility in the limited incumbent category. Spirit alleges that the settlement agreement related to Alaska's acquisition of Virgin America does not supersede the relevant statute, § 41714(k), and thus does not make Alaska eligible in that category. Spirit reiterates that Alaska does gain meaningful access to DCA via its relationship with American, and that § 41714(k) does not specify the type of code-sharing relationship that is, or is not, applicable under that section. Finally, Spirit reiterates its opposition to Alaska's and the Department's interpretation of the legislative history, and the inclusion of such history in the record for this proceeding.

---

[11] DOT-OST-2024-0065-23583, Exhaustless Inc. (Opposition to Show Cause Order 2024-10-11).
[12] *Id.* at 2.
[13] DOT-OST-2024-0065-23596, Answer of Alaska Airlines, Inc.
[14] *Id.* at 8.
[15] DOT-OST-2024-0065-23594, Consolidated Reply of Spirit Airlines, Inc.

Spirit also reiterates its argument that Frontier is not eligible as a limited incumbent in this proceeding. Spirit disputes Frontier's interpretation of the relevant statute and statutory criteria for FAA 2024.

Finally, Spirit alleges that the Department's tentative award of two slot exemptions to United for service between DCA-SFO violates the statutory criteria provided by FAA 2024. Spirit argues that an award to United does not meet the relevant statutory criteria because the service would not be between DCA and an unserved airport, and because the service does not have a positive impact on the overall level of competition in the Washington-San Francisco market.

**Motion for Leave to File and Supplement Objection of Frontier**[16]

On November 26, 2024, Frontier filed a Motion for Leave to File and Supplement Objection. Therein, Frontier stated that its initial submission in this proceeding did not include information with respect to the starting date or aircraft type for the service proposed. Frontier acknowledges that such information is not relevant to the Department's determination regarding its eligibility in this proceeding but seeks leave to submit the additional information as required by 14 CFR § 302.6. Frontier states that good cause exists for granting it leave to file the relevant information. Frontier therefore informs the Department that it would operate the proposed DCA to San Juan Puerto Rico (SJU) service with Airbus A320 family aircraft with between 180 and 240-seats, and that the proposed service would arrive daily at DCA at 1630 EST, departing to SJU at 1730 EST. Frontier provides a desired starting date of March 6, 2025, for the proposed service.

## VI.    DECISION

The Department finalizes its tentative findings and conclusions set forth in Order 2024-10-11, and awards two slot exemptions from the application of 49 U.S.C. §§ 49104(a)(5), 49109, 41714, and 14 C.F.R. Part 93, Subparts K, S, and T pursuant to 49 U.S.C. § 41718(i), to each of five non-limited or limited incumbent air carriers – Alaska, American, Delta, Southwest, and United – to operate new nonstop roundtrip service at DCA. Comments of the objecting parties have been carefully considered, and do not provide a basis for the Department to change the tentative conclusions reached by the Department in this proceeding.

**Discussion**

The Department has decided to finalize the tentative findings, conclusions, and selections in the show-cause order. In reaching this decision, the Department again notes that the statutory criteria provided by FAA 2024 limit our discretion when awarding the new slot exemptions, leaving little room to address a full range of competition issues in a manner consistent with past practice. The statute does so first by requiring air carriers, in addition to qualifying as either limited or non-limited incumbents, to also be incumbents at DCA (*i.e.*, providing air transportation) on the date of enactment of FAA 2024 to be eligible. Second, the amended statute, unlike its prior versions,

---

[16] DOT-OST-2024-0065-23600, Motion for Leave to File and Supplement Objection of Frontier Airlines, Inc. to Order to Show Cause (Corrected).

excludes new entrants from participating in this proceeding. Though both choices by Congress narrow the Department's ability to classify and consider all carriers and business models for the available slot exemptions, the Department has applied the statutory criteria to the applications while maximizing the competitive and public benefits contemplated by FAA 2024.

