**[ORAL ARGUMENT NOT SCHEDULED]**
**No. 25-1002**

---

**IN THE UNITED STATES COURT OF APPEALS FOR THE DISTRICT OF COLUMBIA CIRCUIT**

---

FRONTIER AIRLINES, INC.,

Petitioner,

v.

UNITED STATES DEPARTMENT OF TRANSPORTATION,

Respondent,

ALASKA AIRLINES, INC.,

Respondent-Intervenor.

---

On Petition for Review of a Final Order
of the United States Department of Transportation

---

# JOINT APPENDIX

---

Aaron Schaer
*Counsel of Record*
BALLARD SPAHR LLP
13313 Balfour Ave.
Huntington Woods, MI 48070
(206) 223-7103
schaera@ballardspahr.com

Lorene L. Boudreau
BALLARD SPAHR LLP
1735 Market St., 51st Floor
Philadelphia, PA 19103-7599
(215) 864-8245
boudreaul@ballardspahr.com

*Counsel for Petitioner Frontier Airlines, Inc.*

# TABLE OF CONTENTS

| Docket Entries | | |
|---|---|---|
| Docket Information | Document Title | Page |
| DOT-OST-2000-7181-0093 (July 5, 2000) | Order 2000-7-1 Granting Outside-The-Perimeter Slot Exemptions at Ronald Reagan Washington National Airport | JA 000001 |
| DOT-OST-2000-7181-2117 (Nov. 27, 2002) | Order 2002-11-20 Granting Outside-The-Perimeter Slot Exemptions at Ronald Reagan Washington National Airport | JA 000028 |
| DOT-OST-2000-7181-4657 (Apr. 1, 2004) | Order 2004-4-1 Granting Beyond-Perimeter Slot Exemptions at Ronald Reagan Washington National Airport | JA 000039 |
| DOT-OST-2012-0029-0001 (Feb. 24, 2012) | Order 2012-2-21, Establishment of Slot Exemption Proceedings at Ronald Reagan Washington National Airport | JA 000064 |
| DOT-OST-2012-0029-6192 (May 14, 2012) | Order 2012-5-12 Granting Beyond-Perimeter Slot Exemptions at Ronald Reagan Washington National Airport | JA 000069 |
| DOT-OST-2000-7182-1911 (July 24, 2012) | Order 2012-7-26 Reallocating Within-Perimeter Slot Exemptions at Ronald Reagan Washington National Airport | JA 000095 |
| 1:16-cv-02377 (D.D.C. Dec. 6, 2016) | *United States of America v. Alaska Air Group, Inc. et al.*, No. 1:16-cv-02377 (D.D.C. Dec. 6, 2016), Proposed Final Judgment, available at https://www.justice.gov/atr/case-document/file/915971/dl?inline | JA 000117 |

| | | |
|---|---|---|
| 1:16-cv-02377 (D.D.C. Dec. 6, 2016) | *United States of America v. Alaska Air Group, Inc. et al.*, No. 1:16-cv-02377 (D.D.C. Dec. 6, 2016), Competitive Impact Statement, available at https://www.justice.gov/atr/case-document/file/915986/dl?inline | JA 000129 |
| 81 Fed. Reg. 89979 (Dec. 13, 2016) | *United States v. Alaska Air Group, Inc., et al.*; Proposed Final Judgment and Competitive Impact Statement (Dec. 13, 2016) | JA 000150 |
| DOT-OST-2024-0065-0001 (Jun. 24, 2024) | Notice of Establishment of Slot Exemption Proceeding at Ronald Reagan Washington National Airport Pursuant to 49 U.S.C. § 41718 | JA 000174 |
| DOT-OST-2024-0065-0007 (June 26, 2024) | Letter re Spirit Eligibility for DCA Limited Incumbent Slot Exemptions | JA 000177 |
| DOT-OST-2024-0065-3975 (June 27, 2024) | Ex Parte Correspondence to Brian E. Foont, counsel for Frontier Airlines | JA 000181 |
| DOT-OST-2024-0065-5784 (July 8, 2024) | Application of American Airlines, Inc. | JA 000183 |
| DOT-OST-2024-0065-5802 (July 8, 2024) | Frontier, Application for Slot Exemption | JA 000192 |
| DOT-OST-2024-0065-5926 (July 8, 2024) | Application of Alaska Airlines, Inc. for Slot Exemptions | JA 000201 |
| DOT-OST-2024-0065-5845 (July 9, 2024) | Aquacycl Inc. (Letter of Support for Alaska Airlines) | JA 000213 |
| DOT-OST-2024-0065-5846 (July 9, 2024) | Boston Consulting Group – San Diego (Letter of Support for Alaska Airlines) | JA 000215 |

| | | |
|---|---|---|
| DOT-OST-2024-0065-5843 (July 9, 2024) | San Diego County Regional Airport Authority (Letter of Support for Alaska Airlines) | JA 000216 |
| DOT-OST-2024-0065-5851 (July 9, 2024) | Illumina, Inc. (Letter of Support for Alaska Airlines) | JA 000217 |
| DOT-OST-2024-0065-5921 (July 9, 2024) | Application of Spirit Airlines, Inc. for Two Slot Exemptions for DCA-SJC Service | JA 000218 |
| DOT-OST-2024-0065-5849 (July 9, 2024) | Cyber Center of Excellence (Letter of Support for Alaska Airlines) | JA 000231 |
| DOT-OST-2024-0065-7220 (July 9, 2024) | City of San Diego, California (Letter of Support for Alaska Airlines) | JA 000232 |
| DOT-OST-2024-0065-5847 (July 9, 2024) | Qualcomm (Letter of Support for Alaska Airlines) | JA 000234 |
| DOT-OST-2024-0065-9221 (July 10, 2024) | Evans Hotels (Letter of Support for Alaska Airlines) | JA 000235 |
| DOT-OST-2024-0065-9193 (July 10, 2024) | Cox Communications (Letter of Support for Alaska Airlines) | JA 000236 |
| DOT-OST-2024-0065-9207 (July 10, 2024) | Cultura (Letter of Support for Alaska Airlines) | JA 000237 |
| DOT-OST-2024-0065-9217 (July 10, 2024) | Deloitte (Letter of Support for Alaska Airlines) | JA 000238 |
| DOT-OST-2024-0065-9177 (July 10, 2024) | Clark Construction Group – CA, LP (Letter of Support for Alaska Airlines) | JA 000240 |
| DOT-OST-2024-0065-10979 (July 10, 2024) | San Diego Congressional Delegation (Letter of Support for Alaska Airlines) | JA 000242 |

| | | |
|---|---|---|
| DOT-OST-2024-0065-20620 (July 16, 2024) | California Asian Pacific Chamber of Commerce (Letter of Support for Alaska Airlines) | JA 000244 |
| DOT-OST-2024-0065-22195 (July 17, 2024) | Frontier, Comments On Timely-Filed Applications | JA 000245 |
| DOT-OST-2024-0065-22193 (July 17, 2024) | Consolidated Answer of JetBlue Airways Corporation | JA 000251 |
| DOT-OST-2024-0065-22191 (July 17, 2024) | Consolidated Response of American Airlines, Inc. | JA 000279 |
| DOT-OST-2024-0065-22194 (July 17, 2024) | Comments of Alaska Airlines, Inc. for Slot Exemptions | JA 000288 |
| DOT-OST-2024-0065-22196 (July 17, 2024) | Alaska Airlines Employees (Letter of Support for Alaska Airlines) | JA 000296 |
| DOT-OST-2024-0065-22203 (July 17, 2024) | Consolidated Answer of Spirit Airlines, Inc. | JA 000324 |
| DOT-OST-2024-0065-22226 (July 18, 2024) | Comments of the San Diego County Regional Airport Authority | JA 000333 |
| DOT-OST-2024-0065-22279 (July 18, 2024) | Honorable Maria Cantwell (Correspondence) | JA 000352 |
| DOT-OST-2024-0065-22225 (July 18, 2024) | Consolidated Answer of Southwest Airlines Co. | JA 000353 |
| DOT-OST-2024-0065-23511 (July 31, 2024) | U.S. DOT/OST Notice of Communication | JA 000366 |
| DOT-OST-2024-0065-23548 (Aug. 27, 2024) | Ex Parte Correspondance to Honorable Darrell Issa, et al. | JA 000367 |
| DOT-OST-2024-0065-23551 (Aug. 27, 2024) | Ex Parte Correspondance to Honorable Darrell Issa, et al. | JA 000374 |
| DOT-OST-2024-0065-23549 (Aug. 27, 2024) | Ex Parte Correspondence to Honorable John B. Franklin | JA 000381 |

| | | |
|---|---|---|
| DOT-OST-2024-0065-23579 (Oct. 16, 2024) | Order to Show Cause | JA 000383 |
| DOT-OST-2024-0065-23582 (Oct. 28, 2024) | San Diego Congressional Delegation (Correspondence) | JA 000415 |
| DOT-OST-2024-0065-23587 (Oct. 30, 2024) | Objection of Spirit Airlines to Order to Show Cause | JA 000417 |
| DOT-OST-2024-0065-23586 (Oct. 30, 2024) | Frontier, Objection to Order to Show Cause | JA 000431 |
| DOT-OST-2024-0065-23590 (Oct. 30, 2024) | Alaska, Comments on Order to Show Cause | JA 000444 |
| DOT-OST-2024-0065-23594 (Oct. 31, 2024) | Honorable Laphonza Butler and Honorable Alex Padilla (Correspondence) | JA 000453 |
| DOT-OST-2024-0065-23596 (Nov. 12, 2024) | Answer of Alaska Airlines, Inc. | JA 000454 |
| DOT-OST-2024-0065-23597 (Nov. 12, 2024) | Consolidated Reply of Spirit Airlines, Inc. | JA 000465 |
| DOT-OST-2024-0065-23598 (Nov. 12, 2024) | Ex Parte Correspondence to Scott H. Peters, et al. | JA 000474 |
| DOT-OST-2024-0065-23600 (Nov. 27, 2024) | Motion for Leave to File and Supplement Objection of Frontier Airlines, Inc. to Order to Show Cause (Corrected) | JA 000481 |
| DOT-OST-2024-0065-23605 (Dec. 17, 2024) | Final Order | JA 000485 |
| DOT-OST-2024-0065-23608 (Dec. 31, 2024) | Notice of Alaska Airlines, Inc. | JA 000497 |

Posted: July 5, 2000
3:30 p.m.

**Order 2000-7-1**
**Served: July 5, 2000**

86686

**UNITED STATES OF AMERICA**
**DEPARTMENT OF TRANSPORTATION**
**OFFICE OF THE SECRETARY**
**WASHINGTON, D.C.**

Issued by the Department of Transportation
on the 5th day of July, 2000

| Applications of<br><br>**AMERICA WEST AIRLINES, INC.**<br>**AMERICAN AIRLINES, INC.**<br>**AMERICAN TRANS AIR, INC.**<br>**DELTA AIR LINES, INC.**<br>**FRONTIER AIRLINES, INC.**<br>**NATIONAL AIRLINES, INC.**<br>**NORTHWEST AIRLINES, INC.**<br>**TRANS WORLD AIRLINES, INC.**<br>**UNITED AIR LINES, INC.**<br><br>For exemptions from 14 CFR Part 93, Subparts K and S, pursuant to 49 U.S.C. § 41718(a), Special rules for Ronald Reagan Washington National Airport (beyond perimeter slot exemptions) | **Docket OST-2000-7181**– 93 |
|---|---|

**ORDER GRANTING OUTSIDE-THE-PERIMETER SLOT EXEMPTIONS AT RONALD REAGAN WASHINGTON NATIONAL AIRPORT**

**SUMMARY**

By this order the Department partially grants the applications of a number of carriers for slot exemptions at Ronald Reagan Washington National Airport (hereafter "DCA") in order to provide nonstop service between DCA and five cities, as follows: (1) America West Airlines, six slot exemptions in order to provide one daily nonstop round trip between DCA and Las Vegas, NV, and two daily nonstop round trips between DCA and Phoenix; (2) Frontier Airlines, two slot exemptions to provide one nonstop round trip a day between DCA and Denver; (3) National Airlines, two slot exemptions to provide one nonstop round trip a day between DCA and Las Vegas, NV; and (4) Trans World Airlines, two slot exemptions to provide one nonstop round trip a day between DCA and Los

Angeles, conditioned upon its execution, within 60 days, of a signed agreement with Chatauqua Airlines to provide it on-line feeder service at Los Angeles.

**BACKGROUND**

On April 5, 2000, the President signed into law the Wendell H. Ford Aviation Investment and Reform Act for the 21st Century (AIR-21). Among other things, AIR-21 liberalized slot and slot exemption access at the four airports now subject to the provisions of the High Density Rule, 14 C.F.R. 93 Subparts K and S. Specifically, at DCA, new 49 U.S.C. §41718(a), as added by Section 231 of AIR-21, provides that the Secretary *shall* grant 12 slot exemptions to air carriers for the provision of nonstop air transportation outside the 1,250 mile perimeter established for civil aircraft operations at DCA under 49 U.S.C. §49109.

AIR-21 directs the Secretary to distribute those 12 slot exemptions if the Secretary finds that the exemptions will (1) provide air transportation with domestic network benefits[1] beyond the 1,250 mile perimeter; (2) increase competition by new entrant air carriers or in multiple markets; (3) not reduce travel options for communities served by small hubs airports and medium hub airports within the 1,250 mile perimeter; and (4) not result in meaningful travel delays.

By Notice dated April 14, 2000, the Department notified interested parties that requests under this section had to be submitted to the Secretary not later than May 5; that comments with respect to any timely filed request for a slot exemption had to be filed by May 22; and that the Secretary's decision would be made not later than July 5.

**APPLICATIONS**

**America West Airlines, Inc.**

On May 5, 2000, America West requested 10 slot exemptions under the provisions of AIR-21 to enable it to operate three round trips (six slot exemptions) between Phoenix, AZ, and DCA using B-757 aircraft (190 seats) and two daily round trips (four slot exemptions) between Las Vegas, NV, and DCA.

America West argues that grant of its application will result in the first significant new network of single online connections between DCA and the western United States by a

---

[1] AIR-21 amended the previous definition of "new entrant," and its statutory applicability. Under the revised 49 U.S.C. § 41714(h)(3), as added by section 231 of AIR-21, the term "new entrant," for purposes of the slot exemption provisions including those at DCA, means "an air carrier that does not hold a slot at the airport concerned and has never sold or given up a slot at that airport after December 16, 1985, and a limited incumbent carrier as defined in subpart S of part 93 of title 14 code of federal regulations." The latter term, again as amended by AIR-21, is defined as an air carrier or commuter operator that holds or operates (or held or operated, since December 16, 1985) fewer than 20 slots and slot exemptions at the high density airport in question.

post deregulation low-cost, low-fare carrier. The applicant contends that its proposed service would provide substantial new travel options and flexibility for DCA-western U.S. passengers as well as significant new price competition and fare savings. Specifically, America West states that its proposal would provide 15 communities with their first one-stop online connecting service to DCA as well as competing one-stop connecting service to 42 cities beyond Phoenix and Las Vegas. America West contends that grant of its request would result in $18 million in savings to America West passengers and an additional $12 million in savings to other carriers' passengers whose fares would be disciplined by America West's. The applicant asserts that its unrestricted transcontinental business fares average 43 percent less than those offered by other major network competitors and that those savings would become available to DCA passengers as well if the Department granted its application. America West also argues that lack of DCA access has forced it to operate at a considerable competitive disadvantage since other carriers have better access to points on its network than does America West itself. The carrier contends that grant of its application would address this imbalance. Finally, America West argues that its proposed service would benefit small communities and not reduce travel options for small hub airports and medium hub airports inside the perimeter.

**American Airlines, Inc.**
On March 30, 2000, American Airlines requested four beyond-perimeter slot exemptions to provide two daily round trips between DCA and Los Angeles International Airport (LAX). The carrier would use B-757 aircraft (176 seats).

American maintains that LAX is the best candidate for four of the available twelve slot exemptions. The applicant argues that Los Angeles is the largest city proposed for service in this proceeding and that DCA-LAX is the largest proposed beyond-perimeter market. American contends that its request should be granted for several reasons.

First, the applicant asserts that it would provide the first non-stop service between LAX and DCA.

Second, the carrier claims it would provide connecting service, either on its own or through its code-sharing agreements, to 26 U.S. points and 16 foreign points. American further argues that it would provide first or competitive one-stop service to DCA from numerous California, Nevada, and Hawaii cities.

Third, the applicant contends that the grant of its request would improve competition at LAX, where United Air Lines is the largest carrier. American argues that United has 29.3 percent of total enplanements at LAX, while American has only 12.3 percent. In addition, American maintains that United has a 50.9 percent share of the Washington-LAX market, while American has only a 31.0 percent share. Approval of its application, American argues, would therefore improve competition in the Washington-LAX market. American also states that its proposal has received significant congressional and civic support.

Lastly, American contends that its application best matches all four of the AIR-21 selection criteria. First, American maintains that it will be able to provide on-line connecting benefits to numerous western and international cities. Second, American asserts that approval of its application will improve competition at LAX, in the DCA-LAX market, and at small California cities such as Santa Barbara that will gain first time access to single connecting, on-line service to DCA. Third, American maintains that grant of its request would not reduce existing service to DCA. Fourth, American argues that a 1999 GAO report ultimately concluded that authorizing of additional slots at DCA would not create significant delays.

**American Trans Air, Inc. (ATA)**
On May 5, 2000, ATA requested four slot exemptions to provide one round trip a day to San Francisco International Airport (SFO) and one round trip a day to LAX with B-757 aircraft (216 seats).

Since ATA began providing low-fare DCA-Chicago Midway service, the carrier claims that a high proportion of its capacity has been used to accommodate LAX or SFO passengers. The applicant seeks to better serve this substantial market segment with nonstop, low-fare service from DCA to California.

ATA contends that its low-fare service from New York La Guardia (LGA) to SFO and LAX has proved successful. The carrier argues that despite operating only three daily round trips between LGA and LAX, it is the second largest carrier in the market, offering fares 60 percent below those charged by American and United. ATA argues that it can replicate this success at DCA and consequently lower the DCA high average fares and bring market discipline to the dominant carriers in the Washington-California markets. Based on its LGA experience, ATA estimates that it can generate $64 million in consumer savings in the DCA-California markets.

ATA further argues that its proposal satisfies the selection criteria outlined in AIR-21. First, the applicant maintains that its proposal would enhance competition in the Washington-California markets and offer on-line networking benefits to Hawaii and interline network benefits to numerous west coast communities. Second, ATA contends that the grant of its proposal would enhance the number of travel options available to passengers and reduce travel delays.

Last, ATA contends that its proposal meets the airline selection criteria outlined in section 41715 of AIR-21 by increasing employment at ATA and throughout the nation as a result of ATA's $2 billion aircraft order with Boeing.

**Delta Air Lines, Inc.**
On March 22, 2000, Delta requested four DCA slots to provide two daily non-stop round trips to Salt Lake City (SLC) using B-757 aircraft (183 seats).

Delta argues that the grant of its proposal would best satisfy the selection criteria outlined by AIR-21. Specifically, the applicant contends that its proposal would provide extensive network benefits beyond the 1,250-mile perimeter. Delta maintains that with its partner, Skywest, it can offer connecting service to 65 cities from Salt Lake City, providing dozens of small- and medium-sized communities in the intermountain west region access to either their first online single connecting service or additional competitive online single connecting service to DCA. (SkyWest also code-shares with United Airlines.) In addition, the applicant argues that SLC is among the nation's top business centers and has a rapidly growing population. Second, Delta argues that its proposal will increase competition in multiple markets through its SLC connecting service to 65 cities. Delta contends that ten communities in the northern tier of the western United States would receive their first one-stop, on-line service to DCA. Third, Delta asserts that there would be no reduction in travel options for communities served by small hub airports and medium hub airports within the perimeter, as the carrier has no plans to reduce existing service. Fourth, Delta contends that its proposed service would not cause additional travel delays. The applicant asserts that Salt Lake City is among the least congested of the western U.S. hub airports and that a 1999 GAO report found that the addition of slots at DCA would not cause significant aircraft delays.

**Frontier Airlines, Inc.**
Frontier requests four slot exemptions to enable it to operate two nonstop round trips a day between Denver and DCA with Boeing 737-300 aircraft. Its proposed start-up date is September 7, 2000. In support of its application, Frontier states that it is a true low-fare, new-entrant success story, having started operations in July 1994 at Denver. It has prospered and grown, despite being blocked from several major airports due to a lack of slots. It says it would represent the first low-fare new entry at DCA in 15 years. In support of the favorable competitive impact of its low fares, the carrier points to its entry into the Denver–BWI market in November 1997 and the resulting 20 percent decrease in fares and 67 percent increase in passengers in the market. Frontier paints a similar picture in the Denver-La Guardia market where it inaugurated service in December 1997. Finally, Frontier states that its application meets all of the statutory criteria in that it would: provide network benefits to communities that it currently serves into Denver from the south, west and northwest; increase competition by a new entrant; not reduce travel options for communities within the 1,250-mile perimeter; and not result in increased delays at DCA or elsewhere throughout the system.

**National Airlines, Inc.**
National requests six slot exemptions in order to operate three daily round trips between Las Vegas and DCA with 175-seat B-757 aircraft. National states that Las Vegas is the second-largest domestic market outside DCA's perimeter, and the fastest growing. The applicant maintains that during the past decade, traffic at Las Vegas's McCarran International Airport has increased by 6.5 percent a year. In contrast, says National,

Las Vegas-Washington traffic has been relatively stagnant because of inadequate capacity. National contends that its proposed service would dramatically improve Las Vegas-Washington service and generate significant network benefits by creating online single connecting service to DCA from both Los Angeles and San Francisco immediately, and from additional cities west of the carrier's Las Vegas hub eventually.[2]

National states that it qualifies as a "new entrant carrier" under 49 U.S.C. 41714(h)(3), and that it will promote competition by offering significantly lower fares than those now being offered by United for Las Vegas-Dulles service or by Southwest Airlines, Inc., for Las Vegas-BWI service. National also notes that its introduction of Las Vegas-DCA service could not harm its service from other points to DCA since it serves no such routes, and that the proposed service would not result in meaningfully increased travel delays.

**Northwest Airlines, Inc.**

Northwest requests two slot exemptions in order to operate one daily round trip between Seattle and DCA with 124-seat Airbus 319 aircraft. In support of its request, Northwest notes that Seattle is the fifth-largest origin-and-destination (O&D) market lacking nonstop access to DCA, and only United Air Lines operates nonstop service between Seattle and the Washington area. Northwest states that its proposed service would therefore enable it to compete head-to-head with United's present monopoly in the Seattle-Washington market. Northwest also asserts that it operates a substantial network of connecting services at Seattle in conjunction with its code-share partners, including service at 38 cities in the western United States and eight others in Japan, Canada and Mexico. As a result, its nonstop Seattle-DCA service would provide the first one-stop access to DCA for 16 mostly small- or medium-sized U.S. cities. Northwest further states that it has no plans to reduce its existing services to DCA from any airport within the perimeter as a result of its proposal, and that the grant of its application would not meaningfully increase travel delays at DCA or anywhere else. Northwest says that its service would reduce the travel times and increase the convenience of passengers traveling to DCA from Seattle and other cities on its network. Northwest therefore asserts that its proposal would improve service to DCA for western U.S. cities, particularly small and medium-sized ones, and would promote domestic air transportation.

**Trans World Airlines, Inc.**

On May 5, 2000, TWA requested six slot exemptions to provide three daily round trip flights between DCA and LAX with B-757 aircraft (180 seats).

TWA contends that its proposal would satisfy a need for new competition in the non-stop DCA-LAX market and that it views the opportunity to provide this service as a catalyst for developing an integrated LAX network. The carrier also contends that its application best meets the AIR-21 selection criteria. First, the carrier argues that through a code-

---

[2] National states that it has plans to add flights to Las Vegas from Portland, San Diego, San Jose and Seattle within the next four years.

sharing agreement with regional carrier Chautauqua Airlines, TWA will offer the first or competitive one-stop service to five California cities, namely San Luis Obispo, Bakersfield, Monterey, Santa Barbara, and Palm Springs, in addition to providing first-time service to the largest beyond-perimeter city currently without direct service to DCA. Second, TWA maintains that it would also offer competition in multiple markets and provide the first nonstop service between DCA and LAX. Further, the carrier claims that its strong brand name would facilitate competition with United Air Lines and American Airlines, the dominant carriers in the Washington-LAX market. Third, TWA asserts that its proposal will not reduce travel options for communities within the perimeter, as there will be no reduction in existing service. Fourth, TWA argues that the proposed service will reduce travel time for DCA-LAX passengers. TWA also cites a 1999 GAO report, which concluded that additional operations at DCA would not cause significant delays.

TWA also contends that its proposal best matches the relevant carrier selection criteria outlined in section 41715(c) of AIR-21. The applicant argues that grant of its request would enhance both intra-gateway LAX competition and on the local DCA-LAX route. In a different vein, TWA argues that the grant of its application would be instrumental in revitalizing the carrier's declining fortunes. TWA further argues that it is has the best service performance of any applicant, having the leading on-time performance record. In that regard, TWA also notes that it won J.D. Powers and Associates' 1998 and 1999 awards for customer service.

**United Air Lines, Inc.**

United has applied for four slot exemptions to allow it to operate two nonstop round trips a day between Los Angeles and DCA using 182-seat Boeing 757 Stage 3 aircraft. United states that granting its application would be fully consistent with all of the statutory criteria. Regarding network benefits in multiple markets, United states that it has made a significant investment in developing Los Angeles into a major hub to the point that it now serves 48 domestic cities from Los Angeles, not to mention 11 international cities, with an average of 384 departures a day. In addition, United states that its regional code-share affiliate SkyWest Airlines serves 19 cities from Los Angeles, further enhancing the network benefits. United also asserts that 16 communities would receive their first ever one-stop online connection to DCA, while 16 more would receive their first competitive one-stop service. In addition, United would use 182-seat Boeing 757s--the largest aircraft currently authorized to use DCA. United further states that granting its application would not have a negative effect on service at any communities located within the perimeter. Finally, United states that grant of its application would not result in "meaningfully increased travel delays" at any airport.

**RESPONSIVE PLEADINGS**

**Pleadings in Support of Various Applications**

**Phoenix**

On May 22, 2000, the City of Phoenix filed an answer in support of America West's application. Phoenix argues that it was the fastest growing metropolitan area in the U.S. from 1970 to 1996 and that is enjoys a large, diverse, high-technology economy. Phoenix contends that America West is the only major network carrier that cannot serve its primary hub from DCA. Phoenix argues that, except for United at Los Angeles, America West has more daily departures and serves more points at Phoenix than would any other applicant's proposed services. It further contends that America West offers more U.S. western city departures from Phoenix than would any other carrier in this proceeding from its proposed destination city. Phoenix argues that America West offers the aircraft with the largest two-class service of any of the applicants.

**Denver**

On May 22, 2000, the City and County of Denver filed an answer in support of Frontier's application. Denver asserts that it was the sixth largest U.S. airport in 1999 with 38 million passengers, an extensive route network and a critical link to small and mid-sized communities in the Rocky Mountain and Great Plains regions. Denver argues that of the seven applicant cities, Denver is the closest to DCA and, therefore, awarding Denver service would be the result most consistent with the intent of the Perimeter Rule to limit DCA access to closer cities. Denver contends that granting Denver DCA access would effectively extend the Perimeter Rule by only 220 miles while grant of applications to other cities would unfairly allow other communities to "leapfrog" Denver. Denver argues that Frontier serves 20 cities from Denver and that the carrier would be a new entrant at DCA. Denver argues that Frontier's presence at Denver has had a major impact toward lowering fares in Denver markets.

**Seattle**

On May 22, 2000, the Port of Seattle filed an answer in support of Northwest's application. Seattle argues that absent the Perimeter Rule and High Density Rule, Seattle would have nonstop DCA service today. Seattle asserts that it is the fifth largest market without nonstop DCA service and that it is an important business, high technology, world trade center that generates over 500,000 annual Washington, D.C. O&D passengers. Seattle contends that DCA is largely a business, rather than a leisure, market and that most low-fare Washington leisure travelers use BWI and IAD airports. Seattle argues that these airports could most effectively serve the Las Vegas market. Seattle contends that Northwest's selection would provide domestic network benefits to 38 cities, 16 of which would benefit from first one-stop DCA service. Seattle argues that Los Angeles and San Francisco already enjoy substantial competitive nonstop transcontinental service to two Washington airports and that Phoenix, Denver and Salt Lake City already provide overlapping Rocky Mountain regional service. Seattle cites its rapidly expanding economy

and claims to be the fastest growing of the three west coast airports seeking nonstop service to DCA in this proceeding. Seattle argues that grant of Northwest's application of only two slot exemptions would bring new competitive services to Seattle while reserving a significant slot pool for other applicants.

**Alaska/Horizon Airlines**

On May 22, 2000, Alaska Airlines, Inc., and Horizon Air Industries, Inc. d/b/a Horizon Air (Alaska/Horizon) filed comments in support of Northwest's proposal. Alaska/ Horizon contends that through the Alaska/Northwest codeshare agreement, selection of Northwest's proposal would result in the unique double benefit of two new carriers for Pacific Northwest-DCA passengers. This is because Alaska and Northwest would compete on some routes as well as codeshare, thereby resulting in substantial potential competitive and network benefits.

**St. Louis**

On May 22, 2000, the City of St. Louis and the St. Louis Airport Commission (St. Louis Parties) filed comments in support of TWA's application. The St. Louis Parties argue that TWA's proposal will strengthen the carrier, now an employee-owned company, and positively impact the St. Louis region.

**Las Vegas**

On May 22, 2000, Las Vegas McCarran International Airport, the Las Vegas Chamber of Commerce, the Las Vegas Visitor and Convention Authority, and the Nevada Development Authority (Las Vegas Parties) filed an answer in support of the applications of America West and National. The Las Vegas parties argue that Las Vegas offers service to 70 nonstop domestic destinations and that the Las Vegas area has experienced strong growth and an expanding economy. The Las Vegas parties argue that many incumbent applicant carrier proposals closely resemble existing services to alternative Washington airports and should not be given high selection priority. The Las Vegas Parties also assert that selection of two Las Vegas-Washington proposals would avoid creation of a monopoly in the market. The Las Vegas Parties also argue that Las Vegas-Washington nonstop flights have the highest load factors of any nonstop flights between Washington and the applicant cities.

**Salt Lake City**

On May 22, 2000, the Utah Air Travel Commission and the Salt Lake City Corporation (Utah and the Salt Lake City Parties) filed an answer in support of Delta's application. The Utah and the Salt Lake City Parties argue that an award to Delta would result in new and expanded DCA connecting benefits to 33 beyond-perimeter cities, including 28 small and medium sized cities. The Utah and the Salt Lake City Parties assert that Delta's service would provide 267,000 seats for new DCA services to these points and Salt Lake City and would improve traveling convenience for thousands of passengers. The Utah and the Salt Lake City Parties take no position on other proposals, except to the extent that fully granting America West's request would preclude a full award for Delta's Salt Lake City proposal. The Utah and Salt Lake City Parties argue that Salt Lake City's superior

geographic position would result in significantly overall less DCA connecting circuity for more points than other competing cities.

**Opposition Pleadings**

**America West**

On May 22, 2000, America West filed comments. America West claims that none of the applicants can match the domestic network benefits of its proposal. America West asserts that an award of slot exemptions to any of the established DCA incumbents would provide minimal network benefits since most of the larger cities claimed for new DCA single connecting service in the competing applications can be reached by one-stop service over inside perimeter hubs. America West asserts that Los Angeles applicants United and American emphasize the benefits of their proposals to the local market in contrast to the statutory criteria requiring domestic network benefits and competition in multiple markets. America West also contends that selection of a DCA incumbent, especially American, Delta, or United would do little to lower very high DCA average fares and that it offers lower fares in several of the markets where it competes with Frontier, National and ATA. America West argues that its proposed service would bring new single connecting service to over 1.25 million passengers in concert with the congressional intent of AIR-21.

**American**

On April 7, 2000, American filed a motion to file late[3] and an answer in opposition to Delta's application to the extent that granting Delta's request precludes granting American's application. On May 22, 2000, American filed an answer to all of the applications filed in this docket. American contends that since Los Angeles is the largest U.S. city without DCA service it should be given selection priority over other cities in this proceeding. American argues that of the four carriers seeking DCA slot exemptions for Los Angeles service, it should be ranked first. American asserts that United is the dominant carrier at both Washington and Los Angeles as well as in the Los Angeles-Washington market and should not be selected as a matter of competitive balance. American also argues that the service benefits of ATA's proposed single daily round trip as well as its network benefits at Los Angeles are insufficient. American alleges that TWA is not strong enough to effectively compete against United and that TWA's network benefits are speculative.

**ATA**

ATA filed an answer on May 22, 2000, arguing that the Department should first consider the largest markets for proposed service, i.e., Los Angeles and San Francisco. ATA argues that the other competing hubs are significantly smaller and therefore should be given less consideration for first-time nonstop DCA service than Los Angeles or San Francisco. ATA contends that its proposal would provide the greatest benefits per slot (passengers, seats, and lowest fares) of any of the applicants. ATA contends that selection of United or American for DCA-LAX service would simply strengthen the market

---

[3] We will grant American's motion to file late as well as all other motions to file late or unauthorized documents.

dominance of one of those carriers and that either applicant would simply carry self-diverted traffic that would move on its services in any event.

ATA contends that TWA's difficult financial position, cost structure, and lack of a low-fare reputation would inhibit its full development as an effective competitor against American or United. ATA asserts that San Francisco's position as second largest beyond-perimeter market without nonstop DCA service also makes it a prime candidate for selection for new service. ATA notes that it is the only applicant to propose nonstop service in the San Francisco-DCA market.

ATA argues that America West deserves some consideration for DCA slot exemptions given its role in seeking liberalization of the DCA slot regime. On the other hand, ATA argues that America West's code-sharing relationships with Continental, Mesa, and Northwest disqualify America West as a DCA limited incumbent under 49 U.S.C. §41714(k).[4] ATA argues that its proposal is superior to America West's request based on the importance of the markets to be served, number of passengers, seats, and impact of low fares.

ATA asserts that Delta's proposal offers few, if any, competitive benefits and that most of its anticipated traffic would be self diverted from current services rather than be new traffic. ATA asserts that Delta would be offering service to a smaller market than either Los Angeles or San Francisco and would use a smaller aircraft than ATA. ATA contends that National would bring some low fare benefits to the Las Vegas-Washington market but that National's low-fare offerings require advance purchase and have other restrictions not required by ATA's low-fare services. ATA also argues that the Las Vegas market is considerably smaller than Los Angeles or San Francisco and that National's B-757 aircraft have 20 percent fewer seats than ATA's B-757.

ATA argues that Northwest's Seattle proposal would be provided with a smaller, foreign-manufactured aircraft and serve a market substantially smaller than San Francisco or Los Angeles. ATA asserts that Northwest would offer a "conventional established fare menu." ATA argues that Frontier's Denver proposal with small B-737 aircraft to a market smaller than Los Angeles or San Francisco should be ranked lower than ATA's proposal.

**Delta**

Delta argues that the applications of American, United, TWA, and ATA (California applications) all involve markets that now receive high levels of nonstop service to either Baltimore Washington International or Dulles International airports. Delta also argues that California's far western location does not make its cities a good candidate as a connecting hub except for a few California cities.

---

[4] Under 49 U.S.C. § 41714(k) "...an air carrier that operates under the same designator code, or has or enters into a code-share agreement, with any other air carrier shall not qualify for a new slot or slot exemption as a new entrant or limited incumbent air carrier at an airport if the total number of slots and slot exemptions held by the 2 carriers at the airport exceed 20 slots and slot exemptions."

Delta contends that the American, TWA, and United applications have focused on the large size of the Los Angeles-DCA local market and placed less emphasis on increasing competition in multiple markets. Delta argues that ATA would provide few domestic network benefits. Delta states that American already competes effectively in the Los Angeles-Washington market, both locally and on a connecting basis. Delta asserts that selecting American would do little to increase competition in multiple markets because American already serves most of its claimed Los Angeles connecting cities from its Dallas/Ft. Worth hub and that most of the benefits of United's Los Angeles hub are for international service, rather than for domestic service as required by the statute. Delta argues that United would have an incentive to reserve its DCA-Los Angeles service for its local passengers paying the highest fares and to transport connecting passengers on its existing service, thereby lessening the network benefits of its proposal.

Delta states that ATA would provide no network benefits, and that ATA's existing one-stop service provides the carrier with ample opportunity to compete in the market. Like the other applicants proposing nonstop service to California, TWA's choice of DCA-Los Angeles for DCA service is misguided, and even with its proposed codesharing relationship, TWA's network benefits would be minimal. Delta argues that TWA could better serve DCA-western points through its St. Louis hub.

Delta argues that America West's request for 10 of the 12 available slot exemptions in this proceeding to duplicative and overlapping hubs (Phoenix and Las Vegas) is excessive and unjustified and that fully granting America West's request would preclude development of alternative competitive beyond-perimeter hub services. Delta contends that given reasonable circuity and connecting times, 15 out of 16 potential Las Vegas connecting markets can also be served through America West's larger Phoenix hub.

Delta also contends that the Department should also consider the recent poor on-time arrival performance of carriers serving Las Vegas, Phoenix and Seattle compared to Salt Lake City, given the statutory requirement that an award should not result in meaningful increased traffic delays. Delta argues that its performance at Salt Lake City was ranked first for the same year ended March 2000 period. Delta argues that America West should not be awarded more than two round trips (four slots). Delta argues that Frontier's proposal would offer service to only nine cities beyond Denver and no cities would receive their first time one-stop connecting DCA service. Delta contends that all nine of those cities already receive significant one-stop connecting service to DCA from other carriers. Delta argues that small and medium-sized Rocky Mountain communities would receive few benefits from Frontier's proposal. Delta contends that its proposal would benefit 27 communities with new or improved DCA access as compared to just two for Frontier. Delta argues that Frontier's small aircraft also limit the benefits that could be realized from its proposed service. Delta also contends that its own fares from Washington to Frontier's proposed destinations are 22 percent lower than Frontier's.

Delta argues that National's Las Vegas proposal is flawed because DCA-Las Vegas demand has not been growing and that overall Washington-Las Vegas demand has been

declining. Delta asserts that National's proposal would offer few new network benefits since National's only two beyond-Las Vegas points, Los Angeles and San Francisco, already receive ample one-stop connecting services. Delta asserts that Northwest would operate its proposed Seattle service using the smallest aircraft of all the applicants, thus limiting the benefits of its service, and that Northwest would have to depend on the code-share services of Alaska Airlines. Delta contends that Seattle's Pacific Northwest location limits its utility as a domestic connecting hub and that almost all of Northwest's claimed connecting cities would require a significant backhaul. Delta argues that Northwest already serves many of these communities to DCA with more convenient one-stop connections over Minneapolis/St. Paul, a large within-perimeter hub. Delta argues that Northwest's proposed one-round-trip-a-day limits the number of viable connecting flights and travel options available to passengers as compared to multi-flight proposals.

**Frontier**

On May 22, 2000, Frontier filed an answer arguing that promotion of new entry by new entrant airlines should be a key selection factor given the pro-competitive goals of the Airline Deregulation Act, the Department's own policies promoting new entrant service, and the objectives of AIR-21. Frontier asserts that only it would bring new competition to a highly concentrated hub (Denver) while providing new competitive services to multiple markets. Frontier argues that given the recent general rise in air fares, the Department must ensure that new entrant airlines have every opportunity to offer alternative, lower fares to the traveling public. Frontier contends that of all the applicant cities, Denver is the most conveniently located beyond-perimeter hub, providing significantly less circuity to DCA than other proposed communities. Frontier argues that as a general competitive issue, large slot-holders at all High Density Rule airports, and especially at DCA, should not be given additional slots in this proceeding. Frontier argues that grant of 10 of the 12 slot exemptions to America West would effectively be a monopoly beyond-perimeter award to one carrier. Frontier asserts that an award to America West would not result in new connecting service to many large western cities such as Denver or Albuquerque. Frontier argues that an award to America West would likely result in self diversion of passengers from America West's current Columbus-DCA service, forcing the carrier to reduce flights on that segment. Such a result would be contrary to the beyond-perimeter selection criterion not to denigrate service at communities within the perimeter outlined in 49 U.S.C. §41718(a)(3). Frontier argues that given its current relationships with Northwest and Continental, America West cannot be considered a new entrant air carrier at DCA under 49 U.S.C. § 41714(k).

Frontier asserts that National's Las Vegas proposal would provide service at a community where traffic demand has been flat and that traffic in the Las Vegas-Dulles market has, in fact, decreased. Frontier argues that National offers connecting service only to Los Angeles and San Francisco. Frontier argues that many routings over National's Las Vegas hub are more circuitous than from Frontier's Denver hub and that Frontier would offer connecting service to more communities than would National.

Regarding the Los Angeles proposals, Frontier argues that they should not be favored because effectively only the Los Angeles/Southern California Basin would benefit from nonstop DCA-Los Angeles service. Frontier contends that given the significant circuity involved with LAX connecting service, other major west coast cities such as Portland or Seattle would not benefit from selection of LAX for new DCA service.

**National**

On May 22, 2000, National filed an answer arguing that, consistent with the congressional intent of AIR-21, the Department's policy objectives, and the goals of airline deregulation, the Department should favor awarding DCA slot exemptions to a new entrant carrier such as itself over the DCA incumbent carriers. National asserts that only three applicants (National, Frontier, and ATA) qualify as DCA new entrant/limited incumbent carriers. Specifically, National argues that America West does not qualify as a new entrant/limited incumbent because it has a code-share agreement with Continental Airlines and under the provisions of 49 U.S.C. § 41714(k) the DCA slot holdings of both carriers must be aggregated in considering new entrant/limited incumbent eligibility. National argues that America West and Continental combined hold 49 DCA slots, making the combination the fifth largest DCA slot holder. National argues that the goal of improving competition and facilitating new entrant market entry should take precedence over increasing connections at beyond-perimeter hubs for incumbent carriers. National argues that it would offer significantly lower fares in the DCA-Las Vegas market than incumbent carriers, including America West. National asserts that America West currently matches the higher Dulles-Las Vegas fares offered by United but does not match Southwest's lower fares to BWI. National asserts that DCA passengers traveling on proposed incumbent carrier services would primarily be diverted from existing incumbent within perimeter hub connecting services or from existing incumbent Dulles or BWI services. National argues that those resulting traffic diversions would engender strong incentives to reduce existing incumbent services in contradiction to AIR-21's requirement that a DCA slot exemption award " not reduce travel options for communities served by small hub airports and medium hub airports within the perimeter." Finally, National argues that its proposal could not result in service reductions at within perimeter hubs since National does not serve DCA.

**Northwest**

On May 22, 2000, Northwest filed comments. Northwest asserts that Los Angeles should not be selected over Seattle because Los Angeles already enjoys more competitive nonstop service to Washington than any other city proposed in this proceeding with three carriers offering a total of 14 daily flights to Dulles and four daily flights to Baltimore/Washington International. Also, Northwest asserts that selecting American would not introduce a new competitor in the Los Angeles-Washington market. Northwest alleges that American would provide one-stop connecting service to only 13 communities beyond Los Angeles as compared to 48 cities served comparably by Northwest at Seattle.

Similarly, Northwest states that ATA's proposal for Washington-Los Angeles and Washington-San Francisco service would simply add service to markets already well-served by IAD and BWI airports. Northwest argues that ATA's proposal would add new

service to only two points, Honolulu and Kahului (Maui), Hawaii, beyond the perimeter. Northwest argues that America West's proposals benefit only two of the smallest Washington O&D markets, Phoenix and Las Vegas, and that both of those cities are already competitively served through BWI, while Seattle, a larger Washington O&D market, receives only monopoly service from United. Northwest argues that America West at Las Vegas will offer one-stop connecting service to only 21 domestic points outside the perimeter while Northwest would offer similar service to 48 cities. Northwest argues similarly that America West's proposed Phoenix service would offer one-stop connecting service to fewer domestic points than would Northwest's Seattle proposal. Northwest argues that Delta proposes to serve DCA-Salt Lake City when it provides two daily round trips in the IAD-Salt Lake City market and that selecting Delta will not improve competition since it is the monopoly carrier in the market. Northwest contends that Delta would provide 46 communities with single-connecting service as compared to 48 communities at Seattle by Northwest. Northwest says that Frontier currently operates two daily flights between Denver and BWI and that United also serves the Denver-Dulles market. Northwest argues that Frontier serves only nine cities from Denver and that Frontier would not offer a single community its first single connecting service to Washington. Northwest argues that National's DCA-Las Vegas service would benefit a small market that already receives service to both BWI and IAD. Further, Northwest argues that National offers same-day, one-stop connecting service in only two markets, Los Angeles and San Francisco, both of which already receive substantial Washington service. Northwest argues that TWA's Los Angeles request proposes service for a well-served market and that only two markets, Kona and Honolulu, would receive single connecting service from TWA's proposal. Northwest argues that United's proposal would simply enhance United's dominant position in the well-served Los Angeles-Washington market.

**TWA**

On May 22, 2000, TWA filed comments stating that with limited DCA frequencies the Department must identify the largest DCA markets without nonstop DCA service and decide which applicants can best serve those cities. TWA asserts that no applicant disputes that Los Angeles is the largest market proposed for DCA service and the fact that four carriers applied for Los Angeles indicates its importance. TWA contends that the competing cities have only from 13 to 30 percent of the Los Angeles population and 16 to 62 percent of Los Angeles-Washington O&D traffic. TWA argues that the Department must limit its choices to a few communities to maximize the competitive and service benefits from its total decision package. TWA argues that selecting either United or American for Los Angeles service would only strengthen the positions of one of the two dominant carriers in the market. TWA asserts that AIR-21 gives the Department the opportunity to inject new competition in the Los Angeles-Washington and beyond-Los Angeles markets. TWA argues that its three daily round trip Los Angeles service proposal is superior to United's and American's proposed two daily round trips. TWA further asserts that its Los Angeles network benefits are comparable to those of American and United. While TWA concedes that United's Los Angeles network could reach marginally

greater numbers of passengers, TWA argues that that would not overcome the detrimental competitive impact of selecting United for Los Angeles service.

TWA argues that ATA's primary focus is on serving its Chicago Midway hub rather than serving Los Angeles and that with a single daily round trip, ATA would not provide effective competition in the DCA-Los Angeles market. TWA contends that ATA's proposal offers no network benefits and that ATA's proposed connections to Hawaii are not viable, since they would require a passenger to overnight at either Los Angeles or San Francisco. TWA contends that ATA's corporate strategy has been to avoid competition with major carriers rather than to serve as a low-fare alternative. TWA also argues that it would offer lower fares than those of the Los Angeles-Washington incumbents, as generally evidenced by its transcontinental low-fare policies. TWA argues that ATA's proposed Los Angeles service would cater only to price-sensitive passengers, to the detriment of service and schedule sensitive business passengers, and that TWA would offer a more comprehensive package of service options for both classes of passengers.

TWA argues that Delta's Salt Lake City proposal would result in new single connecting services for only ten new cities and that its proposed new one-stop connecting service would reach communities with a total population of less than 450,000, and only 16,690 O&D passengers a year. TWA argues that those network benefits are modest when compared to the beyond Los Angeles market. TWA concedes that the benefits of America West's Phoenix proposal are significant, with new one-stop connecting service to 14 new cities with a total population of over two million and 73,660 O&D passengers, but TWA argues that its proposal would offer comparable network benefits and would serve a much larger local market. TWA argues that America West's proposed service at Las Vegas would operate at the smallest community with the smallest traffic of any applicant's proposed nonstop DCA markets, providing only one online connection (Bakersfield) that couldn't be accessed via Phoenix. TWA argues that growth in the Las Vegas-DCA market has been flat.

TWA argues that Northwest's Seattle proposal would serve a comparatively smaller volume market with one-stop connecting service to 13 cities. TWA states that Northwest's proposed service would reach cities with a population of 833,535 and 37,980 O&D passengers, or significantly less than the beyond-Los Angeles traffic. TWA argues that Northwest's smaller A319 aircraft would not fully utilize the limited available slot exemptions and, on this basis, Northwest should not be considered for selection.

TWA argues that National's Las Vegas request is excessive in terms of the DCA-Las Vegas market size and National's claimed benefits. TWA asserts that, in contrast to National's assertions, the Las Vegas-Washington market does not require additional service stimulation, and perceived market stagnation is simply a shift in passenger preference from Dulles to BWI service. TWA argues that Frontier's proposed B-737 Denver service (roughly 140 seats) is with an aircraft too small to justify the award of more than one daily round trip (two slot exemptions) in the DCA-Denver market.

**United**

On May 22, 2000, United filed comments. United argues that, as the largest local beyond perimeter market, Los Angeles-Washington requires service to DCA. The applicant asserts that although three other carriers have also applied to serve DCA-Los Angeles, none offer the domestic hub benefits that United would bring since none operate a hub at Los Angeles. United argues that all of the other applicants are either proposing service at smaller points (Northwest, Delta, and America West) or do not operate true hubs comparable to United's Los Angeles operations (America West and National at Las Vegas, Frontier at Denver and American Trans Air at San Francisco). United claims that its service would provide greater benefits to more passengers in more communities in western states than any other applicant including the first one-stop connecting service to 16 cities and competitive DCA connecting service to 16 other cities. United states that it would serve all of American's first-time, one-stop connecting markets and 12 additional cities as well. United says that it will provide additional one-stop connecting service to 16 markets as compared to nine markets for American.

United states that the network benefits claimed by ATA are miniscule and that TWA's claimed network benefits of single connecting service to five communities rest on a uncompleted codesharing arrangement with Chautauqua Airlines. United argues that Delta's Salt Lake City proposal would offer only new single connecting service to 10 points compared to 16 points for United. Also, United argues that its 16 connecting service cities generate 144 Washington passengers per day compared to 18.5 Washington passengers per day for Delta's 10 cities. Delta's 10 cities also involve greater circuity than United's cities. United states that the benefits of additional DCA service to 30 cities claimed by Delta are not substantial since most of those communities enjoy connecting opportunities over numerous alternative within-perimeter hubs. United contends that Northwest's Seattle proposal with a single daily round trip and the smallest aircraft proposed[5] provides fewer benefits than United's. United contends that although Northwest claims one-stop connecting service to 38 communities, many of those connections would not be viable with only one round trip a day in the market. United asserts that the feasibility of these proposed services is further diminished given that many of these communities already have daily connecting service to DCA and that service to DCA via Seattle to many of these points involves substantial circuity. United also asserts that Northwest is the only applicant to propose service with a foreign manufactured aircraft, which is a factor that the Department may consider in granting slot exemption awards.

United argues that America's West's Phoenix and Las Vegas proposals would serve smaller Washington markets than Los Angeles. United argues that both of those cities already receive nonstop Washington service from America West to BWI and connecting service to DCA via Columbus. United argues that only 15 of America West's claimed 42 connecting cities to DCA would receive first time connecting service compared to 16 cities by United. United contends that service to its connecting cities is less circuitous

[5] United also contends that the operating characteristics of Northwest's A319 aircraft limit its full utilization at DCA.

than the service proposed by America West to its connecting cities. United argues that America West's claims of consumer savings from its proposed services are exaggerated and unsupported by its current pricing policies.

United argues that Frontier's proposed service at Denver would be operated with small B737-200 aircraft[6] (136 seats) designed primarily to accommodate the local Denver-DCA market with few network benefits. United contends that most of the connecting cities claimed by Frontier are large cities already well served over alternate connecting hubs or communities involving substantial circuity over Denver. United argues that Frontier already serves the Denver-Washington market with BWI service, and that BWI is better suited to the low-fare, discretionary traffic sought by Frontier. United argues that given Frontier's low load factors on the Denver-BWI route, Frontier would likely reduce that service if its DCA request were granted. United argues that fewer passengers would benefit from selecting Frontier over United.

United argues that National's Las Vegas proposal would provide service to the smallest proposed local market in terms of DCA passengers, and that the Los Angeles-Washington market is almost three times larger. United asserts that Las Vegas is primarily a leisure market that is now well-served by Southwest to BWI. United contends that traffic in the Las Vegas-Washington market grew 17.7 percent per year as compared to 6.5 percent for theoverall Las Vegas market, and therefore lack of DCA service has not limited growth. United asserts that National's proposal provides only minimal network benefits.

**Other Pleadings**

**Washington Airports Authority (MWAA)**

On May 22, 2000, MWAA filed a response. MWAA takes no position on the merits of the various applications, but says that the Department should disregard the irrelevant attacks of some applicants on the Perimeter Rule and the High Density Rule. MWAA argues that the applicants have focused on the first two statutory selection criteria involving domestic network benefits and increased competition by new entrant air carriers or in multiple markets. MWAA asserts that the applicants have not effectively addressed the third criterion involving the reduction of travel options for passengers. MWAA contends that the applicants have not uniformly stated that they would retain current levels of Dulles service if also selected for DCA service. MWAA says that only Delta has addressed this issue. Regarding the fourth criterion involving no increased travel delays resulting from an award, MWAA has also expressed concern that several applicants have cited a General Accounting Office study as evidence that DCA can accommodate up to seven additional flights per hour without additional delay. MWAA argues that the GAO study assumes an increase in combined instrument flight rule (IFR) and visual flight rule (VFR) operations and is not valid for additional available capacity under IFR conditions alone. MWAA also argues that the Department must consider the impact of distributing

---

[6] Like Northwest's aircraft, United also contends that the operating characteristics of Frontier's B737-300 aircraft limit its full utilization at DCA.

hourly slot awards in this proceeding along with "slot slides" permitted under 49 U.S.C. §41714(d).

**Other Issues**

On June 5, National filed a motion to strike portions of comments filed by America West regarding fares offered by National and National's recent financial performance. National alleges that America West has misrepresented National's fare structure by claiming that America West's fares are lower in several markets. National contends that it actually offers lower fares than America West in most comparative markets. National argues that America West has characterized National as conducting unprofitable operations when America West should have been aware of recent press coverage of National's profitable operations.

On June 8, America West filed an answer. America West argues that it made no misstatements concerning National and the motion should be denied. America West contends that its fare comparisons are based on average fares paid by passengers and are derived from the Department's O&D data, DB1B data base. America West argues that these data are better comparative indicators than National's published fare comparisons, which can change frequently. America West also argues that the Department's Form 41 submissions indicate that National experienced a 1999 net loss of over $40 million. America West argues that even if National was profitable for the month of March 2000, the carrier has not demonstrated sustained profitability.

We will deny National's motion. National has not shown that America West has misused, mischaracterized, or distorted this information, and we do not find that its exclusion from the record is warranted. As derived from Department sources, these data are officially noticeable and may be used by any party. Of course, our decision to allow the information into the record of this proceeding does not imply our endorsement of any of the America West's arguments that rely on these data as support.

**DECISION**

We have decided to select America West for four slot exemptions for nonstop service to Phoenix and two slot exemptions for nonstop service to Las Vegas, Frontier for two DCA slot exemptions for nonstop service to Denver, National for two DCA slot exemptions for nonstop service to Las Vegas, and TWA for two slot exemptions for nonstop service to Los Angeles.

While all the applicants put forth strong arguments in favor of their proposals, AIR-21 necessarily requires that we focus our attention on those certain criteria specified by Congress to govern our selection. Section 41718 identifies four criteria the Department

must consider in making allocations in this proceeding. The statute also requires that any successful applicant meet all four criteria.

Accordingly, as directed by new § 41718(a)(1) any slot exemptions we award must provide "domestic network benefits" beyond the perimeter. Next, under § 41718(a)(2), we are directed to ensure that the slot exemptions awarded will also increase competition by new entrant carriers or in multiple markets. Under § 41718(a)(3), we must insure that a grant of exemptions would not reduce travel options for communities served by small hub airports and medium hub airports within the perimeter. Finally, under § 41718(a)(4), the exemptions awarded must not result in meaningfully increased travel delays. With regard to the latter two statutory requirements, as discussed below we find that all applicants meet both.

Our analysis indicated that the network benefit and competition criteria imposed under (a)(1) and (a)(2) were more determinative than the other two Congressionally-mandated criteria. The Congress did not, however, provide any specific direction as to how we should weigh between the former two criteria in our decisional process. This is clearly required, however, since carriers tended to offer more relative strength in meeting one criterion than in the other. Thus, carriers with a stronger existing presence at DCA emphasized their networks and the competitive benefits that could be brought to multiple markets via those networks. Carriers with a less established presence emphasized that Congress's focus on competitive benefits could best be met by selecting their applications, and that even though, in most cases, their networks were smaller they could bring more effective competition to them. We have concluded that, to give full meaning to § 41718(a)(2), Congress's direction could best be met by awarding exemptions to new entrants/limited incumbent carriers, as well as to those carriers that have relatively smaller operations at DCA and would offer competitive benefits in multiple markets, rather than providing additional opportunities for carriers that already have extensive operations at DCA. In other words, we concluded that increased service alternatives by existing competitors at DCA would have less competitive effect than additional service alternatives by new competitors. The latter thus would better meet the statutory intent of increasing competition.

As indicated, under § 41718(b)(3), we must ensure that a grant of exemptions would not reduce travel options for communities served by small hub airports and medium hub airports within the perimeter. By this, we believe Congress wished especially to ensure that the service being provided though the new exemptions would not displace or disrupt service now being provided though a small or medium hub. There was little argument in the responses that service being proposed by other carriers would have this effect, and we did not find any proposals that carried any significant risk that small and medium hubs inside the perimeter would be sufficiently affected by the awards made so as to reduce the travel options for the communities they currently serve.

Finally, we have given heed to Congress's concern that the exemptions awarded would not result in meaningfully increased travel delays. As several commenters pointed out, the

General Accounting Office in 1999 found that additional operations at DCA would not cause significant delays. While we take note of Metropolitan Washington Airports Authority's reservation that that study is not valid for available capacity under IFR conditions alone, our review here indicated that 24 additional operations at DCA, spread out over the slot period as required by § 41718(c)(2) to no more than 2 per hour, would not "meaningfully" increase travel delays at that airport. Nor would the few additional operations at each of the beyond perimeter destination hubs involved – only four per day at Phoenix and Las Vegas and two at each of the other airports – meaningfully increase the delays there.

We concluded that America West had the strongest overall application. It is the only major network carrier that cannot now provide service between DCA and beyond perimeter cities via either of its two principal network hubs, which are themselves beyond the perimeter. Thus, although because of its code-share relationships with Continental it would not be a new entrant at DCA, allowing America West to serve DCA from those hubs will provide the carrier the opportunity to become an effective new competitor between DCA and all beyond perimeter cities it serves via Phoenix and Las Vegas. Even TWA in its answer to competing applications noted that the network benefits of America West's Phoenix hub were significant.

Frontier has argued that giving America West an award would likely cause it to reduce Columbus-DCA service. America West has specifically rejected this contention. America West states "America West, which has by far the smallest presence of any major network carrier at DCA, has no plans to reduce its existing DCA services to Columbus, Ohio the only airport it is currently able to serve from DCA, as a result of its proposed Phoenix and Las Vegas service." We have no reason to dispute that assertion.

America West has applied for six exemptions to serve Phoenix, and four to serve Las Vegas. As respondents pointed out, a grant of ten exemptions to America West – of the twelve overall to be awarded – could preclude development of alternative competitive beyond-perimeter services. As guided by Congress's transcendent interest in promoting competition, and after considering the strengths and weaknesses of the competing applications, we have decided to grant America West four exemptions for Phoenix and two for Las Vegas. Granting two slots at Las Vegas will enable America West to offer additional connecting options to passengers who will have the option of connecting either through Phoenix or Las Vegas.

Having disposed of America West, we turn to the three applicants who clearly qualify as new entrants under § 41718(a)(2): ATA, Frontier, and National.

Although American Trans Air has new entrant status, and the statute provided that we give weight to increased competition by new entrants, the statute also required the provision of network benefits. ATA offers service from Los Angeles and San Francisco only to Honolulu and Kahului. However, given ATA's current schedule a connecting flight to DCA from either Los Angeles of San Francisco would involve an overnight stay,

significantly limiting its attractiveness to passengers. It is difficult to find "network benefits" in this arrangement. ATA argues that the requirement for network benefits could also be met by travelers using its low-fare service to Los Angeles and connecting on an interline basis to other cities beyond. We disagree. Travelers so strongly prefer online connecting services that interline connections would not provide the network benefits sought by Congress. We therefore find that ATA is unable to show, as it must to qualify under § 41718(a)(1), that an award of slot exemptions in this proceeding would enable it to provide domestic network benefits.

We have decided to award two exemptions to Frontier, for service to Denver. Frontier represents a true new entrant at DCA, as its Denver service will represent its first ever from Reagan National Airport. Besides being a true new entrant applicant, Frontier offers connecting service to approximately ten cities to the north, south, and west, including such cities as Portland, San Francisco, and Seattle/Tacoma. While travelers from these cities have present connecting service to the Washington market, we believe that Frontier at Denver would provide a viable and potentially attractive alternative at several of these points. Given the limited number of slot exemptions available and the strengths of some other applicants, we have limited the award to two slots rather than the four the carrier requested. We also recognize that Frontier's proposed service would be provided with B-737's, a relatively small aircraft; however, we believe that these disadvantages are outweighed by Frontier's new entrant status and the network benefits that Frontier's proposal would bring.

Similarly, we have awarded two exemptions to National, for service to Las Vegas. National is also a true new entrant applicant and its selection will bring a new competitor to DCA. National will provide network benefits beyond Las Vegas to Los Angeles and San Francisco, and the carrier has stipulated that it will add service to additional cities west of Las Vegas. Moreover, National has a demonstrated history of offering low fares in the markets it serves, thereby benefiting travelers and enhancing competition. We believe that National's Las Vegas service would provide a viable and potentially attractive alternative at these points. As with Frontier, given the strength of other applications, we have also limited its award to two slots, rather than the six it requested.

None of the remaining applicants for the last two slot exemptions available qualify as new entrant/limited incumbent carriers under the definitions established by AIR-21. American, Delta, Northwest, TWA, and United all serve Reagan National and all hold or held more than 20 slots. However, each would offer network benefits through service provided to cities served beyond their respective outside-perimeter nonstop destinations and would increase competition in multiple markets. One distinction, however, is that all of these carriers, with the exception of TWA, are major operators at Reagan National. American operates 63 daily slots, Delta 95, Northwest 40, and United 34, while TWA presently operates a total of only 13 slots a day at DCA. Of the incumbent carriers, TWA clearly has the smallest presence.

TWA also argues that it has the potential to offer a meaningful competitive alternative to the existing one-stop services to LAX that are now being provided by incumbent DCA slot holders, often through multiple hubs located within the perimeter. Because American, Delta, Northwest, and United operate much more service to DCA than TWA, those carriers can offer multiple flights to alternative hubs that already connect with service to many of the western cities those carriers are proposing to serve on a connecting basis in this proceeding. TWA, on the other hand, in order to provide connecting service to beyond-perimeter cities must rely on its single hub at St. Louis. This hinders its ability to effectively compete in transcontinental markets from DCA and to offer the variety of departure alternatives that its competitors operate in those markets. While we do not overestimate the competitive impact of a single daily round trip in a market of this size, we do believe that enabling TWA to serve on a nonstop basis will afford it the opportunity to become a more effective competitor and to present travelers with an additional service opportunity.

TWA also will offer the benefit of online, single connection service to 5 cities in California through its partner, Chautauqua Airlines. We are mindful that TWA's west coast network is significantly smaller that those of several of the other carriers that are seeking outside-perimeter slot exemptions in this proceeding. However, we find that each of these cities will be afforded either first single-plane or additional competitive access to Washington National by TWA and, when considered together with the competitive benefits derived from expanding service opportunities for a carrier with a relatively limited presence at DCA, the public will be well served by our decision to award TWA two slot exemptions.

We find that these selections will provide the greatest benefit of the 12 slot exemptions the Secretary must grant consistent with the criteria established by AIR-21. The other applicants, other than American Trans Air, would provide additional network benefits, but the competitive significance of those applications is limited by the fact that many of the passengers for which they would provide new single-connecting service are already served by these carriers over alternate inside-perimeter hubs.

In addition, in the case of American and United we must consider the fact that, irrespective of their proposals' network benefits, their proposals would also result in an increased presence in the Washington-Los Angeles market in which they are already the dominant participants. American acknowledges in its pleading that it and United now carry more than 80 percent of the traffic in the Los Angeles-Washington market. Moreover, it would undermine the otherwise pro-competitive intent of § 41718 were we to make available the limited pool of slot exemptions to carriers that have relatively large operations at DCA, and provide considerable service to their principal network hub cities.

Delta's application has merit because Salt Lake City is a major network hub for Delta that is outside the perimeter and, thus, cannot be linked directly to DCA. Like American and United, however, Delta now serves on a single-connection basis via its principal inside the perimeter hubs many of the same cities it would serve via Salt Lake City. Given the

limited number of slot exemptions the Department has to distribute, we have to take into account the fact that a very high percentage of passengers and a large proportion of the communities that Delta would serve via Salt Lake City already receive single connection service on Delta via its other hubs. Delta's increased number of service alternatives would benefit these passengers and communities, but we concluded that increased service alternative by new competitors would have a greater competitive influence.

We decided not to select Northwest's proposal because, while it does offer network benefits, as a whole the Northwest proposal does not offer the same level of benefits as other competing proposals. The geographic location of Seattle limits its effectiveness as a hub for service from the east. In that regard, Northwest in its application includes connections to cities in Arizona, California, Nevada and Montana that would involve very circuitous routings, such as Phoenix, and San Francisco. In fact, like American, Delta and United, Northwest now serves on a, single-connection basis via its principal inside-perimeter hubs many of the same cities it would serve via Seattle, and many would involve less circuity.

**CONDITIONS**

Unused slots: We are directing America West Airlines, Inc., Trans World Airlines, Inc., Frontier Airlines, Inc., and National Airlines, Inc. to file in the Docket no later than July 14, 2000, the proposed flight schedules and effective date for operations authorized by this Order. Once the Department approves the final times for each of the applicants, the carriers will then have 60 days to inaugurate their service as proposed. If service is not inaugurated within that timeframe, or if service is inaugurated and later the awardee discontinues service for any reason, the slot exemptions will be immediately returned to the Department for redistribution.

TWA's slot exemptions: As we noted, one factor that weighed on our decision to provide TWA slot exemptions is its intention to establish network benefits beyond Los Angeles through its commuter partner, Chautauqua Airlines. Because this is fundamental both to the statutory criterion requiring the provision of network benefits, and also to our decision to select TWA's proposal in lieu of other applicants, we will require evidence of a contract with a feeder carrier prior to TWA's implementing service. Should TWA not provide such evidence within 60 days of the service date of this order, the two slot exemptions we are conditionally granting TWA will be automatically returned to the Department for reallocation.

**ENVIRONMENTAL ISSUES**

Although 49 U.S.C. §41718(e) specifically exempts our action here from environmental review[7], we remain sensitive to the environmental impact of increased operations at DCA. Consistent with the statute, we will require that all operations authorized by this order will be conducted with Stage 3 aircraft. We also note that 49 U.S.C. §41718(g) requires the Department to submit a study to the Congress in fiscal 2001 comparing noise levels at the four slot-controlled airports with noise levels experienced before 1991. DCA also has, and must give, priority for noise compatibility planning and program grants, 49 U.S.C. §§ 47117(e), and 41718(e)(3).

**ADMINISTRATIVE TERMS**

As the FAA slot regulation makes clear "slot(s) do not represent a property right but represent an operating privilege subject to absolute FAA control (and) slots may be withdrawn at any time to fulfill the Department's operating needs..." 14 CFR 93.223(a). Under the provisions of 49 U.S.C. §41714(j) these carriers may not sell, trade, transfer, or convey the operating authorities granted by the subject exemptions unless otherwise authorized herein.

Further, granting of these exemptions in no way is to be construed as allowing a carrier to operate services that it could not otherwise operate, *i.e.*, carriers must still meet all the requirements of the Department of Transportation, the Federal Aviation Administration, and all other statutes and regulations governing air transportation.

This Order is issued under authority delegated in 49 CFR 1.56(a).

**ACCORDINGLY,**

1. The Department grants exemptions from 14 CFR Part 93, Subparts K and S, to Frontier Airlines, Inc., (two slot exemptions, to serve Denver, Colorado); National Airlines, Inc., (two slot exemptions, to serve Las Vegas, Nevada); America West Airlines, Inc., (four slot exemptions, to serve Phoenix, Arizona, and two slot exemptions to serve Las Vegas, Nevada); and Trans World Airlines, Inc., (two slot exemptions, to serve Los Angeles, California) to enable these applicants to conduct the operations described in this order at Ronald Reagan Washington National Airport.;

2. The Department directs America West Airlines, Inc., Trans World Airlines, Inc., Frontier Airlines, Inc., and National Airlines, Inc. to file in the Docket no later than July 14, 2000, the proposed flight schedules and effective date for operations authorized by this Order. The slot exemptions granted must be conducted with Stage 3 aircraft, may

[7] §41718(e) states, "Neither the request for, nor the granting of an exemption, under this section shall be considered for purposes of any Federal law a major Federal action significantly affecting the quality of the human environment."

not be used for operations between the hours of 10:00 p.m. and 7:00 a.m., and may not increase the number of operations at Ronald Reagan Washington National Airport in any one-hour period during the hours between 7:00 a.m. and 9:59 p.m. by more than two operations. Carriers are advised to consider maximum flexibility in proposed operating times to ensure compliance with these limits.;

3. The Department will make the final determination of slot times as soon as possible after schedules are filed to enable the carriers to conduct the operations authorized by this Order. The Department directs America West Airlines, Inc., Trans World Airlines, Inc., Frontier Airlines, Inc., and National Airlines, Inc. to contact the Federal Aviation Administration Slot Administration Office after the Department's determination of slot times. The FAA will assign slot exemption numbers, effective dates, and operating times consistent with statutory limitations.

4. If America West Airlines, Inc., Trans World Airlines, Inc., Frontier Airlines, Inc., or National Airlines, Inc. fail to inaugurate service within 60 days of being given their exact slot times by the Department, or if service is inaugurated and subsequently suspended, the Department will reallocate those slot exemptions;

5. We require TWA to provide evidence of a signed contract with a carrier to provide on-line feeder service to TWA at Los Angeles, including start-up dates, frequency levels, aircraft type, and all other relevant operating data within 60 days of the date of service of this order. Should TWA not provide such evidence, the two slot exemptions we are conditionally granting TWA will be automatically returned to the Department for reallocation;

6. Except as otherwise granted, we deny all other applications for exemptions from 14 C.F.R. Part 93, subparts K and S, filed in this dockets;

7. We deny the motion to strike filed by National Airlines, Inc.;

8. We grant all motions to file late or otherwise unauthorized documents;

9. The authorities granted under these exemptions are subject to all of the other requirements delineated in 14 C.F.R. Part 93, subparts K and S, including, but not limited to, the reporting provisions and use or lose requirements; and

10. We will serve this order on all parties in Docket OST-2000-7181.

By:

**A. BRADLEY MIMS**
Acting Assistant Secretary for Aviation
and International Affairs

(SEAL)

*An electronic version of this document will be made available on the World Wide Web at:*
*http://dms.dot.gov/reports/reports-aviatio.asp*

205318

Order 2002-11-20
Served: November 27, 2002

**UNITED STATES OF AMERICA**
**DEPARTMENT OF TRANSPORTATION**
**OFFICE OF THE SECRETARY**
**WASHINGTON, D.C.**

Issued by the Department of Transportation
on the 27th day of November, 2002

**Applications of**

**ALASKA AIRLINES, INC.**
**AMERICA WEST AIRLINES, INC.**
**AMERICAN AIRLINES, INC.**
**DELTA AIR LINES, INC.**
**FRONTIER AIRLINES, INC.**
**UNITED AIRLINES, INC.**
**US AIRWAYS, INC.**

For exemptions from 14 C.F.R. Part 93, Subparts K and S, pursuant to 49 U.S.C. § 41718(a), Special rules for Ronald Reagan Washington National Airport (beyond-perimeter slot exemptions)

**Dockets OST-2000-7181** -- 2117

## ORDER GRANTING OUTSIDE-THE-PERIMETER SLOT EXEMPTIONS AT RONALD REAGAN WASHINGTON NATIONAL AIRPORT

### SUMMARY

By this order, the Department grants the application of Delta Air Lines, Inc., for two slot exemptions at Ronald Reagan Washington National Airport (hereafter "DCA") in order to provide nonstop service between DCA and Salt Lake City, Utah.

### BACKGROUND

On April 5, 2000, the President signed into law the Wendell H. Ford Aviation Investment and Reform Act for the 21st Century (AIR-21). Among other things, AIR-21 liberalized slot and slot exemption access at the four airports subject to the provisions of the High Density Rule, 14 C.F.R. 93 Subparts K and S. Specifically, at DCA, 49 U.S.C. §41718(a), as added by Section 231 of AIR-21, provides that the Secretary shall grant 12

slot exemptions to air carriers for the provision of nonstop air transportation outside the 1,250-mile perimeter established for air transportation at DCA under 49 U.S.C. § 49109.

AIR-21 directs the Secretary to distribute those 12 slot exemptions if the Secretary finds that the exemptions will (1) provide air transportation with domestic network benefits beyond the 1,250-mile perimeter; (2) increase competition by new entrant air carriers[1] or in multiple markets; (3) not reduce travel options for communities served by small hub airports and medium hub airports within the 1,250-mile perimeter; and, (4) not result in meaningful travel delays.

On July 5, 2000, the Department issued Order 2000-7-1, which granted a total of 12 slot exemptions at DCA for services outside the 1,250-mile perimeter to the following carriers: America West Airlines, Inc.; Frontier Airlines, Inc.; National Airlines; and, Trans World Airlines, Inc.[2]

Under the provisions of that order, National Airlines was granted two slot exemptions to provide nonstop service to Las Vegas, Nevada.

In order to optimize utilization of valuable slots and slot exemptions, under Federal Aviation Administration (FAA) regulations, slots or slot exemptions not used at least 80% of the time over a two-month period are subject to recall by the FAA for non-use. In the aftermath of September 11, the FAA suspended the minimum slot usage requirement to give airlines an opportunity to adjust to changes in the aviation operating environment and passenger demand without airlines' losing slots or slot exemptions during this period. On February 28, 2002, the FAA extended the suspension of the use-or-lose requirement until October 27, 2002.

National Airlines ceased all DCA operations shortly after September 11, and never restarted those operations. On September 3, 2002, by letter to the Department, National Airlines, among other things, requested a six-month extension of the FAA suspension of the use-it-or-lose-it requirement at DCA. By letter dated September 27, the FAA denied National's request and stated the Department would institute a proceeding to reallocate the two slot exemptions unless National provided assurance that it would institute DCA service in a timely fashion, so as to comply with the FAA's use-it-or-lose-it requirement.

---

[1] AIR-21 amended the previous definition of "new entrant," and its statutory applicability. Under the revised 49 U.S.C. § 41714(h)(3), as added by section 231 of AIR-21, the term "new entrant," for purposes of the slot exemption provisions including those at DCA, means "an air carrier that does not hold a slot at the airport concerned and has never sold or given up a slot at that airport after December 16, 1985, and a limited incumbent carrier as defined in subpart S of part 93 of title 14 code of federal regulations." The latter term, again as amended by AIR-21, is defined as an air carrier or commuter operator that holds or operates (or held or operated, since December 16, 1985) fewer than 20 slots and slot exemptions at the high density airport in question.

[2] American Airlines subsequently purchased most of TWA's assets. However, because AIR-21 prohibits the sale or transfer of slot exemptions (49 U.S.C. § 41718(e)), the Department conducted a carrier selection case similar to this one and awarded TWA's two slot exemptions to Alaska Airlines for nonstop DCA-Seattle service. See Order 2001-6-20.

In a September 30 response, National indicated that it could not provide that assurance. (These letters have been placed in Docket OST-2000-7181.) As a result, by Notice issued October 15, 2002, the Department invited proposals from eligible carriers for reallocation of the two slot exemptions awarded to National Airlines by Order 2000-7-1 to provide nonstop service to DCA from airports beyond the 1,250-mile perimeter. The Notice specified that applications were to be submitted by October 17 with comments due by October 31. The Department also noted that due to the restrictions of AIR-21, we may not be able to accommodate the slot times requested by applicants.[3]

**APPLICATIONS**

**Alaska Airlines Inc.**

Alaska requests two slot exemptions to operate one daily round trip between Los Angeles and DCA with 120-seat Boeing 737-700 aircraft. Alaska asserts that it is a limited incumbent carrier as it holds only two DCA exemption slots. While Alaska itself serves many cities from Los Angeles, it states that its code-share partner, Horizon Air, provides more connecting opportunities. In addition, Alaska also has a code-share with American Eagle that would provide eight additional cities with one-stop service to DCA. Finally, Alaska states that it plans to add other points over time, and it would bring low-fare competition to the communities it does serve. Alaska's principal justification for its proposal is the success of its DCA-Seattle service.

**America West Airlines, Inc.**

America West requests two slot exemptions to operate one additional round trip between Las Vegas and DCA. It does not specify aircraft type, so it could be any of the three types in its fleet: 190-seat B-757, 150-seat Airbus 320, or 124-seat Airbus 319 aircraft. America West states that it is a limited incumbent carrier, as it holds only six DCA slot exemptions. (The Department notes that, in addition, America West holds three slot exemptions authorized by Federal Aviation Administration Exemption 5133K which are currently operated by America West Express.) It further argues that an additional DCA-Las Vegas frequency would enable it to be an effective competitor at DCA, and that it is the only airline with both a large network and low fares to compete with large incumbent carriers in multiple Washington markets.

Other carrier applicants oppose America West's proposal, arguing that it has already been granted more DCA slot exemptions than any other carrier.

[3] National's allocated slot times for its nonstop DCA-Las Vegas service were in the 800 and 2000 hour periods. 49 U.S.C. § 41718(c)(2) does not allow us to assign more than two slot exemptions per one-hour period, and most one-hour periods were fully subscribed by the Department's Notice dated August 2, 2000.

**American Airlines, Inc.**

American requests two slot exemptions to provide one daily round trip between DCA and Los Angeles using B-757 aircraft (176 seats). American argues that the reasons for selecting Los Angeles in the first proceeding have not changed, and that its request should be granted because its significant presence at Los Angeles would allow it to best compete with the largest Los Angeles carrier, United.

Other carrier applicants oppose American's request, arguing that it already has a strong presence at Los Angeles and DCA, as well as at other Washington area airports. As such, it is a dominant carrier in the Los Angeles-Washington market and it operates substantial connecting service between DCA and Los Angeles via within-perimeter hubs such as Dallas/Ft. Worth, Chicago and St Louis.

**Delta Air Lines, Inc.**

Delta requests two slot exemptions to provide one daily round trip to Salt Lake City using B-757 aircraft (183 seats). Delta argues that its proposal would best satisfy the objectives of maximizing domestic network benefits, that its Salt Lake City hub is well located for low circuity DCA connecting service for numerous communities, and that it would provide the best and strongest competition for American and United. The Utah Air Travel Commission and the Salt Lake City Department of Airports (Utah and the Salt Lake City Parties) filed answers in support of Delta's application. They argue that Delta's strong Salt Lake City presence and the excellent geographic position of Salt Lake City for routings to DCA, which require minimal backhaul, make Delta the superior choice.

The other applicants have stated that Delta already is a large operator at DCA and that most of the markets that could connect at Salt Lake City already have the ability to connect one-stop to DCA via one of Delta's interior hubs at Atlanta and Cincinnati.

**Frontier Airlines, Inc.**

Frontier requests two slot exemptions to operate one additional round trip between Denver and DCA using Boeing 737-300 aircraft. Frontier states that, although its DCA-Denver service authorized by the Department has been successful, that it operates at a significant disadvantage compared with other carriers operating more flights in the Washington-Denver market, and that it could offer better service and compete more effectively with a second daily round trip. The carrier also notes that since the last DCA slot case, it has vastly expanded its network at Denver in three ways: 1) it has increased its own presence at Denver by adding new spokes; 2) it has entered into a code-share agreement with Mesa Airlines to provide regional jet service into Denver from six cities as Frontier JetExpress; and, 3) it has expanded its code-share agreement with Great Lakes Aviation to provide turbo-prop service under the Frontier code. Frontier also argues that due to increasing airline industry concentration, it should be awarded the two available slot exemptions as a way to improve airline competition generally. The City and County

of Denver filed an answer in support of Frontier's application. Denver asserts that Frontier has substantially improved competition at Denver, but the selection of Frontier's proposal is critical to the full development of Frontier's DCA-Denver service and Frontier's continued growth generally as a new entrant carrier.

Other applicants oppose Frontier's application, principally on the grounds that Frontier already received two AIR-21 slot exemptions that it is using to serve the Denver-DCA market.

**United Airlines, Inc.**

United requests two slot exemptions to operate one nonstop round trip between Los Angeles and DCA with 182-seat Boeing 757 aircraft. United contends that TWA's earlier DCA-Los Angeles service was successful and should be reinstated by United. United contends that its significant connecting complex at Los Angeles will enable it to afford significantly greater public benefits than had been provided by TWA's service. United states that its proposal should be given priority because Los Angeles has the largest population, greatest commercial center, and largest connecting hub of any beyond-perimeter community in the United States.

Other carrier applicants oppose United's request, arguing that it already has a strong presence at Los Angeles and DCA, as well as at other Washington airports. As such, it is a dominant carrier in the Los Angeles-Washington market and it operates substantial connecting service between DCA and Los Angeles via its within-perimeter hub at Chicago.

**US Airways, Inc.**

US Airways requests two slot exemptions to provide one nonstop round trip between San Francisco and DCA with 182-seat Boeing 757 aircraft. US Airways states that San Francisco is one of the largest markets without nonstop service to DCA. The carrier also points out that its recent code-sharing relationship with United Airlines provides network benefits to all of the destinations that United serves from its hub at San Francisco. US Airways argues that it offers significant network benefits, primarily due to its substantial DCA presence, for San Francisco local and connecting passengers seeking to connect to east coast points.

Other carrier applicants oppose US Airways' request, arguing that it is already the largest slotholder at DCA.

**DECISION**

We have decided to select Delta Air Lines for nonstop service to Salt Lake City. We conclude that Delta has the application that best meets all of the AIR-21 statutory criteria.

Section 41718(a)(1) directs that any slot exemptions we award must provide "domestic network benefits" beyond the perimeter. Second, under § 41718(a)(2), we are directed to ensure that the slot exemptions awarded will also increase competition by new entrant carriers or in multiple markets. Third, under § 41718(a)(3), we must ensure that an award of exemptions would not reduce travel options for communities served by small hub airports and medium hub airports within the perimeter. Finally, under § 41718(a)(4), the exemptions granted must not result in meaningfully increased travel delays. With regard to the latter two statutory requirements, as discussed below, we find that all applicants meet both.[4]

We affirm our finding in Order 2000-7-1 that the determinative criteria for the allocation of slot exemptions beyond the DCA perimeter are those involving network benefits and competition that is provided by new entrants or in multiple markets. As we also stated in that Order, Congress did not provide any specific guidance as to the relative weight we should assign these two criteria in our decisional process.

As before, applicants stressed their advantages under one or the other of these two criteria, depending upon the strength of their existing presence at DCA. Those with the strongest presence highlighted the scope and size of their respective networks and the competitive benefits that could be brought to multiple markets via those networks (American, Delta, United, and US Airways). Applicants with a more modest DCA presence (Alaska, America West and Frontier) stressed the competitive benefits afforded by their limited incumbency at DCA. These carriers argued that, even though their networks might be smaller, enhancement of their limited presence at DCA would create a stronger competitive impact than an award to any of the larger more established DCA incumbents.

As indicated, under § 41718(b)(3), the Department must also consider the effect of an award of exemptions upon inside-perimeter services. Specifically, we must ensure that an award of exemptions would not reduce travel options for communities served by small hub airports and medium hub airports within the perimeter. In our earlier decision, we concluded that Congress sought to ensure that new services provided though the AIR-21 exemptions would not displace or disrupt existing services at small or medium hubs. No party asserted that the proposed services of the various applicants would produce this result, and we did not conclude that any of the proposed services is likely to cause a reduction in the travel options for the communities currently served by small and medium hubs inside the perimeter.

---

[4] Alaska Airlines argued that Delta, among others, could not use the exact times that National was using and that, therefore, it would be required to swap slot-times internally in order to fit the schedule. That, in turn, Alaska argues, means that an inside-the-perimeter community's service would be denigrated. We do not find that argument compelling; with more than 100 slots at DCA, we find that Delta has sufficient flexibility to fine-tune schedules with slot times so that no community's service need be materially denigrated.

Consistent with our finding in the initial slot exemption proceeding, none of the services proposed in this case would result in meaningfully increased travel delays. The General Accounting Office, in 1999, found that additional operations at DCA would not cause significant delays. We concluded in Order 2000-7-1 that 24 additional operations at DCA, spread out over the entire slot-controlled period to comply with the statutory limitation of no more than two additional operations per hour, would not "meaningfully" increase travel delays at DCA. We affirm that finding here.

In analyzing the applications in this proceeding, we compared all proposals on a city-by-city and carrier-by-carrier basis. We sought to determine which proposal best met the statutorily mandated selection criteria and, in doing so, would afford the greatest public benefits.

**Los Angeles**

The three Los Angeles applicants fall into two groups: the established large incumbents, American and United, with significant Los Angeles hubs; and the smaller network carrier, Alaska Airlines, with minimal Los Angeles presence. Both American and United argued the advantages of their respective Los Angeles networks. They further point out that the Los Angeles market is one of the largest in the country. Nonetheless, neither the size nor the significance of the local market is an AIR-21 selection criterion, and accordingly we cannot make a finding that any one city, such as Los Angeles, deserves DCA nonstop service on that basis. In fact, the argument that Washington-Los Angeles is a large local market militates against its selection, as it would reduce any network benefits. That is, the large number of local passengers would tend to preempt seats that would otherwise be available to connecting passengers for beyond-Los Angeles destinations, thereby diminishing the network benefits and service to multiple markets afforded by these proposals.

Furthermore, both American and United are major DCA incumbents and, therefore, do not qualify as either new entrants or limited incumbents at DCA.

The other Los Angeles applicant, Alaska Airlines, while a limited incumbent at DCA, would provide comparatively minor network benefits. Alaska's only service beyond Los Angeles would be to four U.S. cities -- Anchorage, Seattle, Portland, and San Francisco. Seattle and Anchorage already receive direct DCA service from Alaska Airlines (Seattle nonstop and Anchorage one-stop). Portland would be better served via Seattle than Los Angeles, so any network benefits would be minimal. Its code-share partner, Horizon Air, would provide connections to six destinations.

**San Francisco**

As with the Los Angeles proposals, the statutory criteria do not allow us to consider the needs for service or the benefits to passengers traveling in the local market. As with Los Angeles, San Francisco is also a very large local market. We are required to consider the

network benefits and increase competition in multiple markets. Thus, every seat taken up by a local San Francisco-DCA passenger deprives a connecting passenger the ability to access DCA on a one-stop basis. Further, US Airways is the largest slotholder at DCA, so it also does not meet the new entrant/limited incumbent criterion.

**Las Vegas**

While America West is not a new entrant (it operates 10 DCA slots to serve Columbus, Phoenix, and Las Vegas), it is a limited incumbent, as it has fewer than 20 slot and slot exemptions. Moreover, its proposed service would provide domestic network benefits and increase competition in multiple markets because it has a significant hub and spoke system at Las Vegas, serving 19 U.S. cities. However, because America West already offers nonstop DCA-Las Vegas service, the *new* network benefits provided by America West's additional service would be quite limited. While many of the cities that America West now serves beyond Las Vegas would receive a second daily connecting flight to DCA, no additional market would be afforded first-time access to DCA on the America West network as a result its selection in this proceeding. In addition, America West serves only one city from Las Vegas that it does not serve out of Phoenix, its largest hub, and America West currently provides two nonstop round trips a day in the DCA-Phoenix market.

**Denver**

Frontier clearly qualifies as a limited incumbent airline at DCA, as it currently holds only two DCA slot exemptions for a single daily round trip to Denver. Of the applicants, only Alaska and America West are on a comparable footing as a limited DCA incumbent. Frontier's selection would provide some network benefits and, as a consequence, increase traffic in multiple markets. Frontier has also added cities from its Denver hub since its selection for DCA-Denver slot exemptions in July 2000. Since its initial award, Frontier has also developed a code-share agreement with Mesa Airlines at Denver and has expanded a code-share agreement with Great Lakes Aviation. On the other hand, since Frontier already serves the DCA-Denver market, its selection would not result in any new cities gaining on-line, single-connecting service to DCA. Second, although the aircraft is unspecified, Frontier would likely serve the DCA-Denver route with the same aircraft that it currently operates on the route, B737-300 (136-140 seats), one of the smallest aircraft of any of the applicants.

**Salt Lake City**

Although Delta is not a new entrant or limited incumbent, because it provides considerable service to DCA from both Atlanta and Cincinnati, it offers both significant network benefits and would increase competition in multiple markets as a consequence of its large connecting network at Salt Lake City. And while some communities that would connect at Salt Lake City can already access DCA via Atlanta or Cincinnati, there are a number of communities, principally north and west of Salt Lake City that would benefit from

improved service, namely one-stop connections over Salt Lake City, as opposed to two-stop connections over Salt Lake City and either Atlanta or Cincinnati. As far as capacity, Delta would use 183-seat B-757, a relatively large aircraft. That large aircraft, coupled with the fact that the DCA-Salt Lake City market is likely the smallest local market of any of the applicants, further enhances Delta's network benefits as it would start with a large inventory of seats and relatively fewer would be taken up by local Salt Lake City-DCA passengers.

**CONCLUSION**

Based on all of the above, we believe that Delta's service best meets the statutory criteria of proposing service that would provide network benefits and increase competition in multiple markets. Delta and its code-share partners serve a total of 67 communities from its Salt Lake City hub, including several cities that would gain first-time, single-connect service to DCA. This, combined with the use of large aircraft in a smaller local market, will result in more seats for connecting passengers, and gives Delta a decided advantage in the "network benefits" criterion of the statute. As we have discussed, all three Los Angeles proposals suffer from the fact that Los Angeles is a very large local market, and the almost certain preemption of seats by local passengers seriously diminishes any network benefits that these proposals might offer. And while Alaska, unlike American and United, qualifies as a limited incumbent at DCA, the network benefits afforded by its proposed beyond-Los Angeles service would be negligible. San Francisco suffers from the same weakness as the Los Angeles proposals, namely that it is a very large local market susceptible to seat preemption. In addition, US Airways is the largest slotholder at DCA. At Las Vegas, America West does qualify as a limited incumbent, but it already serves the Las Vegas-DCA market, and, on top of that, it serves all of the same cities, except one, to DCA from its larger Phoenix hub. Frontier also qualifies as a limited incumbent, but it also already serves the Denver-DCA market so no additional communities would receive first-time service to DCA as a direct consequence of its selection in this proceeding.

**CONDITIONS**

Assignment of Slot Times: We are directing Delta Air Lines, Inc. to file in the Docket no later than December 16, 2002, the proposed flight schedules and effective date for inauguration of operations authorized by this order. As we stated in our Notice of October 15, 2001, the slot times currently allocated for National's DCA-Las Vegas service are in the 800 and 2000 hour periods. Since 49 U.S.C. §41718(c)(2) does not allow us to assign more than two slot exemptions per one hour period, and most one hour periods were fully subscribed by the Department's Notice of August 2, 2000, Delta should contact the Slot Administration Office of the Federal Aviation Administration as soon as possible to determine available slot times. The Department will determine the final slot times assigned to Delta in accordance with the provisions of 49 U.S.C. §41718(c)(2). Thereafter, Delta may request the FAA Slot Administration Office to approve exchanges of the assigned slot exemptions times with other slots or slot exemptions for the purpose of conducting the operations authorized by this Order in a different hour. In acting on

such a request, the FAA will employ standard practices in conjunction with applicable statutory and regulatory requirements for the utilization of slot times between and among individual air carriers. Regardless of subsequent approved slot time exchanges, the slot times assigned by the Department or the FAA's Slot Administration Office pursuant to this order will be tagged such that if any of the service granted by this Order is suspended, or is not inaugurated in a timely manner, the Department will withdraw the slot exemptions based on their tagged slot time rather than by any subsequent slot time operated.

**ENVIRONMENTAL ISSUES**

Although 49 U.S.C. §41718(e) specifically exempts our action here from environmental review[5], we remain sensitive to the environmental impact of increased operations at DCA. Consistent with the statute, we will require that all operations authorized by this order will be conducted with Stage 3 aircraft. In addition, this award does not represent additional operations at DCA, but, rather, a redistribution of existing service and slot exemptions from National Airlines to Delta Air Lines. DCA also has, and must be given, priority for noise compatibility planning and program grants, 49 U.S.C. §§ 47117(e), and 41718(e)(3).

**ADMINISTRATIVE TERMS**

As the FAA slot regulation makes clear "slot(s) do not represent a property right but represent an operating privilege subject to absolute FAA control (and) slots may be withdrawn at any time to fulfill the Department's operating needs..." 14 C.F.R. 93.223(a). Under the provisions of 49 U.S.C. §41714(j), these carriers may not sell, trade, transfer, or convey the operating authorities granted by the subject exemptions unless otherwise authorized herein.

Further, granting of these exemptions in no way is to be construed as allowing a carrier to operate services that it could not otherwise operate, *i.e.*, Delta must still meet all the requirements of the Department of Transportation, the Federal Aviation Administration, and all other statutes and regulations governing air transportation.

This order is issued under authority delegated in 49 C.F.R. 1.56(a).

**ACCORDINGLY,**

1. The Department grants two slot exemptions from 14 C.F.R. Part 93, Subparts K and S, to Delta Air Lines, Inc., to enable Delta Air Lines to provide one nonstop round trip a day in the Salt Lake City-DCA market as described in this order;

---

[5] §41718(e) states, "Neither the request for, nor the granting of an exemption, under this section shall be considered for purposes of any Federal law a major Federal action significantly affecting the quality of the human environment."

2. The Department directs Delta Air Lines, Inc., to file in the Docket no later than December 16, 2002, the proposed flight schedules and effective date for operations authorized by this Order, and Delta Air Lines must commence its proposed service no later than January 31, 2003. The slot exemptions granted must be conducted with Stage 3 aircraft, may not be used for operations between the hours of 10:00 p.m. and 7:00 a.m., and may not increase the number of operations at Ronald Reagan Washington National Airport in any one-hour period during the hours between 7:00 a.m. and 9:59 p.m. by more than two operations. Delta Air Lines is advised to consider maximum flexibility in proposed operating times to ensure compliance with these limits;

3. The Department will make the final determination of slot times as soon as possible after schedules are filed to enable the carrier to conduct the operations authorized by this Order. The Department directs Delta Air Lines, Inc. to contact the Federal Aviation Administration Slot Administration Office for the determination of available slot times. The FAA will assign slot exemption numbers, effective dates, and operating times consistent with statutory limitations;

4. Except as otherwise granted, we deny all other applications for exemptions from 14 C.F.R. Part 93, Subparts K and S, filed in these dockets;

5. The authorities granted under these exemptions are subject to all of the other requirements delineated in 14 C.F.R. Part 93, Subparts K and S, including, but not limited to, the reporting provisions and use-or-lose requirements; and,

6. We will serve this order on all parties in Docket OST-2000-7181 and the Federal Aviation Administration Slot Administration Office.

By:

**READ C. VAN DE WATER**
Assistant Secretary for Aviation
and International Affairs

(SEAL)

*An electronic version of this document will be made available on the World Wide Web at: http://dms.dot.gov/*

275347

Order 2004-4-1

**UNITED STATES OF AMERICA**
**DEPARTMENT OF TRANSPORTATION**
**OFFICE OF THE SECRETARY**
**WASHINGTON, D.C.**

Issued by the Department of Transportation
on the 1st day of April, 2004

| Applications of<br><br>**ALASKA AIRLINES, INC.**<br>**ALOHA AIRLINES, INC.**<br>**AMERICA WEST AIRLINES, INC.**<br>**AMERICAN AIRLINES, INC.**<br>**DELTA AIR LINES, INC.**<br>**FRONTIER AIRLINES, INC.**<br>**PRIMARIS AIRLINES, INC.**<br>**UNITED AIR LINES, INC.**<br>**US AIRWAYS, INC.**<br><br>For exemptions from 14 C.F.R. Part 93, Subparts K and S, pursuant to 49 U.S.C. § 41718(a), special rules for Ronald Reagan Washington National Airport (beyond-perimeter slot exemptions) | **Served: April 1, 2004**<br><br>**Docket OST-2000-7181** – 4657 |
|---|---|

**ORDER GRANTING BEYOND-PERIMETER SLOT EXEMPTIONS AT RONALD REAGAN WASHINGTON NATIONAL AIRPORT**

**SUMMARY**

By this Order, the Department partially grants the requests of four carriers for 12 slot exemptions at Ronald Reagan Washington National Airport ("DCA") in order to provide nonstop service to a number of communities, as follows:

1. Alaska Airlines, Inc., four (4) slot exemptions to provide (a) one daily nonstop round trip between DCA and Seattle, Washington, and (b) one daily nonstop round trip between DCA and Los Angeles, California;
2. America West Airlines, Inc., two (2) slot exemptions to provide one daily nonstop round trip between DCA and Phoenix, Arizona;
3. Frontier Airlines, Inc., four (4) slot exemptions to provide two daily nonstop round trips between DCA and Denver, Colorado;
4. United Air Lines, Inc., two (2) slot exemptions to provide one daily nonstop round trip between DCA and Denver, Colorado.

**BACKGROUND**

On December 12, 2003, President Bush signed into law the Vision 100 – Century of Aviation Reauthorization Act, P.L. 108-176 ("Vision 100"), which, among other things, directs the Department to grant 12 new slot exemptions at DCA for nonstop service to/from cities beyond the 1,250-mile perimeter.[1] To that end, we issued a Notice on December 17, 2003, requesting proposals by January 9, 2004. Replies were due on January 23, 2004. In total, we received applications from nine carriers for a total of 44 slot exemptions.[2]

This is our fourth allocation of slot exemptions in the beyond-perimeter docket. Following the passage of the Wendell H. Ford Aviation Investment and Reform Act for the 21st Century (AIR-21), we originally awarded all 12 slot exemptions available under the law to America West, Frontier, National Airlines, and TWA for various nonstop services to communities beyond the perimeter. Order 2000-7-1 (July 5, 2000). In 2001, we reallocated two of the 12 slot exemptions to Alaska after TWA returned its holdings during its bankruptcy and acquisition by another carrier. Order 2001-6-20 (June 22, 2001). In 2002, we reallocated two more of the slot exemptions to Delta after National Airlines ceased operations at DCA. Order 2002-11-20 (Nov. 27, 2002).

For the 12 DCA beyond-perimeter slot exemptions that are now available as a result of Vision 100, the Department considers, using the criteria set forth in 49 U.S.C. § 41718(a), applications from air carriers to provide nonstop service to DCA from airports beyond the 1,250-mile perimeter. The statutory criteria require that the granted exemptions will: (1) provide air transportation with domestic network benefits beyond the 1,250-mile perimeter; (2) increase competition by new entrant air carriers[3] or in multiple markets; (3) not reduce travel options for communities served by small hub airports and medium hub airports within the 1,250-mile perimeter; and (4) not result in meaningfully increased travel delays.

---

[1] Specifically, at DCA, 49 U.S.C. § 41718(a), amended by Vision 100, provides that the Secretary shall, subject to certain findings, grant 24 slot exemptions to air carriers for the provision of air transportation beyond the 1,250-mile perimeter established for air transportation under 49 U.S.C. § 49109. By prior orders, the Department fully allocated 12 beyond-perimeter slot exemptions. Therefore, the Department must now to distribute an additional 12 DCA beyond-perimeter slot exemptions. In like manner, 49 U.S.C. § 41718(b), as amended by Vision 100, provides that the Secretary shall grant 20 slot exemptions to air carriers for the provision of air transportation within the 1,250-mile perimeter, and 10 of the exemptions had been permanently allocated by prior orders. Therefore, the Department must distribute an additional 10 DCA within-perimeter slot exemptions, which the Department will do in a separate order.

[2] The Department received more than 12 comments filed *after* the January 23 deadline established by our Notice. Each commenting party sought leave to file comments out of time. In the interest of a complete record, we grant all leave requests, however, we have not found these additional submissions to contain any new dispositive information. Thus, they do not inform our decision in this Order.

[3] The terms "new entrant air carrier" and "limited incumbent air carrier" are defined in 49 U.S.C. § 41714(h). In addition, under 49 U.S.C. § 41714(k) "…an air carrier that operates under the same designator code, or has or enters into a code-share agreement, with any other air carrier shall not qualify for a new slot or slot exemption as a new entrant or limited incumbent air carrier at an airport if the total number of slots and slot exemptions held by the 2 carriers at the airport exceed 20 slots and slot exemptions."

## APPLICATIONS AND RESPONSIVE PLEADINGS

### A. Application of Alaska Airlines, Inc. ("Alaska")

Alaska has requested eight (8) total slot exemptions in order to establish two daily nonstop round trips to Los Angeles International Airport ("LAX") and two additional daily round trips to Seattle-Tacoma International Airport ("SEA").[4]

*Arguments in Support*
In general support of its application, Alaska cites the success of its single daily DCA roundtrip flight to Seattle (with high load factors), its transcontinental expansion program, usage of Boeing 737 Next Generation aircraft, numerous awards for service, and its marketing know-how in the DCA market. Alaska claims that it satisfies all of the criteria of § 41718(a).[5]

Regarding its proposed service to **LAX**, Alaska argues that Los Angeles is the largest beyond-perimeter market without nonstop service to DCA, and one of the largest markets in the Alaska system without direct access to DCA. Alaska claims that its request would permit passengers to connect to 26 beyond markets. The airline touts attractive departure times at DCA and practical departure times at LAX. The fact that Alaska serves another Washington-area airport ensures Alaska's commitment to develop the DCA-LAX service, according to Alaska. California in general, and Los Angeles in particular, are strategic markets for Alaska – at LAX, Alaska enplaned more than 1.3 million passengers in 2003, and the airline has recently rebuilt its facilities to be the "airport of the future." Finally, Alaska asks the Department to consider the needs of local-market, nonstop passengers, in addition to those passengers connecting to beyond markets since beyond-market passengers can already fly to DCA on a one-stop basis. Alaska believes the Department should look to the total number of local *and* beyond-market network passengers, where Alaska asserts it has a strong application. Alaska proposes to serve both local-market and beyond-market passengers without bias in its reservations system.

Regarding its proposed service to **SEA**, Alaska notes that its second DCA-SEA proposed round trip would continue on a single-plane basis to Fairbanks, linking military bases and the interior and arctic regions to Washington, DC. A third round trip would continue on a single-plane, seasonal basis to Juneau, which establishes new service for the residents of Alaska's capital city. Because Alaska already operates one daily nonstop from DCA to SEA, the airline argues that additional service will provide substantial network benefits. For one, Alaska asserts that new service will maximize connections to the three largest cities in Alaska, and to 70 additional nonstop destinations, including 30 new communities, served by Alaska and its code-share partners.

---

[4] In the 2001 proceeding, the Department reallocated two returned slot exemptions to Alaska for service to SEA. Order 2001-6-20 (June 22, 2001).

[5] On January 14, Alaska requested that Exhibit AS-103 of its application be replaced with a revised schedule. The Department grants Alaska's request.

On January 23, Alaska filed consolidated comments. In those comments, Alaska highlights the size of its proposed markets, its status as a fully-qualified limited incumbent at DCA, its exemplary record of developing new DCA markets, its incentives to market and promote new service, its network benefit potential, and its financial strength and stability. Alaska argues that four applicants – American, Delta, United and US Airways – are substantial slot holders that do not merit slot exemption awards.

*Responsive Pleadings*
Numerous carriers commented on Alaska's application. Carriers most commonly argued that Alaska's choice of aircraft – a B737-700 configured to seat 120 passengers – provided less capacity than other proposals, and that Alaska's alleged network benefits were exaggerated. Regarding network benefits, carriers asserted that Alaska proposed to carry a disproportionate share of local traffic from LAX and that it claimed credit for serving cities in Canada via SEA, which is irrelevant under the controlling statutory criteria, which focus exclusively on "domestic network benefits." In other isolated comments, carriers assert that Alaska is not the best choice for a beyond-perimeter award because: (1) it is not a low-fare carrier; (2) its proposal for DCA-LAX service overlaps with its existing DCA-SEA service; (3) its new entrant status is not sufficient for an award; (4) it already holds slot exemptions; (5) it is more focused on its DCA-SEA service, not its proposed DCA-LAX service; and (6) it has not committed to serving the Washington, D.C. region.

**B. Aloha Airlines, Inc. ("Aloha")**

Aloha has requested a total of four (4) slot exemptions to establish new service to John Wayne Airport ("SNA") in Orange County, California. The two new round trips would continue on a single-plane basis to Honolulu.

*Arguments in Support*
In general support of its application, Aloha asserts that its proposed service would be the only nonstop DCA-SNA service. Aloha argues that Hawaii is separated from the mainland and dependent on reliable, affordable air service. According to Aloha, the airline meets the statutory criteria of § 41718(a). Aloha emphasizes the importance of its new entrant status at DCA and the Washington-Baltimore area, and argues that its network will improve service and connections at its domestic hub, and at its "focus" airports in Kona, Kahului, Reno, and Phoenix. Using Boeing 737s, Aloha's business plan proposes to avoid congested terminals, match fares with those of low-fare and legacy carriers, and provide upscale amenities.

On January 23, Aloha filed consolidated comments. In those comments, Aloha argues that it is the only true new entrant among the applicants in this proceeding. To support its claim, Aloha states that it is the only operating carrier with no presence at DCA, and thus is uniquely positioned to enhance competition and maximize the number of new DCA competitors. Aloha compares itself to Alaska, which in 2001 had no presence on the East Coast, and was awarded beyond-perimeter slot exemptions by the Department.

Aloha reiterates its need for four slot exemptions, notwithstanding that one of its operations has a planned arrival at DCA at 12:25 a.m.[6] Aloha believes that the Department has sufficient authority to issue exemptions under these circumstances, but suggests that if the Department disagrees, the airline will accept an award of three slot exemptions.

Aloha asserts that its proposal would provide the first nonstop service between any of the three Washington area airports and Orange County. All other destinations proposed by the applicants either have existing DCA service or have service from a Washington area airport. Aloha adds that its proposal adds new single-plane service to a major market in Honolulu, with convenient connections to other important Hawaiian and Pacific markets.

Aloha also asserts that it is the only applicant to offer low fares in combination with significant new network benefits. The network carriers, according to Aloha, cannot enhance competition to the same degree, and should be precluded from being awarded slot exemptions. Aloha singles out US Airways, American, Delta, and United as large DCA incumbent network carriers.

*Responsive Pleadings*
Numerous carriers commented on Aloha's application. Carriers most commonly argued that Aloha provides few network benefits, both by proposing to serve SNA instead of the larger LAX, and also because of the relatively small number of one-stops (or spokes) that it offers from SNA. Carriers also commonly noted that its proposed schedule precludes it from consideration by the Department under § 41718(c)(2), that it has no presence in the East of the United States, and that its network is duplicated by other applicants that can reach Hawaii with one-stops while simultaneously offering more network benefits. In other isolated comments, carriers assert that Aloha is not the best choice for a beyond-perimeter award because: (1) it is not a low-fare carrier; (2) it does not have the necessary slots at SNA to realize its proposal; (3) it has less capacity on its proposed aircraft than other applicants; and (4) it is not strong financially.

### C. America West Airlines, Inc. ("America West")

America West has requested a total of six (6) slot exemptions to establish two additional nonstop round trips to Phoenix Sky Harbor International Airport ("PHX") and one additional nonstop flight to Las Vegas' McCarran International Airport ("LAS"). Alternatively, America West requests ten (10) slot exemptions to establish two new daily nonstop round trips to LAX, two new daily nonstop round trips to San Francisco International Airport ("SFO"), and one additional nonstop round trip to PHX.[7]

---

[6] Section 41718(c)(2) states that "[t]he exemptions granted under [the within perimeter and beyond perimeter subsections] may not be for operations between the hours of 10:00 p.m. and 7:00 a.m...."
[7] In the 2000 proceeding, the Department awarded America West four exemptions (two round trips) to Phoenix and two exemptions (one round trip) to Las Vegas.

*Arguments in Support*
In general support of its application, America West asserts that it is the largest low-fare, full-service, hub-and-spoke airline, positioning it to serve 20 million passengers a year at 44 western cities, including 36 competitive one-stop destinations and two hubs. America West also touts the fact that it serves the most passengers in the West of any new entrant network carrier, that it generates substantial consumer value with its current DCA slot portfolio, that it will be able to fully serve business and leisure travelers with additional slot holdings, that it will be able to compete vigorously with legacy carriers with additional slot holdings, and that it is generally in the public interest to award new slot holdings to the airline.

Regarding its proposed service to **PHX**, America West argues that it is best able to maximize consumer benefits and serve the public interest by continuing to serve Phoenix. To support that argument, America West emphasizes its network in Phoenix, which provides 191 daily departures. The airline asserts that it could generate substantial consumer value (mainly in the way of lower fares) with additional DCA-PHX slot exemptions. To compete with legacy carriers – that are expanding domestic alliances and scheduling more within-perimeter flights connecting to the West – America West argues that it requires additional access in the key east-west time channels in order for its DCA-to-the-West concept to work. Although it has fewer slots than some legacy carriers, America West claims that its load factors are higher than all the legacy carriers – on average, 77 percent in the DCA-PHX market. America West's load factors during peak business travel hours average 90 percent.

Regarding its proposed service to **LAS**, America West's arguments in support of its proposed DCA-LAS service mirror those of its proposed DCA-PHX service. America West points out that it provides 57 daily departures from its LAS hub, serving 64,000 DCA passengers annually with its current slot exemption authority to LAS.

Regarding its **alternative proposed service to LAX, SFO and PHX**, America West asserts that, as the largest east-west low-fare, full-service carrier, it is the best choice for point-to-point awards because it has the network scope and scale to influence the pricing of the legacy carriers. America West also argues that its experience with transcontinental service will be an asset. The airline claims that its entry into the JFK-LAX and BOS-LAX markets has dramatically decreased incumbent walk-up and leisure fares. With additional slot exemptions to LAX, SFO and PHX, America West expects to generate $94.7 million in annual consumer savings. The point-to-point awards, according to America West, will also free up seats on its existing beyond-perimeter service to PHX, which will enhance low-fare service for travelers seeking to reach other western destinations served by America West.

On January 23, America West filed consolidated comments. In those comments, America West argues that, as a new entrant with a substantial western hub and spoke network, it is the best choice for beyond-perimeter awards. The airline touts its ability to provide substantial competitive benefits in multiple markets and solid network benefits.

*Responsive Pleadings*
Numerous carriers commented on America West's application. Carriers most commonly argued that America West already holds the most beyond-perimeter slot exemptions, and should therefore not be considered for additional awards. Along the same lines, some carriers added that because America West already has four exemptions to PHX and two to LAS, it can add very few new network benefits; furthermore, the network benefits it does claim to add are duplicative between LAS and PHX. Some carriers also point to the fact that America West's alternative "point-to-point" proposal is weak because it relies too much on local traffic in California and contains no code-sharing benefits. Delta argues that America West fails to meet a statutory criterion because it has reduced travel options by abandoning its Columbus hub. United argues that America West is not the best choice for a beyond-perimeter award because it has less capacity on its proposed aircraft than other applicants. *See* Comments of United at 17 (stating that America West uses a 190-seat B757 for one DCA-PHX operation and a 124-seat A319-100 for one DCA-PHX operation and a DCA-LAS operation).

**D. American Airlines, Inc. ("American")**

American has requested a total of two (2) total exemptions to establish one daily nonstop round trip to LAX.

*Arguments in Support*
In general support of its application, American claims that its new service will bring substantial competitive benefits to the large LAX market, as well as to other cities in California and Hawaii. American argues that it meets the criteria of § 41718(a). Additionally, American argues that, because the Department has awarded beyond-perimeter slot exemptions to cities smaller than Los Angeles in prior proceedings, the airline's application is worthy of an award. American asserts that it is well positioned to benefit the public with service to LAX because it can add one-stop service to five small cities in California, and numerous other large, small, and international destinations. With renovated and enhanced airport facilities, and Boeing 757 jets, American believes it will be competitive and attractive to consumers. American also asserts that it can help redress the competitive imbalance at LAX, reducing the majority market share of United. Lastly, American argues that the Department should restore direct service to LAX, which was contemplated by Congress during deliberation of AIR-21 and originally awarded to TWA in the 2000 proceeding.

On January 23, American filed consolidated comments. In those comments, American argues that reinstatement of LAX service should be a top priority for the Department. Furthermore, American's proposal offers significant capacity, has widespread support, and is well positioned to challenge the alleged dominance of United at LAX.

*Responsive Pleadings*
Numerous carriers commented on American's application. Carriers most commonly argued that American already holds numerous slots at DCA, has a dominant presence at LAX, offers no substantial network benefits, and has presented the same proposal that

has been rejected several times by the Department. With regard to weak network benefits, carriers cite the high percentage of local market passengers, backhaul and circuity problems inherent in an LAX hub, and the fact that American can reach DCA through within-perimeter hubs. In other isolated comments, carriers assert that American is not the best choice for a beyond-perimeter award because: (1) it is not a low-fare carrier; and (2) it has no incentive to aggressively promote DCA-LAX nonstop service.

**E. Delta Air Lines, Inc. ("Delta")**

Delta has requested a total of two (2) slot exemptions to establish one additional daily round trip to Salt Lake City International Airport ("SLC").[8]

*Arguments in Support*

In general support of its application, Delta argues that cities in the Intermountain West are critically underserved, and that Salt Lake City is the only nonstop-to-nonstop DCA gateway for eleven communities in five intermountain states. According to Delta, the single daily round trip awarded to Delta in the 2002 proceeding is insufficient to meet the demands of the region. Highlighting "domestic network benefits" and "competition in multiple markets," Delta claims that a second daily round trip to SLC would create important public interest benefits and significantly enhance the service and competitive benefits of Delta's existing SLC hub. Delta argues that its request will produce important domestic network benefits because SLC is a Delta hub, providing over 300 daily departures to 70 destinations. Twenty-two cities will gain two daily travel times to DCA via SLC, Delta claims. Delta argues that it needs a second daily flight to compete effectively with other carriers who have been awarded beyond-perimeter slot exemptions in the West. The perimeter rule, Delta asserts, prevents the airline from offering the frequency of service that it would otherwise offer to DCA. Lastly, Delta maintains that its proposed additional service will not reduce travel options or result in increased delays.

On January 23, Delta filed consolidated comments. In those comments, Delta argues that its proposal will benefit the most beyond-perimeter network passengers (as opposed to local market passengers in California cities). Delta touts its performance in its current DCA-SLC nonstop service and the fact that it has carried more passengers to DCA than Alaska.

*Responsive Pleadings*

Numerous carriers commented on Delta's application. Carriers most commonly argued that Delta is a large slot holder at DCA, that it can effectively serve DCA through several within-perimeter hubs, and that its offers few new network benefits. With regard to network benefits, carriers allege that Delta can – at most – reach two new cities with its current proposal, which is not the same level of network benefits proposed by other applicants. Alaska suggests that Delta may be precluded from receiving an award under

---

[8] In the 2002 proceeding, the Department reallocated two returned slot exemptions (one round trip) to Delta for service to SLC. Order 2002-11-20 (Nov. 27, 2002).

the Department's authority based on its proposed 10:50 p.m. arrival time at DCA.[9] In other isolated comments, carriers assert that Delta is not the best choice for a beyond-perimeter award because: (1) it is not a low-fare carrier; (2) it has low load factors on its existing DCA-SLC service; and (3) it has reduced capacity on its existing DCA-SLC service.

### F. Frontier Airlines, Inc. ("Frontier")

Frontier has requested four (4) slot exemptions to establish two additional nonstop round trips to Denver International Airport ("DEN").[10]

*Arguments in Support*
In general support of its application, Frontier points to its growing traffic, expansion plans, and position as an east-west hub operator that offers friendly fares and service. Frontier argues that its service will produce substantial network benefits in underserved areas and small to mid-sized communities located beyond the perimeter. Frontier's hub in Denver carries nearly 15 million passengers to 42 cities. Frontier claims that it can bring the first one-stop service to DCA to a number of markets. According to Frontier, it is a good choice for new slot exemptions because of its uncomplicated low-fare options, and because it requires additional frequencies to fully serve customers when security, mechanical, or weather problems occur. Frontier also argues that, as a new entrant with a flexible fare structure, its proposal would increase competition in multiple markets. It cites United' creation of the new brand "Ted" as a reaction to competition injection by Frontier. Frontier asserts that granting multiple slots to low-fare carriers using hubs is the most effective way to stimulate competition in multiple markets. The airline's entry into the Washington/Baltimore-DEN and New York-DEN markets has dramatically reduced fares, according to Frontier. Finally, Frontier argues that its proposed service would not reduce travel options or increase travel delays.

On January 23, Frontier filed consolidated comments. In those comments, Frontier argues that it is committed to the Washington-Denver market, but requires additional access to DCA and relief from United, who operates a hub in Denver.

*Responsive Pleadings*
Numerous carriers commented on Frontier's application. Carriers most commonly argued that Frontier already received slot exemptions in the 2000 proceeding, and therefore proposes no new network benefits. What network benefits do exist, some carriers believe, are overstated. In other isolated comments, carriers assert that Frontier is not the best choice for a beyond-perimeter award because: (1) it has no First Class service; (2) it

---

[9] Alaska refers to § 41718(c)(2), which states that "[t]he exemptions granted under [the within-perimeter and beyond-perimeter subsections] may not be for operations between the hours of 10:00 p.m. and 7:00 a.m.…" We note that Delta stated, on the record, that it is willing to accept a slot time prior to 10:00 p.m., if necessary. *See* Response of Delta (Jan. 30, 2004). However, the Department's decision in this Order is not based on the issue of Delta's proposed schedule.

[10] In the 2000 proceeding, the Department awarded two slot exemptions (one round trip) to Frontier for service to DEN.

carries significant local traffic from Denver; (3) it has less capacity on its proposed aircraft than do other applicants; (4) it already has nonstop service from Denver to Washington Dulles, and (5) it proposes to serve Denver, which has a smaller population than the cities other applicants propose to serve.

### G. Primaris Airlines, Inc. ("Primaris")

Primaris has requested four (4) slot exemptions to establish two new daily nonstop round trips to LAX.

*Arguments in Support*
In general support of its application, Primaris states that it will soon introduce premium, all business-class service at very low fares in high volume origin and destination markets. Primaris states that, having completed Department certification, it expects to complete Federal Aviation Administration (FAA) certification in late winter or early spring 2004.[11] Primaris argues that, despite its current status as a carrier without effective authority, it is eligible to receive slot exemptions based on the Department's decision in Order 99-9-11 (Sept. 16, 1999) (awarding JFK slot exemptions to JetBlue). Primaris argues that it would substantially increase competition by introducing a new-entrant, low-fare carrier in the Washington-Los Angeles market. Los Angeles is the largest market beyond the perimeter that remains unserved, according to Primaris. The airline argues that it will provide domestic network benefits by entering into code-share relationships reaching many cities in California and other western states.[12] Primaris also argues that its proposal would not reduce travel options or result in travel delays.

On January 23, Primaris filed consolidated comments. In those comments, Primaris stresses that it is a new entrant airline, stating that the "new entrant" criterion of § 41718(a) is the weightiest of the statutory criteria. Primaris points to the fact that it proposes to serve the largest DCA origin and destination market without existing nonstop service.

*Responsive Pleadings*
Numerous carriers commented on Primaris's application. Carriers unanimously agree that Primaris should be precluded from consideration because it is not a fully-funded operating carrier with effective authority from either the Department or FAA. Some carriers also point to the fact that Primaris is not proposing to become a network carrier, and, for that reason, cannot offer any substantial network benefits or competition in multiple markets. United argues that Primaris does not propose adequate capacity to

[11] The Department notes that as of February 1, Primaris holds a certificate of convenience and public necessity. Order 2003-9-19 (Sept. 24, 2003). This certificate, when effective, will permit Primaris to operate scheduled service to domestic and limited foreign destinations. The certificate is not yet effective because Primaris has not met its start-up funding goals nor received an FAA Air Carrier Operating Certificate. FAA notified the Department on February 2 that "Primaris is well along the way toward certification, and, barring any unexpected problem, we anticipate that Primaris would receive its Air Carrier Certificate and Operations Specifications in April of this year."

[12] Citing Orders 2000-7-1 (July 5, 2000) and 2001-6-20 (June 22, 2001), Primaris states that code-sharing is sufficient to fulfill the network benefits prong of § 41718(a).

DCA, since it plans to configure Boeing 757s with all first-class seating (with no middle rows). Frontier and United also distinguish Order 99-9-11 (Sept. 16, 1999), upon which Primaris relies to show its eligibility for an award of slot exemptions. Frontier and United argue that Order 99-9-11 involved proceeding with no competing applications whereby the Department awarded slot exemptions to JetBlue at John F. Kennedy International Airport (JFK) following submission of a detailed business plan. Even though JetBlue was not a certificated carrier when the Department granted its request for JFK slot exemptions, Frontier and United point out that no other carriers had applied. Furthermore, United argues that the Department made its award to JetBlue based on a full record. United asserts that Primaris' situation is more analogous to Order 98-4-22 (April 21, 1998), where the Department denied AccessAir's request for LaGuardia slots noting that AccessAir's certification at FAA was not complete.

**H. United Air Lines, Inc. ("United")**

United has requested six (6) slot exemptions to establish two new nonstop round trips to SFO and one new nonstop round trip to DEN.

*Arguments in Support*
In general support of its application, United argues that the Department should correct an imbalance in the current allocation of slot exemptions, which United believes is skewed in favor of smaller network carriers. United argues that it has the best beyond-perimeter network of any carrier, and that its proposal would incorporate DCA service at two geographically distant hubs and promote network-versus-network and gateway-versus-gateway competition for connecting services between the largest possible number of western communities and DCA.

Regarding its proposed service to **SFO**, United argues that it can offer superior domestic network benefits by serving SFO and connecting DCA to its network, which serves 51 medium, small and non-hub beyond-perimeter airports in the contiguous U.S. United claims that SFO generates as many or more business and leisure travelers than the biggest western cities with beyond-perimeter service, and that SFO connects to numerous small and medium-sized communities in California and western states, some of which do not have one-stop access to DCA. United also argues that its proposed service will increase competition in multiple markets by providing new and competitive one-stop services. United asserts that its choice of aircraft and extensive network will foster competition, especially for its broad transcontinental operations. United maintains that its proposed service will not reduce travel options or result in increased travel delays. Because United has a strong beyond-perimeter network reaching more domestic beyond-perimeter airports, the airline concludes that its proposal is in the public interest.

Regarding its proposed service to **DEN**, United argues that its proposal to serve DEN complements its SFO proposal, because each hub offers online connections to distinct geographical areas in multiple western states. United argues further that it offers superior domestic network benefits, especially with respect to Frontier's operations in Denver. As noted above, United points out that it serves the most medium, small, and non-hub

airports of any carrier. United further points out that Denver is a major economic center that can easily support two additional nonstop round trips from DCA. Several cities in the region would gain new one-stop service to DCA. United asserts that it can reach 54 more communities than can Frontier. United argues that its proposed service will increase competition in multiple markets by expanding its network and the aircraft capacity in the DCA-DEN market. United can compete directly with Frontier, according to United. United also argues that its proposed service will not reduce travel options or increase travel delays. Finally, United concludes that granting its request is in the public interest because Denver is a major economic center, where United has a superior network.

On January 23, United filed consolidated comments. In those comments, United argues that it is the only non-incumbent applicant proposing to serve a western hub. United claims to have a more extensive network, more capacity, and a greater number of potential markets to offer than does any other applicant. United also notes an "incrementality" problem with incumbent slot exemption holders; those carriers that already received slot exemptions from the Department in the 2000 proceeding cannot claim to offer new network benefits of the same magnitude that United can.

*Responsive Pleadings*
Numerous carriers commented on United's application. Carriers most commonly argued that United's proposal raises competition concerns because of its extensive service between Washington, DC, and DEN/SFO. Carriers also commonly note that awarding slot exemptions to a carrier in Chapter 11 bankruptcy would constitute unsound public policy. Numerous carriers point out that United's proposed network benefits are illusory because service to DEN and SFO is duplicated by other carriers, duplicative of service that United can offer from its hubs within the perimeter, and because international connections, backhaul, and local traffic complicate United's proposal to serve SFO. In other isolated comments, carriers assert that United is not the best choice for a beyond-perimeter award because: (1) its proposal to serve SFO benefits fewer passengers than do other proposals to serve LAX; (2) it is not a new entrant; and (3) it has no incentive to aggressively promote DCA-DEN/SFO service.

**I. US Airways, Inc. ("US Airways")**

US Airways has requested eight (8) slot exemptions to establish two new nonstop round trips to Luis Muñoz Marín International Airport in San Juan, Puerto Rico ("SJU") and two new nonstop round trips to SFO.

*Arguments in Support*
In general support of its application, US Airways notes that the Department has awarded beyond-perimeter slot exemptions to major incumbents such as Delta, and that the Department has considered substantial route networks in making its route selections. As a new entrant carrier when it comes to operating beyond-perimeter service, US Airways argues that the Department should give priority to those carriers prohibited from operating beyond-perimeter service. The airline claims to be able to offer substantial

consumer network benefits if it were awarded beyond-perimeter slot exemptions, among them service to/from 42 communities. US Airways touts its foresight in developing a strong network at DCA prior to, and especially after, September 11.

Regarding its proposed service to **SJU**, US Airways argues that its proposed service will enhance competition by injecting a major third competitor to the daily nonstop Washington-Puerto Rico market. Besides building its growing Caribbean network, US Airways asserts that new service to SJU will provide code-share connections to 12 total destinations, including domestic destinations such as St. Thomas and St. Croix in the U.S. Virgin Islands. Those beyond-SJU destinations will be able to connect, on a one-stop basis, to 33 destinations in the continental U.S. US Airways also argues that its proposed service would not reduce travel options or increase travel delays.

Regarding its proposed service to **SFO**, US Airways argues that its proposed service to SFO, a first-ever scheduled nonstop service, will save time and provide consumers and shippers with additional options to important regions of the country. Using a simplified fare structure, and maximizing consumer choice and connecting opportunities, US Airways believes it can compete vigorously with other Washington-Bay Area services, including those of JetBlue and Southwest Airlines. US Airways asserts that numerous small and large communities will enjoy connecting service through code-share partners. With additional slots exemptions to SFO, US Airways can improve the value and operation of its mainly East Coast network, more effectively serving West Coast communities than it could through its within-perimeter hubs in Pittsburgh, Philadelphia, and Charlotte. US Airways also argues that its proposed service would not reduce travel options or increase travel delays.

On January 23, US Airways filed consolidated comments. In those comments, US Airways argues that it is the only non-incumbent applicant proposing new service with significant network benefits. US Airways claims to be a new entrant for the purposes of this beyond-perimeter slot exemption proceeding. US Airways points to its large capacity aircraft and ability to draw passengers from behind DCA.

*Responsive Pleadings*
Numerous carriers commented on US Airways' application. Carriers most commonly argued that US Airways is the largest slot holder at DCA. With respect to its proposal to serve SJU, many carriers note a lack of network benefits and a small local market. With respect to its proposal to serve SFO, many carriers note that SFO is the hub of US Airways' code-share partner United, and US Airways has no on-line connections there. In other isolated comments, carriers assert that US Airways is not the best choice for a beyond-perimeter award because: (1) it is not a low-fare carrier; (2) it is not financially sound; and (3) it can serve its proposed destinations through its within-perimeter hubs.

**Answer of the Utah and Salt Lake City Parties**

On January 23, the State of Utah, the Mayor of Salt Lake City, the Salt Lake Chamber, Salt Lake City Department of Airports and the Utah Air Travel Commission jointly filed

an answer. The parties support the application of Delta. The parties believe that Delta's application provides the most significant new and improved service benefits to the traveling public.

**DECISION**

**A. Summary**

We have decided on the following selections: Alaska for two slot exemptions for nonstop service to Seattle and two slot exemptions for nonstop service to Los Angeles; America West for two slot exemptions for nonstop service to Phoenix; Frontier for four slot exemptions for nonstop service to Denver; and United for two slot exemptions for nonstop service to Denver. In making our decision, we have carefully reviewed the applications and responsive pleadings, and conclude that service to these communities by these carriers best meets the applicable statutory criteria and creates the greatest public benefits.

**B. Statutory Criteria**

To award beyond-perimeter slot exemptions, the Department must find that an applicant meets all four criteria enumerated by § 41718(a). First, under (a)(1), we must find that an award of slot exemptions will provide domestic network benefits beyond the perimeter. Second, under (a)(2), we must find that an award of exemptions will increase competition by new entrant carriers or in multiple markets. This second criteria is disjunctive; the Department may consider the impact on competition by carriers with *either* new entrant status *or* an ability to serve multiple markets, *or both*. Third, under (a)(3), we must ensure that an award of exemptions would not reduce travel options for communities served by small hub airports and medium hub airports within the perimeter. Fourth, under (a)(4), the exemptions granted must not result in meaningfully increased travel delays.

Congress did not provide any specific guidance as to the weight we should assign among these criteria in our decisional process. Because we find that each of the proposals would not reduce travel options for communities served by small and medium hub airports within the perimeter under (a)(3)[13] and would not result in meaningfully increased travel

[13] Under (a)(3), we must ensure that an award of exemptions would not reduce travel options for communities served by small hub airports and medium hub airports within the perimeter. In our earlier decisions, we concluded that Congress sought to ensure that new services provided though the AIR-21 exemptions would not displace or disrupt existing services at small or medium hubs. Order 2000-7-1 at 20 (July 5, 2000); Order 2001-6-20 at 7 (June 22, 2001); Order 2002-11-20 at 6 (Nov. 27, 2002). In our view, no party has raised a legitimate concern that any of the proposed applications would produce this result. The Department rejects Delta's argument that America West should be precluded from an award of slot exemptions based on past service reductions in Columbus, Ohio. We find no evidence that America West's actions in Columbus were connected to its operation of slot exemptions at DCA. Similarly, we have no basis upon which to conclude that an award of new slot exemptions to America West would cause a reduction of services within the perimeter.

delays under (a)(4),[14] we affirm our previous statements that the determinative criteria for the allocation of beyond perimeter slot exemptions are those involving network benefits and increased competition by new entrants or in multiple markets under (a)(1) and (a)(2). *See* Order 2000-7-1 at 20 (July 5, 2000); Order 2001-6-20 at 7 (June 22, 2001); Order 2002-11-20 at 6 (Nov. 27, 2002).

As between (a)(1) and (a)(2), we conclude that the Department can best meet Congress' direction by awarding slot exemptions to carriers that can provide the greatest network benefits beyond the perimeter, and that have little or no presence at DCA *and* offer competitive benefits in multiple markets. In practical terms, carriers meeting all elements of the statutory criteria – the domestic network benefits of (a)(1) and both the 'new entrant' and 'multiple markets' element of (a)(2) – will likely demonstrate the greatest public benefits. Carriers that can demonstrate domestic network benefits will logically be able to offer benefits in multiple markets. Carriers that can demonstrate domestic network benefits and new entrant status further increase the number of competitive benefits at DCA and beyond by injecting a new competitor into the relevant markets. Moreover, where new entrants operate their only hubs and focus cities beyond the perimeter, they lack the slot holdings to effectively connect their networks to DCA. Granting exemptions to such carriers can, in many cases, facilitate one-stop service to DCA from beyond-perimeter points, delivering further competitive benefits to underserved communities across the country.

Our approach has been consistent over time. In Order 2000-7-1, we chose service opportunities by new competitors over existing carriers at DCA because we determined that this course would produce a greater competitive impact than would additional service by the larger DCA incumbents, thereby best satisfying the statutory objective of increasing competition. *See* Order 2000-7-1 at 20-21 (July 5, 2000). In Order 2001-6-20, in the process of reallocating slot exemptions that had been returned to the Department, we determined that Alaska best met the statutory criteria because it most successfully combined domestic network benefits with enhanced competition as a result of new entrant status. *See* Order 2001-6-20 at 8 (June 22, 2001). In Order 2002-11-20, the Department again sought to reallocate slot exemptions that had been returned. After having given primary consideration to new entrants in two prior proceedings, involving the same pool of AIR-21 slot exemptions, we determined that Delta, even though it was not a new entrant, best met the statutory criteria. We found that Delta could provide

[14] Under (a)(4), we must ensure that an award of exemptions would not result in meaningfully increased travel delays. The General Accounting Office, in 1999, found that additional operations at DCA would not cause significant delays. The Federal Aviation Administration later concluded that 24 additional operations at DCA, spread out over the entire slot-controlled period to comply with the statutory limitation of no more than two additional operations per hour, would not meaningfully increase travel delays at DCA. *See* Order 2000-7-1 at 21 (July 5, 2000); Order 2001-6-20 at 8 (June 22, 2001); Order 2002-11-20 at 7 (Nov. 27, 2002). Although our past conclusions were drawn from an analysis of 12 total beyond-perimeter exemptions, no party contended – and no evidence in the docket exists to show – that 12 additional slot exemptions would meaningfully increase travel delays at DCA or anywhere else in the U.S. aviation system. To the contrary, each applicant stated that its proposed services would have no appreciable affect on travel delays.

superior network benefits and could increase competition by adding capacity in multiple markets. *See* Order 2002-11-20 at 8-9 (Nov. 27, 2002).

In this proceeding, the Department performed qualitative and quantitative analysis to gauge the network benefits and competitive impact offered by each applicant under (a)(1) and (a)(2). Our analysis focused on the potential number of online single connection markets that could be served via the applicants' proposed points, the size of those potential connecting markets, the extent to which the applicants already competitively serve those potential connecting markets via their existing service at DCA, and the applicants' status as a new entrant or incumbent. We applied this analysis carefully to the pleadings and found that applicants typically stressed their comparative strengths under one or the other of (a)(1) or (a)(2), depending upon the size of their hubs and presence at DCA. Those with the strongest presence at DCA highlighted the scope and size of their respective networks and the competitive benefits that could be brought to multiple markets via those networks (American, Delta, United, and US Airways). Applicants with little or no presence at DCA (Alaska, Aloha, America West, Frontier, and Primaris) stressed the competitive benefits afforded by their new entrant or limited incumbent status, coupled with their ability to discipline multiple markets with low fares and network benefits. The applicants in this latter group of carriers argued that, even though their networks might be smaller, enhancement of their presence at DCA would create a stronger competitive impact than an award to the more established DCA incumbents.

Using this analysis, and following § 41718(a), we find that Frontier, Alaska, and America West fully meet the requirements of the statute by offering substantial domestic network benefits beyond the perimeter under (a)(1) and increasing competition as new entrants *and* in multiple markets under (a)(2). These carriers stand out from the rest in this respect. Aloha and Primaris, although they are new entrants, do not satisfy the statutory criteria to the same degree. We find that Aloha offers far fewer domestic network benefits than Frontier, Alaska, America West, and United, and thus cannot increase competition in the same multiple of markets. We find also that it is not in the public interest to award slot exemptions to Primaris based on its status as a carrier without effective authority from the Department or FAA.

The Department further finds that the competitive benefit of granting additional frequencies to Frontier, Alaska (in the case of Seattle) and America West on routes that they already serve nonstop from DCA is greater than if we only granted new frequencies to incumbent carriers. The reason is that the incumbent carriers in this proceeding can, in many cases, already offer DCA travelers numerous connecting opportunities via their within-perimeter hubs, often with multiple frequencies per day, and in particular to large beyond markets. Frontier, Alaska, and America West each have only limited slot exemptions, enabling them to offer, at most, three round trips per day and limited connecting opportunities in their DCA markets. As frequency of service and schedule convenience is a major driver of airline choice, the Department believes an award of additional frequencies will have a large impact on competition for DCA passengers. Also, Frontier, Alaska, and America West each operate their only hubs and focus cities beyond the perimeter. Thus, unlike the incumbents that possess inherent frequency and

flexibility advantages with respect to the DCA market by virtue of their within-perimeter hubs, these new entrant carriers cannot otherwise provide the same level of networked service to points beyond.

We gave the same careful consideration to American, Delta, United, and US Airways, all of whom are incumbents at DCA. While § 41718(a) specifically mentions new entrants, we have never found that it precludes incumbent carriers from being awarded beyond-perimeter slot exemptions. In fact, an incumbent carrier offering strong domestic network benefits that could increase competition in multiple markets meets the demands of § 41718(a)(1) and (a)(2). We so found in Order 2002-11-20, where we awarded Delta two AIR-21 slot exemptions to serve its Salt Lake City hub. *See* Order 2002-11-20 (Nov. 27, 2002). In this Order, we find that the incumbent carriers submitted meritorious proposals demonstrating a range of domestic network benefits and abilities to increase competition in multiple markets. We find that United meets the requirements of § 41718(a) and deserves an award of two slot exemptions for service to its hub in Denver. United's application, as explained further below, demonstrates unrivaled network benefits and a pro-competitive effect in multiple markets beyond Denver.

**C. Awards**

We conclude that **Alaska** merits an award of four exemptions. Alaska's status as a new entrant/limited incumbent will have a positive effect on competition at DCA and in multiple markets beyond its hub in Seattle and focus city in Los Angeles. Alaska has a proven track record of providing domestic network benefits in DCA origin and destination markets; since Alaska began service at DCA, nearly half of its DCA origin and destination traffic has been in connecting markets.

In the case of its Seattle hub, Alaska could provide single connection service from DCA to as many as 38 domestic points, both large and small. Alaska plans to offer single-plane continuing service to Fairbanks and Juneau (seasonally), which would provide more convenient travel options for passengers in markets that are among Alaska's largest DCA origin and destination markets.

In the case of Los Angeles, Alaska could provide online single connection service from DCA to as many as 17 domestic points. While this is less than half the number of destinations Alaska could serve via Seattle, they account for more than three-fourths of the total traffic in Alaska's beyond-Seattle connecting markets, since many of these beyond-Los Angeles destinations are large cities.[15] While there is overlap between the connecting markets that Alaska could serve over Seattle and Los Angeles, passengers would benefit from an alternative competitive nonstop choice to DCA on Alaska. *See* Order 2000-7-1 at 21 (July 5, 2000). Furthermore, connections to many of the destinations Alaska could serve via both Los Angeles and Seattle, such as major cities in California, would be less circuitous if routed over Los Angeles rather than Seattle, making those services more attractive competitive options. In many cases, Alaska serves those destinations with more frequency in Los Angeles versus Seattle, thereby increasing

[15] Source: DOT DB1B data, for the year ended third quarter 2003.

the opportunity for more timely connections. There are also a couple of smaller cities that Alaska does not serve out of Seattle but does serve out of Los Angeles that would receive new online single connection service from DCA.

Since our 2002 proceeding, Alaska has improved its services at Los Angeles. Besides adding its own service to Reno, Nevada, and code-share service to San Jose, California, Alaska has expanded its marketing alliance with American (which has a large presence at Los Angeles), invested in new facilities and equipment at LAX, and launched additional nonstop transcontinental services. The Department believes that Alaska's growing network and future potential at LAX, combined with its status as a new entrant/limited incumbent and successful operator of two DCA slot exemptions, overshadow any perceived reliance on local market passengers in Los Angeles. *See* Order 2000-7-1 at 23 (July 5, 2000); *cf.* Orders 2001-6-20 at 11 (June 22, 2001) (awarding service to a community other than Los Angeles on the grounds that the carriers proposing Los Angeles service either held a dominant position at LAX or were unable to offer significant domestic network benefits) and 2002-11-20 at 7 (Nov. 27, 2002) (stating that the Department cannot award slot exemptions based only on the size of the local market).

We are not persuaded by the comments opposing an award to Alaska. Carriers most commonly argued that Alaska's choice of aircraft – a B737-700 configured to seat 120 passengers – provides less capacity than other proposals. However, in this instance, the Department will not deny slot exemptions to Alaska solely on this basis. Any lack of capacity is outweighed by the potential domestic network benefits and increased competition that Alaska offers. *See* Order 2001-6-20 at 9, footnote 5 (June 22, 2001) (discussing the Department's view of capacity, and in particular, its view of Frontier's and Alaska's fleet). We note that Alaska indicated in its application that it plans to eventually increase capacity by upgrading to a B737-900 with 172 seats on the DCA-Los Angeles route.

We conclude that **America West** merits an award of two exemptions. America West's status as a new entrant/limited incumbent, price competitor, and successful operator of DCA slot exemptions will have a positive effect on competition at DCA and in multiple markets in the West. America West operates a very strong hub in Phoenix. In the case of Phoenix, America West could provide single connection service from DCA to as many as 38 domestic points, both large and small. The beyond points that America West could serve via Phoenix account for the second highest passenger total of any limited incumbent proposal (slightly less than Frontier).[16]

We are not persuaded by the comments opposing an award to America West. Carriers most commonly noted that America West should be precluded from further awards because it holds the most beyond-perimeter exemptions of any carrier and cannot offer new network benefits. The Department recognizes the fact that America West holds and operates six slot exemptions from the 2000 proceeding, but we believe that the statutory criteria require us to consider incumbency in a broader context. Even with its new allocations, America West remains a limited incumbent, but it is one that can serve

[16] Source: DOT DB1B data, for the year ended third quarter 2003.

multiple markets competitively. Although it has six beyond-perimeter slot exemptions, the Department believes that the competitive benefit of granting an additional frequency to America West is still higher than it would be if we granted frequencies to carriers that in many cases already offer DCA travelers numerous connecting opportunities to the destinations beyond their proposed points via their within-perimeter hubs. At the same time, an award of additional frequency will make America West's still comparatively limited DCA service pattern more competitive with incumbent carriers that, in many cases, offer travelers many more frequencies in these beyond-Phoenix markets with their existing DCA services. Finally, based on the circumstances in this proceeding, the Department rejects the argument that America West's choice of aircraft should preclude it from being awarded slot exemptions.

We conclude that **Frontier** merits four exemptions for service to Denver. Frontier is a new entrant/limited incumbent with a record as a low-fare competitor that will help discipline the multiple markets that it serves via its Denver hub. Frontier's network in Denver is already strong and is expanding. The Department estimates that Frontier could provide single connection service from DCA to as many as 45 domestic points, both large and small, via Denver. In comparison to other limited incumbent applicants, the airline offers the largest number of potential online single connection destinations, and these markets combine to account for the most origin and destination traffic of any other connecting point proposed by a limited incumbent.[17] Like Alaska, Frontier has a proven track record of providing domestic network benefits in DCA origin and destination markets; since Frontier began service at DCA, nearly 40 percent of its origin and destination traffic has been in connecting markets.

No party to this proceeding disputes Frontier's new entrant/limited incumbent status or its capacity to offer substantial network benefits out of Denver. However, carriers most commonly noted that Frontier already received two slot exemptions in the 2000 proceeding, and, therefore, proposed no new network benefits. We disagree with that logic, as we have discussed above. Carriers also argued that Frontier could not provide sufficient capacity to merit slot exemptions, since it proposes to use an A319 aircraft, with seating for 132 in a single-class configuration. The Department does recognize capacity as an important part of enhancing competition, but will not, in this instance, deny slot exemptions to Frontier solely on this basis. Any lack of capacity is outweighed by the potential domestic network benefits and increased competition that Frontier offers. *See* Order 2001-6-20 at 9, footnote 5 (June 22, 2001) (discussing the Department's view of capacity, and in particular, its view of Frontier's and Alaska's fleet).

We conclude that **United**, even though it is not a new entrant/limited incumbent, merits an award of two exemptions for service to Denver. United's application wins our approval based on the strength of its network and ability to increase competition by adding capacity and new one-stop connections to DCA in multiple markets. *Cf.* Order 2002-11-20 (Nov. 27, 2002) (awarding slot exemptions to Delta for service to its western hub, SLC, based on strong network benefits and the ability to increase competition in multiple markets). The Department's action to grant two exemptions to United ensures

[17] Source: DOT DB1B data, for the year ended third quarter 2003.

that many new beyond points in the West are served by more than one competitor, with more than one service option to DCA. Specifically, we note that our award will provide competition with Frontier in the DCA-Denver and beyond markets.

With respect to domestic network benefits, United could provide single connection service from DCA to as many as 68 domestic points via Denver, the most points of any applicant. Although 17 of the 68 points are already served on a one-stop basis via United's within-perimeter hub at Chicago O'Hare, the Department finds that many new destinations are served via Denver, with substantial traffic to support an award of nonstop service to DCA.

With respect to competition by new entrants or in multiple markets, we find that United's ability to serve multiple markets – including many new markets without single connection service to DCA – will enhance competition in the markets involving DCA and areas beyond the perimeter. The Department emphasizes that, having zero slot exemptions in its portfolio, United is currently unable operate nonstop DCA-Denver service. United's only destination out of DCA is Chicago O'Hare, and we find that a beyond-perimeter award will help to discipline western markets through increased competition.

Under the present circumstances, we are not persuaded by the comments opposing an award to United for service to Denver. Carriers most commonly noted United's dominant presence in Denver and its extensive Washington-Denver service. Although the Department does consider the impact on competition that comes from a carrier's position in a given community and a given market, we must also consider the size and reach of a carrier's network in that community. In the case of Denver, the domestic network benefits offered by United at its Denver hub rival those of all applicants in this proceeding – yet, while we frequently look to low-fare competitors, new entrants or other limited incumbents to bolster competition, we believe United's presence will increase competition in the multiple markets that it serves via Denver. Additionally, while the Department believes it is significant that United serves Denver with multiple frequencies from Washington Dulles, we must also recognize the uniqueness of service to DCA, existing DCA-Denver nonstops operated by Frontier, and the fact that United is not otherwise able to offer nonstop service to that market from its Denver hub. Lastly, Alaska and American argued that it would constitute poor public policy to award slot exemptions to United while it is operates in bankruptcy. We disagree, and decline to consider United's status under the bankruptcy code for the purposes of this slot exemption proceeding. United is a fully operating carrier, with effective authority from the Department and FAA, and can thus be considered for slot exemption awards. The Department must consider the public benefits that could be created by awarding slot exemptions to United. In this instance, we believe nonstop service to United's hub in Denver offers substantial public benefits.

### D. Other Applications

***Aloha's*** application, emphasizing the airline's new entrant status, demonstrated that it could bring competitive benefits to DCA and beyond markets. Aloha is correct to note that the Department has emphasized the measurable competitive impact of granting new entrants slot exemptions at DCA. Besides new entrant status, Aloha offers the additional benefits of attractive in-flight amenities and single-plane service to Honolulu. The Department is concerned, however, that Aloha does not offer the kind and quality of domestic network benefits via Orange County as other applicants have offered in this proceeding. We note that Aloha could only offer single connection service to, at most, five points.

***American's*** application has merit. In particular, the Department recognizes American's commitment to improving domestic network benefits in Los Angeles and its ability to serve DCA with large capacity Stage 3 jets. However, we find that American's application constitutes a weaker mix of network benefits and increased competition in multiple markets than proposed by other applicants. American applied for exemptions only to Los Angeles, where it has a large presence in market share, but where it offers fewer online single connection markets than Alaska. Importantly, of the 13 points that American could potentially offer DCA travelers on a one-stop basis, eight may already be reached via one or more of its within-perimeter hubs. We also note that American is not a new entrant/limited incumbent or low-fare price competitor.

***Delta's*** application builds largely on its successful track record of operating DCA slot exemptions to Salt Lake City. The Department recognizes the benefit to consumers and beyond-perimeter passengers that additional frequencies could have – among them, increasing the reach, convenience and competitiveness of Delta's Intermountain West network. However, we find Delta's proposal to add frequency at Salt Lake City – when it simultaneously maintains several within-perimeter hubs – less compelling than the proposals of other applicants. We also note that Delta is not a new entrant/limited incumbent or low-fare competitor.

***Primaris's*** application proposes to introduce a premium, business-class service in medium- and long-haul routes at "comparatively" low fares in high volume O&D markets. We fully recognize that Primaris would be a new entrant, if not for its current status as a carrier without effective certificate authority from the Department or FAA.[18] Under these circumstances, we are reluctant to take the extraordinary step of granting slot exemptions to Primaris when its certification by the FAA is still pending, as is its final fitness certification. *See* Order 98-4-22 at 24 (April 21, 1998) (denying LaGuardia slot exemptions to AccessAir on the grounds that it did not have effective authority from the Department or FAA). We therefore find that it is not in the public interest to award slot

---

[18] Although Primaris was found fit to engage in interstate scheduled air transportation by Order 2003-9-19 (Sept. 24, 2003), the effectiveness of that authority is conditioned upon the carrier's providing the Department with evidence that it has received its FAA Air Carrier Certificate and that it has available to it sufficient financial resources to meet the Department's financial fitness criteria. To date, Primaris has not filed such evidence.

exemptions to Primaris. Order 99-9-11 (Sept. 16, 1999), which Primaris cites in support of its application, is inapposite. Among other differences, there were no competing applications for the slot exemptions in that proceeding. We also note that Primaris is not a network carrier, thus at the outset it cannot argue a strong case for providing domestic network benefits, even with future code-share agreements. On the date of its application, Primaris demonstrated no network benefits in Los Angeles. Furthermore, its capacity is less than other carriers due to its all-business class configuration.

***US Airways'*** application offers substantial capacity and service to new beyond-perimeter cities. However, we find that US Airways is clearly the dominant carrier at DCA, which weighs against it on § 41718(a)(2). In the case of San Francisco, US Airways could provide online connection service from DCA to as many as 20 domestic points. However, eight of those 20 points are already served one-stop from DCA via one or more of US Airways' within-perimeter hubs and/or via code-share with United, via United's within-perimeter hub at Chicago O'Hare. The eight points account for 88 percent of the total traffic generated in the 20 total potential connecting markets. In the case of San Juan, the Department finds that there are almost no network benefits; the additional beyond-perimeter points available via San Juan are already served on a single connection basis via US Airways' within-perimeter hubs. We also note that US Airways is not a low-fare competitor.

**CONDITIONS**

**A. Start-up**

We will require that the awardees inaugurate full service within 90 days of the date on which the Department allocates slot times. If, for any reason, an awardee is not able to use the slot exemptions awarded, we request that it notify the Department as soon as possible, but not later than 30 days after the date of service of this order, so that we can reallocate them.

**B. Assignment of Slot Times**

We are directing Frontier, Alaska, America West, and United to file in the Docket no later than seven business days from the service date of this Order, their proposed flight schedules and effective dates for inauguration of operations authorized by this Order.

As we stated in our Notice of December 22, 2003, 49 U.S.C. § 41718(c)(2) allows us to assign only one additional slot exemption per one-hour period, an increase from the original two per hour authorized in AIR-21. The Department will evaluate the assignment of slot times for both the within- and beyond-perimeter slot exemptions as one "pool." Because many one-hour periods are likely to be over-subscribed, we may not be able to accommodate carrier requests for slot exemption times. There are 15 hourly periods beginning at the 0700 period and ending at the 2100 period and a total of 44 slot

exemptions must fit into those 45 slot times.[19] Thus, under both AIR-21 and Vision 100, the following slot times are available: 0700 (two available), 0800 (one available), 0900 (one available), 1000 (two available), 1100 (three available), 1200 (two available), 1300 (three available), 1400 (one available), 1500 (one available), 1600 (one available), 1700 (one available), 1800 (one available), 1900 (one available), 2000 (two available), 2100 (one available). In instances where carriers granted slot exemptions in the instant proceedings have conflicting requested scheduled times, the Department can be expected to give priority to those carriers with the least flexibility provided by current DCA slot and slot exemption holdings. Moreover, given their longer stage lengths and flight times as well as the requirement for network benefits at § 41718(a)(1) that may require that their DCA slot times be conducted with connecting banks, beyond-perimeter services may have less scheduling flexibility and merit a priority over within-perimeter services. In applying for specific times, applicants granted slot exemptions should be prepared to justify their requests. Applicants should keep these constraints in mind prior to submitting any schedules and should understand that these slot-time constraints may cause some proposals not to be viable. In coordination with Federal Aviation Administration's Slot Administration Office, we shall assign slot times corresponding with the authority granted in these proceedings in a notice subsequent to our decision.

Thereafter, the awardees may request the FAA Slot Administration Office to approve temporary exchanges of the assigned slot exemptions times with other slots or slot exemptions for the purpose of conducting the operations authorized by this Order in a different hour. In acting on such a request, the FAA will employ standard practices in conjunction with applicable statutory and regulatory requirements for the utilization of slot times between and among individual air carriers. Regardless of subsequent approved slot time exchanges, the slot times assigned by the Department or the FAA's Slot Administration Office pursuant to this Order will be tagged such that, if any of the service granted by this Order is suspended or is not inaugurated in a timely manner, the Department will withdraw the slot exemptions based on their tagged slot time rather than by any subsequent slot time operated.

**ENVIRONMENTAL ISSUES**

Although 49 U.S.C. §41718(e) specifically exempts our action here from review under the National Environmental Policy Act,[20] we remain sensitive to the environmental impact of increased operations at DCA. Consistent with the statute, we will require that all operations authorized by this order will be conducted with Stage 3 aircraft. Also,

---

[19] AIR-21 authorized 24 DCA slot exemptions and Vision 100 authorized an additional 20 slot exemptions. As our Notice of October 22 states, the AIR-21 times allocated for the Corporate Airlines' DCA service in the within-perimeter proceeding are in the 1000 and 1100 hour period, and these times will be available. There are times available at the 0700, 1100, 1200, 1300 (two openings available), and 2000 hour periods based on the previous AIR-21 slot times assigned in previous proceedings. Additionally, the Vision 100 legislation increased the amount of permissible operations per hour at DCA by one.

[20] Section 41718(e) states, "Neither the request for, nor the granting of an exemption, under this section shall be considered for purposes of any Federal law a major Federal action significantly affecting the quality of the human environment."

under 49 U.S.C. § 47117(e), the Department will give DCA priority in making grants for airport noise compatibility planning and programs.

**ADMINISTRATIVE TERMS**

As the FAA slot regulation makes clear, "slot(s) do not represent a property right but represent an operating privilege subject to absolute FAA control (and) slots may be withdrawn at any time to fulfill the Department's operating needs . . . ." 14 C.F.R. § 93.223(a). Moreover, under the provisions of 49 U.S.C. § 41714(j), these carriers may not sell, trade, transfer, or convey the operating authorities granted by the subject exemptions unless otherwise authorized herein.

Further, granting of these exemptions in no way is to be construed as allowing a carrier to operate services that it could not otherwise operate. Each of the awardees must still meet all the requirements of the Department of Transportation, the Federal Aviation Administration, and all other statutes and regulations governing air transportation.

This order is issued under authority delegated in 49 C.F.R. § 1.56(a).

**ACCORDINGLY,**

1. The Department grants slot exemptions from 14 C.F.R. Part 93, Subparts K and S, to Alaska Airlines, Inc. (two slot exemptions to serve Seattle-Tacoma International Airport and two to serve Los Angeles International Airport); America West Airlines, Inc. (two slot exemptions to serve Phoenix Sky Harbor International Airport); Frontier Airlines, Inc. (four slot exemptions to serve Denver International Airport); and United Air Lines, Inc. (two slot exemptions to serve Denver International Airport);

2. The Department directs Alaska Airlines, Inc., America West Airlines, Inc., Frontier Airlines, Inc., and United Air Lines, Inc. to file in Docket OST-2000-7181 no later than seven business days after the service date of this Order their proposed flight schedules and effective date for operations authorized by this Order. Further, Alaska Airlines, Inc., America West Airlines, Inc., Frontier Airlines, Inc., and United Air Lines, Inc. must commence their proposed service no later than 90 days after the date on which the Department allocates slot times pursuant to this Order. The slot exemptions granted must be conducted with Stage 3 aircraft, may not be used for operations between the hours of 10:00 p.m. and 7:00 a.m., and may not increase the number of operations at Ronald Reagan Washington National Airport in any one-hour period during the hours of 7:00 a.m. and 9:59 p.m. by more than three operations. These carriers are advised to exercise maximum flexibility in proposed operating times to ensure compliance with these limits;

3. The Department will make the final determination of slot times as soon as possible after the schedules are filed to enable the carrier to conduct the operations authorized by this Order. The Department directs the awardees to contact the FAA Slot Administration Office after the Department's determination of slot times. The FAA will

assign slot exemption numbers, effective dates, and operating times consistent with statutory limitations;

4. We grant all motions to file otherwise unauthorized documents;

5. Except as otherwise granted, we deny all other applications for exemptions from 14 C.F.R. Part 93, Subparts K and S, filed in this docket;

6. The authorities granted under these exemptions are subject to all of the other requirements delineated in 14 C.F.R. Part 93, Subparts K and S, including, but not limited to, the reporting provisions and use-or-lose requirements;

7. This docket will remain open until further order of the Department; and

8. We will serve this order on all interested parties and the Federal Aviation Administration Slot Administration Office.

By:

**KARAN K. BHATIA**
Assistant Secretary for Aviation
and International Affairs

(SEAL)

*An electronic version of this document will be made available on the World Wide Web at: http://dms.dot.gov/*

ORDER 2012-2-21
Served: February 24, 2012

**UNITED STATES OF AMERICA**
**DEPARTMENT OF TRANSPORTATION**
**OFFICE OF THE SECRETARY**
**WASHINGTON, D.C.**

---

**ESTABLISHMENT OF SLOT EXEMPTION PROCEEDINGS AT RONALD REAGAN WASHINGTON NATIONAL AIRPORT PURSUANT TO 49 U.S.C. § 41718**
**Docket DOT-OST-2012-0029**

---

## ORDER

On February 14, 2012, President Obama signed into law the FAA Modernization and Reform Act of 2012 (FAA 2012), Pub. L. No. 112-95. Section 414 of FAA 2012 directs the Department to grant a total of 16 additional slot[1] exemptions at Ronald Reagan Washington National Airport (DCA) for nonstop service between DCA and airports beyond the 1,250-mile perimeter. There are two categories for these new exemptions: eight are reserved for service to be provided by new entrant and limited incumbents, while the other eight are reserved for non-limited incumbent carriers up to a maximum of two each, the operation of which are conditioned upon the carrier's discontinuing use of an equivalent number of existing slots currently used for service between DCA and a large hub airport within the 1,250 mile perimeter of DCA.[2]

By this Order, we are requesting applications from new entrant and limited incumbent carriers[3] for the eight additional beyond-perimeter slot exemptions made available under 49 U.S.C. § 41718(g)(2). Because Section 414 requires the Department to grant the exemptions not later than 90 days after enactment of FAA 2012, we must establish an expedited schedule for the application process. Accordingly, completed applications for any of these eight exemptions must be filed in **Docket DOT-OST-2012-0029** by March 12, 2012, and comments with respect to any such application are due March 27, 2012.

**NOTE: Docket DOT-OST-2000-7181 was earlier established for beyond-perimeter DCA slot exemption matters. For this proceeding, a new docket has been established and filings shall be directed to DOT-OST-2012-0029.**

As to the remaining eight slot exemptions, FAA 2012 directs the Secretary to make these available to incumbent carriers qualifying for status as a non-limited incumbent carrier at DCA as of the date of enactment of the statute.[4] We have determined that four air carriers meet that description: American Airlines, Delta Air Lines, United Air Lines, and US Airways. Under FAA 2012, each of these carriers is entitled to operate up to a maximum of 2 of the newly authorized exemptions subject to the conditions set forth in 49 U.S.C. § 41718(g).[5]

---

[1] A slot is a reservation for an instrument flight rule takeoff or landing. Therefore, two slots are required to operate a round trip. 49 U.S.C. § 41714(h)(4). A slot exemption is an exemption from the slot limitations in the Federal Aviation Administration's High Density Rule, 14 CFR Part 93, subparts K and S.

[2] The first eight are governed by the conditions set out under 49 U.S.C. § 41718(g)(2) as added by section 414, while the second eight are governed by the conditions set out in 49 U.S.C. § 41718(g)(3).

[3] See also 14 CFR §§ 93.213 (a)(5), 93.223 (c), and 93.225 (h), and 49 U.S.C. § 41714(h), as amended by FAA 2012.

[4] 49 U.S.C. § 41718(g)(3).

[5] Under 49 U.S.C. § 41718(g)(3)-(5), the use of the exemptions are conditioned upon, among other things, that the incumbent carrier (1) discontinue the use of a slot for service between DCA and a large hub airport within the perimeter and operate, in place of such

We therefore grant these exemptions by this Order; the operation of these exemptions are subject to these conditions as well as to all other applicable requirements in 14 CFR subparts K and S, including the slot use or lose provisions.

With the creation of these sixteen beyond-perimeter DCA slot exemptions, a total of 40 take-offs or landings at DCA for service beyond 1,250 miles have been authorized by law.[6]

This Order provides information to U.S. and Canadian air carriers regarding these exemptions.

**Recent Developments**

FAA 2012, among other things, made several significant changes to laws regarding slot and slot exemptions at DCA, and we briefly summarize the most significant changes below.

First, as discussed above, the legislation directs the Secretary to grant 16 additional beyond-perimeter slot exemptions. Of those, eight are to be granted to limited incumbent/new entrant carriers to serve airports beyond the 1,250-mile perimeter, with the other eight reserved for non-limited incumbents to trade-in up to two inside-perimeter slots for two beyond-perimeter slot exemptions.

Second, three new criteria (E, F and G) have been added to those already in place for the Secretary to consider in deciding which FAA 2012 beyond-perimeter exemptions to grant to new entrant and limited incumbent carriers. These are: to enhance options for nonstop travel to and from the beyond-perimeter airports that will be served; to have a positive impact on the overall level of competition in the markets that will be served; and to produce public benefits, including lower fares, higher capacity, and a variety of service options. Below, under "Application Process," are the seven criteria verbatim from FAA 2012.

Third, none of the FAA 2012 beyond-perimeter slot exemptions may be used to operate multi-aisle or widebody aircraft.

Fourth, departures conducted by new entrants and limited incumbents utilizing the eight beyond-perimeter DCA slot exemptions (as well as previously authorized beyond-perimeter and within-perimeter slot exemptions) may not be scheduled between the hours of 10:00 p.m. and 7:00 a.m.

Fifth, operations conducted utilizing DCA slot exemptions may not increase the total number of operations at DCA in any 1-hour period between 7:00 a.m. and 9:59 p.m. by more than five operations. The existing hourly limit for operations conducted utilizing slot exemptions is three.

Lastly, Section 414(c) of FAA 2012 amended the definition of a Limited Incumbent Carrier by increasing the threshold of slots held or operated by an air carrier or commuter carrier, not including slot exemptions, slots

---

service, service between DCA and an airport located beyond the perimeter; (2) file a notice of intent with the Office of the Secretary of Transportation specifying the market to be served and the service to be discontinued; (3) not operate a multi-aisle or widebody aircraft in conducting such beyond-perimeter service; (4) not transfer the rights to its beyond-perimeter exemptions pursuant to Section 41714(j), and (5) if utilizing an exemption under this section for an arrival permitted between the hours of 10:01 p.m. and 11:00 p.m., discontinue use of an existing slot during the same time period the arrival exemption is operated.

[6] Of these 40 beyond-perimeter slot exemptions, 32 will have resulted in a net increase in DCA operations. The eight newly-created slot exemptions for non-limited incumbents correspond to a discontinuance of eight existing slot allocations. 49 U.S.C. § 41718(a), added by Section 231 of AIR-21, provided that the Secretary shall, subject to certain findings, grant 12 slot exemptions to air carriers for the provision of air transportation outside the 1,250-mile perimeter established for air transportation under 49 U.S.C. § 49109. By Order 2000-7-1, Order 2001-6-20, and Order 2002-11-20, the Department fully allocated these 12 beyond-perimeter slot exemptions. Vision 100 directed the Department to distribute an additional 12 DCA beyond-perimeter slot exemptions. By Order 2004-4-1, the Department fully allocated those 12 additional beyond-perimeter slot exemptions.

operated under certain fee-for-service arrangements for another carrier, or slots held under a sale and license-back financing arrangement with another carrier, from fewer than 20 to fewer than 40.[7]

**Application Process for New Entrant and Limited Incumbent Air Carriers**

The Department will consider applications and grant a total of eight DCA beyond-perimeter slot exemptions from new entrant and limited incumbent air carriers as made available by FAA 2012.[8] The statutory criteria[9] require that the granted exemptions will: (A) provide air transportation with domestic network benefits beyond the 1,250 mile perimeter; (B) increase competition in multiple markets; (C) not reduce travel options for communities served by small hub airports and medium hub airports within the 1,250 mile perimeter; (D) not result in meaningfully increased travel delays; (E) enhance options for nonstop travel to and from the beyond-perimeter airports that will be served; (F) have a positive impact on the overall level of competition in the markets that will be served; or (G) produce public benefits, including lower fares, higher capacity, and a variety of service options.

Applications for the eight beyond-perimeter slot exemptions must utilize single-aisle and narrowbody aircraft and must be filed in Docket DOT-OST-2012-0029 by March 12, 2012. Comments with respect to any timely filed request for the slot exemptions must be filed by March 27, 2012. We will also require applicants to submit a schedule for their proposed operations, including takeoff and landing times at DCA. In light of the limited time afforded by statute, the Department intends to proceed directly to a final decision regarding these eight exemptions.

**Exemptions Granted to Incumbent Carriers**

We hereby grant to incumbent carriers qualifying under 49 U.S.C. § 41718(g)(3) up to two exemptions for beyond perimeter use. The exercise of the exemptions is subject to the conditions set forth in the statute, and as required by 49 U.S.C. § 41718(g)(3)-(4), the incumbent carriers must file a notice of intent with the Office of the Secretary of Transportation that specifies the beyond perimeter destination to be served and the slots the carrier will discontinue using to serve a large hub airport located within the perimeter. The carriers should file their notices of intent in Docket DOT-OST-2012-0029.

Incumbent carriers are to contact the Federal Aviation Administration (FAA) Slot Administration Office for approval of the substitution and flight times.

**Scheduling Priority**

As a final matter, we note that Section 414 (b) of FAA 2012 allows us to assign two additional slot exemptions per one hour period (for a total of five), an increase from the three per hour authorized in Vision 100-Century of Aviation Reauthorization Act, P.L. 108-176. We anticipate multiple requests for the same slot periods, and therefore, may not be able to accommodate all requests for slot exemption times. There are 15 hourly periods beginning at 7:00 a.m. and ending at 9:59 p.m., and all slot exemptions must fit into those 75 slot times. In applying for specific times, applicants granted slot exemptions may be asked to specifically justify their requests. Applicants should keep these constraints in mind prior to submitting any proposals and should understand that these slot-time constraints may cause some proposals not to be viable. In coordination with FAA's Slot Administration Office, we shall assign slot times corresponding with the authority granted in these proceedings, and in accordance with the requirements of FAA 2012, in a notice subsequent to our decision.

---

[7] See 49 U.S.C. § 41714(h)(5).

[8] New entrant air carriers and limited incumbent air carriers may apply for any number of these eight slot exemptions.

[9] See Section 414 of FAA 2012.

**Environmental Issues**

Although 49 U.S.C. § 41718(e) specifically exempts our action here from review under the National Environmental Policy Act,[10] we remain sensitive to the environmental impact of increased operations at DCA. As required by statute, DCA slot exemptions must be operated by Stage 3 compliant aircraft, and these may not be multi-aisle or widebody in type. Also, under 49 U.S.C. § 47117(e), the Department will give DCA priority in making grants for airport noise compatibility planning and programs.

This Order is issued under authority delegated in 49 CFR 1.56(a).

**ACCORDINGLY**,

1. U.S. and Canadian air carriers qualifying as new entrants or limited incumbents under 49 U.S.C. § 41718(h)(3) and (5), as amended by FAA 2012, that are interested in applying for the eight additional beyond-perimeter slot exemptions made available under 49 U.S.C. § 41718(g)(2) are directed to file their applications in Docket DOT-OST-2012-0029 by March 12, 2012.

2. Comments with respect to any timely filed request are due March 27, 2012.

3. The Department grants two exemptions from 14 CFR Part 93, Subparts K and S, to each of American Airlines, Delta Air Lines, United Air Lines, and US Airways, incumbent carriers qualifying under 49 U.S.C. § 41718(g)(3) for beyond perimeter use. The exercise of the exemptions is subject to the conditions set forth in 49 U.S.C. § 41718(g), including that the incumbent carrier (a) discontinue the use of a slot for service between DCA and a large hub airport within the perimeter and operate, in place of such service, service between DCA and an airport located beyond the perimeter; (b) file a notice of intent with the Office of the Secretary of Transportation specifying the market to be served and the service to be discontinued; (c) not operate a multi-aisle or widebody aircraft in conducting such beyond-perimeter service; (d) not transfer the rights to its beyond-perimeter exemptions pursuant to 49 U.S.C. § 41714(j); and (e) if utilizing an exemption under this section for an arrival permitted between the hours of 10:01 p.m. and 11:00 p.m., discontinue use of an existing slot during the same time period the arrival exemption is operated.

The incumbent carriers should file their notices of intent in Docket DOT-OST-2012-0029.

4. We direct incumbent carriers acting pursuant to the exemptions granted in paragraph 3 to contact the Federal Aviation Administration (FAA) Slot Administration Office for approval of the substitution and flight times.

5. None of the FAA 2012 beyond-perimeter slot exemptions may be used to operate multi-aisle or widebody aircraft.

6. An air carrier granted a beyond-perimeter slot exemption under FAA 2012 is prohibited from transferring the rights to its beyond-perimeter exemptions pursuant to 49 U.S.C. § 41714(j).

---

[10] Section 41718(e) states, "Neither the request for, nor the granting of an exemption, under this section shall be considered for purposes of any Federal law a major Federal action significantly affecting the quality of the human environment."

7. The authority granted under these exemptions is subject to all of the other requirements delineated in 14 CFR Part 93, Subparts K and S, including the slot use or lose provisions.

8. This Order is effective immediately, and shall remain in effect until further order of the Department.

9. We may amend, modify, or revoke this Order at any time and without hearing.

10. We shall serve a copy of this Order on U.S. and Canadian air carriers, the Metropolitan Washington Airports Authority, and the FAA's Slot Administration Office.

By:

**SUSAN L. KURLAND**
Assistant Secretary for Aviation
and International Affairs

Dated: February 24, 2012

(SEAL)

*An electronic version of this document will be available on the World Wide Web at:*
*http://www.regulations.gov*

Order 2012-5-12
Served: May 14, 2012

**UNITED STATES OF AMERICA**
**DEPARTMENT OF TRANSPORTATION**
**OFFICE OF THE SECRETARY**
**WASHINGTON, D.C.**

Issued by the Department of Transportation
on the 14th day of May, 2012

| Applications of:<br><br>**AIR CANADA;**<br>**ALASKA AIRLINES, INC.;**<br>**FRONTIER AIRLINES, INC.;**<br>**JETBLUE AIRWAYS CORPORATION;**<br>**MN AIRLINES LLC d/b/a SUN COUNTRY AIRLINES;**<br>**SOUTHWEST AIRLINES CO.; and**<br>**VIRGIN AMERICA INC.**<br><br>For exemptions from 14 C.F.R. Part 93, Subparts K and S, pursuant to 49 U.S.C. § 41718(g), Special rules for Ronald Reagan Washington National Airport (beyond-perimeter slot exemptions), as added by Section 414 of the Federal Aviation Administration Modernization and Reform Act of 2012 | **Docket DOT-OST-2012-0029** |
|---|---|

## ORDER GRANTING BEYOND-PERIMETER SLOT EXEMPTIONS AT RONALD REAGAN WASHINGTON NATIONAL AIRPORT

### SUMMARY

By this Order, the Department grants two beyond-perimeter slot exemptions at Ronald Reagan Washington National Airport (DCA) to each of four new entrant or limited incumbent carriers, utilizing single-aisle Stage 3 aircraft, to operate a nonstop roundtrip as follows:

- Alaska Airlines, Inc. (Alaska) for service to Portland, Oregon;
- JetBlue Airways Corporation (JetBlue) to serve San Juan, Puerto Rico;
- Southwest Airlines Co. (Southwest) for service to Austin, Texas; and
- Virgin America Inc. (Virgin America) to serve San Francisco, California.

**Background**

On February 14, 2012, President Obama signed into law the FAA Modernization and Reform Act of 2012 (FAA 2012), Pub. L. No. 112-95. Section 414 of FAA 2012 amended Section 41718 of Title 49 U.S. Code by adding a subsection (g), *Additional Slot Exemptions,* which directs the Department to grant, not later than 90 days after enactment, eight slot[1] exemptions for nonstop service between DCA and airports beyond the 1,250-mile perimeter (known as "beyond-perimeter" slot exemptions) for service to be provided by new entrant and limited incumbents.[2]

By Order 2012-2-21(February 24, 2012), the Department requested applications from new entrant and limited incumbent carriers for the eight additional beyond-perimeter slot exemptions made available under 49 U.S.C. Section 41718(g)(2).[3]

This is the fifth allocation proceeding for beyond-perimeter slot exemptions at DCA. With the creation of these 16 additional exemptions,[4] a total of 40 takeoffs and landings for service beyond the 1,250-mile perimeter at DCA have been authorized by law.[5] Following the passage of the Wendell H. Ford Aviation Investment and Reform Act for the 21st Century (AIR-21), the Department awarded all 12 slot exemptions available under the law to America West Airlines, Inc. (America West), Frontier Airlines, Inc.

---

[1] A slot is a reservation for an instrument flight rule takeoff or landing. Therefore, two slots are required to operate a roundtrip. 49 U.S.C. § 41714(h)(4). A slot exemption is an exemption from the slot limitations in the Federal Aviation Administration's High Density Rule, 14 CFR Part 93, subparts K and S.

[2] Section 414(c) of FAA 2012 amended the definition of a limited incumbent carrier by increasing the threshold of slots held or operated by an air carrier or commuter carrier, not including slot exemptions, slots operated under certain fee-for-service arrangements for another carrier, or slots held under a sale and license-back financing arrangement with another carrier, from fewer than 20 to fewer than 40.

[3] Due to the timetable for decision established by statute, applicants were required to submit a schedule for their proposed operations, including takeoff and landing times at DCA.

[4] Section 414 of FAA 2012 also directed the Department to grant eight beyond-perimeter slot exemptions to incumbent carriers qualifying for status as a non-limited incumbent at DCA as of the date of enactment, up to a maximum of two each, the operation of which is conditioned upon the carrier's discontinuing use of an equivalent number of existing slots currently used for service between DCA and a large hub airport within the 1,250 mile perimeter of DCA See, 49 U.S.C. §§ 41718 (c)(2)(B); (g)(1), (3)-(5). The incumbent carriers meeting the Section 41718(g)(3) definition at DCA included American Airlines, Inc. (American), Delta Air Lines, Inc. (Delta), United Air Lines, Inc. (United), and US Airways, Inc. (US Airways). By Order 2012-2-21 (February 24, 2012), the Department granted the incumbent carriers qualifying under 49 U.S.C. Section 41718(g)(3) two exemptions for beyond perimeter use, subject to the conditions set forth in the statute, and as required by 49 U.S.C. Section 41718(g)(3)-(4) for daily nonstop roundtrips to three airports in California and one in Utah. American will discontinue one nonstop roundtrip to Dallas-Fort Worth International Airport and replace it with one nonstop roundtrip to Los Angeles International Airport, starting June 14, 2012. Delta will discontinue the use of two DCA slots for service to New York La Guardia, in order to operate an additional nonstop roundtrip to Salt Lake City International Airport beginning June 7, 2012. Beginning May 15, 2012, United will convert the use of two DCA slot exemptions by discontinuing one roundtrip to O'Hare International Airport and replacing it with a nonstop roundtrip to the San Francisco International Airport. US Airways will discontinue one nonstop roundtrip between DCA and Dallas-Fort Worth International Airport and, instead, provide one nonstop to the San Diego International Airport beginning June 8, 2012.

[5] Of these 40 beyond-perimeter slot exemptions, 32 will have resulted in a net increase in DCA operations. The eight newly-created slot exemptions for non-limited incumbents correspond to a discontinuance of eight existing within-perimeter slot allocations. 49 U.S.C. § 41718(a).

(Frontier), National Airlines, Inc. (National), and Trans World Airlines, Inc (TWA), for various nonstop services to communities beyond the perimeter. Order 2000-7-1 (July 5, 2000). In 2001, the Department reallocated two of the 12 slot exemptions to Alaska Airlines, Inc. (Alaska) after TWA returned its holdings during its bankruptcy and acquisition by another carrier. Order 2001-6-20 (June 22, 2001). In 2002, the Department reallocated two more of the slot exemptions to Delta Air Lines, Inc. (Delta) after National ceased operations at DCA. Order 2002-11-20 (November 27, 2002). Similarly, following the passage of Vision 100 - Century of Aviation Reauthorization Act, P.L. 108-176 (Vision 100), the Department awarded the 12 additional DCA beyond-perimeter slot exemptions that were made available under the law to: Alaska for single daily nonstop roundtrip service to both Seattle, Washington, and Los Angeles, California; America West for a daily nonstop roundtrip to Phoenix, Arizona; and Frontier for two daily nonstop roundtrips and United for one daily nonstop roundtrip to Denver, Colorado.[6]

As detailed in Order 2012-2-21, Section 414 of FAA 2012 directs the Department to consider seven criteria in awarding the eight additional DCA beyond-perimeter slot exemptions that have been created and made available to new entrant and limited incumbent carriers. We are directed to consider the extent to which the exemptions will: (A) provide air transportation with domestic network benefits beyond the 1,250 mile perimeter; (B) increase competition in multiple markets; (C) not reduce travel options for communities served by small hub airports and medium hub airports within the 1,250 mile perimeter; (D) not result in meaningfully increased travel delays; (E) enhance options for nonstop travel to and from the beyond-perimeter airports that will be served; (F) have a positive impact on the overall level of competition in the markets that will be served; or (G) produce public benefits, including lower fares, higher capacity, and a variety of service options.[7] The statutory amendments provide three new criteria for our

---

[6] See Order 2004-4-1.

[7] Section 41718 (g)(1)-(2) reads:

> (1) Increase in Slot Exemptions.—Not later than 90 days after the date of enactment of the FAA Modernization and Reform Act of 2012, the Secretary shall grant, by order 16 exemptions from—
>
> (A) the application of sections 49104(a)(5), 49109, and 41714 to air carriers to operate limited frequencies and aircraft on routes between Ronald Reagan Washington National Airport and airports located beyond the perimeter described in section 49109; and
>
> (B) the requirements of subparts K and S of part 93, Code of Federal Regulations.
>
> (2) New Entrants and Limited Incumbents—Of the slot exemptions made available under paragraph (1), the Secretary shall make 8 available to limited incumbent air carriers or new entrant air carriers (as such terms are defined in section 41714(h)). Such exemptions shall be allocated pursuant to the application process established by the Secretary under subsection (d). The Secretary shall consider the extent to which the exemptions will—
>
> (A) provide air transportation with domestic network benefits in areas beyond the perimeter described in section 49109;
>
> (B) increase competition in multiple markets;
>
> (C) not reduce travel options for communities served by small hub airports and medium hub airports within the perimeter described in section 49109;
>
> (D) not result in meaningfully increased travel delays;
>
> (E) enhance options for nonstop travel to and from the beyond-perimeter airports that will be served as a result of those exemptions;

consideration in making these awards (new subsections (E), (F) and (G)) and do not require that an application meet each of the seven criteria.

Because we find that each of the proposals would not reduce travel options for communities served by small and medium hub airports within the perimeter and would not result in meaningfully increased travel delays, we focus our analysis in this proceeding on the extent to which the applicants meet other statutory criteria.

## APPLICATIONS

As summarized below, the Department received applications from Air Canada, Alaska, Frontier, JetBlue, Southwest, MN Airlines LLC d/b/a Sun Country Airlines (Sun Country), and Virgin America. The entire public record for this proceeding, including proposals and reply comments, may be accessed online through the Federal Docket Management System at http://www.regulations.gov by doing a "search" on docket number DOT-OST-2012-0029.

### Air Canada

Air Canada has requested two slot exemptions in order to establish one daily nonstop roundtrip to Vancouver International Airport (YVR) utilizing Airbus A319 aircraft configured with 120 seats, including 14 in business class and 106 in economy.

*Arguments in Support*

Air Canada states that, as Canada's largest full-service airline, it is the first and only foreign carrier operating out of DCA.[8] The carrier argues that it has made a significant financial investment in securing slots at DCA and is committed to maintaining a presence

---

(F) have a positive impact on the overall level of competition in the markets that will be served as a result of those exemptions; or

(G) produce public benefits, including the likelihood that the service to airports located beyond the perimeter described in section 49109 will result in lower fares, higher capacity, and a variety of service options.

Prior to the 2012 amendment, the pertinent provision in Section 41718 read:

(a) The Secretary shall grant, by order, 24 exemptions from the application of sections 49104(a)(5), 49109, 49111(e), and 41714 of this title to air carriers to operate limited frequencies and aircraft on select routes between Ronald Reagan Washington National Airport and domestic hub airports and exemptions from the requirements of subparts K and S of part 93, Code of Federal Regulations, if the Secretary finds that the exemptions will—

(1) provide air transportation with domestic network benefits in areas beyond the perimeter described in that section;

(2) increase competition by new entrant air carriers or in multiple markets;

(3) not reduce travel options for communities served by small hub airports and medium hub airports within the perimeter described in section 49109; and

(4) not result in meaningfully increased travel delays.

[8] Air Canada states that it has operated flights between points in Canada and DCA since it was granted access to DCA under the 1995 U.S.-Canada Air Transport Agreement, which provides that Canadian carriers are to acquire necessary DCA slots "under the prevailing rules for slot acquisition and minimum slot use applicable to United States Airlines," DOT Order 95-4-30. Air Canada also states that it supported the 2007 U.S.-Canada Open Skies Agreement.

at the airport. Air Canada confirms its status as a limited incumbent carrier at DCA, holding 16 slots and slot exemptions[9], and states that, despite its efforts to do so, it has been unable to secure additional slots to expand service at DCA. The carrier also maintains that the statutory criteria that guided the award of previous DCA slot exemptions effectively prevented it from participating because service was to be provided to airports within the United States.

Regarding its proposed service to YVR, Air Canada claims that the airport is Canada's second busiest and that Vancouver is Canada's third largest urban area. The carrier describes Vancouver as "the commercial heart of Western Canada," and states that it is the largest market in Canada without nonstop service from the DC area. The carrier argues that its proposed service will reduce travel time to Vancouver by at least 1 hour and 39 minutes when compared to existing one-stop alternatives and will have a positive impact on competition. Air Canada proposes to use Airbus 319 aircraft configured with 120 seats, providing two-class service. Air Canada also asserts that, together with its regional partner, Jazz, the two airlines provide service to 10 communities in the United States, and to a total of 46 destinations in North America (including Mexico and Caribbean), Asia Pacific, and Europe from YVR. The carrier also argues that its proposed service would create new within network connecting opportunities to 17 new communities in Western Canada. The carrier asserts its proposed service will have a positive impact on competition by competing with existing one-stop service to YVR from DCA and Washington Dulles International Airport (IAD), operated by Delta, United, American and Alaska.

In its March 27 answer, Air Canada reiterated the advantages that would be realized through its proposed service, and again asserted that it is not economically feasible for it to offer service to YVR from IAD, due to the high costs and inefficiencies of providing service at two airports in the same metropolitan area, and that its business travelers prefer DCA. Air Canada also urges the Department to extend DCA service to as many new markets as possible, rather than granting slot exemptions to markets already receiving nonstop DCA service.

*Responsive Pleadings*

Many of the other applicants commented on Air Canada's proposal. They most commonly argued that Air Canada's proposal would not provide low fares or domestic network benefits, and that Air Canada should not receive any preferential treatment as a non-U.S. air carrier.[10] Several carriers also explain that Air Canada already holds a comparatively significant number of within-perimeter slots at DCA and provides air service to its within-perimeter hubs, which offer connecting service to Vancouver. Many of the applicants also make note of Air Canada's proposed aircraft type, which would offer comparatively fewer seats, and of the relatively small size of the Vancouver - Washington, D.C., market. Some highlight Air Canada's code-share relationship with United and its Star Alliance membership and claim that an award to Air Canada would

---

[9] Air Canada holds slot exemptions under 49 USC 41718.

[10] In this regard, some commenters argue that, because the U.S.-Canada Air Transport Agreement subjects Air Canada's access to DCA to the "prevailing perimeter rule," the bilateral agreement does not require the Secretary to consider Air Canada's application for beyond-perimeter slots. See, Section 41718(h)(3), as added by FAA 2012.

effectively provide a large incumbent carrier access to another transpacific gateway, which is contrary to the purpose of awarding DCA slot exemptions to new entrants or limited incumbents. Competing carriers also argue that the schedule included as part of Air Canada's proposal is not convenient for customers in the local market, but intended to facilitate connections to international destinations.

**Alaska**

Alaska has requested four total slot exemptions in order to operate one daily nonstop roundtrip each to Portland International Airport (PDX) and San Diego International Airport (SAN), both utilizing Boeing 737-800 aircraft with 157 seats, 16 in first class and 141 in economy. The carrier states that the proposed service to PDX is its first priority and that proposed service to SAN would continue on a single-plane basis to Honolulu, Hawaii.

*Arguments in Support*

Alaska points to its presence along the entire West Coast, the high load and completion factors and on-time performance of its service utilizing DCA slot exemptions, comparatively low customer complaint ratio, history of providing lower DCA fares (and the associated passenger cost savings), and status as a growing and financially strong carrier with excellent relationships with its stakeholders. Alaska also points out that it is the only network carrier not to have filed for bankruptcy, that it has received industry awards, and that political, civic and employee interests support its application. Alaska states that it operates only three roundtrips at DCA, which, with the exception of Sun Country, represents the smallest presence when compared to other carriers operating at DCA. Alaska states that FAA 2012 added three new decisional criteria and changed the manner in which the criteria are to be applied by no longer requiring that an applicant meet each enumerated standard, but instead provided more flexibility for the Department to weigh each criterion separately. Alaska argues that the amended statute requires that local market benefits be treated as a co-equal decisional factor with beyond-perimeter network benefits and that its proposal to serve Portland and San Diego, the two largest Washington, D.C.-area markets lacking nonstop DCA service, is the strongest application in the docket.

In reference to its proposed service to PDX, Alaska argues that Portland is the third largest beyond-perimeter market within its network system without nonstop service to DCA. Alaska commits to providing low-fares, approximately 18 percent below existing fares for Portland service at IAD, for at least a year, subject to adjustment as a result of increasing fuel prices. Alaska claims that its request would produce immediate network benefits by connecting to 10 communities from Portland, and over time, even more opportunities because of its substantial presence at the airport. The airline claims that its proposal would offer service with a convenient schedule, provide additional capacity in the Washington, D.C. area – Pacific Northwest market, represent a convenient, low-fare alternative to existing service at IAD, and increase competition.

Regarding its proposed service to SAN**,** the carrier states that it would offer service to close-in DCA for a large volume of government traffic, including military. Alaska

argues that San Diego is the second largest beyond-perimeter market within its network system without nonstop service to DCA. Similar to its proposal to PDX, the carrier commits to providing low fares, approximately 31 percent below existing fares for SAN service at IAD, for at least a year, subject to adjustment as a result of increasing fuel prices. Alaska asserts that its proposal would provide additional capacity and a convenient, low-fare alternative to existing service at IAD and Baltimore/Washington International Thurgood Marshall Airport (BWI), and provide important new competition as well.

In its March 27 reply comments, Alaska acknowledges US Airways' recent announcement to inaugurate DCA - SAN service on June 8 and argues that its proposed service to SAN is even more important because it will provide much needed and well-timed competition in the market. Alaska also explains that, unlike US Airways' proposed service, its service would become permanent in nature due to the conditions associated with the beyond-perimeter slot exemptions, and be suitable for SAN originating passengers while US Airways' service appears to be timed to accommodate DCA originating passengers.

*Comments of the Port of Portland*

The Port of Portland, the owner and operator of PDX, submitted reply comments in support of Alaska's application on March 27. The Port asserts that it has been experiencing rapid growth in passenger traffic and that the PDX - DCA market is the largest origin and destination (O&D) market without current or announced service in this proceeding. The Port also claims that DCA is PDX's second largest destination without nonstop service. The Port contends that it has better access to capital cities in Europe and Asia than it does to DCA.

*Comments of the San Diego County Regional Airport Authority (SDCRAA)*

SDCRAA, operator of SAN, also submitted comments in support of Alaska's proposal on March 27. SDCRAA explains that the City of San Diego is the second largest city in California and the County is the fifth most populous county in the United States and second most populous in California. The Airport Authority states that SAN is situated 18 miles from the US-Mexico border and therefore serves a diverse bi-national catchment area and has the highest airport-wide load factor in this proceeding. SDCRAA states that the San Diego region represents the single largest concentration of active duty military in the country and would benefit from direct access to the closest airport to the Pentagon. The airport operator also mentions that Alaska's proposal would provide Honolulu - DCA passengers with their first roundtrip single-plane one-stop flight. SDCRAA also asserts that Alaska's proposal would introduce new airline competition in the Washington market and is supported by a broad coalition of over 100 political leaders, civic organizations, corporations and individuals.

*Reply comments of Association of Flight Attendants – CWA*

On March 27, the Association of Flight Attendants-CWA (AFA) submitted reply comments in support of Alaska's application. AFA explains that Alaska and its employees have a very good working relationship. The Association also makes note that

Alaska is the only established network carrier that has not filed for bankruptcy and therefore has avoided major job losses and service terminations.

*Responsive Pleadings*
Competing applicants explain that Alaska is not typically categorized as a low-fare carrier and has already been awarded a significant number of beyond-perimeter slot exemptions at DCA. Competitors also urge the Department not to award Alaska four slot exemptions in this proceeding. Several carriers highlight that both PDX and SAN already have mainline service to IAD and/or BWI and question the need for proposed SAN service based on US Airways' recent announcement to provide service in the DCA - SAN market beginning June 8. Several other carriers dispute Alaska's claims of network benefits based on the service the carrier already provides at the Los Angeles International Airport (LAX) and the Seattle-Tacoma International Airport (SEA). Carriers offering single-plane service to an additional destination argue that their respective proposals offer more benefits to a greater number of passengers. Applicants proposing aircraft with more passenger seats also argue that Alaska will offer service to fewer passengers.

**Frontier**

Frontier has requested two slot exemptions in order to offer one daily nonstop roundtrip to Colorado Springs Airport (COS), utilizing Airbus A320 aircraft with 168 seats, 36 of which have increased pitch, while the remaining 132 are economy. Proposed service would continue on a single-plane basis to San Diego, California.

*Arguments in Support*
Frontier claims to be a well-established carrier known for offering low air fares and high quality customer service. Frontier confirms its status as a limited incumbent carrier and states that Denver is the only beyond-perimeter community it serves, and that it provides service to five within-perimeter communities using slots held by its affiliate, Republic Airlines. The carrier claims its nonstop DCA-COS operation fulfills the statutory criteria and would best maximize the public interest and competition benefits.

Specifically for Colorado Springs, Frontier states that the community is the second largest city in Colorado and that Washington, D.C. is its largest destination due in part to the Air Force Academy and the significant presence of military personnel in the region. The carrier also argues that Colorado Springs is an underserved, high-fare market without nonstop service to DCA, and asserts that its proposal would not only provide additional capacity and offer a convenient, low-fare alternative to existing nonstop regional jet service at IAD and other connecting service, but also produce public benefits and introduce competition. In support of its claim to offer low fare service and stimulate demand in the COS market, Frontier references the 37 percent increase in DCA-Denver passenger traffic and 13 percent decrease in average DCA-DEN fares after it entered that market. Frontier also argues that its proposed service would enhance market structure, competition and network benefits to at least five additional beyond-perimeter communities, including its extensive network at Denver International Airport (DEN). Frontier also claims that its proposed service would increase competition by reducing the

travel time to Colorado Springs by at least 1 hour and 44 minutes when compared to existing one-stop alternatives. Also, Frontier claims that its one stop DCA-SAN flight would inject low-fare competition into the DCA-SAN and broader WAS-SAN markets.

In its consolidated answer of March 27, Frontier urges the Department not to grant any carrier more than one pair of slot exemptions, in order to maximize the number of carriers receiving slot exemption awards, and to limit the awards for service to cities that will receive first-time nonstop DCA service. In addition to restating many of arguments made in its application, Frontier explains that, like Alaska and Virgin America, it lacks a within-perimeter hub from which it could flow traffic to the west. The carrier also explains that Colorado Springs is a newly established western focus city from which it plans to serve or already serves five different western markets, including its Denver hub, and asserts that its proposal would provide the only low-cost, low-fare service to Colorado Springs from the entire Washington, D.C., metropolitan area, thereby competing with United Express' IAD-COS service.[11] It argues that its proposal would provide more annual seats than any other applicant and states that its application has strong public support from government officials, Members of Congress, travelers and businesses.

*Answer of the City of Colorado Springs and the Colorado Springs Airport (COS)*
COS submitted comments strongly supporting Frontier's application on March 27. COS emphasizes that the Washington, D.C., metropolitan area is its largest market in terms of daily passengers. The Colorado Springs representatives highlight many of the arguments made by Frontier and explain that because of the variability in travel time, the air service available at DEN is not an acceptable substitute for its community. COS reiterates that Frontier would offer a low-fare service alternative utilizing mainline aircraft with on-board amenities (including personal TVs) to compete against the regional jet service provided by a legacy carrier at IAD.

*Responsive Pleadings*
Most of the other applicants in the proceeding offered comments on Frontier's proposal. Many make note of the comparatively small size of the Washington, D.C. - Colorado Springs O&D market and reference the existing regional jet service available at IAD.[12] Several carriers also claim that Denver is an acceptable substitute for Colorado Springs because of the reasonable driving distance between them. The carriers state that Frontier has already been awarded six beyond-perimeter DCA slot exemptions to serve Denver

---

[11] Frontier claims that its beyond-COS connections would offer the traveling public an alternative, low-fare service option that the Department should consider, citing our consideration of Alaska Airlines' connecting service, in DOT Order 2004-4-1 (Apr. 1, 2004), at 17, as precedent

[12] Southwest argues that, in measuring the Washington Metro region origin and destination traffic at COS, we should disregard the BWI and IAD traffic, because of a previous DOT/FAA determination that the three Washington area airports are "not interchangeable." Notice Granting Petition with Conditions, 75 Fed. Reg., 26322-26333 (May 11, 2010). Frontier, in its April 11 Motion for Leave to File and Response to Second Unauthorized Filing by Southwest, argues that the proceedings are distinguishable because the Delta-US Airways slot swap divestitures were identified to address concentration and competition concerns that otherwise would have arisen with the slot exchange, and the Department of Justice noted that other area airports may be acceptable substitutes for price-sensitive passengers.

and explain that Denver is also served from IAD and BWI. Other applicants also dispute Frontier's claims of domestic network benefits. They argue that many of the additional connections (including San Diego) that may be available on Frontier's network at Colorado Springs already have, or shortly will have, nonstop service to DCA and that Frontier has a very limited presence at SAN. Other carriers also argue that the carrier has an uncertain future, as its parent, Republic Airways Holdings, Inc., has mentioned that Frontier may be spun off or sold.

**JetBlue**

JetBlue has requested two slot exemptions in order to add one daily nonstop roundtrip to Luis Muñoz Marín International Airport (SJU) in San Juan, Puerto Rico, and, if granted, another pair of slot exemptions to provide one daily roundtrip to Austin-Bergstrom International Airport (AUS) in Austin, Texas. Proposed service to SJU would utilize Airbus A320 aircraft configured with 150 seats, while service to AUS would utilize 100-seat Embraer E190 aircraft.

*Arguments in Support*

JetBlue highlights its award-winning customer service, "everyday" air fares, history of stimulating demand for service, and the standard features of its service, including no overbooking, first checked bag free, all one-way fares, pre-assigned seats, the amount of legroom available in its seats, the relatively young age of its aircraft fleet, unlimited snacks and drinks, and 136 channels of free entertainment. In support of its claims to stimulate demand and lower fares, JetBlue points to the highly favorable impact of its services on fares and traffic in the Jacksonville, FL-SJU, Orlando, FL-Bogota, Colombia markets, and Boston-DCA markets, respectively. The carrier also explains that while it has recently begun service at DCA and that it has a growing presence at the airport through newly acquired and leased slots, it remains a limited incumbent carrier.

Regarding its proposed service to SJU, JetBlue explains that San Juan is the capital of the Commonwealth of Puerto Rico and a focus city within its network. It states that with its partner Cape Air, the two airlines provide connections to eight domestic and international destinations from SJU. The carrier argues that its proposed service would provide an important boost to Puerto Rico's economy, and therefore is consistent with the Obama administration's goal of fostering and sustaining the economic development of Puerto Rico (citing to Executive Order 13517, of October 30, 2009). JetBlue also explains that nonstop service between DCA and SJU currently does not exist and asserts that its proposal would introduce a unique coach product in the market, lower fares, increase capacity, expand service options and offer an increased level of competition to service offered at IAD and BWI.

Similar to its arguments in support of SJU, JetBlue describes Austin as the fifth largest market beyond the 1,250-mile perimeter that does not have nonstop service from DCA. The carrier explains that the community's population is increasing and describes the community as a growing center for business and tourism. The carrier states that it currently offers service to six destinations from Austin and asserts that its proposed service would offer meaningful competition, primarily in the DCA-AUS local market.

Similar to its arguments for its proposed service to SJU, the carrier also claims that its AUS proposal would lower fares, expand service options, stimulate the markets, provide public benefits and increase competition. For example, JetBlue states that its proposed $125 - $665 one way fare is “significantly” lower than United’s current one way IAD-AUS fare structure of $222-$1,473.

In its March 27 filing, JetBlue asserts that its proposal to SJU would introduce nonstop service to the Caribbean, a region that is not currently served from DCA. JetBlue also highlights the significant financial investment it has made in gaining competitive access to, and securing slots at, DCA, which the Department should recognize. In regard to its proposed service to SJU, JetBlue notes reports that American Eagle may suspend operations at the airport, indicating that additional opportunities for its expansion at SJU may exist. The applicant also states that its SJU proposal would increase service to small hub airports and notes that its proposed schedule would occur at off-peak times at DCA and therefore not increase travel delays. JetBlue states that its application is supported by Congressional interests, economic development officials, the cruise industry, and private citizens. In regard to Austin, JetBlue states that it would connect with service to Long Beach, and, like its proposed schedule for SJU service, its service would occur during uncongested times at DCA and not increase travel delays.

*Answer of the City of Austin in Support of the Applications of JetBlue and Southwest*

The City of Austin (Austin), owner and operator of AUS, submitted comments in support of both carriers’ applications. The city explains that it is only 65 miles beyond the current 1,250 mile perimeter from DCA and argues that it would already have multiple nonstop flights to DCA, if the perimeter rule did not exist. Austin claims that originating travelers to DCA are currently paying significantly higher fares than from other destinations under consideration. The City also states that with the recent announcement of United to SFO and US Airways to SAN, Austin is the second largest market in this proceeding without nonstop service to DCA. Austin also maintains that yields to DCA are the highest among destinations included in the applications under consideration. The City also asserts that service to AUS would create public benefits at San Antonio International Airport (SAT). The owner and operator of AUS also states that both carriers’ applications have support from its 16 elected leaders, their more than two million constituents, twenty-one Austin area business and economic development groups, two major universities, the Austin Convention and Visitors Bureau and Texas Department of Transportation, four national associations based in Austin, and the AFSCME, Local 1624.

*Responsive Pleadings*

Most competing applicants in the proceeding offered comments on JetBlue’s application. These carriers note that while JetBlue has not been awarded previous DCA slot exemptions, it has already established a significant presence at DCA, operating more flights than any other applicant in this proceeding. The commenting carriers provide details on the existing service to both SJU and AUS that is available at IAD and BWI from low-cost and legacy carriers. Other applicants note that JetBlue’s proposal would

serve smaller and/or leisure markets, utilize aircraft with fewer passenger seats, offer very limited connecting opportunities, and assert that monopoly routes from DCA usually result in fares that are comparatively more expensive.[13] One of the other applicants also mentions JetBlue's cooperative agreement with American Airlines, which operates a significant number of DCA slots, and questions the likelihood of any resulting pricing discipline on fares.

**Southwest**

Southwest's proposal is for two slot exemptions to establish one daily nonstop roundtrip to AUS, initially utilizing Boeing 737-700 aircraft with 137 seats and, by November 2012, Boeing 737-800 aircraft with 175 seats. Service would also continue on a single-plane basis to San Diego, California.

*Arguments in Support*

Southwest's application asserts in particular the fare savings it would bring to passengers in Austin, San Diego, and other connecting markets. The carrier also highlights its award winning customer service, lower air fares, "no-fee" policy for checked baggage and reservation changes, the popularity of its frequent flier program and status as the nation's largest domestic airline in terms of passenger traffic. The carrier also relates it has only a small presence at DCA, with access to 25 slots and slot exemptions, all through its AirTran subsidiary.

Similar to JetBlue's arguments in support of proposed service to Austin, Southwest also notes the lack of nonstop service from DCA and the economic growth the community has recently experienced. The carrier also details its presence at AUS by explaining that in June 2012, it will operate nonstop to 20 communities. Southwest also stresses that its proposed service to AUS will provide immediate connecting service to Dallas Love Field (DAL) and William P. Hobby Airport (HOU), offering a low-fare competitive alternative to customers that prefer close-in airports in Dallas and Houston, Texas. The carrier also argues that its proposal will produce public benefits in the form of fare savings, traffic stimulation, new service options and increased competition. In support of these claims, for example, Southwest claims that its projected DCA-AUS fare will be 36 percent lower than the current average DCA-AUS fare and that it will compete with United's IAD-AUS service by offering lower fares.

On March 27, Southwest filed a consolidated answer asserting that when compared to the other proposals, DCA - AUS is the second largest market that currently does not have nonstop service, that market yields are the highest, and that its proposed service will generate 147,000 new passengers, which it claims is the largest estimate of traffic stimulation among the applicants. The applicant also states that, based on its presence in the domestic market, it holds the smallest relative portfolio of DCA slot or slot exemptions and that offering single-plane, one-stop service to an underserved market increases competition and maximizes network benefits. Southwest claims its fares would

[13] The carriers note that the Department, in the past, has favored carriers offering greater capacity in restricted-entry proceedings, citing to DOT Order 2005-3-25, at 4.

be significantly lower than JetBlue's in the DCA-AUS market and that it would attract more passengers due to its relatively large AUS presence.

*Comments of the City of Austin in Support of the Applications of JetBlue and Southwest*
See discussion above, at page 11.

*Comments of the Southwest Airlines Pilots' Association (SWAPA)*
On March 27, the Southwest Airlines Pilots' Association (SWAPA) submitted comments in support of Southwest's application. SWAPA notes that when compared to the other applications, Southwest's Boeing 737-800 aircraft will provide the highest level of seating capacity. SWAPA also argues that the network benefits associated with Southwest's proposal could extend to additional communities with adjustments in schedule. SWAPA claims that Southwest will maximize the utilization of a scarce resource and produce the greatest public benefits.

*Responsive Pleadings*
The other applicants contend that Southwest already has a substantial presence at DCA via its AirTran subsidiary. Several applicants also note that Southwest's proposal offers very limited connecting opportunities at AUS and that monopoly routes from DCA usually result in fares that are comparatively more expensive. Several carriers detail the existing mainline service to AUS available at both BWI and IAD. Other carriers also downplay any of the additional network benefits that may exist at SAN, DAL and HOU, arguing that numerous connecting opportunities to DCA already exist and that Southwest's connections to DAL and HOU should not be considered because they are each within-perimeter destinations. JetBlue also compares Southwest's forecast traffic stimulation with its own and asserts that if several assumptions and the methodology used were consistent among the two proposals, the differences in stimulated passenger demand would be small.

*Supplemental Pleadings*
On April 3, Southwest filed a limited response and motion for leave to file. In response to comments from the other applicant proposing service to Austin, Southwest asserts that its presence in Austin is larger, that it will operate aircraft with more seats and offer lower fares and, therefore, its proposal will produce greater stimulation in the DCA-AUS market. Southwest references the Department's finding in the recent Delta– US Airways slot swap proceeding to argue that BWI and DCA are not effective substitutes for one another. Second, Southwest explains that traffic stimulation is expected to be larger in the earlier periods of service and taper off as service on the specific route matures.

Frontier replied to Southwest's response on April 5. Frontier argues that Southwest is inconsistent in its arguments regarding the availability of competing service in the Washington, D.C., area and argues that traffic data at all three airports (BWI, DCA and IAD) are competitive alternatives and makes note of Southwest's significant presence at BWI. The carrier explains that the Department's finding in the recent slot swap between Delta and US Airways was in the context of a slot exchange of within-perimeter slots to

mitigate competition issues specific to DCA and not in regard to specific beyond-perimeter route applications.

On April 6, JetBlue also replied to Southwest's filing. JetBlue challenges Southwest's traffic stimulation projections, and argues that Southwest's projections are overly optimistic.

In response to Frontier and JetBlue, Southwest filed a second response on April 9. In that filing, Southwest makes references to several additional statements made by the Department in the Delta – US Airways slot swap case to further justify its claims that BWI and DCA are not interchangeable. Moreover, Southwest details the recent results of the mandated divestiture as a result of the Delta – US Airways slot swap to illustrate the value airlines place on the possibility of operating a few flights at DCA. Southwest also explains that its pricing strategy is based on distance and not on competition, and therefore its projected fares are based on its yield curve. In responding to JetBlue, Southwest provides additional detail with regard to its calculations.

Frontier also filed a response to Southwest's second filing on April 11. In the reply, Frontier provides several examples of the fares Southwest offers in monopoly markets. Frontier uses these examples to argue that Southwest's estimated average DCA – AUS fare of $169 is unrealistic, to challenge Southwest's claim that its fares are based on distance rather than the competitive landscape and as further evidence to indicate that Southwest may not provide low fares in markets where competition does not exist.

### Sun Country

Sun Country applied for two slot exemptions to operate one daily nonstop roundtrip to Las Vegas McCarran International Airport (LAS), utilizing Boeing 737-700 aircraft with 129 seats, including 12 in first-class.

*Arguments in Support*

Sun Country states that it is an independent low-fare carrier that has been recognized for its low fares, quality of service and customer satisfaction. It claims that it has a history of increasing passenger demand and lowering air fares in the markets it enters. Sun Country states that it qualifies as a limited incumbent, noting that it currently operates only a single roundtrip at DCA. The carrier argues that it could reduce its airport unit costs and serve its customers better if it could increase its presence at DCA.

Regarding its proposed service to LAS, Sun Country explains that it has served the community for 29 years and that the demand for flights continues to increase. The carrier also notes that Las Vegas is a major convention and trade show destination and the fourth largest O&D market beyond the 1,250 perimeter at DCA. The airline acknowledges that the Department has already granted slot exemptions for service to Las Vegas (operated now by US Airways), but argues that its proposal would offer service with a more attractive schedule, provide convenient, low-fare travel, additional capacity and enhanced service options in the two markets, produce public benefits and increase competition.

Sun Country submitted additional comments on March 27. The carrier argues that based on the size of the DCA-LAS market, additional service is warranted. Sun Country restates many of the arguments made in its original application and urges the Department to award these slot exemptions to carriers that are not adequately represented at DCA. The applicant also highlights the competitive impact its DCA – Lansing, Michigan, service has had and states that an award of two additional slot exemptions would be helpful in obtaining "a critical mass of slots" at DCA.[14]

*Responsive Pleadings*

Several other applicants argued that Las Vegas is primarily a leisure market with low fares that limit the extent of competitive benefits, and that service would be provided with aircraft with comparatively smaller seating capacity. Other parties make note of both the existing service in the DCA – LAS market and the additional low-fare nonstop service available at IAD and BWI. The other carriers also mention that the carrier has a very limited presence at LAS, and highlight the lack of domestic network benefits associated with Sun Country's proposal.

**Virgin America**

Virgin America has requested four slot exemptions in order to establish two daily nonstop roundtrips to SFO utilizing Airbus A319 aircraft with 8 first class seats, 12 main cabin select seats and 99 seats in the main cabin, or 119 seats in total. The proposed service will offer both morning and afternoon/evening flights in each direction.

*Arguments in Support*

Virgin America summarizes its growth in size as an airline since beginning service in 2007, describes its focus towards improving customers' in-flight experience, including the features of its award winning product (fuel efficiency, in-flight WiFi, interactive flight status maps, seat-to-seat chat, power outlets, USB jacks at every seat, movies, satellite TV, premium TV, music videos, radio, games, on-demand food and beverage ordering), and explains its history of lowering air fares in the markets it enters. The carrier also confirms that it qualifies as a new entrant carrier and that it has never held, sold or given up a DCA slot. The applicant argues that the size and significance of the local market, rather than a strict focus on demonstrating "domestic network benefits" and "increasing competition in multiple markets," should now play a more prominent role when evaluating applications, in light of the additional statutory selection criteria included in FAA 2012 and the fact that the Department may choose to consider the criteria either in isolation or in combination. Virgin America, accordingly, suggests the Department should select the service proposed at a beyond-perimeter market serving a large metropolitan area with significant O&D traffic.

In regard to its proposal to serve San Francisco, the carrier argues that the San Francisco Bay Area is the largest metropolitan area and O&D market in the country without

---

[14] Sun Country refers to the DOT/FAA Notice Granting Petition with Conditions, 75 Fed. Reg., 26322-26333 (May 11, 2010), in which we recognized the importance of a critical mass of slots by structuring a slot auction for DCA and LaGuardia Airport slots in bundles of eight slot pairs.

nonstop service to DCA, and therefore its proposal will benefit more local passengers than any other application in this proceeding. The carrier states that SFO serves as its base of operations where it offers service to five (one seasonally) destinations in the west and three in Mexico. Virgin America also asserts that the Washington, D.C. – San Francisco market is important to the carrier by referencing its current service at IAD, which has been in place since 2007. The carrier urges that the proposed service will complement this existing service and allow it to continue to grow the market. The applicant also argues that its proposal would offer a viable service pattern of at least two daily nonstop flights in the market, and provide convenient one-stop connections to four of its other destinations in the west. The carrier claims its proposed service will also provide public benefits, including lower fares, offer a wide array of price, service and quality options, greater capacity in the market, and enhance competition. In support of this claim, Virgin America asserts that average fares fell in several markets within a year after it commenced service, including DFW-SFO/LAX, BOS-SFO/LAX, JFK-SFO, LAS-SFO, JFK-LAS, and ORD-SFO/LAX. Virgin America also states that its DCA-SFO service will offer convenient online connections to other western cities.

In its March 27 filing the carrier reiterates that it is the only carrier in this proceeding that does not operate at DCA,[15] and that with the revision to the statutory selection criteria included in FAA 2012, the size of the local market should play a more prominent role when applications in this proceeding are evaluated, with less weight given to domestic network benefits and increased competition in multiple markets.[16] It stresses that the SFO – DCA market is significantly larger than those included in other applications. The carrier acknowledges United's recent announcement to inaugurate DCA – SFO service on May 14th and argues that its proposed service to SFO is even more important because it will provide much needed and well-timed competition in the market. Virgin America argues that its request for two roundtrips in the same market is consistent with some of the Department's previous DCA slot exemption awards[17] and necessary for it to compete with United, which has a much larger presence at both DCA and SFO.

*Comments of the City and County of San Francisco and San Francisco International Airport (SF0)*

SFO submitted comments strongly supporting Virgin America's application on March 27. Similar to the carrier's arguments, SFO explains that Virgin America is the only new entrant in the proceeding and has provided important service quality and fare competition since its launch in 2007. The San Francisco parties also highlight the revisions made to the statutory selection criteria in FAA 2012 and assert that much

[15] Virgin America claims that the Department has favored new entrants in the past, citing to the DOT/FAA O'Hare Notice, 71 Fed. Reg. 51381, 51388-90 (Aug. 29, 2006) and to the US Airways/Delta slot swap for the proposition that a new entrant needs a critical mass of slots. 75 Fed. Reg. 7130-11 (Feb. 28, 2010).
[16] In this regard, it refers to one of our former beyond-perimeter selection cases in which we indicated that the AIR-21 selection criteria did not afford us sufficient discretion to consider the size and significance of the local beyond-perimeter market. Order 2002-11-20 (Nov. 27, 2002).
[17] DOT Order 2000-7-1 (Jul. 5, 2000), awarding four exemptions to America West under AIR-21 to provide two roundtrip DCA-PHX flights; and Order 2004-4-1 (Apr. 1, 2004), awarding four Vision-100 exemptions to Frontier for two roundtrip DCA-DEN flights.

greater emphasis should be placed on the size of the local markets proposed and competitive benefits associated with each proposal. The commenters explain that the SFO – Washington, D.C., market (approximately one million passengers) is nearly three times larger than the next largest market which does not have nonstop service to DCA. SFO estimates that, based on the size of the SFO-DCA market, six flights would be warranted.

*Responsive Pleadings*

The majority of other applicants filed reply comments on Virgin America's application. Competitors urge the Department not to award half of the slot exemptions available in this proceeding to a single applicant.[18] Several of the competing carriers highlight the existing service available at BWI and IAD, including more than 12 daily frequencies at IAD, a portion of which is provided by Virgin America. The other carriers also make note of the relatively low average market load factors and fares to argue that the San Francisco – Washington, D.C. market is already well-served. The other carriers also question the need for the proposed SFO service based on United's recent announcement to provide service from DCA beginning May 14, 2012. Several other carriers also dispute Virgin America's claims of network benefits based on inefficient routing that would occur from SFO and because many of the communities that Virgin America's proposed service would connect to already have or soon will have nonstop service from DCA.[19] One of the competing applicants also references a recent news article and questions the performance capability of the engines on Virgin America's proposed aircraft and suggests that an upgrade will be required to ensure the maximum number of passenger seats will be available for sale.[20]

*Comments of the Metropolitan Washington Airports Authority (MWAA)*

On March 27, MWAA filed comments to inform the Department and applicants of the circumstances at DCA. MWAA does not state a preference for any application. Rather, MWAA explains that the new service to be awarded under this proceeding will increase both congestion and noise within the vicinity of DCA and place additional strain on the airport's facilities, including automobile parking. MWAA explains that the 44 gates and overnight aircraft parking spaces at DCA are heavily utilized and that carriers hoping to gain access to the airport may have difficulty securing gates and other essential operating space. MWAA also expresses concern with the increase in authorized flights at DCA and the decline in domestic service at IAD.[21]

---

[18] Frontier, for example, referred to a 2000 Order in which we allocated twelve slot exemptions by granting two per carrier. DOT Order 2000-7-1.

[19] The carriers also refer to DOT Order 2000-7-1, at 24, where we declined to find significant beyond-perimeter network benefits in a proposal that offered circuitous routings and duplicative service.

[20] On March 30 and April 2, Virgin America filed responses stating that engine upgrades are in process and will be completed on any of the aircraft that will be used to operate at DCA by June 30.

[21] These additional slot exemptions, however, were mandated by FAA 2012, which also increased permissible operations by two per hour. We note that MWAA, in the past, has successfully managed to accommodate requests by new or expanding airlines to gates and facilities. MWAA has facilitated access by airlines that leased, purchased or traded slots, received slots through lotteries, or were granted slot exemptions. We firmly expect MWAA to similarly facilitate these additional operations.

## DECISION

All of the applications have merit and have received strong community support. In reaching our decision, we have carefully reviewed the applications and responsive pleadings, and we have evaluated the extent to which each application met the revised factors Congress outlined in Section 41718(g)(2). We conclude that the following proposed services merit allocations under the statute and award slot exemptions to: Alaska Airlines, for two slot exemptions for nonstop service to Portland, Oregon; JetBlue Airways, for two slot exemptions for nonstop service to San Juan, Puerto Rico; Southwest Airlines, for two slot exemptions for nonstop service to Austin, Texas; and Virgin America, for two slot exemptions for nonstop service to San Francisco, California. Our reasoning to support these decisions is set out below.

## Alaska to Portland

We conclude that Alaska merits an award of two exemptions for service to Portland (PDX). Alaska's application will enhance options for nonstop travel, have a positive impact on competition, and produce public benefits of higher capacity and service options.

We find that Alaska's nonstop DCA-PDX service will enhance options for nonstop travel, because PDX is the fourth largest local O&D[22] market from DCA currently without nonstop service.[23] Currently, Alaska's ability to accommodate the DCA-PDX demand for service is limited, given the carrier's sustained load factors of 91% on its existing nonstops to Seattle and 88% to Los Angeles. [24] We further find that Alaska's nonstop DCA-PDX service will have a positive impact on the overall level of competition in the markets that will be served by increasing competition in the local market, which today consists of connecting service from DCA. Alaska's new service will also increase competition in multiple markets throughout the Pacific Northwest, particularly in conjunction with its Seattle nonstop operations. As a new entrant/limited incumbent, Alaska has had a highly positive impact on competition between DCA and both Seattle and Los Angeles following its market entries in 2001 and 2004, respectively.[25] We also find that the nonstop DCA-PDX service will produce public benefits by Alaska's use of high capacity aircraft and convenient schedules. Based on the service patterns Alaska established with its existing exemptions, it has attracted the third highest passenger share between DCA and PDX and the fourth highest revenue share[26] even without the ability to flow traffic over multiple within perimeter hubs. However, Alaska's current ability to enhance the level of competition between DCA and PDX as

[22] DOT DB1B data, year ended September 30, 2011.
[23] Schedules as of May 1, 2012. The three larger O&D markets without current nonstop service are San Francisco (receiving an award here for service by Virgin America, and, prospectively, service from United); San Diego (receiving prospective service from US Airways), and San Antonio, TX, for which no application for service has been filed in this docket.
[24] DOT T-100 onboard passengers, Year 2011.
[25] *See*, Order 2001-6-20 and Order 2004-4-1.
[26] DOT DB1B data, year ended September 30, 2011.

well as increase the amount of competitive network benefits to markets in the Pacific Northwest is limited, as it has no intervening within-perimeter hub over which to flow traffic to/from DCA. Operating in conjunction primarily with its Seattle nonstops, Alaska's DCA-PDX service also will enhance domestic network benefits and increase competition in multiple markets throughout the Pacific Northwest.

We are not persuaded by the comments opposing an award to Alaska for Portland. The primary contention raised in opposition to this application is that Alaska is not typically categorized as a low-fare carrier. Although criterion (G) from FAA 2012 provides for consideration of whether exemptions "produce public benefits, including low fares, higher capacity, and a variety of service options," the language of this provision does not require us to disqualify from favorable consideration any carrier not classified as "low-fare." Alaska, with just three roundtrips from DCA, has produced a positive competitive impact at the airport. Its proposal for Portland will build on its prior operational achievements and produce public benefits by offering the second highest capacity aircraft of all applicants from the launch date. The carrier will also provide a variety of service options, such as using complementary flight times to flow traffic to the Pacific Northwest either via Portland or Seattle, depending on consumer preference. These particular strengths, together with the network benefits offered in the Pacific Northwest, support our decision that the benefits of an award to Alaska for Portland outweigh the benefits that would be achieved under the proposals that we have not selected.

### JetBlue to San Juan

We conclude that JetBlue merits an award of two exemptions for service to San Juan. JetBlue's application will enhance options for nonstop travel, have a positive impact on competition and provide domestic network benefits.

We find that JetBlue's nonstop DCA-SJU service will enhance options for nonstop travel to a unique region. The focus of all beyond-perimeter exemptions thus far has been to markets in the western U.S. Eight western cities[27] have been awarded nonstop service and many more communities have gained single-connection service to DCA through beyond-perimeter hubs. JetBlue's current share of DCA-SJU is less than five percent, resulting in a sixth place ranking.

We also find that JetBlue's nonstop DCA-SJU service will have a positive impact on competition in the markets to be served, based particularly on the carrier's experience serving DCA. JetBlue recently began operations at DCA[28] via a lease of slots from American and one pair of allocated slots from FAA, in 2010, and plans to expand its operations in June, utilizing the slots it purchased from Delta in 2011. Although its time in DCA has been short and its scope of nonstop services is limited, initial data indicate

---

[27] Denver, Las Vegas, Los Angeles, Phoenix, Salt Lake City, and Seattle currently have nonstop beyond perimeter service. New service will be initiated to San Diego and San Francisco in June and May 2012, respectively.
[28] Effective November 2010.

that JetBlue, an established low-fare carrier, has generated positive competitive discipline in the DCA markets it serves, as it has rapidly gained passenger share, while at the same time recording average fares below the respective incumbent carriers.

Further, we find JetBlue's nonstop DCA-SJU service will provide beyond-perimeter domestic network benefits on a roundtrip basis to St. Thomas, a sizeable market from DCA in which JetBlue would be a new entrant. Overall JetBlue's service will have a positive impact on the level of competition.

We are not persuaded by the comments opposing an award to JetBlue for San Juan. Carriers' comments included references to JetBlue's having the largest presence of all applicants at DCA, that nonstop service to SJU already exists from IAD and BWI, and that SJU is primarily a leisure destination. Although JetBlue will have the largest DCA operation of all the applicants,[29] it remains qualified as a limited incumbent. In the last beyond-perimeter exemption case, we recognized the uniqueness of service to DCA, even when other area airports may have nonstop service to the same beyond-perimeter destination.[30] Finally, nothing within the selection criteria directs us to avoid granting exemptions to leisure-oriented markets, as public benefits may accrue to any segment of the traveling public.

## Southwest to Austin

We conclude that Southwest merits an award of two exemptions for service to Austin. Southwest's application will enhance options for nonstop travel, have a positive impact on competition and produce public benefits including lower fares.

Southwest's nonstop DCA-AUS service will enhance options for nonstop travel to a market located just 65 miles beyond DCA's perimeter that is ranked fifth among cities without nonstop service to DCA.[31] We also find that Southwest's nonstop DCA-AUS service will have a positive impact on competition, because current service from DCA to AUS is divided primarily between the four non-limited incumbents (American, Delta, United and US Airways) with each carrier having at least a double-digit share, and, based on Southwest's past performance, its new service would stimulate traffic. We further find that Southwest's nonstop DCA-AUS service will produce public benefits, particularly by lowering fares in the market. Austin has the highest average local O&D fare[32] and yield of all applicant destinations, and Southwest, an established low-fare carrier, is expected to exert competitive discipline on the fare levels.

We are not persuaded by the comments opposing an award to Southwest. Southwest has a solid history of offering low fares and, given its specific commitments here, we believe its proposal for service to a large and growing market like Austin, where DCA's four

[29] Effective June 2012.
[30] *See* Order 2004-4-1 at 20.
[31] DOT DB1B data, year ended September 30, 2011.
[32] *Id.*

non-limited incumbents currently control over 90 percent of the local O&D revenue,[33] merits an award.

### Virgin America to San Francisco

We conclude that Virgin America merits an award of two exemptions for service to San Francisco. Virgin America's application will enhance options for nonstop travel, have a positive impact on competition and produce public benefits including lower fares.

We find that Virgin America's nonstop DCA-SFO service will enhance options for nonstop travel, because Virgin America is the only new entrant applicant in this proceeding, and San Francisco is the largest O&D market from DCA without nonstop service. The local DCA-SFO market is currently fragmented, with all four non-limited incumbents at DCA (American, Delta, United and US Airways) having double-digit passenger shares via their existing connecting services.

Commenters asserted that establishing a sustainable presence in such a market will be challenging, especially given the nonstop entry of SFO hub carrier United.[34] However, we note that Alaska at Seattle, and Frontier at Denver, initially launched and successfully maintained beyond perimeter operations at DCA with only two exemptions each. Additionally, the size of the DCA-SFO market can accommodate Virgin America's competitive nonstop service.

Although Virgin America has put forth strong arguments supporting its request for four SFO exemptions, in the context of only eight exemptions being available and given the merits of the other proposals, we believe the overall benefits of a second SFO pair do not exceed the benefits attained through award of the first nonstops to Austin, Portland, or San Juan.

## Other Applications

### Air Canada to Vancouver

We decided not to select Air Canada's proposed nonstop DCA-YVR proposal because, although it would enhance nonstop travel options, the local O&D market is relatively small compared to the DCA-Portland/Austin/San Francisco/and San Juan markets. Additionally, due to the seasonal nature of the DCA-YVR market, we do not find the impact to the overall level of competition from Air Canada's proposal would be as robust as that of the selected markets. Air Canada currently provides nonstop service from DCA to two of its hubs, Montreal and Toronto, as well as its nation's capital of Ottawa.[35]

---

[33] *Id.*

[34] United will commence service on May 14, 2012.

[35] Contrary to the assertions made by some commenters, the terms of the U.S.-Canada Agreement do not preclude an award of beyond-perimeter slot exemptions under Section 41718(g)(2) to a Canadian carrier.

Other applicants commented about the very small size of the local O&D market with one noting further that there had been multiple unsuccessful attempts made by Air Canada and its Star Alliance partner, United, to offer sustained hub-to-hub service between Washington Dulles and Vancouver.[36] We find Air Canada's application substantially less compelling than those for nonstop service to Portland, Austin, San Francisco and San Juan.

**Alaska to San Diego**

In its application, Alaska states that its number one priority for slot exemptions is Portland, making San Diego its second choice. Although San Diego is the second largest O&D without nonstop service from DCA and has the second highest average fare of all applicant cities,[37] we find that Alaska's case for Portland is the stronger of the two, due primarily to the network benefits associated with Alaska's Pacific Northwest operations. While we cannot disagree that there are strong benefits generated from an award to Alaska for San Diego,[38] they are not as compelling as those for an award to Portland, (including to Alaska Airlines itself), Austin, San Francisco, and San Juan. The services to Portland, Austin and San Juan that we are selecting here represent the first and only nonstop operations between those cities and DCA. Unlike those markets, San Diego, beginning in less than a month, will have nonstop US Airways service to DCA, and Southwest plans, soon thereafter, to offer single plane DCA service through Austin. We recognize that San Francisco's award does not constitute the first nonstop service in the market, as United is inaugurating its new nonstop service this week. However, as already discussed, San Francisco is a larger O&D market than San Diego, and it will be served by a low-fare carrier that will also be the only new entrant at DCA.

**Frontier to Colorado Springs**

We have determined not to select Frontier's application primarily due to the relatively small size of the DCA-COS market. Although Frontier seeks to complement its successful record of operating six beyond-perimeter exemptions to Denver with a first nonstop to COS and plans to use the largest capacity aircraft of all applicants, COS is the smallest domestic O&D market of all the proposals. COS, with 49 passengers per day each way,[39] is only the 19th largest O&D market from DCA without nonstop service. Frontier already captures 21 per cent of the local DCA-COS market via its existing connections in Denver.

---

Annex II, section 2, para 1 of the Agreement allows Canadian carriers to operate in the DCA-Canada markets subject to "(a) the prevailing perimeter rule" and "(c) the acquisition by Canadian airlines of necessary slots at [DCA] under the prevailing rules for slot acquisition and minimum slot use applicable to United States airlines." The Agreement provides that Canadian carriers are to be subject to the same perimeter and slot rules as US carriers.

[36] *See*, Consolidated Answer of Southwest Airlines Co.,March 27, 2012, Exhibit WN-R-701A.

[37] DOT DB1B data, year ended September 30, 2011.

[38] US Airways will commence nonstop service effective June 8, 2012.

[39] DOT DB1B data, year ended September 30, 2011.

Frontier claims that its DCA-COS nonstop would provide extensive network benefits beyond the perimeter in the form of single connections to Seattle, Los Angeles, Portland, and Phoenix.[40] All of these services from its designated "focus city" are scheduled to start after this Order is issued, and none of these points, as scheduled, will connect to Frontier's proposed service between COS and DCA. San Diego, which Frontier proposes to serve on a one-stop basis over COS, is already served by Frontier on a single-connection basis to DCA over Denver at the same time of day in both directions as proposed via COS. Additionally, Frontier says that it would offer an attractive low-fare service alternative to its beyond points,[41] but it already does so via its Denver hub.

### JetBlue to Austin

JetBlue requested that its application for service to Austin be granted only if its San Juan application is granted first. We agree that Austin merits an award of slot exemptions, but we find that the range and scale of benefits resulting from an award to Southwest, particularly in the areas of aircraft capacity and beyond markets, to be superior. Regarding aircraft capacity, as we described above, Southwest will commence service using Boeing 737-700 aircraft with 137 seats and, in November 2012, upgrade to B 737-800 aircraft with 175 seats, whereas JetBlue proposes use of 100-seat Embraer E190 aircraft.

### Sun Country to Las Vegas

We have decided not to select Sun Country's application for nonstop DCA-LAS service primarily because, as discussed, LAS already receives nonstop service to DCA via slot exemptions. We note, however, that the DCA-LAS market generates the largest local demand from DCA of all the applicant destinations, and Sun Country's proposed schedule would complement the existing schedule offered by US Airways, by providing attractive departure and arrival times for convention and conference attendees in both LAS and DCA. Nonetheless, we find that without any beyond Las Vegas connecting opportunities, Sun Country's proposed benefits are less compelling when compared to the scale of benefits offered by the service proposals for Portland, Austin, San Francisco, and San Juan.

---

[40] *See* Frontier Application at 14.
[41] *Id.* at 13.

## CONDITIONS

### Start-up

We will require that the awardees inaugurate full service by no later than September 8, 2012. If, for any reason, an awardee is not able to use the slot exemptions awarded, we request that it notify the Department as soon as possible, but not later than 10 days after the date of service of this Order.

### Assignment of Slot Times

As stated in Order 2012-2-21, Section 414 (b) of FAA 2012 allows the Department to assign two additional slot exemptions per one hour period (for a total of five), an increase from the three per hour authorized in Vision 100. There are 15 hourly periods beginning at 7:00 a.m. and ending at 9:59 p.m., and all slot exemptions must fit into those 75 slot times. Applicants were advised of these slot-time constraints. The Department noted that it anticipated multiple requests for the same slot periods, and therefore, all requests for slot exemption times may not be accommodated. In applying for specific times, the Department indicated to applicants that if they were awarded slot exemptions, specific justification of their requests may be required and that these slot-time constraints may cause some proposals not to be viable. In coordination with FAA's Slot Administration Office, we shall assign slot times corresponding with the authority granted in these proceedings, and in accordance with the requirements of FAA 2012, in a notice subsequent to our decision.

## ENVIRONMENTAL ISSUES

Although 49 U.S.C. Section 41718(e) specifically exempts our action here from review under the National Environmental Policy Act,[42] we remain sensitive to the environmental impact of increased operations at DCA. Consistent with the statute, we will require that all operations authorized by this Order be conducted with Stage 3 aircraft.

Also, under 49 U.S.C. § 47117(e), the Department will give DCA priority in making grants for airport noise compatibility planning and programs.

## ADMINISTRATIVE TERMS

Under the provisions of 49 U.S.C. Section 41714(j), awardees may not sell, trade, transfer, or convey the operating authorities granted by the subject exemptions, except through an air carrier merger or acquisition.

---

[42] Section 41718(e) states, "Neither the request for, nor the granting of an exemption, under this section shall be considered for purposes of any Federal law a major Federal action significantly affecting the quality of the human environment."

Further, granting of these exemptions in no way is to be construed as allowing a carrier to operate services that it could not otherwise operate. Each awardee must still meet all the requirements of the Department and FAA, including but not limited to, use-or-lose provisions, and all other statutes and regulations governing air transportation.

This Order is issued under authority delegated in 49 C.F.R. Section 1.56(a).

**ACCORDINGLY,**

1. The Department grants slot exemptions from 14 C.F.R. Part 93, Subparts K and S, to Alaska Airlines, Inc. (two slot exemptions to serve Portland International Airport); JetBlue Airways Corporation (two slot exemptions to serve Luis Muñoz Marín International Airport); Southwest Airlines Co. (two slot exemptions to serve Austin-Bergstrom International Airport); and Virgin America Inc. (two slot exemptions to serve San Francisco International Airport);

2. The Department directs Alaska Airlines, Inc., JetBlue Airways Corporation, Southwest Airlines Co., and Virgin America Inc., to file in Docket OST-2012-0029 no later than ten business days after the service date of this Order their proposed flight schedules and effective date for operations authorized by this Order. Further, Alaska Airlines, Inc., JetBlue Airways Corporation, Southwest Airlines Co., and Virgin America Inc., must commence their proposed service by no later than September 8, 2012. The slot exemptions granted must be conducted with single-aisle Stage 3 aircraft, may not be used for operations between the hours of 10:00 p.m. and 7:00 a.m., and may not increase the number of operations at Ronald Reagan Washington National Airport in any one-hour period during the hours of 7:00 a.m. and 9:59 p.m. by more than five operations. These carriers are advised to exercise maximum flexibility in proposed operating times to ensure compliance with these limits;

3. In coordination with the FAA Slot Administration Office, the Department will make the final assignment of operating times for these beyond-perimeter slot exemptions in a separate notice, as soon as possible. The Department directs the awardees to contact the FAA Slot Administration Office regarding their proposed schedules associated with the slot exemptions. FAA will assign slot exemption numbers, effective dates, and operating times consistent with statutory limitations;

4. The Department prohibits Alaska Airlines, Inc., JetBlue Airways Corporation, Southwest Airlines Co., and Virgin America Inc., from selling, trading, transferring, or conveying the operating authorities granted by the subject exemptions, except through an air carrier merger or acquisition;

5. The Department grants all motions to file otherwise unauthorized documents and denies motions to strike such documents;

6. Except as otherwise granted, we deny all other applications for exemptions from 14 C.F.R. Part 93, Subparts K and S, filed in this docket;

7. The authorities granted under these exemptions are subject to all of the other requirements delineated in 14 C.F.R. Part 93, Subparts K and S, including, but not limited to, the reporting provisions and use-or-lose requirements;

8. This docket will remain open until further order of the Department; and

9. We will serve this Order on all interested parties including MWAA and the FAA Slot Administration Office.

By:

**SUSAN L. KURLAND**
Assistant Secretary for Aviation
and International Affairs

(SEAL)

*An electronic version of this document will be made available on the World Wide Web at:*
*http://www.regulations.gov/*

Order 2012-7-26
Served: July 24, 2012

**UNITED STATES OF AMERICA**
**DEPARTMENT OF TRANSPORTATION**
**OFFICE OF THE SECRETARY**
**WASHINGTON, D.C.**

Issued by the Department of Transportation
on the 24th day of July, 2012

| Applications of: <br><br> **FRONTIER AIRLINES, INC.; SOUTHWEST AIRLINES CO.; and US AIRWAYS, INC.** <br><br> For exemptions from 14 C.F.R. Part 93, Subparts K and S, pursuant to 49 U.S.C. § 41718(b), Special rules for Ronald Reagan Washington National Airport (within-perimeter slot exemptions) | **Docket DOT-OST-2000-7182** |
|---|---|

## ORDER REALLOCATING WITHIN-PERIMETER SLOT EXEMPTIONS AT RONALD REAGAN WASHINGTON NATIONAL AIRPORT

### SUMMARY

By this Order, the Department is reallocating two within-perimeter slot exemptions at Ronald Reagan Washington National Airport (DCA) to US Airways, Inc. for a daily nonstop roundtrip to Jackson-Medgar Wiley Evers International Airport (JAN) in Jackson, Mississippi.

### Background

On December 6, 2004, the Department of Transportation issued Order 2004-12-6, granting two slot exemptions at DCA for service inside the 1,250-mile perimeter to Atlantic Southeast Airlines, Inc. d/b/a Delta Connection (ASA) to provide a daily nonstop round trip to JAN. This Order was issued pursuant to the Wendell H. Ford Aviation

Investment and Reform Act for the 21st Century (AIR-21), as amended by the Vision 100 – Century of Aviation Reauthorization Act of 2003, P.L. 108-176 (Vision 100).[1]

By letter dated December 28, 2011, Delta Air Lines, Inc. informed the Department that ASA's operation of the DCA-JAN service would cease effective March 2, 2012.

To minimize inconvenience to the traveling public using the DCA-JAN service, on January 25, 2012, the Department issued Order 2012-1-19 granting US Airways Inc. temporary authority to operate the slot exemptions for DCA-JAN service until such time as the Department granted long-term authority to operate the two slot exemptions pursuant to a reallocation proceeding and the selected air carrier initiated service. As we stated in Order 2012-1-19, this grant of temporary authority was made without prejudice to our decision in this proceeding.

Due to ASA's discontinuation of the DCA-JAN service, the Department requested applications from air carriers using Stage 3 aircraft to provide service to DCA from airports that were designated as medium hub, small hub or nonhub airports in 1997[2] within the 1,250-mile perimeter established for civil operations at DCA under Title 49 U.S.C. § 49109.

The selection criteria applicable to grant the slot exemptions are found in Title 49 U.S.C. § 41718(b), which directs the Secretary to distribute within-perimeter slot exemptions in a manner that promotes air transportation: (1) by new entrant air carriers and limited incumbent air carriers;[3] (2) to communities without existing nonstop air transportation to DCA; (3) to small communities; (4) that will provide competitive nonstop air transportation on a monopoly nonstop route to DCA; or (5) that will produce the maximum competitive benefits, including low fares.

Further, Title 49 U.S.C. § 41718(c)(3) specifies additional requirements governing the grant of within-perimeter slot exemptions related to airport size, stating that "[o]f the exemptions granted under 49 U.S.C. § 41718: (A) without regard to the criteria contained in subsection (b)(1), six shall be for air transportation to small hub airports and nonhub

[1] See 49 U.S.C. § 41718(b).

[2] Definitions of nonhub, small hub, and medium hub airports are provided under Title 49 U.S.C. § 41714 (h)(7), (8), and (9), which requires that hub classifications be based on the Federal Aviation Administration's Primary Airport Enplanement Activity Summary for Calendar Year 1997.

[3] A new entrant carrier or limited incumbent carrier is an air carrier that holds or operates fewer than 40 slots at DCA. See 49 U.S.C. § 41714(h)(3), (5), as amended by the FAA Modernization and Reform Act of 2012, Pub. L. No. 112-95, 126 Stat. 11 (Feb. 14, 2012).

airports; (B) ten shall be for air transportation to medium hub and smaller airports; and (C) four shall be for air transportation to airports without regard to their size." Under that provision, then, a maximum of four slot exemptions may be used to serve large hubs.

The proceeding under which the Department granted ASA the slot exemptions for the DCA-JAN service categorized the slot exemptions as available for medium hub and smaller airports. See Order 2004-12-6.

## APPLICATIONS

As summarized below, the Department received applications from Frontier Airlines, Inc., Southwest Airlines Co., and US Airways. The entire public record for this proceeding, including proposals and reply comments, may be accessed online through the Federal Docket Management System at http://www.regulations.gov by performing a "search" on docket number DOT-OST-2000-7182.

### Frontier Airlines: Washington DCA-Louisville, Kentucky (SDF)[4]

Frontier Airlines is requesting the two available within-perimeter DCA slot exemptions for service between DCA and Louisville International Airport (SDF). Frontier states that it is a limited incumbent air carrier, does not directly hold any within-perimeter slot exemptions, and relies on the limited slots and slot exemption held by its affiliate Republic Airlines to offer a limited within-perimeter network at DCA.

Frontier claims that Louisville is an inadequately-served monopoly market with high fares and low capacity relative to its market demand. Frontier maintains that the current average fare for the US Airways service between DCA and Louisville is $240. Frontier asserts that its low-fare service would maximize the public interest objectives with competitive service against US Airways' three daily flights. Frontier points out that, because of the short distance between DCA and SDF, one-stop options are not competitive nor do they offer any pricing or service discipline. Contrasting US Airways' current regional jet service between DCA and SDF, Frontier states that it would operate larger 138-seat A-319 aircraft on the route, a more than 90% increase in market capacity over US Airways' 45- to 70-seat regional jets.

---

[4] Application of Frontier Airlines, Inc., DOT-OST-2000-7182-1863, March 5, 2012.

**Southwest Airlines: Washington DCA-Oklahoma City, Oklahoma (OKC)[5]**

Southwest Airlines has applied for the within-perimeter slot exemptions for DCA service to Oklahoma City's Will Rogers World Airport (OKC) with continuing same-plane service to Dallas Love Field Airport (DAL). Southwest points out that it is a recent new entrant to DCA, through its acquisition of AirTran, and that its proposed service would provide nonstop service to a community without any such service from DCA. Southwest states that it has less than 3% of all DCA slots, while US Airways has over 50% of the total slots.

Southwest maintains that OKC is currently the largest DCA market without nonstop service, and that it has the highest average DCA fare, at $271, of the top ten inside perimeter markets without nonstop service to DCA. Southwest states that its flight would also connect to five additional markets beyond Oklahoma City, including Dallas Love Field Airport (through-service from DCA), Houston's William P. Hobby Airport, Denver International Airport, Las Vegas McCarran International Airport, and Phoenix Sky Harbor International Airport. Southwest would serve the market with 137-seat Boeing 737-700 aircraft.

**US Airways: Washington DCA-Jackson, Mississippi (JAN)[6]**

US Airways requests allocation of the available within-perimeter slot exemptions for US Airways or US Airways Express service between DCA and JAN.

US Airways urges the Department to ensure that service to Jackson continues. Stating that Jackson is a small community that has supported nonstop service to DCA for the last seven years, US Airways maintains that Jackson would be harmed by the loss of its only service to DCA, and that the economic impact on Jackson would affect the entire State of Mississippi. According to US Airways, if the Department awards these slot exemptions for service to another airport, Mississippi will be the only State east of the Mississippi River without nonstop service to DCA, with the exception of Delaware and Maryland, and JAN will be left with only eight destinations served on a nonstop service basis from the airport.

The airline contends that legislative history shows that Congress believed service to small communities such as Jackson is an essential priority in DCA slot exemption allocations, and that AIR-21 further reflected the legislative intent to benefit small communities. US Airways argues that almost all of the statutory criteria in Section 41718(b) explicitly or implicitly benefit small communities. US Airways further asserts that Vision 100 affirmed this legislative intent by increasing the number of slot exemptions reserved for

[5] Application of Southwest Airlines Co., DOT-OST-2000-7182-1867, March 5, 2012.
[6] Application of US Airways, Inc. for an Exemption, DOT-OST-2000-7182-1864, March 5, 2012.

small- and non-hub airports from four to six. Moreover, US Airways argues, Vision 100 removed the language from AIR-21 that gave a preference to new entrants and limited incumbents by providing in Section 41718(c)(3)(A) that the allocation of slot exemptions to small hub airports and nonhub airports could be granted without regard to whether the service would be provided by new entrants or limited incumbents. The airline asserts that Jackson continues to deserve the benefits of nonstop air service to DCA.

US Airways asserts that the only prior case in which slot exemptions for a small-hub airport were returned, and DOT selected another city rather than maintaining service to the same airport, was Midwest Airlines' return of exemptions to serve Des Moines International Airport (DSM).[7] The airline argues that this case is distinguishable because, unlike the Midwest case where the service to DSM was being operated at a loss, there is no evidence that Delta's cessation of service was due to a lack of support from the Jackson community. The airline asserts that Delta's decision to exit this route was related to Delta's decision to shift many of its services from DCA to New York LaGuardia Airport (LGA), and not through any fault of, or lack of support for the service from, JAN. US Airways also cites to past and current Congressional support for DCA-JAN service.

US Airways also states that it would be unable to serve JAN with slots from its current holdings at DCA because the airline has already made commitments to serve other small communities, and electing to serve JAN with its own slots would require US Airways to cancel service to one of these other small communities. The airline argues that its DCA-JAN service would offer connecting service to 27 additional destinations in the Ohio Valley and Northeastern United States, and it proposes to use either 69-seat Embraer E-170 or 80-seat Embraer E-175 aircraft with two classes of service.

**<u>Summary of the Comments</u>**

**Answer of Frontier Airlines[8]**

Frontier contends it should be chosen over both US Airways and Southwest.

Frontier maintains that US Airways' application improperly emphasizes that its within-perimeter service proposal is to a small community and ignores the other statutory criteria under which applications are to be evaluated. Frontier argues that this case is not about preserving service to JAN and that JAN effectively lost service on March 2, 2012, when Atlantic Southeast Airlines ceased flying the route under its slot exemption authority.

---

[7] See *Order Granting Within-Perimeter Slot Exemptions at Ronald Reagan Washington National Airport*, Order 2004-8-3 (DOT August 9, 2004), at 6-7 (awarding within-perimeter slot exemptions to Spirit Airlines for service to Myrtle Beach, South Carolina).

[8] Answer of Frontier Airlines, Inc., DOT-OST-2000-7182-1885, March 20, 2012.

Frontier argues that the Department should not award the within-perimeter slot exemptions to US Airways, because US Airways is a legacy carrier with the largest pool of slots at DCA and its service proposal does not comprehensively address the statutory criteria. Instead, Frontier asserts, the Department should award the slot exemptions to it because it is an acknowledged low-cost, low-fare, limited incumbent whose service proposal meets the maximum number of statutory criteria possible, including competition on a monopoly DCA route and low fares.

Contrasting its application with that of US Airways, Frontier argues that it meets the test of Section 41718(b)(1) as a limited incumbent, whereas US Airways not only does not but is the single largest holder and operator of slots at DCA with more than 450 slots after the recent approval by the DOT of the Delta Air Lines – US Airways slot exchange. Frontier also asserts that US Airways could elect to serve JAN by using a pair of slots from its current holdings. Frontier further maintains that its proposed SDF service also satisfies the Section 41718(b)(3) criterion for service to small communities, with Louisville having fewer than 600,000 residents. Frontier additionally asserts that its proposal meets the Section 41718(b)(4) standard of providing competitive nonstop air transportation on a monopoly nonstop route to DCA. Finally, Frontier argues that its proposal best meets the Section 41718(b)(5) standard of producing the maximum competitive benefits, including low fares, because it, unlike US Airways, is an established low-cost, low-fare competitor; its 138-seat A319 mainline aircraft would produce more consumer benefits as compared to US Airways Express' 69-seat regional jet; SDF has two and half times more traffic demand for DCA air service than does Jackson; and SDF-DCA has much higher average fares per mile than DCA-JAN.

As to Southwest's OKC application, Frontier claims that the Department should regard it and not Southwest a "limited incumbent" under Section 41718(b)(1) if Southwest's operations at DCA are aggregated with its frequent service at Thurgood Marshall Baltimore/Washington International Airport (BWI) and Washington Dulles International Airport (IAD). Frontier further argues that its proposed SDF service would produce more competitive benefits than Southwest's proposed OKC service because, while Frontier asserts its proposed SDF service would bring a new and low-fare competitor in the Washington-SDF market, Southwest already operates daily service from BWI to OKC (and United also has daily service from IAD to OKC). In addition, as further detailed below, Frontier claims that, on a per-mile basis, Louisville's DCA fares are higher than Oklahoma City's, and Frontier's low-fare, monopoly-breaking SDF service would generate more direct annual consumer savings than Southwest's proposed OKC service. Frontier maintains that OKC receives more than 35 one-stop connections from DCA, while there are few viable alternative options to US Airways' nonstop monopoly flights to SDF. Frontier also contends that Louisville has a greater demand and higher prioritization for nonstop service to Washington, D.C., asserting that the DCA-SDF

market is 76% larger than the DCA-OKC market and that Washington, D.C. is Louisville's top destination, compared to being the fourth largest destination for Oklahoma City.

With respect to Southwest's arguments about the beyond-OKC benefits, Frontier asserts that Southwest's same-plane service to DAL underscores the fact that the DCA-OKC market alone is not sufficiently large enough to merit the service and that, in any event, there are 12 daily nonstop flights from DCA to Dallas/Ft. Worth International Airport. Frontier claims the beyond-OKC benefits asserted by Southwest are "minimal," because Denver International Airport currently has four daily nonstop flights from DCA, 11 from IAD, and eight from BWI. Houston's William P. Hobby Airport has eight daily nonstop flights from DCA, six from IAD, and eight from BWI. Phoenix Sky Harbor International Airport has three daily nonstop flights from DCA, one from IAD, and six from BWI. Las Vegas McCarran International Airport has one nonstop flight from DCA, three from IAD, and four from BWI.

In addition, Frontier urges us to be skeptical of Southwest's claim that the DCA-OKC fare will decrease to $163, given Southwest's current average $186 fare in the BWI-OKC market. Frontier estimates its average net fare on the DCA-SDF route at $103, claiming a savings of nearly 50% on the current net average fare of $190. Frontier asserts that its low fares will stimulate the current DCA-SDF market of 64,000 annual passengers to 129,940 annual passengers and will result in $9.9 million in annual consumer savings on the DCA-SDF route, thereby exceeding Southwest's claimed benefits of $8.2 million. Finally, Frontier states that the DCA-SDF market is much more expensive under US Airways' monopoly, as DCA-Oklahoma City travel costs 21 cents per mile, whereas DCA-Louisville costs 40 cents per mile.

**Response of Southwest Airlines**[9]

Southwest states that it is a limited incumbent; under Section 41718(b)(2), it proposes nonstop service to OKC, a community without existing nonstop service to DCA; under Section 41718(b)(3), OKC is a small community, as it is classified as a small hub by the FAA; and, under Section 41718(b)(5), its proposal would produce the greatest level of competitive benefits, including low fares, among the three competing applicants. Southwest's economic analysis and forecasts demonstrate, according to the applicant, that its DCA-OKC proposal would generate $8.2 million in annual consumer savings while stimulating the market by an additional 55,000 passengers.

With respect to US Airways' DCA-JAN proposal, Southwest states that US Airways is not a new or limited incumbent, as it holds 54 percent of the DCA slots, and it could use

[9] Response of Southwest Airlines Co., DOT-OST-2000-7182-1889, March 20, 2012

two of its current slot holdings if it desires to continue serving JAN. Southwest urges us to consider the totality of DCA slot holdings, comparing US Airways' portfolio of more than 450 slots to Southwest's holdings of 25 slots, and to that of the aggregate 87 slot holdings of all low-cost carriers at DCA. Southwest also points out that US Airways operates 73 percent of its DCA slot holdings with commuter or regional jets, and Southwest argues that this use of smaller aircraft does not maximize public use and benefits as it fails to accommodate the greatest number of air travelers seeking to use DCA. In addition, the airline notes that, since Delta's DCA-JAN service began in 2005, total O&D traffic declined 35% and the load factor decreased from 68% in calendar year 2005 to 46% for the year ended third quarter 2011, and the fare increased 87% from 2004. Southwest also asserts that it would charge lower fares to OKC than US Airways would to JAN. The airline estimates that the fare US Airways would charge in DCA-JAN would produce a yield of 27.0 cents per Revenue Passenger Mile (RPM) while Southwest's yield for DCA-OKC would average 14.1 cents per RPM, or 48% less.

With regard to Frontier's DCA-SDF proposal, Southwest maintains that the market is already well-served from DCA with three daily nonstop flights provided by Frontier's affiliated companies on US Airways' behalf, generating 84 passengers per day each way (PDEW). The Oklahoma City route, on the other hand, with no current nonstop service to DCA, generates 46 PDEW, and Southwest estimates that new daily DCA-OKC nonstop service would stimulate and increase the local market to 109 PDEW. Finally, Southwest believes the interlocking relationships between Republic Holdings and US Airways, under which Republic's commuter carriers fly major contract services for US Airways, and to a smaller degree, for Frontier, will discourage "vigorous" competition by Frontier in the DCA-SDF market. Southwest maintains that, under Frontier's proposal, DCA-SDF would become the third DCA route (along with Omaha and Kansas City) where both nonstop competitors would be a member of the Republic Holdings family. According to Southwest, US Airways accounts for 43 percent of all Republic Holdings' contract daily departures – 392 out of 904 – and is twice the size of Republic's next largest customer.

**Consolidated Answer of US Airways**[10]

US Airways argues that only its proposal seeks to serve a small-hub airport, as both SDF and OKC were ranked as medium-hub airports in 1997 while JAN was ranked as a small hub. The airline reasserts its argument that, because it is proposing service to a small-hub airport, the bias favoring limited incumbents does not apply when considering Jackson because Vision 100 removed the new entrant/limited incumbent criterion in Section 41718(c)(3)(A). Thus, US Airways maintains that its proposal would provide service to a

[10] Consolidated Answer of US Airways, Inc., DOT-OST-2000-7182-1884, March 20, 2012.

small community on a route with no existing DCA nonstop service that provides the maximum competitive benefits.

US Airways asserts that Jackson, a small community, has supported its nonstop DCA service for seven years, and it would be a major blow to job creation, the business climate, and the economic stability and competitiveness of Jackson and the State of Mississippi if the service ceased. The airline contends that the benefits of the US Airways service to the Jackson passenger would include larger, two-class regional jet service, a second nonstop US Airways destination, and more choices for connecting service to 27 destinations in the Ohio Valley and Northeast United States.

US Airways also argues that JAN has less service to the Washington, DC area airports (DCA, IAD, and BWI) than either SDF or OKC. The airline argues that its proposed service, which would include an early morning flight from JAN and an evening departure back from DCA, would not require an overnight stay, thus providing greater convenience for the Jackson passenger.

As to Southwest's application, US Airways disputes Southwest's claims of OKC connecting benefits. US Airways maintains that only Dallas and Houston passengers can reasonably connect via the OKC service, while Denver, Las Vegas, and Phoenix connection times are excessive. US Airways also argues that Southwest overstates the effect of both stimulation and fares and that a more reasonable forecast suggests that Southwest's DCA-OKC flights would be half-full and the route would be unsustainable.

With regard to Frontier's proposal for DCA-SDF service, US Airways states that SDF already has eight roundtrip flights provided by three airlines from the Washington area. US Airways also maintains that, since load factors from DCA, IAD, and BWI to SDF are less than 70% for the year-end November 2011, which is more than 12% below the average load factor for all Washington airports and more than 15% below the overall average domestic load factor across the industry, the demand for service between Louisville and Washington is already being met.

US Airways urges us to be skeptical of Frontier's proposal, contending that Frontier is reducing its DCA-Kansas City and DCA-Milwaukee service in April, it lacks available connecting opportunities at SDF, and its reliance on stimulation based on Independence Air's pricing model is flawed.

**Additional Comments of Frontier Airlines[11]**

Frontier states that, contrary to Southwest's assertion, it vigorously competes with US Airways and similarly competes with the other legacy carriers that utilize one of Republic

[11] Motion For Leave and Reply of Frontier Airlines, Inc., DOT-OST-2000-7182-1894, March 23, 2012.

Holdings' fee-for-service carriers (whereby the legacy carrier partners set the schedules, routes, and fares of the fee-for-service carriers). Frontier further states that it operates under an independent commercial management team.

**Additional Comments of US Airways**[12]

US Airways filed additional comments to counter Southwest's arguments about an asserted lack of competition between itself and Frontier, maintaining that its commercial relationships with Republic are conducted at arm's length and are the result of independent bargaining on both sides. In addition, US Airways points out that commuter slots, which are restricted to aircraft with 76 seats or less, make up a substantial portion of its DCA slot portfolio.

**Consolidated Reply of Southwest**[13]

Southwest filed additional comments to counter US Airways' argument that it overstated the effect of its proposed service on stimulation and fares. In asserting that its forecast traffic stimulation of 137 percent for DCA-OKC is reasonable, Southwest analyzes eight markets that it entered since 2009 with fare reductions of 40 percent or more and argues that traffic stimulation occurred in all eight markets as a result of Southwest's low fares. The airline also refutes US Airways' claim that commuter slots, which are restricted to aircraft with 76 seats or less, make up a substantial portion of its DCA slot portfolio. Instead, Southwest argues, 71 percent of US Airways' slots at DCA are unrestricted air carrier slots and US Airways operates only 27% of its DCA flights with mainline jet aircraft.

Southwest further contends that, contrary to US Airways' contentions, the slot exemptions at issue in this case are authorized for service to medium hub and smaller airports under Section 41718(c)(3)(B), which, unlike Section 41718(c)(3)(A), does not eliminate consideration of the new entrant/limited incumbent criterion. With respect to the size of OKC, Southwest contends that OKC is classified as a small hub in the FAA's most current Terminal Area Forecasts, and therefore must be considered as such for the purposes of this case. Southwest further argues that the 1997 classification is irrelevant since the slot exemptions in this case may be used for service to medium hub or smaller airports.

With respect to Frontier's proposal, Southwest challenges the economic impact and benefits analysis Frontier provided in its Answer. Southwest argues that, by redoing

[12] Motion For Leave to File an Otherwise Unauthorized Document and Additional Comments of US Airways, Inc., DOT-OST-2000-7182-1993, March 22, 2012.

[13] Consolidated Reply of Southwest Airlines Co. and Motion for Leave to File, DOT-OST-2000-7182, March 29, 2012.

Southwest's fare savings model using Frontier's methodology, Southwest's DCA-OKC savings would increase to $11.1 million annually. In addition, Southwest contends that, if Frontier's and Southwest's fares are compared on a per-mile basis, Frontier's yield would be 54 percent higher than Southwest's. Southwest also counters Frontier's argument that consideration of the services available at BWI and IAD should be used in weighing the applications in this case by asserting that the Department has not found that airlines or passengers consider the three Washington/Baltimore area airports to be economic substitutes for one another. Southwest also reasserts that the commercial and contractual relationships among Frontier, Republic, and US Airways continue to be relevant to this case.

**Comments (Additional and Second Additional Comments) of the Jackson Municipal Airport Authority**[14]

The Jackson Municipal Airport Authority (JMAA) supports US Airways' application for nonstop DCA-JAN service. JMAA states that JAN serves 58% of airline passengers originating in Mississippi, and that Jackson is the economic, business, and government center of Mississippi. The airport authority lists Nissan, Lockheed Martin, General Electric, Entergy, AT&T, C Spire Wireless, and L-3 Communications as among its major corporate employers, and notes that the city also has the largest concentration of Federal, State, and local agencies in Mississippi.

Noting that the *pendente lite* exemption granted to US Airways when Delta ceased service is the only nonstop service in the market, JMAA argues that awarding US Airways the slot exemptions would prevent the loss of this nonstop service for the small community, satisfying Sections 41718(b)(2) and (3). JMAA also asserts that the US Airways proposal satisfies Section 41718(b)(5) by offering passengers access to about 14 US Airways East Coast destinations. The airport authority further claims that the US Airways DCA-JAN service allows for significantly less travel time and the ability of one-day business trips between Washington, D.C. and Jackson.

In comparing the applications from Frontier and Southwest, JMAA argues that the US Airways proposal to serve JAN would best promote air transportation under Sections 41718(b)(2) and (3) by ensuring that JAN, a small hub airport in a small community, maintains nonstop service to the Washington, D.C. metropolitan area. JMAA asserts that, unlike Louisville that currently has nonstop service to DCA and IAD, and Oklahoma City that currently has nonstop service to IAD, Mississippi has no other nonstop service

---

[14] Additional Comments of the Jackson Municipal Airport Authority in Support of the Application by US Airways, Inc. for an Exemption, DOT-OST-2000-7182-1865/6, March 5, 2012; and Second Additional Comments of the Jackson Municipal Airport Authority in Support of the Application by US Airways, Inc. for an Exemption to Provide Nonstop Service Between Ronald Reagan Washington National Airport and Jackson-Medgar Wiley Evers International Airport, DOT-OST-200-7182-1892, March 20, 2012.

to Washington, D.C. The airport authority contends that not having this nonstop service would be devastating economically for both the city and the State. JMAA further emphasizes that Jackson is the smallest of the communities in terms of Metropolitan Statistical Area populations and airport size.

**Comments of the Louisville Regional Airport Authority (LRAA)[15]**

The Louisville Regional Airport Authority (LRAA) supports Frontier's application for service between DCA and SDF, arguing that the application best fits the statutory criteria. LRAA contends that SDF is a small community with a small hub airport, satisfying Section 41718(b)(3). The airport authority further states that DCA-SDF is a monopoly market served only by US Airways Express with regional jets, and it argues that Frontier's proposal will introduce competition and offer public benefits, such as lower fares and additional capacity on a route with demonstrated market demand, satisfying Sections 41718(b)(4) and (5). The airport authority further contends that awarding the slot exemptions to Frontier for the DCA-SDF service would stimulate traffic by other carriers in the SDF-Washington, D.C. market.

LRAA asserts that, while the Louisville area is properly viewed as a small community served by a small hub airport, the area also has many businesses, military facilities, and government offices with interests in and ties to the Washington, D.C. area, including the U.S. Army installation at Fort Knox. The airport authority claims that the Louisville area is headquarters for seven companies with annual revenues above $1 billion, naming Humana Inc. the largest company in the area with revenues of more than $33 billion per year. Finally, LRAA believes that Frontier's large-jet, low-fare service to DCA would encourage tourism, convention, and leisure traffic on a route that currently predominantly serves business travelers.

**Answer of Oklahoma City Department of Airports[16]**

Arguing that its economy can take the maximum advantage of new nonstop service to DCA, the City of Oklahoma City Department of Airports supports Southwest's application for DCA-OKC service and satisfies the applicable statutory criteria because it would: 1) under 41718(b)(1), provide service by a limited incumbent airline at DCA; 2) under 41718(b)(2), offer nonstop service to a community without such service; 3) under

---

[15] Comments of the Louisville Regional Airport Authority in Support of the Application of Frontier Airlines, DOT-OST-2000-7182-1886, March 20, 2012.

[16] Answer of Oklahoma City Department of Airports in Support of the Application of Southwest Airlines to Serve Ronald Reagan Washington National Airport from Will Rogers World Airport, DOT-OST-2000-7182-1887, March 20, 2012.

41718(b)(3), provide DCA service to a small community; and 4) under 41718(b)(5), produce the maximum competitive service, including low fares.

The airport authority states that Oklahoma City has a population of almost 1.3 million people, a number that grew more than 14% from 2000 to 2010, above average for the top 50 metropolitan regions. The airport authority also states that Oklahoma City is the State Capital and, with low unemployment and high GDP growth, is the primary economic engine for the region. Noting ties to the Washington, D.C. area, the authority lists major employers such as Tinker Air Force Base and the Federal Aviation Administration's Mike Monroney Aeronautical Center. The authority also claims that OKC generates more traffic to DCA than any other market within the 1,250-mile perimeter lacking nonstop service, despite the daily nonstop service from OKC to BWI and IAD, and that its fares are the highest among the top ten inside-the-perimeter markets from DCA without nonstop service.

**Comments of the Southwest Airlines Pilots' Association (SWAPA)**[17]

The Southwest Airlines Pilots' Association (SWAPA) supports Southwest's application for nonstop service between DCA and OKC, arguing that Southwest is a limited incumbent proposing service to a small community without current nonstop service to DCA, the proposed service would introduce competitive benefits, including low fares, and Southwest would use a larger aircraft – the 137-seat Boeing 737-700 – than the other applicants. SWAPA also noted that DCA-OKC is the largest inside-the-perimeter market without nonstop service.

In comparing the competing service proposal by US Airways, SWAPA asserts that, since 2005, load factors on Delta's DCA-JAN flights were generally at or below 50% on regional jet aircraft ranging from 50 to 75 seats, and SWAPA notes that US Airways proposes to use similarly sized aircraft. The association also contends that US Airways does not require the slot exemptions to serve JAN because of the large number of DCA slots it currently holds. SWAPA further contends that Southwest's proposal offers more competitive benefits than Frontier's proposed service to SDF when considering that Southwest operates, from OKC, 21 daily flights on Boeing 737 aircraft to eight cities on a nonstop basis and 64 cities on a one-stop or connecting basis.

**DECISION**

We have carefully considered the relevant statute and our previous slot exemption decisions, and reviewed the applications and responsive pleadings. We have determined to award US Airways these two slot exemptions for service to Jackson, Mississippi

[17] Comments of the Southwest Airlines Pilots' Association, DOT-OST-2000-7182-1888, March 20, 2012.

because, based on our analysis and judgment in this proceeding, its application best meets the objectives of the slot exemption statute. Our reasoning to support this decision is set out below.

As a preliminary matter grounding our analysis, it is important to understand foundational language in the Department's very first decision awarding within-perimeter slot exemptions following enactment of AIR-21.

In this initial decision, the Department set forth its construction of Section 41718(b), in addressing whether an application must meet each of the applicable criteria that were specified in that section. One of the carriers applying for exemptions in that case argued that unless a carrier can qualify for an inside the perimeter slot under all applicable criteria and procedures as required by statute, the application must be dismissed by the Department as being legally insufficient.

In rejecting that interpretation, the Department reasoned as follows:

> 49 U.S.C. §41718(b) directs the Secretary to develop criteria for distributing slot exemptions for flights within the perimeter of DCA to medium hub or smaller airports in a manner that promotes air transportation:
>
> (1) by new entrant air carriers and limited incumbent air carriers;
> (2) to communities without existing nonstop air transportation to Ronald Reagan Washington National Airport;
> (3) to small communities;
> (4) that will provide competitive nonstop air transportation on a monopoly nonstop route to Ronald Reagan Washington National Airport; or (emphasis added)
> (5) that will produce the maximum competitive benefits, including low fares.
>
> The statutory requirements for the awarding of within-perimeter slot exemptions in §41718(b) are in the disjunctive. This reading of the statute is evident since the five criterion [sic] are separated by the term "or" as opposed to the term "and." While the statute provides the Department with specific criteria that it must use in evaluating these applications, the statute also provides the Department with the essential flexibility it needs in comparing these applications, ensuring that its determinations in these matters will maximize public benefits.

*See Order Granting Within-Perimeter Slot Exemptions at Ronald Reagan-Washington National Airport*, Order 2000-7-2, 14-15 (DOT July 5, 2000).[18]

We recognize that there have been a number of decisions subsequent to Order 2000-7-2 awarding within-perimeter slot exemptions to applicants that met more than one, if not several or the most, of the Section 41718(b) criteria. We also recognize that our within-perimeter slot exemption award decisions subsequent to Order 2000-7-2 may have appeared inconsistent with our previously stated interpretation of Section 41718(b). In some instances, those orders characterized such applications as those that "best" meet the criteria in the statute.[19] At least one of our within-perimeter slot exemption orders premised the award on the application satisfying numerically "more" of the Section

[18] *See also Final Order Granting Within-Perimeter Slot Exemptions at Ronald Reagan Washington National Airport*, Order 2008-12-22, at 4 (DOT December 29, 2008) (making final a tentative allocation of two within-perimeter slot exemptions to US Airways for service to Akron-Canton; "what cannot be argued is the express language Congress used in establishing the selection criteria that govern these proceedings, as well as our obligation to first look to that express language in implementing the statute. Accordingly . . . the relative merits of each carrier's proposal were analyzed by applying the statutory criteria set out at 49 U.S.C. § 41718."); *Order Granting Within-Perimeter Slot Exemptions at Ronald Reagan Washington National Airport*, Order 2003-1-16, at 2, 8 (DOT Jan. 22, 2003) (awarding within-perimeter slot exemptions to Corporate Airlines for service to Wilmington, North Carolina or Jacksonville, North Carolina and AirTran for service to Fort Lauderdale, Fort Myers or West Palm Beach, Florida; emphasis added to the word "or" in Section 41718(b) criteria).

[19] *See, e.g., Order Reallocating Within-Perimeter Slot Exemptions at Ronald Reagan Washington National Airport*, Order 2010-12-16, at 10 (DOT December 10, 2010), *vacated on other grounds*, *Republic Airline, Inc. v. Dep't of Trans*., 669 F.3d 296 (D.C. Cir. 2012) (reallocating two within-perimeter slot exemptions to Sun Country Airlines for service to Lansing Michigan; "[t]he statutory criteria for assessing the proposals in this docket are set out at 49 U.S.C. § 41718. As discussed in detail below, Sun Country's proposal meets four out of five selection criteria, the maximum number possible."); *Order Tentatively Granting Within-Perimeter Slot Exemptions at Ronald Reagan Washington National Airport*, Order 2008-11-19, at 2, 5 (DOT November 25, 2008) (tentative allocation of two within-perimeter slot exemptions to US Airways for service to Akron-Canton); *Order Granting Within-Perimeter Slot Exemptions at Ronald Reagan Washington National Airport*, Order 2008-2-28, at 2, 9, 11 (DOT Feb. 27, 2008) (awarding within-perimeter slot exemptions to Spirit Airlines for service to Fort Lauderdale, Florida and to AirTran Airways for service to either Jacksonville, Florida or Milwaukee, Wisconsin, with a backup selection of Midwest Airlines for service to Milwaukee or Kansas City, Missouri); *Order Granting Within-Perimeter Slot Exemptions at Ronald Reagan Washington National Airport*, Order 2007-5-12, at 2, 13 (DOT May 23, 2007) (awarding within-perimeter slot exemptions to AirTran for service to Atlanta); *Order Granting Within-Perimeter Slot Exemptions at Ronald Reagan Washington National Airport*, Order 2006-6-17, at 7 (DOT June 12, 2006) (awarding within-perimeter slot exemptions to US Airways for service to Sarasota/Bradenton, Florida); *Order Granting Within-Perimeter Slot Exemptions at Ronald Reagan Washington National Airport*, Order 2004-12-6, at 6-8 (DOT Dec. 6, 2004) (awarding within-perimeter slot exemptions to Atlantic Southeast Airlines for service to Jackson, Mississippi); *Order Granting Within-Perimeter Slot Exemptions at Ronald Reagan Washington National Airport*, Order 2004-4-2, at 15, 17, 18-19 (DOT April 1, 2004) (awarding within-perimeter slot exemptions to AirTran for service to Atlanta; Comair for service to Jackson, Mississippi or Lexington, Kentucky; Midwest Airlines for service to Kansas City, Missouri; Spirit Airlines for service to Detroit, Michigan; and US Airways for service to Asheville, North Carolina, Chattanooga, Tennessee, or Wilmington, North Carolina).

41718(b) criteria. *See Order Granting Within-Perimeter Slot Exemptions at Ronald Reagan Washington National Airport*, Order 2004-8-3, at 9 (DOT Aug. 9, 2004) (awarding within-perimeter slot exemptions to Spirit Airlines for service to Myrtle Beach, South Carolina, and finding that "Spirit's proposal meets more of the statutory criteria than either Comair's or Northwest's"). None of these decisions stated that we were adopting a new standard or modifying our original construction of Section 41718(b) as set forth in Order 2000-7-2. We nevertheless recognize that some of these precedents might be construed as setting forth the principle that the applicable criteria must be evaluated as having equivalent weight and that a slot exemption must always be awarded to the application that appears to satisfy the greatest number of Section 41718(b) criteria.[20] That is not the case.

Therefore, the Department reaffirms its interpretation of Section 41718(b) as set forth in Order 2000-7-2, which has not changed, and will apply that interpretation in this proceeding and in future proceedings under Section 41718(b).[21] That construction comports with the language of the statute. By its use of the disjunctive "or" in separating the award criteria, the statute "provides the Department with the essential flexibility it needs in comparing these applications, ensuring that its determinations in these matters will maximize public benefits." Order 2000-7-2 at 15. Accordingly, the Department has the discretion to premise an award based upon satisfaction of less than the greatest number of criteria, or even one criteria, listed in Section 41718(b), based upon the Department's analysis of the relative merits of each carrier's proposal when evaluated under the Section 41718(b) criteria. Congress plainly vested the Department with that discretion by enumerating the five criteria and then separating them by the term "or" as opposed to the term "and." In doing so, the statute provides the Department with specific

---

[20] For example, in a prior proceeding, slot exemptions for a small-hub airport were returned, another airline proposed to serve the same small-hub airport, and the Department selected another destination rather than restoring service to the same small-hub airport. The decision in that proceeding is among those that may have given the impression that the proposal meeting the greatest number of criteria would prevail; however, that decision was based on the relative merits of the particular proposals submitted and, in that proceeding, the Department's decision hinged on its findings that the new destination had comparably fewer connecting opportunities to DCA and a greater need for competitive low-fare service on a low-fare carrier. *See Order Granting Within-Perimeter Slot Exemptions at Ronald Reagan Washington National Airport*, Order 2004-8-3 (DOT Aug. 9, 2004) (awarding within-perimeter slot exemptions to Spirit Airlines for service to Myrtle Beach, South Carolina).

[21] To the extent our decision today might be construed as a change in statutory interpretation, it is well-established that "an agency's interpretation of an ambiguous statute is entitled to judicial deference" under *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc*., 467 U.S. 837 (1984), and the agency may change "a prior statutory interpretation . . . without notice and comment." *Syncor Int'l Corp. v. Shalala*, 127 F.3d 90, 94 (D.C. Cir. 1997). *See also, e.g., Firearms Import/Export Roundtable Trade Group v. Jones*, No. 11-547, 2012 WL 1288476, at *5 (D.D.C. March 12, 2012) ("[W]ithout notice and comment an agency may issue an interpretation that changes a prior statutory interpretation.") (quoting *Syncor*, 127 F.3d at 94) (internal citations omitted).

criteria that it must use in evaluating these applications, but also provides the Department with the essential flexibility it needs in comparing these applications, ensuring that its determinations in these matters will maximize public benefits. [22]

To the extent our prior decisions could be interpreted to require the Department to award within-perimeter slot exemptions to an application satisfying "more" of the Section 41718(b) criteria, we now expressly clarify that, consistent with our first interpretation of Section 41718 in Order 2000-7-2, the Department has the discretion to award slot exemptions to applicants with proposals satisfying fewer than the maximum number of criteria – or fewer than other applicants – and, in given circumstances, one criterion may be more material to a decision than other criteria.

While each of the three applications in this proceeding has merit, based upon the applications received, and under our analysis of the relative merits of each carrier's proposal when evaluated under the Section 41718(b) criteria, we are persuaded that these slot exemptions should be allocated to US Airways for service to Jackson. We have concluded that the criterion set forth in Section 41718(b)(2) – promoting service to communities without existing nonstop air transportation to DCA – is most material to this decision. And as between the two communities without this nonstop service – Jackson and Oklahoma City - we have concluded that public benefits, in our judgment, are best maximized with an award to Jackson.

First, as convincingly argued by both US Airways and JMAA, we conclude that Jackson is a small community that substantially benefitted from nonstop service to DCA for seven years, which service it stands to lose if US Airways' application is not selected to the detriment of the city and the State of Mississippi. While Oklahoma City could reasonably expect economic benefits from a grant of the competing Southwest application, in our judgment, we conclude on this record that Jackson would face significant adverse economic consequences if nonstop DCA service were not maintained, with adverse effects felt throughout the State of Mississippi.

---

[22] We note that Congress recently amended the statute governing the award of slot exemptions for certain nonstop service between DCA and airports beyond the 1,250-mile perimeter, making 8 new slot exemptions available to new entrants and limited incumbents. See FAA Modernization and Reform Act of 2012 (FAA 2012), Section 414, P. L. 112-95 (Feb. 14, 2012), amending 49 U.S.C. § 41718. For these 8 new slot exemptions, the amended statute contains a new Section 41718(g)(2) that sets forth seven criteria for selection in the disjunctive. *Id*. On May 14, 2012, the Department issued its first order under the amended statute, awarding two beyond-perimeter slot exemptions to each of Alaska Airlines, Inc., Jet Blue Airways Corporation, Southwest Airlines Co., and Virgin America Inc. See Order 2012-5-12 (DOT May 14, 2012), at 3-4.

JMAA has represented that JAN serves 58% of airline passengers originating in Mississippi, that Jackson is the economic, business, and government center of Mississippi, and that Jackson has the largest concentration of Federal, State, and local agencies in Mississippi. We have concluded that those agencies, together with such major corporate employers as Nissan, Lockheed Martin, General Electric, Entergy, AT&T, C Spire Wireless, and L-3 Communications, which have been reliant on convenient nonstop service to DCA, would all be adversely impacted if that nonstop service to DCA were lost.

US Airways contends that the DCA-JAN service is viable under its business plan, and we note that US Airways' application received strong airport and community endorsements, as is reflected in the numerous comments of support set forth in the record of this proceeding from business, political and community leaders and regular DCA-JAN travelers, all expressing support for the US Airways application and further describing the negative impact that would follow a loss of service to DCA.

The carriers have also raised as an issue the nonstop travel alternatives available from each competing community to the other major airports serving the Washington, D.C. metropolitan area, BWI and IAD. While BWI and IAD are not economically interchangeable with DCA,[23] they do provide the nearest alternative access to the Washington area for many travelers. Absent the *pendente lite* authority in place, JAN has only one daily nonstop roundtrip into the Washington area, that being into BWI. That roundtrip from Jackson, arriving midday in both directions, offers JAN fewer nonstop options than the three daily nonstops from Louisville to DCA,[24] the four weekday nonstops from Louisville to BWI, and the once daily weekday nonstop from Louisville to IAD. Oklahoma City has two nonstop options available to other WAS airports with its once daily nonstop roundtrip into each of BWI and IAD.

In evaluating the relative merits of the applications submitted in this proceeding under the Section 41718(b) criteria, we also conclude that all three proposals meet the criterion set forth in Section 41718(b)(3) as each proposal would provide air transportation to small communities. Frontier, a limited incumbent carrier at DCA, proposes low-fare service to compete directly with the US Airways nonstop roundtrips to Louisville, Kentucky, a proposal that satisfies the criterion set forth in Section 41718(b)(4). Southwest, a limited incumbent at DCA, seeks to provide low-fare, first nonstop service to Oklahoma City, Oklahoma. US Airways, an incumbent carrier at DCA, plans to restore Jackson, Mississippi's only nonstop service to DCA.

---

[23] *See*, Notice on Petition for Waiver of the Terms of the Order Limiting Scheduled Operations at LaGuardia Airport, 75 Fed. Reg. 26,332 (May 11, 2010).
[24] Effective, on July 11, 2012, nonstop access on US Airways increases to four each weekday.

But under our analysis of the relative merits of each carrier's proposal when evaluated under the Section 41718(b) criteria, we are persuaded that the criterion set forth in Section 41718(b)(2) is most material to this decision because, as explained above, the public benefits are best maximized with an award to JAN as opposed to OKC. Jackson is a small community that significantly benefitted from nonstop service to DCA for seven years. Jackson would face significant adverse economic consequences if the service that formerly existed to JAN were not restored, with adverse effects felt throughout the State of Mississippi. Given that situation, the benefits of providing nonstop service between DCA and JAN are more compelling on this record in this proceeding as weighed against the particulars of the other applications. And we are persuaded that the criterion set forth in Section 41718(b)(2) should be accorded the greatest weight in this proceeding, and we therefore award US Airways these two slot exemptions for service to Jackson, Mississippi.

## CONDITIONS

### Start-up

We will require US Airways to inaugurate full service by no later than September 8, 2012. If, for any reason, US Airways is not able to use the slot exemptions awarded, we request that it notify the Department as soon as possible, but not later than 10 days after the date of service of this Order.

### Assignment of Slot Times

We are directing US Airways to file in the Docket, no later than 10 business days from the date of this Order, their proposed flight schedule.

Section 414 (b) of FAA 2012 allows the Department to assign two additional slot exemptions per one hour period (for a total of five), an increase from the three per hour authorized in Vision 100. There are 15 hourly periods beginning at 7:00 a.m. and ending at 9:59 p.m., and all slot exemptions must fit into those 75 slot times. Applicants were advised of these slot-time constraints. In coordination with FAA's Slot Administration Office, we shall assign slot times corresponding with the authority granted in this proceeding, and in accordance with the requirements of FAA 2012, in a notice subsequent to our decision.

**ENVIRONMENTAL ISSUES**

Although 49 U.S.C. Section 41718(e) specifically exempts our action here from review under the National Environmental Policy Act,[25] we remain sensitive to the environmental impact of increased operations at DCA. Consistent with the statute, we will require that all operations authorized by this Order be conducted with Stage 3 aircraft.

Also, under 49 U.S.C. § 47117(e), the Department will give DCA priority in making grants for airport noise compatibility planning and programs.

**ADMINISTRATIVE TERMS**

Under the provisions of 49 U.S.C. Section 41714(j), an awardee may not sell, trade, transfer, or convey the operating authorities granted by the subject exemptions, except through an air carrier merger or acquisition.

Further, granting of these exemptions in no way is to be construed as allowing a carrier to operate services that it could not otherwise operate. An awardee must still meet all the requirements of the Department and FAA, including but not limited to, use-or-lose provisions, and all other statutes and regulations governing air transportation.

This Order is issued under authority delegated in 49 C.F.R. Section 1.56(a).

---

[25] Section 41718(e) states, "Neither the request for, nor the granting of an exemption, under this section shall be considered for purposes of any Federal law a major Federal action significantly affecting the quality of the human environment."

**ACCORDINGLY,**

1. The Department reallocates the two slot exemptions to US Airways, Inc. to serve Jackson-Evers International Airport;

2. The Department directs US Airways, Inc., to file in Docket OST-2000-7182 no later than ten business days after the service date of this Order their proposed flight schedules and effective date for operations authorized by this Order. The slot exemptions granted must be conducted with single-aisle Stage 3 aircraft, may not be used for operations between the hours of 10:00 p.m. and 7:00 a.m., and may not increase the number of operations at Ronald Reagan Washington National Airport in any one-hour period during the hours of 7:00 a.m. and 9:59 p.m. by more than five operations. The slot times currently allocated for nonstop DCA-JAN service are both in the 1300 hour period. The air carrier is advised to exercise maximum flexibility in proposed operating times to ensure compliance with these limits;

3. In coordination with the FAA Slot Administration Office, the Department will make the final assignment of operating times for these within-perimeter slot exemptions in a separate notice, as soon as possible. The Department directs the awardee to contact the FAA Slot Administration Office regarding their proposed schedules associated with the slot exemptions. FAA will assign slot exemption numbers, effective dates, and operating times consistent with statutory limitations;

4. The Department prohibits US Airways, Inc., from selling, trading, transferring, or conveying the operating authorities granted by the subject exemptions, except through an air carrier merger or acquisition;

5. The Department grants all motions to file otherwise unauthorized documents and denies motions to strike such documents;

6. Except as otherwise granted, we deny all other applications for exemptions from 14 C.F.R. Part 93, Subparts K and S, filed in this docket;

7. The authorities granted under these exemptions are subject to all of the other requirements delineated in 14 C.F.R. Part 93, Subparts K and S, including, but not limited to, the reporting provisions and use-or-lose requirements;

8. This docket will remain open until further order of the Department; and

9. We will serve this Order on all interested parties including MWAA and the FAA Slot Administration Office.

By:

**SUSAN L. KURLAND**
Assistant Secretary for Aviation
and International Affairs

(SEAL)

*An electronic version of this document will be made available on the World Wide Web at:*
*http://www.regulations.gov/*

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

UNITED STATES OF AMERICA,
*Plaintiff*,

v.

ALASKA AIR GROUP, INC.

and

VIRGIN AMERICA INC.,
*Defendants*.

**PROPOSED FINAL JUDGMENT**

Whereas, Plaintiff United States of America ("United States") filed its Complaint on December 6, 2016, the United States and Defendants, Alaska Air Group, Inc. ("Alaska") and Virgin America Inc. ("Virgin"), by their respective attorneys, have consented to entry of this Final Judgment without trial or adjudication of any issue of fact or law, and without this Final Judgment constituting any evidence against or admission by any party regarding any issues of fact or law;

AND WHEREAS, Defendants agree to be bound by the provisions of this Final Judgment pending its approval by the Court;

AND WHEREAS, this Final Judgment requires Defendants to undertake certain actions and refrain from certain conduct for the purpose of remedying the loss of competition alleged in the Complaint;

AND WHEREAS, Defendants have represented to the United States that the actions and conduct restrictions described below can and will be undertaken, and that Defendants will later raise no claim of hardship or difficulty as grounds for asking the Court to modify any provisions contained below;

NOW, THEREFORE, before any testimony is taken, without trial or adjudication of any issue of fact or law, and upon consent of the parties, it is ORDERED, ADJUDGED AND DECREED:

## I. Jurisdiction

The Court has jurisdiction over the subject matter of this action and Defendants. The Complaint states a claim upon which relief can be granted against Defendants under Section 7 of the Clayton Act, as amended, 15 U.S.C. § 18.

## II. Definitions

As used in this Final Judgment:

A. "Alaska" means Alaska Air Group, Inc., a Delaware corporation headquartered in Seattle, Washington, its successors and assigns, its Affiliates, and its subsidiaries or divisions,and their respective directors, officers, managers, agents, and employees.

B. "Alaska/American Codeshare Agreement" means the Amended and Restated Codeshare Agreement entered into between Alaska and American, dated February 15, 2015, and all predecessors, exhibits, schedules and amendments thereto.

C. "Alaska/American Overlap Routes" means any routes between two cities in the United States on which Alaska and American both provide nonstop scheduled air passenger service. For purposes of this definition only, the city that an airport serves will be determined by the City Market ID assigned to each airport by the U.S. Department of Transportation in the

Airline Origin and Destination Survey ("DB1B"), and airports with the same City Market ID will be considered to serve the same city, except the following airports will not be considered to serve the same city as any other airport: (1) Los Angeles International Airport and (2) Norman Y. Mineta San Jose International Airport. The routes covered by this definition may change over the term of this Final Judgment as Alaska and American adjust their respective schedules The Alaska/American Overlap Routes as of December 6, 2016 are listed in Appendix A for illustrative purposes.

D. "American" means American Airlines Group Inc., a Delaware corporation headquartered in Fort Worth, Texas, its successors and assigns, and its subsidiaries, divisions, groups and Affiliates, and their respective directors, officers, managers, agents, and employees.

E. "Affiliate" means an entity that is related to another entity by one owning shares of the other, by common ownership, or by other means of control, and includes any airline that operates Flights for Alaska or American pursuant to a capacity purchase agreement, but such airline shall only be deemed an Affiliate with respect to such Flights.

F. "Codeshare Agreement" means a contract between two airlines that allows them to market one another's flights by placing their respective unique, identifying codes on those flights. Each airline's code is established by the International Air Transportation Association.

G. "Connecting Itinerary" means a route within the United States with at least one intermediate stop at any airport between the origination and destination airports.

H. "Defendants" means Alaska and Virgin, and any successor or assignee to all or substantially all of the business or assets of Alaska or Virgin.

I. "US/AA Divestiture Assets" means all rights and interests held by Defendants in the two gates at Dallas Love Field ("DAL"), eight slots at Washington Reagan National Airport

("DCA"), and 12 slots at New York LaGuardia Airport ("LGA"), acquired by Virgin pursuant to the Final Judgment entered in *United States v. US Airways Group, Inc.*, Case No. 1:13-cv-01236 (CKK) (Dkt. No. 170) (D.D.C. Apr. 25, 2014).

J. "Flight" means scheduled air passenger service, without any intermediate stops, between an origin airport and destination airport, both within the United States.

K. "Future Alaska-American Overlap Route" means any Alaska-American Overlap Route created by Defendants or American commencing service between two cities after the consummation of the Transaction.

L. "Key Alaska Airports" means each of the following airports: (1) Portland International Airport ("PDX"); (2) Seattle-Tacoma International Airport ("SEA"); (3) San Francisco International Airport ("SFO"); and (4) Ted Stevens Anchorage International Airport ("ANC").

M. "Key American Airports" means each of the following airports: (1) Charlotte Douglas International Airport ("CLT"); (2) Chicago Midway International Airport ("MDW"); (3) Chicago O'Hare International Airport ("ORD"); (4) Dallas/Fort Worth International Airport ("DFW"); (5) Dallas Love Field ("DAL"); (6) Fort Lauderdale-Hollywood International Airport ("FLL"); (7) John F. Kennedy International Airport ("JFK"); (8) Miami International Airport ("MIA"); (9) New York LaGuardia Airport ("LGA"); (10) Philadelphia International Airport ("PHL"); (11) Phoenix Sky Harbor International Airport ("PHX"); and (12) Washington Reagan National Airport ("DCA").

N. "LAX" means Los Angeles International Airport.

O. "Market" means to sell tickets for a Flight pursuant to a Codeshare Agreement, either as a standalone Flight or as part of a Connecting Itinerary.

P. "Transaction" means the transaction referred to in the Agreement and Plan of Merger by and among Alaska, Alpine Acquisition Corp., a wholly owned subsidiary of Alaska, and Virgin, dated April 1, 2016.

Q. "Virgin" means Virgin America Inc., a Delaware corporation headquartered in Burlingame, California, its successors and assigns, and its subsidiaries, divisions, groups, Affiliates, partnerships and joint ventures, and their directors, officers, managers, agents, and employees.

R. "Virgin/American Overlap Routes" means any routes on which Virgin and American both provide nonstop scheduled air passenger service as of December 6, 2016. The Virgin/American Overlap Routes are listed in Appendix B and will not change over the term of this decree.

## III. Applicability

A. This Final Judgment applies to Alaska and Virgin, as defined above, and all other persons in active concert or participation with any of them who receive actual notice of this Final Judgment by personal service or otherwise.

## IV. Prohibited Conduct

A. Beginning

Defendants shall not directly or indirectly, under the Alaska/American Codeshare Agreement or otherwise:

1. Market any American Flight serving a Virgin/American Overlap Route, or permit American to Market any Alaska Flight serving a Virgin/American Overlap Route;

2. Market any American Flight serving an Alaska/American Overlap Route, or permit American to Market any Alaska Flight serving an Alaska/American Overlap Route;

3. Market any American Flight that originates or terminates at any Key Alaska Airport, or permit American to Market any Alaska Flight that originates or terminates at any Key American Airport; and

4. Market any American Flight, or permit American to Market any Alaska Flight, serving any route between LAX and a Key Alaska Airport or a Key American Airport.

B. Defendants shall not directly or indirectly sell, trade, lease, or sub-lease any of the US/AA Divestiture Assets without the prior written consent of the United States. Defendants shall not directly or indirectly transfer any interest in the US/AA Divestiture Assets to American or permit American to use the US/AA Divestiture Assets.

C. Notwithstanding Section IV.B, nothing in this Final Judgment shall prevent Defendants from (i) engaging in one-for-one trades of slots at different times at the same airport, (ii) engaging in one-for-one trades of gates at the same airport, (iii) continuing the subleases of the US/AA Divestiture Assets already in place as of December 6, 2016; (iv) permitting any airline to use any slots or airport gates if required by lawful directive of an airport authority or any other governmental body; or (v) permitting any airline to use any slots or airport gates on an ad hoc basis to accommodate a safety, security, or exigent operational need.

## V. Required Conduct

A. Within thirty (30) calendar days of entry of this Final Judgment, Defendants shall certify to the United States that they have informed (i) all of Defendants' personnel involved in

the implementation, operation, and enforcement of the Alaska/American Codeshare Agreement and (ii) all of Defendants' officers and directors of the obligations set forth in this Final Judgment.

B. Within sixty (60) calendar days of the creation of a Future Alaska/American Overlap Route, Defendants shall comply with the prohibition set forth in Section IV.A(2) on that Future Alaska/American Overlap Route.

C. Defendants shall certify to the United States annually on the anniversary date of the entry of this Final Judgment that Defendants have complied with all of the provisions of this Final Judgment.

D. Defendants shall notify the United States annually on the anniversary date of the entry of this Final Judgment of:

1. the identity of routes on which Alaska Markets American Flights, and separately for each route, whether Alaska Markets American Flights on a standalone basis, as part of a Connecting Itinerary, or both;
2. the number of passengers that purchased tickets pursuant to the Alaska/American Codeshare Agreement or any other Codeshare Agreement between Alaska and American for American Flights Marketed by Alaska during the prior calendar year; and
3. the amount of revenue that Alaska received during the previous calendar year from American pursuant to the Alaska/American Codeshare Agreement.

E. If Defendants amend the Alaska/American Codeshare Agreement or enter into any new or restated Codeshare Agreement with American, Defendants shall provide a copy of such amendment or agreement to the United States at least thirty (30) calendar days in advance

of such amendment or agreement becoming effective, unless the United States agrees in writing that Defendants may make such agreement(s) or amendment(s) effective at an earlier date. Defendants shall satisfy the obligations set forth in parts A, C, D, and E of this Section by providing the required certifications, notifications, and copies of agreements to the Chief of the Transportation, Energy, and Agriculture Section, Antitrust Division, U.S. Department of Justice.

## VI. Compliance and Inspection

A. For the purposes of determining or securing compliance with this Final Judgment, or of any related orders, or of determining whether the Final Judgment should be modified or vacated, and subject to any legally recognized privilege, from time to time authorized representatives of the United States Department of Justice, including consultants and other persons retained by the United States, shall, upon written request of an authorized representative of the Assistant Attorney General in charge of the Antitrust Division, and on reasonable notice to Defendants, be permitted:

1. access during Defendants' office hours to inspect and copy, or at the option of the United States, to require Defendants to provide hard copy or electronic copies of, all books, ledgers, accounts, records, data, and documents in the possession, custody, or control of Defendants, relating to any matters contained in this Final Judgment; and

2. to interview, either informally or on the record, Defendants' officers, employees, or agents, who may have their individual counsel present, regarding such matters. The interviews shall be subject to the reasonable convenience of the interviewee and without restraint or interference by Defendants.

B. Upon the written request of an authorized representative of the Assistant Attorney General in charge of the Antitrust Division, Defendants shall submit written reports or responses to written interrogatories, under oath if requested, relating to any of the matters contained in this Final Judgment.

C. No information or documents obtained by the means provided in this Section shall be divulged by the United States to any person other than an authorized representative of the executive branch of the United States, except in the course of legal proceedings to which the United States is a party (including grand jury proceedings), or for the purpose of securing compliance with this Final Judgment, or as otherwise required by law.

D. If at the time information or documents are furnished by Defendants to the United States, Defendants represent and identify in writing the material in any such information or documents to which a claim of protection may be asserted under Rule 26(c)(1)(G) of the Federal Rules of Civil Procedure, and Defendants mark each pertinent page of such material, "Subject to claim of protection under Rule 26(c)(1)(G) of the Federal Rules of Civil Procedure," then the United States shall give Defendants ten (10) calendar days' notice prior to divulging such material in any legal proceeding (other than a grand jury proceeding).

## VII. No Limitation on Government Rights

Nothing in this Final Judgment shall limit the right of the United States to investigate and bring actions as necessary to prevent or restrain violations of the antitrust laws relating to the Alaska/American Codeshare Agreement, or any past, present, or future conduct, policy, practice or agreement of Defendants.

**VIII. Retention of Jurisdiction**

This Court retains jurisdiction to enable any party to this Final Judgment to apply to this Court at any time for such further orders and directions as may be necessary or appropriate to carry out or construe this Final Judgment, to modify any of its provisions, to enforce compliance, and to punish violations of its provisions.

**IX. Expiration of Final Judgment**

Unless this Court grants an extension, this Final Judgment shall expire ten (10) years from the date of its entry.

**X. Public Interest Determination**

The entry of this Final Judgment is in the public interest. The parties have complied with the requirements of the Antitrust Procedures and Penalties Act, 15 U.S.C. § 16, including making copies available to the public of this Final Judgment, the Competitive Impact Statement, and any comments thereon, and the United States' responses to comments. Based upon the record before the Court, which includes the Competitive Impact Statement and any comments and responses to comments filed with the Court, entry of this Final Judgment is in the public interest

DATED: __________________

Court approval subject to the
Antitrust Procedures and Penalties Act,
15 U.S.C. § 16

____________________________

United States District Judge

# Appendix A

Alaska/American Domestic U.S. Overlap Routes as of December 6, 2016

| ***Non-Directional Origin and Destination Pairs*** | |
|---|---|
| | |
| Ted Stevens Anchorage International Airport | Los Angeles International Airport |
| Ted Stevens Anchorage International Airport | Phoenix Sky Harbor International Airport |
| Chicago O'Hare International Airport | Portland International Airport |
| Chicago O'Hare International Airport | Seattle – Tacoma International Airport |
| Dallas/Fort Worth International Airport | Portland International Airport |
| Dallas/Fort Worth International Airport | Seattle – Tacoma International Airport |
| Los Angeles International Airport | Portland International Airport |
| Los Angeles International Airport | Salt Lake City International Airport |
| Los Angeles International Airport | Seattle – Tacoma International Airport |
| John F. Kennedy International Airport | Seattle – Tacoma International Airport |
| Philadelphia International Airport | Seattle – Tacoma International Airport |
| Phoenix Sky Harbor International Airport | Seattle – Tacoma International Airport |
| Phoenix Sky Harbor International Airport | Portland International Airport |
| Ronald Regan Washington National Airport | Los Angeles International Airport |
| Baltimore – Washington International Airport | Los Angeles International Airport |
| Newark Liberty International Airport | Seattle – Tacoma International Airport |
| John F. Kennedy International Airport | San Diego International Airport |
| Newark Liberty International Airport | San Diego International Airport |
| Miami International Airport | Seattle – Tacoma International Airport |
| Fort Lauderdale–Hollywood International Airport | Seattle – Tacoma International Airport |
| Washington Dulles International Airport | Los Angeles International Airport |

# Appendix B

Virgin/American Domestic U.S. Overlap Routes

| ***Non-Directional Origin and Destination Pairs*** | |
|---|---|
| | |
| Boston Logan International Airport | Los Angeles International Airport |
| Chicago O'Hare International Airport | Los Angeles International Airport |
| Dallas Love Field Airport | Los Angeles International Airport |
| Dallas/Fort Worth International Airport | Los Angeles International Airport |
| Fort Lauderdale – Hollywood International Airport | Los Angeles International Airport |
| Los Angeles International Airport | Miami International Airport |
| Honolulu International Airport | Los Angeles International Airport |
| McCarran International Airport | Los Angeles International Airport |
| Los Angeles International Airport | Washington Dulles International Airport |
| Los Angeles International Airport | Ronald Regan Washington National Airport |
| Los Angeles International Airport | John F. Kennedy International Airport |
| Los Angeles International Airport | Newark Liberty International Airport |
| Los Angeles International Airport | Orlando International Airport |
| Los Angeles International Airport | Seattle – Tacoma International Airport |
| Dallas Love Field Airport | San Francisco International Airport |
| Dallas/Fort Worth International Airport | San Francisco International Airport |
| Fort Lauderdale – Hollywood International Airport | San Francisco International Airport |
| Miami International Airport | San Francisco International Airport |
| John F. Kennedy International Airport | San Francisco International Airport |
| Los Angeles International Airport | San Francisco International Airport |
| Chicago O'Hare International Airport | San Francisco International Airport |
| Dallas Love Field Airport | Ronald Regan Washington National Airport |
| Dallas/Fort Worth International Airport | Ronald Regan Washington National Airport |
| Dallas Love Field Airport | LaGuardia Airport |
| Dallas/Fort Worth International Airport | LaGuardia Airport |
| Dallas Love Field Airport | McCarran International Airport |
| Dallas/Fort Worth International Airport | McCarran International Airport |
| Fort Lauderdale – Hollywood International Airport | John F. Kennedy International Airport |
| Miami International Airport | John F. Kennedy International Airport |
| Los Angeles International Airport | Kahului Airport |
| McCarran International Airport | John F. Kennedy International Airport |

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

UNITED STATES OF AMERICA,

*Plaintiff,*

v.

ALASKA AIR GROUP, INC.

and

VIRGIN AMERICA INC.,

*Defendants.*

**COMPETITIVE IMPACT STATEMENT**

Plaintiff United States of America ("United States"), pursuant to Section 2(b) of the Antitrust Procedures and Penalties Act ("APPA" or "Tunney Act"), 15 U.S.C. § 16(b)-(h), files this Competitive Impact Statement relating to the proposed Final Judgment submitted for entry in this civil antitrust proceeding.

## I. NATURE AND PURPOSE OF THE PROCEEDING

On April 4, 2016, Alaska Air Group, Inc. ("Alaska"), the sixth-largest domestic airline, agreed to acquire Virgin America, Inc. ("Virgin"), the ninth-largest domestic airline, for $2.6 billion in cash and the assumption of $1.4 billion in liabilities.

The airline industry in the United States is dominated by four large airlines – American Airlines, Delta Air Lines, United Airlines, and Southwest Airlines – that collectively account for over 80% of domestic air travel each year. In this highly-concentrated industry, the smaller

airlines play a critical competitive role. In order to compete with the four largest airlines, these smaller airlines often must offer consumers lower fares, additional flight options, and innovative services.

Although Alaska would become only the fifth-largest domestic airline as a result of the proposed merger, its extensive codeshare agreement with the largest domestic airline, American, threatens to blunt important competition supplied by Virgin today. A codeshare agreement is a commercial relationship that allows each airline to market tickets for certain flights on the other's network. Although the codeshare agreement effectively extends Alaska's geographic reach – potentially strengthening Alaska's ability to compete against other carriers like Delta and United – it also creates an incentive for Alaska to cooperate rather than compete with American.

Alaska's acquisition of Virgin would significantly increase Alaska's network overlaps with American, and would thus dramatically increase the circumstances where the incentives created by the codeshare threaten to soften head-to-head competition. Roughly two-thirds of Virgin's network overlaps with American's network, and Virgin has aggressively competed with American on many of these overlap routes in ways that have forced American to respond with lower fares and better service. Unless the codeshare is substantially modified, the proposed merger would diminish the important competition Virgin has provided on these routes.

On December 6, 2016, the United States filed a civil antitrust Complaint seeking to enjoin the proposed acquisition. The Complaint alleges that Defendants' proposed merger would likely lessen competition substantially for scheduled air passenger service in numerous markets throughout the United States in violation of Section 7 of the Clayton Act, 15 U.S.C. § 18. Specifically, the Complaint alleges that following the merger, Alaska, as a result of its extensive

codesharing relationship with American, would likely exit or compete less aggressively on routes where Virgin and American compete today, and would be less likely to enter new routes in competition with American in the future than Virgin would be standing alone.

At the same time the Complaint was filed, the United States filed a Stipulation and Order and proposed Final Judgment, which are designed to eliminate the likely anticompetitive effects of the acquisition. Under the proposed Final Judgment, which is explained more fully below, Alaska would be obligated to substantially reduce the scope of its codeshare agreement with American in order to enhance Alaska's incentive to compete with American after the merger.

The United States and Defendants have stipulated that the proposed Final Judgment may be entered after compliance with the APPA. Entry of the proposed Final Judgment would terminate this action, except that the Court would retain jurisdiction to construe, modify, or enforce the provisions of the proposed Final Judgment and to punish violations thereof.

## II. DESCRIPTION OF THE EVENTS GIVING RISE TO THE ALLEGED VIOLATION

### A. The Defendants and the Transaction

Defendant Alaska Air Group, Inc. is a Delaware corporation headquartered in Seattle, Washington. Last year, Alaska flew over 31 million passengers to approximately 112 locations worldwide, taking in more than $5.5 billion in revenue. Alaska operates hubs in Seattle, Washington; Portland, Oregon; and Anchorage, Alaska, and has the largest share of traffic at each of these hubs.

Defendant Virgin America Inc. is a Delaware corporation headquartered in Burlingame, California. Last year, Virgin America flew over 7 million passengers to approximately 24 locations worldwide, taking in more than $1.5 billion in revenue. Virgin America is one of

several entities bearing the "Virgin" name pursuant to a licensing agreement with the Virgin Group, which owns approximately 18% of Virgin America's outstanding voting common stock.

Virgin America was founded in 2004. Unlike Alaska, Virgin does not have a hub-and-spoke network. Although Virgin has "focus cities" – Los Angeles, San Francisco, and Dallas – from which it provides service to many destinations, Virgin does not use these focus cities as points for transferring large volumes of connecting traffic. Instead, the bulk of Virgin's passengers fly on nonstop flights in markets where Virgin is typically not the dominant carrier.

On April 1, 2016, Alaska and Virgin agreed to merge for $2.6 billion in cash and the assumption of $1.4 billion in liabilities.

**B. Alaska's Codeshare Agreement with American**

Although codeshare agreements can take various forms, they generally allow for flights operated by one airline to be marketed and sold by another airline under the marketing airline's own brand. A codeshare agreement can extend an airline's network by enabling passengers to seamlessly book a connecting itinerary consisting of flights operated by different airlines. For example, a passenger seeking to fly from Walla Walla, Washington to Charlotte, North Carolina could purchase tickets for the entire trip through Alaska, using an Alaska flight from Walla Walla to Seattle that connects to an American flight from Seattle to Charlotte. This arrangement allows Alaska to rely on the codeshare agreement with American to offer service to Charlotte, instead of having to launch its own competing service between Seattle and Charlotte in order to serve the customer.

The codesharing partnership between Alaska and American began in 1999. The initial scope of the parties' codeshare agreement was very limited: it allowed Alaska to market

American's flights on only 88 routes where Alaska did not otherwise provide service, and did not permit American to market any Alaska flights. Since 1999, however, Alaska and American have repeatedly expanded their codeshare arrangement, enabling American to also market certain Alaska flights and steadily increasing the number of flights each partner may sell on behalf of the other. American and Alaska most recently expanded the codeshare agreement in April 2016. As a result of the most recent expansion, Alaska is able to market American flights on over 250 routes, and American is able to market Alaska flights on about 80 routes. The April 2016 expansion also enabled American and Alaska to sell one another's flights on certain overlap routes where both companies offer competing nonstop service.

### C. Virgin's Aggressive Competition with American

Virgin has served as one of American's fiercest competitors. Virgin competes directly with American on twenty nonstop routes, which constitute approximately two-thirds of Virgin's entire network. These twenty routes represent about $8 billion in commerce annually.

Virgin and American vigorously compete on numerous nonstop routes in part because Virgin controls critical assets in cities where American maintains a hub. These assets include gates and/or takeoff and landing rights at airports including Washington Reagan National Airport, Dallas Love Field, and Los Angeles International Airport. Virgin's presence in these markets provides a critical alternative for consumers and helps keep American's prices lower than they otherwise would be.

Virgin's ownership of many of these assets and aggressive competition with American is no coincidence – consumers were promised the benefits of expanded Virgin service to counteract the anticompetitive effects threatened by the 2013 merger between American and US Airways.

To resolve the United States's challenge to that merger, American agreed to divest a host of critical assets at key airports where the two firms had a significant presence to low-cost competitors, including Virgin. *See* Final Judgment, *United States v. US Airways Group, Inc.*, Case No. 1:13-cv-01236 (CKK) (Dkt. No. 170) (D.D.C. Apr. 25, 2014). As contemplated by the settlement, Virgin has used the assets to compete directly with American. For instance, Virgin has utilized the two airport gates it acquired at Dallas Love Field to launch aggressive new service against American, forcing American to respond with lower prices. Virgin has estimated that its entry at Love Field caused American to lower certain fares on flights out of Dallas by more than 50%.

**D. The Transaction's Likely Anticompetitive Effects**

**1. Relevant Markets**

As alleged in the Complaint, scheduled air passenger service enables consumers to travel quickly and efficiently between various cities in the United States. Air travel offers passengers significant time savings and convenience over other forms of travel. For example, a flight from Washington, D.C. to Detroit takes just over an hour of flight time. Driving between the two cities takes at least eight hours. A train between the two cities takes more than fifteen hours.

Due to time savings and convenience afforded by scheduled air passenger service, few passengers would substitute other modes of transportation (car, bus, or train) for scheduled air passenger service in response to a small but significant industry-wide fare increase. Another way to say this, as described in the Department of Justice and Federal Trade Commission's *Horizontal Merger Guidelines* (2010), and endorsed by courts in this Circuit, is that a hypothetical monopolist of all scheduled air passenger service could profitably increase its prices

by at least a small but significant and non-transitory amount. The Complaint alleges, therefore, that scheduled air passenger service constitutes a line of commerce and a relevant product market within the meaning of Section 7 of the Clayton Act.

Moreover, most passengers book flights with their origins and destinations predetermined. Few passengers who wish to fly from one city to another would switch to flights between other cities in response to a small but significant and non-transitory fare increase. A hypothetical monopolist of all scheduled air passenger service on any particular route between two destinations likely would be able to profitably increase its prices by at least a small but significant and non-transitory amount. Accordingly, scheduled air passenger service between each origin and destination pair constitutes a line of commerce and section of the country under Section 7 of the Clayton Act.

The Complaint alleges that scheduled air passenger service on those twenty routes on which Virgin and American compete today, and the routes on which they would have likely competed in the future, are relevant markets within the meaning of Section 7 of the Clayton Act.

**2. Competitive Effects**

The codeshare agreement between Alaska and American creates an incentive for Alaska to cooperate rather than compete with American. Alaska's acquisition of Virgin's network would extend this incentive to the extensive overlaps between Virgin and American, and will therefore likely reduce the vigorous competition that Virgin is presently providing against American. Specifically, the Complaint alleges that the merger is likely to substantially lessen competition on each of the twenty nonstop routes on which Virgin and American currently compete because Alaska will have an incentive to avoid aggressive head-to-head competition in

order to preserve its codeshare relationship with American. Once Alaska has control of Virgin, it is likely to reduce capacity, decrease service quality, and/or raise prices on these routes. In some cases, Alaska may completely stop serving the routes with its own flights, and instead simply market American's flights between the destinations, thereby eliminating an independent and meaningful competitive choice for millions of consumers. The Complaint further alleges that Alaska's acquisition of Virgin will likely lessen competition because Alaska is likely to enter fewer new routes in competition with American than Virgin would if Virgin remained a standalone airline.

#### 3. Entry and Expansion

As alleged in the Complaint, new entry, or expansion by existing competitors, is unlikely to prevent or remedy the merger's likely anticompetitive effects. New entrants into a particular market face significant barriers to success, including difficulty in obtaining access to slots and gate facilities; the effects of corporate discount programs offered by dominant incumbents; loyalty to existing frequent flyer programs; an unknown brand; and the risk of aggressive responses to new entry by the dominant incumbent carrier. In addition, entry is highly unlikely on routes where the origin or destination airport is another airline's hub, because the new entrant would face substantial challenges attracting sufficient local passengers to support service.

## III. EXPLANATION OF THE PROPOSED FINAL JUDGMENT

As alleged in the Complaint, Alaska's acquisition of Virgin threatens to substantially lessen competition on the routes where Virgin and American compete today, and would likely compete in the future, because Alaska's existing codeshare agreement with American creates significant incentives for Alaska to reduce – or eliminate – its competition with American on

these routes.

The codeshare agreement incentivizes Alaska to avoid competition with American in two ways. First, the overall scale of the codeshare agreement and Alaska's dependence on it creates an incentive for Alaska to compete less aggressively with American in order to avoid upsetting American and jeopardizing the codeshare partnership. Second, the opportunity to market American's flights on particular routes creates an incentive for Alaska to rely on the codeshare to provide service to its customers rather than undertaking the risk and expense of initiating its own service. Alaska's acquisition of Virgin would significantly increase Alaska's network overlaps with American, and would thus dramatically increase the circumstances where these incentives threaten to soften head-to-head competition.

As explained in more detail below, the relief set forth in the "Prohibited Conduct" section of the proposed Final Judgment would substantially reduce each of these incentives. First, through prohibitions on codesharing in a variety of circumstances, it would substantially reduce the overall size and scope of the codeshare partnership between Alaska and American, which, in turn, would decrease Alaska's reliance on the codeshare and enhance Alaska's incentive to compete on those routes where Virgin and American compete today. Second, it would prohibit Alaska from substituting to codeshare service on routes that Virgin already serves or would otherwise be likely to serve.

At the same time, because the codeshare between Alaska and American may benefit consumers in some circumstances by enabling Alaska and American to offer their customers service that neither airline would provide on its own, the proposed Final Judgment does not categorically prohibit all codesharing. Instead, the proposed Final Judgment focuses on reducing

codesharing where it is likely to blunt Alaska's incentives to compete with American after the merger.

In addition, the proposed Final Judgment provides protections for the assets that Virgin acquired from American as part of the settlement of the lawsuit challenging the merger of American and US Airways to ensure the continued use of these assets in competition with American. Finally, the proposed Final Judgment includes notification, monitoring, and enforcement provisions so that Defendants comply with all of their obligations.

**A. By Prohibiting Codesharing in Certain Circumstances, the Proposed Final Judgment Incentivizes the Merged Firm to Compete Aggressively**

To reduce Alaska's dependence on the codeshare agreement with American, Section IV.A of the proposed Final Judgment requires Alaska to cease codesharing in four different scenarios no later than sixty days after the closing of the transaction. Together, the restrictions on codesharing will reduce by approximately 50% the volume of Alaska passengers flying on American flights.

First, Section IV.A.1 of the proposed Final Judgment prohibits Alaska and American from codesharing on routes where Virgin and American both offer competing nonstop service today, irrespective of network changes that either carrier makes in the future. By eliminating Alaska's ability to replace Virgin's service with codeshare flights on American, this provision will ensure that if Alaska wishes to offer its customers service on these routes, it will need to continue to compete head-to-head with American as Virgin does today.

Second, Section IV.A.2 of the proposed Final Judgment further reduces the overall scope of the codeshare relationship by prohibiting codesharing on all routes on which Alaska and American both offer competing nonstop service. Prohibiting codesharing on the

Virgin/American overlap routes alone is insufficient to prevent harm from the merger because Alaska would retain the broader incentive to avoid endangering the partnership and could still choose to reduce or eliminate service on the routes where Virgin and American compete today. To adequately address this broader incentive, the proposed Final Judgment also prohibits codesharing on Alaska/American overlap routes because, as previously recognized by both the U.S. Department of Transportation and the Department of Justice, such codesharing can diminish competition and facilitate collusion by, for example, creating opportunities for the airlines to communicate about fares and closely coordinate their service offerings. Such codesharing is also especially unlikely to benefit consumers because it does not extend the reach of either carrier's network.

Third, in order to ensure that Alaska uses the Virgin assets to grow in ways that continue to enhance competition following the merger, the proposed Final Judgment prohibits Alaska from marketing American flights on routes that it is most likely to serve itself and prohibits Alaska from permitting American to market Alaska flights on routes that American is most likely to serve itself. Airlines are most likely to enter routes that emanate from one of their hubs or focus cities, and thus, Section IV.A.3 of the proposed Final Judgment prevents both Alaska and American from marketing each other's flights on routes that touch their respective hubs or focus cities, defined as "Key Alaska Airports" and "Key American Airports" in Definitions II.L and II.M of the proposed Final Judgment, respectively.

Finally, Los Angeles International Airport ("LAX"), which is not included as a "Key Alaska Airport" or "Key American Airport," is a special case because both carriers will have significant operations at this airport post-merger. If Section IV.A.3 applied to LAX, it would

eliminate all codesharing at this airport, including potentially beneficial codesharing on routes the two airlines would be unlikely to serve independently. Section IV.A.4 of the proposed Final Judgment therefore prohibits either carrier from codesharing on routes between LAX and either an American or Alaska hub or focus city, as the airlines are more likely to serve these routes on a standalone basis, but allows for codesharing on routes between LAX and other cities.

**B. The Proposed Final Judgment Provides Additional Protections for Assets American Divested to Virgin as Part of the American-US Airways Merger Settlement**

As alleged in the Complaint, Virgin aggressively competes with American on several routes using assets that American divested to Virgin to settle the United States's challenge to American's 2013 merger with US Airways. These assets, which include gates and takeoff and landing rights (known as "slots"), are located at constrained airports in several of American's strongholds. Although the proposed Final Judgment strongly incentivizes Alaska to continue competing with American on routes that Virgin serves today through limitations on codesharing, Alaska may decide for independent reasons that these assets do not fit into its business or network plans and seek to sell or lease them to another carrier. Section IV.B of the proposed Final Judgment prohibits Alaska from allowing American to acquire or use the assets, which would circumvent the purpose of the American/US Airways settlement. In addition, Section IV.B of the proposed Final Judgment requires Alaska to obtain the United States's approval of a buyer or lessee if the combined company chooses to sell or lease these assets to a carrier other than American. This provision allows the United States to ensure that American does not have undue influence over the disposition of these assets. Section IV.C of the proposed Final Judgment permits Alaska to allow another airline to use the assets in limited

circumstances that are routine, short-term, or necessary for operational or safety reasons and thus highly unlikely to harm competition – for example, when an airport orders Alaska to permit another airline to use an asset to prevent a potentially dangerous situation. Section IV.C also permits Alaska to make one-for-one trades of slots or gates at the same airport, which is also highly unlikely to harm competition.

**C. The Proposed Final Judgment Includes Robust Notification, Monitoring, and Enforcement Provisions**

The proposed Final Judgment includes several provisions designed to allow the United States to assess the implementation and effectiveness of the proposed Final Judgment and ensure Alaska's compliance with its requirements. To this end, Section V.A requires Defendants to inform pertinent personnel of the Defendants' obligations under the proposed Final Judgment. Section V.B requires Defendants to comply with Section IV.A.2 no later than sixty days after Alaska or American enters a new route that creates a new competitive overlap. Section V.D of the proposed Final Judgment imposes annual reporting requirements regarding the scope of the codeshare relationship, including the identity of the routes subject to the codeshare, the number of passengers that have purchased tickets pursuant to the codeshare, and the amount of revenue Alaska has received from the codeshare. Section V.E also requires Alaska to notify the United States in advance if Alaska seeks to modify its contractual relationship with American as a means of providing the United States an opportunity to take action if the modification would threaten competition. In addition, Section VII of the proposed Final Judgment expressly reserves the right of the United States to take enforcement action to enjoin the codeshare agreement should changes in the competitive landscape or the networks or incentives of these airlines warrant such action.

## IV. REMEDIES AVAILABLE TO POTENTIAL PRIVATE LITIGANTS

Section 4 of the Clayton Act, 15 U.S.C. § 15, provides that any person who has been injured as a result of conduct prohibited by the antitrust laws may bring suit in federal court to recover three times the damages the person has suffered, as well as costs and reasonable attorneys' fees. Entry of the proposed Final Judgment will neither impair nor assist the bringing of any private antitrust damage action. Under the provisions of Section 5(a) of the Clayton Act, 15 U.S.C. § 16(a), the proposed Final Judgment has no prima facie effect in any subsequent private lawsuit that may be brought against Defendants.

## V. PROCEDURES AVAILABLE FOR MODIFICATION OF THE PROPOSED FINAL JUDGMENT

The United States and Defendants have stipulated that the proposed Final Judgment may be entered by the Court after compliance with the provisions of the APPA, provided that the United States has not withdrawn its consent. The APPA conditions entry upon the Court's determination that the proposed Final Judgment is in the public interest.

The APPA provides a period of at least sixty (60) days preceding the effective date of the proposed Final Judgment within which any person may submit to the United States written comments regarding the proposed Final Judgment. Any person who wishes to comment should do so within sixty (60) days of the date of publication of this Competitive Impact Statement in the *Federal Register*, or the last date of publication in a newspaper of the summary of this Competitive Impact Statement, whichever is later. All comments received during this period will be considered by the United States Department of Justice, which remains free to withdraw its consent to the proposed Final Judgment at any time prior to the Court's entry of the judgment. The comments and the response of the United States will be filed with the Court. In addition,

comments will be posted on the U.S. Department of Justice, Antitrust Division's internet website and, under certain circumstances, published in the *Federal Register*.

Written comments should be submitted to:

Kathleen O'Neill
Chief, Transportation, Energy & Agriculture Section
Antitrust Division
United States Department of Justice
450 Fifth Street, N.W., Suite 8000
Washington, DC 20530

The proposed Final Judgment provides that the Court retains jurisdiction over this action, and that the parties may apply to the Court for any order necessary or appropriate for the modification, interpretation, or enforcement of the Final Judgment.

## VI. ALTERNATIVES TO THE PROPOSED FINAL JUDGMENT

The United States considered, as an alternative to the proposed Final Judgment, a full trial on the merits against Defendants. The United States could have sought preliminary and permanent injunctions against Alaska's acquisition of Virgin. The United States is satisfied, however, that the remedies described in the proposed Final Judgment will effectively address the transaction's likely anticompetitive effects and preserve competition for the provision of scheduled air passenger service in the relevant markets identified by the United States. Thus, the proposed Final Judgment would achieve all or substantially all of the relief the United States would have obtained through litigation, but avoids the time, expense, and uncertainty of a full trial on the merits of the Complaint.

## VII. STANDARD OF REVIEW UNDER THE APPA FOR THE PROPOSED FINAL JUDGMENT

The APPA requires that proposed consent judgments in antitrust cases brought by the

United States be subject to a sixty-day comment period, after which the court shall determine whether entry of the proposed Final Judgment is "in the public interest." 15 U.S.C. § 16(e)(1). In making that determination, the court, in accordance with the statute as amended in 2004, is required to consider:

> (A) the competitive impact of such judgment, including termination of alleged violations, provisions for enforcement and modification, duration of relief sought, anticipated effects of alternative remedies actually considered, whether its terms are ambiguous, and any other competitive considerations bearing upon the adequacy of such judgment that the court deems necessary to a determination of whether the consent judgment is in the public interest; and
>
> (B) the impact of entry of such judgment upon competition in the relevant market or markets, upon the public generally and individuals alleging specific injury from the violations set forth in the complaint including consideration of the public benefit, if any, to be derived from a determination of the issues at trial.

*Id.* at § 16(e)(1)(A) & (B). In considering these statutory factors, the court's inquiry is necessarily a limited one as the government is entitled to "broad discretion to settle with the defendant within the reaches of the public interest." *United States v. Microsoft Corp.*, 56 F.3d 1448, 1461 (D.C. Cir. 1995); *see generally United States v. SBC Commc'ns, Inc.*, 489 F. Supp. 2d 1 (D.D.C. 2007) (assessing public interest standard under the Tunney Act); *United States v. US Airways Group, Inc.*, 38 F. Supp. 3d 69, 75 (D.D.C. 2014) (noting that the court's "inquiry is limited" because the government has "broad discretion" to determine the adequacy of the relief secured through a settlement); *United States v. InBev N.V./S.A.*, No. 08-1965 (JR), 2009-2 Trade Cas. (CCH) ¶ 76,736, 2009 U.S. Dist. LEXIS 84787, at *3 (D.D.C. Aug. 11, 2009) (noting that the court's review of a consent judgment is limited and only inquires "into whether the government's determination that the proposed remedies will cure the antitrust violations alleged

in the complaint was reasonable, and whether the mechanism to enforce the final judgment are clear and manageable").[1]

As the United States Court of Appeals for the District of Columbia Circuit has held, a court conducting inquiry under the APPA may consider, among other things, the relationship between the remedy secured and the specific allegations set forth in the government's complaint, whether the decree is sufficiently clear, whether enforcement mechanisms are sufficient, and whether the decree may positively harm third parties. *See Microsoft*, 56 F.3d at 1458-62. With respect to the adequacy of the relief secured by the decree, a court may not "engage in an unrestricted evaluation of what relief would best serve the public." *United States v. BNS, Inc*., 858 F.2d 456, 462 (9th Cir. 1988) (quoting *United States v. Bechtel Corp*., 648 F.2d 660, 666 (9th Cir. 1981)); *see also Microsoft*, 56 F.3d at 1460-62; *United States v. Alcoa, Inc.*, 152 F. Supp. 2d 37, 40 (D.D.C. 2001); *InBev*, 2009 U.S. Dist. LEXIS 84787, at *3. Courts have held that:

> [t]he balancing of competing social and political interests affected by a proposed antitrust consent decree must be left, in the first instance, to the discretion of the Attorney General. The court's role in protecting the public interest is one of insuring that the government has not breached its duty to the public in consenting to the decree. The court is required to determine not whether a particular decree is the one that will best serve society, but whether the settlement is "*within the reaches of the public interest*." More elaborate requirements might undermine the effectiveness of antitrust enforcement by consent decree.

*Bechtel*, 648 F.2d at 666 (emphasis added) (citations omitted).[2] In determining whether a

---

[1] The 2004 amendments substituted "shall" for "may" in directing relevant factors for courts to consider and amended the list of factors to focus on competitive considerations and to address potentially ambiguous judgment terms. *Compare* 15 U.S.C. § 16(e) (2004), *with* 15 U.S.C. § 16(e)(1) (2006); *see also SBC Commc'ns*, 489 F. Supp. 2d at 11 (concluding that the 2004 amendments "effected minimal changes" to Tunney Act review).

[2] *Cf. BNS*, 858 F.2d at 464 (holding that the court's "ultimate authority under the [APPA] is limited to approving or disapproving the consent decree"); *United States v. Gillette Co.*, 406 F. Supp. 713, 716 (D.

proposed settlement is in the public interest, a court "must accord deference to the government's predictions about the efficacy of its remedies, and may not require that the remedies perfectly match the alleged violations." *SBC Commc'ns*, 489 F. Supp. 2d at 17; *see also US Airways*, 8 F. Supp. 3d at 75  (noting that a court should not reject the proposed remedies because it believes others are preferable); *Microsoft*, 56 F.3d at 1461 (noting the need for courts to be "deferential to the government's predictions as to the effect of the proposed remedies"); *United States v. Archer-Daniels-Midland Co.*, 272 F. Supp. 2d 1, 6 (D.D.C. 2003) (noting that the court should grant due respect to the government's prediction as to the effect of proposed remedies, its perception of the market structure, and its views of the nature of the case).

Courts have greater flexibility in approving proposed consent decrees than in crafting their own decrees following a finding of liability in a litigated matter.  "[A] proposed decree must be approved even if it falls short of the remedy the court would impose on its own, as long as it falls within the range of acceptability or is 'within the reaches of public interest.'" *United States v. Am. Tel. & Tel. Co.*, 552 F. Supp. 131, 151 (D.D.C. 1982) (citations omitted) (quoting *United States v. Gillette Co.*, 406 F. Supp. 713, 716 (D. Mass. 1975)), *aff'd sub nom. Maryland v. United States*, 460 U.S. 1001 (1983); *see also US Airways*, 38 F. Supp. 3d at 76 (noting that room must be made for the government to grant concessions in the negotiation process for settlements (citing *Microsoft*, 56 F.3d at 1461)); *United States v. Alcan Aluminum Ltd.*, 605 F. Supp. 619, 622 (W.D. Ky. 1985) (approving the consent decree even though the court would have imposed a greater remedy).  To meet this standard, the United States "need only provide a

---

Mass. 1975) (noting that, in this way, the court is constrained to "look at the overall picture not hypercritically, nor with a microscope, but with an artist's reducing glass"). *See generally Microsoft*, 56 F.3d at 1461 (discussing whether "the remedies [obtained in the decree are] so inconsonant with the allegations charged as to fall outside of the 'reaches of the public interest'").

factual basis for concluding that the settlements are reasonably adequate remedies for the alleged harms." *SBC Commc'ns*, 489 F. Supp. 2d at 17.

Moreover, the court's role under the APPA is limited to reviewing the remedy in relationship to the violations that the United States has alleged in its Complaint, and does not authorize the court to "construct [its] own hypothetical case and then evaluate the decree against that case." *Microsoft*, 56 F.3d at 1459; *see also US Airways*, 38 F. Supp 3d at 75 (noting that the court must simply determine whether there is a factual foundation for the government's decisions such that its conclusions regarding the proposed settlements are reasonable); *InBev*, 2009 U.S. Dist. LEXIS 84787, at *20 (concluding that "the 'public interest' is not to be measured by comparing the violations alleged in the complaint against those the court believes could have, or even should have, been alleged"). Because the "court's authority to review the decree depends entirely on the government's exercising its prosecutorial discretion by bringing a case in the first place," it follows that "the court is only authorized to review the decree itself," and not to "effectively redraft the complaint" to inquire into other matters that the United States did not pursue. *Microsoft*, 56 F.3d at 1459-60. As this Court confirmed in *SBC Communications*, courts "cannot look beyond the complaint in making the public interest determination unless the complaint is drafted so narrowly as to make a mockery of judicial power." 489 F. Supp. 2d at 15.

In its 2004 amendments, Congress made clear its intent to preserve the practical benefits of utilizing consent decrees in government antitrust enforcement actions, adding the unambiguous instruction that "[n]othing in this section shall be construed to require the court to conduct an evidentiary hearing or to require the court to permit anyone to intervene." 15 U.S.C.

§ 16(e)(2); *see also US Airways*, 38 F. Supp. 3d at 76 (indicating that a court is not required to hold an evidentiary hearing or to permit intervenors as part of its review under the Tunney Act). This language codified what Congress intended when it enacted the Tunney Act in 1974, as, Senator Tunney, the author of this legislation, unambiguously explained: "The court is nowhere compelled to go to trial or to engage in extended proceedings which might have the effect of vitiating the benefits of prompt and less costly settlement through the consent decree process." 119 Cong. Rec. 24,598 (1973) (statement of Sen. Tunney). Rather, the procedure for the public interest determination is left to the discretion of the court, with the recognition that the court's "scope of review remains sharply proscribed by precedent and the nature of Tunney Act proceedings." *SBC Commc'ns*, 489 F. Supp. 2d at 11. A court can make its public interest determination based on the competitive impact statement and response to public comments alone. *US Airways*, 38 F. Supp. 3d at 76.[3]

## VIII. DETERMINATIVE DOCUMENTS

There are no determinative materials or documents within the meaning of the APPA that were considered by the United States in formulating the proposed Final Judgment.

[3] *See also United States v. Enova Corp.*, 107 F. Supp. 2d 10, 17 (D.D.C. 2000) (noting that the "Tunney Act expressly allows the court to make its public interest determination on the basis of the competitive impact statement and response to comments alone"); *United States v. Mid-Am. Dairymen, Inc.*, No. 73-CV-681-W-1, 1977-1 Trade Cas. (CCH) ¶ 61,508, at 71,980, *22 (W.D. Mo. 1977) ("Absent a showing of corrupt failure of the government to discharge its duty, the Court, in making its public interest finding, should . . . carefully consider the explanations of the government in the competitive impact statement and its responses to comments in order to determine whether those explanations are reasonable under the circumstances."); S. Rep. No. 93-298, at 6 (1973) ("Where the public interest can be meaningfully evaluated simply on the basis of briefs and oral arguments, that is the approach that should be utilized.").

Dated: December 6, 2016

Respectfully submitted,

/s/

Katherine Celeste
U.S. Department of Justice
Antitrust Division
Transportation Energy & Agriculture Section
450 Fifth Street, N.W., Suite 8000
Washington, DC 20530
Telephone: (202) 532-4713
E-mail: katherine.celeste@usdoj.gov

81 FR 89979-01, 2016 WL 7188358(F.R.)
NOTICES
DEPARTMENT OF JUSTICE
Antitrust Division

United States v. Alaska Air Group, Inc., et al.; Proposed Final Judgment and Competitive Impact Statement

Tuesday, December 13, 2016

***89979** Notice is hereby given pursuant to the Antitrust Procedures and Penalties Act, 15 U.S.C. 16(b)-(h), that a proposed Final Judgment, Stipulation, and Competitive Impact Statement have been filed with the United States District Court for the District of Columbia in United States of America v. Alaska Air Group, Inc., et al., Civil Action No. 1:16-cv-02377. On December 6, 2016, the United States filed a Complaint alleging that Alaska Air Group's proposed acquisition of Virgin America Inc. would violate Section 7 of the Clayton Act, 15 U.S.C. 18. The proposed Final Judgment, filed at the same time as the Complaint, requires Alaska to reduce the scope of its codeshare agreement with American Airlines and obtain Antitrust Division approval before selling certain assets.

Copies of the Complaint, proposed Final Judgment, and Competitive Impact Statement are available for inspection on the Antitrust Division's Web site at http://www.justice.gov/atr and at the Office of the Clerk of the United States District Court for the District of Columbia. Copies of these materials may be obtained from the Antitrust Division upon request and payment of the copying fee set by Department of Justice regulations.

Public comment is invited within 60 days of the date of this notice. Such comments, including the name of the submitter, and responses thereto, will be posted on the Antitrust Division's Web site, filed with the Court, and, under certain circumstances, published in the Federal Register. Comments should be directed to Kathleen S. O'Neill, Chief, Transportation, Energy, and Agriculture Section, Antitrust Division, Department of Justice, 450 Fifth Street NW., Suite 8000, Washington, DC 20530 (telephone: 202-307-2931).

Patricia A. Brink,

Director of Civil Enforcement.

**United States District Court for the District of Columbia**
United States of America, Department of Justice, Antitrust Division, 450 Fifth Street NW., Suite 8000, Washington, DC 20530, Plaintiff, v. Alaska Air Group, Inc., 19300 International Boulevard, Seattle, WA 98188, and Virgin America Inc., 555 Airport Boulevard, Burlingame, CA 94010, Defendants.

Case No.: 1:16-cv-02377.

Judge: Reggie B. Walton.

Filed: 12/06/2016.

**Complaint**

The United States of America ("Plaintiff"), acting under the direction of the Attorney General of the United States, brings this civil antitrust action to enjoin the proposed merger of Defendants Alaska Air Group, Inc. ("Alaska") and Virgin America Inc. ("Virgin"), and to obtain equitable and other relief as appropriate. The United States alleges as follows:

**I. Introduction**

1. The airline industry in the United States is dominated by four large airlines—American Airlines, Delta Air Lines, United Airlines, and Southwest Airlines—that collectively account for over 80% of domestic air travel each year. In this highly-concentrated industry, the smaller airlines play a critical competitive role. In order to compete with the four largest airlines, these smaller airlines often must offer consumers lower fares, additional flight options, and innovative services. The proposed merger of Alaska and Virgin would bring together two of these smaller airlines—the sixth- and ninth-largest U.S. carriers, respectively—to create the fifth-largest U.S. airline.

2. Alaska and Virgin both provide award-winning service and tend to offer lower prices than the larger airlines, but they differ in at least one critical respect. Unlike Virgin, Alaska has closely aligned itself with American, the largest U.S. airline, through a commercial relationship known as a codeshare agreement, which allows each airline to market tickets for certain flights on the other's network. The codeshare agreement began in 1999 as a limited arrangement that permitted Alaska to market American's flights on a small number of routes Alaska did not serve on its own. Over the years, the two airlines have significantly expanded their relationship in size and scope through a series of amendments to the codeshare agreement. The most recent of these amendments was executed in April 2016—around the same time Alaska agreed to purchase Virgin.

3. Although the codeshare agreement effectively extends Alaska's geographic reach—potentially strengthening Alaska's ability to compete against other carriers like Delta and United—it also creates an incentive for Alaska to cooperate rather than compete with its larger partner, American. Specifically, Alaska may choose not to launch new service on routes served by American, or it may opt to compete less aggressively on the routes that both carriers serve, to avoid upsetting American and jeopardizing the partnership. Alaska may also decide to rely on the codeshare relationship in lieu of entering routes already served by American because doing so allows it to offer its customers the benefits of an expanded network without undertaking the risk and expense of offering its own competing service. As a result of these incentives, Alaska and American often behave more like partners than competitors.

4. Alaska's acquisition of Virgin would significantly increase Alaska's network overlaps with American, and would thus dramatically increase the circumstances where the incentives created by the codeshare threaten to soften head-to-head competition. Roughly two-thirds of Virgin's network overlaps with American's network, and Virgin has aggressively competed with American on many of these overlap routes in ways that have forced American to respond with lower fares and better service.

5. The proposed acquisition would diminish Virgin's competitive impact on the Virgin-American overlap routes by subjecting Virgin's network to the incentives that arise from Alaska's codeshare agreement with American. Virgin holds critical assets, including gates and takeoff and landing rights (known as "slots"), at key airports within American's network. American divested some of these assets to Virgin as part of the settlement of the United ***89980** States's antitrust challenge to American's 2013 merger with US Airways. Once Alaska controls the Virgin assets, it likely will redeploy them in ways that accommodate rather than challenge American in order to preserve its codeshare agreement. To avoid competing head-to-head with its codeshare partner, Alaska will likely reduce service, decrease service quality, and/or raise prices on the Virgin-American overlap routes—or exit them entirely. Alaska will also be less likely to enter new routes in competition with American than Virgin is today. These harms will be heightened if Alaska continues to deepen its cooperation with American, which would have the effect of tying the nation's first- and fifth-largest airlines even more closely together.

6. Alaska's internal planning documents demonstrate how the incentives created by the codeshare agreement would likely reduce competition on the routes where American and Virgin compete today. In analyzing the proposed merger, Alaska executives reported to the company's board of directors that certain Virgin operations "would not have [the] support of the American partnership." Accordingly, early during the consideration process, Alaska executives developed a plan that called for changes

"that we think would need to be made" to Virgin's service following the merger. The plan contemplated reducing or eliminating service on many of the routes where Virgin and American offer competing service today, including some of the most traveled routes in the country.

7. For these and the reasons discussed below, the proposed merger between Alaska and Virgin likely would lessen competition substantially in numerous U.S. markets for scheduled air passenger service in violation of Section 7 of the Clayton Act, 15 U.S.C. 18, and should be permanently enjoined.

**II. Jurisdiction, Interstate Commerce, and Venue**

8. The United States brings this action pursuant to Section 15 of the Clayton Act, as amended, 15 U.S.C. 25, to prevent and restrain Alaska and Virgin from violating Section 7 of the Clayton Act, 15 U.S.C. 18. This Court has subject matter jurisdiction over this action under Section 15 of the Clayton Act, 15 U.S.C. 25, and 28 U.S.C. 1331, 1337(a), and 1345.

9. Defendants are engaged in, and their activities substantially affect, interstate commerce, and commerce throughout the United States. Alaska and Virgin each annually transport millions of passengers across state lines throughout this country, generating billions of dollars in revenue.

10. Venue is proper under Section 12 of the Clayton Act, 15 U.S.C. 22, and 28 U.S.C. 1391(b) and (c). This Court also has personal jurisdiction over each Defendant. Both Defendants are found and transact business, and have consented to venue and personal jurisdiction, in this District.

**III. The Defendants and the Transaction**

11. Defendant Alaska Air Group, Inc. is a Delaware corporation headquartered in Seattle, Washington. Last year, Alaska flew over 31 million passengers to approximately 112 locations worldwide, taking in more than $5.5 billion in revenue.

12. Alaska operates hubs in Seattle, Washington; Portland, Oregon; and Anchorage, Alaska, and has the largest share of traffic at each of these hubs. Alaska has maintained its status as the market share leader throughout the Pacific Northwest, which has helped Alaska achieve higher profit margins than most other domestic airlines for the past several years.

13. Defendant Virgin America Inc. is a Delaware corporation headquartered in Burlingame, California. Last year, Virgin America flew over 7 million passengers to approximately 24 locations worldwide, taking in more than $1.5 billion in revenue. Virgin America is one of several entities bearing the "Virgin" name pursuant to a licensing agreement with the Virgin Group, which owns approximately 18% of Virgin America's outstanding voting common stock.

14. Virgin America was founded in 2004. Unlike Alaska, Virgin does not have a hub-and-spoke network. Although Virgin has "focus cities"—Los Angeles, San Francisco, and Dallas—from which it provides service to many destinations, Virgin does not use these focus cities as points for transferring large volumes of connecting traffic. Instead, the bulk of Virgin's passengers fly on nonstop flights in markets where Virgin is typically not the dominant carrier.

15. On April 1, 2016, Alaska and Virgin agreed to merge for $2.6 billion in cash and the assumption of $1.4 billion in liabilities.

**IV. Competition Between American, Alaska, and Virgin Today**

***A. The Formation and Expansion of the Codeshare Relationship Between American and Alaska***

16. Although codeshare agreements can take various forms, they generally allow for flights operated by one airline to be marketed and sold by another airline under the marketing airline's own brand. A codeshare agreement can extend an airline's network by enabling passengers to seamlessly book a connecting itinerary consisting of flights operated by different airlines.

 © 2025 Thomson Reuters. No claim to original U.S. Government Works.

For example, a passenger seeking to fly from Walla Walla, Washington to Charlotte, North Carolina could purchase tickets for the entire trip through Alaska, using an Alaska flight from Walla Walla to Seattle that connects to an American flight from Seattle to Charlotte. This arrangement allows Alaska to rely on the codeshare agreement with American to offer service to Charlotte, instead of having to launch its own competing service between Seattle and Charlotte in order to serve the customer.

17. The codesharing partnership between Alaska and American began in 1999. The initial scope of the agreement was very limited: It allowed Alaska to market American's flights on only 88 routes where Alaska did not otherwise provide service, and did not permit American to market any Alaska flights. Since 1999, however, Alaska and American have repeatedly expanded their codeshare arrangement, enabling American to also market certain Alaska flights and increasing the number of flights each partner may sell on behalf of the other.

18. American and Alaska most recently expanded the codeshare agreement in April 2016, around the same time that Alaska was concluding its agreement to acquire Virgin. In agreeing to the amendment, Alaska chose to continue to expand its partnership with American even though it planned to grow its own network by acquiring Virgin. This April 2016 expansion further increased the number of routes included in the agreement, allowing Alaska to market American flights on over 250 routes, and American to market Alaska flights on about 80 routes.

19. The April 2016 expansion of the codeshare agreement also enabled American and Alaska to sell one another's flights on certain overlap routes where both companies offer competing nonstop service. Under this new arrangement, instead of strictly competing against one another to sell tickets between, for example, Seattle and Los Angeles, American and Alaska began selling each other's tickets for these routes as well. This type of codesharing on nonstop overlap routes, by definition, does not expand either airline's network. Instead, it provides them the opportunity to closely coordinate their service offerings on a ***89981** route where they would otherwise be competing at arm's length for business. Such close contact between competing airlines on routes they both serve can diminish competition and facilitate collusion.

***B. The Codeshare Relationship Incentivizes Alaska To Cooperate Rather Than Compete With American***

20. Today, Alaska is stronger than American in the Pacific Northwest, where American is comparatively weak, whereas American is stronger than Alaska throughout the rest of the United States. Through the codeshare agreement, Alaska offers its customers flights to more destinations, which helps Alaska retain the loyalty of frequent fliers who prefer to use one airline but want the ability to travel to domestic cities that Alaska does not serve independently. American derives similar benefits from the codeshare agreement—loyal American customers are provided greater ability to travel throughout the Pacific Northwest using Alaska's network.

21. Although the codeshare agreement provides both carriers commercial benefits by linking the Alaska and American networks, the agreement also makes Alaska dependent on American in a way that discourages competition between the two airlines. Specifically, American has significant leverage over Alaska because Alaska derives considerable value from using the American network to provide service throughout many areas of the United States it does not otherwise serve, while American relies on Alaska to provide access to far fewer destinations. To avoid undermining this lucrative partnership, Alaska may forego launching new service on routes served by American, or it may opt to compete less aggressively on the routes they both serve.

22. In addition, Alaska may choose to rely on the codeshare agreement in lieu of entering some routes already served by American because doing so allows it to offer its customers the benefits of an expanded network without undertaking the risk and expense of commencing its own competing service. By relying on an American flight to provide its customers service, Alaska can boast a more extensive network without actually launching service in competition with American. In essence, by choosing to rely on the codeshare agreement, Alaska is forgoing entry that would likely provide lower prices and more flight options to consumers.

23. The incentives created by the codeshare agreement are illustrated by the five-year growth plan that Alaska prepared prior to agreeing to acquire Virgin. The plan envisioned further cooperation between Alaska and American, calling for Alaska to

"strengthen the [American] partnership by trying to grow LA in a way that is complimentary [sic] to AA rather than competitive." But competitors are supposed to compete with, not complement, each other. Alaska would likely continue this strategy of avoiding growth that challenges American if it were to complete the merger. When Alaska was weighing whether to acquire Virgin, for example, a senior Alaska executive recognized that "LAX . . . expansion may be counterproductive to our relationship with AA."

***C. Unhindered by a Codeshare Relationship, Virgin Competes Aggressively With American***

24. In contrast to Alaska, Virgin has served as one of American's fiercest competitors. Virgin competes directly with American on twenty nonstop routes, which constitute approximately two-thirds of Virgin's entire network. In total, passengers spend about $8 billion per year to travel on these routes.

25. Virgin and American vigorously compete on so many nonstop routes in part because Virgin controls critical assets in cities where American maintains a hub. These assets include gates and/or takeoff and landing rights at airports such as Los Angeles International Airport, Washington Reagan National Airport, and Dallas Love Field. Virgin's presence at these important airports provides a critical alternative for consumers and helps keep American's prices lower than they otherwise would be.

26. Virgin's ownership of these assets and aggressive competition with American is no coincidence—consumers were promised the benefits of expanded Virgin service to counteract the anticompetitive effects threatened by the 2013 merger between American and US Airways. To resolve the United States's challenge to that merger, American agreed to divest a host of critical assets to low-cost competitors, including Virgin, at key U.S. airports. As contemplated by the settlement, Virgin has used the assets to compete directly with American. For instance, Virgin has utilized the two airport gates it acquired at Dallas Love Field to launch aggressive new service against American, forcing American to respond with lower prices. Virgin has estimated that its entry at Love Field caused American to lower certain fares on flights out of Dallas by more than 50%.

**V. The Relevant Markets**

27. Scheduled air passenger service enables consumers to travel quickly and efficiently between various cities in the United States. Air travel offers passengers significant time savings and convenience over other forms of travel. For example, a flight from Washington, DC to Detroit takes just over an hour of flight time. Driving between the two cities takes at least eight hours. A train between the two cities takes more than fifteen hours.

28. Due to time savings and convenience afforded by scheduled air passenger service, few passengers would substitute other modes of transportation (car, bus, or train) for scheduled air passenger service in response to a small but significant industry-wide fare increase. Another way to say this, as described in the Department of Justice and Federal Trade Commission's Horizontal Merger Guidelines (2010), and endorsed by courts in this Circuit, is that a hypothetical monopolist of all scheduled air passenger service likely would increase its prices by at least a small but significant and non-transitory amount. Scheduled air passenger service, therefore, constitutes a line of commerce and a relevant product market within the meaning of Section 7 of the Clayton Act.

29. Moreover, most passengers book flights with their origins and destinations predetermined. Few passengers who wish to fly from one city to another would switch to flights between other cities in response to a small but significant and non-transitory fare increase. A hypothetical monopolist of all scheduled air passenger service on any particular route between two destinations likely would be able to profitably increase its prices by at least a small but significant and non-transitory amount. Accordingly, scheduled air passenger service between each origin and destination pair constitutes a line of commerce and section of the country under Section 7 of the Clayton Act.

30. Scheduled air passenger service on those twenty routes on which Virgin and American compete today, and the routes on which they would have likely competed in the future, are relevant markets within the meaning of Section 7 of the Clayton Act.

**VI. The Transaction's Likely Anticompetitive Effects**

***A. The Merger Is Likely To Lessen Competition on the Routes Where Virgin and American Compete Today***

31. Alaska's acquisition of Virgin's network will extend the incentives ***89982** created by the codeshare agreement to the extensive overlaps between Virgin and American, and will therefore reduce the vigorous competition that Virgin is presently providing against American on some of the nation's largest nonstop routes. Specifically, the merger is likely to substantially lessen competition on each of the twenty nonstop routes on which Virgin and American currently compete because Alaska will have an incentive to avoid aggressive head-to-head competition in order to preserve its codeshare relationship with American. Once Alaska has control of Virgin, it is likely to reduce capacity, decrease service quality, and/or raise prices on these routes. In some cases, Alaska may completely stop serving the routes with its own flights, instead simply marketing American's flights between the destinations, thereby eliminating a meaningful competitive choice for millions of consumers.

32. Alaska itself has recognized that its acquisition of Virgin's assets will likely reduce competition on the Virgin-American overlap routes. As part of Alaska's early analysis of a possible acquisition of Virgin, Alaska executives developed a plan for post-merger changes to Virgin's service that specifically called for reducing—and in some instances completely eliminating—service on many of the routes where Virgin and American compete today, including routes that are among the most heavily traveled in the country. If carried out, these service reductions would not only cost consumers tens of millions of dollars each year, they would deprive consumers of some of the competitive benefits enabled by the American-US Airways merger settlement.

***B. The Merged Firm Will Be Less Likely To Enter Into New Competition With American Than Virgin Would Be Standing Alone***

33. Alaska's acquisition of Virgin will also lessen competition because Alaska is likely to enter fewer new routes in competition with American post-merger than Virgin would if Virgin remained a standalone airline. Alaska may avoid entering a route in competition with American for two reasons related to the codeshare: (1) It will fear endangering its lucrative relationship with American, and (2) it can already offer tickets on the route through the codeshare agreement. Virgin has no such inhibitions. In fact, Virgin's standalone growth plan called for the airline to enter several nonstop routes currently served by American but not Alaska. Alaska presently relies on its codeshare relationship with American to serve some of these routes, as well as others that may have been served by an independent Virgin in the future. Post-merger, Virgin's independent decision-making will be lost, and Alaska may avoid entering these types of routes. As a result, consumers will be deprived of the benefits of the future competition that Virgin would have provided.

**VII. Absence of Countervailing Factors**

34. New entry, or expansion by existing competitors, is unlikely to prevent or remedy the merger's likely anticompetitive effects. New entrants into a particular market face significant barriers to success, including difficulty in obtaining access to slots and gate facilities; the effects of corporate discount programs offered by dominant incumbents; loyalty to existing frequent flyer programs; an unknown brand; and the risk of aggressive responses to new entry by the dominant incumbent carrier. In addition, entry is highly unlikely on routes where the origin or destination airport is another airline's hub, because the new entrant would face substantial challenges attracting sufficient local passengers to support service.

35. Defendants cannot demonstrate acquisition-specific and cognizable efficiencies that would offset the proposed acquisition's likely anticompetitive effects.

**VIII. Violation Alleged**

36. The United States hereby incorporates the allegations of paragraphs 1 through 35 above as if set forth fully herein.

37. The effect of the proposed merger, if approved, likely will be to lessen competition substantially, or tend to create a monopoly, in interstate trade and commerce in the numerous U.S. markets for scheduled air passenger service identified above, in violation of Section 7 of the Clayton Act, 15 U.S.C. 18.

38. Unless enjoined, the proposed merger likely would have the following effects in the relevant markets, among others:

(a) Actual and potential competition in the relevant markets would be eliminated, including competition between Virgin and American;

(b) ticket prices and other fees would be higher than they otherwise would;

(c) industry capacity would be lower than it otherwise would; and

(d) service quality would be lessened.

**IX. Request for Relief**

39. Plaintiff requests:

(a) That Alaska's proposed merger with Virgin be adjudged to violate Section 7 of the Clayton Act, 15 U.S.C. 18;

(b) that Defendants be permanently enjoined from and restrained from carrying out the planned merger of Alaska and Virgin or any other transaction that would combine the two companies;

(c) that Plaintiff be awarded its costs of this action; and

(d) that Plaintiff be awarded such other relief as the Court may deem just and proper.

Dated: December 6, 2016

Respectfully submitted,

FOR PLAINTIFF UNITED STATES:

——————/s/——————

RENATA B. HESSE (D.C. Bar 1B466107)

Acting Assistant Attorney General

——————/s/——————

JUAN A. ARTEAGA

Deputy Assistant Attorney General

——————/s/——————

JONATHAN SALLET

Deputy Assistant Attorney General

 © 2025 Thomson Reuters. No claim to original U.S. Government Works.

——————/s/——————

PATRICIA A. BRINK

Director of Civil Enforcement

——————/s/——————

KATHLEEN S. O'NEILL

Chief

Transportation, Energy & Agriculture Section

——————/s/——————

ROBERT A. LEPORE

Assistant Chief

Transportation, Energy & Agriculture Section

——————/s/——————

KATHERINE CELESTE *

Attorney

Antitrust Division

U.S. Department of Justice

450 Fifth Street N.W., Suite 8000

Washington, DC 20530

Telephone: (202) 532-4713

Facsimile: (202) 307-2784

Email: Katherine.Celeste@usdoj.gov

MICHELE B. CANO

J. RICHARD DOIDGE

BRIAN E. HANNA

RACHELLE R. KETCHUM

AMANDA D. KLOVERS

CHRISTOPHER M. WILSON

Attorneys for the United States

* Attorney of Record

**United States District Court for the District of Columbia**
United States of America, Plaintiff, v. Alaska Air Group, Inc. and Virgin America Inc., Defendants.

Case No.: 1:16-cv-02377.

Judge: Reggie B. Walton.

Filed: 12/06/2016.

**Competitive Impact Statement**
Plaintiff United States of America ("United States"), pursuant to Section ***89983** 2(b) of the Antitrust Procedures and Penalties Act ("APPA" or "Tunney Act"), 15 U.S.C. 16(b)-(h), files this Competitive Impact Statement relating to the proposed Final Judgment submitted for entry in this civil antitrust proceeding.

**I. Nature and Purpose of the Proceeding**
On April 4, 2016, Alaska Air Group, Inc. ("Alaska"), the sixth-largest domestic airline, agreed to acquire Virgin America, Inc. ("Virgin"), the ninth-largest domestic airline, for $2.6 billion in cash and the assumption of $1.4 billion in liabilities.

The airline industry in the United States is dominated by four large airlines—American Airlines, Delta Air Lines, United Airlines, and Southwest Airlines—that collectively account for over 80% of domestic air travel each year. In this highly-concentrated industry, the smaller airlines play a critical competitive role. In order to compete with the four largest airlines, these smaller airlines often must offer consumers lower fares, additional flight options, and innovative services.

Although Alaska would become only the fifth-largest domestic airline as a result of the proposed merger, its extensive codeshare agreement with the largest domestic airline, American, threatens to blunt important competition supplied by Virgin today. A codeshare agreement is a commercial relationship that allows each airline to market tickets for certain flights on the other's network. Although the codeshare agreement effectively extends Alaska's geographic reach—potentially strengthening Alaska's ability to compete against other carriers like Delta and United—it also creates an incentive for Alaska to cooperate rather than compete with American.

Alaska's acquisition of Virgin would significantly increase Alaska's network overlaps with American, and would thus dramatically increase the circumstances where the incentives created by the codeshare threaten to soften head-to-head competition. Roughly two-thirds of Virgin's network overlaps with American's network, and Virgin has aggressively competed with American on many of these overlap routes in ways that have forced American to respond with lower fares and better service. Unless the codeshare is substantially modified, the proposed merger would diminish the important competition Virgin has provided on these routes.

On December 6, 2016, the United States filed a civil antitrust Complaint seeking to enjoin the proposed acquisition. The Complaint alleges that Defendants' proposed merger would likely lessen competition substantially for scheduled air passenger service in numerous markets throughout the United States in violation of Section 7 of the Clayton Act, 15 U.S.C. 18. Specifically, the Complaint alleges that following the merger, Alaska, as a result of its extensive codesharing relationship with American, would likely exit or compete less aggressively on routes where Virgin and American compete today, and would be less likely to enter new routes in competition with American in the future than Virgin would be standing alone.

At the same time the Complaint was filed, the United States filed a Stipulation and Order and proposed Final Judgment, which are designed to eliminate the likely anticompetitive effects of the acquisition. Under the proposed Final Judgment, which is explained more fully below, Alaska would be obligated to substantially reduce the scope of its codeshare agreement with American in order to enhance Alaska's incentive to compete with American after the merger.

The United States and Defendants have stipulated that the proposed Final Judgment may be entered after compliance with the APPA. Entry of the proposed Final Judgment would terminate this action, except that the Court would retain jurisdiction to construe, modify, or enforce the provisions of the proposed Final Judgment and to punish violations thereof.

**II. Description of the Events Giving Rise to the Alleged Violation**

***A. The Defendants and the Transaction***

Defendant Alaska Air Group, Inc. is a Delaware corporation headquartered in Seattle, Washington. Last year, Alaska flew over 31 million passengers to approximately 112 locations worldwide, taking in more than $5.5 billion in revenue. Alaska operates hubs in Seattle, Washington; Portland, Oregon; and Anchorage, Alaska, and has the largest share of traffic at each of these hubs.

Defendant Virgin America Inc. is a Delaware corporation headquartered in Burlingame, California. Last year, Virgin America flew over 7 million passengers to approximately 24 locations worldwide, taking in more than $1.5 billion in revenue. Virgin America is one of several entities bearing the “Virgin” name pursuant to a licensing agreement with the Virgin Group, which owns approximately 18% of Virgin America's outstanding voting common stock.

Virgin America was founded in 2004. Unlike Alaska, Virgin does not have a hub-and-spoke network. Although Virgin has “focus cities”—Los Angeles, San Francisco, and Dallas—from which it provides service to many destinations, Virgin does not use these focus cities as points for transferring large volumes of connecting traffic. Instead, the bulk of Virgin's passengers fly on nonstop flights in markets where Virgin is typically not the dominant carrier.

On April 1, 2016, Alaska and Virgin agreed to merge for $2.6 billion in cash and the assumption of $1.4 billion in liabilities.

***B. Alaska's Codeshare Agreement With American***

Although codeshare agreements can take various forms, they generally allow for flights operated by one airline to be marketed and sold by another airline under the marketing airline's own brand. A codeshare agreement can extend an airline's network by enabling passengers to seamlessly book a connecting itinerary consisting of flights operated by different airlines. For example, a passenger seeking to fly from Walla Walla, Washington to Charlotte, North Carolina could purchase tickets for the entire trip through Alaska, using an Alaska flight from Walla Walla to Seattle that connects to an American flight from Seattle to Charlotte. This arrangement allows Alaska to rely on the codeshare agreement with American to offer service to Charlotte, instead of having to launch its own competing service between Seattle and Charlotte in order to serve the customer.

The codesharing partnership between Alaska and American began in 1999. The initial scope of the parties' codeshare agreement was very limited: it allowed Alaska to market American's flights on only 88 routes where Alaska did not otherwise provide service, and did not permit American to market any Alaska flights. Since 1999, however, Alaska and American have repeatedly expanded their codeshare arrangement, enabling American to also market certain Alaska flights and steadily increasing the number of flights each partner may sell on behalf of the other. American and Alaska most recently expanded the codeshare agreement in April 2016. As a result of the most recent expansion, Alaska is able to market American flights on over 250 routes, and American is able to market Alaska flights on about 80 routes. The April 2016 expansion also enabled American and Alaska to sell one another's flights on certain overlap routes where both companies offer competing nonstop service.

***89984** ***C. Virgin's Aggressive Competition With American***

 © 2025 Thomson Reuters. No claim to original U.S. Government Works.

Virgin has served as one of American's fiercest competitors. Virgin competes directly with American on twenty nonstop routes, which constitute approximately two-thirds of Virgin's entire network. These twenty routes represent about $8 billion in commerce annually.

Virgin and American vigorously compete on numerous nonstop routes in part because Virgin controls critical assets in cities where American maintains a hub. These assets include gates and/or takeoff and landing rights at airports including Washington Reagan National Airport, Dallas Love Field, and Los Angeles International Airport. Virgin's presence in these markets provides a critical alternative for consumers and helps keep American's prices lower than they otherwise would be.

Virgin's ownership of many of these assets and aggressive competition with American is no coincidence—consumers were promised the benefits of expanded Virgin service to counteract the anticompetitive effects threatened by the 2013 merger between American and US Airways. To resolve the United States's challenge to that merger, American agreed to divest a host of critical assets at key airports where the two firms had a significant presence to low-cost competitors, including Virgin. See Final Judgment, United States v. US Airways Group, Inc., Case No. 1:13-cv-01236 (CKK) (Dkt. No. 170) (D.D.C. Apr. 25, 2014). As contemplated by the settlement, Virgin has used the assets to compete directly with American. For instance, Virgin has utilized the two airport gates it acquired at Dallas Love Field to launch aggressive new service against American, forcing American to respond with lower prices. Virgin has estimated that its entry at Love Field caused American to lower certain fares on flights out of Dallas by more than 50%.

***D. The Transaction's Likely Anticompetitive Effects***

**1. Relevant Markets**

As alleged in the Complaint, scheduled air passenger service enables consumers to travel quickly and efficiently between various cities in the United States. Air travel offers passengers significant time savings and convenience over other forms of travel. For example, a flight from Washington, DC to Detroit takes just over an hour of flight time. Driving between the two cities takes at least eight hours. A train between the two cities takes more than fifteen hours.

Due to time savings and convenience afforded by scheduled air passenger service, few passengers would substitute other modes of transportation (car, bus, or train) for scheduled air passenger service in response to a small but significant industry-wide fare increase. Another way to say this, as described in the Department of Justice and Federal Trade Commission's Horizontal Merger Guidelines (2010), and endorsed by courts in this Circuit, is that a hypothetical monopolist of all scheduled air passenger service could profitably increase its prices by at least a small but significant and non-transitory amount. The Complaint alleges, therefore, that scheduled air passenger service constitutes a line of commerce and a relevant product market within the meaning of Section 7 of the Clayton Act.

Moreover, most passengers book flights with their origins and destinations predetermined. Few passengers who wish to fly from one city to another would switch to flights between other cities in response to a small but significant and non-transitory fare increase. A hypothetical monopolist of all scheduled air passenger service on any particular route between two destinations likely would be able to profitably increase its prices by at least a small but significant and non-transitory amount. Accordingly, scheduled air passenger service between each origin and destination pair constitutes a line of commerce and section of the country under Section 7 of the Clayton Act.

The Complaint alleges that scheduled air passenger service on those twenty routes on which Virgin and American compete today, and the routes on which they would have likely competed in the future, are relevant markets within the meaning of Section 7 of the Clayton Act.

**2. Competitive Effects**

 © 2025 Thomson Reuters. No claim to original U.S. Government Works.

The codeshare agreement between Alaska and American creates an incentive for Alaska to cooperate rather than compete with American. Alaska's acquisition of Virgin's network would extend this incentive to the extensive overlaps between Virgin and American, and will therefore likely reduce the vigorous competition that Virgin is presently providing against American. Specifically, the Complaint alleges that the merger is likely to substantially lessen competition on each of the twenty nonstop routes on which Virgin and American currently compete because Alaska will have an incentive to avoid aggressive head-to-head competition in order to preserve its codeshare relationship with American. Once Alaska has control of Virgin, it is likely to reduce capacity, decrease service quality, and/or raise prices on these routes. In some cases, Alaska may completely stop serving the routes with its own flights, and instead simply market American's flights between the destinations, thereby eliminating an independent and meaningful competitive choice for millions of consumers. The Complaint further alleges that Alaska's acquisition of Virgin will likely lessen competition because Alaska is likely to enter fewer new routes in competition with American than Virgin would if Virgin remained a standalone airline.

**3. Entry and Expansion**

As alleged in the Complaint, new entry, or expansion by existing competitors, is unlikely to prevent or remedy the merger's likely anticompetitive effects. New entrants into a particular market face significant barriers to success, including difficulty in obtaining access to slots and gate facilities; the effects of corporate discount programs offered by dominant incumbents; loyalty to existing frequent flyer programs; an unknown brand; and the risk of aggressive responses to new entry by the dominant incumbent carrier. In addition, entry is highly unlikely on routes where the origin or destination airport is another airline's hub, because the new entrant would face substantial challenges attracting sufficient local passengers to support service.

**III. Explanation of the Proposed Final Judgment**

As alleged in the Complaint, Alaska's acquisition of Virgin threatens to substantially lessen competition on the routes where Virgin and American compete today, and would likely compete in the future, because Alaska's existing codeshare agreement with American creates significant incentives for Alaska to reduce—or eliminate—its competition with American on these routes.

The codeshare agreement incentivizes Alaska to avoid competition with American in two ways. First, the overall scale of the codeshare agreement and Alaska's dependence on it creates an incentive for Alaska to compete less aggressively with American in order to avoid upsetting American and jeopardizing the codeshare partnership. Second, the opportunity to market American's flights on particular routes creates an incentive for Alaska to rely on the codeshare to provide service to ***89985** its customers rather than undertaking the risk and expense of initiating its own service. Alaska's acquisition of Virgin would significantly increase Alaska's network overlaps with American, and would thus dramatically increase the circumstances where these incentives threaten to soften head-to-head competition.

As explained in more detail below, the relief set forth in the “Prohibited Conduct” section of the proposed Final Judgment would substantially reduce each of these incentives. First, through prohibitions on codesharing in a variety of circumstances, it would substantially reduce the overall size and scope of the codeshare partnership between Alaska and American, which, in turn, would decrease Alaska's reliance on the codeshare and enhance Alaska's incentive to compete on those routes where Virgin and American compete today. Second, it would prohibit Alaska from substituting to codeshare service on routes that Virgin already serves or would otherwise be likely to serve.

At the same time, because the codeshare between Alaska and American may benefit consumers in some circumstances by enabling Alaska and American to offer their customers service that neither airline would provide on its own, the proposed Final Judgment does not categorically prohibit all codesharing. Instead, the proposed Final Judgment focuses on reducing codesharing where it is likely to blunt Alaska's incentives to compete with American after the merger.

In addition, the proposed Final Judgment provides protections for the assets that Virgin acquired from American as part of the settlement of the lawsuit challenging the merger of American and US Airways to ensure the continued use of these assets in

competition with American. Finally, the proposed Final Judgment includes notification, monitoring, and enforcement provisions so that Defendants comply with all of their obligations.

***A. By Prohibiting Codesharing in Certain Circumstances, the Proposed Final Judgment Incentivizes the Merged Firm To Compete Aggressively***

To reduce Alaska's dependence on the codeshare agreement with American, Section IV.A of the proposed Final Judgment requires Alaska to cease codesharing in four different scenarios no later than sixty days after the closing of the transaction. Together, the restrictions on codesharing will reduce by approximately 50% the volume of Alaska passengers flying on American flights.

First, Section IV.A.1 of the proposed Final Judgment prohibits Alaska and American from codesharing on routes where Virgin and American both offer competing nonstop service today, irrespective of network changes that either carrier makes in the future. By eliminating Alaska's ability to replace Virgin's service with codeshare flights on American, this provision will ensure that if Alaska wishes to offer its customers service on these routes, it will need to continue to compete head-to-head with American as Virgin does today.

Second, Section IV.A.2 of the proposed Final Judgment further reduces the overall scope of the codeshare relationship by prohibiting codesharing on all routes on which Alaska and American both offer competing nonstop service. Prohibiting codesharing on the Virgin/American overlap routes alone is insufficient to prevent harm from the merger because Alaska would retain the broader incentive to avoid endangering the partnership and could still choose to reduce or eliminate service on the routes where Virgin and American compete today. To adequately address this broader incentive, the proposed Final Judgment also prohibits codesharing on Alaska/American overlap routes because, as previously recognized by both the U.S. Department of Transportation and the Department of Justice, such codesharing can diminish competition and facilitate collusion by, for example, creating opportunities for the airlines to communicate about fares and closely coordinate their service offerings. Such codesharing is also especially unlikely to benefit consumers because it does not extend the reach of either carrier's network.

Third, in order to ensure that Alaska uses the Virgin assets to grow in ways that continue to enhance competition following the merger, the proposed Final Judgment prohibits Alaska from marketing American flights on routes that it is most likely to serve itself and prohibits Alaska from permitting American to market Alaska flights on routes that American is most likely to serve itself. Airlines are most likely to enter routes that emanate from one of their hubs or focus cities, and thus, Section IV.A.3 of the proposed Final Judgment prevents both Alaska and American from marketing each other's flights on routes that touch their respective hubs or focus cities, defined as “Key Alaska Airports” and “Key American Airports” in Definitions II.L and II.M of the proposed Final Judgment, respectively.

Finally, Los Angeles International Airport (“LAX”), which is not included as a “Key Alaska Airport” or “Key American Airport,” is a special case because both carriers will have significant operations at this airport post-merger. If Section IV.A.3 applied to LAX, it would eliminate all codesharing at this airport, including potentially beneficial codesharing on routes the two airlines would be unlikely to serve independently. Section IV.A.4 of the proposed Final Judgment therefore prohibits either carrier from codesharing on routes between LAX and either an American or Alaska hub or focus city, as the airlines are more likely to serve these routes on a standalone basis, but allows for codesharing on routes between LAX and other cities.

***B. The Proposed Final Judgment Provides Additional Protections for Assets American Divested to Virgin as Part of the American-US Airways Merger Settlement***

As alleged in the Complaint, Virgin aggressively competes with American on several routes using assets that American divested to Virgin to settle the United States's challenge to American's 2013 merger with US Airways. These assets, which include gates and takeoff and landing rights (known as “slots”), are located at constrained airports in several of American's strongholds. Although the proposed Final Judgment strongly incentivizes Alaska to continue competing with American on routes that Virgin serves today through limitations on codesharing, Alaska may decide for independent reasons that these assets do not fit into

 © 2025 Thomson Reuters. No claim to original U.S. Government Works.

its business or network plans and seek to sell or lease them to another carrier. Section IV.B of the proposed Final Judgment prohibits Alaska from allowing American to acquire or use the assets, which would circumvent the purpose of the American/ US Airways settlement. In addition, Section IV.B of the proposed Final Judgment requires Alaska to obtain the United States's approval of a buyer or lessee if the combined company chooses to sell or lease these assets to a carrier other than American. This provision allows the United States to ensure that American does not have undue influence over the disposition of these assets. Section IV.C of the proposed Final Judgment permits Alaska to allow another airline to use the assets in limited circumstances that are routine, short-term, or necessary for operational or safety reasons and thus highly unlikely to harm competition—for example, when an airport orders Alaska to permit another airline to use an asset to prevent a potentially dangerous situation. Section IV.C also ***89986** permits Alaska to make one-for-one trades of slots or gates at the same airport, which is also highly unlikely to harm competition.

***C. The Proposed Final Judgment Includes Robust Notification, Monitoring, and Enforcement Provisions***

The proposed Final Judgment includes several provisions designed to allow the United States to assess the implementation and effectiveness of the proposed Final Judgment and ensure Alaska's compliance with its requirements. To this end, Section V.A requires Defendants to inform pertinent personnel of the Defendants' obligations under the proposed Final Judgment. Section V.B requires Defendants to comply with Section IV.A.2 no later than sixty days after Alaska or American enters a new route that creates a new competitive overlap. Section V.D of the proposed Final Judgment imposes annual reporting requirements regarding the scope of the codeshare relationship, including the identity of the routes subject to the codeshare, the number of passengers that have purchased tickets pursuant to the codeshare, and the amount of revenue Alaska has received from the codeshare. Section V.E also requires Alaska to notify the United States in advance if Alaska seeks to modify its contractual relationship with American as a means of providing the United States an opportunity to take action if the modification would threaten competition. In addition, Section VII of the proposed Final Judgment expressly reserves the right of the United States to take enforcement action to enjoin the codeshare agreement should changes in the competitive landscape or the networks or incentives of these airlines warrant such action.

**IV. Remedies Available to Potential Private Litigants**

Section 4 of the Clayton Act, 15 U.S.C. 15, provides that any person who has been injured as a result of conduct prohibited by the antitrust laws may bring suit in federal court to recover three times the damages the person has suffered, as well as costs and reasonable attorneys' fees. Entry of the proposed Final Judgment will neither impair nor assist the bringing of any private antitrust damage action. Under the provisions of Section 5(a) of the Clayton Act, 15 U.S.C. 16(a), the proposed Final Judgment has no prima facie effect in any subsequent private lawsuit that may be brought against Defendants.

**V. Procedures Available for Modification of the Proposed Final Judgment**

The United States and Defendants have stipulated that the proposed Final Judgment may be entered by the Court after compliance with the provisions of the APPA, provided that the United States has not withdrawn its consent. The APPA conditions entry upon the Court's determination that the proposed Final Judgment is in the public interest.

The APPA provides a period of at least sixty (60) days preceding the effective date of the proposed Final Judgment within which any person may submit to the United States written comments regarding the proposed Final Judgment. Any person who wishes to comment should do so within sixty (60) days of the date of publication of this Competitive Impact Statement in the Federal Register, or the last date of publication in a newspaper of the summary of this Competitive Impact Statement, whichever is later. All comments received during this period will be considered by the United States Department of Justice, which remains free to withdraw its consent to the proposed Final Judgment at any time prior to the Court's entry of the judgment. The comments and the response of the United States will be filed with the Court. In addition, comments will be posted on the U.S. Department of Justice, Antitrust Division's internet Web site and, under certain circumstances, published in the Federal Register.

Written comments should be submitted to: Kathleen O'Neill, Chief, Transportation, Energy & Agriculture Section, Antitrust Division, United States Department of Justice, 450 Fifth Street NW., Suite 8000, Washington, DC 20530.

The proposed Final Judgment provides that the Court retains jurisdiction over this action, and that the parties may apply to the Court for any order necessary or appropriate for the modification, interpretation, or enforcement of the Final Judgment.

**VI. Alternatives to the Proposed Final Judgment**

The United States considered, as an alternative to the proposed Final Judgment, a full trial on the merits against Defendants. The United States could have sought preliminary and permanent injunctions against Alaska's acquisition of Virgin. The United States is satisfied, however, that the remedies described in the proposed Final Judgment will effectively address the transaction's likely anticompetitive effects and preserve competition for the provision of scheduled air passenger service in the relevant markets identified by the United States. Thus, the proposed Final Judgment would achieve all or substantially all of the relief the United States would have obtained through litigation, but avoids the time, expense, and uncertainty of a full trial on the merits of the Complaint.

**VII. Standard of Review Under the APPA for the Proposed Final Judgment**

The APPA requires that proposed consent judgments in antitrust cases brought by the United States be subject to a sixty-day comment period, after which the court shall determine whether entry of the proposed Final Judgment is “in the public interest.” 15 U.S.C. 16(e)(1). In making that determination, the court, in accordance with the statute as amended in 2004, is required to consider:

(A) The competitive impact of such judgment, including termination of alleged violations, provisions for enforcement and modification, duration of relief sought, anticipated effects of alternative remedies actually considered, whether its terms are ambiguous, and any other competitive considerations bearing upon the adequacy of such judgment that the court deems necessary to a determination of whether the consent judgment is in the public interest; and

(B) the impact of entry of such judgment upon competition in the relevant market or markets, upon the public generally and individuals alleging specific injury from the violations set forth in the complaint including consideration of the public benefit, if any, to be derived from a determination of the issues at trial.

Id. at § 16(e)(1)(A) & (B). In considering these statutory factors, the court's inquiry is necessarily a limited one as the government is entitled to “broad discretion to settle with the defendant within the reaches of the public interest.” United States v. Microsoft Corp., 56 F.3d 1448, 1461 (D.C. Cir. 1995); see generally United States v. SBC Commc'ns, Inc., 489 F. Supp. 2d 1 (D.D.C. 2007) (assessing public interest standard under the Tunney Act); United States v. US Airways Group, Inc., 38 F. Supp. 3d 69, 75 (D.D.C. 2014) (noting that the court's “inquiry is limited” because the government has “broad discretion” to determine the adequacy of the relief secured through a settlement); United States v. InBev N.V./S.A., No. 08-1965 (JR), 2009-2 Trade Cas. (CCH) ) 76,736, 2009 U.S. Dist. LEXIS 84787, at *3 (D.D.C. Aug. 11, 2009) (noting that the court's review of a consent judgment is limited and only inquires “into whether the government's determination that the proposed ***89987** remedies will cure the antitrust violations alleged in the complaint was reasonable, and whether the mechanism to enforce the final judgment are clear and manageable”).[FN1]

As the United States Court of Appeals for the District of Columbia Circuit has held, a court conducting inquiry under the APPA may consider, among other things, the relationship between the remedy secured and the specific allegations set forth in the government's complaint, whether the decree is sufficiently clear, whether enforcement mechanisms are sufficient, and whether the decree may positively harm third parties. See Microsoft, 56 F.3d at 1458-62. With respect to the adequacy of the relief secured by the decree, a court may not “engage in an unrestricted evaluation of what relief would best serve the public.” United States v. BNS, Inc., 858 F.2d 456, 462 (9th Cir. 1988) (quoting United States v. Bechtel Corp., 648 F.2d 660, 666 (9th Cir.

1981)); see also Microsoft, 56 F.3d at 1460-62; United States v. Alcoa, Inc., 152 F. Supp. 2d 37, 40 (D.D.C. 2001); InBev, 2009 U.S. Dist. LEXIS 84787, at *3. Courts have held that:

[t]he balancing of competing social and political interests affected by a proposed antitrust consent decree must be left, in the first instance, to the discretion of the Attorney General. The court's role in protecting the public interest is one of insuring that the government has not breached its duty to the public in consenting to the decree. The court is required to determine not whether a particular decree is the one that will best serve society, but whether the settlement is "within the reaches of the public interest." More elaborate requirements might undermine the effectiveness of antitrust enforcement by consent decree.

Bechtel, 648 F.2d at 666 (emphasis added) (citations omitted).[FN2] In determining whether a proposed settlement is in the public interest, a court "must accord deference to the government's predictions about the efficacy of its remedies, and may not require that the remedies perfectly match the alleged violations." SBC Commc'ns, 489 F. Supp. 2d at 17; see also US Airways, 8 F. Supp. 3d at 75 (noting that a court should not reject the proposed remedies because it believes others are preferable); Microsoft, 56 F.3d at 1461 (noting the need for courts to be "deferential to the government's predictions as to the effect of the proposed remedies"); United States v. Archer-Daniels-Midland Co., 272 F. Supp. 2d 1, 6 (D.D.C. 2003) (noting that the court should grant due respect to the government's prediction as to the effect of proposed remedies, its perception of the market structure, and its views of the nature of the case).

Courts have greater flexibility in approving proposed consent decrees than in crafting their own decrees following a finding of liability in a litigated matter. "[A] proposed decree must be approved even if it falls short of the remedy the court would impose on its own, as long as it falls within the range of acceptability or is 'within the reaches of public interest.' " United States v. Am. Tel. & Tel. Co., 552 F. Supp. 131, 151 (D.D.C. 1982) (citations omitted) (quoting United States v. Gillette Co., 406 F. Supp. 713, 716 (D. Mass. 1975)), aff'd sub nom. Maryland v. United States, 460 U.S. 1001 (1983); see also US Airways, 38 F. Supp. 3d at 76 (noting that room must be made for the government to grant concessions in the negotiation process for settlements (citing Microsoft, 56 F.3d at 1461)); United States v. Alcan Aluminum Ltd., 605 F. Supp. 619, 622 (W.D. Ky. 1985) (approving the consent decree even though the court would have imposed a greater remedy). To meet this standard, the United States "need only provide a factual basis for concluding that the settlements are reasonably adequate remedies for the alleged harms." SBC Commc'ns, 489 F. Supp. 2d at 17.

Moreover, the court's role under the APPA is limited to reviewing the remedy in relationship to the violations that the United States has alleged in its Complaint, and does not authorize the court to "construct [its] own hypothetical case and then evaluate the decree against that case." Microsoft, 56 F.3d at 1459; see also US Airways, 38 F. Supp 3d at 75 (noting that the court must simply determine whether there is a factual foundation for the government's decisions such that its conclusions regarding the proposed settlements are reasonable); InBev, 2009 U.S. Dist. LEXIS 84787, at *20 (concluding that "the 'public interest' is not to be measured by comparing the violations alleged in the complaint against those the court believes could have, or even should have, been alleged"). Because the "court's authority to review the decree depends entirely on the government's exercising its prosecutorial discretion by bringing a case in the first place," it follows that "the court is only authorized to review the decree itself," and not to "effectively redraft the complaint" to inquire into other matters that the United States did not pursue. Microsoft, 56 F.3d at 1459-60. As this Court confirmed in SBC Communications, courts "cannot look beyond the complaint in making the public interest determination unless the complaint is drafted so narrowly as to make a mockery of judicial power." 489 F. Supp. 2d at 15.

In its 2004 amendments, Congress made clear its intent to preserve the practical benefits of utilizing consent decrees in government antitrust enforcement actions, adding the unambiguous instruction that "[n]othing in this section shall be construed to require the court to conduct an evidentiary hearing or to require the court to permit anyone to intervene." 15 U.S.C. 16(e)(2); see also US Airways, 38 F. Supp. 3d at 76 (indicating that a court is not required to hold an evidentiary hearing or to permit intervenors as part of its review under the Tunney Act). This language codified what Congress intended when it enacted the Tunney Act in 1974, as, Senator Tunney, the author of this legislation, unambiguously explained: "The court is nowhere compelled to go to trial or to engage in extended proceedings which might have the effect of vitiating the benefits of prompt and less costly settlement through the consent decree process." 119 Cong. Rec. 24,598 (1973) (statement of Sen. Tunney). Rather,

the procedure for the public interest determination is left to the discretion of the court, with the recognition that the court's "scope of review remains sharply proscribed by precedent and the nature of Tunney Act proceedings." SBC Commc'ns, 489 F. Supp. 2d at 11. A court can make its public interest determination based on the competitive impact statement and response to public comments alone. US Airways, 38 F. Supp. 3d at 76.[FN3]

***89988 VIII. Determinative Documents**

There are no determinative materials or documents within the meaning of the APPA that were considered by the United States in formulating the proposed Final Judgment.

Dated: December 6, 2016

Respectfully submitted,

——————/s/——————

Katherine Celeste

U.S. Department of Justice

Antitrust Division

Transportation Energy & Agriculture Section

450 Fifth Street NW., Suite 8000

Washington, DC 20530

Telephone: (202) 532-4713

Email: katherine.celeste@usdoj.gov

**United States District Court for the District of Columbia**

United States of America, Plaintiff, v. Alaska Air Group, Inc. and Virgin America Inc., Defendants.

Case No.: 1:16-cv-02377.

Judge: Reggie B. Walton,

Filed: 12/06/2016,

**Proposed Final Judgment**

Whereas, Plaintiff United States of America ("United States") filed its Complaint on December 6, 2016, the United States and Defendants, Alaska Air Group, Inc. ("Alaska") and Virgin America Inc. ("Virgin"), by their respective attorneys, have consented to entry of this Final Judgment without trial or adjudication of any issue of fact or law, and without this Final Judgment constituting any evidence against or admission by any party regarding any issues of fact or law;

And whereas, Defendants agree to be bound by the provisions of this Final Judgment pending its approval by the Court;

And whereas, this Final Judgment requires Defendants to undertake certain actions and refrain from certain conduct for the purpose of remedying the loss of competition alleged in the Complaint;

 © 2025 Thomson Reuters. No claim to original U.S. Government Works.

and whereas, Defendants have represented to the United States that the actions and conduct restrictions described below can and will be undertaken, and that Defendants will later raise no claim of hardship or difficulty as grounds for asking the Court to modify any provisions contained below;

Now, therefore, before any testimony is taken, without trial or adjudication of any issue of fact or law, and upon consent of the parties, it is ordered, adjudged and decreed:

**I. Jurisdiction**

The Court has jurisdiction over the subject matter of this action and Defendants. The Complaint states a claim upon which relief can be granted against Defendants under Section 7 of the Clayton Act, as amended, 15 U.S.C. 18.

**II. Definitions**

As used in this Final Judgment:

A. "Alaska" means Alaska Air Group, Inc., a Delaware corporation headquartered in Seattle, Washington, its successors and assigns, its Affiliates, and its subsidiaries or divisions, and their respective directors, officers, managers, agents, and employees.

B. "Alaska/American Codeshare Agreement" means the Amended and Restated Codeshare Agreement entered into between Alaska and American, dated February 15, 2015, and all predecessors, exhibits, schedules and amendments thereto.

C. "Alaska/American Overlap Routes" means any routes between two cities in the United States on which Alaska and American both provide nonstop scheduled air passenger service. For purposes of this definition only, the city that an airport serves will be determined by the City Market ID assigned to each airport by the U.S. Department of Transportation in the Airline Origin and Destination Survey ("DB1B"), and airports with the same City Market ID will be considered to serve the same city, except the following airports will not be considered to serve the same city as any other airport: (1) Los Angeles International Airport and (2) Norman Y. Mineta San Jose International Airport. The routes covered by this definition may change over the term of this Final Judgment as Alaska and American adjust their respective schedules. The Alaska/American Overlap Routes as of December 6, 2016 are listed in Appendix A for illustrative purposes.

D. "American" means American Airlines Group Inc., a Delaware corporation headquartered in Fort Worth, Texas, its successors and assigns, and its subsidiaries, divisions, groups and Affiliates, and their respective directors, officers, managers, agents, and employees.

E. "Affiliate" means an entity that is related to another entity by one owning shares of the other, by common ownership, or by other means of control, and includes any airline that operates Flights for Alaska or American pursuant to a capacity purchase agreement, but such airline shall only be deemed an Affiliate with respect to such Flights.

F. "Codeshare Agreement" means a contract between two airlines that allows them to market one another's flights by placing their respective unique, identifying codes on those flights. Each airline's code is established by the International Air Transportation Association.

G. "Connecting Itinerary" means a route within the United States with at least one intermediate stop at any airport between the origination and destination airports.

H. "Defendants" means Alaska and Virgin, and any successor or assignee to all or substantially all of the business or assets of Alaska or Virgin.

 © 2025 Thomson Reuters. No claim to original U.S. Government Works.

I. "US/AA Divestiture Assets" means all rights and interests held by Defendants in the two gates at Dallas Love Field ("DAL"), eight slots at Washington Reagan National Airport ("DCA"), and 12 slots at New York LaGuardia Airport ("LGA"), acquired by Virgin pursuant to the Final Judgment entered in United States v. US Airways Group, Inc., Case No. 1:13-cv-01236 (CKK) (Dkt. No. 170) (D.D.C. Apr. 25, 2014).

J. "Flight" means scheduled air passenger service, without any intermediate stops, between an origin airport and destination airport, both within the United States.

K. "Future Alaska-American Overlap Route" means any Alaska-American Overlap Route created by Defendants or American commencing service between two cities after the consummation of the Transaction.

L. "Key Alaska Airports" means each of the following airports: (1) Portland International Airport ("PDX"); (2) Seattle-Tacoma International Airport ("SEA"); (3) San Francisco International Airport ("SFO"); and (4) Ted Stevens Anchorage International Airport ("ANC").

M. "Key American Airports" means each of the following airports: (1) Charlotte Douglas International Airport ("CLT"); (2) Chicago Midway International Airport ("MDW"); (3) Chicago O'Hare International Airport ("ORD"); (4) Dallas/Fort Worth International Airport ("DFW"); (5) Dallas Love Field ("DAL"); (6) Fort Lauderdale-Hollywood International Airport ("FLL"); (7) John F. Kennedy International Airport ("JFK"); (8) Miami International Airport ("MIA"); (9) New York LaGuardia Airport ("LGA"); (10) Philadelphia International Airport ("PHL"); (11) Phoenix Sky Harbor International Airport ("PHX"); and (12) ***89989** Washington Reagan National Airport ("DCA").

N. "LAX" means Los Angeles International Airport.

O. "Market" means to sell tickets for a Flight pursuant to a Codeshare Agreement, either as a standalone Flight or as part of a Connecting Itinerary.

P. "Transaction" means the transaction referred to in the Agreement and Plan of Merger by and among Alaska, Alpine Acquisition Corp., a wholly owned subsidiary of Alaska, and Virgin, dated April 1, 2016.

Q. "Virgin" means Virgin America Inc., a Delaware corporation headquartered in Burlingame, California, its successors and assigns, and its subsidiaries, divisions, groups, Affiliates, partnerships and joint ventures, and their directors, officers, managers, agents, and employees.

R. "Virgin/American Overlap Routes" means any routes on which Virgin and American both provide nonstop scheduled air passenger service as of December 6, 2016. The Virgin/American Overlap Routes are listed in Appendix B and will not change over the term of this decree.

**III. Applicability**

A. This Final Judgment applies to Alaska and Virgin, as defined above, and all other persons in active concert or participation with any of them who receive actual notice of this Final Judgment by personal service or otherwise.

**IV. Prohibited Conduct**

A. Beginning sixty (60) calendar days after consummation of the Transaction, Defendants shall not directly or indirectly, under the Alaska/American Codeshare Agreement or otherwise:

1. Market any American Flight serving a Virgin/American Overlap Route, or permit American to Market any Alaska Flight serving a Virgin/American Overlap Route;

 © 2025 Thomson Reuters. No claim to original U.S. Government Works.

2. Market any American Flight serving an Alaska/American Overlap Route, or permit American to Market any Alaska Flight serving an Alaska/American Overlap Route;

3. Market any American Flight that originates or terminates at any Key Alaska Airport, or permit American to Market any Alaska Flight that originates or terminates at any Key American Airport; and

4. Market any American Flight, or permit American to Market any Alaska Flight, serving any route between LAX and a Key Alaska Airport or a Key American Airport.

B. Defendants shall not directly or indirectly sell, trade, lease, or sub-lease any of the US/AA Divestiture Assets without the prior written consent of the United States. Defendants shall not directly or indirectly transfer any interest in the US/AA Divestiture Assets to American or permit American to use the US/AA Divestiture Assets.

C. Notwithstanding Section IV.B, nothing in this Final Judgment shall prevent Defendants from (i) engaging in one-for-one trades of slots at different times at the same airport, (ii) engaging in one-for-one trades of gates at the same airport, (iii) continuing the subleases of the US/AA Divestiture Assets already in place as of December 6, 2016; (iv) permitting any airline to use any slots or airport gates if required by lawful directive of an airport authority or any other governmental body; or (v) permitting any airline to use any slots or airport gates on an ad hoc basis to accommodate a safety, security, or exigent operational need.


**V. Required Conduct**

A. Within thirty (30) calendar days of entry of this Final Judgment, Defendants shall certify to the United States that they have informed (i) all of Defendants' personnel involved in the implementation, operation, and enforcement of the Alaska/American Codeshare Agreement and (ii) all of Defendants' officers and directors of the obligations set forth in this Final Judgment.

B. Within sixty (60) calendar days of the creation of a Future Alaska/American Overlap Route, Defendants shall comply with the prohibition set forth in Section IV.A(2) on that Future Alaska/American Overlap Route.

C. Defendants shall certify to the United States annually on the anniversary date of the entry of this Final Judgment that Defendants have complied with all of the provisions of this Final Judgment.

D. Defendants shall notify the United States annually on the anniversary date of the entry of this Final Judgment of:

1. The identity of routes on which Alaska Markets American Flights, and separately for each route, whether Alaska Markets American Flights on a standalone basis, as part of a Connecting Itinerary, or both;

2. The number of passengers that purchased tickets pursuant to the Alaska/American Codeshare Agreement or any other Codeshare Agreement between Alaska and American for American Flights Marketed by Alaska during the prior calendar year; and

3. The amount of revenue that Alaska received during the previous calendar year from American pursuant to the Alaska/American Codeshare Agreement.

E. If Defendants amend the Alaska/American Codeshare Agreement or enter into any new or restated Codeshare Agreement with American, Defendants shall provide a copy of such amendment or agreement to the United States at least thirty (30) calendar days in advance of such amendment or agreement becoming effective, unless the United States agrees in writing that Defendants may make such agreement(s) or amendment(s) effective at an earlier date. Defendants shall satisfy the obligations set forth in parts A, C, D, and E of this Section by providing the required certifications, notifications, and copies of agreements to the Chief of the Transportation, Energy, and Agriculture Section, Antitrust Division, U.S. Department of Justice.

**VI. Compliance and Inspection**

A. For the purposes of determining or securing compliance with this Final Judgment, or of any related orders, or of determining whether the Final Judgment should be modified or vacated, and subject to any legally recognized privilege, from time to time authorized representatives of the United States Department of Justice, including consultants and other persons retained by the United States, shall, upon written request of an authorized representative of the Assistant Attorney General in charge of the Antitrust Division, and on reasonable notice to Defendants, be permitted:

1. Access during Defendants' office hours to inspect and copy, or at the option of the United States, to require Defendants to provide hard copy or electronic copies of, all books, ledgers, accounts, records, data, and documents in the possession, custody, or control of Defendants, relating to any matters contained in this Final Judgment; and

2. To interview, either informally or on the record, Defendants' officers, employees, or agents, who may have their individual counsel present, regarding such matters. The interviews shall be subject to the reasonable convenience of the interviewee and without restraint or interference by Defendants.

B. Upon the written request of an authorized representative of the Assistant Attorney General in charge of the Antitrust Division, Defendants shall submit written reports or responses to written interrogatories, under oath if requested, relating to any of the matters contained in this Final Judgment.

C. No information or documents obtained by the means provided in this Section shall be divulged by the United States to any person other than an authorized representative of the ***89990** executive branch of the United States, except in the course of legal proceedings to which the United States is a party (including grand jury proceedings), or for the purpose of securing compliance with this Final Judgment, or as otherwise required by law.

D. If at the time information or documents are furnished by Defendants to the United States, Defendants represent and identify in writing the material in any such information or documents to which a claim of protection may be asserted under Rule 26(c)(1)(G) of the Federal Rules of Civil Procedure, and Defendants mark each pertinent page of such material, "Subject to claim of protection under Rule 26(c)(1)(G) of the Federal Rules of Civil Procedure," then the United States shall give Defendants ten (10) calendar days' notice prior to divulging such material in any legal proceeding (other than a grand jury proceeding).

**VII. No Limitation on Government Rights**

Nothing in this Final Judgment shall limit the right of the United States to investigate and bring actions as necessary to prevent or restrain violations of the antitrust laws relating to the Alaska/American Codeshare Agreement, or any past, present, or future conduct, policy, practice or agreement of Defendants.

**VIII. Retention of Jurisdiction**

This Court retains jurisdiction to enable any party to this Final Judgment to apply to this Court at any time for such further orders and directions as may be necessary or appropriate to carry out or construe this Final Judgment, to modify any of its provisions, to enforce compliance, and to punish violations of its provisions.

**IX. Expiration of Final Judgment**

Unless this Court grants an extension, this Final Judgment shall expire ten (10) years from the date of its entry.

**X. Public Interest Determination**

The entry of this Final Judgment is in the public interest. The parties have complied with the requirements of the Antitrust Procedures and Penalties Act, 15 U.S.C. 16, including making copies available to the public of this Final Judgment, the Competitive Impact Statement, and any comments thereon, and the United States' responses to comments. Based upon the record before the Court, which includes the Competitive Impact Statement and any comments and responses to comments filed with the Court, entry of this Final Judgment is in the public interest

DATED:——————

Court approval subject to the Antitrust Procedures and Penalties Act, 15 U.S.C. 16
United States District Judge

**Appendix A**

**Alaska/American Domestic U.S. Overlap Routes as of December 6, 2016**

**Non-directional origin and destination pairs**

| Origin | Destination |
|---|---|
| Ted Stevens Anchorage International Airport | Los Angeles International Airport. |
| Ted Stevens Anchorage International Airport | Phoenix Sky Harbor International Airport. |
| Chicago O'Hare International Airport | Portland International Airport. |
| Chicago O'Hare International Airport | Seattle—Tacoma International Airport. |
| Dallas/Fort Worth International Airport | Portland International Airport. |
| Dallas/Fort Worth International Airport | Seattle—Tacoma International Airport. |
| Los Angeles International Airport | Portland International Airport. |
| Los Angeles International Airport | Salt Lake City International Airport. |
| Los Angeles International Airport | Seattle—Tacoma International Airport. |
| John F. Kennedy International Airport | Seattle—Tacoma International Airport. |
| Philadelphia International Airport | Seattle—Tacoma International Airport. |
| Phoenix Sky Harbor International Airport | Seattle—Tacoma International Airport. |
| Phoenix Sky Harbor International Airport | Portland International Airport. |
| Ronald Reagan Washington National Airport | Los Angeles International Airport. |
| Baltimore—Washington International Airport | Los Angeles International Airport. |
| Newark Liberty International Airport | Seattle—Tacoma International Airport. |
| John F. Kennedy International Airport | San Diego International Airport. |
| Newark Liberty International Airport | San Diego International Airport. |

| | |
|---|---|
| Miami International Airport | Seattle—Tacoma International Airport. |
| Fort Lauderdale-Hollywood International Airport | Seattle—Tacoma International Airport. |
| Washington Dulles International Airport | Los Angeles International Airport. |

**Appendix B**

**Virgin/American Domestic U.S. Overlap Routes**

| Non-directional origin and destination pairs | |
|---|---|
| **Origin** | **Destination** |
| Boston Logan International Airport | Los Angeles International Airport. |
| Chicago O'Hare International Airport | Los Angeles International Airport. |
| Dallas Love Field Airport | Los Angeles International Airport. |
| Dallas/Fort Worth International Airport | Los Angeles International Airport. |
| Fort Lauderdale—Hollywood International Airport | Los Angeles International Airport. |
| Los Angeles International Airport | Miami International Airport. |
| Honolulu International Airport | Los Angeles International Airport. |
| McCarran International Airport | Los Angeles International Airport. |
| Los Angeles International Airport | Washington Dulles International Airport. |
| Los Angeles International Airport | Ronald Reagan Washington National Airport. |
| Los Angeles International Airport | John F. Kennedy International Airport. |
| Los Angeles International Airport | Newark Liberty International Airport. |
| Los Angeles International Airport | Orlando International Airport. |
| Los Angeles International Airport | Seattle—Tacoma International Airport. |
| Dallas Love Field Airport | San Francisco International Airport. |
| Dallas/Fort Worth International Airport | San Francisco International Airport. |
| Fort Lauderdale—Hollywood International Airport | San Francisco International Airport. |
| Miami International Airport | San Francisco International Airport. |
| John F. Kennedy International Airport | San Francisco International Airport. |
| Los Angeles International Airport | San Francisco International Airport. |
| Chicago O'Hare International Airport | San Francisco International Airport. |

| | |
|---|---|
| Dallas Love Field Airport | Ronald Reagan Washington National Airport. |
| Dallas/Fort Worth International Airport | Ronald Reagan Washington National Airport. |
| Dallas Love Field Airport | LaGuardia Airport. |
| Dallas/Fort Worth International Airport | LaGuardia Airport. |
| Dallas Love Field Airport | McCarran International Airport. |
| Dallas/Fort Worth International Airport | McCarran International Airport. |
| Fort Lauderdale—Hollywood International Airport | John F. Kennedy International Airport. |
| Miami International Airport | John F. Kennedy International Airport. |
| Los Angeles International Airport | Kahului Airport. |
| McCarran International Airport | John F. Kennedy International Airport. |

***89991** [FR Doc. 2016-29883 Filed 12-12-16; 8:45 am]

BILLING CODE 4410-11-P

## Footnotes

1 The 2004 amendments substituted "shall" for "may" in directing relevant factors for courts to consider and amended the list of factors to focus on competitive considerations and to address potentially ambiguous judgment terms. Compare 15 U.S.C. 16(e) (2004), with 15 U.S.C. 16(e)(1) (2006); see also SBC Commc'ns, 489 F. Supp. 2d at 11 (concluding that the 2004 amendments "effected minimal changes" to Tunney Act review).

2 Cf. BNS, 858 F.2d at 464 (holding that the court's "ultimate authority under the [APPA] is limited to approving or disapproving the consent decree"); United States v. Gillette Co., 406 F. Supp. 713, 716 (D. Mass. 1975) (noting that, in this way, the court is constrained to "look at the overall picture not hypercritically, nor with a microscope, but with an artist's reducing glass"). See generally Microsoft, 56 F.3d at 1461 (discussing whether "the remedies [obtained in the decree are] so inconsonant with the allegations charged as to fall outside of the 'reaches of the public interest' ").

3 See also United States v. Enova Corp., 107 F. Supp. 2d 10, 17 (D.D.C. 2000) (noting that the "Tunney Act expressly allows the court to make its public interest determination on the basis of the competitive impact statement and response to comments alone"); United States v. Mid-Am. Dairymen, Inc., No. 73-CV-681-W-1, 1977-1 Trade Cas. (CCH) ) 61,508, at 71,980, *22 (W.D. Mo. 1977) ("Absent a showing of corrupt failure of the government to discharge its duty, the Court, in making its public interest finding, should . . . carefully consider the explanations of the government in the competitive impact statement and its responses to comments in order to determine whether those explanations are reasonable under the circumstances."); S. Rep. No. 93-298, at 6 (1973) ("Where the public interest can be meaningfully evaluated simply on the basis of briefs and oral arguments, that is the approach that should be utilized.").

**End of Document**

© 2025 Thomson Reuters. No claim to original U.S. Government Works.

**Served: June 24, 2024**

**UNITED STATES OF AMERICA**
**DEPARTMENT OF TRANSPORTATION**
**OFFICE OF THE SECRETARY**

---

# ESTABLISHMENT OF SLOT EXEMPTION PROCEEDING AT RONALD REAGAN WASHINGTON NATIONAL AIRPORT PURSUANT TO 49 U.S.C. § 41718

**Docket DOT-OST-2024-0065**

---

## NOTICE

### Summary

By this Notice, the U.S. Department of Transportation (the Department) is requesting applications from eligible air carriers for 10 slot exemptions for service to Ronald Reagan Washington National Airport (DCA) from domestic airports within or beyond the 1,250-mile perimeter established by 49 U.S.C. § 49109. Completed applications must be filed in docket DOT-OST-2024-0065 by July 8, 2024, and comments on any timely-filed applications must be filed by July 17, 2024.

### Background

On May 16, 2024, President Biden signed into law the Securing Growth and Robust Leadership in American Aviation Act of 2024, also known as the FAA Reauthorization Act of 2024 (FAA 2024). Section 502 of FAA 2024 authorizes ten (10) new slot exemptions[1] at DCA for service to domestic airports either within or beyond the 1,250-mile perimeter established by 49 U.S.C. § 49109. By this Notice, the Department is requesting applications from eligible air carriers that wish to provide new nonstop services using these exemptions. FAA 2024 directs the Department to grant the 10 exemptions in two categories: eight exemptions, or four round trips, are reserved for incumbent carriers qualifying as non-limited incumbent carriers, while the remaining two exemptions, or one round trip, are reserved for limited incumbent carriers.[2] Any one carrier may be awarded no more or less than two exemptions (one round trip).

---

[1] A slot is a reservation for an instrument flight rule takeoff or landing. Therefore, two slots are required to operate a round trip. 49 U.S.C. § 41714(h)(4). A slot exemption is an exemption from the slot limitations in the Federal Aviation Administration's High Density Rule, 14 CFR Part 93, subparts K and S.

[2] 49 U.S.C. § 41714(h)(5) defines a limited-incumbent carrier as one that holds or operates fewer than 40 slots at DCA, not including any slot exemptions granted by the Secretary.

**Applications Requested**

The Department requests applications from eligible non-limited and limited incumbent air carriers for the slot exemptions made available by FAA 2024. Because Section 502 requires the Department to grant the exemptions not later than 60 days after the enactment of FAA 2024, we are establishing an expedited schedule for the application process. Accordingly, completed applications must be filed in Docket DOT-OST-2024-0065 no later than July 8, 2024. Any comments related to timely applications must be filed in Docket DOT-OST-2024-0065 no later than July 17, 2024. The Department anticipates issuing a single final selection order in this proceeding.

*Eligibility*

FAA 2024 directs the Department to make eight of the 10 additional slot exemptions available to incumbent air carriers qualifying for status as a non-limited incumbent carrier at DCA as of the date of the enactment of the statute. The remaining two slot exemptions shall be made available to incumbent air carriers qualifying for status as a limited incumbent carrier at DCA as of the date of the enactment of the statute, and as defined by 49 U.S.C. § 41714(h)(5). Additionally, FAA 2024 requires that the slot exemptions be used only to provide service to U.S. domestic airports. The Department, in coordination with the FAA Slot Administration Office, is providing below a list of current DCA Non-Limited and Limited Incumbent carriers at the time of the enactment of FAA 2024.[3]

| Non-Limited Incumbent Carriers | Limited Incumbent Carriers |
|---|---|
| American Airlines (AA)<br>Delta Air Lines (DL)<br>JetBlue (B6)<br>Southwest Airlines (WN)<br>United Airlines (UA) | Alaska Airlines (AS)<br>Air Canada (AC) [4] |

*Application Process for Eligible Air Carriers*

As required by FAA 2024, the Department will consider applications and grant a total of ten (10) within or beyond perimeter slot exemptions for eligible non-limited (8), and eligible limited incumbent (2) air carriers. In assigning the slot exemptions, FAA 2024 directs the Department to consider the extent to which the exemptions will: (i) enhance options for nonstop travel to beyond-perimeter airports that do not have nonstop service from DCA as of the date of enactment of FAA 2024; or (ii) have a positive impact on the overall level of competition in the markets that will be served as a result of those exemptions.

[3] This list includes only those carriers marketing air transportation at DCA on the date of enactment of FAA 2024.
[4] *See* 49 U.S.C. § 41718(h)(3) and Order 2012-2-21.

At a minimum, carriers should include in their applications the market (and airport) to be served, the aircraft type, a schedule showing proposed times, an approximate start-up date, and an analysis of the relative merits of the carrier's proposed service when evaluated under the Section 502 criteria.[5] Applications should otherwise conform with the requirements of 14 CFR Subpart C. Completed applications must be properly served and filed in Docket DOT-OST-2024-0065 by July 8, 2024, and comments with respect to any timely-filed request for slot exemptions must be properly served and filed by July 17, 2024. Consistent with past practice and the expedited timeframe in the legislation, the Department expects to make selections in a single final order.

*Scheduling of Within and Beyond Perimeter Slot Exemptions*

After the final order, we will direct selected carriers to work with the FAA Slot Administration Office to assign slot times corresponding with the authority granted in this proceeding and in accordance with the requirements of FAA 2024. Under 49 U.S.C. § 41718(c)(2), the Secretary may not increase the number of operations at DCA by more than five in any of 15 one-hour periods between 7:00 a.m. and 9:59 p.m. EST. Many hours have already reached the statutory cap with existing exemptions and therefore not all requests will be able to be granted. Final slot times for the granted exemptions will be allocated via notice after the Department's decision.

We shall serve a copy of this Notice on all certificated U.S. Air Carriers, Air Canada, the Metropolitan Washington Airports Authority, the Mayor of the District of Columbia, the Governor of Virginia, and the FAA's Slot Administration Office.

By:

**CAROL (ANNIE) PETSONK**
Assistant Secretary for Aviation
and International Affairs

Dated:

(SEAL)

*An electronic version of this document will be available online at:*
*http://www.regulations.gov*

---

[5] Due to the expedited schedule required by Section 502, the Department encourages applicants to provide no more than one backup service proposal in their applications.



June 26, 2024

The Honorable Carol A. "Annie" Petsonk
Assistant Secretary of Transportation for
Aviation and International Affairs
U.S. Department of Transportation
1200 New Jersey Avenue S.E.
Washington, D.C. 20590

**Re: Spirit Airlines Eligibility for DCA Limited Incumbent Slot Exemptions**

Dear Assistant Secretary Petsonk:

On behalf of Spirit Airlines, Inc. we write to advise the Department that Spirit intends to apply for the two (2) limited incumbent slot exemptions to be awarded under the FAA Reauthorization Act of 2024 (2024 Reauthorization) for service to Ronald Reagan Washington National Airport (DCA).[1] Under applicable law, Spirit qualifies as a "limited incumbent" – and may be the only carrier qualifying under that category – because as of the 2024 Reauthorization enactment date Spirit is considered to hold no more and no less than four (4) permanent slots at DCA which it obtained through an FAA-administered lottery on August 12, 2003.[2]

As explained below, although Alaska Airlines and Air Canada are listed in the Notice under the category of "Limited Incumbent Carriers," neither carrier qualifies for slots under that category. Consistent with two decades of Department precedent, 49 U.S.C. § 41714(k) expressly prohibits Alaska from qualifying as a limited incumbent for new slot exemptions because it has an ongoing codeshare agreement with American Airlines and the "*total number of slots and slot exemptions held by the two carriers at the airport exceed 20.*"[3]

Air Canada does not qualify for an award of any slot exemptions because it is a foreign air carrier, and further cannot provide service to a domestic airport from DCA as required by the 2024 Reauthorization as this would be cabotage.[4]

---

[1] Spirit saw that the Department's June 24, 2024 Notice only listed "those carriers marketing air transportation at DCA on the date of enactment of FAA 2024" which does not account for all eligible carriers.

[2] *See, e.g.*, 68 Fed. Reg. 50584 (Aug. 21, 2003); Order 2003-9-30, Docket DOT-OST-2003-15972 (granting Spirit request to slide operating times of four (4) slots permanently allocated by FAA on August 12, 2003).

[3] 49 U.S.C. § 41714(k).

[4] 49 U.S.C. 41714(h)(3), referenced in the Department's Notice, does not apply to this proceeding as it relates to the Department giving consideration to Canadian applications related to "scheduling priority" when such conditions and limitations being considered "apply to such foreign air carriers."

1750 K Street N.W., Suite 700, Washington, D.C. 20006
202.331.3348 *tel* 202.331.3393 *fax*
www.yklaw.com

## I. Spirit is Considered to Hold Four Slots and Qualifies as A Limited Incumbent Even Though it Does Not Currently Market or Operate Flights to DCA

The 2024 Reauthorization amended 49 U.S.C. 41718 to require the Department to award two (2) slot exemptions, to "air carriers qualifying for status as a limited incumbent carrier." In footnote 2 of the Notice, the Department correctly notes Congress has defined a limited incumbent in 49 U.S.C. § 41714(h)(5) as a carrier that holds or operates fewer than 40 slots. However, Section 41714(h)(5) also expressly incorporates the meaning of a limited incumbent as set out in 14 CFR Part 93, Subpart S, which states:

> ***Limited incumbent carrier*** means an air carrier … that holds or operates fewer than 12 air carrier … slots, in any combination, at a particular airport, not including international slots, Essential Air Service Program slots, or slots between the hours of 2200 and 0659 at Washington National Airport or LaGuardia Airport. However, for the purposes of this paragraph (a)(5), *the carrier is considered to hold the number of slots at that airport that the carrier has, since December 16, 1985: (i) Returned to the FAA; (ii) Had recalled by the FAA under § 93.227(a); or (iii) Transferred to another party other than by trade for one or more slots at the same airport.*[5]

As new entrant carrier, Spirit received four (4) permanent slots for service to DCA under an FAA lottery slot allocation proceeding conducted on August 12, 2003.[6] In 2012, Spirit entered into an agreement to sell these slots to Southwest Airlines. As set forth in the emphasized Subpart S language above, Spirit is considered as continuing to hold its four (4) permanent slots at DCA because they were held by Spirit after December 16, 1985 and were subsequently "*transferred to another party other than by trade for one or more slots at the same airport.*"[7] Spirit therefore meets all criteria establishing it as a limited incumbent for purposes of new slot exemption awards under Section 41718: (i) Spirit is not a "new entrant" carrier; [8] (ii) Spirit holds less than 40 slots at DCA; and (iii) Spirit is not engaged in a codeshare agreement with another carrier. Accordingly, Spirit is eligible to apply for and receive the two (2) limited incumbent slots under the 2024 Reauthorization even though it does not currently operate or market flights at DCA. Spirit is not aware of any other carrier meeting the criteria to qualify as a limited incumbent under Section 41714.

---

[5] 14 C.F.R. § 93.213(a)(5) (emphasis added).

[6] *See*, *e.g.*, 68 Fed. Reg. 50584 (Aug. 21, 2003); Order 2003-9-30, Docket DOT-OST-2003-15972 (granting Spirit request to slide operating times of four (4) slots permanently allocated by FAA on August 12, 2003). These permanent slots were later sold to Southwest Airlines.

[7] 14 C.F.R. § 93.213(a)(5)(iii) (emphasis added).

[8] 45 Fed. Reg. 71236 ("*The definition of "new entrant carrier" is particularly important since those carriers will be provided a preference in any lotteries held to distribute slots in the future. "New entrant carrier" is defined as any commuter operator or air carrier that does not hold a slot at a particular airport and has never sold or given up a slot at that airport after December 16, 1985.*").

## II. 49 U.S.C. 41714(k) Expressly Disqualifies Alaska as a Limited Incumbent Because it Has a Codeshare Relationship With American and the Two Carriers Hold Over 500 Slots or Exemptions at DCA

Since the enactment of Air-21 legislation in 2000 which provided the current statutory framework for slot and slot exemption access "*at the four airports now subject to the provisions of the High Density Rule*", Congress has restricted airlines in a codeshare agreement from qualifying for new slot exemptions as limited incumbents when the combined number of slot and slot exemptions held by both airlines exceeds 20. Specifically, 49 U.S.C. 41714(k) states as follows:

> **(k) Affiliated carriers**. *<u>For purposes of this section and sections 41716, 41717, and 41718,</u>* an air carrier that operates under the same designator code, or has or enters into a code-share agreement, with any other air carrier shall not qualify for a new slot or slot exemption as a new entrant or limited incumbent air carrier at an airport if the total number of slots and slot exemptions held by the two carriers at the airport exceed 20 slots and slot exemptions.[9]

American Airlines, the holder of more than 50% of all DCA slots, and Alaska Airlines have been in a codeshare relationship for over two decades,[10] which subjects both carriers to the provisions of 49 U.S.C. § 41714(k). As of the most current slot data on the FAA website, American holds 503 regular slots or exemptions, while Alaska holds 18 – for a total of 521 and well over the 20 slot/exemption threshold for disqualification as a limited incumbent. As the Department has noted in numerous prior slot exemption award proceedings at DCA and other high-density airports, *"[f]or the purposes of these slot exemptions, 49 U.S.C. Section 41714(k)* ***<u>mandates</u>*** *that, in the case of code-share carriers, the slot holdings of both carriers must be aggregated in determining the 20-operations threshold."*[11]

Notably, Alaska and American recently expanded their codeshare relationship and in May 2024 it included over 100 scheduled codeshare flights originating or departing from DCA.[12] Accordingly, Alaska Airlines is not eligible for the two (2) limited incumbent slot exemptions

---

[9] 49 U.S.C. § 41714(k) (emphasis added).

[10] 81 Fed. Reg. 89979, *United States v. Alaska Air Group, Inc., et al.; Proposed Final Judgment and Competitive Impact Statement* (Dec. 13, 2016) ("Alaska has closely aligned itself with American, the largest U.S. airline, through a commercial relationship known as a codeshare agreement, which … began in 1999….").

[11] Order 2004-12-6, p.6, Docket DOT-OST-2000-7182 (Dec. 6, 2004) (emphasis added). *See also, e.g.*, Order 2004-4-2, at n.2, Docket DOT-OST-2000-7182 (Apr. 1, 2004) (requiring compliance with 41714(k) for DCA slot exemptions); Order 2000-4-10, at n.2, Docket DOT-OST-2000-7176 (Apr. 19, 2000) (requiring compliance with 41714(k) for LGA slot exemptions); Order 2000-4-15, at n.3, Docket DOT-OST-2000-7180 (Apr. 19, 2000) (requiring compliance with 41714(k) for ORD slot exemptions); Order 2000-4-13, at n.2, Docket DOT-OST-2000-7178 (Apr. 19, 2000) (requiring compliance with 41714(k) for JFK slot exemptions).

[12] *See* May 2024 AA-AS flight data in Exhibit A.

under the 2024 Reauthorization and can only pursue one of the 4 slot-pair exemptions provided for non-limited incumbents.

Spirit appreciates the Department's efforts to initiate the slot exemption proceeding for DCA. The airline looks forward to submitting its application for the first and only non-stop low-fare service between Silicon Valley and the nation's capital.

Respectfully,

Joanne W. Young
David M. Kirstein
Donald L. Crowell

**Kirstein & Young PLLC**
1750 K Street NW, Suite 700
Washington, DC 20006
Phone: (202) 331-3348
Fax: (202) 331-3933
jyoung@yklaw.com
dkirstein@yklaw.com
dcrowell@yklaw.com

***Counsel for Spirit Airlines, Inc.***

Enclosure

CC: The Honorable Jonathan Kanter, Assistant Attorney General of the Antitrust Division, U.S. Department of Justice

Patricia Corcoran, Esq., Acting Chief, Transportation, Energy & Agriculture Section, Antitrust Division, U.S. Department of Justice

**From:** Muldoon, Albert (OST)
**To:** Brian Foont
**Subject:** RE: Establishment of Slot Exemption Proceeding at DCA
**Date:** Thursday, June 27, 2024 9:31:00 AM

---

Mr. Foont,

The Department's *ex parte* communication rules (14 CFR Part 300.2) now apply to this proceeding. Therefore, I cannot discuss the merits of the proceeding, including eligibility. However, you and your client are free to file in the docket as you see fit.

As is our standard practice, I will be placing a copy of your email and this response in docket DOT-OST-2024-0065 as a contact outside of the record.

Regards,
A.J.

A.J. Muldoon
Associate Director, Office of Aviation Analysis
U.S. Department of Transportation

---

**From:** Brian Foont <foont@foontlaw.com>
**Sent:** Wednesday, June 26, 2024 4:56 PM
**To:** Muldoon, Albert (OST) <albert.muldoon@dot.gov>
**Subject:** Establishment of Slot Exemption Proceeding at DCA

**CAUTION:** This email originated from outside of the Department of Transportation (DOT). Do not click on links or open attachments unless you recognize the sender and know the content is safe.

Good afternoon.

Following up on my message, I was referred to you by Al Meilus.

I am pleased to represent Frontier Airlines.

According to the notice issued on June 24, there are five Non-Limited Incumbent Carriers and two Limited Incumbent Carriers. Frontier Airlines, however, holds and operates three slot pairs at DCA. We, therefore, believe that they should be included and considered as a Limited Incumbent Carrier. I would appreciate you confirming that is so.

Further, I would appreciate you confirming that Spirit Airlines is not eligible to receive the available slots because it is not an incumbent because it does not presently operate at DCA.

Also, given that Air Canada would not be eligible to operate a domestic route from DCA

(because that would be cabotage), it is fair to conclude that they are not eligible to receive the slot that will be granted to a Limited Incumbent Carrier?

Thank you for your help.

Sincerely,

Brian

Brian E. Foont
The Foont Law Firm, LLC
11727 Gainsborough Road
Potomac, MD 20854-3247
Tel. 202-236-4851
Fax. 202-318-9195
E-Mail: Foont@FoontLaw.com
Web: www.FoontLaw.com

This email and any attachments hereto are intended only for use by the addressee(s) and may contain privileged and/or confidential information. If you are not the intended recipient of this e-mail you are hereby notified that any distribution or copying of it (including attachments) is prohibited. If you receive this email in error please immediately notify me at 202-236-4851 and permanently delete the original and any copies of this e-mail.

BEFORE THE
U.S. DEPARTMENT OF TRANSPORTATION
WASHINGTON, D.C.

| | |
|---|---|
| Application of<br><br>AMERICAN AIRLINES, INC.<br><br>in the matter of Establishment of Slot Exemption Proceeding at Ronald Reagan Washington National Airport Pursuant to 49 U.S.C. § 41718 | Docket DOT-OST-2024-0065 |

**APPLICATION OF AMERICAN AIRLINES, INC.**

Pursuant to the Department's Notice in this docket dated June 24, 2024, American Airlines, Inc. (American) submits this application for the allocation of two slot exemptions for American to provide new nonstop roundtrip service between San Antonio International Airport (SAT) and Ronald Reagan Washington National Airport (DCA).

**INTRODUCTION**

Section 502 of the Federal Aviation Administration (FAA) Reauthorization Act of 2024 authorizes eight new slot exemptions available to non-limited incumbent carriers at DCA to serve domestic within-perimeter or beyond-perimeter airports. American, as one of the eligible non-limited incumbent carriers at DCA, seeks to be awarded two of these slot exemptions to serve the beyond-perimeter SAT market.

Consistent with the selection criteria established in Section 502, an award of this slot pair exemption to American will enable American to initiate new competitive beyond-perimeter service to the second largest unserved market from DCA, providing the only nonstop service between SAT and DCA. This award will maximize public benefits by

meeting robust passenger demand between SAT and DCA, enhancing one-stop connectivity options for consumers traveling between the San Antonio region and the Eastern United States, and providing a diverse city with robust military and business ties to Washington, D.C. with a nonstop flight to the airport most convenient to our nation's capital.

American proposes to operate daily roundtrip SAT-DCA service, starting in approximately the beginning of October of 2024, with the following schedule and aircraft:

| Flight | Departure | Time | Arrival | Time | Aircraft |
|---|---|---|---|---|---|
| 1718 | SAT | 6:35 | DCA | 10:59 | Airbus A321 |
| 1947 | DCA | 19:45 | SAT | 22:20 | Airbus A321 |

Mindful of the need for "selected carriers to work with the FAA Slot Administration Office to assign slot times" and the constraint that at DCA "[m]any hours have already reached the statutory cap with existing exemptions,"[1] American is prepared to support appropriate schedule adjustments that allow for the safe and efficient integration of its SAT-DCA service into operations at DCA and the broader Washington metropolitan area airspace.

## DISCUSSION

### I. AMERICAN'S SAT-DCA SERVICE WILL ENHANCE TRAVEL OPTIONS AND BOOST COMPETITION BY PROVIDING NONSTOP SERVICE TO THE SECOND LARGEST UNSERVED MARKET FROM DCA AND THE SECOND LARGEST UNSERVED AIRPORT FROM SAT.

American's proposal responds compellingly to the first criterion specified in Section 502 of the FAA Reauthorization Act of 2024: the extent to which the proposed service will "enhance options for nonstop travel to beyond-perimeter airports that do not have nonstop

[1] Notice, dated June 24, 2024, in this docket.

service from Ronald Reagan Washington National Airport" currently. Adding nonstop service to SAT, a beyond-perimeter airport, creates new options for travelers to and from the second largest market (as measured by passenger demand) that presently lacks nonstop service to DCA (Exhibit AA-1). Not only is San Antonio the second largest unserved local market from DCA, but moreover DCA is also the second largest unserved airport from San Antonio as measured by passenger demand (Exhibit AA-2). Robust demand for this new nonstop service is palpable: in 2023, over 56,000 passengers traveled between these two airports even in the absence of nonstop service, which equates to roughly 154 passengers daily each way. When also considering passengers who are travelling between SAT and nearby Washington Dulles International Airport (IAD) and Baltimore/Washington International Thurgood Marshall Airport (BWI), there are over 221,000 annual passengers who travel between San Antonio and the Washington, D.C. region (Exhibit AA-3).

American's proposal also delivers powerfully on the second criterion stated in Section 502: the extent to which the proposed use of the slot exemptions will "have a positive impact on the overall level of competition in the markets that will be served as a result of those exemptions." The addition of American's competitive new SAT-DCA service promises relief from high fares that consumers have faced in these markets.

- The Metropolitan Washington Airports Authority (MWAA) operates the two primary Washington, D.C. area airports: DCA and IAD.[2] As of June 2024, United Airlines has a monopoly as the only carrier operating any nonstop service from San Antonio to either IAD or DCA. As a result, consumers have

[2] https://www.mwaa.com/about-airports-authority

faced a consistently high fare environment. In fact, of all routes from San Antonio, United's IAD-SAT route had the highest average fare of any route in 2023 (Exhibit AA-4).

- Additionally, as of June 2024, Southwest Airlines is the only carrier operating nonstop service from BWI to SAT. This route also suffers from a consistently high fare environment: BWI-SAT was Southwest's highest average fare nonstop route from San Antonio in 2023 (Exhibit AA-5).

American's proposed SAT-DCA service will provide much needed competition to both United's IAD-SAT service and Southwest's BWI-SAT service, benefitting consumers in the San Antonio and Washington markets.

## II. AMERICAN'S SAT-DCA SERVICE WILL PROVIDE NONSTOP SERVICE TO THE THIRD LARGEST UNSERVED ORIGIN & DESTINATION PAIR IN THE CONTINENTAL UNITED STATES.

Reinforcing the compelling public and competitive benefits of American's proposal, SAT-DCA is the third largest origin and destination ("OD") pair in the entire continental United States that currently lacks nonstop service. In 2023, there were over 1400 ODs that had more than 100 passengers daily each way in the United States. All but twelve of the 1400 ODs have scheduled nonstop service on at least one commercial airline in either 2023 and/or 2024.[3] Among those twelve ODs without any nonstop scheduled service, SAT-DCA is the third largest as measured by passenger demand (Exhibit AA-6).

## III. AMERICAN'S SAT-DCA SERVICE WILL ENHANCE CONNECTIVITY BETWEEN SAN ANTONIO AND THE EASTERN UNITED STATES.

American's proposal to serve SAT further enhances travel options and promotes competition by enabling seamless one-stop connections via DCA to and from several

[3] 2023 U.S. DOT O&D (via Cirium)

destinations in the Eastern United States, including LaGuardia Airport (LGA), which is the largest unserved airport from SAT as measured by passenger demand (Exhibit AA-2).

At least a dozen such cities will have round-trip connectivity with SAT via DCA (Exhibit AA-7). These cities include both large business and tourism markets such as New York (JFK and LGA) and Boston (BOS) as well as mid-sized cities such as Buffalo, NY (BUF) and Burlington, VT (BTV). Furthermore, the SAT-DCA service will provide one-stop connectivity to eight additional cities in one direction that will have round-trip connectivity via another one of American's hubs. For example, passengers wishing to travel between San Antonio and Syracuse, NY (SYR) will be able to use the SAT-DCA route to connect in one direction and use American's hub in Dallas/Fort Worth (DFW) as the connecting hub in the other direction (i.e., SAT-DCA-SYR in one direction, SYR-DFW-SAT in the other direction).

In total, the demand between the cities that will be able to connect onto the SAT-DCA and DCA-SAT flight legs represents more than 1,100 passengers daily each way (Exhibit AA-8). American's proposed SAT-DCA service will provide additional competitive options to these consumers – those in San Antonio who need to make a connection to get to and from the Eastern United States, and those in the Eastern United States who need to make a connection to get to and from San Antonio.

## IV. AMERICAN'S SAT-DCA SERVICE WILL PROVIDE CRITICAL CONVENIENCE, CONNECTIVITY, AND COMPETITION BETWEEN OUR NATION'S CAPITAL AND ONE OF THE FASTEST-GROWING LARGE METRO AREAS IN THE UNITED STATES.

It is readily apparent why robust passenger demand exists and will continue growing to support SAT-DCA service. San Antonio has a thriving economy, bolstered by a rapidly expanding and diverse population. Among the thirty largest U.S. metro areas,

San Antonio is by far the fastest growing without a DCA nonstop flight (Exhibit AA-9). As of 2023, the San Antonio Metropolitan Statistical Area (MSA) has a population of 2.7 million people, representing over 18% growth in the past decade and making it the nation's 24th largest MSA.[4] The San Antonio MSA has a $163B economy, the 5th largest outside the DCA perimeter that currently lacks a DCA nonstop flight.[5] San Antonio is also the largest city in the United States with a majority Hispanic population.[6]

The city is affectionately known as Military City USA ® and is home to Joint Base San Antonio, which is comprised of three large military bases: Fort Sam Houston, Randolph Air Force Base, and Lackland Air Force Base.[7] Joint Base San Antonio supports 266 mission partners and over 88,000 personnel,[8] cumulatively contributing at least $55B to the Texas economy in 2023.[9] Military travel to our nation's capital is vital, exemplified in the General Services Administration estimating that there are 17,472 federal government travelers on official business on the OD SAT-DCA in FY2024.[10] With DCA just three Metrorail stops away from the Pentagon, American's SAT-DCA service will significantly enhance the connectivity and convenience for our national defense community.

The San Antonio region is also a large and growing node of healthcare and biosciences, with hospitals, health systems, biomedical and research agencies, and

---

4 U.S. Census Bureau estimate, 2023

5 Bureau of Economic Analysis, 2022

6 https://en.wikipedia.org/wiki/List_of_U.S._cities_with_large_Hispanic_populations

7 https://www.visitsanantonio.com/san-antonio-culture/military-city-usa/

8 https://installations.militaryonesource.mil/in-depth-overview/joint-base-san-antonio-lackland-randolph-sam-houston

9 https://comptroller.texas.gov/economy/economic-data/military/2023/joint-base-sa.php

10 https://www.gsa.gov/system/files/awards_2024.csv

bioscience and related industries that directly employ more than 180,000 people and contribute an estimated $44B annually to the San Antonio economy.[11] In sum, American's proposed SAT-DCA service would provide convenience, connectivity, and competition to a flourishing majority-Hispanic community that is a critical hub for military and business activity that supports robust passenger demand to and from DCA.

## V. AA HAS STRONG SUPPORT FOR ITS PROPOSED SAT-DCA SERVICE.

American has strong support for its nonstop SAT-DCA service from elected officials, local governmental authorities, businesses, institutions, civic organizations, nonprofits, and others in San Antonio and beyond. A compilation of over 150 letters of support is appended to this Application.

These letters explain why support for American's proposed nonstop SAT-DCA service is so robust. A letter from both U.S. Senators and 34 Members of Congress from Texas states that service to "San Antonio undoubtedly meets the letter and spirit" of the prescribed selection criteria and "the five new round trips allocated should include San Antonio to DCA" given that San Antonio is "one of the largest cities in the country without a direct flight to DCA."[12] San Antonio's Mayor "appreciate[s] American Airlines' partnership with SAT" to "provide San Antonians with the same ability to travel to our

[11] https://www.sachamber.org/clientuploads/Economic_Impact_Studies/2022_Healthcare_and_Bioscience_Economic_Impact_Study.pdf

[12] In addition to participating in the Texas delegation's letter, officials have separately voiced their support elsewhere. Sen. Ted Cruz's office has welcomed "a direct flight from San Antonio to DCA" as "delivering a more convenient travel experience for members of the military traveling from Joint Base San Antonio, business travelers, and tourists." *See* https://www.cruz.senate.gov/newsroom/press-releases/sen-cruz-reps-roy-castro-mayor-nirenberg-outline-next-steps-for-nonstop-flight-from-san-antonio-to-washington-dc. Rep. Joaquin Castro observed that absent nonstop SAT-DCA service, "San Antonio is losing out on opportunities to attract business and travel that could create thousands of jobs." *See* https://castro.house.gov/media-center/press-releases/congressman-castro-urges-senate-to-authorize-direct-flights-from-san-antonio-to-washington-dc-to-support-military-travel-economic-growth. Rep. Chip Roy and seven other Members of Congress have written that "[s]ecuring a nonstop flight between DCA and SAT would promote national security and economic opportunity and make it easier for tens of thousands of veterans to be honored in our nation's capital." *See* https://roy.house.gov/media/press-releases/rep-roy-leads-7-texans-supporting-authorization-non-stop-flight-military-city.

nation's capital as almost every other major city in the United States," asserting that "establishing this nonstop flight will have a profound impact on the San Antonio region" and that an "efficient connection between SAT and DCA is not just a convenience, but a necessity for our city's continued prosperity." In addition, seven Texas state senators and representatives have individually written letters of support all affirming their support for American's application for nonstop SAT-DCA service.

The Greater San Antonio Chamber of Commerce, representing nearly 1,800 members, confirms that "[a] wide range of industry professions have business and policy concerns in Washington, DC and would benefit from easier access to the DCA airport"; for example, the Greater Chamber "leads a local delegation of hundreds of business and civic leaders on an annual trip to Washington, DC each year." A regional economic development organization, greater:SATX, emphasizes "the urgent need and economic opportunity this route offers as San Antonio is *both* the 7th largest and fastest growing city in the nation." The U.S. Hispanic Chamber of Commerce asserts that San Antonio, with its majority Hispanic population, "boasts an expansive and diverse set of Hispanic owned businesses" and that "[p]roviding new service to our nation's capital would only serve to strengthen business ties between these two important regions."

San Antonio's Director of Airports supports "allocating two slots to American Airlines to initiate daily nonstop service" between SAT and DCA. SAT believes "this route will increase competition and choices for San Antonio travelers who have long awaited nonstop service to DCA." SAT thus "is working in collaboration with American Airlines" to secure "a route to DCA that will be especially beneficial to our business and leisure markets."

## CONCLUSION

Awarding two slot exemptions to American for daily roundtrip service between SAT and DCA provides compelling public and competitive benefits in enabling nonstop travel to a beyond-perimeter airport that currently lacks nonstop service from DCA and supporting the overall level of competition in those markets. American respectfully requests that the Department grant its application.

Respectfully submitted,

Molly Wilkinson
American Airlines, Inc.

Arjun Garg
Counsel for American Airlines, Inc.

**BEFORE THE**
**DEPARTMENT OF TRANSPORTATION**
**WASHINGTON, D.C.**

| | |
|---|---|
| **Application of**<br><br>**FRONTIER AIRLINES, INC.**<br><br>**For Slot Exemption at Ronald Reagan Washington National Airport Pursuant to 49 U.S.C. § 41718** | **Docket DOT-OST-2024-0065** |

## APPLICATION FOR SLOT EXEMPTION

Communications concerning this document should be sent to:

Howard M. Diamond
EVP, Legal and Corporate Affairs
Frontier Airlines
4545 Airport Way
Denver, CO 80239
Tel. 720-374-4367
E-mail: Howard.Diamond@flyfrontier.com

Brian E. Foont
The Foont Law Firm, LLC
11727 Gainsborough Road
Potomac, MD 20854
Tel. 202-236-4851
E-Mail: Foont@FoontLaw.com

**BEFORE THE**
**DEPARTMENT OF TRANSPORTATION**
**WASHINGTON, D.C.**

| | |
|---|---|
| **Application of**<br><br>**FRONTIER AIRLINES, INC.**<br><br>**For Slot Exemption at Ronald Reagan Washington National Airport Pursuant to 49 U.S.C. § 41718** | **Docket DOT-OST-2024-0065** |

## APPLICATION FOR SLOT EXEMPTION

### I. Frontier's Request

Regarding the U.S. Department of Transportation (DOT)'s Slot Exemption Proceeding at Ronald Reagan Washington National Airport Pursuant to 49 U.S.C. § 41718 issued June 24, 2024 ("Notice"),[1] Frontier Airlines, Inc. ("Frontier") hereby requests two (2) slots (*i.e.*, 1 slot pair) for use in the operation of daily flights from Ronald Reagan Washington National Airport (DCA) to/from Luis Muñoz Marín International Airport (SJU).

### II. Eligibility

As explained in the Notice, Section 502 of the Securing Growth and Robust Leadership in American Aviation Act of 2024, also known as the FAA Reauthorization Act of 2024 ("FAA 2024"), authorizes ten (10) new slot exemptions at DCA. Eight (8) (*i.e.*, 4 slot pairs) of those are to be distributed to "incumbent air carriers qualifying for status as a non-limited incumbent carrier at Ronald Reagan Washington National Airport as of the date of enactment of the FAA Reauthorization Act of 2024"[2] and two (2) (*i.e.*, 1 slot pair) to "incumbent air carriers qualifying

[1] Docket DOT-OST-2024-0065.

[2] 49 U.S.C. § 41718(i)(2).

for status as a limited incumbent carrier at Ronald Reagan Washington National Airport as of the date of enactment of the FAA Reauthorization Act of 2024."[3] In both cases, eligibility first requires being an "incumbent air carrier." That is, the carriers that will receive slot exemptions must have been operating at DCA on May 16, 2024. With that prerequisite met, a carrier is eligible if it is a non-limited incumbent carrier at DCA or a limited incumbent carrier at DCA.[4]

The statutory definition of "limited incumbent air carrier" provided at 49 U.S.C. § 41714(h)(5) is as follows:

> Limited incumbent air carrier.—The term "limited incumbent air carrier" has the meaning given that term in subpart S of part 93 of title 14, Code of Federal Regulations; except that—
>
> (A) "40" shall be substituted for "12" in sections 93.213(a)(5), 93.223(c)(3), and 93.225(h);
>
> (B) for purposes of such sections, the term "slot" shall not include—
>
> (i) "slot exemptions";
>
> (ii) slots operated by an air carrier under a fee-for-service arrangement for another air carrier, if the air carrier operating such slots does not sell flights in its own name, and is under common ownership with an air carrier that seeks to qualify as a limited incumbent and that sells flights in its own name; or
>
> (iii) slots held under a sale and license-back financing arrangement with another air carrier, where the slots are under the marketing control of the other air carrier; and
>
> (C) for Ronald Reagan Washington National Airport, the Administrator shall not count, for the purposes of section 93.213(a)(5), slots currently held by an air carrier but leased out on a long-term basis

[3] 49 U.S.C. § 41718(i)(3). We note that FAA 2024 refers to "limited incumbent carrier" as opposed to "limited incumbent air carrier," the latter of which is defined in the statute at 49 U.S.C. § 41714(h)(5) and adopted by the DOT in the Notice (note 2). The regulations at 14 C.F.R. § 93.213(a)(5), however, define the term "limited incumbent carrier" (*i.e.*, without the word "air"), which is referenced in the statutory definition of "limited incumbent air carrier." Given that the DOT has adopted the statutory, rather than the regulatory, definition in the Notice, Frontier applies that definition herein, but notes that Congress may have been referring to the precisely matching regulatory term. Frontier hereby reserves its arguments in that regard, having concluded that under either definition, it is the only incumbent limited incumbent carrier eligible to receive a slot pair in the present proceeding.

[4] FAA 2024 effectively precludes granting slots to a new entrant air carrier unless it is also a limited incumbent air carrier. "New entrant air carrier" is defined in the statute as (emphasis added) "an air carrier that does not hold a slot at the airport concerned and has never sold or given up a slot at that airport after December 16, 1985, *and a limited incumbent carrier*." 49 U.S.C. § 41718(h)(3). Because FAA 2024 requires that the grantee of the slot be an incumbent air carrier, *i.e.*, already operating at DCA, new entrant air carriers that are not also limited incumbent carriers are excluded. Note that the regulatory definition of "New entrant carrier" does not include limited incumbent carriers. 14 C.F.R. § 93.213(a)(1).

> by that carrier for use in foreign air transportation and renounced by the carrier for return to the Department of Transportation or the Federal Aviation Administration.

The definition referred to above at 14 C.F.R. § 93.213(a)(5) is as follows:

> *Limited incumbent carrier* means an air carrier or commuter operator that holds or operates fewer than 12 air carrier or commuter slots, in any combination, at a particular airport, not including international slots, Essential Air Service Program slots, or slots between the hours of 2200 and 0659 at Washington National Airport or LaGuardia Airport. However, for the purposes of this paragraph (a)(5), the carrier is considered to hold the number of slots at that airport that the carrier has, since December 16, 1985:
> (i) Returned to the FAA;
> (ii) Had recalled by the FAA under § 93.227(a); or
> (iii) Transferred to another party other than by trade for one or more slots at the same airport.

As noted, Frontier is a limited incumbent carrier at DCA.[5] Specifically, because Frontier "holds or operates fewer than 12" slots at DCA, *i.e.*, six (6),[6] and (i), (ii), and (iii) in the above regulation do not add to that number, it is a limited incumbent carrier under 14 C.F.R. § 93.213(a)(5). Applying the adjustments specified in the above statute, the upper limit of slots to qualify as a limited incumbent carrier is increased to forty (40). There is, however, no minimum specified, with the regulation simply requiring that an air carrier hold or operate "fewer than 12" slots at DCA. Consequently, even though Frontier's slot total is reduced to zero (0) under 49 U.S.C. § 41714(h)(5)(B)(i) because all of its slots are 'exemption slots', Frontier remains a limited incumbent carrier under the statute.[7]

---

[5] Docket DOT-OST-0029-6192 at 8 (DOT acknowledging Frontier's confirmation of its status as a limited incumbent carrier without contradiction).

[6] Frontier received one (1) slot pair pursuant to Order 2000-7-1 and two (2) slot pairs pursuant to Order 2004-4-1.

[7] It is worth addressing the contrary argument that Frontier is not a limited incumbent air carrier. Under the statute, one of three categories must apply: (i) new entrant air carriers (definition provided *supra* at note 4), (ii) limited incumbent air carriers (as defined above), and (iii) non-limited incumbent air carriers, which, as commonly used, refers to carriers whose holding of slots (with the adjustments applied) exceeds forty (40). Because the statutory definition includes limited incumbent air carriers, a carrier may be both a new entrant air carrier and a limited incumbent air carrier (this is not so under the regulatory definition (*see*, *supra*, note 4) that does not include limited incumbent carriers). If one were, however, to deny that Frontier is a limited incumbent air carrier, it would not then

Not only is Frontier a limited incumbent carrier, but it is also *the only limited incumbent carrier eligible to receive slot exemptions in the present proceeding*. In the Notice, the DOT, citing the FAA Slot Administration Office, asserts that there are two (2) limited incumbent carriers: Alaska Airlines and Air Canada. A third carrier, Spirit Airlines, Inc. ("Spirit"), asserts that it is as well.[8] Concerning Alaksa Airlines, Spirit's counsel correctly explains in a letter to DOT that:

> Consistent with two decades of Department precedent, 49 U.S.C. § 41714(k) expressly prohibits Alaska from qualifying as a limited incumbent for new slot exemptions because it has an ongoing codeshare agreement with American Airlines and the "total number of slots and slot exemptions held by the two carriers at the airport exceed 20."[9]

Further, Spirit's counsel correctly notes that Air Canada, being a foreign carrier, is not able to provide service to a U.S. domestic airport from DCA as required for the slots being distributed.[10] Air Canada is, therefore, ineligible to receive any of the slot exemptions in the present proceeding.[11]

Spirit's counsel concludes by asserting that Spirit is a limited incumbent carrier and, therefore eligible to receive slots in the present proceeding.[12] The problem is that Spirit's counsel avoids addressing the first "incumbent" in 49 U.S.C. § 41718 (i)(3) (emphasis added):

> LIMITED INCUMBENTS.—Of the slot exemptions made available under paragraph (1), the Secretary shall make 2 available to *incumbent* air carriers

---

be a new entrant air carrier because Frontier holds slots (the definition of "new entrant air carrier" does not exclude 'exemption slots'). Thus, such a denial would put Frontier in a category not encompassed by the statute, *i.e.*, not a new entrant air carrier, limited incumbent carrier, or non-limited incumbent carrier. That is contrary to both a reasonable interpretation of the definition of "limited incumbent carrier" and the framework of the statute that is designed to categorize all carriers.

[8] Docket DOT-OST-2024-0065-0007.

[9] *Supra*, note 8 at 1. We note that, in contrast to the definition of "limited incumbent air carrier" under 49 U.S.C. § 41714(h)(5), the rule under 49 U.S.C. § 41714(k) counts both "slots and slot exemptions" for the purposes of the limit of twenty (20) specified in that provision.

[10] 49 U.S.C. § 41718 (i)(1)(A).

[11] *Supra*, note 8 at 1. *See also* Docket DOT-OST-2012-0029-6192 at 5 (DOT noting Air Canada's acknowledgment where the same requirement applied in a prior proceeding, that it "maintains that the statutory criteria that guided the award of previous DCA slot exemptions effectively prevented it from participating because service was to be provided to airports within the United States.").

[12] *Supra*, note 8 at 2.

> *qualifying for status as a limited incumbent carrier* at Ronald Reagan Washington National Airport as of the date of enactment of the FAA Reauthorization Act of 2024.

As explained above, the FAA 2024 requires that both types of "incumbency" must be met, *i.e.*, the carrier must be both an "incumbent air carrier," *i.e.*, operating at DCA, and a "limited incumbent carrier." Spirit may meet the latter requirement, but as Spirit's counsel notes, Spirit "does not currently operate or market flights at DCA."[13] Spirit is, therefore, not an incumbent air carrier at DCA and, consequently, ineligible to receive slots under FAA 2024.

Based on the above, Frontier is the only carrier eligible to receive the DCA slots in this proceeding given its status as both an incumbent air carrier and a limited incumbent carrier at DCA. All others are (i) not an incumbent carrier at DCA, *i.e.*, do not operate at DCA (*e.g.*, Spirit), (ii) ineligible to operate domestic service from DCA (*e.g.*, Air Canada), (iii) ineligible as a limited incumbent carrier under the statute due to code sharing arrangement with which it exceeds the limits under 49 U.S.C. § 41714(k) (*e.g.*, Alaska), or (iv) a non-limited incumbent carrier (as listed in the Notice).

## III. Why Frontier? Why SJU?

FAA 2024 specifies two (2) alternative criteria for the Secretary to consider in granting the exemptions available in the present proceeding. The second specifies, "have a positive impact on the overall level of competition in the markets that will be served as a result of those exemptions."[14]

Beyond being the only carrier eligible to receive the slot pair allocated by FAA 2024 as an incumbent air carrier qualifying for status as a limited incumbent carrier at DCA and permitted to operate domestic service, Frontier is the right carrier to receive a slot pair and SJU is the right deployment option for that slot pair. Both are pro-consumer and pro-competition.

---

[13] *Supra*, note 8 at 2.

[14] 49 U.S.C. § 41718(i)(4)(B)(ii).

**A. Fares**

Frontier operates and promotes itself as an "ultra-low-cost carrier" charging fares substantially lower than those offered by other carriers. Frontier frequently offers the lowest fares available in the markets in which it operates, often by a substantial margin.

In the present proceeding, Frontier is seeking a slot pair to be used for flights to/from SJU. At present, only JetBlue operates from DCA to SJU. That exclusivity allows JetBlue to charge a substantial premium relative to fares from other Washington, DC area airports (BWI and IAD). By way of example, JetBlue's average fare on that non-stop route in 2019 was $219, by 2023 it had increased to $246, and for January through April 2024, it had increased still further to $247. In contrast, the average non-stop fare from other D.C.-area airports (BWI and IAD) in 2019 was $180, in 2023 it increased slightly to $185, but in the first four months of 2024 fell to $171.[15] Thus, JetBlue not only enjoys a premium versus other DC-area airports, but that premium increased from 22% in 2019 to 33% in 2023, and even further to 44% for the first four months of 2024.

| | 2019 | 2023 | **Jan - Apr 2024** |
|---|---|---|---|
| DCA - SJU average non-stop fare on JetBlue | $219 | $246 | **$247** |
| BWI and IAD - SJU average non-stop fare | $180 | $185 | **$171** |
| JetBlue Premium | 22% higher | 33% higher | **44% higher** |

[15] We skip 2020, 2021, and 2022 to avoid the influence and anomaly of COVID-19.

Frontier introducing direct competition in the DCA-SJU market will increase capacity and allow consumers more choices with more favorable pricing – as is the case on every route on which Frontier and JetBlue compete head-to-head. In most cases, JetBlue's average fares are more than double Frontier's, and for some, the difference reaches five and even almost ten times Frontier's.

**B. SJU**

*Frontier SJU Routes to/from Mainland Americas Destinations*

*Frontier Routes SJU Routes to/from Caribbean Destinations*

Frontier's interest in and dedication to the SJU market are substantial. In support of that, on January 17, 2024, Frontier announced that it would open a crew base at SJU.[16] Frontier opened that base on June 4, 2024.[17] During that same month, Frontier launched service to several new

[16] Frontier Airlines to Open Crew Base at San Juan's Luis Muñoz Marín International Airport, January 17, 2024 (https://news.flyfrontier.com/frontier-airlines-to-open-crew-base-at-san-juans-luis-munoz-marin-international-airport/) (last visited 07/08/24).

[17] Frontier Airlines Opens Crew Base at Luis Muñoz Marín International Airport, June 5, 2024 (https://news.flyfrontier.com/frontier-airlines-opens-crew-base-at-luis-munoz-marin-international-airport/#:~:text=SAN%20JUAN%2C%20P.R.,its%20first%20year%20of%20operation (last visited 07/08/24)).

destinations, with more scheduled for July 2024. That was on top of the destinations Frontier already served and continues to serve to/from SJU bringing the total to over twenty (20).[18]

Frontier hopes to continue to develop its already extensive network of flight offerings to and from SJU, including from DCA, as it brings its competitive ultra-low-cost business model to ever more markets. It, therefore, respectfully requests that it be granted two (2) slots / one (1) slot pair to operate DCA-SJU.

Respectfully submitted

Brian E. Foont
The Foont Law Firm, LLC
11727 Gainsborough Road
Potomac, MD 20854
Tel. 202-236-4851
E-Mail: Foont@FoontLaw.com

Counsel for Frontier Airlines, Inc.

July 8, 2024

[18] Service to certain destinations is seasonal.

**BEFORE THE**
**DEPARTMENT OF TRANSPORTATION**
**OFFICE OF THE SECRETARY**
**WASHINGTON, DC**

| | | |
|---|---|---|
| Establishment of Slot Exemption Proceeding<br>At Ronald Reagan Washington National Airport<br>Pursuant to 49 U.S.C. § 41718 | ) | Docket DOT-OST-2024-0065 |

**APPLICATION OF ALASKA AIRLINES, INC.**
**FOR SLOT EXEMPTIONS**
**Washington, DC (DCA)–San Diego, CA (SAN)**

Alaska Airlines, Inc. ("Alaska") hereby applies for two slot exemptions to operate daily nonstop roundtrip service between Ronald Reagan Washington National Airport ("DCA") and San Diego International Airport ("SAN").[1] No carrier operates such service today.

The need for nonstop service between DCA and SAN is compelling. San Diego is the eighth largest U.S. city, home to the nation's largest military community, sits in the fifth largest U.S. county, and its airport, SAN, accounts for the greatest number of passengers of any U.S. airport outside the DCA perimeter without nonstop DCA service.[2]

Alaska, the nation's premier West Coast-based airline, is renowned for its low fares, high-quality, award-winning service and operational excellence. Having served SAN for nearly 40 years, Alaska maintains San Diego as a focus city and has consistently grown its presence in this market, including opening its fifth flight attendant base there in 2013. With this strong history of commitment to the San Diego community, Alaska is the ideal carrier to bring nonstop

[1] This application responds to the Department's Notice served June 24, 2024 in the above-captioned docket (the "Notice"). As the Department stated in the Notice, Alaska is eligible to apply for an allocation of two slot exemptions as a limited incumbent carrier. *See* Notice at 2.

[2] *See* Exhibit AS-1.

DCA service to SAN. Since 2010, Alaska has expanded its services at SAN to include 38 destinations, with plans to continue to grow its presence and bring more convenient flight options to the traveling public. The addition of nonstop DCA service will enable Alaska to further expand its network at SAN and deliver greater competitive service options for both local SAN customers and many passengers connecting through the airport to/from destinations across the West Coast.

## I. <u>Alaska's DCA-SAN Service Proposal</u>

Alaska will begin its proposed daily nonstop roundtrip DCA-SAN service within 90 days of its receipt of final slot times.[3] Alaska's daily eastbound service will depart SAN at 8:30 a.m, arriving at DCA at 4:30 p.m. Its daily westbound service will depart DCA at 5:30 p.m., arriving at SAN at 7:50 p.m.[4] Alaska will operate DCA-SAN service using either Boeing 737-800 or 737-8 MAX aircraft, each of which has 159 seats, configured with 12 First Class seats, 30 Premium Class seats, and 117 Main Cabin seats.[5]

With hubs in Anchorage, Seattle, Portland, San Francisco, and Los Angeles, Alaska is the nation's only airline based on and primarily serving the West Coast. Alaska is well positioned to serve the San Diego market from DCA, as demonstrated by its successful use of limited slot exemption allocations to successfully serve Seattle, Portland, San Francisco, and Los Angeles from DCA, as well as its longstanding commitment to grow its network and maintain a flight attendant base at SAN.

---

[3] As DOT has stated, selected carriers will have to work with the FAA Slot Administration Office for the assignment of slot times. DOT will then issue a notice confirming allocation of final slot times for the granted exemptions. *See* Notice at 3.

[4] *See* Exhibit AS-2. All times are local. In accordance with the Notice, Alaska will work with the FAA Slot Administration Office on the assignment of slot times.

[5] *See* Exhibit AS-3.

Alaska's DCA-SAN service will enhance competition in the Washington, DC-San Diego market and immensely benefit both regions' business and tourism sectors. It will offer a valuable new option for the large volume of U.S. government (including military) travelers between Washington, DC, and San Diego, which is home to the nation's largest military community. What's more, Alaska will schedule its new DCA-SAN service to connect passengers traveling between Washington, DC, and other airports in the western U.S. and Hawai'i.[6] And passengers can stop over in San Diego and enjoy all the region has to offer on their way to/from any of the 38 nonstop destinations Alaska serves from San Diego, 19 of which are served on a nonstop basis exclusively by Alaska.[7] As discussed further below, Alaska's plans to bring nonstop DCA-SAN service offers substantial benefits to the nation's capital, San Diego and its large population of military personnel, and the SAN airport while enhancing competitive service options for nonstop and connecting passengers.

## II. Alaska's Service Proposal Satisfies the FAA Reauthorization Act's Selection Criteria

Section 502 of the FAA Reauthorization Act of 2024 ("FAA 2024") directs the Department to consider "the extent to which the exemptions will (i) enhance options for nonstop travel to beyond-perimeter airports that do not have service from [DCA]…or (ii) have a positive impact on the overall level of competition in the markets that will be served as a result of those exemptions." Alaska's proposal satisfies both of these requirements.

First, Alaska's proposal will bring nonstop DCA service to SAN, a beyond-perimeter airport that does not (and as of the date of enactment of the FAA 2024, did not) have such

---

[6] These airports include Fresno, CA (FAT), Las Vegas, NV (LAS), Monterey, CA (MRY), San Luis Obispo County, CA (SBP), San José, CA (SJC), Sacramento, CA (SMF), and Santa Rose, CA (STS) and, on a seasonal basis, Honolulu, HI (HNL), Kona, HI (KOA), and Lihue, HI (LIH).

[7] *See* Exhibit AS-4.

service.[8] SAN, with a "Passengers Per Day Each Way" ("PPDEW") measure of 225, is by far the U.S. airport with the greatest number of passengers without nonstop service to DCA.[9] For context, the second-largest domestic airport without nonstop service to DCA, San Antonio International Airport ("SAT"), has a PPDEW of 155.[10] As a significant hub for the defense, biotech, and communications technology industries, San Diego requires efficient nonstop service options to the nation's capital. In addition, DCA-SAN is one of the largest government-related travel markets and continues to grow in size. The General Services Administration ("GSA") estimates that over 28,000 government personnel (civilian and military) will travel between DCA and SAN in Fiscal Year ("FY") 2024, increasing to nearly 32,000 such personnel in FY 2025.[11] This demand reflects the location of key institutions in close proximity to DCA, like the Pentagon, the many federal agencies located in or close to downtown Washington, DC, and the numerous large military bases in the Washington, DC, area.

Currently, San Diego travelers must rely on connections to travel to DCA. Despite the current lack of nonstop service, in 2023, approximately 164,000 passengers traveled between SAN and DCA, accumulating an additional approximately 328,000 hours of annual travel time due to having to make a connection.[12] Alternatively, San Diego travelers may fly nonstop to

[8] US Airways operated a daily nonstop flight between DCA and SAN from June 2012 (*see* Docket DOT-OST-2012-0029, Notice of US Airways (Mar. 21, 2012)) until the spring of 2014, when, following the American Airlines/US Airways merger, American switched the DCA–SAN service to DCA–LAX service. *See* Docket DOT-OST-2012-0029, US Airways Change of Market for Beyond-Perimeter Slot Exemption (Jan. 15, 2014).

[9] *See* Exhibit AS-1.

[10] *See id.*

[11] *See* Exhibit AS-5. GSA also estimates approximately 42,000 additional government/military employees will travel between IAD and SAN in FY 2024 and FY 2025. *See id.*

[12] *See* Exhibit AS-6.

Washington Dulles International Airport ("IAD"), but that airport is located approximately 25 miles from downtown Washington, DC.

Washington, DC-San Diego is also a busy market for leisure and tourist travelers, with tourism generating $23.4 billion for San Diego[13] and $10.2 billion[14] for Washington, DC, in 2023. Alaska's DCA-SAN service will meaningfully increase nonstop capacity and service options between Washington, DC, and San Diego, further benefitting consumers with fares that are on average lower than those of Alaska's competitors. Following Alaska's entry into the IAD-SAN market in Q2 2023, average fares on that route decreased by approximately 26%.[15] Alaska expects this downward trend to continue with the introduction of its DCA-SAN service.

Second, Alaska's new nonstop DCA-SAN service will have a positive effect on the overall level of fare and service competition not only on a nonstop basis between Washington, DC, and San Diego, but also for passengers who will benefit from a broader range of connecting service options between the Washington, DC, area and communities in the western U.S.[16]

---

[13] *See* https://sdtmd.org/case-study-san-diego-tourism-authority/#:~:text=Tourism%20is%20the%20third%2Dlargest,related%20jobs%20in%20the%20County.

[14] *See* https://washington.org/press/destination-dc-announces-record-visitation-economic-impact#:~:text=Washington%2C%20DC%20welcomed%2025.95%20million,a%20record%20102%2C366%20local%20jobs.

[15] *See* Exhibit AS-7.

[16] Alaska's DCA-SAN service will also further the goals of President Biden's executive order addressing competition across the U.S. economy, which broadly directs the Department to take steps to "provide consumers with more flight options at better prices and with improved service, and to extend opportunities for competition and market entry as the industry evolves." Executive Order on Promoting Competition in the American Economy (July 9, 2021), at § 5(m)(ii). *See* Exhibit AS-11.

## III. Alaska Has a Strong Record of Developing Service at DCA and SAN Through Product Offerings That Provide Consumer Choice

### A. *Alaska's DCA Services*

Alaska began service at DCA in September 2001. Since then, Alaska has established popular and successful nonstop DCA flights to major West Coast cities beyond the DCA perimeter: today, Alaska operates nonstop service between DCA and Seattle, Portland, San Francisco, and Los Angeles, offering customers a variety of product offerings on each flight. San Diego will be an important addition to this list. Alaska has made exceptionally productive use of the limited number of slot exemptions it has been allocated to serve these West Coast beyond-perimeter cities. Alaska operates its DCA flights at an average 87.76% load factor and a 99.78% completion factor—both of which are the highest of all carriers operating at DCA.[17] This performance exemplifies the efficiency with which Alaska operates its entire network. Systemwide, Alaska has an average completion factor of 99.28%, the second highest among the nation's largest carriers.[18] Alaska also has the second highest on-time performance of all U.S. carriers, and the seventh highest on-time performance among all global carriers.[19]

### B. *San Diego is a Key Focus City for Alaska*

Alaska began serving SAN in 1985 and has continued to grow at the airport ever since. Alaska currently employs approximately 800 San Diego-based team members, including a labor-represented flight attendant base, and serves 38 nonstop markets from San Diego, 19 of which are served exclusively by Alaska on a nonstop basis.[20] Those destinations include airports

---

[17] *See* Exhibit AS-8.

[18] *See* Exhibit AS-9.

[19] *See id*.

[20] *See* Exhibit AS-4.

throughout the western U.S., as well as Los Cabos, Mexico, and Honolulu, Maui, Kona, and Lihue.

Since 2010, Alaska's departures at SAN have increased by 367%, its available seats at SAN have increased by 299%, and its available seat miles ("ASMs") at SAN have increased by 381%.[21] To date this year, all of these figures exceed pre-pandemic levels, with departures up by 19%, seats up by 21%, and ASMs up by 38% compared with 2019. Alaska currently averages 59 daily departures from SAN, 6,400 daily departing seats, and 15.9 million daily ASMs.[22] Alaska's ASMs at SAN have grown more than any other carrier since 2010.[23]

Nonstop service to/from DCA will be an important addition to Alaska's existing network at SAN,[24] establishing a key additional transcontinental route that will enable Alaska to further grow at SAN and serve a broad range of passenger demand.[25]

## IV. Alaska Offers Consumers a Unique Combination of Low Fares and Award-Winning Service Across a Growing Network

Alaska is renowned for its unique and innovative business model, delivering low fares, award-winning service, and operational excellence for a broad range of passengers. Alaska's DCA-SAN service will provide a new, attractive service option for consumers and lower-fare competition against higher-fare legacy network carriers between Washington, DC, and San Diego. Customers traveling between SAN and DCA will have lounge access at both airports through Alaska's premium lounge program.

---

[21] *See* Exhibit AS-10.

[22] *See id.*

[23] *See* Exhibit AS-11.

[24] *See* Exhibit AS-12.

[25] *See* Exhibit AS-13.

Alaska successfully competes against larger carriers (including at their hubs and focus cities) by providing consumers a unique combination of lower fares across four product offerings, high-quality guest service, and an award-winning Mileage Plan loyalty program, which consistently ranks as the industry's highest-value loyalty program. Alaska's Mileage Plan Program has been ranked as the best airline rewards program for *nine consecutive years* by U.S. News & World Report[26] and *five consecutive years* by NerdWallet.[27] Alaska's Mileage Plan is at or near the top of the industry for many categories, including "reward rates," "best basic economy tickets," "operations," "elite status benefits," "total fees," and "in-flight experience."[28] Alaska's co-branded credit card[29] has a relatively modest annual fee of $95, yet offers industry-leading benefits, including Alaska's "Famous Companion Fare,"[30] priority boarding, a free checked bag for the cardholder and up to six additional guests traveling on the same reservation, 20% off all Alaska inflight purchases and $100 off an annual Alaska Lounge+ Membership.[31] Moreover, at a time when many of the largest U.S. airlines have abandoned set redemption levels for award travel in favor of an opaque system that relies on dynamic pricing (often de-valuing how much a mile is worth), Alaska bases redemption on published award charts that clearly establish, by region, how many miles are needed for award travel, thus enabling members to

---

[26] *See* https://www.usnews.com/info/blogs/press-room/articles/2023-07-25/u-s-news-announces-the-2023-2024-best-travel-rewards-programs ("Alaska Airlines Mileage Plan holds on to the No. 1 spot for the ninth consecutive year in the Best Airline Rewards Programs ranking. The rewards program consistently outperforms others with its high earning power, and offers elite status members benefits like lounge access, upgrades and same-day confirmed flight changes.").

[27] *See* https://www.nerdwallet.com/article/travel/alaska-airlines-mileage-plan-your-complete-guide ("For the fifth year in a row, Alaska came in first in NerdWallet's airline rewards program analysis.").

[28] *See id.*

[29] *See* https://www.alaskaair.com/content/credit-card/visa-signature.

[30] Cardholders receive a $99 companion fare (plus taxes and fees from $23), valid on all Alaska flights booked on alaskaair.com, each account anniversary after spending $6,000 or more on purchases within the prior anniversary year.

[31] Alaska Lounge+ Members receive access to all Alaska lounges and nearly 90 partner airlines' lounges.

know when they join the Mileage Plan program and thereafter how many miles are needed for award travel.[32]

Alaska also offers its guests a global network through its membership in the **one**world Alliance and partnerships with 30 airlines. With annual operating revenue of $10.4 billion, 23,000 employees, and a fleet of 326 aircraft, Alaska has the resources to compete head-to-head with the larger carriers and a strong record of doing so.

### A. *Alaska Continues to Invest in Growing Its Network to Enhance Competition Against the Much Larger "Big Four" Carriers*

Alaska has a history of network growth. During the pre-pandemic years of 2015-2019, Alaska (i) grew to become the largest West Coast carrier, including one of the top three carriers in six of the ten largest West Coast markets, and (ii) increased its number of destinations to 128.[33] Since 2010, Alaska grew faster than any of the Big Four carriers (American, Delta, United, and Southwest).[34] Alaska's commitment to expansion at SAN is an important part of that growth. As a member of the **one**world Alliance, Alaska's customers can book travel to more than 1,000 destinations on any of Alaska's 30 worldwide airline partners while earning miles and redeeming award tickets.[35]

### B. *Alaska's High-Quality Services Appeal to All Types of Air Travelers*

Alaska offers four distinct fare products[36] that appeal to the broadest range of travelers:

- Alaska's First-Class product features the most legroom in any U.S. domestic airline, priority boarding, a dedicated flight attendant for the First-Class cabin,

---

[32] *See* https://www.alaskaair.com/content/mileage-plan/use-miles/award-charts.

[33] In April, Alaska announced new nonstop service between San Diego and Las Vegas, beginning October 1, 2024. *See* https://news.alaskaair.com/alaska-airlines/alaska-airlines-expands-presence-in-southern-california-with-new-routes-and-increased-service-to-popular-west-coast-destinations/.

[34] *See* Exhibit AS-14.

[35] *See* Exhibit AS-15.

[36] *See* Exhibit AS-16.

two complimentary checked bags, lounge access on select flights, and complimentary food and drinks.

- Alaska's Premium Class product features include extra legroom, early boarding, and complimentary beer, wine and cocktails.
- Alaska's award-winning Main Cabin offers passengers an unrivaled inflight service, no change fees, and complimentary seat selection.
- Alaska's Saver Fare, popular among price-sensitive travelers, features Alaska's lowest rates and offers a complimentary carry-on bag and Alaska's Main Cabin inflight amenities.

Alaska offers high-speed internet access for purchase across all cabins. Alaska aircraft are equipped with a streaming entertainment system, enabling passengers to choose from a library of over 800 free movies and television shows to watch on their own device. Alaska offers hot and cold meal options for purchase by Premium, Main Cabin, and Saver Fare passengers.

C. *Alaska's Award-Winning Service*

Alaska's ability to deliver high-quality service reliably and consistently over time is unmatched by the competition. It has earned countless awards, including: 2024 Best U.S. Airline & Frequent Flier Program (Wallet Hub); Top Airline Reputation (2024 Axios Harris Poll); 2023 Worldwide Airline of the Year (Centre for Aviation); Best Airline Overall and #1 for Crew, Comfort, Food, and Boarding (KAYAK 2023); Best Airline Rewards (US News 2023-2024); Best Employers for Diversity (Forbes 2024); Best Airline Rewards (NerdWallet 2023); Best Customer Service (Newsweek 2023); and Best Airline in North America (APEX 2022).[37]

D. *Alaska's Environmental Commitment*

Alaska's growth has been guided by its core values, including a commitment to environmental stewardship. Alaska has set a long-term goal to achieve net-zero carbon emissions

---

[37] *See* Exhibit AS-17.

by 2040,[38] which exceeds the International Civil Aviation Organization's long-term net-zero target of 2050.[39] Since announcing this goal, Alaska has made historic orders for new, more efficient aircraft, built a coalition of sustainable aviation fuel partners, and advanced the use of artificial intelligence to fly more efficient routings that reduce fuel consumption.

Alaska is proud to be the first U.S. airline to eliminate plastic bottles, cups, straws, stir packs, and citrus picks. By partnering with Boxed Water and serving drinks in responsibly sourced paper cups, Alaska saves over 2.2 million pounds of plastic from landfills every year. Alaska also encourages guests to #FillBeforeYouFly, avoiding waste altogether by bringing refillable water bottles and filling them up at the airport before a flight.

## V. Governmental, Business and Civic Leaders Strongly Support Alaska's DCA-SAN Service Proposal

Alaska's proposal to introduce daily nonstop service between DCA and San Diego has garnered strong support from a wide range of San Diego area and State of California government leaders, as well as the San Diego area business and civic communities. Exhibit AS-19 lists and provides copies of letters of support from those diverse interests for Alaska's proposal. These parties recognize the substantial public benefits that Alaska's service will generate for the San Diego area and other western U.S. communities, as well as for passengers, including business, government, military, and leisure travelers.

[38] *See* Exhibit AS-18.

[39] *See* https://www.icao.int/Newsroom/Pages/States-adopts-netzero-2050-aspirational-goal-for-international-flight-operations.aspx.

## VI. Conclusion

For all of the foregoing reasons, Alaska Airlines, Inc. requests that the Department grant it two slot exemptions at Ronald Reagan Washington National Airport to enable Alaska to operate once-daily nonstop roundtrip service to/from San Diego International Airport.

Respectfully submitted,

David Hefferan
Michael Deutsch
**COZEN O'CONNOR**
1200 19th Street, NW
Washington, DC 20036
dheffernan@cozen.com
mdeutsch@cozen.com

Counsel for
**ALASKA AIRLINES, INC.**



1040 South Andreasen Drive
Escondido, CA 92029
www.aquacycl.com

Friday, June 07, 2024

The Honorable Pete Buttigieg
U.S. Department of Transportation
1200 New Jersey Ave. SE
Washington, D.C. 20590

Re: Alaska Airlines' application for SAN-DCA

Dear Secretary Buttigieg:

Aquacycl Inc. enthusiastically supports the application of Alaska Airlines to initiate nonstop air service between San Diego International Airport (SAN) and Ronald Reagan Washington National Airport (DCA or Reagan National). This new route is not only vital for enhancing the connectivity between the two strategic regions, but also supports the growing demand for nonstop service for both business and leisure passengers.

San Diego and Washington, D.C. are hubs of significant defense, economic and social activity. San Diego's sectors in defense, biotech and communications technology require efficient access to the core of the national capital region. San Diego is the second largest government related travel market – driven by demand to key institutions closest to DCA including the Pentagon and Department of Homeland Security.

At 225 passengers daily each direction, not only does U.S. Department of Transportation (DOT) data demonstrate that San Diego is the largest origin-destination market without service to Reagan National, the SAN-DCA market is the largest in the entire domestic network without nonstop service. The annual 180,000 passenger population between SAN and DCA have endured connections that add more than 360,000 hours annually of time inefficiency.

Alaska Airlines' reputation for exceptional service, reliability, and customer satisfaction make it the ideal carrier to bridge these two important markets. Alaska Airlines began serving SAN in 1985 and in the last 10 years has grown by more than 75%. Today that means about 6,500 guests served daily and 60 average daily departures from SAN. Adding a nonstop to DCA to Alaska Airlines' daily destinations from SAN will mean increased connectivity for our larger community, will fill a critical gap in the national air service network, and also provide a more streamlined, efficient service that will benefit the greatest number of passengers.

We appreciate your consideration of this application. We hope to hear of your favorable response to this request in the coming weeks.



1040 South Andreasen Drive
Escondido, CA 92029
www.aquacycl.com

Sincerely,

**Jill Litschewski, COO**
**Aquacycl Inc.**
(760)519-9454
jlitschewski@aquacycl.com

**June 3, 2024**

The Honorable Pete Buttigieg
U.S. Department of Transportation
1200 New Jersey Ave, SE
Washington, D.C. 20590

Re: Alaska Airlines' application for SAN-DCA

Dear Secretary Buttigieg:

**Boston Consulting Group – San Diego** enthusiastically supports the application of Alaska Airlines to initiate nonstop air service between San Diego International Airport (SAN) and Ronald Reagan Washington National Airport (DCA or Reagan National). This new route is not only vital for enhancing the connectivity between the two strategic regions, but also supports the growing demand for nonstop service for both business and leisure passengers.

San Diego and Washington, D.C. are hubs of significant defense, economic and social activity. San Diego's sectors in defense, biotech and communications technology require efficient access to the core of the national capital region. San Diego is the second largest government related travel market – driven by demand to key institutions closest to DCA including the Pentagon and Department of Homeland Security.

At 225 passengers daily each direction, not only does U.S. Department of Transportation (DOT) data demonstrate that San Diego is the largest origin-destination market without service to Reagan National, the SAN-DCA market is the largest in the entire domestic network without nonstop service. The annual 180,000 passenger population between SAN and DCA have endured connections that add more than 360,000 hours annually of time inefficiency.

Alaska Airlines' reputation for exceptional service, reliability, and customer satisfaction make it the ideal carrier to bridge these two important markets. Alaska Airlines began serving SAN in 1985 and in the last 10 years has grown by more than 75%. Today that means about 6,500 guests served daily and 60 average daily departures from SAN. Adding a nonstop to DCA to Alaska Airlines' daily destinations from SAN will mean increased connectivity for our larger community, will fill a critical gap in the national air service network, and also provide a more streamlined, efficient service that will benefit the greatest number of passengers.

We appreciate your consideration of this application. We hope to hear of your favorable response to this request in the coming weeks.

Sincerely,

**Jason Jager**

**Managing Director and Senior Partner**

**Founding Partner of BCG San Diego**
**Boston Consulting Group**



July 2, 2024

The Honorable Pete Buttigieg
Secretary of Transportation
U.S. Department of Transportation
1200 New Jersey Ave, SE
Washington, DC 20590

Re: Alaska Airlines' application for SAN-DCA, Docket No. DOT-OST-2024-0065

Dear Secretary Buttigieg:

The San Diego County Regional Airport Authority, operator of San Diego International Airport
(SAN) is pleased to support the application of Alaska Airlines for nonstop service between SAN and
Ronald Reagan Washington National Airport (DCA).  San Diego has the largest unserved passenger
market demand to DCA – more than 30% higher than the next largest unserved market.
Additionally, at approximately 225 daily passengers each way, SAN-DCA is the largest unserved
airport pair in the entire country.

San Diego has highly diverse business relationships with Washington, DC.  San Diego is home to
key industrial clusters such as health science, mobile telecommunications, and national defense.
These clusters collaborate frequently with private industry and regulatory bodies in the Nation's
Capital.  Convention and leisure travelers in both regions could benefit from quick and convenient
access between SAN and DCA, significantly reducing downtown to downtown travel times.  One
cannot understate the efficiencies gained by having the closest airport to the Pentagon linked nonstop
to the closest airport to Navy Region Southwest headquarters.  Both installations are situated 3 miles
from their respective airports.

Alaska Airlines' reputation for exceptional service, reliability, and customer satisfaction make it the ideal
carrier to bridge these two important markets.  This nonstop flight will fill a critical gap in the national air
service network and provide a more efficient service that will benefit the greatest number of passengers.

We appreciate your consideration of this application.  We hope to hear of your favorable response to
this request in the coming weeks.

Sincerely,

Kimberly J. Becker
President / CEO



June 13, 2024

The Honorable Pete Buttigieg
U.S. Department of Transportation
1200 New Jersey Ave, SE
Washington, D.C. 20590

Re: Alaska Airlines' application for SAN-DCA

Dear Secretary Buttigieg:

On behalf of Illumina, Inc., I am writing to express our support for the application of Alaska Airlines to initiate nonstop air service between San Diego International Airport (SAN) and Ronald Reagan Washington National Airport (DCA or Reagan National). This new route is not only vital for enhancing the connectivity between the two strategic regions, but also supports the growing demand for nonstop service for both business and leisure passengers.

Illumina is a leading developer and manufacturer of life science tools and integrated systems for large-scale analysis of genetic variation and function. Our systems are critical in the progress toward the realization of personalized medicine. With nearly 9,100 employees worldwide, and almost 4,100 in its San Diego headquarters, Illumina drives the development of better, faster applications of its technology.

San Diego and Washington, D.C. are hubs of significant activity for Illumina. With an office in Washington, D.C. and Baltimore, MD., adding an additional airline with direct access to Reagan National Airport, would be a considerable improvement over our current corporate travel options.

Current U.S. Department of Transportation (DOT) data demonstrate that San Diego is the largest origin-destination market without service to Reagan National, the SAN-DCA market is the largest in the entire domestic network without nonstop service with 225 daily passengers. The annual 180,000 passenger population between SAN and DCA have endured connections that add more than 360,000 hours annually of time inefficiency.

We appreciate your consideration of this application. We hope to hear of your favorable response to this request in the coming weeks. Should you have any questions or concerns, please contact at me nmagallanes@illumina.com.

Sincerely,

Nick Magallanes
Illumina, Inc.
Vice President and Head, Government Affairs & Public Policy for U.S., Canada, and Latin America

**BEFORE THE**
**DEPARTMENT OF TRANSPORTATION**
**OFFICE OF THE SECRETARY**
**WASHINGTON, D.C.**

| Establishment of Slot Exemption Proceeding at Ronald Reagan Washington National Airport Pursuant to 49 U.S.C. § 41718 | Docket DOT-OST-2024-0065 |
|---|---|

**APPLICATION OF SPIRIT AIRLINES, INC. FOR**
**TWO SLOT EXEMPTIONS FOR DCA-SJC SERVICE**

Spirit Airlines, Inc. ("Spirit") respectfully submits this application requesting two (2) slot exemptions under 49 U.S.C. § 41718 for service between Ronald Reagan Washington National Airport ("DCA") and San Jose Mineta International Airport (SJC).[1] Spirit will use these slots to provide the first and only low-cost, non-stop service between our Nation's capital and the heart of Silicon Valley, comprised of the world's most valuable and innovative companies totaling over $14 trillion in market capitalization.

Spirit will initiate its DCA-SJC service using its modern and highly fuel-efficient Airbus A320Neo aircraft in a 182-seat configuration including up to eight (8) business-friendly Big Front Seats. Spirit expects that growing demand for its DCA-SJC service will support up gauging to an A321Neo aircraft in a 235-seat configuration, also with eight (8) business-friendly Big Front Seats. Spirit is committed to commencing its proposed service in early fall 2024.

[1] As explained in the June 26, 2024 letter from Spirit's counsel to the Department, Spirit qualifies under the statutory definition of a limited incumbent and is considered to hold four (4) permanent slots at DCA.

## I. Background

The Securing Growth and Robust Leadership in American Aviation Act of 2024, known as the FAA Reauthorization Act of 2024 (FAA 2024), directs the Department to grant "10 exemptions in two categories: eight exemptions, or four round trips, are reserved for incumbent carriers qualifying as non-limited incumbent carriers, and two exemptions, or one round trip, are reserved for limited incumbent carriers."[2] In allocating these 10 slot exemptions, FAA 2024 requires the Secretary to consider:

> the extent to which [a carrier's use of] the exemptions will—
>
> (i) enhance options for nonstop travel to beyond-perimeter airports that do not have nonstop service from Ronald Reagan Washington National Airport as of the date of enactment of the FAA Reauthorization Act of 2024; or
>
> (ii) have a positive impact on the overall level of competition in the markets that will be served as a result of those exemptions.

Under applicable law, Spirit is seeking and qualifies for the two "limited incumbent" slot exemptions made available by FAA 2024.[3] Spirit understands that no other carrier is eligible to receive the limited incumbent slot exemptions provided by FAA 2024.[4]

---

[2] *Establishment of Slot Exemption Proceeding at Ronald Reagan Washington National Airport Pursuant to 49 U.S.C. § 41718*, Notice, Docket DOT-OST-2024-0065 (June 24, 2024); *see also* Sec. 502, FAA 2024.

[3] Spirit meets all criteria for limited incumbent status under 49 U.S.C. § 41714(h)(5), under which there is no requirement to currently operate or market any service to DCA. Per 14 C.F.R. § 93.213(a)(5), which is incorporated into § 41714(h)(5), Spirit is considered to hold no less and no more than the four (4) permanent DCA slots it received through an FAA lottery on August 12, 2003, which were later sold to Southwest Airlines. Spirit is not a new entrant carrier because it has "*sold or given up a slot at [DCA] after December 16, 1985*)."

[4] Neither Alaska Airlines nor Air Canada qualify for the FAA 2024 Limited Incumbent slot exemptions. Alaska Airlines is prohibited from receiving new slots as a limited incumbent by 49 U.S.C. § 41714(k) because it has a codeshare relationship with American Airlines and the combined slots/exemptions held by both carriers at DCA exceeds 500, well above the maximum of 20 permitted by § 41714(k). Air Canada is a

## II. Proposal: Spirit's DCA-SJC Service Will Usher in Multi-Market Competition and Provide the First Direct Service Between the World's Tech Hub in Silicon Valley and the Nation's Capital

If granted, Spirit's proposed new DCA-SJC service will fill the current gap in the market for affordable and direct low-cost flights between Northern California and the Washington, D.C. metroplex.[5] According to recent Census data, nearly 40% of the San Fransico Bay Area population's air travel needs are best served geographically from SJC.[6] With a new, low-cost option, many more travelers will have the opportunity to make coast-to-coast flights at a lower cost and from a more convenient airport than is available through existing service.[7]

Spirit expects its DCA-SJC service to grow in popularity and plans to incorporate its larger Airbus A321 aircraft over time to match the passenger demand.[8] As census data shows, the region surrounding the SJC Airport is geographically located to the highest percentage of the population of the Bay Area at 40%, compared to SFO Airport with only 26%.[9] This evidence highlights the comparatively greater opportunities for expanded SJC service which would reach more of the Bay Area population than is currently served through SFO and OAK. As shown on the map of the region, SJC is the closest and most convenient choice for many in the southern parts of the Bay Area.[10]

foreign air carrier and cannot provide the service to domestic airports from DCA which is required by FAA 2024 in order to receive one of the 10 new slot exemptions.

[5] See Exhibit 2. SJC Share of Bay Area to Washington, D.C. Origin-Destination Passengers.

[6] See Exhibit 1. SJC Airport Market Capture Area.

[7] Compared to SFO and OAK

[8] See *id.*

[9] See Exhibit 11. Bay Area Population and Allocation by Airport.

[10] See Exhibit 12. Map of Bay Area Counties.

In addition to providing important new non-stop service to Silicon Valley, Spirit's service will usher in critically-needed new competition to the region on routes involving DCA as well as to other markets originating from Northern California. Importantly, published flight data shows there are only two (2) daily roundtrips from SFO-DCA and overall only 10 between SFO and DCA or IAD. Importantly, none of these flights originate from SJC.[11] Granting Spirit's requested slot exemptions will be pro-competitive, giving travelers a much-needed new low fare option.

### A. Market: San Jose Mineta International Airport is the Best Choice for New Service to Reagan National and Will Enhance Competition in Multiple Markets

In partnership with the Mayor of San José, Mayor Matt Mahan, and SJC's Director of Aviation, Mookie Patel, Spirit announced its intention to apply for this nonstop service between SJC and DCA on May 23, 2024. This flight, if approved, would be the only nonstop, low-fare service between Silicon Valley and the nation's capital, adding a new choice for customers in the broader Bay Area to reach the Washington D.C.. Indeed, San José is one of the largest cities in the United States without a nonstop flight option to Washington D.C. San Josè Mayor Mahan himself said, "*[i]n today's digital age, there is perhaps no place more important for our national leaders to access than the capital of Silicon Valley. San José is home to the experts and entrepreneurs at the forefront of AI, data privacy, and CHIPs Act implementation, who are writing the code for the future and establishing best practices to navigate that future.*"

[11] See Exhibit 10. Bay Area Scheduled Flights to Washington, D.C.

Further, SJC Director of Aviation, Mookie Patel stated:

> "We're excited to partner with Spirit to secure highly demanded, nonstop service between SJC and DCA. DCA is a uniquely well-positioned gateway to both the center of federal decision-making in Washington and the booming tech center in the surrounding region. Together with SJC's unmatched reliability and convenience for Silicon Valley – and Spirit's low fares – this proposed service will provide travelers between two important markets with an exceptional customer experience end-to-end."

Spirit has already been widely successful serving the SJC market and is continuing to evaluate how it can expand this service. For example, in June 2023, Spirit launched new nonstop flights to Dallas-Fort Worth (DFW), Las Vegas (LAS), and San Diego (SAN) from SJC. Spirit has proven itself to be an in-demand carrier in this region, and has developed great relationships with San José residents and leaders, emphasizing a strong foundation upon which to build and expand its service with a new nonstop flight to DCA. Guests originating from DCA on Spirit's new service would have the additional benefit of being able to travel on one-stop flights through San Jose across the multiple markets Spirit serves from that airport.

### B. Schedule: Morning-Out from San Jose Provides a Traveler-Friendly and Convenient Schedule to Support Spirit's New San Jose Service

Spirit's new service is scheduled to provide convenient options for travelers on both coasts. Spirit proposes the following schedule, which it would plan to begin operating in early Fall 2024[12]:

| Route | Time |
|---|---|
| **SJC-DCA** | 0700-1520 |

[12] The exact start date would depend in part on the Department's timeframe for allocating the slot and coordinating final slot times. Spirit intends to quickly move to initiate its new service.

| **DCA-SJC** | 1620-1920 |
|---|---|

Spirit would consider alternative times which are no later than the following:

| **Route** | **Time** |
|---|---|
| **SJC-DCA** | 0910-1730 |
| **DCA-SJC** | 1830-2130 |

### C. Aircraft: Spirit's San Jose Service Would Utilize the Newest and Fuel-Efficient Airbus A320 and A321 Aircraft, Configured with Business-Friendly "Big Front Seats"

Spirit was the first North American carrier to operate the "new engine option" ("Neo") version of the Airbus A320 aircraft, powered by the most fuel-efficient engine ever made for this aircraft. Spirit plans to operate this new and efficient aircraft on its DCA-SJC route. Here, Spirit will initially use the A320Neo model with plans to up-gauge to the A321Neo when demand warrants it. The A320Neo aircraft will be configured with 182 seats and will have available Big Front Seat options. The A321Neo would be configured with 235 seats and would also include Big Front Seats.

## III. Spirit's Proposed DCA-SJC Service is the Best Choice under Section 502 Criteria and the Public Interest

Granting Spirit's DCA-SJC low-fare service will "enhance options for nonstop travel to beyond-perimeter airports that do not have nonstop service from Ronald Reagan Washington National Airport as of the date of enactment of the FAA Reauthorization Act of 2024," and fully meets the criteria for the Department's allocation of the two requested slot

exemptions.    Further, by awarding Spirit its requested DCA-SJC slot exemptions, the Department will be making a conscious decision to support the public interest by selecting a carrier with a history of providing good-paying jobs, using a modern fleet to reduce noise and emissions, and providing sustained competition to legacy carriers across a variety of markets.[13]

### A.    SJC is the Best Choice for Initiating a New Once-Daily Round Trip to the Nation's Capital

Spirit's Core Business Focus is "People Mobility"— *Flying Where People are and Want to Go*. Silicon Valley is the tech center of the world, home to the world's largest technology companies including Nvidia, Apple, Meta, Intel, Google, Netflix, Samsung, LinkedIn, and many others which combine to make up over $14 trillion in market cap value.[14]

These companies are all located within 12 miles of SJC Airport.[15] As of 2022, the Joint Venture Silicon Valley 2024 Index published data listing the movement of tech talent in the working age group of 25-44 years old.  Silicon Valley boasted the top numbers, with over 50,000 new workers in technical occupations in the private sector.[16]  Importantly, Silicon Valley based companies have significant investments in facilities located in the Washington, D.C. region.[17]  In part, this relates to Washington D.C. standing as one of the top locations for

---

[13] Spirit has received numerous support letters for its application which it will be filing separately in the docket.

[14] See Exhibit 9. Concentration Map of Silicon Valley Companies.

[15] See *id.*

[16] See Exhibit 4. In-Migration to Silicon Valley.

[17] See Exhibit 5. Silicon Valley Corporate Locations in Washington, D.C. Area (listing companies like Google, Intel, Cisco Systems, Palo Alto Networks Inc., Yahoo!, etc.); Exhibit 6. Data Center Locations in Washington, D.C. Area (listing companies like Google, Microsoft, Amazon, Visa, Meta, Capital One, Bank of America, etc.).

tech talent in the United States.[18] This data strongly supports the need for Spirit service between San Jose and Washington, D.C.

San Jose is also the top patent-producing city in California, and the United States.[19] Seven of the top 10 patent-generating cities in California list their closest airport as SJC. With the United States Patent and Trademark Office located in the Washington, D.C. metro area near DCA, there is an obvious need for a nonstop flight option to San Jose.

Further, the top university for producing startup founders in the United States is Stanford University—a known driver of success in the Silicon Valley tech ecosystem.[20] A low-cost option for flights between a convenient airport like SJC and the Nation's capital is an attractive option for students interested in connecting with tech company counterparts on the east coast.

### B. The "Spirit Effect" Consistently Brings the Lowest Fares to a Large Number of Travelers Across Markets

For more than fifteen years, Spirit has provided affordable travel opportunities for value-conscious consumers. The business model championed by Spirit offers customers a straightforward base fare and allows guests to add À La Smarte options as the passenger desires. Customers never have to pay for more than what they absolutely want or need, such as advance seat assignments, priority boarding options, checked baggage, and meal and drink services while onboard. Spirit has also worked to competitively introduce bundled

[18] See Exhibit 3. Top U.S. Tech Talent Centers.

[19] See Exhibit 8. San Jose and Silicon Valley Patent Activities and Ranking (of these cities, San Jose, Sunnyvale, Mountain View, Palo Alto, Santa Clara, Fremont, Cupertino list their closest airport as SJC).

[20] See Exhibit 7. Top University for Startup Founders in U.S.

travel options which serve a greater reach of guests. The variety of these service options Spirit provides are especially significant on this new planned service between SJC and DCA.

Further, Spirit offers a broad selection of product offerings and onboard services which are continually being upgraded. These product offerings include one of the most widely-praised business-friendly seat options, which Spirit calls the "Big Front Seat". The Big Front Seats, which will be included in Spirit's DCA-SJC service, are for Guests who prefer a larger seat in the front of the plane. The seats boast 11" of additional legroom compared to the standard deluxe leather seats.

### C. Spirit's New and Improved Innovative Digital Experiences

Spirit has a user-friendly and updated website, which clearly guides its customers through the process of booking their flights. Additionally, Spirit has its own mobile app, SMS

messaging, and webchat communication services in order to provide customers with a more seamless and streamlined passenger experience. Customers can enjoy control over loyalty management, booking, checking-in, airport, and in-flight experiences like never before. Spirit takes great pride in offering this ease of access and choice for its customers.

**D. Spirit's Product Offerings Prioritize Maximum Customer Choice**

Spirit's fare options include unbundled fares, discounted bundles, and innovative products which provide the highest value for Guests. Additionally, Spirit has been increasing its in-flight Wi-Fi across its fleet, which is available on most aircraft and will be included on DCA-SJC service. Spirit knows how important internet access is on every flight, but especially this new flight planned between two tech-heavy destinations.

Further, Spirit implemented new partners who will offer more options for hotels, vacation packages, and car rentals as part of a customer's trip experience if they choose. Spirit emphasizes its ease of access and consumer choice, ensuring customers have all the options they want without forcing them to pay for more than they wish or needs.

**E. Free Spirit Loyalty Program Provides Additional Benefits for Travelers**

Spirit offers a widely praised loyalty program which has shown to vastly improve points earning capabilities and redemption options for its customers. These improvements include added benefits to a co-branded credit card with in-flight discounts and travel companion vouchers. Spirit has further expanded ancillary options through its loyalty subscription program and has included more partner relationships to provide services to its members in addition to expanding customer earning options.

### F. Spirit Proudly Flies an Industry-Leading Fleet of Modern and Fuel-Efficient Aircraft, Which Results in Cost Savings and Environmental Benefits

Spirit is proud to fly one of the youngest and most fuel-efficient fleets in the United States.[21] This fleet includes some of the newest aircraft on the market, which provide substantially higher fuel efficiency and lower carbon emission than others flown today. Indeed, Spirit is flying next-generation aircraft. Spirit was the first North American carrier to operate the "new engine option" or "Neo" version of the Airbus A320 aircraft, powered by the most fuel-efficient engine ever made for this aircraft class. This groundbreaking technology has resulted in a reduction of the acoustic footprint by up to 50% and 15-20% less fuel, reducing greenhouse gas emissions.

Spirit has worked hard to reduce its carbon footprint per passenger while increasing its fuel efficiency. The company has been a relentless and consistent leader in the aviation industry as measured by lowest fuel consumption per passenger on its flights.

[21] Additional details available in 2020 Sustainability Report (may need to include in exhibits).

**NOTE: This Industry Average is defined as 10 US carriers (AA, AS, B6, DL, F9, G4, NK, SY, UA, WN)*

### G. Spirit's New Cancellation Policies

Last month, Spirit announced its new change/cancellation policies. This ensures customers who need to cancel or change their flights can use the initial cost of the reservation toward rebooking. The elimination of change and cancellation fees is one of the ways in which Spirit is evolving to meet Guest needs and expectations, while emphasizing its focus on providing flight options that have more flexibility for maximum Guest benefit. Spirit is committed to offering its Guests the most flexible options possible, understanding that plans change and the need for a changed flight to accommodate various circumstances is extremely important when choosing an airline.

## IV. Conclusion

Spirit's request for a SJC-DCA roundtrip is the best choice for allocation of the two limited-incumbent DCA slots. Spirit meets both aspects of the Department decisional criteria

**Application of Spirit Airlines for DCA-SJC Slot Exemptions** **DOT-OST-2024-0065**
July 8, 2024 Page 13

by 1) bringing first non-stop service to a market that has a unique and strong connection to the Washington metropolitan area and 2) by bringing the first direct low-fare competition to this Northern California market. Spirit has a long history of introducing low fares into a market and will create new travel options for both leisure and business travelers.

Respectfully submitted,

Joanne W. Young
David M. Kirstein
Donald L. Crowell
**Counsel for Spirit Airlines, Inc.**

JA 000230



Cyber Center of Excellence
451 A Street
Suite 500
San Diego, CA 92101
www.sdccoe.org

May 30, 2024

The Honorable Pete Buttigieg
U.S. Department of Transportation
1200 New Jersey Ave, SE
Washington, D.C. 20590

Re: Alaska Airlines' application for SAN-DCA

Dear Secretary Buttigieg:

Cyber Center of Excellence (CCOE) enthusiastically supports the application of Alaska Airlines to initiate nonstop air service between San Diego International Airport (SAN) and Ronald Reagan Washington National Airport (DCA or Reagan National). This new route is not only vital for enhancing the connectivity between the two strategic regions, but also supports the growing demand for nonstop service for both business and leisure passengers.

Now celebrating 10 years of service to the San Diego cyber community, CCOE maintains strong ties to Washington, D.C. and was highlighted as an "Ecosystem in Action" in the White House National Cyber Workforce & Education Strategy report. CCOE is currently working with the White House ONCD and CISA to organize San Diego innovation tours, and we're partnering with the Joint Cyber Defense Collaborative (JCDC) on their cyber resources map with CISA that will feature CCOE and San Diego's efforts as part of the White House Ecosystems in Action highlight. Maintaining strong connections between San Diego and Washington, D.C. is essential for fostering collaboration, innovation, economic prosperity, and national security.

San Diego and Washington, D.C. are hubs of significant defense, economic and social activity. San Diego's sectors in defense, biotech and communications technology require efficient access to the core of the national capital region. San Diego is the second largest government related travel market – driven by demand to key institutions closest to DCA including the Pentagon and Department of Homeland Security. Adding an Alaska Airlines' nonstop flight to DCA from SAN will mean increased connectivity for our larger community, will fill a critical gap in the national air service network, and also provide a more streamlined, efficient service that will benefit the greatest number of passengers.

We appreciate your consideration of this application. We hope to hear of your favorable response to this request in the coming weeks.

Sincerely,

Lisa Easterly

Lisa Easterly
President & CEO, Cyber Center of Excellence



THE CITY OF SAN DIEGO

TODD GLORIA

MAYOR

June 3, 2024

The Honorable Pete Buttigieg
Secretary
U.S. Department of Transportation
1200 New Jersey Ave, SE
Washington, D.C. 20590

**RE:** Alaska Airlines' application for SAN-DCA

Dear Secretary Buttigieg:

As Mayor of the City of San Diego, I am writing to express my strong support for Alaska Airlines' application to initiate nonstop air service between San Diego International Airport (SAN) and Ronald Reagan Washington National Airport (DCA or Reagan National). As the largest market in the country not serviced by DCA, this new route is vital for enhancing the connectivity between these two strategic regions, but also will support the growing demand for nonstop service for both business and leisure passengers.

As you know, San Diego and Washington, D.C. are hubs of significant defense, economic, and tourism industries. San Diego's core sectors in defense, biotech and communications technology require efficient access to key institutions closest to DCA including the Pentagon, Department of Homeland Security, and the U.S. Congress.

At 225 passengers daily each direction, not only does U.S. Department of Transportation (DOT) data demonstrate that San Diego is the largest origin-destination market without service to Reagan National, but the SAN-DCA market is the largest in the entire domestic network without nonstop service. The annual 180,000-passenger population between SAN and DCA have endured connections that add more than 360,000 hours annually of time inefficiency.

I am confident that Alaska Airlines' reputation for exceptional service, reliability, and customer satisfaction make it an ideal carrier to bridge these two important markets. Alaska Airlines began serving SAN in 1985 and, in the last 10 years, has grown by more than 75%. Today, that means about 6,500 passengers served daily and 60 average daily departures from SAN.

Adding a nonstop to DCA to Alaska Airlines' daily destinations from SAN will mean increased connectivity for our larger community, will fill a critical gap in the national air service network, and provide a more streamlined, efficient service that will benefit the greatest number of passengers.

Thank you for your consideration of this application.

Sincerely,

TODD GLORIA
Mayor
City of San Diego

USCA Case #25-1002 Document #2102487 Filed: 02/24/2025 Page 240 of 503

Qualcomm

**Qualcomm Incorporated**

5775 Morehouse Drive, San Diego, CA 92121

www.qualcomm.com

June 11, 2024

The Honorable Pete Buttigieg
U.S. Department of Transportation
1200 New Jersey Ave, SE
Washington, D.C. 20590

Re: Alaska Airlines' application for SAN-DCA

Dear Secretary Buttigieg:

On behalf of Qualcomm, I am writing to express our enthusiastic support for Alaska Airlines nonstop air service between San Diego International Airport (SAN) and Ronald Reagan Washington National Airport (DCA or Reagan National). This new route is not only vital for enhancing the connectivity between the two strategic regions, but also supports the growing demand for nonstop service for both business and leisure passengers.

At 225 passengers daily each direction, not only does U.S. Department of Transportation (DOT) data demonstrate that San Diego is the largest origin-destination market without service to Reagan National, but the SAN-DCA market is the largest in the entire domestic network without nonstop service. The annual 180,000 passenger population between SAN and DCA have endured connections that add more than 360,000 hours annually of time inefficiency.

SAN - Washington DC is among Qualcomm's top 10 domestic travel markets. Flying nonstop to DCA from SAN would be a considerable improvement over our current Travel options, which require layovers that can result in result in travel delays, or additional transportation costs and time for our travelers between IAD and the metro DC area.

Qualcomm has had a long and successful relationship with Alaska Airlines, which is designated as a Qualcomm Preferred Airline for our employees. We can attest to Alaska Airlines' reputation for exceptional service, reliability, and customer satisfaction, and believe it would be the ideal carrier to bridge these two important markets. Alaska Airlines began serving SAN in 1985 and in the last 10 years has grown by more than 75%. Today that means about 6,500 guests served daily, including many Qualcomm employees, and 60 average daily departures from SAN. Adding a nonstop to DCA to Alaska Airlines' daily destinations from SAN will mean increased connectivity for our larger community, will fill a critical gap in the national air service network, and provide a more streamlined, efficient service that will benefit the greatest number of passengers.

We appreciate your consideration of this application. We hope to hear of your favorable response to this request in the coming weeks.

Sincerely,

Anne Otsuka
Global Travel Category Manager
Qualcomm Inc.



May 29, 2024

The Honorable Pete Buttigieg
U.S. Department of Transportation
1200 New Jersey Avenue, SE
Washington, D.C. 20590

**Re: Alaska Airlines' application for SAN-DCA**

Dear Secretary Buttigieg:

As the President and CEO of Evans Hotels, I am writing to express our strong support for Alaska Airlines' application to initiate nonstop service between San Diego International Airport (SAN) and Washington, DC's Ronald Reagan National Airport (DCA).

The critical importance of connecting San Diego's economy to other significant markets cannot be overstated. Adding a direct flight between SAN and DCA is vital for several reasons:

1. Economic Growth: San Diego is home to thriving sectors such as biotech, defense, and academia. Direct access to the nation's capital will cultivate new business opportunities, attract investment, and facilitate closer collaboration with federal agencies and policymakers.

2. Tourism: As a top destination known for its beautiful beaches, cultural attractions, and pleasant climate, improved connectivity to Washington, DC, will bolster tourism. This influx benefits hotels, restaurants, and other local enterprises, providing employment opportunities, and strengthening the overall economy.

3. Conferences and Meetings: Our hotels frequently host national and international conferences, including association and government meetings from the DC and surrounding areas. Ease and travel convenience are critical factors in site selection for event organizers and attendees. Adding a nonstop flight to DCA would make San Diego a more attractive choice for many organizations, bringing increased revenue and visibility to our hotels and region as well as additional employment opportunities.

Despite the critical economic and security linkages between our region's academic, innovation, and defense clusters and our nation's capital, San Diego remains the largest metropolitan area without nonstop service to DCA. This gap hampers our potential for growth and collaboration on a national level.

**Evans Hotels** is proud to support Alaska Airlines in this initiative. We believe that establishing nonstop service between SAN and DCA is essential to meeting the evolving needs of our community and maintaining our competitive edge.

Thank you for considering this request and we urge you to approve Alaska Airlines application. We look forward to the positive impact that this service will bring to our region.

Sincerely,

Robert H. Gleason, JD, CHAE
President and Chief Executive Officer
Evans Hotels

EvansHotels.com | 998 West Mission Bay Drive | San Diego, California 92109



June 3rd, 2024

The Honorable Pete Buttigieg
U.S. Department of Transportation
1200 New Jersey Ave, SE
Washington, D.C. 20590

Re: Alaska Airlines' application for SAN-DCA

Dear Secretary Buttigieg:

Cox Communications enthusiastically supports the application of Alaska Airlines to initiate nonstop air service between San Diego International Airport (SAN) and Ronald Reagan Washington National Airport (DCA or Reagan National). This new route is not only vital for enhancing the connectivity between the two strategic regions, but also supports the growing demand for nonstop service for both business and leisure passengers.

San Diego and Washington, D.C. are hubs of significant defense, economic and social activity. San Diego's sectors in defense, biotech and communications technology require efficient access to the core of the national capital region. San Diego is the second largest government related travel market – driven by demand to key institutions closest to DCA including the Pentagon and Department of Homeland Security.

At 225 passengers daily each direction, not only does U.S. Department of Transportation (DOT) data demonstrate that San Diego is the largest origin-destination market without service to Reagan National, the SAN-DCA market is the largest in the entire domestic network without nonstop service. The annual 180,000 passenger population between SAN and DCA have endured connections that add more than 360,000 hours annually of time inefficiency.

Cox Communications serves over 580,000 business and residential customers in San Diego County and with more federal focus on the funding of Broadband infrastructure and adoption efforts. It is critical to our business that we have access to the federal lawmakers and agencies that are crafting and executing polices that directly impact us in the San Diego region.

Alaska Airlines' reputation for exceptional service, reliability, and customer satisfaction make it the ideal carrier to bridge these two important markets. Alaska Airlines began serving SAN in 1985 and in the last 10 years has grown by more than 75%. Today that means about 6,500 guests served daily and 60 average daily departures from SAN. Adding a nonstop to DCA to Alaska Airlines' daily destinations from SAN will mean increased connectivity for our larger community, will fill a critical gap in the national air service network, and will provide a more streamlined, efficient service that will benefit the greatest number of passengers.

We appreciate your consideration of this application. We hope to hear of your favorable response to this request in the coming weeks.

Sincerely,

Ingo Hentschel
San Diego Market Vice President
Cox Communications



**June 3, 2024**

The Honorable Pete Buttigieg
U.S. Department of Transportation
1200 New Jersey Ave, SE
Washington, D.C. 20590

Re: Alaska Airlines' application for SAN-DCA

Dear Secretary Buttigieg:

**Cultura** enthusiastically supports the application of Alaska Airlines to initiate nonstop air service between San Diego International Airport (SAN) and Ronald Reagan Washington National Airport (DCA or Reagan National). This new route is not only vital for enhancing the connectivity between the two strategic regions, but also supports the growing demand for nonstop service for both business and leisure passengers.

San Diego and Washington, D.C. are hubs of significant defense, economic and social activity. San Diego's sectors in defense, biotech and communications technology require efficient access to the core of the national capital region. San Diego is the second largest government related travel market – driven by demand to key institutions closest to DCA including the Pentagon and Department of Homeland Security.

At 225 passengers daily each direction, not only does U.S. Department of Transportation (DOT) data demonstrate that San Diego is the largest origin-destination market without service to Reagan National, the SAN-DCA market is the largest in the entire domestic network without nonstop service. The annual 180,000 passenger population between SAN and DCA have endured connections that add more than 360,000 hours annually of time inefficiency.

**Cultura has long time employees with families in the greater DC area and also supports the federal government as a client.**

Alaska Airlines' reputation for exceptional service, reliability, and customer satisfaction make it the ideal carrier to bridge these two important markets. Alaska Airlines began serving SAN in 1985 and in the last 10 years has grown by more than 75%. Today that means about 6,500 guests served daily and 60 average daily departures from SAN. Adding a nonstop to DCA to Alaska Airlines' daily destinations from SAN will mean increased connectivity for our larger community, will fill a critical gap in the national air service network, and also provide a more streamlined, efficient service that will benefit the greatest number of passengers.

We appreciate your consideration of this application. We hope to hear of your favorable response to this request in the coming weeks.

Sincerely,

**Anne Benge**
**CEO**

CULTURA | 5010 Shoreham Place, Suite 110, San Diego, CA 92122 | www.wearecultura.com | Phone 858-755-1390

Deloitte.

**Deloitte & Touche LLP**
12830 El Camino Real
Suite 600
San Diego, CA 92130
USA

Tel:+1 619 232 6500
Fax:+1 619 237 6802
www.deloitte.com

June 13, 2024

The Honorable Pete Buttigieg
U.S. Department of Transportation
1200 New Jersey Ave, SE
Washington, D.C. 20590

Re: Alaska Airlines' application for SAN-DCA

Dear Secretary Buttigieg:

Deloitte enthusiastically supports the application of Alaska Airlines to initiate nonstop air service between San Diego International Airport (SAN) and Ronald Reagan Washington National Airport (DCA or Reagan National). This new route is not only vital for enhancing the connectivity between the two strategic regions, but also supports the growing demand for nonstop service for both business and leisure passengers.

San Diego and Washington, D.C. are hubs of significant defense, economic and social activity. San Diego's sectors in defense, biotech and communications technology require efficient access to the core of the national capital region. San Diego is the second largest government related travel market – driven by demand to key institutions closest to DCA including the Pentagon and Department of Homeland Security.

At 225 passengers daily each direction, not only does U.S. Department of Transportation (DOT) data demonstrate that San Diego is the largest origin-destination market without service to Reagan National, the SAN-DCA market is the largest in the entire domestic network without nonstop service. The annual 180,000 passenger population between SAN and DCA have endured connections that add more than 360,000 hours annually of time inefficiency.

This direct flight would provide a much needed flight option between our two Washington DC Deloitte offices and San Diego for our 5000+ professionals in DC and 1000+ professionals in San Diego. Deloitte provides professional services to a number of Defense sector clients and Government and Public sector clients.

Alaska Airlines' reputation for exceptional service, reliability, and customer satisfaction make it the ideal carrier to bridge these two important markets. Alaska Airlines began serving SAN in 1985 and in the last 10 years has grown by more than 75%. Today that means about 6,500 guests served daily and 60 average daily departures from SAN. Adding a nonstop to DCA to Alaska Airlines' daily destinations from SAN will mean increased connectivity for our larger community, will fill a critical gap in the national air service network, and also provide a more streamlined, efficient service that will benefit the greatest number of passengers.

We appreciate your consideration of this application.  We hope to hear of your favorable response to this request in the coming weeks.

Sincerely,

**Juli Moran**

San Diego Office Marketplace Leader
Managing Director | LCSP/Life Sciences, Deloitte Consulting, LLP



May 31, 2024

The Honorable Pete Buttigieg
U.S. Department of Transportation
1200 New Jersey Ave, SE
Washington, D.C. 20590

Re: Alaska Airlines' application for SAN-DCA

Dear Secretary Buttigieg:

Clark Construction Group - CA, LP enthusiastically supports the application of Alaska Airlines to initiate nonstop air service between San Diego International Airport (SAN) and Ronald Reagan Washington National Airport (DCA or Reagan National). This new route is not only vital for enhancing the connectivity between the two strategic regions, but also supports the growing demand for nonstop service for both business and leisure passengers.

San Diego and Washington, D.C. are hubs of significant defense, economic and social activity. San Diego's sectors in defense, biotech and communications technology require efficient access to the core of the national capital region. San Diego is the second largest government related travel market – driven by demand to key institutions closest to DCA including the Pentagon and Department of Homeland Security.

At 225 passengers daily each direction, not only does U.S. Department of Transportation (DOT) data demonstrate that San Diego is the largest origin-destination market without service to Reagan National, the SAN-DCA market is the largest in the entire domestic network without nonstop service. The annual 180,000 passenger population between SAN and DCA have endured connections that add more than 360,000 hours annually of time inefficiency.

As a local builder with national reach, our offices span across the country from San Diego to Washington, DC. With our deep roots in the DMV our corporate leadership teams frequently traverse the country to support our people and projects. A nonstop flight would seamlessly bridge the geographical gap between our operations on the West Coast and our vital presence in the nation's capital. This enhanced connectivity not only boosts our operational efficiency, but also reinforces our commitment to delivering excellence.

Alaska Airlines' reputation for exceptional service, reliability, and customer satisfaction make it the ideal carrier to bridge these two important markets. Alaska Airlines began serving SAN in 1985 and in the last 10 years has grown by more than 75%. Today that means about 6,500 guests served daily and 60 average daily departures from SAN.

**Clark Construction Group - California, LP**
525 B Street, Suite 250
San Diego, California 92101
Phone: (619) 578-2650
www.clarkconstruction.com



Adding a nonstop to DCA to Alaska Airlines' daily destinations from SAN will mean increased connectivity for our larger community, will fill a critical gap in the national air service network, and also provide a more streamlined, efficient service that will benefit the greatest number of passengers.

We appreciate your consideration of this application. We hope to hear of your favorable response to this request in the coming weeks.

Sincerely,

Carlos Gonzalez, Division President
Clark Construction Group – CA, LP

**Clark Construction Group - California, LP**
525 B Street, Suite 250
San Diego, California 92101
Phone: (619) 578-2650
www.clarkconstruction.com

Congress of the United States

Washington, DC 20515

May 30, 2024

The Honorable Pete Buttigieg
Secretary
U.S Department of Transportation
1200 New Jersey Avenue, SE
Washington, D.C. 20590

Dear Secretary Buttigieg:

Thank you for your leadership in the process to reauthorize the Federal Aviation Administration (FAA). As members of the California House delegation representing San Diego, we write to express our support for Alaska Airlines' petition to be awarded a new slot pair at Ronald Reagan Washington National Airport (DCA) to provide non-stop service between San Diego International Airport (SAN) and DCA. SAN serves constituents in all our districts in San Diego, and we respectfully request that as the Department of Transportation carries out its process to allocate the new DCA slots under the Federal Aviation Administration Reauthorization Act of 2024, you provide full and fair consideration to Alaska Airlines' petition.

Of the airports outside of the perimeter without existing service to DCA, San Diego International Airport has the highest number of daily passengers to DCA via connecting service and is the largest hub airport. San Diego is consistently touted as one of the best places to visit in the U.S., and it is not just tourism that drives the city, but also the enormous presence of our country's military.

Due to previous slot limitations and the perimeter rule at DCA, there is no current non-stop route between the two airports, resulting in travel delays and hardships. We believe greater connectivity between SAN and DCA through a new non-stop route will improve quality of life for servicemembers while providing economic benefits for both regions. The time lost by our military and tourists on every flight between San Diego and Washington, DC is something that can, and should, change. Alaska Airlines' reputation for exceptional service, reliability, and customer satisfaction combined with its growing presence in San Diego make it the ideal carrier to bridge these two important markets. Additionally, with more than 60 daily departures from SAN, this proposed Alaska Airlines flight, if appropriately timed, will provide critical connectivity to consumers beyond SAN who will also benefit from this direct service.

San Diego International Airport recognizes the demand for travel and has undertaken significant investments to prepare itself for additional flight opportunities. Over the last several years, San Diego International Airport has rebuilt its Terminal 2 with a LEED certified, award-winning facility and is in the process of a $3.8 billion Terminal 1 project that will construct 30 gates. This is a significant investment that will put infrastructure in place for the airport to meet rising demand efficiently and safely.

Again, we respectfully request that you provide full and fair consideration to Alaska Airlines' petition for new non-stop service between DCA and SAN.

Sincerely,

Scott H. Peters
Member of Congress

Sara Jacobs
Member of Congress

Mike Levin
Member of Congress

Juan Vargas
Member of Congress

Darrell Issa
Member of Congress




May 29, 2024

The Honorable Pete Buttigieg
U.S. Department of Transportation
1200 New Jersey Ave, SE
Washington, D.C. 20590

Re: Alaska Airlines' application for SAN-DCA

Dear Secretary Buttigieg:

The California Asian Pacific Chamber of Commerce (CalAsian) enthusiastically supports the application of Alaska Airlines to initiate nonstop air service between San Diego International Airport (SAN) and Ronald Reagan Washington National Airport (DCA or Reagan National). This new route is not only vital for enhancing the connectivity between the two strategic regions, but also supports the growing demand for nonstop service for both business and leisure passengers.

San Diego and Washington, D.C. are hubs of significant defense, economic and social activity. San Diego's sectors in defense, biotech and communications technology require efficient access to the core of the national capital region. San Diego is the second largest government related travel market – driven by demand to key institutions closest to DCA including the Pentagon and Department of Homeland Security.

At 225 passengers daily each direction, not only does U.S. Department of Transportation (DOT) data demonstrate that San Diego is the largest origin-destination market without service to Reagan National, the SAN-DCA market is the largest in the entire domestic network without nonstop service. The annual 180,000 passenger population between SAN and DCA have endured connections that add more than 360,000 hours annually of time inefficiency.

Alaska Airlines' reputation for exceptional service, reliability, and customer satisfaction make it the ideal carrier to bridge these two important markets. Alaska Airlines began serving SAN in 1985 and in the last 10 years has grown by more than 75%. Today that means about 6,500 guests served daily and 60 average daily departures from SAN. Adding a nonstop to DCA to Alaska Airlines' daily destinations from SAN will mean increased connectivity for our larger community, will fill a critical gap in the national air service network, and also provide a more streamlined, efficient service that will benefit the greatest number of passengers.

We appreciate your consideration of this application. We hope to hear of your favorable response to this request in the coming weeks.

Sincerely,

Pat Fong Kushida

Pat Fong Kushida
President & CEO, California Asian Pacific Chamber of Commerce

**Phone Number:**
P (916) 446-7883
F (916) 307-5251

**Office Address:**
2125 19th Street, Suite 220
Sacramento, CA 95818

**Social Media:**

@calasian_chamber @calasiancc @calasiancc CalAsian Chamber
calasiancc.org

**BEFORE THE**
**DEPARTMENT OF TRANSPORTATION**
**WASHINGTON, D.C.**

| **Application of**<br><br>**FRONTIER AIRLINES, INC.**<br><br>**For Slot Exemption at Ronald Reagan Washington National Airport Pursuant to 49 U.S.C. § 41718** | **Docket DOT-OST-2024-0065** |
|---|---|

**COMMENTS ON TIMELY-FILED APPLICATIONS**

## I. Background

The U.S. Department of Transportation (DOT)'s Slot Exemption Proceeding at Ronald Reagan Washington National Airport Pursuant to 49 U.S.C. § 41718 issued June 24, 2024 ("Notice"),[1] called for applications for ten (10) slots (5 slot pairs) for use in the operation of daily flights from Ronald Reagan Washington National Airport (DCA). Subject to other qualifications, four (4) of the slot pairs are to be allocated to non-limited incumbent carriers and one (1) slot pair to a limited incumbent carrier. Three (3) carriers have applied in that latter category: Alaska Airlines, Inc. ("Alaska"), Spirit Airlines, Inc. ("Spirit"), and Frontier Airlines, Inc. ("Frontier"). Only Frontier, however, is eligible to receive the slot pair to be allocated to a limited incumbent carrier.

## II. Spirit Airlines

In its application, seemingly to justify its eligibility, Spirit quotes from the Background section of Notice (emphasis added):

> The Securing Growth and Robust Leadership in American Aviation Act of 2024, known as the FAA Reauthorization Act of 2024 (FAA 2024), directs the

[1] Docket DOT-OST-2024-0065-0001.

> Department to grant "10 exemptions in two categories: eight exemptions, or four round trips, are reserved for **incumbent carriers** qualifying as non-limited incumbent carriers, and **two exemptions, or one round trip, are reserved for limited incumbent carriers**."[2]

This appears to suggest that "incumbent carriers" modifies "non-limited incumbent carriers" but not "limited incumbent carriers." Even if that were a reasonable interpretation, it disregards the section of the Notice on Eligibility that makes clear that "incumbent carrier" modifies both non-limited incumbent carriers and limited incumbent carriers (emphasis added):

> FAA 2024 directs the Department to make eight of the 10 additional slot exemptions available to incumbent air carriers qualifying for status as a non-limited incumbent carrier at DCA as of the date of the enactment of the statute. The remaining two slot exemptions shall be made available to **incumbent air carriers qualifying for status as a limited incumbent carrier at DCA as of the date of the enactment of the statute**, and as defined by 49 U.S.C. § 41714(h)(5).[3]

The above Notice language accurately reflects the statute (emphasis added):

> LIMITED INCUMBENTS.—Of the slot exemptions made available under paragraph (1), the Secretary shall make 2 available to **incumbent air carriers qualifying for status as a limited incumbent carrier at Ronald Reagan Washington National Airport as of the date of enactment of the FAA Reauthorization Act of 2024**.[4]

The statute and the Notice are clear: to receive a slot pair, the applying carrier must be an incumbent air carrier, *i.e.*, operating at DCA. Without that, the carrier is not eligible even if it happens to be a limited incumbent carrier. As Spirit's counsel notes, Spirit "does not currently operate or market flights at DCA."[5] Spirit is, therefore, not an incumbent air carrier at DCA and, consequently, ineligible to receive slots under FAA 2024.

---

[2] Application of Spirit Airlines, Inc. for Two Slot Exemptions for DCA-SJC Service (Docket DOT-OST-2024-0065-5921) (quoting the Notice at 1).

[3] Notice at 3.

[4] 49 U.S.C. § 41718(i)(3).

[5] Docket DOT-OST-2024-0065-0007 at 2.

## III. Alaska Airlines

In its application, seemingly to justify its eligibility, Alaska asserts in a footnote:

> This application responds to the Department's Notice served June 24, 2024 in the above-captioned docket (the "Notice"). As the Department stated in the Notice, Alaska is eligible to apply for an allocation of two slot exemptions as a limited incumbent carrier. See Notice at 2.[6]

The above, however, does not accurately reflect what the Notice says. Rather, it says:

> The Department, in coordination with the FAA Slot Administration Office, is providing below a list of current DCA Non-Limited and Limited Incumbent carriers at the time of the enactment of FAA 2024.[7]

The DOT only shared a list of non-limited incumbent carriers and limited incumbent carriers at DCA.[8] It said nothing concerning their being eligible to receive slots in this proceeding. By way of example, Air Canada is also listed among the limited incumbent carriers. The slots being distributed, however, must be used to provide service to a U.S. domestic airport from DCA.[9] Thus, while Air Canada may be correctly listed as a limited incumbent carrier, being a foreign carrier, it is not permitted to provide domestic service from DCA. It is, therefore, ineligible and did not apply to receive any of the slot exemptions in the present proceeding.

Likewise, Alaska may be a limited incumbent carrier, but as Spirit's counsel correctly explains in a letter to DOT:

> Consistent with two decades of Department precedent, 49 U.S.C. § 41714(k) expressly prohibits Alaska from qualifying as a limited incumbent for new slot exemptions because it has an ongoing codeshare agreement with American Airlines

[6] Application of Alaska Airlines, Inc. for Slot Exemptions, Docket DOT-OST-2024-0065-5926 at note 1.

[7] Notice at 2.

[8] *See*, *infra*, Section IV (concerning an omission from that list).

[9] 49 U.S.C. § 41718(i)(1)(A).

> and the "total number of slots and slot exemptions held by the two carriers at the airport exceed 20."[10, 11]

That statute provides:

> Affiliated Carriers.—
> For purposes of this section and sections 41716, 41717, and 41718, an air carrier that operates under the same designator code, or has or enters into a code-share agreement, with any other air carrier shall not qualify for a new slot or slot exemption as a new entrant or limited incumbent air carrier at an airport if the total number of slots and slot exemptions held by the two carriers at the airport exceed 20 slots and slot exemptions.

The provisions of FAA 2024 establishing the slots that are the subject of the Notice and this proceeding were added to 49 U.S.C. § 41718, which is one of the three (3) sections of the U.S. Code referenced in the above statute. There is, therefore, no question that 49 U.S.C. § 41714(k) applies in determining Alaska's eligibility to bid. Because American Airlines is a non-limited incumbent carrier,[12] when combined with Alaska, "the total number of slots and slot exemptions held by the two carriers at the airport exceed 20 slots and slot exemptions." Thus, Alaska does not "qualify for a new slot or slot exemption as a new entrant or limited incumbent air carrier."

---

[10] Docket DOT-OST-2024-0065-0007 at 1. We note that in contrast to the definition of "limited incumbent air carrier" under 49 U.S.C. § 41714(h)(5), the rule under 49 U.S.C. § 41714(k) counts both "slots and slot exemptions" for the purposes of the limit of twenty (20) specified in that provision.

[11] See https://www.alaskaair.com/content/travel-info/before-your-trip/codeshare-information (page at Alaska Airlines' website describing its code sharing relationships) (last visited 07/17/24) and https://www.alaskaair.com/content/mileage-plan/how-to-earn-miles/airline-partners/american-airlines?lid=airline-partners:partners-american (page at Alaska Airlines' website describing its code sharing relationship with American Airlines) (last visited 07/17/24). That code sharing includes over fifty (50) flights operating from DCA each day.

[12] Notice at 2.

## IV. Frontier Airlines

Frontier is: (i) an incumbent carrier at DCA, *i.e.*, it operates flights at DCA,[13] (ii) a limited incumbent carrier,[14] (iii) is not a party to a relationship that invokes 49 U.S.C. § 41714(k) addressed above, and (iv) as a domestic carrier may operate domestic flights.

Frontier noticed its omission from the table of Non-Limited Incumbent Carrier and Limited Incumbent Carriers in the Notice. We sought to understand the omission. By way of example, Spirit's omission makes sense in light of footnote 4 in the Notice, "This list includes only those carriers marketing air transportation at DCA on the date of enactment of FAA 2024." Spirit does not operate flights at DCA. Frontier, however, does operate flights at DCA, including "on the date of enactment of FAA 2024."

Moreover, noting that Alaska was included on the list of limited incumbent air carriers in the Notice (despite being excluded from eligibility under that status by a different part of the statute[15]), all of Frontier's DCA slots, like Alaska's, are exemption slots.[16] We suggest that Frontier's omission from the list was an error.

## V. Conclusion

In light of the above, we respectfully submit that Frontier is the only "incumbent air carrier[] qualifying for status as a limited incumbent carrier at Ronald Reagan Washington National Airport as of the date of enactment of the FAA Reauthorization Act of 2024."[17] It,

---

[13] Frontier presently operates three (3) daily trips on DCA-DEN (Denver International Airport).

[14] *See* Frontier's Application for Slot Exemption, Docket DOT-OST-2024-0065-5802 at Section 2 (addressing Frontier's eligibility for the slot pair it is seeking).

[15] *See*, *supra*, Section IV.

[16] That is under an exemption from the perimeter rules that otherwise bar flights from DCA exceeding 1,250 miles (14 C.F.R. § 93.253). Specifically, Frontier utilizes three (3) slot pairs to operate flights on DCA-DEN, while Alaska utilizes five (5) slot pairs to operate one (1) daily flight to each of Los Angeles International Airport (LAX), Portland International Airport (PDF), San Francisco International Airport (SFO), and two (2) to Seattle-Tacoma International Airport (SEA).

[17] 49 U.S.C. § 41718(i)(3).

therefore, looks forward to being granted a slot pair to operate daily flights from Ronald Reagan Washington National Airport (DCA) to/from Luis Muñoz Marín International Airport (SJU).

Respectfully submitted,

Brian E. Foont
The Foont Law Firm, LLC
11727 Gainsborough Road
Potomac, MD 20854
Tel. 202-236-4851
E-Mail: Foont@FoontLaw.com

Counsel for Frontier Airlines, Inc.

July 17, 2024

**BEFORE THE**
**U.S. DEPARTMENT OF TRANSPORTATION**
**OFFICE OF THE SECRETARY**
**WASHINGTON, D.C.**

| | |
|---|---|
| Application of<br><br>**JETBLUE AIRWAYS CORPORATION**<br><br>for beyond-perimeter slot exemptions<br><br>(Washington, D.C. (DCA)-San Juan, PR (SJU)) | Docket DOT-OST-2024-0065 |

**CONSOLIDATED ANSWER OF JETBLUE AIRWAYS CORPORATION**

JetBlue Airways Corporation (JetBlue) hereby submits this Consolidated Answer to the various applications submitted for beyond-perimeter exemption slots, including four applications that involve California service. There are significant flaws with several of these applications. JetBlue respectfully urges DOT to promptly issue a final order, as Congress mandated, that accounts for broad competitive issues facing the U.S. airline industry, geographic diversity in the allocation of beyond-perimeter exemption slots, and the likely impact of awards on operations and competition at Ronald Reagan Washington National Airport (DCA) and other Washington-area airports.[1]

As Secretary Buttigieg has recognized, "Done right, transportation policy can help level the playing field. It can transform economies, connect people to opportunity, and empower underserved communities to build generational wealth for the future."[2] More than any other

[1] JetBlue supports DOT's decision "to make selections in a single final order." "Establishment of Slot Exemption Proceeding at Ronald Reagan Washington National Airport Pursuant to 49 U.S.C. § 41718" Notice at 3 ("DOT Notice"), June 24, 2024.

[2] *See* <https://www.transportation.gov/sites/dot.gov/files/2022-04/Equity_Action_Plan.pdf>.

application, JetBlue's proposal would advance these important policy goals. JetBlue is the smallest non-limited incumbent carrier eligible for slot exemptions under this grant. It has a long and proud history of competing hard for the business of American consumers, and forcing its larger rivals to do the same. And JetBlue proposes to use these beyond-perimeter exemption slots to increase service to San Juan and points beyond, underserved communities that are wholly reliant on air travel.

As a small airline in an industry dominated by four immense airlines, JetBlue has always been an advocate for increased competition and has not hesitated to share its view on public policy issues, particularly on airport access and slot issues which are so crucial when evaluating competition. JetBlue's application strongly demonstrates that it is well placed to serve as a competitive check on larger carriers and fulfill the Congressional mandate to "have a positive impact on the overall level of competition in the markets that will be served as a result of those exemptions."[3] As of today, more than 5,000 comments have been submitted to the Docket in support of JetBlue's application, which reflects the broad support for JetBlue's proposal. JetBlue is ready, willing and able to accept DOT beyond-perimeter slot exemptions and promptly launch a second-daily flight between DCA and Luis Muñoz Marin International Airport (SJU) in San Juan, Puerto Rico, again using the consistently largest gauge offering at DCA.

**DOT's 2022 Conclusions about LCCs are Relevant to this Proceeding**

Two years ago, in one of the last major domestic airline competitive proceedings, DOT made a number of findings regarding JetBlue and LCC/ULCC competitive impact versus United and other legacy carriers:

[3] DOT Notice at 2.

> Airlines with comparatively low-cost structures are positioned to offer lower fares and attractive service options to a large number of travelers, including new travelers, verses larger incumbent carriers…United, like other legacy carriers, has operating costs that necessitate higher fares in order to maintain profitability. JetBlue offers a "hybrid" approach that seeks to offer many of the amenities of a legacy carrier, such as premium seating, onboard entertainment and food and beverage, while seeking to maintain low costs and, by extension, lower fares.[4]

JetBlue ultimately was unsuccessful in that proceeding, in large part due to litigation brought by Spirit against DOT/FAA. However, DOT's findings in favor of Spirit in 2022, and dicta about JetBlue, apply forcefully today in JetBlue's pending application against American, Delta, Southwest and United[5]:

> [LCC/ULCC] business model[s] enables [them] to operate at a significantly lower cost per seat, allowing [them] to make significantly lower fares available to many more customers in the market. [They have] a track record of entering and staying in hub markets (including at EWR) and offer[ing] a product offering that can appeal to a broad cross section of consumers. JetBlue competes well with United on product offering, with a range of fare and onboard products that can appeal to various passenger segments. JetBlue also has a strong history of competitive entry and has a larger network footprint at EWR, including overlap markets with United.[6]
>
> [LCC/ULCCs have] demonstrated [their] ability to maintain a significantly lower cost structure, allowing [them] to offer lower fares to more passengers, and [have] a demonstrated history of entering and stimulating markets (including those dominated by United or other legacy carriers).[7]

---

[4] DOT Order 2022-7-1 at 5-6 ("Reassignment of Schedules at Newark-Liberty International Airport").

[5] Although JetBlue offers some commentary in this Consolidated Answer about the applications filed by Alaska, Frontier and Spirit, we note that the DOT Notice classified Alaska as a limited incumbent carrier. Based on legal reliance on the DOT Notice, JetBlue considers the applications filed by American, Delta, Southwest and United to be its competition in the non-limited incumbent category. Under no circumstances should DOT deviate from its Notice and consider Alaska a non-limited incumbent carrier as it grants slot exemptions in this proceeding, without first providing prior notice to applicants and an opportunity to comment on any changed DOT analysis of the DCA carrier categories. Although not in the same category, JetBlue offers significant commentary later in this filing about Frontier's application due to the number of assertions Frontier inaccurately made about JetBlue.

[6] DOT Order 2022-7-1 at 9.

[7] *Id.* at 10.

DOT also noted in 2022 that JetBlue's average fares are "still below United."[8] In JetBlue's application submitted last week, we included evidence and fare data demonstrating that this DOT conclusion from 2022 remains valid. DOT's 2022 findings in favor of LCC/ULCCs is highly relevant and applies today. As JetBlue explained in its application, DOT has an obligation to "take steps to promote the stability and sustainability of airlines that seek to challenge incumbents, not merely strengthen those large incumbents."[9] DOT should incorporate its 2022 findings in Order 2022-7-1 and continue its long tradition of recognizing that smaller carriers have "served as an important and unique source of fare and service competition in the airline industry in the past quarter century."[10]

**DOT Must Account for Available Slot Exemption Times and Carefully Scrutinize Proposed Schedules**

JetBlue appears to be the only airline, with the exception of American, to have even considered DCA operational constraints in formulating its service proposal. As DOT is aware, such constraints are of vital importance to the airport and surrounding community. It is surprising how few airlines actually seemed to have checked slot exemption availability before applying for slot exemptions.[11]

---

[8] *Id.* at 9.

[9] "Application of JetBlue Airways Corporation for Beyond-Perimeter Slot Exemptions" at 23, Docket DOT-OST-2024-0065, July 8, 2024 ("JetBlue Application").

[10] *Id.* at 3.

[11] In previous beyond-perimeter slot exemption proceedings, DOT has regularly urged carriers to contact the FAA to determine available slot exemption times.

Below is the chart that was provided to JetBlue by the Federal Aviation Administration (FAA) in May 2024 listing available DOT slot exemption times at DCA:

| **Available Hours for Slot Exemptions at DCA** | **Number of Remaining Available Exemptions** |
|---|---|
| 700 | 2 |
| 800 | 1 |
| 900 | 3 |
| 1000 | 4 |
| 1100 | 2 |
| 1200 | 2 |
| 1300 | 0 |
| 1400 | 2 |
| 1500 | 0 |
| 1600 | 0 |
| 1700 | 0 |
| 1800 | 0 |
| 1900 | 3 |
| 2000 | 3 |
| 2100 | 1 |

Of the eight airlines that submitted applications, four applied for hours where there is no slot exemption availability (from 3:00 p.m.-7:00 p.m.). In addition, United applied for a slot exemption outside of the time window authorized by Congress and Frontier did not submit any proposed

schedule as required by DOT. Only JetBlue and American submitted applications involving hours where there is slot exemption availability.

While airlines like Alaska, Delta or Southwest may have some flexibility to seek to swap their existing slot exemptions supporting flights/destinations at other times to cover their new proposed slot exemption flying, they would still need to replace their existing slot-exemption flying (*i.e.*, Portland or Salt Lake City or Austin) with new slot exemptions in vastly different hours, which could have a profound impact on DCA operations.[12] The new flying contemplated by most airlines in this proceeding is not viable as proposed without impacting existing DCA operations and longstanding flight schedule patterns in other markets. As a result, claims made by these airlines about connecting flight options and associated consumer benefits are misleading as they are based on fictional flight schedules that can not legally or operationally be flown.[13]

Based on JetBlue's analysis of existing DCA beyond-perimeter patterns and slot exemption availability, and the new applications and proposed schedules/destinations, it is clear that DOT must account for these issues as it reaches a final decision. JetBlue urges DOT to rigorously examine this aspect of carriers' applications and service proposals, and to account for those applicants that propose viable operations, and to discount those that do not.

---

[12] United does not have the same amount of flexibility as these other carriers because it only holds two DCA slot exemption pairs and already operates one of those two for service to San Francisco, so swapping an SFO exemption to improve its schedule pattern to SFO would be self-defeating. United's other slot exemption pair is used for DCA-DEN service but has a similar schedule to United's existing DCA-SFO exemption, which further limits United's options. Finally, Southwest and Delta (including regional partners) also hold various other DCA slot exemptions that might provide them more flexibility, while United does not have this flexibility.

[13] It also has potential to delay this proceeding as carriers that receive awards belatedly realize that their proposed schedules are not viable and require additional aircraft deployment time, or require changes to other DCA routes/patterns, which may or may not be practical.

Finally, it is likely that several of the applications, if selected by DOT, are likely to involve additional Remain Over Night (RON) parking positions—United's application specifically envisions a RON and it is likely that one among Alaska, Delta or Southwest would similarly require a RON—either for their new beyond-perimeter flights or for their re-purposed existing slot exemption operations.[14] In the 2012 DCA beyond-perimeter proceeding, the Metropolitan Washington Airports Authority (MWAA) noted that DCA "parking space[s] for aircraft remaining overnight is now virtually at capacity."[15] With the new Concourse E opening in 2021, gates on all concourses *are now completely full* overnight. DCA RON positions *are now completely full* as well. This was confirmed to JetBlue by MWAA on Friday July 12, 2024. During winter when there are inclement weather events, DCA loses ~15 RON spots for deicing, which requires airlines to alter their schedules to accommodate the decreased overnight parking. DOT should be extraordinarily mindful before selecting an application that will require a RON that is unavailable. By disproportionally approving new West Coast late afternoon proposals, DOT could be creating a situation in which there is no physical room for new beyond-perimeter operations, which could cause operational chaos at the airport. This issue is very real and significant as noted by Congress.

For these reasons, JetBlue reiterates its request that DOT follow Congress' edict and "account for DCA airfield and terminal resiliency and spread slot-exemption awards evenly

[14] Unless Alaska, Delta or Southwest are willing to operate a beyond-perimeter Westbound departure after 7:00 p.m., which would arrive at its West Coast destination very late in the evening, some of them would likely have no choice but to attempt to add a RON at DCA. Even if they re-purpose an existing slot exemption flight (*i.e.*, Alaska using its current DCA-PDX slot exemption for DCA-SAN), they would have to find new times in permissible hours for the original flight and/or change other exemption-operation schedule patterns. Because Southwest proposes direct service to Sacramento with a stop in Las Vegas, Southwest in particular will have extremely tight time window limitations.

[15] "Comments of the Metropolitan Washington Airports Authority" at 2, Docket DOT-OST-2012-0029, March 27, 2012.

throughout the day."[16] As demonstrated in the chart above on page 5, JetBlue has confirmed with the FAA Slot Administration Office that the 1200 and 1400 hours that JetBlue proposes to operate in have unassigned slot exemption availability for DOT to allocate. JetBlue's proposed DCA-SJU schedule would allow for an optimal mid-day turn when slot exemptions are readily available and when the airport is least congested.[17] By contrast, almost all of the other applications would create significant operational obstacles that DOT will have to address, either now or in the weeks after a final order is issued when airlines and the FAA and MWAA confront the operational reality of what has occurred.

**DOT Should Account for Geographic Diversity**

A DOT final order should also account for geographic diversity. At least four applications pending before DOT propose adding more service to California (NK SJC, UA SFO/LAX, AS SAN, WN SMF (via LAS)).[18] Today, California already has more beyond-perimeter DCA service than any other state or territory, and DOT should at most grant only one application involving non-stop service to California. Against this backdrop and in furtherance of the Biden Administration's goal of ensuring that federal resources are not unduly focused on select geographic areas or entrenched interests,[19] DOT should award slot exemptions to support underserved communities. In particular, an award to JetBlue would ensure that some of the benefits of the FAA Reauthorization Act of 2024

---

[16] JetBlue Application at 20.

[17] JetBlue's DCA-SJU flight would be on approach to San Juan as the scores of West Coast arrivals and departures begin to congest DCA.

[18] This does not include JetBlue's backup authority request.

[19] *See* <https://www.nytimes.com/2024/07/02/us/politics/504-million-tech-hubs-overlooked-regions.html> ("The program reflects a federal effort to expand America's science and technology funding beyond Silicon Valley and a few coastal regions, an initiative that Biden administration officials say will help revitalize areas that have traditionally received less government investment. Proponents say the projects will help create "good-paying" jobs and tap into underutilized pools of workers and resources across the country.")

flow to the territories of the United States in the Caribbean, including Puerto Rico, Saint Thomas and Saint Croix, as well as the Eastern seaboard more broadly.

A JetBlue award for SJU would also further the Biden Administration's "support of Puerto Rico's renewal."[20] The Biden Administration has directed billions of dollars in federal funding to rebuild Puerto Rico after the devastation wrought by hurricanes Maria and Fiona, and expanded economic and healthcare assistance programs to ensure that Puerto Rico has a strong foundation for sustained growth. These revitalization efforts work in parallel with the Biden Administration's whole-of-government approach to advancing equity in Executive Order (EO) 13985, "Advancing Racial Equity and Support for Underserved Communities Through the Federal Government."[21] The DOT Equity Action Plan recognizes the importance of transportation access as a catalyst to advance equity initiatives and grow economic prosperity in underserved communities.[22] Thus, JetBlue seeks to add service to a community in the midst of a recovery with historically limited, though critically important, access to the mainland United States. In contrast, other applicants propose service to prosperous well-served cities in the western United States – including cities that already have multiple daily nonstop flights to/from DCA today.

---

[20] *See* <https://www.whitehouse.gov/briefing-room/statements-releases/2023/06/26/fact-sheet-biden-harris-administration-steadfast-in-support-of-puerto-ricos-renewal/#:~:text=The%20Biden%2DHarris%20Administration%20is,assistance%20programs%20for%20Puerto%20Rico.> ("The Biden-Harris Administration is committed to supporting Puerto Rico's recovery and renewal… the Biden-Harris Administration has built on these unprecedented investments to ensure Puerto Rico has a strong foundation for sustained growth… Puerto Rico is now a more attractive place for companies to invest, expand, and drive U.S. competitiveness.")

[21] *See* <https://www.whitehouse.gov/briefing-room/presidential-actions/2021/01/20/executive-order-advancing-racial-equity-and-support-for-underserved-communities-through-the-federal-government/>.

[22] *See* <https://www.transportation.gov/sites/dot.gov/files/2023-12/2023%20update%20to%20the%20DOT%20Equity%20Action%20Plan.pdf> ("Our Department is mindful of the importance of fair access to transportation, a powerful force for opportunity as Americans of all backgrounds in all kinds of communities seek safe and affordable means to get to work, school, and everywhere else we need to be.")

In 2012, DOT concluded that JetBlue's original DCA-SJU application would "enhance options for nonstop travel to a unique region" and shift DOT away from its previous "focus of all beyond-perimeter exemptions…[being] markets in the western U.S."[23] DOT also concluded that an award to JetBlue would "provide beyond-perimeter domestic network benefits on a roundtrip basis to St. Thomas, a sizeable market from DCA in which JetBlue would be a new entrant…Overall JetBlue's service will have a positive impact on the level of competition."[24] These attributes of DCA-SJU service remain true today and support an award to JetBlue. An additional daily DCA-SJU flight would support underserved Americans in Puerto Rico and the U.S. Virgin Islands, and strengthen JetBlue's presence in San Juan and the Northeast, resulting in a stronger national and international JetBlue, which will benefit American consumers in all geographies.

**New Service Proposed by Alaska, Delta, Southwest and United Would Likely be Funded by Service Reductions at IAD/BWI and Run Counter to Congressional Intent**

At least four airlines are likely, if selected by DOT, to simply shift existing IAD or BWI frequencies over to DCA. The DCA flight times proposed by those carriers are nearly identical to their existing services at IAD today.

DOT approval of Alaska, Delta, Southwest or United's application will almost surely result in those carriers merely shifting a flight from IAD or BWI to DCA. The irony of United applying for beyond-perimeter service, let alone potentially winning an award, should not be lost on anyone, especially MWAA, given United's vehement opposition to any liberalization of the DCA perimeter rule on the basis that DCA beyond-perimeter growth would come at the expense of IAD, a United

[23] DOT Order 2012-5-12 at 19.

[24] *Id.* at 20.

hub.[25] Indeed, having resisted for years any attempt to loosen the perimeter restrictions at DCA in an effort to insulate its service, and fare premiums, at IAD from competition, United now seeks to benefit from an award of beyond-perimeter service. But United's application here exemplifies the very concerns that United itself has raised and lodged against other airlines seeking to provide beyond-perimeter service at DCA.

Specifically, any award of slot exemptions to United in this proceeding is likely to result in a commensurate drawdown of service at IAD as United simply shifts service from IAD to DCA. United operates four "banks" at its fortress IAD hub and operates a handful of extra frequencies to large markets or other hubs outside of its four banks. These extra frequencies include flights to SFO and LAX that operate outside United's main IAD banks. If United is selected by DOT, it will almost certainly shift one of these fights (and the aircraft that operate it in this time of airplane shortages) from IAD to DCA rather than having metaphorical wing-tip departures at the main Washington, D.C.-area airports to the same destination in California.[26] United currently operates IAD-SFO/LAX at 6:30 a.m. and 7:00 a.m. outside of its IAD banks and at virtually identical times to its proposed DCA-SFO/LAX schedules. United also operates BWI-SFO at similar times.

Alaska and Delta are also likely to merely shift flights from IAD to DCA. Alaska announced IAD-SAN service in January 2023. United responded by adding a fourth daily frequency and deploying a widebody Boeing 777 on the route effective when Alaska launched its

---

[25] United's applications for DCA slot exemptions stands in contrast to its extensive documented advocacy against DCA beyond-perimeter liberalization, both as a standalone company and by its creation of the "Coalition to Protect America's Regional Airports" (CPARA). United outspent all others in lobbying efforts against any DCA beyond-perimeter growth. *See* <https://rollcall.com/2023/11/01/united-airlines-leads-air-lobbying-as-faa-bill-stalls/>. United's adamant opposition to the events that led to this proceeding should be taken into consideration by DOT.

[26] United uses a Boeing 737-MAX9 on these non-banked IAD-SFO/LAX sections, but proposes to use a Boeing 737-MAX8 on DCA-SFO/LAX, so United would actually likely be reducing overall capacity in the Washington-California market. Boeing 737-MAX-family aircraft do not have the same performance capabilities as the Airbus A321-NEO.

flights in June 2023, flooding the route with capacity presumably in an effort to drive out Alaska.[27] Alaska subsequently responded by renumbering its flight number on the route to "AS 777," a classy response to United's retaliation.[28] While Alaska has maintained its IAD-SAN service for the past year, there can be no doubt that it will move this service to DCA at the earliest opportunity. To this end, Alaska's proposed schedule for SAN-DCA-SAN is nearly identical to its current schedule for SAN-IAD-SAN.[29] If DOT awards Alaska a DCA-SAN exemption, Alaska will almost certainly shift its existing IAD flight (including its limited aircraft and crew deployed on a transcontinental roundtrip) to DCA rather than doubling capacity in the Washington-San Diego market. And United, one would surmise, will likely remove its Boeing 777 deployed on IAD-SAN the next day. The result will be a <u>reduction in service</u> (frequency and capacity) between Washington, D.C. and San Diego.[30]

---

[27] “"Don't poke the bear." That's the warning that United Airlines is seemingly sending to Alaska Airlines. Instead of flying a Boeing 737 as it does on the three other daily flights in the market, United will deploy a 364-seat Boeing 777-200, its largest plane in the fleet by capacity, on the new frequency. This upgauge means that United will offer a whopping 888 seats each day in the market, a roughly 70% increase from its previous plans.

In fact, the airline hasn't operated a Boeing 777 on this route for as long as Cirium schedules have been published (since August 2003). These high-density Boeing 777s are usually reserved for United's busiest domestic routes, including those to and from Hawaii.

So, why the sudden change of strategy?

Well, it's perhaps no coincidence that Alaska Airlines last week announced a big expansion from San Diego, which includes three new routes. Without any competition on the nonstop, the airline had strong pricing power on the route for more than six years." *See* <https://thepointsguy.com/news/united-alaska-airlines-san-diego-competition/>.

[28] *See* <https://x.com/crankyflier/status/1629501836217712643>.

[29] As explained elsewhere in this Consolidated Answer, JetBlue believes Alaska's proposed DCA schedule is not viable unless Alaska shifts the schedule for one of its other long-standing beyond-perimeter DCA flights. We note, however, that Alaska as a limited incumbent carrier would have scheduling priority over Delta, Southwest and United, including if United attempts to shift the scheduled times for its slot exemptions at DCA. *See* 49 U.S.C § 41718(h).

[30] Unfortunately, this is part of a recent pattern of anti-competitive behavior by United towards smaller airlines. For example, after JetBlue recently won its first-ever Essential Air Service (EAS) contract, restoring a remote community's historic air link with Boston, United filed a meritless and procedurally-deficient "request for reconsideration,"

Similarly, Delta operates two SEA-IAD-SEA flights, including one with a nearly identical schedule to its SEA-DCA-SEA proposal. It is likely that Delta will merely shift one of these SEA-IAD frequencies to DCA. Southwest operates up to five LAS-BWI-LAS flights; it is also very likely Southwest will merely shift a LAS frequency from BWI to DCA if selected.

JetBlue highlights these points to demonstrate that any frequency award to Alaska, Delta, Southwest or United is likely to have an immediate negative impact on IAD and BWI services, and overall capacity levels in the Washington-West Coast markets. The net result of an award to these carriers would likely be fewer seats in the Washington, D.C. market, exactly the opposite outcome than Congress intended with its mandate for the exemptions to "have a positive impact on the overall level of competition in the markets that will be served as a result of those exemptions."[31] DOT should take this into consideration in its analysis and final decision. By contrast, a DOT award to JetBlue would result in a net new flight in the Washington, D.C. market, with the most consistently largest gauge offering at DCA, resulting in a more balanced schedule pattern and lower fares.[32]

---

needlessly straining DOT personnel and resources while DOT's focus was on beginning this DCA beyond-perimeter proceeding. United filed its legal objection against DOT leadership and career staff who professionally and proudly work with their assigned communities to ensure that community preferences are reflected in DOT EAS decisions. JetBlue understands United engaging in a vigorous fight during the EAS application process, but filing a meritless and entirely unprecedented request for reconsideration, after a final order was issued and new tickets were out for sale, is offensive and gratuitous, to both DOT and the EAS community. United's specific arguments border both on the conspiratorial (suggesting that pro-United views on Facebook were being censored) and ridiculous (suggesting that a 5-1 City Council vote in support of JetBlue was anti-democratic and ignored the views of local citizens). *See* <https://www.regulations.gov/document/DOT-OST-2000-8012-0343>. JetBlue urges DOT to dismiss or ignore United's incorrectly filed "request" and focus on efficiently administering this DCA slot proceeding in the weeks ahead and on the timeline mandated by Congress.

[31] DOT Notice at 2.

[32] "Simple economics teaches that the greater the supply of goods offered in a market, the greater the downward pressure on price, other things being equal." *See* "Comments of United Air Lines, Inc." at 19-20, Docket DOT-OST-2000-7181, October 31, 2002.

**United's Application is Not Compliant and Should Be Set Aside**

In United's timely response to JetBlue's July 10th Motion, United doubled down on its procedurally-deficient and non-compliant primary application rather than addressing its flaws. United's reading of the relevant DCA statute is incorrect and conflates different statutory regimes. This DCA beyond-perimeter proceeding is guided by 49 U.S.C. § 41718(i). The limitations in § 41718(i) are guided by § 41718(c)(2)(A) and are ironclad. Applications must be for service between the hours of 7:00 a.m. and 9:59 p.m. United's citation to DOT's 2012 beyond-perimeter exemption proceeding, which was guided by § 41718(g), does not support its pending application for a 6:30 a.m. slot exemption in this proceeding. United argues:

> The last time United was allocated a beyond-perimeter DCA slot by the FAA was in 2012 and the award was for the *6:00am hour*. The allocation was part of a conversion of within perimeter slots to outside perimeter slots. Thus, United's application to operate at 6:30am is not out of the realm of possibilities. Having previously received a beyond-perimeter slot in the 6:00am hour, United believes that requesting a 6:30am slot for its SFO service is reasonable.[33]

But United was not "allocated a beyond-perimeter DCA slot by the FAA…in 2012" and it is concerning that United thinks this is the case.[34] The 2012 legislation merely allowed United to convert an existing FAA DCA slot into a DOT beyond-perimeter exemption. United chose to convert a 6:00 a.m. slot (used for DCA-ORD service) into a beyond-perimeter exemption (used for DCA-SFO service, initially in the 8:00 a.m.-hour and now in the early evening).[35] This was a unique *sui generis* method of Congressional beyond-perimeter slot exemption growth. It has not been repeated since then. Four of such 'flex' beyond-perimeter slot exemptions exist today and one

---

[33] "Objection of United Airlines, Inc." at 2, Docket DOT-OST-2024-0065, July 10, 2024.

[34] *Id.*

[35] *See* "Notice of Intent of United Air Lines, Inc.," Docket DOT-OST-2012-0029, February 27, 2012.

is controlled by United, which continues to use it for DCA-SFO service.[36] This unique grant in 2012 has no bearing on the award here, which must comply with the requirements of Section § 41718(i).

United concludes that "requesting a 6:30am slot for its SFO service is "reasonable" and "not out of the realm of possibilities"[37] but United is incorrect. It cites no statutory basis for its conclusion. It is an aspirational theory that is legally impermissible. A clear reading of the statute concludes that the conversion of a 6:00-a.m. hour slot to a beyond-perimeter slot exemption in 2012 has no bearing on the applicability of the beyond-perimeter slot exemptions being allocated in 2024, which are clearly guided by § 41718(c)(2)(A). DOT should be dubious of United's broad unsubstantiated proclamations:

> United believes there is ample room to work collaboratively with the FAA to ensure the proposed DCA to SFO flight can depart as planned at 6:30am. In fact, as stated in its application, United is committed to leveraging its existing pool of slots and engaging in constructive dialogue with the FAA to achieve an optimal solution that benefits all stakeholders.[38]

United working "collaboratively with the FAA" on slot issues sounds like a recipe for litigation.[39] DOT should proceed with caution. United, in particular, has a history of misusing scarce government-provided resources as the federal government has repeatedly recognized.[40]

---

[36] United no longer even operates its largest gauge aircraft on DCA-SFO. In previous years, it was operated by the Boeing 757-300 and today operates with a Boeing 737-MAX8, a nearly 30% seat reduction.

[37] "Objection of United Airlines, Inc." at 2, Docket DOT-OST-2024-0065, July 10, 2024.

[38] *Id.*

[39] Spirit successfully sued DOT/FAA after United worked 'collaboratively with the FAA' to retire Southwest's EWR operating authorizations.

[40] For example, in 2015, DOJ sued United for monopolizing slots and air travel at EWR. *See* <https://www.justice.gov/opa/file/792401/dl?inline.>.

United's paean for 'constructive dialogue' represents hope against reality. DOT can not grant United its wish as it directly contradicts the law passed by Congress, and once again United demonstrates a fundamental misunderstanding of the statutory regime for DCA slot exemptions. Contrary to United's assertion, DOT grants slot exemptions, not the FAA.[41] DOT merely works "in coordination with the FAA Slot Administration Office."[42] After FAA input, DOT issues the slot exemptions, as noted in the DOT Notice: "Final slot times for the granted exemptions will be allocated via notice after the Department's decision."[43] And the statute is crystal clear that "exemptions granted…under subsections… (i)…may not be for operations between the hours of 10:00 p.m. and 7:00 a.m."[44] Once DOT issues slot exemptions, FAA administers them as a technical matter and maintains a firm dividing line between slots and slot exemptions for coverage and usage purposes.

---

[41] *See Republic Airline Inc vs. United States Department of Transportation*, 669 F.3d 296 (D.C. Cir. 2012) at FN4 ("…FAA distributes slots…but DOT issues slot exemptions.")

[42] DOT Notice at 2.

[43] *Id.* at 3. *See also* DOT Notice, May 24, 2012, Docket DOT-OST-2012-0029 (DOT-OST "assigning slot times awarded by Order 2012-5-12" after DOT Order 2012-5-12 "directed these four air carriers to file…their proposed flight schedules" in the DOT Docket. DOT noted that "[r]egardless of subsequent slot time exchanges, slot times assigned by this notice will be fixed" and that DOT was "fully complying with the statutory requirements" including that assigned slot exemptions not exceed five per hour between 7:00 a.m. and 9:59 p.m.)

[44] 49 U.S.C. § 41718(c)(2)(A). Emphasis added. In 2012, when DOT issued beyond-perimeter slot exemptions, its ordering paragraphs specifically stated that:

"The slot exemptions granted…may not be used for operations between the hours of 10:00 p.m. and 7:00 a.m., and may not increase the number of operations at Ronald Reagan Washington National Airport in any one-hour period during the hours of 7:00 a.m. and 9:59 p.m. by more than five operations. These carriers are advised to exercise maximum flexibility in proposed operating times to ensure compliance with these limits." DOT Order 2012-5-12, Ordering Paragraph 2.

United itself has previously agreed with JetBlue's interpretation of the relevant statute,[45] which is consistent with DOT's actions in 2012. At that time, DOT noted that the statute:

> …allows the Department to assign two additional slot exemptions per one hour period (for a total of five), an increase from the three per hour authorized in Vision 100. There are 15 hourly periods beginning at 7:00 a.m. and ending at 9:59 p.m., and *all slot exemptions must fit into those 75 slot times*. Applicants were advised of these slot-time constraints…In applying for specific times, the Department indicated to applicants that if they were awarded slot exemptions, specific justification of their requests may be required and that these slot-exemption time constraints may cause some proposals not to be viable. In *coordination* with FAA's Slot Administration Office, *we shall assign slot times* corresponding with the authority granted in these proceedings, and in accordance with the requirements of FAA 2012, in a notice subsequent to our decision.[46]

Even if DOT wished to look past United's procedural insufficiencies (which DOT cannot overlook as a matter of law), there are substantive competitive reasons to reject United's application. In 2000 and again in 2001, DOT rejected applications by United for DCA-LAX beyond-perimeter slots, noting that United and another airline (American) collectively controlled a combined 80% market share in the Washington-Los Angeles market. DOT concluded that "selection of either carrier would increase the dominant position that the pair already maintains in the Washington-Los Angeles market."[47] This remains true today. United and another airline currently control a combined 61% market share in the Washington-Los Angeles market (48% United and 13% American) and 100% in the Washington-San Francisco market (83% United and

[45] "Proposed Schedule of United Air Lines, Inc.," April 8, 2004, Docket DOT-OST-2000-7181 ("United confirms that these services…*will not increase the number of operations at DCA in any one-hour period during the hours of 7:00 a.m. and 9:59 p.m.* by more than three operations.") Emphasis added.

[46] DOT Order 2012-5-12 at 24. Emphasis added.

[47] DOT Order 2001-6-20 at 11. *See also* DOT Order 2000-7-1.

17% Alaska).[48] If the 80% concentration levels in the Washington-Los Angeles market were concerning for DOT in 2000/2001, the current concentration levels should be even more alarming: United is significantly larger and more dominant today than two decades ago.

Under the *Ashbacker* doctrine, DOT need not undertake a rigorous comparative selection between JetBlue, American, Delta, Southwest and United.[49] Because United did not submit a compliant application and DOT is not authorized to grant slot exemptions for service earlier than 7:00 a.m., DOT is prohibited by Congress from approving United's primary application for a 6:30 a.m. DCA-SFO departure. After JetBlue filed its July 10th Motion, United could have chosen to amend its application but it elected to not do so. Thus, United has forfeited its rights to mutual consideration under *Ashbacker*. DOT could simply dismiss United's primary application and proceed to grant the authority sought by the other four non-limited incumbent carriers.[50]

The Supreme Court of the United States recently ruled in *Loper Bright Enterprises v. Raimondo* that courts may not defer to an agency interpretation of a law simply because a statute is ambiguous.[51] Here, there is no ambiguity in the statute, which clearly states that "exemptions granted… may not be for operations between the hours of 10:00 p.m. and 7:00 a.m.."[52] DOT may not grant United the primary authority it seeks nor may DOT cure United's flawed application of its

---

[48] American's joint venture partner Alaska separately has a 12% share in the Washington-Los Angeles market, which means that United, American and Alaska combined control a 73% share. Alaska's IAD-SFO flights also carry the AA* code of American Airlines, Inc.

[49] *Ashbacker Radio Corp. v. FCC*, 326 U.S. 327 (1945).

[50] *See* DOT Order 90-4-44 (holding that America West could not be selected for primary authority in a carrier selection proceeding because "of its failure to fully comply with the evidence requests, its failure to submit alternative schedules to take into account the probability that it could not obtain [airport] slots at the times proposed, and because of [its] lack of candor…")

[51] *Loper Bright Enterprises v. Raimondo*, 603 U.S. ___ (2024). *See also* DOT Order 2012-7-26, FN 21.

[52] 49 U.S.C. § 41718(c)(2)(A).

procedural ailments. DOT has no choice but to consider the applications before it as submitted by regulated entities such as airlines.[53] Thus, DOT has only four compliant applications before it for four incumbent category beyond-perimeter slot exemptions. Any DOT decision to grant United a slot-exemption based on its application to operate in the 6:00 a.m.-hour (regardless of whether or not United intends later to attempt to shift the flights to other times) would be susceptible to legal challenge from stakeholders, including other airlines in this proceeding or even from other local entities that have standing to challenge DOT's order.

As the leader of community efforts to prevent any beyond-perimeter DCA growth, United is surely aware of the passions of the local community regarding early-morning transcontinental flights from DCA using large aircraft. United's application to operate a 6:30 a.m. DCA-SFO departure is Congressionally prohibited and should not be entertained.

**Spirit and Frontier Applications Present Challenges**

As noted throughout our application, JetBlue strongly believes that DOT must affirmatively help smaller carriers. But smaller carriers also need to help themselves, and this includes complying with DOT procedures.

Similar to United, Spirit and Frontier did not follow applicable DOT procedures. The DOT Notice did not identify either Spirit or Frontier as an eligible limited incumbent carrier. These airlines could have challenged the eligibility determinations set forth in the DOT Notice. Either carrier could have filed an interlocutory petition for reconsideration seeking to challenge DOT's list

[53] JetBlue notes that Delta's backup proposal for SLC contemplates an 11:55 p.m. DCA arrival, which is also prohibited by § 41718(c)(2)(A).

of eligible carriers within 10 days of June 24, but neither airline chose to do so.[54]  Spirit at least submitted a legal analysis to justify its pending application.

On the merits of Spirit's application, we note that although SJC does not currently have non-stop DCA service, nearby SFO has two flights a day to DCA (and up to eleven daily flights to IAD and BWI) and United is seeking a third in this proceeding.  Spirit's rigid declaration that it would only consider times that "are no later than the following" limits DOT's ability to select Spirit.[55]  As JetBlue has explained elsewhere in this Consolidated Answer, DOT has no ability to depart from the hourly slot exemption limitations set forth in the statute, which would preclude the service Spirit has requested.  Spirit is the only carrier in this proceeding that dictated such tight operating time parameters.  Based on slot exemption availability though, and lacking the slot exemption portfolio flexibility that certain other carriers enjoy, Spirit's only choices are to operate a red-eye turn, schedule a several-hour sit, and/or operate a later-day flight that might involve a 7:00 p.m.-hour arrival at DCA and an 8:00 p.m.-hour departure for SJC, four hours later than Spirit requested and two hours later than the hours it said are off-limits.  Based on the chart of slot exemption availability on page 5 above, this would be the only viable option for Spirit and would result in service that is commercially unattractive and therefore not a good use of scarce slot exemptions.  There is no sense in DOT granting Spirit a limited beyond-perimeter exemption if there is no practical way for Spirit to provide the service.

Frontier's application also has significant deficiencies and should not be selected.  Further, Frontier did not comply with the basic requirements of the DOT Notice:

---

[54] *See* 14 CFR 302.14(a)(2).

[55] "Application of Spirit Airlines, Inc. For Two Slot Exemptions for DCA-SJC Service" at 6, Docket DOT-OST-2024-0065, July 8, 2024.

> **At a minimum**, carriers should include in their applications the market (and airport) to be served, **the aircraft type, a schedule showing proposed times, an approximate start-up date,** and an analysis of the relative merits of the carrier's proposed service when evaluated under the Section 502 criteria.[56]

Frontier did not bother to adhere to DOT's instructions and list an aircraft type, flight schedule, or approximate start date. Pursuant to 14 CFR 302.206, DOT should dismiss or reject Frontier's application as "incomplete."[57] United may have submitted an application for a departure time that is not legally permissible for DOT to grant, but at least they attempted to address DOT's requirements for a flight schedule, even if fundamentally flawed. Frontier did not.

Frontier's application contains no information or data in support of its application to provide 1x daily DCA-SJU service, nor a justification for its service proposal. Therefore, there is no way for DOT to assess Frontier's application for SJU service and compare it to the merits of the application submitted by JetBlue or other airlines. For example, if Frontier proposed to operate at extremely off-peak hours, as they are known to do, this would affect DOT's analysis of its application. A 3:00 a.m. Frontier departure from SJU arriving at DCA at 7:00 a.m. would merit a different analysis than JetBlue's perfectly-timed proposed flight schedule for this principally Visiting Friends and Relatives (VFR) and leisure market.

Frontier's application also made a number of unfounded assertions about JetBlue, which need to be corrected. The fact of the matter is that Frontier's application ignores the economic

---

[56] DOT Notice at 3. Emphasis added.

[57] 14 CFR 302.306 - Dismissal or rejection of incomplete applications

(a) Dismissal or rejection. The Department may dismiss or reject any application for exemption that does not comply with the requirements of this part.

(b) Additional data. The Department may require the filing of additional data with respect to any application for exemption, answer, or reply.

realities of the airline industry following the COVID pandemic, as JetBlue forthrightly described in its application. Frontier even conveniently provides a footnote in its application stating "We skip 2020, 2021, and 2022 to avoid the influence and anomaly of COVID-19."[58] It is not reasonable to ignore the incredible impact of the COVID pandemic on the airline industry. The reason Frontier attempted to do so is because they would otherwise have to explain their own fare increases. Comparing 2023 versus 2019, Frontier's average fare increased by 22.4%.[59] Over the same time span, JetBlue's average fare only increased 14.8%, lower than other carriers such as American (15.6%) and Alaska (18.7%).[60]

U.S. DOT O&D summary report, full year 2023 data vs full year 2019 data per Diio, downloaded July 2024.

In 2023, Frontier's average fare on their 3x-daily beyond-perimeter DCA-DEN flights was $106, 51.4% higher than the average fare for all of Frontier's Denver routes.[61] The idea that Frontier would lower fares on DCA-SJU while they already charge a 51% premium on their DCA-DEN

[58] "Application For Slot Exemption" at 6, Docket DOT-OST-2024-0065, July 8, 2024 ("Frontier Application").

[59] U.S. DOT O&D summary report, full year 2023 data vs full year 2019 data per Diio, downloaded July 2024.

[60] *Id.*

[61] U.S. DOT O&D summary report, full year 2023 data per Diio, downloaded July 2024.

service compared to the rest of their DEN flying is highly speculative and rather unlikely. Unlike JetBlue, they provided no forecast details suggesting otherwise.

By contrast, JetBlue's application is straightforward and candid about JetBlue's position on our existing DCA-SJU flight, including our inability to meet all current consumer demand, and our pricing position relative to SJU flights from IAD or BWI and other similar stage-length nonstop flights operated by American, Delta and United between all U.S. origin cities and Latin America and the Caribbean.

Ironically, Frontier argues its application is "pro-consumer"[62] despite the fact it simply does not offer the same amenities as JetBlue, or any for that matter, for their increasingly higher fares. Frontier's lowest seat pitch is a mere 28 inches compared to JetBlue's 32 inches. Frontier's aircraft do not include seatback televisions or free Wi-Fi, which is in complete contrast to JetBlue which has personal seatback entertainment systems at every seat, and live TV and Wi-Fi on every plane, all for free. Because Frontier did not include an aircraft type in its proposal, it is possible, and perhaps likely, that Frontier will deploy A-320/A-320NEOs that have 180 or 186 seats, both smaller than JetBlue's proposed 200-seat A-321/A-321NEO.

Frontier also stated in its application that their dedication to the San Juan market is "substantial."[63] However, as part of its recent expansion in San Juan, for example, Frontier announced plans to launch SJU-PBI and SJU-RSW. Instead, as they often do after splashy new market entries, Frontier cancelled SJU-PBI and SJU-RSW less than a month after their respective launches.[64] SJU-PBI only flew from June 2nd-June 9th, with only 3 scheduled frequencies. SJU-

[62] Frontier Application at 5.

[63] *Id.* at 7.

[64] *See* <https://thepointsguy.com/news/frontier-airlines-route-cuts-july/>.

RSW only few from June 2nd-June 30th, with only 7 scheduled frequencies.[65] If Frontier's 'commitment' to San Juan is so 'substantial,' it would not exit markets on such short notice during the peak summer travel season, wreaking havoc for its customers reliant on the flights they booked.[66] Such opportunistic moves are no basis to convince DOT, or the people of Puerto Rico, that Frontier is deserving to operate a scarce beyond-perimeter DCA-SJU flight.

Finally, Frontier's application does not contain a single letter of support from any government official or private entity. Conversely, JetBlue's proposal for a 2nd daily DCA-SJU is supported by Pedro R. Pierluisi, the Governor of Puerto Rico, and Jennifer González-Colon, the Resident Commissioner of Puerto Rico in the U.S. House of Representatives, as well as numerous other elected officials, civic groups and other stakeholders as indicated in the growing number of support letters filed in the Docket. It could not be clearer that the people and government of Puerto Rico, along with other stakeholders, support JetBlue's application over Frontier's half-hearted attempt to obtain a beyond-perimeter exemption.

For these reasons, DOT should not consider Frontier's application in any serious manner and, consistent with precedent,[67] reject it expeditiously. It does not include the minimum information required by the DOT Notice, it does not provide any serious forecast of the purported economic benefits of its proposed service, and it cannot be trusted to actually serve the market after

---

[65] Daily summary report, data per Diio, downloaded May/June 2024.

[66] This past weekend, Frontier abruptly suspended its 3x-weekly BWI-SJU and 1x-weekly CUN-SJU service for several weeks in September and October.

[67] *See* DOT Order 2001-6-20 at 12 ("We have chosen not to select Vanguard, not only because of its dubious claim to eligibility…but also because it failed to provide sufficient evidence showing how its proposal would meet the AIR-21 statutory criteria. Specifically, Vanguard has failed to satisfactorily demonstrate the domestic network benefits flowing from its proposed service nor did it adequately outline the competitive advantages of its proposal.")

launch as demonstrated by Frontier's recent behavior in San Juan. DOT must reject Frontier's application.

**JetBlue Deserves an Award Before American, Delta or Southwest**

JetBlue believes it would be a poor public policy choice for DOT to select American's proposal for beyond-perimeter service over an award to JetBlue. In 2023, San Antonio was only the 33rd largest destination from the Washington metropolitan area and it is within driving distance to/from Austin. The catchment area for Southwest's Austin-DCA flight in fact includes San Antonio. By contrast, the closest U.S. mainland airport with service to DCA from San Juan is Miami, a staggering 1,045 miles away from San Juan. While people in San Antonio can drive to Austin for the existing non-stop service to DCA, flying is the only available means of transportation between San Juan and the mainland United States. DOT should acknowledge the unique importance of air service to Puerto Rico and award JetBlue a second daily DCA-SJU service before considering airports such as SAT, which already has nearby service to DCA.

JetBlue is sympathetic to the San Antonio community's desire for non-stop service to DCA, but respectfully suggests that the easiest way for them to gain such service would be for the community (and American) to support legislation modestly extending the DCA perimeter rule ever so slightly beyond 1,250 miles. This would allow carriers to use their existing DCA slots to serve additional markets as they desire and the market demands, consistent with the principles of the Airline Deregulation Act. Specifically, American would be able to serve San Antonio and Southwest would be able to serve Austin; both today require beyond-perimeter exemptions.[68] There is ample precedent for this in Texas as the DCA perimeter rule was gradually expanded over time to include Dallas and Houston without altering DCA's physical runway capacity levels. The best way DOT can ensure San

[68] This would free up beyond-perimeter exemption slots to be more efficiently used.

Antonio obtains DCA service is by using its technical industry expertise to make suggestions to Congress on modest pro-competitive reforms of the slot rules, similar to how the NTSB makes recommendations on safety enhancements. In recent years, courts and agencies have used legal proceedings such as this one to highlight the shortfalls of existing laws, which galvanized public consensus and Congress for change. There is no reason DOT can not do so here. It has had decades of experience as the overseer of DCA.

Delta and Southwest's applications would provide a second competitive alternative in the SEA-DCA and LAS-DCA markets. While recognizing the competitive attributes of their applications, JetBlue believes DOT should afford its application priority over Delta's and Southwest's proposals. For the reasons explained in JetBlue's application, JetBlue strongly believes that DOT and the federal government have an obligation to strengthen smaller carriers and communities at this crucial juncture. Just last week, Delta CEO Ed Bastian acknowledged that "50% of the overall industry profitability [is] here at Delta" and that "the lower end of the industry's food chain…the lower half is struggling."[69] Of all the major U.S. airlines, Delta had the 2nd highest average fare in 2023, trailing only United[70]:

[69] Delta Air Lines Q2 2024 Earnings Call – July 11, 2024.

[70] U.S. DOT O&D summary report, full year 2023 data per Diio, downloaded July 2024.

Delta has ample opportunities to connect its customers between DCA and SEA, including via its other beyond-perimeter exemptions at LAX and SLC, or through their own core hubs in Atlanta, Detroit, Minneapolis, and New York.

As noted above, Southwest serves the Washington-Las Vegas market from its Baltimore hub with as many as five flights a day. Awarding one of the available slot pairs to Southwest for DCA-LAS is not as compelling as an additional DCA-SJU flight given Southwest's current levels of service between Las Vegas and the Washington D.C. metropolitan area. Neither Delta nor Southwest should be granted a beyond-perimeter exemption before JetBlue.

**Conclusion**

JetBlue's proposed use of beyond-perimeter slots would deliver more value to more people including underserved communities in San Juan and points beyond than any other service proposed in this proceeding. It would enable JetBlue to meet unmet demand for service on the DCA-SJU route, and result in significantly lower fares for travel between the Washington D.C. area and San Juan (and points beyond). In contrast, proposed new service to California would require red-eye flying, early morning departures from the West Coast, or additional DCA RONs that would place additional strain on an already overtaxed airport. Perhaps most significantly, such 'new' flying likely would not represent new or incremental flying at all; rather, these airlines are likely to simply shift existing flights from other Washington area airports to DCA bringing no net benefits to consumers. Finally, each of the other non-limited incumbent applicants is orders of magnitude larger than JetBlue and enjoys scale advantages that JetBlue has been unable to achieve.

For these reasons, JetBlue respectfully requests that DOT grant it one pair of beyond-perimeter slot exemptions allowing it to operate a second daily low-fare flight between Washington, D.C., and San Juan, Puerto Rico.

Respectfully submitted,

Robert C. Land
Senior Vice President, Government Affairs and
Associate General Counsel

July 17, 2024

BEFORE THE
U.S. DEPARTMENT OF TRANSPORTATION
WASHINGTON, D.C.

| | |
|---|---|
| Application of<br><br>AMERICAN AIRLINES, INC.<br><br>in the matter of Establishment of Slot Exemption Proceeding at Ronald Reagan Washington National Airport Pursuant to 49 U.S.C. § 41718 | Docket DOT-OST-2024-0065 |

**CONSOLIDATED RESPONSE OF AMERICAN AIRLINES, INC.**

Pursuant to the Department's Notice in this docket dated June 24, 2024, American Airlines, Inc. (American) submits this consolidated response to other carriers' applications in this proceeding for newly available slot exemptions at Ronald Reagan Washington National Airport (DCA). A comparison to other applications reinforces that American's proposal to provide new nonstop roundtrip service between San Antonio International Airport (SAT) and DCA merits one of the awards available to non-limited incumbent carriers. American's SAT-DCA proposal stands out as the sole proposal that delivers on both prongs of the statutorily prescribed selection criteria and facilitates the safe and efficient integration of the proposed flights into the existing schedule at DCA.

**INTRODUCTION**

American's application demonstrated the compelling benefits of its proposal to initiate the only nonstop service between SAT and DCA. This new beyond-perimeter service connects the second largest unserved market from DCA with the second largest unserved airport from SAT, as measured by passenger demand. The route supports

robust point-to-point demand, bolsters one-stop connectivity between San Antonio and the Eastern United States via DCA, and competes with other carriers' high fares for flights between San Antonio and other airports in the Washington, D.C. region (Washington Dulles International Airport (IAD) and Baltimore/Washington International Thurgood Marshall Airport (BWI)). Moreover, demand for SAT-DCA service is poised to grow because San Antonio, already the nation's largest majority Hispanic city and boasting robust military and business ties to Washington, D.C., is also one of the country's fastest-growing large metropolitan areas.[1]

Among applicants that the Department's Notice lists as non-limited incumbent carriers, American is the only applicant that fulfills both of the selection criteria established at Section 502 of the Federal Aviation Administration Reauthorization Act of 2024, and American's SAT-DCA service compares advantageously to other applicants' proposals:

- Newly Served Market: *Unlike American, all other non-limited incumbent proposals would add extra service to beyond-perimeter airports that already have nonstop DCA service*, even though the first criterion for awards is the extent to which the proposal will "enhance options for nonstop travel to beyond-perimeter airports that do not have nonstop service from Ronald Reagan Washington National Airport" currently.
- Competition: *Unlike American, other carriers would add more service to airports that those same carriers already serve nonstop from DCA*, falling short on the second selection criterion of whether the proposed use of slot exemptions will

---

[1] American is appending to this consolidated response a set of additional letters of support that it has compiled, supplementing the substantial collection of support letters from elected officials, local governmental authorities, businesses, institutions, civic organizations, nonprofits, and others in San Antonio and beyond that was included with American's application.

"have a positive impact on the overall level of competition in the markets that will be served as a result of those exemptions."

- Integration: *Unlike American, multiple other carriers propose their new operations at DCA during the same 4:00 p.m. - 5:00 p.m. hour that is already congested*, portending a logjam whereas American is the only carrier proposing new operations at DCA in the 10:00 a.m. and 7:00 p.m. hours.

In contrast to the proposals by Delta, JetBlue, Southwest, and United,[2] American is the only carrier that delivers unequivocally on all three of these dimensions (Exhibit AA-R-1).

For all of these reasons, the Department should grant American's application. Weighed against other proposals, American's SAT-DCA service meets the criteria in law and is an easy choice for one of the awards available to non-limited incumbent carriers.

## DISCUSSION

### I. AMERICAN PROPOSES TO SERVE A MARKET THAT CURRENTLY LACKS NONSTOP SERVICE FROM DCA; OTHER PROPOSALS WOULD NOT.

As American explained in its application, its proposed new nonstop service to SAT responds compellingly to the first criterion prescribed in law: the extent to which the proposed service will "enhance options for nonstop travel to beyond-perimeter airports that do not have nonstop service from Ronald Reagan Washington National Airport" currently. As measured by passenger demand, SAT is the second largest market that presently lacks nonstop service to DCA (Exhibit AA-1) and DCA is the second largest unserved airport from San Antonio (Exhibit AA-2). SAT-DCA is the third largest origin and destination pair in the entire continental United States that currently lacks nonstop service, as measured by passenger demand (Exhibit AA-6).

---

[2] Airlines are referred to by their common names.

Instead of proposing nonstop travel to beyond-perimeter airports that currently lack nonstop service from DCA, other carriers propose to add more flights to airports that already have nonstop DCA service. Delta's primary proposal is Seattle (SEA), with Salt Lake City (SLC) as a backup. JetBlue proposes San Juan (SJU), with Los Angeles (LAX) as a backup. Southwest proposes Las Vegas (LAS). United proposes San Francisco (SFO), with LAX as a backup. All of SEA, SLC, SJU, LAX, LAS, and SFO already have nonstop service from DCA. Accordingly, all of Delta, JetBlue, Southwest, and United fail to meet the first criterion for selecting among applications.[3]

This failure of the applications of Delta, JetBlue, Southwest, and United relative to American is not salvaged by arguments about the size of the markets where those airlines propose adding more service. In the first instance, that consideration is not one of the two criterion that Congress directed. But even setting aside that threshold point, comparative passenger demand weighs in favor of SAT gaining its first roundtrip service to DCA before additional service is awarded to many of these other airports (Exhibit AA-R-2).[4] Using 2023 data, SAT-DCA would have 1 roundtrip service for 56,545 annual passengers traveling between these two airports (a number that likely would be higher in the real world given that this level of demand exists despite no nonstop service today). By

[3] Attempting to compensate for this flaw in its application, Delta gets nowhere by suggesting that American could serve SAT-DCA by adjusting one of American's two "flexible beyond perimeter slot-pairs" that American uses to serve LAX, without needing the Department's authorization. (Application of Delta Air Lines, dated July 8, 2024, at 6 n.5.) This self-defeating argument ignores that Delta itself holds a "flexible" beyond-perimeter slot pair that Delta likewise uses to serve LAX, after Delta switched that slot pair in 2016 from serving Salt Lake City. (Letter of Delta Air Lines, dated October 4, 2016, in Docket DOT-OST-2012-0029.) Delta could switch that slot pair to Seattle (Delta's primary proposal) or switch it back to Salt Lake City (Delta's backup proposal) – but American does not suggest this is a sound basis to criticize Delta's application. United also holds a "flexible" beyond-perimeter slot pair. (Notice of United Airlines, dated February 27, 2012, in Docket DOT-OST-2012-0029.)

[4] American clarifies that its application and consolidated response use "non-directional (averaged)" data to measure passenger demand, whereas some other applicants may be presenting "bi-directional total" or other metrics for passenger demand that produce numbers approximately double the numbers that American is using. The bi-directional total for SAT-DCA in 2023 is 113,090 passengers.

comparison, other proposals imply that SEA would have 3 roundtrips for 99,026 passengers (a ratio of 1:33,009), SJU would have 2 roundtrips for 66,437 passengers (a ratio of 1:33,219), and SFO would have 3 roundtrips for 136,016 passengers (a ratio of 1:45,339). Backup proposals of LAX and SLC similarly compare unfavorably against SAT; LAX would have 5 roundtrips for 260,253 passengers (a ratio of 1:52,051) and SLC would have 2 roundtrips for 94,420 passengers (a ratio of 1:47,210). The controlling consideration is that Congress directed focus on adding nonstop service from DCA to beyond-perimeter airports that currently lack it, but in all events this comparison reveals that relative passenger demand favors adding a first roundtrip service to SAT before adding extra roundtrip service to SEA, SJU, SFO, LAX, or SLC.

## II. AMERICAN PROPOSES TO COMPETE AGAINST OTHER CARRIERS; SOME OTHER CARRIERS PROPOSE TO "COMPETE" AGAINST THEMSELVES.

American's application discussed how its SAT-DCA proposal delivers powerfully on the second criterion prescribed in law: the extent to which the proposed use of the slot exemptions will "have a positive impact on the overall level of competition in the markets that will be served as a result of those exemptions." The introduction of American's competitive new SAT-DCA service promises relief from high fares that consumers have faced on United's IAD-SAT route, which in 2023 had the highest average fare among all routes from San Antonio (Exhibit AA-4), and on Southwest's BWI-SAT route, which in 2023 was Southwest's highest average fare nonstop route from San Antonio (Exhibit AA-5). American's proposal to initiate nonstop SAT-DCA service where none exists today benefits consumers in the San Antonio and Washington, D.C. area markets by competing against United's IAD-SAT service and Southwest's BWI-SAT service.

Whereas American's novel SAT-DCA route competes squarely against other carriers, some proposals would have carriers adding more flights to routes those same carriers already serve from DCA. United wants to add more to the nonstop SFO-DCA flights that it already runs. JetBlue likewise wants to add more to the nonstop SJU-DCA flights that it already runs, a route on which JetBlue moreover is the only operator.[5]

Whatever competitive benefit United and JetBlue might attempt to claim from reinforcing their existing SFO-DCA and SJU-DCA routes, their proposals to "compete" against their own existing service do not surpass the positive competitive impact of American's SAT-DCA service introducing brand new competition against other carriers' high-priced offerings. And that is before even considering the additional competitive benefits of the new one-stop connections that American's proposal will create between SAT and numerous destinations in the Eastern United States via DCA (Exhibit AA-7), cumulatively representing demand of more than 1,100 passengers daily each way (Exhibit AA-8).

The competitive impact of American's proposal also compares favorably to other applications when considering the number of seats proposed to be added in the marketplace to/from DCA. American proposes using Airbus A321 aircraft with 190 seats, whereas Southwest and United propose using Boeing aircraft with 175 seats and 166 seats, respectively. This gauge disparity means that American's proposal annually makes available 10,950 more seats than Southwest and 17,520 more seats than United.

Finally, there is much to disagree with in certain characterizations offered about American's broader competitive position at DCA. Without attempting to catalogue all

---

[5] The same can be said of Delta's backup SLC-DCA proposal.

objections that American has,[6] the central consideration here is that this is a route proceeding for the allocation of, at most, one roundtrip DCA service to any applicant. At issue in this route proceeding is American's specific application, not some generalized discourse on American's broader position at DCA. The law prescribes the criteria that the Department must apply in evaluating American's specific proposal. Those criteria focus on benefits for unserved beyond-perimeter airports and for competition. American's SAT-DCA proposal delivers in spades. Spurious criticisms of American's broader position at DCA are an effort to distract from that dispositive analysis, and in any case are not meaningfully affected by the addition or withholding of a single roundtrip. The fundamental point on competition, demonstrated above, is that American's SAT-DCA service will have a positive impact on the overall level of competition in the markets that will be served.

## III. AMERICAN PROPOSES FLIGHT TIMINGS THAT SUPPORT INTEGRATION AT DCA; OTHER PROPOSALS CLUSTER IN A SINGLE HOUR CREATING A LOGJAM.

American is highly sensitive to the safe and efficient integration of its SAT-DCA service into operations at DCA and the broader Washington metropolitan area airspace. For that reason, American proposes its SAT flights to arrive at DCA at 10:59 a.m. and depart from DCA at 7:45 p.m. – hours that no other applicant seeks and are less likely to contribute to increased delays or cancellations (Exhibit AA-R-3).

By contrast, other proposals collectively seek 5 new operations between 4:00 p.m. - 5:00 p.m., an hour that is already among the most congested at DCA (*Id*.). Southwest

[6] American specifically rejects the false assertion that American and Alaska "are not vigorous independent competitors at DCA" and any insinuation of a "symbiotic relationship" and "interdependence" between the American and Alaska domestic networks that may involve the coordination of schedules, service levels, or prices. (Application of Delta Air Lines, dated July 8, 2024, at 10.) That is inaccurate, and clear protocols are in place to ensure against it. American does not market any Alaska flight that originates or terminates at any key American hub (including DCA), and Alaska does not market any American flight that originates or terminates at any key Alaska hub. The proportion of passengers on Alaska's DCA flights connecting to American's DCA flights destined for points beyond is less than 5%. An attempt to aggregate the separate presences of American and Alaska at DCA into a combined market share is a self-serving distortion.

seeks to have *both* its arrivals and departures occur during this one-hour window, while Delta, Alaska, and Spirit also each seek a time in this same window. Combined with the additional DCA operations that Delta and Alaska seek at 5:00 p.m. and 5:30 p.m., respectively, 7 new operations are sought at DCA in a 90-minute window from 4:00 p.m. - 5:30 p.m. (*Id*.). That logjam would have to be untangled in accommodating those carriers' applications, to mitigate the risk of operational impacts at the airport during and spilling outside of that 90-minute window. By contrast, American's application avoids those coordination challenges and increased operational risks.[7]

American's purposeful effort at scheduling that supports efficient operations at DCA and in the Washington metropolitan area airspace presents a concrete environmental benefit in helping to avoid the fuel usage and emissions associated with congestion on the tarmac and in the airspace. That is more directly relevant than generalized claims of environmental stewardship that other carriers' applications offer. American, of course, takes pride in being a leader among airlines on sustainability initiatives and addressing climate change. In 2023, American Airlines was named to the Dow Jones Sustainability World Index (DJSI World) for the first time, as one of only two passenger airlines included. American was also included in the Dow Jones Sustainability North America Index for the third year in a row. American also was named 2023 Air Transport World Eco-Airline of the Year. In 2022, American became the first airline globally to set externally validated, science-based 2035 greenhouse gas (GHG) reduction targets. American's goal is to achieve net zero GHG emissions by 2050.

Unlike other applicants, American's proposed schedule supports safe and efficient integration at DCA. On this dimension, too, American's SAT-DCA application rises above.

[7] Additionally, JetBlue has questioned whether United's proposed 6:30 a.m. departure time from DCA is eligible for a beyond-perimeter slot exemption. (Motion of JetBlue Airways, dated July 10, 2024.)

## CONCLUSION

American's proposed daily roundtrip service between SAT and DCA provides compelling public and competitive benefits, delivers on the statutorily prescribed selection criteria, and compares favorably to other applications by non-limited incumbent carriers. American respectfully requests that the Department grant its application.

Respectfully submitted,

Molly Wilkinson
American Airlines, Inc.

Arjun Garg
Counsel for American Airlines, Inc.

**BEFORE THE**
**DEPARTMENT OF TRANSPORTATION**
**OFFICE OF THE SECRETARY**
**WASHINGTON, DC**

| | |
|---|---|
| Establishment of Slot Exemption Proceeding At Ronald Reagan Washington National Airport Pursuant to 49 U.S.C. § 41718 | Docket DOT-OST-2024-0065 |

**COMMENTS OF ALASKA AIRLINES, INC.**
**FOR SLOT EXEMPTIONS**
**Washington, DC (DCA)–San Diego, CA (SAN)**

Alaska Airlines, Inc. ("Alaska"), the nation's premier West Coast-based airline, renowned for its low fares, high-quality service and operational excellence, submits these comments in support of its application for two slot exemptions to operate daily nonstop roundtrip service between Ronald Reagan Washington National Airport ("DCA") and San Diego International Airport ("SAN").[1] Alaska's application amply satisfies Congress's and DOT's requirements for an allocation of slot exemptions, and will enable Alaska to introduce nonstop DCA service to the San Diego area—the largest market without such service.

## I. Alaska's DCA-SAN Service Will Generate Substantial Consumer Benefits and Enhance Competition

The need for nonstop service between DCA and SAN is compelling. San Diego is the eighth largest U.S. city, home to the nation's largest military community, located in the fifth largest U.S. county, and its airport, SAN, accounts for the greatest number of passengers of any U.S. airport without nonstop DCA service.[2]

[1] Application of Alaska Airlines, Inc., July 8, 2024 (Docket DOT-OST-2024-0065) ("Alaska Application").

[2] SAN, with a "Passengers Per Day Each Way" ("PPDEW") measure of 225, is by far the U.S. airport with the greatest number of passengers without nonstop service to DCA. For context, the second-largest airport without nonstop service to DCA, San Antonio International Airport, has a PPDEW of 155. *See* Alaska Application at 4.

Alaska's DCA-SAN nonstop service will enhance competition and provide myriad service benefits to consumers, including:

- Meaningfully increase nonstop capacity and service options between Washington, DC, and San Diego, a key focus city for Alaska,[3] benefiting business and leisure travelers with fares that on average are lower than those of Alaska's competitors.[4]

- Enhance fare and service competition on a nonstop basis between Washington, DC, and San Diego, and in other markets in the western U.S. and Hawai'i, where passengers travelling to and from Washington, DC, will benefit from additional connecting service via SAN.[5]

- Provide San Diego's large community of government personnel (civilian and military)[6] with convenient nonstop access to DCA[7] and its nearby government and military facilities, including the Pentagon, numerous federal agencies, and many large military bases.[8]

Alaska continues to grow its network at SAN, and just last week announced new nonstop service, beginning in December 2024, from SAN to Reno, Nevada ("RNO") and Vail (Eagle County), Colorado ("EGE").[9] Alaska will be the only carrier operating nonstop service on the

---

[3] Alaska began serving SAN in 1985 and has continued to expand its presence ever since. Alaska employs approximately 800 team members and maintains a flight attendant base in SAN. Commencing December 2024, Alaska will serve 39 nonstop markets from SAN. Nonstop service to/from DCA will be an important addition to Alaska's network, establishing a key additional transcontinental route that will enable Alaska to further grow at SAN and serve a broad range of passenger demand. *See* Alaska Application at 6-7.

[4] Average fares on the IAD-SAN route decreased by approximately 26% following Alaska's entry into the market. Alaska Application at 5. Alaska expects this downward trend to continue with the introduction of its DCA-SAN service.

[5] *See* Alaska Application at 2 n.6.

[6] San Diego is home to the largest concentration of active-duty military personnel in the United States.

[7] Currently, local San Diego travelers must rely on connections to travel to DCA. In 2023, approximately 164,000 passengers traveled between SAN and DCA, accumulating approximately 328,000 hours of additional annual travel time in the aggregate due to having to make a connection. *See* Alaska Application at 4.

[8] The General Services Administration estimates that over 28,000 government personnel will travel between DCA and SAN in Fiscal Year ("FY") 2024, increasing to nearly 32,000 in FY 2025. *See* Alaska Application at 4.

[9] *See* Maria Cid, *Alaska Airlines expands winter travel options with 18 exciting new sun and ski routes*, Alaska Airlines (July 10, 2024), https://news.alaskaair.com/alaska-airlines/alaska-airlines-expands-winter-travel-options-with-18-exciting-new-sun-and-ski-routes/.

SAN-EGE route. With these additions, Alaska will operate nonstop service to a total of 39 destinations from SAN, 19 of which will be served exclusively by Alaska on a nonstop basis.[10]

Alaska's proposal to introduce daily nonstop service between DCA and SAN has strong support from the San Diego County Regional Airport Authority, a wide range of San Diego area and State of California government leaders, as well as San Diego area business and civic organizations. These parties recognize the substantial public benefits that Alaska's service will generate for the San Diego area and other western U.S. communities, as well as for passengers, including business, government, military, and leisure travelers.[11]

## II. Response to Other Carrier Applications

### A. Spirit and Frontier are Ineligible Carriers

Spirit Airlines, Inc. ("Spirit") and Frontier Airlines, Inc. ("Frontier") filed applications to serve San Jose[12] and San Juan, respectively, positing that they are eligible to apply for slot exemptions as "limited incumbent carriers."[13] However, DOT, in its Notice served June 24, 2024 in the above-captioned docket establishing this proceeding, determined the carriers eligible to apply for slot exemptions either as a non-limited incumbent or limited incumbent carrier. DOT reached this determination after conferring with the FAA Slot Administration Office.[14] In

---

[10] *See* Exhibit AS-R-1.

[11] *See* Alaska Application, Exhibit AS-19.

[12] Today (as was the case on the date that Section 502 of the FAA Reauthorization Act of 2024 was enacted), Spirit operates no service at DCA, having abandoned the airport in 2012. Setting aside the merits of Spirit's application, it is curious that an airline professing to be "ultra-low cost" like Spirit, would incur the expense and complexity to reestablish a DCA presence just to operate a single-daily service to San Jose. It is an even more perplexing business decision given the fact that SJC is only 34 miles from San Francisco International Airport, which already has double-daily (and, if United's application is approved, triple-daily) nonstop DCA service.

[13] Application of Spirit Airlines, Inc., July 8, 2024; Application of Frontier Airlines, Inc., July 8, 2024 (Docket DOT-OST-2024-0065).

[14] *See* Establishment of Slot Exemption Proceeding at Ronald Reagan Washington National Airport Pursuant to 49 U.S.C. § 41718, June 24, 2024 (Docket DOT-OST-2024-0065) ("DOT Notice").

identifying the list of carriers eligible to apply, DOT specifically noted that "the list only includes those carriers marketing air transportation at DCA on the date of enactment of [the FAA Reauthorization Act of 2024]."[15]

DOT thus determined that Alaska, but not Spirit or Frontier, is eligible to apply as a limited incumbent carrier.[16] Alaska, therefore, will not address the applications of Spirit or Frontier[17] on their respective merits, on the reasonable expectation that DOT, in its final order, will re-confirm those carriers' ineligibility and appropriately decline to entertain their applications.[18]

**B. Correction of False Statements in Delta's Application**

Delta Air Lines, Inc. ("Delta") applied for an allocation of slot exemptions to operate nonstop service between DCA and Seattle ("SEA") and, in doing so, made numerous false and misleading statements about Alaska's existing service on that route.[19] Alaska takes no position as to which non-limited incumbent carriers should receive an allocation of slot exemptions in this case, but is compelled to correct the record. While the Delta Application is replete with

---

[15] DOT Notice at 2 n.3.

[16] DOT Notice at 2. Neither Spirit nor Frontier filed a petition for reconsideration or motion to amend the DOT Notice. Spirit filed a letter expressing its intent to apply for the slot exemption pair available for allocation to an eligible limited incumbent carrier despite DOT's prior determination of Spirit's ineligibility. Letter of Counsel for Spirit Airlines, Inc., June 26, 2024 (Docket DOT-OST-2024-0065). Frontier sent an email to DOT staff on an *ex-parte* basis two days after issuance of the DOT Notice seeking "confirmation" that Frontier qualifies as a limited incumbent carrier. Email from Brian Foont, Counsel for Frontier Airlines, Inc., to Albert Muldoon, DOT, June 26, 2024. DOT declined to respond to Frontier's email, citing DOT's prohibition against *ex-parte* communications. Perhaps not surprisingly, Spirit and Frontier each take the position that the other is ineligible.

[17] The DOT Notice sets forth "minimum" requirements for submission of a complete application, including that an applicant identify the aircraft type it would use to provide its proposed service, "a schedule showing proposed times" and "an approximate start-up date." DOT Notice at 3. Frontier's perfunctory application contains none of this information. Thus, even if Frontier were eligible to apply (DOT has determined that it is not), Frontier would be subject to disqualification for its failure to provide the minimum information DOT requires.

[18] If DOT were to decide otherwise, Alaska, as a matter of due process, would be entitled to an opportunity to address both the issue of carrier eligibility and the applications of Spirit and Frontier on the merits.

[19] Application of Delta Air Lines, Inc., July 8, 2024 (Docket DOT-OST-2024-0065) ("Delta Application").

disingenuous claims and petty pejoratives, Alaska will limit its comments to the below two claims.

*Claim 1:* Delta falsely claims that Alaska's DCA-SEA service has "some of the highest ticket prices in the country"[20] and that its DCA-SEA service would "exert[] downward fare pressure" on Alaska:

- Alaska's DCA-SEA fares are consistent with fare levels for other nonstop services between DCA and cities on the West Coast. By contrast, the DCA-beyond perimeter city nonstop route with the "highest ticket prices in the country" is DCA-Salt Lake City ("SLC"), where Delta operates the only nonstop service.[21]

- Two of the top three highest DCA-beyond perimeter nonstop fares are on Delta's DCA-SLC and DCA-LAX routes.[22] Perhaps Delta is waiting for a later date to "exert downward fare pressure" for LA-based travelers.

- Of the three carriers that operate nonstop DCA-LAX service, Delta's fares are the highest, whereas Alaska's are the lowest.[23]

- It is Delta, not Alaska, that has "some of the highest ticket prices *in the count*ry." In fact, Delta has the highest domestic fares of *any* U.S. airline nationwide.[24]

In sum, Delta's DCA-beyond perimeter nonstop route fares are the highest of any carrier, regardless of whether Delta is the only carrier or faces competition on a given nonstop route. The

---

[20] *See* David Shepardson, *Delta seeks new Seattle flight as airlines jockey over DC slots*, Reuters (June 6, 2024), https://www.reuters.com/business/aerospace-defense/delta-seeks-new-seattle-flight-airlines-jockey-over-dc-slots-2024-06-06/. Delta did not repeat this false claim in its application but rather stated that it would "exert[] downward fare pressure" on Alaska's DCA-SEA service. Delta Application at 3, 6. As the data Alaska cites herein reflects, Delta's pricing strategy is to use its size and scale to maximize yields rather than serve as a lower-fare option. This contrasts with Alaska's approach, which, as a much smaller carrier dedicated to maintaining customer loyalty, is to offer lower fares and high-quality service.

[21] *See* Exhibit AS-R-2.

[22] Delta's DCA-SLC fares are the highest beyond-perimeter DCA fares in the nation. *See* Exhibit AS-R-3.

[23] *See* Exhibit AS-R-4.

[24] *See* Exhibit AS-R-5 (as measured by stage-length adjusted yields).

particular route and availability of nonstop competition may vary, but Delta's high fares remain ever-present.[25]

*Claim 2:* Delta falsely claims that Alaska's existing DCA-SEA service is "inadequate" and "lackluster"[26]:

- Alaska is proud of its popular and successful nonstop DCA-SEA service, which has sufficient capacity to accommodate both nonstop and connecting passengers. In 2023, an average of 271[27] passengers traveled between DCA and SEA each day relative to an average availability of 318 daily seats, thus demonstrating that Alaska's capacity on the DCA-SEA route is more than "adequate" to meet demand.[28] In stark contrast, in 2023, an average of 259 passengers per day traveled between DCA and SLC, yet capacity was lacking as there were only 194 nonstop seats offered on Delta's nonstop route.

- Moreover, 29% of travelers on Alaska's DCA-SEA nonstop flights are connecting passengers, thus further undercutting Delta's erroneous and irresponsible assertion that DCA-SEA flights have "some of the highest ticket prices in the country." If such flights were among the highest priced in the country (they are not), surely connecting passengers would connect on other routes.[29]

- Alaska has earned countless awards for its outstanding service, including 2024 Best U.S. Airline & Frequent Flier Program (Wallet Hub), Top Airline Reputation (2024 Axios Harris Poll), and 2023 Worldwide Airline of the Year (Centre for Aviation).[30] Alaska's Mileage Plan is the industry's leading loyalty program (ranked as the best airline rewards program for *nine*

---

[25] *See* Veronika Bondarenko, *Delta CEO sounds alarm about a growing problem*, TheStreet (July 12, 2024), https://www.thestreet.com/lifestyle/travel/why-is-delta-stock-so-low (noting "Delta was 'fairly well insulated' from [lower fare discounting] due to the higher number of business and other premium tickets it sells as [a] luxury-minded airline") (quoting Delta CEO Ed Bastian).

[26] Delta Application at 1, 2, 5, 7.

[27] This number includes passengers who flew on Alaska's nonstop DCA-SEA service as well as passengers flying on another carrier's connecting service.

[28] *See* Exhibit AS-R-6.

[29] Alaska's DCA-SEA service is popular with both nonstop and connecting passengers. Specifically, Alaska's nonstop flights between DCA and SEA serve 73% of origin & destination passengers traveling between the two airports, with the remaining 27% making connections. By contrast, more than half (53%) of DCA-SLC passengers make a connection to avoid the high fares on Delta's nonstop DCA-SLC service—nearly double the number of connecting passengers as those that travel on Alaska's DCA-SEA route.

[30] *See* Alaska Application, Exhibit AS-17.

*consecutive years* by U.S. News & World Report and *five consecutive years* by NerdWallet).[31]

- Alaska's combination of lower fares and customer service excellence across multiple cabin and fare product options, and its ability to offer guests travel options to more than 1,000 destinations worldwide on Alaska's 30 **one**world Alliance and other global partner airlines, enables Alaska to compete effectively against Delta and other much larger carriers. Alaska's track record of network growth (at a faster rate than Delta and the other "Big Four" carriers)[32] is testament to Alaska's competitive tenacity.

These facts, though inconvenient for Delta, demonstrate that Alaska's service, whether on the DCA-SEA route or elsewhere, is consistently embraced by passengers for its quality *and* value, which Alaska's crew members consistently deliver with care and thoughtfulness year after year, to industry-leading accolades.

## III. <u>Conclusion</u>

Alaska requests that the Department grant it two slot exemptions at Ronald Reagan Washington National Airport to enable Alaska to operate once-daily nonstop roundtrip service to/from San Diego International Airport.

[*Signature Page Follows*]

---

[31] *See* Alaska Application at 8.

[32] *See* Alaska Application, Exhibit AS-14.

Respectfully submitted,

David Heffernan
Michael Deutsch
Amanda Geary Losacco
**COZEN O'CONNOR**
1200 19th Street, NW
Washington, DC 20036
dheffernan@cozen.com
mdeutsch@cozen.com
alosacco@cozen.com

Counsel for
**ALASKA AIRLINES, INC.**



July 17, 2024

The Honorable Pete Buttigieg
Secretary
U.S. Department of Transportation
1200 New Jersey Avenue, SE
Washington, D.C. 20590

Secretary Buttigieg:

As employees of Alaska Airlines, we write to strongly support Alaska's application for slot exemptions to connect San Diego International Airport (SAN) and Reagan National Airport in Washington, D.C. (DCA).

San Diego is the largest unserved nonstop market from DCA today. Alaska Airlines has been growing San Diego as a focus city for the last decade including opening a flight attendant base in 2013. Today, we have an average of 59 daily departures. Alaska's new nonstop DCA-SAN will also have a positive effect on the overall level of fare and service competition not only on a nonstop basis between Washington, D.C., and San Diego, but also for passengers, including government and military passengers, who will benefit from a broader range of connecting service options between the Washington, D.C. area and communities in the western United States.

As employees of Alaska Airlines, we're committed to providing exemplary service to all our passengers and urge the U.S. Department of Transportation to award Alaska Airlines the necessary slot exemptions to operate this important route.

Sincerely,

Mona Abd Rabo,
Customer Service Agent

Tatiana Acain,
Lead CSA

Ryan Agoot,
Flight Attendant

Greg Abner,
Sup Cargo Operations

Jacob Acosta-Almanza,
Mgr Station Ops

Daniel Aguilar,
Customer Service Agent

PO Box 68900, Seattle, WA 98168

P 206.433.3200

William Aguilar,
Maintenance Controller

Sabrina Aguirre,
Mgr Inflight Base Ops II

Mohammed Ahmed,
Dir Airworthiness

Tristian Akahoshi-Nugent,
Flight Attendant

Charity Aki,
Concierge SEA

Michelle Ala,
Customer Care Rep II

Abdoulaye Alaganou,
Customer Service Agent

Farzana Ali,
Customer Service Agent

Keith Allen,
Mgr Product Management

Katie Alonso,
Cust Svc Agent-Departure Ctrl

Laura Alonzo,
Sup Reservations

Diego Altamirano,
Drug Abatement Rep Vrbl Time

Lilia Alvarado,
Customer Service Agent

Rickie Alvarado,
Pilot Crew Scheduler

DJ Ames,
Captain

Liz Andersen,
Sup Reservations

Breanna Anderson,
Accounting Specialist

Cole Anderson,
Communications Agent

Jay Anderson,
Customer Service Agent

Brian Andrews,
Designated DPASA CSA

Steve Angerman,
Ground Service Agent

Francisco Angulo-Martinez,
Customer Service Agent

Stephanie Anima,
Flight Attendant

Greg Annis,
Flight Attendant

Jeremy Antoine,
First Officer

Ediber Araujo Araujo,
Customer Service Agent Mexico

Angie Argirova,
Front Desk Receptionist

Brent Armstrong,
Flight Attendant

Felix Arndt,
Captain

Megan Arnold,
Customer Care Rep II

Rhonda Ashpole,
Sourcing Spec

Russ Astahov,
Customer Service Agent

Davin Asuncion,
Flight Attendant

Rob Atterton,
Flight Attendant

Morgan Atwell,
Flight Attendant

Janeen Auelua,
Designated Trnr CSA Air Frght

Deborah Austin,
VT Customer Service Agent

Erin Ayala,
Information Technology Support

Erik Bacon,
Captain

Baseem Bader,
Line Aircraft Technician

David Baerson,
Pricing Analyst I

Walter Bailey,
Lead Line Aircraft Technician

Carrie Baker,
Assoc Employee Relations
Ptnr

Kenedy Baker,
Ground Service Agent

Debbie Baldwin,
Flight Attendant

Richard Baltero,
Stores Agent

Abigail Banggo,
Designated Trnr CSA

Van Bao,
Principal Product Mgr

Denisse Barajas,
Sr Tax Accountant

Krista Barbic,
Reservations Sales Agent

Johnna Barker,
Crew Planning Analyst II

Dominic Barrera,
Policy & Procedures Spec

Elias Barrera Lomeli,
Mgr Inflight Base Ops II

Vikram Baskaran,
VP Information Technology
Svcs

Timothy Bateman,
Lead Customer Service Agent

Robin Bater,
Dir Enterprise Architecture

Lucee Bathery,
Lead Customer Service Agent

Michael Battista,
Guest Care Lead Trnr Coach

Benjamin Battle,
Line Aircraft Technician Trnr

Ruth Bayang,
Temp Assignment P1

Christine Bazar,
Mgr Station Ops

Steven Beatty,
Mgr Station Ops

Shane Bechtol,
Reg Cargo Cmplnce & Ops
Mgr

Tami Becker Gomez,
MD AGC Labor &
Employment Law

Jonena Beckstrom,
Reservations Sales Agent

Laurelle Bednar,
Training Delivery Spec

Brett Beeching,
Stores Agent

Ross Belfiore,
Line Aircraft Technician Trnr

Angel Benedetti,
Sr UX Researcher

Kim Benhardus,
AQP Administrator II

Elizabeth Bennett,
Customer Service Agent

Jared Benson,
Customer Service Agent

Andrea Benson,
Flight Attendant

Ori Berger,
Mgr Powerplant Engineering

Janette Bernasconi,
Flight Attendant

Niecey Bessellieu,
Customer Service Agent

Tammy Beutler,
Flight Attendant

David Beyer,
Dir Risk Management

Rikki Bhattarai,
Principal DBA

Shirley Bi,
Airport Lounge Spec SFO

Owen Bickford,
Paid Performance Media Dir

John Bilbo,
Dispatcher

Janet Birch,
Environmental Affairs Prgm Mgr

Shawn Bjorgen,
Lead Ramp Service

Matt Black,
Flight Attendant

Jessica Blackman,
CSA / PSA

Miranda Blanchet,
Passenger Service Agt Trnr

Leo Blanco,
Lead Dispatcher - Tech & Admin

Andrew Blank,
Captain

Gary Blattenbauer,
Customer Service Agent

Shay Blodgett,
Lead Reservations Sales Agent

Crista Blood,
Temp Assignment AP2

Kerchynna Blue,
Customer Service Agent

Stacey Bobek,
Customer Service Agent

Christopher Boeh,
IAM 1yr Temp Assignment L1

Anya Bogdanova,
Lounge On-Call ANC

Matthew Bolton,
First Officer

Janlaine Boman,
Designated Trnr CSA

Frank Borbe,
Mgr Safety Pgms & Reg Compl

David Borja,
Customer Service Agent

Joseph Bos,
Paid Undergraduate Intern

Robb Boscardin,
Sup Reservations

Benn Bostic,
First Officer E175

John Boswell,
Customer Service Agent

Melissa Botello,
Designated Scheduler Lead CSA

Brian Bouse,
Principal Engineering Spec

Jackie Bousquet,
Flight Attendant

Jennifer Boydstun,
Flight Attendant

Yuriy Boytsov,
Line Aircraft Technician

Josh Bozzay,
Customer Service Agent

Leighvye Bradley,
Customer Service Agent

Lori Bradshaw,
MD Guest Care

Manpreet Singh Brar,
Sr Software Engineer

Brittani Bravo,
Reservations Sales Agent

Breanna Bray,
Customer Service Agent TC

Noah Brener,
Revenue Management Analyst I

Taton Brewer,
Customer Service Agent

Katherine Breyfogle,
Airport Svcs Tech Pub Coord

Gerry Brinn,
Dir Call Center Ops & Tech

Christian Britton,
Flight Attendant

Dave Brochier,
Ground Service Agent

Janelle Broda,
Passenger Service Agent CAN

Kristi Brodie,
Flight Attendant

Calvin Brookman,
FO Trainee

Jason Brown,
Dir Environmental Affairs

Sherri Brown,
Lead Customer Service Agent

Andrew Brown,
Revenue Management Analyst I

Tim Brubaker,
LMS Administrator

Kris Brugman,
Base Spec I

CeeBee Brunn,
Sr Engineering Spec

Teressa Bullard,
Guest Care Trainer & Coach

Beverly Bullock,
Flight Attendant

Scott Burch,
Flt Ops Instr Dsgnr & Trnr III

Jeanna Burkholder,
Flight Attendant

Bryan Burks,
Captain

Suzanne Burns,
Flight Attendant

John Burris,
First Officer

Elijah Bush,
Reservations Sales Agent

Joe Butler,
First Officer

Jason Byal,
Sr AQP Courseware Dev & Instr

Gabe Caceres Espinosa,
Customer Service Agent

Ben Cage,
Captain

Camile Caldwell,
Flight Attendant

Jody Call,
Reservations Sales Agent

Jessica Campbell,
Concierge SEA

Scott Campbell,
Flight Attendant

Rich Cantrall,
Flight Attendant

Jorge Capacete,
Customer Service Agent

Agatha Carboni,
Customer Service Agent

Benjamin Cardin,
Executive Assistant

Lance Carlson,
Sector Mgr

Joshua Carpenter,
Reservations Sales Agent

Sara Carpenter-Wade,
Ground Service Agent

Megan Carranza,
Flight Attendant

Angel Carrero,
Flight Attendant

Allison Carretta,
Flight Attendant

Jason Carrig,
Designated Trnr CSA

Jose Carrillo,
Line Aircraft Technician

Valeria Carrion,
Flight Attendant

Janice Carter,
Customer Service Agent

Ron Carter,
Line Inspector

Jillian Carter,
Reservations Sales Agent

Thomas Carvalho,
Sup Station Operations

Ben Casad,
SCM Mgr - Airport Operations

Alicia Cassarino,
Reservations Sales Agent

Angela Castillo,
Customer Service Agent

Joe Castro,
Maintenance Controller

Ginny Cavins,
Flight Attendant

Cathrina Chanco,
Aircraft Records Analyst II

Blake Chandler,
First Officer

Jennifer Chang,
Base Spec I

Yong Joo Chang,
Pricing Analyst II

Jacquie Chavez,
Lounge Hospitality Host SFO

Alexander Chavez,
Sup Inflight

JoAnne Cheechov,
Concierge PDX

Harry Cheema,
Public Affairs Program Mgr

Kenzie Chelemedos,
Flight Attendant

Sherry Chen,
Sr Threat Defense Analyst

Shannon Cheng,
Mgr Station Ops

Ben Chenoweth,
Mgr Policy & Procedure

Henry Chi,
ATC Chief Dispatcher

Leilani Chichenoff,
Customer Service Agent

Jenny Chin-Lai,
Revenue Management Analyst II

Linda Chism,
Fleet Tech Program Mgr

Grace Cho,
Sr Tax Accountant

Andrew Christensen,
Customer Service Agent Trainer

Eric Christensen,
Inflight ISD II

Nicole Christian,
Temp Assignment L1 A

Brenda Christopherson,
CSA - Air Freight

Daniel Chun,
Regional VP Hawaii

Esther Chung,
Sr Instruct Sys Dev & LMS Spec

Maureen Ciulla,
Flight Attendant

Shari Clark,
Flight Attendant

Joey Clark,
Flight Attendant

Barbara Clark,
HR Specialist II

Debbie Clarke,
Reservations Sales Agent

Jose Clemente,
Lead Line Aircraft Technician

Samuel Clifton,
Flight Attendant

Cameron Cloar-Zavaleta,
MD DGC Litigtn & Rglatory Law

Timothy Cochran,
First Officer

Andrew Cockerham,
Lead Dispatcher Training

James Coffelt,
Captain

Jamie Cogen,
Flight Attendant

Kitty Cohen,
Flight Attendant

Rhomelle Colina,
Line Aircraft Technician

Will Collier III,
Captain

Ryan Collins,
Line Inspector Trainer

Kelly Colman,
Customer Service Agent

Shela Colton,
Flight Attendant

Darren Compher,
Sr Software Engineer

Soul Conde,
Line Aircraft Technician

Trevor Conroy,
First Officer

William Cook,
Ground Service Agent

Ben Corner,
Captain

Jorge Corradine Fajardo,
Line Aircraft Technician

Everett Costello,
First Officer

Ken Costello,
Standards & Training Mgr

David Costillo,
Station Agent

Stephen Couckuyt,
Flight Attendant

Torr Coulthard,
Assoc Network Sched Analyst

Carolyn Counihan,
Learning Delivery Coord

Jon Covey,
Principal Ent System Engineer

Kathleen Cranfield,
Lead Customer Service Agent

Robb Crawford,
Captain

Kimberly Crawford,
Lead Customer Service Agent

Brittany Creek,
Dir Fin Rptng & Tech Acctng

Jeff Crose,
Principal Software Engineer

Justin Crosson,
Customer Service Agent

Sean Culligan,
First Officer

Dano Cummins,
First Officer

Derrick Cunningham,
Principal Loyalty Elite Pgm

Lori Curtis,
Dir Employee Communications

Amanda Dabbs,
IAM 1yr Temp Assignment L1

Ryan Daley,
Flight Attendant

Paul Dalton,
Customer Service Agent

Hayle Darden,
Flight Attendant

Luc Davies,
Captain

Kristine Davies,
Material Control Spec III

Ryan Davis,
Captain

Clint Davis,
Customer Service Agent

Vicki Davis,
Flight Attendant

Shawn Davis,
Sr Quality Assurance Auditor

Alicia Davisson,
Flight Attendant

Jarrett Day,
First Officer

Matt De Lancey,
Network Analyst

Genny Dean,
Sr QA Auditor Audit Programs

Morgan DeGregorio,
Customer Service Agent

Joy Del Rosario,
Customer Service Agent

Christopher Dela Rosa,
Principal Cabin Prod & Exp Mgr

Marco Deltoro Puerto,
Designated Trnr CSA

Lance Demicilio,
Lead Line Avionics Technician

Kathy Denker,
MD Operations

Ryan Di Giovanni,
Duty Mgr Pilot Crew Scheduling

Lyndsey Di Sabella,
Legal Coord

Alan Diaz,
Lead Customer Service Agent

AJ Diaz,
Line Aircraft Technician

Janice Dillon,
Reservations Sales Agent

Criselda Dinglasan,
Crew Resource & Finance Mgr

Diane Dingman,
Flight Attendant

Anna Dischinger,
Employee Relations Partner

Katy Dolan,
Flight Attendant

Kat Dooley,
Reservations Sales Agent

Norma Dormann,
Flight Attendant

Deshun Douglas,
Flight Attendant

Andrea Downey-Baumert,
Sr HR Business Partner

Trevor Downtain,
Fleet Planner II

Mitch Drake,
First Officer

Michael Drapela,
Dispatcher

Mike Druydd,
Flight Attendant

Danile Ducette,
Customer Service Agent Trainer

Kierra Duggan,
Passenger Service Agent CAN

Garrett Dunn,
Apprentice Simulator Tech

Richard Duplain,
Captain

RaeAnne Dutto,
IAM 89d Temp Assignment L1

Sheri Dutton,
Lead Customer Service Agent

Deanne Ealey,
Reservations Sales Agent

Tarinn Eason,
Centralized Load Plan Agent

Ryan Eatinger,
Dispatcher

Dan Echeverria,
Line Aircraft Technician

Bradley Eckstein,
Sr Cargo Strat & Rprtg Analyst

Doug Edgar,
Flight Attendant

Eric Edge,
MD Marketing & Advertising

Mike Edger,
First Officer

Wkl Edgerly,
Reservations Sales Agent

Jason Eichem,
First Officer

Rebecca Eilers,
Passenger Service Agent

Aeden Elder,
Passenger Service Agent

Joshua Ellis,
First Officer

Richie Elmore,
Customer Service Agent

Cristin Eng,
Lead Customer Service Agent

Naomi Ercolano,
Inflight Svcs Trng Spec I

Altynbek Erkinbek Uulu,
Lead Customer Service Agent

Jamie Etheridge,
Customer Service Agent

Vincent Evans,
Customer Service Agent

Faafouina Faimalie,
Flght Attendant Crew Scheduler

Addison Fair,
BI Team Lead

Zain Fares-Boulos,
Engineer

Susan Farrow,
Reservations Sales Agent

Alex Faust,
Fin Systems Analyst

Mia Federico,
Customer Service Agent TC

Dean Fellas,
Lead Reservations Sales Agent

Matt Felmlee,
Flight Attendant

Andrea Fenwick,
Flight Attendant

Morgan Fields,
Flight Attendant

Katie Figoni,
Sfty Compliance & Supt Mgr

Mike Finlay,
Dispatcher Instructor

Bree Fischer,
Flight Attendant

Hazel Flack-Barley,
Customer Service Agent TC

Given Flaviano,
Designated Trnr Lead Ramp

Shannon Fleischfresser,
IAM 2yr Special Project C3

Danny Flores,
Dir Station Ops

Emmanuel Fofiu,
Line Aircraft Technician Trnr

Sean Foley,
Captain

Matt Fontana,
ATC & Airfield Ops Program Mgr

Caroline Foote,
Reservations Sales Agent

Brad Fornelius,
Line Avionics Technician

Sean Forrey,
Passenger Service TC

Julie Forster,
Customer Service Agent

Marlon Forsythe,
Sup Line Maintenance

Jonathan Foster Harris,
Sup Alaska Lounge

Christine Frandsen,
Maintenance Reporting Analyst

Bryce Franklin,
Flight Attendant

Rachel Frazier,
Passenger Service Agt Trnr

Lori Fredericks,
Customer Service Agent

Richard Freeman,
Captain

Pablo Fregoso,
Flight Attendant

Ted Frey,
Captain

Sarai Frias-Heredia,
Customer Service Agent

Kasey Froehlich,
Flight Attendant

Aaron Fry,
Captain

Kiel Fullmer,
Mtx Planner/Aircraft Router

Zach Funes,
Concierge PDX

Brittany Furgason,
Lead Customer Service Agent

Chad Gabagat,
Assoc F&B Plng Systems Spec

Jake Gale,
Flight Attendant

Conner Gallagher,
Flight Attendant

Mari Gamero,
Lead Customer Service Agent

Jordan Garana,
Customer Service Agent

Rebecca Garcia,
Flight Attendant

Izzy Garcia,
Ground Service Agent

Brent Garries,
Sector Mgr

Viruol Gatchalian,
Customer Service Agent

Megan Gates,
Engineer

Jay Gatmin,
Customer Service Agent

Kate Geldaker,
Government Affairs Dir

J.R. George,
Flight Attendant

Valerie George,
Flight Attendant

Ari Gerdes,
Sr QA Prgm Mgr

Melissa Gesford,
Sr MP & Elite Loyalty Analyst

Rick Gideon,
Data Center Platforms Mgr

Cheryl Gilbert,
Customer Care Rep II

Jessica Gill,
Reservations Sales Agent

David Ginsburg,
Passenger Service Agent

Kennedy Glick,
Ground Service Agent

Aaron Glorioso,
Lead Dispatcher - Tech & Admin

James Goellner,
Guest Care Trainer & Coach

David Goetz,
Customer Service Agent

Stephen Goldberg,
Logistics Analyst

Joshua Gonzales,
Line Aircraft Technician

Cameron Gonzalez,
Dispatcher

Martin Gonzalez Pedraza,
Passenger Service Agent CAN

Fatima Gonzalez Perez,
Customer Service Agent

Andre Gore,
First Officer

Alex Gorinsky,
MD M&E ACSC Ops Material Mgmt

Matt Gorlewski,
Line Aircraft Technician

Owen Grace,
Customer Service Agent

Sidney Graham,
Captain

Brian Graham,
Sr Mgr CyberSec Threat Defense

Matt Graham,
Sup Line Maintenance

GG Granger,
Customer Service Agent

Gil Grawunder,
Captain

James Green,
Lead Reservations Sales Agent

Josh Green,
Lounge Hospitality Host SFO

Makenzie Greenblatt,
Flight Attendant

Tammy Greenwood,
Reservations Sales Agent

Garrett Greitzer,
Passenger Service Agent

Kendall Grimes,
Captain

Nick Griswold,
Video Production Specialist

Tom Grob,
First Officer

Noah Gronwald,
Mgr Business Intelligence

Bryan Grosvold,
Flight Attendant

Julio Guardado,
Line Inspector

Mauricio Guerra Escamez,
MD Enterprise Project Mgmt Org

Beth Gullett,
Customer Service Agent

David Guthrie,
Sector Mgr

Carlos Gutierrez Archila,
Ground Service Agent

Megan Haddad,
Flight Attendant

Nissa Haines,
Reservations Sales Agent

Harut Hakopyan,
Flight Attendant

Doug Hall,
Captain

Cody Hamilton,
First Officer

Ginger Hamilton,
Reservations Sales Agent

Franziska Hammer,
First Officer

David Hand,
Airport Lounge Spec JFK

Suzi Hand,
People Ops Specialist

Natalie Harding,
Designated Trnr CSA

Cody Hargreaves,
Sr Perf Based Nav Mgr

Ken Harker,
Flight Attendant

Leanna Harris,
Workforce Planning Spec I

Kelley Harrison,
Alliances Principal

Shawn Harshbarger,
Ground Service Agent TC

Austin Hart,
Mgr Operations Maintenance

Midori Hartgraves,
Customer Service Agent

Sue Haschke,
Engineering Support Spec

Christopher Haskell,
AMFA Temp Assignment P1

Chad Hastie,
Mgr Drug Abatement

Christa Hastings,
Airport Lounge Spec SEA

Sherry Hattendorf,
Flight Attendant

Lucienne Havey,
Flight Attendant

Joe-Ann Hawkins,
Guest Care Trainer & Coach

Ryan Hayden,
Line Aircraft Technician

Melissa Hedges,
Flight Attendant

Heinz Heiber,
Captain

Casie Helgeson,
Sr Auditor Audit Programs

Angie Hellriegel,
Executive Assistant II

Spencer Henderson,
Captain

Sam Heng,
Customer Service Agent

Kaila Heng,
Flight Attendant

David Henrich,
Sr Mgr Comm Ops

Brenda Hernandez,
Lead Customer Service Agent

Elise Hernandez,
Reservations Sales Agent

Christian Hernandez Segovia,
Flight Attendant

Jeff Hersom,
First Officer

Mackenzie Hertogs,
Talent Acq Outreach Prgm
Mgr

Chip Hestle,
Flight Attendant

Lena Hettler,
Background Check Spec

Suzanne Hicks,
Reservations Sales Agent

Leslie Hill,
Call Center Coord

Trevor Hill,
Captain

Jim Hinz,
Captain

Suzanne Hitztaler,
Sr Reg Cargo Cmplnce & Ops
Mgr

Chris Hjort,
Dir P&P & Reg Compliance

Connor Hobby,
First Officer

Susanne Hoffmann,
Reservations Sales Agent

Kyle Hoffpauir,
Dispatcher

Tanner Holbrook,
Customer Service Agent

Jason Holden,
Line Aircraft Technician Trnr

Mikael Hole,
Flight Attendant

Dianna Hollowell,
Flight Attendant

Keith Holman,
First Officer

Jennifer Hopkins,
Customer Service Agent

Todd Horn,
Flight Attendant

Anthony Hort,
First Officer

Jason Houston,
First Officer

Jack Huang,
First Officer

Eliza Huang,
Sr Software Engineer

James Huddleston,
Public Policy Mgr

Dean Hudson,
First Officer

Heather Huertas,
Designated Trnr CSA

Irwin Hui,
First Officer

Les Humphreys,
Operational Specialist II

Traci Hunt,
Customer Service Agent

Chris Hunter,
Maintenance Stores Clerk

Tuan Michael Huynh,
Line Aircraft Technician

Michael Ibrahim,
Lead Line Aircraft Technician

Ryan Ihrig,
Flight Attendant

Mari Ilias,
HR Systems Analyst

Tupu-Jedidiah Inailau,
Customer Service Agent

Norma Infanzon,
Concierge ANC

Steven Irurueta,
Principal Ent System
Engineer

Rick Jabusch,
Chief Dispatcher

Andrea Jackson,
Flight Attendant

Brett Jacobs,
Dir Divisional FP&A

Karl Jahnke,
Principal Engineer

Daryl Janes,
Captain

Kipp Jarrell,
Sr Ground Policy & Proc Spec

Cole Jarvis,
First Officer

Bernie Jessop,
Mgr Training Development

Viwena Jim,
Flight Attendant

Kerry Johnsen,
Mgr People Team Pgms &
Events

AJ Johnson,
Captain

Annette Johnson,
Customer Service Agent

Lucas Johnson,
Lounge On-Call PDX

Chase Johnson,
Machinist

Chad Johnson,
Mgr Station Ops

Matt Johnson,
Princ Solutions Engineer

Kelley Johnson,
Reservations Sales Agent

Gina Johnson,
Sr SOC Aircraft Controller

Lauren Jones,
Assoc Engineer

Ben Jones,
Captain

Chris Jones,
Captain

Markees Jones,
Line Aircraft Technician

Joakim Jonsson,
Captain

Justice Jozic,
Flight Attendant

Francisco Juarez,
Customer Service Agent

Mandee Julius,
Flight Attendant

Kenny Kagawa,
Customer Service Agent

Cody Kaifes,
Mgr Inflight Training Delivery

Donna Kanahele,
Reservations Sales Agent

Reynette Kaopua,
Designated Scheduler CSA

Dan Kapeller,
Ground Service Agent TC

Mac Karikari,
Operations Agent

Teresa Kavanagh,
Flight Attendant

Rose Keene,
Call Center Coord

Tracey Keiser,
Ground Service Agent

Morgan Kelleher,
Lead Customer Service Agent

Evan Kelley,
First Officer

Ross Kellogg,
Reservations Sales Agent

Andrew Kelly,
Flight Attendant

Dan Kenber,
Captain

Kathy Kennedy,
Sr DOT Consumr Protect Auditor

Rachel Kent,
Ground Service Agent

Carman Keogh,
Cust Svc Agent-Departure Ctrl

Ty Kershaw,
Flight Attendant

Todd Ketcham,
First Officer

Kerri Ketz,
Customer Service Agent

Diana Keyson,
Sr IEP Auditor Audit Programs

Bip Khatri,
MD Accounting Operations

Lisa Kieswetter,
Flight Attendant

Ryan Kim,
Line Avionics Technician

Shirley Kingery,
Flight Attendant

Kasey Kinsman,
Mgr Station Ops

Kim Kittilsby,
Pricing Analyst III

Blake Klaich,
Sup Customer Service

John Klehr,
Line Aircraft Technician

Karissa Kleps,
Stn Compliance & Support Spec

Rob Kloft,
Captain

Brian Kmetz,
Captain

Mackenzie Knott,
Sup Network Ops Support

Andrew Konradi,
MD Revenue Management

Kip Kontos,
Captain

Euka Kotabe,
Captain

Steven Kriese,
Captain

Jamila Kubalek,
Reservations Sales Agent

Lyndsey Kueckelhan,
Sup Inflight

Mirjana Kuljanin,
Mgr Central Load Planning

Meg Kunold,
Flight Attendant

Matt La Croix,
Financial Planning Analyst III

Anna Lacroix,
BI Analyst II

Mark LaGasse,
Sr Perf Based Nav Specialist

Jason Lai,
MD Engineering

Chris Lamb,
Concierge SEA

Jenna Landau,
Passenger Service TC

Jaqulynn Landeis,
Mtx Planner/Aircraft Router

Sam Landry,
First Officer

Steven Lankarge,
Customer Service Agent

Jordan Lapin,
Principal Engineer

Christopher Large,
First Officer

James LaRonde,
CA Commercial Performance
Dir

Kevin Larson,
Mgr Central Baggage
Services

Joey Lawrence,
Flight Attendant

Mike Lawson,
Captain

DT Law-White,
Concierge SFO

Rumie Lee,
BI Analyst II

Nicole Lee,
Call Center Ops Spec I

Lara Lee,
Flight Attendant

Shing Lee,
Flight Attendant

Ariel Lee,
Line Aircraft Technician

Latrice Lee,
Sr Corporate Counsel

Jessie Lefebvre,
Flight Attendant

Trent Lehmann,
Cargo Agent

Patty Lehnert,
Temp Assignment C3 AS

Josh Lenker,
Mgr Inflight Training

Melanie Lesh,
Station Agent

Bill Lettner,
Schedule Distrbtn Analyst

Alex Levy,
ASCAP

Andrea Lewis,
Lead Reservations Sales
Agent

Henry Leyvas,
Flight Attendant

Zakaria Liban,
CSA / PSA

Becky Lichtenhagen,
Flight Attendant

Andy Lieser,
Principal Technical
Accountant

Kristen Lighthipe,
Reservations Sales Agent

Steve Lilley,
Captain

Andrew Limardo,
Captain

Patrick Lindsay,
Dispatcher

Lori Lindstrom,
Lead Reservations Sales
Agent

Nicholas Liotta,
Revenue Management
Analyst III

Christine Little,
Customer Service Agent

Michaela Littman,
MD Inflight Operations

Hailey Lively,
Financial Planning Analyst III

Kelo Llamas,
Lead Customer Service Agent

Jordyn Lloyd,
Passenger Service Agent

Rich Loffelmacher,
Captain

Laury Long,
Flight Attendant

Demarcus Long,
Flight Attendant

Kim Lopes,
Operations Agent

Scarlet Lopez,
Customer Service Agent

Ada Lopez,
Lead Customer Service Agent

Marco Losauro,
Customer Service Agent

Megan Low,
Sr Product Mgr

Laura Lozoya,
Reservations Sales Agent

Sharline Lucas,
Lead Customer Service Agent

Tristan Luce,
First Officer

Aaron Lucich,
Flight Attendant

Jackie Lundberg,
Lead CSA - Air Freight

Chloe Lyles,
Flight Attendant

Sheena Lyte,
Line Aircraft Technician

Ty Ma'ae,
Executive Assistant II

Johnny Mabry,
Reservations Sales Agent

Lance Mace,
Flight Attendant

Dakota MacLennan,
Stores Agent

Sam Madison,
Line Aircraft Technician

Christina Maggio,
Sr HR Business Partner

Alex Maglinao,
Assoc EE Onboarding Ops Spec

Ayla Mainz,
Flight Attendant

Lori Maloney,
Lead CRC Agent

Rocky Mamea,
Customer Service Agent

Pavel Manchik,
Cargo Network Control Mgr

Alex Mandus,
Crew Staffing Mgr

Nav Mangat,
Captain

Craig Marcus,
Information Technology Support

Adam Maritz,
First Officer

Clann Marok,
Stores Agent

Dyani Martin,
Customer Service Agent

Frank Martin,
MD Operations

Mytha Martinez,
Ground Service Agent

Mimi Martins,
Customer Care Rep I

Ryan Maser,
Aircraft Technician

Steven Mataya,
Disability Inclusion Spec

Heather Mattingly,
Flight Attendant

Mae Matuszewski,
Flight Attendant

Marie Maxwell,
Flight Attendant

Baleigh May,
Customer Service Agent

Arturo Maytorena Camero,
Sup Reservations

Samuel Maziak,
First Officer

Michelle Mazza,
Flight Attendant

Scott McCaverty,
Captain

Bill McConnaughey,
Lead Customer Service Agent

Regan McCrary,
Pre-Emp & Badging Rep III

Owen McDill,
Customer Service Agent

Nick Mcdougall,
Accounting Specialist

Dianne McGinness,
Employee Communications
Mgr

Abby Mcginnis,
Paid Undergraduate Intern

Jane-Marie McGrath,
Customer Service Agent

Nathan McGuire,
First Officer

Bryan McKune,
Captain

Heather McNeese,
Mail Specialist

Kris Medchill,
Captain

Sheri Meech,
Flight Attendant

Clare Megathlin,
MD EComm Software
Engineering

Taylor Meliza,
GSE Leader

Chad Memmel,
First Officer

Jarrod Merchant,
Shift Mgr Line Maintenance

Desiree Meyers,
IAM 1yr Temp Assignment L1

Jessie Meza,
Central Duty Desk

Lora Michael,
Lead Customer Service Agent

Stephanie Michels,
Talent Acq Ops Specialist

Vette Miller,
Drug Abatement Rep Vrbl
Time

Monte Miller,
First Officer

Alyssa Miller,
Sr Auditor Audit Programs

Jarod Mills,
Lead Line Inspector

Evan Millstein,
Flight Attendant

Jazz Miranda,
Customer Service Agent

Brett Mirly,
Sfty Compliance & Supt Mgr

Domonique Mirrors,
Customer Service Agent

Cody Mitchell,
BI Team Lead

Meri Mitchell,
Passenger Service Agent

Jason Mlady,
Crew Scheduler

Milly Moe,
Customer Service Agent

Michelle Moede,
Flight Attendant

Peter Moffat,
Stores Agent

Kyle Moline,
Dir FP&A

Andrew Molitor,
Captain

Craig Mollerstuen,
Passenger Service TC

Roger Monsanto,
Sr Engineer

Misti Montgomery,
Flight Attendant

Travis Moore,
Captain

Jeffrey Moore,
Flight Attendant

Jay Morales,
Flight Attendant

Nick Morales,
Flt Ops Engineer

Declan Moran,
First Officer

Butch Morgan,
First Officer

Nicholas Morris,
Customer Service Agent

Jennifer Morris,
Lead Customer Service Agent

Kerri-Ann Morrison,
Customer Service Agent

Lavessa Morrison,
Ground Service Agent

Jason Motley,
Flight Attendant

Rebecca Moyer,
Project Mgr III

Daniel Mpinga,
Crew Planning Analyst II

Peter Muessle,
First Officer

Ash Mughal,
Lead Customer Service Agent

Steven Mullinax,
MD ITS Infrastructure

Crystal Mundo,
Designated Trnr CSA Air Frght

Kelly Munro,
Employee Communications Mgr

Pam Munson,
Aircraft Records Coord

Ethan Munson,
Customer Service Agent

Adde Munye,
First Officer

Sanjeev Muralidharan,
CA Commercial Performance Mgr

Stephen Mureithi,
Lead Line Avionics Technician

Carol Murray,
Dir Divisional FP&A

Margaret Myers,
Flight Attendant

Loghan Myers,
Flight Attendant

Brandi Myers-Shank,
EE Onboarding Ops Spec

Martha Najera Nieblas,
Customer Service Agent Mexico

Austin Nalley,
Customer Service Agent

Mike Narowski,
Regional Cargo Sales Mgr

Charles Nash,
Maintenance Stores Clerk

Farah Nasri,
Customer Service Agent

Joe Nauman,
Captain

Benjamin Nealy,
Captain

Rich Neill,
Sr Software Engineer

Steve Nelson,
Access/Diversity Pgm Mgr

Bryce Nelson,
Ground Service Agent

Jemo Nepomuceno,
Flght Attendant Crew
Scheduler

John Nesbit,
Dispatcher

Kevin Neuwirth,
Customer Service Agent

Debbie Newell,
Accounting Specialist

Eduine Ngendakuriyo,
Concierge SEA

Kathy Nguyen,
Cust Svc Agent-Departure
Ctrl

Ashley Nguyen,
Customer Service Agent

Trang Nguyen,
Line Aircraft Technician

Alma Nguyen,
Sup Station Operations

Georgia Nichols,
Customer Service Agent

Samir Nicola,
Line Aircraft Technician Trnr

Rashad Nijim,
Flight Attendant

Paul Nilson,
First Officer

Paula Ninataype,
Tech Editor & Pubs Spec I

Drew Niva,
Customer Service Agent

Michael Nixon,
Flight Attendant

Michael Nolting,
Captain

Gee Gee Norah,
Lead Customer Service Agent

Michele Nordstrom,
Reservations Sales Agent

Jeannie North,
Flight Attendant

Dimitri Nosarev,
Reservations Sales Agent

Blanche Ntumba,
Flight Attendant

Chad Nye,
Captain

Omar Ochoa,
Line Aircraft Technician

James Ochoa-Rea,
Captain

Valerie O'Donnell,
Reservations Sales Agent

Nick Oestreich,
Sr SOX Program Mgr

Bruce Ofstun,
Captain

Kristin Olsen,
Dir Product Management

Scott Olson,
Captain

Kim Olson,
Flight Attendant

Ahmed Omar,
Customer Service Agent

Anja O'Neil,
Flight Attendant

Michelle O'Neill,
Sup Customer Care

Virginie Ongla Manga,
Customer Service Agent

Michael Ortega,
Captain

Justin Osborne,
Customer Service Agent

Ingrid Otteson,
Flight Attendant

Jayden Ou,
Designated Trnr CSA

David Over,
MD Station Operations
Support

Nick Paavola,
Mgr Revenue Mgt Pricing

Zeke Pacheco,
Technician Helper

Jennifer Paculdo,
Fit Center Coord

Jennifer Page,
Flight Attendant

Megan Page,
Flight Attendant

Kevin Paine,
Princ Commercial Prod Mgr

Brian Palmer,
Flight Attendant

Sandra Pangallo,
Customer Service Agent

Laura Pardue,
Designated Trnr CSA Dept Ctrl

Marcos Paredes Recinos,
Sr Engineer

Theresa Parke,
Mgr Alaska Lounge

Karen Parsons,
Designated Trnr CSA

Kevin Passa,
IAM 89d Temp Assignment L1

Shawna Patterson,
Flight Attendant

Julian Payumo,
Customer Service Agent

Jonathan Pearson,
Mgr Tax

Ryan Pecha,
Dir Financial Accounting

Anthony Pellizzari,
Customer Service Agent

Mel Penitusi,
Passenger Service Agent

Cameron Penny,
Flight Attendant

Riley Peper,
Mgr Revenue Mgt Inventory

Glory Peralta Bencosme,
Customer Service Agent

Tatianna Peratrovich,
Lead Customer Service Agent

Tracy Pereira,
SkyWest Operations Program Mgr

Colette Perez,
Flight Attendant

Luis Perez,
Regional Compliance Mgr

Andy Perez-Rodriguez,
Flight Attendant

Melinda Perkins,
Project Mgr IV

Mary Pesce,
Flight Attendant

Elliott Pesut,
MD Culture Learning&Inclusion

Brad Peters,
Captain

Jacob Peterson,
Captain

Jeffrey Peterson,
Flight Attendant

Abby Pfeifer,
Sr Auditor Audit Programs

David Pham,
Stores Agent

Adrienne Phillip,
Mgr Station Ops

Eric Phillipson,
Dir Procurement

Veronica Piazzi,
Flight Attendant

Deanna Pierson,
Reservations Sales Agent

Mariah Pilegard,
Customer Service Agent

Michele Plage,
Flight Attendant

Kyle Plankers,
Cargo Services Agent

Rosie Podsakoff,
Flight Attendant

Marci Pokorney,
IAM 1yr Special Project C3

James Polivka,
Sr Flight Ops Engineer

Andrew Pongtananon,
Flight Attendant

Conner Poore,
Flight Ops Intern

Devin Posey,
Customer Service Agent

Antonio Posta,
Flight Attendant

Ann Potter,
Flight Attendant

Helmar Prael,
Passenger Service Agent CAN

Chris Pratt,
Dir Maintenance Planning

Payton Price,
First Officer E175

Deanna Price,
Reservations Sales Agent

Rodney Prioleau,
Fit Center Spec I

Sonya Pritchett,
Flight Attendant

Starlette Pruitt,
Accounting Specialist

Beth Pugel,
HR Business Partner

Bill Quackenbush,
Captain

Darren Quigley,
Customer Service Agent

Kenzie Quintal,
Customer Service Agent

Chad Rabinowitz,
Captain

Jacob Rahn,
Flight Attendant

Daniel Raikes,
Revenue Management Team
Lead

Marissa Rainieri,
Sales & Loyalty Market Mgr

Jodie Ramey,
Captain

Darcy Ramey,
Flight Attendant

Lauren Ramirez,
Flight Attendant

Alfredo Ramos,
Customer Service Agent

Ruby Ramos,
Customer Service Agent

Chris Randall,
Dir Software Engineering

Andrew Ransom-Kinsfather,
Customer Service Agent

Sanam Rashid,
Customer Service Agent

Linda Rasmussen,
Flight Attendant

Maribelle Raza-Tsui,
Flight Attendant

Rick Rebollo,
Lead Stores Agent

Wendy Reddick,
Risk Management Spec II

Nick Redford,
Flight Attendant

Bertha Regalado de Fagan,
Sup Reservations

Corey Reidy,
Line Maintenance Planner II

Tyler Reilly,
Dir Ground Crew Resource
Plan

Kris Reinisch,
Captain

Janine Reyes,
Customer Service Agent

Blake Reynolds,
Captain

Kris Reynolds,
Line Aircraft Technician

Megan Rickman,
Sr Compensation Anlyst On-Call

Glenn Ricks,
Sr Mgr EPMO Portfolio

Maria Riley,
Base Spec I

Dave Riley,
Mtx Resource Planning Dir

Kaija Risdal,
Inf Safety & Compl Spec I

John Risko,
Customer Service Agent

Jorge Rivera,
Dispatcher

Jose Roa,
Customer Service Agent

Bryce Roberts,
First Officer

Elizabeth Roberts,
Flight Attendant

Dan Robinson,
Captain

Kent Robinson,
Flight Attendant

Louie Robles,
Flight Attendant

Misael Robles Gonzalez,
Customer Service Agent Mexico

Tim Roddy,
Sr Tax Accountant

James Rodriguez,
Captain

Holly Rodriguez,
Flight Attendant

Rod Rodriguez,
Line Aircraft Technician

Johan Rodriguez Alizo,
Line Aircraft Technician

Tina Rodriguez Heald,
Environmental Affairs Prgm Mgr

Linsey Rogers,
Customer Service Agent

Pamela Rolle,
Flight Attendant

Sean Rolleg,
Flight Attendant

Gypsy Romero,
Customer Service Agent

Rick Romero,
Flight Attendant

Jennifer Romero,
Lead Customer Service Agent

Patricia Rosenkoetter,
Flight Attendant

Kelly Ross,
Lead Customer Service Agent

Matt Ross,
Sr Retirement Services Partner

Nicolette Rossiter-French,
Flight Attendant

Jeremy Rubenstein,
Mgr FP&A

Kelly Ruddis,
Flight Attendant

Alexa Rudin,
MD Communications

Sarah Rueger,
Flight Attendant

Cheri Ruger,
MD People & Labor Relations

Jeraldo Ruiz,
Sup Station Operations

Dennis Rumpel,
Talent Acq Outreach Ptnr

Babrah Rupke,
Reservations Sales Agent

Kristen Ryan,
Sr Talent Acquisition Partner

Angel Sabangan,
Operations Agent

Adam Sadler,
Temp Assignment P3 A SOC

Kelly Safley,
Reservations Sales Agent

Nikki Salazar,
Flight Attendant

Nia Salgado,
Software Engineer I

Santiago Samuel Samuel,
Ramp - Air Freight

Talia Samuelson,
Executive Assistant

Dale Sanderson,
Sup Maintenance

Angela Sandominick,
Customer Service Agent

Michelle Sandoval,
Flight Attendant

Sukhvirpal Sangha,
Sup Line Maintenance

Jose Santiago,
Reservations Sales Agent

Louis Santiago-Buterbaugh,
Flight Attendant

Todd Scarlett,
Flight Attendant

Anthony Schad,
Captain

Isaac Schaefer,
Captain

Andrew Schecker,
Strategic Analytics Mgr

Will Scheele,
First Officer

Andy Schell,
Flight Attendant

Kiley Schlader,
Lead Reservations Sales Agent

Erich Schneider,
First Officer

Timo Schueler,
First Officer

Christina Schultz,
Project Mgr IV

Cheryl Schulz,
Executive Assistant to CEO

Craig Schweitzer,
Line Aircraft Technician Trnr

Peter Schwenke,
Sr Fraud&Rev Protection Anlyst

David Scotland,
Inflight Product & Exp Dir

Marisa Scudero Habegger,
Customer Service Agent

James Seagraves,
Engineer

Susannah Sedgewick,
Flight Attendant

Tony Seisser,
Captain

Nathan Self,
Flight Attendant

Naylhea Serrano,
Customer Service Agent

Patricia Severkovski,
Reservations Sales Agent

Jeff Severns,
MD Flight Ops Training

Ryan Sexton,
First Officer

Omar Shaar,
Captain

Igor Shandler,
Sr Employee Relations Partner

Niki Sharan,
Group Sales Mgr

Kristine Sharick,
CSA - Air Freight

Jeffrey Sharples,
Captain

Jean Sharrock,
Flight Attendant

Steven Shaw,
Passenger Service Agent

Rindle Shedlin,
Customer Service Agent

Becca Shepard,
Flight Attendant

Melanie Shepherd,
Lead Reservations Sales
Agent

Scot Sherbert,
Principal Engineer

Kai-Chin Shih,
Sr Commercial Prod Mgr

Lyndsey Shimazu,
BI Analyst III

Terri Shintaku,
Sup Accounting Office

Kyle Shoun,
Sr Engineer

Chris Shupe,
First Officer

Aaron Siclovan,
Maintenance Controller

Nathan Sielaff,
Principal Ent System
Engineer

Peter Silberstein,
Mgr Crew Pay

Seth Silvernail,
Principal Scrum Master

Laura Simmons,
Flight Attendant

Kenny Simmons,
Flight Attendant

Amber Simonsen,
Dir EPMO Portfolio

Kushal Singh,
Captain

Marci Singleton,
Reservations Sales Agent

Jon Sites,
Dir Flight Operations Safety

Gargaar Siyad,
Flight Attendant

Brent Skuba,
Flight Attendant

Jonda Sleppy,
IAM 89d Temp Assignment
L1

John Sluys,
Captain

Dom Smith,
Customer Service Agent

Tron Smith,
First Officer

Ernesto Smith,
Flight Attendant

Andrew Smith,
Reservations Sales Agent

Cameron Smith,
Software Engineer II

Wesley Smith,
Sr AOG Engineer

James Sniezak,
Line Aircraft Technician

Cameron Snyder,
Line Avionics Technician

Andrea Soltesz,
CSA - Air Freight

Kelvin Sonnekson,
Flight Attendant

Gregory Sorini,
Customer Service Agent

Rosalinda Sosa,
Stores Agent

Dania Soto Escobar,
Fraud & Rev Protection
Analyst

Stacia Spence,
Guest Care Trainer & Coach

Alex Spiegel,
Customer Service Agent

Renae Spooner,
Payroll Analyst II

Sam Staab,
Ground Service Agent

Sally Stagner,
Lead Station Agent

Dana Stahla,
Flight Attendant

Brent Stanghelle,
Sr Field Planning Spec

Marvin Stark,
Line Aircraft Technician Trnr

Jennifer Stauffacher,
Flight Attendant

Denise Stecconi Ferraro,
Captain

Jeff Stein,
Flight Attendant

Eddie Stevens,
Customer Service Agent

Brennan Stewart,
Flt Ops Instr Dsgnr & Trnr II

Natasha Stober,
Customer Service Agent

Cassondra Stoter,
Paid Undergraduate Intern

Marv Stover,
Captain E175

Neil Stover,
Employee Comms Mgr

Tyler Strader,
Dispatcher

Heidi Strom,
Customer Service Agent

Aaron Stroope,
Lead Customer Service Agent

Joanne Stroud,
Flight Attendant

Nellie Suess,
Mgr Engineering Support

Jessica Sullivan,
Sup Reservations

Austin Sumsion,
Mgr Station Ops

Alana Sundahl,
Inflight ISD I

Sreekanth Surabhi,
Principal Software Engineer

Infinity Swaim,
Flight Attendant

Tieran Sweeny-Bender,
Lead Customer Service Agent

Christine Ta,
Principal Software Engineer

Jeffrey Tabaco,
Lead Customer Service Agent

Olga Taghavi,
Flight Attendant

Randi Taylor,
Reservations Sales Agent

Jules Tcheuga,
Designated Trnr CSA Air Frght

Delaney Telford,
Flight Attendant

Clem Terino,
Captain

Wilson Terng,
Passenger Service TC

Anne Marriele Terrobias,
Concierge ANC

Annie Terry,
Flight Attendant

Gary Thomas,
Concierge SFO

Austin Thomas,
QA Auditor Audit Programs

Tim Thompson,
Cmmnty Mktg & PR Dir AK

Marcia Thompson,
Customer Service Agent

Fern Thompson,
Customer Service Agent

Kelsi Thompson,
Flight Attendant

Karen Thompson,
Lead Reservations Sales Agent

Nathaniel Thompson,
Mgr Station Ops

Annika Thorpe,
HR Business Partner

Neil Thwaites,
Regional VP California

Dan Tilton,
Project Mgr V

Ed Tinker,
Customer Service Agent

Derek Tiplin,
Captain

David Tisch,
Sr Policy & Procedure Spec

Jeff Tobius,
Customer Service Agent

Taniela Tokailagi,
CSA - Air Freight

Hamid Tokhi,
Line Aircraft Technician

Alison Tong,
Sr HR Compliance Analyst

Olivia Torres,
Operations Agent Trainer

Samuel Trahan,
Central Load Planning Trainer

Jennifer Traini,
IAM 2yr Special Project C3

Binh Tran,
Dispatcher

Craig Trounce,
Mgr Reservations II

Matthew Trujillo,
Sup Inflight Crew Scheduling

Lindsay Tuiasosopo,
Training Delivery Spec

Karmin Tyler,
Customer Service Agent

Courtney Unruh,
SAF & Sustainability Engmt
Dir

McNeil Urseth,
Flight Attendant

Gavin Usher,
Customer Service Agent TC

Melanie Uyeda,
Guest Care Trainer & Coach

Jong Valientes,
Flight Attendant

Gregory Van,
Pricing Team Lead

Ted Van Der Kolk,
Captain

Chad Van Someren,
Captain

Margareta Vanderpoel,
Flight Attendant

Nick Vanni,
Customer Service Agent TC

Dennis VanTrease,
Dir ITS Field Services

Lourdes Velasquez,
Reservations Sales Agent

Lillian Velazquez,
Flight Attendant

Luis Vera Tadeo,
Line Aircraft Technician

Maria Luisa Villalobos
Barrios,
Customer Service Agent

Nick Villani,
First Officer

Jose Villanueva,
Customer Service Agent

Jennifer Villar,
Dir Network & Connctvty
Solns

Ivan Villela,
Flight Attendant

Adela Vincenty,
Flight Attendant

Joost Vlek,
Airport Affairs Dir

Nicolas Volante,
Flight Attendant

Leeanna Wagner,
Concierge SEA

Chris Wagstaff,
Lounge On-Call LAX

Molly Waldman,
Flight Attendant

Steve Walkington,
Sr Simulator Engineer

Jen Wallace,
Flight Attendant

Nicole Wallace,
Sr Auditor Audit Programs

Chaz Walsh,
Network Operations Control Dir

Joni Walter,
Flight Attendant

Chris Walthall,
Mgr ITS Endpoint Platform

Richard Wang,
Engineer

Amanda Want,
Government Relations Mgr

Deja Wanzer,
Lead Customer Service Agent

Andy Ward,
Captain

Reed Warner,
Customer Service Agent

Jay Warren,
Dispatcher

Dustin Watkins,
First Officer

Nisha Watts,
Customer Service Agent

Kevin Weatherbie,
Inf Policy & Procedure Spec

Tim Weigand,
Sr Service Engineer

Kelsey Weinkauf,
Flight Ops Trng Cmplnce Spec

Seth Weinstock,
Flight Attendant

Linda Weiss,
Passenger Service Agent

Carla Weller,
IT Services Coord

Chris Welter,
Sr Tech Audit Program Mgr

Dante West,
Dir Revenue Management

Ray West,
Flight Attendant

Sara White,
Customer Care Rep II

Taylor White,
Flight Attendant

Brian White,
Mgr HRBP

Eva Whitfield,
Customer Service Agent Trainer

Chris Wieland,
Reservations Sales Agent

Alexander Wigoda,
Mgr Flight Ops Performance

Trevor Williams,
BI Analyst II

Mickey Williams,
Ground Service Agent

Wendy Williams,
Inflight Svcs Trng Spec II

Andray Williams,
Mgr Line Maintenance

Diane Williams,
Passenger Service Agent

Dylan Williams,
Passenger Service TC

Ryan Williams,
SCM Mgr

Tyler Williams,
Strategic Analytics Mgr

Tierra Willoughby,
Designated Trnr CSA

Elliot Wilson,
Captain

Brittain Wilson,
Passenger Service Agent

Mark Winter,
ASMTX

Andrew Winter,
Customer Service Agent TC

Kimi Wisniowicz,
Treasury Analyst III

Len Wolford,
Sr Policy & Procedure Spec

Tak Wong,
Princ Data Scientist

Dayna Wongpoe,
Instructional Designer

Dave Wood,
Captain

Daniel Wood,
Captain

Geoffrey Wood,
First Officer

Joel Wood,
Flight Attendant

Dave Woodall,
Captain

Portia Woodard,
Customer Service Agent

Mitchell Woods,
Customer Service Agent TC

Wendi Woodyard,
Reservations Sales Agent

Athena Xiong,
Reservations Sales Agent

Marie Yadao,
Customer Service Agent

Nathan Yagi Stanton,
Cust Svc Agent-Departure
Ctrl

Todd Yakel,
First Officer

Henry Yamamoto,
Principal Product Mgr

Wihianna Yavorsky,
Customer Service Agent

Renee Yeargin,
Sup Station Operations

Jerry Yim,
Mgr Indirect Tax

Brad Young,
Flight Attendant

Su Zhao,
Sr Product Mgr

May Zhen,
Passenger Service TC

Jialu Zhu,
Sr Software Engineer

Rick Ziegenhagen,
Reservations Sales Agent

Damon Zirkler,
Sr Princ Solutions Architect

Jared Zwanziger,
First Officer

**BEFORE THE**
**DEPARTMENT OF TRANSPORTATION**
**OFFICE OF THE SECRETARY**
**WASHINGTON, D.C.**

| Establishment of Slot Exemption Proceeding at Ronald Reagan Washington National Airport Pursuant to 49 U.S.C. § 41718 | Docket DOT-OST-2024-0065 |
|---|---|

**CONSOLIDATED ANSWER OF SPIRIT AIRLINES, INC.**

Spirit Airlines (Spirit) submits this Consolidated Answer to address matters raised in the applications of Alaska Airlines (Alaska), Frontier Airlines, (Frontier), and United Airlines (United), as well as the Comments submitted by the Service Employees International Union (SEIU).

Spirit again emphasizes that its proposed service from San Jose (SJC) to Washington Reagan National Airport (DCA) is in the public interest and is the best choice for receiving an award of slot exemptions in this proceeding. DCA beyond perimeter exemption slots are an extraordinary giveaway of a federal benefit worth millions of dollars in revenues to the airlines that receive them. Today there are eight major airlines that applied for these DCA slots: American, Alaska, Delta, Frontier, JetBlue, Southwest, Spirit and United. All of these, except for Spirit, have been awarded at least one beyond perimeter slot pair. American already holds 6 beyond perimeter slot pairs, Alaska holds 5, and Frontier holds 3.[1]

[1] At least three (3) of American's slot pair were inherited from America West when that carrier was considered a low-fare new entrant.

Given this background, and simply on the basis of promoting competition, Spirit must be the number one choice for a slot pair. While there are several lists of the most expensive U.S. airports to fly from, it is not surprising that not surprisingly, SFO and IAD rank in the top four in every list, which San Jose (SJC) ranks among the lowest cost.[2] Also not surprising is that Fort Lauderdale-Hollywood International Airport (FLL), where Spirit is based, as well as Orlando International Airport (MCO), another major Spirit hub, often rank among the "least expensive."[3] Increasing United at SFO will neither add non-stop service where none exists nor stimulate competition. Indeed, the most likely outcome of an award to United would be higher fares in the Bay Area – Washington Metro market. Spirit's service will create a significant low fare option for the 40% of the San Francisco Bay area population for which SJC is the most convenient airport in the heart of Silicon Valley.

## I. Application of Alaska Airlines

Alaska is clearly disqualified by statute from receiving new slot exemptions as a limited incumbent. But even considering the merits of its application, Alaska already has five beyond perimeter slot pairs for service to DCA: two (2) pairs for Seattle, and one pair each for Portland, San Francisco, and Los Angeles. Awarding Alaska another slot pair on the West Coast would be the antithesis of promoting the competition envisioned by FAA 2024. Moreover, San Diego, already has five daily non-stop flights to Dulles (IAD), including four by United and one by Alaska. Awarding a non-stop to DCA likely will divert traffic from IAD but will not substantially

---

[2] IAD and SFO were found to be the #1 and #2 most expensive airports, respectively, based on analysis conducted using data published by the Department. *See The most and least expensive U.S. airports to fly from in 2024*, MIAMI HERALD (July 17, 2024), https://www.miamiherald.com/living/travel/article290161064.html.

[3] In the same analysis, MCO and FLL were found to be the #1 and #2 ***least expensive*** airports. *Id.*

improve market access to the Washington area from San Diego or generate much in the way of new competition. This is a complete contrast to Spirit at San Jose, which as shown in Spirit's application, is more convenient for approximately 40% of the population who live north of SFO and would provide true low fare competition to United and Alaska which each currently operate an SFO-DCA non-stop.

FAA 2024 was quite specific as to the statutes and regulations which define which airlines are limited incumbents and Spirit reiterates its previous statement that Alaska is not eligible and "*shall not qualify for a new … slot exemption as a … limited incumbent air carrier*" because it has a codeshare agreement with American Airlines, [4] and "*the total number of slots and slot exemptions held by the two carriers at the airport exceed 20 slots and slot exemptions.*"[5] As the Department has made clear, *"[f]or the purposes of these slot exemptions, 49 U.S.C. Section 41714(k)* ***mandates*** *that, in the case of code-share carriers, the slot holdings of both carriers must be aggregated in determining the 20-operations threshold.*"[6]

In this instance, Alaska's codeshare partner American Airlines is the holder of more than 50% of all DCA slots. As of the most current slot data on the FAA website, American holds 503 regular slots or exemptions, while Alaska holds 18 – for a combined total of 521. Notably,

---

[4] *See* 81 Fed. Reg. 89979, *United States v. Alaska Air Group, Inc., et al.; Proposed Final Judgment and Competitive Impact Statement* (Dec. 13, 2016) ("Alaska has closely aligned itself with American, the largest U.S. airline, through a commercial relationship known as a codeshare agreement, which … began in 1999….").

[5] 49 U.S.C. § 41714(k); *see also* Letter from Counsel for Spirit Airlines to Assistant Secretary Petsonk, Docket DOT-OST-2024-0065 (June 26, 2024).

[6] Order 2004-12-6, p.6, Docket DOT-OST-2000-7182 (Dec. 6, 2004) (emphasis added). *See also, e.g.*, Order 2004-4-2, at n.2, Docket DOT-OST-2000-7182 (Apr. 1, 2004) (requiring compliance with 41714(k) for DCA slot exemptions); Order 2000-4-10, at n.2, Docket DOT-OST-2000-7176 (Apr. 19, 2000) (requiring compliance with 41714(k) for LGA slot exemptions); Order 2000-4-15, at n.3, Docket DOT-OST-2000-7180 (Apr. 19, 2000) (requiring compliance with 41714(k) for ORD slot exemptions); Order 2000-4-13, at n.2, Docket DOT-OST-2000-7178 (Apr. 19, 2000) (requiring compliance with 41714(k) for JFK slot exemptions).

Alaska and American continue to expand their codeshare relationship, and in May 2024 it included over 100 scheduled codeshare flights originating or departing from DCA.[7] Evaluating the Alaska-American codeshare relationship in both aspects leads to a combined number of slot/exemption totals that greatly exceed the 20 slot/exemption maximum. Contrary to footnote 1 of Alaska's application, Section §41714(k) requires the Department to deem Alaska ineligible to receive new slot exemptions as a limited incumbent.

## II. Application of Frontier Airlines

Frontier's imaginative argument to support eligibility for limited incumbent slots is incorrect and contradicts the position it previously took in the 2012 DCA slot proceeding. In that proceeding Frontier asserted: (1) "*Statutorily speaking, **Frontier is a 'new entrant,'** given the recent amendments int the 2012 FAA Act*," [8] and (2) "***None of [Frontier's] DCA slot exemptions counts** for purposes of Frontier's qualifying as a limited incumbent.*"[9]

Frontier also makes the implausible argument that Congress intended the word "*incumbent*" to allow slot exemption awards only to an airline currently operating at DCA. Frontier did not support this assertion with reference to any authority. Its assertion contradicts unambiguous statutory language stating incumbency is based on whether a carrier has held or operated slots (not slot exemptions) at DCA after December 16, 1985. Unlike Frontier, Spirit meets all statutory and regulatory criteria for status as a limited incumbent and remains the only carrier eligible for an award of the limited incumbent slot exemptions provided by FAA 2024. Frontier,

[7] *See* Spirit Letter, *supra* note 2, at Exhibit A.

[8] Application of Frontier Airlines, Inc., at n.6, DOT-OST-2012-0029 (Mar. 12, 2012).

[9] Application of Frontier Airlines, Inc., at 5-6, DOT-OST-2012-0029 (Mar. 12, 2012).

according to its own words, is a "new entrant" – which is the only place where the distinction for eligibility based on the word "incumbent" applies– and remains *ineligible* for any award of the FAA 2024 slot exemptions.

An airline must fall under one of three operating categories at an airport: (1) a new entrant; (2) a non-limited incumbent; or (3) a limited incumbent. A "new entrant" is defined for DOT statutory purposes as a carrier "*that does not hold a slot at the airport concerned and has never sold or given up a slot at that airport after December 16, 1985, and a limited incumbent carrier*."[10] The latter reference to "*and a limited incumbent carrier*" (*i.e.*, a "*New Entrant Limited Incumbent*") only has one meaning when read consistently with the definition of a Limited Incumbent in 49 U.S.C § 41714(h)(5).

Specifically, this encompasses carriers which hold or operate slot exemptions at an airport (thus negating the first part of the "new entrant" definition), but not qualifying as a limited incumbent carrier because they have never held or operated a permanent slot ***as 49 U.S.C. § 41714(h)(5) requires and distinguishes***.[11] This is precisely why, as it asserted in 2012, Frontier qualifies as a new entrant although it may operate slot exemptions at the airport now. This is not punitive, but a carefully considered system Congress established which benefits Frontier by granting it priority to receive permanent slots in any future FAA slot lotteries (just as Spirit did in 2003).[12] Spirit, on the other hand, would only qualify as a limited incumbent in such lottery as it meets the definition of a limited incumbent, and simultaneously meets the criteria

[10] 49 U.S.C. § 41714(h)(3)

[11] 49 U.S.C. § 41714(h)(5).

[12] New entrants, for example, can select more slots in a lottery and receive priority for selections over all other categories of carriers. *See* 14 C.F.R. § 93.225.

excluding it from qualifying as a "new entrant' because Spirit has "sold or given up a slot at that airport after December 16, 1985."[13]

Incredibly, Frontier reads the statute to mean that "fewer than 12" slots includes zero, such that any and all carriers qualify as "limited incumbents."[14] But under the proper definition of limited incumbent carrier, "fewer than 12" must mean greater than zero. Otherwise there would be no purpose for a definition of new entrant carrier if zero slots constituted a limited incumbent.

Contrary to assertion made by Frontier, Spirit *is* under statutory and regulatory definitions a limited incumbent carrier who qualifies under FAA 2024 for a pair of slot exemptions. Spirit is the only carrier that qualifies as a limited incumbent carrier. At the date of enactment of the 2024 Reauthorization, Spirit held no more than and no less than four permanent slots at DCA which it was awarded through an FAA-administered lottery on August 12, 2003.[15] Because of this previous award of slots, Spirit qualifies under the statute.

Even if Frontier could by some twisted logic be considered a limited incumbent it already has six DCA exemption slots so awarding it two more while rejecting Spirit's application to a significant market area which now has zero flights to DCA, would be contrary to both decisional criterial imposed by the FAA 2024.

---

[13] 14 C.F.R. § 93.213(a)(1).

[14] Application of Frontier Airlines, Inc. for Slot Exemption, Docket DOT-OST-2024-0065 (July 8. 2024).

[15] See Application of Spirit Airlines, Inc. for Two Slot Exemptions for DCA-SJC Service, Docket DOT-OST-2024-0065 (July 8, 2024); *see also*, 68 Fed. Reg. 50584 (Aug. 21, 2003); Order 2003-9-30, Docket DOT-OST-2003-15972 (granting Spirit's request to slide operating times of four slots permanently allocated by FAA on August 12, 2003).

## III. Application of United Airlines

In response to the United Airlines application seeking to add more flights to its existing service from San Francisco International Airport (SFO), Spirit emphasizes how its own SJC-DCA service would bring low fares and fierce competition in the Bay Area against the existing SFO-DCA service provided by United and Alaska. **Spirit expects its average fares for SJC-DCA ($152) to come in on average at 60% lower than United's ($383) and 50% lower than Alaska's average fares for SFO-DCA ($309).**[16]

Spirit's proposed service connecting Northern Californians in the Bay Area from SJC directly with service to DCA is the most efficient, convenient, and affordable option that is not available to travelers yet.[17] Indeed, United itself states in its initial application for service to SFO that:

> "Expanding further to include the San Francisco Bay Area and the communities of, and surrounding, San Jose (SJC) and Oakland (OAK), ***neither of which have a nonstop flight to/from DCA***, increases the number of annual bookings under consideration by United's proposal to 685,000, amounting to nearly the second largest beyond-perimeter metropolitan route."[18]

Clearly, there is great need for another flight option, in particular one that is more convenient for travelers in the Bay Area. But this goes beyond convenience and affordability for passengers—it has a tremendous impact on the airport service workers.

[16] March 2023 – March 2024 revenue data, Cirium (Diio).

[17] See Spirit Application for Slot Exemption, Docket DOT-OST-2024-0065

[18] See Application of United Airlines, Docket DOT-OST-2024-0065 at 4 (emphasis added).

### IV. Comments of Service Employees International Union (SEIU)

Spirit agrees in principle with the statement made by Service Employees International Union (SEIU) in its filed comments, which state:

> "In keeping with the Department's mission to promote competition in the airline industry, we strongly urge the Department to award the slots to ***air carriers that do not already control large numbers of slots at the airport***. We believe that awarding the beyond-perimeter slots in a way that creates more competition at DCA will benefit both workers and passengers."[19]

Spirit agrees that competition is essential for a thriving economy, which will serve to benefit not only travelers but the airport and airline employees that provide safe air transportation. Granting Spirit's DCA-SJC service would support competition across many interests, and promote the Department's mission to "*deliver the world's leading transportation system,* ***serving the American people and economy*** *through safe, efficient, sustainable, and equitable movement of people and goods.*"[20] Spirit is the only limited incumbent choice which will uphold the mission and ideals of the Department.

### V. Conclusion

In conclusion, Spirit Airlines is the only airline who qualifies under the definition of "limited incumbent carrier" and makes the strongest argument for why its option to service a flight between DCA and SJC is the best choice—if granted, Spirit would service the only direct flight between DCA and SJC at a low-cost, affordable price for value-conscious passengers.

---

[19] See Comment of Service Employees International Union, Docket DOT-OST-2024-0065 (emphasis added).

[20] *About DOT*, U.S. DEP'T OF TRANS. (2022), https://www.transportation.gov/about (emphasis added).

**Consolidated Answer of Spirit Airlines, Inc.** **DOT-OST-2024-0065**
July 17, 2024 Page 9

This supports economic efficiency, consumer choice, and competition—factors the Department of Transportation has emphasized as important over the last several decades. Spirit is qualified and ready to implement this flight route which will benefit consumers, enhance competition, and overall support the mission of the Department.

Respectfully submitted,

Joanne W. Young
David M. Kirstein
Donald L. Crowell
**Counsel for Spirit Airlines, Inc.**

JA 000332

**BEFORE THE**
**U.S. DEPARTMENT OF TRANSPORTATION**
**WASHINGTON, D.C.**

| | |
|---|---|
| Establishment of Slot Exemption Proceeding At Ronald Reagan Washington National Airport Pursuant to 49 U.S.C. § 41718 | Docket DOT-OST-2024-0065 |

**COMMENTS OF**
**THE SAN DIEGO COUNTY REGIONAL**
**AIRPORT AUTHORITY**

In communication dated June 24, 2024, the Department of Transportation invited air carriers to file applications for five roundtrip slot exemptions at Ronald Reagan National Airport ("DCA") for flights to airports located within or beyond the 1,250-mile DCA perimeter pursuant to the Securing Growth and Robust Leadership in American Aviation Act of 2024 ("FAA 2024"). Five pairs of roundtrip slot exemptions are expected to be granted, four to non-limited incumbent air carriers and one to a limited incumbent carrier.

Alaska Airlines ("Alaska") has applied for a pair of roundtrip slot exemptions to serve San Diego International Airport ("SAN") from DCA. The San Diego County Regional Airport Authority ("SDCRAA"), operator of San Diego International Airport, strongly supports Alaska's application to serve the largest unserved DCA market. As explained below, it is in the public interest to award a roundtrip exemption to Alaska for SAN-DCA service.

***Background***

San Diego, California, is a large metropolitan area that lies 2,276 miles from DCA. The City of San Diego is the second largest city in California. At 3.3 million inhabitants, the County of San Diego is the

fifth most populous county in the United States and second most populous in California. SAN serves a diverse bi-national catchment area which includes San Diego County, Imperial County, and southern Orange and Riverside counties. Situated only 15 miles from the US – Mexico border, SAN also serves the five Mexican municipios of Tijuana, Mexicali, Tecate, Playas de Rosarito and Ensenada. The Mexican census and statistical agency, INEGI (2020), estimates over 3.7 million inhabitants live within the five Baja California municipios. The Baja California community uses SAN frequently to avail domestic flights to points in the United States.

The economy of San Diego is anchored in key sectors such as aerospace, cleantech, cybersecurity, defense, life sciences, manufacturing, software, tech and visitor hospitality. All sectors have a broad interest in flights to DCA.

The federal government has a large presence in the region employing nearly 183,000 people. Many of the federal employees are engaged in national defense activities; in fact, at over 111,000 the San Diego region hosts the single largest concentration of active-duty military in the country. This sector would benefit from critical nonstop access to DCA, the closest airport to the headquarters of the Department of Defense, the Pentagon.

The life sciences, tech, clean technology, and visitor hospitality all have a deep community of interest with branch offices, associations, organizations, and government entities in the Washington region including: the Food and Drug Administration (FDA), National Institutes of Health (NIH), National Institute of Standards and Technology (NIST), Customs and Border Protection (CBP), and the Department of Energy (DOE).

***Application***

Alaska has filed for authority to operate a nonstop roundtrip San Diego – DCA flight utilizing large capacity 159-seat Boeing 737-800 or 737-MAX 8 aircraft.

Using the criteria set forth by FAA 2024, the SDCRAA places the following facts into the public record.

***A) Enhance options for nonstop travel to beyond-perimeter airports that do not have nonstop service from DCA as of the date of enactment of FAA 2024***

San Diego – DCA is the largest unserved domestic origin and destination (O&D) market (SAN-1) and the largest unserved market from each airport (SAN-2). DCA-SAN is the largest at 225 PDEW (passengers daily each way). The next highest unserved DCA market, San Antonio (SAT) is only 69% of the O&D of DCA-SAN.

DCA-SAN has always been a strong O&D market (SAN-3). Apart from the pandemic period, average annual passengers have consistently exceeded 150,000. In the five years before the pandemic, traffic volumes were averaging nearly 180,000 passengers annually. DCA-SAN is the ninth largest O&D market outside the perimeter (SAN-4) yet has no nonstop service to DCA. Current DCA-SAN traffic volumes are higher than two current DCA-beyond perimeter markets: San Juan (SJU) and Portland (PDX).

When all Washington area airports (BWI, DCA, IAD) are included, the San Diego – Washington area market (WAS) is the seventh largest outside the 1,250-mile perimeter (SAN-5). In 2023, the WAS-SAN market represented 1,004 PDEW (732,920 total passengers annually). The aggregate San Diego – Washington market is larger than four (4) markets with beyond perimeter access from DCA, including Austin (AUS), San Juan (SJU), Salt Lake City (SLC) and Portland (PDX). Additionally in 2023, 281,269 of the total annual passengers between San Diego and Washington (WAS) endured connections (SAN-6).

Alaska service between DCA and San Diego would add new gateway airport competition in the Washington – San Diego market (SAN-7). This would help San Diego's situation greatly as historically San Diego has paid relatively high nonstop fares to Washington Dulles.[1] For instance, the federal

[1] After Alaska entered the IAD-SAN route in Q2 2023, fares on the route decreased by about 26%. See Alaska Application at 5, Exhibit AS-7.

government is currently paying contract fares between Dulles and San Diego of $496. This GSA contract fare is the highest of any market in this proceeding (SAN-8). Add on the average taxi/TNC fare from Dulles to the District of Columbia and the government is paying nearly $600.

***Nonstop Air Access between SAN and DCA – Critical Importance for Industry***

San Diego's defense cluster is critical for the region's innovation and military economies, and ultimately, to the United States' national security priorities. San Diego is home to the largest concentration of military assets in the world and the largest federal military workforce in the country. When considering the overall ripple effects of the defense cluster in San Diego, about 20 percent of San Diego's gross regional product (GRP) is the result of defense-related spending. In the GSA City-Pair 2024 contract year, SAN-DCA was the second largest GSA city-pair market (SAN-9) at a passenger count of 28,317. SAN-IAD and SAN-BWI had GSA passenger counts of 14,979 and 6,866 respectively. Huge efficiencies could be gained by having a segment of SAN-DCA federal government travelers travel nonstop. Additionally, there is a profound efficiency in linking key Pacific defense installations with the airport (DCA) closest to the Pentagon. For instance, the Navy Region Southwest headquarters and the Pentagon are located 3 miles or less from their respective home airports SAN and DCA (SAN-10).

San Diego's Life Sciences industry cluster has a deep history in the region's innovation economy, contributing for nearly half a century to global advances in pharmacology, genomics, and medical device manufacturing. Seeded by globally renowned research institutions, and fueled by private and public investment, San Diego has grown into one of the top three Life Sciences markets in the world. The life science sector has extensive interactions with NIH and FDA. DCA is the closest airport to the federal health research and regulatory institutions. Policy decisions, regulatory approvals and funding play crucial roles in the development and success of this industry.

San Diego's technology industry, including telecommunications and software development is influenced by federal policies on technology, cybersecurity and intellectual property. Federal research grants and

contracts also support innovation in this sector. San Diego's universities and research institutions receive federal funding for research projects and educational programs. Policies, intellectual exchange, and funding from the nation's capital influence the scope and direction of research initiatives in the region.

Travelers, both business and leisure, have wasted hundreds and thousands of hours annually on connecting flight itineraries between the two central airports (DCA and SAN) (AS-6) – representing 30+ years of time. Inefficiencies are centered around increased travel time and risk of missed connections. Using July 22, 2024 Cirium schedules as a proxy day, Alaska's proposed 300 minute eastbound travel time would reduce travel time by at least 100 minutes (1 hour 40 minutes). Westbound travel would save 75 minutes (1 hour 15 minutes) or more. The resulting roundtrip time savings equates to nearly 3 hours. At an 87% load factor, this would create efficiencies of more than 300,000 hours annually. More importantly, flying this route nonstop would benefit individual CO2 contributions as flying without connecting eliminates additional fuel intensive take-offs and landings.

Sustainability is an important principle in SAN's planning for a zero-carbon future. In fact, SAN has already achieved the highest level of carbon reduction certification under the Airport's Council International's *Airport Carbon Accreditation (ACA) program.* San Diego has reached the highest level 4+ "Transition", which was achieved through programs that instituted carbon-free electricity and all-electric vehicles at the airport. The airport also facilitated carbon-emission reductions by airlines and transportation network providers and enabled carbon-offset purchases by air passengers. SAN is the only airport in this proceeding that has achieved Level 4+ Transition. Having a nonstop flight to one of our largest unserved airports will help us continue the effort to reduce the unnecessary carbon contributions of connecting flights.

Establishing nonstop SAN-DCA service deserves prioritization because San Diego would provide a new market as called for in FAA 2024 and enhance service options and competition in the national air transportation network. Prioritizing San Diego will ensure better utilization of flight capacity where

demand is more diversified, proven, and consistent.  SAN has the capacity to handle additional nonstop services, the Airport Authority began construction on the New Terminal 1 which includes the replacement of the current Terminal 1, improvements to the airfield, and improved transportation connectivity to the airport.

Alaska's application for SAN-DCA service is supported by a broad coalition of political leaders, civic organizations, corporations, and individuals. The list below outlines the appeal for nonstop flights to DCA and real public benefits (efficiencies and SAN-WAS competition).

**Elected Officials:**

1. Members of Congress Representing San Diego – Rep. Sara Jacobs, Rep. Juan Vargas, Rep. Scott H Peters, Rep. Mike Levin, Rep. Darrell Issa
2. San Diego Mayor Todd Gloria
3. California State Senator Toni Atkins (39th Senate District and Senate President pro Tempore Emeritas)
4. California State Senator Stephen Padilla (18th Senate District)
5. California State Senator Catherine Blakespear (38th Senate District)
6. California State Senator Brian Jones (40th Senate District)
7. Assemblymember Chris Ward (78th Assembly District)
8. Assemblymember David Alvarez (80th Assembly District)
9. Assemblymember Akilah Weber (79th Assembly District)
10. Assemblymember Brian Maienschein (76th Assembly District)
11. Chairwoman, Nora Vargas, San Diego Board of Supervisors
12. Supervisor Joel Anderson, San Diego Board of Supervisors
13. Vice Chair Terra Lawson-Remer, San Diego Board of Supervisors
14. Supervisor Monica Montgomery Steppe, San Diego Board of Supervisors
15. Supervisor Jim Desmond, San Diego Board of Supervisors
16. Council President Sean Elo-Rivera, San Diego City Council (District 9)
17. Council President Pro Tem Joe LaCava, San Diego City Council (District 1)
18. Councilmember Stephen Whitburn, San Diego City Council (District 3)
19. Councilmember Henry Foster III, San Diego City Council (District 4)
20. Councilmember Marni von Wilpert, San Diego City Council (District 5)
21. Councilmember Kent Lee, San Diego City Council (District 6)
22. Councilmember Raul Campillo, San Diego City Council (District 7)
23. Councilmember Vivian Moreno, San Diego City Council (District 8)
24. Oceanside Mayor Esther Sanchez
25. Poway Mayor Steve Vaus
26. Imperial Beach Mayor Paloma Aguirre
27. Chula Vista Mayor John McCann
28. Vista Mayor John Franklin
29. Solana Beach Mayor Lesa Heebner
30. Escondido Mayor Dane White
31. San Marcos Mayor Rebecca Jones

**Labor:**

1. Alaska Airlines Master Executive Council – Air Line Pilots Association, International
2. Aircraft Mechanics Fraternal Association
3. San Diego and Imperial Counties Labor Council, AFL-CIO

**Airport & Port:**

1. San Diego International Airport
2. Port of San Diego

**Associations:**

1. San Diego Tourism Authority
2. California Travel Association
3. San Diego Regional Chamber of Commerce
4. East County Chamber of Commerce
5. North San Diego Business Chamber
6. San Diego County Lodging Association
7. San Diego Regional Economic Development Council
8. San Diego East County Economic Development Council
9. South County Economic Development Council
10. Imperial Valley Economic Development Corporation
11. Downtown San Diego Partnership
12. San Diego Sport Innovators/Sports San Diego
13. San Diego Working Waterfront
14. San Diego Convention Center Corporation
15. Asian Business Association of San Diego
16. CA State Hispanic Chamber of Commerce
17. CA State African American Chamber of Commerce
18. Cyber Center of Excellence
19. NAIOP Commercial Real Estate Development Association
20. Cleantech
21. San Deigo Sport Innovators

**Businesses:**

1. SeaWorld San Diego
2. Lockheed Martin Corporation
3. General Atomics
4. Qualcomm
5. Deloitte
6. Boston Consulting Group – San Diego
7. Clark Construction
8. Cox
9. Cultura
10. TaylorMade Golf Company
11. Evans Hotels
12. Firestorm
13. Aquacycl

14. GKN Aerospace
15. Biocom
16. Health Innovation Products
17. Intesa Communications Group
18. Quantum Applied Science and Research (QUASAR) and Wearable Sensing
19. Epitope Diagnostics, Inc.
20. Visaic, Inc.
21. Ace Parking
22. Illumina
23. Harland Brewing Company
24. Scout Distribution
25. REP Publishing, Inc.

**Government & Education:**

1. San Diego Association of Governments
2. San Diego County Water Authority
3. San Diego Gas & Electric
4. San Diego State University
1. University of California SD Chancellor Pradeep K. Khosla
2. UCSD Jacobs School of Engineering
3. MiraCosta College
4. California State University, San Marcos
5. Point Loma Nazarene University

**Military/Veterans Organizations:**

1. San Diego Military Advisory Council (SDMAC)
2. Veterans In Business Network
3. Coalition of retired military leaders

**Nonprofits:**

1. San Diego Zoo Wildlife Alliance
2. Burnham Center
3. The Leukemia and & Lymphoma Society, Southern California/Hawaii Region
4. United Way of San Diego County
5. Policy & Innovation Center

# SAN-1: San Diego-Washington DCA is the Largest Unserved Market in the USA

**LARGEST UNSERVED DOMESTIC O&D IN USA**

| Rank | Org | Dst | Passengers per Day |
|---|---|---|---|
| **1** | **DCA** | **SAN** | **225** |
| 2 | LAX | LGA | 212 |
| 3 | MCO | SMF | 179 |
| 4 | LGA | SAT | 166 |
| 5 | LGA | PHX | 160 |
| 6 | MCO | ONT | 157 |
| 7 | DCA | SAT | 155 |
| 8 | LAX | SJU | 149 |
| 9 | AUS | LGA | 145 |
| 10 | LAS | LGA | 139 |

Source: US DOT O&D 2023 via Cirium

# SAN-2: SAN-DCA is the Largest Unserved Market for each Airport

**LARGEST UNSERVED O&D FROM DCA**

| Rank | Org | Dst | Passengers per Day | % OF DCA-SAN |
|---|---|---|---|---|
| **1** | **DCA** | **SAN** | **225** | **100%** |
| 2 | DCA | SAT | 155 | 69% |
| 3 | DCA | ABQ | 123 | 55% |
| 4 | DCA | SMF | 106 | 47% |
| 5 | DCA | SNA | 82 | 37% |
| 6 | DCA | ONT | 77 | 34% |
| 7 | DCA | HNL | 76 | 34% |
| 8 | DCA | TUS | 75 | 34% |
| 9 | DCA | ELP | 69 | 31% |
| 10 | DCA | SJC | 60 | 27% |

**LARGEST UNSERVED O&D FROM SAN**

| Rank | Org | Dst | Passengers per Day |
|---|---|---|---|
| **1** | **SAN** | **DCA** | **225** |
| 2 | SAN | CLE | 128 |
| 3 | SAN | CMH | 114 |
| 4 | SAN | LGA | 99 |
| 5 | SAN | OMA | 91 |
| 6 | SAN | OKC | 83 |
| 7 | SAN | BDL | 81 |
| 8 | SAN | RIC | 71 |
| 9 | SAN | CHS | 70 |
| 10 | SAN | MEM | 65 |

Source: US DOT O&D YE 2023 via Cirium

# SAN-3: SAN-DCA has always been a strong O&D Market

Source: US DOT O&D via Cirium

# SAN-4: SAN-DCA is the 9th Largest Beyond Perimeter Market, but has None of the 20 Authorized Exemptions

**LARGEST DCA O&D MARKETS - BEYOND-PERIMETER**

| Rank | Org | Dst | Passengers per Day | Current N/S Capacity | Service |
|---|---|---|---|---|---|
| 1 | DCA | LAX | 713 | 719 | ✓✓✓✓ |
| 2 | DCA | DEN | 503 | 715 | ✓✓✓✓ |
| 3 | DCA | PHX | 471 | 588 | ✓✓✓ |
| 4 | DCA | SFO | 373 | 325 | ✓✓ |
| 5 | DCA | LAS | 358 | 172 | ✓ |
| 6 | DCA | SEA | 271 | 318 | ✓✓ |
| 7 | DCA | SLC | 259 | 194 | ✓ |
| 8 | DCA | AUS | 238 | 170 | ✓ |
| **9** | **DCA** | **SAN** | **225** | -- | ☒ |
| 10 | DCA | PDX | 206 | 159 | ✓ |
| 11 | DCA | SJU | 182 | 200 | ✓ |

Source: US DOT O&D YE 2023 via Cirium and schedules

**BEYOND-PERIMETER FLIGHTS**

| Count | Org | Dst |
|---|---|---|
| 1 | DCA | AUS |
| 2 | DCA | DEN |
| 3 | DCA | DEN |
| 4 | DCA | DEN |
| 5 | DCA | DEN |
| 6 | DCA | LAS |
| 7 | DCA | LAX |
| 8 | DCA | LAX |
| 9 | DCA | LAX |
| 10 | DCA | LAX |
| 11 | DCA | PDX |
| 12 | DCA | PHX |
| 13 | DCA | PHX |
| 14 | DCA | PHX |
| 15 | DCA | SEA |
| 16 | DCA | SEA |
| 17 | DCA | SFO |
| 18 | DCA | SFO |
| 19 | DCA | SJU |
| 20 | DCA | SLC |

SAN DIEGO
INTERNATIONAL AIRPORT
LET'S GO.

# SAN-5: SAN is the 7th Largest WAS O&D outside Perimeter

LARGEST WASHINGTON REGION (WAS) O&D
>1,250 miles
Passengers Daily Each Way
2,500
2,000
1,500
1,000
500
0
2,370
1,885
1,600
1,356
1,152
1,132
1,004
943
791
626
608
416
315
302
266
LAX DEN SFO LAS PHX SEA SAN AUS SJU SLC SAT PDX HNL SMF ABQ
DCA nonstop? Yes Yes Yes Yes Yes Yes NO Yes Yes Yes NO Yes NO NO NO

SAN DIEGO
INTERNATIONAL AIRPORT
LET'S GO.

Source: US DOT O&D YE 2023 via Cirium

5

JA 000346

# SAN-6: Over a Quarter Million Annual SAN-WAS Passengers Connect

*In contrast, the following markets have lower proportions of connecting passengers due to abundant nonstop options:*

| Market | Pax Connecting |
|---|---|
| WAS-LAX | 16% |
| WAS-SFO | 22% |
| WAS-SEA | 19% |
| WAS-LAS | 29% |
| WAS-PHX | 26% |
| WAS-DEN | 11% |
| WAS-AUS | 22% |
| WAS-SJU | 14% |

Source: US DOT O&D YE 2023 via Cirium

# SAN-7: Alaska would inject a new Gateway Competitor in the SAN-WAS Market

After Alaska entered the IAD-SAN route in Q2 2023, fares on the route decreased by about 26%. See Alaska Application at 5, Exhibit AS-7.

*Subject to Government Approval

# SAN-8: GSA IAD contract fares

| | FY 2024 |
|---|---|
| IAD-SAN | $496 |
| IAD-DEN | $427 |
| IAD-SFO | $407 |
| IAD-PDX | $390 |
| IAD-SAT | $380 |
| IAD-SLC | $364 |
| IAD-PHX | $363 |
| IAD-SJU | $361 |
| IAD-LAX | $305 |
| IAD-SEA | $176 |
| IAD-AUS | $170 |

Source: GSA City-pair FY 2024 contract fare query

# SAN 9: DCA-SAN is the Only Top 10 GSA Market Without Nonstop Service

FY 2024 GSA Projected Passenger Count
35,000
30,000
25,000
20,000
15,000
10,000
5,000
-
31,347
28,317
28,115
25,629
24,955
24,712
24,474
23,433
21,371
20,543
SAN-SEA
DCA-SAN
ORF-SAN
ATL-DCA
BOS-DCA
HNL-SAN
DCA-LAX
ANC-FAI
GUM-HNL
DCA-MCO
Number of Nonstops
15
0
1
20
29
5
4
8
1
14

SAN DIEGO
INTERNATIONAL AIRPORT
LET'S GO.

Source: GSA City-pair FY 2024 award file csv ; # of nonstops is based on Peak Day in July

# SAN 10: Efficiencies in Linking National Defense Installations to their Closest Airports

Source: Google Map Directions

MARIA CANTWELL, WASHINGTON, CHAIR
TED CRUZ, TEXAS, RANKING MEMBER

AMY KLOBUCHAR, MINNESOTA
BRIAN SCHATZ, HAWAII
EDWARD J. MARKEY, MASSACHUSETTS
GARY C. PETERS, MICHIGAN
TAMMY BALDWIN, WISCONSIN
TAMMY DUCKWORTH, ILLINOIS
JON TESTER, MONTANA
KYRSTEN SINEMA, ARIZONA
JACKY ROSEN, NEVADA
BEN RAY LUJÁN, NEW MEXICO
JOHN W. HICKENLOOPER, COLORADO
RAPHAEL G. WARNOCK, GEORGIA
PETER WELCH, VERMONT

JOHN THUNE, SOUTH DAKOTA
ROGER F. WICKER, MISSISSIPPI
DEB FISCHER, NEBRASKA
JERRY MORAN, KANSAS
DAN SULLIVAN, ALASKA
MARSHA BLACKBURN, TENNESSEE
TODD YOUNG, INDIANA
TED BUDD, NORTH CAROLINA
ERIC SCHMITT, MISSOURI
J.D. VANCE, OHIO
SHELLEY MOORE CAPITO, WEST VIRGINIA
CYNTHIA M. LUMMIS, WYOMING

LILA HARPER HELMS, MAJORITY STAFF DIRECTOR
BRAD GRANTZ, REPUBLICAN STAFF DIRECTOR

# United States Senate

COMMITTEE ON COMMERCE, SCIENCE, AND TRANSPORTATION

WASHINGTON, DC 20510–6125

WEBSITE: https://commerce.senate.gov

July 17, 2024

The Honorable Pete Buttigieg
Secretary, U.S. Department of Transportation
1200 New Jersey Avenue, S.E.
Washington, D.C. 25090

Dear Secretary Buttigieg:

In section 502 of the *Federal Aviation Administration (FAA) Reauthorization Act of 2024*, Congress authorized five new roundtrip flights from Ronald Reagan Washington National Airport (DCA) to destinations within or beyond the 1,250 mile perimeter codified in 49 U.S.C. § 49109. In reviewing applications from airlines for these five new flights, section 502 requires the Department of Transportation to consider the extent to which proposed flights will (i) provide nonstop service to beyond-perimeter airports that do not already have direct flights to DCA or (ii) have a positive impact on competition in the markets with existing nonstop service to DCA.

To be sure, section 502 was intended to provide direct access to DCA from unserved beyond-perimeter locations in the western and southwestern United States, such as San Antonio and San Diego.

Congress also intended to add more competition and choice for consumers on existing routes with limited service, such as Las Vegas and Seattle.

Most importantly, the Federal Aviation Administration's responsibility to manage the safety and efficiency of the National Airspace System, coupled with the unused capacity at DCA, ensures that five new roundtrip flights will have no negative impact on aviation safety.

Sincerely,

Maria Cantwell
Chair

**BEFORE THE**
**DEPARTMENT OF TRANSPORTATION**
**OFFICE OF THE SECRETARY**
**WASHINGTON, D.C.**

| | |
|---|---|
| **2024 SLOT EXEMPTION PROCEEDING AT RONALD REAGAN WASHINGTON NATIONAL AIRPORT PURSUANT TO 49 USC § 41718** | **Docket DOT-OST-2024-0065** |

**CONSOLIDATED ANSWER OF**
**SOUTHWEST AIRLINES CO.**

Pursuant to the Notice issued by the Department of Transportation ("DOT" or "the Department") on June 24, 2024 ("DOT Notice"), establishing this proceeding, Southwest Airlines Co. ("Southwest") files this Consolidated Answer ("Answer") to the applications filed by the four other participating carriers that the Department has deemed eligible to compete as "DCA Non-Limited Incumbent Carriers" for the eight slot exemptions designated for this class of carriers.[1]

Of the five Non-Limited Incumbent carriers, DOT must base its final decision on the selection criteria specified in the 2024 FAA Reauthorization Act (Section 502 of Public Law Number 118-63) ("FAA Act"), which directs the Department to consider the extent to which the exemptions will: (i) enhance options for nonstop travel to beyond-perimeter airports that do not have nonstop service from DCA, or (ii) have a positive impact on the overall level of competition in the markets that will be served as a result of those exemptions.[2] DOT's

[1] In reliance on the DOT Notice, Southwest limits this Answer to the applications of the five airlines that the Department has designated as DCA Non-Limited Incumbent carriers. Should the Department amend its designation of carriers to add one or more carriers to the DCA Non-Limited Incumbent Carrier class, Southwest reserves the right to provide an additional response.

[2] DOT Notice at 2.

decision must also be consistent with its overarching duty to act in the "public interest" under Title 49 of the United States Code. As detailed below, a review of the competing applications of these carriers makes clear that Southwest's proposal best meets the decisional criteria specified in the DOT Notice and will generate the greatest public benefits.

## I. Overview of Southwest's DCA-LAS-SMF Application

- **Southwest Will Reduce Fares and Enhance Competition** – Southwest offers the lowest average fares at DCA of all the Non-Limited Incumbent airlines (Exhibit WN-A-101). In fact, Southwest was the *only* applicant to quantify the expected fare savings that consumers would gain from its proposed new service – conservatively estimating that passengers would save $13 million per year from Southwest's proposed DCA-Las Vegas (LAS) service, including a projected *37% reduction* in DCA-LAS average fares (Exhibits WN-A-102 and WN-302). No other applicant predicted *any* fare savings from their proposed DCA flights – in effect admitting that no such savings would occur (Exhibit WN-A-102).

- **Southwest Proposes Service to a Large, Growing, and Underserved Market** – Southwest is also proposing to add service to the existing beyond-perimeter market that is most in need of a new nonstop flight to DCA. DCA-LAS currently has the most passenger traffic per slot pair of any of the existing beyond-perimeter markets (Exhibit WN-A-103).[3] Putting it another way, of all the existing beyond-perimeter markets, DCA-LAS suffers the greatest disparity between passengers and available seats (Exhibit WN-A-104), with a stunning 123,903 more passengers per year than nonstop seats available (Exhibits WN-A-104). The indisputable conclusion is that LAS is by far the most underserved of all existing beyond-perimeter DCA markets (Exhibits WN-A-103/104). In addition, the DCA-LAS route is

[3] "Passengers," as used in this Answer, refers to Origin and Destination (O&D) passengers unless otherwise noted.

also the fastest-growing market of all those proposed in this proceeding with an extraordinary 28% growth since 2019 (Exhibit WN-A-105).

- **Southwest's DCA-LAS Service Will Generate Twenty (20) New Direct and Connecting DCA Itineraries** – Southwest will provide online connecting routings between DCA and 20 other beyond-perimeter cities, more than any other applicant, thereby greatly increasing the public benefits from scarce beyond-perimeter slot exemptions (Exhibit WN-A-106). The most important of these is Sacramento (SMF), for which Southwest will provide one-stop, *same-plane* service via a DCA-LAS-SMF routing. This new service will provide the fastest, most convenient, and lowest-priced travel option between the two capital cities.

Taken together, the enormous public benefits from Southwest's proposed DCA-LAS-SMF service are significantly greater than the benefits from any other applicants' proposal.

## II. Overview of Other Airline Applications

Based on the statutory criteria and the public interest standard used in prior slot proceedings, Southwest offers the following observations on the four competing airline proposals:

- **American** (DCA-SAT) – Of all the airline applicants, American Airlines is by far the least deserving of an additional slot pair. Granting American more DCA slots or slot exemptions – and especially another monopoly route – would be anti-competitive, violate the spirit of criterion (ii), and be clearly contrary to the public interest. American already holds the dominant share of DCA slots and DOT should not exacerbate DCA's competitive imbalance by awarding American even more slots. Furthermore, the DCA-LAS market is 131% larger than the DCA-SAT market and American can serve SAT today with its existing beyond-perimeter slots. DOT should reject American's application.

- **Delta** (DCA-SEA) – The DCA-SEA market already boasts two existing daily nonstop flights, even though it is smaller than DCA-LAS, which has only one nonstop flight per day. Adding an additional Delta flight would increase capacity and introduce a new airline to the route but would not do much to enhance competition due to Delta's high fares. Southwest concedes that, unlike American, United and JetBlue's proposals, Delta's proposal for SEA-DCA service does satisfy criterion (ii), although far less robustly than Southwest's proposal Conversely, Delta's alternative DCA-SLC proposal fails to meet either of the selection criteria because it would add an additional flight to a nonstop market it already dominates.

- **United** (DCA-SFO or DCA-LAX) – United's DCA-SFO proposal fails to meet either selection criterion. United already serves the market and enabling United to dominate this route with an additional flight would raise fares and harm consumers. United's backup DCA-LAX market already has three carriers providing four daily nonstop flights. Adding an additional high-fare United flight would not enhance competition or benefit consumers.

- **JetBlue** (DCA-SJU or DCA-LAX) – JetBlue's DCA-SJU proposal fails to meet either criterion as it already provides the only daily nonstop service between DCA and SJU. Thus, adding another JetBlue flight would not provide new nonstop service or competition, and the market would remain a nonstop JetBlue monopoly. Its proposal should be rejected. Moreover, JetBlue's passing reference to serving DCA-LAX (as an alternative to DCA-SJU) would make it the fourth carrier providing the fifth flight in the market, wasting scarce beyond-perimeter slot exemptions.

***Answer to Application of American Airlines***

### III. Awarding a New Slot Pair to American Would Increase Consolidation and Further Stifle Competition at DCA, All to the Detriment of Consumers.

Granting American an additional slot pair, particularly a scarce beyond-perimeter slot pair, would be counter to this Administration's and this DOT's focus on increasing competition

at capacity-constrained airports. American already dominates DCA, operating nearly 60% of all DCA slots while the next largest carrier (Delta) has 13% and Southwest – the largest Low-Cost Carrier (LCC) at DCA – has only 10% (Exhibit WN-A-201). American operates a staggering 4.4 as many DCA slots as its next closest competitor, Delta (508 slots for American vs. 116 for Delta); Southwest operates only 90 slots (Exhibit WN-A-201).

To put American's DCA dominance in further perspective, American already operates 50% of all beyond-perimeter slots held by Non-Limited Incumbent carriers, while the next largest carriers in that group (Delta and United) have 17% each (Exhibit WN-A-202). Southwest, at the other end of the spectrum, accounts for just a single beyond-perimeter slot pair (or 8% of the Non-Limited Incumbent slot pairs) (Exhibit WN-A-202).

Today, competition at DCA is stifled because the airport is heavily dominated by one airline. This unfortunate situation is even more disturbing since DCA is one of the nation's most important airports, yet entry or expansion by airlines is virtually impossible absent government action. American's dominance of slots at DCA no doubt explains why *American's average distance-adjusted DCA fares are an alarming 56% higher than Southwest's fares* (Exhibit WN-A-203). Awarding yet another DCA slot pair to American would increase this dominance, is inconsistent with the selection criteria for this proceeding, and would harm the public interest.[4]

With this level of dominance, awarding *any* additional slots to American will only serve to further entrench the severe competitive imbalance that currently exists at DCA, to the

[4] *See, e.g.*, comments in this docket from unions and consumer advocacy groups voicing concern about the impact of American's dominance at DCA – Service Employees International Union (SEIU), Comment Letter on Competitive Selection Proceeding for DCA Slot Exemptions (July 16, 2024); Travelers United, Comment Letter on Competitive Selection Proceeding for DCA Slot Exemptions (July 8, 2024); Blue Future, Letter to Secretary Buttigieg on Increasing Competition Among U.S. Airlines on Key Routes, co-signed by eleven consumer advocate groups (June 28, 2024).

detriment of consumers. If, on the other hand, the DOT were to allocate a beyond-perimeter slot pair to each of the other eligible Non-Limited Incumbent carriers, American would *still* have twice as many beyond-perimeter slots as the next closest competitors (six for American vs. three each for Delta and United) (Exhibit WN-A-205). Awarding slots in this way would begin to make DCA a more competitive market, at least with respect to beyond-perimeter service.[5] It would also lead to lower fares for consumers as other carriers (including most importantly Southwest) gained a higher share of beyond-perimeter slots.[6]

## IV. Today American Squanders Scarce DCA Resources by Connecting Millions of Passengers Over DCA – A New Slot Pair Would Only Perpetuate This Practice.

American further abuses its dominant position by deliberately using DCA as a connecting hub for nearly *a third of its passengers.* This practice is not a public benefit. It wastes valuable slots, takes scarce seats away from local passengers, and drives up prices. In 2023, American funneled nearly 4 million passengers through DCA merely to connect them to flights to other destinations (Exhibit WN-A-206). These passengers have no reason to be at DCA except to change planes. American could just as easily connect these passengers via other American East Coast hubs (such as Philadelphia or Charlotte) that are not slot constrained. Consistent with this approach, American is attempting to perpetuate this wasteful practice in its current proposal by ignoring connections that DCA-SAT passengers could realize *via SAT* and instead touting connections that will be available *through DCA*.[7]

---

[5] The above analysis does not even include American's codeshare and oneworld Alliance partnership with Alaska Airlines. Combined, American and Alaska account for a stunning 64% of the beyond-perimeter slots of Non-Limited Incumbent carriers in this proceeding and 5.5 as many as the carriers with the second most beyond-perimeter slots (Delta and United, each with two slot pairs) (Exhibits WN-A-204).

[6] While Southwest focuses its Answer to American on American's anticompetitive dominance at DCA, it is important to note for this proceeding that according to U.S. DOT O&D Survey data, the DCA-LAS route is 131% larger than DCA-SAT and DCA-LAS passenger numbers are growing while DCA-SAT passenger numbers are shrinking.

[7] Application of American at 4, Exhibits AA-7 and AA-8.

American should not be rewarded with additional slots so long as it continues to squander nearly a third of its existing slots on connecting passengers at DCA.[8]

***<u>Answer to Application of Delta Air Lines</u>***

**V. The DCA-SEA Market Has Ample Service Today and Does Not Warrant Another Scarce DCA Beyond-Perimeter Slot Pair.**

Delta's proposal for a *third* DCA-SEA flight is analytically flawed and would not produce close to the level of public benefits as Southwest's DCA-LAS proposal. To begin with, Delta's average distance-adjusted DCA fare levels are a stunning 58% higher than Southwest's fares (Exhibit WN-A-301). Further, empirical data show that DCA-SEA is *not* underserved and *does not* merit a third precious beyond-perimeter slot pair.

SEA is by far the smallest DCA market with two or more beyond-perimeter slot pairs (Exhibit WN-A-302). In fact, the DCA-LAS market is 32% larger than DCA-SEA (approximately 261,000 passengers for LAS vs. 198,000 for SEA) despite DCA-LAS having only a single slot pair (Exhibit WN-A-303). Stated another way, DCA-LAS has 163% more daily passengers per slot pair than DCA-SEA, with 358 passengers per day per slot at DCA-LAS vs. only 136 for DCA-SEA (Exhibits WN-A-103/304). Finally, Southwest's proposal would also offer more extensive convenient connecting opportunities (20 via LAS vs. 13 for Delta via SEA) (Exhibit WN-A-305).

Moreover, DCA-SEA has a *surplus* of nearly 34,000 more seats annually than there are passengers to fill them (Exhibit WN-A-306). Conversely, the DCA-LAS market has a significant *shortage* of seats, with approximately 124,000 *fewer* seats annually than passengers travelling on that route. (Exhibit WN-A-306). Further, these demand trends appear unlikely to improve considering that DCA-SEA passenger volume has contracted

[8] American could serve DCA-SAT today with one of the two beyond-perimeter slot pairs it holds that are non-market specific and can be moved. American currently uses both slot pairs to provide double daily nonstop service to LAX. See Exhibit WN-A-204.

7.8% over the last four years (while DCA-LAS traffic grew more than 28% over the same period) (Exhibit WN-A-307).

**VI. Delta's Attempt to Artificially Enlarge the DCA-SEA Market is Flawed and Should Be Rejected.**

Despite all the empirical data demonstrating that SEA is adequately served with two daily nonstop flights, Delta claims that DCA-SEA is in desperate need of additional service.[9] But this claim cannot withstand even the mildest scrutiny. Delta draws this conclusion only by artificially *combining* passenger demand to SEA from both DCA and Dulles International Airport (IAD). Delta then *assumes* that 72% of that aggregated demand has a DCA preference because 72% of passengers use DCA for within-perimeter markets.[10] However, this percentage simply tracks the number of seats available and today 71% of within-perimeter *seats* are offered at DCA as opposed to IAD (Exhibit WN-A-308).

In the case of DCA/IAD-SEA, on the other hand, just 24% of the seats are from DCA, although this share could increase to as high as 39% if Delta discontinues its IAD-SEA service[11]. Delta's assumption that 72% of the DCA/IAD-SEA traffic would use DCA with no more than 39% of the seats being available from DCA is completely unrealistic. As a result, Delta's forecasting methodology in this case is simply not credible.[12] In fact, Delta's forecast

[9] Application of Delta at 2.

[10] *Id.* at Ex. DL-107.

[11] Cirium Schedule data, CY 2024 and Delta's proposed seats. Note that if Delta discontinues IAD-SEA, there would of course be some disbenefits to consumers.

[12] Even using Delta's flawed methodology, LAS is still significantly more under-served than SEA. Delta argues that SEA is the largest DCA beyond perimeter single-carrier market, with 629 PDEW, as opposed to 500 PDEW for LAS. However, Delta glosses over the fact that SEA is served by 2 slot pairs, reducing its PDEW per slot to 315. DCA-LAS, which is served by a single carrier and a single slot pair, has a PDEW of 500 per slot, <u>nearly 60% more than SEA</u> (Exhibit WN-A-310).

is so detached from reality that it produces a DCA-SEA market that is more than double the actual size of the market based on empirical passenger data (Exhibit WN-A-309).

DOT should disregard Delta's artificially modified DCA demand numbers and instead rely on actual DCA passenger demand, as verified by DOT's own O&D Survey. DCA's actual data require no assumptions and make clear that Delta's forecasting assertions are invalid.

**VII. Delta's Backup Proposal to Add Its Second Nonstop to SLC Does Not Meet the Required Statutory Criteria and is Therefore Ineligible.**

Delta's backup proposal of DCA-SLC does not merit an additional slot pair. First, this proposal does not meet the statutory requirements of the 2024 FAA Act. Delta currently has the only nonstop service between DCA and SLC (Exhibit WN-A-311), and thus this proposal would neither enhance nonstop travel to beyond-perimeter airports that currently "do not have nonstop service from DCA," nor would it increase competition in the DCA-SLC market. *See* 49 U.S.C. § 41718(i)(4)(B); DOT Notice at 2. Delta already controls all the seats in the nonstop DCA-SLC market, so awarding it a second DCA-SLC slot pair would increase capacity but not competition (Exhibit WN-A-311).

Beyond this, the DCA-LAS market is 38% larger than the DCA-SLC market, with both markets only being served with a single DCA slot pair. (Exhibit WN-A-312). Additionally, DCA-LAS passengers have grown almost twice as fast as DCA-SLC passengers (28.4% versus 14.9%, respectfully) (Exhibit WN-A-313). Finally, Southwest's proposed DCA-LAS service would provide new convenient online connecting routings to 53% more airports than Delta's proposed SLC route (20 via Southwest versus 13 via Delta) (Exhibit WN-A-314). For all these reasons, Southwest's proposed DCA-LAS service will provide far greater public benefits than either of Delta's proposals in this proceeding.

***Answer to Application of United Airlines***

**VIII. United's Proposal to Add a Second DCA-SFO Flight Will Degrade the Overall Level of Competition on the Route and Should Be Rejected.**

United's SFO proposal does not satisfy either of the selection criteria in this proceeding. First, United adding a second daily nonstop in a market it already serves and competes against Alaska is obviously not providing service in a market without nonstop service. Second and equally important, such service will not "have a positive impact on the overall level of competition" on the DCA-SFO route. United is already the largest airline in the market with 36% of the passengers and 51% of the seats (Exhibit WN-A-401).

Currently, United competes head-to-head with Alaska which accounts for 35% of the O&D passengers and 49% of the seats in the DCA-SFO market (Exhibit WN-A-401). If United gains an additional slot pair for another DCA-SFO nonstop flight, the market will be transformed into one dominated by United with a seat share of 68% (Exhibit WN-A-401). This would have a *negative* impact on competition, not a positive one. Fares are likely to move higher, not lower. United's fares are currently already 21% higher than Alaska's and 19% higher than the DCA-SFO average (Exhibit WN-A-402). With the award of a second flight, United will only gain a more dominant position in the DCA-SFO market and have a greater ability to raise fares.

**IX. United's SFO Proposal Will Add High Fare Service to a Declining Market that Does Not Warrant Additional Flights.**

Much like its fellow legacy carriers American and Delta, United charges much higher fares at DCA than Southwest. In fact, United's average distance-adjusted DCA fares are a shocking 67% above Southwest's (Exhibit WN-A-403). In addition, the DCA-LAS market is 92% larger than DCA-SFO on a per-slot pair basis yet it has only a single slot pair compared to two pairs for SFO (Exhibit WN-A-404). The DCA-LAS market has also grown an impressive 28% since 2019 compared to an 11% *decline* for DCA-SFO over the same period (Exhibit

WN-A-405). In addition, Southwest's DCA-LAS proposal will also connect to 20 new convenient online options compared to 16 for United's DCA-SFO proposal (Exhibit WN-A-406). In the face of these data, United's claim that DCA-SFO deserves an additional slot pair is simply not credible.

**X. DCA-LAX Already Boasts Three Airlines and Four Nonstop Flights; It Does Not Warrant a Fifth Flight by United.**

As a backup, United proposes to add service in the most heavily served DCA beyond-perimeter market, DCA-LAX. Like its DCA-SFO proposal, this alternative also fails to satisfy either of the selection criteria for proposals in this proceeding because four slot pairs provided by three airlines (American-2, Alaska-1, and Delta-1) are already devoted to the DCA-LAX market (Exhibit WN-A-407). Adding another high-fare legacy carrier to the mix will do virtually nothing to provide a "positive impact" on competition.

While DCA-LAX is the largest DCA beyond-perimeter market, it has slightly *more seats* than O&D passengers (Exhibit WN-A-408). This compares to DCA-LAS which has a *deficit* of almost 124,000 fewer seats than passengers (Exhibit WN-A-408). It is also significant that the DCA-LAS market has grown over 28% since 2019, compared to a *decline* in passengers of 2% for DCA-LAX over the same period (Exhibit WN-A-409). United's DCA-LAX proposal also has half as many convenient online connections as Southwest's DCA-LAS proposal (10 for UA DCA-LAX compared to 20 for WN DCA-LAS) (Exhibit WN-A-410). In sum, DCA-LAX is not underserved by any objective measure and added service by United would not enhance competition.

***<u>Answer to Application of JetBlue Airways</u>***

**XI. JetBlue's Application Does Not Meet the Statutory Criteria and Should Be Rejected.**

JetBlue has requested slot exemptions to add a second daily nonstop between DCA and San Juan, Puerto Rico (SJU). Additional JetBlue service in this market fails to meet the

statutory selection criteria for this proceeding and should be rejected for that reason (Exhibit WN-A-501). JetBlue has operated daily nonstop service between DCA and SJU since 2012, and thus SJU fails to qualify as an airport that does "not have nonstop service from DCA."[13] Furthermore, an additional JetBlue DCA-SJU nonstop does not meet the second prong because it will not have a "positive impact on the overall level of competition" in the DCA-SJU market (Exhibit WN-A-502). While an additional JetBlue flight would add capacity, it would do nothing to enhance competition and DCA-SJU would remain a JetBlue nonstop monopoly.

## XII. Even if DCA-SJU Did Qualify for Consideration, the Market Does Not Merit Additional Service, Particularly When Compared Side-by-Side with DCA-LAS.

Even if DOT were to consider JetBlue's application on the merits, which it should not, SJU does not warrant an additional scarce DCA slot pair, especially when compared side-by-side with Southwest's LAS proposal. A few objective facts make this resoundingly clear:

- **Market Size** – DCA-SJU is the smallest of all beyond-perimeter markets with nonstop service today (Exhibit WN-A-503). The DCA-LAS route is 96% larger with the same number of slot pairs today (Exhibit WN-A-504), and DCA-LAS has grown more than four times greater than DCA-SJU over the last four years (28% vs. 6%) (Exhibit WN-A-505).
- **Fares** – As shown in its application, Southwest will offer substantial price competition against American with its proposed DCA-LAS service, with a projected average fare that is 37% below American's actual average fare.[14] JetBlue makes no fare level projections in its application, and it should be noted that JetBlue's average distance-adjusted fare levels at DCA are 19% higher than Southwest's (Exhibit WN-A-506).

---

[13] DOT Notice at 2; *see also* DOT Order 2012-5-12, Feb. 24, 2012.

[14] See Exhibit WN-302, which compares Southwest's projected average DCA-LAS fare of $188 vs. American's actual average DCA-LAS fare of $298.

- **Beyond Connections** – JetBlue has failed to offer any new online connecting options at SJU, in contrast to Southwest's proposal, which offers 20 convenient connections from LAS (Exhibit WN-A-507).

In sum, awarding another valuable DCA slot exemption to the smallest beyond-perimeter market while perpetuating JetBlue's monopoly in that same market would fail to meet the relevant statutory criteria and waste extremely scarce resources. Moreover, JetBlue's application is far inferior to Southwest's under all relevant decisional criteria.[15]

## CONCLUSION

For the reasons given in this Answer and in its Application, Southwest's proposed DCA-LAS-SMF service will provide the greatest overall public benefits of all proposals under consideration. It will also meet the carrier selection criteria specified in the Department's June 24 Notice. Accordingly, Southwest urges the Department to grant it two beyond-perimeter DCA slot exemptions to provide nonstop service between DCA and LAS, with single-plane beyond service to SMF.

Respectfully submitted,

Leslie C. Abbott

July 17, 2024

[15] We have not addressed JetBlue's backup DCA-LAX proposal that it relegated to a footnote on page 22 of its application with no supporting exhibits or analysis. It should be noted however, that the proposal would have many of the same problems as United's backup DCA-LAX proposal addressed in Section VIII.



U.S. Department of Transportation

Office of the Secretary of Transportation

Assistant Secretary

1200 New Jersey Avenue, SE
Washington, DC 20590

Subject: Notice of Communication in Docket: DOT-OST-2024-0065

Competitive Selection Proceeding for Slot Exemptions at Ronald Reagan Washington National Airport

Date: July 30, 2024

From: Assistant Secretary for Aviation and International Affairs, Annie Petsonk

To: Chief, Dockets

In accordance with Department rules (14 CFR 300), I am reporting the following communication on behalf of the U.S. Secretary of Transportation, Pete Buttigieg.

On July 16, 2024, during a telephone conversation between U.S. Secretary of Transportation Pete Buttigieg and the Honorable Senator Alex Padilla of California, the Senator raised the subject of the Department's proceeding to allocate ten slot exemptions for operations between Ronal Reagan Washington National Airport (DCA) and airports within or beyond the 1,250-mile DCA perimeter. The Senator expressed his support for the applications of Alaska Airlines and United Airlines to provide service between DCA and points in California.

Secretary Buttigieg informed the Senator that he could not comment on the merits of this case because the proceeding is under active consideration by the Department. Senator Padilla was informed that his support would be entered into the record for this proceeding.

Please place this memorandum in the appropriate Docket.



**U.S. Department of Transportation**

Office of the Secretary of Transportation

Assistant Secretary

1200 New Jersey Avenue, SE
Washington, DC 20590

August 20, 2024

The Honorable Darrell Issa
U.S. House of Representatives
Washington, DC 20515

Dear Representative Issa:

Thank you for your letters regarding the U.S. Department of Transportation's (the Department) Slot Exemption Proceeding for Ronald Reagan Washington National Airport (DCA).

As you know, the Federal Aviation Administration Reauthorization Act of 2024 directs the Department to allocate 10 new slot exemptions at DCA. The Department is doing so via a competitive selection proceeding that was initiated in Docket DOT-OST-2024-0065. The docket contains the Department's Notice initiating this proceeding and all publicly available documents filed in the docket. As this proceeding is currently ongoing, I cannot comment on the merits of points raised in your letters. However, please be assured that all properly filed applications and comments will receive thorough consideration.

Per our normal practice, I will be placing a copy of your letters and this response in docket DOT-OST-2024-0065. You may track the progress of this proceeding by accessing the Federal eRulemaking Portal at http://www.regulations.gov and placing DOT-OST-2024-0065 in the search box. A similar response has been sent to each cosigner of your letters.

Sincerely,

Carol A. (Annie) Petsonk

Carol A. (Annie) Petsonk
Assistant Secretary
for Aviation and International Affairs



**U.S. Department of Transportation**

Office of the Secretary of Transportation

Assistant Secretary

1200 New Jersey Avenue, SE
Washington, DC 20590

August 20, 2024

The Honorable Sara Jacobs
U.S. House of Representatives
Washington, DC 20515

Dear Representative Jacobs:

Thank you for your letters regarding the U.S. Department of Transportation's (the Department) Slot Exemption Proceeding for Ronald Reagan Washington National Airport (DCA).

As you know, the Federal Aviation Administration Reauthorization Act of 2024 directs the Department to allocate 10 new slot exemptions at DCA. The Department is doing so via a competitive selection proceeding that was initiated in Docket DOT-OST-2024-0065. The docket contains the Department's Notice initiating this proceeding and all publicly available documents filed in the docket. As this proceeding is currently ongoing, I cannot comment on the merits of points raised in your letters. However, please be assured that all properly filed applications and comments will receive thorough consideration.

Per our normal practice, I will be placing a copy of your letters and this response in docket DOT-OST-2024-0065. You may track the progress of this proceeding by accessing the Federal eRulemaking Portal at http://www.regulations.gov and placing DOT-OST-2024-0065 in the search box. A similar response has been sent to each cosigner of your letters.

Sincerely,

Carol A. (Annie) Petsonk

Carol A. (Annie) Petsonk
Assistant Secretary
for Aviation and International Affairs



**U.S. Department of Transportation**

Office of the Secretary of Transportation

Assistant Secretary

1200 New Jersey Avenue, SE
Washington, DC 20590

August 20, 2024

The Honorable Mike Levin
U.S. House of Representatives
Washington, DC 20515

Dear Representative Levin:

Thank you for your letters regarding the U.S. Department of Transportation's (the Department) Slot Exemption Proceeding for Ronald Reagan Washington National Airport (DCA).

As you know, the Federal Aviation Administration Reauthorization Act of 2024 directs the Department to allocate 10 new slot exemptions at DCA. The Department is doing so via a competitive selection proceeding that was initiated in Docket DOT-OST-2024-0065. The docket contains the Department's Notice initiating this proceeding and all publicly available documents filed in the docket. As this proceeding is currently ongoing, I cannot comment on the merits of points raised in your letters. However, please be assured that all properly filed applications and comments will receive thorough consideration.

Per our normal practice, I will be placing a copy of your letters and this response in docket DOT-OST-2024-0065. You may track the progress of this proceeding by accessing the Federal eRulemaking Portal at http://www.regulations.gov and placing DOT-OST-2024-0065 in the search box. A similar response has been sent to each cosigner of your letters.

Sincerely,

Carol A. (Annie) Petsonk

Carol A. (Annie) Petsonk
Assistant Secretary
for Aviation and International Affairs



**U.S. Department of Transportation**

Office of the Secretary of Transportation

Assistant Secretary

1200 New Jersey Avenue, SE
Washington, DC 20590

August 20, 2024

The Honorable Scott Peters
U.S. House of Representatives
Washington, DC 20515

Dear Representative Peters:

Thank you for your letters regarding the U.S. Department of Transportation's (the Department) Slot Exemption Proceeding for Ronald Reagan Washington National Airport (DCA).

As you know, the Federal Aviation Administration Reauthorization Act of 2024 directs the Department to allocate 10 new slot exemptions at DCA. The Department is doing so via a competitive selection proceeding that was initiated in Docket DOT-OST-2024-0065. The docket contains the Department's Notice initiating this proceeding and all publicly available documents filed in the docket. As this proceeding is currently ongoing, I cannot comment on the merits of points raised in your letters. However, please be assured that all properly filed applications and comments will receive thorough consideration.

Per our normal practice, I will be placing a copy of your letters and this response in docket DOT-OST-2024-0065. You may track the progress of this proceeding by accessing the Federal eRulemaking Portal at http://www.regulations.gov and placing DOT-OST-2024-0065 in the search box. A similar response has been sent to each cosigner of your letters.

Sincerely,

Carol A. (Annie) Petsonk

Carol A. (Annie) Petsonk
Assistant Secretary
for Aviation and International Affairs



**U.S. Department of Transportation**

Office of the Secretary of Transportation

Assistant Secretary

1200 New Jersey Avenue, SE
Washington, DC 20590

August 20, 2024

The Honorable Juan Vargas
U.S. House of Representatives
Washington, DC 20515

Dear Representative Vargas:

Thank you for your letters regarding the U.S. Department of Transportation's (the Department) Slot Exemption Proceeding for Ronald Reagan Washington National Airport (DCA).

As you know, the Federal Aviation Administration Reauthorization Act of 2024 directs the Department to allocate 10 new slot exemptions at DCA. The Department is doing so via a competitive selection proceeding that was initiated in Docket DOT-OST-2024-0065. The docket contains the Department's Notice initiating this proceeding and all publicly available documents filed in the docket. As this proceeding is currently ongoing, I cannot comment on the merits of points raised in your letters. However, please be assured that all properly filed applications and comments will receive thorough consideration.

Per our normal practice, I will be placing a copy of your letters and this response in docket DOT-OST-2024-0065. You may track the progress of this proceeding by accessing the Federal eRulemaking Portal at http://www.regulations.gov and placing DOT-OST-2024-0065 in the search box. A similar response has been sent to each cosigner of your letters.

Sincerely,

Carol A. (Annie) Petsonk

Carol A. (Annie) Petsonk
Assistant Secretary
for Aviation and International Affairs

# Congress of the United States

## Washington, DC 20515

May 16, 2024

The Honorable Pete Buttigieg
Secretary of Transportation
U.S. Department of Transportation
1200 New Jersey Avenue, S.E.
Washington, D.C. 20590

Dear Secretary Buttigieg,

We write to you regarding the recently passed Federal Aviation Administration Reauthorization Act, as Members of Congress representing San Diego, California. We are thrilled that this reauthorization included additional slots at Washington, D.C.'s Ronald Reagan National Airport (DCA), and we are respectfully requesting that the Department of Transportation, under your leadership, ensure that at least one of the newly approved slot pairs allows for a non-stop flight to and from San Diego, CA.

As the eighth largest city in the United States, San Diego is the largest passenger market located outside the perimeter without non-stop service to DCA. Terminal 1 of the San Diego International Airport is currently undergoing upgrades and renovations to add 30 new gates to meet the existing and growing demand of travelers. In 2023 alone, visitors spent roughly $14.3 billion in San Diego and the city welcomed 31.8 million visitors.

San Diego is also home to 110,000 active-duty military personnel and more than 118,000 of their family members, making it the largest military community in the United States. Our nation's service members should have an efficient route from one of San Diego's four installations to the Pentagon, but expensive plane tickets and additional time on flights hinder their job performance. A direct flight would dramatically improve their commute to Washington, D.C. and their ability to focus on their mission. Given San Diego's military presence and its status as a binational tourist destination, a direct non-stop flight to and from DCA would improve our community's ability to thrive, grow, and meet the national security demands of our country.

We appreciate your work to implement this FAA Reauthorization, and we appreciate your urgent consideration of this important request.

Sincerely,

**OST-S10-240517-020**

Sara Jacobs
Member of Congress

Juan Vargas
Member of Congress

Scott H. Peters
Member of Congress

Mike Levin
Member of Congress

Darrell Issa
Member of Congress

OST-S10-240517-020



**U.S. Department of Transportation**

Office of the Secretary of Transportation

Assistant Secretary

1200 New Jersey Avenue, SE
Washington, DC 20590

August 20, 2024

The Honorable Darrell Issa
U.S. House of Representatives
Washington, DC 20515

Dear Representative Issa:

Thank you for your letters regarding the U.S. Department of Transportation's (the Department) Slot Exemption Proceeding for Ronald Reagan Washington National Airport (DCA).

As you know, the Federal Aviation Administration Reauthorization Act of 2024 directs the Department to allocate 10 new slot exemptions at DCA. The Department is doing so via a competitive selection proceeding that was initiated in Docket DOT-OST-2024-0065. The docket contains the Department's Notice initiating this proceeding and all publicly available documents filed in the docket. As this proceeding is currently ongoing, I cannot comment on the merits of points raised in your letters. However, please be assured that all properly filed applications and comments will receive thorough consideration.

Per our normal practice, I will be placing a copy of your letters and this response in docket DOT-OST-2024-0065. You may track the progress of this proceeding by accessing the Federal eRulemaking Portal at http://www.regulations.gov and placing DOT-OST-2024-0065 in the search box. A similar response has been sent to each cosigner of your letters.

Sincerely,

Carol A. (Annie) Petsonk

Carol A. (Annie) Petsonk
Assistant Secretary
for Aviation and International Affairs



**U.S. Department of Transportation**

Office of the Secretary of Transportation

Assistant Secretary

1200 New Jersey Avenue, SE
Washington, DC 20590

August 20, 2024

The Honorable Sara Jacobs
U.S. House of Representatives
Washington, DC 20515

Dear Representative Jacobs:

Thank you for your letters regarding the U.S. Department of Transportation's (the Department) Slot Exemption Proceeding for Ronald Reagan Washington National Airport (DCA).

As you know, the Federal Aviation Administration Reauthorization Act of 2024 directs the Department to allocate 10 new slot exemptions at DCA. The Department is doing so via a competitive selection proceeding that was initiated in Docket DOT-OST-2024-0065. The docket contains the Department's Notice initiating this proceeding and all publicly available documents filed in the docket. As this proceeding is currently ongoing, I cannot comment on the merits of points raised in your letters. However, please be assured that all properly filed applications and comments will receive thorough consideration.

Per our normal practice, I will be placing a copy of your letters and this response in docket DOT-OST-2024-0065. You may track the progress of this proceeding by accessing the Federal eRulemaking Portal at http://www.regulations.gov and placing DOT-OST-2024-0065 in the search box. A similar response has been sent to each cosigner of your letters.

Sincerely,

Carol A. (Annie) Petsonk

Carol A. (Annie) Petsonk
Assistant Secretary
for Aviation and International Affairs



**U.S. Department of Transportation**

Office of the Secretary of Transportation

Assistant Secretary

1200 New Jersey Avenue, SE
Washington, DC 20590

August 20, 2024

The Honorable Mike Levin
U.S. House of Representatives
Washington, DC 20515

Dear Representative Levin:

Thank you for your letters regarding the U.S. Department of Transportation's (the Department) Slot Exemption Proceeding for Ronald Reagan Washington National Airport (DCA).

As you know, the Federal Aviation Administration Reauthorization Act of 2024 directs the Department to allocate 10 new slot exemptions at DCA. The Department is doing so via a competitive selection proceeding that was initiated in Docket DOT-OST-2024-0065. The docket contains the Department's Notice initiating this proceeding and all publicly available documents filed in the docket. As this proceeding is currently ongoing, I cannot comment on the merits of points raised in your letters. However, please be assured that all properly filed applications and comments will receive thorough consideration.

Per our normal practice, I will be placing a copy of your letters and this response in docket DOT-OST-2024-0065. You may track the progress of this proceeding by accessing the Federal eRulemaking Portal at http://www.regulations.gov and placing DOT-OST-2024-0065 in the search box. A similar response has been sent to each cosigner of your letters.

Sincerely,

Carol A. (Annie) Petsonk

Carol A. (Annie) Petsonk
Assistant Secretary
for Aviation and International Affairs



**U.S. Department of Transportation**

Office of the Secretary of Transportation

Assistant Secretary

1200 New Jersey Avenue, SE
Washington, DC 20590

August 20, 2024

The Honorable Scott Peters
U.S. House of Representatives
Washington, DC 20515

Dear Representative Peters:

Thank you for your letters regarding the U.S. Department of Transportation's (the Department) Slot Exemption Proceeding for Ronald Reagan Washington National Airport (DCA).

As you know, the Federal Aviation Administration Reauthorization Act of 2024 directs the Department to allocate 10 new slot exemptions at DCA. The Department is doing so via a competitive selection proceeding that was initiated in Docket DOT-OST-2024-0065. The docket contains the Department's Notice initiating this proceeding and all publicly available documents filed in the docket. As this proceeding is currently ongoing, I cannot comment on the merits of points raised in your letters. However, please be assured that all properly filed applications and comments will receive thorough consideration.

Per our normal practice, I will be placing a copy of your letters and this response in docket DOT-OST-2024-0065. You may track the progress of this proceeding by accessing the Federal eRulemaking Portal at http://www.regulations.gov and placing DOT-OST-2024-0065 in the search box. A similar response has been sent to each cosigner of your letters.

Sincerely,

Carol A. (Annie) Petsonk

Carol A. (Annie) Petsonk
Assistant Secretary
for Aviation and International Affairs



**U.S. Department of Transportation**

Office of the Secretary of Transportation

Assistant Secretary

1200 New Jersey Avenue, SE
Washington, DC 20590

August 20, 2024

The Honorable Juan Vargas
U.S. House of Representatives
Washington, DC 20515

Dear Representative Vargas:

Thank you for your letters regarding the U.S. Department of Transportation's (the Department) Slot Exemption Proceeding for Ronald Reagan Washington National Airport (DCA).

As you know, the Federal Aviation Administration Reauthorization Act of 2024 directs the Department to allocate 10 new slot exemptions at DCA. The Department is doing so via a competitive selection proceeding that was initiated in Docket DOT-OST-2024-0065. The docket contains the Department's Notice initiating this proceeding and all publicly available documents filed in the docket. As this proceeding is currently ongoing, I cannot comment on the merits of points raised in your letters. However, please be assured that all properly filed applications and comments will receive thorough consideration.

Per our normal practice, I will be placing a copy of your letters and this response in docket DOT-OST-2024-0065. You may track the progress of this proceeding by accessing the Federal eRulemaking Portal at http://www.regulations.gov and placing DOT-OST-2024-0065 in the search box. A similar response has been sent to each cosigner of your letters.

Sincerely,

Carol A. (Annie) Petsonk

Carol A. (Annie) Petsonk
Assistant Secretary
for Aviation and International Affairs

Congress of the United States
Washington, DC 20515

May 30, 2024

The Honorable Pete Buttigieg
Secretary
U.S Department of Transportation
1200 New Jersey Avenue, SE
Washington, D.C. 20590

Dear Secretary Buttigieg:

Thank you for your leadership in the process to reauthorize the Federal Aviation Administration (FAA). As members of the California House delegation representing San Diego, we write to express our support for Alaska Airlines' petition to be awarded a new slot pair at Ronald Reagan Washington National Airport (DCA) to provide non-stop service between San Diego International Airport (SAN) and DCA. SAN serves constituents in all our districts in San Diego, and we respectfully request that as the Department of Transportation carries out its process to allocate the new DCA slots under the Federal Aviation Administration Reauthorization Act of 2024, you provide full and fair consideration to Alaska Airlines' petition.

Of the airports outside of the perimeter without existing service to DCA, San Diego International Airport has the highest number of daily passengers to DCA via connecting service and is the largest hub airport. San Diego is consistently touted as one of the best places to visit in the U.S., and it is not just tourism that drives the city, but also the enormous presence of our country's military.

Due to previous slot limitations and the perimeter rule at DCA, there is no current non-stop route between the two airports, resulting in travel delays and hardships. We believe greater connectivity between SAN and DCA through a new non-stop route will improve quality of life for servicemembers while providing economic benefits for both regions. The time lost by our military and tourists on every flight between San Diego and Washington, DC is something that can, and should, change. Alaska Airlines' reputation for exceptional service, reliability, and customer satisfaction combined with its growing presence in San Diego make it the ideal carrier to bridge these two important markets. Additionally, with more than 60 daily departures from SAN, this proposed Alaska Airlines flight, if appropriately timed, will provide critical connectivity to consumers beyond SAN who will also benefit from this direct service.

San Diego International Airport recognizes the demand for travel and has undertaken significant investments to prepare itself for additional flight opportunities. Over the last several years, San Diego International Airport has rebuilt its Terminal 2 with a LEED certified, award-winning facility and is in the process of a $3.8 billion Terminal 1 project that will construct 30 gates. This is a significant investment that will put infrastructure in place for the airport to meet rising demand efficiently and safely.

Again, we respectfully request that you provide full and fair consideration to Alaska Airlines' petition for new non-stop service between DCA and SAN.

Sincerely,

**OST-S10-240605-009**

Scott H. Peters
Member of Congress

Sara Jacobs
Member of Congress

Mike Levin
Member of Congress

Juan Vargas
Member of Congress

Darrell Issa
Member of Congress

**OST-S10-240605-009**



**U.S. Department of Transportation**

Office of the Secretary of Transportation

Assistant Secretary

1200 New Jersey Avenue, SE
Washington, DC 20590

August 20, 2024

The Honorable John B. Franklin
Mayor of the City of Vista
200 Civic Center Drive
Vista, CA 92084-6275

Dear Mayor Franklin:

Thank you for your letter regarding the U.S. Department of Transportation's (the Department) Slot Exemption Proceeding for Ronald Reagan Washington National Airport (DCA).

As you know, the Federal Aviation Administration Reauthorization Act of 2024 directs the Department to allocate 10 new slot exemptions at DCA. The Department is doing so via a competitive selection proceeding that was initiated in Docket DOT-OST-2024-0065. The docket contains the Department's Notice initiating this proceeding and all publicly available documents filed in the docket. As this proceeding is currently ongoing, I cannot comment on the merits of points raised in your letter. However, please be assured that all properly filed applications and comments will receive thorough consideration.

Per our normal practice, I will be placing a copy of your letter and this response in docket DOT-OST-2024-0065. You may track the progress of this proceeding by accessing the Federal eRulemaking Portal at http://www.regulations.gov and placing DOT-OST-2024-0065 in the search box.

Sincerely,

Carol A. (Annie) Petsonk

Carol A. (Annie) Petsonk
Assistant Secretary
for Aviation and International Affairs



**MAYOR & CITY COUNCIL**

**John B. Franklin**
Mayor

**Katie Melendez**
Deputy Mayor

**Joe Green**
Councilmember

**Corinna Contreras**
Councilmember

**Dan O'Donnell**
Councilmember

**CITY MANAGER**

**John Conley**

June 3, 2024

The Honorable Pete Buttigieg
U.S. Department of Transportation
1200 New Jersey Ave, SE
Washington, D.C. 20590

Re: Alaska Airlines' application for SAN-DCA, Docket No. DOT-OST-2024

Dear Secretary Buttigieg:

The City of Vista enthusiastically supports the application of Alaska Airlines to initiate nonstop air service between San Diego International Airport (SAN) and Ronald Reagan Washington National Airport (DCA or Reagan National). This new route is not only vital for enhancing the connectivity between the two strategic regions, but also supports the growing demand for nonstop service for both business and leisure passengers.

San Diego and Washington, D.C. are hubs of significant defense, economic, and social activity. San Diego's sectors in defense, biotech and communications technology require efficient access to the core of the national capital region. San Diego is the second largest government related travel market – driven by demand to key institutions closest to DCA including the Pentagon and Department of Homeland Security.

At 225 passengers daily each direction, not only does U.S. Department of Transportation (DOT) data demonstrate that San Diego is the largest origin-destination market without service to Reagan National, the SAN-DCA market is the largest in the entire domestic network without nonstop service. The annual 180,000 passenger population between SAN and DCA have endured connections that add more than 360,000 hours annually of time inefficiency.

Alaska Airlines' reputation for exceptional service, reliability, and customer satisfaction make it the ideal carrier to bridge these two important markets. Alaska Airlines began serving SAN in 1985 and in the last 10 years has grown by more than 75%. Today that means about 6,500 guests served daily and 60 average daily departures from SAN. Adding a nonstop to DCA to Alaska Airlines' daily destinations from SAN will mean increased connectivity for our larger community, will fill a critical gap in the national air service network, and also provide a more streamlined, efficient service that will benefit the greatest number of passengers.

We appreciate your consideration of this application. We hope to hear of your favorable response to this request in the coming weeks.

Sincerely,

John B. Franklin
Mayor
City of Vista

200 Civic Center Drive , Vista, California 92084-6275 CITY OF VISTA P: (760) 726-1340 | F: (760) 639-6132 | cityofvista.com

Order 2024-10-11
Served: October 16, 2024

**UNITED STATES OF AMERICA**
**DEPARTMENT OF TRANSPORTATION**
**OFFICE OF THE SECRETARY**
**WASHINGTON, D.C.**

Issued by the Department of Transportation
On the 16th day of October, 2024

| | |
|---|---|
| **Applications of:**<br><br>**ALASKA AIRLINES, INC.;**<br>**AMERICAN AIRLINES, INC.;**<br>**DELTA AIR LINES, INC.;**<br>**FRONTIER AIRLINES, INC.;**<br>**JETBLUE AIRWAYS CORPORATION;**<br>**SPIRIT AIRLINES, INC.;**<br>**SOUTHWEST AIRLINES CO.; and**<br>**UNITED AIRLINES, INC.**<br><br>For exemptions from 14 C.F.R. Part 93, Subparts K and S, pursuant to 49 U.S.C. § 41718(i), Special rules for Ronald Reagan Washington National Airport (Additional Slot Exemptions), as added by Section 502 of the Federal Aviation Administration Modernization and Reauthorization Act of 2024 | **Docket DOT-OST-2024-0065** |

**ORDER TO SHOW CAUSE**

## I. SUMMARY

By this Order, the U.S. Department of Transportation (the Department) tentatively grants two slot exemptions at Ronald Reagan Washington National Airport (DCA) to each of five non-limited incumbent or limited incumbent air carriers, to operate new nonstop roundtrip service as follows:

- Alaska Airlines, Inc. (Alaska) for service to San Diego, California (SAN);
- American Airlines, Inc. (American) for service to San Antonio, Texas (SAT);

- Delta Air Lines, Inc. (Delta) for service to Seattle, Washington (SEA);
- Southwest Airlines Co. (Southwest) for service to Las Vegas, Nevada (LAS); and
- United Airlines, Inc. (United) for service to San Francisco, California (SFO).

## II. BACKGROUND

On May 16, 2024, President Biden signed into law the Federal Aviation Administration Modernization and Reauthorization Act of 2024 (FAA 2024).[1] Section 502 of FAA 2024 amends § 41718 of Title 49 of the U.S. Code by adding subsection (i), "*Additional Slot Exemptions*." That subsection reads, in relevant part:

> (i) Additional Slot Exemptions.—
>
> (1)Increase in slot exemptions.—Not later than 60 days after the date of enactment of the FAA Reauthorization Act of 2024, the Secretary shall grant, by order, 10 exemptions from—
>
> (A) the application of sections 49104(a)(5), 49109, and 41714 to air carriers to operate limited frequencies and aircraft on routes between Ronald Reagan Washington National Airport and domestic airports located within or beyond the perimeter described in section 49109; and
>
> (B) the requirements of subparts K, S, and T of part 93 of title 14, Code of Federal Regulations.
>
> (2)Non-limited incumbents.— Of the slot exemptions made available under paragraph (1), the Secretary shall make 8 available to incumbent air carriers qualifying for status as a non-limited incumbent carrier at Ronald Reagan Washington National Airport as of the date of enactment of the FAA Reauthorization Act of 2024.
>
> (3)Limited incumbents.— Of the slot exemptions made available under paragraph (1), the Secretary shall make 2 available to incumbent air carriers qualifying for status as a limited incumbent carrier at Ronald Reagan Washington National Airport as of the date of enactment of the FAA Reauthorization Act of 2024.
>
> (4)Allocation procedures.—The Secretary shall allocate the 10 slot exemptions provided under paragraph (1) pursuant to the application process established by the Secretary under subsection (d), subject to the following:
>
> (A)Limitations.—Each air carrier that is eligible under paragraph (2) and paragraph (3) shall be eligible to operate no more and no less than 2 of the newly authorized slot exemptions.
>
> (B)Criteria.—The Secretary shall consider the extent to which the exemptions will—
>
> (i)enhance options for nonstop travel to beyond-perimeter airports that do not have nonstop service from Ronald Reagan Washington National Airport as of the date of enactment of the FAA Reauthorization Act of 2024; or
>
> (ii)have a positive impact on the overall level of competition in the markets that will be served as a result of those exemptions.

Section 41718(i) directs the Department to grant ten slot exemptions for nonstop service between DCA and domestic U.S. airports within or beyond the 1,250-mile perimeter established for

[1] FAA Reauthorization Act of 2024, Pub L. No. 118-63 (May 16, 2024) ("FAA 2024").

commercial operations at DCA.[2] Section 41718(i) allocates two new slot exemptions to an incumbent air carrier that qualifies for status as a limited incumbent carrier as of the date of enactment of FAA 2024, with the remaining eight slot exemptions allocated to incumbent air carriers that qualify for status as non-limited incumbent carriers as of the date of enactment of FAA 2024. [3] No air carrier selected by the Department may receive more or less than two slot exemptions.

## III. APPLICATIONS

By Notice on June 24, 2024, the Department requested applications for the ten new slot exemptions made available by § 41718(i).[4] As detailed in the Department's Notice and referenced above, section 41718(i) directs the Secretary to consider two criteria when awarding the new exemptions. Specifically, the Secretary must consider the extent to which the exemptions will: (A) enhance options for nonstop travel to beyond-perimeter airports that do not have nonstop service from Ronald Reagan Washington National Airport as of the date of enactment of FAA 2024, or (B) have a positive impact on the overall level of competition in the markets that will be served as a result of those exemptions. The Department's analysis focuses on the extent to which the applications meet the eligibility and allocation criteria provided by § 41718(i).

As summarized below, the Department received applications from Alaska, American, Delta, Frontier, JetBlue, Southwest, Spirit, and United. The entire public record for this proceeding, including proposals, answers, and all public comments, may be accessed online at https://www.regulations.gov, by searching for docket DOT-OST-2024-0065.

**Alaska Airlines[5]**

In its application, Alaska requests two slot exemptions to establish one daily nonstop roundtrip service between DCA and San Diego International Airport (SAN) using 159-seat Boeing 737-800 or 737-8 MAX aircraft, commencing within 90-days of allocation.

**Arguments in Support**

Alaska states that San Diego is the largest market from DCA without nonstop service, with 225 passengers per-day each-way (PPDEW) and 164,000 total annual origin/destination passengers

---

[2] A slot exemption is an exemption from the slot limitations in the Federal Aviation Administration's High Density Rule, 14 CFR Part 93, subparts K and S. A slot exemption permits one instrument flight rule takeoff or landing. Two slot exemptions are required to operate one roundtrip service. 49 U.S.C. § 41714(h)(4).

[3] A limited incumbent is generally an air carrier that holds or operates fewer than 40 slots (i.e. 20 roundtrips) and is not a new entrant, where any slot exemptions are excluded from the count. *See* 49 U.S.C. § 41714(h)(5); 14 C.F.R. § 93.213(a)(5).

[4] DOT-OST-2024-0065-5926, Establishment of Slot Exemption Proceeding at Ronald Reagan Washington National Airport Pursuant to 49 U.S.C. § 41718.

[5] *See* DOT-OST-2024-0065-5926, Application of Alaska Airlines, Inc. for Slot Exemptions.

in 2023.[6] Additionally, the application cites General Services Administration (GSA) estimates of approximately 28,000 travelers between DCA-SAN on official government business during 2024, increasing to 32,000 in 2025.[7] In its application, Alaska argues that the introduction of service to SAN will result in price discipline, stating that the carrier's entry in the IAD-SAN market during Q2 2023 reduced average air fares by 26%.[8] Alaska states that this price discipline would extend to customers using DCA-SAN service to connect onward to one of the carrier's nonstop markets from SAN. Additionally, Alaska states that consumers will benefit from time-savings associated with the new nonstop service, and global connections via its membership in the Oneworld Global Alliance and other airline partnerships.

Regarding demand for the proposed service, Alaska states in its application that San Diego is the eighth-largest city in the United States, is home to the country's largest military community, and is the largest market beyond DCA's 1,250-mile perimeter without nonstop service. Alaska cites $23.4B and $10.2B in economic impact to the tourism sectors of San Diego and Washington, DC, respectively.[9]

Alaska provides detail in its application regarding perceived competitive and consumer benefits related to the carrier's product offering and operational record. Specifically, Alaska states that customers travelling between DCA-SAN will benefit from a diverse product offering, which includes First Class, Premium, and Main Cabin seating, as well as a range of air fare options, such as its "Saver Fare." Alaska argues that its mix of products and loyalty program will have a positive impact for consumers traveling between DCA-SAN, offering additional choices and competitive service to that of other incumbent air carriers.[10] Operationally, Alaska states that its DCA flights operate with an 87.76% load factor, and a 99.78% completion factor, which the carrier describes as the highest of all carriers operating at DCA. Because of this, Alaska argues it is positioned to utilize new slot exemptions most efficiently.

**Responsive Pleadings**

Multiple other applicants submitted comments regarding Alaska's classification as a limited incumbent or non-limited incumbent in this proceeding. JetBlue and United state that all carriers should have the opportunity to provide comment should the Department make any changes regarding Alaska's eligibility in this proceeding. Frontier and Spirit state that Alaska should not be eligible as a limited incumbent in this proceeding, and instead should be evaluated as a non-limited incumbent. We address these comments later in this order.[11]

JetBlue states that Alaska's proposed schedule may require the use of airport infrastructure at DCA that is not presently available (for example, remain overnight "RON" parking). JetBlue

[6] *Id.* at 4 and AS-1.
[7] *Id* and at AS-5.
[8] *Id.* at 5 and AS-7.
[9] *Id.*
[10] Quality-of-service metrics, such as onboard product offerings, are outside the scope of consideration for this proceeding.
[11] *See infra* at 18.

also states that Alaska's addition of DCA-SAN service may lead to a reduction in service at IAD or BWI.[12] Spirit states that SAN is presently well served from IAD and therefore an allocation for DCA-SAN service would not be sufficiently competitive.[13]

**American Airlines**[14]

In its application, American requests two slot exemptions to establish one daily nonstop roundtrip service between DCA and San Antonio International Airport (SAT) using Airbus A321 aircraft.

**Arguments in Support**

American states that San Antonio is the second-largest market from DCA without nonstop service, with 154 PPDEW and 56,000 total annual origin/destination passengers in 2023. American further states that between DCA, IAD, BWI and SAT, there were 221,000 total annual origin/destination passengers in 2023.[15] The application argues that the introduction of American's nonstop service to SAT will result in price discipline and states that IAD and BWI are presently United's and Southwest's highest-fare routes respectively, from SAT.

Regarding demand for the proposed service, American states that DCA-SAT is the third-largest unserved origin/destination market in the United States.[16] American further notes in its application that the proposed schedule will enable round-trip connectivity via DCA to 20 markets, and one-way connectivity to an additional three markets. American states that the total PPDEW for anticipated reachable markets via one-stop connections from new DCA-SAT service, was more than 1,100 in July 2023.[17]

In its application, American states that San Antonio is the fastest growing U.S. city without nonstop service to DCA. The proposal specifically cites the city's population growth over the last decade (18%) and economic output ($163B). American discusses the high concentration of U.S. military activity in the San Antonio region, including three military bases, cited at $55B in state economic impact in 2023. Additionally, American states that the GSA estimates that there will be 17,472 U.S. Government travelers on official business between DCA-SAT in 2024.[18]

---

[12] *See* DOT-OST-2024-0065-22193, Consolidated Answer of JetBlue Airways Corporation.
[13] *See* DOT-OST-2024-0065-22203, Consolidated Answer of Spirit Airlines, Inc.
[14] *See* DOT-OST-2024-0065-5784, Application of American Airlines, Inc.
[15] *Id*. At 3.
[16] *Id.* At 4.
[17] *Id.* At 5.
[18] *Id.* At 6.

**Responsive Pleadings**
Multiple other applicants commented on American's application, stating that American should not receive an allocation in this proceeding due to the carrier's dominant position at DCA.[19] Other applicants stated that American presently holds the largest single-carrier share of beyond-perimeter slot exemptions at DCA. For example, Delta stated that American's share of flights and slot exemptions at DCA is 60% and 30%, respectively. Delta, Southwest, and United state that because American presently holds two pairs of slot exemptions at DCA that do not have a route-specific requirement, it could feasibly use its existing exemptions to commence service between DCA and SAT.[20]

Additionally, United states that American presently serves customers sufficiently between DCA-SAT via connections over its other hubs, and that passenger demand for its own proposal for service to SFO is greater than that for American's proposed service. Southwest states that its proposed addition of service at DCA is superior to American's proposal because American's average air fares are higher than its own. Southwest also alleges that American does not presently utilize its slots and slot exemptions at DCA efficiently because it uses its DCA hub to serve a significant number of connecting passengers. Southwest further states that providing American two slot exemptions to provide service to San Antonio is not in the public interest because of limited available capacity at DCA. JetBlue states that SAT is presently accessible to customers via Southwest's service between DCA and AUS, and suggests that there may be alternative legislative solutions for enabling access to SAT, such as minimally expanding the existing DCA perimeter.

**Delta Air Lines[21]**

In its application, Delta requests two slot exemptions to establish one daily nonstop roundtrip service between DCA and Seattle-Tacoma International Airport (SEA), or to establish a second daily roundtrip service between DCA and Salt Lake City International Airport (SLC). The proposed service would be operated using 194-seat Airbus A321NEO aircraft, commencing within 60-days of allocation.

**Arguments in Support**
Delta states that Seattle is the fourth largest beyond-perimeter market from DCA, with 629 PPDEW.[22] Delta argues that unlike other beyond-perimeter markets, DCA-SEA lacks adequate capacity and competition. The application states that DCA-SEA is presently operated by a single

---

[19] *See* DOT-OST-2024-0065-22180, Comments of Delta Air Lines, Inc.; DOT-OST-2024-0065-22193, Consolidated Answer of JetBlue Airways Corporation; DOT-OST-2024-0065-22225, Consolidated Answer of Southwest Airlines Co.; DOT-OST-2024-0065-22188, Consolidated Comments of United Airlines, Inc.
[20] American holds four slot exemptions created under 49 U.S.C. § 41718(g)(3) for non-limited incumbent air carriers at DCA. § 41718(g)(3)(D) states that each non-limited incumbent carrier receiving slot exemptions under the statute shall "have sole discretion concerning the use of an exemption made available under paragraph (1), including the initial or any subsequent beyond perimeter destinations to be served."
[21] *See* DOT-OST-2024-0065-5803, Application of Delta Air Lines, Inc. for Slot Exemptions.
[22] *Id.* at 8.

carrier, which cannot alone meet existing demand for the route. Delta estimates that demand for DCA-SEA exceeds available capacity by 311 PPDEW.

In its application, Delta states that the average air fare for service between IAD-SEA is $289, while the average air fare for DCA-SEA is $355. Delta also states that in 2023, 72% of customers in the Washington, DC metro area preferred to use DCA for destinations within the 1,250-mile perimeter.[23] Delta states that the addition of its service between DCA-SEA would meet 60% of unmet demand for the market and provide a competitive balance with the single carrier presently operating on this route.

Delta further states that Seattle has the fifth largest population of cities beyond DCA's 1,250-mile perimeter. The application discusses Seattle's population of 4.1 million (citing 30% growth over the last 20 years) and large business community (e.g., 10 Fortune 500, 17 Fortune 1000 companies). Delta argues that corporate travelers prefer to use DCA to reach SEA and estimates that Alaska currently serves 80% of corporate travelers on the DCA-SEA route.[24] Delta states it presently operates more than 150 peak day departures from SEA to 60 global markets, and that its growth in SEA has resulted in a reduction of single-carrier markets from 47 to 23 in 12 years.[25]

Delta provides detail in its application regarding competitive and consumer benefits related to the carrier's product offering and operational record. Specifically, Delta states that it leads global network carriers in operational reliability. Delta also states that it has the lowest number of complaints per 100,000 passengers (3.5) when compared to American (6) and United (6.6), and it cites its award of a top ranking in J.D. Power's 2024 North America Airline Satisfaction Study for first/business and premium economy travelers in its application.

Delta's application includes a backup service proposal for a second daily nonstop operation between DCA and Salt Lake City International Airport. Delta asserts that the additional service would provide customers with connections between DCA and markets in the western United States.[26]

---

[23] *Id.* at 9. The Department notes that Delta's estimate is based on a comparison of PPDEW between DCA/IAD-SEA for FY2023 and average daily seats for June 2024. Delta's PPDEW calculation assumes that 72% of origin/destination passengers between IAD/DCA-SEA prefer to use DCA in an unconstrained perimeter environment. To achieve this, Delta combines origin/destination passengers for IAD/DCA in markets with greater than two daily frequencies, and with a greater than 500mi stage length. See *id.* at DL-107).

[24] *Id.* at 11.

[25] *Id.* at 12.

[26] *Id.* at 14 and DL-504. Delta states that its proposed schedule for DCA-SLC service would provide connections "to and from dozens of cities in the western United States." Delta estimates that 40% of passengers on DCA-SLC would connect onward from SLC, and provides a forecasted distribution of connecting passengers for 10 markets in the western U.S.

**Responsive Pleadings**
Multiple other applicants submitted comments regarding Delta's application.[27] Alaska did not submit comments regarding the merits of Delta's application, but rebutted statements made in Delta's proposal regarding DCA-SEA service. For example, Alaska states that air fare levels between DCA-SEA are consistent with that of other transcontinental routes from DCA. Alaska also states that Delta's DCA-SLC service has the highest ticket price in the country, and that Delta's beyond-perimeter flying has some of the highest air fares of any carrier at DCA. Alaska further states that its existing service between DCA-SEA is successful and that capacity on the route presently exceeds demand.

In response to Delta's application, JetBlue states that Delta's DCA-SEA service may lead to a reduction in service from IAD or BWI, and that Delta customers can reach SEA today from DCA, connecting over LAX or SLC and its other core hubs. Southwest states that SEA is already served from DCA and therefore Delta's proposed service would not enhance competition on the route, because Delta operates at a higher fare premium than Southwest and other carriers. Southwest also states that there is presently a surplus of seats in the DCA-SEA market and disagrees with Delta's presentation of passenger demand data for the proposed route. Southwest further states that Delta should not be eligible to serve its backup market (SLC) because it already does so with another DCA slot exemption.[28] Additionally, United states that Delta did not acknowledge capacity constraints at DCA in its application, and that demand between DCA-SFO exceeds that of DCA-SEA. United also states that it can connect more passengers over its SFO hub than Delta does via SEA.

**JetBlue[29]**

In its application, JetBlue requests two slot exemptions to establish a second daily nonstop roundtrip service between DCA and Luis Muñoz Marin International Airport (SJU) in San Juan, PR, or to establish one daily roundtrip service between DCA and Los Angeles International Airport (LAX). The proposed service would utilize 160- or 200-seat Airbus A321 or A321NEO aircraft.

**Arguments in Support**
JetBlue states that consumer demand for its current nonstop service between DCA-SJU exceeds the carrier's capacity on the route.[30] As such, JetBlue states that the proposed additional operation would capture unmet demand on the DCA-SJU route. JetBlue argues that the additional 200 daily seats between DCA and SJU would offer price discipline in the form of an estimated 31% decrease in average air fares between Washington, DC, and San Juan. JetBlue

---

[27] *See* DOT-OST-2024-0065-22194, Comments of Alaska Airlines, Inc. for Slot Exemptions; DOT-OST-2024-0065-22193, Consolidated Answer of JetBlue Airways Corporation; DOT-OST-2024-0065-22225, Consolidated Answer of Southwest Airlines Co.; DOT-OST-2024-0065-22188, Consolidated Comments of United Airlines, Inc.
[28] Order 2002-11-20.
[29] *See* DOT-OST-2024-0065-5808, Application of JetBlue Airways Corporation for Beyond-Perimeter Slot Exemptions.
[30] *Id.* at 10.

cites a $270, $245, and $147 average fare to SJU from IAD, DCA, and BWI respectively in 2023. In its application, JetBlue estimates that the average fare between DCA-SJU could fall to an estimated $170 if it commences a second daily operation on the route.[31] Additionally, JetBlue states that consumers would benefit from eleven (11) additional one-stop connections via SJU to various points in the Caribbean.

Regarding demand for the proposed service, JetBlue states that San Juan is the 25th largest market from Washington, DC and is underserved because there is only one daily nonstop service from DCA. JetBlue states that unlike other markets, demand for flying to Puerto Rico and the Caribbean has not fluctuated but has steadily grown. The application states that two million annual cruise passengers use the Port of San Juan, and that JetBlue's second daily service to SJU would enable greater connectivity for travelers boarding cruises. JetBlue further states that approximately 100,000 people of Puerto Rican descent live in the Washington, DC metropolitan area, and therefore the new service would also benefit travelers visiting friends and relatives (VFR).

Additionally, JetBlue states that after commencing service between DCA-SJU in 2012, PPDEW increased by 93% to 175. In its application, JetBlue estimates an additional 51.1% growth if it commences a second daily operation on the route – to approximately 275 passengers per-day each-way.[32]

JetBlue also notes in its application that the GSA estimates more than 6,000 travelers in 2024 will use the DCA-SJU route on official business. The application states that there is a clear preference for travelers on this route to use DCA, citing GSA figures for IAD-SJU and BWI-SJU that show DCA-SJU is estimated to serve a greater number of travelers in 2024. JetBlue points out that between July 2023-June 2024, the carrier served 4,079 travelers on government contracted fares for the DCA-SJU route.[33]

Finally, JetBlue describes in its application its commitment to the San Juan market, including approximately 700 staff and a future crew and pilot base at SJU. JetBlue states it is the largest airline at SJU, with over 4.7 billion available seat miles (ASMs) in 2024.[34]

No supporting materials were provided in the application for JetBlue's backup market of Los Angeles, CA.

**Responsive Pleadings**

Multiple other applicants submitted comments stating that JetBlue's proposal is not competitive because it is presently the only carrier operating on the DCA-SJU route and uses existing slot

---

[31] *Id.* The Department notes that this analysis is illustrative. The Department's assessment of air fare levels for proposed markets in this proceeding focuses only on observed data.
[32] *Id.* at 12.
[33] *Id.* at 13.
[34] *Id.* at 15.

exemptions to do so.[35, 36] Other applicants stated that an allocation for JetBlue's proposed second-daily service would strengthen its dominance on the route and insulate it from competition. For example, Delta states that because JetBlue is the only carrier operating between DCA-SJU, its own air fare projections included in its proposal are without merit.

In response to JetBlue's application, United notes that JetBlue proposes to serve the smallest market of all applicants in this proceeding and would not provide competitive and efficient connections for consumers. United further states that air fares on the DCA-SJU route have gradually increased over time. United also states that JetBlue's backup proposal (LAX) should not be considered because JetBlue did not include any information regarding this service in its application. Finally, Southwest states that there is presently adequate competition and service on the DCA-LAX route.

**Southwest Airlines[37]**

In its application, Southwest requests two slot exemptions to establish one daily nonstop roundtrip between DCA and Harry Reid International Airport (LAS) in Las Vegas, NV (with continuing service to Sacramento International Airport (SMF)), commencing within 90-days of allocation using Boeing 737-800 or 737-8 MAX aircraft with 175 seats.[38]

**Arguments in Support**

Southwest states that Las Vegas is DCA's largest underserved market by population size. The application cites 261,000 total annual origin/destination passengers, or 358 PPDEW.[39] Southwest argues that current capacity on the DCA-LAS route is not sufficient to meet demand, stating that American, which is the single carrier operating this route, has 137,128 annual scheduled seats between DCA-LAS. Southwest argues that this represents a 90% market gap, when scheduled nonstop seats are compared to total origin/destination passengers. Southwest also notes that LAS is the fifth largest beyond-perimeter market from DCA.[40]

In its application, Southwest states that demand for DCA-LAS was 28% higher in CY2023 than in CY2019, compared to an average of -0.1% for all other beyond-perimeter markets.[41] Southwest further states that compared to 2019 levels, demand for DCA-LAS has recovered at a higher rate than that of all domestic markets from DCA (+0.2% when compared to CY2019).[42]

---

[35] *See* DOT-OST-2024-0065-22191, Consolidated Response of American Airlines, Inc.; DOT-OST-2024-0065-22180, Comments of Delta Air Lines, Inc.; DOT-OST-2024-0065-22225, Consolidated Answer of Southwest Airlines Co.; DOT-OST-2024-0065-22188, Consolidated Comments of United Airlines, Inc.
[36] Order 2012-5-12.
[37] *See* DOT-OST-2024-0065-5815, Application of Southwest Airlines Co.
[38] Because a slot exemption award in this proceeding would be used to operate service between DCA and LAS, Las Vegas is evaluated as the primary proposed market when assessing Southwest's application against the statutory criteria.
[39] *Id.* at 6.
[40] *Id.*
[41] *Id.* at 7.
[42] *Id.* at 8.

Southwest also cites a greater than 90% load factor for current nonstop service between DCA-LAS as representative of the strong passenger demand for the route.[43]

Southwest further states that its projected average one-way fare on the DCA-LAS route is estimated at $188.[44] In its application, Southwest compares this to a current average of $258 across all DCA carriers, and $298 for American Airline's nonstop service. Southwest argues that it would introduce price discipline on the DCA-LAS route, lowering average fares by around 27%. Southwest states that it is likely American and other carriers would also lower air fares to compete with the new service. For example, Southwest explains in its application that for past market-entry at DCA, Southwest's service resulted in an average reduction of 21% for air fares and a passenger increase of approximately 42%.[45]

Southwest's proposal also includes a one-stop connection between DCA and Sacramento (SMF). Regarding the proposed connection between DCA and SMF, Southwest states that it will provide the only one-stop "same plane" service between the markets. The application also states that the proposed DCA-LAS-SMF route will be the "fastest flight option" available to passengers traveling between DCA-SMF. Southwest states that SMF is the fourth-largest market without service from DCA and cites current average Southwest fare levels at 29% lower than average fares between DCA-SMF. Southwest states that the proposed DCA-LAS-SMF route would provide connecting itinerary opportunities for more than two million annual passengers.[46] Additionally, Southwest states in its application that its average fares in potential downline/connecting markets from SMF are lower than average in all but one. Southwest argues that its entry on the DCA-LAS-SMF route would therefore create additional options for travelers while stimulating price discipline through lower average fares.

**Responsive Pleadings**

Delta submitted comments in support of Southwest's application, stating that the proposal demonstrates an "earnest commitment to enhancing competition."[47] However, JetBlue states that Southwest's proposed DCA service could lead to the reduction of current service at BWI and states that Southwest already serves LAS from BWI.[48]

United submitted comments stating that passenger demand between DCA/IAD/BWI (WAS)-SFO is greater than between WAS-LAS, arguing that its own application, therefore, has greater merit based on anticipated consumer benefit.[49] United also states that Southwest's proposed one-stop

---

[43] *Id.*
[44] *Id.* at 9 and WN-301. Southwest calculates forecasted fare levels for new DCA-LAS service using systemwide average domestic average air fares, compared to systemwide stage length in 2023. The Department notes that this analysis is illustrative. The Department's assessment of air fare levels for proposed markets in this proceeding focuses only on observed data.
[45] *Id.* at 10 and WN-303.
[46] *Id.* at 12 and WN-311.
[47] *See* DOT-OST-2024-0065-22180, Comments of Delta Air Lines, Inc.
[48] *See* DOT-OST-2024-0065-22193, Consolidated Answer of JetBlue Airways Corporation
[49] *See* DOT-OST-2024-0065-22188, Consolidated Comments of United Airlines, Inc.

service to SMF is not competitive as SMF is already served with one-stop service on United and other carriers. United further states that Southwest's forecast air fare impacts, included in its proposal, are without merit because they are not consistent with Southwest's current business practices and air fare levels.

**United Airlines**[50]

In its application, United Airlines requests two slot exemptions to establish a second daily nonstop roundtrip between DCA and San Francisco International Airport (SFO), or to establish once daily roundtrip service between DCA and Los Angeles International Airport (LAX). The service would commence approximately 90-days after allocation using Boeing 737-8 MAX aircraft with 166 seats.

**Arguments in Support**

United states that while it was not supportive of expanding access to DCA due to concerns regarding airport capacity and congestion, its proposed service would offer consumer benefits while mitigating operational impacts at the airport. To this end, United states that it intends to operate the new service during early morning or late evening hours, which it states are less congested periods at DCA.

Regarding demand for the service, United's application cites 584,000 annual bookings between Washington, DC, and San Francisco. When also considering Oakland (OAK) and San Jose (SJC), United cites 685,000 total annual bookings.[51] United states SFO is presently the second largest beyond-perimeter route from a passenger-demand perspective. The application discusses existing corporate ties between Washington, DC, and San Francisco, stating that the presence of Fortune 500 companies and leading industries drive time-sensitive travel between the two markets. United points out that California's economy is the fifth largest in the world and increased by 6.1% in 2023 versus the year prior.

United further states that in 2023, 60% of the carrier's frequent flyers who traveled from DCA used the airport exclusively for Washington, DC travel.[52] United argues that this indicates there is a significant group of travelers who only use DCA when traveling, and when traveling with United. The application argues that this suggests the proposed new service would not conflict with United's existing hub presence at IAD.

Additionally, United states that its proposed SFO service would provide one-stop connections to 25 domestic, and seven international markets. Further, United's application cites 16 cities which would receive new roundtrip connecting service to/from DCA. While the DCA-SFO route is presently served, United states that the addition of this second daily service would improve

---

[50] *See* DOT-OST-2024-0065-5775, Application of United Airlines, Inc.
[51] *Id.* at 4 and UA-107.
[52] *Id.* at 5. Calculated as 60% of United MileagePlus members traveling to/from DCA in 2023, based on United passenger flown databases.

schedule utility for customers traveling between the two markets. United argues that the increase in capacity would result in additional flight options and lower air fares on the route.

Regarding the potential competitive benefit of the proposed routes, United states that it holds only a small share of operations at DCA, while American Airlines and Alaska Airlines are the largest carriers for service between California and DCA. The application cites a 52% seat share for Alaska on all transcontinental routes, a 26% seat share for American's service to Los Angeles, and an 11% seat share for Delta's service to Los Angeles.[53] United argues that its proposed service would provide competition to incumbent air carriers presently operating on these routes.

Regarding its backup proposal for once daily service between DCA and Los Angeles, United states that it presently only serves DCA-LAX customers with one-stop, connecting service, and thus carries approximately 4% of its Washington, DC-Los Angeles customers via DCA.[54] United states that the introduction of new nonstop service between DCA-LAX would provide competition for American, Alaska, and Delta which currently operate on this route. United further states that its proposed schedule would avoid peak hours at DCA to have a smaller impact on airport delays and operations. United also notes that the proposed service would enable roundtrip connections to eight domestic destinations from Los Angeles.

**Motion of JetBlue[55]**
JetBlue filed a motion to disqualify United from consideration, stating that the application includes a proposed departure time that is outside of hours when slot exemptions may be allocated at DCA. In its motion, JetBlue states that United submitted an application that includes a proposed 6:30am departure from DCA, which falls outside of the slot exemption periods defined in 49 U.S.C. § 41718(c)(2). JetBlue also states that the data provided by United supporting its proposal are invalid because they are premised on a flight schedule not within slot exemption hours at DCA. We address this Motion later in this Order.[56]

**Answer of United Airlines in Objection of JetBlue's Motion[57]**
United submitted an objection to JetBlue's motion to disqualify, stating that there is no basis or precedent for disqualification from this proceeding. United states that it is aware of the technical language specified by the Department that directs successful applicants to work with the FAA Slot Administration Office regarding the scheduling of new slot exemptions. Additionally, United states that it has previously received an award of a DCA slot exemption with proposed service during an hour falling outside of slot exemption periods defined by 49 U.S.C. § 41718(c)(2). United states it would work with the FAA to achieve an "optimal solution" regarding the scheduling of new slot exemptions.

[53] *Id.* at 13 and UA-113.
[54] *Id.* at 18.
[55] *See* DOT-OST-2024-0065-10863, Motion of JetBlue Airways Corporation.
[56] *See infra* at 18.
[57] *See* DOT-OST-2024-0065-12069, Objection of United Airlines, Inc.

**Responsive Pleadings**
Other applicants submitted comments regarding United's application.[58] Multiple other applicants stated that United already serves SFO from DCA, and therefore does not offer a competitive proposal under the statutory criteria in this proceeding. Delta states that United strongly opposed the creation of new slot exemptions under FAA 2024. Delta further states that United's market share at DCA will not change if it receives a slot exemption in this proceeding, and that the proposed DCA-SFO service would not generate city-pair competition, but strengthen United's dominant presence in the Washington, DC market.

JetBlue states that United's proposed schedule could require RON parking positions at DCA, and notes that there is limited available gate and parking capacity at the airport. JetBlue also states that the addition of DCA-SFO service could lead to the reduction of service at BWI or IAD. Additionally, Spirit states that its own proposed service to SJC would provide competition for United's existing DCA-SFO service, and that a second-daily SFO service would not reduce air fares between the two markets. Southwest also states that United's proposed service would reduce competition at DCA by adding a frequency on an already high-fare market that does not have sufficient demand to warrant new flying.

**Supplemental Pleadings**[59]
On July 24, United filed a limited response and motion for leave to file.[60] In response to comments from other applicants, United states that the statutory criteria provided by FAA 2024 allow for a broad assessment of competitive impacts resulting from exemptions in this proceeding. United argues that its application enhances competition in multiple areas that merit consideration. United alleges that an additional frequency on the DCA-SFO route, or introduction of new service on the DCA-LAX route, as stated by United, would provide consumer benefits by increasing competition on routes served by other air carriers. United further alleges that its proposed SFO service would enable the greatest number of connections of all proposed markets. United further argues that competitive impacts on beyond-perimeter routes at DCA are unique and dissimilar to those in within-perimeter markets. For example, United argues in its response that past beyond-perimeter exemptions have resulted in competitive benefits (such as price discipline) even when a route is operated by a single air carrier. Regarding its backup application for DCA-LAX service, United alleges that this service would provide a long-term competitive benefit, as other carriers on this route presently operate using slot exemptions which do not include a market requirement and could plausibly be changed.

---

[58] *See* DOT-OST-2024-0065-22191, Consolidated Response of American Airlines, Inc.; DOT-OST-2024-0065-22180, Comments of Delta Air Lines, Inc.; DOT-OST-2024-0065-22193, Consolidated Answer of JetBlue Airways Corporation; DOT-OST-2024-0065-22195, Frontier Airlines, Inc. Comments on Timely-Filed Applications; DOT-OST-2024-0065-22225, Consolidated Answer of Southwest Airlines Co.; DOT-OST-2024-0065-22203, Consolidated Answer of Spirit Airlines, Inc.
[59] By this Order, the Department is granting all motions seeking leave to file otherwise unauthorized documents submitted by various air carriers in the docket.
[60] DOT-OST-2024-0065-23492, Motion for Leave to File and Supplemental Comments of United Airlines, Inc.

In response to comments from JetBlue, United states that its application should not be dismissed by the Department and doing so would be contrary to precedent. United states that its proposed service can be operated flexibly in the hours in which the Department is permitted to add slot exemptions. United further states that its application is fully compliant with the statutory criteria for this proceeding.

On July 24, JetBlue filed a letter in response to United's motion for leave to file.[61] JetBlue stated that the Department should not consider the motion because United did not provide good cause for not addressing issues discussed in an earlier answer. In its letter, JetBlue states that the Department should not delay the issuance of a final order in this proceeding. On July 25, Southwest filed a letter in support of JetBlue's response to United's motion for leave to file.[62] In its letter, Southwest states that United's motion should be denied as it does not provide good cause for filing additional comments after the Department's deadline.

**Spirit[63]**

In its application, Spirit requests two slot exemptions to establish one daily roundtrip service between DCA and San Jose Mineta International Airport (SJC) using 182-seat Airbus A320NEO aircraft.

**Arguments in Support**

Spirit states that SJC is geographically located in proximity to 40% of the population in the Bay Area, making it the most convenient option for southern Bay Area travelers.[64] While San Francisco is served from both DCA and IAD, Spirit states that there is not presently nonstop service to/from SJC from either airport. Spirit's application argues that the new service would therefore provide a competitive, low fare option for travelers between the two regions.

Regarding demand for the proposed service, Spirit cites 1,445.9 PPDEW travelling between SFO/SJC/OAK and IAD/DCA in YE4Q2023.[65] Spirit states that San Jose is one of the largest U.S. cities that does not presently have nonstop service to Washington, DC. Additionally, Spirit states that customers would have access to one-stop destinations on Spirit via SJC.[66]

Spirit further states that the San Jose region is home to the world's largest technology companies, most of which are located within 12 miles of SJC Airport. In its application, Spirit argues that the

[61] *See* DOT-OST-2024-0065-23495, JetBlue Airways Corporation (Letter in Response to United Airlines Unauthorized Filing).

[62] *See* DOT-OST-2024-0065-23502, Southwest Airlines Co. (Letter in Response to United Airlines Unauthorized Filing).

[63] *See* DOT-OST-2024-0065-5921, Application of Spirit Airlines, Inc. for Two Slot Exemptions for DCA-SJC Service.

[64] *Id.* at 3.

[65] *Id.* at Exhibit 3.

[66] *Id.* at 5. Spirit cites new service between SJC and Dallas Ft. Worth (DFW), Las Vegas (LAS), and San Diego (SAN).

presence of these companies suggests that there is demand for the additional connection to Washington DC, stating that Silicon Valley companies have "significant investments in facilities located in the Washington, DC region."[67]

Spirit provides detail in its application, regarding perceived competitive and consumer benefits related to the carrier's product offering. Specifically, Spirit states that its service offers a range of air fare options and bundles for "value-conscious consumers." Spirit further states that in multiple cases of market entry, its presence has resulted in a reduction in average industry fares at airports with competition from a hub competitor.

**Responsive Pleadings**

Multiple other applicants submitted comments stating that Spirit was not eligible for this proceeding.[68] For example, Alaska asked that DOT confirm Spirit's ineligibility in a final order. Alaska and others state that Spirit does not presently operate service at DCA. JetBlue states that Spirit is not eligible because it proposes to operate slot exemptions during hours that are presently fully subscribed. We address these comments later in this Order.[69]

**Frontier[70]**

In its application, Frontier requests two slot exemptions to establish one daily roundtrip service between DCA and Luis Muñoz Marin International Airport in San Juan, PR (SJU). Frontier does not specify an aircraft type or starting date for the proposed service in its application.

**Arguments in Support**

Frontier states that its air fares are typically the lowest available in the markets in which they operate.[71] Frontier argues that JetBlue's status as the single-carrier operating the DCA-SJU route disincentivizes price discipline and has led to higher air fares. Frontier's application cites a $247 average air fare between January-April 2024, compared to $219 in 2019. Additionally, Frontier states that the average air fare for service between BWI/IAD-SJU is notably lower, citing $171 and $180 for the same periods, respectively.[72]

Frontier further states in its application that the additional service between DCA-SJU would benefit consumers by introducing price discipline and additional flight options. Frontier states that the carrier offers "favorable" pricing on routes for which it competes with JetBlue.[73]

---

[67] *Id.* at 7.
[68] *See* DOT-OST-2024-0065-22194, Comments of Alaska Airlines, Inc. for Slot Exemptions; DOT-OST-2024-0065-22193, Consolidated Answer of JetBlue Airways Corporation; DOT-OST-2024-0065-22195, Frontier Airlines, Inc. Comments on Timely-Filed Applications.
[69] *See infra* at 18.
[70] *See* DOT-OST-2024-0065-5802, Frontier Airlines, Inc. Application for Slot Exemption.
[71] *Id.* at 6.
[72] *Id.*
[73] *Id.* at 7. Frontier comparison of average air fares for 2H2023 in JetBlue/ Frontier "head-to-head" markets.

Frontier adds that it will open a crew base at SJU, with additional planned growth to more than 20 markets.

**Responsive Pleadings**

In response to Frontier's application, Alaska submitted comments stating that Frontier is not eligible to receive a slot exemption in this proceeding because it is a new entrant carrier.[74] Alaska asks the Department to confirm this eligibility determination in a final order. Spirit also states that Frontier is not eligible for an allocation in this proceeding, and that Frontier previously acknowledged its status as a new entrant at DCA.[75] Alaska and JetBlue state that Frontier should be disqualified from this proceeding because it did not provide in its application the required information regarding its proposed service. JetBlue states that Frontier does not accurately present data related to average air fares between DCA-SJU, alleging that that Frontier's average fare for its current slot exemption route at DCA (Denver) is higher than any of its service to DEN from all other points.

**Other Comments Filed**

**Comments of Consumer Advocates[76]**

Representatives of eleven consumer advocacy groups submitted joint comments asking the Department to ensure that new slot exemptions at DCA are allocated to maximize consumer benefit by increasing airline competition and reducing air fares. Specifically, the comments suggest that the Department allocate new slot exemptions at DCA to "airlines that do not currently control large numbers of long-haul slots at DCA," including "as many ultra-low cost carriers as are legally qualified under the act." The comments also ask the Department to ensure that carriers receiving new slot exemptions have access to "gates and other critical airport facilities" at DCA which are requisite for operating new service. In support of this, the comments cite a 4% increase in the Consumer Price Index over the last year, as compared to a 25% increase in air fares (reported by the Bureau of Labor Statistics). The comments also cite estimates from the International Air Transport Association of a 14.7% increase in airline operating profit, and 11.3% increase in airline net profit, respectively, between 2023 and 2024. The comments state concern regarding the impact of air carrier dominance at DCA and other major U.S. gateways, and further discuss that 55% of beyond-perimeter slot pairs at DCA are allocated to two carriers, American and Alaska.

**Comments of Breeze Aviation Group, Inc.[77]**

Breeze Aviation Group, Inc. (Breeze) submitted comments expressing interest in applying for the slot exemptions in this proceeding. Breeze states that, had it been eligible, its application may have included proposed service between DCA and U.S. points including Boise, Sacramento, Reno, and Albuquerque. Breeze states that their application would have well-satisfied FAA

---

[74] *See infra* at 18.
[75] *See infra* at 18. Spirit cites the Application of Frontier for slot exemptions made available by Order 2012-2-21.
[76] *See* DOT-OST-2024-0065-4565, Blue Future (Correspondence).
[77] *See* DOT-OST-2024-0065-5714, Comments of Breeze Aviation Group, Inc.

2024's statutory criteria. The comments discuss Breeze's stated operating model, which connects unserved markets, and markets with only one-stop service via other air carrier hubs. Breeze states that its entry in other markets has led to a reduction in air fares and an increase in passenger traffic. Breeze's comments state that FAA 2024, as passed by Congress, is incongruent with prior DCA legislation because it does not permit the Department to allocate slot exemptions to new entrant air carriers. Accordingly, Breeze asks that the Department "advocate for policies that make opportunities available for new entrant airlines at DCA and other constrained airports."

**Comments of Service Employees International Union**[78]

The Service Employees International Union (SEIU) submitted comments on behalf of its members. SEIU states that it is a labor organization representing two million workers across the United States and Canada. SEIU states that it represents more than 42,000 airport service workers. SEIU states that the employees it represents work for contractors hired by airlines, and therefore it is concerned regarding the "deeply consolidated" nature of the airline industry.[79] SEIU states that it is concerned about the potential for the allocation of additional slot exemptions at DCA to increase airline market concentration. SEIU requests that the Department award slot exemptions in this proceeding to air carriers that do not already have large slot portfolios at DCA. SEIU explains that doing so will create more competition at DCA, which benefits travelers and airport workers. SEIU states that DCA is the only U.S. slot-controlled airport where a single airline "holds a majority of slots."[80] The comments further discuss concern regarding the impact of an increase in airline concentration at DCA on airport workers, stating that in the past airlines have "outsourced jobs, changed contractors, and moved work to subsidiaries as it suits their bottom line."[81] SEIU states that allocating slot exemptions in a pro-competitive manner would disincentivize unfair or deceptive employment practices for airport workers at DCA. SEIU states that some airlines and airline trade groups have argued against past attempts to update labor and wage practices by some airports, citing, for example, the Philadelphia City Council's attempt to update minimum wage standards at Philadelphia International Airport. SEIU states that improved standards for airport workers bring consumer benefits through improved service and lower rates of turnover. SEIU requests that the Department consider these factors to allocate additional slot exemptions at DCA in a pro-competitive manner, and with recognition of Department precedent and current air carrier dominance at DCA.

## IV. ELIGIBILITY OF AIR CARRIERS TO APPLY FOR AND RECEIVE SLOT EXEMPTIONS

The Department received multiple comments from air carriers regarding the eligibility of certain air carriers for available slot exemptions in this proceeding. The Department summarizes these comments and its tentative determinations regarding air carrier eligibility below.

[78] *See* DOT-OST-2024-0065-19814, Comments of Service Employees International Union.
[79] *Id.* at 2.
[80] *Id.*
[81] *Id.* at 5.

**Incumbency at DCA**

Section 41718(i) states, "the Secretary shall make 2 [slot exemptions] available to incumbent air carriers qualifying for status as a limited incumbent carrier," and, "shall make 8 [slot exemptions] available to incumbent air carriers qualifying for status as a non-limited incumbent carrier at Ronald Reagan Washington National Airport as of the date of enactment of the FAA Reauthorization Act of 2024." This denotes a two-part test for eligibility: first, a carrier must be an incumbent on the date of enactment of FAA 2024; and second, a carrier must then also qualify for status as a limited incumbent, or non-limited incumbent carrier. "Incumbent air carrier" is not a defined term under either 14 C.F.R. Part 93 or 49 U.S.C. Subtitle VII. Therefore, we rely on a plain language reading of the statute. In this case, "incumbent air carrier" is a carrier that is engaged in air transportation at DCA as of the date of enactment of FAA 2024.[82]

In its June 24, 2024 Notice, the Department, in coordination with the FAA Slot Administration Office, provided a list of non-limited incumbent and limited incumbent carriers providing air transportation at DCA on the date of the enactment of FAA 2024.[83] The Department notes that it did not receive comments regarding, and finds no reason not to confirm the eligibility of: American, Delta, Southwest, and United as non-limited incumbent air carriers in this proceeding. Each of these air carriers was engaged in air transportation at DCA as of the enactment date of the FAA 2024 Act and holds or operates more than 40 slots.

**Eligibility of Frontier Airlines**

In its application for service to SJU, Frontier states that it is eligible for slot exemptions in this proceeding as a limited incumbent carrier. Frontier states that it meets a plain meaning definition of "incumbent air carrier" because it marketed service at DCA as of the date of the enactment of FAA 2024. Additionally, Frontier states that 49 U.S.C. § 41714(h)(5) amends the regulatory definition of limited incumbent carrier under 14 C.F.R. § 93.213(a)(5) to increase the upper threshold from twelve to 40 slots, but does not specify a lower limit.[84] Therefore, Frontier argues that it is eligible as a limited incumbent in the Department's proceeding, despite operating at DCA with six statutory slot exemptions but no slots.[85] Frontier states that it is the only limited incumbent air carrier eligible to apply for slot exemptions in this proceeding.

In comments filed July 17, 2024,[86] Frontier reiterates its position, stating that Spirit is not eligible to apply for slot exemptions in this proceeding due to the statutory requirement that any

---

[82] *See* 49 U.S.C. § 40102(a)(5).

[83] *See* 6-24-2024 Notice at 2.

[84] *See* DOT-OST-2024-0065-5802, Frontier Airlines, Inc. Application for Slot Exemption.

[85] 49 U.S.C. § 41714(h)(5)(B)(i) amends the definition of limited incumbent air carrier in 14 CFR §§ 93.213(a)(5) and 93.223(c)(3) to exclude slot exemptions in a carrier's total number of slots at a particular airport.

[86] *See* DOT-OST-2024-0065-22195, Frontier Airlines, Inc. Comments on Timely-Filed Applications.

qualifying carrier is an "incumbent," interpreted by Frontier as marketing service at DCA at time of the enactment of FAA 2024.

**Tentative Determination**

Based upon the drafting of FAA 2024, the Department tentatively finds Frontier Airlines ineligible to apply for slot exemptions in this proceeding. Frontier passes the first test for eligibility but not the second. While Frontier was engaged in air transportation at DCA on the date of enactment of FAA 2024, therefore qualifying as an incumbent air carrier, it did (and continues to do) so by only using six slot exemption awards.[87] 49 U.S.C. § 41714(h)(5)(B)(i) excludes an air carrier's count of slot exemptions at DCA for purposes of determining a carrier's status as a limited incumbent air carrier in order to allocate slot exemptions at DCA.[88] 49 U.S.C. § 41714(h)(3) states that "[t]he term 'new entrant air carrier' means an air carrier that does not hold a slot at the airport concerned and has never sold or given up a slot at that airport after December 16, 1985, and a limited incumbent carrier." It is important to note that while § 41714(h)(3) states that limited incumbent carriers are also new entrant carriers, the reverse is not true, *i.e.,* all new entrant carriers are not limited incumbent carriers.

Frontier, therefore, is not a limited incumbent air carrier, but rather meets the definition of a new entrant air carrier as defined by 49 U.S.C. § 41714(h)(3) since, at time of enactment of FAA 2024, Frontier did not hold or operate any non-exemption slots at DCA, nor had ever sold or given up a slot at DCA after December 16, 1985. Congress did not make any of the ten slot exemptions from the FAA 2024 Act available to new entrant air carriers. We tentatively determine, therefore, that Frontier is not eligible to receive a slot exemption award under 49 U.S.C. § 41718(i).

**Eligibility of Spirit Airlines**

On June 26, 2024, Spirit filed a Letter of Intent to apply for the two slot exemptions available for limited incumbent air carriers in this proceeding.[89] In its letter, Spirit states that it is eligible to apply for exemptions as a limited incumbent in this proceeding because it meets the definition of a limited incumbent carrier under 14 CFR § 93.213(a)(5) and a limited incumbent air carrier in 49 U.S.C. § 41714(h)(5). Spirit states that it received four permanent slots for service at DCA under an FAA slot lottery allocation proceeding conducted on August 12, 2003. In 2012, Spirit entered into an agreement to sell those four slots to Southwest. Therefore, Spirit argues that, under 14 CFR § 93.213(a)(5), it should be considered to hold its four permanent slots at DCA because they were held by Spirit after December 16, 1985, and were subsequently "transferred to another party other than by trade for one or more slots at the same airport."

---

[87] Frontier received two slot exemptions by Order 2000-7-1 and four slot exemptions by Order 2004-4-1.
[88] 49 U.S.C. § 41714(h)(5)(B)(i) states that "[t]he term 'limited incumbent air carrier' has the meaning given that term in subpart S of part 93 of title 14, Code of Federal Regulations; except that—for purposes of such sections, the term 'slot' shall not include 'slot exemptions.'"
[89] *See* DOT-OST-2024-0065-0007, Spirit Airlines, Inc. (Intent to Apply for 2 Limited Incumbent Slot Exemptions).

**Tentative Determination**
The Department tentatively finds Spirit Airlines ineligible to apply for slot exemptions in this proceeding. As above, the same two-part test applies: first, a carrier must be an incumbent on the date of enactment of FAA 2024; and second, a carrier must then also qualify for status as a limited incumbent carrier. In contrast to Frontier, Spirit does not pass the first part of the test. Spirit has not engaged in air transportation at DCA since 2012 (after it sold its slots to Southwest). Therefore, Spirit does not meet the prerequisite of incumbency under § 41718(i)(3) as it did not provide air transportation at DCA as of May 16, 2024 (the date of enactment of FAA 2024). We therefore tentatively find that Spirit is ineligible for an award in this proceeding.

**Classification of Alaska Airlines**

Spirit and Frontier both argue in comments to the Department that 49 U.S.C. § 41714(k) disqualifies Alaska from applying for slot exemptions as a limited incumbent air carrier.[90] Specifically, the carriers argue that Alaska's code sharing relationship with American requires that the Department consider the number of combined slots and slot exemptions held by both carriers when determining Alaska's status at DCA. The carriers request that Alaska only be considered eligible for slot exemptions in this proceeding as a non-limited incumbent carrier.

**Tentative Determination**
The Department tentatively determines for this proceeding that Alaska Airlines qualifies as a limited incumbent air carrier and is eligible to apply for slot exemptions in this category. Section 41714(k) states that "…an air carrier that operates under the same designator code, or has or enters into a code-share agreement, with any other air carrier shall not qualify for a new slot or slot exemption as a new entrant or limited incumbent air carrier at an airport if the total number of slots and slot exemptions held by the two carriers at the airport exceed 20 slots and slot exemptions." Section 41714(k) was created by the Wendell H. Ford Aviation Investment and Reform Act for the 21st Century in April of 2000.[91] Alaska and American have had a code share relationship at DCA since at least 2000.[92] In 2012, Alaska received two slot exemption awards as a new entrant/limited incumbent carrier.[93]

The scope of Alaska and American's code sharing relationship is limited by a settlement agreement reached in 2017 to resolve issues related to the merger transaction between Alaska and Virgin America Airlines.[94] The agreement prohibits Alaska from marketing any American flight that originates or terminates at any Key Alaska Airport, or American from marketing any

[90] See DOT-OST-2024-0065-22195, Frontier Airlines, Inc. Comments on Timely-Filed Applications; DOT-OST-2024-0065-22203, Consolidated Answer of Spirit Airlines, Inc.
[91] Pub L. No. 106-181, Apr. 5, 2000.
[92] Sabre GDD.
[93] *See* Order 2012-5-12 at 8.
[94] *See* https://www.justice.gov/atr/case-document/file/915971/dl?inline.

Alaska flight that originates or terminates at any Key American Airport.[95] The agreement also prohibits the marketing of Alaska and American service on defined overlap routes.[96] Therefore, Alaska does not presently place the American Airlines code on any nonstop flight it operates at DCA, and would not be permitted to do so for any service operated with a new slot exemption award. Additionally, the relationship between Alaska and American does not include any slot sharing provisions. Therefore, Alaska does not receive any meaningful access to the DCA market via its relationship with American. Further, the legislative history of § 41714(k), as represented by its predecessor provisions in the House and Senate, indicates that it was intended to prevent commuter air carriers (as defined at 49 U.S.C. § 41714(h)(1)) from gaining preferential access to slots or slot exemptions as a new entrant or limited incumbent, only to market and operate those slots on behalf of a larger, incumbent mainline carrier. [97] That is not the case here as Alaska is not a commuter air carrier and is not seeking to operate its proposed DCA-SAN service under the marketing control and branding of American.[98]

**Motion of JetBlue Concerning Application of United Airlines**

JetBlue filed a motion to disqualify United's primary application for service to San Francisco from consideration in this proceeding. In its motion, JetBlue argues that United's application includes a proposed departure time that is outside of hours when slot exemptions may be allocated at DCA.[99] Specifically, JetBlue references Section 41718(c)(2)(A), which states that slot exemptions "may not be for operations between the hours of 10:00 p.m. and 7:00 a.m.; and…may not increase the number of operations at Ronald Reagan Washington National Airport in any 1-hour period during the hours between 7:00 a.m. and 9:59 p.m. by more than five operations."

**Tentative Determination**

The Department tentatively denies JetBlue's motion for the following reasons. United has submitted an application in this proceeding that is compliant with the relevant statute and the Department's June 24, 2024, Notice. In keeping with the requirements of § 41718(i), the Department requested that air carriers submit certain information in their applications including

---

[95] Key American Airports are – DCA, Charlotte Douglas International Airport (CLT), Chicago Midway and Chicago O'Hare International Airports (MDW/ORD), Dallas Ft. Worth International Airport and Love Field (DFW/DAL), Fort Lauderdale Hollywood International Airport (FLL), John F. Kennedy International Airport (JFK), Miami International Airport (MIA), New York LaGuardia Airport (LGA), Philadelphia International Airport (PHL), Phoenix Sky Harbor International Airport (PHX). Key Alaska Airports are – Portland International Airport (PDX), Seattle-Tacoma International Airport (SEA), San Francisco International Airport (SFO), Ted Stevens Anchorage International Airport (ANC).

[96] Alaska and American are prohibited from marketing any flight that serves an Alaska/American overlap route, and any route between Los Angeles (LAX) and a Key Alaska Airport or a Key American Airport.

[97] *See* H.R. No. 106-167 *and* S. Rep. No. 106-9.

[98] 14 CFR § 298.3(b) defines a commuter air carrier as one that, among other things, does not directly or indirectly utilize large aircraft in air transportation and does not hold a certificate of public convenience and necessity. Alaska utilizes large aircraft in air transportation and holds a certificate of public convenience and necessity.

[99] *See* DOT-OST-2024-0065-10863, Motion of JetBlue Airways Corporation.

*proposed* operating schedules. [100] While the Department has used this information to assess the merits and viability of the applicants' proposals, as stated in the Department's Notice, final slot times for the granted exemptions will be allocated via Notice after the Department's final allocation decision. Selected carriers will be directed to work with the FAA Slot Administration Office to assign slot times corresponding with the authority granted in this proceeding and in accordance with the requirements of § 41718.[101]

## V. TENTATIVE DECISION

The Department, in reaching its tentative decision, has carefully evaluated each application against the statutory criteria, and assessed the competitive and public benefits presented by each proposal. Following its evaluation, the Department tentatively concludes that the following applications best align with the statutory criteria and will provide the greatest competitive and public benefits: Alaska, for nonstop service to San Diego, CA; American, for nonstop service to San Antonio, TX; Delta, for nonstop service to Seattle, WA; Southwest, for nonstop service to Las Vegas, NV; and United, for nonstop service to San Francisco, CA. The Department provides its reasoning to support these decisions below.

As stated herein, § 41718(i) directs the Secretary to consider the extent to which the exemptions will: (A) enhance options for nonstop travel to beyond-perimeter airports that do not have nonstop service from Ronald Reagan Washington National Airport as of the date of enactment of FAA 2024, or (B) have a positive impact on the overall level of competition in the markets that will be served as a result of those exemptions. All of the eligible applications received by the Department have merit and are supported by stakeholders such as state and local elected officials, airports, regional corporations, and community organizations.

The Department also acknowledges comments received in this proceeding by multiple other stakeholders concerning the allocation of these additional slot exemptions.[102] These comments primarily discuss market concentration at DCA and new entrant access to slots and slot exemptions. The Department notes that the criteria established by Congress in the FAA 2024 Act limit our discretion to select a wide range of air carriers and business models for the new slot exemptions made available at DCA.[103] The Department seeks to ensure that scarce aviation infrastructure and landing permissions, such as slots and slot exemptions, are used to the

---

[100] § 41718(i) states, "any slot exemption request filed with the Secretary…shall include: the names of the airports to be served, the times requested, and such additional information as the Secretary may require."

[101] As referenced by this Order, 49 U.S.C. § 41718(c)(2)(A)(ii) limits the number of operations that may be added during any one hour between 7:00 a.m. and 9:59 p.m. at DCA to no more than five. Several hours have already reached the statutory limit and slot exemptions awarded in this proceeding will not be eligible for operation during these hours. Selected carriers are expected to work collaboratively with the Department and the FAA Slot Administration Office to accommodate new operations. Selected carriers may be asked to justify requested slot times or the viability of the proposed service during alternate operating hours.

[102] *See infra* at 17.

[103] Departing from past practice, § 41718(i) does not reserve any exemptions in this proceeding for new entrant air carriers at DCA.

maximum benefit of the traveling public, as contemplated by 41718(i)(4)(B), and further discussed below.

**Alaska to San Diego, CA**

We tentatively conclude that Alaska merits an award of two exemptions for service to San Diego, CA. The proposed service will enhance options for travel to a beyond-perimeter airport that does not presently have nonstop service from DCA. The service will also have a positive impact on the overall level of competition in the Washington, DC-San Diego, CA market.

SAN is the largest local origin/destination market from DCA currently without nonstop service. The Department's analysis finds that there are approximately 139,000 annual local O&D passengers between DCA-SAN, or roughly 189 per-day, each way.[104] Because there is not presently nonstop service between the two markets, local travelers between DCA-SAN today can only access either market via connecting flight options from DCA or SAN. Further, the Department's analysis indicates that 34% of all local O&D customers between DCA-SAN are carried by American, with the second-largest share of O&D customers carried by Southwest (23%). Alaska currently carries a negligible share (less than 1%) of local O&D customers between DCA-SAN, and approximately 8% of local O&D customers between all Washington, DC airports and SAN. The introduction of nonstop service on Alaska would therefore provide a new, convenient flight option, and enhance competition by increasing the number of air carriers in the WAS-SAN market.

The Department's analysis indicates that air fares for DCA-SAN are currently 30% higher than the average for DCA, as well as the average air fare for the greater-Washington, DC market, and the U.S. national average. [105, 106] Alaska does not have a dominant presence at DCA, holding only approximately 2% of allocated slots, and carrying approximately 3% of O&D traffic.[107, 108] These factors combined persuade the Department to tentatively conclude that Alaska's DCA-SAN service would have a positive impact on the overall level of competition in the Washington, DC-San Diego market. While Alaska did not provide detail in its proposal regarding the availability of new connecting itineraries via the DCA-SAN service, the Department acknowledges that customers may also benefit from access to the carrier's nonstop network at SAN.

We are not persuaded by comments in opposition of an award to Alaska in this proceeding. The primary contention against Alaska is related to Alaska's classification as a limited incumbent carrier. This issue is addressed elsewhere herein.[109] Other comments from applicants concern the

---

[104] DOT DB1B Market YE 1Q2024.
[105] DCA/IAD/BWI Airports.
[106] DOT DB1B Market, OAG Schedules, DOT F41 Financials YE 1Q2024.
[107] FAA Slot Administration Data.
[108] DOT DB1B Market YE 1Q2024.
[109] *See supra*, at 18.

availability of existing nonstop service between other Washington-area airports and SAN.[110] As stated above, Alaska carries a minimal share of local customers between Washington, DC, and San Diego, and does not hold a dominant share of allocated slots at DCA. The Department tentatively concludes that the benefits of an award to Alaska outweigh those of the proposals not selected in this proceeding.

**American to San Antonio, TX**

We tentatively conclude that American merits an award of two slot exemptions for service to San Antonio, TX. The proposed service will enhance options for travel to a beyond-perimeter airport that does not presently have service from DCA. The service will also have a positive impact on the overall level of competition in the Washington, DC-San Antonio market.

SAT is the second-largest local origin/destination market from DCA currently without nonstop service. The Department's analysis finds that there are approximately 110,000 annual local O&D passengers between DCA-SAT, or roughly 151 per-day, each way.[111] Because there is not presently nonstop service between the two markets, local travelers between DCA-SAT today can only access either market via connecting flight options from DCA or SAT. The Department notes its analysis finds that Southwest presently carries the single-largest share of local O&D customers between DCA-SAT (45%).[112] Therefore, it can be reasonably assessed that the introduction of new nonstop service between DCA-SAT will enhance the overall level of competition in the market by adding new capacity in a presently unserved market, and providing alternate flight options to the primary carrier in this city-pair.

Multiple parties and other carriers note that American holds the dominant share of allocated slots and slot exemptions at DCA and therefore should not receive additional access through this proceeding.[113] Comments also state that American could feasibly serve SAT from DCA today using slot exemptions which it holds, and which do not include a market/ airport requirement (sometimes referred to as "flexible slot exemptions").[114]

The Department is not persuaded by these arguments against an award to American for service to SAT. The primary reason for this tentative conclusion is that American's application is one of only two from eligible air carriers that proposes new service to an unserved beyond-perimeter

---

[110] Alaska and United currently operate nonstop service between IAD-SAN, Spirit and Southwest currently operate nonstop service between BWI-SAN.
[111] DOT DBIB Market YE 1Q2024.
[112] *Id.*
[113] *See* DOT-OST-2024-0065-22180, Comments of Delta Air Lines, Inc.; DOT-OST-2024-0065-22193, Consolidated Answer of JetBlue Airways Corporation; DOT-OST-2024-0065-22225, Consolidated Answer of Southwest Airlines Co.; DOT-OST-2024-0065-22188, Consolidated Comments of United Airlines, Inc.; DOT-OST-2024-0065-4565, Blue Future (Correspondence); DOT-OST-2024-0065-5714, Comments of Breeze Aviation Group, Inc.; DOT-OST-2024-0065-19814, Comments of Service Employees International Union.
[114] *See* Order 2012-2-1.

market from DCA – clearly fulfilling the first statutory requirement defined by § 41718(i).[115] Further, and as stated above, American does not presently carry a majority-share of customers traveling between DCA-SAT. Finally, the award of an additional slot exemption pair for service to SAT will provide new connectivity from DCA without requiring a reduction in service to another beyond-perimeter market.

The Department is concerned about the concentration of slots at DCA. We note, however, that were American to use an existing "flexible" slot exemption pair to commence DCA-SAT service, it would require the removal of service from another beyond-perimeter market, which weighs against the statutory criteria in this proceeding. Additionally, as the slot exemptions being awarded here are market-specific, this mitigates the risk that American could move the service to a less competitive market in the future. The Department therefore tentatively concludes that the benefits of an award to American outweigh those of the proposals not selected in this proceeding as well as the detriments of selecting American.

**Delta to Seattle, WA or Salt Lake City, UT**

We tentatively conclude that Delta merits an award of two slot exemptions for service to Seattle, WA. The proposed service will enhance options for travel to a beyond-perimeter airport and have a positive impact on the overall level of competition in the Washington, DC-Seattle market.

The Department's analysis finds that there are approximately 232,000 total annual local O&D passengers between DCA-SEA, or 279 per-day, each way.[116] While there is a large local O&D market for DCA-SEA, the route is presently only served nonstop by one carrier, Alaska. The Department finds that Alaska presently carries approximately 73% of local O&D customers between DCA-SEA, with American a distant second-place competitor with only approximately 9% of passengers. Delta currently carries only approximately 6% of local O&D customers between DCA-SEA. Additionally, the Department notes that average air fares for DCA-SEA are presently more than 60% higher than the average at DCA, as well as the average air fare for the greater-Washington, DC market, and the U.S. national average. [117, 118] This combination of factors leads the Department to tentatively conclude that an award to Delta for service to SEA would have a positive impact on the overall level of competition in the Washington, DC-Seattle market. The service will provide new capacity in a high-demand, beyond-perimeter market, while also offering consumers an alternative to the dominant, sole carrier on the route.

Other carriers stated that SEA is already served from DCA, and from the greater-Washington, DC market today.[119] JetBlue states that Delta's addition of service between DCA-SEA may result

[115] *See supra* at 18.
[116] DOT DB1B Market YE 1Q2024.
[117] DCA/IAD/BWI Airports.
[118] DOT DB1B Market, OAG Schedules, DOT F41 Financials YE 1Q2024.
[119] *See* DOT-OST-2024-0065-22225, Consolidated Answer of Southwest Airlines Co.

in a reduction of service to SEA from other Washington-area airports.[120] JetBlue and Southwest state that Delta customers can presently access SEA via service connecting over other Delta hubs, and that Delta's air fares are typically higher than others in the markets it serves. Lastly, Southwest states that there is presently a surplus of seats in the DCA-SEA market, disagreeing with Delta's assessment of passenger demand for the proposed route.

The Department is not persuaded by these comments because, as stated above, the DCA-SEA route is presently served by a single carrier which carries a majority-share of local O&D traffic, and because current air fares are notably higher than the average for DCA and the Washington, DC market. The Department's analysis also finds that a large share of customers traveling between the greater-Washington, DC market and Seattle are connecting beyond either WAS or SEA (approximately 26%).[121] This leads the Department to tentatively conclude that Delta's proposed service would increase nonstop seat capacity for local O&D customers, better serving customers traveling to/from Washington, DC, and Seattle. In consideration of the above, the Department tentatively concludes that the benefits of an award to Delta outweigh those of the proposals not selected in this proceeding.

In awarding two slot exemptions for service to Seattle, the Department selects Delta's primary proposed market in this proceeding. The Department tentatively concludes that Delta's primary proposal more fully meets the criteria of the statute, and its benefits outweigh a selection of Delta's backup proposal (SLC) in this proceeding.

**Southwest to Las Vegas, NV**

We tentatively conclude that Southwest merits an award of two slot exemptions for service to Las Vegas, NV. The proposed service will enhance options for travel to a beyond-perimeter airport and have a positive impact on the overall level of competition in the Washington, DC-Las Vegas market.

LAS is one of the largest local O&D markets proposed for service in this proceeding. The Department's analysis finds that there are approximately 275,000 annual O&D customers between DCA-LAS, or 376 per-day, each way.[122] Further, the DCA-LAS O&D market has the greatest discrepancy between annual passengers and available nonstop seats of any market proposed in this proceeding. For the year ending first quarter of 2024, there were approximately 137,000 nonstop seats between DCA-LAS, or 0.5 seats per O&D passenger.[123] Put simply, the current O&D market between DCA-LAS is roughly two times larger than the available nonstop capacity. Southwest's service would therefore enhance competition by providing new service in a high-demand, underserved beyond-perimeter market.

---

[120] *See* DOT-OST-2024-0065-22193, Consolidated Answer of JetBlue Airways Corporation.
[121] SABRE GDD.
[122] DOT DB1B Market YE 1Q2024.
[123] DOT DB1B Market, OAG Schedules YE 1Q2024.

DCA-LAS is presently served nonstop by American using an existing slot exemption award from the Department.[124] Of local O&D customers traveling between DCA-LAS, nearly 56% are carried by American. Southwest carries the second-largest share of customers between DCA-LAS (20%).[125] However, because Southwest does not currently offer nonstop service on this route, the carrier's customers can only access DCA or LAS via one-stop connecting service. Further, current air fares between DCA-LAS are roughly 27-29% higher than average for DCA, as well as the average air fare for the greater-Washington, DC market, and the U.S. national average.[126, 127] These factors suggest that new nonstop service between DCA-LAS would have a positive impact on the overall level of competition in the market by providing a nonstop alternative to service currently operated by the dominant carrier at DCA, and by increasing flight options from DCA on a low fare air carrier.

United, in opposition, states that the consumer benefits of its own proposal for service to SFO or LAX outweighs that of Southwest's proposed DCA-LAS service.[128] United also states that its proposed service would benefit a larger passenger market and provide greater one-stop connections for DCA travelers. JetBlue states that the addition of DCA-LAS service by Southwest could lead to the reduction of service from IAD or BWI to LAS by Southwest and other carriers.[129]

As stated above, the DCA-LAS local O&D market is large, and there is presently a deficit of nonstop seats as compared to annual passengers. Additionally, the introduction of Southwest's service would compete with American, which is the only carrier operating DCA-LAS, and which carries a majority share of O&D passengers on the route. The Department also notes comments of Delta in support of Southwest's proposal.[130] In consideration of the above, the Department tentatively concludes that the benefits of an award to Southwest outweigh those of the proposals not selected in this proceeding.

**United to San Francisco, CA or Los Angeles, CA**

We tentatively conclude that United merits an award of two slot exemptions for service to San Francisco, CA. The proposed service will enhance options for travel to a beyond-perimeter airport and have a positive impact on the overall level of competition in the Washington, DC-San Francisco market.

SFO is one of the largest local O&D markets proposed for service in this proceeding. The Department's analysis finds that there are approximately 238,000 total annual local O&D

---

[124] *See* Order 2000-7-1.
[125] DOT DB1B Market YE 1Q2024.
[126] DCA/IAD/BWI Airports.
[127] DOT DB1B Market, OAG Schedules, DOT F41 Financials YE 1Q2024.
[128] *See* DOT-OST-2024-0065-22188, Consolidated Comments of United Airlines, Inc.
[129] *See* DOT-OST-2024-0065-22193, Consolidated Answer of JetBlue Airways Corporation.
[130] *See* DOT-OST-2024-0065-22180, Comments of Delta Air Lines, Inc.

passengers between DCA-SFO, or roughly 393 per-day, each way.[131] Of these passengers, United and Alaska both carry a roughly even share, around 36% and 35% respectively. While Alaska and United presently operate nonstop service between DCA-SFO using slot exemption awards, the Department tentatively concludes that United's proposed second-daily service would have a positive impact on the overall level of competition in the market.[132]

This is primarily due to the prospective addition of newly accessible one-stop connecting markets from DCA, over United's SFO hub. The Department's analysis of United's application finds that the proposed service could add up to 32 new roundtrip one-stop connections from DCA via SFO, including seven international connections to points in Asia.[133] While the availability of new connecting points is, in part, dependent on United's operating schedule for the proposed service, the Department believes it is likely that new time-of-day coverage between DCA-SFO would enable added one-stop connections that will benefit consumers in the Washington, DC-San Francisco market.

Current air fares between DCA-SFO are approximately 60% higher than the average for DCA, as well as the average air fare for the greater-Washington, DC market, and the U.S. national average. [134], [135] Because United is not the sole nor dominant carrier on the DCA-SFO route, the Department believes that the addition of nonstop seat capacity on the route would likely place downward pressure on air fare levels for DCA-SFO. Additionally, United is not a dominant carrier at DCA, holding only nine percent of allocated slots, including four slot exemptions.[136] These factors combined lead the Department to tentatively conclude that the addition of service between DCA-SFO will have a positive impact on the overall level of competition in the market by providing additional flight options in a high-demand beyond-perimeter market, expanding accessible one-stop markets from DCA, and stimulating price discipline on the route through added capacity.

Multiple other applicants state that United already serves DCA-SFO, and therefore its proposal would not enhance competition on the route.[137] Delta states that the addition of service between DCA-SFO would further strengthen United's dominance in the greater-Washington, DC market, and would not enhance competition because DCA-SFO is presently served nonstop. The Department acknowledges United's presence in the greater-Washington, DC market through its IAD hub. For the specific circumstance of this proceeding, however, the Department is persuaded that the competitive benefit of an award to United fulfills the direction of the statute.

[131] DOT DB1B Market YE 1Q2024.
[132] *See* Order 2012-2-21.
[133] OAG Schedules YE 1Q2024.
[134] DCA/IAD/BWI Airports.
[135] DOT DB1B Market, OAG Schedules, DOT F41 Financials YE 1Q2024.
[136] FAA Slot Administration Data.
[137] *See* DOT-OST-2024-0065-22180, Comments of Delta Air Lines, Inc.; DOT-OST-2024-0065-22193, Consolidated Answer of JetBlue Airways Corporation; DOT-OST-2024-0065-22225, Consolidated Answer of Southwest Airlines Co., DOT-OST-2024-0065-22203, Consolidated Answer of Spirit Airlines, Inc.

The Department tentatively concludes that the benefits of an award to United outweigh those of the proposals not selected in this proceeding and the potential detriments of selecting United.

In awarding two slot exemptions for service to San Francisco, the Department selects United's primary proposed market in this proceeding. The Department tentatively concludes that United's primary proposal more fully meets the criteria of the statute, and its benefits outweigh a selection of United's backup proposal (LAX) in this proceeding.

**JetBlue to San Juan, PR or Los Angeles, CA**

We tentatively conclude that JetBlue does not merit an award of two slot exemptions in this proceeding for proposed service to San Juan, PR or backup proposed service to Los Angeles, CA. While JetBlue's primary proposal would provide expanded access between Washington, DC and Puerto Rico, the service would not enhance air travel options in an unserved beyond-perimeter market. Additionally, because JetBlue is currently the sole operator between DCA-SJU, the Department finds that the proposed second-daily service would not have a significant, positive impact on the level of competition in the Washington, DC-San Juan market.

While JetBlue is not a significant slot-holder at DCA, the Department's analysis finds that JetBlue presently carries nearly 80% of local O&D passengers traveling between DCA-SJU, and that air fares on the route are approximately 16-18% higher than the average for DCA, as well as the average air fare for the greater-Washington, DC market, and the U.S. national average.[138, 139] Because an award to JetBlue would further strengthen the carrier's dominance in the DCA-SJU market, the application is less compelling than others in this proceeding. The Department acknowledges the importance of air connectivity between the continental U.S. and Puerto Rico. In consideration of the above factors however, the Department tentatively finds that the potential benefits of JetBlue's proposal do not outweigh those of the other applications tentatively selected in this proceeding.

Regarding its backup proposal for service to Los Angeles, JetBlue did not supply the Department with material analysis supporting its application for DCA-LAX. Therefore, the Department cannot adequately assess the merits or deficiencies of the proposed service, nor transparently evaluate the backup proposal.

## VI. CONDITIONS

**Start-up**

We expect that awardees will inaugurate full service in a reasonable timeframe – tentatively 90 days following the date of service of a Final Order, unless otherwise approved by the

[138] DCA/IAD/BWI Airports.
[139] DOT DB1B Market YE 1Q2024.

Department. If, for any reason, an awardee is not able to use the slot exemptions awarded, the carrier shall notify the Department as soon as possible - tentatively not later than 10 days after the date of service of a Final Order.

**Assignment of Slot Times**

As stated in the Department's June 24, 2024, Notice, 49 U.S.C. § 41718(C)(2)(ii) allows the Department to assign two additional slot exemptions per one hour period (for a total of five). There are 15 hourly periods between 7:00 a.m. EST and 9:59 p.m. EST, and all slot exemptions must fit into the combined 75 slot times during these periods. Applicants were advised of these constraints, and that multiple periods have already reached the statutory cap for slot exemption assignments. In a Final Order in this proceeding, selected carriers will be directed to work collaboratively with the FAA Slot Administration Office to accommodate these new operations. Selected carriers may be asked to justify requested slot times or the viability of the proposed service during alternate operating hours.

This Order is issued under authority redelegated by the Under Secretary of Transportation in 49 CFR § 1.25a(b)(6)(ii)(D) to the Assistant Secretary for Aviation and International Affairs.

**ACCORDINGLY,**

1. We direct all interested persons to show cause why we should not issue an order making final our tentative findings and conclusions discussed herein. Objections or comments to our tentative findings and conclusions shall be due no later than 14 calendar days from the service date of this Order, and answers to objections shall be due no later than seven (7) business days thereafter. In the event that no objections are filed, all further procedural steps shall be deemed waived, and we may enter an order making final our tentative findings and conclusions;

2. We tentatively grant slot exemptions from 14 C.F.R. Part 93, Subparts K and S, to Alaska Airlines, Inc. (two slot exemptions to serve San Diego International Airport); American Airlines, Inc. (two slot exemptions to serve San Antonio International Airport); Delta Air Lines, Inc. (two slot exemptions to serve Seattle-Tacoma International Airport); Southwest Airlines Co. (two slot exemptions to serve Harry Reid International Airport); and United Airlines, Inc. (two slot exemptions to serve San Francisco International Airport);

3. Except as otherwise granted, we tentatively deny all other applications for exemptions from 14 C.F.R. Part 93, Subparts K and S, filed in this docket;

4. The Department prohibits Alaska Airlines, Inc., American Airlines, Inc., Delta Air Lines, Inc., Southwest Airlines Co., and United Airlines, Inc. from selling, trading, transferring,

or conveying the operating authorities granted by the subject exemptions, except through an air carrier merger or acquisition;

5. The Department prohibits Alaska Airlines, Inc., American Airlines, Inc., Delta Air Lines, Inc., Southwest Airlines Co., and United Airlines, Inc. from using the operating authorities granted by the subject exemptions to conduct air transportation to points other than those approved by this Order;

6. The authorities tentatively granted under these exemptions are subject to all of the other requirements delineated in 14 C.F.R. Part 93, Subparts K and S, including, but not limited to, the reporting provisions and use-or-lose requirements set forth in 14 C.F.R. § 93.227;

7. The Department tentatively denies the motion of JetBlue Airways Corporation to disqualify United from consideration for an award of DCA beyond-perimeter exemption slots, filed on July 10, 2024;

8. The Department grants all motions seeking leave to file otherwise unauthorized documents submitted by various air carriers in the docket; and

9. We will serve this Order on all parties on the service list in this docket.

By:

**CAROL A. (ANNIE) PETSONK**
Assistant Secretary for Aviation
and International Affairs

(SEAL)

*An electronic version of this document will be available online at:*
https://www.regulations.gov

Congress of the United States

Washington, DC 20515

October 29, 2024

The Honorable Pete Buttigieg
Secretary
U.S. Department of Transportation
1200 New Jersey Avenue, SE
Washington, D.C. 20590

RE: Order to Show Cause 2024-10-11 (Docket DOT-OST-2024-0065)

Dear Secretary Buttigieg:

We write to applaud your tentative decision to grant two slot exemptions at Ronald Reagan Washington National Airport (DCA) to Alaska Airlines, Inc. (Alaska) for new non-stop service between DCA and San Diego, California. As members of the California House delegation representing San Diego County, we write to express our strong support for this tentative decision, which will greatly benefit constituents in all our districts in the San Diego area, in the National Capital region, and across the nation. We commend the Department of Transportation for its detailed and well-reasoned tentative decision, which faithfully reflects Congress's criteria, as stated in the *FAA Reauthorization Act of 2024*, for allocating the available slot exemptions. We encourage you to finalize this decision as soon as practicable.

As we shared during the previous public comment period, San Diego International Airport (SAN) has the highest number of daily passengers to DCA via connecting service and is the largest hub airport out of all the airports outside of the perimeter without existing service to DCA. San Diego is consistently touted as one of the best places to visit in the U.S., and it is not just tourism that drives the city, but also the enormous presence of our country's military.

As the Department's Order to Show Cause makes clear, adding Alaska's new non-stop service between SAN and DCA will significantly enhance options for business and leisure travel, improve quality of life for servicemembers, and provide economic benefits for both regions. Alaska's growing presence in San Diego makes it the ideal carrier to bridge these two important markets. Additionally, with more than 60 daily departures from SAN, this proposed Alaska Airlines flight, if appropriately timed, will provide critical connectivity to consumers beyond SAN who will also benefit from this direct service. We ask that the Federal Aviation Administration consider this important connectivity in assigning slot times to Alaska in conjunction with a final order.

SAN recognizes the demand for travel and has undertaken significant investments to prepare itself for additional flight opportunities. Over the last several years, the airport has rebuilt its Terminal 2 with a LEED certified, award-winning facility and is in the process of a $3.8 billion Terminal 1 project that will construct 30 gates. This is a significant investment that will put infrastructure in place for the airport to meet rising demand efficiently and safely.

Finally, we thank you for the clarity in the Order to Show Cause regarding Alaska's status as a limited incumbent air carrier that is eligible to apply for slot exemptions in this category. This is consistent with the plain reading of the statute, the legislative history, and previous DCA slot decisions, and we appreciate your decision that this is the appropriate category in which to consider Alaska's application.

Thank you again for your leadership, and for this tentative decision that will bring such important benefits to San Diego and to the nation.

Sincerely,

Scott H. Peters
Member of Congress

Sara Jacobs
Member of Congress

Mike Levin
Member of Congress

Juan Vargas
Member of Congress

Darrell Issa
Member of Congress

cc: Administrator Michael Whitaker, Federal Aviation Administration

**BEFORE THE**
**DEPARTMENT OF TRANSPORTATION**
**OFFICE OF THE SECRETARY**
**WASHINGTON, D.C.**

**Applications of:**

**ALASKA AIRLINES, INC.;**
**AMERICAN AIRLINES, INC.;**
**DELTA AIR LINES, INC.;**
**FRONTIER AIRLINES, INC.;**
**JETBLUE AIRWAYS CORPORATION;**
**SPIRIT AIRLINES, INC.;**
**SOUTHWEST AIRLINES CO.; and**
**UNITED AIRLINES, INC.**

For exemptions from 14 C.F.R. Part 93, Subparts K and S, pursuant to 49 U.S.C. § 41718(i), Special rules for Ronald Reagan Washington National Airport (Additional Slot Exemptions), as added by Section 502 of the Federal Aviation Administration Modernization and Reauthorization Act of 2024

Docket DOT-OST-2024-0065

**OBJECTION OF SPIRIT AIRLINES TO ORDER TO SHOW CAUSE**

Spirit Airlines Inc. submits this objection to two tentative findings of Show Cause Order 2024-10-11, issued on October 16, 2024, and seeks grant of its application for service between Reagan National Airport (DCA) and San Jose International Airport (SJC). Specifically, and for the reasons stated below, Spirit objects to the Department's tentative findings that:

1) Spirit does not qualify as a limited incumbent to participate in this proceeding; and
2) Alaska Airlines is a limited incumbent despite its massive codeshare flights with American Airlines at Reagan National Airport (DCA).

On July 14, 2021, the President issued Executive Order 14036, titled: Executive Order on Promoting Competition in the American Economy. Among other tasks of the Secretary of Transportation listed at section 5(m) is: *"(ii) to provide consumers with more flight options at better prices and with improved service, and to extend opportunities for competition and market entry as the industry evolves:"*

On May 16, 2024 the President signed into law the 2024 FAA Reauthorization Act, Section 502 of which directed the Department to allocate 10 exemption slots that would:

> (i) enhance options for nonstop travel to beyond-perimeter airports that do not have nonstop service from Ronald Reagan Washington National Airport as of the date of enactment of the FAA reauthorization Act of 2024; or (ii) have a positive impact on the overall level of competition in the markets.

Although the Executive Order and the FAA Reauthorization Act directed the Department to promote competition and market entry, Section 502 was primarily a giveaway to the legacy airlines which dominate domestic air transportation. The legislation virtually guaranteed American, Delta, and Southwest would each be gifted 2 slots. Combined, those 3 legacy airlines, together with the awards to United, and Alaska account for an approximate domestic market share of 77% and operate 90% of the DCA slots.

As if there was any doubt about which airlines would be selected, Senator Cantwell, the Chairman of the Senate Commerce Committee, on July 17, 2024, submitted a letter to the Department explaining which cities should receive service – specifically San Antonio (American), Seattle (Delta) and Las Vegas (Southwest). She added San Diego, Alaska's pick to the big three winners. With the recently approved Alaska/Hawaiian merger, Alaska now stands as the 5th largest domestic airline with almost an 8% market share.

Faced with this virtually pre-determined outcome, the Department had two choices: 1) properly find Alaska to be a non-limited incumbent under applicable statutes and regulations and award Spirit the San Jose (SJC) route as a limited incumbent which the Department concedes,[1] or 2) interpret the governing authority such that it could label Alaska a limited incumbent and allocate the remaining non-limited incumbent slots to JetBlue for Puerto Rico or United for SFO. Incredibly, ensuring that low-fare carriers got shut out, the Department chose United Airlines, led by a management team that openly predicts the demise of ULCCs and has radically expanded its basic economy fare to advance that result.[2]

Ironically, only eight days after tentatively ensuring the four dominant airlines in the country received their DCA gift, the Department together with the Department of Justice issued a joint Request for Information on the state of competition in the air transportation industry including *e.g.*, mergers/airline competition, airport access, sales distribution, product pricing and competition, and rewards programs. Importantly the two Departments went on to ask "*What, if any, previous actions or lack thereof by the agencies eliminated, reduced, or otherwise harmed competition in the air transportation industry.*" The DCA Show Cause Order will surely be included in the harmed competition list.

---

[1] The Show Cause Order properly found that Frontier Airlines is not a limited incumbent because it holds no slots other than exemption slots at DCA.

[2] The Chairman of United has incredibly and on more than one occasion forecast the demise of the ULCC business model and those that operate it. *See e.g.* "So, you often like to talk about the cost convergence that we're seeing with ULCCs. How does this shake out eventually? [Scott Kirby] Maybe not next year, but in five years, what do you see the future of the ULCC business here in the United States? I think they're going out of business. It's a fundamentally flawed business model…" https://crankyflier.com/2024/06/05/the-air-show-podcast-interviews-united-ceo-scott-kirby/. During its 3Q 24 earnings call, United said its basic economy traffic was up 21 percent.

By improperly concluding that Alaska is a limited incumbent and awarding the last non-limited incumbent slots to United, the Department ignored both the statutory selection criteria and, if made final, ensured that airlines which today control an approximate 77% domestic market share and 90% of DCA operations receive all these slots.[3]

Had the Department followed the law and its own competition policy and made the correct decision, it could have still awarded the SAN slots to Alaska as a non-limited incumbent. Moreover, by awarding two slots to Spirit, which it continues to request, the Department would have fulfilled the stated objectives of the Reauthorization Act. The correct decision would have established non-stop service to a beyond perimeter airport that has none from DCA and would have made service available that would have a substantial competitive impact on a major market.

**Alaska is Not a Limited Incumbent**

In the June 24, 2024, Notice initiating this proceeding the Department included the categories of "Non Limited Incumbent Carriers" and "Limited Incumbent Carriers." In footnote 3, the Department notes that they included only airlines "marketing air transportation at DCA" on the date of the Reauthorization Act. However, the fact that the Department and the FAA Slot Administration came up with these groups does not automatically make it correct.[4] Indeed, it is wrong in two respects - first by including Alaska as a Limited Incumbent and second by excluding Spirit from the Limited Incumbent category.

[3] These slots include both regular and exemption slots. It does not include commuter slots of which American controls 79%. See FAA Slot Holding Data – Winter 2023-2024.

[4] For example Air Canada which is ineligible is shown as a limited incumbent.

It bears emphasis that the term **limited incumbent** is defined in 14 CFR §93.213 (a)(5) and was specifically confirmed by Congress in 49 USC §41714(h)(5) and states in relevant part:

> ***Limited incumbent carrier*** means an air carrier … that holds or operates fewer than 12 air carrier … slots, in any combination, at a particular airport, not including international slots, Essential Air Service Program slots, or slots between the hours of 2200 and 0659 at Washington National Airport or LaGuardia Airport. However, for the purposes of this paragraph (a)(5), *the carrier is considered to hold the number of slots at that airport that the carrier has, since December 16, 1985: (i) Returned to the FAA; (ii) Had recalled by the FAA under § 93.227(a); or (iii) Transferred to another party other than by trade for one or more slots at the same airport.*[5] *(emphasis added)*

The Department, in misclassifying Alaska as a limited incumbent, attempts to skate over and ignore the very relevant statutory language in 49 U.S.C. §41714(k). The statute provides:

> **Affiliated Carriers**
>
> For purposes of this section and sections 41716, 41717, and 41718, an air carrier that operates under the same designator code, *or has or enters into a code-share agreement, with any other air carrier* shall not qualify for a new slot or slot exemption as a new entrant or limited incumbent air carrier at an airport if the total number of slots and slot exemptions held by the two carriers at the airport exceed 20 slots and slot exemptions.

(Emphasis added).

Importantly, Section 502 of the Reauthorization Act (49 U.S.C. §41718(i)) did nothing to alter either the definition of limited incumbent, or the definition of affiliated carriers specif-

[5] 14 C.F.R. § 93.213(a)(5) (emphasis added). Congress subsequently amended 12 air carrier slots to 40.

ically adopted by Congress. Moreover, the fact cited by the Show Cause Order that Alaska received slots 12 years ago in 2012 as a new entrant/limited incumbent - four years before its acquisition of Virgin and their DCA slots - does not override or change the definitions established by Congress.

The Department is also wrong in asserting that the very carefully crafted specific Congressional language about the effect of codeshare agreements on exemption slot allocations means something different from what it says. The Department's reliance on earlier legislation from 22 years ago is misplaced.

The Department cannot magically decide that legislation also included language specific to commuter carrier arrangements with mainline carriers it can thereby read the broad unambiguous codeshare language out of the statute. *See Barnhart v. Sigmon Coal Co.*, 534 U.S. 438, 449 (2002) (when statutory language is "unambiguous" the "inquiry ceases."); *see also Lamie v. United States Tr.*, 540 U.S. 526, 534 (2004) ("[i]t is well established that 'when the sole function of the courts—at least where the disposition required by the text is not absurd—is to enforce it according to its terms.'" (quoting *Hartford Underwriters Ins. Co. v. Union Planters Bank, N.A.*)); *United States v. Ron Pair Enters.*, 489 U.S. 235, 240-41 (1989) ("as long as the statutory scheme is coherent and consistent, there is generally no need for a court to inquire beyond the plain language of the statute."); *Ardestani v. INS*, 502 U.S. 129 (1991) ("[t]he 'strong presumption' that the plain language of the statute expresses congressional intent is rebutted only in 'rare and exceptional circumstances'…when a contrary legislative intent is clearly expressed" (quoting *Rubin v. United States*, 449 U.S. 424, 420 (1981)).

Turning to the facts at DCA, American Airlines, which holds more than 50% of all DCA slots, and Alaska Airlines have had a strong codeshare relationship for over two decades.[6] Their agreement directly subjects both airlines to 49 U.S.C. § 41714(k). The most current slot data on the FAA website, shows American operates 504 regular and commuter slots or exemptions, and Alaska holds 18 for a total of 522—well over the 20 slot/exemption threshold which automatically disqualifies Alaska as a limited incumbent. Specifically, the Department has held in multiple prior slot exemption award proceedings for DCA and other high-density airports: *"[f]or the purposes of these slot exemptions, 49 U.S.C. Section 41714(k)* ***mandates*** *that, in the case of code-share carriers, the* ***slot holdings of both carriers must be aggregated*** *in determining the 20-operations threshold*."[7]

Notably, Alaska and American recently expanded their codeshare relationship and in May 2024 it included over 100 scheduled codeshare flights originating or departing from DCA—more than 800 a week.[8] In light of this long and extensive relationship, it is astonishing the Show Cause Order could say: "Therefore, Alaska does not receive any meaningful access to the DCA market via its relationship with American." Both factually *and* legally it is not possible to conclude that a mutual business relationship between two independent airlines in place for

---

[6] 81 Fed. Reg. 89979, *United States v. Alaska Air Group, Inc., et al.; Proposed Final Judgment and Competitive Impact Statement* (Dec. 13, 2016) ("Alaska has closely aligned itself with American, the largest U.S. airline, through a commercial relationship known as a codeshare agreement, which … began in 1999….").

[7] Order 2004-12-6, p.6, Docket DOT-OST-2000-7182 (Dec. 6, 2004) (emphasis added). *See also, e.g.*, Order 2004-4-2, at n.2, Docket DOT-OST-2000-7182 (Apr. 1, 2004) (requiring compliance with 41714(k) for DCA slot exemptions); Order 2000-4-10, at n.2, Docket DOT-OST-2000-7176 (Apr. 19, 2000) (requiring compliance with 41714(k) for LGA slot exemptions); Order 2000-4-15, at n.3, Docket DOT-OST-2000-7180 (Apr. 19, 2000) (requiring compliance with 41714(k) for ORD slot exemptions); Order 2000-4-13, at n.2, Docket DOT-OST-2000-7178 (Apr. 19, 2000) (requiring compliance with 41714(k) for JFK slot exemptions).

[8] *See* May 2024 AA-AS flight data.

more than 20 years and in which Alaska has its code on hundreds of American flights at DCA does not provide Alaska with meaningful access.[9] Any federal Court of Appeals almost assuredly would find such a statement as lacking substantial evidentiary support and therefore arbitrary and capricious.[10]

For these reasons the Department must reverse its tentative decision finding for Alaska eligible as a limited incumbent and treat it as a non-limited incumbent at DCA.

**Spirit is an Eligible Limited Incumbent**

The Show Cause Order reflects that Spirit is a Limited Incumbent. However, in both its treatment of Alaska and Spirit the Department ignores the governing statutes and regulations to achieve a pre-determined/arranged outcome. For Alaska, the Department simply ignored the clear governing language. For Spirit, the Department improperly concocted a new eligibility criterion from whole cloth never intended or passed by Congress. *See United States v. Locke*, 471 U.S. 84, 96 (1985) ("[w]hen even after" going beyond the plain language of a statute to look for congressional intent and "nothing in the legislative history remotely suggests a congressional intent contrary to Congress' chosen words…any further steps take the courts out of the realm of interpretation and place them into the domain of legislation."); *American Tobacco Co. v. Patterson*, 456 U.S. 63, 75 (1982) ("[g]oing beyond the plain language of a statute in search of a possibly contrary congressional intent is a step to be taken cautiously even under the best

[9] The fact that the settlement with Justice in the Virgin merger prevented code sharing with American involving Key Airport markets, does not undermine the law nor the scope of the code sharing which obviously benefits Alaska or it would not have continued that agreement for the last 8 years following the merger.

[10] Although the Department may feel compelled by Senator Cantwell's letter of instruction, it can still award Alaska the DCA-SAN nonstop as a non-limited incumbent carrier.

of circumstances" (quoting *Piper v. Craft Industries, Inc.*, 430 U.S. 1, 26 (1977) (internal quotation marks omitted)).

The Department readily agrees that Spirit is a limited incumbent as defined by the applicable statute and regulation. However, the Show Cause Order wrongly concludes that Spirit had to be operating at DCA on the date of enactment to be eligible. Nothing in the statute or prior legislation supports the Department's conclusion that somehow Congress established a new criterion for these slots.

In 2012 Congress amended 49 U.S.C. § 41718(g) to distinguish non-limited incumbents from limited incumbents. The statute reads:

> **(3) Improved network slots.—**Of the slot exemptions made available under paragraph (1), the Secretary shall make 8 available to incumbent *air carriers* qualifying for status as a non-limited incumbent carrier at Ronald Reagan Washington National *Airport* as of the date of enactment of the FAA Modernization and Reform Act of 2012. (Emphasis added)

In § 41718(g)(2), Congress allocated 8 slots to limited incumbents or new entrants "as such terms are defined in section 41714(h)."

As in 2012, all Congress did in Section 502 was clarify which group of incumbent carriers was entitled to a total of 8 slots and which group was entitled to only 2 slots. There is no definition of incumbent in any relevant statute or regulation. But the language used in Section 502 is essentially the same as previously used in § 41718(g) The definition of limited incumbent in Section 41714(h) defines limited incumbent as it is defined in 14 CFR Subpart S which is 93.213 and, as noted above, that definition includes Spirit since it held slots and sold them to another airline after December 16, 1985.

Importantly, Congress knows precisely what to say when it wants to refer to an operating carrier and the chosen word is "operates," as used in 49 USC §41714(d) and by the FAA in 14 CFR §93.213. If Congress intended to require that a limited incumbent be operating on the date of enactment, it would have said "operating" air carriers qualifying as a limited incumbent. *See United States v. Locke*, 471 U.S. 84, 95 (1985) ("deference to the supremacy of the Legislature, as well as recognition that Congressmen typically vote on the language of a bill, generally requires us to assume that the legislative purpose is expressed by the ordinary meaning of the words used" (quoting *Richards v. United States*, 369 U.S. 1, 9 (1962); *see also Holloway v. United States*, 526 U.S. 1, 7 (1999) (where the Supreme Court held that the legislature would have included specific "qualifying words" if they intended to limit the scope of the statute in question).

In sum, the Department's effort reflected in the show cause order to tentatively find Alaska to be an eligible limited incumbent but conclude Spirit is not eligible are both wrong.

***Spirit is the only eligible limited incumbent.***

**<u>Spirit's San Jose Application Achieves Both Objectives in Section 502</u>**

Spirit's proposal to serve SJC fully meets the Congressional selection criteria. As shown in Spirit's application, new DCA-SJC service will fill the current gap in the market for affordable, low-cost flights between Northern California and the Washington, D.C. area. It bears emphasis that nearly 40% of the San Fransico Bay Area population air travel needs are <u>best served</u> geographically from SJC. With a new, low-cost option, many more travelers will have the opportunity to make coast-to-coast flights at a lower cost and from a more convenient airport than is available through existing service.

Spirit expects its DCA-SJC flights to be in high demand and plans to incorporate its larger aircraft to match passenger demand. Moreover, Spirit's service will provide the non-stop, low-fare service currently lacking in the market. United currently dominates this market with 8 daily nonstop flights between SFO and IAD and one to DCA.

Alaska, with the other DCA-SFO flight does not have the same incentive to offer significantly lower fares as would Spirit which has shown in many markets that even with one daily roundtrip it can lower fares by all carriers in a market. It is unquestionably in the public interest to discipline high air fares in key markets.

The law requires Spirit as the only qualified limited incumbent, and the criteria in Section 502 of the Reauthorization Act makes Spirit the obvious choice. Importantly, the facts demonstrate that SJC is the far better public interest choice than simply adding additional flights to United's already substantial SFO service:

- Spirit and United both propose routes to connect Silicon Valley to the Washington, D.C. metroplex, but a route to SJC serves a greater percentage of the Bay Area population and fills a greater gap than a route to SFO.
- As one of the largest cities in the United States, San José anchors a region of approximately three million people and is home to some of the most influential corporations in the world.

- As census data shows the region surrounding the SJC Airport encompasses approximately 40% of the Bay Area's nine-county population, compared to United's proposal of SFO Airport with only 26%:

**9-County Bay Area Region Population Statistics**
**Source: U.S. Census Bureau 2023 Update**

| | Bay Area Counties | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **Airport Allocation** | **Santa Clara** | **San Mateo** | **Alameda** | **San Francisco** | **Contra Costa** | **Santa Cruz** | **Monterey** | **Marin** | **Solano** | **TOTAL** | **Share** |
| **SJC** | **1,877,592<br>100%** | | **567,766<br>35%** | | | **222,315<br>85%** | **344,579<br>80%** | | | **3,012,252** | **40%** |
| SFO | | 726,353<br>100% | | 808,988<br>100% | | 39,232<br>15% | 64,609<br>15% | 228,966<br>90% | 112,305<br>25% | 1,980,452 | 26% |
| OAK | | | 1,054,423<br>65% | | 1,155,025<br>100% | | | | 157,226<br>35% | 2,366,674 | 31% |
| Other | | | | | | | 21,536<br>5% | 25,441<br>10% | 179,687<br>40% | 226,664 | 3% |
| **Total** | **1,877,593** | **726,354** | **1,622,190** | **808,989** | **1,155,026** | **261,548** | **430,725** | **254,407** | **449,218** | **7,586,043** | **100%** |

- Published flight data shows there are 2 daily roundtrips from SFO-DCA and overall 10 between SFO and DCA or IAD. In comparison, **no flights to DCA or IAD originate from SJC**:

| Airline | Flight | Airport Origin | Airport Destination | Departure Time | Arrival Time | Note |
|---|---|---|---|---|---|---|
| Alaska | 434 | SFO San Francisco | IAD - Washington Dulles | 0700 | 1515 | |
| **Alaska** | **8** | **SFO San Francisco** | **DCA - Reagan National** | **0800** | **1614** | **Perimeter Exemption** |
| United | 1322 | SFO San Francisco | IAD - Washington Dulles | 0815 | 1620 | |
| **United** | **1954** | **SFO San Francisco** | **DCA - Reagan National** | **0837** | **1700** | **Perimeter Exemption** |
| United | 487 | SFO San Francisco | IAD - Washington Dulles | 1110 | 1936 | |
| United | 1738 | SFO San Francisco | IAD - Washington Dulles | 1310 | 2114 | |
| United | 2626 | SFO San Francisco | IAD - Washington Dulles | 1635 | 0054 | |
| United | 2117 | SFO San Francisco | IAD - Washington Dulles | 2104 | 0523 | |
| Alaska | 455 | SFO San Francisco | IAD - Washington Dulles | 2130 | 0540 | |
| United | 1849 | SFO San Francisco | IAD - Washington Dulles | 2240 | 0659 | |
| (none) | - - - | SJC San Jose | DCA - Reagan National | - - - | - - - | |
| (none) | - - - | SJC San Jose | IAD - Washington Dulles | - - - | - - - | |

- Major tech companies, to include, Nvidia, Apple, Meta, Intel, Google, Netflix, Samsung, LinkedIn, and many others are all located within 12 miles of SJC Airport:

- Spirit has already been widely successful serving the SJC market.
- In June 2023, Spirit launched new nonstop flights to Dallas-Fort Worth (DFW), Las Vegas (LAS), and San Diego (SAN) from SJC.
- Guests originating from DCA on Spirit's new service would have the additional benefit of being able to travel on one-stop flights through San Jose across the multiple markets Spirit already serves from SJC.
- Spirit emphasizes how its own SJC-DCA service would bring low fares and fierce competition to the Bay Area against the <u>existing</u> SFO-DCA service provided by United and Alaska.

- Spirit expects its average fares for SJC-DCA ($152) to come in on average at 60% lower than United's ($383) and 50% lower than Alaska's average fares for SFO-DCA ($309). March 2023 – March 2024 revenue data, Cirium (Diio).
  - Spirit now offers four fare/service classes to appeal to business travelers as well as leisure travelers.
- Choosing Spirit over United would have a tremendous impact on the airport service workers.
  - Spirit has a history of providing good-paying jobs, compared to United Airlines, which recently had the Association of Flight Attendants (AFA) authorize a strike against United if United does not meet the Association's contract demands.

**<u>Conclusion</u>**

For the reasons set forth above, Spirit respectfully requests that the Department reverse its tentative decision finding Alaska to be an eligible limited incumbent, find Spirit to be an eligible limited incumbent and award the two limited incumbent slots to Spirit.

Respectfully submitted,

Joanne W. Young
David M. Kirstein
Donald L. Crowell
**Counsel for Spirit Airlines, Inc.**

**BEFORE THE**
**DEPARTMENT OF TRANSPORTATION**
**WASHINGTON, D.C.**

| | |
|---|---|
| **Application of**<br><br>**FRONTIER AIRLINES, INC.**<br><br>**For Slot Exemption at Ronald Reagan Washington National Airport Pursuant to 49 U.S.C. § 41718** | **Docket DOT-OST-2024-0065** |

## OBJECTION TO ORDER TO SHOW CAUSE

### I. Background

The U.S. Department of Transportation (DOT)'s Slot Exemption Proceeding at Ronald Reagan Washington National Airport Pursuant to 49 U.S.C. § 41718 issued June 24, 2024 ("Notice")[1] called for applications for ten (10) slots (5 slot pairs) for use in the operation of daily flights from Ronald Reagan Washington National Airport (DCA). Four (4) slot pairs are to be allocated to incumbent carriers with status as a non-limited incumbent carriers and one (1) slot pair to an incumbent carrier with status as a limited incumbent carrier.

Frontier Airlines, Inc. ("Frontier") requested the one (1) slot pair allocated to an incumbent carrier with status as a limited incumbent carrier.[2] In its application, and further supported in its Comments on Timely-Filed Applications,[3] Frontier asserted that it is the only air carrier eligible to receive the slot pair allocated to an incumbent carrier with status as a limited incumbent carrier.

[1] Docket DOT-OST-2024-0065-0001 (Jun. 24, 2024).

[2] Frontier Airlines, Inc., Application for Slot Exemption, Docket DOT-OST-2024-0065-5802 (July 8, 2024) ("Frontier Application").

[3] Frontier Airlines, Inc., Comments on Timely-Filed Applications, Docket DOT-OST-2024-0065-22195 (July 17, 2024).

In connection with that, it addressed the applications of the two (2) other carriers that applied in the same category: Spirit Airlines, Inc. ("Spirit") and Alaska Airlines, Inc. ("Alaska").

Concerning Spirit, Frontier noted that Spirit did not operate at Ronald Reagan Washington National Airport (DCA) on May 16, 2024 (and still does not) and, therefore, did not meet the requirement of being an "incumbent."[4] The DOT has tentatively agreed with that basis for Spirit not being eligible to receive slots in the present proceeding.[5]

Regarding Alaska, Frontier (and Spirit) noted that Alaska is ineligible to receive slots as a limited incumbent carrier under 49 U.S.C. § 41714(k).[6] The DOT has, however, tentatively determined that Alaska is eligible despite that statutory bar.[7]

Finally, concerning Frontier's application, the DOT has tentatively determined that Frontier, while an incumbent, *i.e.*, was operating flights at DCA on May 16, 2024, contrary to its prior determinations,[8] is not a limited incumbent air carrier and is, therefore, ineligible to receive slots in the present proceeding.[9]

Frontier respectfully objects. As explained herein, the DOT's exempting Alaska from the statutory exclusion under 49 U.S.C. § 41714(k) exceeds the DOT's authority by adding an exception to the statute that is neither specified in the text nor supported by the statutory scheme or legislative intent. Moreover, Frontier's disqualification is based on an erroneous interpretation of 49 U.S.C. § 41714(h)(5) and contrary to the DOT's prior determinations concerning Frontier.

---

[4] Frontier Application at 6.

[5] DOT Order 2024-10-11, Docket DOT-OST-2024-0065-23579 (Oct. 16, 2024) at 21 ("Order").

[6] Frontier Application at 4. Letter from Counsel to Spirit, Docket DOT-OST-2024-0065-0007 (June 26, 2024).

[7] Order at 21-22.

[8] *See*, *infra*, § III.a.

[9] Order at 20.

## II. Alaska Airlines

### a. Statutory Exclusion

The DOT recognizes the difficulty presented by 49 U.S.C. § 41714(k) in awarding Alaska the slots allocated to a limited incumbent carrier in the present proceeding. That statute provides:

> For purposes of this section and sections 41716, 41717, and 41718, an air carrier that operates under the same designator code, or has or enters into a code-share agreement, with any other air carrier shall not qualify for a new slot or slot exemption as a new entrant or limited incumbent air carrier at an airport if the total number of slots and slot exemptions held by the two carriers at the airport exceed 20 slots and slot exemptions.

Despite Spirit raising this issue on June 26, 2024[10] prior to Alaska submitting its application on July 8, 2024,[11] and both Spirit[12] and Frontier[13] raising it in their applications for slots in this proceeding, Alaska did not address this issue in its application or subsequent comments in this proceeding.[14] Rather, the DOT, *sua sponte*, tentatively determined:

> The scope of Alaska and American's code sharing relationship is limited by a settlement agreement reached in 2017 to resolve issues related to the merger transaction between Alaska and Virgin America Airlines. The agreement prohibits Alaska from marketing any American flight that originates or terminates at any Key Alaska Airport, or American from marketing any Alaska flight that originates or terminates at any Key American Airport. The agreement also prohibits the marketing of Alaska and American service on defined overlap routes. Therefore, Alaska does not presently place the American Airlines code on any nonstop flight it operates at DCA, and would not be permitted to do so for any service operated with a new slot exemption award. Additionally, the relationship between Alaska and American does not include any slot sharing provisions. Therefore, Alaska does not receive any meaningful access to the DCA market via its relationship with American. Further, the legislative history of § 41714(k), as represented by its predecessor provisions in the House and Senate, indicates that it was intended to prevent commuter air carriers (as defined at 49 U.S.C. § 41714(h)(1)) from gaining preferential access to slots or slot exemptions as a new entrant or limited incumbent,

---

[10] Letter from Spirit Airlines, Inc., Docket DOT-OST-2024-0065-0007 (Jun. 26, 2024).

[11] Application of Alaska Airlines, Inc. for Slot Exemptions, Docket DOT-OST-2024-0065-5926 (July 8, 2024).

[12] Application of Spirit Airlines, Inc. for Two Slot Exemptions for DCA-SJC Service, Docket DOT-OST-2024-0065-5821 (July 8, 2024) at footnote 4.

[13] Frontier Airlines, Inc. Application For Slot Exemption, Docket DOT-OST-2024-0065-5802 (July 8, 2024) at 4.

[14] *See, generally,* supra footnotes 11 and 12.

> only to market and operate those slots on behalf of a larger, incumbent mainline carrier. That is not the case here as Alaska is not a commuter air carrier and is not seeking to operate its proposed DCA-SAN service under the marketing control and branding of American.[15]

There are three difficulties with the DOT's above analysis. First, it is contrary to rules established by the Supreme Court for statutory interpretation. Second, it disregards Alaska's code sharing on American Airlines, Inc.'s ("American") flights, including those operating from DCA. Third, it misrepresents the legislative history of 49 U.S.C. § 41714(k).

**i. Contrary to Statute's Plain Meaning**

The Supreme Court has held, "If the statutory language is plain, we must enforce it according to its terms."[16] The Court continues, "So when deciding whether the language is plain, we must read the words 'in their context and with a view to their place in the overall statutory scheme.'"[17] The meaning of 49 U.S.C. § 41714(k) is plain. The DOT is not interpreting the statute in light of its legislative history or otherwise but instead amending it to provide an exception that is simply not in its text. Specifically, the DOT adds a discretionary exemption as to whether the code-sharing provides "meaningful access to the airport." With respect to code-sharing partners collectively holding more than twenty (20) slots, the statute says, "shall not qualify," not "may not qualify" with discretion left to the DOT.

Moreover, the statute does not require that the carriers involved codeshare on DCA flights for the exclusion under 49 U.S.C. § 41714(h)(5) to apply. Rather, it presents a straightforward test of summing the number of slots (including slot exemptions) of each of the code sharing partners and determining if that total exceeds twenty (20). In this case, Alaska holds eighteen (18) slots,

---

[15] Order at 21.

[16] *King v. Burwell*, 576 U.S. 473, 486, 486 (2015) *citing Hardt v. Reliance Standard Life Ins. Co.*, 560 U.S. 242, 251 (2010).

[17] *Id.* at 486 *citing FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 133 (2000).

including slot exemptions,[18] and American has three hundred and fifty-eight (358)[19] for a total of three hundred and seventy-six (376) – more than seventeen (17) times the limit specified in the statute. Even if, *arguendo*, "meaningful access" were an appropriate standard, Alaska alone has three (3) and American nearly sixty (60) times as many slots as Frontier. Alaska placing its code on even a small portion of American's flights operated from DCA would give it via code sharing greater access to DCA than Frontier has with its limited number of slots. In any event, however, there is no such discretion under the statute to exempt Alaska from its application.

We further note that the DOT reports that, "In 2012, Alaska received two slot exemption awards as a new entrant/limited incumbent carrier."[20] 49 U.S.C. § 41714(k) is not referenced in the order awarding those slot exemptions.[21] We suggest that the 2012 award to Alaska may have been an error and contrary to 49 U.S.C. § 41714(k). In any event, 49 U.S.C. § 41714(k) clearly bars Alaska from receiving slots allocated to a limited incumbent carrier in this proceeding.

**ii. Code Share Provides Meaningful Access**

In support of its tentative conclusion, the DOT asserts that ". . . Alaska does not presently place the American Airlines code on any nonstop flight it operates at DCA . . ." While that may be true, the reverse is not. In May through September 2024, approximately fifty-seven (57) of American's daily flights from DCA were marketed under Alaska's code to fifty-three (53)

*Figure 1 – American's Flights Operated With Alaska's Code*

[18] *Winter 2023/2024 DCA Air Carrier Holder Details*, FEDERAL AVIATION ADMINISTRATION, at 3 (https://www.faa.gov/about/office_org/headquarters_offices/ato/service_units/systemops/perf_analysis/slot_administration/data/doc/DCA_W23_AC_HOLDER_DETAIL.pdf (last visited 10/30/2024).

[19] Id at 2.

[20] Order at 21.

[21] DOT Order 2012-5-12, Docket DOT-OST-2012-0029-6192 (May 14, 2012).

different destinations (see Figure 1).[22] Thus, we suggest its code-sharing with American does provide Alaska with "meaningful access to the DCA market." Moreover, noting that in the Order the DOT tentatively awards one (1) slot pair to American as a non-limited incumbent carrier, even if Alaska does not, as the DOT suggests, place American's code on its flights, Alaska's code may very well end up on the flights that American operates with its new slot pair. Thus, in this proceeding, Alaska alone stands to obtain the ability to market two (2) new flights from DCA.

### iii. Conclusion Not Supported by Congressional Intent

Citing H.R. No. 106-167 and S. Rep. No. 106-9, the DOT asserts:

> the legislative history of § 41714(k), as represented by its predecessor provisions in the House and Senate, indicates that it was intended to prevent commuter air carriers (as defined at 49 U.S.C. § 41714(h)(1)) from gaining preferential access to slots or slot exemptions as a new entrant or limited incumbent, only to market and operate those slots on behalf of a larger, incumbent mainline carrier.[23]

We note that H.R. Rept. No. 106-167 comes in two (2) parts. The first is dated May 28, 1999[24] and the second June 9, 1999.[25] S. Rep. No. 106-9 on the unenacted Air Transportation Improvement Act[26] is dated March 8, 1999.[27] While the DOT asserts that the legislative history of 49 U.S.C. § 41714(k) "indicates that it was intended to prevent commuter air carriers (as defined at 49 U.S.C. § 41714(h)(1)) from gaining preferential access to slots or slot exemptions as a new entrant or limited incumbent, only to market and operate those slots on behalf of a larger, incumbent mainline carrier," H.R. Rept. No. 106-167 anticipated a provision that would instead require treating

[22] Cirium Codeshare Summary Report for the months of May, June, July, August, and September 2024 based on data for Sunday through Friday with fewer on Saturdays.

[23] Order at 22.

[24] See https://www.congress.gov/congressional-report/106th-congress/house-report/167/1 (last visited 10/30/2024).

[25] See https://www.congress.gov/congressional-report/106th-congress/house-report/167/2 (last visited 10/30/2024).

[26] S.82, 106th Cong. (1999-2000).

[27] See https://www.congress.gov/congressional-report/106th-congress/senate-report/9/1 (last visited 10/30/2024).

commuter air carriers with cooperative agreements with other air carriers comparably without regard to the form of the relationship:

> Treatment of Certain Commuter Air Carriers.--The Secretary shall treat all commuter air carriers that have cooperative agreements, including code share agreements with other air carriers, equally for determining eligibility for exemptions under this section regardless of the form of the corporate relationship between the commuter air carrier and the other air carrier.[28]

The above text also appears in S. Rep. No. 106-9 with the title "Commuter Air Carrier."[29] Thus, the early legislative history does not accord with the DOT's representation above. Note, however, that the "Commuter Air Carrier" material was not included in the final statute. Instead, the text that appears at 49 U.S.C. § 41714(k) was added via an amendment months later in the course of the conference between the House of Representatives and the Senate on H.R. 1000[30] and appeared in Section 231 of the enrolled bill on January 24, 2000.[31] The purpose of that section is explained in the conference report where the text of 49 U.S.C. § 41714(k) appears:

> For the purpose of determining whether an airline qualifies as a new entrant or limited incumbents for receiving slot exemptions, DOT shall count the slots and slot exemptions of both that airline and any other airline that it has a code-share agreement at that airport.[32]

Thus, the legislative history and intent of 49 U.S.C. § 41714(k) supports the plain meaning of the text of the statute and reinforces that Alaska is not eligible to receive slots as a limited incumbent carrier given its code-sharing relationship with American because, combined, Alaska and

---

[28] H.R. Rept. No. 106-167 dated May 28, 1999 at 17 (see https://www.congress.gov/congressional-report/106th-congress/house-report/167/1?outputFormat=pdf (last visited 10/23/2024)).

[29] S. Rep. No. 106-9 dated March 8, 1999 at 88 (See https://www.congress.gov/congressional-report/106th-congress/senate-report/9/1?outputFormat=pdf (last visited 10/23/2024)).

[30] H.R. Rept. No. 106-513 dated March 8, 2000 at 174 (see https://www.congress.gov/106/crpt/hrpt513/CRPT-106hrpt513.pdf (last visited 10/30/2024)).

[31] H.R. 1000, Enrolled Bill dated January 24, 2000 at 47 (see https://www.congress.gov/106/bills/hr1000/BILLS-106hr1000enr.pdf) (last visited 10/30/2024)).

[32] H.R. Rept. No. 106-513 dated March 8, 2000 at 174 (see https://www.congress.gov/congressional-report/106th-congress/house-report/513/1 (last visited 10/30/2024)).

American hold three hundred and seventy-six (376) slots – more than seventeen (17) times the limit of twenty (20) specified in the statute.

## III. Frontier Airlines

### a. DOT Tentative Finding

In 2002, the DOT determined, "Frontier clearly qualifies as a limited incumbent airline at DCA, as it currently holds only two DCA slot exemptions for a single daily round trip to Denver."[33] Since that time, Frontier has been granted four (4) further slot exemptions.[34] The definition of limited incumbent airline that applied in 2002 remains unchanged but for the upper limit having been increased from twenty (20) to forty (40).[35] In 2012, the DOT stood by that finding despite all of Frontier's slots still being slot exemptions, "Frontier, a limited incumbent carrier at DCA . . ."[36] Despite its earlier determinations, the DOT now asserts:

> Based upon the drafting of FAA 2024, the Department tentatively finds Frontier Airlines ineligible to apply for slot exemptions in this proceeding. Frontier passes the first test for eligibility but not the second. While Frontier was engaged in air transportation at DCA on the date of enactment of FAA 2024, therefore qualifying as an incumbent air carrier, it did (and continues to do) so by only using six slot exemption awards. 49 U.S.C. § 41714(h)(5)(B)(i) excludes an air carrier's count of slot exemptions at DCA for purposes of determining a carrier's status as a limited incumbent air carrier in order to allocate slot exemptions at DCA. 49 U.S.C. § 41714(h)(3) states that "[t]he term 'new entrant air carrier' means an air carrier that does not hold a slot at the airport concerned and has never sold or given up a slot at that airport after December 16, 1985, and a limited incumbent carrier." It is important to note that while § 41714(h)(3) states that limited incumbent carriers are also new entrant carriers, the reverse is not true, i.e., all new entrant carriers are not limited incumbent carriers.[37]

---

[33] DOT Order 2002-11-20, Docket DOT-OST-2000-7181-2117 (Nov. 27, 2002) at 8.

[34] As noted in the Order at footnote 87, "Frontier received two slot exemptions by Order 2000-7-1 and four slot exemptions by Order 2004-4-1."

[35] Per Pub. L. 106-181 (Apr. 5, 2000) the definition of "limited incumbent air carrier" was added as quoted above at p. 8, except that the limit under (A) was then twenty (20). That limit was subsequently increased to 40 pursuant to Section 414(c) of Pub. L. 112-95 (Feb. 14, 2012).

[36] DOT Order 2012-7-26, Docket DOT-OST-2000-7182 (July 24, 2012) at 18.

[37] Order at 20.

While the DOT asserts that, "Based upon the drafting of FAA 2024 . . .," FAA 2024 does not change the definition of "limited incumbent air carrier."[38] The DOT further concludes:

> Frontier, therefore, is not a limited incumbent air carrier, but rather meets the definition of a new entrant air carrier as defined by 49 U.S.C. § 41714(h)(3) since, at time of enactment of FAA 2024, Frontier did not hold or operate any non-exemption slots at DCA, nor had ever sold or given up a slot at DCA after December 16, 1985. Congress did not make any of the ten slot exemptions from the FAA 2024 Act available to new entrant air carriers. We tentatively determine, therefore, that Frontier is not eligible to receive a slot exemption award under 49 U.S.C. § 41718(i).[39]

We submit that logic is flawed, inconsistent with the statutory scheme, and, as noted above, contrary to the DOT's prior determinations.[40]

**b. Analysis of Definition of "New Entrant Air Carrier"**

The definition of "new entrant air carrier" specified at 49 U.S.C. § 41714(h)(3) as "an air carrier that does not hold a slot at the airport concerned and has never sold or given up a slot at that airport after December 16, 1985, and a limited incumbent carrier." The DOT asserts that Frontier is not a limited incumbent carrier (emphasis added):

> but rather meets the definition of a new entrant air carrier as defined by 49 U.S.C. § 41714(h)(3) since, at time of enactment of FAA 2024, **Frontier did not hold or**

[38] *See, generally*, Pub. L. 118.63, H.R. 3935, Sec. 502.

[39] *Supra*, footnote 37.

[40] We note that the DOT has previously altered its interpretation of statutes, explaining, "To the extent our decision today might be construed as a change in statutory interpretation, it is well-established that 'an agency's interpretation of an ambiguous statute is entitled to judicial deference' under *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984), and the agency may change 'a prior statutory interpretation . . . without notice and comment.' *Syncor Int'l Corp. v. Shalala*, 127 F.3d 90, 94 (D.C. Cir. 1997). *See also, e.g., Firearms Import/Export Roundtable Trade Group v. Jones*, No. 11-547, 2012 WL 1288476, at *5 (D.D.C. March 12, 2012) ('[W]ithout notice and comment an agency may issue an interpretation that changes a prior statutory interpretation.') (quoting *Syncor*, 127 F.3d at 94) (internal citations omitted)." DOT Order 2012-7-26, Docket DOT-OST-2000-7182 (July 24, 2012) at footnote 21, but note that *Chevron U.S.A.* has been overturned by *Loper Bright Enterprises v. Raimondo*, 603 U.S. ___ (2024), 144 S. Ct. 2244 (2024). Thus, the DOT is no longer entitled "Chevron deference," and, we suggest, all the more so when changing its application of a statute that it had applied in a different fashion for over twenty (20) years without notice or basis for that change and in a fashion and context that may not have even obtained such deference. *See Chevron Deference: A Primer*, CONGRESSIONAL RESEARCH SERVICE, September 19, 2017 at 4-18 (https://crsreports.congress.gov/product/pdf/R/R44954/3 (last visited 10/30/2024)).

> **operate any non-exemption slots at DCA**, nor had ever sold or given up a slot at DCA after December 16, 1985.[41]

The statute at 49 U.S.C. § 41714(h)(3), however, refers to "slots," not "non-exemption slots." Within the statutory scheme, "slot" is defined at 49 U.S.C. § 41714(h)(4) as "a reservation for an instrument flight rule takeoff or landing by an air carrier of an aircraft in air transportation." That definition does not differentiate between exemption slots and non-exemption slots. This stands in contrast to, for example, the definition of "limited incumbent air carrier" which excludes slot exemptions from the count of slots held by the carrier. If slots always excluded slot exemptions, the exclusion of slot exemptions would not be necessary and, of course, the definition of "slot" would be different.

Given the above, we arrive at a paradoxical result: Because Frontier holds slots at DCA, Frontier is not a new entrant air carrier (but for being a limited incumbent air carrier). Per the DOT, however, Frontier is not a limited incumbent air carrier at DCA because it "did not hold or operate any non-exemption slots at DCA."[42] Consequently, applying the correct meaning of new entrant carrier, the DOT's selective analysis places Frontier – which the DOT acknowledges is an incumbent at DCA[43] – in a category all its own outside the universe of carriers defined in 49 U.S.C. § 41714: a carrier that operates at DCA but is not a new entrant air carrier, a limited incumbent air carrier, or a non-limited incumbent air carrier. We suggest that is at odds with the statutory scheme of 49 U.S.C. § 41714.

[41] *Supra*, footnote 37.

[42] Id.

[43] Order at 20.

**c. Frontier's Qualification as a Limited Incumbent Carrier**

The statutory definition of "limited incumbent air carrier" provided at 49 U.S.C. § 41714(h)(5) is as follows:

> Limited incumbent air carrier.—The term "limited incumbent air carrier" has the meaning given that term in subpart S of part 93 of title 14, Code of Federal Regulations; except that—
>
> (A) "40" shall be substituted for "12" in sections 93.213(a)(5), 93.223(c)(3), and 93.225(h);
>
> (B) for purposes of such sections, the term "slot" shall not include—
>
> (i) "slot exemptions";
>
> (ii) slots operated by an air carrier under a fee-for-service arrangement for another air carrier, if the air carrier operating such slots does not sell flights in its own name, and is under common ownership with an air carrier that seeks to qualify as a limited incumbent and that sells flights in its own name; or
>
> (iii) slots held under a sale and license-back financing arrangement with another air carrier, where the slots are under the marketing control of the other air carrier; and
>
> (C) for Ronald Reagan Washington National Airport, the Administrator shall not count, for the purposes of section 93.213(a)(5), slots currently held by an air carrier but leased out on a long-term basis by that carrier for use in foreign air transportation and renounced by the carrier for return to the Department of Transportation or the Federal Aviation Administration.

The definition referred to above at 14 C.F.R. § 93.213(a)(5) is as follows:

> *Limited incumbent carrier* means an air carrier or commuter operator that holds or operates **fewer than 12** air carrier or commuter slots, in any combination, at a particular airport, not including international slots, Essential Air Service Program slots, or slots between the hours of 2200 and 0659 at Washington National Airport or LaGuardia Airport. However, for the purposes of this paragraph (a)(5), the carrier is considered to hold the number of slots at that airport that the carrier has, since December 16, 1985:
>
> (i) Returned to the FAA;
>
> (ii) Had recalled by the FAA under § 93.227(a); or
>
> (iii) Transferred to another party other than by trade for one or more slots at the same airport.

Holding just six (6) slots, Frontier is a limited incumbent carrier under 14 C.F.R. § 93.213(a)(5).

We must, however, apply the modifications specified in 49 U.S.C. § 41714(h)(5). First, per 49

U.S.C. § 41714(h)(5)(A), we substitute "40" for "12." That does not change the result. Next, per 49 U.S.C. § 41714(h)(5)(B)(i), we subtract slot exemptions. Because all of Frontier's slots are slot exemptions, that reduces its total to zero (0). The remaining modifications do not apply. Zero (0) is less than forty (40), so Frontier remains a limited incumbent air carrier.

It should be noted that 49 U.S.C. § 41714(h)(5) expands the scope 14 C.F.R. § 93.213(a)(5). That is, 14 C.F.R. § 93.213(a)(5) specifies a cap of twelve (12) slots, with a few exclusions, and requires carriers to add to its total slots under (i), (ii), and (iii). The statute at 49 U.S.C. § 41714(h)(5) does the reverse by increasing the cap to forty (40) and giving carriers the benefit of subtracting some or even all of its slot holdings. The key, however, is the term "fewer." The DOT's interpretation would suggest that the regulation states "fewer but not less than two (2)," which it does not.

We respectfully submit correctly applying the plain meaning of "new entrant carrier" (but for also including limited incumbent air carriers), would exclude Frontier from that categorization. Further, applying both the plain meaning of "limited incumbent air carrier" and the DOT's precedent would include Frontier in that category. These straightforward and common-sense conclusions would maintain all carriers operating at DCA within the statutory scheme of 49 U.S.C. § 41714, in contrast, as noted above, to the DOT's interpretation that would paradoxically leave Frontier outside of its scope.

## IV. Conclusions and Prayer for Relief

In light of the above, Frontier respectfully submits that 49 U.S.C. § 41714(k) bars Alaska from receiving slots in this proceeding as a limited incumbent carrier because of its code sharing with American and their combined total slots at DCA far exceeding the limit of twenty (20) in that statute. Further, as explained above, Frontier is a limited incumbent air carrier at DCA and,

moreover, is the only limited incumbent air carrier that is also an incumbent air carrier at DCA. It is, therefore, the only limited incumbent air carrier eligible to receive slots in this proceeding. Consequently, Frontier requests that the DOT modify its tentative ruling and award Frontier the two (2) exemption slots allocated to an incumbent air carrier with status as a limited incumbent carrier for which it has applied to operate daily flights from DCA to/from Luis Muñoz Marín International Airport (SJU).

Respectfully submitted,

Brian E. Foont
The Foont Law Firm, LLC
11727 Gainsborough Road
Potomac, MD 20854
Tel. 202-236-4851
E-Mail: Foont@FoontLaw.com

Counsel for Frontier Airlines, Inc.

October 30, 2024

**BEFORE THE**
**DEPARTMENT OF TRANSPORTATION**
**OFFICE OF THE SECRETARY**
**WASHINGTON, DC**

| | | |
|---|---|---|
| Establishment of Slot Exemption Proceeding At Ronald Reagan Washington National Airport Pursuant to 49 U.S.C. § 41718 | ) | Docket DOT-OST-2024-0065 |

**COMMENTS OF ALASKA AIRLINES, INC.**
**ON SHOW CAUSE ORDER 2024-10-11**

Alaska Airlines, Inc. ("Alaska") applauds the Department's tentative decision to grant Alaska two slot exemptions to operate daily nonstop roundtrip service between Ronald Reagan Washington National Airport ("DCA") and San Diego International Airport ("SAN").[1] Alaska appreciates the Department's findings that Alaska's proposal will introduce new nonstop flights for the largest community outside the DCA perimeter without such service[2] while generating substantial new competition and benefitting both nonstop and connecting passengers. A final order affirming the tentative decision will enable Alaska to restore nonstop DCA service at San Diego, which is the eighth largest U.S. city, home to the nation's largest military community, and located in the fifth largest U.S. county.

[1] Order 2024-10-11.

[2] *See* id. at 24 ("SAN is the largest local origin/destination market from DCA currently without nonstop service").

## I. DOT is Correct That Alaska's DCA-SAN Proposal Satisfies Congress's and DOT's Requirements.

Congress directed DOT to consider two criteria in selecting carriers to receive slot exemptions in this proceeding:

1) whether a proposal will "enhance options for nonstop travel to beyond-perimeter airports that do not have nonstop service from [DCA] as of" May 16, 2024; or

2) whether a proposal will "have a positive impact on the overall level of competition in the markets that will be served."[3]

DOT tentatively found that Alaska's proposal satisfies both of those criteria. Alaska will:

- Introduce daily nonstop DCA service for San Diego, as it "is the largest local origin/destination market from DCA currently without nonstop service."[4]
- Increase nonstop capacity and service options for local market travelers between Washington, DC, and San Diego, a key focus city for Alaska,[5] benefiting business and leisure travelers with fares that on average are lower than those of Alaska's competitors.
- "Enhance options for [Washington, DC-originating passengers traveling] to SAN, a beyond-perimeter airport that does not presently have nonstop service from DCA."[6]
- Increase fare competition between DCA and SAN – a market where fares "are currently 30% higher than the average for DCA, as well as the average air fare for the greater Washington, DC, market, and the U.S. national average."[7]
- "[H]ave a positive impact on the overall level of competition in the Washington, DC-San Diego, CA market." Alaska "currently carries a negligible share (less

---

[3] *Id.* at 3.

[4] *Id.* at 24.

[5] Alaska began serving SAN in 1985 where it today employs approximately 800 team members and maintains a flight attendant base. While Alaska continues to grow its presence at SAN, it is not the largest carrier at the airport and competition there is intense and will remain so.

[6] *Id.*

[7] *Id.* at 24 & nn.105, 106. Alaska has a proven track record of reducing fares when it enters a route. Average fares on the IAD-SAN route decreased by approximately 26% following Alaska's entry into the market. Application of Alaska Airlines, Inc., July 8, 2024 (Docket DOT-OST-2024-0065) ("Alaska Application") at 5. Alaska expects this downward fare trend to continue with the introduction of its DCA-SAN service.

than 1%) of local O&D customers between DCA-SAN, and approximately 8% of local O&D customers between all Washington, DC, airports and SAN." [8]

- Increase competition at DCA, where "Alaska does not have a dominant presence, holding only approximately 2% of allocated slots, and carrying approximately 3% of O&D traffic."[9]

- "[P]rovide a new, convenient flight option, and enhance competition by increasing the number of air carriers in the WAS-SAN market."[10]

- Enhance fare and service competition in other markets in the western U.S. and Hawaiʻi, where passengers travelling to and from Washington, DC, will benefit from additional connecting service via SAN.[11]

- Provide San Diego's large community of government personnel (civilian and military)[12] with convenient nonstop access to DCA[13] and its nearby government and military facilities, including the Pentagon, numerous federal agencies, and many large military bases.[14]

Alaska's DCA-SAN nonstop service has attracted strong support from the San Diego County Regional Airport Authority, a wide range of San Diego area and California federal, state and local government leaders, as well as San Diego area business and civic organizations. These parties recognize the substantial public benefits that Alaska's service will generate for the San

[8] Order 2024-10-11 at 24.

[9] *Id.*

[10] *Id.*

[11] *See* Alaska Application at 2 n.6; Order 2024-10-11 at 24 ("customers may also benefit from access to [Alaska's] nonstop network at SAN"). Alaska will operate nonstop service to a total of 39 destinations from SAN, 19 of which will be served exclusively by Alaska on a nonstop basis. *See* Comments of Alaska Airlines, Inc., July 17, 2024 (Docket DOT-OST-2024-006), at 6-7, Exhibit AS-R-1.

[12] San Diego is home to the largest concentration of active-duty military personnel in the United States. Alaska Application, Exhibit AS-1.

[13] Currently, local San Diego travelers must rely on connections to travel to DCA. In 2023, approximately 164,000 passengers traveled between SAN and DCA, accumulating approximately 328,000 hours of additional annual travel time in the aggregate due to having to make a connection. *See* Alaska Application at 4.

[14] The General Services Administration estimates that in fiscal year 2025 nearly 32,000 government personnel will travel between DCA and SAN. *Id.*

Diego area and other Californian and western U.S. communities, as well as for passengers, including business, government, military, and leisure travelers.[15]

**II. DOT is Correct That Alaska Qualifies as "Limited Incumbent Air Carrier," But Spirit and Frontier Do Not.**

Spirit Airlines, Inc. ("Spirit") and Frontier Airlines, Inc. ("Frontier") filed applications for slot exemptions to serve San Jose and San Juan, respectively, on the basis that they qualify as "limited incumbent air carriers."[16] They also question Alaska's (and each other's) eligibility as a limited incumbent air carrier. DOT is correct in its tentative decision that Alaska qualifies as a limited incumbent air carrier, while Spirit and Frontier do not.[17]

As DOT correctly explained, for a carrier to be eligible for an allocation of slot exemptions as a "limited incumbent air carrier," it must satisfy both prongs of a two-part test:

1) "[A] carrier must be an incumbent [at DCA] on the date of enactment of the [FAA Reauthorization Act of 2024]," *i.e.*, May 16, 2024. DOT, assigning a plain meaning to the statutory text, defines "incumbent air carrier" as one that was "engaged in air transportation at DCA as of [May 16, 2024]."[18]

2) "[A] carrier must also qualify for status as a limited incumbent [air carrier]…." 49 U.S.C. § 41714(h)(5)(A) defines a "limited incumbent air carrier" by reference to 14 C.F.R. Part 93, Subpart S:

---

[15] *See* id., Exhibit AS-19.

[16] Application of Spirit Airlines, Inc., July 8, 2024; Application of Frontier Airlines, Inc., July 8, 2024 (Docket DOT-OST-2024-0065).

[17] Although DOT's decision is tentative, it confirmed DOT's initial determination regarding which carriers are (and are not) eligible to receive slot exemptions in this case. DOT reached that determination after conferring with the FAA Slot Administration Office. DOT Notice, Establishment of Slot Exemption Proceeding at Ronald Reagan Washington National Airport Pursuant to 49 U.S.C. § 41718, June 24, 2024 (Docket DOT-OST-2024-0065) ("DOT Notice") at 2.

[18] Order 2024-10-11 at 19.

> [A]n air carrier or commuter operator that holds or operates fewer than [40][19] air carrier or commuter slots, in any combination, at a particular airport, not including international slots, Essential Air Service Program slots, or slots between the hours of 2200 and 0659 at [DCA]. However, for the purposes of this [14 C.F.R. § 93.213](a)(5), the carrier is considered to hold the number of slots at [DCA] that the carrier has, since December 16, 1985: (i) Returned to the FAA; (ii) Had recalled by the FAA under [14 C.F.R.] § 93.227(a); or (iii) Transferred to another party other than by trade for one or more slots at the same airport.[20]

Section 41714(h)(5)(B)(i) also provides that, for purposes of defining "limited incumbent air carrier," the term "slot" shall not include slot exemptions.[21]

*A. Alaska Qualifies as a "Limited Incumbent Air Carrier."*

Alaska satisfies both elements of the test. First, it is an incumbent at DCA because, on May 16, 2024, it operated roundtrip flights at DCA. Second, it is a "limited incumbent air carrier" because, although Alaska only operates flights at DCA using slot exemptions (which are specifically excluded from the definition), Alaska also holds non-exemption DCA slots that it leases to Southwest Airlines. Those count as slots that, since December 16, 1985, Alaska has "[t]ransferred to another party other than by trade…."

Neither Spirit nor Frontier disputes Alaska's qualification as a "limited incumbent air carrier," but argue that it should be disqualified under a different statutory provision, 49 U.S.C. § 41714(k), which states that:

> [A]n air carrier that … has entered into a code-share agreement with any other air carrier shall not qualify for a new slot or slot exemption as a new entrant or limited incumbent air carrier at an airport if the total number of slots and slot exemptions held by the two carriers at the airport exceed 20 slots and slot exemptions.

---

[19] *See* 49 U.S.C. § 41714(h)(5)(A) (substituting "40" for "12" in 14 C.F.R. §§ 93.213(a)(5), 93.223(c)(3), and 93.225(h)).

[20] 14 C.F.R. § 93.213(a)(5).

[21] 49 U.S.C. § 41714(h)(5)(B)(i).

The sole focus of this objection is that Alaska has a codeshare agreement with American Airlines, Inc. ("American") and that if Alaska's modest DCA slot holdings were combined with American's much larger holdings at the airport, the combined number would exceed 20 slots. The Department, however, rejected Spirit and Frontier's contention that Alaska's codeshare relationship with American disqualifies Alaska from receiving slot exemptions as a "limited incumbent air carrier" in this case.[22]

As the Order to Show Cause explains, Alaska's codesharing with American is strictly limited by the terms of a 2017 formal settlement agreement with the U.S. Department of Justice ("DOJ") relating to Alaska's acquisition of Virgin America.[23] Under those terms, Alaska is legally prohibited from displaying American's code on any Alaska flight that originates or terminates at DCA: "Alaska does not presently place the American Airlines code on any nonstop flight it operates at DCA, and would not be permitted to do so for any service operated with a new slot exemption award. . . . Therefore, Alaska does not receive any meaningful access to the DCA market via its relationship with American."[24]

As the Department also correctly pointed out, the purpose of section 41714(k) is to prevent an "affiliated" carrier (*i.e.*, one that operates under the same code as, or displays the code of, a non-limited incumbent carrier on flights it operates to or from a particular airport) "from

---

[22] Order 2024-10-11 at 21-22.

[23] *Id.* (the DOJ "agreement prohibits … American from marketing any Alaska flight that originates or terminates at a "Key American Airport[,]" which includes DCA). DOT also noted that the Alaska/American agreement "does not include any slot sharing provisions." *Id.* at 22.

[24] *Id*. at 22. Spirit and Frontier's argument that section 41714(k) disqualifies Alaska from eligibility to receive slot exemptions as a "limited incumbent air carrier" in this case is based on the erroneous assumption that American's display of Alaska's code on its flights that originate or terminate at DCA would be disqualifying. *See* Letter of Spirit Airlines to DOT, dated June 26, 2024 (Docket DOT-OST-2024-0065) at 3 & n.12, Exhibit A; Comments of Frontier Airlines, Inc., July 17, 2024, at 3-4. As the Department tentatively determined, however, that is incorrect and inconsistent with legislative intent.

gaining preferential access to slots or slot exemptions as a new entrant or limited incumbent, only to market and operate those slots on behalf of a larger, incumbent mainline carrier."[25] As explained above, however, Alaska cannot display American's code on any Alaska-operated flights to or from DCA and thus is not an "affiliated carrier" for purposes of section 41714(k). Alaska has applied for slot exemptions to serve SAN in its own right and has no legal authority or intention to display American's code on those DCA-SAN flights.[26]

*B. Neither Spirit Nor Frontier Qualifies as a "Limited Incumbent Air Carrier."*

As DOT explained, neither Spirit nor Frontier is eligible to receive an allocation of slot exemptions in this case in the "limited incumbent air carrier" category. Both Spirit and Frontier fail the two-part test required for eligibility purposes.

Spirit fails the test's first prong: it was not an incumbent air carrier at DCA on May 16, 2024, because it did not "engage in air transportation" at the airport on that date.[27] In fact, as DOT notes, "Spirit has not engaged in air transportation at DCA since 2012. . . .Therefore, Spirit does not meet the prerequisite of incumbency under [49 U.S.C.] § 41718(i)(3)."[28] Spirit previously held four slots at DCA, but sold them to Southwest, ceased operating at DCA, and has never since returned to the airport. [29]

---

[25] Order 2024-10-11 at 21-22.

[26] This case is not the first occasion in which Alaska has been selected for an award of slot exemptions at DCA since Alaska entered into a codeshare agreement with American more than 20 years ago. As DOT noted, "[i]n 2012, Alaska received two slot exemption awards as a new entrant/limited incumbent carrier." *Id.* at 21 & n.93, citing Order 2012-5-12 at 8 (a DCA beyond-perimeter slot exemption allocation case in which Frontier was also an applicant).

[27] Order 2024-10-11 at 20-21. Nowhere in Spirit's application or other filings in this docket does Spirit claim that it engaged in air transportation at DCA on May 16, 2024.

[28] *Id.* at 21.

[29] *Id.* at 20. Spirit argues that it meets the second prong of the eligibility test for a "limited incumbent air carrier" by reference to the statute and related FAA regulations because it held those four slots "after December 16, 1985 and subsequently transferred those slots to another party other than by trade for one or more slots at the same airport." *Id.*That argument is moot, however, because it is indisputable that Spirit fails to satisfy the test's first prong.

Frontier is likewise ineligible, but for a different reason. It satisfies the test's first prong, but not the second. Frontier was an incumbent carrier at DCA on May 16, 2024, because it operated roundtrip flights using slot exemptions. Frontier, however, does not satisfy the test's second prong: it is not a "limited incumbent air carrier" as that term is defined in the statute and related FAA regulations. As the Department stated, the statute (49 U.S.C.§ 41714(h)(5)(B)(i)) "excludes an air carrier's count of slot exemptions at DCA for purposes of determining a carrier's status as a limited incumbent air carrier in order to allocate slot exemptions at DCA."[30] Although Frontier may qualify as a new entrant air carrier (under 49 U.S.C.§ 41714(h)(3)) because, as of May 16, 2024, Frontier did not hold or operate any non-exemption slots at DCA, nor has it sold or given up a slot at DCA after December 16, 1985, as the Department explained, "Congress did not make any of the ten slot exemptions from the [FAA Reauthorization Act of 2024] available to new entrant air carriers."[31]

Because DOT has correctly reaffirmed its prior determination that neither Spirit nor Frontier is eligible to receive slot exemptions as a "limited incumbent air carrier" in this case, Alaska will not address the applications of Spirit or Frontier on their specific respective merits except to note that neither application offers even a fraction of the consumer service and competition benefits of Alaska's DCA-SAN proposal.

---

[30] *Id*.

[31] *Id*. DOT succinctly explained why Frontier's new entrant status renders it ineligible in this case: "while § 41714(h) states that limited incumbent carriers are also new entrants, the reverse is not true, i.e., all new entrant carriers are not limited incumbent carriers." *Id*.

## III. Conclusion

Alaska urges the Department to expeditiously issue a final order confirming its tentative selection of Alaska so that Alaska can complete the additional steps necessary to begin daily nonstop roundtrip service between DCA and SAN as soon as possible.

Respectfully submitted,

David Heffernan
Michael Deutsch
**COZEN O'CONNOR**
2001 M Street, NW
Washington, DC 20036
(202) 912-4800
dheffernan@cozen.com
mdeutsch@cozen.com

Counsel for
**ALASKA AIRLINES, INC.**

# United States Senate

WASHINGTON, DC 20510

October 30, 2024

The Honorable Pete Buttigieg
Secretary
U.S. Department of Transportation
1200 New Jersey Ave SE
Washington, D.C. 20590

The Honorable Michael G. Whitaker
Administrator
Federal Aviation Administration
800 Independence Ave SW #300
Washington, D.C. 20591

Dear Secretary Buttigieg and Administrator Whitaker:

We commend the Department of Transportation's (the Department) recent order of the five tentative slot exemptions at Ronald Reagan Washington National Airport (DCA), as permitted by the *Federal Aviation Administration Modernization and Reauthorization Act of 2024* (FAA 2024). The selections of San Diego, San Francisco, and Sacramento (via Las Vegas, NV) will provide underserved markets with enhanced connectivity and cost competitiveness for the millions of Americans who fly between the nation's capital and the world's fifth largest economy, California.

Following the Department's review and response to comments regarding the tentative order, we encourage the Department to promptly finalize the selection of the five destinations. Additionally, upon finalization of such order, we encourage the Federal Aviation Administration to work with the awarded airlines to prioritize the accommodation of these new routes at DCA with departure times that improve connectivity and cost competitiveness to these five destinations and the beyond-perimeter markets these airports serve.

California's more than 40 million residents are key drivers of our growth and innovation in our nation's commercial aviation industry, economic activity, and national security. The three tentatively-selected California airports collectively serve more than 13.5 million Californians, provide access to key military bases, financial and government institutions, and are located in areas of the state with growing demand for service to DCA.

As stated in the Department's order, these destinations meet the FAA 2024's requirements for "a positive impact on the overall competition in the markets that will be served." We appreciate the Department's consideration of the airlines' applications and their impacts on beyond-perimeter destinations, and request that these destinations be awarded their slot exemptions in a final order.

Sincerely,

Laphonza Butler
United States Senator

Alex Padilla
United States Senator

**BEFORE THE**
**DEPARTMENT OF TRANSPORTATION**
**OFFICE OF THE SECRETARY**
**WASHINGTON, DC**

| | |
|---|---|
| Establishment of Slot Exemption Proceeding At Ronald Reagan Washington National Airport Pursuant to 49 U.S.C. § 41718 | Docket DOT-OST-2024-0065 |

**ANSWER OF ALASKA AIRLINES, INC.**

Alaska Airlines, Inc. ("Alaska") responds to the objections of Spirit Airlines, Inc. ("Spirit")[1] and Frontier Airlines, Inc. ("Frontier")[2] to Order to Show Cause 2024-10-11 ("SCO"), in which DOT tentatively determined that Alaska is eligible for an allocation of slot exemptions, whereas Spirit and Frontier are not. DOT's tentative decision to grant two slot exemptions to Alaska to provide daily nonstop roundtrip service between Ronald Reagan Washington National Airport ("DCA") and San Diego International Airport ("SAN") is correct under the clear requirements of the FAA Reauthorization Act of 2024 ("FAA 2024").

Spirit's and Frontier's fundamental objection is that each exclusively qualifies for a slot exemption allocation as a "limited incumbent air carrier." As explained below, however, DOT's tentative decision regarding Alaska's eligibility, and Spirit's and Frontier's ineligibility, for such an allocation is correct with respect to each carrier. Spirit's and Frontier's arguments are unpersuasive and not supported by applicable law. Alaska therefore urges DOT to expeditiously

[1] Objection of Spirit Airlines, Inc. to Order to Show Cause, Oct. 30, 2024 (Docket DOT-OST-2024-0065) ("Spirit Objection").

[2] Objection of Frontier Airlines, Inc. to Order to Show Cause, Oct. 30, 2024 (Docket DOT-OST-2024-0065) ("Frontier Objection").

issue a final order confirming its selection so that Alaska can implement DCA-SAN service as soon as possible.

### I. DOT is Correct That Neither Spirit Nor Frontier Qualifies for an Allocation of Slot Exemptions.

Section 502 of FAA 2024 directs DOT to allocate two slot exemptions as follows:

> Limited Incumbents.—Of the slot exemptions made available … , the Secretary shall make 2 available to *incumbent air carriers* qualifying for status as a *limited incumbent* carrier at [DCA] as of [May 16, 2024].[3]

The congressional mandate is clear and DOT correctly interpreted it as requiring a "two-part test for eligibility" whereby (1) "a carrier must be an incumbent [air carrier] at DCA on" May 16, 2024, *i.e.*, it must have "provid[ed] air transportation" at the airport on that date,[4] and (2) such a carrier must "also qualify for status as a limited incumbent [carrier]…."[5] As explained below, DOT is correct in finding that Alaska satisfies both prongs of the test whereas Spirit and Frontier do not.

It is telling that Spirit's 14-page objection to the SCO includes only two pages in which Spirit unavailingly attempts to establish its eligibility, which is the *sine qua non* for Spirit. Apparently frustrated by its indefensible legal position, Spirit lashes out, not merely arguing that DOT is "[in]correct" in deeming Spirit ineligible, but accusing DOT of acting "improperly" to achieve a "virtually pre-determined outcome."[6] Spirit also recklessly insinuates that the SCO is the product of a conspiracy between two branches of government and American, Delta,

---

[3] 49 U.S.C. § 41718(i)(3) (emphasis added). May 16, 2024 is the date of enactment of FAA 2024.

[4] DOT explained that "incumbent air carrier" is "not a defined term" under the relevant statute or regulations, and thus, relying "on a plain language reading of the statute," properly defined "incumbent air carrier" as "a carrier that is engaged in air transportation as of the date of enactment of FAA 2024." SCO at 19; *see also id.* (a carrier "providing air transportation at DCA on the date of enactment of FAA 2024" (*i.e.*, May 16, 2024)).

[5] *Id.*

[6] Spirit Objection at 3, 4; *see also id.* at 2 ("As if there was any doubt about which airlines would be selected….").

Southwest, and United, the four largest "legacy airlines which dominate domestic air transportation[,]" to effect a "giveaway" of slot exemptions to each of those carriers and Alaska.[7] If Spirit had a plausible case for its statutory eligibility, it presumably would have devoted more time in its objection to that topic rather than denigrating the integrity of government officials. But it did not do so.

*A. Spirit is Not an Incumbent Carrier at DCA*

Spirit concedes that it did not "provid[e] air transportation at DCA" on May 16, 2024. Perhaps that is why Spirit ignores the statute's crystal-clear language allocating slot exemptions only to "*incumbent carriers* qualifying for status as a limited incumbent carrier …."[8] Instead, Spirit claims that it qualifies for slot exemptions under section 502 *solely* on the basis that it meets the definition of a "limited incumbent carrier"[9] (*i.e.*, that it can satisfy the test's second prong). Spirit thus invites DOT to read section 502 as only involving a single-element test. The problem with Spirit's argument is that it would require DOT to ignore and effectively eradicate from the statutory text of section 502 the words "…incumbent air carriers qualifying for status as…" If Congress wanted to enact a provision reflecting Spirit's interpretation, it could have simply excluded that phrase from section 502. Put another way, Congress could have directed DOT to make 2 slot exemptions available to a carrier meeting the definition of limited incumbent

---

[7] *Id.* at 2-3. Spirit even castigates Senator Cantwell, Chair of the Senate Committee on Commerce, Science and Transportation, for allegedly having "instruct[ed]" DOT to select Alaska. *Id.* at 2, 8 n.10 (DOT "may feel compelled by Senator Cantwell's letter of instruction" to select Alaska). Spirit fails to recognize that, far from issuing an instruction, the Senator simply emphasized that "[t]o be sure, section 502 was intended to provide direct access to DCA from unserved beyond perimeter locations in the western and southwestern United States, such as San Antonio and San Diego." She also referenced Seattle and Las Vegas as examples of other western cities that would benefit from new DCA service. Letter of Sen. Maria Cantwell to DOT Secretary Pete Buttigieg, dated July 17, 2024 (Docket DOT-OST-2024-0065).

[8] 49 U.S.C. § 41718(i)(3) (emphasis added).

[9] *See* 14 C.F.R. § 93.213(a)(5), 49 U.S.C. § 41714(h)(5).

carrier even if that carrier did not "provide" air transportation at DCA on May 16, 2024. Congress, however, did not do that, and DOT must faithfully apply Congress' mandate that only carriers that were incumbent air carriers at DCA on May 16, 2024 are eligible for an allocation of slot exemptions in this case.[10] Thus, DOT correctly concluded that Spirit "is ineligible for an award in this proceeding."[11]

Spirit strains to rationalize away the actual meaning and effect of the complete text of section 502. It argues that if Congress wanted to limit eligibility to carriers that operated flights at DCA on May 16, 2024, it would have referred to "operating carriers," using that phrase as essential "qualifying words" (rather than "incumbent air carriers").[12] This argument is fatally flawed, first, in its assumption that legislative drafting is always so specific and consistent in terms of word choice that Congress invariably "knows precisely what to say" or that the only way for Congress to so say would be to use a term that Spirit alone deems to be "qualifying words."

Second, Spirit is simply wrong in claiming that "operating carrier" is a universal term of reference or "qualifying words." On the contrary, 49 U.S.C. § 40102, which contains a litany of statutory definitions of key terms in the Aviation Code, contains no reference whatsoever to "operating carrier." Indeed, the statutory definition of "air carrier" refers to a carrier that

[10] Spirit accuses DOT of having "improperly concocted a new eligibility criterion from whole cloth never intended or passed by Congress." Spirit Objection at 8. DOT, however, did nothing of the sort. On the contrary, DOT's interpretation recognizes and applies a clause in the statutory text, whereas Spirit's interpretation, by contrast, would disregard that clause for Spirit's expediency.

[11] SCO at 21.

[12] Spirit Objection at 10 ("Congress knows precisely what to say when it wants to refer to an operating carrier and the chosen word is 'operates'").

"*provides* air transportation."[13] That definition supports DOT's interpretation here of "incumbent air carrier" as one that "provid[ed] air transportation at DCA on" May 16, 2024.[14]

*B. Frontier is Not a Limited Incumbent Carrier at DCA*

Like Spirit, Frontier cannot satisfy both prongs of the test. Frontier satisfies the first prong as it was an "incumbent air carrier" at DCA on May 16, 2024 (when it operated three roundtrip flights using slot exemptions). DOT correctly determined, however, that Frontier fails the test's second prong because it is not a "limited incumbent air carrier" and thus is "ineligible to apply for slot exemptions in this proceeding."[15]

As DOT noted, the statute (section 41714(h)(5)(B)) defines "limited incumbent air carrier" by reference to 14 C.F.R. § 93.213 as "an air carrier or commuter operator that holds or operates fewer than 40 air carrier or commuter slots, in any combination" at DCA, while "exclud[ing] an air carrier's count of slot exemptions at DCA for purposes of determining a carrier's status as a limited incumbent air carrier in order to allocate slot exemptions at DCA."[16] Frontier acknowledges that "[b]ecause all of Frontier's slots are slot exemptions, that reduces [Frontier's] total to zero (0)."[17]

Frontier's effort to qualify as a "limited incumbent air carrier" rests on a single proposition: that a carrier such as Frontier that holds zero slots (excluding slot exemptions) at DCA is nonetheless a "limited incumbent air carrier" on the basis that zero slots is fewer than 40 slots. DOT's response to this argument is succinct and incontrovertible: although Frontier may

---

[13] 49 U.S.C. § 40102(a)(2) (emphasis added).

[14] SCO at 19.

[15] *Id.* at 20.

[16] *Id.*

[17] Frontier Objection at 12.

qualify as a new entrant air carrier (under section 41714(h)(3)), "Congress did not make any of the ten slot exemptions from FAA 2024 available to new entrant air carriers."[18] DOT neatly encapsulated Frontier's plight thus: "while § 41714(h)(3) states that limited incumbent carriers are also new entrant carriers, the reverse is not true, *i.e.*, all new entrant carriers are not limited incumbent carriers."[19] The statutory definitions of those two terms more than adequately support DOT's conclusion.[20] If the terms "new entrant air carrier" and "limited incumbent carrier" were identical or interchangeable, Congress would not have created two different definitions. Thus, DOT correctly determined that "Frontier is ineligible to receive a slot exemption award."[21]

**II. DOT is Correct That Alaska Qualifies for an Allocation of Slot Exemptions.**

Spirit and Frontier do not dispute that Alaska is an incumbent carrier at DCA, having operated service at the airport on May 16, 2024. They also do not question that Alaska meets the definition of "limited incumbent carrier" in 14 C.F.R. § 93.213(a)(5) as amended by 49 U.S.C. § 41714(h)(5). Rather, they argue that Alaska should be disqualified under a different statutory provision, section 41714(k), which states that:

> For purposes of this section [41714] and sections 41716, 41717, and 41718, an air carrier that … has … a code-share agreement with any other air carrier shall not qualify for a new slot or slot exemption as a new entrant or limited incumbent air carrier at an airport if the total number of slots and slot exemptions held by the two carriers at the airport exceed 20 slots and slot exemptions.

---

[18] SCO at 20.

[19] *Id.* Frontier disputes that it is a new entrant (Frontier Objection at 9-10), but, per DOT's comment, even if that were true, it would not further Frontier's claim to be a limited incumbent carrier.

[20] *See* 49 U.S.C. § 41714(h)(3) (defining "new entrant air carrier" as "an air carrier that does not hold a slot at the airport concerned and has never sold or given up a slot at that airport after December 16, 1985, and a limited incumbent carrier"); *but see* 49 U.S.C. § 41714(h)(5) (defining "limited incumbent air carrier" without including new entrant air carriers).

[21] SCO at 20.

The sole focus of this objection is that Alaska has a codeshare agreement with American Airlines, Inc. ("American") and that if Alaska's modest DCA slot holdings were combined with American's much larger holdings at the airport, the combined number would exceed 20 slots. As DOT correctly recognized, however, Alaska does not display American's code "on any nonstop flight it operates at DCA, and it would not be permitted to do so for any service operated with a new slot exemption award."[22]

The crux of Spirit's and Frontier's argument is that the "broad," "unambiguous" and "plain" text of section 41714(k) compels DOT to disqualify Alaska from eligibility without regard to context (*e.g.*, as a legal matter, how the provision relates to the overall DCA slot-related statutory scheme and, as a factual matter, how Alaska does and does not engage in codesharing with American at that airport).[23] As Spirit's and Frontier's subjective reading of section 41714(k) demonstrates, "plain meaning" is in the eye of the beholder and context not only matters but U.S. Supreme Court precedent (including as cited by Frontier) compels its consideration.

Frontier appropriately cites the U.S. Supreme Court's 2015 decision in *King v Burwell*, in which the Court held that: "If the statutory language is plain, we must enforce it according to its terms."[24] The Court, however, did not stop there, but rather continued (using language Frontier selectively omitted in its quotation from the case):

> ***But oftentimes the 'meaning—or ambiguity— of certain words or phrases may only become evident when placed in context.'*** So when deciding whether the language is plain, we must read the words 'in their context and with a view to

---

[22] SCO at 21-22 (citing a legally binding settlement agreement between Alaska and the U.S. Department of Justice that prohibits the display of American's code on Alaska flights to or from DCA).

[23] Spirit Objection at 6; Frontier Objection at 4.

[24] *King v. Burwell*, 576 U.S. 473, 486 (2015), *citing* Hardt v. Reliance Standard Life Ins. Co., 560 U.S. 242, 251 (2010).

> their place in the overall statutory scheme.' ***Our duty, after all, is 'to construe statutes, not isolated provisions***.'[25]

Thus, the language of section 41714(k) must be read, not in "isolat[ion]," but in the context of the "overall statutory scheme," particularly because the provision begins: "For purposes of this section [41714] and … section 41718." Section 41714 is titled "Availability of Slots," while section 41718 is titled "Special Rules for Ronald Reagan Washington National Airport." Thus, Congress and the Supreme Court require that section 41714(k) be read in context and with reference to the "overall statutory scheme" governing slots at DCA.

Congress, in adopting section 41714(k), was emphatic about that context and the provision's purpose. As then-Senate Commerce Committee Chair John McCain stated on the Senate floor:

> Let me be perfectly clear what this provision means. A major airline should not be allowed to game the system and add to its hundreds of daily slots through its commuter affiliates and codeshare partners.[26]

Senators Charles Grassley and Tom Harkin, "two of the principal architects" of the legislation, later reinforced Senator McCain's "perfectly clear" point: "The clear intent of Congress was to keep the major airlines from gaming the system to the detriment of new entrant airlines specifically and airline competition generally."[27]

The "context" in this case is that although Alaska has a codeshare agreement with American, Alaska does not display American's code on any of Alaska's flights at DCA, nor will

---

[25] *King*, 576 U.S. at 486, *quoting FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 133 (2000), *Graham County Soil & Water Conservation Dist. v. United States ex rel. Wilson*, 559 U.S. 280, 290 (2010) (bolded and italicized text was omitted from Frontier's quotation from the case); *see also* King, 576 U.S. at 492 (referencing "the fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme") (internal citation omitted).

[26] Letter from Senators Charles E. Grassley and Tom Harkin to DOT Secretary Rodney Slater, Nov. 14, 2000, quoting statement of Senator John McCain on Senate floor, Oct. 6, 1999 (attached as Exhibit hereto) (explaining the meaning and intent of section 41714(k)).

[27] *Id.*

Alaska display American's code on Alaska's DCA-SAN flights.[28] Therefore, DOT was correct when it determined that section 41714(k) does not affect Alaska's eligibility because "Alaska is not a commuter air carrier and is not seeking to operate its proposed DCA-SAN service under the marketing control and branding of American."[29]

### III. Neither Frontier Nor Spirit Has Presented a Credible Case for an Allocation of Slot Exemptions.

Alaska has consistently refrained from commenting on the merits of Spirit's and Frontier's applications because that issue is moot when the applicant is ineligible to apply. It bears noting, however, that Frontier failed to file a complete application in accordance with the minimum requirements set forth in DOT's notice establishing this proceeding.[30] Therefore, even if Frontier were eligible to apply (which, as DOT has correctly determined, it is not), it would be subject to disqualification for its failure to provide even the minimum required information in support of its application.

[28] Spirit and Frontier argue that because Alaska places its code on American's flights at DCA, section 41714(k) acts as a bar to Alaska's eligibility as a limited incumbent carrier. That unilateral (as opposed to bilateral) codesharing, however, is fundamentally different from the type of codesharing that section 41714(k) is intended to address, *i.e.*, where a commuter or codeshare carrier that is a new entrant or limited incumbent procures slots to be operated on behalf of a non-limited incumbent carrier, typically through a capacity purchase arrangement. American is not "gaming the system" or "add[ing] to its hundreds of daily slots" via Alaska here; on the contrary, Alaska is seeking two slot exemptions to operate DCA-SAN service under its own code in competition with American and other carriers and will not place American's code on its DCA-SAN flights. *See* SCO at 21-22; Comments of Alaska Airlines, Oct. 30, 2024 (Docket DOT-OST-2024-0065) at 6-7.

[29] SCO at 22. Frontier misconstrues the statute and DOT's tentative decision when it claims that, were DOT to finalize the SCO, DOT would grant slot exemptions to Alaska by means of a "discretionary exemption" from section 41714(k). Frontier Objection at 4. On the contrary, DOT's tentative decision is based on its correct interpretation of section 41714(k).

[30] *See* Establishment of Slot Exemption Proceedings at Ronald Reagan Washington National Airport Pursuant to 49 U.S.C. § 41718, June 24, 2024 (Docket DOT-OST-2024-0065) ("DOT Notice"). The DOT Notice sets forth "minimum" requirements for submission of a complete application, including that an applicant identify the aircraft type it would use to provide its proposed service, "a schedule showing proposed times" and "an approximate start-up date." *Id.* at 3. Frontier's application contained none of this information. Application of Frontier Airlines, Inc. for Slot Exemption, July 8, 2024 (Docket DOT-OST-2024-0065).

Spirit, meanwhile, is reportedly considering a bankruptcy filing or merger (or possibly both).[31] It has applied for slot exemptions to initiate service between DCA, an airport it abandoned more than a decade ago after a history of service failure there, and San José Mineta International Airport ("SJC"), an airport where Spirit has very limited service and can offer no meaningful connections.[32] This begs the question whether Spirit's real objective is to add two slot exemptions to buttress its balance sheet regardless of whether its service proposal would enhance competition or travel options for consumers.[33]

## IV. Conclusion

Alaska urges DOT to expeditiously issue a final order confirming its tentative selection of Alaska so that Alaska can complete the additional steps necessary to begin daily nonstop roundtrip service between DCA and SAN as soon as possible.

*[Signature Page Follows]*

---

[31] *See* Bloomberg, *Spirit Airlines Pursues Bankruptcy as a Path to Tie-Up With Frontier,* Oct. 23, 2024, available at https://www.bloomberg.com/news/articles/2024-10-23/spirit-air-pursues-bankruptcy-as-a-path-to-tie-up-with-frontier; AirlineGeeks, *Spirit to Furlough Over 300 Pilots as Losses Mount*, Oct. 30, 2024, available at https://airlinegeeks.com/2024/10/30/spirit-to-furlough-over-300-pilots-as-losses-mount/.

[32] Spirit argues that "[t]he correct decision would have established non-stop service to a beyond perimeter airport that has none from DCA and would have made service available that would have a substantial competitive impact on a major market." Spirit Objection at 4. By Spirit's own criteria, however, DOT *did* make the correct decision in selecting Alaska because SAN (not SJC) is the largest beyond perimeter market and Alaska's SAN service will generate far more substantial competitive and consumer benefits.

[33] As Alaska has explained in both this answer and its comments on the SCO, DOT's legal interpretation that Alaska, but not Spirit or Frontier, is eligible to receive the two available limited incumbent slot exemptions is correct. If, as Spirit and Frontier urge, Alaska were to be deemed a non-limited incumbent carrier, due process would require that DOT restart this proceeding to afford Alaska the opportunity for consideration for an allocation of slot exemptions in the non-limited incumbent carrier category.

Respectfully submitted,

David Heffernan
Michael Deutsch
**COZEN O'CONNOR**
2001 M Street, NW
Washington, DC 20036
(202) 912-4800
dheffernan@cozen.com
mdeutsch@cozen.com

Counsel for
**ALASKA AIRLINES, INC.**

**BEFORE THE**
**DEPARTMENT OF TRANSPORTATION**
**OFFICE OF THE SECRETARY**
**WASHINGTON, D.C.**

| | |
|---|---|
| **Applications of:**<br><br>**ALASKA AIRLINES, INC.;**<br>**AMERICAN AIRLINES, INC.;**<br>**DELTA AIR LINES, INC.;**<br>**FRONTIER AIRLINES, INC.;**<br>**JETBLUE AIRWAYS CORPORATION;**<br>**SPIRIT AIRLINES, INC.;**<br>**SOUTHWEST AIRLINES CO.; and**<br>**UNITED AIRLINES, INC.**<br><br>For exemptions from 14 C.F.R. Part 93, Subparts K and S, pursuant to 49 U.S.C. § 41718(i), Special rules for Ronald Reagan Washington National Airport (Additional Slot Exemptions), as added by Section 502 of the Federal Aviation Administration Modernization and Reauthorization Act of 2024 | Docket DOT-OST-2024-0065 |

**CONSOLIDATED REPLY OF SPIRIT AIRLINES, INC.**

Spirit Airlines files this Reply to the Comments of Alaska Airlines and the Objection of Frontier Airlines to the Department's Show Cause Order (SCO) to award slots at Reagan National Airport (DCA) as required by Section 502 of the 2024 FAA Reauthorization Act. As explained in Spirit's letter of June 26, 2024, its Application in this proceeding and its Objection to the SCO, Spirit is the only eligible limited incumbent as defined by applicable statutes and regulations, including Section 502 of the 2024 FAA Reauthorization Act. As such the Department

must grant Spirit the two limited incumbent slots for service between Reagan National Airport (DCA) and San Jose International Airport (SJC).

As Spirit explained in its Objection, the Department misconstrued the law in labeling Spirit an ineligible limited incumbent. In so doing the Department closed the door to the one opportunity to promote the very competition Congress required, and which the President has claimed is this Administration's goal. Instead of awarding two slots to a large airport without non-stop service to DCA and creating low fare competition against service from San Francisco International, the Department literally doubled down on United at SFO. This award if finalized would not only establish three non-stops between SFO and DCA but foreclose any low fare competition for the San Francisco Bay area. Properly classifying Alaska as a non-limited incumbent and awarding it the slots gifted to United in the Show Cause Order would satisfy Section 502 criteria by adding the first non-stop service in a major market.

Alaska in its Comments endorsed the incorrect reasoning used by the Department in concluding that Alaska is the only qualified limited incumbent despite its massive and longstanding codeshare arrangement with American Airlines at DCA. Importantly, while both Alaska and the Department reference a 2017 settlement agreement related to a merger with a third-party airline (Virgin America), nothing about that agreement abrogates the separate statutory requirements prohibiting Alaska from being classified as a limited incumbent in this pro-

ceeding. Nor could the Department change such requirements, because the entirety of "section[] … 41714" is excluded from the Department's authority to exempt under 49 U.S.C. § 40109.[1]

Frontier, while correctly sharing Spirit's legal position that Alaska is not a limited incumbent, mistakenly argues that it is an eligible limited incumbent. Frontier reaches this conclusion by both misinterpreting the use of the word "incumbent" in Section 502 and by ignoring the crystal-clear language in 49 U.S.C. §41714(h)(5) and thereby concluding that it is a limited-incumbent because it has zero slots.

## I. Alaska is Not an Eligible Limited Incumbent

As Spirit noted in its Objection, the Department is fully capable, under applicable law, of awarding Alaska two non-limited incumbent slots to operate non-stop service between San Diego and DCA. As noted, as a non-limited incumbent, Alaska's application is far stronger than United Airlines' application for SFO.[2]

Under the legislation, Alaska is a non-limited incumbent. Contrary to Alaska's contention at page 6 of its comment, Spirit *does* dispute that Alaska meets the definition of limited incumbent at DCA. The relevant statute, 49 U.S.C. §41714(k), defining "Affiliated Carriers" and quoted by Alaska, specifically says a carrier that has a codeshare with another carrier such that the total slots and slot exemptions exceeds 20 "***shall not qualify for a new slot or slot exemption as a new entrant or limited incumbent air carrier at an airport…"*** Importantly, the key

[1] 49 U.S.C. § 40109(c).

[2] As JetBlue notes in its succinct objection to the anticompetitive show cause order, United spent millions in lobbying against any expansion of beyond perimeter flying. The award to United just further cements its substantial control of the SFO market to the two DC area airports.

language which both the Department and Alaska ignore is that this definition of Affiliated Carriers applies to the entirety of Section 41714. This means that Section 41714(k) modifies the definition of limited incumbent in Section 41714(h)(5) as that definition would otherwise apply to exclude Alaska.[3] At DCA, Alaska is legally simply not a limited incumbent.

Alaska's other two arguments (simply repeating the Show Cause Order) for its claim to be a limited incumbent also fail. First, the 2017 settlement agreement related to Alaska's merger with third-party airline Virgin America does not and cannot override a statutory requirement related to codesharing with American Airlines. Notwithstanding anything in that agreement, Alaska and the Show Cause Order do not dispute that Alaska "has … a code-share agreement, with [another] air carrier … exceed[ing] 20 slots and slot exemptions."[4] Nothing under that agreement, the Department's authority, or the DOJ's authority can abrogate a completely unrelated statutory requirement prohibiting Alaska from being classified as a limited incumbent in this proceeding. Congress made this expressly clear by prohibiting the Department from granting any exemption to the requirements of Section 41714(k), because the entirety of "*section[] … 41714" is excluded from the Department's authority to exempt under 49 U.S.C. § 40109.*"[5]

---

[3] When a statute includes an explicit definition, we must follow that definition, even if it varies from that term's ordinary meaning. *Meese v Keene*, 481 US 465, 484-485, 107 S Ct 1862 (1987) ("It is axiomatic that the statutory definition of the term excludes unstated meanings of that term"); *Colautti v Franklin*, 439 US at 392-393, n 10, 99 S Ct 675' ("As a rule, 'a definition which declares what a term "means". . . excludes any meaning that is not stated'").

[4] 49 U.S.C. § 41714(k).

[5] 49 U.S.C. § 40109(c). For the same reason, the Department has no authority to grant exemptions to Alaska or any carrier from the definitions Congress established in 41714(h).

Second, Alaska and the Department read into Section 41714(k) language that does not exist regarding meaningful access. **Nothing in Section 41714(k) says that codesharing involving two air carriers must be bilateral**, and the Department has never before departed from the plain language of that text in such an egregious manner. Specifically, it is immaterial whether American can put its code on Alaska flights at DCA. As reflected in both the Spirit and Frontier objections it is preposterous to say that Alaska receives no "meaningful access" from the codeshare while it puts its code on over 50 daily American DCA flights to over 50 cities. The American codeshare literally turns DCA into a mini hub for Alaska. If Alaska honestly believes it gets no meaningful benefit from its codeshare with American at DCA it should submit the codeshare agreement in this proceeding so the Department and other parties can see the scope of the benefit.

Second, like the Department, Alaska seeks to rely on legislative history from another era to bolster the Department's explanation that the statute which bars Alaska from consideration as a limited incumbent does not mean exactly what it says. As both Spirit and Frontier pointed out in their objections, the cited legislative history does not support the conclusion that the only purpose for Section 41714(k) was to address issues with commuter carriers. More fundamentally, the law is clear that the agency cannot resort to legislative history unless the statute is ambiguous and in this case the statute is perfectly clear.[6]

Under the statute and regulations, Alaska is eligible for slots *only* as a non-limited incumbent. A first-ever, non-stop service from SAN to DCA is far more consistent with the Section

[6] See, *Barnhill v. Johnson*, 503 U.S. 393, 401. To begin, we note that appeals to statutory history are well taken only to resolve "statutory ambiguity." *Toibb* v. *Radloff,* 501 U. S. 157, 162 (1991).

502 criteria of first non-stop service in a major market and promoting competition than handing United, by far the dominant carrier in the San Francisco – Washington, DC market, another non-stop round trip. Indeed, the carrier that is hurt the most by the United award is Alaska, which currently holds the other SFO-DCA non-stop authority.

## II. Frontier is Not an Eligible Limited Incumbent

Frontier has again presented the Department with a miasma of circular arguments about why it is an eligible Limited Incumbent. The culmination of this trip through wonderland is that because Frontier has zero slots it is a limited incumbent. (Frontier Objection at 12). It points out that zero is less than 40, the most slots a carrier can hold to be a limited incumbent (except if a carrier also codeshares, like Alaska, with another carrier which together operate more than 20 slots). Of course, if zero slots made a carrier a limited incumbent, then the statutory definition of "new entrant" which has been in the law for 30 years would be superfluous. Unfortunately for Frontier, Congress is not in the business of issuing superfluous statutes.[7]

To achieve its untenable conclusion that zero slots make it a limited incumbent Frontier has also misinterpreted 49 U.S.C. §41714(h)(4) and (h)(5)(B). Specifically, Frontier notes that the definition of "slot" in (h)(4) does not itself differentiate between regular slots and exemption slots. However, it is axiomatic that all parts of a statute must be read as a whole.[8] In this

---

[7] "It is a cardinal principle of statutory construction that a statute ought, upon the whole, to be so construed that, if it can be prevented, no clause, sentence, or word shall be superfluous, void, or insignificant." *Texas v. United States EPA*, 91 F.4th 280, 298 (5th Cir. 2024) (quoting *United States v. Lauderdale Cnty.*, 914 F.3d 960, 966 (5th Cir. 2019) (internal quotation marks omitted)); *see also Exelon Wind 1, LLC v. Nelson*, 766 F.3d 380, 399-400 (5th Cir. 2014) (noting this is "the most basic interpretive canon").

[8] Determining the scope of that authority requires the Court to evaluate the whole text, "interpret[ing] the statute 'as a symmetrical and coherent regulatory scheme,' … and 'fit, if possible, all parts into an harmonious whole,'" *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 133 (2000) (quoting *Gustafson v. Alloyd Co.*, 513 U.S. 561, 569 (1995); *FTC v. Mandel Brothers, Inc.,* 359 U.S. 385, 389 (1959)).

case, Section 41714 must be viewed as a whole. This section refers to 14 C.F.R. Part 93 Subpart S. Under Subpart S, the use of the term "Slot" extends back to the 1985-1986 period, years before introduction of the terms "Limited Incumbent" or "Exemption." These words were not added to 49 U.S.C. §41718 for use with respect to DCA until 2000.[9] Accordingly, when used throughout the relevant statute, the term "slots" standing alone was never intended to include "slot exemptions."

Indeed, this fact, as the Department explains at page 20 of the SCO, is clearly stated in 49 U.S.C. §41714(h)(5)(B)(i) which reads:

> *(B) for purposes of such sections, the term "slot" shall not include—*
>
> *(i) "slot exemptions";*

Both the plain language of the relevant statutes and the regulations as well as the applicable regulations confirm that Frontier is not an eligible limited incumbent.[10]

**III. A Second DCA-SFO Route for United Violates the Requirements of Section 502**

The selection of United makes little sense. And if the Department corrected its error in rejecting Spirit, even the thin support for United would be eroded. SFO-DCA already has two nonstop roundtrips a day, one by United and one by Alaska. So immediately, the first Section 502 criteria – first non-stop where none exists – could not be met. Accordingly, the Department

[9] See Pub. L 106-181 title ll §231(e)(1).

[10] If Frontier was a limited incumbent, as Spirit explained in its Objection to the SCO, it would not matter if the carrier was operating or not, since use of the term incumbent in Section 502, was just a generic reference to both limited incumbents and non-limited incumbents and had nothing to do with whether the carriers were operating on a specific day.

had to resort to concluding that award of a second daily to United at SFO would enhance competition.[11] In its comments on the SCO, United lists bullet points about the benefits – which appear to be mostly benefits to it rather than benefits to the public. United then quotes the Department's competition analysis which stands economic analysis on its head. Specifically, the Department concludes that giving a second roundtrip to United will put "downward pressure" on fares. United Comment at 2, citing SCO at 29.

Nothing supports the Department's conclusion. It is true that currently United's SFO-DCA market share is only slightly larger than Alaska's. However, it is also true that United's revenue share is 10% higher than Alaska's.[12] As the Department itself noted: "Current air fares between DCA-SFO are approximately 60% higher than the average for DCA, as well as the average air fare for the greater-Washington, DC market, and the U.S. national average." SCO at 29. Moreover, the load factors in this market are high. Doubling United's capacity will likely simply divert traffic from Alaska rather than lower fares once United dominates the market. Thus, courtesy of this gift from the Department, fares likely will go up. Moreover, United claims as a benefit over 100,000 new passengers a year. Yet these passengers live much closer to SJC where Spirit would provide actual low-fare competition rather than them commuting an hour or more to SFO to catch a high fare United flight.

As discussed in Spirit's objection to the Show Cause Order, Spirit and United both propose routes connecting Silicon Valley to the Washington, D.C. metroplex, but a route to SJC

---

[11] The statute specifically reads: "have a positive impact on the overall level of competition in the markets that will be served as a result of those exemptions."

[12] See US DOT O&D Summary Report SFO to DCA YR Q2 2024.

serves a greater percentage of the Bay Area population and fills a greater gap than a route to SFO. Census data shows the region surrounding the SJC Airport encompasses approximately 40% of the Bay Area's nine-county population, compared to United's proposal of SFO Airport with only 26%. Moreover, published flight data shows there are 2 daily roundtrips between SFO and DCA and 10 overall between SFO and DCA or IAD. In comparison, no flights to DCA or IAD originate from SJC. Finally, choosing Spirit over United would have a tremendous impact on the airport service workers. Spirit has a history of providing good-paying jobs, compared to United Airlines, which recently had the Association of Flight Attendants (AFA) authorize a strike against United if United does not meet the Association's contract demands.

**Conclusion**

For the reasons stated above, Spirit respectfully requests the Department correct its legal error and award Spirit the two limited incumbent slots for DCA - SJC service.

Respectfully submitted,

Joanne W. Young
David M. Kirstein
Donald L. Crowell
**Counsel for Spirit Airlines, Inc.**



**U.S. Department of Transportation**

Office of the Secretary of Transportation

Assistant Secretary

1200 New Jersey Avenue, SE
Washington, DC 20590

November 6, 2024

The Honorable Scott H. Peters
U.S. House of Representatives
Washington, DC 20515

Dear Representative Peters:

Thank you for your letter regarding the U.S. Department of Transportation's (the Department) Slot Exemption Proceeding for Ronald Reagan Washington National Airport (DCA).

As you know, the Federal Aviation Administration Reauthorization Act of 2024 directed the Department to allocate 10 new slot exemptions at DCA. The Department announced its tentative allocation decision in an Order to Show Cause (Order 2024-10-11) on October 16, 2024. As this proceeding is currently ongoing, I cannot comment on the merits of the points raised in your letter.

Per our normal practice, I will be placing a copy of your letter and this response in docket DOT-OST-2024-0065. You may track the progress of this proceeding by accessing the Federal eRulemaking Portal at http://www.regulations.gov and placing DOT-OST-2024-0065 in the search box. A similar response has been sent to each cosigner of your letter.

Sincerely,

Carol A. (Annie) Petsonk
Assistant Secretary
for Aviation and International Affairs



**U.S. Department
of Transportation**

Office of the Secretary
of Transportation

Assistant Secretary

1200 New Jersey Avenue, SE
Washington, DC  20590

November 6, 2024

The Honorable Sara Jacobs
U.S. House of Representatives
Washington, DC  20515

Dear Representative Jacobs:

Thank you for your letter regarding the U.S. Department of Transportation's (the Department)
Slot Exemption Proceeding for Ronald Reagan Washington National Airport (DCA).

As you know, the Federal Aviation Administration Reauthorization Act of 2024 directed the
Department to allocate 10 new slot exemptions at DCA. The Department announced its tentative
allocation decision in an Order to Show Cause (Order 2024-10-11) on October 16, 2024. As this
proceeding is currently ongoing, I cannot comment on the merits of the points raised in your
letter.

Per our normal practice, I will be placing a copy of your letter and this response in docket
DOT-OST-2024-0065. You may track the progress of this proceeding by accessing the Federal
eRulemaking Portal at http://www.regulations.gov and placing DOT-OST-2024-0065 in the
search box. A similar response has been sent to each cosigner of your letter.

Sincerely,

Carol A. (Annie) Petsonk
Assistant Secretary
for Aviation and International Affairs



**U.S. Department
of Transportation**

Office of the Secretary
of Transportation

Assistant Secretary

1200 New Jersey Avenue, SE
Washington, DC 20590

November 6, 2024

The Honorable Mike Levin
U.S. House of Representatives
Washington, DC 20515

Dear Representative Levin:

Thank you for your letter regarding the U.S. Department of Transportation's (the Department)
Slot Exemption Proceeding for Ronald Reagan Washington National Airport (DCA).

As you know, the Federal Aviation Administration Reauthorization Act of 2024 directed the
Department to allocate 10 new slot exemptions at DCA. The Department announced its tentative
allocation decision in an Order to Show Cause (Order 2024-10-11) on October 16, 2024. As this
proceeding is currently ongoing, I cannot comment on the merits of the points raised in your
letter.

Per our normal practice, I will be placing a copy of your letter and this response in docket
DOT-OST-2024-0065. You may track the progress of this proceeding by accessing the Federal
eRulemaking Portal at http://www.regulations.gov and placing DOT-OST-2024-0065 in the
search box. A similar response has been sent to each cosigner of your letter.

Sincerely,

Carol A. (Annie) Petsonk
Assistant Secretary
for Aviation and International Affairs



**U.S. Department of Transportation**

Office of the Secretary of Transportation

Assistant Secretary

1200 New Jersey Avenue, SE
Washington, DC 20590

November 6, 2024

The Honorable Juan Vargas
U.S. House of Representatives
Washington, DC 20515

Dear Representative Vargas:

Thank you for your letter regarding the U.S. Department of Transportation's (the Department) Slot Exemption Proceeding for Ronald Reagan Washington National Airport (DCA).

As you know, the Federal Aviation Administration Reauthorization Act of 2024 directed the Department to allocate 10 new slot exemptions at DCA. The Department announced its tentative allocation decision in an Order to Show Cause (Order 2024-10-11) on October 16, 2024. As this proceeding is currently ongoing, I cannot comment on the merits of the points raised in your letter.

Per our normal practice, I will be placing a copy of your letter and this response in docket DOT-OST-2024-0065. You may track the progress of this proceeding by accessing the Federal eRulemaking Portal at http://www.regulations.gov and placing DOT-OST-2024-0065 in the search box. A similar response has been sent to each cosigner of your letter.

Sincerely,

Carol A. (Annie) Petsonk
Assistant Secretary
for Aviation and International Affairs



**U.S. Department of Transportation**

Office of the Secretary of Transportation

Assistant Secretary

1200 New Jersey Avenue, SE
Washington, DC 20590

November 6, 2024

The Honorable Darrell Issa
U.S. House of Representatives
Washington, DC 20515

Dear Representative Issa:

Thank you for your letter regarding the U.S. Department of Transportation's (the Department) Slot Exemption Proceeding for Ronald Reagan Washington National Airport (DCA).

As you know, the Federal Aviation Administration Reauthorization Act of 2024 directed the Department to allocate 10 new slot exemptions at DCA. The Department announced its tentative allocation decision in an Order to Show Cause (Order 2024-10-11) on October 16, 2024. As this proceeding is currently ongoing, I cannot comment on the merits of the points raised in your letter.

Per our normal practice, I will be placing a copy of your letter and this response in docket DOT-OST-2024-0065. You may track the progress of this proceeding by accessing the Federal eRulemaking Portal at http://www.regulations.gov and placing DOT-OST-2024-0065 in the search box. A similar response has been sent to each cosigner of your letter.

Sincerely,

Carol A. (Annie) Petsonk
Assistant Secretary
for Aviation and International Affairs

# Congress of the United States

Washington, DC 20515

October 29, 2024

The Honorable Pete Buttigieg
Secretary
U.S. Department of Transportation
1200 New Jersey Avenue, SE
Washington, D.C. 20590

RE: Order to Show Cause 2024-10-11 (Docket DOT-OST-2024-0065)

Dear Secretary Buttigieg:

We write to applaud your tentative decision to grant two slot exemptions at Ronald Reagan Washington National Airport (DCA) to Alaska Airlines, Inc. (Alaska) for new non-stop service between DCA and San Diego, California. As members of the California House delegation representing San Diego County, we write to express our strong support for this tentative decision, which will greatly benefit constituents in all our districts in the San Diego area, in the National Capital region, and across the nation. We commend the Department of Transportation for its detailed and well-reasoned tentative decision, which faithfully reflects Congress's criteria, as stated in the *FAA Reauthorization Act of 2024*, for allocating the available slot exemptions. We encourage you to finalize this decision as soon as practicable.

As we shared during the previous public comment period, San Diego International Airport (SAN) has the highest number of daily passengers to DCA via connecting service and is the largest hub airport out of all the airports outside of the perimeter without existing service to DCA. San Diego is consistently touted as one of the best places to visit in the U.S., and it is not just tourism that drives the city, but also the enormous presence of our country's military.

As the Department's Order to Show Cause makes clear, adding Alaska's new non-stop service between SAN and DCA will significantly enhance options for business and leisure travel, improve quality of life for servicemembers, and provide economic benefits for both regions. Alaska's growing presence in San Diego makes it the ideal carrier to bridge these two important markets. Additionally, with more than 60 daily departures from SAN, this proposed Alaska Airlines flight, if appropriately timed, will provide critical connectivity to consumers beyond SAN who will also benefit from this direct service. We ask that the Federal Aviation Administration consider this important connectivity in assigning slot times to Alaska in conjunction with a final order.

SAN recognizes the demand for travel and has undertaken significant investments to prepare itself for additional flight opportunities. Over the last several years, the airport has rebuilt its Terminal 2 with a LEED certified, award-winning facility and is in the process of a $3.8 billion Terminal 1 project that will construct 30 gates. This is a significant investment that will put infrastructure in place for the airport to meet rising demand efficiently and safely.

Finally, we thank you for the clarity in the Order to Show Cause regarding Alaska's status as a limited incumbent air carrier that is eligible to apply for slot exemptions in this category. This is consistent with the plain reading of the statute, the legislative history, and previous DCA slot decisions, and we appreciate your decision that this is the appropriate category in which to consider Alaska's application.

Thank you again for your leadership, and for this tentative decision that will bring such important benefits to San Diego and to the nation.

Sincerely,

**OST-S10-241029-021**

Scott H. Peters
Member of Congress

Sara Jacobs
Member of Congress

Mike Levin
Member of Congress

Juan Vargas
Member of Congress

Darrell Issa
Member of Congress

cc: Administrator Michael Whitaker, Federal Aviation Administration

**OST-S10-241029-021**

**BEFORE THE**
**DEPARTMENT OF TRANSPORTATION**
**WASHINGTON, D.C.**

| | |
|---|---|
| **Application of**<br><br>**FRONTIER AIRLINES, INC.**<br><br>**For Slot Exemption at Ronald Reagan Washington National Airport Pursuant to 49 U.S.C. § 41718** | **Docket DOT-OST-2024-0065** |

**MOTION FOR LEAVE TO FILE AND SUPPLEMENT OBJECTION OF FRONTIER AIRLINES, INC. TO ORDER TO SHOW CAUSE**

Pursuant to 14 C.F.R. § 302.6, Frontier Airlines, Inc. ("Frontier"), in an abundance of caution, respectfully seeks leave to supplement its Objection to Order to Show Cause submitted on October 30, 2024.[1]

## I. Background

The U.S. Department of Transportation ("DOT")'s Slot Exemption Proceeding at Ronald Reagan Washington National Airport Pursuant to 49 U.S.C. § 41718 issued June 24, 2024 ("Notice")[2] called for applications for ten (10) slot exemptions (5 slot pairs) for use in the operation of daily flights from Ronald Reagan Washington National Airport (DCA). Four (4) slot pairs are to be allocated to incumbent carriers with status as a non-limited incumbent carriers and one (1) slot pair to an incumbent carrier with status as a limited incumbent carrier. Frontier requested the one (1) slot pair allocated to an incumbent carrier with status as a limited incumbent carrier.[3]

[1] Frontier Airlines, Inc., Objection to Order to Show Cause, Docket DOT-OST-2024-0065-23586 (Oct. 30, 2024).

[2] Docket DOT-OST-2024-0065-0001 (Jun. 24, 2024).

[3] Frontier Airlines, Inc., Application for Slot Exemption, Docket DOT-OST-2024-0065-5802 (July 8, 2024) ("Frontier Application").

In the Notice, the DOT explained that carriers' applications "should" (not "shall") include, among other things, the aircraft type, a schedule showing proposed times, and an approximate start-up date. The Notice clarified, however, that the selected carriers would ultimately need "to work with the FAA Slot Administration Office to assign slot times," and that "[f]inal slot times" would not be allocated until "after the Department's decision."[4]

In its Application, Frontier stated its desire to operate "daily" service from DCA to/from Luis Muñoz Marín International Airport (SJU).[5] Frontier also only operates Airbus A320 family aircraft. Frontier's Application further outlined the merits of its proposed route, why its Application best satisfied the policy considerations expressed in 49 U.S.C. § 41718(i), and how Frontier is the only "incumbent air carrier[] qualifying for status as a limited incumbent carrier at Ronald Reagan Washington National Airport as of the date of enactment of the FAA Reauthorization Act of 2024."[6]

## II.    DOT Should Grant Leave to Supplement

In its Order to Show Cause, the DOT noted that Frontier's Application did not specify the type of aircraft or a proposed starting date for the flights.[7] However, the DOT's tentative determination relating to Frontier did not rely upon this point.[8] Frontier now requests leave to submit that information, even though this supplemental information is not relevant to the DOT's determination of Frontier's eligibility for a slot exemption.

---

[4] Notice at 3.

[5] Frontier Application at 1; *see also* Frontier Airlines, Inc., Comments on Timely-Filed Applications, Docket DOT-OST-2024-0065-22195 (July 17, 2024) at 6.

[6] Frontier Application at 1–8 and 49 U.S.C. § 41718(i)(3).

[7] DOT Order 2024-10-11, Docket DOT-OST-2024-0065-23579 (Oct. 16, 2024) at 16 ("Order").

[8] Order at 21. Further, the DOT chose not to dismiss Frontier's Application due to incompleteness, nor did the DOT request that Frontier submit additional information.

Likewise, the DOT tentatively granted United one (1) slot pair while overlooking a similar issue with United's application (and tentatively denying JetBlue's motion to disqualify United on this ground), explaining that the DOT used the information to assess the carriers' applications, but that such information was only '*proposed*'[9] because "final slot times for the granted exemptions will be allocated via Notice after the Department's final allocation decision."[10]

Since the information is not relevant to DOT's determination, the DOT's consideration of the supplemental information will not prejudice any of the other applicants. Good cause exists for the DOT to consider Frontier's supplemental information as it will remove any doubt as to whether Frontier's Application is complete.

Moreover, and as more fully explained in Frontier's other filings, Frontier remains the only eligible "incumbent air carrier[] qualifying for status as a limited incumbent carrier" at DCA—a designation that the DOT has recognized for Frontier numerous times before[11]—and thus any initial omission of proposed information could not foreclose Frontier's Application.

**III. Supplemental Information**

Nevertheless, in an abundance of caution, Frontier submits the following information:

1. *Aircraft Type* – Frontier would operate its flights using Airbus A320 family aircraft (the only aircraft it presently operates) configured with between 180 and 240 seats.
2. *Proposed Schedule* – Frontier desires to operate daily flights that will arrive from SJU at DCA at 1630 ET and depart from DCA to SJU at 1730 ET. Frontier, however, understands that after the final order in this proceeding allocating the slots, the DOT

[9] Order at 23 (emphasis in original).

[10] Order at 23.

[11] *See, e.g.*, DOT Order 2002-11-20, Docket DOT-OST-2000-7181-2117 (Nov. 27, 2002) at 8 ("Frontier clearly qualifies as a limited incumbent airline at DCA, as it currently holds only two DCA slot exemptions for a single daily round trip to Denver.").

"will direct selected carriers to work with the FAA Slot Administration Office to assign slot times corresponding with the authority granted in this proceeding and in accordance with the requirements of FAA 2024."[12]

3. *Proposed Starting Date* – Subject to adjustment based on when the slots are granted and their schedule determined, Frontier desires to commence its new DCA-SJU service on March 6, 2025.

## IV. Conclusion

For the reasons stated above, Frontier respectfully requests the DOT grant leave to file information requested in the Notice and provided herein.

Respectfully submitted,

Brian E. Foont
The Foont Law Firm, LLC
11727 Gainsborough Road
Potomac, MD 20854
Tel. 202-236-4851
E-Mail: Foont@FoontLaw.com

Counsel for Frontier Airlines, Inc.

November 26, 2024

[12] Notice at 3; *see also* Order at 22–23.

Order 2024-12-8
Served: December 17, 2024

**UNITED STATES OF AMERICA**
**DEPARTMENT OF TRANSPORTATION**
**OFFICE OF THE SECRETARY**
**WASHINGTON, D.C.**

Issued by the Department of Transportation
On the 17th day of December, 2024

| **Applications of:**<br><br>**ALASKA AIRLINES, INC.;**<br>**AMERICAN AIRLINES, INC.;**<br>**DELTA AIR LINES, INC.;**<br>**FRONTIER AIRLINES, INC.;**<br>**JETBLUE AIRWAYS CORPORATION;**<br>**SPIRIT AIRLINES, INC.;**<br>**SOUTHWEST AIRLINES CO.; and**<br>**UNITED AIRLINES, INC.**<br><br>For exemptions from 14 C.F.R. Part 93, Subparts K and S, pursuant to 49 U.S.C. § 41718(i), Special rules for Ronald Reagan Washington National Airport (Additional Slot Exemptions), as added by Section 502 of the Federal Aviation Administration Modernization and Reauthorization Act of 2024 | **Docket DOT-OST-2024-0065** |
|---|---|

**FINAL ORDER**

## I. SUMMARY

By this Order, the U.S. Department of Transportation (the Department) makes final its tentative findings and conclusions set forth in Order 2024-10-11 and awards two slot exemptions at Ronald Reagan Washington National Airport (DCA) to each of the five air carriers listed below, to operate new nonstop roundtrip service as follows:

- Alaska Airlines, Inc. (Alaska) for service to San Diego, California (SAN);
- American Airlines, Inc. (American) for service to San Antonio, Texas (SAT);

- Delta Air Lines, Inc. (Delta) for service to Seattle, Washington (SEA);
- Southwest Airlines Co. (Southwest) for service to Las Vegas, Nevada (LAS); and
- United Airlines, Inc. (United) for service to San Francisco, California (SFO).

## II. BACKGROUND

Section 502 of the Federal Aviation Administration Reauthorization Act of 2024 (FAA 2024), signed into law on May 16, 2024, amends Section 41718 of Title 49 of the U.S. Code by directing the Department to grant 10 exemptions to air carriers to operate limited frequencies and aircraft on routes between Ronald Reagan Washington National Airport and domestic airports within or beyond the airport's 1,250-mile perimeter.[1] Accordingly, by Notice on June 24, 2024, the Department sought applications for the 10 exemptions. By Order 2024-10-11, issued on October 16, 2024, the Department directed all interested persons to show cause why we should not make final our tentative findings and conclusions stated therein and award two slot exemptions at DCA to each of five air carriers to operate new nonstop roundtrip service. We gave interested persons 14 calendar days to file objections or comments to Order 2024-10-11 and 7 business days thereafter to file answers to any objections or comments.

## III. SUPPORTING COMMENTS

The Department received comments in support of its tentative findings and conclusions from Alaska, American, Delta, Southwest, and United.[2, 3] These parties support the Department's assessment of the statute, and the Department's determination of the competitive benefits associated with our tentative allocation of the 10 additional slot exemptions at DCA.

**Comments of Alaska**

In its comments to the Department, Alaska supports the Department's tentative determination that Alaska is *eligible* in this proceeding as a limited incumbent. Additionally, Alaska supports the Department's tentative determination that Frontier and Spirit are *ineligible* to apply for slot exemptions in this proceeding. Alaska also states that its codeshare relationship with American is strictly limited by its formal settlement agreement related to the acquisition of Virgin America. Alaska alleges that the nature of its relationship with American does not make it an "affiliated

---

[1] FAA Reauthorization Act of 2024, Pub L. No. 118-63 (May 16, 2024) ("FAA 2024").

[2] DOT-OST-2024-0065-23590, Comments of Alaska Airlines, Inc. on Show Cause Order 2024-10-11; DOT-OST-2024-0065-23585, Comments of American Airlines, Inc.; DOT-OST-2024-0065-23584, Comments of Delta Air Lines, Inc.; DOT-OST-2024-0065-23593, Comments of Southwest Airlines Co. to Order to Show Cause; DOT-OST-2024-0065-23588, Comments of United Airlines, Inc.

[3] The San Diego Congressional Delegation and California Senate Delegation also filed letters in support of the Department's tentative findings and conclusions.

carrier" of American at DCA, and that Alaska cannot, and will not, place American's code on Alaska-operated DCA-SAN flights.

## IV. OBJECTIONS

Objections to Order 2024-10-11 were filed by JetBlue Airways Corporation (JetBlue), Frontier Airlines, Inc. (Frontier), Spirit Airlines, Inc. (Spirit), and the San Jose Mineta International Airport (SJC Airport).[4]

**Objection of JetBlue**[5]
In objection to Order 2024-10-11, JetBlue argues that the Department's decision in this proceeding contrasts with stated policy goals with respect to competition in the airline industry. JetBlue objects to the Department's selections, stating that the Department rejects the "three smallest applicants who deliver lower-fare competition."[6] JetBlue alleges that the Department, in making final its tentative findings and conclusions, would "further erode competition" with an award of slot exemptions to "high-fare legacy carriers." JetBlue states that the Department's decision in this proceeding, and in other actions, has strengthened the position of dominant carriers and challenged the growth of smaller carriers. Further, JetBlue reiterates its own comments made on the public record for this proceeding regarding the alleged noncompliance of United's application for slot exemptions, and United's history of strong public opposition to additional slot exemptions at DCA.

Finally, JetBlue objects to the Department's analysis of air fares in the Washington-San Juan market. JetBlue states that the assessment of air fares is not adjusted for the stage-length of proposed routes, and therefore does not provide an accurate comparison for beyond-perimeter routes at DCA.

**Objection of Frontier**[7]
Frontier objects to the Department's tentative determination that the carrier is ineligible to apply for slot exemptions in this proceeding as a limited incumbent air carrier. Frontier alleges that because the statutory definition of new entrant does not distinguish between slots and slot exemptions, Frontier cannot be classified as such due to its status as a carrier operating with slot exemptions at DCA at the time of the enactment of FAA 2024. Further, Frontier states that the Department, in previous proceedings, has treated it as a limited incumbent air carrier.[8] Finally, Frontier reiterates that because § 41714(h)(5)(B) does not specify a lower limit for slot holdings to be counted when considering the classification of DCA air carriers, Frontier – which holds

---

[4] Additional comments in opposition were filed by Exhaustless, Inc. *See* DOT-OST-2024-0065-23583, as discussed below.
[5] DOT-OST-2024-0065-23589, Objection of JetBlue Airways Corporation.
[6] *Id.*
[7] DOT-OST-2024-0065-23586, Frontier Airlines, Inc. (Objection to Order to Show Cause).
[8] *Id.*

zero (0) slots at DCA when slot exemptions are excluded – remains eligible as a limited incumbent.

Frontier also objects to the Department's tentative determination of Alaska's eligibility as a limited incumbent air carrier in this proceeding. Frontier alleges that this approach is contrary to a plain reading of the statute, that the tentative determination is not supported by the legislative history or congressional intent of 49 U.S.C. § 41714(k), and that Alaska's codeshare relationship with American provides the carrier with meaningful access at DCA.

**Objection of Spirit**[9]

Spirit objects to the Department's tentative determination that the carrier is ineligible to apply for slot exemptions in this proceeding in the limited incumbent air carrier category. Specifically, Spirit objects to the tentative conclusion that carriers eligible to obtain slot exemptions in this proceeding must have been incumbents providing air transportation at DCA on the date of the enactment of FAA 2024. Spirit alleges that the word "incumbent" is not defined in any relevant statute or regulation, and that the text of FAA 2024 does not depart from past slot exemption provisions. Additionally, Spirit states that prior versions of the statute – prior to the amendment made by Congress in enacting FAA 2024 – utilize the term "operates," not "incumbent," when referring to air carriers providing service at an airport. Therefore, Spirit argues that FAA 2024 does not require a carrier to be operating on the date of enactment to qualify as a limited incumbent in this proceeding. Spirit asks that the Department amend its tentative determination and recognize the carrier as an eligible limited incumbent in this proceeding.

Spirit also objects to the Department's tentative determination of Alaska's classification as a limited incumbent air carrier in this proceeding. Spirit alleges that the Department misclassified Alaska, contrary to § 41714(k). According to Spirit, Alaska's codeshare relationship with American disqualifies Alaska from consideration as a limited incumbent. Spirit notes that FAA 2024 does not amend the statutory definition of limited incumbent or affiliated air carriers. Finally, Spirit objects to the Department's assessment of the legislative history for § 41714(k). Spirit asks that the Department amend its tentative determination and re-categorize Alaska as a non-limited incumbent in this proceeding.

**Objection of San Jose Mineta International Airport**[10]

SJC Airport objects to the Department's tentative determination that Spirit is ineligible to apply for slot exemptions in this proceeding. SJC Airport states that Spirit's application to serve its airport is consistent with the statutory criteria provided by FAA 2024 and would enable new, competitive service between Washington, D.C. and the South Bay region.

---

[9] DOT-OST-2024-0065-23587, Objection of Spirit Airlines to Order to Show Cause.

[10] DOT-OST-2024-0065-23591, San Jose Mineta International Airport (Objection to Show Cause Order 2042-10-11).

**Objection of Exhaustless Inc.**[11]
Exhaustless Inc. (Exhaustless) opposes the Department's tentative findings and conclusions in Order 2024-10-11. Exhaustless states that, in awarding additional slot exemptions at DCA, the Department "has tentatively decided to purloin all supplier and consumer airspace reservations serving D.C. Airport – and those serving every other airport in the United States – from Exhaustless' multi-sided market-clearing service," and "unlawfully 'grant' to certain carriers a title of heredity for those reservations to use the public's airspace."[12]

## V. RESPONSES TO OBJECTIONS

**Answer of Alaska**[13]
In its answer of November 8, Alaska opposes the objections of Spirit and Frontier, which allege that Alaska's codeshare agreement with American disqualifies it from being classified as a limited incumbent. Alaska argues that the context and legislative history of the relevant statute are valid, of relevance, and support the Department's tentative determination. Alaska, in support of its argument, provides additional legislative history for the relevant statute.[14]

Additionally, Alaska restates its argument that Spirit and Frontier are not eligible to apply for slot exemptions in this proceeding. Alaska disputes Spirit's contention that certain, more specific wording in the statute would need to specify that eligible carriers had to be providing air transportation at DCA as of the date of enactment of FAA 2024. Alaska also restates its support for the Department's tentative determinations regarding air carrier eligibility. Alaska again states that Spirit is not eligible as a limited incumbent in this proceeding because it does not meet a plain-meaning definition of "incumbent." Regarding Frontier, Alaska states that the statutory language is unambiguous in that it classifies Frontier as a new entrant, and thus as ineligible to receive slot exemptions under the criteria established by FAA 2024.

**Reply of Spirit**[15]
Spirit filed a consolidated reply in response to Alaska and Frontier. Spirit disputes the comments of Alaska, which supports its eligibility in the limited incumbent category. Spirit alleges that the settlement agreement related to Alaska's acquisition of Virgin America does not supersede the relevant statute, § 41714(k), and thus does not make Alaska eligible in that category. Spirit reiterates that Alaska does gain meaningful access to DCA via its relationship with American, and that § 41714(k) does not specify the type of code-sharing relationship that is, or is not, applicable under that section. Finally, Spirit reiterates its opposition to Alaska's and the Department's interpretation of the legislative history, and the inclusion of such history in the record for this proceeding.

---

[11] DOT-OST-2024-0065-23583, Exhaustless Inc. (Opposition to Show Cause Order 2024-10-11).
[12] *Id.* at 2.
[13] DOT-OST-2024-0065-23596, Answer of Alaska Airlines, Inc.
[14] *Id.* at 8.
[15] DOT-OST-2024-0065-23594, Consolidated Reply of Spirit Airlines, Inc.

Spirit also reiterates its argument that Frontier is not eligible as a limited incumbent in this proceeding. Spirit disputes Frontier's interpretation of the relevant statute and statutory criteria for FAA 2024.

Finally, Spirit alleges that the Department's tentative award of two slot exemptions to United for service between DCA-SFO violates the statutory criteria provided by FAA 2024. Spirit argues that an award to United does not meet the relevant statutory criteria because the service would not be between DCA and an unserved airport, and because the service does not have a positive impact on the overall level of competition in the Washington-San Francisco market.

**Motion for Leave to File and Supplement Objection of Frontier**[16]
On November 26, 2024, Frontier filed a Motion for Leave to File and Supplement Objection. Therein, Frontier stated that its initial submission in this proceeding did not include information with respect to the starting date or aircraft type for the service proposed. Frontier acknowledges that such information is not relevant to the Department's determination regarding its eligibility in this proceeding but seeks leave to submit the additional information as required by 14 CFR § 302.6. Frontier states that good cause exists for granting it leave to file the relevant information. Frontier therefore informs the Department that it would operate the proposed DCA to San Juan Puerto Rico (SJU) service with Airbus A320 family aircraft with between 180 and 240-seats, and that the proposed service would arrive daily at DCA at 1630 EST, departing to SJU at 1730 EST. Frontier provides a desired starting date of March 6, 2025, for the proposed service.

## VI. DECISION

The Department finalizes its tentative findings and conclusions set forth in Order 2024-10-11, and awards two slot exemptions from the application of 49 U.S.C. §§ 49104(a)(5), 49109, 41714, and 14 C.F.R. Part 93, Subparts K, S, and T pursuant to 49 U.S.C. § 41718(i), to each of five non-limited or limited incumbent air carriers – Alaska, American, Delta, Southwest, and United – to operate new nonstop roundtrip service at DCA. Comments of the objecting parties have been carefully considered, and do not provide a basis for the Department to change the tentative conclusions reached by the Department in this proceeding.

**Discussion**
The Department has decided to finalize the tentative findings, conclusions, and selections in the show-cause order. In reaching this decision, the Department again notes that the statutory criteria provided by FAA 2024 limit our discretion when awarding the new slot exemptions, leaving little room to address a full range of competition issues in a manner consistent with past practice. The statute does so first by requiring air carriers, in addition to qualifying as either limited or non-limited incumbents, to also be incumbents at DCA (*i.e.*, providing air transportation) on the date of enactment of FAA 2024 to be eligible. Second, the amended statute, unlike its prior versions,

[16] DOT-OST-2024-0065-23600, Motion for Leave to File and Supplement Objection of Frontier Airlines, Inc. to Order to Show Cause (Corrected).

excludes new entrants from participating in this proceeding. Though both choices by Congress narrow the Department's ability to classify and consider all carriers and business models for the available slot exemptions, the Department has applied the statutory criteria to the applications while maximizing the competitive and public benefits contemplated by FAA 2024.

With respect to the objection of JetBlue, the Department is not persuaded to amend its decision and select JetBlue's proposal for a second-daily service in the DCA-SJU market or for daily service between DCA and Los Angeles, California (LAX). The Department considers and rejects JetBlue's comments with respect to its competitive position at DCA relative to the awardees and other applicants in this proceeding. In affirming our tentative findings, we note that FAA 2024 directs the Department to expressly consider the impact of proposed service on competition in the markets that will be served to/from DCA. While JetBlue may be a smaller competitor at DCA, its status as the sole-operator of DCA-SJU service, and commanding share of local origin/destination customers on this route outweigh, in this case, the competitive merits of a slot exemption award. As noted in Order 2024-10-11, our analysis of widely available market data finds that JetBlue carried approximately 80 percent of customers traveling between DCA-SJU for the year-ending first quarter of 2024.[17] JetBlue, therefore, competes only minimally with other DCA carriers for customers in this market, despite its smaller overall scale. With an additional DCA-SJU frequency, JetBlue's incentive to compete with other carriers in this market may be reduced further. The Department also considers and rejects JetBlue's comments with respect to our analysis of air fares. The Department balanced a variety of competitive factors while adhering to the statutory criteria in this proceeding- of which air fare was one. Adjusting our analysis post-hoc, to account for the stage-length of routes proposed, would not make a material difference or lead to different tentative findings and conclusions. In consideration of the above factors and statutory criteria, the Department affirms its tentative conclusion that an award to JetBlue for DCA-SJU service would not enhance air travel options in an unserved beyond-perimeter market, nor do the benefits of the proposed service outweigh those of other applicants selected in this proceeding.

Regarding the objections of Spirit and Frontier, and based upon the statutory text provided by Congress, the Department is not persuaded by the arguments the carriers make regarding their eligibility in this proceeding. In its objection, Frontier does not provide arguments that the Department did not already consider in issuing Order 2024-10-11. Our determination is therefore unchanged, and the Department finds that under the applicable statutes and regulations, Frontier is a new entrant carrier at DCA and does not qualify as a limited incumbent carrier in this proceeding.[18]

The arguments made by Spirit and SJC Airport do not provide a further persuasive basis to change our approach vis-à-vis Spirit's eligibility in this proceeding. Spirit's argument, that

---

[17] Bureau of Transportation Statistics Airline Origin and Destination Survey (DB1B).
[18] The Department grants Frontier's Motion for Leave to File of November 26, 2024. However, the supplemental filing does not present new arguments, or information persuasive to the Department with respect to the carrier's eligibility in this proceeding.

section 502 of FAA 2024 does not use certain wording such as the term "operates," is not supported by a plain reading of the statute as it existed at the time the Department was required to apply it in this proceeding. Further, Spirit's argument is not supported by the preceding amendment to the statute that added slot exemptions at DCA.[19] The preceding amendment to the statute that added slot exemptions required the Secretary to "make 8 available to limited incumbent air carriers or new entrant air carriers."[20] In this matter, the relevant statute contains additional qualifying language requiring the Secretary to "make 2 [slot exemptions] available to incumbent air carriers qualifying for status as a limited incumbent carrier."[21] Therefore, as stated in Order 2024-10-11, the Department determines that the amended statute presents a clear two-part test for determining carrier qualification in this proceeding. Spirit did not provide air transportation at DCA on the date of the enactment of FAA 2024. Therefore, the Department cannot reasonably determine that Spirit is an "incumbent carrier qualifying as a limited incumbent." The relevant question is not whether Spirit could be a limited incumbent under the terms of § 41714(h)(5), but whether Spirit was an incumbent at DCA on May 16, 2024. Spirit was not.

The Department also considered all arguments with respect to Alaska's eligibility. The Department notes that the only two parties to question Alaska's eligibility—Spirit and Frontier—are not themselves eligible, and therefore are not directly injured or affected by our determination that Alaska is eligible as a limited incumbent. The Department's tentative determination in the show cause order, finalized herein, that Alaska is a limited incumbent for the purposes of this proceeding, is based upon the best reading of the applicable statutes. The Department reads §41714(k), which is a generally applicable statute, in the context of the specific language in FAA 2024, which clearly requires the Department to grant slot exemptions for two different categories of carriers operating at the airport, using a set of specific and narrow qualifying criteria without reference to codeshare agreements. Section 41714(k) is properly interpreted to exclude regional affiliates from obtaining slot exemptions that would likely be controlled by the larger mainline incumbents.[22]

Alaska has demonstrably fewer slots and slot exemptions at DCA in comparison to larger incumbents. And like other carriers operating at DCA, Alaska has codeshare arrangements that the carrier uses to expand the breadth of destinations it offers to customers traveling to/from points in its network. As stated in Order 2024-10-11, the code-sharing relationship between Alaska and American at DCA does not include slot-sharing provisions, does not increase the slot holdings of the dominant carrier at DCA (i.e., American), and does not place Alaska-operated

[19] 49 U.S.C. § 41718(g).
[20] 49 U.S.C. § 41718(g)(2).
[21] 49 U.S.C. § 41718(i)(3).
[22] For example, larger mainline carriers may enter into agreements (such as a fee per-departure arrangement) with regional affiliates that operate services under the mainline carrier's marketing control. In such arrangements, the non-marketing carrier may hold and operate slots at an airport but does not compete directly with the mainline/marketing carrier. This is not the case for Alaska and American at DCA, where both carriers operate independently under their own marketing control.

slots under the marketing control of American (i.e., American cannot place its code on any Alaska flight originating or terminating at DCA).

Reading the statute as a whole, the best interpretation is that Alaska is a limited incumbent carrier. Reading § 41714(k) rigidly as Spirit and Frontier urge us to do, detracts from the broader text and purpose of the statute, which provides slot exemptions to address competition and access issues at DCA. Moving Alaska into the non-limited incumbent category would result in a suboptimal outcome, reducing the maximum public benefits available from these scarce assets. As Spirit and Frontier are ineligible (and no other eligible applications were received in the limited incumbent category), placing Alaska in the non-limited incumbent category would necessarily result in one of the five slot pairs going unallocated, and therefore not fulfill the directive of Congress to allocate the five slot pairs. We are therefore not persuaded to amend our tentative determination.

Finally, with respect to the objection of Exhaustless, the Department finds the arguments stated therein to be outside of the scope of this proceeding and not directly relevant to the statutory requirements imposed by Congress.

With consideration for the above, the Department finalizes its tentative findings and conclusions set forth in Order 2024-10-11.

## VII.    CONDITIONS

**Start-up**
Carriers are expected to inaugurate full service within 90 days following the date of service of this Order, unless otherwise requested, and approved, in writing by the Department in docket DOT-OST-2024-0065. If, for any reason, an awardee is not able to use the slot exemptions awarded, the carrier shall notify the Department not later than ten (10) days after the date of service of this Order.

**Assignment of Slot Times**
In coordination with the Federal Aviation Administration (FAA) Slot Administration Office, the Department will assign slot times corresponding with the authority granted in this proceeding, and in accordance with the requirements of FAA 2024.[23] The Department directs Alaska, American, Delta, Southwest, and United to work with the FAA Slot Administration Office to identify slot times for these new operations. Carriers are asked for flexibility and cooperation with the statutory cap for slot exemption assignments. Carriers may be required to justify the viability of proposed service during available slot exemption hours. Final slot times will be assigned in a notice subsequent to our decision.

---

[23] As stated in the Department's June 24, 2024 Notice, and in Order 10-11-2024, 49 U.S.C. § 41718(C)(2)(ii) allows the Department to assign two additional slot exemptions per one hour period (for a total of five). There are 15 hourly periods between 7:00 a.m. EST and 9:59 p.m. EST, and all slot exemptions must fit into the combined 75 slot times during these periods. Applicants were advised of these constraints, including that multiple periods have already reached the statutory cap for slot exemption assignments.

**Environmental Issues**

49 U.S.C. § 41718(e) specifically exempts our action here from review under the National Environmental Policy Act. Additionally, under 49 U.S.C. § 47117(e), the Department will continue to give DCA priority in making grants for airport noise compatibility planning and programs.[24]

**Administrative Terms**

49 U.S.C. § 417149(j) prohibits awardees from selling, trading, transferring, or conveying the operating authorities granted by the subject exemptions, except through an air carrier merger or acquisition. Additionally, the Department prohibits carriers from using the operating authorities granted by the subject exemptions to conduct air transportation to points other than those approved by this Order.

This Order is issued under authority redelegated by the Under Secretary of Transportation in 49 CFR § 1.25a(b)(6)(ii)(D) to the Assistant Secretary for Aviation and International Affairs.

**ACCORDINGLY,**

1. We make final our findings and conclusions as stated in Order 2024-10-11 and grant additional slot exemptions pursuant to 49 U.S.C. § 41718(i) to Alaska Airlines, Inc. (two slot exemptions to serve San Diego International Airport); American Airlines, Inc. (two slot exemptions to serve San Antonio International Airport); Delta Air Lines, Inc. (two slot exemptions to serve Seattle-Tacoma International Airport); Southwest Airlines Co. (two slot exemptions to serve Las Vegas Harry Reid International Airport); and United Airlines, Inc. (two slot exemptions to serve San Francisco International Airport);

2. The Department directs Alaska Airlines, Inc., American Airlines, Inc., Delta Air Lines, Inc., Southwest Airlines Co., and United Airlines, Inc. to file in Docket DOT-OST-2024-0065 no later than ten (10) business days after the service date of this Order their proposed flight schedules and effective date for operations authorized by this Order. Further, the awardees must commence their service by no later than March 17, 2025, unless otherwise requested and approved in writing by the Department;

3. The Department directs the awardees to contact the FAA Slot Administration Office regarding their proposed schedules associated with the slot exemptions. FAA will assign slot exemption numbers, effective dates, and operating times consistent with statutory limitations. The Department will coordinate with the FAA Slot Administration Office to make a final assignment of operating times for these slot exemptions in a separate notice, as soon as possible;

---

[24] The Department expects all operations conducted with the additional slot exemptions to utilize single-aisle aircraft meeting, at minimum, FAA Stage 3 noise standards as required by 49 U.S.C. § 41718(c).

4.  The slot exemptions granted under 49 U.S.C. § 41718(i) may not be used for operations between the hours of 10:00 p.m. and 7:00 a.m., and the exemptions granted under 49 U.S.C. § 41718 (a), (b), (g), and (i) may not increase the number of operations at Ronald Reagan Washington National Airport in any one-hour period during the hours of 7:00 a.m. and 9:59 p.m. by more than five operations;

5.  Except as otherwise granted, we deny all other applications for slot exemptions filed in this docket;

6.  The Department prohibits Alaska Airlines, Inc., American Airlines, Inc., Delta Air Lines, Inc., Southwest Airlines Co., and United Airlines, Inc. from selling, trading, transferring, or conveying the operating authorities granted by the subject exemptions, except through an air carrier merger or acquisition;

7.  The Department prohibits Alaska Airlines, Inc., American Airlines, Inc., Delta Air Lines, Inc., Southwest Airlines Co., and United Airlines, Inc. from using the operating authorities granted by the subject exemptions to conduct air transportation to points other than those approved by this Order;

8.  The authorities granted under these exemptions are subject to all of the other requirements delineated in 14 C.F.R. Part 93, Subparts K and S, including, but not limited to, the reporting provisions and use-or-lose requirements set forth in 14 C.F.R. § 93.227;

9.  The Department denies the motion of JetBlue Airways Corporation to disqualify United from consideration for an award of DCA beyond-perimeter exemption slots, filed on July 10, 2024;

10. The Department grants the motion seeking leave to file otherwise unauthorized documents submitted by Frontier Airlines, Inc. in the docket;

11. This docket will remain open until further order of the Department; and

12. We will serve this Order on all parties on the service list in this docket.

By:

**CAROL A. (ANNIE) PETSONK**
Assistant Secretary for Aviation
and International Affairs

(SEAL)

An electronic version of this document will be available online at:
https://www.regulations.gov

**BEFORE THE**
**DEPARTMENT OF TRANSPORTATION**
**OFFICE OF THE SECRETARY**
**WASHINGTON, DC**

Establishment of Slot Exemption Proceeding )
At Ronald Reagan Washington National Airport ) Docket DOT-OST-2024-0065
Pursuant to 49 U.S.C. § 41718 )

**NOTICE OF ALASKA AIRLINES, INC.**

Pursuant to the Department's Order 2024-12-8, ordering paragraph 2, Alaska Airlines, Inc. ("Alaska") hereby submits its proposed flight schedule and effective date for operations for daily roundtrip nonstop service between Ronald Reagan Washington National Airport ("DCA") and San Diego International Airport ("SAN"). In accordance with ordering paragraph 3, the FAA Slots Administration Office has notified Alaska that it may use the following slot times:

| Flight | Eff Date | Freq | Slot ID | Time |
|---|---|---|---|---|
| AS 14 | 17-Mar-25 | 1234567 | 11117 | 2100 |
| AS 15 | 18-Mar-25 | 1234567 | 11118 | 0800 |

Alaska will use single-aisle Boeing 737 aircraft that complies with FAA Stage 3 noise standards as required by 49 U.S.C. § 41718(c).

Respectfully submitted,

David Heffernan
Michael Deutsch

Counsel for
**ALASKA AIRLINES, INC.**