**[ORAL ARGUMENT NOT SCHEDULED]**
**No. 25-1002**

_____

**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———————————————

FRONTIER AIRLINES, INC.,

Petitioner,

v.

UNITED STATES DEPARTMENT OF TRANSPORTATION,

Respondent,

ALASKA AIRLINES, INC.,

Respondent-Intervenor.

———————————————

On Petition for Review of a Final Order
of the United States Department of Transportation

———————————————

**BRIEF FOR PETITIONER FRONTIER AIRLINES, INC.**

———————————————

Aaron Schaer                        Lorene L. Boudreau
 _Counsel of Record_                BALLARD SPAHR LLP
BALLARD SPAHR LLP                   1735 Market St., 51st Floor
13313 Balfour Ave.                  Philadelphia, PA 19103-7599
Huntington Woods, MI 48070          (215) 864-8245
(206) 223-7103                      boudreaul@ballardspahr.com
schaera@ballardspahr.com

_Counsel for Petitioner Frontier Airlines, Inc._

_____

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

Petitioner Frontier Airlines, Inc. (Frontier) in Case No. 25-1002 hereby submits this updated certificate as to parties, rulings, and related cases, certifying as follows:

**A.    Parties and Amici.**

Petitioner

The Petitioner in this matter is Frontier. Pursuant to Federal Rule of Appellate Procedure 26.1 and Circuit Rule 26.1, a Corporate Disclosure Statement for Frontier was provided to the Court with the Petition for Review filed January 3, 2025 and assigned Docket No. 25-1002.

Respondent

The Respondent in this matter is the United States Department of Transportation (DOT).

Intervenors

On January 27, 2025, the Court granted the motion of Alaska Airlines, Inc. (Alaska) to intervene in support of Respondent.

*Amici*

Frontier is not aware of any *amici* in this matter to date.

### B.    Rulings Under Review.

Pursuant to 49 U.S.C. § 46110(a) and (c), 5 U.S.C. § 706, and Federal Rule of Appellate Procedure 15(a), Frontier seeks partial review of DOT's Final Order styled as DOT Order 2024-12-8, Docket DOT-OST-2024-0065-23605, *see* J.A. 485–96, as well as all interlocutory orders, decisions, determinations, and conclusions supporting the above Final Order.

### C.    Related Cases.

The case on review has not previously been before this Court or any other court. On February 14, 2025, Alaska filed a Petition for Review, docketed as *Alaska Airlines, Inc. v. United States Department of Transportation*, No. 25-1062 (D.C. Cir.). Alaska requests that its Petition be consolidated with the present case because Alaska conditionally challenges the same DOT Final Order—albeit a different part than Frontier challenges. Alaska Pet. at 1. Alaska describes its Petition for Review as a "conditional cross-petition," requesting that, if the Court grants Frontier relief related to the Final Order's decision regarding slot exemptions for limited incumbents, Alaska be allowed "to seek vacatur of the full Order so Alaska can apply to DOT as a non-limited incumbent air carrier for slot exemptions allocated to that other category of carriers." *Id.* at 1–2. As of this filing, Alaska's Petition for Review has not been consolidated with Case No. 25-1002.

Frontier is not aware of any other related cases currently pending in this Court or any other court within the meaning of Circuit Rule 28(a)(1)(C).

## CORPORATE DISCLOSURE STATEMENT

Frontier is a Colorado corporation wholly owned by Frontier Airlines Holdings, Inc., a Delaware corporation. Frontier Airlines Holdings, Inc. is wholly owned by Frontier Group Holdings, Inc., a Delaware publicly-traded corporation. There are four entities that own greater than ten percent of Frontier Group Holdings, Inc.: William A. Franke; Indigo Denver Management Company, LLC; Group Holdings – Frontier LLC; and Wildcat Partner Holdings LP. Frontier is an ultra-low-fare air carrier headquartered in Denver, Colorado that provides passenger service throughout the United States and to select international destinations in the Americas.

# **TABLE OF CONTENTS**

**Page**

CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES ............. i

CORPORATE DISCLOSURE STATEMENT ........................................ iv

TABLE OF AUTHORITIES ………………………………………………...vi

GLOSSARY.................................................................................. x

I.      INTRODUCTION................................................................ 1

II.     JURISDICTIONAL STATEMENT......................................... 3

III.    STATEMENT OF ISSUES.................................................... 4

IV.     STATUTES AND REGULATIONS ...................................... 5

V.      STATEMENT OF THE CASE .............................................. 5

    A.      Statutory and regulatory background........................ 5

    B.      Slot exemption proceedings at DCA. ....................... 9

    C.      Current proceedings. ............................................. 11

VI.     SUMMARY OF ARGUMENT ........................................... 16

VII.    STANDING...................................................................... 19

VIII.   ARGUMENT ................................................................... 21

    A.      Standard of Review............................................... 21

    B.      Because Frontier is an incumbent at DCA and holds and operates "fewer than" 40 slots, DOT erred by not qualifying Frontier as eligible for the slot exemptions made available to "limited incumbent carriers." .................... 23

    C.      DOT erred by disregarding the statute's text and qualifying Alaska as an eligible limited incumbent despite Alaska's codeshare agreement that increases its slot holdings to well above the 20 slot threshold for disqualification..................................................... 30

    D.      Remedy. ................................................................ 36

IX.     CONCLUSION ................................................................ 36

# TABLE OF AUTHORITIES*

**Page(s)**

**Federal Cases**

*Barnhart v. Sigmon Coal Co.*,
   534 U.S. 438 (2002)................................................................27

*Burlington Truck Lines, Inc. v. United States*,
   371 U.S. 156 (1962)................................................................26

*City of N.Y. v. Minetta*,
   262 F.3d 169 (2d Cir. 2001) ......................................................6

*Eagle Pharms., Inc. v. Azar*,
   952 F.3d 323 (D.C. Cir. 2020)............................................26, 34

*Exhaustless Inc. v. FAA*,
   931 F.3d 1209 (D.C. Cir. 2019)................................................19

*FCC v. Prometheus Radio Project*,
   592 U.S. 414 (2021)................................................................21

*Gorman v. NTSB*,
   558 F.3d 580 (D.C. Cir. 2009)............................................17, 24

*Gross v. FBL Fin. Servs., Inc.*,
   557 U.S. 167 (2009)................................................................26

*Kreis v. Sec'y of the Air Force*,
   406 F.3d 684 (D.C. Cir. 2005)................................................30

*Lake Region Healthcare Corp. v. Becerra*
   113 F.4th 1002 (D.C. Cir. 2024)........................................22, 31

*LeMoyne–Owen Coll. v. NLRB*,
   357 F.3d 55 (D.C. Cir. 2004)..................................................30

---

*Authorities upon which we chiefly rely are marked with asterisks.

*Loper Bright Enters. v. Raimondo*,
603 U.S. 369 (2024)...........................................................1, 22, 30

*Lujan v. Defs. of Wildlife*,
504 U.S. 555 (1992).................................................................19

*Maracich v. Spears*,
570 U.S. 48 (2013).................................................................27

*Mesa Air Grp., Inc. v. DOT*,
87 F.3d 498 (D.C. Cir. 1996).......................................................3

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
463 U.S. 29 (1983)..............................................................21, 26

*Pacific Gas v. FERC*,
113 F.4th 943 (D.C. Cir. 2024)..............................1, 21, 22, 25, 31

*Republic Airline Inc. v. DOT*,
669 F.3d 296 (D.C. Cir. 2012)................................1, 6, 21, 30

*Safe Extensions, Inc. v. FAA*,
509 F.3d 593 (D.C. Cir. 2007).....................................................22

*SEC v. Chenery Corp.*,
332 U.S. 194 (1947).................................................................21

*SW General, Inc. v. NLRB*,
796 F.3d 67 (D.C. Cir. 2015).......................................................27

*U.S. Sugar Corp. v. EPA*,
113 F.4th 984 (D.C. Cir. 2024)..............................................22, 27, 31

**Federal Statutes**

5 U.S.C. § 706.........................................................................4

5 U.S.C. § 706(2)(A)..................................................................21

49 U.S.C. § 41714......................................................................6

49 U.S.C. § 41714(a)(2)...............................................................6

49 U.S.C. § 41714(h)............................................................8, 13, 23

49 U.S.C. § 41714(h)(1) .........................................................................34

*49 U.S.C. § 41714(h)(3) ....................................................7, 10, 17, 25

49 U.S.C. § 41714(h)(4) ....................................................................5, 6

*49 U.S.C. § 41714(h)(5) .................................. 7, 16, 20, 23, 24, 25, 30

49 U.S.C. § 41714(h)(5)(B) (2001) ..........................................7, 24, 25

*49 U.S.C. § 41714(k) ............................ 2, 8, 12, 14, 15, 18, 20, 31, 32, 33, 34, 36

49 U.S.C. § 41718.................................................................................31

*49 U.S.C. § 41718(i) ..................................................................3, 11, 31

49 U.S.C. § 41718(i)(2) ....................................................................7, 11

*49 U.S.C. § 41718(i)(3) .......................... 2, 4, 11, 16, 18, 20, 23, 27, 30

49 U.S.C. § 41718(a) .............................................................................9

49 U.S.C. § 41718(g)(2) ......................................................................10

49 U.S.C. § 46110(a) .............................................................................3

49 U.S.C. § 46110(c) ...............................................................19, 22, 36

Pub. L. 106-181, § 231, 114 Stat. 61, 108 (Apr. 5, 2000) ..............7, 9, 34

Pub. L. No. 103-305, § 206, 108 Stat. 1569, 1587 (Aug. 23, 1994).........7

Pub. L. No. 108-176, § 425, 117 Stat. 2490, 2555 (Dec. 12, 2003) ........9

Pub. L. No. 112-95, § 414, 126 Stat. 11, 90 (Feb. 14, 2012) .................10

Pub. L. No. 118-63, § 502, 138 Stat. 1025, 1187–88 (May 16, 2024) ...............3, 11

**Regulations**

14 C.F.R. pt. 93, subpts. K & S .........................................................5, 6

14 C.F.R. § 93.123 .................................................................................6

14 C.F.R. § 93.123(a)–(b)......................................................................9

14 C.F.R. § 93.123(c)(2) ........................................................................34

14 C.F.R. § 93.213 ..................................................................................6

*14 C.F.R. § 93.213(a)(1) ...................................................................7, 17

14 C.F.R. § 93.213(a)(2) .........................................................................6

*14 C.F.R. § 93.213(a)(5) .......................................................7, 16, 24, 25

14 C.F.R. § 93.223(c)(3) ........................................................................25

14 C.F.R. § 93.225(h) ............................................................................25

57 Fed. Reg. 37,308 (Aug. 18, 1992).....................................................5, 7

71 Fed. Reg. 77,854 (Dec. 27, 2006) ........................................................5

## Other Authorities

Air Transp. Agreement Between The Gov't Of The U.S. And The
    Gov't Of Can., State Dept. No. 07-74, 2007 WL 4864001 (Mar.
    12, 2007) ...........................................................................................12

Airport Monopolization: Barriers to Entry & Impediments to
    Competition: Hearings On the State of Competition In the Airline
    Industry Before the H. Comm. on the Judiciary, 106th Cong. 2d.
    Sess., 2000 WL 780670 (June 14, 2000) ............................................8

H.R. Rep. No. 106-167, pt. 2 (June 9, 1999) ............................................6

H.R. Rep. No. 106-513 (Mar. 8, 2000) ...................................................34

# **<u>GLOSSARY</u>**

| | |
|---|---|
| DCA | Ronald Reagan Washington National Airport |
| DOT | Department of Transportation |
| FAA | Federal Aviation Administration |
| FAA 2024 | FAA Reauthorization Act of 2024, Pub. L. No. 118-63, 138 Stat. 1025, 49 U.S.C. § 41718(i) |
| J.A. | Joint Appendix |

## I.    **INTRODUCTION**

This case involves basic legal principles—such as that statutes must be construed according to their plain meaning, *Pacific Gas v. FERC*, 113 F.4th 943, 947–48 (D.C. Cir. 2024), and that a federal agency "must treat similar cases in a similar manner unless it can provide a legitimate reason for failing to do so," *Republic Airline Inc. v. DOT*, 669 F.3d 296, 299 (D.C. Cir. 2012) (citation omitted)—which the Department of Transportation (DOT) repeatedly disregarded. DOT admittedly reached atextual conclusions, introduced conflicts into the statute, created for itself discretionary rules where none exist, and contradicted its prior holdings without any explanation. Because DOT's actions do not come close to applying the "single, best meaning" of the relevant statute, *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 400 (2024), Frontier's Petition should be granted and DOT's Final Order should be partially vacated.

The DOT order under review arises from the FAA Reauthorization Act of 2024 (FAA 2024), in which Congress empowered DOT to award 10 "slot exemptions"—takeoff and landing rights—at Ronald Reagan Washington National Airport (DCA). Two slot exemptions for a new domestic roundtrip flight were made available to "incumbent air carriers qualifying for status as a limited incumbent carrier at [DCA] as of the date of enactment of [FAA 2024]." Thus, the carrier must (1) have operated at DCA on May 16, 2024 (*i.e.*, an "incumbent"); and

(2) hold or operate "fewer than" 40 slots (*i.e.*, a "limited incumbent"). 49 U.S.C. § 41718(i)(3); *id.* § 41714(h)(5)(A). Only one carrier is eligible: Frontier Airlines.

