No. 25-1002

# In the United States Court of Appeals for the District of Columbia Circuit

FRONTIER AIRLINES, INC.,

*Petitioner*,

SPIRIT AIRLINES, INC.,

*Movant-Intervenor*,

*v.*

UNITED STATES DEPARTMENT OF TRANSPORTATION,

*Respondent*,

ALASKA AIRLINES, INC.,

*Intervenor*.

On Petition for Review of a Final Order of the U.S. Department of Transportation

## Opening Brief of Spirit Airlines, Inc.

Joanne W. Young
*Counsel of Record*
David M. Kirstein
Donald L. Crowell III
KIRSTEIN & YOUNG PLLC
1750 K Street NW, Suite 700
Washington, DC  20006
(202) 331-3348

*Counsel for Spirit Airlines, Inc.*

# CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

Pursuant to D.C. Circuit Rule 28(a)(1), Spirit Airlines, Inc. hereby submits its Certificate as to Parties Rulings, and Related Cases:

## I.    Parties

Petitioner in this matter is Frontier Airlines, Inc.

Respondent in this matter is the U.S. Department of Transportation.

Intervenors in this matter include Alaska Airlines, Inc., which was allowed to intervene in support of Respondent on January 27, 2025. Spirit Airlines, Inc. has moved to intervene in support of Petitioner. On March 3, 2025, the Court issued a per curiam order referring Spirit's motion to the merits panel and allowing Spirit "as movant intervenor lodge an opening brief by March 3, 2025 and any reply brief by April 7, 2025." Doc. #2103604, No. 25-1002 (D.C. Cir. Mar. 3, 2025).

## II.    Rulings Under Review

Frontier seeks review of the Department of Transportation Final Order 2024-12-8 in Docket DOT-OST-2024-0065, see J.A. 485–96, as well as all interlocutory orders, decisions, determinations, and conclusions supporting the above Final Order.

III.    Related Cases

On February 14, 2025, Alaska filed a Petition for Review, docketed as *Alaska Airlines, Inc. v. United States Department of Transportation*, No. 25-1062 (D.C. Cir.). Alaska requested that its Petition be consolidated with No. 25-1002 because Alaska conditionally challenges the same Final Order. On February 25, 2025, this Court denied Alaska's consolidation request and held that case in abeyance pending further order of the court. Parties in No. 25-1062 were directed to file motions to govern further proceedings in that case within 30 days of the disposition of this case No. 25-1002. Spirit is not aware of any other related cases currently pending in this Court or any other court within the meaning of Circuit Rule 28(a)(1)(C).

Dated: March 3, 2025                    Respectfully submitted,

                                        /s/ Joanne W. Young
                                        Joanne W. Young

                                        *Counsel for Spirit Airlines, Inc.*

## TABLE OF CONTENTS

Page

Table of Contents ................................................................................. iii

Table of Authorities ............................................................................. v

Glossary ................................................................................................. i

Introduction ......................................................................................... 1

Statement of the Case ......................................................................... 2

    I.   The Legal and Regulatory Framework for Allocating Beyond-Perimeter Slot Exemptions at Ronald Reagan Washington National Airport ....................................................................... 2

        A.  High-Density Rule and Congressional Refinements ....................... 3

        B.  Section 41714(k)'s Aggregator Rule for Code-Share Partners ....... 8

        C.  The 2024 FAA Reauthorization Act and Section 41718(i) ........... 9

        D.  Relevant DOT Regulations and Precedent .................................... 12

Summary of the Argument ................................................................. 13

Standard of Review ............................................................................. 15

Argument .............................................................................................. 17

    I.   Frontier Is Not an Incumbent or Limited Incumbent as Those Terms Apply for Purposes of Slot Allocations in 49 U.S.C. §§ 41714(h)(5) and 41718 ............................................................................. 17

        A.  All Limited Incumbent are Incumbents ........................................ 17

        B.  Frontier Cannot Be an Incumbent Because it has Never Held or Operated Permanent Slots at DCA—Making it a New Entrant, as DOT Found ............................................................................. 25

II.  Alaska Airlines Is Statutorily Barred from "Limited Incumbent" or "New Entrant" Status by 49 U.S.C. § 41714(k) Because of its Extensive Codeshare Arrangement with American Airlines, including at DCA......27

    A.  The Scope and Purpose of Section 41714(k) ..............................28

    B.  Alaska and American's Decades-long Codeshare Relationship Extends to Hundreds of Flights, Frequent Flyer Programs, and Beyond...........................................................................................29

    C.  The DOT's Erroneous "Meaningful Access" Standard Serves Only as *Post-Hoc* Justification to Support a Pre-Conceived Decision ........................................................................................29

III. The DOT's Decision Undermines Congress' Pro-Competitive Intent and Cannot Survive Arbitrary-and-Capricious Review ..........................32

IV.  The Proper Remedy is Vacatur Which Would Provide an Opportunity for Alaska to Still Operate DCA Service as a Non-Limited Incumbent...33

Conclusion ...............................................................................................37

## TABLE OF AUTHORITIES

Page

**Cases**

*Holloway v. United States*, 526 U.S. 1 (1999) ............................................................21

*Loper Bright Enters. v. Raimondo*, 603 U.S. 369 (2024) ........................................16

*Nat'l Ass'n of Mfrs. v. Dept. of Defense*, 583 U.S. 109 (2018) ...........................24, 25

*Pacific Gas v. FERC*, 113 F.4th 943 (D.C. Cir. 2024) ...............................................15

*Richards v. United States*, 369 U.S. 1 (1962) ..........................................................21

*Sierra Club v. United States DOT*, Nos. 20-1317, 20-1318, 20-1431, 21-1009, 2025 U.S. App. LEXIS 1362 (D.C. Cir. Jan. 17, 2025) ......................................................

**Statutes**

49 U.S.C. § 49109 ....................................................................................................9

**Legislation**

Airline Deregulation Act of 1978, Pub. L. 95-504, 92 Stat. 1705 (1978) ................3

Department of Transportation and Related Agencies Appropriations Act of 1989, Pub. L. 100-457, 102 Stat. 2125 (1988)................................................................7

Wendell H. Ford Aviation Investment and Reform Act for the 21st Century, Pub. L. 106-181, 114 Stat. 61 (2000) ..................................................................................8

# GLOSSARY

| | |
|---|---|
| 2024 FAA Act | FAA Reauthorization Act of 2024, Pub. L. No. 118-63, 138 Stat. 1025 |
| Alaska | Alaska Airlines, Inc. |
| DCA | Ronald Reagan Washington National Airport |
| DOT | Department of Transportation |
| Frontier | Frontier Airlines, Inc. |
| Spirit | Spirit Airlines, Inc. |

## INTRODUCTION

Ronald Reagan Washington National Airport (DCA) remains one of the most constrained and fiercely competitive airports in the nation. When Congress enacted Section 502 of the 2024 FAA Reauthorization Act—creating ten new slot exemptions, two specifically for "limited incumbents"—it sought to expand beyond-perimeter service and spark long-overdue fare competition. Yet the Department of Transportation's (DOT) final order distributing those two limited incumbent exemptions has raised serious legal and policy concerns focused on two core issues.

