**[ORAL ARGUMENT NOT SCHEDULED]**

**No. 25-1002**

---

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

FRONTIER AIRLINES, INC.,

Petitioner,

SPIRIT AIRLINES, INC.,

Movant-Intervenor,

v.

UNITED STATES DEPARTMENT OF TRANSPORTATION,

Respondent,

ALASKA AIRLINES, INC.,

Intervenor.

On Petition for Review of a Final Order
of the United States Department of Transportation

### BRIEF FOR RESPONDENT

*Of Counsel:*

GREGORY COTE
  *Acting General Counsel*

CHARLES E. ENLOE
  *Assistant General Counsel*

PETER J. PLOCKI
  *Deputy Assistant General
  Counsel*

EMILY KVESELIS
  *Trial Attorney
  U.S. Department of
  Transportation*

YAAKOV M. ROTH
  *Acting Assistant Attorney
  General*

MICHAEL S. RAAB
SIMON C. BREWER
  *Attorneys, Appellate Staff
  Civil Division, Room 7529
  U.S. Department of Justice
  950 Pennsylvania Avenue NW
  Washington, DC 20530
  (202) 616-5367*

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

Pursuant to D.C. Circuit Rule 28(a)(1), the undersigned counsel certifies as follows:

### A.     Parties and Amici

Petitioner is Frontier Airlines, Inc.  Respondent is the United States Department of Transportation.

On January 27, 2025, the Court granted the motion of Alaska Airlines, Inc. to intervene in support of respondent.  On February 25, 2025, Spirit Airlines, Inc. sought leave to intervene in support of petitioner.  That motion has been deferred to the merits panel.  *See* Order (Mar. 3, 2025).

To date, no amici have appeared in this Court.

### B.     Rulings Under Review

The order under review is Department of Transportation Order 2024-12-8 (Dec. 17, 2024).  The docket number is DOT-OST-2024-0065.

### C.     Related Cases

This case has not previously been before this Court or any other court.  Counsel is aware of only one related case within the meaning of Circuit Rule 28(a)(1)(C): *Alaska Airlines, Inc. v. U.S. Dep't of Transp.*,

No. 25-1062 (D.C. Cir.) (petition for review filed Feb. 14, 2025). That

case is currently in abeyance, with motions to govern due 30 days after

the Court's disposition of this case. *See* Order, *Alaska Airlines*, No. 25-

1062 (Feb. 25, 2025).

　　　　　　　　　　　　　　　 */s/ Simon C. Brewer*
　　　　　　　　　　　　　　　 Simon C. Brewer

# TABLE OF CONTENTS

**Page**

GLOSSARY

INTRODUCTION ................................................................................... 1

STATEMENT OF JURISDICTION ......................................................... 2

STATEMENT OF THE ISSUES ............................................................. 2

PERTINENT STATUTES AND REGULATIONS ................................... 3

STATEMENT OF THE CASE ................................................................ 3

    A.    Statutory and Regulatory Background .................................. 3

    B.    Factual Background and Prior Proceedings .......................... 7

SUMMARY OF ARGUMENT ............................................................... 12

STANDARD OF REVIEW .................................................................... 14

ARGUMENT ........................................................................................ 14

I.    As a new entrant air carrier, Frontier is ineligible for the slot exemptions. ............................................................................ 15

II.    Spirit has no basis for seeking to overturn DOT's order .............. 24

    A.    Spirit's intervention motion should be denied. .................... 25

    B.    DOT correctly determined that Spirit is ineligible for the slot exemptions. .......................................................... 27

III.    DOT properly awarded the slot exemptions to Alaska. ............... 30

    A.    Frontier and Spirit fail to demonstrate their standing ........ 30

B.    DOT reasonably concluded that Alaska is an eligible limited incumbent air carrier. ..............................................32

IV.    If the Court were to grant Frontier's petition, it should defer any decision regarding the appropriate remedy.............................36

CONCLUSION ........................................................................38

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

ADDENDUM

# TABLE OF AUTHORITIES

**Cases:**                                               **Page(s)**

*Air Transp. Ass'n of Am. v. FAA,*
    921 F.3d 275 (D.C. Cir. 2019) ............................................................ 14

*American Fuel & Petrochemical Mfrs. v. EPA,*
    937 F.3d 559 (D.C. Cir. 2019) ...................................................... 25, 26

*Associated Builders & Contractors, Inc. v. Herman,*
    166 F.3d 1248 (D.C. Cir. 1999) ........................................................ 25

*Cardillo v. Liberty Mut. Ins. Co.,*
    330 U.S. 469 (1947) ........................................................................ 35

*Center for Biological Diversity v. U.S. Int'l Dev. Fin. Corp.,*
    77 F.4th 679 (D.C. Cir. 2023) .......................................................... 24

*Central Va. Cmty. Coll. v. Katz,*
    546 U.S. 356 (2006) ........................................................................ 23

*Department of Agric. Rural Dev. Rural Hous. Serv. v. Kirtz,*
    601 U.S. 42 (2024) ...................................................................... 29-30

*Eastern Air Lines, Inc. v. FAA,*
    772 F.2d 1508 (11th Cir. 1985) ........................................................ 31

*Exhaustless Inc. v. FAA,*
    931 F.3d 1209 (D.C. Cir. 2019) .......................................................... 3

*Gorman v. National Transp. Safety Bd.,*
    558 F.3d 580 (D.C. Cir. 2009) .......................................................... 20

*Gray v. Powell,*
    314 U.S. 402 (1941) ........................................................................ 35

*Illinois Bell Tel. Co. v. FCC,*
    911 F.2d 776 (D.C. Cir. 1990) ...................................................... 25-26

*Jicarilla Apache Nation v. U.S. Dep't of the Interior,*
    613 F.3d 1112 (D.C. Cir. 2010) ........................................................ 23

*Loper Bright Enters. v. Raimondo*,
　603 U.S. 369 (2024) ........................................................... 35

*Marx v. General Revenue Corp.*,
　568 U.S. 371 (2013) ........................................................... 17

*National Ass'n of Regulatory Util. Comm'rs v. Interstate Commerce Comm'n*,
　41 F.3d 721 (D.C. Cir. 1994) ............................................. 25

*National Weather Serv. Emps. Org. v. Federal Labor Relations Auth.*,
　966 F.3d 875 (D.C. Cir. 2020) ..................................... 23-24

*NLRB v. Hearst Publ'ns, Inc.*,
　322 U.S. 111 (1944) ........................................................... 35

*Noble v. National Ass'n of Letter Carriers*,
　103 F.4th 45 (D.C. Cir. 2024) ........................................... 16

*O'Keeffe v. Smith, Hinchman & Grylls Assocs., Inc.*,
　380 U.S. 359 (1965) ........................................................... 35

*Pulsifer v. United States*,
　601 U.S. 124 (2024) ........................................................... 16

*Republic Airline Inc. v. U.S. Dep't of Transp.*,
　669 F.3d 296 (D.C. Cir. 2012) ............................................. 4

*Taniguchi v. Kan Pac. Saipan, Ltd.*,
　566 U.S. 560 (2012) ........................................................... 27

*Town of Chester v. Laroe Estates, Inc.*,
　581 U.S. 433 (2017) ........................................................... 30

*Twin Rivers Paper Co. v. SEC*,
　934 F.3d 607 (D.C. Cir. 2019) ........................................... 32

*U.S. Tel. Ass'n v. FCC*,
　188 F.3d 521 (D.C. Cir. 1999) ........................................... 27

*United States v. Taylor*,
　596 U.S. 845 (2022) ........................................................... 29

**Statutes:**

FAA Modernization and Reform Act of 2012,
     Pub. L. No. 112-95, tit. IV, subtitle A, § 414(c),
     126 Stat. 11, 92 (codified at 49 U.S.C. § 41714(h)(5)(B)(i)) ................. 6

