**ORAL ARGUMENT SCHEDULED FOR MAY 8, 2025**

UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT
_____

No. 25-1002
_____

FRONTIER AIRLINES, INC.

*Petitioner,*

SPIRIT AIRLINES, INC.

*Movant-Intervenor,*

v.

UNITED STATES DEPARTMENT OF TRANSPORTATION,

*Respondent,*

ALASKA AIRLINES, INC.,

*Respondent-Intervenor.*

On Petition for Review of a Final Order of the
United States Department of Transportation

**Brief of San Diego County Regional Airport Authority as**
***Amicus Curiae*** **in Support of Department of Transportation and**
**in Support of Denying Frontier's Petition for Review**

Sean M. Grammel (D.C. Cir. #65923)
Mina S. Makarious
ANDERSON & KREIGER LLP
50 Milk Street, 21st Floor
Boston, MA  02109
Phone: (617) 621-6523
sgrammel@andersonkreiger.com

March 24, 2025                    *Counsel for Amicus Curiae*

## <u>Certificate as to Parties, Rulings, and Related Cases</u>

As required by D.C. Circuit Rule 28(a)(1), the undersigned *amicus curiae* San Diego County Regional Airport Authority submits this Certificate of Counsel:

1.      **Parties and *Amici*.**  The following is a list of parties and *amici* who, to counsel's knowledge, are parties or *amici* in this Court:

      a.      Petitioner Frontier Airlines, Inc. ("Frontier")

      b.      Respondent United States Department of Transportation ("DOT")

      c.      Intervenor Alaska Airlines, Inc. ("Alaska")

      d.      Movant-Intervenor Spirit Airlines, Inc. ("Spirit")

      e.      *Amicus Curiae* San Diego County Regional Airport Authority ("SDCRAA")

2.      **Ruling Under Review.**  The ruling at issue in this Court is DOT's Final Order styled as DOT Order 2024-12-8, Docket No. DOT-OST-0065-23605 (the "Final Order"), which is in the Joint Appendix ("JA") at pages 485-96, as well as all other interlocutory orders, decisions, determinations, and conclusions supporting the above Final Order.

3.      **Related Cases.**  Alaska has filed a Petition for Review, docketed

as *Alaska Airlines, Inc. v. United States Department of Transportation*, Case No. 25-1062 (D.C. Cir.).  Alaska filed this as a "conditional cross-petition," in the event the Court partially vacates the Final Order.  The Court denied Alaska's motion for consolidation and held Case No. 25-1062 in abeyance until the resolution of this case.  SDCRAA is not aware of any other related cases pending in this Court or any other court within the meaning of Circuit Rule 28(a)(1)(C).

    */s/  Sean Grammel*

Sean M. Grammel
*Counsel for Amicus Curiae*

ii

## **Rule 26.1 Corporate Disclosure Statement**

Pursuant to D.C. Circuit Rule 26.1, SDCRAA states that it is a governmental entity and therefore it has no parent company and no publicly held company holds a 10% or greater interest in it.

_/s/  Sean Grammel_

Sean M. Grammel
*Counsel for Amicus Curiae*

# <u>Table of Contents</u>

**Page**

Certificate as to Parties, Rulings, and Related Cases ..............................i

Rule 26.1 Corporate Disclosure Statement ............................................. iii

Table of Authorities ....................................................................................ii

Glossary.........................................................................................................iv

Statement of Identity, Interest in Case, and Authority to File ...............1

Statement of Authorship and Financial Contributions ...........................2

Introduction..................................................................................................3

Statutes and Regulations.............................................................................4

Background ...................................................................................................4

      Creation of the High Density and Perimeter Rules ........................5

      Statutory Slot Exemptions at DCA ................................................. 8

      The FAA Reauthorization Act of 2024...........................................13

Summary of the Argument ....................................................................... 16

Argument .................................................................................................... 17

Conclusion .................................................................................................. 25

Certificate of Compliance.........................................................................27

Certificate of Service .................................................................................28

## <u>Table of Authorities</u>

**Page(s)**

**Cases**

*Alaska Airlines, Inc. v. United States Department of Transportation,*
 Case No. 25-1062 (D.C. Cir.)............................................................25

*City of Houston v. Federal Aviation Administration,*
 679 F.2d 1184 (5th Cir. 1982) ..........................................................5

*Exhaustless Inc. v. FAA,*
 931 F.3d 1209 (D.C. Cir. 2019) ........................................................4

