**ORAL ARGUMENT SCHEDULED FOR MAY 8, 2025**

No. 25-1002

In the

# United States Court of Appeals
### for the District of Columbia Circuit

FRONTIER AIRLINES, INC.,

*Petitioner,*

v.

UNITED STATES DEPARTMENT OF TRANSPORTATION,

*Respondent,*

ALASKA AIRLINES, INC.,

*Intervenor.*

On Petition for Review of a Final Order of the
United States Department of Transportation

**BRIEF FOR INTERVENOR
ALASKA AIRLINES, INC.**

Sarah Leitner
SKADDEN, ARPS, SLATE,
 MEAGHER & FLOM LLP
One Manhattan West
New York, NY 10001

Shay Dvoretzky
 *Counsel of Record*
Parker Rider-Longmaid
Steven Marcus
SKADDEN, ARPS, SLATE,
 MEAGHER & FLOM LLP
1440 New York Ave., NW
Washington, DC 20005
Telephone: 202-371-7000
shay.dvoretzky@skadden.com

*Counsel for Intervenor Alaska Airlines, Inc.*

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

Pursuant to D.C. Circuit Rule 28(a)(1), Intervenor Alaska Airlines, Inc., hereby submits its Certificate as to Parties, Rulings, and Related Cases:

### I.    Parties

Petitioner is Frontier Airlines, Inc. Respondent is the United States Department of Transportation (DOT). On January 27, 2025, the Court granted Alaska's motion to intervene in support of DOT. On February 25, 2025, Spirit Airlines, Inc., moved to intervene, claiming it would do so in support of Frontier (which, along with Alaska and DOT, in fact opposed Spirit's intervention motion, which Spirit improperly filed to try pursuing an argument, outside the scope of Frontier's petition, that Spirit and only Spirit is eligible for the contested limited incumbent slot exemptions). On March 3, 2025, this Court issued an order referring Spirit's motion to the merits panel and allowing Spirit to lodge briefs as a "movant-intervenor" in the meantime. Spirit Airlines Movant-Intervenor Br. (Mar. 3, 2025). San Diego County Regional Airport Authority has filed an amicus brief supporting DOT.

### II.    Rulings under review

Frontier seeks review of Department of Transportation Final Order 2024-12-8 (Dec. 17, 2024), DOT-OST-2024-0065-23605, *see* JA485-96.

## III.    Related cases

This case has not previously been before this Court or any other court. On February 14, 2025, Alaska filed a conditional cross-petition for review, docketed as *Alaska Airlines, Inc. v. United States Department of Transportation*, No. 25-1062 (D.C. Cir.). The Court put the cross-petition proceedings into abeyance pending resolution of Frontier's petition. Per Curiam Order, *Alaska Airlines, Inc. v. United States Department of Transportation*, No. 25-1062 (D.C. Cir. Feb. 25, 2025). Alaska is not aware of any related cases currently pending in this Court or any other court within the meaning of D.C. Circuit Rule 28(a)(1)(C).

Dated: March 24, 2025                    Respectfully submitted,

*/s/ Shay Dvoretzky*
Shay Dvoretzky
SKADDEN, ARPS, SLATE,
  MEAGHER & FLOM LLP
1440 New York Ave., NW
Washington, DC 20005
202-371-7000
shay.dvoretzky@skadden.com

*Counsel for Intervenor*
 *Alaska Airlines, Inc.*

## RULE 26.1 DISCLOSURE STATEMENT

Petitioner Alaska Airlines, Inc., is a wholly owned subsidiary of Alaska Air Group, Inc., a publicly held corporation. Blackrock, Inc., and The Vanguard Group each own 10% or more of Alaska Air Group, Inc.'s stock. No other publicly held corporation holds 10% or more of Alaska Airlines, Inc.'s or Alaska Air Group, Inc.'s stock. Alaska Airlines, Inc., provides airline service in the United States, including, as relevant here, to and from Ronald Reagan Washington National Airport (DCA).

Dated: March 24, 2025

Respectfully submitted,

*/s/ Shay Dvoretzky*
Shay Dvoretzky
SKADDEN, ARPS, SLATE,
  MEAGHER & FLOM LLP
1440 New York Ave., NW
Washington, DC 20005
202-371-7000
shay.dvoretzky@skadden.com

*Counsel for Alaska Airlines, Inc.*

# TABLE OF CONTENTS

**Page**

CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES..........i

RULE 26.1 DISCLOSURE STATEMENT ........................................... iii

TABLE OF AUTHORITIES................................................... vii

GLOSSARY ................................................................ xii

STATEMENT REGARDING ORAL ARGUMENT....................................... xiii

INTRODUCTION ...............................................................1

JURISDICTIONAL STATEMENT .......................................................4

STATEMENT OF ISSUES .......................................................5

PERTINENT STATUTES AND REGULATIONS...............................6

STATEMENT OF THE CASE.........................................................6

    A.    Legal background ..........................................................6

        1.    To reduce delays at congested airports, the Federal
Aviation Administration limits flights by imposing
slot limits—limits on the number of takeoffs and
landings. ..................................................................6

        2.    In 2024, Congress adds ten slot exemptions at DCA..........9

    B.    Factual and procedural background .............................9

        1.    DOT requests applications for the 2024 slot
exemptions and finds that Alaska is a qualifying
limited incumbent carrier eligible for two of those
exemptions. ...............................................................9

# TABLE OF CONTENTS
## (continued)

Page

2.  DOT indicates it intends to award the limited incumbent slot exemptions to Alaska and finds that Frontier and Spirit are ineligible for those exemptions. ...........................................................10

3.  DOT issues a Final Order awarding Alaska the two limited incumbent slot exemptions for DCA–SAN service, and Frontier petitions for review of the order. ........................................................................14

SUMMARY OF ARGUMENT ..........................................................16

ARGUMENT ....................................................................................20

I.   Frontier is ineligible for the limited incumbent slot exemptions. .......20

    A.   Frontier is not a limited incumbent air carrier because it holds zero slots at DCA, and instead operates at DCA only through slot exemptions. ........................................21

    B.   Frontier's counterarguments fail ....................................23

II.  Spirit's intervention is impermissible and its arguments are wrong in any event. .................................................................28

    A.   Spirit's motion to intervene is untimely and improper. .............28

    B.   Spirit is not eligible anyway, because it is not an "incumbent air carrier" under the 2024 Act. ................................32

III. DOT properly awarded the limited incumbent slot exemptions to Alaska, and Frontier and Spirit lack standing to challenge that award. ................................................................35

    A.   Frontier and Spirit lack standing to challenge Alaska's eligibility. ...........................................................36

# TABLE OF CONTENTS
(continued)

**Page**

    B.    Alaska is a limited incumbent carrier at DCA because it holds fewer than 40 slots and does not have a "code-share agreement" under § 41714(k)............................................38

CONCLUSION ...........................................................................44

CERTIFICATE OF COMPLIANCE ...................................45

CERTIFICATE OF SERVICE .............................................46

INDEX OF ADDENDUM ......................................................48

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Advocate Health Care Network v. Stapleton*,
 581 U.S. 468 (2017)..................................................................34

*Alabama Power Co. v. Interstate Commerce Commission*,
 852 F.2d 1361 (D.C. Cir. 1988)............................................ 28, 29

*American Fuel & Petrochemical Manufacturers v.
 Environmental Protection Agency*,
 937 F.3d 559 (D.C. Cir. 2019)..................................... 30, 31, 32

*Auer v. Robbins*,
 519 U.S. 452 (1997)............................................................ 17, 25

*California Department of Water Resources v.
 Federal Energy Regulatory Commission*,
 306 F.3d 1121 (D.C. Cir. 2002)............................................ 29, 30

*Corley v. United States*,
 556 U.S. 303 (2009)..................................................................24

*DaimlerChrysler Corp. v. Cuno*,
 547 U.S. 332 (2006)..................................................................36

*Eastern Air Lines, Inc. v. Federal Aviation Administration*,
 772 F.2d 1508 (11th Cir. 1985).................................................37

*Garvey v. National Transportation Safety Board*,
 190 F.3d 571 (D.C. Cir. 1999)..................................................25

*Gorman v. National Transportation Safety Board*,
 558 F.3d 580 (D.C. Cir. 2009)........................... 16, 17, 24, 25

*Gustafson v. Alloyd Co.*,
 513 U.S. 561 (1995)............................................................ 40, 41

*HollyFrontier Cheyenne Refining, LLC v. Renewable Fuels Ass'n*,
 594 U.S. 382 (2021)............................................................ 32, 33

*Hunt Refining Co. v. U.S. Environmental Protection Agency*,
 90 F.4th 1107 (11th Cir. 2024).............................................. 28, 29

# TABLE OF AUTHORITIES
## (continued)

**Page(s)**

*Illinois Bell Telephone Co. v. Federal Communications Commission*,
911 F.2d 776 (D.C. Cir. 1990) ............................................................29

*Life Technologies Corp. v. Promega Corp.*,
580 U.S. 140 (2017) ...........................................................................40

*Loper Bright Enterprises v. Raimondo*,
603 U.S. 369 (2024) .......................................................... 17, 25, 27

*Louisiana Public Service Commission v.
Federal Communications Commission*,
476 U.S. 355 (1986) ...........................................................................38

*National Ass'n of Regulatory Utility Commissioners v.
Interstate Commerce Commission*,
41 F.3d 721 (D.C. Cir. 1994) ...................................................... 29, 30

*Petro Star Inc. v. Federal Energy Regulatory Commission*,
835 F.3d 97 (D.C. Cir. 2016) .............................................................29

*PHH Corp. v. Consumer Financial Protection Bureau*,
881 F.3d 75 (D.C. Cir. 2018) ...................................................... 28, 29

*Ransom v. FIA Card Services, N.A.*,
562 U.S. 61 (2011) .............................................................................23

*Republic Airline Inc. v. United States Department of Transportation*,
669 F.3d 296 (D.C. Cir. 2012) ........................................................6, 7

*Robinson v. Shell Oil Co.*,
519 U.S. 337 (1997) .................................................................... 38, 39

*Simon v. Eastern Kentucky Welfare Rights Organization*,
426 U.S. 26 (1976) .............................................................................36

*Taniguchi v. Kan Pacific Saipan, Ltd.*,
566 U.S. 560 (2012) .................................................................... 32, 33

*Twin Rivers Paper Co. v. Securities & Exchange Commission*,
934 F.3d 607 (D.C. Cir. 2019) ...........................................................36

## TABLE OF AUTHORITIES
(continued)

**Page(s)**

*United States v. Alaska Air Group, Inc.*,
No. 16-cv-2377, 2017 WL 3674773 (D.D.C. June 23, 2017) .............. 39, 41, 42

*Vinson v. Washington Gas Light Co.*,
321 U.S. 489 (1944) .................................................................................29

**CONSTITUTION AND STATUTES**

U.S. Const. art. III ................................................................................4, 5

49 U.S.C. Subtitle VII ...........................................................................11

49 U.S.C. § 41714(h) ............................................................................26

49 U.S.C. § 41714(h)(3) ........................................................ 7, 21, 22, 26

49 U.S.C. § 41714(h)(4) ...........................................................................6

49 U.S.C. § 41714(h)(5) ................................................................. 11, 23

49 U.S.C. § 41714(h)(5)(A) ............................................... 2, 20, 21, 38

49 U.S.C. § 41714(h)(5)(B)
(effective Jan. 2, 2001, to Feb. 13, 2012) ......................................26

49 U.S.C. § 41714(h)(5)(B)(i) ............................... 2, 8, 16, 20, 21

49 U.S.C. § 41714(k) ......................................................... 4, 5, 6, 8,
.............................................................................. 12, 13, 19, 35,
.............................................................................. 36, 38, 39, 40, 41

49 U.S.C. § 41714 note (2012 amendment) ....................................26

49 U.S.C. § 41718(a)(2) .............................................................. 22, 24

49 U.S.C. § 41718(g)(2) ......................................................................24

49 U.S.C. § 41718(i) ................................................................... 27, 33

49 U.S.C. § 41718(i)(1) ...........................................................................9

49 U.S.C. § 41718(i)(2) ......................................................... 3, 9, 11,
.............................................................................. 18, 32, 34, 35

