ORAL ARGUMENT SCHEDULED FOR MAY 8, 2025

No. 25-1002
━━━━━━━━━━━━━━━━━━━━━━━

# 𝔍𝔫 𝔱𝔥𝔢 𝔘𝔫𝔦𝔱𝔢𝔡 𝔖𝔱𝔞𝔱𝔢𝔰 ℭ𝔬𝔲𝔯𝔱 𝔬𝔣 𝔄𝔭𝔭𝔢𝔞𝔩𝔰 𝔣𝔬𝔯 𝔱𝔥𝔢 𝔇𝔦𝔰𝔱𝔯𝔦𝔠𝔱 𝔬𝔣 ℭ𝔬𝔩𝔲𝔪𝔟𝔦𝔞 ℭ𝔦𝔯𝔠𝔲𝔦𝔱

━━━━━━━━━━━━━━━━━━━━━━━

FRONTIER AIRLINES, INC.,

*Petitioner,*

SPIRIT AIRLINES, LLC,

*Movant-Intervenor,*

*v.*

UNITED STATES DEPARTMENT OF TRANSPORTATION,

*Respondent,*

ALASKA AIRLINES, INC.,

*Intervenor.*

On Petition for Review of a Final Order of the U.S. Department of Transportation

## Reply Brief of Spirit Airlines, LLC

Joanne W. Young
*Counsel of Record*
David M. Kirstein
Donald L. Crowell III
KIRSTEIN & YOUNG PLLC
1750 K Street NW, Suite 700
Washington, DC 20006
(202) 331-3348

*Counsel for Spirit Airlines, LLC*

# CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

Pursuant to D.C. Circuit Rule 28(a)(1), Spirit Airlines, LLC hereby submits its Certificate as to Parties Rulings, and Related Cases:

## I.    Parties

Petitioner in this matter is Frontier Airlines, Inc.

Respondent in this matter is the U.S. Department of Transportation.

Intervenors in this matter include Alaska Airlines, Inc., which was allowed to intervene in support of Respondent on January 27, 2025. Spirit Airlines, LLC has moved to intervene in support of Petitioner. On March 3, 2025, the Court issued a per curiam order referring Spirit's motion to the merits panel and allowing Spirit "as movant intervenor lodge an opening brief by March 3, 2025 and any reply brief by April 7, 2025." Doc. #2103604, No. 25-1002 (D.C. Cir. Mar. 3, 2025).

## II.    Rulings Under Review

Frontier seeks review of the Department of Transportation Final Order 2024-12-8 in Docket DOT-OST-2024-0065, see J.A. 485–96, as well as all interlocutory orders, decisions, determinations, and conclusions supporting the above Final Order.

III.    Related Cases

On February 14, 2025, Alaska filed a Petition for Review, docketed as *Alaska Airlines, Inc. v. United States Department of Transportation*, No. 25-1062 (D.C. Cir.). Alaska requested that its Petition be consolidated with No. 25-1002 because Alaska conditionally challenges the same Final Order. On February 25, 2025, this Court denied Alaska's consolidation request and held that case in abeyance pending further order of the court. Parties in No. 25-1062 were directed to file motions to govern further proceedings in that case within 30 days of the disposition of this case No. 25-1002. Spirit filed a motion to intervene in No. 25-1062, which remains pending. Spirit is not aware of any other related cases currently pending in this Court or any other court within the meaning of Circuit Rule 28(a)(1)(C).

Dated: April 7, 2025                              Respectfully submitted,

                                                  */s/* Joanne W. Young
                                                  Joanne W. Young

                                                  *Counsel for Spirit Airlines, LLC*

## TABLE OF CONTENTS

**Page**

Table of Contents ......................................................................... iii

Table of Authorities .................................................................... v

Glossary ......................................................................................... i

Introduction .................................................................................. 1

Argument ....................................................................................... 3

    I.    Spirit Has Standing and A Right To Be Heard In This Appeal ................. 3

        A.  Spirit's Intervention Is Proper and Brings No "New Issue" Beyond the Scope of Frontier's Petition for Review ........................ 3

        B.  Spirit Suffered Competitive Injury from DOT's Unlawful Exclusion of Spirit and Award to Alaska. ........................................ 5

        C.  Spirit's Application for DCA-SJC Service Met All Criteria for the Slot Exemptions, Thus Distinguishing this Case from the Eleventh Circuit *Eastern Air Lines, Inc.*, Case which Respondents Erroneously Rely On. ................................................. 7