With respect to the objection of JetBlue, the Department is not persuaded to amend its decision and select JetBlue's proposal for a second-daily service in the DCA-SJU market or for daily service between DCA and Los Angeles, California (LAX). The Department considers and rejects JetBlue's comments with respect to its competitive position at DCA relative to the awardees and other applicants in this proceeding. In affirming our tentative findings, we note that FAA 2024 directs the Department to expressly consider the impact of proposed service on competition in the markets that will be served to/from DCA. While JetBlue may be a smaller competitor at DCA, its status as the sole-operator of DCA-SJU service, and commanding share of local origin/destination customers on this route outweigh, in this case, the competitive merits of a slot exemption award. As noted in Order 2024-10-11, our analysis of widely available market data finds that JetBlue carried approximately 80 percent of customers traveling between DCA-SJU for the year-ending first quarter of 2024.[17] JetBlue, therefore, competes only minimally with other DCA carriers for customers in this market, despite its smaller overall scale. With an additional DCA-SJU frequency, JetBlue's incentive to compete with other carriers in this market may be reduced further. The Department also considers and rejects JetBlue's comments with respect to our analysis of air fares. The Department balanced a variety of competitive factors while adhering to the statutory criteria in this proceeding- of which air fare was one. Adjusting our analysis post-hoc, to account for the stage-length of routes proposed, would not make a material difference or lead to different tentative findings and conclusions. In consideration of the above factors and statutory criteria, the Department affirms its tentative conclusion that an award to JetBlue for DCA-SJU service would not enhance air travel options in an unserved beyond-perimeter market, nor do the benefits of the proposed service outweigh those of other applicants selected in this proceeding.

Regarding the objections of Spirit and Frontier, and based upon the statutory text provided by Congress, the Department is not persuaded by the arguments the carriers make regarding their eligibility in this proceeding. In its objection, Frontier does not provide arguments that the Department did not already consider in issuing Order 2024-10-11. Our determination is therefore unchanged, and the Department finds that under the applicable statutes and regulations, Frontier is a new entrant carrier at DCA and does not qualify as a limited incumbent carrier in this proceeding.[18]

The arguments made by Spirit and SJC Airport do not provide a further persuasive basis to change our approach vis-à-vis Spirit's eligibility in this proceeding. Spirit's argument, that

---

[17] Bureau of Transportation Statistics Airline Origin and Destination Survey (DB1B).

[18] The Department grants Frontier's Motion for Leave to File of November 26, 2024. However, the supplemental filing does not present new arguments, or information persuasive to the Department with respect to the carrier's eligibility in this proceeding.

-8-

section 502 of FAA 2024 does not use certain wording such as the term "operates," is not supported by a plain reading of the statute as it existed at the time the Department was required to apply it in this proceeding. Further, Spirit's argument is not supported by the preceding amendment to the statute that added slot exemptions at DCA.[19] The preceding amendment to the statute that added slot exemptions required the Secretary to "make 8 available to limited incumbent air carriers or new entrant air carriers."[20] In this matter, the relevant statute contains additional qualifying language requiring the Secretary to "make 2 [slot exemptions] available to incumbent air carriers qualifying for status as a limited incumbent carrier."[21] Therefore, as stated in Order 2024-10-11, the Department determines that the amended statute presents a clear two-part test for determining carrier qualification in this proceeding. Spirit did not provide air transportation at DCA on the date of the enactment of FAA 2024. Therefore, the Department cannot reasonably determine that Spirit is an "incumbent carrier qualifying as a limited incumbent." The relevant question is not whether Spirit could be a limited incumbent under the terms of § 41714(h)(5), but whether Spirit was an incumbent at DCA on May 16, 2024. Spirit was not.