DOT, however, erroneously determined that Frontier is not a limited incumbent—and instead is a "new entrant"—and did not award Frontier the two slot exemptions. DOT then awarded these slot exemptions to Alaska Airlines even though Alaska has a codeshare agreement with American Airlines at DCA where the two carriers hold a combined 522 slots, and the statute expressly disqualifies airlines in a codeshare relationship from applying as "limited incumbents" if their combined slot holdings "exceed 20." 49 U.S.C. § 41714(k).

DOT's action—both disqualifying Frontier, and qualifying Alaska—is arbitrary and capricious. DOT wholly misinterpreted the statute to wrongfully deny Frontier the two limited incumbent slot exemptions. DOT also disregarded—without explanation—its precedent that repeatedly qualified Frontier as a "limited incumbent" carrier in prior slot exemption proceedings. Further, DOT admitted the statute's codeshare provision disqualifies Alaska from these slot exemptions—but expressly chose to not apply it. Neither DOT decision can withstand scrutiny.

Accordingly, Frontier requests that the Court partially vacate DOT's Final Order, and allocate to Frontier the two slot exemptions made available to limited incumbent carriers in FAA 2024.

2

## II.    JURISDICTIONAL STATEMENT

This Court has jurisdiction to review the challenged DOT decision under 49 U.S.C. § 46110(a). *See Mesa Air Grp., Inc. v. DOT*, 87 F.3d 498, 503 (D.C. Cir. 1996). On May 16, 2024, Congress created 10 slot exemptions for flights between DCA and domestic airports, including two for "limited incumbent carriers" at DCA. Pub. L. No. 118-63, 138 Stat. 1025, 1187–88 (2024) (FAA 2024); 49 U.S.C. § 41718(i). DOT issued a Notice requesting applications for these slot exemptions on June 24, 2024. J.A. 174. Following its review of applications for the 10 slot exemptions, DOT issued an Order to Show Cause on October 16, 2024, which, in relevant part, tentatively concluded that Frontier did not qualify for the two slot exemptions provided for "limited incumbents," and tentatively awarded these slot exemptions to Alaska. *Id.* at 402–04.

On December 17, 2024, DOT issued a final order styled as DOT Order 2024-12-8 (Final Order), finalizing its denial of Frontier's application for the two limited incumbent slot exemptions and awarding them to Alaska. *Id.* at 494. DOT directed Alaska to begin service "no later than March 17, 2025." *Id.* Alaska has confirmed that it will do so. *Id.* at 497. Frontier filed its petition for review of DOT's Final Order on January 3, 2025, within the 60-day period set by statute. *See* 49 U.S.C. § 46110(a).

### III.  STATEMENT OF ISSUES

1.  Whether DOT's conclusion that Frontier does not qualify as a "limited incumbent carrier" at DCA even though Frontier operates at DCA with "fewer than" 40 slots—and is therefore ineligible for the slot exemptions made available to a limited incumbent carrier under 49 U.S.C. § 41718(i)(3)—is arbitrary, capricious, an abuse of discretion, contrary to statutory authorization, or otherwise contrary to law under 5 U.S.C. § 706; and

2.  Whether DOT's conclusion that Alaska is eligible for slot exemptions as a "limited incumbent carrier" at DCA even though Alaska has a codeshare agreement with American Airlines and the two carriers' combined slot holdings far exceed the 20-slot threshold for eligibility—and consequently allocating Alaska the only slot exemptions made available to a limited incumbent carrier under 49 U.S.C. § 41718(i)(3)—is arbitrary, capricious, an abuse of discretion, contrary to statutory authorization, or otherwise contrary to law under 5 U.S.C. § 706.

4

## IV.    STATUTES AND REGULATIONS

Pertinent statutes and regulations, as well as a docket entry from the proceeding below, are reprinted in the addendum to this brief.

## V.    STATEMENT OF THE CASE

### A.    Statutory and regulatory background.

To improve airport safety and efficiency, the Federal Aviation Administration (FAA) strictly limits the number of takeoffs and landings at the nation's most congested airports. *See, e.g.*, Operating Limitations at N.Y. LaGuardia Airport, Notice of Order, 71 Fed. Reg. 77,854 (Dec. 27, 2006). Since 1968, it did so in part through regulations called the High Density Rule, which require airlines to obtain some of the capped number of "slots"—*i.e.*, reservations for a takeoff or landing—from the FAA before operating certain flights. 14 C.F.R. pt. 93, subpts. K & S; 49 U.S.C. § 41714(h)(4). Slots come in "pairs" for a roundtrip flight.

New slots are seldom created. And given the value of operating at the nation's busiest airports, carriers are reluctant to sell slots even when they are not being fully utilized. *See* High Density Traffic Airports, 57 Fed. Reg. 37,308–13 (Aug. 18, 1992). The High Density Rule therefore came to be "perceived as a barrier to improved service, in part because new air carriers were unable to

establish service due to the lack of slot availability." *City of N.Y. v. Minetta*, 262 F.3d 169, 172–73 (2d Cir. 2001).

Accordingly, in 1994, Congress provided DOT the ability to grant exemptions from the limits on the number of slots available. *Id.* at 173. These exemptions are "aptly named 'slot exemptions.'" *Republic Airline*, 669 F.3d at 297.

A slot exemption provides the same thing as a slot: "a reservation for a[] . . . takeoff or landing." 49 U.S.C. § 41714(h)(4); 14 C.F.R. § 93.213(a)(2). Neither Congress nor DOT defined "slot exemption" separately from "slot" in the statute or regulations. *See generally* 49 U.S.C. § 41714; 14 C.F.R. § 93.213. And when creating slot exemptions, Congress explained their purpose was to "increase the number of slots available." H.R. Rep. No. 106-167, pt. 2, at 12 (June 9, 1999). What distinguishes them is that "[a] slot exemption is an exemption from the slot limitations in the [FAA's] High Density Rule, 14 C.F.R. Part 93, subparts K and S." J.A. 385 n.2; *see* 49 U.S.C. § 41714(a)(2), (d); *see also* 14 C.F.R. § 93.123. In other words, slot exemptions provide a way to add takeoffs and landings to the otherwise capped slot limit at an airport. Otherwise, in relevant part, slots and slot exemptions are identical.

Congress specifies which carriers can apply for slots and slot exemptions, and how to prioritize applications, by categorizing airlines in one of three ways:

6

(1) **New entrant air carrier**: "[A]n air carrier that does not hold a slot at [DCA] and has never sold or given up a slot at [DCA] after December 16, 1985, and a limited incumbent carrier," 49 U.S.C. § 41714(h)(3), 14 C.F.R. § 93.213(a)(1);

(2) **Limited incumbent air carrier**: "[A]n air carrier or commuter operator that holds or operates fewer than [40] air carrier or commuter slots" at DCA, 49 U.S.C. § 41714(h)(5), 14 C.F.R. § 93.213(a)(5); or

(3) **Non-limited incumbent air carrier**: An air carrier that holds 40 or more slots at DCA.[2]

For the first six years slot exemptions existed, Congress did not mention slot exemptions in the carrier categories. In 2000, Congress first discussed slot exemptions only in the limited incumbent definition, explaining that "'slot' shall include 'slot exemptions'" when counting a carrier's slot holdings and operations. Pub. L. 106-181, § 231, 114 Stat. 61, 108 (Apr. 5, 2000); 49 U.S.C. § 41714(h)(5)(B) (2001). Congress stopped counting slot exemptions toward the slot count for limited incumbents in 2012. *See* 49 U.S.C. § 41714(h)(5)(B)(i). In doing so, Congress again expressly confined this qualification to the limited incumbent definition. *Id*. Thus, when counting slots for purposes of the limited and

---

[2]    "Non-limited incumbent air carrier" is not defined, but Congress and DOT use this term as described here. *See* DOT Response in Opposition to Petitioner's Motion for a Partial Stay, Document #2096688 at 4 (describing the same three categories of carriers). *See also* 49 U.S.C. § 41718(i)(2). From the beginning of the slot exemption regime, Congress and DOT have used the term "non-limited incumbent" and have inextricably connected it to the slot limit provided in the limited incumbent definition. *See* High Density Traffic Airports, 57 Fed. Reg. 37308–11; Pub. L. No. 103-305, § 206, 108 Stat. 1569, 1587 (Aug. 23, 1994) (adopting DOT's definitions).

7

non-limited incumbent categories (but *not* the new entrant category), "slot exemptions" are excluded from the total. *See id.* § 41714(h).

The statute has an additional rule for categorizing carriers in "codeshare agreements." 49 U.S.C. § 41714(k). "Although codeshare agreements can take various forms, they generally allow for flights operated by one airline to be marketed and sold by another airline under the marketing airline's own brand." J.A. 132. Codeshares allow an airline to "extend" its network without needing to operate additional flights. *Id.* The statute provides that, for carriers in a codeshare agreement, if the two carriers' combined slots and slot exemptions at DCA "exceed 20," then neither carrier qualifies "for a new slot or slot exemption as a new entrant or a limited incumbent air carrier." 49 U.S.C. § 41714(k). Section 41714(k) was enacted in 2000, alongside other significant amendments, to ensure that slot and slot exemption applications are evaluated with the goals of preventing major airlines from blocking smaller airlines' access to high-density airports (including through use of affiliates and codeshare agreements), enhancing competition, reducing barriers to entry, fostering low-priced services, and strengthening small carriers.[3]

---

[3]     *Airport Monopolization: Barriers to Entry & Impediments to Competition: Hearings On the State of Competition In the Airline Industry Before the H. Comm. on the Judiciary,* 106th Cong. 2d. Sess., 2000 WL 780670, at *7, *18 (June 14, 2000) (testimony of Paul Stephen Dempsey).

**B.**     **Slot exemption proceedings at DCA.**

DCA is, in relevant part, limited to 60 slots per hour between 6 a.m. and midnight. 14 C.F.R. § 93.123(a)–(b). Congress has increased this total through slot exemptions four times.

In April 2000, Congress passed the Wendell H. Ford Aviation Investment and Reform Act for the 21st Century, Pub. L. No. 106-181, 114 Stat. 61, which directed DOT to grant 12 slot exemptions at DCA to any type of carrier (new entrant, limited incumbent, non-limited incumbent) for nonstop flights beyond DCA's 1,250 mile perimeter. 49 U.S.C. § 41718(a) (2001). Frontier was awarded two exemption slots. J.A. 22. At the time, because Frontier did not have any slots or exemptions, DOT concluded, "Frontier represents a true new entrant at DCA." *Id.*

DOT later reallocated certain exemptions post-September 11 because some carriers were not utilizing them. *Id.* at 29. Although DOT did not reallocate any slot exemptions to Frontier, DOT noted in one proceeding that "Frontier clearly qualifies as a limited incumbent airline at DCA, as it currently holds only two DCA slot exemptions for a single daily round trip to Denver." *Id.* at 35.

In December 2003, the Vision 100–Century of Aviation Reauthorization Act created 12 more slot exemptions at DCA for beyond-perimeter flights. Pub. L. No. 108-176, § 425, 117 Stat. 2490, 2555 (Dec. 12, 2003); 49 U.S.C. § 41718(a)

(2004). Frontier, which still only held two slot exemptions, applied for and was awarded four more. J.A. 57. DOT's order considered Frontier "[i]n comparison to other limited incumbent applicants," and stated that "[n]o party to this proceeding disputes Frontier's new entrant/limited incumbent status."[4] *Id.* at 57.

The FAA Modernization and Reform Act of 2012 authorized eight more slot exemptions for new entrants and limited incumbents. Pub. L. No. 112-95, § 414, 126 Stat. 11, 90 (2012); 49 U.S.C. § 41718(g)(2) (2013). Frontier applied for two, but was not awarded any (for reasons not relevant here). J.A. 90–91. DOT noted, however, that "Frontier confirms its status as a limited incumbent carrier" in light of operating six slot exemptions. *Id.* at 76. Of note, Alaska also applied for slot exemptions in that proceeding. *Id.* at 74. At the time—and like Frontier then and now—Alaska operated only through slot exemptions at DCA. *See id.* at 86. In awarding Alaska two slot exemptions, DOT also confirmed Alaska's status "[a]s a new entrant/limited incumbent."[5] J.A. 86.

---

[4] A carrier can be categorized as a "new entrant/limited incumbent" by virtue of the "new entrant" definition including "limited incumbent carrier." 49 U.S.C. § 41714(h)(3) ("The term 'new entrant air carrier' means an air carrier that does not hold a slot . . . and a limited incumbent carrier."). As DOT has articulated, "the reverse is not true, *i.e.*, all new entrant carriers are not limited incumbent carriers." J.A. 402. Thus, to be a "new entrant/limited incumbent," a carrier *must* qualify as a limited incumbent in the first instance.

[5] *See supra* n.3.

Shortly afterwards, in July 2012, DOT reallocated two other slot exemptions because they were no longer being utilized. *Id.* at 96. Frontier applied for these slot exemptions as a limited incumbent. *Id.* at 97, 100. Although DOT did not award Frontier these slot exemptions, it held again that Frontier is "a limited incumbent carrier at DCA." *Id.* at 112.