First, DOT misapplied the longstanding definitions that distinguish "new entrant" from "limited incumbent." Under 49 U.S.C. § 41714(h)(5) and 14 C.F.R. § 93.213(a)(5), a carrier that has ever held permanent slots remains a limited incumbent, even if it later transferred those slots—ensuring that airlines cannot game the system to gain special privileges. Despite this clear directive, DOT effectively discounted carriers that parted with their permanent slots, while simultaneously treating an airline with zero historic slots as an incumbent.

Second, DOT ignored the "aggregator rule" in 49 U.S.C. § 41714(k), which forbids code-sharing partners that collectively hold more than 20 slots from claiming limited-incumbent (or new-entrant) status. By awarding the exemptions to an airline closely aligned with the largest slot-holder at DCA, DOT effectively nullified

– 1 –

Congress's intent to foster genuine competition by empowering truly smaller carriers.

These errors not only contradict unambiguous statutory language but also thwart the core legislative purpose of spurring new, lower-fare service at a capacity-constrained airport. Spirit's brief demonstrates why the final order should be vacated and remanded for proper adherence to both the text and spirit of the law.

## STATEMENT OF THE CASE

### I.  The Legal and Regulatory Framework for Allocating Beyond-Perimeter Slot Exemptions at Ronald Reagan Washington National Airport

Decades ago, the Federal Aviation Administration ("FAA") promulgated the High-Density Rule, initially applicable to a small group of airports, including Washington National (now Ronald Reagan National Airport) (DCA). This rule arose from the need to mitigate air congestion, manage capacity, and prevent an unsustainable surge of scheduled operations at certain major urban airports. Under these rules, scheduled operations could only occur under the authority of FAA issued "slots," which signified discrete takeoff and landing rights at particular times of day. Over time, Congress codified the "slot" system by setting forth statutory provisions aimed at distributing or reallocating slot holdings to improve competition, maintain adequate service, and preserve safety.

Congress's approach to awarding and reassigning slots has always entailed balancing multiple objectives. While it seeks to ensure that heavily congested airports like DCA do not become overwhelmed by unrestrained growth, Congress also recognized these controls limit capacity and create barriers to entry. Particularly following the Airline Deregulation Act of 1978, Pub. L. 95-504, 92 Stat. 1705 (1978) [ADA], large legacy airlines with historically high slot holdings might use their position to suppress competition and keep fares elevated. Recognizing these effects, Congress enacted legislation with a fundamental statutory imperative to promote competition at slot-restricted airports, such as DCA. One approach taken by Congress was to create and allocate slot exemptions in ways that advantage smaller or newer carriers. In so doing, Congress has consistently separated carriers into categories—"new entrant," "limited incumbent," or "non-limited incumbent"—and tied slot exemption eligibility to those classifications.

### A. High-Density Rule and Congressional Refinements

Since the 1960s, the Federal Aviation Administration ("FAA") has enforced "High-Density Rules" restricting scheduled operations at certain busy airports. Over time, Congress expressly integrated these rules into statutes at 49 U.S.C. § 41714. The statutory definitions that matter here are found in 49 U.S.C. § 41714(h). That section classifies carriers based on how many permanent slots they have ever held,

or currently operate (*e.g.*, by way of leasing a slot or code-sharing with another airline which holds a slot at that airport):

1. A **new entrant air carrier** is an air carrier that "does not hold a slot at the airport concerned *and has never sold or given up a slot at that airport after December 16, 1985.*" 49 U.S.C. § 41714(h)(3) (emphasis added). Limited incumbent carriers are also new entrants so long as they do not "hold a slot" and have never "sold or given up a slot." Without creating conflict with the first part of the definition, this can only mean that the subcategory of limited incumbents which also qualify as "new entrants" are those which have under 14 CFR § 93.213(a)(5) "operate[d] fewer than [40]" slots (not slot exemptions because § 41714(h)(5)(A) modifies the regulation to exclude them), but have never held a slot since December 16, 1985. Accordingly, a carrier which has only held or operated *slot exemptions* does not qualify under 49 U.S.C. § 41714(h)(3) as the type of limited incumbent which could also be a new entrant.

2. A **limited incumbent air carrier** is an air carrier which meets "the meaning given that term in subpart S of part 93 of title 14, Code of Federal Regulations," § 41714(h)(5), subject to some exceptions written into the statute. As relevant here, Subpart S of Part 93 defines a "limited incumbent carrier" as

– 4 –

"an air carrier . . . that holds or operates fewer than [40] . . . slots . . . . However, for the purposes of this paragraph (a)(5), the carrier is considered to hold the number of slots at that airport that the carrier has, since December 16, 1985:

(i) Returned to the FAA;

(ii) Had recalled by the FAA under § 93.227(a); or

(iii) Transferred to another party other than by trade for one or more slots at the same airport.

14 C.F.R. § 93.213(a)(5).

Section 41714(h)(5) has amended the 12-slot maximum in Part 93 to qualify as a limited incumbent to be a 40-slot maximum. 49 U.S.C. § 41714(h)(5)(A) ("'40' shall be substituted for '12' in sections 93.213(a)(5), 93.223(c)(3), and 93.225(h)").

3. A **non-limited incumbent** has no specific statutory or regulatory definition and is understood only as part of the broader slot-incumbent category by way of contrasting the prefix "non-" to the word "limited" in the term "limited incumbent." The prefixes "non-limited" and "limited" both modify the word incumbent. A non-limited incumbent is thus a permanent slot-incumbent carrier that is not a limited incumbent. The Supplemental Notice of Proposed Rulemaking which resulted in the Part 93 definition of "limited incumbent" re-

ferred to this other category of slot-incumbents as "[o]ther, non-limited incumbent carriers."  Accordingly, a non-limited incumbent cannot be a new entrant and must have held, or must currently hold/operate, more than 40 permanent slots at an airport.

4. A **slot** "means a reservation for an instrument flight rule takeoff or landing by an air carrier of an aircraft in air transportation." 49 U.S.C. § 41714(h)(4).

5. A **slot exemption** is used in sections 41714, 41715, 41716, to refer to "exemptions from the requirements of subparts K and S of part 93 of title 14, Code of Federal Regulations (pertaining to slots at Ronald Reagan Washington National Airport), to enable" a specified type of carrier (like a limited incumbent), to provide new or more service at DCA.