FAA Reauthorization Act of 2024,
     Pub. L. No. 118-63, tit. V, subtitle A, § 502,
     138 Stat. 1025, 1187 (codified at 49 U.S.C. § 41718(i)) ...................... 7

5 U.S.C. § 706 ............................................................ 24

49 U.S.C. § 40109(c) ................................................... 36

49 U.S.C. § 41714(d)(1) ............................................... 29

49 U.S.C. § 41714(h)(3) ......................................... 5, 15, 18, 19, 20

49 U.S.C. § 41714(h)(4) ................................................. 3

49 U.S.C. § 41714(h)(5) ......................................... 5, 20, 32

49 U.S.C. § 41714(h)(5)(A)-(B) ..................................... 18

49 U.S.C. § 41714(h)(5)(B) ....................................... 5, 6, 17, 19

49 U.S.C. § 41714(h)(5)(B)(i) ...................................... 17

49 U.S.C. § 41714(j) .................................................... 4

49 U.S.C. § 41714(k) .......................................... 6, 9, 14, 32

49 U.S.C. § 41714 note ........................................ 6, 9, 14

49 U.S.C. § 41718 ............................................... 4, 16

49 U.S.C. § 41718(a) .................................................. 4-5

49 U.S.C. § 41718(g) .................................................. 4-5

49 U.S.C. § 41718(g)(2) ............................................ 21, 23

49 U.S.C. § 41718(i) ............................................. 4-5, 15

49 U.S.C. § 41718(i)(2) ................................................................ 7

49 U.S.C. § 41718(i)(3) ................................. 1, 2, 7, 8, 9, 27, 29

49 U.S.C. § 41718(i)(4)(B) .......................................................... 30

49 U.S.C. § 46110 ....................................................................... 2

49 U.S.C. § 46110(c) ........................................................... 14, 36

## Regulations:

14 C.F.R. pt. 93, subpart K ....................................................... 3
   14 C.F.R. § 93.123 .................................................................. 3

14 C.F.R. pt. 93, subpart S ........................................................ 3
   14 C.F.R. § 93.213 ................................................................ 27
   14 C.F.R. § 93.213(a)(5) .................................................... 5, 18
   14 C.F.R. § 93.215 .................................................................. 4
   14 C.F.R. § 93.221 .................................................................. 4
   14 C.F.R. §§ 93.223-93.227 ...................................................... 4

14 C.F.R. § 257.3 ....................................................................... 6

## Rules:

Fed. R. App. P. 15(d) ............................................................... 25

D.C. Cir. R. 28(a)(7) ................................................................ 32

## Legislative Material:

H.R. Rep. No. 106-167 (1999) ................................................... 33

S. Rep. No. 106-9 (1999) ......................................................... 33

## Other Authorities:

*Incumbent*, American Heritage Dictionary of the
   English Language (5th ed. 2022) .......................................27-28

Final Judgment, *United States v. Alaska Air Grp.*,
   1:16-cv-2377 (D.D.C. June 23, 2017), Dkt. No. 16 .............................. 33

Order, *Alaska Airlines, Inc. v. U.S. Dep't of Transp.*,
   No. 25-1062 (D.C. Cir. Feb. 25, 2025) ......................................... 12, 37

# GLOSSARY

DOT                          Department of Transportation

FAA                          Federal Aviation Administration

## INTRODUCTION

In 2024, Congress authorized additional flights at Ronald Reagan Washington National Airport (Reagan National). It directed the Department of Transportation (DOT) to allow 10 additional takeoff and landing authorizations at that airport by granting exemptions from the statutory and regulatory limits on flight operations. These are known as "slot exemptions."

Congress reserved two slot exemptions for a particular class of airline. To be eligible, an airline must have been both an "incumbent air carrier[]" and a "limited incumbent air carrier" as of the date of the statute's enactment. 49 U.S.C. § 41718(i)(3). DOT carefully analyzed the eligibility of each applicant for the slot exemptions. It found that only one—intervenor Alaska Airlines, Inc. (Alaska)—qualified. The new flights operated by Alaska as a limited incumbent air carrier will increase competition and travel options at Reagan National, as Congress intended.

Petitioner Frontier Airlines, Inc. (Frontier) and movant-intervenor Spirit Airlines, Inc. (Spirit) offer no basis for overturning that determination. Neither airline meets both parts of the statutory test for

eligibility, and accepting their contrary arguments would require disregarding the plain statutory text. And neither provides a basis for disqualifying Alaska. The petition for review should therefore be denied.

## STATEMENT OF JURISDICTION

DOT served the Final Order under review on December 17, 2024. JA485. Frontier filed a timely petition for review on January 3, 2025. This Court has jurisdiction under 49 U.S.C. § 46110.

## STATEMENT OF THE ISSUES

The FAA Reauthorization Act of 2024 directed DOT to award two slot exemptions at Reagan National to an "incumbent air carrier[] qualifying for status as a limited incumbent carrier." 49 U.S.C. § 41718(i)(3). DOT determined that only Alaska met both qualifications and therefore awarded it the slot exemptions. The questions presented are:

**1.** Whether DOT correctly determined that Frontier does not qualify as a "limited incumbent air carrier" at Reagan National.

**2.** Whether Spirit should be permitted to intervene in this matter and, if so, whether DOT correctly determined that Spirit is not an "incumbent air carrier[]" at Reagan National.

**3.** Whether DOT properly awarded the slot exemptions reserved for a limited incumbent air carrier to Alaska.

## PERTINENT STATUTES AND REGULATIONS

Pertinent statutes and regulations are reproduced in the addendum to this brief.

## STATEMENT OF THE CASE

### A.    Statutory and Regulatory Background

**1.** At some airports, demand for runway operations exceeds available capacity.  As a result, the Federal Aviation Administration (FAA) has long "restricted the number of takeoffs and landings at certain highly congested airports in order to reduce inefficient flight delays.  The restrictions were codified in a series of regulations known as the High Density Rule." *Exhaustless Inc. v. FAA*, 931 F.3d 1209, 1210 (D.C. Cir. 2019); *see* 14 C.F.R. pt. 93, subparts K, S.  The High Density Rule, which applies to Reagan National, allocated to airlines a limited number of "slots," which are authorizations to conduct takeoffs and landings.  *See* 14 C.F.R. § 93.123; *accord* 49 U.S.C. § 41714(h)(4).

Since 2000, Congress has adopted a series of special rules for Reagan National authorizing "slot exemptions." *See* 49 U.S.C. § 41718. Slot exemptions provide additional takeoff and landing authorizations outside the ordinary slot allocations authorized by the High Density Rule. *See Republic Airline Inc. v. U.S. Dep't of Transp.*, 669 F.3d 296, 297 (D.C. Cir. 2012) ("These aptly-named 'slot exemptions' permit take-offs and landings in addition to those available under the [High Density Rule].");  JA174 n.1.  Although they perform a similar function in that they authorize flight takeoffs and landings, slots and slot exemptions differ in several ways.  For example, slots are created by regulation and allocated by the FAA, while slot exemptions are created by statute and allocated by the Secretary of Transportation.  *Compare* 14 C.F.R. §§ 93.215, 93.223-93.227 (slots), *with* 49 U.S.C. § 41718 (slot exemptions).  And unlike slots, slot exemptions generally cannot be bought, sold, leased, or otherwise transferred in private transactions among air carriers.  *Compare* 14 C.F.R. § 93.221 (slots), *with* 49 U.S.C. § 41714(j) (slot exemptions).

Congress has instructed DOT to allocate slot exemptions at Reagan National to specific categories of airlines.  *See* 49 U.S.C.