*Fed. Commc'ns Comm'n v. Prometheus Radio Project,*
 592 U.S. 414 (2021)....................................................................18, 21

*Loper Bright Enterps. v. Raimondo,*
 603 U.S. 369 (2024)..........................................................................17

*Next Era Resources, LLC v. Federal Energy Regulatory Comm'n,*
 118 F.4th 361 (D.C. Cir. 2024)........................................................17

**Statutes**

49 U.S.C. § 41715 ..............................................................................9

49 U.S.C. § 41716 ..............................................................................9

49 U.S.C. § 41717 ..............................................................................9

49 U.S.C. § 41718 ..............................................9, 10, 11, 12, 14, 16, 18, 19, 22, 23

49 U.S.C. § 49109 ..............................................................................5

5 U.S.C. § 706 ..................................................................................17

Airline Deregulation Act of 1978, Pub. L. No. 95-504 (now codified at 49
 U.S.C. §§ 40101 *et seq.*)....................................................................6

FAA Modernization and Reform Act of 2012, Pub. L. No. 112-95 .........11

ii

FAA Reauthorization Act of 1994, Pub. L. 103-305, § 206(a)(1) (1994)
(now codified at 49 U.S.C. § 41714)................................................7, 8, 9

Federal Aviation Administration Reauthorization Act of 2024, Pub. L.
118-63 ............................................................................................3

Vision 100-Century of Aviation Reauthorization Act, Pub. L. 108-176 . 10

Wendell H. Ford Aviation and Investment Reform Act of the 21st
Century, Pub. L. No. 106-181 (2000)................................................8, 9

**Other Authorities**

Change of Market for Beyond-Perimeter Slot Exemption,
Docket No. DOT-OST-2012-0029-6307 (Jan. 15, 2014) ....................13

H.R. Rep. 106-167.........................................................................9

S. Rep. 106-9................................................................................9

Senate Committee-Passed FAA Bill Revived Debate Over Reagan
National Airport Slot and Perimeter Rules, Congressional Research
Service, (Apr. 29, 2024) ........................................................24

**Regulations**

14 C.F.R. § 93.123 ........................................................................4

33 Fed. Reg. 17896 (Dec. 3, 1968) ..................................................6

High Density Traffic Airports; Slot Allocation and Transfer Methods,
50 Fed. Reg. 52180 (Dec. 20, 1985)................................................6, 7

## Glossary

| TERM OR ABBREVIATION | DEFINITION |
| --- | --- |
| JA | Joint Appendix |
| AIR-21 | Wendell H. Ford Aviation and Investment Reform Act of the 21st Century, Pub. L. No. 106-181 (2000) |
| Alaska | Alaska Airlines, Inc. |
| DCA | Ronald Reagan Washington National Airport (formerly known as Washington National Airport) |
| DOT | Department of Transportation |
| FAA | Federal Aviation Administration |
| FAA 2012 | FAA Modernization and Reform Act of 2012, Pub. L. No. 112-95 (2012) |
| FAA 2024 | Federal Aviation Administration Reauthorization Act of 2024, Pub. L. 118-63 (2024) |
| Frontier | Frontier Airlines, Inc. |
| SAN | San Diego International Airport |
| SDCRAA | San Diego County Regional Airport Authority |
| Spirit | Spirit Airlines |
| Vision 100 | Vision 100-Century of Aviation Reauthorization Act, Pub. L. 108-176 (2003) |

## <u>Statement of Identity, Interest in Case, and Authority to File</u>

SDCRAA is an independent agency that manages the day-to-day operations of San Diego International Airport ("SAN") and addresses the San Diego region's long-term air transportation needs. Both of these interests will be affected by DOT's Final Order.

Every day, hundreds of passengers depart from SAN with an ultimate destination of DCA (or vice versa), but before Alaska started nonstop service between SAN and DCA on March 17, 2025, all of them had to make at least one connection. This direct route will save enormous amounts of time and create efficiencies for thousands of travelers annually. The San Diego region at large will benefit from nonstop DCA service, which will link significant national defense, telecommunications, and biotech industries in San Diego to regulatory agencies in Washington, DC. SDCRAA submits this brief to provide background on slot and slot exemptions, and to support DOT's decision to award two slot exemptions to Alaska.

All parties have consented to the filing of this amicus brief.

## <u>Statement of Authorship and Financial Contributions</u>

Pursuant to Fed. R. App. P. 29(a)(4)(E), SDCRAA states that no party's counsel authored this brief in whole or in part, and no person other than SDCRAA or its counsel contributed money that was intended to fund preparing or submitting this brief.