49 U.S.C. § 41718(i)(3) ......................................................... 3, 9, 11, 12, 18,
.............................................................................. 23, 28, 32, 33, 34, 35

# TABLE OF AUTHORITIES
(continued)

**Page(s)**

49 U.S.C. § 46110(a) ............................................................ 4, 15, 30, 31

Federal Aviation Administration Reauthorization Act of 1994,
Pub. L. No. 103-305, 108 Stat. 1569 .................................................7

§ 206, 108 Stat. at 1584.................................................................6, 7

§ 206(a)(1), 108 Stat. at 1587 ............................................... 7, 26, 27

Federal Aviation Administration Modernization and
Reform Act of 2012, Pub. L. No. 112-95, § 414(a),
126 Stat. 11, 92 ............................................................................7

Federal Aviation Administration Reauthorization Act of 2024,
Pub. L. No. 118-63, 138 Stat. 1025 ....................................... 1, 2, 3, 9,
........................................................................ 11, 16, 18, 20, 23,
........................................................................ 28, 32, 33, 34, 35, 42

REGULATIONS

14 C.F.R. pt. 93 .............................................................................11

14 C.F.R. § 93.213(a)(5) ..................................................... 2, 7, 12, 16,
........................................................................ 20, 21, 22, 23, 34, 35

14 C.F.R. § 93.213(a)(5)(iii) ..........................................................7, 8

*High Density Traffic Airports,*
33 Fed. Reg. 17,896 (Dec. 3, 1968).................................................6

*Enhancing Airline Passenger Protections,*
74 Fed. Reg. 68,983 (Dec. 30, 2009)........................................ 39, 40

RULES

Fed. R. App. P. 15 ..........................................................................30

Fed. R. App. P. 15(d) ......................................................... 15, 28, 30

D.C. Cir. R. 28(a)(7) .......................................................................36

D.C. Cir. R. 28(d)(2)........................................................................30

# TABLE OF AUTHORITIES
(continued)

**Page(s)**

OTHER AUTHORITIES

145 Cong. Rec. S12096 (daily ed. Oct. 6, 1999) ...................................... 8, 19, 41

*Incumbent*, Merriam-Webster,
   https://www.merriam-webster.com/dictionary/incumbent ........... 21, 33

*Reservations*, Republic Airways,
   https://rjet.com/passengers/reservations/
   (last visited March 24, 2025) ............................................................................40

# GLOSSARY

| | |
|---|---|
| 1994 Act | Federal Aviation Administration Reauthorization Act of 1994, Pub. L. No. 103-305, 108 Stat. 1569 |
| 2024 Act | FAA Reauthorization Act of 2024, Pub. L. No. 118-63, 138 Stat. 1025 |
| Alaska | Alaska Airlines, Inc. |
| American | American Airlines, Inc. |
| DCA | Ronald Reagan Washington National Airport |
| DOJ | Department of Justice |
| DOT | Department of Transportation |
| FAA | Federal Aviation Administration |
| Frontier | Frontier Airlines, Inc. |
| SAN | San Diego International Airport |
| SJC | San José Mineta International Airport |
| SJU | Luis Muñoz Marín International Airport in San Juan, Puerto Rico |
| Southwest | Southwest Airlines Co. |
| Spirit | Spirit Airlines, Inc. |

## STATEMENT REGARDING ORAL ARGUMENT

The Court has scheduled oral argument for May 8, 2025. Alaska appreciates the opportunity to aid the Court's decisionmaking by presenting oral argument.

## INTRODUCTION

After extensive notice and comment, the Department of Transportation (DOT) awarded Alaska Airlines two "slot exemptions"—congressionally created takeoff and landing rights—at Ronald Reagan Washington National Airport (DCA). The Federal Aviation Administration (FAA) regulates air traffic at DCA by awarding airlines takeoff and landing "slots." Congress, in turn, sometimes creates "slot exemptions," which are takeoff and landing rights named for the exception they make to the FAA's slot limits. Congress makes slot exemptions available for different categories of carriers based on the number of slots they hold at a particular airport.

Here, DOT concluded that Alaska qualified as a "limited incumbent air carrier" eligible for two slot exemptions that Congress created in the FAA Reauthorization Act of 2024 (2024 Act). DOT further ruled that Frontier Airlines, Inc., and Spirit Airlines, Inc., were not eligible—Frontier because it had no slots at DCA and Spirit because it hasn't flown at DCA since 2012. Granting the takeoff and landing rights to Alaska, DOT cleared Alaska to operate the only nonstop roundtrip service between DCA and San Diego International Airport (SAN). Those rulings were correct, and the new Alaska DCA–SAN route, which began operating on March 17, 2025, is creating valuable

- 1 -

travel choice for the many passengers, including government officials and members of the military, who regularly travel between Washington, DC, and San Diego.

Frontier nonetheless petitioned this Court for review, challenging DOT's determinations as to its own ineligibility and Alaska's eligibility. The Court granted Alaska's motion to intervene, and should now deny Frontier's petition, along with Spirit's untimely motion to intervene and improper attempt to expand the issues before the Court without filing its own timely petition for review.

**1.** Frontier is ineligible for the two limited incumbent slot exemptions Congress created in the 2024 Act. A limited incumbent carrier is an airline that "holds or operates fewer than [40] … slots, in any combination, at a particular airport." *See* 49 U.S.C. § 41714(h)(5)(A) (incorporating 14 C.F.R. § 93.213(a)(5)). Slot exemptions don't count. 49 U.S.C. § 41714(h)(5)(B)(i). The definition thus excludes Frontier, DOT correctly determined, because Frontier holds zero slots at DCA. Frontier's contrary argument rests on the (incorrect) notion that holding "fewer than [40] … slots" includes carriers with *zero* slots. But a carrier isn't an *incumbent* as to slots if it holds zero slots; nor is it natural to speak of having fewer than some

number of something if the speaker has *none* of that thing. What's more, Congress created a category for carriers with zero slots: "new entrant air carriers." That's what Frontier is, as DOT correctly concluded.

2.    Spirit's intervention motion is untimely, and Spirit's proposed brief impermissibly expands the scope of Frontier's petition to include *Spirit's* eligibility. The Court should deny Spirit's motion for those reasons alone. In any event, Spirit's merits arguments fail. The 2024 Act makes slot exemptions available for limited incumbents and non-limited incumbents only if the carrier is also an "incumbent air carrier." 49 U.S.C. § 41718(i)(2), (3). Unlike "limited incumbent air carrier," the term "incumbent air carrier" isn't defined, meaning it bears its ordinary meaning. And that meaning is simple as a matter of plain English: the carrier must fly at DCA. Spirit hasn't flown in or out of DCA since 2012.

3.    Since they aren't eligible for the limited incumbent slot exemptions DOT awarded to Alaska, Frontier and Spirit lack standing to challenge Alaska's eligibility. After all, they can't get the slot exemptions no matter whether Alaska is eligible. But neither Frontier nor Spirit has contended, much less shown, that it would suffer any harm from the award to Alaska if they are not eligible for the exemptions. And it is now too late to offer

another theory of standing. Regardless, DOT correctly concluded that Alaska is an eligible limited incumbent. Alaska holds fewer than 40 slots (eight) at DCA, and Alaska's relationship with American Airlines doesn't trigger 49 U.S.C. § 41714(k)'s separate rule requiring aggregation of airlines' total number of slots and slot exemptions if the airlines have a "code-share agreement." Statutory text, context, and purpose all make clear that "code-share agreement" refers only to arrangements where the limited incumbent applicant allows another carrier to place its designator codes on the applicant's flights. But Alaska doesn't let American put its codes on Alaska's flights, meaning § 41714(k)'s aggregation rule doesn't apply.

## JURISDICTIONAL STATEMENT

The Court has jurisdiction under 49 U.S.C. § 46110(a) to review Frontier's petition, which Frontier timely filed within 60 days of DOT's Final Order. As explained below (at 29-32), Spirit, as would-be intervenor, hasn't properly invoked the Court's jurisdiction to review the issues Spirit wishes to add about its own ineligibility for the slot exemptions because it failed to file its own petition for review, much less a timely one, *see* 49 U.S.C. § 46110(a). Further, neither Frontier nor Spirit has Article III standing (and both have forfeited any contrary argument) to challenge Alaska's eligibility,

- 4 -

because neither airline is eligible for limited incumbent slot exemptions, even assuming DOT improperly awarded those exemptions to Alaska. Thus, neither carrier has shown that it has any concrete stake in Alaska's eligibility. *Infra* pp. 36-37.

## STATEMENT OF ISSUES

1.    Whether DOT correctly concluded that Frontier is ineligible for limited incumbent slot exemptions at DCA because a limited incumbent air carrier must have at least one slot or else it can be only a new entrant air carrier, and Frontier holds zero slots.

2.    Whether the Court should deny Spirit's motion to intervene because (a) Spirit, which has not filed its own petition for review, improperly seeks to add questions, outside the scope of Frontier's petition, about Spirit's own eligibility, and (b) in any event, DOT correctly concluded that Spirit is ineligible for limited incumbent slot exemptions at DCA because it is not an "incumbent air carrier" given that it hasn't flown at DCA since 2012.

3.    Whether Frontier and Spirit lack standing to challenge Alaska's eligibility and, regardless, whether DOT correctly concluded that Alaska is eligible for limited incumbent slot exemptions at DCA, because Alaska holds

fewer than 40 slots at DCA (just eight) and does not have a codeshare agreement with American Airlines within the meaning of 49 U.S.C. § 41714(k).

## PERTINENT STATUTES AND REGULATIONS

The addendum reproduces pertinent statutes and regulations.

## STATEMENT OF THE CASE

### A.    Legal background

**1.    To reduce delays at congested airports, the Federal Aviation Administration limits flights by imposing slot limits—limits on the number of takeoffs and landings.**

In 1968, to address delays at congested airports like DCA, the FAA issued the *High Density Traffic Airports* rule, 33 Fed. Reg. 17,896 (Dec. 3, 1968). The rule restricts the number of flights by allocating airlines limited numbers of takeoff and landing "slots," *id.*, or rights to take off or land at an airport, 49 U.S.C. § 41714(h)(4).

Slot limits suppressed flight options. *See* San Diego County Regional Airport Authority Amicus Br. 4-5. So in 1994, Congress permitted DOT to grant exemptions from the FAA's slot limits—or "slot exemptions"—in limited circumstances to eligible air carriers. *See Republic Airline Inc. v. United States Department of Transportation*, 669 F.3d 296, 297 (D.C. Cir. 2012) (citing FAA Reauthorization Act of 1994 (1994 Act), Pub. L. No. 103-305, § 206, 108

Stat. 1569, 1584). Like a slot, a slot exemption is a right to conduct one takeoff or landing. *Id.*

To allocate slot exemptions, the 1994 Act introduced the terms "new entrant air carrier" and "limited incumbent carrier." § 206(a)(1), 108 Stat. at 1587. Congress defined "new entrant air carrier" as including both an "air carrier that does not hold a slot at the airport," as well as a carrier qualifying as a "limited incumbent carrier." *Id.* Congress defined "limited incumbent carrier," in turn, by incorporating the definition then in 14 C.F.R. § 93.213(a)(5)—a carrier that "holds or operates fewer than 12 air carrier or commuter slots, in any combination, at a particular airport." *See* 1994 Act, § 206(a)(1), 108 Stat. at 1587. In 2012, Congress amended that definition by specifying that "slots" shall not include "slot exemptions." FAA Modernization and Reform Act of 2012, Pub. L. No. 112-95, § 414(a), 126 Stat. 11, 92.

The current definitions are largely the same. A "new entrant air carrier" means a carrier "that does not hold a slot at the airport concerned," or "a limited incumbent carrier." 49 U.S.C. § 41714(h)(3). And a "limited incumbent air carrier" is a carrier that holds or operates fewer than 40 slots at an airport. Under the regulation incorporated into the statute, slots include slots that, among other things, the carrier has "[t]ransferred to another party other

- 7 -

than by trade for one or more slots at the same airport." 14 C.F.R. § 93.213(a)(5)(iii). In addition, Congress made explicit that slots "shall not include … 'slot exemptions.'" 49 U.S.C. § 41714(h)(5)(B)(i).