            1.  Enhanced Beyond-Perimeter Service .................................... 8

            2.  Heightened Competition and Lower Fares ........................... 8

            3.  Underserved Market and Public-Interest Benefits ............... 9

    II.  Alaska Is Indisputably "An Air Carrier That Operates Under The Same Designator Code, Or Has Or Enters Into A Code-Share Agreement With Any Other Air Carrier" ....................................................... 9

        A.  The Legislative History Hurts Respondents' Arguments .............. 12

B.  DOT Had No Authority to Ignore the Statutory Bar Based on Its Own Policy Views.............................................................................14

III. Dot Misinterpreted 49 U.S.C. § 41714(H)(5) to Unlawfully Exclude Other Airlines from Competing for the Slot Exemptions Against Alaska ...................................................................................................................16

A.  Congress Did Not Require Ongoing Operations at DCA to Qualify as an "Incumbent Air Carrier." .........................................16

Conclusion ................................................................................................22

## TABLE OF AUTHORITIES

Page

Cases

*Bates v. United States*, 522 U.S. 23 (1997) ............................................................... 11

*BP Am. Prod. Co. v. Burton*, 549 U.S. 84 (2006) ..................................................... 15

*Canadian Lumber Trade Alliance v. United States*, 517 F.3d 1319 (Fed. Cir. 2008) ...................................................................................................... 6

*City & Cty. of San Francisco v. EPA*, 145 S. Ct. 704, 221 L.Ed.2d 166 (2025) ....... 19

*Dean v. United States*, 556 U.S. 568 (2009) ............................................................. 11

*EEOC v. Nat'l Children's Ctr.*, 146 F.3d 1042 (D.C. Cir. 1998) ................................ 4

*Ex parte Tiffany*, 252 U.S. 32 (1920) ......................................................................... 4

*Fusari v. Steinberg*, 419 U.S. 379 (1975) ................................................................... 4

*La. Energy & Power Auth. v. FERC*, 141 F.3d 364 (D.C. Cir. 1998) ........................ 6

*llinois Bell Tel. Co. v. FCC*, 911 F.2d 776 (D.C. Cir. 1990) ..................................... 4

*New World Radio, Inc. v. FCC*, 294 F.3d 164 (D.C. Cir. 2002) ................................ 6

*Russello v. United States*, 464 U.S. 16 (1983) .......................................................... 19

*Sherley v. Sebelius*, 610 F.3d 69 (D.C. Cir. 2010) ..................................................... 6

*Synovus Fin. Corp. v. Board of Governors*, 952 F.2d 426 (D.C. Cir. 1991) .............. 4

*Town of Chester v. Laroe Estates, Inc.*, 581 U.S. 433 (2017) .................................... 3

*Util. Air Regulatory Grp. v. EPA*, 573 U.S. 302 (2014) ........................................... 14

Statutes

28 U.S.C. § 1291 ........................................................................................................ 4

49 U.S.C. § 40109(c) .................................................................................... 14

49 U.S.C. § 41714(h)(5) ................................................. 3, 16, 17, 21

49 U.S.C. § 41714(k) .........................................1, 3, 10, 11, 12, 13, 14, 15

49 U.S.C. § 41716(b) .............................................................................18, 20

49 U.S.C. § 41718(i)(3) .......................................................................16, 19, 20

5 U.S.C. § 706(2)(A) .................................................................................. 16

**Other Authorities**

145 Cong. Rec. S12096 (1999) ............................................................... 12

DOT Order 2004-12-6, Docket DOT-OST-2000-7182 (Dec. 6, 2004)................... 15

H.R. Rep. No. 106-513 (Mar. 8, 2000) .................................................. 13

**Rules**

Fed. R. Civ. Proc. 24(b) .............................................................................. 4

**Regulations**

14 C.F.R. § 257 ...........................................................................................10

14 C.F.R. § 257.3 ...................................................................................... 10

14 C.F.R. § 93.213(a)(5) ........................................................................ 17

14 C.F.R. Part 93....................................................................................20, 21

14 C.F.R. Part 93, Subpart S.................................................................... 17

# GLOSSARY

| | |
|---|---|
| 2024 FAA Act | FAA Reauthorization Act of 2024, Pub. L. No. 118-63, 138 Stat. 1025 |
| AIR21 | Wendell H. Ford Aviation Investment and Reform Act for the 21st Century |
| Alaska | Alaska Airlines, Inc. |
| DCA | Ronald Reagan Washington National Airport |
| DOT | Department of Transportation |
| Final Order | Department of Transportation Final Order 2024-12-8 in Docket DOT-OST-2024-0065 |
| Frontier | Frontier Airlines, Inc. |
| JA | Joint Appendix |
| SJC | San José Mineta International Airport |
| Spirit | Spirit Airlines, LLC. |

## INTRODUCTION

Respondents' defense of the DOT Final Order hinge on legal distortions, selective reading of statutory text, and a cut-off quote from Senator John McCain about the purpose of the code-share aggregator rule in 49 U.S.C. § 41714(k).