The Department also considered all arguments with respect to Alaska's eligibility. The Department notes that the only two parties to question Alaska's eligibility—Spirit and Frontier—are not themselves eligible, and therefore are not directly injured or affected by our determination that Alaska is eligible as a limited incumbent. The Department's tentative determination in the show cause order, finalized herein, that Alaska is a limited incumbent for the purposes of this proceeding, is based upon the best reading of the applicable statutes. The Department reads §41714(k), which is a generally applicable statute, in the context of the specific language in FAA 2024, which clearly requires the Department to grant slot exemptions for two different categories of carriers operating at the airport, using a set of specific and narrow qualifying criteria without reference to codeshare agreements. Section 41714(k) is properly interpreted to exclude regional affiliates from obtaining slot exemptions that would likely be controlled by the larger mainline incumbents.[22]

Alaska has demonstrably fewer slots and slot exemptions at DCA in comparison to larger incumbents. And like other carriers operating at DCA, Alaska has codeshare arrangements that the carrier uses to expand the breadth of destinations it offers to customers traveling to/from points in its network. As stated in Order 2024-10-11, the code-sharing relationship between Alaska and American at DCA does not include slot-sharing provisions, does not increase the slot holdings of the dominant carrier at DCA (i.e., American), and does not place Alaska-operated

---

[19] 49 U.S.C. § 41718(g).
[20] 49 U.S.C. § 41718(g)(2).
[21] 49 U.S.C. § 41718(i)(3).
[22] For example, larger mainline carriers may enter into agreements (such as a fee per-departure arrangement) with regional affiliates that operate services under the mainline carrier's marketing control. In such arrangements, the non-marketing carrier may hold and operate slots at an airport but does not compete directly with the mainline/marketing carrier. This is not the case for Alaska and American at DCA, where both carriers operate independently under their own marketing control.

slots under the marketing control of American (i.e., American cannot place its code on any Alaska flight originating or terminating at DCA).

Reading the statute as a whole, the best interpretation is that Alaska is a limited incumbent carrier. Reading § 41714(k) rigidly as Spirit and Frontier urge us to do, detracts from the broader text and purpose of the statute, which provides slot exemptions to address competition and access issues at DCA. Moving Alaska into the non-limited incumbent category would result in a suboptimal outcome, reducing the maximum public benefits available from these scarce assets. As Spirit and Frontier are ineligible (and no other eligible applications were received in the limited incumbent category), placing Alaska in the non-limited incumbent category would necessarily result in one of the five slot pairs going unallocated, and therefore not fulfill the directive of Congress to allocate the five slot pairs. We are therefore not persuaded to amend our tentative determination.

Finally, with respect to the objection of Exhaustless, the Department finds the arguments stated therein to be outside of the scope of this proceeding and not directly relevant to the statutory requirements imposed by Congress.

With consideration for the above, the Department finalizes its tentative findings and conclusions set forth in Order 2024-10-11.

## VII.    CONDITIONS

**Start-up**

Carriers are expected to inaugurate full service within 90 days following the date of service of this Order, unless otherwise requested, and approved, in writing by the Department in docket DOT-OST-2024-0065. If, for any reason, an awardee is not able to use the slot exemptions awarded, the carrier shall notify the Department not later than ten (10) days after the date of service of this Order.

**Assignment of Slot Times**

In coordination with the Federal Aviation Administration (FAA) Slot Administration Office, the Department will assign slot times corresponding with the authority granted in this proceeding, and in accordance with the requirements of FAA 2024.[23] The Department directs Alaska, American, Delta, Southwest, and United to work with the FAA Slot Administration Office to identify slot times for these new operations. Carriers are asked for flexibility and cooperation with the statutory cap for slot exemption assignments. Carriers may be required to justify the viability of proposed service during available slot exemption hours. Final slot times will be assigned in a notice subsequent to our decision.

---

[23] As stated in the Department's June 24, 2024 Notice, and in Order 10-11-2024, 49 U.S.C. § 41718(C)(2)(ii) allows the Department to assign two additional slot exemptions per one hour period (for a total of five). There are 15 hourly periods between 7:00 a.m. EST and 9:59 p.m. EST, and all slot exemptions must fit into the combined 75 slot times during these periods. Applicants were advised of these constraints, including that multiple periods have already reached the statutory cap for slot exemption assignments.