### C.    Current proceedings.

On May 16, 2024, in FAA 2024, Congress created 10 new slot exemptions for flights between DCA and domestic airports. Pub. L. No. 118-63, § 502, 138 Stat. 1025, 1187–88 (2024); 49 U.S.C. § 41718(i). Of these 10 slot exemptions, eight are for "incumbent air carriers qualifying for status as a non-limited incumbent carrier at [DCA] as of the date of enactment of [FAA 2024]," 49 U.S.C. § 41718(i)(2), and two are for "incumbent air carriers qualifying for status as a limited incumbent carrier at [DCA] as of the date of enactment of [FAA 2024]," *id.* § 41718(i)(3). DOT explained that FAA 2024 creates "a two-part test for eligibility: first, a carrier must be an incumbent on the date of enactment of FAA 2024; and second, a carrier must then also qualify for status as a limited incumbent, or non-limited incumbent carrier." J.A. 401. No slot exemptions were made available for "new entrant air carriers." *Id.*; *see also* 49 U.S.C. § 41718(i).

DOT's June 24, 2024 Notice requesting applications listed only two carriers as potentially eligible for the limited incumbent slot exemptions: (1) Air Canada,

11

even though it does not qualify because it cannot service a flight between DCA and another U.S. domestic airport;[6] and (2) Alaska, even though Alaska (which has 18 combined slots and slot exemptions at DCA) has a codeshare agreement with American (which has 504 combined slots and slot exemptions at DCA),[7] thus exceeding the limit of "20 slots and slot exemptions," and disqualifying it from receiving slots or slot exemptions as a limited incumbent. J.A. 175; 49 U.S.C. § 41714(k). The Notice did not list Frontier. J.A. 175.

Frontier applied for the two limited incumbent slot exemptions, proposing a nonstop flight from DCA to San Juan, Puerto Rico. J.A. 193. Alaska also applied for the limited incumbent slots for a flight from DCA to San Diego, California. *Id.* at 201. Frontier and Spirit Airlines objected to Alaska's application because of its codeshare, with Spirit noting that Alaska could apply for two of the eight *non-*

---

[6]  Air Transp. Agreement Between The Gov't Of The U.S. And The Gov't Of Can., State Dept. No. 07-74, 2007 WL 4864001 (Mar. 12, 2007).

[7]  FAA Air Carrier Flight Totals, (March 24, 2024), https://www.faa.gov/about/office_org/headquarters_offices/ato/service_units/systemops/perf_analysis/slot_administration/data/doc/DCA_W23_AC_HOLDER_TOTALS.pdf (American has 358 slots; Alaska has 18 slots; and Frontier has 6 slots); FAA Commuter Holder Totals, (March 24, 2024), https://www.faa.gov/about/office_org/headquarters_offices/ato/service_units/systemops/perf_analysis/slot_administration/data/doc/DCA_W23_COMMUTER_HOLDER_TOTALS.pdf (American has 146 slots).

*limited incumbent* slot exemptions instead of the only two provided for limited incumbents. *Id.* at 179–80, 196, 219 n.4, 433–38, 466–70. Alaska chose not to.

On October 16, 2024, DOT issued an Order to Show Cause. *Id.* at 383. In it, DOT concluded that Frontier qualifies as an "incumbent" under part one of FAA 2024's two-part test because it operates at DCA through six slot exemptions. *Id.* at 401–02. Under part two of the test, however, DOT tentatively determined that Frontier is a "new entrant." *Id.* at 402; 49 U.S.C. § 41714(h). DOT reasoned that Frontier is not a "limited incumbent" because it operates only through slot exemptions, which the statutory definition of "limited incumbent air carrier" does not count. J.A. 402. DOT acknowledged that the same definition does not contain a minimum limit for slots—*i.e.*, a carrier must hold or operate "fewer than" 40 slots—and that it previously qualified Frontier as a limited incumbent in other proceedings, including twice after the definition of limited incumbent was amended in 2012 to no longer include slot exemptions toward the 40-slot count. *Id.* Nevertheless, in spite of the statutory language and without addressing or distinguishing its precedent, DOT held that Frontier was both an incumbent and a new entrant. *Id.* DOT therefore denied Frontier's application without considering its merits. *Id.*

At the same time, DOT tentatively qualified Alaska as an eligible limited incumbent and tentatively awarded Alaska the only two limited incumbent slot

exemptions. *Id.* at 403–04, 406. In doing so, DOT recognized Alaska's codeshare with American, under which (as of May 2024) Alaska places its code on over 100 American flights at DCA, totaling 794 flights per week—far exceeding the 20-slot limit for codeshares. *Id.* at 179–80, 403–04, 423.[8] Nevertheless, DOT decided the codeshare is exempt from 49 U.S.C. § 41714(k) because it had been partially limited seven years prior in a settlement agreement related to the anti-competitive effects of Alaska's merger with Virgin America Airlines. J.A. 403–04. Alaska was the only carrier DOT qualified as a limited incumbent, and thus the only carrier DOT deemed eligible for these slot exemptions. *See generally id.* at 383–414.

Frontier objected to DOT's Order to Show Cause as it related to the limited incumbent slot exemptions, taking issue with DOT's disqualification of Frontier and qualification of Alaska. *See id.* at 431–43.[9]

On December 17, 2024, DOT made final its tentative rulings, awarding Alaska the two limited incumbent slot exemptions. J.A. 485. DOT did not discuss

---

[8]   Exhibit A to Spirit, Letter re Spirit Eligibility for DCA Limited Incumbent Slot Exemptions, Docket DOT-OST-2024-0065-0007 (June 26, 2024) https://www.regulations.gov/document/DOT-OST-2024-0065-0007 (Spirit Letter) J.A. 179 n.12 (Exhibit A to the Spirit Letter is included in the Addendum at 20).

[9]   On November 26, 2024, Frontier sought leave to supplement its objection to cure any potential doubt as to whether its original application was complete. J.A. 481–84. DOT granted Frontier's motion for leave. J.A. 491 n.18.

Frontier other than to say it addressed Frontier's arguments in the Order to Show Cause, reaffirming its determination that Frontier "is a new entrant carrier at DCA and does not qualify as a limited incumbent carrier in this proceeding." *Id*. at 491.

In discussing Alaska, DOT admitted that "[r]eading § 41714(k) rigidly" would exclude Alaska as an eligible limited incumbent due to its codeshare. *Id.* at 492–93. DOT further recognized that the codeshare provision is "generally applicable," but then asserted that FAA 2024 "requires the Department to grant slot exemptions . . . without reference to codeshare agreements." *Id.* at 492. DOT further claimed that § 41714(k) "is properly interpreted to exclude regional affiliates from obtaining exemptions," even though the statute does not include this limitation. *Id.* DOT finally noted that, because it qualified only Alaska as a limited incumbent carrier, "[m]oving Alaska into the non-limited incumbent category [based on its codeshare] would result in a suboptimal outcome" because the two limited incumbent slot exemptions would go unallocated. *Id.* at 493. To avoid this "suboptimal outcome," DOT awarded the limited incumbent slot exemptions to Alaska. *Id.*

The Final Order directed the slot awardees to begin service "no later than March 17, 2025." *Id.* at 494. Alaska has confirmed it will do so. *Id*. at 497.

Frontier timely petitioned for review. On January 17, 2025, Frontier moved to partially stay DOT's Final Order and for expedited consideration. On February

15

6, 2025, the Court denied Frontier's motion to stay (without mentioning the likelihood of success on the merits), and granted Frontier's request for expedited consideration.

## VI.    SUMMARY OF ARGUMENT

<u>First</u>, Frontier qualifies for the two slot exemptions made available to limited incumbent carriers in FAA 2024. 49 U.S.C. § 41718(i)(3). Indeed, Frontier is the only carrier eligible for these slot exemptions.

FAA 2024 creates a two-part test to be eligible for these slot exemptions: (1) "a carrier must be an incumbent on the date of enactment of FAA 2024"; and (2) "a carrier must then also qualify for status as a limited incumbent." J.A. 401. DOT correctly concluded at part one that Frontier is an "incumbent" because it operates at DCA through six slot exemptions. *Id.* at 402. At part two, however, DOT incorrectly concluded that Frontier is a "new entrant carrier," not a "limited incumbent carrier," and thus ineligible for these slot exemptions. *Id.* DOT's conclusion—and rejection of Frontier's slot exemption application—is arbitrary and capricious, contrary to law, and requires vacatur.

Frontier meets the definition of "limited incumbent carrier." 49 U.S.C. § 41714(h)(5); 14 C.F.R. § 93.213(a)(5). That is because Frontier operates at DCA through six slot exemptions and "holds or operates fewer than" 40 slots. *Id.* It does not matter that, for purposes of determining whether a carrier holds or operates

16

"fewer than" 40 slots, slot exemptions are not included in the tally. This simply means that Frontier's slot count is "zero," and thus is "fewer than" 40.

In addition, Frontier does not meet the definition of "new entrant carrier." 49 U.S.C. § 41714(h)(3); 14 C.F.R. § 93.213(a)(1). A new entrant is defined as "an air carrier that does not hold a slot at [DCA] . . . and a limited incumbent carrier." 49 U.S.C. § 41714(h)(3); *see also* 14 C.F.R. § 93.213(a)(1). In contrast to the limited incumbent definition, the term "slot" in the new entrant definition *does* include "slot exemption." Accordingly, Frontier cannot be a new entrant (except by virtue of also qualifying as a limited incumbent, *see infra* n.11) because it holds and operates slots at DCA.

DOT's contrary conclusion—that Frontier is an incumbent at DCA but also a new entrant and not a limited incumbent—cannot withstand scrutiny. It ignores the plain language of the statute. It renders the statute self-contradictory and leads to absurd results. Without any explanation or analysis, it conflicts with DOT's prior holdings in slot exemption proceedings in which, after awarding Frontier its first slot exemptions in 2000, DOT *always* categorized Frontier as a "limited incumbent carrier." It ignores precedent from FAA (DOT's subagency) in the similar context of categorizing types of aircraft—upheld by this Court—that "[z]ero is, in fact, a number and [i]f you have zero seats, you do have less than 20." *Gorman v. NTSB*, 558 F.3d 580, 588 (D.C. Cir. 2009) (quotation marks omitted)

17

(second alteration in original). And it ignores the common sense conclusion that zero is "fewer than" 40.

Second, Alaska does not qualify for the two slot exemptions made available to limited incumbent carriers in FAA 2024. 49 U.S.C. § 41718(i)(3). Alaska has a codeshare agreement with American. This agreement includes DCA, where they hold 522 slots combined. The statute plainly directs that "an air carrier that . . . has or enters into a code-share agreement, with any other carrier shall not qualify for a new slot or slot exemption as a new entrant or limited incumbent air carrier at an airport if the total number of slots and slot exemptions held by the two carriers at the airport exceed 20 slots and slot exemptions." *Id.* § 41714(k). Alaska's ineligibility is obvious.

Nevertheless, despite recognizing Alaska's codeshare with American, DOT chose to not apply this statutory provision and to grant the limited incumbent slot exemptions to Alaska. In doing so, DOT admitted it was departing from a "rigid" reading of the statute to achieve its desired result. J.A. 493. But the statute does not provide DOT any discretion to limit or otherwise not apply the generally applicable and mandatory codeshare provision. *See* 49 U.S.C. § 41714(k).

Because Frontier is the only carrier eligible for the two limited incumbent slot exemptions made available in FAA 2024, further DOT proceedings are not necessary. The Court can and should grant complete relief and save agency

resources by allocating Frontier the limited incumbent slot exemptions. 49 U.S.C.

§ 46110(c). In the alternative, the Court should vacate DOT's determinations

regarding Frontier's and Alaska's eligibility and remand to the agency with

instructions that DOT allocate the slot exemptions to Frontier, the only eligible

limited incumbent carrier. *Id.*

## VII.    <u>STANDING</u>

To establish standing, a party:

> must demonstrate that: (i) it has suffered an injury-in-fact that is
> "concrete and particularized" and "actual or imminent"; (ii) the injury
> is "fairly traceable to the challenged action" of the respondent; and (iii)
> it is "likely, as opposed to merely speculative, that the injury will be
> redressed by a favorable decision."

*Exhaustless Inc. v. FAA,* 931 F.3d 1209, 1212 (D.C. Cir. 2019) (citing *Lujan v.*

*Defs. of Wildlife,* 504 U.S. 555, 560–61 (1992)). Frontier has standing because it

has been injured in fact by DOT's action, because its injuries are traceable to that

action, and because those injuries would be redressed by a favorable ruling from

this Court. *See Exhaustless,* 931 F.3d at 1212 ("When a petitioner itself is the

object of the challenged agency action, there usually is little doubt of causation.").

Frontier calls for the Court's partial review and vacatur of DOT's Final

Order, through which DOT allocated 10 "slot exemptions" at DCA. Two of these

slot exemptions were made available to "incumbent air carriers qualifying for

19

status as a limited incumbent carrier at [DCA] as of the date of enactment of [FAA 2024]." 49 U.S.C. § 41718(i)(3); *see also id.* § 41714(h)(5).

Frontier applied for the two slot exemptions reserved for a "limited incumbent carrier." DOT, however, determined that Frontier did not qualify as a "limited incumbent carrier" at DCA, was therefore ineligible to apply for these slot exemptions, and thus denied Frontier's application without considering its merits.

DOT further held that Alaska is the only airline that qualifies as an eligible "limited incumbent carrier" at DCA, and accordingly awarded these two slot exemptions to Alaska. In doing so, DOT chose to not apply statutory provisions that disqualify Alaska from these slot exemptions. *See* 49 U.S.C. § 41714(k). DOT directed Alaska to begin servicing its new flight under these slot exemptions no later than March 17, 2025. Alaska has confirmed that it will do so.