In determining whether an air carrier holds or operates the number of slots to qualify as a Limited Incumbent Air Carrier in Section 41714(h)(5), Congress expressly stated that "for purposes of such sections [93.213(a)(5), 93.223(c)(3), and 93.225(h) wherein 'limited incumbent air carrier is defined'], the term 'slot' shall not include—(i) "slot exemptions." 49 U.S.C. § 41714(h)(5)(B).

These classifications matter because the statutory framework for awarding new slot exemptions or reassigning existing slots often provides distinct benefits or

eligibility criteria to carriers depending on their category. For example, in 2024, Section 502 of the 2024 FAA Act singled out two slot exemptions exclusively for carriers that qualified as "limited incumbents." Meanwhile, the eight remaining slot exemptions were made available only to "non-limited incumbents."

To avoid confusion, it is important to note that the terms "new entrant air carrier" and "limited incumbent air carrier" were defined and introduced prior to 1994, contrary to Alaska's assertion in its Reply to Frontier's Motion for Stay, at 4. The term "new entrant air carrier" was defined in a 1982 rulemaking, 47 Fed. Reg. 7816, 7818-7821 (Feb. 22, 1982), and further used by Congress in legislation passed in 1990, Omnibus Budget Reconciliation Act of 1990, Pub. L. 101-508, Section 9126, 104 Stat. 1388, 1388-371. The term "limited incumbent air carrier" was defined in a 1991 Supplemental Notice of Proposed Rulemaking, which resulted in the current text of 14 C.F.R. § 93.213. 56 Fed. Reg. 46674, 46675, 46680 (Sept. 13, 1991).

Both terms were also used in pre-1994 slot allocation rulemakings. *E.g.*, Department of Transportation and Related Agencies Appropriations Act of 1989, Pub. L. 100-457, Section 349, 102 Stat. 2125, 2156 (1988) ("the Administrator of the Federal Aviation Administration shall institute a rulemaking proceeding to consider the need for changes to the existing regulation concerning the allocation and transfer of "slots" held by air carriers and commuter operators . . . Included among the issues

that shall be considered in this proceeding are (1) the overall effect of the existing buy-sell regulation upon new entry or limited incumbents at these four airports"); 53 Fed. Reg. 51628, 51629 (Dec. 22, 1988) ("Since the rule was first issued, a total of 140 slots have been made available to new entrants or limited incumbents (holding less than 8 slots).").

### B.  Section 41714(k)'s Aggregator Rule for Code-Share Partners

In the Wendell H. Ford Aviation Investment and Reform Act for the 21st Century, Pub. L. 106-181, 114 Stat. 61 (2000) [Air-21]. Congress added an aggregator rule at 49 U.S.C. § 41714(k). This rule states:

> Affiliated Carriers.—For purposes of this section and sections 41716, 41717, and 41718, an air carrier that operates under the same designator code, or has or enters into a code-share agreement, with any other air carrier shall not qualify for a new slot or slot exemption as a new entrant or limited incumbent air carrier at an airport if the total number of slots and slot exemptions held by the two carriers at the airport exceed 20 slots and slot exemptions.

The plain text is sweeping. It applies to "any air carrier" that has or enters into a code-share relationship with "any other air carrier." The aggregator rule ensures that large or entrenched carriers cannot artificially rebrand themselves as "limited incumbents" or "new entrants" by funneling capacity through code-share affiliates, thereby blocking genuinely smaller carriers from obtaining newly created or reallocated slots.

– 8 –

### C.  The 2024 FAA Reauthorization Act and Section 41718(i)

In May 2024, Congress enacted section 502 of the Act, which directed the Secretary of Transportation to grant 10 slot exemptions to air carriers for operations at DCA for either within or beyond-perimeter routes. *See* 49 U.S.C. § 49109 (prohibiting nonstop air carrier flights to DCA and airports more than 1,250 statute miles away). Four roundtrips (eight slot exemptions) were earmarked for "non-limited incumbents," and one roundtrip (two slot exemptions) for "limited incumbents."

The legislative impetus was to provide beyond perimeter service to airports without non-stop DCA service and bolster competition at DCA, which has historically high fares, ensuring smaller incumbents had at least some protected route expansions. The statutory text at 49 U.S.C. § 41718(i) indicated that the two "limited incumbent" slot exemptions should go to carriers that genuinely satisfy the limited incumbent criteria "as of the date of enactment." It did not override existing definitions in 49 U.S.C. § 41714(h), nor did it exempt or contradict the aggregator rule in § 41714(k). Indeed, that code-share bar remains in full force and effect.

On June 24, 2024, in accordance with Section 502, the Secretary of Transportation issued notice that it would accept applications for these ten slots. Spirit Airlines, Inc. (Spirit), J.A. 218, Frontier Airlines, Inc. (Frontier), J.A. 192, and Alaska

Airlines, Inc. (Alaska), J.A. 201, submitted applications for the two limited incumbent slots. On October 16th, 2024, the DOT issued an Order to Show Cause indicating it intended to give the limited incumbent slots to Alaska Airlines, Inc. J.A. 383. Spirit, J.A. 325-37, 420-24, 467-70, and Frontier, J.A. 433-38, both objected to Alaska being eligible for the non-limited incumbent slots. Both carriers argued Alaska was only eligible for the non-limited incumbent slots because it had a code-share agreement with American Airlines. Alaska and American together held over 520 slots or slot exemptions at DCA—hundreds more than the 20 slot or slot exemption cap to qualify as a limited incumbent under 49 U.S.C. § 41714(k). This restriction expressly applies for "purposes of [41714] and sections 41716, 41717, and 41718. Section 41718 is the statute which Section 502 of the Act amended to authorize the proceeding below.

The DOT gave the limited incumbent slot exemptions to Alaska, refusing to apply the plain and unambiguous language of "§ 41714(k) as Spirit and Frontier urge [it] to do." J.A. 493. Ironically, the DOT states it awarded Alaska the slots "to address competition and access issues at DCA" while deeming Spirit and Frontier, Alaska's only competitors, ineligible. The DOT implies that, even though awarding the slots to Alaska violates Section 41714(k), the spirit of the laws and regulations justify ignoring the plain language.

Crucially, the text of Section 502 does not alter the definitions set forth in 49 U.S.C. § 41714(h). Indeed, Section 502 instructs the DOT to carry out these allocations in accordance with the definitions and constraints spelled out in those existing statutory provisions. Instead, as Frontier notes, the DOT employs a two-part test for whether airlines were eligible for the DCA slots created by Section 502. Frontier br. 23. The DOT claimed a carrier both must be an incumbent, which it mistakenly defines as operating at DCA on the date of the Act's enactment, and must separately be a limited incumbent.