4

§ 41718(a), (g), (i).  By statute and regulation, airlines are grouped into three categories:

**New entrant air carriers:** a "new entrant air carrier" is one that "does not hold a slot at the airport concerned and has never sold or given up a slot at that airport after December 16, 1985."  49 U.S.C. § 41714(h)(3).  A "limited incumbent air carrier," as defined below, also qualifies as a "new entrant air carrier."  *Id.*

**Limited incumbent air carriers:** a "limited incumbent air carrier" is one that holds or operates fewer than 40 slots at a particular airport, subject to several exceptions not relevant here.  49 U.S.C. § 41714(h)(5); 14 C.F.R. § 93.213(a)(5).

Importantly, the method for calculating an airline's number of "slots" has changed over time.  Until 2012, an airline's slot exemptions counted as "slots" for purposes of qualifying as a limited incumbent air carrier.  *See* 49 U.S.C. § 41714(h)(5)(B) (effective Apr. 5, 2000, to Feb. 13, 2012) ("The term 'limited incumbent air carrier' has the meaning given that term in [the High Density Rule]; except that . . . the term 'slot' shall include 'slot exemptions' . . . .").  In 2012, Congress enacted new legislation that excluded slot exemptions from the count when

5

determining an airline's status as a limited incumbent. FAA Modernization and Reform Act of 2012, Pub. L. No. 112-95, tit. IV, subtitle A, § 414(c), 126 Stat. 11, 92 (codified at 49 U.S.C. § 41714(h)(5)(B)(i)). As a result, the statutory definition of a "limited incumbent air carrier" now provides that "the term 'slot' shall not include . . . 'slot exemptions.'" 49 U.S.C. § 41714(h)(5)(B).

**Non-limited incumbent air carriers:** non-limited incumbent carriers are those that hold or operate too many slots to qualify as a limited incumbent carrier.

Airlines sometimes enter into "code-share" agreements in which one airline places its designator code on a flight operated by another airline and sells tickets for that flight. *Cf.* 14 C.F.R. § 257.3 (defining "[c]ode-sharing arrangement"). An airline that "has or enters into a code-share agreement[] with any other air carrier" is ineligible "for a new slot or slot exemption as a new entrant or limited incumbent air carrier . . . if the total number of slots and slot exemptions held by the two carriers at the airport exceed 20 slots and slot exemptions." 49 U.S.C. § 41714(k).

6

**2.** In 2024, Congress directed DOT to make available 10 additional slot exemptions at Reagan National. *See* FAA Reauthorization Act of 2024, Pub. L. No. 118-63, tit. V, subtitle A, § 502, 138 Stat. 1025, 1187 (codified at 49 U.S.C. § 41718(i)) (FAA Reauthorization Act). Of those slot exemptions, Congress directed that eight must be allocated "to incumbent air carriers qualifying for status as a non-limited incumbent carrier at [Reagan National] as of the date of enactment of the" FAA Reauthorization Act. 49 U.S.C. § 41718(i)(2). Congress reserved the remaining two slot exemptions for "incumbent air carriers qualifying for status as a limited incumbent carrier as of the date of enactment of the" FAA Reauthorization Act. *Id.* § 41718(i)(3).

## B.    Factual Background and Prior Proceedings

**1.** Pursuant to the FAA Reauthorization Act, DOT established slot-exemption proceedings at Reagan National and invited applications from eligible air carriers. JA174-176. As principally relevant here, Frontier, Spirit, and Alaska all submitted applications for the slot exemptions reserved for limited incumbent air carriers. JA192-200 (Frontier); JA201-212 (Alaska); JA218-230 (Spirit).

7

**2.** After receiving various other pleadings and comments on timely filed applications, DOT issued an order to show cause with its tentative conclusions. JA383-414. Because objections were raised to all three applicants' eligibility, DOT set forth its tentative conclusions regarding each airline's eligibility. JA400-404.

The agency first laid out the statutory framework. JA401. The FAA Reauthorization Act reserved two slot exemptions for "incumbent air carriers qualifying for status as a limited incumbent carrier" as of the statute's enactment. 49 U.S.C. § 41718(i)(3). DOT explained that this language established a two-part test for eligibility: "first, a carrier must be an incumbent on the date of enactment of [the FAA Reauthorization Act]; and second, a carrier must then also qualify for status as a limited incumbent." JA401.

DOT tentatively determined that Frontier met the first part of the test, but not the second. Frontier qualified as an "incumbent air carrier" because it was engaged in air transportation at Reagan National. JA402. But Frontier did not qualify as a "limited incumbent air carrier," as defined by statute and regulation, because it only operated at Reagan National through slot exemptions. JA402. Because

8

Frontier held or operated zero slots, it qualified only as a new entrant air carrier.  JA402.

By contrast, DOT tentatively determined that Spirit was not an "incumbent air carrier," as required by the first statutory criterion. JA403.  It observed that "Spirit has not engaged in air transportation at [Reagan National] since 2012."  JA403.  Because Spirit did not currently operate at the airport, it could not be an "incumbent," as the FAA Reauthorization Act used that term.  JA403.  In light of that conclusion, DOT did not reach the question whether Spirit "qualif[ied] for status as a limited incumbent carrier."  49 U.S.C. § 41718(i)(3).

DOT also tentatively determined that Alaska qualified as a limited incumbent air carrier.  JA403.  Spirit and Frontier had objected that Alaska's code-sharing relationship with American Airlines, Inc. (American) was disqualifying under 49 U.S.C. § 41714(k).  JA403.  DOT tentatively rejected this view, explaining that "[t]he scope of Alaska and American's code sharing relationship is limited by a settlement agreement reached in 2017 to resolve issues related to the merger transaction between Alaska and Virgin America Airlines."  JA403. That agreement includes a number of limitations, including one which

9

prohibits American from placing its code on Alaska's flights originating at Reagan National.  JA404.  Given those limitations, DOT saw no imminent risk that Alaska would "gain[] preferential access to slots or slot exemptions" only to turn around and "market and operate those slots on behalf of a larger, incumbent mainline carrier."  JA404.  The Alaska-American relationship therefore did not raise the type of concerns that § 41714(k) was designed to prevent.  JA404.

**3.**  After receiving additional comments, DOT issued a final order confirming its tentative conclusions.  JA485-496.  Frontier presented no new arguments regarding its eligibility, so DOT found that "under the applicable statutes and regulations, Frontier is a new entrant carrier at [Reagan National] and does not qualify as a limited incumbent carrier in this proceeding."  JA491.  DOT also rejected Spirit's additional arguments regarding its eligibility.  The agency reiterated that "a plain reading of the statute" requires that an airline have "provide[d] air transportation at [Reagan National] on the date of the enactment" of the FAA Reauthorization Act.  JA492.  Spirit undisputedly did not do so.  JA492.

The Final Order also confirmed that Alaska was an eligible limited incumbent air carrier. JA492. In rejecting Frontier's and Spirit's objections, the agency first observed that because those airlines were ineligible for the slot exemptions, they did not appear to suffer any harm from DOT's award of the slot exemptions to Alaska. JA492. In any event, DOT concluded that § 41714(k) did not apply to Alaska's application. The agency again observed that the Alaska-American relationship "does not include slot-sharing provisions, does not increase the slot holdings of the dominant carrier at [Reagan National] (i.e., American), and does not place Alaska-operated slots under the marketing control of American." JA492-493. Given those restrictions, DOT determined that § 41714(k) did not preclude treating Alaska as a limited incumbent. JA493.

DOT thus awarded the slot exemptions to Alaska. JA494. Alaska has confirmed its intent to begin its new service to San Diego, California no later than March 17, 2025. JA497.

**4.** Frontier filed this petition for review on January 3, 2025. Two weeks later, it filed an emergency motion seeking a partial stay pending

review of the Final Order.  This Court denied the stay motion and

expedited the case.  *See* Order (Feb. 6, 2025).