　　　　　　　　　　　*/s/  Sean Grammel*

　　　　　　　　　　　Sean M. Grammel
　　　　　　　　　　　*Counsel for Amicus Curiae*

## Introduction

All parties to this case agree that DCA is one of the busiest, most congested, and most competitive airports in the country. Air carriers strive for valuable slots or slot exemptions at DCA, hoping to gain lucrative rights that become available every few years at most. But Congress, DOT, and the government entities that sponsor airports around the country have a different focus in allocating these slot exemptions: the public interest. These public officials have worked to ensure that a scarce resource—takeoff and landing rights at DCA—are optimized for the benefit of all passengers and the entire air transportation system, rather than the profit of any one air carrier.

The *amicus curiae* SDCRAA shares that focus and urges the Court to uphold DOT's Final Order, because it will support a vital new link across the country and incentivize healthy competition, as called for in the Federal Aviation Administration Reauthorization Act of 2024, Pub. L. 118-63 ("FAA 2024"). SDCRAA does not wade into the dispute about eligibility between Alaska, Frontier, and Spirit, but rather focuses on the merits of DOT's analysis, which correctly found that service between SAN and DCA would produce enormous savings, efficiency,

3

and benefits to the public at large.

## Statutes and Regulations

All applicable statutes and regulations are contained in the briefs

for Frontier, DOT, and Alaska.

## Background

DOT has, for decades, used different administrative and market

tools to address congestion and delays at DCA and a few other busy

airports, either on its own initiative or because Congress mandated

DOT to do so.  These methods include two regulatory programs relevant

here.

First is the use of "slots" or "slot exemptions" to limit the number

of takeoffs and landings at DCA.  *See Exhaustless Inc. v. FAA*, 931 F.3d

1210 (D.C. Cir. 2019).  A slot or slot exemption provides an air

carrier with the right to take off or land at DCA.  With limited

exceptions not applicable here, no plane may arrive at, or depart from,

DCA without a slot or slot exemption.  The Federal Aviation

Administration ("FAA") distributes slots by regulation.  *Id.*; *see* 14

C.F.R. § 93.123.  Congress has occasionally directed DOT, through

statute, to allow a specific amount of more takeoffs and landings at

4

DCA. The rights for these additional, statutorily mandated takeoffs and landings are slot exemptions.

The second regulatory tool used at DCA is a requirement that any flight landing or taking off at DCA travel no more than 1,250 miles. 49 U.S.C. § 49109 (the "Perimeter Rule"); *see generally City of Houston v. Federal Aviation Administration*, 679 F.2d 1184 (5th Cir. 1982) (providing an overview of the creation and regulatory history of the Perimeter Rule). DCA is the only airport in the country with such a restriction. When creating slot exemptions, Congress has at times directed DOT to award these exemptions to "beyond-perimeter" flights (i.e., those traveling more than 1,250 miles).

Both of these rules restrict flights to DCA and are relevant to FAA 2024. This dispute, however, turns on the creation of new slot exemptions at DCA and so this brief focuses on that regulatory and legislative history, along with DOT's analysis of why service to SAN is the best use of two new slot exemptions.

### Creation of the High Density and Perimeter Rules

DOT and FAA have sought to address congestion management at DCA for more than 50 years. In 1968, FAA issued the "High Density

Traffic Airports" Rule. *See* 33 Fed. Reg. 17896, 17898 (Dec. 3, 1968) (the "High Density Rule"). Under that Rule, FAA capped the number of arrivals and departures permitted at DCA and several other busy airports. At the time, the Civil Aeronautics Board closely regulated which airlines served each airport and what prices, routes, and services they offered there. FAA left it to the handful of airlines serving each of these airports to allocate the slots at each airport amongst themselves.

Following passage of the Airline Deregulation Act of 1978, Pub. L. No. 95-504 (now codified at 49 U.S.C. §§ 40101 *et seq*.), airlines could freely compete for service at any airport without prior federal approval. At highly profitable, slot-controlled airports like DCA, this precipitated fierce competition for each slot, and airlines serving, or seeking to serve, each airport were often at an impasse on how to allocate slots.