Having established the limited incumbent category to target small carriers, Congress was concerned that large air carriers not qualifying as limited incumbents could "game the system" by using regional affiliates they functionally controlled or unduly influenced to obtain limited incumbent slot exemptions for themselves. *See* 145 Cong. Rec. S12096 (daily ed. Oct. 6, 1999) (statement of Sen. McCain). So, in 2000, Congress added a provision—49 U.S.C. § 41714(k)—to provide a different test for limited incumbent status in certain circumstances. Section 41714(k) applies if the airline applying for slots or slot exemptions "operates under the same designator code, or has or enters into a code-share agreement, with any other air carrier." *Id.* If the statute applies, the applicant "shall not qualify" as a "limited incumbent air carrier" "if the total number of slots and slot exemptions held by the two carriers at the airport exceed 20 slots and slot exemptions." *Id.* The provision ensures that applicants for limited incumbent slot exemptions do not allow other airlines to market or control their flights.

## 2. In 2024, Congress adds ten slot exemptions at DCA.

Congress enacted the 2024 Act, Pub. L. No. 118-63, 138 Stat. 1025, requiring DOT to grant ten slot exemptions at DCA, 49 U.S.C. § 41718(i)(1). Of those exemptions, eight must go to "incumbent air carriers qualifying for status as a non-limited incumbent carrier at [DCA] as of the date of enactment of the FAA Reauthorization Act of 2024." *Id.* § 41718(i)(2). The other two exemptions must go to "incumbent air carriers qualifying for status as a limited incumbent carrier at [DCA] as of the date of enactment of the FAA Reauthorization Act of 2024." *Id.* § 41718(i)(3). Congress did not allocate any exemptions to "new entrant air carriers."

### B. Factual and procedural background

#### 1. DOT requests applications for the 2024 slot exemptions and finds that Alaska is a qualifying limited incumbent carrier eligible for two of those exemptions.

To implement the 2024 Act, DOT requested applications for the slot exemptions from eligible airlines. JA174. DOT identified two carriers as limited incumbents: Alaska and Air Canada. JA175.

Alaska applied for the two limited incumbent slot exemptions, proposing to operate nonstop roundtrip service between DCA and SAN—a service no carrier offered. JA201-212. Alaska explained that the route would provide

a "valuable new option for the large volume of U.S. government (including military) travelers between Washington, DC, and San Diego, which is home to the nation's largest military community." JA203. San Diego is "by far the U.S. airport with the greatest number of passengers without nonstop service to DCA"; the government estimates that over 32,000 government personnel (military and civilian) would travel between DCA and SAN in 2025. JA204.

Frontier also applied for the limited incumbent slot exemptions, even though DOT had already determined that Frontier was not a limited incumbent. JA192. Frontier proposed operating roundtrip service between DCA and San Juan (SJU), a route JetBlue already serves. JA197-98.

Spirit, too, applied as a limited incumbent, likewise despite DOT's preliminary finding that Spirit was ineligible, JA177. Spirit proposed running non-stop service between DCA and San Jose (SJC). JA218-30.

Air Canada, the only other carrier DOT had preliminarily found eligible, did not apply for the limited incumbent slot exemptions. JA175.

### 2. DOT indicates it intends to award the limited incumbent slot exemptions to Alaska and finds that Frontier and Spirit are ineligible for those exemptions.

After reviewing the airlines' applications and comments, DOT explained that it intended to award the two slot exemptions to Alaska. JA403-

07. DOT also determined that Frontier and Spirit are ineligible for slot exemptions because neither airline qualifies as a limited incumbent air carrier or a non-limited incumbent carrier. JA401-03.

a.    DOT interpreted the 2024 Act as creating a two-part eligibility test for slot exemptions in 49 U.S.C. § 41718(i)(2) and (3). *First*, the carrier must be an "incumbent," meaning a carrier that "was engaged in air transportation at DCA as of the enactment date of the FAA 2024 Act." JA401. DOT explained that "'[i]ncumbent air carrier' is not a defined term under either 14 C.F.R. Part 93 or 49 U.S.C. Subtitle VII," so it should be defined based "on a plain language reading of the statute" to mean "a carrier that is engaged in air transportation at DCA as of the date of enactment of FAA 2024." JA401. *Second*, the carrier must also be a limited incumbent air carrier (for two available slot exemptions) or a non-limited incumbent air carrier (for eight available slot exemptions). JA401.

b.    *i.*    Applying that test, DOT tentatively found Frontier ineligible for limited incumbent air carrier status. JA402. Although Frontier was "engaged in air transportation at DCA," and thus was an "incumbent air carrier," DOT determined that Frontier was not a "limited incumbent" as the term is defined in § 41714(h)(5). JA402. Limited incumbent status turns on

slots, not slot exemptions, and Frontier held zero slots at DCA and operated at DCA only with slot exemptions. JA402. Frontier was thus a "new entrant air carrier," not a limited incumbent. JA402.

*ii.*    DOT also determined that Spirit was ineligible, because it failed the first step. JA403. DOT noted that Spirit argued that it was a limited incumbent because it held four slots that "were subsequently 'transferred to another party'" within the meaning of 14 C.F.R. § 93.213(a)(5) because it sold those slots to Southwest. JA402. But Spirit failed "the first part of the test" in § 41718(i)(3): it did "not meet the prerequisite of incumbency" because it "has not engaged in air transportation at DCA since 2012." JA403.

**c.**    DOT then (i) determined that Alaska is a limited incumbent carrier because it holds slots at DCA and (ii) awarded the exemptions to Alaska. JA403-404.

DOT first addressed Alaska's eligibility, noting that "[i]n 2012, Alaska received two slot exemption awards as a new entrant/limited incumbent carrier." JA403. DOT explained that the slot and slot exemption aggregation rule in § 41714(k) did not apply. Although Alaska and American Airlines have a relationship at DCA, that "relationship is limited by a settlement agreement reached in 2017 to resolve issues related to the merger transaction

between Alaska and Virgin America Airlines." JA403. That "agreement pro-

hibits American from marketing any Alaska flight that originates or

terminates at [DCA]," and so "Alaska does not presently place the American

Airlines code on any nonstop flight it operates at DCA, and would not be

permitted to do so for any service operated with a new slot exemption

award." JA403-04. Thus, DOT explained, "Alaska does not receive any

meaningful access to the DCA market via its relationship with American."

JA404. And "the legislative history of § 41714(k) … indicates that it was in-

tended to prevent commuter air carriers … from gaining preferential access

to slots or slot exemptions as a new entrant or limited incumbent, only to

market and operate those slots on behalf of a larger, incumbent mainline car-

rier." JA404. That concern didn't apply because "Alaska is not a commuter

air carrier" as defined in the relevant statute "and is not seeking to operate

its proposed DCA-SAN service under the marketing control and branding

of American." JA404.

DOT then explained that it would award Alaska the two limited

incumbent slot exemptions to operate the only nonstop service between

DCA and SAN. JA406-07. DOT found that 139,000 passengers travel

annually between DCA and SAN, with no option for nonstop service. JA406.

American and Southwest provide most of that service, and the average fare for those connecting flights is "currently 30% higher than the average for DCA." JA406. DOT also reasoned that "Alaska does not have a dominant presence at DCA, holding only approximately 2% of allocated slots, and carrying approximately 3% of … traffic" beginning or ending at DCA. JA406. DOT thus found that granting slot exemptions to Alaska would "provide a new, convenient flight option, and enhance competition by increasing the number of air carriers in the [DCA]-SAN market." JA406.

### 3. DOT issues a Final Order awarding Alaska the two limited incumbent slot exemptions for DCA–SAN service, and Frontier petitions for review of the order.

**a.** On December 17, 2024, DOT issued a Final Order (i) adopting its tentative findings; (ii) rejecting Frontier's and Spirit's renewed arguments about their ineligibility and Alaska's eligibility; and (iii) allocating the ten exemptions, including the two limited incumbent exemptions to Alaska. JA490-93. DOT noted that "[c]arriers are expected to inaugurate full service within 90 days." JA493.

**b.** Frontier timely petitioned for review of the Final Order, and filed an emergency motion to partially stay the Final Order. Alaska filed a motion to intervene, which the Court granted, and opposed Frontier's stay motion,

which the Court denied. Alaska also filed a timely conditional cross-petition for review of the Final Order, so that Alaska can seek vacatur of the remainder of DOT's ruling and reapply for non-limited incumbent slot exemptions if the Court finds that Alaska is ineligible for the limited-incumbent slot exemptions. *See* Petition for Review, *Alaska Airlines, Inc. v. Department of Transportation*, No. 25-1062 (D.C. Cir. Feb. 14, 2025). That conditional petition, which the Court held in abeyance, applies only if this Court finds that Alaska is not a limited incumbent air carrier after all. *Id.* at 1-2.

**c.** On February 25, 2025—after the 60-day deadline to file a petition under 49 U.S.C. § 46110(a) had run; after the 30-day deadline for intervention under Federal Rule of Appellate Procedure 15(d) had run; and after Frontier had filed its opening brief—Spirit filed motions to intervene in both Frontier's petition and Alaska's conditional cross petition. Alaska, DOT, and Frontier all opposed intervention, explaining that Spirit's motion was untimely; that Spirit hadn't filed its own petition, let alone a timely one; and that Spirit couldn't raise its own eligibility without filing its own petition, because doing so would expand the issues before the Court on Frontier's timely petition. The Court referred Spirit's motion to the merits panel and permitted Spirit to lodge proposed briefs.

## SUMMARY OF ARGUMENT

I.    Frontier is ineligible for limited incumbent slot exemptions under the 2024 Act because it is a new entrant air carrier at DCA, not a limited incumbent.

A.    Frontier is not a limited incumbent carrier because it holds zero slots at DCA and instead operates at DCA through slot exemptions. A limited incumbent carrier is a carrier that "holds or operates fewer than [40] … slots," excluding slot exemptions. 14 C.F.R. § 93.213(a)(5); 49 U.S.C. § 41714(h)(5)(B)(i) (incorporating regulatory definition). And a non-limited incumbent carrier is a carrier with more than 40 slots. Fewer than 40 slots does not include zero slots, because (1) the carrier must be an *incumbent* as to slots, and holding no slots means a carrier is not an incumbent in the ordinary sense; and (2) Congress created a separate category, new entrant carriers, for carriers with zero slots. Frontier holds zero slots at DCA and thus is a new entrant, not a limited incumbent.

B.    Frontier's counterarguments fail: they ignore the word "incumbent" in "limited incumbent air carrier" and erase the distinction between limited incumbents and new entrants, even though Congress uses the separate categories. Frontier points to *Gorman v. National Transportation Safety*

*Board*, 558 F.3d 580 (D.C. Cir. 2009), to argue that zero is "fewer than" 40, but that case concerned a regulation with contextual clues that "less than 20 seats" could encompass cargo planes without passenger seats. What's more, the Court deferred to DOT's construction under *Auer v. Robbins*, 519 U.S. 452, 461 (1997); here, *Loper Bright Enterprises v. Raimondo*, 603 U.S. 369, 391-92, 412-13 (2024), makes clear that the Court's duty is to determine the best reading of the statute for itself. Frontier also argues that it cannot be a "new entrant" because it operates at DCA with slot exemptions, but the statute is plain that "slots" do not include slot exemptions. Finally, DOT's prior classification of Frontier as a limited incumbent doesn't move the needle either, both because that determination was made under an earlier statutory regime counting slot exemptions as slots and because, in any event, Frontier's status is a legal question for the court under *Loper Bright*.

**II.**    Spirit cannot intervene, but its arguments lack merit regardless.

**A.**    A party seeking to intervene must file a motion within 30 days. And an intervenor cannot raise issues beyond those raised by the petition; to add issues, a party must file its own petition. Spirit flouts both rules. It filed its intervention motion well after the 30-day deadline—indeed, after Frontier filed its opening brief. It failed to file its own petition. And it seeks

to intervene (as its opening brief confirms) to relitigate its own eligibility — which isn't at issue in Frontier's petition. Spirit could have filed its own petition, but it blew that deadline, too. The Court should deny Spirit's intervention motion.