**First**, Respondents further seek to evade review by spending approximately one-third of the argument sections of their briefs focused solely on keeping Spirit out of this case. Their argument that an unlawfully excluded applicant—whether Spirit or Frontier—suffers no cognizable injury turns the competitive injury doctrine on its head. The loss of a statutory opportunity to compete, which results in the award of a finite benefit to a legally disqualified competitor, is the very kind of harm Article III protects against.

**Second**, Respondents propose a reading of the aggregator rule in 41714(k) divined by DOT which seeks to rewrite the meaning of code-share agreement in an extraordinary departure from what Congress defined in statutes. The aggregator rule is triggered by a simple numerical threshold. Alaska's long-standing code-share agreement and extensive commercial partnership with American Airlines falls squarely within the straightforward language of the statute. Rather than apply the unambiguous statutory bar, the Department substituted its own judgment for the law. Assessing whether Alaska posed an "imminent risk" of abuse because of self-

imposed contractual boundaries effectively nullified the rule altogether. But the law does not ask whether the arrangement is benign; it asks whether the combined holdings exceed the statutory ceiling. They do and Alaska's eligibility fails as a matter of law.

**Third**, Respondents ask this Court to ratify a meaning of "incumbent" which not only contradicts how that term is used in adjacent statutory text but would also absurdly exclude as an incumbent any airline which currently holds and leases slots at DCA without operating them. Nowhere does the law impose such drastic conditions. To the contrary, Congress incorporated established definitions that classify the only two types of incumbent carriers that exist—"limited incumbents" and "non-limited incumbents"—based on slot history, not present operations.

At bottom, the Department has allowed an unlawful, anticompetitive award to stand by rewriting statutory thresholds and redefining the terms Congress created. Today, the law (which DOT ignored) is that agencies cannot make up their own interpretations of statutes simply to achieve a political or policy result. Spirit urges the Court to reject DOT's statutory circumvention and remand for an allocation process consistent with the law.

## ARGUMENT

### I.  Spirit Has Standing and A Right To Be Heard In This Appeal

#### A.  Spirit's Intervention Is Proper and Brings No "New Issue" Beyond the Scope of Frontier's Petition for Review.

Frontier's petition for review calls into question DOT's **entire decision** allocating the limited-incumbent slot exemptions—including the agency's statutory interpretation of eligibility criteria and its selection of Alaska. Spirit, as an applicant in that very proceeding, seeks the same ultimate relief (vacatur of the Final Order) based on **the same statutory provisions** that Frontier has put before the Court. Only one party needs Article III standing for a given form of relief sought, *Town of Chester v. Laroe Estates, Inc.*, 581 U.S. 433, 439-40 (2017)—and nonetheless, as explained below, Spirit has established Article III standing even if it was necessary to consider it separately from Frontier.

Equally meritless are Respondents' procedural objections that Spirit's intervention "inserts new issues" outside Frontier's petition. DOT Br. 26. Spirit's contentions regarding 49 U.S.C. § 41714(h)(5) and § 41714(k) simply provide additional grounds for why the Final Order cannot stand. This is not a "new case" or remedy outside the petition; it is an intervenor reinforcing and expanding upon issues already open on review. Intervenors in appeals of an agency order are permitted to argue in support of the petitioning party's requested relief, even if they emphasize

different reasoning. *See, e.g., Illinois Bell Tel. Co. v. FCC*, 911 F.2d 776, 786 (D.C. Cir. 1990) (intervenor may "bolster" petitioner's attack on agency decision with additional arguments so long as they do not seek to enlarge the judgment). Spirit seeks the same relief as Frontier—vacatur of the DCA slot allocation Final Order—and which places it well within the typical role of an intervenor.

Spirit's participation illuminates questions already at issue and aids the Court's review. This Court has specifically held that there is no "jurisdictional bar" preventing "an intervenor rather than a party . . . from defending its position on the same grounds it raised before the [agency]." *Synovus Fin. Corp. v. Board of Governors*, 952 F.2d 426, 433 (D.C. Cir. 1991) ("Our jurisdiction, in other words, is over the Board's order, much the same as our jurisdiction in a typical civil appeal is over the judgment or decree of the district court. . . . **On what grounds we decide 'to affirm, set aside, or modify' a Board order over which we have jurisdiction is a different matter**." (emphasis added) (citing 28 U.S.C. § 1291; *Ex parte Tiffany*, 252 U.S. 32, 36 (1920); *Cf. Fusari v. Steinberg*, 419 U.S. 379, 387-88 n.13 (1975)).