-10-

**Environmental Issues**

49 U.S.C. § 41718(e) specifically exempts our action here from review under the National Environmental Policy Act. Additionally, under 49 U.S.C. § 47117(e), the Department will continue to give DCA priority in making grants for airport noise compatibility planning and programs.[24]

**Administrative Terms**

49 U.S.C. § 417149(j) prohibits awardees from selling, trading, transferring, or conveying the operating authorities granted by the subject exemptions, except through an air carrier merger or acquisition. Additionally, the Department prohibits carriers from using the operating authorities granted by the subject exemptions to conduct air transportation to points other than those approved by this Order.

This Order is issued under authority redelegated by the Under Secretary of Transportation in 49 CFR § 1.25a(b)(6)(ii)(D) to the Assistant Secretary for Aviation and International Affairs.

**ACCORDINGLY,**

1. We make final our findings and conclusions as stated in Order 2024-10-11 and grant additional slot exemptions pursuant to 49 U.S.C. § 41718(i) to Alaska Airlines, Inc. (two slot exemptions to serve San Diego International Airport); American Airlines, Inc. (two slot exemptions to serve San Antonio International Airport); Delta Air Lines, Inc. (two slot exemptions to serve Seattle-Tacoma International Airport); Southwest Airlines Co. (two slot exemptions to serve Las Vegas Harry Reid International Airport); and United Airlines, Inc. (two slot exemptions to serve San Francisco International Airport);

2. The Department directs Alaska Airlines, Inc., American Airlines, Inc., Delta Air Lines, Inc., Southwest Airlines Co., and United Airlines, Inc. to file in Docket DOT-OST-2024-0065 no later than ten (10) business days after the service date of this Order their proposed flight schedules and effective date for operations authorized by this Order. Further, the awardees must commence their service by no later than March 17, 2025, unless otherwise requested and approved in writing by the Department;

3. The Department directs the awardees to contact the FAA Slot Administration Office regarding their proposed schedules associated with the slot exemptions. FAA will assign slot exemption numbers, effective dates, and operating times consistent with statutory limitations. The Department will coordinate with the FAA Slot Administration Office to make a final assignment of operating times for these slot exemptions in a separate notice, as soon as possible;

---

[24] The Department expects all operations conducted with the additional slot exemptions to utilize single-aisle aircraft meeting, at minimum, FAA Stage 3 noise standards as required by 49 U.S.C. § 41718(c).

4. The slot exemptions granted under 49 U.S.C. § 41718(i) may not be used for operations between the hours of 10:00 p.m. and 7:00 a.m., and the exemptions granted under 49 U.S.C. § 41718 (a), (b), (g), and (i) may not increase the number of operations at Ronald Reagan Washington National Airport in any one-hour period during the hours of 7:00 a.m. and 9:59 p.m. by more than five operations;

5. Except as otherwise granted, we deny all other applications for slot exemptions filed in this docket;

6. The Department prohibits Alaska Airlines, Inc., American Airlines, Inc., Delta Air Lines, Inc., Southwest Airlines Co., and United Airlines, Inc. from selling, trading, transferring, or conveying the operating authorities granted by the subject exemptions, except through an air carrier merger or acquisition;

7. The Department prohibits Alaska Airlines, Inc., American Airlines, Inc., Delta Air Lines, Inc., Southwest Airlines Co., and United Airlines, Inc. from using the operating authorities granted by the subject exemptions to conduct air transportation to points other than those approved by this Order;

8. The authorities granted under these exemptions are subject to all of the other requirements delineated in 14 C.F.R. Part 93, Subparts K and S, including, but not limited to, the reporting provisions and use-or-lose requirements set forth in 14 C.F.R. § 93.227;

9. The Department denies the motion of JetBlue Airways Corporation to disqualify United from consideration for an award of DCA beyond-perimeter exemption slots, filed on July 10, 2024;

10. The Department grants the motion seeking leave to file otherwise unauthorized documents submitted by Frontier Airlines, Inc. in the docket;

11. This docket will remain open until further order of the Department; and

-12-

12. We will serve this Order on all parties on the service list in this docket.


By:



**CAROL A. (ANNIE) PETSONK**
Assistant Secretary for Aviation
and International Affairs

(SEAL)


An electronic version of this document will be available online at:
https://www.regulations.gov