A proper application of the relevant law makes Frontier the only limited incumbent carrier eligible for these slot exemptions, necessitating that DOT award them to Frontier. DOT's two contrary and erroneous determinations—that (1) Frontier is not a "limited incumbent carrier" and thus ineligible to apply for these slot exemptions, and (2) Alaska is the only carrier eligible as a "limited incumbent carrier" and thus entitled to these slot exemptions—harm Frontier through, among other things, depriving it the benefits of operating a new roundtrip flight at DCA.

20

A favorable decision from this Court, properly applying the relevant law and partially vacating DOT's Final Order, would redress Frontier's injuries.

## VIII.    ARGUMENT

### A.    Standard of Review.

This Court must "hold unlawful and set aside agency action, findings, and conclusions found to be [] arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A); *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 41 (1983); *Republic Airline*, 669 F.3d at 299. An agency action is "arbitrary" or "capricious" if it is not "reasonable and reasonably explained." *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021). "One of the core tenets of reasoned decision-making is that 'an agency [when] changing its course . . . is obligated to supply a reasoned analysis for the change.'" *Republic Airline*, 669 F.3d at 299 (citation omitted) (alteration in original). "The reviewing court should not attempt itself to make up for" an agency's deficient decision-making, and "'may not supply a reasoned basis for the agency's action that the agency itself has not given.'" *Motor Vehicle Mfrs.*, 463 U.S. at 43 (quoting *SEC v. Chenery Corp.*, 332 U.S. 194, 196 (1947)).

DOT's decision here is not entitled to deference. *See Pacific Gas*, 113 F.4th at 947–48 ("We 'need not and under the APA may not defer to an agency

21

interpretation of the law.'") (quoting *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 413 (2024)). Instead, the Court reviews questions of law *de novo*, exercises "independent judgment," and uses traditional tools of interpretation to construe statutes. *Loper Bright*, 603 U.S. at 394, 403; *Pacific Gas*, 113 F.4th at 947–48; *see also Lake Region Healthcare Corp. v. Becerra* 113 F.4th 1002, 1007 (D.C. Cir. 2024); *U.S. Sugar Corp. v. EPA*, 113 F.4th 984, 991 n.7 (D.C. Cir. 2024) ("*Loper Bright* held that the Administrative Procedure Act requires courts to construe statutes *de novo*, without deference to the views of agencies entrusted to administer the statutes."). The Court "must seek the 'single, best meaning' of a statute, not just permissible interpretations." *Pacific Gas*, 113 F.4th at 949 (citing *Loper Bright*, 603 U.S. at 400).

Agency "[f]indings of fact . . . , if supported by substantial evidence, are conclusive." 49 U.S.C. § 46110(c). However, an agency decision that is not supported by "substantial evidence . . . found within the record of closed-record proceedings" is arbitrary and capricious. *Safe Extensions, Inc. v. FAA*, 509 F.3d 593, 604 (D.C. Cir. 2007) (emphasis removed) (citation omitted). Likewise, "an agency's declaration of fact that is capable of exact proof but is unsupported by any evidence is insufficient to make the agency's decision non-arbitrary." *Id.* at 605 (citation and quotation omitted).

22

**B.** **Because Frontier is an incumbent at DCA and holds and operates "fewer than" 40 slots, DOT erred by not qualifying Frontier as eligible for the slot exemptions made available to "limited incumbent carriers."**

DOT's conclusion that Frontier is not a limited incumbent carrier, and thus ineligible for slot exemptions under FAA 2024, is arbitrary and capricious, contrary to law, and requires vacatur.

FAA 2024 creates "a two-part test for eligibility: first, a carrier must be an incumbent on the date of enactment of FAA 2024; and second, a carrier must then also qualify for status as a limited incumbent, or non-limited incumbent carrier." J.A. 401; 49 U.S.C. § 41718(i)(3).[10] DOT concluded that Frontier qualified as an "incumbent air carrier" under part one because it "was engaged in air transportation at DCA" through slot exemptions when FAA 2024 was enacted. J.A. 402. There are only two options for part two because there are only two types of incumbent carriers: a limited incumbent (holding or operating "fewer than" 40 slots) or a non-limited incumbent (holding or operating 40 or more slots). 49 U.S.C. § 41714(h)(5). There is no such thing as a "new entrant incumbent." *See id.* § 41714(h).

---

[10]  DOT's Final Order summarily affirmed its preliminary determinations in the Order to Show Cause with respect to Frontier, and thus the Order to Show Cause is the appropriate citation. J.A. 491.

23

DOT veered off course and concluded otherwise. It held that, although Frontier is an "incumbent air carrier," it is also a "new entrant" because it only operates slot exemptions at DCA, which are not counted in the limited incumbent definition. J.A. 402; 49 U.S.C. § 41714(h)(5)(B)(i). For numerous reasons, DOT's determination is in error.

First, Frontier fits squarely within the definition of "limited incumbent air carrier." 49 U.S.C. § 41714(h)(5); 14 C.F.R. § 93.213(a)(5). It is undisputed that Frontier both operates at DCA and "holds or operates fewer than" 40 slots. J.A. 402; *see also id.* at 491. That should be the end of the analysis, as these are the only requirements under FAA 2024 and the "limited incumbent" definition. It does not matter that, once excluding exemptions per § 41714(h)(5)(B)(i), Frontier's slot count equals zero because zero is obviously "fewer than" 40.

DOT's contrary conclusion relies on the factually incorrect premise that zero is *not* "fewer than" 40. J.A. 402. In doing so, DOT ignores the determination of FAA (its sub-agency) in a similar context, holding that "less than 20 seats" includes zero seats when categorizing types of aircraft. *Gorman*, 558 F.3d at 588 ("Zero is, in fact, a number and [i]f you have zero seats, you do have less than 20" (internal quotations omitted) (alteration in original)). This Court agreed. *Id.* Because it is undisputed that Frontier is an incumbent at DCA that holds or

24

operates "fewer than" 40 slots, Frontier qualifies for the FAA 2024 slot exemptions as a limited incumbent carrier.

Second, DOT's determination is incompatible with the definition of "new entrant." New entrant is defined as "an air carrier that does not hold a slot at [DCA] . . . and a limited incumbent carrier." 49 U.S.C. § 41714(h)(3). Congress's directive in the 2012 amendment to not count slot exemptions applies *only* to the "limited incumbent" definition,[11] *not* to the "new entrant" definition. *Id.* §§ 41714(h)(5)(B)(i), 41714(h)(3). This is explicit. Not only is this qualification embedded within the statutory definition of "limited incumbent carrier," but the statute identifies "such sections" to which the qualification applies—namely, the regulatory definition of "limited incumbent carrier" in 14 C.F.R. § 93.213(a)(5), and two other sections of the regulation not relevant here. 49 U.S.C. § 41714(h)(5)(A)–(B) (citing 14 C.F.R. §§ 93.223(c)(3), 93.225(h)); *see also Pacific Gas*, 113 F.4th at 950–51 (explaining in a similar statutory structure that the term "'[s]uch' . . . emphasizes the specific term being qualified"). Thus, "slot" in the new entrant definition includes "slot exemption"—as it historically has, and also because Congress did not expressly exclude it in 2012 like it did for limited incumbents.

---

[11]    And consequently the "non-limited incumbent" definition.

Any potential argument that the 2012 amendment excluded "slot exemptions" from *both* the new entrant and limited incumbent definitions is without merit. As an initial matter, DOT did not base its determination on that potential reading of the statute, and so this Court should not consider it. *Motor Vehicle Mfrs.*, 463 U.S. at 49 ("[A]n agency's action must be upheld, if at all, on the basis articulated by the agency itself." (citing *Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 168 (1962)).

But more importantly, and again, Congress could not have been more explicit when it confined the exclusion of slot exemptions within the limited incumbent definition. Had Congress intended to make the exclusion generally applicable, it easily could have done so. It did not. And DOT does not have the authority to ignore the statute's plain language or graft a limitation where Congress expressly did not. *See, e.g.*, *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 174–75 (2009) ("When Congress amends one statutory provision but not another, it is presumed to have acted intentionally," especially for language in the same statute); *Eagle Pharms., Inc. v. Azar*, 952 F.3d 323, 339 (D.C. Cir. 2020) (courts cannot "read[] a limitation into the [statute's] text that is not there"). In short, "courts must presume that a legislature says in a statute what it means and means in a statute what it says there. When the words of a statute are unambiguous, then, this first canon is also the last: judicial inquiry is complete." *Eagle Pharms.*, 952 F.3d at

339–40 (quotation marks omitted) (quoting *Barnhart v. Sigmon Coal Co.*, 534 U.S. 438, 461–62 (2002)).

The consequence is that, contrary to DOT's determination, Frontier's holding and operation of slot exemptions means it cannot be a new entrant at DCA *except* by virtue of being a limited incumbent carrier.[12] Thus, if DOT's errors stand, then Frontier may *never* qualify for DCA slot exemptions because it is definitionally excluded from all categories: (1) it is not a "new entrant" because it operates slots/slot exemptions at DCA; (2) it is not a "limited incumbent" because its slot count is zero (based on DOT's premise that "zero" is not "fewer than" 40); and (3) it is not a "non-limited incumbent" because its slot holdings do not exceed 40. That is not the "best," let alone a permissible, reading of the statute. *U.S. Sugar Corp.*, 113 F.4th at 991.

Third, DOT's reading violates the principle that statutes must be "interpreted in a way that renders them compatible, not contradictory." *Maracich v. Spears*, 570 U.S. 48, 68 (2013) ("There can be no justification for needlessly rendering provisions in conflict if they can be interpreted harmoniously." (citation and alteration omitted)); *SW General, Inc. v. NLRB*, 796 F.3d 67, 75 (D.C. Cir. 2015).

---

[12] To be clear, Frontier *can* be a "new entrant" by virtue of that definition including "limited incumbent carrier." But to be eligible for the operative slot exemptions, Frontier must be a "limited incumbent carrier" in the first instance, 49 U.S.C. § 41718(i)(3), which it is.

Specifically, DOT manufactured a contradiction in the statute: that a carrier can simultaneously be an incumbent that operates at DCA, and a new entrant that does not operate at DCA. This fiction finds no support in the statute—which does not contain a "new entrant incumbent" category—or in common sense.

All of these blunders are easily avoided by applying the statute's plain language. In short, a carrier is: (1) an incumbent if it operates at DCA through slots or slot exemptions (as DOT determined for Frontier); and (2) a limited incumbent if it holds or operates "fewer than" 40 slots (including "zero" if the carrier only operates slot exemptions). Moreover, if a carrier does not hold or operate any slots or slot exemptions at DCA, then it is: (1) not an incumbent; and (2) a new entrant. It is that simple.

This straightforward reading just so happens to be how DOT read the statute and categorized Frontier in all prior proceedings. Only before Frontier was awarded any slot exemptions did DOT consider Frontier a "new entrant" at DCA. J.A. 22. After Frontier received two slot exemptions, DOT consistently classified Frontier as a limited incumbent. *See id.* at 35 ("Frontier clearly qualifies as a limited incumbent airline at DCA, as it currently holds only two DCA slot exemptions"); *id.* at 57, 76, 112.

Importantly, DOT made these determinations before *and* after the 2012 amendment that added the slot exemption exclusion to the limited incumbent

28

definition. In two separate slot exemption proceedings in 2012, DOT stated that "Frontier confirms its status as a limited incumbent carrier," *id.* at 76, and held that Frontier is "a limited incumbent carrier at DCA." *Id.* at 112. These holdings align with DOT confirming Alaska's status "[a]s a new entrant/limited incumbent" in 2012, when Alaska—like Frontier—only operated through slot exemptions. *Id.* at 86.

This interpretation is likewise consistent with DOT's contemporaneous understanding of the 2012 amendment. According to DOT, the purpose of the amendment was to "increas[e] the threshold of slots held or operated by an air carrier or commuter carrier, not including slot exemptions . . . , from fewer than 20 to fewer than 40." *Id.* at 70 n.2. Similarly, DOT explained at the time that "[a] new entrant carrier *or* limited incumbent carrier is an air carrier that holds or operates fewer than 40 slots at DCA." *Id.* at 96 n.3 (emphasis added). In other words, DOT understood that the amendment raised the ceiling for carriers to qualify as limited incumbents, rather than disqualify previously eligible carriers like Frontier.

To be sure, DOT acknowledged the conflict between its current holding and its past precedent, but did not address or distinguish its precedent at all. *Id.* at 487–88, 491. Instead, DOT simply was "not persuaded by the arguments [Frontier makes] regarding [its] eligibility in this proceeding." *Id.* at 491. DOT's decision to contradict and ignore its precedent (let alone the statute)—without explanation or

29

reason—cannot survive arbitrary and capricious review, particularly since *Loper Bright*. 603 U.S. at 410–13. *See Republic Airline*, 669 F.3d at 299 ("It is axiomatic that an agency must treat similar cases in a similar manner unless it can provide a legitimate reason for failing to do so." (quoting *Kreis v. Sec'y of the Air Force*, 406 F.3d 684, 687 (D.C. Cir. 2005)); *LeMoyne–Owen Coll. v. NLRB*, 357 F.3d 55, 61 (D.C. Cir. 2004) (explaining that, where "a party makes a significant showing that analogous cases have been decided differently, the agency must do more than simply ignore that argument").

In sum, Frontier qualifies under the statute as a "limited incumbent air carrier" because it operates at DCA and "holds or operates fewer than" 40 slots. 49 U.S.C. § 41714(h)(5). Frontier is therefore eligible for the two slot exemptions made available at DCA to limited incumbents in FAA 2024. *Id.* § 41718(i)(3). DOT's holding that Frontier is ineligible for these slot exemptions because it is an incumbent *and* a "new entrant"—which (often without explanation) contradicts the statute, the regulations, DOT's prior holdings, caselaw, and common sense—is arbitrary and capricious and requires vacatur.