As a result, the DOT ignored the statutory requirements in three respects: first, by labeling Alaska a limited incumbent; second, by labeling Frontier an incumbent; and third, by finding that Spirit was not an incumbent within the meaning of Section 502, while it tacitly accepted Spirit's status as a limited incumbent under the statutory slot allocation rules.

As explained below, all limited incumbents are incumbents for purposes of slot allocation rules, so the DOT erred in creating a definition for incumbent, contradicting history and turning the word into a tool for disqualifying Spirit, the only eligible limited incumbent. Thus, while the DOT was correct that Frontier was ineligible, *see* J.A. 327-29, 470-71, it erred in finding Spirit ineligible based on an incorrect interpretation of the statutory text which it applied in its analysis as to Frontier. The

DOT held Spirit to not be an incumbent even though it did not dispute Spirit met the definition of a type of incumbent carrier—a "limited incumbent," by recognizing Spirit had held slots after December 16, 1985—unlike Frontier. J.A. 402-03.

### D.  Relevant DOT Regulations and Precedent

In addition to the statutory language, the DOT and its sub-agency the Federal Aviation Administration, have promulgated and enforced regulations under 14 C.F.R. § 93.213(a)(5) that specify how to count or "attribute" slots to carriers for purposes of deciding whether they are "limited incumbents." One critical component is the "since December 16, 1985" clause, which states that if an airline ever held or operated a slot at a high-density airport on or after that date, then sold or gave it away, that airline is still "considered to hold" those slots for purposes of determining incumbency.

The DOT's logic behind the Part 93 rule, per prior administrative decisions, is that carriers should not be able to reclassify themselves as "new entrants" by selling their slots, nor should they lose "incumbent" status if they parted with a slot in a direct sale rather than a reciprocal trade for other DCA slots. That principle under-scores that limited incumbent status is a function of historical possession of perma-

nent slots. The word has never been used to address current, active, day-to-day operations. Nor has it ever been used to apply to carriers that only hold exemption slots.

## SUMMARY OF THE ARGUMENT

This controversy centers on how DOT misapplied statutory definitions in place for decades in an attempt to substantiate a pre-conceived decision over which carriers would receive slot exemptions under Section 502. DOT reached its erroneous decision by: (1) creating a novel two-part test specifically to disqualify Frontier and Spirit based on defining "incumbent" language in Section 502 contrary to existing DOT regulations and prior rulemaking explanations; and (2) by completely ignoring express language in Section 41714(k) disqualifying Alaska from being a limited incumbent unless it gives up its extensive codeshare relationship at DCA with American Airlines.

DOT's stridency in reaching its pre-baked decision to award Alaska slot exemptions created outrageous inconsistencies. First, it found that Frontier was both an "incumbent" and a "new entrant," even though a carrier which has never held and does not currently operate a permanent slot cannot be an incumbent for purposes of slot allocation rules. However, DOT, did properly rely on the statutory slot category definitions to determine that Frontier was a new entrant because it never

had held or sold/given away a slot at DCA—and it does not currently operate any permanent slot. Yet, DOT also found that for slot allocation purposes in this proceeding, Frontier was an incumbent – a term which refers to the categories of air carriers other than "new entrants," *i.e.*, limited **incumbents** or non-limited **incumbents**.

The DOT agreed Spirit historically held four permanent slots at DCA (obtained in an August 12, 2003, FAA lottery), which by its own definition in the Order qualifies Spirit as a statutory "limited incumbent." But without a reasonable basis the DOT then concluded that Spirit was nonetheless not an "incumbent." That conclusion is irreconcilable with 14 C.F.R. § 93.213(a)(5), which states that the number of slots a carrier sells after December 16, 1985 are permanently counted towards assessing whether it is a specific type of incumbent *i.e.* a limited incumbent.

Meanwhile, the DOT recognized Alaska as a limited incumbent—even though Alaska code-shares at DCA with American, which alone holds more than 50% of DCA slots and far above 20 in combined slot holdings. By ignoring 49 U.S.C. § 41714(k), the DOT contravened an explicit statutory bar. The net result is that the two "limited incumbent" slot exemptions went to an airline that is anything but small at DCA (by virtue of its tie-up with American), while Spirit was locked out entirely. Indeed, this unusual result appeared to have been part of an effort by the DOT to achieve an outcome which was pressured by certain Members

of Congress. Senator Cantwell, then Chair of the Senate Commerce, Science, and

Transportation, had transmitted a letter during the DOT's deliberation phase which

brazenly directed the DOT as to which carriers should receive the slot awards. J.A.

352. The unprecedented basis for the DOT's decision strongly suggests it intended

to reach the outcome dictated to it, employing any novel rationale it could find to

support a pre-conceived decision.

## STANDARD OF REVIEW

Agency actions are subject to review under the Administrative Procedure Act

("APA"), 5 U.S.C. § 706(2). The reviewing court must set aside decisions that are

arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with

law. *Id.* at § 706(2)(A). Where the text of the statute or regulation is unambiguous,

an agency's deviation from that text is unlawful. *Id.* at § 706(2)(C); *Pacific Gas v.

FERC*, 113 F.4th 943, 947–48, 951 (D.C. Cir. 2024) (requiring the FERC to apply

the statute's plain meaning on remand).Here, the DOT's approach flouts not just one

unambiguous textual command but two:

1. The plain text of 14 C.F.R. § 93.213(a)(5)(iii) and 49 U.S.C. § 41714(h)(5),

    which defines an incumbent that is classified as a limited incumbent carrier.

2. The bright-line aggregator rule in 49 U.S.C. § 41714(k), which bars any code-sharing carriers with combined slot holdings above 20 from qualifying as limited incumbents or new entrants.

No special deference is owed to the DOT's construction of these provisions. *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 413 (2024) ("courts need not and under the APA may not defer to an agency interpretation of the law simply because a statute is ambiguous"). Courts must seek the best reading of the relevant statutory language, employing standard interpretive tools. *Id.* at 374 ("Courts interpret statutes, no matter the context, based on the traditional tools of statutory construction, not individual policy preferences."). The DOT's final order effectively rewrites both sets of definitions to achieve a policy outcome that appears to reflect an administrative preference, *see* Sen. Cantwell's letter at J.A. 352, rather than the legislative command. That is by definition arbitrary and capricious. These errors contravene established canons of statutory interpretation, producing an outcome that runs counter to the legislative scheme.

## ARGUMENT

I.  **Frontier Is Not an Incumbent or Limited Incumbent as Those Terms Apply for Purposes of Slot Allocations in 49 U.S.C. §§ 41714(h)(5) and 41718**

Congress's method for identifying "limited incumbents" is straightforward: any air carrier that holds or operates fewer than forty permanent slots at DCA (excluding certain specialized categories like international, nighttime, or essential air service slots), and that has not parted with them in a slot-for-slot trade, remains a limited incumbent. Frontier has never held a permanent slot at DCA. Therefore for purposes of slot or slot exemption awards Frontier cannot be an incumbent – which requires having held such a slot— nor can it be a limited incumbent because it does not even "operate" any permanent slots.