5.  Under a separate case number, Alaska has conditionally cross-

petitioned for review of the Final Order.  *See* Petition for Review,

*Alaska Airlines, Inc. v. U.S. Dep't of Transp.*, No. 25-1062 (D.C. Cir.

Feb. 14, 2025).  If "the Court finds that Alaska is not a limited

incumbent air carrier," Alaska intends "to seek vacatur of the full

[Final] Order so Alaska can apply to DOT as a non-limited incumbent

air carrier for slot exemptions allocated to that other category of

carriers."  *Id.* at 1-2.  That petition is in abeyance pending the

disposition of this case.  Order, *Alaska Airlines*, No. 25-1062 (Feb. 25,

2025).

## SUMMARY OF ARGUMENT

**I.**    Frontier is ineligible for the slot exemptions reserved for a

limited incumbent air carrier.  Frontier operates only through slot

exemptions at Reagan National.  In other words, it holds zero slots.

The relevant statutory and regulatory definitions provide that an air

carrier with zero slots qualifies only as a new entrant air carrier, not as

a limited incumbent.  The FAA Reauthorization Act did not authorize

any slot exemptions for new entrant air carriers.  As a result, DOT correctly rejected Frontier's application.

II.    Spirit cannot intervene in this matter to press its eligibility for the slot exemptions.  Spirit's intervention motion was untimely, and Spirit seeks to go beyond the proper role of an intervenor by inserting new issues into this case.  But even if Spirit's arguments were properly presented, they would not change the proper outcome.  The FAA Reauthorization Act limited eligibility to "incumbent air carriers," which signifies that an applicant must currently provide air transportation at Reagan National.  Spirit does not, so it cannot obtain the slot exemptions.

III.    DOT properly awarded the slot exemptions to Alaska.  As an initial matter, neither Frontier nor Spirit demonstrates Article III standing to challenge that portion of the Final Order.  Because neither airline is itself eligible, neither suffers evident harm from award of the slot exemptions to a different airline.  And any other basis for standing has been forfeited.

In any event, DOT correctly determined that Alaska is an eligible limited incumbent.  Alaska's code-sharing relationship with American

13

does not trigger the statutory bar on being treated as a limited incumbent under 49 U.S.C. § 41714(k). That provision addresses concerns that larger incumbents, such as American, will try to use their code-sharing relationships to gain access to slots and slot exemptions reserved for smaller air carriers. But here, the Alaska-American relationship is restricted by, among other things, a 2017 antitrust settlement agreement between the United States and Alaska. The terms of that agreement ensure that awarding slot exemptions to Alaska poses no risk of unduly increasing American's access to the Reagan National market.

## STANDARD OF REVIEW

This Court will overturn a DOT order "only if it is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *Air Transp. Ass'n of Am. v. FAA*, 921 F.3d 275, 280 (D.C. Cir. 2019). DOT's factual findings are "conclusive" unless not "supported by substantial evidence." 49 U.S.C. § 46110(c).

## ARGUMENT

DOT's Final Order correctly applied the FAA Reauthorization Act. Neither Frontier nor Spirit was eligible for the slot exemptions at issue.

14

Frontier did not qualify as a "limited incumbent air carrier," while Spirit was not an "incumbent air carrier[]," as required by 49 U.S.C. § 41718(i).  Because Alaska was the only eligible applicant, DOT properly awarded it the slot exemptions.

## I.    As a new entrant air carrier, Frontier is ineligible for the slot exemptions.

DOT correctly disqualified Frontier's application for the slot exemptions reserved for a limited incumbent air carrier.  As of the FAA Reauthorization Act's enactment, Frontier qualified only as a new entrant air carrier at Reagan National.  It was therefore ineligible for the slot exemptions.

**A.**  Frontier falls within the definition of a new entrant air carrier at Reagan National.  A "new entrant air carrier" is one that "does not hold a slot at the airport concerned and has never sold or given up a slot at that airport after December 16, 1985."  49 U.S.C. § 41714(h)(3).  It is undisputed that Frontier holds zero slots, and has never sold or given up a slot, at Reagan National.  *E.g.*, JA195 (conceding that Frontier operates only through slot exemptions at Washinton National Airport). The statutory definition of a new entrant thus encompasses Frontier. JA491.

15

Frontier resists this straightforward conclusion with an atextual gloss on the statute. According to Frontier, the statutory reference to "slots" should be read to include "slot exemptions" as well. Pet'r Br. 25. That contention is incompatible with the overall statutory scheme, which consistently distinguishes between "slots" and "slot exemptions." *See, e.g.*, *Noble v. National Ass'n of Letter Carriers*, 103 F.4th 45, 50 (D.C. Cir. 2024) ("The text must be read in the context of the entire statute."). For example, the relevant statutory section directs DOT to grant "slot exemptions," not additional "slots," to certain airlines operating at Reagan National. 49 U.S.C. § 41718. And when Congress intended DOT to consider an air carrier's slots and slot exemptions jointly, it has said so explicitly. *See, e.g.*, *id.* § 41714(k) (directing DOT to consider an air carrier's "total number of slots and slot exemptions"). That usage accords with the general principle that "different terms usually have different meanings." *Pulsifer v. United States*, 601 U.S. 124, 149 (2024); *see also supra* p. 4 (describing the differences between slots and slot exemptions).

Frontier's approach would upend that common-sense understanding. It attempts to justify that result by drawing a negative

16

inference from the statutory definition of a limited incumbent air carrier. Pet'r Br. 25. As explained above, the definition of a limited incumbent explicitly excludes "slot exemptions" when determining how many "slot[s]" an air carrier holds and operates. 49 U.S.C. § 41714(h)(5)(B)(i). But the statutory history makes clear why that provision does not support any negative inference. *See Marx v. General Revenue Corp.*, 568 U.S. 371, 381 (2013) ("The force of any negative implication, however, depends on context.").

From 2000 until 2012, the "limited incumbent" definition provided that "the term 'slot' shall include 'slot exemptions.'" *See* 49 U.S.C. § 41714(h)(5)(B) (effective Apr. 5, 2000, to Feb. 13, 2012). Congress thus created an exception to the background understanding that those two terms are distinct. In 2012, Congress decided to reverse this prior exception. *See id.* § 41714 note (2012 amendment). It inserted the current language, which provides that even for limited incumbents, "the term 'slot' shall not include . . . 'slot exemptions.'" *Id.* § 41714(h)(5)(B). It is not sensible to infer from this amendment that Congress intended to collapse the generally applicable distinction between slots and slot exemptions.

17

It is therefore clear that Frontier is a new entrant air carrier because it "does not hold a slot at the airport concerned."  49 U.S.C. § 41714(h)(3).  Because Congress did not allocate any slot exemptions for new entrant air carriers, Frontier's application was properly denied. JA402, 491.

**B.**  DOT correctly rejected Frontier's arguments for classifying it as a limited incumbent air carrier.  To be a limited incumbent, an air carrier must "hold[] or operate[] fewer than [40] air carrier . . . slots," 14 C.F.R. § 93.213(a)(5), excluding slot exemptions, 49 U.S.C. § 41714(h)(5)(A)-(B).  All agree that, for purposes of this definition, Frontier holds and operates zero slots at Reagan National.  Pet'r Br. 24 ("Frontier's slot count equals zero . . . ."); *accord* JA195, 402.  As a result, it cannot qualify as a limited incumbent.

Frontier contends (at 24-25) that having zero slots suffices to qualify for limited incumbent status.  In short, Frontier argues that zero slots is "'fewer than' 40."  Pet'r Br. 24 (quoting 14 C.F.R. § 93.213(a)(5)).  But DOT correctly understood the cited definition to require that an air carrier hold and operate at least one slot.  JA402, 491.  If Congress required companies operating "fewer than" 40 aircraft

18

to obtain a particular type of license, one would not expect companies operating zero aircraft to apply for the license. Similarly, it would be odd to say that "fewer than 40" published judicial decisions address a topic if, in fact, no published decision has addressed the topic.