To address this problem, FAA amended the High Density Rule in 1985. FAA "grandfathered" slots held by certain airlines; permitted airlines to sell, lease, or otherwise transfer slots subject to FAA approval (the "Buy/Sell Rule"); and reserved to FAA the right to withdraw slots from use. "High Density Traffic Airports; Slot Allocation and Transfer Methods," 50 Fed. Reg. 52180 (Dec. 20, 1985). FAA also

6

found it necessary to require airlines to utilize their slots at least 65% of the time to address concerns that dominant carriers would "hoard" slots "in an attempt to restrict service to drive up fares or to keep smaller competitors from entering into or expanding in certain markets" to the detriment of both those competitors and the markets they would have served. *Id.* at 52188.

Between 1985 and 2001, FAA relied primarily on the Buy/Sell Rule, and the market it created, to govern slot allocations at slot-controlled airports. But in a market where supply was capped, and where established carriers serving each airport held a preference on grandfathered slots, anticompetitive behavior intensified.

In 1994, Congress took action in response. It authorized DOT and FAA to grant exemptions from the High Density Rule (i.e., slot exemptions) to enable airlines to provide new service at certain slot-controlled airports. FAA Reauthorization Act of 1994, Pub. L. 103-305, § 206(a)(1) (1994) (now codified at 49 U.S.C. § 41714). Congress limited the applicability of these exemptions at DCA, permitting DOT to award additional slots at DCA "only under circumstances determined by the

Secretary to be exceptional," with additional conditions placed on slots where large aircraft would be used.  49 U.S.C. § 41714(d).

Through the end of the 1990s, flights at DCA thus remained restricted by FAA's regulatory slot controls and the statutory Perimeter Rule.

### Statutory Slot Exemptions at DCA

Over the last 25 years, Congress has slowly expanded access to DCA through a series of limited exemptions to the Perimeter Rule.  In three FAA reauthorization statutes (in 2000, 2003, and 2012), Congress directed DOT to award a total amount of 40 beyond-perimeter daily slot exemptions at DCA (i.e., 20 round-trips).  In each statute, Congress specified the kind of flights that should be added and the criteria under which DOT should award these valuable slot exemptions.  These instructions differed among these three statutes and, most importantly, differed from FAA 2024.

*AIR-21.*  In 2000, Congress passed the Wendell H. Ford Aviation and Investment Reform Act of the 21st Century, Pub. L. No. 106-181 (2000) ("AIR-21").  Among other things, AIR-21 increased FAA's authority to grant airlines exemptions to operate at slot-controlled

8

airports, 49 U.S.C. §§ 41714, 41716-41718, and directed FAA to phase out the High Density Rule at all airports except DCA by 2007. 49 U.S.C. § 41715(a).

In AIR-21, Congress directed DOT to grant 12 slot exemptions at DCA for nonstop service outside the 1,250-mile perimeter. *See* Pub. L. 106-181, 114 Stat. 61. The purpose of these additional slot exemptions was to improve service and competition among air carriers. The High Density Rule was originally adopted as a "temporary" measure to reduce congestion and delays. H.R. Rep. 106-167, at 77. But once passage of the ADA ushered in deregulation of the airline industry, many air carriers could not "establish new service because of the lack of slot availability." H.R. Rep. 106-167, at 77. Slots were not serving their "intended purpose of reducing delays and congestion," but were rather placing an "artificial limitation on operations at these airports which, in effect, harms the traveling public by reducing competition." *Id.* at 78; *see also* S. Rep. 106-9, at 41 (directing DOT to award these slots to improve "competition in the airline industry" and increase "consumer choice").

9

In keeping with this focus on increased competition, AIR-21 outlined four criteria that each air carrier had to meet to receive one of these new slot exemptions.  49 U.S.C. § 41718(a)(1)-(4).  DOT awarded these 12 beyond-perimeter slots in July 2000.  *See* JA01 (DOT Order 2000-7-1, Order Granting Outside-the-Perimeter Slot Exemptions at Ronald Regan Washington National Airport, Docket OST-2000-7181-93 (July 5, 2000)).

***Vision 100.***  Three years later, Congress created additional slot exemptions in the Vision 100-Century of Aviation Reauthorization Act, Pub. L. 108-176 ("Vision 100").  Like AIR-21, Congress directed DOT to grant 12 new beyond-perimeter slot exemptions at DCA.  *See* 49 U.S.C. § 41718(a) (listing the 24 total slot exemptions between AIR-21 and Vision 100).  And Congress directed DOT to use the same four criteria from AIR-21.  *See* 49 U.S.C. § 41718(a)(1)-(4).  DOT granted the new slot exemptions on April 1, 2004.  JA39 (DOT Order 2004-4-41, Order Granting Beyond-Perimeter Slot Exemptions at Ronald Reagan Washington National Airport, Docket No. OST-2000-7181 (Apr. 1, 2004)).