**B.**    In any event, Spirit's position lacks merit. The 2024 Act makes slot exemptions available only to "incumbent air carriers" that are also limited incumbents or non-limited incumbents. 49 U.S.C. § 41718(i)(2), (3). The term "incumbent air carrier" is not defined by statute, so it takes its ordinary meaning: a carrier that flies at the airport. Spirit hasn't flown at DCA since 2012, so it's not an incumbent air carrier.

**III.**    DOT properly awarded the limited incumbent slot exemptions to Alaska, and Frontier and Spirit lack standing to challenge that award because they aren't eligible for the slot exemptions.

**A.**    A party challenging agency action needs to establish its standing no later than when it files its opening brief. A party forfeits any theory of standing it doesn't raise by that time. Here, because Frontier and Spirit aren't eligible for the slot exemptions, they don't have standing to challenge Alaska's eligibility, either: they can't get the slot exemptions even if Alaska is ineligible. And neither carrier has argued, much less introduced evidence,

that the award to Alaska causes harm sufficient to confer standing if it is itself ineligible for the slot exemptions. The Court should thus dismiss Frontier's petition as to Alaska's eligibility for lack of standing.

**B.**     In any event, Alaska is a limited incumbent carrier at DCA because it holds fewer than 40 slots. And contrary to Frontier and Spirit's argument, Alaska doesn't have a code-share agreement as that term is used in § 41714(k). Statutory text, context, and purpose make clear that the focus of the term "code-share agreement" is on the operations of the carrier applying for limited incumbent status, and the question is whether that carrier allows another carrier to place its designator code on the carrier's flights. Congress's goal was preventing large carriers from "gam[ing] the system" by using regional affiliates to obtain limited incumbent slots that they would effectively exercise control over. 145 Cong. Rec. S12096 (statement of Sen. McCain). Alaska's relationship with American doesn't trigger § 41714(k). Although Alaska places its code on American's flights at DCA, American is prohibited from placing its code on Alaska's flights. There is thus no concern that American is controlling the slot exemptions Alaska applied for, and the arrangement falls outside the term "code-share agreement" in § 41714(k).

## ARGUMENT

### I.  Frontier is ineligible for the limited incumbent slot exemptions.

DOT correctly concluded that Frontier is ineligible for limited incumbent slot exemptions because Frontier holds zero slots at DCA. An airline is eligible for the two limited incumbent slot exemptions created by the 2024 Act only if it holds "fewer than" 40 slots at DCA. 14 C.F.R. § 93.213(a)(5); *see* 49 U.S.C. § 41714(h)(5)(A). And Congress made clear that slot exemptions do not count as slots. 49 U.S.C. § 41714(h)(5)(B)(i). Thus, an airline must hold at least one slot at DCA to be a limited incumbent. That's true for two reasons. *First*, as a matter of ordinary English, an applicant is not an "incumbent" as to slots if it has zero slots, so "fewer than" 40 slots in this context requires at least *one* slot. *Second*, the statutory structure confirms the point, because Congress created a *separate* category for carriers with zero slots: new entrants—the kind of carrier DOT concluded Frontier, which has zero slots at DCA, must be. Frontier's contrary arguments ignore plain text, context clues, and statutory structure, and instead collapse the limited incumbent category into the new entrant category. In short, DOT correctly concluded that Frontier is ineligible for limited incumbent status because it holds zero slots at DCA.

**A.    Frontier is not a limited incumbent air carrier because it holds zero slots at DCA, and instead operates at DCA only through slot exemptions.**

**1.**    To qualify as a limited incumbent carrier, a carrier must hold between one and 39 slots at DCA. The statute uses the term "fewer than [40] … slots," *see* 49 U.S.C. § 41714(h)(5)(A) (incorporating 14 C.F.R. § 93.213(a)(5)), and text, context, and structure confirm that fewer than 40 requires at least one slot.

*First*, a carrier with zero slots cannot count as a limited incumbent carrier, because as the text makes clear, a limited incumbent must be an *incumbent*. An incumbent is "one that occupies a particular position or place." *Incumbent*, Merriam-Webster, https://www.merriam-webster.com/ dictionary/incumbent. Here, the particular position or place is slot holding, and the statute requires "slots … at a particular airport," 14 C.F.R. § 93.213(a)(5), but expressly excludes consideration of slot exemptions, *see* 49 U.S.C. § 41714(h)(5)(B)(i). A carrier with zero slots occupies no position with respect to slots, so it cannot be an incumbent with respect to slots and cannot qualify as a limited incumbent.

*Second*, statutory structure supports that conclusion. Congress created a separate category, "new entrant air carrier," and defined it to mean a

- 21 -

carrier "that does not hold a slot at the airport concerned." 49 U.S.C. § 41714(h)(3). Put differently, Congress created a separate category for carriers with zero slots. Treating carriers with zero slots as limited incumbents would collapse the limited incumbent and new entrant categories, frustrating Congress's creation of separate categories as a way to make slot exemptions available to different kinds of carriers. Indeed, Congress has separately referred to new entrants, confirming that it did not intend to collapse the categories. *See* 49 U.S.C. § 41718(a)(2) (requiring DOT to consider, when awarding beyond-perimeter exemptions, whether the award will "increase competition by new entrant air carriers or in multiple markets").

*Finally*, treating "fewer than" 40 slots to mean between 1 and 39 slots accords with ordinary usage. Having "fewer than" something often implies having at least one of that thing. If a school boasted about having "fewer than 15 students in a classroom," one would be surprised to learn the school was referring to an empty classroom. Here, limited incumbents must "hold[] or operate[]" slots, 14 C.F.R. § 93.213(a)(5), and a new entrant carrier must "not hold a slot," 49 U.S.C. § 41714(h)(3). A carrier that holds zero slots doesn't *hold* slots, making it unnatural to speak of holding zero slots as holding any slots at all, not just "fewer than" 40.

- 22 -

**2.** Frontier is ineligible for the two slot exemptions, because it holds zero slots at DCA and is thus a new entrant, not a limited incumbent. While Frontier is an "incumbent air carrier" under the first part of the 2024 Act's test in § 41718(i)(3), it is not a limited incumbent carrier under § 41714(h)(5), because it holds zero slots. Frontier operates at DCA through slot exemptions, but slot exemptions don't count as slots. *Supra* pp. 7-8, 11-12 That makes Frontier an ineligible "new entrant air carrier," because it "does not hold a slot at" DCA. *Supra* pp. 21-22.

### B. Frontier's counterarguments fail.

Frontier's eligibility arguments rely principally on the misguided notion that a carrier with zero slots is a limited incumbent because zero slots is "fewer than [40] … slots." 14 C.F.R. § 93.213(a)(5). Frontier's arguments fail.

**1.** For starters, text, context, and structure all make clear that holding or operating "fewer than" 40 slots doesn't mean having zero slots. *First*, a limited incumbent must be *an incumbent*, and the plain meaning of incumbent, together with the statutory context, requires the carrier to hold at least one slot at DCA. Frontier reads "incumbent" out of the definition, failing to "ensure[] that the term … carries meaning, as each word in a statute should." *Ransom v. FIA Card Services, N.A.*, 562 U.S. 61, 70 (2011).

- 23 -

*Second*, as noted, Frontier's reading erases the distinction between limited incumbents and new entrants, making the new entrant category superfluous. That violates "one of the most basic interpretive canons" — that a "statute should be construed so that effect is given to all its provisions, so that no part will be inoperative or superfluous, void or insignificant." *Corley v. United States*, 556 U.S. 303, 314 (2009). Erasing the distinction would also make little sense given the statutory scheme. For instance, Congress required DOT to award 24 slot exemptions at DCA if it found that the exemptions would "increase competition by new entrant air carriers." 49 U.S.C. § 41718(a)(2). And in 2012, Congress authorized 16 slot exemptions at DCA, and required that eight slots go "to limited incumbent air carriers *or* new entrant air carriers." *Id.* § 41718(g)(2) (emphasis added). Congress's use of both terms makes clear that the terms have different meanings.

**2.**    Frontier next relies (Br. 24) on *Gorman*, where this Court concluded that it was required to defer to the FAA's interpretation of a regulation governing planes with "less than 20 seats" because the regulation was "ambiguous" as to planes with zero seats. 558 F.3d at 588. Crucial to the Court's reasoning was the "language of the regulation's heading," which confirmed that a plane engaged in "*cargo operations*" — and that "therefore

has zero passenger seats"—was covered. *Id.* The Court also reasoned that it "must defer to the FAA's interpretations of its own aviation regulations," quoting and relying on an earlier decision (*Garvey v. National Transportation Safety Board*, 190 F.3d 571, 577 (D.C. Cir. 1999)) requiring deference under *Auer*. *Gorman*, 558 F.3d at 589. *Gorman* is unlike this case: Frontier identifies nothing like the context clues in *Gorman* allowing "less than 20 seats" to mean zero seats. And, of course, *Gorman*'s *Auer*-deference mode of analysis doesn't fly after *Loper Bright*, which made clear that courts must "use every tool at their disposal to determine the best reading of the statute" and that it "makes no sense to speak of a 'permissible' interpretation that is not the one the court, after applying all relevant interpretive tools, concludes is best." 603 U.S. at 400. Here, the single best reading of the statute is that holding zero slots doesn't make a carrier a limited incumbent.

**3.    a.**    Frontier next argues (Br. 25) that it cannot be a "new entrant" because it operates with slot exemptions. In Frontier's view, only the limited incumbent definition, and not the new entrant definition, excludes slot exemptions from consideration.

That argument fails, because slots and slot exemptions are different (as the entire statutory scheme makes clear), and Frontier points to no authority

that slots include slot exemptions. The definition of new entrant is an airline that "does not hold a slot." 49 U.S.C. § 41714(h)(3). Those plain terms do not require the airline also to hold no slot exemptions.

Statutory history drives the point home. Before 2012, the statutory scheme made an exception to the general rule that a slot exemption is not a slot by specifically providing that "the term 'slot' shall include 'slot exemptions.'" 49 U.S.C. § 41714(h)(5)(B) (effective Jan. 2, 2001, to Feb. 13, 2012). In 2012, Congress reversed course, eliminating that provision. 49 U.S.C. § 41714 note (2012 amendment). In other words, Congress made clear that going forward, "slot" would once again mean only slot, and would not by special provision include slot exemptions.

**b.**    Relatedly, Frontier contends that it must be right because Congress must have intended to encompass *all* air carriers in 49 U.S.C. § 41714(h). Frontier says (Br. 27) it may *never* qualify for DCA slot exemptions because it has slot exemptions and thus isn't a "new entrant." But DOT correctly concluded that Frontier is a new entrant, because slot exemptions don't count as slots. Regardless, Frontier cannot support its premise that Congress must have intended to cover all carriers—indeed, statutory text and history belie such a purpose. As originally enacted, the statute contained

only two categories (new entrant air carriers and limited incumbent carriers). 1994 Act, § 206(a)(1), 108 Stat. at 1587. Congress later authorized slot exemptions for carriers outside those categories, including here—namely, non-limited incumbents. *See* 49 U.S.C. § 41718(i).

**4.**    Finally, Frontier argues (Br. 28-30) that DOT previously characterized it as a limited incumbent. But Frontier relies on orders that predate Congress's 2012 amendment removing slot exemptions from the calculation of slots, meaning that Frontier's slot exemptions, at that time, may have made it qualify as a limited incumbent. Today, however, slot exemptions are not slots. *Supra* pp. 7-8. And Frontier's two post-2012 orders (Br. 28-29) fare no better. The first merely noted that "*Frontier confirms its status* as a limited incumbent carrier." JA76 (emphasis added). The second described Frontier in passing as a "limited incumbent carrier," JA112, a meaningless characterization given that the proceeding awarded slot exemptions to both "new entrant air carriers and limited incumbent air carriers," JA96, so DOT didn't need to be precise about Frontier's classification. Regardless, DOT's prior interpretation doesn't matter, because Frontier's status is a legal question for the Court. *Loper Bright*, 603 U.S. at 391-92, 412-13.