Nor is Spirit's intervention in any way prejudicial. *See EEOC v. Nat'l Children's Ctr.*, 146 F.3d 1042, 1045 (D.C. Cir. 1998) (citing Fed. R. Civ. Proc. 24(b)). Notwithstanding the dozens of pages of arguments already filed in motion papers by

Respondents against Spirit joining this case, there is no claim that Spirit's participation delayed the case or changed the issues so late as to cause prejudice. DOT and Alaska fully responded to Spirit's intervenor brief on the merits and even had sufficient words leftover to address intervention. This clearly shows Spirit's arguments were aired in the normal course and should be decided with the merits of Frontier's petition.

### B.  Spirit Suffered Competitive Injury from DOT's Unlawful Exclusion of Spirit and Award to Alaska.

Respondents argue that Spirit lacks Article III standing to challenge DOT's award of the limited-incumbent exemptions to Alaska, asserting that because Spirit was deemed ineligible, it "suffers [no] evident harm" from losing out to Alaska. Alaska Br. 13. This argument flips standing doctrine on its head. Spirit's injury is direct and concrete, as laid out in its Intervenor Brief and Motion to Intervene papers. Spirit *applied* for the two limited-incumbent slot exemptions created by Congress, but DOT's legally erroneous criteria eliminated Spirit from consideration and instead awarded the exemptions to a competitor (Alaska).

This Court has long recognized that *competitor standing* is satisfied when an agency's actions cause a party to lose a fair opportunity to obtain a benefit or avoid a competitive harm. "The doctrine of competitor standing recogniz[es] that economic actors 'suffer [an] injury in fact when agencies lift regulatory restrictions on

their competitors or otherwise allow increased competition' against them." *Sherley v. Sebelius*, 610 F.3d 69, 72 (D.C. Cir. 2010) (citing *La. Energy & Power Auth. v. FERC*, 141 F.3d 364, 367 (D.C. Cir. 1998); *accord New World Radio, Inc. v. FCC*, 294 F.3d 164, 172 (D.C. Cir. 2002) ("basic law of economics" that increased competition leads to actual injury); *see also Canadian Lumber Trade Alliance v. United States*, 517 F.3d 1319, 1332 (Fed. Cir. 2008) (doctrine of competitor standing "relies on economic logic to conclude that a plaintiff will likely suffer an injury-in-fact when the government acts in a way that increases competition or aids the plaintiff's competitors)). Here, the Final Order denied Spirit the statutory benefit of competing on equal footing for the DCA slot exemptions and handed that benefit to Alaska.

The position put forth by Respondents confuses the merits and jurisdiction (whether Spirit was eligible to apply and appeal under statute) with Article III standing to bring a case. At a minimum, Spirit has standing to challenge DOT's legal interpretation that *denied Spirit eligibility in the first place*.

Spirit's standing extends to challenging DOT's Final Order in its entirety—including DOT's classification of Alaska as a limited incumbent because that decision cemented Spirit's injury. By misapplying the "aggregator rule" and deeming Alaska eligible, DOT gave Spirit's competitor a considerable advantage and foreclosed Spirit's own chances in the limited-incumbent category. Spirit was ready, willing,

and able to commence the San Jose service—the only thing missing was a fair shot at the slot pair, which the Department's misinterpretation of the law took away. This easily satisfies Article III's standing.

### C. Spirit's Application for DCA-SJC Service Met All Criteria for the Slot Exemptions, Thus Distinguishing this Case from the Eleventh Circuit *Eastern Air Lines, Inc.,* Case which Respondents Erroneously Rely On.

Neither DOT nor Alaska meaningfully rebuts this straightforward competitive harm. They rely on a misapplication of an Eleventh Circuit case, *Eastern Air Lines, Inc. v. FAA*, 772 F.2d 1508 (11th Cir. 1985), suggesting Spirit wasn't injured because "if [the challenged award] had not been approved, [Spirit] still would not…have any right to the airport slots." DOT Br. 31. But Eastern Air Lines involved an incumbent airline objecting to a **private slot transfer** between carriers; Eastern had no statutory entitlement to those slots under any circumstance.

Spirit's situation is fundamentally different from *Eastern Air Lines, Inc.* Congress specifically set aside two slot exemptions for which Spirit was eligible to compete. Spirit applied for those slot exemptions and ensured its application to serve the DCA–San Jose (SJC) route met *every* statutory criterion: (1) enhancing beyond-perimeter service, (2) promoting airline competition, and (3) connecting an underserved market. *See* JA218.