### C.     DOT erred by disregarding the statute's text and qualifying Alaska as an eligible limited incumbent despite Alaska's codeshare agreement that increases its slot holdings to well above the 20 slot threshold for disqualification.

Alaska's ineligibility is obvious. Alaska has a codeshare agreement with American. This agreement includes DCA, where the two carriers hold a combined

30

522 slots.[13] Alaska thus is ineligible for the limited incumbent slot exemptions. 49 U.S.C. § 41714(k). DOT's decision to disregard the statute completely—even suggesting that § 41714(k) does not apply in these proceedings because it is not repeated in § 41718(i), J.A. 492—cannot withstand *de novo* review. *Lake Region*, 113 F.4th at 1007; *U.S. Sugar Corp.*, 113 F.4th at 991.

This Court uses the traditional rules of statutory construction. *Pacific Gas*, 113 F.4th at 947–48. That means beginning with the text. *Id*. The text reads:

> For purposes of this section and sections 41716, 41717, and 41718, an air carrier that operates under the same designator code, or has or enters into a code-share agreement, with any other air carrier shall not qualify for a new slot or slot exemption as a new entrant or limited incumbent air carrier at an airport if the total number of slots and slot exemptions held by the two carriers at the airport exceed 20 slots and slot exemptions.

49 U.S.C. § 41714(k). Section 41718, of course, contains FAA 2024. *Id.* § 41718(i).

DOT determined that Alaska and American have a codeshare relationship at DCA, where Alaska holds 18 slots (including exemptions) and American holds 504 slots (including exemptions), totaling 522. J.A. 403; *see also id.* at 492–93 (recognizing that Alaska uses its codeshare agreement, like other carriers, "to expand the breadth of destinations it offers to customers"). Again, that should have

---

[13]    *See supra* n.6.

been the end of the analysis because the statute facially and unambiguously renders Alaska ineligible. 49 U.S.C. § 41714(k). DOT previously understood that this provision is mandatory—"shall not qualify"—not permissive: "Section 41714(k) mandates that, in the case of code-share carriers, the slot holdings of both carriers must be aggregated in determining the 20-operations threshold." J.A. 423 n.7 (quoting DOT Order 2004-12-6 at 6 and citing numerous similar orders).[14] Nevertheless, DOT chose to not apply the codeshare provision, instead granting the slot exemptions to Alaska.

In doing so, DOT recognized it was departing from the statute's plain meaning: "Reading § 41714(k) rigidly as Spirit and Frontier urge us to do, detracts from the broader text and purpose of the statute, which provides slot exemptions to address competition and access issues at DCA." J.A. 493. As cover for abandoning the text, DOT asserted that FAA 2024 requires it to grant slot exemptions "without reference to codeshare agreements," even while acknowledging that the codeshare provision is "generally applicable." *Id.* at 492.

DOT also based its decision on the premise that Alaska's codeshare with American was too "limited" to count. It then created out of whole cloth a discretionary and undefined "meaningful access" test by which DOT gets to

---

[14]    DOT Order 2004-12-6; DOT-OST-2000-7182-1072 (Dec. 6, 2012) at 6, https://www.regulations.gov/document/DOT-OST-2000-7182-1072.

determine which codeshare agreements qualify under the statute. This fails for two clear reasons: First, the statute says *nothing* about different types of codeshare agreements. There either is a codeshare agreement or there is not. And no one disputes that Alaska has a codeshare agreement with American at DCA.

Second, Alaska fails DOT's invented "meaningful access" test. *Id.* at 404. To place Alaska on its preferred side of the imagined criteria, DOT focused on the fact that American cannot place its code on Alaska's flights at DCA. Of course, Alaska operates only nine flights at DCA, so this restriction is de minimis. What DOT omitted is that Alaska *can* display its code on every American flight at DCA (except those to Los Angeles), J.A. 120–22, of which there are hundreds each day. Indeed, as of May 2024, Alaska was placing its code on over 100 American flights at DCA, totaling 794 flights per week—far exceeding the 20-slot limit for codeshares. J.A. 179;[15] J.A. 423; 49 U.S.C. § 41714(k). Under any definition this is "meaningful access," and precisely what the codeshare provision sought to remedy: airlines with outsized access at DCA preventing other carriers from entering the market and increasing competition for the public's benefit.

---

[15]    Addendum at 20 (showing that, in May 2024, Alaska marketed and sold flights using its code "AS" on 112 different flights to and from DCA that are operated by American "AA").

Although the Court need not consider legislative history because the statute is unambiguous, *see Eagle Pharms*., 952 F.3d at 338–39, the snippets DOT relied on when excluding Alaska's codeshare agreement from the clear text of § 41714(k) do not support its determination. DOT cited proposed legislation pertaining to equal treatment of "commuter" airlines—which are defined as "operations using aircraft having a certificated maximum seating capacity of 76 or less," 49 U.S.C. § 41714(h)(1); 14 C.F.R. § 93.123(c)(2)—and found it significant that Alaska is not one. J.A. 404. Whether Alaska is a "commuter" or not is irrelevant to § 41714(k). The proposed provision DOT relies on was eliminated a year later in H.R. Rep. No. 106-513, at 49 (Mar. 8, 2000), when the language currently codified in § 41714(k) was proposed and ultimately adopted without any mention of "commuter." Pub. L. No. 106-181, § 231,114 Stat. 61, 108. Instead, the operative statute uses the general term "air carrier," which undoubtedly includes Alaska and American. 49 U.S.C. § 41714(k) ("[A]n air carrier that . . . has or enters into a code-share agreement, with any other air carrier . . . ."). The earlier and inapposite legislative history has no place in this analysis, and whether Alaska is a "commuter" is wholly beside the point. *See Eagle Pharms*., 952 F.3d at 339 (explaining that "a report for a provision that was left out of the" operative statute is "particularly unhelpful").

It is worth pausing to juxtapose how DOT analyzed the statute when considering Frontier's and Alaska's respective applications. On the one hand, for Frontier, DOT professed to be bound by a strict (albeit incorrect) statutory construction that finds no room for the idea that zero is "fewer than" 40, and requires the paradoxical result that Frontier's operations at DCA mean it is both an incumbent *and* a new entrant. On the other hand, for Alaska, DOT was willing to depart from a "rigid" reading of the statute to qualify Alaska—the country's fifth largest airline, J.A. 151, which is taking significant advantage of its codeshare with the country's largest airline that alone holds over 50% of all available slots at DCA, *id.* at 151, 179–80, 326–27, 466–69—as an eligible limited incumbent. Part of DOT's justification for loosening its adherence to the statute when analyzing (only) Alaska is that, because DOT had already disqualified all other limited incumbent applicants, DOT did not want to be left unable to allocate the two limited incumbent slot exemptions Congress created. J.A. 493. This implies that DOT would have reached the opposite result had it first considered Alaska's application (for which it admits a "rigid" textual reading is disqualifying) before analyzing Frontier's. That is the epitome of arbitrary agency action.

In sum, DOT openly disregarded the statute's unambiguous language and amended it to create a discretionary and undefined exception that Congress did not authorize. A straightforward application leads to a clear result: Alaska—with its

combined 522 slots through its (meaningful) codeshare with American—is ineligible to receive the limited incumbent slot exemptions provided in FAA 2024. 49 U.S.C. § 41714(k). DOT's contrary holding requires vacatur.

### D.    Remedy.

This Court has authority to "amend, modify, or set aside any part of the order" at issue, and it should do so here. 49 U.S.C. § 46110(c). Because Frontier is the only carrier eligible for the two limited incumbent slot exemptions made available in FAA 2024, further DOT proceedings are not necessary and would be a waste of agency and party resources. Accordingly, the Court should amend DOT's Final Order to reverse the award of slot exemptions to Alaska and allocate them to Frontier.

In the alternative, the Court should vacate DOT's determinations regarding Frontier's and Alaska's eligibility and remand to the agency with instructions to allocate the slot exemptions to Frontier, the only eligible limited incumbent. 49 U.S.C. § 46110(c).

## IX.    CONCLUSION

Based on the foregoing, Frontier's Petition for Review should be granted and the Court should allocate Frontier the two slot exemptions made available to limited incumbent carriers in FAA 2024.

36

Dated: February 24, 2025                    Respectfully submitted:

/s/  Aaron Schaer

Aaron Schaer
D.C. Circuit #65864
BALLARD SPAHR LLP
13313 Balfour Ave
Huntington Woods, MI 48070
Direct: 206.223.7103
Fax: 206.223.7107
schaera@ballardspahr.com

Lorene L. Boudreau
D.C. Circuit #55126
BALLARD SPAHR LLP
1735 Market Street, 51st Floor
Philadelphia, PA 19103-7599
Direct: 215.864.8245
Fax: 215.864.8999
boudreaul@ballardspahr.com

## <u>CERTIFICATE OF COMPLIANCE WITH TYPEFACE AND WORD-COUNT LIMITATIONS</u>

I, Aaron Schaer, counsel for Petitioners and a member of the Bar of this Court, certify pursuant to Fed. R. App. P. 32(a)(7) that the foregoing brief complies with the type-volume limitation because it contains 8,959 words, excluding the parts exempted by F. R. App. P. 32(f) and Circuit Rule 32(e)(1). I further certify that this brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the typeface style requirements of Fed. R. App. P. 32(a)(6).

Respectfully submitted:

*/s/ Aaron Schaer*
Aaron Schaer
D.C. Circuit #65864
BALLARD SPAHR LLP
13313 Balfour Ave
Huntington Woods, MI 48070
Direct: 206.223.7103
Fax: 206.223.7107
schaera@ballardspahr.com

*Counsel for Petitioner Frontier Airlines, Inc.*

Dated: February 24, 2025

**ADDENDUM TO**

**BRIEF FOR PETITIONER FRONTIER AIRLINES, INC.**

# <u>TABLE OF CONTENTS</u>

<u>**Page**</u>

**Statutes:**

49 U.S.C. § 41714…………………………………………………...…......A-1

49 U.S.C. § 41718…………………………………………………...…...A-9

**Regulations:**

14 C.F.R. § 93.213……………………………………………………..A-16

**Docket entry:**

Exhibit A to Spirit, Letter re Spirit Eligibility for DCA
Limited Incumbent Slot Exemptions,
Docket DOT-OST-2024-0065-0007 (June 26, 2024)…………………………A-20

**49 U.S.C.A. § 41714**

§ 41714. Availability of slots

Effective: February 14, 2012

Currentness

**(a) Making slots available for essential air service.--**

**(1) Operational authority.--**If basic essential air service under subchapter II of this chapter is to be provided from an eligible point to a high density airport (other than Ronald Reagan Washington National Airport), the Secretary of Transportation shall ensure that the air carrier providing or selected to provide such service has sufficient operational authority at the high density airport to provide such service. The operational authority shall allow flights at reasonable times taking into account the needs of passengers with connecting flights.

**(2) Exemptions.--**If necessary to carry out the objectives of paragraph (1), the Secretary shall by order grant exemptions from the requirements of subparts K and S of part 93 of title 14, Code of Federal Regulations (pertaining to slots at high density airports), to air carriers using Stage 3 aircraft or to commuter air carriers, unless such an exemption would significantly increase operational delays.

**(3) Assurance of access.--**If the Secretary finds that an exemption under paragraph (2) would significantly increase operational delays, the Secretary shall take such action as may be necessary to ensure that an air carrier providing or selected to provide basic essential air service is able to obtain access to a high density airport.

**(4) Action by the Secretary.--**The Secretary shall issue a final order under this subsection on or before the 60th day after receiving a request from an air carrier for operational authority under this subsection.

**(b) Slots for foreign air transportation.--**

**(1) Exemptions.--**If the Secretary finds it to be in the public interest at a high density airport (other than Ronald Reagan Washington National Airport), the Secretary may grant by order exemptions from the requirements of subparts K and S of part 93 of title 14, Code of Federal

A-1

Regulations (pertaining to slots at high density airports), to enable air carriers and foreign air carriers to provide foreign air transportation using Stage 3 aircraft

**(2) Slot withdrawals.--**The Secretary may not withdraw a slot at Chicago O'Hare International Airport from an air carrier in order to allocate that slot to a carrier to provide foreign air transportation.

**(3) Equivalent rights of access.--**The Secretary shall not take a slot at a high density airport from an air carrier and award such slot to a foreign air carrier if the Secretary determines that air carriers are not provided equivalent rights of access to airports in the country of which such foreign air carrier is a citizen.

**(4) Conversions of slots.--**Effective May 1, 2000, slots at Chicago O' Hare International Airport allocated to an air carrier as of November 1, 1999, to provide foreign air transportation shall be made available to such carrier to provide interstate or intrastate air transportation.

**(c) Slots for new entrants.--**If the Secretary finds it to be in the public interest, the Secretary may by order grant exemptions from the requirements under subparts K and S of part 93 of title 14, Code of Federal Regulations (pertaining to slots at high density airports), to enable new entrant air carriers to provide air transportation at high density airports (other than Ronald Reagan Washington National Airport).