Spirit, on the other hand, held four permanent slots at DCA after December 16, 1985—slots that Spirit later sold. By statutory definition, Spirit remains a limited incumbent under the plain text of 49 U.S.C. 41714(h)(5) which relies expressly on 14 C.F.R. § 93.213(a)(5). Under any reasonable definitions of incumbent and limited incumbent, only Spirit qualifies for an award of the two limited incumbent slots under Section 502. The DOT thus erred in its decision as to these definitions and the classification of Frontier with both respects.

### A.  All Limited Incumbent are Incumbents

The Final Order states that carriers must satisfy "a two-part test for eligibility:

> first, a carrier must be an incumbent on the date of enact-
> ment of FAA 2024; and

> second, a carrier must then also qualify for status as a lim-
> ited incumbent, or non-limited incumbent carrier."

J.A. 401. This is patently incorrect. The only reason the term incumbent is used in

Section 502 is to enable the allocation of exemption slots between non-limited in-

cumbents and limited incumbents. The "two-part" test runs contrary to 49 U.S.C.

Chapter 417 and 14 C.F.R. Part 93, Subpart S.

49 U.S.C. § 41718 is where Section 502 of the 2024 Reauthorization Act

places the language making slots available at DCA. Section 41718 does not define

"limited incumbent," because the definitions in Section 41714(h) apply to "41715-

41718 and 41734(h). 49 U.S.C. § 41714(h). 41714(h)(5) in turn requires use of the

definition in 14 C.F.R. Part 93, Subpart S, which is found at 14 CFR § 93.213(a)(5)

and reads as follow:

> Limited incumbent carrier means an air carrier … that
> holds or operates fewer than [40, as modified by 49 U.S.C.
> § 41714(h),] air carrier … slots, in any combination, at a
> particular airport, not including international slots, Essen-
> tial Air Service Program slots, or slots between the hours
> of 2200 and 0659 at Washington National Airport or
> LaGuardia Airport. *However, for the purposes of this par-*
> *agraph (a)(5), the carrier is considered to hold the num-*
> *ber of slots at that airport that the carrier has, since De-*
> *cember 16, 1985: (i) Returned to the FAA; (ii) Had re-*
> *called by the FAA under § 93.227(a); or (iii) Transferred*

– 18 –

> *to another party other than by trade for one or more slots*
> *at the same airport.*

*Id.* § 93.213(a)(5)(emphasis added).

The emphasized language in the above definition of "limited incumbent" expressly prevents a carrier from ceasing to be a limited incumbent by having its slots returned, recalled, or transferred. Moreover, there is no limitation on the number of slots a carrier can return, recall, or transfer. The number can go down to zero, which was intentional to prevent gaming the system, as is discussed below.

In spite of the § 93.213(a)(5) definition of "limited incumbent," the DOT creates a further qualification criterion for DCA slot eligibility; A carrier cannot only be a limited incumbent but must also be an incumbent to be eligible for the DCA slots allotted to limited incumbents. J.A. 401. DOT's sole basis for this requirement is the following language from Section 502, published as 41718(i)(3):

> Of the slot exemptions made available under paragraph
> (1), the Secretary shall make 2 available to *incumbent air*
> *carriers qualifying for status as a limited incumbent carrier*
> at Ronald Reagan Washington National Airport as of the
> date of enactment of the FAA Reauthorization Act of 2024.
> (Emphasis added.)

*Id.* (Emphasis added).

The DOT states that a plain language reading of the above provision creates a two-part test wherein carriers must be both an incumbent and a limited incumbent

– 19 –

in order to be eligible for the two slots. *Id.* Rather than reaching the most straight-forward conclusion that two of the slot exemptions are reserved for one type of incumbent—a "limited incumbent"— while 8 slot exemptions are reserved for the other type of incumbent, a "non-limited incumbent." Because, as the DOT acknowledges, "incumbent air carrier" is not a defined term under 14 C.F.R. Part 93 or 49 U.S.C. Subtitle VII, the DOT extrapolates further. *Id.* It creates *ex nihilo* a definition for "incumbent air carrier" wherein the coined term means a carrier currently operating at the given airport. *Id.*

Under the DOT's new "plain reading" framework, a limited incumbent is not a kind of incumbent. To create this novel requirement commits violence on the § 93.213(a)(5) definition of "limited incumbent" and renders superfluous its language concerning returns, recalls, and transfers. If Congress had intended to ignore the broader requirements of Chapter 417, Section 502 would have placed the slot award provisions in another section of the U.S. Code or at least amended the existing language in Section 41714 to indicate it did not apply. Congress did no such thing.

Stunningly, the DOT would have this court believe that a "plain reading" of Section 502 is complete by (a) stopping short of the full text of Chapter 417 and 14 C.F.R. Part 93 and (b) ignoring the oddity of a limited incumbent not being a kind of incumbent. These arguments are not persuasive.

Importantly, Congress knows precisely what to say when it wants to refer to an operating carrier and the chosen word is "operates," as used in 49 USC § 41714(d) and by the FAA in 14 CFR § 93.213. If Congress intended to require that a limited incumbent be operating on the date of enactment, it would have said "operating" air carriers qualifying as a limited incumbent. *See United States v. Locke*, 471 U.S. 84, 95 (1985) ("deference to the supremacy of the Legislature, as well as recognition that Congressmen typically vote on the language of a bill, generally requires us to assume that the legislative purpose is expressed by the ordinary meaning of the words used" (quoting *Richards v. United States*, 369 U.S. 1, 9 (1962); *see also Holloway v. United States*, 526 U.S. 1, 7 (1999) (where the Supreme Court held that the legislature would have included specific "qualifying words" if they intended to limit the scope of the statute in question).

Moreover, the DOT ignores or is unaware of the fact that its own regulations treat all limited incumbents and non-limited incumbents categorically as, intuitively and unsurprisingly, two kinds of incumbents. For example, the slot lottery regulations identify that: "New entrant and *limited incumbent carriers* will be permitted to complete their selections before participation by *other incumbent carriers* is initiated." 14 C.F.R. § 93.225(e) (emphasis added). The regulation goes on further to

describe the process for how a slot lottery is conducted by way of comparing limited incumbent carriers to other incumbents:

> If every participating new entrant carrier and *limited incumbent carrier* has ceased selection of available slots or has obtained 12 slots at that airport, *other incumbent carriers* may participate in selecting the remaining slots; however, slots selected by non-limited incumbent carriers will be allocated only until the date of the next lottery. (Emphasis added.)