Adopting Frontier's interpretation would lead to anomalous results. A brand-new airline that has never operated a flight anywhere would seem to qualify as a limited incumbent, as it would also hold or operate fewer than zero slots. At the same time, it seems self-evident that such an airline would meet the statutory definition of a new entrant air carrier. And it is no answer to say that, unlike a brand-new airline, Frontier operates at Reagan National through slot exemptions. The statute explicitly forecloses consideration of slot exemptions. 49 U.S.C. § 41714(h)(5)(B). Frontier's interpretation of "limited incumbent air carrier" would therefore render that term redundant with "new entrant." *See* JA402.[1]

---

[1] As noted above, Congress has decided that a limited incumbent may be treated as a new entrant. *See* 49 U.S.C. § 41714(h)(3) ("The term 'new entrant air carrier' means . . . a limited incumbent carrier."). But the reverse is not true: a new entrant is not automatically treated as a limited incumbent as well. It is therefore necessary to preserve the distinction between those categories. JA402.

That refutes Frontier's argument that, as Congress used the phrase here, "fewer than [40] . . . slots" includes zero slots. In some other contexts, "less than" or "fewer than" sensibly can be interpreted to include zero. That explains this Court's decision in *Gorman v. National Transportation Safety Board*, 558 F.3d 580 (D.C. Cir. 2009), on which Frontier relies (at 24). This Court explained that a regulation applying to aircraft with "less than 20 seats" was "ambiguous" as to aircraft with zero seats. *Gorman*, 558 F.3d at 588 (quotation marks omitted). Critically, the regulation's context rendered "permissible" the agency's interpretation that the regulation applied to cargo-only aircraft with zero passenger seats. *See id.* (observing that the regulation's heading "plainly includes an aircraft that carries cargo only"). But Frontier identifies no analogous context here to support its reading.

Just the opposite: the statutory and regulatory context confirms DOT's interpretation. In establishing three categories of air carriers, Congress distinguished between those with zero slots (new entrants); those with between 1 and 39 slots (limited incumbents); and those with 40 or more slots (non-limited incumbents). *See* 49 U.S.C. § 41714(h)(3), (5). To preserve those carefully drawn groups, DOT correctly

20

determined that an air carrier that concededly has zero slots qualifies only as a new entrant.

And contrary to Frontier's suggestion (at 27), being a new entrant does not mean that Frontier "may *never* qualify for [Reagan National] slot exemptions." Congress previously has made available slot exemptions for "new entrant air carriers." *E.g.*, 49 U.S.C. § 41718(g)(2). Had Congress taken that approach in the FAA Reauthorization Act, Frontier could have been eligible. But Congress instead decided to reserve these slot exemptions for limited incumbent air carriers. DOT faithfully carried out those statutory instructions when assessing Frontier's application. JA491 (recognizing that Congress narrowed DOT's ability to "consider all carriers and business models for the available slot exemptions").

**C.** Frontier purports to identify a conflict between the Final Order and how DOT characterized Frontier's status in prior proceedings. Pet'r Br. 28-29. It further claims that DOT failed to distinguish those orders, making DOT's determination arbitrary and capricious. Pet'r Br. 30. Those past decisions are not probative of Frontier's status, so there was no need to address them.

21

As an initial matter, Frontier relies on several decisions that predate the 2012 amendment to the definition of a limited incumbent air carrier. *See* Pet'r Br. 28 (first citing JA35 (DOT order dated Nov. 27, 2002); and then citing JA57 (DOT order dated Apr. 1, 2004)). Those decisions are plainly irrelevant to Frontier's classification under the post-amendment statutory definition.

Frontier also cites two orders from 2012 that it claims support its position. In one, DOT did not opine on Frontier's classification. Rather, it merely recounted Frontier's assertion of its own status. *See* JA76 ("Frontier confirms its status as a limited incumbent carrier . . . ."). In the other, DOT did describe Frontier as "a limited incumbent carrier." JA112. No participant in that proceeding appears to have disputed Frontier's status, *see* JA97-107, so it is not surprising that the agency accepted Frontier's self-characterization—particularly because that proceeding did not require DOT to distinguish between new entrants and limited incumbents, as both were eligible for the same pool of slot exemptions. *See* JA96 (noting that the selection criteria encompassed "new entrant air carriers and limited incumbent air carriers"). In that context, a passing remark about Frontier's status cannot bind the

22

agency in future proceedings. *Cf. Central Va. Cmty. Coll. v. Katz*, 546 U.S. 356, 363 (2006) ("[W]e are not bound to follow our dicta in a prior case in which the point now at issue was not fully debated.").

There is also no conflict between the order under review and how DOT has previously characterized Alaska. *Contra* Pet'r Br. 29 (citing JA86). In the cited decision, DOT explained that Alaska—which then operated at Reagan National only through slot exemptions—qualified as a "new entrant/limited incumbent." JA86. Because both types of carriers were eligible, *see* 49 U.S.C. § 41718(g)(2), DOT had no reason to determine which category encompassed Alaska.

Frontier suggests that DOT did not sufficiently explain its departure from these prior orders. Pet'r Br. 29-30. There is no such departure because the cited orders did not establish a relevant precedent. This Court has never "require[d] an agency to grapple with every last one of its precedents, no matter how distinguishable." *Jicarilla Apache Nation v. U.S. Dep't of the Interior*, 613 F.3d 1112, 1120 (D.C. Cir. 2010). Consequently, an agency decision need not articulate such "evident" distinguishing features. *National Weather*

23

*Serv. Emps. Org. v. Federal Labor Relations Auth.*, 966 F.3d 875, 884 (D.C. Cir. 2020).

In any event, even if DOT should have discussed its prior orders in greater detail, any error was harmless.  *See* 5 U.S.C. § 706 ("[D]ue account shall be taken of the rule of prejudicial error.").  Any discussion of past practice "would not alter the legal conclusion" that Frontier is a new entrant air carrier because that conclusion is compelled by the statutory text.  *Center for Biological Diversity v. U.S. Int'l Dev. Fin. Corp.*, 77 F.4th 679, 690 (D.C. Cir. 2023).  Because the statutory text "foreclose[s]" Frontier's arguments, it cannot meet its "responsibility to show that an error is harmful."  *Id.*

## II. Spirit has no basis for seeking to overturn DOT's order.

As DOT's opposition to Spirit's intervention motion explained, Spirit's untimely attempt to intervene should be denied.  But even if the Court were inclined to grant the motion, Spirit's participation would have no effect on the proper disposition of this case.  Under well-settled law, Spirit cannot enlarge the issues presented in Frontier's petition.  And even if it could, Spirit's arguments regarding its own eligibility are meritless.

24

### A.    Spirit's intervention motion should be denied.

The Court should deny Spirit's untimely intervention motion. That motion was filed well after the deadline set by rule, *see* Fed. R. App. P. 15(d), and by this Court's order, *see* Order (Jan. 27, 2025).  It would therefore be proper to deny intervention solely on procedural grounds.  *Cf. Associated Builders & Contractors, Inc. v. Herman*, 166 F.3d 1248, 1257 (D.C. Cir. 1999) ("If the motion was not timely, there is no need for the court to address the other factors that enter into an intervention analysis.").

Even setting the timeliness problem aside, Spirit's lodged brief goes far beyond the proper role for an intervenor.  "By failing to file a timely petition for review, [Spirit] forfeited any guarantee to judicial review of its claim." *American Fuel & Petrochemical Mfrs. v. EPA*, 937 F.3d 559, 590 (D.C. Cir. 2019) (per curiam).  As a proposed intervenor, it "may only argue issues that have been raised by the principal parties." *National Ass'n of Regulatory Util. Comm'rs v. Interstate Commerce Comm'n*, 41 F.3d 721, 729 (D.C. Cir. 1994).  Absent such a rule, "the time limitations for filing a petition for review . . . could easily be circumvented through the device of intervention." *Illinois Bell Tel.*

*Co. v. FCC*, 911 F.2d 776, 786 (D.C. Cir. 1990). Those circumvention concerns are evident here, as Spirit waited until after the statutory petition deadline to seek review of the Final Order.