10

*FAA 2012.* About a decade later, Congress passed the FAA Modernization and Reform Act of 2012, Pub. L. No. 112-95 ("FAA 2012"), which directed DOT to grant 16 more slot exemptions for service to DCA. *See* 49 U.S.C. § 41718(g). These slot exemptions had a different focus and different criteria.

Eight of these new exemptions had to go to airlines with existing inside-perimeter routes that would be converted to beyond-perimeter routes. *See* 49 U.S.C. § 41718(g)(3). The air carriers selected to convert an inside-perimeter route to a beyond-perimeter location had "sole discretion" about which airport would receive new nonstop service, both at the time of FAA 2012 and for any "subsequent" decision to move the route to a different beyond-perimeter airport. *See* 49 U.S.C. § 41718(g)(3)(D).

The other eight exemptions were for new routes, which DOT had to award to "limited incumbent air carriers or new entrant air carriers." 49 U.S.C. § 41718(g)(2). FAA 2012 did not allow air carriers to move these new routes at their sole discretion.

Congress tasked DOT with considering the same four criteria as AIR-21 and Vision 100, while adding three more factors. 49 U.S.C. §

41718(g)(2)(A)-(G). Unlike AIR-21 and Vision 100, Congress did not

require each applicant to meet all the factors outlined in FAA 2012.

*Compare* 49 U.S.C. § 41718(g)(2) (using "or" in FAA 2012) *with* 49

U.S.C. § 41718(a) (using "and" for the prior two statutes). Rather, DOT

could weigh these seven disjunctive factors to decide which applications

best met the criteria of FAA 2012. DOT awarded these eight slot

exemptions (i.e., four round-trips) for nonstop service to four different

cities, including nonstop service to Luis Muñoz International Airport

("SJU") in San Juan, Puerto Rico. *See* JA87-88 (DOT Order 2012-5-12,

Order Granting Beyond-Perimeter Slot Exemptions at Ronald Reagan

Washington National Airport, at 19-20, Docket No. DOT-OST-2012-

0029 (May 14, 2012)).

Alaska unsuccessfully applied for a route to SAN. During the

FAA 2012 slot proceedings, US Airways indicated that it planned to

convert its inside-perimeter slot for Dallas/Fort Worth into a beyond-

perimeter route to SAN. JA70 n.4. As a result, DOT rejected Alaska's

application in part because "San Diego, beginning in less than a month,

will have nonstop US Airways service to DCA." JA90. US Airways

indeed started that service at SAN, but later merged with American

12

Airlines, which decided to switch this beyond-perimeter route to Los Angeles instead. *See* Change of Market for Beyond-Perimeter Slot Exemption, Docket No. DOT-OST-2012-0029-6307 (Jan. 15, 2014). This change left SAN without nonstop service to DCA after 2014.

### The FAA Reauthorization Act of 2024

Ten more years went by before Congress directed DOT to grant 10 more slot exemptions at DCA in FAA 2024. Senator Cantwell, then-Chair of the Senate Committee on Commerce, Science, and Transportation, specifically noted in a letter to the Secretary of Transportation that FAA 2024 "was intended to provide direct access to DCA from unserved beyond-perimeter locations in the western and southwestern United States, such as San Antonio and San Diego." JA352.

Just as the criteria in FAA 2012 differed from those in AIR-21 and Vision 100, FAA 2024 gave DOT particular instructions about how to award these slot exemptions. FAA 2024 directed DOT to consider just two disjunctive criteria: whether the new exemptions will:

> 1) enhance options for nonstop travel to beyond-perimeter airports that lack nonstop service to DCA as of FAA 2024, or

13

2) have a positive impact on the overall level of competition in the market to be served by an exemption.  49 U.S.C. § 41718(i)(4)(B). In contrast to prior allocations, DOT could award new slot exemptions for flights either inside or outside the perimeter, 49 U.S.C. § 41718(i)(1)(A).  And Congress mandated that two of these slot exemptions (i.e., one round-trip) go to a limited incumbent air carrier, 49 U.S.C. § 41718(i)(3), while eight of the exemptions (four round-trips) go to non-limited incumbent air carriers.  49 U.S.C. § 41718(i)(2).  None was reserved for a new entrant.