## II.    Spirit's intervention is impermissible and its arguments are wrong in any event.

Spirit's motion to intervene is impermissible both because it is untimely and because Spirit seeks to expand the scope of the issues raised by Frontier's petition to obtain review of DOT's ruling that *Spirit* is ineligible for limited incumbent slot exemptions. Frontier's petition doesn't raise Spirit's ineligibility, and Spirit can't do so by intervening. In any event, Spirit's arguments are wrong on the merits. Spirit is not eligible for limited incumbent slot exemptions because it is not an "incumbent air carrier" at DCA. Spirit provided no service at DCA when the 2024 Act was passed. Spirit thus isn't eligible for the limited incumbent slots under the plain terms of § 41718(i)(3).

### A.    Spirit's motion to intervene is untimely and improper.

**1.    a.**    Federal Rule of Appellate Procedure 15(d) requires motions to intervene to be filed within 30 days from the filing of a petition for review. This Court has long recognized that disregarding the 30-day deadline would "sanction[] an undisputed failure to comply with applicable … rules." *Alabama Power Co. v. Interstate Commerce Commission*, 852 F.2d 1361, 1367 (D.C. Cir. 1988). Thus, this Court and others regularly deny

intervention motions as untimely. *See, e.g.*, *id.* at 1366-68; En Banc Per Curiam Order of March 7, 2017, *PHH Corp. v. Consumer Financial Protection Bureau*, 881 F.3d 75 (D.C. Cir. 2018) (No. 15-1177); Order, *Hunt Refining Co. v. U.S. Environmental Protection Agency*, 90 F.4th 1107 (11th Cir. 2024) (No. 22-11617), Doc. 88.

**b.**    Under bedrock law, intervenors may address only the issues raised by the principal parties; they may not expand the scope of the issues before the court. *See Petro Star Inc. v. Federal Energy Regulatory Commission*, 835 F.3d 97, 110 (D.C. Cir. 2016). "[A]n intervenor is admitted to the proceeding as it stands, and in respect of the pending issues, but is not permitted to enlarge those issues." *Vinson v. Washington Gas Light Co.*, 321 U.S. 489, 498 (1944). Otherwise, an intervenor could circumvent "the time limitations for filing a petition for review." *Illinois Bell Telephone Co. v. Federal Communications Commission*, 911 F.2d 776, 786 (D.C. Cir. 1990). Thus, this Court regularly finds intervention improper where the proposed intervenor seeks to expand the scope of relief the petitioner seeks. *See, e.g.*, *id.*; *Petro Star Inc.*, 835 F.3d at 110; *National Ass'n of Regulatory Utility Commissioners v. Interstate Commerce Commission*, 41 F.3d 721, 729-30 (D.C. Cir. 1994); *California Department of Water Resources v. Federal Energy Regulatory Commission*, 306 F.3d 1121,

1126 (D.C. Cir. 2002). Aligning with that caselaw, this Court's rules require an intervenor's brief to present only those arguments that are "relevant to the issues before this court." D.C. Cir. R. 28(d)(2). In short, even a "cursory reading of [this Court's] case law makes clear that a party who seeks to challenge an aspect of agency action not questioned by any other petitioner must file a separate petition for review." *National Ass'n of Regulatory Utility Commissioners*, 41 F.3d at 730. When a party fails to do so, this Court is "reticent to consider an intervenor-only argument if the intervenor 'had every incentive to petition for review of the administrative decision and its failure to do so was without excuse.'" *American Fuel & Petrochemical Manufacturers v. Environmental Protection Agency*, 937 F.3d 559, 590 (D.C. Cir. 2019).

**2.**    These fundamental timeliness and scope rules foreclose Spirit's attempt to intervene.

**a.**    Spirit's motion is untimely because it missed the 30-day deadline to intervene in Frontier's petition. *See* Fed. R. App. P. 15(d). Frontier filed its petition for review on January 3, 2025, and Spirit moved to intervene on February 25, 2025. And while Spirit complains that Frontier failed to serve Spirit with its petition, there's no such excuse in Rule 15, and Alaska—which has timely and properly intervened—wasn't served, either. What's more, Spirit

also missed the statutory deadline in 49 U.S.C. § 46110(a) to file its own petition for review—a filing it needed to make to seek to remedy the harm it claims it has suffered from denial of its slot exemption application. Spirit's problem isn't that it wasn't served—it's that Spirit has shown no diligence throughout and has instead attempted to sandbag parties who have complied with the relevant statute and rules. Spirit's dilatory conduct is reason enough to deny intervention.

      **b.**    In any event, as Spirit's proposed brief makes clear, Spirit's proposed intervention is improper because its purpose is not to address the issues raised by Frontier's petition but to challenge DOT's denial of Spirit's application for slot exemptions and to relitigate *Spirit's* ineligibility. Spirit's purpose is to show that DOT is wrong that Spirit is not an "incumbent air carrier" and that Spirit thus should have been eligible for the limited incumbent slot exemptions. Spirit contends that "only Spirit qualifies for an award of the two limited incumbent slots"; that Spirit is "firmly among the limited incumbent class of incumbent carriers"; that DOT "[m]isclassif[ied] Spirit as ineligible"; that Spirit is "the only actual limited incumbent"; and that awarding the slots to Spirit would have better served Congress's objectives. Br. 17, 26, 31, 32-33. None of those arguments is properly before the Court

and none is "'an essential' predicate to the issues raised by" Frontier. *American Fuel & Petrochemical Manufacturers*, 937 F.3d at 590. And because Spirit never filed its own petition for review (much less a timely one), this Court should not entertain Spirit's arguments. Spirit "had every incentive to petition for review of the administrative decision and its failure to do so was without excuse." *Id.* Indeed, Spirit still hasn't offered one, and any attempt to do so now is doubly forfeited.

### B. Spirit is not eligible anyway, because it is not an "incumbent air carrier" under the 2024 Act.

Even if Spirit's intervention were timely and proper, its arguments would fail on the merits because Spirit is not an "incumbent air carrier" — the first of two requirements for a limited incumbent slot exemption under the 2024 Act.

1.    The 2024 Act creates a two-part test for carriers seeking an exemption as either a limited incumbent or a non-limited incumbent. To qualify in either category, the airline must first be an "incumbent air carrier … as of the date of enactment of the FAA Reauthorization Act of 2024." 49 U.S.C. § 41718(i)(2), (3). Congress didn't define "incumbent air carrier" in the statute, and "[w]hen a term goes undefined in a statute, [courts] give the

term its ordinary meaning," looking to dictionaries to do so. *Taniguchi v. Kan Pacific Saipan, Ltd.*, 566 U.S. 560, 566 (2012); *accord, e.g.*, *HollyFrontier Cheyenne Refining, LLC v. Renewable Fuels Ass'n*, 594 U.S. 382, 388 (2021). Here, again, an incumbent is "one that occupies a particular position or place." *Incumbent*, Merriam-Webster, https://www.merriam-webster.com/dictionary/incumbent. The particular position here is air carrier and the place is DCA. So a carrier satisfies the first part of the test if it operated flights in and out of DCA as of the 2024 Act. And Spirit hasn't operated out of DCA since 2012, so it fails that test. JA403.

**2.** Spirit's contrary arguments lack merit. Spirit collapses "incumbent air carrier" with the separate requirement that an applicant also be a limited incumbent or non-limited incumbent. Spirit suggests that "incumbent air carrier" is just the term encompassing all limited incumbent and non-limited incumbents in the aggregate. That's wrong. Congress would have had no reason to write the term "incumbent air carrier" in § 41718(i) if Spirit were right. On Spirit's view that "incumbent air carrier" just means all limited and non-limited incumbents, the statute nonsensically reads, "the Secretary shall make 2 [slot exemptions] available to [*limited incumbent air carriers or non-limited incumbent air carriers*] qualifying for status as a limited

incumbent carrier at [DCA] as of the date of enactment of the FAA Reauthorization Act of 2024." 49 U.S.C. § 41718(i)(3). Simply put, Spirit's argument "runs aground on the so-called surplusage canon — the presumption that each word Congress uses is there for a reason." *Advocate Health Care Network v. Stapleton*, 581 U.S. 468, 477 (2017).

What's more, Spirit's own argument proves that it is wrong. Spirit contends that "incumbent air carrier" incorporates the qualification in 14 C.F.R. § 93.213(a)(5)'s definition of "limited incumbent carrier" that slots count even if they were "[t]ransferred to another party" "since December 16, 1985." 14 C.F.R. § 93.213(a)(5). (Spirit makes this argument because, it says (Br. 14), it was awarded four slots at DCA in 2003 that it sold in 2012, JA402.) But that's exactly why it makes sense to give "incumbent air carrier" its ordinary meaning. Even assuming Spirit is a limited incumbent because it has slots qualifying under § 93.213(a)(5), it doesn't fly in and out of DCA, and whether a carrier currently flies in and out of DCA is exactly the kind of consideration Congress wanted to address when considering which airlines should get slot exemptions. Spirit's contrary interpretation would make "incumbent air carrier" entirely redundant and *also* undermine the language in § 41718(i)(2) and (3) requiring the assessment "as of the date of the FAA Reauthorization

Act of 2024," since, as Spirit's own argument makes clear, § 93.213(a)(5) looks retrospectively. In sum, Spirit was not an incumbent at DCA on May 16, 2024, because it held no slots on that date.

## III. DOT properly awarded the limited incumbent slot exemptions to Alaska, and Frontier and Spirit lack standing to challenge that award.

DOT correctly awarded the limited incumbent slot exemptions to Alaska, and Frontier's and Spirit's counterarguments fail twice over. *First*, Frontier and Spirit lack standing to challenge Alaska's eligibility because they are not themselves eligible for the slot exemptions, and if Alaska is ineligible the slot exemptions will simply go unused, as DOT explains (Br. 13). Neither carrier has even contended that the award to Alaska will cause it any harm, and it is now too late for either carrier to try to show otherwise. *Second*, Frontier and Spirit are wrong on the merits anyway. Alaska is a limited incumbent because it holds fewer than 40 (*i.e.*, eight) slots at DCA. *See* Alaska Airlines' Response in Opposition to Stay at SA2 (Jan. 27, 2025). Alaska's relationship with American Airlines at DCA does not change the analysis, because that relationship is not a "code-share agreement" as that term is used in § 41714(k). American does not place its code on Alaska's

flights at DCA. That arrangement is not a "code-share agreement" under § 41714(k), as statutory structure, context, and purpose show.

### A. Frontier and Spirit lack standing to challenge Alaska's eligibility.

**1.** A party "must demonstrate standing separately for each form of relief sought." *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 352 (2006). The party thus must "stand to profit in some personal interest" from each form of relief. *Simon v. Eastern Kentucky Welfare Rights Organization*, 426 U.S. 26, 39 (1976). When a petitioner seeks review of agency action directly in a court of appeals, it must show that it has standing "no later than when it files the opening brief"; if it fails to do so, it forfeits any later claim of standing, because "the ordinary rules of forfeiture apply to standing." *Twin Rivers Paper Co. v. Securities & Exchange Commission*, 934 F.3d 607, 613, 615 (D.C. Cir. 2019). And those forfeiture rules apply to particular theories of standing just as standing applies to particular forms of relief: if a petitioner's "opening submissions did not fairly raise the theory of injury that it [later] seeks to press," the theory is forfeited. *Id.* at 615. This Court's Rule 28(a)(7) thus requires an opening brief to "include arguments and evidence establishing the claim of standing" if the standing "is not apparent from the administrative record."

**2.** Spirit and Frontier needed to show that they have standing to challenge the award to Alaska assuming they are not themselves eligible for limited incumbent slot exemptions. But neither carrier even tried. Spirit said nothing about standing. And Frontier (Br. 19-21) discussed only its desire to obtain the exemptions that went to Alaska. Neither carrier claimed, much less showed how, it would suffer any harm from the award to Alaska if it isn't eligible. The carriers thus lack any interest in the award to Alaska—just as the Eleventh Circuit held that Eastern Airlines had "suffered no injury" from the approval of a slot transfer to another airline, because "[i]f that transaction had not been approved, Eastern still would not in consequence have any right to the airport slots." *Eastern Air Lines, Inc. v. Federal Aviation Administration*, 772 F.2d 1508, 1512 (11th Cir. 1985). And both carriers have now forfeited the opportunity to try coming up with an injury. Nor can either carrier contend it lacked notice: DOT observed in the Final Order that "the only two parties to question Alaska's eligibility—Spirit and Frontier—are not themselves eligible, and therefore are not directly injured or affected by [DOT's] determination that Alaska is eligible as a limited incumbent." JA492. Because Frontier and Spirit lack standing to challenge Alaska's eligibility, the Court should simply dismiss Frontier's petition as to that issue.