### 1. Enhanced Beyond-Perimeter Service

Spirit's proposal would have created the first-ever nonstop link between Washington National and the Silicon Valley region—a glaring gap given San Jose's stature as the nation's tech hub. By introducing *new* coast-to-coast service where none existed, Spirit's SJC flight would squarely "enhance options for nonstop travel to beyond-perimeter airports that do not have nonstop service from Ronald Reagan Washington National Airport" as mandated by Congress. 49 U.S.C. § 41718(i)(4)(B). Washington, D.C., and Silicon Valley are two of the most economically and politically vital regions in the country, yet travelers between them have had to rely on time-consuming connections or flights into distant airports.

### 2. Heightened Competition and Lower Fares

Spirit's low-fare business model exerts competitive pressure that forces legacy carriers to reduce fares or improve service quality. If Spirit were operating DCA–SJC, the incumbent airlines currently serving the broader DC–Bay Area route (United and Alaska via DCA-SFO flights) would be compelled to compete for Silicon Valley travelers on price and service, rather than continue charging the sky-high fares typical in that market—among the most expensive transcontinental trips in the country.

### 3.  Underserved Market and Public-Interest Benefits

Spirit's DCA–SJC proposal targeted a profoundly underserved market— nearly *40% of the San Francisco Bay Area's population*—for whom San Jose is the closest, most convenient airport. JA220. Yet not a single nonstop flight connects San Jose to Washington, D.C.'s downtown airport. JA221. By contrast, other proposals like that of non-limited incumbent United Airlines sought to add yet another flight to existing DCA-SFO service. Another proposal (Frontier's) aimed to duplicate an existing DCA route (San Juan) that is already served by a competitor. Spirit's San Jose plan was different in kind: it would open an entirely new city-pair and serve a thriving region currently lacking any direct DCA link.

\* \* \*

By meeting all the statutory standards and policy goals for eligibility to receive the slot exemptions (as this Court should assume for purposes of considering standing), Spirit had a legitimate expectation of a fair opportunity to obtain the available slot pair for limited incumbents.

## II.  Alaska Is Indisputably "An Air Carrier That Operates Under The Same Designator Code, Or Has Or Enters Into A Code-Share Agreement With Any Other Air Carrier"

On the statutory text alone, once Alaska "enter[ed] into a code-share agreement" with American, and their combined holdings exceeded 20 slots, Alaska **"shall**

not qualify" for a limited-incumbent slot exemption. DOT nevertheless ignored the law, reasoning that Alaska's particular arrangement with American posed "no imminent risk" of abuse. That was not DOT's judgment to make. Congress already made the judgment in § 41714(k), drawing a bright line at 20 combined slots.

Alaska's brief acknowledges that *"Alaska and American have a relationship at DCA"* and that *"Alaska places its code on American's flights at DCA."* Under the regulatory definition in 14 C.F.R. § 257 and common-sense understanding, that is a "code-share agreement" between two carriers. Section 41714(k) applies to *any* carrier that "has…a code-share agreement with any other air carrier" (plus the designator-code scenario). 14 C.F.R. § 257.3 defines "Code-sharing agreement" to mean "an arrangement whereby a carrier's designator code is used to identify a flight operated by another carrier." Any time one carrier uses another's code, they are engaging in a code-sharing agreement. The statute's use of "any" is deliberately expansive, making no exception for the nature, scope, or direction of the code-share. By its plain terms, § 41714(k) squarely encompasses the Alaska-American partnership.

Attempting to evade this straightforward reading, Alaska advances a novel theory that it doesn't really have a "code-share agreement" *"as that term is used"* in § 41714(k). According to Alaska, Congress was only concerned with code-share ar-

– 10 –

rangements where the applicant carrier (Alaska) operates flights under another carrier's code—*e.g.*, regional affiliates flying for a major airline. Alaska's argument boils down to asserting that a code-share partnership counts under the statute only if the smaller carrier is displaying the larger carrier's code.

This cramped interpretation finds no support in the statute's text and violates the cardinal rule that courts must interpret the statute as written, not engraft exceptions or limitations not made by Congress. *Dean v. United States*, 556 U.S. 568, 572 (2009) ("we ordinarily resist reading words or elements into a statute that do not appear on its face." (quoting *Bates v. United States*, 522 U.S. 23, 29 (1997)). Section 41714(k) does not differentiate based on which carrier's code is on whose flights; it speaks broadly to carriers that operate under the same code **or** have a code-share agreement with each other. Congress easily could have limited § 41714(k) to code-shares of a particular nature (such as regional feeder arrangements) if it wanted. It did not.