**(d) Special rules for Ronald Reagan Washington National Airport.—**

**(1) In general.--**Notwithstanding sections 49104(a)(5) and 49111(e) of this title, or any provision of this section, the Secretary may, only under circumstances determined by the Secretary to be exceptional, grant by order to an air carrier currently holding or operating a slot at Ronald Reagan Washington National Airport an exemption from requirements under subparts K and S of part 93 of title 14, Code of Federal Regulations (pertaining to slots at Ronald Reagan Washington National Airport), to enable that carrier to provide air transportation with Stage 3 aircraft at Ronald Reagan Washington National Airport; except that such exemption shall not--

**(A)** result in an increase in the total number of slots per day at Ronald Reagan Washington National Airport;

A-2

**(B)** result in an increase in the total number of slots at Ronald Reagan Washington National Airport from 7:00 ante meridiem to 9:59 post meridiem;

**(C)** increase the number of operations at Ronald Reagan Washington National Airport in any 1-hour period by more than 2 operations;

**(D)** result in the withdrawal or reduction of slots operated by an air carrier;

**(E)** result in a net increase in noise impact on surrounding communities resulting from changes in timing of operations permitted under this subsection; and

**(F)** continue in effect on or after the date on which the final rules issued under subsection (f) become effective.

**(2) Limitation on applicability.--**Nothing in this subsection shall adversely affect Exemption No. 5133, as from time-to-time amended and extended.

**(e) Study.--**

**(1) Matters to be considered.--**The Secretary shall continue the Secretary's current examination of slot regulations and shall ensure that the examination includes consideration of--

**(A)** whether improvements in technology and procedures of the air traffic control system and the use of quieter aircraft make it possible to eliminate the limitations on hourly operations imposed by the high density rule contained in part 93 of title 14 of the Code of Federal Regulations or to increase the number of operations permitted under such rule;

**(B)** the effects of the elimination of limitations or an increase in the number of operations allowed on each of the following:

**(i)** congestion and delay in any part of the national aviation system;

**(ii)** the impact of noise on persons living near the airport;

**(iii)** competition in the air transportation system;

A-3

**(iv)** the profitability of operations of airlines serving the airport; and

**(v)** aviation safety;

**(C)** the impact of the current slot allocation process upon the ability of air carriers to provide essential air service under subchapter II of this chapter;

**(D)** the impact of such allocation process upon the ability of new entrant air carriers to obtain slots in time periods that enable them to provide service;

**(E)** the impact of such allocation process on the ability of foreign air carriers to obtain slots;

**(F)** the fairness of such process to air carriers and the extent to which air carriers are provided equivalent rights of access to the air transportation market in the countries of which foreign air carriers holding slots are citizens;

**(G)** the impact, on the ability of air carriers to provide domestic and international air service, of the withdrawal of slots from air carriers in order to provide slots for foreign air carriers; and

**(H)** the impact of the prohibition on slot withdrawals in subsections (b)(2) and (b)(3) of this section on the aviation relationship between the United States Government and foreign governments, including whether the prohibition in such subsections will require the withdrawal of slots from general and military aviation in order to meet the needs of air carriers and foreign air carriers providing foreign air transportation (and the impact of such withdrawal on general aviation and military aviation) and whether slots will become available to meet the needs of air carriers and foreign air carriers to provide foreign air transportation as a result of the planned relocation of Air Force Reserve units and the Air National Guard at O'Hare International Airport.

**(2) Report.--**Not later than January 31, 1995, the Secretary shall complete the current examination of slot regulations and shall transmit to the Committee on Commerce, Science, and Transportation of the Senate and the

Committee on Transportation and Infrastructure of the House of Representatives a report containing the results of such examination.

**(f) Rulemaking.--**The Secretary shall conduct a rulemaking proceeding based on the results of the study described in subsection (e). In the course of such proceeding, the Secretary shall issue a notice of proposed rulemaking not later than August 1, 1995, and shall issue a final rule not later than 90 days after public comments are due on the notice of proposed rulemaking.

**(g) Weekend operations.--**The Secretary shall consider the advisability of revising section 93.227 of title 14, Code of Federal Regulations, so as to eliminate weekend schedules from the determination of whether the 80 percent standard of subsection (a)(1) of that section has been met.

**(h) Definitions.--**In this section and sections 41715-41718 and 41734(h), the following definitions apply:

> **(1) Commuter air carrier.--**The term "commuter air carrier" means a commuter operator as defined or applied in subpart K or S of part 93 of title 14, Code of Federal Regulations.

> **(2) High density airport.--**The term "high density airport" means an airport at which the Administrator limits the number of instrument flight rule takeoffs and landings of aircraft.

> **(3) New entrant air carrier.--**The term "new entrant air carrier" means an air carrier that does not hold a slot at the airport concerned and has never sold or given up a slot at that airport after December 16, 1985, and a limited incumbent carrier.

> **(4) Slot.--**The term "slot" means a reservation for an instrument flight rule takeoff or landing by an air carrier of an aircraft in air transportation.

> **(5) Limited incumbent air carrier.--**The term "limited incumbent air carrier" has the meaning given that term in subpart S of part 93 of title 14, Code of Federal Regulations; except that--

>> **(A)** "40" shall be substituted for "12" in sections 93.213(a)(5), 93.223(c)(3), and 93.225(h);

>> **(B)** for purposes of such sections, the term "slot" shall not include--

>>> **(i)** "slot exemptions";

A-5

(ii) slots operated by an air carrier under a fee-for-service arrangement for another air carrier, if the air carrier operating such slots does not sell flights in its own name, and is under common ownership with an air carrier that seeks to qualify as a limited incumbent and that sells flights in its own name; or

(iii) slots held under a sale and license-back financing arrangement with another air carrier, where the slots are under the marketing control of the other air carrier; and

(C) for Ronald Reagan Washington National Airport, the Administrator shall not count, for the purposes of section 93.213(a)(5), slots currently held by an air carrier but leased out on a long-term basis by that carrier for use in foreign air transportation and renounced by the carrier for return to the Department of Transportation or the Federal Aviation Administration.

(6) **Regional jet.--**The term "regional jet" means a passenger, turbofan-powered aircraft with a certificated maximum passenger seating capacity of less than 71.

(7) **Nonhub airport.--**The term "nonhub airport" means an airport that had less than .05 percent of the total annual boardings in the United States as determined under the Federal Aviation Administration's Primary Airport Enplanement Activity Summary for Calendar Year 1997.

(8) **Small hub airport.--**The term "small hub airport" means an airport that had at least .05 percent, but less than .25 percent, of the total annual boardings in the United States as determined under the summary referred to in paragraph (7).

(9) **Medium hub airport.--**The term "medium hub airport" means an airport that each year has at least .25 percent, but less than 1.0 percent, of the total annual boardings in the United States as determined under the summary referred to in paragraph (7).

**(i) 60-day application process.--**

(1) **Request for slot exemptions.--**Any slot exemption request filed with the Secretary under this section or section 41716 or 41717 (other than subsection (c)) shall include--

A-6

(A) the names of the airports to be served;

(B) the times requested; and

(C) such additional information as the Secretary may require.

**(2) Action on request; failure to act.**--Within 60 days after a slot exemption request under this section or section 41716 or 41717 (other than subsection (c)) is received by the Secretary, the Secretary shall--

(A) approve the request if the Secretary determines that the requirements of the section under which the request is made are met;

(B) return the request to the applicant for additional information relating to the request to provide air transportation; or

(C) deny the request and state the reasons for its denial.

**(3) 60-day period tolled for timely request for more information.**--If the Secretary returns under paragraph (2)(B) the request for additional information during the first 20 days after the request is filed, then the 60-day period under paragraph (2) shall be tolled until the date on which the additional information is filed with the Secretary.

**(4) Failure to determine deemed approval.**--If the Secretary neither approves the request under paragraph (2)(A) nor denies the request under paragraph (2)(C) within the 60-day period beginning on the date the request is received, excepting any days during which the 60-day period is tolled under paragraph (3), then the request is deemed to have been approved on the 61st day, after the request was filed with the Secretary.

**(j) Exemptions may not be transferred.**--No exemption from the requirements of subparts K and S of part 93 of title 14, Code of Federal Regulations, granted under this section or section 41716, 41717, or 41718 may be bought, sold, leased, or otherwise transferred by the carrier to which it is granted, except through an air carrier merger or acquisition.

**(k) Affiliated carriers.**--For purposes of this section and sections 41716, 41717, and 41718, an air carrier that operates under the same designator code, or has or enters into a code-share agreement, with any other air carrier shall not qualify for a new slot or slot exemption as a new entrant or limited incumbent air carrier at an

A-7

airport if the total number of slots and slot exemptions held by the two carriers at the airport exceed 20 slots and slot exemptions.

## CREDIT(S)

(Added Pub.L. 103-305, Title II, § 206(a)(1), Aug. 23, 1994, 108 Stat. 1584; amended Pub.L. 104-287, § 5(9), Oct. 11, 1996, 110 Stat. 3389; Pub.L. 105-66, Title III, § 345, Oct. 27, 1997, 111 Stat. 1449; Pub.L. 105-102, § 2(24), Nov. 20, 1997, 111 Stat. 2205; Pub.L. 105-154, § 2(a)(1)(C), (2), Feb. 6, 1998, 112 Stat. 3; Pub.L. 106-181, Title II, § 231(a), (d)(2) to (4), Apr. 5, 2000, 114 Stat. 106, 112; Pub.L. 112-95, Title IV, § 414(c), (d), Feb. 14, 2012, 126 Stat. 92.)

Notes of Decisions (1)

49 U.S.C.A. § 41714, 49 USCA § 41714

Current through P.L. 118-151. Some statute sections may be more current, see credits for details.

**End of Document** © 2024 Thomson Reuters. No claim to original U.S. Government Works.

## 49 U.S.C.A. § 41718

§ 41718. Special rules for Ronald Reagan Washington National Airport

Effective: May 16, 2024

Currentness

**(a) Beyond-perimeter exemptions.--**The Secretary shall grant, by order, 24 exemptions from the application of sections 49104(a)(5), 49109, 49111(e), and 41714 of this title to air carriers to operate limited frequencies and aircraft on select routes between Ronald Reagan Washington National Airport and domestic hub airports and exemptions from the requirements of subparts K and S of part 93, Code of Federal Regulations, if the Secretary finds that the exemptions will--

> **(1)** provide air transportation with domestic network benefits in areas beyond the perimeter described in that section;

> **(2)** increase competition by new entrant air carriers or in multiple markets;

> **(3)** not reduce travel options for communities served by small hub airports and medium hub airports within the perimeter described in section 49109; and

> **(4)** not result in meaningfully increased travel delays.

**(b) Within-perimeter exemptions.--**The Secretary shall grant, by order, 20 exemptions from the requirements of sections 49104(a)(5), 49111(e), and 41714 of this title and subparts K and S of part 93 of title 14, Code of Federal Regulations, to air carriers for providing air transportation to airports within the perimeter established for civil aircraft operations at Ronald Reagan Washington National Airport under section 49109. The Secretary shall develop criteria for distributing slot exemptions for flights within the perimeter to such airports under this paragraph in a manner that promotes air transportation--

> **(1)** by new entrant air carriers and limited incumbent air carriers;

> **(2)** to communities without existing nonstop air transportation to Ronald Reagan Washington National Airport;

> **(3)** to small communities;

**(4)** that will provide competitive nonstop air transportation on a monopoly nonstop route to Ronald Reagan Washington National Airport; or

**(5)** that will **produce** the maximum competitive benefits, including low fares.

**(c) Limitations.—**

**(1) Stage 3 aircraft required.--**An exemption may not be granted under this section with respect to any aircraft that is not a Stage 3 aircraft (as defined by the Secretary).

**(2) General exemptions.--**

**(A) Hourly limitation.--**The exemptions granted--

**(i)** under subsections (a), (b), and (i) and departures authorized under subsection (g)(2) may not be for operations between the hours of 10:00 p.m. and 7:00 a.m.; and

**(ii)** under subsections (a), (b), (g), and (i) may not increase the number of operations at Ronald Reagan Washington National Airport in any 1-hour period during the hours between 7:00 a.m. and 9:59 p.m. by more than 5 operations.

**(B) Use of existing slots.--**A non-limited incumbent air carrier utilizing an exemption authorized under subsection (g)(3) for an arrival permitted between the hours of 10:01 p.m. and 11:00 p.m. under this section shall discontinue use of an existing slot during the same time period the arrival exemption is operated.

**(3) Allocation of within-perimeter exemptions.--**Of the exemptions granted under subsection (b)--

**(A)** without regard to the criteria contained in subsection (b)(1), six shall be for air transportation to small hub airports and nonhub airports;

**(B)** ten shall be for air transportation to medium hub and smaller airports; and

**(C)** four shall be for air transportation to airports without regard to their size.

A-10

**(4) Applicability to Exemption No. 5133.--**Nothing in this section affects Exemption No. 5133, as from time-to-time amended and extended.

**(d) Application procedures.--**The Secretary shall establish procedures to ensure that all requests for exemptions under this section are granted or denied within 90 days after the date on which the request is made.

**(e) Applicability of certain laws.--**Neither the request for, nor the granting of an exemption, under this section shall be considered for purposes of any Federal law a major Federal action significantly affecting the quality of the human environment.

**(f) Commuters defined.--**For purposes of aircraft operations at Ronald Reagan Washington National Airport under subpart K of part 93 of title 14, Code of Federal Regulations, the term "commuters" means aircraft operations using aircraft having a certificated maximum seating capacity of 76 or less.