*Id.* at § 93.225(h) (emphasis added).

Likewise, the Supplemental Notice of Proposed Rulemaking (SNPRM), 56 Fed. Reg. 46674 (Sep. 13, 1991), which created the original and current definition of "limited incumbent" as well as the current version of the above § 93.225, again treats limited incumbents and non-limited incumbents as the universe of what could be considered an incumbent for the purposes of slot allocation:

> The restrictions would apply only to slots allocated to a new entrant or *limited incumbent carrier* in a lottery held after June 1, 1991. Slots acquired by *other incumbent carriers* would not be subject to the same restrictions, because the allocation to the incumbent would expire on the date of the next lottery.

56 Fed. Reg. 46674, 46676 (Sep. 13, 1991) (Emphasis added). *See also Id.* at 46676 ("The slots could be sold or leased only to another new entrant or *limited incumbent carrier*; . . . *Other, non-limited incumbent carriers* could select remaining slots for temporary allocation until the next lottery." (emphasis added)).

– 22 –

There are limited incumbent carriers—a kind of incumbent carrier—and then there are other incumbent carriers, *i.e.,* non-limited incumbent carriers. Incumbent is not its own separate category. Instead, for purposes of slot allocation, incumbent describes carriers that have hold or have previously held, or have operated, permanent slots at the airport in question.

It is no accident the above regulations and SNPRM treat limited incumbents as a kind of incumbent and define limited incumbents to remain as such when all their slots are returned, recalled, or transferred. *Id.* The purpose of the categories of "new entrant" and "limited incumbent" in the regulations is to "permit new entrant and limited incumbent carriers to acquire any available slots without competing with carriers already holding a substantial number of slots at the airport." *Id.* ("Carriers holding 12 or more slots at an airport [*i.e.* non-limited incumbents] would be eligible for participation in the lottery only after all participating new entrants and limited incumbents had completed their selections."). *Id.* The SNPRM prevents the abuse of these privileges by placing certain limits on the transference of slots "to make it impractical for a carrier to participate in lotteries for the purpose of selling the slots obtained." *Id.* Viewed in this context, the definition of "limited incumbent" serves to prevent a carrier from continually receiving and distributing slots.

The DOT's attempt to disregard or nullify 14 C.F.R. § 93.213(a)(5)(iii) effectively rewrites the regulation, collapsing the distinction between carriers that parted with permanent slots and those carriers which have never held and do not currently operate permanent slots. That rewriting contradicts the plain language in Section 41714(h)(5) which unambiguously compels finding that Spirit "is considered to hold" at least four permanent slots at DCA.

No statutory or regulatory text demands that a carrier be operating flights at the time of the new slot award to be considered a "limited incumbent." Rather, the slot allocation laws look to how many permanent slots the carrier has or once had, and how many remain in that carrier's operational or historical possession. Indeed, if the DOT's position were correct—that is, that only carriers who continuously hold or operate the slots can remain incumbents—then the carefully delineated language of 14 C.F.R. § 93.213(a)(5)(iii) would be a dead letter, contravening the standard canon of statutory and regulatory interpretation that no portion of a validly enacted text should be rendered meaningless. *Nat'l Ass'n of Mfrs. v. Dept. of Defense*, 583 U.S. 109, 128 (2018) ("Absent clear evidence that Congress intended this surplusage, the Court rejects an interpretation of the statute that would render an entire subparagraph meaningless.").

### B. Frontier Cannot Be an Incumbent Because it has Never Held or Operated Permanent Slots at DCA—Making it a New Entrant, as DOT Found

Frontier argues it qualifies as a limited incumbent, because it has held and operated exactly zero permanent slots at DCA. That stance quickly collapses upon review of the statutory definitions. A "new entrant" is specifically a carrier that does "not hold a slot at the airport concerned and has never sold or given up a slot at that airport after December 16, 1985." 49 U.S.C. § 41714(h)(3) (emphasis added). Frontier does not hold a permanent slot, does not operate a permanent slot at DCA, and has never previously held or operated a permanent slot at DCA any of which need to be met to qualify as a limited incumbent. Hence, Frontier can only qualify as a "new entrant," as the DOT found.

The entire system of classification around the concept of holding or operating permanent slots that Congress created would be meaningless if any carrier that possessed zero permanent slots could automatically be a "limited incumbent," by ignoring the separate new-entrant category. The word fewer must mean "some" in order to give a non-absurd meaning to the related term new entrant which is entirely based on holding zero slots. Nothing in the text supports Frontier's notion that zero is fewer than 40, but greater than zero. That reading would effectively eviscerate the "new entrant" concept altogether, rendering it superfluous. *Nat'l Ass'n of Mfrs. v. Dept. of Defense*, 583 U.S. 109, 128 (2018) ("Absent clear evidence that Congress

intended this surplusage, the Court rejects an interpretation of the statute that would render an entire subparagraph meaningless.").

By contrast, Spirit has held four permanent slots and as described, *supra*, still holds them for purposes of slot rule classification as a limited incumbent. Under the statutory scheme, that places Spirit firmly among the limited incumbent class of incumbent carriers. There is no basis for discounting those sold slots when determining classification—which is exactly what DOT's new test requiring a carrier to currently operate at the airport to be an incumbent would do.

Misclassifying Spirit as ineligible ultimately denies travelers the benefits of new or resumed service from an ultra-low-fare carrier at a slot-constrained airport widely known for high fares. The impetus for awarding new slot exemptions at DCA was to expand city-pair coverage, and to protect some measure of fare-competition by enabling smaller incumbents to add service. Spirit's presence, with its historically lower fare structure, would exert downward pricing pressure at DCA. Denying that possibility via a misreading of the regulation effectively punishes the traveling public and contravenes the statutory scheme.

## II. Alaska Airlines Is Statutorily Barred from "Limited Incumbent" or "New Entrant" Status by 49 U.S.C. § 41714(k) Because of its Extensive Codeshare Arrangement with American Airlines, including at DCA

While Frontier is not a limited incumbent, neither is Alaska. By awarding the "limited incumbent" slot exemptions to Alaska, the DOT flouted 49 U.S.C. § 41714(k). That subsection unequivocally bars any code-sharing carrier that collectively exceeds 20 slots at the airport from qualifying as a limited incumbent or new entrant. Because Alaska's 18 or more slots plus American's 500+ far surpass 20, the aggregator bar is triggered. Alaska "shall not qualify" as a "new entrant or limited incumbent air carrier" for these new slot exemptions. 49 U.S.C. § 41714(k). The DOT's contrary determination, awarding the two "limited incumbent" slot exemptions to Alaska, is irreconcilable with the statutory text.