Spirit's brief plainly attempts to raise new issues. Most notably, Spirit attempts to assert its own eligibility for the slot exemptions. Spirit Br. 17-24. That is far outside the issues raised in Frontier's petition, which concerns only (1) Frontier's eligibility, and (2) Alaska's eligibility. *See* Pet'r Br. 4. And despite its purported support of Frontier's petition, "Spirit does not support Frontier's" requested remedy. Spirit Br. 27. Instead, it attempts to offer an alternative remedy that would require reconsideration of *Spirit's* application. *See* Spirit Br. at 33-36. If Spirit wished to secure judicial review of the rejection of its application, it needed to timely file its own petition for review. *See American Fuel & Petrochemical Mfrs.*, 937 F.3d at 590 (declining to consider an argument when the intervenor had "every incentive to file its own petition for review"). Because Spirit "presents no reason why it could not have petitioned in its own right" within the statutory deadline, this Court should "decline to consider" these

26

additional issues. *U.S. Tel. Ass'n v. FCC*, 188 F.3d 521, 531 (D.C. Cir. 1999).

**B.    DOT correctly determined that Spirit is ineligible for the slot exemptions.**

Even if Spirit were entitled to press its arguments here, they would fail. DOT correctly determined that Spirit was not an "incumbent air carrier[]" at Reagan National and was, therefore, ineligible for the slot exemptions.

To qualify for the slot exemptions at issue, an airline must have been both (1) an "incumbent air carrier[]" and (2) "qualif[ied] for status as a limited incumbent carrier" as of the FAA Reauthorization Act's enactment. 49 U.S.C. § 41718(i)(3); *see* JA401, 490. As DOT observed, the term "incumbent air carrier" is not defined by either statute or regulation. JA401, 490-492; *see also* 14 C.F.R. § 93.213 (not defining that term). The agency therefore accorded the term its ordinary meaning. JA401, 490-492; *see Taniguchi v. Kan Pac. Saipan, Ltd.*, 566 U.S. 560, 566 (2012) ("When a term goes undefined in a statute, we give the term its ordinary meaning.").

In common usage, "incumbent" denotes one that "[c]urrently hold[s] a specified office." *Incumbent*, American Heritage Dictionary of

the English Language (5th ed. 2022).  Given that ordinary meaning, DOT appropriately defined "incumbent air carrier" as "a carrier that is engaged in air transportation at [Reagan National] as of the date of enactment of" the FAA Reauthorization Act.  JA401.  It is undisputed that Spirit does not currently provide air transportation at Reagan National, having sold its only slots to another air carrier in 2012. JA402-403.  Spirit therefore could not satisfy the first statutory criterion.[2]

Spirit suggests (at 18) that DOT erred in applying a two-part test. According to Spirit, the statute sets forth only one criterion: whether an airline is a limited incumbent air carrier.  Spirit Br. 18.  If Congress had wanted to make being a "limited incumbent air carrier" the sole eligibility criterion, it would have said so.  Instead, it restricted

---

[2] This definition also explains why there is no contradiction in treating Frontier as both an "incumbent air carrier" and a new entrant air carrier.  *Contra* Pet'r Br. 23, 28.  Frontier is an "incumbent air carrier," as the FAA Reauthorization Act uses that term, because it provides transportation at Washington National Airport.  JA402.  It does so solely through slot exemptions, however.  JA402.  The statutory and regulatory definitions of new entrant air carrier and limited incumbent air carrier exclude slot exemptions, so Frontier qualifies only as a new entrant.  *See supra* pp. 15-21.

eligibility to "incumbent air carriers qualifying for status as a limited incumbent air carrier." 49 U.S.C. § 41718(i)(3). Spirit's interpretation requires disregarding the first half of that phrase. If "all limited incumbents are incumbents," as Spirit contends (at 11), then "incumbent air carrier[]" is redundant. Such an atextual interpretation should be rejected. *See, e.g.*, *United States v. Taylor*, 596 U.S. 845, 857 (2022) ("[W]e do not lightly assume Congress adopts two separate clauses in the same law to perform the same work.").

Spirit offers one last argument: that Congress could have referred to "operating" air carriers to denote those that currently provide air transportation services. Spirit Br. 21. In support, Spirit cites a different statutory provision that refers to "an air carrier currently holding or operating a slot at Ronald Reagan Washington National Airport." 49 U.S.C. § 41714(d)(1). Even assuming that phrasing would have achieved the same effect, Congress is not required to use magic words to express its intent. "[T]he fact that Congress chose to use certain language" in one subsection "hardly means it was foreclosed from using different language to accomplish the same goal in a different set of amendments." *Department of Agric. Rural Dev. Rural Hous. Serv.*

29

*v. Kirtz*, 601 U.S. 42, 52 (2024) (alterations and quotation marks

omitted).

## III.   DOT properly awarded the slot exemptions to Alaska.

After determining that Frontier and Spirit were ineligible for the

limited incumbent slot exemptions, DOT concluded that Alaska was the

only eligible applicant.  JA493.  It therefore awarded Alaska those slot

exemptions, which it explained would maximize the "public benefits

available from these scarce assets."  JA493; *see also* JA406-407.  That

accords with Congress's determination that the additional slot

exemptions would "enhance options for nonstop travel" from Reagan

National and "have a positive impact on the overall level of

competition." 49 U.S.C. § 41718(i)(4)(B).  DOT's reasoned determination

should be upheld.

### A.    Frontier and Spirit fail to demonstrate their standing.

As an initial matter, neither Frontier nor Spirit appears to have

Article III standing to contest DOT's decision to award the slot

exemptions to Alaska.  *See Town of Chester v. Laroe Estates, Inc.*, 581

U.S. 433, 439 (2017) ("[A] plaintiff must demonstrate standing for each

claim he seeks to press and for each form of relief that is sought."

(quotation marks omitted)).  Frontier's claim to standing is premised solely on its desire to obtain the limited-incumbent slot exemptions.  *See* Pet'r Br. 19-21.  Spirit, for its part, does not set forth its claim to standing.  *See generally* Spirit Br.  But for the reasons set forth above, neither airline is eligible for those slot exemptions.  As a result, neither has an apparent interest in whether DOT properly determined that Alaska qualifies as a limited incumbent air carrier.  *See Eastern Air Lines, Inc. v. FAA*, 772 F.2d 1508, 1512 (11th Cir. 1985) ("Eastern has suffered no injury from the FAA's approval of the Midway/Air Florida transaction [transferring slots from Air Florida to its successor, Midway Airlines].  If that transaction had not been approved, Eastern still would not in consequence have any right to the airport slots.").

Indeed, DOT observed that because Frontier and Spirit are themselves ineligible for the slot exemptions, neither suffers any injury from the award of slot exemptions to Alaska.  *See* JA492 ("[T]he only two parties to question Alaska's eligibility—Spirit and Frontier—are not themselves eligible, and therefore are not directly injured or affected by our determination that Alaska is eligible as a limited incumbent.").  Neither Frontier nor Spirit disputes that observation.

31

And, as noted, neither asserts any other basis for standing. As a result, any other arguable standing theory has been forfeited. *See Twin Rivers Paper Co. v. SEC*, 934 F.3d 607, 613 (D.C. Cir. 2019); *see also* D.C. Cir. R. 28(a)(7).