DOT requested applications for these new slot exemptions.  *See* JA174 (Notice of Establishment of Slot Exemption proceeding at Ronald Reagan Washington National Airport, Docket No. DOT-OST-2024-0065, at 2 (June 24, 2024)).  DOT, in conjunction with FAA's Slot Administration Office, listed the air carriers that operated at DCA as of the enactment of FAA 2024 as either limited incumbents or non-limited incumbents.  Alaska and Air Canada were the only two limited incumbents.  *Id.*

Alaska timely applied for a slot exemption for service to SAN.  *See* JA201 (Application of Alaska Airlines, Inc. for Slot Exemptions, Docket

14

No. DOT-OST-2024-0065-5926 (July 8, 2024) (the "Application")).  A flood of comments supported nonstop service between SAN and DCA, including letters from national defense interests,[1] governmental entities,[2] the telecommunications industry,[3] biotech industry,[4] other private interests,[5] employees at Alaska Airlines,[6] and a bipartisan letter from the San Diego region's congressional delegation.[7]

 DOT tentatively awarded two slot exemptions (i.e., one round-trip) to Alaska for service to SAN, along with an explanation of why Alaska's proposal best met the criteria required by FAA 2024.  *See* JA406-07 (Order to Show Cause, Docket No. DOT-OST-2024-0065, at 24-25 (Oct. 16, 2024)).  DOT also explained that Alaska cannot place American Airlines code on any flight to or from DCA, according to the terms of a settlement agreement with the Department of Justice.  *See* JA403-04.

---

[1] JA 000231 (Cyber Center of Excellence).

[2] JA 000232 (City of San Diego).

[3] JA 000234 (Qualcomm); JA 000236 (Cox Communications).

[4] JA 000213 (Aquacycl Inc.); JA 000217 (Illumina, Inc.).

[5] JA 000215 (Boston Consulting Group-San Diego); JA 000238 (Deloitte); JA000235 (Evans Hotels); JA 000240 (Clark Construction Group); JA 000237 (Cultura); JA 000244 (California Asian Pacific Chamber of Commerce).

[6] JA 000296 (Alaska Airline Employees).

[7] JA 000242; JA 000415 (both from the San Diego Congressional Delegation).

In other words, Alaska will be advertising and conducting service between DCA and SAN as Alaska, not in conjunction with American.

After receiving additional materials from all interested parties, JA415-484, DOT confirmed its tentative decision in a Final Order on December 17, 2024.  *See* JA490-93 (Final Order, Docket No. 2024-OST-2024-0065, at 6-10 (Dec. 17, 2014)).  Frontier's petition followed.

### Summary of the Argument

DOT properly decided that Alaska qualifies as a limited incumbent and that Alaska's Application best met the factors required by FAA 2024.  Congress required DOT to look at two factors when allocating slot exemptions under FAA 2024: whether the slot exemptions will 1) enhance options for nonstop travel to beyond-perimeter airports that lack nonstop service to DCA, or 2) have a positive impact on the overall level of competition in the markets to be served by these exemptions.  49 U.S.C. § 41718(i)(4)(B).  DOT reasonably concluded, based on the record materials submitted by all parties, that nonstop service between SAN and DCA would meet these goals.  Alaska's Application would be strong regardless of the category in which DOT placed it.  If this Court were to agree with Frontier's

16

Petition, it should ensure that Alaska can compete for slot exemptions in the non-limited incumbent category.

## Argument

The Court reviews DOT's decision under the Administrative Procedure Act, which asks whether the agency's decision is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). On questions of statutory authorization, the Court must decide whether the agency acted consistent with the "best reading" of the underlying statute. *Loper Bright Enterps. v. Raimondo*, 603 U.S. 369, 373 (2024). If the Court decides that the agency acted consistently with the statute, then the standard of review is deferential to the agency, such that courts uphold decisions that are "reasonable and reasonably explained." *Next Era Resources, LLC v. Federal Energy Regulatory Comm'n*, 118 F.4th 361, 368 (D.C. Cir. 2024).

DOT correctly found that Alaska is a limited incumbent. Frontier and Spirit each disputes this decision, and each argues that only it can be eligible for the limited incumbent slot exemptions. DOT and Alaska have capably rebutted these arguments in their briefs.

17

This brief, however, focuses not on air carrier eligibility, but rather on the ways in which DOT properly considered the benefits to the national aviation system of nonstop SAN-DCA service, and the implications of that consideration on the Court's choice of remedies if it disagrees with Alaska and DOT. *See Fed. Commc'ns Comm'n v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021) (inquiring only to see if agency acted "within a zone of reasonableness" and not to "substitute" a court's "policy judgment for that of the agency").