**B.  Alaska is a limited incumbent carrier at DCA because it holds fewer than 40 slots and does not have a "code-share agreement" under § 41714(k).**

Alaska is a qualifying "limited incumbent air carrier" because it holds fewer than 40 slots—just eight—at DCA, not including slot exemptions. *See* 49 U.S.C. § 41714(h)(5)(A); Alaska Airlines' Response in Opposition to Stay at SA2. Frontier (and Spirit) claim that § 41714(k) disqualifies Alaska because of Alaska's arrangement with American to place Alaska's code on American's flights. That argument lacks merit.

1.  Congress provided a special rule in § 41714(k) for "an air carrier that operates under the same designator code, or has or enters into a code-share agreement, with any other air carrier": the airline cannot qualify for exemptions as a limited incumbent "if the total number of slots and slot exemptions held by the two carriers at the airport exceed[s] 20." 49 U.S.C. § 41714(k). Congress did not define "code-share agreement." But the phrase is an industry term of art, and "technical terms of art should be interpreted by reference to the trade or industry to which they apply." *Louisiana Public Service Commission v. Federal Communications Commission*, 476 U.S. 355, 372 (1986). In addition, when a statutory term "standing alone" is capable of multiple meanings, a court must consider "the specific context in which that

[term] is used, and the broader context of the statute as a whole," to discern the correct interpretation. *Robinson v. Shell Oil Co.*, 519 U.S. 337, 341, 343-44 (1997). Generally speaking, a code-share agreement "means a contract between two airlines that allows them to market one another's flights by placing their respective unique, identifying codes on those flights." *United States v. Alaska Air Group, Inc.*, No. 16-cv-2377, 2017 WL 3674773, at *2 (D.D.C. June 23, 2017), *available at* JA117. Just so here: context shows that a relationship between airlines is a "code-share agreement" under § 41714(k) only if the applicant for limited incumbent status agrees to display another carrier's code on its flights.

Start with the language of § 41714(k), which shows that "code-share agreement" must be understood by reference to the airline that is "operat[ing]" and is seeking to "qualify for a new … slot exemption." 49 U.S.C. § 41714(k). The statute's lead language applies to "an air carrier that operates under the same designator code … with any other air carrier." *Id.* That language makes clear that what triggers § 41714(k) is the applicant's agreement to display another carrier's code on its flights, and it applies most readily to commuter or regional affiliates that operate but do not market or place their own designator codes on their own flights. As DOT has explained elsewhere,

"most regional flights are operated by regional carriers affiliated with a major carrier via a code-share agreement, a fee-for-service arrangement, and/or an equity stake in the regional carrier." *Enhancing Airline Passenger Protections*, 74 Fed. Reg. 68,983, 68,985 (Dec. 30, 2009). Take Republic Airways, for example, which is "a regional airline that has an operating agreement with American, Delta and United," on which it relies for "reservations, ticketing, refunds, changes, seat assignments, baggage issues, ground services, and ground operations personnel." *Reservations*, Republic Airways, https://rjet.com/passengers/reservations/ (last visited March 24, 2025). Congress wanted such carriers to trigger § 41714(k), because, as DOT explained in the Final Order, not aggregating slots in that instance would allow major carriers to game the system by using regional affiliates to obtain limited-incumbent slot exemptions but then display their code on those flights and control those flights and their marketing. JA492 & n.22.

That same context informs the meaning of "code-share agreement" in § 41714(k). A term "is known by the company it keeps (the doctrine of *noscitur a sociis*)." *Gustafson v. Alloyd Co.*, 513 U.S. 561, 575 (1995); *accord, e.g., Life Technologies Corp. v. Promega Corp.*, 580 U.S. 140, 146-47 (2017). Courts rely on that rule "to avoid ascribing to one word a meaning so broad that it is

inconsistent with its accompanying words, thus giving 'unintended breadth to the Acts of Congress.'" *Gustafson*, 513 U.S. at 575. Here, the concern about a carrier operating under another carrier's designator code makes clear that the kind of "code-share agreement" § 41714(k) contemplates is one where the operating carrier (the applicant that is the focus of the statute) agrees to place another carrier's code on its flights, and thus share codes on its flights. And as then–Senate Commerce Committee Chair John McCain explained, "[a] major airline should not be allowed to game the system and add to its hundreds of daily slots through its commuter affiliates and codeshare partners." 145 Cong. Rec. S12096 (statement of Sen. McCain). If the applicant invoking limited incumbent status does not agree to display another carrier's code on its flights, in contrast, those concerns do not exist and the applicant has no "code-share agreement" under § 41714(k).

**2.**    Alaska does not have a "code-share agreement" at DCA with American. As DOT recognized, while Alaska and American have a code-share relationship at other airports where they place their codes on each other's flights, they do not have a "code-share agreement" under § 41714(k) at DCA. Under the terms of the 2017 settlement related to Alaska's merger with Virgin American Airlines, Alaska cannot place American codes on any

flights Alaska operates at DCA. *See Alaska Air Group*, 2017 WL 3674773, at *2-3 (JA118-22); JA403-04; JA492-93 & n.22. The airlines thus do not have an agreement to place codes on each other's flights. Alaska, as the limited incumbent applicant, does not display American's code, and the Alaska–American relationship "does not place Alaska-operated slots under the marketing control of American." JA492-93.

\* \* \*

DOT correctly concluded that neither Frontier nor Spirit qualifies for the limited incumbent slot exemptions Congress directed it to allocate under the 2024 Act. Frontier holds no slots at DCA and thus isn't a limited incumbent air carrier. Spirit hasn't flown at DCA since 2012 and thus isn't an incumbent air carrier. So neither carrier could get Alaska's slots, and neither carrier has standing to challenge Alaska's eligibility because neither carrier has shown that Alaska's award will cause it any harm. The Court should deny Frontier's petition for review as to Frontier's eligibility; dismiss Frontier's petition for review as to Alaska's eligibility for lack of standing (or else deny it on the merits); and deny Spirit's improper motion to intervene to inject its own ineligibility into the case.

- 42 -

DOT granted Alaska slot exemptions to "enhance options for travel to a beyond-perimeter airport" lacking "nonstop service from DCA." JA406. DOT foresaw "a positive impact on the overall competition" from "a new, convenient flight option" for the "139,000 annual" passengers—"roughly 189 per-day, each way"—who travel between DCA and SAN. JA406. The result Frontier and Spirit seek, in contrast, would be "suboptimal"—it would "reduc[e] the maximum public benefits available from these scarce assets" by allowing two exemptions to go unallocated. JA493. Frontier and Spirit provide no good reason to reach that result.

## CONCLUSION

The Court should deny Frontier's petition as to Frontier's eligibility; dismiss Frontier's petition as to Alaska's eligibility for lack of standing; and deny Spirit's motion to intervene.

Dated: March 24, 2025

Respectfully submitted,

*/s/ Shay Dvoretzky*

Shay Dvoretzky
  *Counsel of Record*
Parker Rider-Longmaid
Steven Marcus
SKADDEN, ARPS, SLATE,
  MEAGHER & FLOM LLP
1440 New York Ave., NW
Washington, DC 20005
Telephone: 202-371-7000
shay.dvoretzky@skadden.com

Sarah Leitner
SKADDEN, ARPS, SLATE,
  MEAGHER & FLOM LLP
One Manhattan West
New York, NY 10001

*Counsel for Intervenor Alaska Airlines, Inc.*

# CERTIFICATE OF COMPLIANCE

Pursuant to Federal Rule of Appellate Procedure 32(g), I hereby certify that this brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B) because, as calculated by Microsoft Word, it contains 9,100 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f) and Circuit Rule 32(e)(1). I also certify that this brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in a 14-point Book Antiqua font.

Dated: March 24, 2025                    Respectfully submitted,

                                        */s/ Shay Dvoretzky*
                                        Shay Dvoretzky
                                        SKADDEN, ARPS, SLATE,
                                          MEAGHER & FLOM LLP
                                        1440 New York Ave., NW
                                        Washington, DC 20005
                                        202-371-7000
                                        shay.dvoretzky@skadden.com

                                        *Counsel for Intervenor*
                                          *Alaska Airlines, Inc.*

- 45 -

## CERTIFICATE OF SERVICE

Pursuant to Federal Rule of Appellate Procedure 25(b) and Circuit Rule 25(f), I hereby certify that on March 24, 2025, I electronically filed the foregoing brief and following addendum with the Clerk of the Court for the United States Court of Appeals for the District of Columbia Circuit by using the CM/ECF system. I certify that all participants in the case are registered CM/ECF users and the CM/ECF system will accomplish service.

Dated: March 24, 2025

Respectfully submitted,

*/s/ Shay Dvoretzky*
Shay Dvoretzky
SKADDEN, ARPS, SLATE,
  MEAGHER & FLOM LLP
1440 New York Ave., NW
Washington, DC 20005
202-371-7000
shay.dvoretzky@skadden.com

*Counsel for Intervenor*
 *Alaska Airlines, Inc.*

[This page intentionally left blank.]

## INDEX OF ADDENDUM

**Page**

49 U.S.C. § 41714 ................................................................Add. 1

49 U.S.C. § 41718 ...............................................................Add. 14

49 U.S.C. § 46110 ...............................................................Add. 26

14 C.F.R. § 93.213 ..............................................................Add. 29

# ADDENDUM

## 49 U.S.C. § 41714. Availability of Slots

(a) MAKING SLOTS AVAILABLE FOR ESSENTIAL AIR SERVICE.—

(1) OPERATIONAL AUTHORITY.—If basic essential air service under subchapter II of this chapter is to be provided from an eligible point to a high density airport (other than Ronald Reagan Washington National Airport), the Secretary of Transportation shall ensure that the air carrier providing or selected to provide such service has sufficient operational authority at the high density airport to provide such service. The operational authority shall allow flights at reasonable times taking into account the needs of passengers with connecting flights.

(2) EXEMPTIONS.—If necessary to carry out the objectives of paragraph (1), the Secretary shall by order grant exemptions from the requirements of subparts K and S of part 93 of title 14, Code of Federal Regulations (pertaining to slots at high density airports), to air carriers using Stage 3 aircraft or to commuter air carriers, unless such an exemption would significantly increase operational delays.

(3) ASSURANCE OF ACCESS.—If the Secretary finds that an exemption under paragraph (2) would significantly increase operational delays, the

- Add. 1 -

Secretary shall take such action as may be necessary to ensure that an air carrier providing or selected to provide basic essential air service is able to obtain access to a high density airport.

(4) ACTION BY THE SECRETARY.—The Secretary shall issue a final order under this subsection on or before the 60th day after receiving a request from an air carrier for operational authority under this subsection.

(b) SLOTS FOR FOREIGN AIR TRANSPORTATION.—

(1) EXEMPTIONS.—If the Secretary finds it to be in the public interest at a high density airport (other than Ronald Reagan Washington National Airport), the Secretary may grant by order exemptions from the requirements of subparts K and S of part 93 of title 14, Code of Federal Regulations (pertaining to slots at high density airports), to enable air carriers and foreign air carriers to provide foreign air transportation using Stage 3 aircraft.

(2) SLOT WITHDRAWALS.—The Secretary may not withdraw a slot at Chicago O'Hare International Airport from an air carrier in order to allocate that slot to a carrier to provide foreign air transportation.

(3) EQUIVALENT RIGHTS OF ACCESS.—The Secretary shall not take a slot at a high density airport from an air carrier and award such slot to a

foreign air carrier if the Secretary determines that air carriers are not provided equivalent rights of access to airports in the country of which such foreign air carrier is a citizen.

(4) CONVERSIONS OF SLOTS.—Effective May 1, 2000, slots at Chicago O'Hare International Airport allocated to an air carrier as of November 1, 1999, to provide foreign air transportation shall be made available to such carrier to provide interstate or intrastate air transportation.