Nor does the statute suggest that the code sharing must be bilateral. Congress opted for comprehensive language covering **any** code-sharing affiliation between two carriers, so long as their combined slots exceed 20. Alaska asks the Court to read an atextual loophole into § 41714(k)—essentially saying the provision is triggered

only by a one-way code display. Neither the text nor the legislative history of section 41714(k) contains any hint that a partial carve-out in a private agreement nullifies the existence of a "code-share agreement" between the carriers.

### A.  The Legislative History Hurts Respondents' Arguments

Alaska and DOT lean heavily on an isolated floor statement by Senator McCain, a co-author of the 2000 legislation that added § 41714(k). Sen. McCain's fuller quotation reads as follows:

> A major airline should not be allowed to game the system and add to its hundreds of daily slots through its commuter affiliates and codeshare partners. **Genuine new entrants and limited incumbents are startup airlines that cannot get competitive access to the high density markets.**

145 Cong. Rec. S12096 (1999) (emphasis added to language not quoted in Respondents' briefs).

As Senator McCain explained, Congress did not just want 41714(k) to apply to arrangements with commuter affiliates, it also wanted 41714(k) to apply to code-share partners in general so the statute could more broadly protect "genuine new entrants and limited incumbents." The concern was large incumbents teaming up with ostensibly "small" carriers to expand the large airline's effective slot portfolio. It

– 12 –

is then no coincidence that the text of 41714(k) does not narrowly apply to arrangements between major airlines and commuter affiliates, because increased access flows both ways when one carrier uses another's code.

The Conference Report for the passed legislation (AIR21) was even clearer: "For the purpose of determining whether an airline qualifies as a new entrant or limited incumbents for receiving slot exemptions, **DOT shall count the slots and slot exemptions of both that airline and any other airline that it has a code-share agreement at that airport**." H.R. Rep. No. 106-513, at 174 (Mar. 8, 2000) (emphasis added)).

Both concerns are fully implicated here: American and Alaska have an extensive nationwide (indeed, international) alliance—including loyalty program integration and revenue-sharing; each feeds traffic to the other at DCA and beyond. An Alaska nonstop from DCA to the West Coast complements American's network and can be marketed in coordination. By Alaska's logic, two airlines can escape § 41714(k) simply by carving out a limited subset of certain flights routes at DCA from their otherwise comprehensive code-share pact—a loophole nowhere hinted at in the statute and for which Alaska cites **no** authority.

### B. DOT Had No Authority to Ignore the Statutory Bar Based on Its Own Policy Views.

DOT's handling of § 41714(k) was not a statutory interpretation at all, but an outright nullification. Through its actions, DOT unilaterally wrote an exemption into § 41714(k) even though it is expressly prohibited from doing so under 49 U.S.C. § 40109(c) ("[T]he Secretary may exempt to the extent the Secretary considers necessary a person or class of persons from a provision of . . . chapter 417 (**except section[] . . . 41714**) . . .." (emphasis added).

When Congress sets a categorical rule, the agency's role is to enforce it, not tailor it on a case-by-case basis. *See Util. Air Regulatory Grp. v. EPA*, 573 U.S. 302, 325 (2014) ("An agency has no power to 'tailor' legislation to bureaucratic policy goals by rewriting unambiguous statutory terms."). Section 41714(k) leaves no room for an agency waiver or a context-specific balancing test—it says the carrier "*shall not qualify*" if the objective criteria are met. 49 U.S.C. § 41714(k). DOT's policy view that American's access wouldn't "unduly increase" in this instance cannot override the statute's command.

The antitrust settlement cited related to Alaska's acquisition of Virgin America, Inc. has absolutely nothing to do with this case. *See* DOT Br. 34. That agreement was a result of a Department of Justice concern that "Alaska, as a result of its exten-

– 14 –

sive code-sharing relationship with American, would likely exit or compete less aggressively on routes where Virgin and American compete today, and would be less likely to enter new routes in competition with American in the future than Virgin would be standing alone." JA130-31. This in no way relates to § 41714(k). The point of that settlement was to ensure Alaska continued operating certain Virgin America routes.

Congress knows how to give DOT discretion in slot allocation decisions, for example by listing factors for DOT to "consider" in choosing among applications. But § 41714(k) is not a discretionary factor; it is a prohibition. DOT itself previously described § 41714(k) as a *statutory bar* on limited incumbent status in situations like this. *E.g.*, DOT Order 2004-12-6, at 6, Docket DOT-OST-2000-7182 (Dec. 6, 2004) ("For the purposes of these slot exemptions, 49 U.S.C. Section 41714(k) mandates that, in the case of code-share carriers, the slot holdings of both carriers must be aggregated in determining the 20-operations threshold.").