**(g) Additional slot exemptions.--**

**(1) Increase in slot exemptions.--**Not later than 90 days after the date of enactment of the FAA Modernization and Reform Act of 2012, the Secretary shall grant, by order 16 exemptions from--

**(A)** the application of sections 49104(a)(5), 49109, and 41714 to air carriers to operate limited frequencies and aircraft on routes between Ronald Reagan Washington National Airport and airports located beyond the perimeter described in section 49109; and

**(B)** the requirements of subparts K and S of part 93, Code of Federal Regulations.

**(2) New entrants and limited incumbents.--**Of the slot exemptions made available under paragraph (1), the Secretary shall make 8 available to limited incumbent air carriers or new entrant air carriers (as such terms are defined in section 41714(h)). Such exemptions shall be allocated pursuant to the application process established by the Secretary under subsection (d). The Secretary shall consider the extent to which the exemptions will--

**(A)** provide air transportation with domestic network benefits in areas beyond the perimeter described in section 49109;

**(B)** increase competition in multiple markets;

A-11

**(C)** not reduce travel options for communities served by small hub airports and medium hub airports within the perimeter described in section 49109;

**(D)** not result in meaningfully increased travel delays;

**(E)** enhance options for nonstop travel to and from the beyond-perimeter airports that will be served as a result of those exemptions;

**(F)** have a positive impact on the overall level of competition in the markets that will be served as a result of those exemptions; or

**(G)** produce public benefits, including the likelihood that the service to airports located beyond the perimeter described in section 49109 will result in lower fares, higher capacity, and a variety of service options.

**(3) Improved network slots.--**Of the slot exemptions made available under paragraph (1), the Secretary shall make 8 available to incumbent air carriers qualifying for status as a non-limited incumbent carrier at Ronald Reagan Washington National Airport as of the date of enactment of the FAA Modernization and Reform Act of 2012. Each such non-limited incumbent air carrier--

**(A)** may operate up to a maximum of 2 of the newly authorized slot exemptions;

**(B)** prior to exercising an exemption made available under paragraph (1), shall discontinue the use of a slot for service between Ronald Reagan Washington National Airport and a large hub airport within the perimeter as described in section 49109, and operate, in place of such service, service between Ronald Reagan Washington National Airport and an airport located beyond the perimeter described in section 49109;

**(C)** shall be entitled to return of the slot by the Secretary if use of the exemption made available to the carrier under paragraph (1) is discontinued;

**(D)** shall have sole discretion concerning the use of an exemption made available under paragraph (1), including the initial or any subsequent beyond perimeter destinations to be served; and

A-12

**(E)** shall file a notice of intent with the Secretary and subsequent notices of intent, when appropriate, to inform the Secretary of any change in circumstances concerning the use of any exemption made available under paragraph (1).

**(4) Notices of intent.--**Notices of intent under paragraph (3)(E) shall specify the beyond perimeter destination to be served and the slots the carrier shall discontinue using to serve a large hub airport located within the perimeter.

**(5) Conditions.--**Beyond-perimeter flight operations carried out by an air carrier using an exemption granted under this subsection shall be subject to the following conditions:

**(A)** An air carrier may not operate a multi-aisle or widebody aircraft in conducting such operations.

**(B)** An air carrier granted an exemption under this subsection is prohibited from transferring the rights to its beyond-perimeter exemptions pursuant to section 41714(j).

**(h) Scheduling priority.--**In administering this section, the Secretary shall—

**(1)** afford a scheduling priority to operations conducted by new entrant air carriers and limited incumbent air carriers over operations conducted by other air carriers granted additional slot exemptions under subsection (g) for service to airports located beyond the perimeter described in section 49109;

**(2)** afford a scheduling priority to slot exemptions currently held by new entrant air carriers and limited incumbent air carriers for service to airports located beyond the perimeter described in section 49109, to the extent necessary to protect viability of such service; and

**(3)** consider applications from foreign air carriers that are certificated by the government of Canada if such consideration is required by the bilateral aviation agreement between the United States and Canada and so long as the conditions and limitations under this section apply to such foreign air carriers.

**(i) Additional slot exemptions.--**

> **(1) Increase in slot exemptions.--**Not later than 60 days after the date of enactment of the FAA Reauthorization Act of 2024, the Secretary shall grant, by order, 10 exemptions from--
>
>> **(A)** the application of sections 49104(a)(5), 49109, and 41714 to air carriers to operate limited frequencies and aircraft on routes between Ronald Reagan Washington National Airport and domestic airports located within or beyond the perimeter described in section 49109; and
>>
>> **(B)** the requirements of subparts K, S, and T of part 93 of title 14, Code of Federal Regulations.
>
> **(2) Non-limited incumbents.--**Of the slot exemptions made available under paragraph (1), the Secretary shall make 8 available to incumbent air carriers qualifying for status as a non-limited incumbent carrier at Ronald Reagan Washington National Airport as of the date of enactment of the FAA Reauthorization Act of 2024.
>
> **(3) Limited incumbents.--**Of the slot exemptions made available under paragraph (1), the Secretary shall make 2 available to incumbent air carriers qualifying for status as a limited incumbent carrier at Ronald Reagan Washington National Airport as of the date of enactment of the FAA Reauthorization Act of 2024.
>
> **(4) Allocation procedures.--**The Secretary shall allocate the 10 slot exemptions provided under paragraph (1) pursuant to the application process established by the Secretary under subsection (d), subject to the following:
>
>> **(A) Limitations.--**Each air carrier that is eligible under paragraph (2) and paragraph (3) shall be eligible to operate no more and no less than 2 of the newly authorized slot exemptions.
>>
>> **(B) Criteria.--**The Secretary shall consider the extent to which the exemptions will—
>>
>>> **(i)** enhance options for nonstop travel to beyond-perimeter airports that do not have nonstop service from Ronald Reagan Washington National Airport as of the date of enactment of the FAA Reauthorization Act of 2024; or

**(ii)** have a positive impact on the overall level of competition in the markets that will be served as a result of those exemptions.

**(5) Prohibition.--**

**(A) In general.--**The Metropolitan Washington Airports Authority may not assess any penalty or similar levy against an individual air carrier solely for obtaining and operating a slot exemption authorized under this subsection.

**(B) Rule of construction.--**Subparagraph (A) shall not be construed as prohibiting the Metropolitan Washington Airports Authority from assessing and collecting any penalty, fine, or other levy, such as a handling fee or landing fee, that is--

**(i)** authorized by the Metropolitan Washington Airports Regulations;

**(ii)** agreed to in writing by the air carrier; or

**(iii)** charged in the ordinary course of business to an air carrier operating at Ronald Reagan Washington National Airport regardless of whether or not the air carrier obtained a slot exemption authorized under this subsection.

## CREDIT(S)

(Added Pub.L. 106-181, Title II, § 231(e)(1), Apr. 5, 2000, 114 Stat. 112; amended Pub.L. 108-176, Title IV, §§ 425, 426(a), Dec. 12, 2003, 117 Stat. 2555; Pub.L. 112-95, Title IV, § 414(a), (b), Feb. 14, 2012, 126 Stat. 90; Pub.L. 118-63, Title V, § 502(a), (b), May 16, 2024, 138 Stat. 1187.)

49 U.S.C.A. § 41718, 49 USCA § 41718

Current through P.L. 118-151. Some statute sections may be more current, see credits for details.

**End of Document** © 2024 Thomson Reuters. No claim to original U.S. Government Works.

A-15

## 14 C.F.R. § 93.213

§ 93.213 Definitions and general provisions.

Currentness

(a) For purposes of this subpart—

(1) New entrant carrier means a commuter operator or air carrier which does not hold a slot at a particular airport and has never sold or given up a slot at that airport after December 16, 1985.

(2) Slot means the operational authority to conduct one IFR landing or takeoff operation each day during a specific hour or 30 minute period at one of the High Density Traffic Airports, as specified in subpart K of this part.

(3) Summer season means the period of time from the first Sunday in April until the last Sunday in October.

(4) Winter season means the period of time from the last Sunday in October until the first Sunday in April.

(5) Limited incumbent carrier means an air carrier or commuter operator that holds or operates fewer than 12 air carrier or commuter slots, in any combination, at a particular airport, not including international slots, Essential Air Service Program slots, or slots between the hours of 2200 and 0659 at Washington National Airport or LaGuardia Airport. However, for the purposes of this paragraph (a)(5), the carrier is considered to hold the number of slots at that airport that the carrier has, since December 16, 1985:

(i) Returned to the FAA;

(ii) Had recalled by the FAA under § 93.227(a); or

(iii) Transferred to another party other than by trade for one or more slots at the same airport.

(b) The definitions specified in subpart K of this part also apply to this subpart.

(c) For purposes of this subpart, if an air carrier, commuter operator, or other person has more than a 50–percent ownership or control of one or more other air carriers, commuter operators, or other persons, they shall be considered to be a single air carrier, commuter operator, or person. In addition, if a single company

A-16

has more than a 50–percent ownership or control of two or more air carriers and/or commuter operators or any combination thereof, those air carriers and/or commuter operators shall be considered to be a single operator. A single operator may be considered to be both an air carrier and commuter operator for purposes of this subpart.

## Credits

[Amdt. 93–52, 51 FR 21717, June 13, 1986; Amdt. 93–57, 54 FR 34906, Aug. 22, 1989; 54 FR 37303, Sept. 8, 1989; Amdt. 93–65, 57 FR 37314, Aug. 18, 1992; 57 FR 52590, Nov. 4, 1992]

SOURCE: 50 FR 52195, Dec. 20, 1985; 51 FR 2873, Jan. 22, 1986; 51 FR 43586, Dec. 3, 1986; 56 FR 48094, Sept. 23, 1991; 56 FR 65662, Dec. 17, 1991; Amdt. 93–72, 60 FR 67255, Dec. 28, 1995; Amdt. 93–82, 68 FR 9795, Feb. 28, 2003; Amdt. 93–98, 79 FR 35490, June 23, 2014; Amdt. 93–100, 81 FR 62806, Sept. 12, 2016, unless otherwise noted.

AUTHORITY: 49 U.S.C. 106(f), 106(g), 40103, 40106, 40109, 40113, 44502, 44514, 44701, 44715, 44719, 46301.

Notes of Decisions (1)

Current through December 17, 2024, 89 FR 102635. Some sections may be more current. See credits for details.

**End of Document** © 2024 Thomson Reuters. No claim to original U.S. Government Works.

A-17

Exhibit A to Spirit, Letter re Spirit Eligibility for DCA Limited Incumbent Slot Exemptions, Docket DOT-OST-2024-0065-0007 (June 26, 2024)

**Schedule Code Share Summary Report for AS nonstop Passenger (Air - All) flights operated by AA from DCA for travel in May 2024**
All flights, seats, and ASMs given are per week.