Spirit argues in line with Frontier that the Court should vacate the DOT's determinations regarding Alaska's eligibility. Frontier. Br. 36. However, Spirit does not support Frontier's requests that the Court vacate the DOT's determinations regarding Frontier's eligibility, nor that the Court amend the DOT's Final Order to award the slots to Frontier. *Id.*

– 27 –

## A.  The Scope and Purpose of Section 41714(k)

As originally designed, 49 U.S.C. § 41714(k) prevents carriers from circumventing the new-entrant or limited-incumbent definitions by "franchising" their operations or forming partial alliances. Congress recognized that codeshare agreements could effectively allow two airlines to combine operations in ways that gave them access to more slots than a putative small or new entrant would normally hold. The Congressional approach fosters fairness and prevents carriers from overshadowing genuine new entrants or truly limited incumbents that do not have the benefit of a major partner's slots.

The phrasing in Section 41714(k) of "shall not qualify" is mandatory and admits no exceptions. The aggregator rule does not hinge on whether the code-share is partial, reciprocal, or restricted by some side agreement. Nor does it limit the aggregator rule only to commuter affiliates or wholly owned subsidiaries. The bar extends to "any air carrier" that has or enters into a code-share arrangement with "any other air carrier," if together they exceed 20 slots or slot exemptions. Because American by itself holds 500+ at DCA, and Alaska's additional 18 bring that total even higher, there is no question that their combined holdings outstrip the 20-slot threshold. The plain language thus dictates that Alaska cannot be a limited incumbent or new entrant for any new slot or slot exemption at DCA. This is **not** a close call.

– 28 –

### B. Alaska and American's Decades-long Codeshare Relationship Extends to Hundreds of Flights, Frequent Flyer Programs, and Beyond

Alaska and American have collaborated under a formal codeshare relationship going back to the late 1990s, which has facilitated mutual branding of flights and linking frequent flyer programs. Currently, the arrangement includes at least 100 daily American flights from DCA which carry Alaska's designator code. By putting the "AS" code on these flights, Alaska effectively markets them as part of its own network, benefiting from American's extensive presence at DCA. As a result, Alaska can offer travelers connections to more than 50 destinations from DCA that it does not serve independently—an obvious competitive advantage. Such cooperation has historically been recognized as code-sharing or affiliation, precisely what triggers the aggregator rule of 49 U.S.C. § 41714(k). Regardless of how Alaska might attempt to characterize the commercial arrangement, it is undisputed that both carriers hold far more than twenty slots or slot exemptions collectively at DCA. Under the plain language of Section 41714(k), that should be the end of the inquiry.

### C. The DOT's Erroneous "Meaningful Access" Standard Serves Only as *Post-Hoc* Justification to Support a Pre-Conceived Decision

In the final order, the DOT presented multiple unsound reasons for ignoring or downplaying the aggregator rule. For instance, it suggested that the original impetus for Section 41714(k) was to address commuter affiliates, not mainline code-

share partners. But this reading impermissibly rewrites the text, which specifically mentions "any other air carrier." Congress could have confined the aggregator rule to commuter affiliates only, but it did not. An agency cannot carve out exceptions from statutory text based on extratextual motives. Courts must apply the law as written.

In an attempt to justify awarding Alaska the two "limited incumbent" slots, the DOT also wrongly reasoned that Alaska does not receive "meaningful access" from its codeshare with American. That concept of "meaningful access" is nowhere in the statutory text. Indeed, the language does not differentiate between "large-scale code-sharing" or "small-scale code-sharing." Section 41714(k) uses broad phrasing — "any other air carrier"— and sets a numeric threshold: "shall not qualify … if … exceed 20 slots." Because American alone holds hundreds more than 20, there is no room for the DOT to impose an extratextual "but is it meaningful?" inquiry.

The DOT further alluded to an argument that awarding the "limited incumbent" slot exemptions to Alaska is more "optimal" from some policy vantage, and that strictly applying the aggregator rule might leave the two slot exemptions unused or produce "suboptimal" outcomes. J.A. 493. Yet that is precisely the tradeoff Congress required. The aggregator rule ensures that carriers effectively allied with major

incumbents do not reclassify as smaller incumbents, even if that leads to unawarded exemptions in certain scenarios. In any event, the possibility of awarding those slot exemptions to the only actual limited incumbent, Spirit, demolishes the notion that they must go to Alaska or be wasted.

Nor can the DOT rely on any purported settlement agreement relating to Alaska's acquisition of Virgin America or other antitrust oversight to override the aggregator bar. The settlement concerned different issues and did not purport to waive or nullify 49 U.S.C. § 41714(k). In fact, Congress has expressly withheld from the DOT any authority to exempt carriers from that aggregator bar, precluding an administrative override. *Cf.* 49 U.S.C. § 40109(c) (49 U.S.C. § 41714 is expressly carved out of the scope of the DOT's exemption authority). The DOT's suggestion that the aggregator rule might not apply because of a partial settlement is irreconcilable with the plain text, which states no exceptions.

Finally, the DOT's approach of insisting that Alaska "does not receive meaningful access from the code-share" is factually wrong. By placing its code on more than 100 daily American flights from DCA, Alaska obtains a broad connecting network. Even if that were not so, the aggregator bar in § 41714(k) contains no "meaningful access" test. The text is absolute: "if the total number of slots and slot exemptions . . . exceed 20 . . . shall not qualify." The DOT may not rewrite that language.

– 31 –

Courts have consistently rejected attempts by agencies to add or subtract language from unambiguous statutes.

### III. The DOT's Decision Undermines Congress' Pro-Competitive Intent and Cannot Survive Arbitrary-and-Capricious Review

In addition to conflicting with the plain text, the DOT's classification choices for "limited incumbents" contravene the legislative objective of awarding the 2024 Reauthorization's newly created slot exemptions in a manner that enhances competition. 49 U.S.C. § 41718(i)(4)(B). When Congress mandated that two of those slot pairs go to limited incumbent carriers, it expressly cited the impetus for the award to "have a positive impact on the overall level of competition in the markets that will be served as a result of those exemptions." 49 U.S.C. § 41718(i)(4)(B)(ii).

By awarding the two slot pairs to Alaska on bogus grounds, the DOT gave them to a carrier that is functionally affiliated with the single largest slot holder at DCA. This arrangement further entrenches the dominance of American's broader alliance, contrary to Section 502 and making it that much harder for independent carriers like Spirit to gain a foothold at the constrained airport.

Indeed, awarding the limited incumbent slots to Spirit would have introduced an entirely distinct competitor with an established track record of offering lower fares. Not to mention that the San Jose-DCA route Spirit proposed would have brought significant downward fare competition directly against the United Airlines

and Alaska Airlines nonstop service between San Francisco and DCA one of the highest fare non-stop markets in the U.S. That is precisely the outcome that the statutory scheme was designed to foster: enabling smaller or mid-sized carriers to break into "fortress hubs" or slot-constrained airports and discipline the market. Instead, the DOT's approach perpetuates a fortress hub environment at DCA.