### B. DOT reasonably concluded that Alaska is an eligible limited incumbent air carrier.

In any event, DOT properly awarded the slot exemptions to Alaska. There is no dispute that Alaska itself holds and operates fewer than 40 slots at Reagan National. It is therefore a limited incumbent air carrier within the statutory definition. *See* 49 U.S.C. § 41714(h)(5).

Frontier and Spirit contend that 49 U.S.C. § 41714(k) nonetheless renders Alaska ineligible. Pet'r Br. 30-36; Spirit Br. 27-33. That provision prevents an air carrier that "has or enters into a code-share agreement[] with any other air carrier" from qualifying for a new slot exemption as a limited incumbent air carrier "if the total number of slots and slot exemptions held by the two carriers at the airport exceed 20 slots and slot exemptions." 49 U.S.C. § 41714(k). Frontier and Spirit submit that the code-share relationship between Alaska and American Airlines, *see* JA403, triggers the statutory bar.

32

DOT rightly rejected this argument. JA403-404, 492-493. As DOT explained, the Alaska-American "code sharing relationship is limited by a settlement agreement reached in 2017" to resolve antitrust concerns arising from the merger of Alaska and Virgin American Airlines. JA403; *see* JA117-128 (reproducing the settlement agreement).[3] This unique factual situation required DOT to make a judgment about whether this particular arrangement triggered the application of § 41714(k). The agency reasonably concluded that the scenario here is not the one contemplated by Congress.

As DOT observed, the animating concern behind § 41714(k) is that "larger, incumbent mainline carrier[s]" not receive "preferential access to slots or slot exemptions" by virtue of their relationships with smaller airlines, such as commuter air carriers. JA404 (citing H.R. Rep. No. 106-167 (1999); S. Rep. No. 106-9 (1999)). Section 41714(k) thus operates to prevent such smaller players from obtaining slots and slot exemptions as a new entrant or limited incumbent "only to market and

---

[3] DOT cited the proposed final judgment in that case. JA403. The final judgment entered by the district court is identical. *See* Final Judgment, *United States v. Alaska Air Grp.*, 1:16-cv-2377 (D.D.C. June 23, 2017), Dkt. No. 16.

operate those slots [or slots exemptions] on behalf of" their larger code-share partner.  JA404; *accord* JA492 ("Section 41714(k) is properly interpreted to exclude regional affiliates from obtaining slot exemptions that would likely be controlled by the larger mainline incumbents.").[4]

Here, there is no concern that Alaska will "market and operate" the slot exemptions on behalf of American.  JA404.  The Alaska-American relationship "does not include slot-sharing provisions, does not increase the slot holdings of the dominant carrier at [Reagan National] (i.e., American), and does not place Alaska-operated slots under the marketing control of American."  JA492-493.  Critically, the 2017 settlement agreement prohibits Alaska from placing American's code on any nonstop flight it operates originating at Reagan National.  JA404, 492-493; *see* JA122 (prohibiting American from marketing "any Alaska Flight that originates or terminates at any Key American Airport," including Reagan National).

---

[4] Spirit observes (at 34) that portions of the legislative history focused on commuter air carriers.  That misses the point.  DOT looked to this legislative history to illustrate the general principle that smaller air carriers, such as Alaska, may not leverage their status for the benefit of their larger partners.  JA404, 492.

As a result, American does not stand to benefit from the award of the slot exemptions to Alaska. *See* JA139 (explaining that the settlement's code-sharing limitations incentivize Alaska "to grow in ways that continue to enhance competition"). *Contra* Spirit Br. 32-33.

Frontier and Spirit suggest that this conclusion departed from the statutory text. *E.g.*, Pet'r Br. 31; Spirit Br. 27. But here, as in many circumstances, the agency needed "to decide how a broad statutory term applie[s] to specific facts found by the agency." *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 388 (2024). That kind of routine, "factbound" determination is within the agency's ken, as many Supreme Court decisions illustrate. *Id.* at 389; *see, e.g.*, *O'Keeffe v. Smith, Hinchman & Grylls Assocs., Inc.*, 380 U.S. 359, 364 (1965) (per curiam); *Cardillo v. Liberty Mut. Ins. Co.*, 330 U.S. 469, 478 (1947); *NLRB v. Hearst Publ'ns, Inc.*, 322 U.S. 111, 131 (1944); *Gray v. Powell*, 314 U.S. 402, 412-13 (1941). DOT's orders reflect a factual determination about the nature of the Alaska-American relationship, and then reasonably concluded that such a relationship does not implicate the concerns addressed in § 41714(k). That was a faithful application of the statutory scheme.

Spirit also notes (at 31) that 49 U.S.C. § 40109(c) authorizes DOT the authority to grant exemptions from certain requirements, but that provision does not apply to § 41714.  That observation is beside the point.  DOT did not purport to grant an exemption to Alaska, and it did not rely on the authority provided in § 40109(c).  DOT simply applied the relevant statutory provision to the particular facts it found with respect to the Alaska-American code-share relationship.

## IV.  If the Court were to grant Frontier's petition, it should defer any decision regarding the appropriate remedy.

If the Court were to grant Frontier's petition in whole or part, it could "amend, modify, or set aside any part of the order" or remand for "the Secretary [of Transportation] . . . to conduct further proceedings" as appropriate.  49 U.S.C. § 46110(c).  But the Court should defer any consideration of the appropriate remedy pending further proceedings on Alaska's conditional cross-petition for review in No. 25-1062.

Alaska's petition raises the question whether the Final Order should be vacated in full if DOT erred in awarding the slot exemptions.  *See* Petition for Review, *Alaska Airlines, Inc. v. U.S. Dep't of Transp.*, No. 25-1062 (D.C. Cir. filed Feb. 14, 2025).  That petition is currently in

36

abeyance pending the disposition of this case.  *See* Order, *Alaska Airlines*, No. 25-1062 (Feb. 25, 2025).  Should Frontier's petition be granted, it would be appropriate to consider briefing in the *Alaska* case regarding the scope of any remedy, which will necessarily be informed by the precise disposition here.  Frontier's (at 36) and Spirit's (at 33-36) competing requests to either amend the Final Order or remand with instructions are therefore premature.

## CONCLUSION

For the foregoing reasons, the petition for review should be

denied.

Respectfully submitted,

*Of Counsel:*

GREGORY COTE
*Acting General Counsel*

CHARLES E. ENLOE
*Assistant General Counsel*

PETER J. PLOCKI
*Deputy Assistant General Counsel*

EMILY KVESELIS
*Trial Attorney*
*U.S. Department of*
*Transportation*

YAAKOV M. ROTH
*Acting Assistant Attorney*
*General*

MICHAEL S. RAAB
*/s/ Simon C. Brewer*
SIMON C. BREWER
*Attorneys, Appellate Staff*
*Civil Division, Room 7529*
*U.S. Department of Justice*
*950 Pennsylvania Avenue NW*
*Washington, DC 20530*
*(202) 616-5367*
*Simon.C.Brewer@usdoj.gov*

March 2025

# CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limit of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 6927 words. This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because it was prepared using Word for Microsoft 365 in Century Schoolbook 14-point font, a proportionally spaced typeface.

*/s/ Simon C. Brewer*
Simon C. Brewer

## CERTIFICATE OF SERVICE

I hereby certify that on March 17, 2025, I electronically filed the foregoing brief with the Clerk of the Court for the United States Court of Appeals for the District of Columbia Circuit by using the appellate CM/ECF system.  Service will be accomplished by the appellate CM/ECF system.

*/s/ Simon C. Brewer*
Simon C. Brewer

**ADDENDUM**

# TABLE OF CONTENTS

49 U.S.C. § 41714 ................................................................. A1

49 U.S.C. § 41718 ................................................................. A3

14 C.F.R. § 93.213 ................................................................. A7

**49 U.S.C. § 41714**

**§ 41714. Availability of slots**

. . .