FAA 2024 required DOT to look at two criteria: if the slot exemptions would 1) enhance options for nonstop travel to beyond-perimeter airports that lack nonstop service to DCA, or 2) have a positive impact on the overall level of competition in the markets to be served by these exemptions. 49 U.S.C. § 41718(i)(4)(B). DOT was correct to find that Alaska's proposed service between DCA and SAN easily meets both these criteria. To the extent this Court determines DOT analyzed Alaska's application under the wrong rubric by treating it as a limited incumbent, the paramount interests of FAA 2024 would be best served by requiring DOT to restart the process for awarding the

FAA 2024 exemptions and allowing Alaska to compete for a non-limited incumbent slot exemption.

***Enhanced Options for Nonstop Travel***.  DOT first had to consider if a slot exemption would "enhance options for nonstop travel to beyond-perimeter airports that do not have nonstop service from Ronald Reagan Washington National Airport as of the date of enactment of the FAA Reauthorization Act of 2024."  49 U.S.C. § 41718(i)(4)(B)(i).  As Alaska noted on the first page of its Application, "San Diego is the eighth largest U.S. city, home to the nation's largest military community, sits in the fifth largest U.S. County, and its airport, SAN, accounts for the greatest number of passengers of any U.S. airport outside of the DCA perimeter without nonstop DCA service."  JA201.  Service to SAN plainly meets the first criterion of FAA 2024.

SAN and DCA were the nation's most heavily traveled airport pair that lacked a direct connection.  JA216.  Even without a direct flight, 225 passengers traveled between SAN and DCA each way every day, totaling about 164,000 passengers in 2023 alone.  JA207.  San Antonio (which was also allocated a slot exemption under FAA 2024, JA494) had

19

the next highest amount of passengers who traveled to DCA without nonstop service, at 155 passengers each way every day—a large amount, but only 69% of the DCA-SAN total. JA343. These high numbers are not a flash in the pan—the SAN-DCA route has always been well traveled, with more than 100,000 passengers trekking between these two unconnected airports since 2003 (with the lone exception of COVID-impacted 2020). JA344.

Before Alaska began its new route on March 17, 2025, each of the passengers who traveled between SAN and DCA had to make a connection as they traveled across the country. JA207. For the 164,000 passengers making this trip in 2023, those connections added approximately 328,000 hours of travel time. JA207; JA224.

Included among these tens of thousands of travelers is a significant number of federal employees, particularly in the national defense industry. The federal government employs about 183,000 people in the San Diego region, and 111,000 of those are active-duty military. JA334. In fact, San Diego has the largest population of active-duty military of any region in the country, and is home to the largest concentration of military assets in the world. JA334. The

20

individuals working for our national defense should have a direct route between SAN and DCA, the airport closest to the Pentagon and the Department of Homeland Security.

Nonstop service between SAN and DCA serves many other industries important to the national economy. San Diego is home to one of the top three life science markets in the world, JA336, in addition to thriving technology, clean tech, telecommunications, and visitor hospitality sectors. *Id.* These industries will benefit from direct connection to agencies like the Food and Drug Administration, the National Institute of Health, the National Institute of Science and Technology, Customs and Border Protection, and the Department of Energy. *Id.*

By all accounts, service to SAN easily meets the first factor of FAA 2024, and DOT's analysis of the benefits falls safely with the agency's discretion. *See Prometheus Radio Project*, 592 U.S. at 423.

***Enhanced Competition***.  DOT also had to consider whether a slot exemption would "have a positive impact on the overall level of competition in the markets that will be served as a result of those

21

exemptions." 49 U.S.C. § 41718(i)(4)(B)(ii).  Again, DOT correctly found that service to SAN achieves this goal.

According to DOT's analysis, fares to DCA from SAN are "30% higher than the average for DCA," and above the average for both the greater Washington, DC market and the national market.  JA406. Once Alaska started nonstop service between SAN and Washington Dulles International Airport ("IAD"), fares on that route decreased by about 26%.  JA335 at n.1.  As DOT explained, adding new service to DCA will likely also have a positive impact on fares.  JA406.

Nonstop service between SAN and DCA will help consumers not just with fares on that route, but with fares on other, similar routes as well.  The addition of nonstop service between SAN and IAD decreased fares for passengers traveling between those airports, but prices still remain high.  JA335.  The federal government pays contract fares between SAN and IAD of $496, which is the highest amount of any market in this slot proceeding.  JA349.  Adding another flight to the Washington region will help apply downward pressure not just on the cost of flying between SAN and DCA, but also SAN and the Washington, DC region in general.