(c) SLOTS FOR NEW ENTRANTS.—If the Secretary finds it to be in the public interest, the Secretary may by order grant exemptions from the requirements under subparts K and S of part 93 of title 14, Code of Federal Regulations (pertaining to slots at high density airports), to enable new entrant air carriers to provide air transportation at high density airports (other than Ronald Reagan Washington National Airport).

(d) SPECIAL RULES FOR RONALD REAGAN WASHINGTON NATIONAL AIRPORT.—

(1) IN GENERAL.—Notwithstanding sections 49104(a)(5) and 49111(e) of this title, or any provision of this section, the Secretary may, only under circumstances determined by the Secretary to be exceptional, grant by order to an air carrier currently holding or operating a slot at Ronald

Reagan Washington National Airport an exemption from requirements under subparts K and S of part 93 of title 14, Code of Federal Regulations (pertaining to slots at Ronald Reagan Washington National Airport), to enable that carrier to provide air transportation with Stage 3 aircraft at Ronald Reagan Washington National Airport; except that such exemption shall not—

(A) result in an increase in the total number of slots per day at Ronald Reagan Washington National Airport;

(B) result in an increase in the total number of slots at Ronald Reagan Washington National Airport from 7:00 ante meridiem to 9:59 post meridiem;

(C) increase the number of operations at Ronald Reagan Washington National Airport in any 1-hour period by more than 2 operations;

(D) result in the withdrawal or reduction of slots operated by an air carrier;

(E) result in a net increase in noise impact on surrounding communities resulting from changes in timing of operations permitted under this subsection; and

(F) continue in effect on or after the date on which the final rules issued under subsection (f) become effective.

(2) LIMITATION ON APPLICABILITY.—Nothing in this subsection shall adversely affect Exemption No. 5133, as from time-to-time amended and extended.

(e) STUDY.—

(1) MATTERS TO BE CONSIDERED.—The Secretary shall continue the Secretary's current examination of slot regulations and shall ensure that the examination includes consideration of—

(A) whether improvements in technology and procedures of the air traffic control system and the use of quieter aircraft make it possible to eliminate the limitations on hourly operations imposed by the high density rule contained in part 93 of title 14 of the Code of Federal Regulations or to increase the number of operations permitted under such rule;

(B) the effects of the elimination of limitations or an increase in the number of operations allowed on each of the following:

(i) congestion and delay in any part of the national aviation system;

(ii) the impact of noise on persons living near the airport;

(iii) competition in the air transportation system;

(iv) the profitability of operations of airlines serving the airport; and

(v) aviation safety;

(C) the impact of the current slot allocation process upon the ability of air carriers to provide essential air service under subchapter II of this chapter;

(D) the impact of such allocation process upon the ability of new entrant air carriers to obtain slots in time periods that enable them to provide service;

(E) the impact of such allocation process on the ability of foreign air carriers to obtain slots;

(F) the fairness of such process to air carriers and the extent to which air carriers are provided equivalent rights of access to the air transportation market in the countries of which foreign air carriers holding slots are citizens;

(G) the impact, on the ability of air carriers to provide domestic and international air service, of the withdrawal of slots from air carriers in order to provide slots for foreign air carriers; and

(H) the impact of the prohibition on slot withdrawals in subsections (b)(2) and (b)(3) of this section on the aviation relationship between the United States Government and foreign governments, including whether the prohibition in such subsections will require the withdrawal of slots from general and military aviation in order to meet the needs of air carriers and foreign air carriers providing foreign air transportation (and the impact of such withdrawal on general aviation and military aviation) and whether slots will become available to meet the needs of air carriers and foreign air carriers to provide foreign air transportation as a result of the planned relocation of Air Force Reserve units and the Air National Guard at O'Hare International Airport.

(2) REPORT.—Not later than January 31, 1995, the Secretary shall complete the current examination of slot regulations and shall transmit to the Committee on Commerce, Science, and Transportation of the Senate and

the Committee on Transportation and Infrastructure of the House of Representatives a report containing the results of such examination.

(f) RULEMAKING.—The Secretary shall conduct a rulemaking proceeding based on the results of the study described in subsection (e). In the course of such proceeding, the Secretary shall issue a notice of proposed rulemaking not later than August 1, 1995, and shall issue a final rule not later than 90 days after public comments are due on the notice of proposed rulemaking.

(g) WEEKEND OPERATIONS.—The Secretary shall consider the advisability of revising section 93.227 of title 14, Code of Federal Regulations, so as to eliminate weekend schedules from the determination of whether the 80 percent standard of subsection (a)(1) of that section has been met.

(h) DEFINITIONS.—In this section and sections 41715–41718 and 41734(h), the following definitions apply:

(1) COMMUTER AIR CARRIER.—The term ''commuter air carrier'' means a commuter operator as defined or applied in subpart K or S of part 93 of title 14, Code of Federal Regulations.

(2) HIGH DENSITY AIRPORT.—The term ''high density airport'' means an airport at which the Administrator limits the number of instrument flight rule takeoffs and landings of aircraft.

- Add. 8 -

(3) NEW ENTRANT AIR CARRIER.—The term ''new entrant air carrier'' means an air carrier that does not hold a slot at the airport concerned and has never sold or given up a slot at that airport after December 16, 1985, and a limited incumbent carrier.

(4) SLOT.—The term ''slot'' means a reservation for an instrument flight rule takeoff or landing by an air carrier of an aircraft in air transportation.

(5) LIMITED INCUMBENT AIR CARRIER.—The term ''limited incumbent air carrier'' has the meaning given that term in subpart S of part 93 of title 14, Code of Federal Regulations; except that—

(A) ''40'' shall be substituted for ''12'' in sections 93.213(a)(5), 93.223(c)(3), and 93.225(h);

(B) for purposes of such sections, the term ''slot'' shall not include—

(i) ''slot exemptions'';

(ii) slots operated by an air carrier under a fee-for-service arrangement for another air carrier, if the air carrier operating such slots does not sell flights in its own name, and is under common

ownership with an air carrier that seeks to qualify as a limited incumbent and that sells flights in its own name; or

(iii) slots held under a sale and license-back financing arrangement with another air carrier, where the slots are under the marketing control of the other air carrier; and

(C) for Ronald Reagan Washington National Airport, the Administrator shall not count, for the purposes of section 93.213(a)(5), slots currently held by an air carrier but leased out on a long-term basis by that carrier for use in foreign air transportation and renounced by the carrier for return to the Department of Transportation or the Federal Aviation Administration.

(6) REGIONAL JET.—The term ''regional jet'' means a passenger, turbo-fan-powered aircraft with a certificated maximum passenger seating capacity of less than 71.

(7) NONHUB AIRPORT.—The term ''nonhub airport'' means an airport that had less than .05 percent of the total annual boardings in the United States as determined under the Federal Aviation Administration's Primary Airport Enplanement Activity Summary for Calendar Year 1997.

(8) SMALL HUB AIRPORT.—The term ''small hub airport'' means an airport that had at least .05 percent, but less than .25 percent, of the total annual boardings in the United States as determined under the summary referred to in paragraph (7).

(9) MEDIUM HUB AIRPORT.—The term ''medium hub airport'' means an airport that each year has at least .25 percent, but less than 1.0 percent, of the total annual boardings in the United States as determined under the summary referred to in paragraph (7).

(i) 60-DAY APPLICATION PROCESS.—

(1) REQUEST FOR SLOT EXEMPTIONS.—Any slot exemption request filed with the Secretary under this section or section 41716 or 41717 (other than subsection (c)) shall include—

(A) the names of the airports to be served;

(B) the times requested; and

(C) such additional information as the Secretary may require.

(2) ACTION ON REQUEST; FAILURE TO ACT.— Within 60 days after a slot exemption request under this section or section 41716 or 41717 (other than subsection (c)) is received by the Secretary, the Secretary shall—

(A) approve the request if the Secretary determines that the requirements of the section under which the request is made are met;

(B) return the request to the applicant for additional information relating to the request to provide air transportation; or

(C) deny the request and state the reasons for its denial.

(3) 60-DAY PERIOD TOLLED FOR TIMELY REQUEST FOR MORE INFORMATION.—If the Secretary returns under paragraph (2)(B) the request for additional information during the first 20 days after the request is filed, then the 60-day period under paragraph (2) shall be tolled until the date on which the additional information is filed with the Secretary.

(4) FAILURE TO DETERMINE DEEMED APPROVAL.—If the Secretary neither approves the request under paragraph (2)(A) nor denies the request under paragraph (2)(C) within the 60- day period beginning on the date the request is received, excepting any days during which the 60-day period is tolled under paragraph (3), then the request is deemed to have been approved on the 61st day, after the request was filed with the Secretary.

(j) EXEMPTIONS MAY NOT BE TRANSFERRED.— No exemption from the requirements of subparts K and S of part 93 of title 14, Code of Federal Regulations, granted under this section or section 41716, 41717, or 41718 may

be bought, sold, leased, or otherwise transferred by the carrier to which it is granted, except through an air carrier merger or acquisition.

(k) AFFILIATED CARRIERS.—For purposes of this section and sections 41716, 41717, and 41718, an air carrier that operates under the same designator code, or has or enters into a code-share agreement, with any other air carrier shall not qualify for a new slot or slot exemption as a new entrant or limited incumbent air carrier at an airport if the total number of slots and slot exemptions held by the two carriers at the airport exceed 20 slots and slot exemptions.

## 49 U.S.C. § 41718. Special rules for Ronald Reagan Washington National Airport

(a) BEYOND-PERIMETER EXEMPTIONS.—The Secretary shall grant, by order, 24 exemptions from the application of sections 49104(a)(5), 49109, 49111(e), and 41714 of this title to air carriers to operate limited frequencies and aircraft on select routes between Ronald Reagan Washington National Airport and domestic hub airports and exemptions from the requirements of subparts K and S of part 93, Code of Federal Regulations, if the Secretary finds that the exemptions will--

(1) provide air transportation with domestic network benefits in areas beyond the perimeter described in that section;

(2) increase competition by new entrant air carriers or in multiple markets;

(3) not reduce travel options for communities served by small hub airports and medium hub airports within the perimeter described in section 49109; and

(4) not result in meaningfully increased travel delays.

(b) WITHIN-PERIMETER EXEMPTIONS.—The Secretary shall grant, by order, 20 exemptions from the requirements of sections 49104(a)(5), 49111(e),

and 41714 of this title and subparts K and S of part 93 of title 14, Code of Federal Regulations, to air carriers for providing air transportation to airports within the perimeter established for civil aircraft operations at Ronald Reagan Washington National Airport under section 49109. The Secretary shall develop criteria for distributing slot exemptions for flights within the perimeter to such airports under this paragraph in a manner that promotes air transportation—

(1) by new entrant air carriers and limited incumbent air carriers;

(2) to communities without existing nonstop air transportation to Ronald Reagan Washington National Airport;

(3) to small communities;

(4) that will provide competitive nonstop air transportation on a monopoly nonstop route to Ronald Reagan Washington National Airport; or

(5) that will produce the maximum competitive benefits, including low fares.

(c) LIMITATIONS. —

(1) STAGE 3 AIRCRAFT REQUIRED. — An exemption may not be granted under this section with respect to any aircraft that is not a Stage 3 aircraft (as defined by the Secretary).

(2) GENERAL EXEMPTIONS. —

(A) HOURLY LIMITATION. — The exemptions granted —

(i) under subsections (a), (b), and (i) and departures authorized under subsection (g)(2) may not be for operations between the hours of 10:00 p.m. and 7:00 a.m.; and

(ii) under subsections (a), (b), (g), and (i) may not increase the number of operations at Ronald Reagan Washington National Airport in any 1-hour period during the hours between 7:00 a.m. and 9:59 p.m. by more than 5 operations.

(B) USE OF EXISTING SLOTS. — A non-limited incumbent air carrier utilizing an exemption authorized under subsection (g)(3) for an arrival permitted between the hours of 10:01 p.m. and 11:00 p.m. under this section shall discontinue use of an existing slot during the same time period the arrival exemption is operated.