Either carriers have a code-share agreement or they do not. Here, indisputably, they do. Because they do, and because their combined slots exceed 20, § 41714(k) applies by its plain terms. *See BP Am. Prod. Co. v. Burton*, 549 U.S. 84, 91 (2006) ("We assume that Congress says what it means and means what it says.").

Congress said that code-sharing partners over the 20-slot limit get no slot exemptions—full stop. By flouting that command, DOT acted *ultra vires* and "not in accordance with law." 5 U.S.C. § 706(2)(A).

## III. Dot Misinterpreted 49 U.S.C. § 41714(H)(5) to Unlawfully Exclude Other Airlines from Competing for the Slot Exemptions Against Alaska

### A. Congress Did Not Require Ongoing Operations at DCA to Qualify as an "Incumbent Air Carrier."

According to DOT and Alaska, because Spirit "hasn't flown at DCA since 2012," Spirit is not an "incumbent" and thus was categorically ineligible. This interpretation finds no support in the text, structure, or history of the statute. It is an artificial add-on that DOT read into the law, contrary to fundamental canons of statutory construction. To start, the phrase Congress used in the Act is "incumbent air carriers qualifying for status as a limited incumbent carrier at [DCA] as of the date of enactment." By its terms, this provision directs DOT to identify which carriers "qualify for status as a limited incumbent" at DCA on the law's enactment date (May 16, 2024), and reserve two slot exemptions for those carriers. 49 U.S.C. § 41718(i)(3).

The key question is what it means to "qualif[y] for status as a limited incumbent carrier." Congress answered in § 41714(h)(5) by explicitly cross-referencing

the regulatory *definition* of "limited incumbent air carrier" in the FAA's slot regulations (14 C.F.R. Part 93, Subpart S)—subject to certain adjustments, most notably substituting "40" for "12" in the slot-count threshold). Nothing in § 41714(h)(5) or related provisions says a carrier must be presently operating at the airport or hold at least one slot on the enactment date. To the contrary, the statute adopts wholesale the regulatory definition of limited incumbent—a definition that **expressly includes carriers with no current operations at the airport.**

Under the incorporated regulation (14 C.F.R. § 93.213(a)(5)), a "limited incumbent carrier" an airline that once possessed slots at DCA but gave them up—the former slots **always** count toward its total for incumbency purposes. This in part prevents carriers from shedding slots to masquerade as "new entrants." Conversely, an airline that truly never had any slots is classified as a distinct category: a "new entrant" carrier, defined in the regulation as operating fewer than 12 slots *and* never having previously owned (held) any. By importing these definitions, Congress signaled that *historical slot holdings*—not merely current operations—determine a carrier's incumbent/new entrant status. This statutory text protects carriers like Spirit, which formerly operated at DCA, from being unfairly treated as "new entrants" — *i.e.,* as if they had never operated at the airport—after a temporary exit.

Given this framework, Spirit plainly "qualif[ied] for status as a limited incumbent" on May 16, 2024. On that date, Spirit still benefited from the four permanent DCA slots (acquired in 2003 and relinquished in 2012). Under the statute's incorporated definition, Spirit is "considered to hold" those four slots for purposes of determining its status. While the Court does not need to decide Spirit's status in this case, it certainly can and should use Spirit's situation as evidence of DOT's arbitrary decision contrary to law.

DOT's contrary interpretation distorts the phrase "incumbent air carriers" beyond its context. Certainly, in ordinary usage "incumbent" can mean an existing occupant or current holder. But here, "incumbent air carriers" is immediately qualified by the phrase "qualifying for status as a limited incumbent carrier…as of [the enactment date]." This is a term of art, tying eligibility to the regulatory slot-based classification. The statute does *not* say "air carriers operating at DCA as of the enactment date."

Congress knows how to impose a requirement of ongoing service when it wishes. Indeed, earlier legislation did exactly that when it authorized DOT to award "4 additional slot exemptions at LaGuardia Airport to an incumbent air carrier **operating** at least 20 but not more than 28 slots at such airport as of October 1, 2004." 49 U.S.C. § 41716(b).

– 18 –

In 2024, Congress chose a different formulation for the limited-incumbent set-aside, suggesting a deliberate broadening. See *Russello v. United States*, 464 U.S. 16, 23 (1983) ("We refrain from concluding here that the differing language in the two subsections has the same meaning in each. We would not presume to ascribe this difference to a simple mistake in draftsmanship"); *accord City & Cty. of San Francisco v. EPA*, 145 S. Ct. 704, 221 L.Ed.2d 166, 175-76 (2025) ("[W]here Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." (quoting *Russello*, 464 U.S. at 23)). The more appropriate reading is that Congress intended to include all carriers who fit the limited incumbent profile as of May 16, 2024—which logically encompasses carriers that had a prior presence at DCA, even if not literally flying on that exact day.