| Mkt Al | Op Al | Orig | Dest | Miles | Mon | Tue | Wed | Thu | Fri | Sat | Sun | Ops/Week | Seats | Seats/ Dep | ASMs |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| AS | AA | ALB | DCA | 318 | 2 | 2 | 2 | 2 | 2 | 2 | 2 | 14 | 1,009 | 72.1 | 320,862 |
| AS | AA | ATL | DCA | 547 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 7 | 532 | 76.0 | 291,004 |
| AS | AA | AVL | DCA | 384 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 7 | 455 | 65.0 | 174,720 |
| AS | AA | BDL | DCA | 313 | 2 | 2 | 2 | 2 | 2 | 2 | 1 | 13 | 922 | 70.9 | 288,586 |
| AS | AA | BGR | DCA | 590 | 0 | 0 | 0 | 1 | 1 | 1 | 1 | 4 | 260 | 65.0 | 153,400 |
| AS | AA | BHM | DCA | 654 | 1 | 1 | 1 | 1 | 1 | 1 | 0 | 6 | 390 | 65.0 | 255,060 |
| AS | AA | BNA | DCA | 562 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 7 | 521 | 74.4 | 292,802 |
| AS | AA | BOS | DCA | 399 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 7 | 896 | 128.0 | 357,504 |
| AS | AA | BTV | DCA | 437 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 7 | 455 | 65.0 | 198,835 |
| AS | AA | BUF | DCA | 296 | 2 | 2 | 2 | 2 | 2 | 1 | 1 | 12 | 912 | 76.0 | 269,952 |
| AS | AA | CAE | DCA | 408 | 1 | 1 | 1 | 1 | 1 | 1 | 0 | 6 | 390 | 65.0 | 159,120 |
| AS | AA | CHS | DCA | 444 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 7 | 455 | 65.0 | 202,020 |
| AS | AA | CID | DCA | 801 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 7 | 455 | 65.0 | 364,455 |
| AS | AA | CLE | DCA | 310 | 1 | 1 | 1 | 1 | 1 | 0 | 0 | 5 | 325 | 65.0 | 100,750 |
| AS | AA | CLT | DCA | 330 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 7 | 896 | 128.0 | 295,680 |
| AS | AA | CMH | DCA | 322 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 7 | 532 | 76.0 | 171,304 |
| AS | AA | CRW | DCA | 249 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 7 | 455 | 65.0 | 113,295 |
| AS | AA | CVG | DCA | 411 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 7 | 532 | 76.0 | 218,652 |
| AS | AA | DAY | DCA | 391 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 7 | 532 | 76.0 | 208,012 |
| AS | AA | DCA | AGS | 468 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 7 | 455 | 65.0 | 212,940 |
| AS | AA | DCA | ALB | 318 | 1 | 1 | 1 | 1 | 1 | 0 | 1 | 6 | 456 | 76.0 | 145,008 |
| AS | AA | DCA | ATL | 547 | 1 | 1 | 1 | 1 | 1 | 0 | 1 | 6 | 456 | 76.0 | 249,432 |
| AS | AA | DCA | BDL | 313 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 7 | 532 | 76.0 | 166,516 |
| AS | AA | DCA | BGR | 590 | 0 | 0 | 1 | 1 | 1 | 1 | 1 | 5 | 325 | 65.0 | 191,750 |
| AS | AA | DCA | BHM | 654 | 1 | 1 | 1 | 1 | 1 | 0 | 1 | 6 | 390 | 65.0 | 255,060 |
| AS | AA | DCA | BNA | 562 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 7 | 532 | 76.0 | 298,984 |
| AS | AA | DCA | BOS | 399 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 7 | 896 | 128.0 | 357,504 |
| AS | AA | DCA | BTR | 985 | 1 | 1 | 1 | 1 | 1 | 0 | 1 | 6 | 390 | 65.0 | 384,150 |
| AS | AA | DCA | BTV | 437 | 1 | 1 | 1 | 1 | 1 | 0 | 1 | 6 | 456 | 76.0 | 199,272 |
| AS | AA | DCA | BUF | 296 | 1 | 1 | 1 | 1 | 1 | 0 | 1 | 6 | 456 | 76.0 | 134,976 |
| AS | AA | DCA | CAE | 408 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 7 | 455 | 65.0 | 185,640 |
| AS | AA | DCA | CAK | 274 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 7 | 455 | 65.0 | 124,670 |
| AS | AA | DCA | CHA | 523 | 1 | 1 | 1 | 1 | 1 | 0 | 1 | 6 | 390 | 65.0 | 203,970 |
| AS | AA | DCA | CHS | 444 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 7 | 584 | 83.4 | 259,296 |
| AS | AA | DCA | CLE | 310 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 7 | 488 | 69.7 | 151,280 |
| AS | AA | DCA | CLT | 330 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 7 | 1,204 | 172.0 | 397,320 |
| AS | AA | DCA | CMH | 322 | 1 | 1 | 1 | 1 | 1 | 0 | 1 | 6 | 456 | 76.0 | 146,832 |
| AS | AA | DCA | CRW | 249 | 1 | 1 | 1 | 1 | 1 | 0 | 1 | 6 | 390 | 65.0 | 97,110 |
| AS | AA | DCA | CVG | 411 | 1 | 1 | 1 | 1 | 1 | 0 | 1 | 6 | 390 | 65.0 | 160,290 |
| AS | AA | DCA | DAY | 391 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 7 | 455 | 65.0 | 177,905 |
| AS | AA | DCA | DSM | 897 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 7 | 532 | 76.0 | 477,204 |
| AS | AA | DCA | DTW | 405 | 1 | 1 | 1 | 1 | 1 | 0 | 1 | 6 | 456 | 76.0 | 184,680 |
| AS | AA | DCA | GRR | 524 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 7 | 455 | 65.0 | 238,420 |
| AS | AA | DCA | GSO | 248 | 1 | 1 | 1 | 1 | 1 | 0 | 1 | 6 | 390 | 65.0 | 96,720 |
| AS | AA | DCA | GSP | 396 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 7 | 455 | 65.0 | 180,180 |
| AS | AA | DCA | HPN | 234 | 1 | 1 | 1 | 1 | 1 | 0 | 1 | 6 | 390 | 65.0 | 91,260 |
| AS | AA | DCA | HSV | 613 | 1 | 1 | 1 | 1 | 1 | 0 | 1 | 6 | 390 | 65.0 | 239,070 |
| AS | AA | DCA | ILM | 320 | 1 | 1 | 1 | 1 | 1 | 0 | 1 | 6 | 401 | 66.8 | 128,320 |
| AS | AA | DCA | IND | 499 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 7 | 532 | 76.0 | 265,468 |

1

A-18

| Mkt Al | Op Al | Orig | Dest | Miles | Mon | Tue | Wed | Thu | Fri | Sat | Sun | Ops/Week | Seats | Seats/ Dep | ASMs |
|--------|-------|------|------|-------|-----|-----|-----|-----|-----|-----|-----|----------|-------|-----------|------|
| AS | AA | DCA | JAN | 860 | 1 | 1 | 1 | 1 | 1 | 0 | 1 | 6 | 390 | 65.0 | 335,400 |
| AS | AA | DCA | JAX | 634 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 7 | 896 | 128.0 | 568,064 |
| AS | AA | DCA | JFK | 213 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 7 | 532 | 76.0 | 113,316 |
| AS | AA | DCA | LGA | 214 | 1 | 1 | 1 | 1 | 1 | 0 | 1 | 6 | 768 | 128.0 | 164,352 |
| AS | AA | DCA | LIT | 888 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 7 | 532 | 76.0 | 472,416 |
| AS | AA | DCA | MHT | 407 | 1 | 1 | 1 | 1 | 1 | 0 | 1 | 6 | 456 | 76.0 | 185,592 |
| AS | AA | DCA | MIA | 920 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 7 | 1,204 | 172.0 | 1,107,680 |
| AS | AA | DCA | MYR | 372 | 1 | 1 | 1 | 1 | 1 | 0 | 1 | 6 | 456 | 76.0 | 169,632 |
| AS | AA | DCA | ORD | 612 | 6 | 3 | 3 | 4 | 4 | 4 | 4 | 28 | 4,222 | 150.8 | 2,583,864 |
| AS | AA | DCA | ORF | 142 | 1 | 1 | 1 | 1 | 1 | 0 | 1 | 6 | 456 | 76.0 | 64,752 |
| AS | AA | DCA | PHL | 119 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 7 | 532 | 76.0 | 63,308 |
| AS | AA | DCA | PHX | 1,979 | 1 | 1 | 1 | 0 | 0 | 0 | 0 | 3 | 588 | 196.0 | 1,163,652 |
| AS | AA | DCA | PIT | 205 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 7 | 532 | 76.0 | 109,060 |
| AS | AA | DCA | PNS | 816 | 1 | 1 | 1 | 1 | 1 | 0 | 1 | 6 | 456 | 76.0 | 372,096 |
| AS | AA | DCA | PVD | 357 | 1 | 1 | 1 | 1 | 1 | 0 | 1 | 6 | 445 | 74.2 | 158,865 |
| AS | AA | DCA | PWM | 482 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 7 | 521 | 74.4 | 251,122 |
| AS | AA | DCA | RDU | 227 | 1 | 1 | 1 | 1 | 1 | 0 | 1 | 6 | 456 | 76.0 | 103,512 |
| AS | AA | DCA | ROC | 296 | 1 | 1 | 1 | 1 | 1 | 0 | 1 | 6 | 456 | 76.0 | 134,976 |
| AS | AA | DCA | SAV | 520 | 1 | 1 | 1 | 1 | 1 | 0 | 1 | 6 | 390 | 65.0 | 202,800 |
| AS | AA | DCA | SDF | 474 | 1 | 1 | 1 | 1 | 1 | 0 | 1 | 6 | 456 | 76.0 | 216,144 |
| AS | AA | DCA | SYR | 298 | 1 | 1 | 1 | 1 | 1 | 0 | 1 | 6 | 456 | 76.0 | 135,888 |
| AS | AA | DCA | TLH | 716 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 7 | 532 | 76.0 | 380,912 |
| AS | AA | DCA | TPA | 814 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 7 | 896 | 128.0 | 729,344 |
| AS | AA | DCA | TYS | 436 | 1 | 1 | 1 | 1 | 1 | 0 | 1 | 6 | 390 | 65.0 | 170,040 |
| AS | AA | DCA | XNA | 963 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 7 | 532 | 76.0 | 512,316 |
| AS | AA | DSM | DCA | 897 | 1 | 1 | 1 | 1 | 1 | 0 | 1 | 6 | 456 | 76.0 | 409,032 |
| AS | AA | DTW | DCA | 405 | 0 | 0 | 0 | 1 | 1 | 1 | 1 | 4 | 304 | 76.0 | 123,120 |
| AS | AA | ECP | DCA | 769 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 1 | 76 | 76.0 | 58,444 |
| AS | AA | EYW | DCA | 1,023 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 7 | 584 | 83.4 | 597,432 |
| AS | AA | GRR | DCA | 524 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 7 | 455 | 65.0 | 238,420 |
| AS | AA | GSO | DCA | 248 | 1 | 1 | 1 | 1 | 1 | 0 | 0 | 5 | 325 | 65.0 | 80,600 |
| AS | AA | GSP | DCA | 396 | 1 | 1 | 1 | 1 | 1 | 1 | 0 | 6 | 390 | 65.0 | 154,440 |
| AS | AA | HPN | DCA | 234 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 7 | 455 | 65.0 | 106,470 |
| AS | AA | HSV | DCA | 613 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 7 | 466 | 66.6 | 285,658 |
| AS | AA | ILM | DCA | 320 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 7 | 455 | 65.0 | 145,600 |
| AS | AA | IND | DCA | 499 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 7 | 532 | 76.0 | 265,468 |
| AS | AA | JAX | DCA | 634 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 7 | 455 | 65.0 | 288,470 |
| AS | AA | JFK | DCA | 213 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 7 | 532 | 76.0 | 113,316 |
| AS | AA | LGA | DCA | 214 | 1 | 1 | 1 | 1 | 1 | 0 | 1 | 6 | 768 | 128.0 | 164,352 |
| AS | AA | MCO | DCA | 759 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 7 | 1,204 | 172.0 | 913,836 |
| AS | AA | MHT | DCA | 407 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 7 | 455 | 65.0 | 185,185 |
| AS | AA | MIA | DCA | 920 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 7 | 1,204 | 172.0 | 1,107,680 |
| AS | AA | MYR | DCA | 372 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 7 | 455 | 65.0 | 169,260 |
| AS | AA | ORD | DCA | 612 | 5 | 3 | 3 | 3 | 3 | 2 | 3 | 22 | 3,344 | 152.0 | 2,046,528 |
| AS | AA | ORF | DCA | 142 | 2 | 2 | 2 | 2 | 2 | 1 | 2 | 13 | 988 | 76.0 | 140,296 |
| AS | AA | PBI | DCA | 857 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 7 | 896 | 128.0 | 767,872 |
| AS | AA | PHL | DCA | 119 | 2 | 2 | 2 | 2 | 2 | 1 | 1 | 12 | 912 | 76.0 | 108,528 |
| AS | AA | PHX | DCA | 1,979 | 1 | 1 | 1 | 0 | 0 | 0 | 0 | 3 | 588 | 196.0 | 1,163,652 |
| AS | AA | PIT | DCA | 205 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 7 | 532 | 76.0 | 109,060 |
| AS | AA | PNS | DCA | 816 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 7 | 532 | 76.0 | 434,112 |
| AS | AA | PVD | DCA | 357 | 2 | 2 | 2 | 2 | 2 | 1 | 1 | 12 | 901 | 75.1 | 321,657 |
| AS | AA | PWM | DCA | 482 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 7 | 518 | 74.0 | 249,676 |
| AS | AA | RDU | DCA | 227 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 7 | 532 | 76.0 | 120,764 |

2

A-19

| Mkt Al | Op Al | Orig | Dest | Miles | Mon | Tue | Wed | Thu | Fri | Sat | Sun | Ops/Week | Seats | Seats/ Dep | ASMs |
|--------|-------|------|------|-------|-----|-----|-----|-----|-----|-----|-----|----------|-------|-----------|------|
| AS | AA | ROC | DCA | 296 | 2 | 2 | 2 | 2 | 2 | 1 | 1 | 12 | 835 | 69.6 | 247,160 |
| AS | AA | RSW | DCA | 892 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 7 | 896 | 128.0 | 799,232 |
| AS | AA | SAV | DCA | 520 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 7 | 532 | 76.0 | 276,640 |
| AS | AA | SDF | DCA | 474 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 7 | 477 | 68.1 | 226,098 |
| AS | AA | SRQ | DCA | 851 | 0 | 0 | 0 | 0 | 0 | 1 | 1 | 2 | 193 | 96.5 | 164,243 |
| AS | AA | SYR | DCA | 298 | 2 | 2 | 2 | 2 | 2 | 1 | 1 | 12 | 1,276 | 106.3 | 380,248 |
| AS | AA | TPA | DCA | 814 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 7 | 896 | 128.0 | 729,344 |
| AS | AA | TUL | DCA | 1,050 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 1 | 76 | 76.0 | 79,800 |
| AS | AA | TYS | DCA | 436 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 7 | 532 | 76.0 | 231,952 |
| AS | AA | VPS | DCA | 789 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 7 | 896 | 128.0 | 706,944 |
| | | | TOTAL | | 123 | 118 | 119 | 120 | 120 | 84 | 110 | 794 | 69,009 | 86.9 | 36,016,932 |

3

A-20

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on February 24, 2025, I electronically filed the

foregoing brief with the Clerk of the Court for the United States Court of Appeals

for the District of Columbia Circuit by using the appellate CM/ECF system.

Service of a true and accurate copy of the same occurred through the appellate

CM/ECF system upon the following:

Michael S. Raab
Simon Christopher Brewer
*Attorneys for Respondent*

Shay Dvoretzky
Parker Andrew Rider-Longmaid
Sarah Leitner
*Attorneys for Respondent-Intervenor*

Respectfully submitted:

*/s/ Aaron Schaer*
Aaron Schaer
D.C. Circuit #65864
BALLARD SPAHR LLP
13313 Balfour Ave
Huntington Woods, MI 48070
Direct: 206.223.7103
Fax: 206.223.7107
schaera@ballardspahr.com

*Counsel for Petitioner Frontier
Airlines, Inc.*