From a policy standpoint, awarding the limited incumbent slots to a de facto extension of the largest incumbent at DCA is the antithesis of promoting new competition. The net effect is a serious blow to price competition. A truly "limited" carrier stands apart from the dominant slot holders and can exert price discipline. Spirit's well-known ultra-low-fare model is precisely that discipline. If the new DCA slot pairs were used for Spirit's San Jose–DCA flights, the legacy carriers operating out of SFO and IAD would likely have to adjust fares downward or enhance service quality to compete for the large volume of Silicon Valley travelers forced to travel to SFO for direct flights to DCA. Currently, no direct flights between San Jose and DCA exist. The DOT's approach, however, ensures that the new flight authority remains within the large incumbents' orbit.

## IV.  The Proper Remedy is Vacatur Which Would Provide an Opportunity for Alaska to Still Operate DCA Service as a Non-Limited Incumbent

Given the DOT's errors, the appropriate remedy is for the Court to: (i) vacate the DOT's final Order, at least as to the two "limited incumbent" slot exemptions;

(ii) recognize that Alaska is statutorily barred from receiving the limited incumbent slot exemptions under 49 U.S.C. § 41714(k); and (iii) direct the DOT to reallocate the slots under the proper definition of "incumbent" and "limited incumbent" carrier put forth by Spirit here. At a minimum, the Court on remand should allow Spirit and Frontier to compete for the slots head-to-head on the merits of their individual proposals; given that Alaska expressly is disqualified. The Court is empowered to grant such relief under 49 U.S.C. § 46110(c), which instructs the Court to set aside unlawful agency actions and remand for further proceedings consistent with the correct interpretation.

Recognizing that Alaska is not a "limited incumbent" does not bar it from serving obtaining exemption slots at DCA under Section 502 as a non-limited incumbent. If the DOT wishes to expand Alaska's service further, it can do so from the pool of "non-limited incumbent" or "incumbent" allocations that Section 502 also created. But it cannot lawfully shoehorn Alaska into the "limited incumbent" category in direct defiance of the aggregator bar.

Spirit requests that the Court direct the DOT to reallocate the limited incumbent slots in accordance with the following instructions:

1) The DOT shall assign the limited incumbent slots to a carrier meeting the definition of "limited incumbent" in 14 CFR § 93.213(a)(5), as incorporated into 49 U.S.C. § 41714(h)(5);

2) For the purposes of assessing whether a carrier meets the definition of "limited incumbent" in 14 CFR § 93.213(a)(5), the DOT shall not count slot exemptions as slots.

3) Carriers not operating at DCA on the date of enactment of the FAA Reauthorization Act of 2024 must not be deemed ineligible for the limited incumbent slots so long as they meet the definition of "limited incumbent."

4) Carriers exceeding the code-share operation limit in 49 U.S.C. § 41714(k) must be deemed ineligible for the limited incumbent slots.

Remand in accordance with these instructions is proper, because "[r]emand with vacatur is the ordinary remedy for unlawful agency action." *Sierra Club v. United States DOT*, Nos. 20-1317, 20-1318, 20-1431, 21-1009, 2025 U.S. App. LEXIS 1362, at *30 (D.C. Cir. Jan. 17, 2025); *See Flyers Rights Educ. Fund, Inc. v. FAA*, 864 F.3d 738, 747 (D.C. Cir. 2017) ("remand is the presumptive remedy when the agency record is insufficient 'to permit [the court] to engage in meaningful review.'" (quoting American Horse Prot. Ass'n v. Lyng, 812 F.2d 1, 7 (D.C. Cir. 1987))).

The DOT needs to review the record to ensure slots are allocated in accordance with the principles established by Section 502 of the Act, found at 49 U.S.C. § 41718(i)(4)(B), which concern enhancing travel options and promoting competition. The DOT failed to properly assess the merits of Spirit's proposed San Jose route due to it improperly deeming Spirit ineligible. Spirit notes there is recent precedent specifically for the D.C. Circuit remanding the DOT's decision so that it will "deal

with the issue of competition." *Spirit Airlines, Inc. v. United States DOT*, 997 F.3d 1247, 1255 (D.C. Cir. 2021).

Contrary to Frontier's requests, the court should neither amend the DOT's Order to allocate slots to Frontier, nor should the DOT remand the slots with instructions for the DOT to award them to Frontier. Frontier. Br. 36. This would be inappropriate both because it would not allow the DOT to assess the substance of Spirit's proposed service under the proper definition of a limited incumbent, which it did not reach below, and because it would prevent Alaska from pursuing non-limited incumbent slots consistent with its status as a non-limited incumbent at the time Section 502 became effective.

## CONCLUSION

We urge the Court to vacate the DOT Order and remand for further action consistent with the law.

Dated: March 3, 2025                     Respectfully submitted,


/s/ Joanne W. Young
Joanne W. Young
jyoung@yklaw.com
*Counsel of Record*
David M. Kirstein
dkirstein@yklaw.com
Donald L. Crowell III
dcrowell@yklaw.com
**Kirstein & Young PLLC**
1750 K Street NW, Suite 700
Washington, DC  20006
Phone: (202) 331-3348
Fax: (202) 331-3933

*Counsel for Spirit Airlines, Inc.*

## CERTIFICATE OF COMPLIANCE

I hereby certify that (1) this filing complies with the type-volume limitation of Federal Rule of Appellate Procedure 27(d)(2)(A) because, as calculated by Microsoft Word, it contains 7879 words, excluding the parts of the filing exempted by Federal Rule of Appellate Procedure 32(f), and (2) this filing complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the typestyle requirements of Federal Rule of Appellate Procedure 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in a 14-point Charter font.

Dated: March 3, 2025                    Respectfully submitted,

                                        /s/ Joanne W. Young_____
                                        Joanne W. Young

                                        *Counsel for Spirit Airlines, Inc.*

## RULE 26.1 CORPORATE DISCLOSURE STATEMENT

Spirit Airlines, Inc. is a publicly held corporation. It has no parent corporation.

No publicly-held corporation holds a 10% or greater ownership interest in Spirit.

Dated: March 3, 2025                    Respectfully submitted,

                                        /s/ Joanne W. Young
                                        Joanne W. Young

                                        *Counsel for Spirit Airlines, Inc.*

## CERTIFICATE OF SERVICE

I certify that, on March 3, 2025, I electronically filed the foregoing brief with the United States Court of Appeals for the District of Columbia Circuit through the Court's CM/ECF system.

Dated: March 3, 2025                    Respectfully submitted,

                                        /s/ Joanne W. Young
                                        Joanne W. Young

                                        *Counsel for Spirit Airlines, Inc.*