**(h) Definitions.**--In this section and sections 41715-41718 and 41734(h), the following definitions apply:

. . .

    **(3) New entrant air carrier.**--The term "new entrant air carrier" means an air carrier that does not hold a slot at the airport concerned and has never sold or given up a slot at that airport after December 16, 1985, and a limited incumbent carrier.

    **(4) Slot.**--The term "slot" means a reservation for an instrument flight rule takeoff or landing by an air carrier of an aircraft in air transportation.

    **(5) Limited incumbent air carrier.**--The term "limited incumbent air carrier" has the meaning given that term in subpart S of part 93 of title 14, Code of Federal Regulations; except that--

    **(A)** "40" shall be substituted for "12" in sections 93.213(a)(5), 93.223(c)(3), and 93.225(h);

    **(B)** for purposes of such sections, the term "slot" shall not include--

        **(i)** "slot exemptions";

        **(ii)** slots operated by an air carrier under a fee-for-service arrangement for another air carrier, if the air carrier operating such slots does not sell flights in its own name, and is under common ownership with an air carrier that seeks to qualify as a limited incumbent and that sells flights in its own name; or

        **(iii)** slots held under a sale and license-back financing arrangement with another air carrier, where the slots are under the marketing control of the other air carrier; and

    **(C)** for Ronald Reagan Washington National Airport, the Administrator shall not count, for the purposes of section 93.213(a)(5), slots currently held by an air carrier but leased out

A1

on a long-term basis by that carrier for use in foreign air transportation and renounced by the carrier for return to the Department of Transportation or the Federal Aviation Administration.

. . .

**(k) Affiliated carriers.**--For purposes of this section and sections 41716, 41717, and 41718, an air carrier that operates under the same designator code, or has or enters into a code-share agreement, with any other air carrier shall not qualify for a new slot or slot exemption as a new entrant or limited incumbent air carrier at an airport if the total number of slots and slot exemptions held by the two carriers at the airport exceed 20 slots and slot exemptions.

A2

**49 U.S.C. § 41718**

**§ 41718. Special rules for Ronald Reagan Washington National Airport**

. . .

**(g) Additional slot exemptions.**--

   **(1) Increase in slot exemptions.**--Not later than 90 days after the date of enactment of the FAA Modernization and Reform Act of 2012, the Secretary shall grant, by order 16 exemptions from--

   **(A)** the application of sections 49104(a)(5), 49109, and 41714 to air carriers to operate limited frequencies and aircraft on routes between Ronald Reagan Washington National Airport and airports located beyond the perimeter described in section 49109; and

   **(B)** the requirements of subparts K and S of part 93, Code of Federal Regulations.

   **(2) New entrants and limited incumbents.**--Of the slot exemptions made available under paragraph (1), the Secretary shall make 8 available to limited incumbent air carriers or new entrant air carriers (as such terms are defined in section 41714(h)). Such exemptions shall be allocated pursuant to the application process established by the Secretary under subsection (d). The Secretary shall consider the extent to which the exemptions will--

   **(A)** provide air transportation with domestic network benefits in areas beyond the perimeter described in section 49109;

   **(B)** increase competition in multiple markets;

   **(C)** not reduce travel options for communities served by small hub airports and medium hub airports within the perimeter described in section 49109;

   **(D)** not result in meaningfully increased travel delays;

   **(E)** enhance options for nonstop travel to and from the beyond-perimeter airports that will be served as a result of those exemptions;

**(F)** have a positive impact on the overall level of competition in the markets that will be served as a result of those exemptions; or

**(G)** produce public benefits, including the likelihood that the service to airports located beyond the perimeter described in section 49109 will result in lower fares, higher capacity, and a variety of service options.

**(3) Improved network slots.**--Of the slot exemptions made available under paragraph (1), the Secretary shall make 8 available to incumbent air carriers qualifying for status as a non-limited incumbent carrier at Ronald Reagan Washington National Airport as of the date of enactment of the FAA Modernization and Reform Act of 2012. Each such non-limited incumbent air carrier--

**(A)** may operate up to a maximum of 2 of the newly authorized slot exemptions;

**(B)** prior to exercising an exemption made available under paragraph (1), shall discontinue the use of a slot for service between Ronald Reagan Washington National Airport and a large hub airport within the perimeter as described in section 49109, and operate, in place of such service, service between Ronald Reagan Washington National Airport and an airport located beyond the perimeter described in section 49109;

**(C)** shall be entitled to return of the slot by the Secretary if use of the exemption made available to the carrier under paragraph (1) is discontinued;

**(D)** shall have sole discretion concerning the use of an exemption made available under paragraph (1), including the initial or any subsequent beyond perimeter destinations to be served; and

**(E)** shall file a notice of intent with the Secretary and subsequent notices of intent, when appropriate, to inform the Secretary of any change in circumstances concerning the use of any exemption made available under paragraph (1).

. . .

**(i) Additional slot exemptions.**--

**(1) Increase in slot exemptions.**--Not later than 60 days after the date of enactment of the FAA Reauthorization Act of 2024, the Secretary shall grant, by order, 10 exemptions from--

**(A)** the application of sections 49104(a)(5), 49109, and 41714 to air carriers to operate limited frequencies and aircraft on routes between Ronald Reagan Washington National Airport and domestic airports located within or beyond the perimeter described in section 49109; and

**(B)** the requirements of subparts K, S, and T of part 93 of title 14, Code of Federal Regulations.

**(2) Non-limited incumbents.**--Of the slot exemptions made available under paragraph (1), the Secretary shall make 8 available to incumbent air carriers qualifying for status as a non-limited incumbent carrier at Ronald Reagan Washington National Airport as of the date of enactment of the FAA Reauthorization Act of 2024.

**(3) Limited incumbents.**--Of the slot exemptions made available under paragraph (1), the Secretary shall make 2 available to incumbent air carriers qualifying for status as a limited incumbent carrier at Ronald Reagan Washington National Airport as of the date of enactment of the FAA Reauthorization Act of 2024.

**(4) Allocation procedures.**--The Secretary shall allocate the 10 slot exemptions provided under paragraph (1) pursuant to the application process established by the Secretary under subsection (d), subject to the following:

**(A) Limitations.**--Each air carrier that is eligible under paragraph (2) and paragraph (3) shall be eligible to operate no more and no less than 2 of the newly authorized slot exemptions.

**(B) Criteria.**--The Secretary shall consider the extent to which the exemptions will--

**(i)** enhance options for nonstop travel to beyond-perimeter airports that do not have nonstop service from Ronald Reagan Washington National Airport as of the date of enactment of the FAA Reauthorization Act of 2024; or

A5

**(ii)** have a positive impact on the overall level of competition in the markets that will be served as a result of those exemptions.

. . .

**14 C.F.R. § 93.213**

**§ 93.213. Definitions and general provisions**

**(a)** For purposes of this subpart—

**(1)** New entrant carrier means a commuter operator or air carrier which does not hold a slot at a particular airport and has never sold or given up a slot at that airport after December 16, 1985.

**(2)** Slot means the operational authority to conduct one IFR landing or takeoff operation each day during a specific hour or 30 minute period at one of the High Density Traffic Airports, as specified in subpart K of this part.

. . .

**(5)** Limited incumbent carrier means an air carrier or commuter operator that holds or operates fewer than 12 air carrier or commuter slots, in any combination, at a particular airport, not including international slots, Essential Air Service Program slots, or slots between the hours of 2200 and 0659 at Washington National Airport or LaGuardia Airport. However, for the purposes of this paragraph (a)(5), the carrier is considered to hold the number of slots at that airport that the carrier has, since December 16, 1985:

(i) Returned to the FAA;

(ii) Had recalled by the FAA under § 93.227(a); or

(iii) Transferred to another party other than by trade for one or more slots at the same airport.

. . .

A7