And there is a significant amount of people who travel to the Washington, DC region from SAN. Every day, 1,004 passengers travel between SAN and one of the three airports in the Washington, DC region (DCA, IAD, and Baltimore Washington International Airport). JA346. Adding service to DCA would increase competition among these air carriers for passengers traveling from SAN to the Washington, DC area in general, not just on DCA-bound flights.

Finally, DOT analyzed which air carriers service passengers that start in either DCA or SAN and end at the other. Alaska carried less than 1% of these passengers on an annual basis. JA406. Awarding Alaska these slot exemptions will "therefore provide a new, convenient flight option" and will "enhance competition by increasing the number of air carriers" in the Washington DC-San Diego market. JA406.

***DOT's Process***. FAA 2024 charged DOT with establishing the process to allocate new slot exemptions. *See* 49 U.S.C. § 41718(i)(4); 49 U.S.C. § 41718(d). Alaska applied through DOT's process, in good faith and in reliance on DOT's designation of Alaska as a limited incumbent. *See* pages 13 through 14 *supra*. Service to SAN was supported by a wide range of community interests, all with the understanding that

23

Alaska was competing as a limited incumbent.  *See* pages 14 through 15 *supra*.

Congress has provided new slot exemptions only four times in the last 25 years.  *See* Frontier Brief at 5 ("New slots are seldom created.").  Before FAA 2024, Congress had only created slot exemptions for a total of 20 round-trip flights, which went to 10 cities.  *See* "Senate Committee-Passed FAA Bill Revived Debate Over Reagan National Airport Slot and Perimeter Rules," Congressional Research Service, at 2 (Apr. 29, 2024).  Some beyond-perimeter cities have as many as four daily flights to DCA every day.  *Id.*  Many air carriers hold multiple beyond-perimeter slot exemptions, sometimes holding multiple daily slot exemptions for the same city.  *Id.*

Yet the 164,000 passengers traveling between SAN and DCA every year lacked even a single nonstop flight before FAA 2024.  San Diego was the largest city in the country without such service and SAN had, by far, the most passengers that originate or end at DCA without a nonstop flight.  Even without nonstop service, more passengers traveled between SAN and DCA than DCA and two airports that do have nonstop service (San Juan, Puerto Rico, and Portland, Oregon).  JA335.

24

If not for the Perimeter Rule, air carriers would enthusiastically compete for this route. The strength of Alaska's Application under FAA 2024 would be the same regardless of the category in which DOT placed it.

It would be unfair and prejudicial to SAN to deny the return of nonstop service to DCA because of any potential mix-up about which category Alaska belonged in. If the Court were to disagree with DOT's analysis about eligibility, then Alaska should nonetheless be provided adequate opportunity to compete for slot exemptions among the non-limited incumbent air carriers. *See Alaska Airlines, Inc. v. Department of Transportation*, Case No. 25-1062.

## Conclusion

For these reasons, the Court should deny Frontier's petition and affirm DOT's decision.

March 24, 2025                          Respectfully submitted,

                                         /s/ Sean Grammel
                                        Sean Grammel (D.C. Cir. #65923)
                                        Mina S. Makarious
                                        ANDERSON & KREIGER LLP
                                        50 Milk St., 21st. Floor
                                        Boston, MA  02109
                                        Phone: (617) 621-6523
                                        Fax: (617) 621-6623
                                        sgrammel@andersonkreiger.com
                                        mina@andersonkreiger.com

                                        *Counsel for Amicus Curiae*

## <u>Certificate of Compliance</u>

Pursuant to Fed. R. App. P. 32(g)(1): I certify the following:

1.      This brief complies with the word limit set forth in Fed. R. App. P. 29(d) of half the maximum length authorized by Fed. R. App. P. 32(a)(7), because it is 4,428 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f) and D.C. Circuit R. 32(e)(1).

2.      This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word Century Schoolbook 14-point font.

*/s/  Sean Grammel*
Sean Grammel
*Counsel for Amicus Curiae*

## **Certificate of Service**

I hereby certify that, on this 24th day of March 2025, a true and correct copy of the foregoing was filed with the Clerk of the United States Court of Appeals for the D.C. Circuit via the Court's CM/ECF system, which will send notice of such filing to all counsel who are registered CM/ECF users.

_/s/  Sean Grammel_

Sean M. Grammel
_Counsel for Amicus Curiae_