(3) ALLOCATION OF WITHIN-PERIMETER EXEMPTIONS.—Of the exemptions granted under subsection (b)—

(A) without regard to the criteria contained in subsection (b)(1), six shall be for air transportation to small hub airports and nonhub airports;

(B) ten shall be for air transportation to medium hub and smaller airports; and

(C) four shall be for air transportation to airports without regard to their size.

(4) APPLICABILITY TO EXEMPTION NO. 5133.—Nothing in this section affects Exemption No. 5133, as from time-to-time amended and extended.

(d) APPLICATION PROCEDURES.—The Secretary shall establish procedures to ensure that all requests for exemptions under this section are granted or denied within 90 days after the date on which the request is made.

(e) APPLICABILITY OF CERTAIN LAWS.—Neither the request for, nor the granting of an exemption, under this section shall be considered for purposes of any Federal law a major Federal action significantly affecting the quality of the human environment.

(f) COMMUTERS DEFINED.—For purposes of aircraft operations at Ronald Reagan Washington National Airport under subpart K of part 93 of title 14, Code of Federal Regulations, the term "commuters" means aircraft operations using aircraft having a certificated maximum seating capacity of 76 or less.

(g) ADDITIONAL SLOT EXEMPTIONS.—

(1) INCREASE IN SLOT EXEMPTIONS.—Not later than 90 days after the date of enactment of the FAA Modernization and Reform Act of 2012, the Secretary shall grant, by order 16 exemptions from—

(A) the application of sections 49104(a)(5), 49109, and 41714 to air carriers to operate limited frequencies and aircraft on routes between Ronald Reagan Washington National Airport and airports located beyond the perimeter described in section 49109; and

(B) the requirements of subparts K and S of part 93, Code of Federal Regulations.

(2) NEW ENTRANTS AND LIMITED INCUMBENTS.—Of the slot exemptions made available under paragraph (1), the Secretary shall make 8 available to limited incumbent air carriers or new entrant air carriers (as such terms are defined in section 41714(h)). Such exemptions shall be

allocated pursuant to the application process established by the Secretary under subsection (d). The Secretary shall consider the extent to which the exemptions will—

(A) provide air transportation with domestic network benefits in areas beyond the perimeter described in section 49109;

(B) increase competition in multiple markets;

(C) not reduce travel options for communities served by small hub airports and medium hub airports within the perimeter described in section 49109;

(D) not result in meaningfully increased travel delays;

(E) enhance options for nonstop travel to and from the beyond-perimeter airports that will be served as a result of those exemptions;

(F) have a positive impact on the overall level of competition in the markets that will be served as a result of those exemptions; or

(G) produce public benefits, including the likelihood that the service to airports located beyond the perimeter described in section 49109 will result in lower fares, higher capacity, and a variety of service options.

(3) IMPROVED NETWORK SLOTS.—Of the slot exemptions made available under paragraph (1), the Secretary shall make 8 available to incumbent air carriers qualifying for status as a non-limited incumbent carrier at Ronald Reagan Washington National Airport as of the date of enactment of the FAA Modernization and Reform Act of 2012. Each such non-limited incumbent air carrier—

(A) may operate up to a maximum of 2 of the newly authorized slot exemptions;

(B) prior to exercising an exemption made available under paragraph (1), shall discontinue the use of a slot for service between Ronald Reagan Washington National Airport and a large hub airport within the perimeter as described in section 49109, and operate, in place of such service, service between Ronald Reagan Washington National Airport and an airport located beyond the perimeter described in section 49109;

(C) shall be entitled to return of the slot by the Secretary if use of the exemption made available to the carrier under paragraph (1) is discontinued;

(D) shall have sole discretion concerning the use of an exemption made available under paragraph (1), including the initial or any subsequent beyond perimeter destinations to be served; and

(E) shall file a notice of intent with the Secretary and subsequent notices of intent, when appropriate, to inform the Secretary of any change in circumstances concerning the use of any exemption made available under paragraph (1).

(4) NOTICES OF INTENT.—Notices of intent under paragraph (3)(E) shall specify the beyond perimeter destination to be served and the slots the carrier shall discontinue using to serve a large hub airport located within the perimeter.

(5) CONDITIONS.—Beyond-perimeter flight operations carried out by an air carrier using an exemption granted under this subsection shall be subject to the following conditions:

(A) An air carrier may not operate a multi-aisle or widebody aircraft in conducting such operations.

(B) An air carrier granted an exemption under this subsection is prohibited from transferring the rights to its beyond-perimeter exemptions pursuant to section 41714(j).

(h) SCHEDULING PRIORITY.—In administering this section, the Secretary shall—

(1) afford a scheduling priority to operations conducted by new entrant air carriers and limited incumbent air carriers over operations conducted by other air carriers granted additional slot exemptions under subsection (g) for service to airports located beyond the perimeter described in section 49109;

(2) afford a scheduling priority to slot exemptions currently held by new entrant air carriers and limited incumbent air carriers for service to airports located beyond the perimeter described in section 49109, to the extent necessary to protect viability of such service; and

(3) consider applications from foreign air carriers that are certificated by the government of Canada if such consideration is required by the bilateral aviation agreement between the United States and Canada and so long as the conditions and limitations under this section apply to such foreign air carriers.

(i) ADDITIONAL SLOT EXEMPTIONS.—

(1) INCREASE IN SLOT EXEMPTIONS.—Not later than 60 days after the date of enactment of the FAA Reauthorization Act of 2024, the Secretary shall grant, by order, 10 exemptions from—

(A) the application of sections 49104(a)(5), 49109, and 41714 to air carriers to operate limited frequencies and aircraft on routes between Ronald Reagan Washington National Airport and domestic airports located within or beyond the perimeter described in section 49109; and

(B) the requirements of subparts K, S, and T of part 93 of title 14, Code of Federal Regulations.

(2) NON-LIMITED INCUMBENTS.—a Of the slot exemptions made available under paragraph (1), the Secretary shall make 8 available to incumbent air carriers qualifying for status as a non-limited incumbent carrier at Ronald Reagan Washington National Airport as of the date of enactment of the FAA Reauthorization Act of 2024.

(3) LIMITED INCUMBENTS.—Of the slot exemptions made available under paragraph (1), the Secretary shall make 2 available to incumbent air carriers qualifying for status as a limited incumbent carrier at Ronald

Reagan Washington National Airport as of the date of enactment of the FAA Reauthorization Act of 2024.

(4) ALLOCATION PROCEDURES.—The Secretary shall allocate the 10 slot exemptions provided under paragraph (1) pursuant to the application process established by the Secretary under subsection (d), subject to the following:

(A) LIMITATIONS.—Each air carrier that is eligible under paragraph (2) and paragraph (3) shall be eligible to operate no more and no less than 2 of the newly authorized slot exemptions.

(B) CRITERIA.—The Secretary shall consider the extent to which the exemptions will--

(i) enhance options for nonstop travel to beyond-perimeter airports that do not have nonstop service from Ronald Reagan Washington National Airport as of the date of enactment of the FAA Reauthorization Act of 2024; or

(ii) have a positive impact on the overall level of competition in the markets that will be served as a result of those exemptions.

(5) PROHIBITION. —

(A) IN GENERAL. — The Metropolitan Washington Airports Authority may not assess any penalty or similar levy against an individual air carrier solely for obtaining and operating a slot exemption authorized under this subsection.

(B) RULE OF CONSTRUCTION. — Subparagraph (A) shall not be construed as prohibiting the Metropolitan Washington Airports Authority from assessing and collecting any penalty, fine, or other levy, such as a handling fee or landing fee, that is —

(i) authorized by the Metropolitan Washington Airports Regulations;

(ii) agreed to in writing by the air carrier; or

(iii) charged in the ordinary course of business to an air carrier operating at Ronald Reagan Washington National Airport regardless of whether or not the air carrier obtained a slot exemption authorized under this subsection.

**49 U.S.C. § 46110. Judicial review**

(a) FILING AND VENUE. — Except for an order related to a foreign air carrier subject to disapproval by the President under section 41307 or 41509(f) of this title, a person disclosing a substantial interest in an order issued by the Secretary of Transportation (or the Administrator of the Transportation Security Administration with respect to security duties and powers designated to be carried out by the Administrator of the Transportation Security Administration or the Administrator of the Federal Aviation Administration with respect to aviation duties and powers designated to be carried out by the Administrator of the Federal Aviation Administration) in whole or in part under this part, part B, or subsection (*l*) or (s)[1] of section 114 may apply for review of the order by filing a petition for review in the United States Court of Appeals for the District of Columbia Circuit or in the court of appeals of the United States for the circuit in which the person resides or has its principal place of business. The petition must be filed not later than 60 days after the order is issued. The court may allow the petition to be filed after the 60th day only if there are reasonable grounds for not filing by the 60th day.

---

[1] See References in Text note below.

(b) JUDICIAL PROCEDURES.—When a petition is filed under subsection (a) of this section, the clerk of the court immediately shall send a copy of the petition to the Secretary, Administrator of the Transportation Security Administration, or Administrator of the Federal Aviation Administration, as appropriate. The Secretary, Administrator of the Transportation Security Administration, or Administrator of the Federal Aviation Administration shall file with the court a record of any proceeding in which the order was issued, as provided in section 2112 of title 28.

(c) AUTHORITY OF COURT.—When the petition is sent to the Secretary, Administrator of the Transportation Security Administration, or Administrator of the Federal Aviation Administration, the court has exclusive jurisdiction to affirm, amend, modify, or set aside any part of the order and may order the Secretary, Administrator of the Transportation Security Administration, or Administrator of the Federal Aviation Administration to conduct further proceedings. After reasonable notice to the Secretary, Administrator of the Transportation Security Administration, or Administrator of the Federal Aviation Administration, the court may grant interim relief by staying the order or taking other appropriate action when good cause for its action exists. Findings of fact by the Secretary, Administrator of the Transportation

Security Administration, or Administrator of the Federal Aviation Administration, if supported by substantial evidence, are conclusive.

(d) REQUIREMENT FOR PRIOR OBJECTION.—In reviewing an order under this section, the court may consider an objection to an order of the Secretary, Administrator of the Transportation Security Administration, or Administrator of the Federal Aviation Administration only if the objection was made in the proceeding conducted by the Secretary, Administrator of the Transportation Security Administration, or Administrator of the Federal Aviation Administration or if there was a reasonable ground for not making the objection in the proceeding.

(e) SUPREME COURT REVIEW.—A decision by a court under this section may be reviewed only by the Supreme Court under section 1254 of title 28.

- Add. 28 -

**14 C.F.R. § 93.213. Defitions and general provisions.**

(a) For purposes of this subpart—

(1) *New entrant carrier* means a commuter operator or air carrier which does not hold a slot at a particular airport and has never sold or given up a slot at that airport after December 16, 1985.

(2) *Slot* means the operational authority to conduct one IFR landing or takeoff operation each day during a specific hour or 30 minute period at one of the High Density Traffic Airports, as specified in subpart K of this part.

(3) *Summer season* means the period of time from the first Sunday in April until the last Sunday in October.

(4) *Winter season* means the period of time from the last Sunday in October until the first Sunday in April.

(5) *Limited incumbent carrier* means an air carrier or commuter operator that holds or operates fewer than 12 air carrier or commuter slots, in any combination, at a particular airport, not including international slots, Essential Air Service Program slots, or slots between the hours of 2200 and 0659 at Washington National Airport or LaGuardia Airport. However, for the purposes of this paragraph (a)(5), the carrier is considered to hold the number of slots at that airport that the carrier has, since December 16, 1985:

- Add. 29 -

(i) Returned to the FAA;

(ii) Had recalled by the FAA under § 93.227(a); or

(iii) Transferred to another party other than by trade for one or more slots at the same airport.

(b) The definitions specified in subpart K of this part also apply to this subpart.

(c) For purposes of this subpart, if an air carrier, commuter operator, or other person has more than a 50-percent ownership or control of one or more other air carriers, commuter operators, or other persons, they shall be considered to be a single air carrier, commuter operator, or person. In addition, if a single company has more than a 50-percent ownership or control of two or more air carriers and/or commuter operators or any combination thereof, those air carriers and/or commuter operators shall be considered to be a single operator. A single operator may be considered to be both an air carrier and commuter operator for purposes of this subpart.