Alaska insists that only the DOT and Alaska interpretation of § 41718(i) avoids surplusage. Alaska Br. 33-34. Supposedly, Spirit's interpretation treats 41718(i)(3) as if it stated, "the Secretary shall make 2 [slots] available to a limited incumbent carrier" rather than "the Secretary shall make 2 [slots] available to **incumbent air carriers qualifying for status as** a limited incumbent carrier."

Not so. The bolded language bolsters Spirit's interpretation rather than being reduced to surplusage by it. The phrase 41718(i)(3) "incumbent air carriers qualifying as . . ." serves to distinguish the DCA allocations from the LaGuardia allocations in 41716(b). Whereas 41716(b) allocates slots "to an incumbent air carrier **operating**" a certain number of slots, 41718(i) allocates slots to "incumbent air carriers **qualifying** as a limited incumbent". Incumbent carriers needed to be **operating** at the specified date to be eligible under § 41716(b), but § 41718(i)(3) only needs incumbent carriers to have been **qualifying** as limited incumbents on the 2024 FAA Reauthorization's enactment date. The contrast created by § 41718(i)(3) rephrasing § 41716(b) emphasizes how only the carrier's status as a limited incumbent matters.

Alaska argues that as a matter of "ordinary English," "fewer than 40 slots" **"requires at least one slot."** Alaska Br. 20. However, as noted above, the statute was not referring to slots being operated, but rather whether a carrier had slots to qualify as a limited incumbent. For that purpose Spirit held four slots on "the date of enactment of the FAA Reauthorization Act of 2024." 49 U.S.C. § 41718(i)(3). Alaska's contrary reading would require the Court to ignore the statute's cross-reference to the 14 C.F.R. Part 93 definitions and invent a novel prerequisite that **no law or regulation articulates**. The Court should reject that invitation.

In sum, the text and context of §41714(h)(5) confirm that the *best reading* of the statute is the one that gives effect to Congress's references to the 14 C.F.R. Part 93 definitions ensuring incumbency is tied to an airlines slot holding history. DOT's contrary interpretation is not just unreasonable; it flouts the statute's letter and purpose.

* * *

## CONCLUSION

Spirit urges the Court to vacate the Final Order and remand for further action consistent with the law.

Dated: April 7, 2025                     Respectfully submitted,


                                         /s/ Joanne W. Young
                                         Joanne W. Young
                                         jyoung@yklaw.com
                                         *Counsel of Record*
                                         David M. Kirstein
                                         dkirstein@yklaw.com
                                         Donald L. Crowell III
                                         dcrowell@yklaw.com
                                         **Kirstein & Young PLLC**
                                         1750 K Street NW, Suite 700
                                         Washington, DC  20006
                                         Phone: (202) 331-3348
                                         Fax: (202) 331-3933

                                         *Counsel for Spirit Airlines, LLC*

## CERTIFICATE OF COMPLIANCE

I hereby certify under Federal Rule of Appellate Procedure 32(g) that (1) this filing complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(e) because, as calculated by Microsoft Word, it contains 4414 words, excluding the parts of the filing exempted by Federal Rule of Appellate Procedure 32(f), and (2) this filing complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in a 14-point Charter font.

Dated: April 7, 2025

Respectfully submitted,

/s/ Joanne W. Young
Joanne W. Young

*Counsel for Spirit Airlines, LLC*

## RULE 26.1 CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1 and D.C. Circuit Rule 26.1, undersigned counsel certifies as follows:

**Spirit Airlines, LLC** is a Delaware limited liability company and a wholly owned subsidiary of Spirit Aviation Holdings, Inc. Spirit Airlines, LLC provides air transportation services in the United States and internationally.

**Spirit Aviation Holdings, Inc.** is a Delaware corporation. No publicly held company owns 10% or more of Spirit Aviation Holdings Inc.'s stock.

Dated: April 7, 2025

Respectfully submitted,

/s/ Joanne W. Young
Joanne W. Young

*Counsel for Spirit Airlines, LLC*

– 24 –

## CERTIFICATE OF SERVICE

I certify that, on April 7, 2025, I electronically filed the foregoing reply brief with the United States Court of Appeals for the District of Columbia Circuit through the Court's CM/ECF system.

Dated: April 7, 2025

Respectfully submitted,

/s/ Joanne W. Young
Joanne W. Young

*Counsel for Spirit Airlines, LLC*